**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUCKY BUCKS, LLC, *et al.* | Case No. 23-10758 (KBO) |
| Debtors.[1] | |
| | |
| LB NEWHOLDCO, LLC and LUCKY BUCKS, LLC, | Adversary Proceeding |
| Plaintiffs, | Adv. Proc. No. 25-50965 (KBO) |
| v. | **COMPLAINT** |
| TRIVE CAPITAL MANAGEMENT LLC, TRIVE CAPITAL FUND III LP, TRIVE CAPITAL FUND III-A LP, TCFIII LUCK LP, TCFIII LUCK SPV LP, TCFIII LUCK ACQUISITION LLC, TCFIII LUCK HOLDINGS LLC, QUANTUM GAMING CORP., SOUTHERN STAR GAMING LLC, SHRAVAN THADANI, ANIL DAMANI, LBV27, LLC, LUCKY BUCKS VENTURES, INC., SHAFIK KASSAM, JAMES BOYDEN, RYAN BOUSKILL, MANU SEKHRI, SEVEN ACES HOLDINGS ULC AND HASSAN IJAZ, | |
| Defendants. | |

---

[1] The Debtors in the chapter 11 cases (the "Chapter 11 Cases"), when filed, along with the last four digits of each Debtor's federal identification number were: (i) Lucky Bucks, LLC (4376) and its Chapter 11 Case, the "Lucky Bucks Chapter 11 Case") and (ii) Lucky Bucks HoldCo, LLC (0081) and its Chapter 11 Case, the "HoldCo Chapter 11 Case" and together with the Lucky Bucks Chapter 11 Case, the "OpCo Chapter 11 Cases"). The HoldCo Chapter 11 Case was closed on September 25, 2024. While Lucky Bucks Holdings LLC (3221) ("Holdings" and its Chapter 11 Case, the "Holdings Chapter 11 Case") previously was also a Debtor, its case has since been converted to a chapter 7 liquidation. The Debtors' primary mailing address was 5820 Live Oak Parkway, Suite 300, Norcross, Georgia 30093.

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ..................................................................................3

JURISDICTION AND VENUE ..............................................................................6

PARTIES ................................................................................................................7

    A.    Plaintiffs..................................................................................................7

    B.    Trive Defendants....................................................................................7

    C.    Damani Defendants................................................................................9

    D.    Former Officer Defendants and Related Entities..................................10

FACTUAL BACKGROUND................................................................................11

    A.    Damani founds Lucky Bucks, which becomes one of the largest owners and operators of COAMs in Georgia. ...................................................11

    B.    Damani sells a majority interest in the Company to Trive. ..................13

    C.    The GLC bans Damani from involvement in Lucky Bucks operations, but Damani nevertheless escalates his efforts to loot the business. ........13

    D.    Trive takes formal and informal control of the Company, but still involves Damani in the Company's operations, both directly and through Kassam............16

    E.    Trive and the HoldCo Board plan a series of financings to fund distributions to themselves at the expense of the Company and its creditors....................................................................................................20

    F.    The Defendants' schemes inevitably push Lucky Bucks into bankruptcy. ...........29

    G.    After the Effective Date, Reorganized Lucky Bucks's new management and the Holdings Trustee uncover the Defendants' various fraudulent schemes. ................................................................................................31

    H.    The Defendants' willful misconduct and actual fraud in connection with the OpCo Distribution give rise to preserved claims that are neither released by the OpCo Plan, nor exculpated in the HoldCo LLC Agreement or the Lucky Bucks Operating Agreement. ..........................................32

CAUSES OF ACTION.........................................................................................37

DEMAND FOR RELIEF......................................................................................54

Plaintiffs LB NewHoldCo, LLC ("NewHoldCo") and its subsidiary, Lucky Bucks, LLC ("Lucky Bucks" and, together with NewHoldCo, "Reorganized Lucky Bucks"), are the successors in interest to Lucky Bucks and Lucky Bucks HoldCo, LLC ("HoldCo," and together with Lucky Bucks, the "Company" or the "OpCo Debtors") with sole authority to prosecute or otherwise dispose of all non-released claims and causes of action preserved by the OpCo Plan (as defined below). Reorganized Lucky Bucks, by and through the undersigned counsel, files this adversary complaint and respectfully alleges as follows.

## NATURE OF THE ACTION

1.      Reorganized Lucky Bucks brings this action against its former equity holders, insiders, managers and officers to remedy the damage caused by their fraudulent scheme to siphon $203.6 million out of the Company for their own enrichment through an improper leveraged LLC distribution (the "OpCo Distribution"). This distribution (and related subsequent distributions) rendered the Company insolvent, leading to the Company's inevitable financial demise and causing the Company's creditors to suffer enormous losses.

2.      Anil Damani founded Lucky Bucks in 2011 as a coin-operated amusement machine ("COAM") business. In June 2020, Damani was banned from managing or operating the business by the Georgia Lottery Commission ("GLC") for offering illegal inducements to COAM license holders. Far from ending Damani's fraudulent conduct, the GLC ban triggered the escalation of Damani's parallel efforts to extract as much value from the Company as he could for the benefit of him and his allies.

3.      Working through a trusted lieutenant, Shafik "Tony" Kassam—Lucky Bucks's COO, a member of Holdco's Board of Managers (the "HoldCo Board"), and Damani's *de facto* puppet—Damani stole COAM machines and diverted valuable contracts to entities that Damani secretly controlled. To make matters worse, Damani and Kassam often forced Lucky Bucks to

3

repurchase the diverted contracts at grossly inflated prices after using sham players to artificially boost the projected revenue at those locations. Because contract values are tied to monthly revenue, this scheme not only drove up the repurchase price but also caused the Company to overstate the value of those contracts on its financial statements.

4.      In August 2020, Trive (as defined in paragraph 29, below) acquired a majority stake in HoldCo, Lucky Bucks's direct parent, and secured the right to appoint two of the three HoldCo Board members—Manu Sekhri (then CEO and a major equity holder) and James Boyden (EVP of Business Development). Through this transaction, Trive obtained veto power over all major, non-ordinary course decisions, including acquisitions, the issuance of debt, and distributions. Trive also required Sekhri and Boyden to follow Trive's directions per a side letter. Sekhri was awarded a $20 million loan as "incentive" in connection with the Trive acquisition, and he and Boyden regularly reported on the Company's activities to Shravan Thadani, then a Trive managing director.[2]

5.      Rather than curtailing Damani's theft, Trive worked with Damani and his allies to loot the Company on an even greater scale—ultimately at the expense of the Company's creditors—beginning with the OpCo Distribution.

6.      Defendants first hid the illicit involvement of Damani in the Company's operations from prospective lenders. Defendants then used the Company's artificially inflated financials to fraudulently convince the prospective lenders to provide substantial new debt. Finally, Defendants used the new debt to repay the Company's existing debt and fund the $203.6 million OpCo Distribution.

---

[2] Right around the time of the OpCo Distribution, Trive promoted Thadani to Partner.

7.      The OpCo Distribution was rubber-stamped on July 30, 2021, by the HoldCo Board—composed entirely of the two Trive appointees (Sekhri and Boyden), and Damani's puppet manager, Kassam—based on the false claim that the Company's assets exceeded its liabilities. In reality, Lucky Bucks's balance sheet immediately before the OpCo Distribution showed a $45 million deficit without even factoring in the inflated asset valuations caused by Damani and Kassam's ongoing fraud. That already understated shortfall ballooned to approximately $258.2 million after the OpCo Distribution.

8.      Even before receiving their $203.6 million windfall, Defendants were already laying the groundwork for the second leg of their plan to loot the Company before it collapsed. Because the Company's new facility precluded HoldCo from borrowing more money, Defendants created a new parent entity above HoldCo ("Holdings") that could take on even more debt and fund two more distributions in November 2021 and January 2022 (the "Holdings Distributions"). The Holdings Distributions totaled approximately $240 million, which the Defendants knew the Company lacked the ability to repay as it was already rendered insolvent by the OpCo Distribution.[3]

9.      The crushing burdens imposed on the Company by Trive and the HoldCo Board members—with the aid of numerous Lucky Bucks officers acting at the direction of Trive and Damani—ultimately caused the Debtors to seek chapter 11 protection in June 2023. At the request of the Holdings noteholders, the Holdings Chapter 11 Case was severed from the OpCo Chapter 11 Cases and ultimately converted to a chapter 7 liquidation shortly after confirmation of the *First*

---

[3] This Adversary Proceeding seeks to claw back the OpCo Distribution. Claims related to the Holdings Distributions belong to the Holdings estate and are part of a separate litigation. Complaint, *Marc Abrams v. Trive Capital Management LLC, et al.,* Adv. Pro. No. 24-50130 (KBO) (Bankr. D. Del. filed Sept. 13, 2024).

*Amended Joint Chapter 11 Plan for Lucky Bucks, LLC and Lucky Bucks HoldCo LLC* (the "OpCo Plan").

10.    Through the OpCo Plan, the OpCo Debtors' heavily impaired lenders swapped their prepetition claims at a significant discount for equity in the reorganized NewHoldCo and certain takeback second lien debt. The lenders also invested significant new capital into the reorganized business. Following a lengthy regulatory approval process, the Company emerged from bankruptcy on October 2, 2023.

11.    Pursuant to the terms of the OpCo Plan, the OpCo Debtors and certain third parties provided standard releases for the benefit of the "Released Parties" (as defined in the OpCo Plan). Importantly, the releases expressly excluded claims and liabilities "arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence[.]" This release is inapplicable here because, as further described below, Defendants' role in authorizing and orchestrating the OpCo Distribution constituted willful misconduct and actual fraud. Similarly, the Defendants' misconduct is not shielded by any exculpation of their respective fiduciary duties in applicable Company agreements.

12.    Reorganized Lucky Bucks thus brings this action to recover the OpCo Distribution as an actual fraudulent transfer and to hold the Company's fiduciaries—as well as Trive and Damani, who aided and abetted the scheme through their appointed Board members—accountable for their misconduct.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over certain claims and causes of action brought in this Complaint pursuant to 28 U.S.C. §§ 157 and 1334, and supplemental jurisdiction over the related claims pursuant to 28 U.S.C. § 1367.

14.    This is a core proceeding pursuant to 28 U.S.C. § 157(b) with respect to the claims over which this Court has original jurisdiction.

15.    Plaintiffs consent to the entry of final orders or judgments pursuant to Fed. R. Bankr. P. 7008.

16.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**PARTIES**

**A.    Plaintiffs**

17.    **LB NewHoldCo, LLC** is a Delaware limited liability company and the parent company of Lucky Bucks LLC. Pursuant to the OpCo Plan, all non-released claims and causes of action that belonged to the OpCo Debtors vested in Reorganized Lucky Bucks.

18.    **Lucky Bucks, LLC** is a Georgia limited liability company, with the trade name Arc Gaming and Technology, and is a wholly owned subsidiary of NewHoldCo.

**B.    Trive Defendants**

19.    **Trive Capital Management LLC** ("TCM") is a Delaware limited liability company with a principal place of business in Dallas, Texas. At the time of the OpCo Distribution, TCM beneficially owned or controlled several entities, including TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, TCFIII Luck Holdings LLC, Quantum Gaming Corp., and Southern Star Gaming LLC. At the time of the OpCo Distribution, Southern Star Gaming LLC held all shares of HoldCo that were not owned directly by Trive entities TCFIII Luck Acquisition LLC and TCFIII Luck SPV LP or Damani's entity, Lucky Bucks Ventures, Inc. Entities owned or controlled by TCM received a combined approximate $120 million of the OpCo Distribution through their direct and indirect equity stakes in HoldCo. At the time of the OpCo Distribution, Trive owned or controlled approximately 58.6% of HoldCo in the aggregate and had appointed two of the three HoldCo Board members.

20.     **Trive Capital Fund III LP** ("Trive Fund III") is a Delaware limited partnership managed by TCM. At the time of the OpCo Distribution, Trive Fund III owned 100% of TCFIII Luck Holdings LLC and TCFIII Luck Acquisition LLC.

21.     **Trive Capital Fund III-A LP** ("Trive Fund III-A") is a Delaware limited partnership managed by TCM. At the time of the OpCo Distribution, Trive Fund III-A, through Trive Capital Luck Blocker LLC, owned 100% of TCFIII Luck SPV LP.

22.     **TCFIII Luck LP** is a Delaware limited partnership. At the time of the OpCo Distribution, TCFIII Luck LP owned 100% of Quantum Gaming Corp., which owned 100% of Southern Star Gaming LLC, which, in turn, owned 70% of HoldCo. TCFIII Luck LP was the indirect recipient of approximately $142.5 million of the OpCo Distribution through Quantum Gaming Corp. TCFIII Luck LP is ultimately controlled by TCM through TCFIII Luck Holdings LLC.

23.     **TCFIII Luck SPV LP** is a Delaware limited partnership. At the time of the OpCo Distribution, TCFIII Luck SPV LP owned 1.7816% of the membership interests in HoldCo and was the direct recipient of approximately $3.6 million of the OpCo Distribution.

24.     **TCFIII Luck Acquisition LLC** is a Delaware limited liability company. At the time of the OpCo Distribution, TCFIII Luck Acquisition LLC owned 3.2184% of the membership interests in HoldCo and was the direct recipient of approximately $6.5 million of the OpCo Distribution.

25.     **TCFIII Luck Holdings LLC** is a Delaware limited liability company. TCFIII Luck Holdings LLC was the indirect recipient of approximately $109.2 million of the OpCo Distribution through its indirect ownership interest of approximately 76.6% of Quantum Gaming Corp.'s class A units through TCFIII Luck LP.

26.    **Shravan Thadani**, upon information and belief, resides in Dallas, Texas. Thadani is now a partner at TCM and was in charge of Trive's investment in the Company. As set forth in more detail below, Thadani, as an agent of TCM, was heavily involved in the day-to-day management and operations of the Company, including the issuance of the OpCo Distribution.

27.    **Southern Star Gaming LLC** ("Southern Star") is a Delaware limited liability company. At the time of the OpCo Distribution, Southern Star was 100% owned by Quantum Gaming Corp., which was 100% owned by TCFIII Luck LP. At the time of the OpCo Distribution, Southern Star owned 70% of the membership interests in HoldCo. Upon information and belief, Southern Star's 70% share of the OpCo Distribution was paid directly to Quantum Gaming Corp.

28.    **Quantum Gaming Corp.** ("Quantum Gaming") is a Delaware corporation. At the time of the OpCo Distribution, Quantum Gaming was the 100% owner of Southern Star and was, in turn, 100% owned by TCFIII Luck LP. Quantum Gaming was the direct recipient of approximately $142.5 million of the OpCo Distribution.

29.    TCM, Trive Fund III, Trive Fund III-A, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, TCFIII Luck Holdings LLC, Southern Star, Quantum Gaming and Thadani shall collectively be referred to as "Trive" or the "Trive Defendants."

**C.    Damani Defendants**

30.    **Anil Damani**, upon information and belief, is a resident of Gwinnett County, Georgia. Damani was the founder of Lucky Bucks and, until June 2020, its Chief Executive Officer, controlling virtually all aspects of its operations. Damani was the indirect recipient of approximately $50.9 million of the OpCo Distribution through his ownership of Lucky Bucks Ventures, Inc., which, at the time of the OpCo Distribution, owned 25% of the membership interests in HoldCo.

31.    **Lucky Bucks Ventures, Inc.** ("LBVI") is a Georgia corporation with its principal place of business in Georgia. LBVI is owned and controlled by Damani. Following the Trive Acquisition (defined below), LBVI owned 25% of the membership interests in HoldCo. Upon information and belief, LBVI's 25% share of the OpCo Distribution was paid directly to LBV27, LLC.

32.    **LBV27, LLC** ("LBV27") is a Georgia limited liability company with its principal place of business in Norcross, GA. LBV27, upon information and belief, is owned and/or controlled by Damani. LBV27 was the direct recipient of approximately $50.9 million of the OpCo Distribution designated for LBVI.

### D.    Former Officer Defendants and Related Entities

33.    **Ryan Bouskill** alleges to be a citizen and resident of Canada. At the time of the OpCo Distribution, Bouskill was the Chief Financial Officer of Lucky Bucks. At the direction of Trive, Bouskill received a $100,000 bonus in connection with the OpCo Distribution.

34.    **James Boyden** alleges to be a citizen of both Canada and the United States of America, as well as a resident of Canada. At the time of the OpCo Distribution, Boyden was a member of the HoldCo Board, appointed by Trive, as well as the Executive Vice President of Business Development of Lucky Bucks. Subsequent to the formation of Holdings, Boyden was also a member of the Holdings Board (defined below). At the direction of Trive, Boyden received a $50,000 bonus in connection with the OpCo Distribution.

35.    **Shafik "Tony" Kassam**, upon information and belief, is a resident of Gwinnett County, Georgia. At the time of the OpCo Distribution, Kassam was a member of the HoldCo Board, appointed by Damani, as well as the Chief Operating Officer of OpCo. Subsequent to the

formation of Holdings, Kassam was also a member of the Holdings Board. At the direction of Trive, Kassam received a $50,000 bonus in connection with the OpCo Distribution.

36.     **Hassan Ijaz** alleges to be a citizen and resident of Canada. At the time of the OpCo Distribution, Ijaz was the Executive Vice President of Finance of Lucky Bucks. At the direction of Trive, Ijaz received a $100,000 bonus in connection with the OpCo Distribution.

37.     **Manu Sekhri** alleges to be a citizen and resident of Canada. At the time of the OpCo Distribution, Sekhri was the Chief Executive Officer of Lucky Bucks and member of the HoldCo Board, appointed by Trive. Subsequent to the formation of Holdings, Sekhri was also a member of the Holdings Board. Sekhri was the indirect recipient of approximately $33.3 million of the OpCo Distribution, through his 23.26% ownership interest in TCFIII Luck LP and Quantum Gaming through Seven Aces Holding ULC.

38.     Bouskill, Boyden, Kassam, Ijaz and Sekhri shall collectively be referred to as the "Former Officer Defendants."

39.     **Seven Aces Holdings ULC** ("Seven Aces Holdings") is a British Columbia unlimited liability company. At the time of the OpCo Distribution, Seven Aces Holdings was 100% owned by 2759536 Ontario Inc., which was, in turn, 100% owned by Ascendant Group Holdings Inc., which was itself 100% owned by Sekhri. Seven Aces Holdings was the indirect recipient of approximately $33.3 million of the OpCo Distribution through its 23.26% ownership interest in TCFIII Luck LP.

## **FACTUAL BACKGROUND**

**A.     Damani founds Lucky Bucks, which becomes one of the largest owners and operators of COAMs in Georgia.**

40.     Damani founded Lucky Bucks in 2011. The Company's business was premised on the ownership and operation of skill-based amusement machines (COAMs) placed in gas stations,

convenience stores, and other businesses that derive the majority of their income from the sale of goods and services. The businesses reward winners of the COAMs almost exclusively with gift cards and merchandise from their stores. By 2020, the Company had become one of the largest COAM businesses in Georgia, owning and operating more than 3,500 machines at the height of its business.

41.     COAMs are highly regulated by the GLC, which issues various types of licenses, including "Master Licenses" and "Location Licenses." Holders of Master Licenses may buy, own, and service COAMs throughout the state of Georgia. Holders of Location Licenses may host COAMs owned by Master License holders at a specific location. Under Georgia law, every Location License holder must operate pursuant to a written, exclusive contract with a Master License holder, which must have a term longer than one year. Master License holders are not permitted to either hold Location Licenses or have an interest in locations under contract with a Master License holder.

42.     Master Licenses and contracts are transferable, subject to the approval of the GLC. Thus, Master License holders often acquire COAM Location License contracts from other Master License holders, and they often purchase the associated Master License itself as part of the transaction. Given the regulated nature of the industry and the limited number of licenses, there can be substantial value in owning a Master License and contracting with a Location License holder.

43.     Location License contracts typically are sold at a multiple of the historical monthly revenue earned by the COAMs at that location. Thus, a contract with a location that generates more revenue per COAM (and/or has more COAMs) is more valuable than a contract with a location where the COAMs generate less revenue (and/or has fewer COAMs).

44.     The Company held Master Licenses from the GLC and grew to be one of the largest Master License holders in the state of Georgia. The Company's growth was fueled almost entirely by acquisitions, both of Master Licenses and location contracts.

**B.     Damani sells a majority interest in the Company to Trive.**

45.     In 2016, Damani sold 51% of his equity interest in HoldCo, Lucky Bucks's direct parent company, to Southern Star for $13.5 million. Southern Star's then-parent company, Seven Aces Limited, was a publicly traded company on the Toronto Stock Exchange. Damani retained a significant minority equity interest in HoldCo through his ownership in HoldCo's former parent company, LBVI, which he retained until the commencement of the Chapter 11 Cases.

46.     To finance Southern Star's purchase of Damani's majority stake in HoldCo, Trive—building on a historical relationship with Seven Aces—provided it with a $1.5 million equity investment and $11 million in secured debt. Trive committed to further debt financing that ultimately totaled about $54 million.

47.     Between August 2018 and July 15, 2019, Southern Star acquired an additional 19% equity interest in HoldCo, for a total price of $12.72 million, which gave Southern Star a 70% total equity interest in HoldCo. In the interim, Trive collaborated with Damani and other members of Lucky Bucks's management to pursue and execute on strategic acquisitions, including acquisitions of 19 other COAM operators and their associated portfolios.

**C.     The GLC bans Damani from involvement in Lucky Bucks operations, but Damani nevertheless escalates his efforts to loot the business.**

48.     On May 8, 2020, the GLC notified Lucky Bucks that it intended to revoke its Master Licenses because of allegations that Damani offered illegal inducements to a Location License holder in the form of a residence. That notification resulted in an administrative proceeding between Lucky Bucks and the GLC.

13

49.     On June 2, 2020, a GLC hearing officer approved a settlement in the administrative proceeding and issued an executive order finding that Damani violated two provisions of Georgia's COAM laws and setting forth the terms under which Lucky Bucks would keep its Master Licenses (the "GLC Executive Order").

50.     The GLC Executive Order required that Damani resign as an officer of Lucky Bucks and as a member of the HoldCo Board. Sekhri replaced Damani as Lucky Bucks's CEO, and Damani appointed Kassam as his replacement on the HoldCo Board.

51.     The GLC Executive Order further required that Damani "relinquish all operational control over the business and operations of [Lucky Bucks]" and "cease to have any managerial functions or operational control of either [Lucky Bucks] or Lucky Bucks Holdco." Damani was permitted to retain his equity interest in HoldCo, but the GLC Executive Order required that his shares be converted to a non-voting interest.

52.     As part of the GLC Executive Order, Damani also entered into a five-year non-compete agreement with the Company, meaning that while he still had a substantial ownership interest in the Company through his HoldCo equity, Damani was not permitted to hold managerial or operational authority at the Company, nor could he compete with the Company through a separate business.

53.     But the GLC did not know that Damani's fraudulent conduct, with the help of Kassam and other Lucky Bucks employees, ran much deeper. Beginning at least as of 2019, Damani, Kassam, and others at the Company masterminded a scheme to loot the Company's assets for their own benefit. The breadth of this unlawful enterprise is set forth in greater detail in a complaint filed by Reorganized Lucky Bucks in Georgia state court. As most relevant here, Damani and Kassam's scheme involved siphoning off dozens of valuable Location License

14

contracts from Lucky Bucks to businesses they secretly controlled—known as the "B-Side Businesses"—and in some cases, forcing Lucky Bucks to repurchase those same contracts at grossly inflated prices.

54.    Damani, Kassam and other participants in the scheme went to extensive lengths to conceal their misconduct, including by using covert communications applications, deleting files and records from the Company's computer systems and using a network of B-Side Businesses and individuals to disguise their systematic pillaging of the Company. Damani and Kassam were in frequent contact regarding their diversion of Company assets, including through weekly meetings with various other Company employees that helped Damani and Kassam's efforts, both knowingly and unknowingly.

55.    Before Damani and Kassam launched their criminal scheme, the Company routinely challenged any attempt by a Location License owner to switch to a competitor, fighting to retain each contract as long as possible. Once the scheme was underway, Kassam began filing "no dispute" forms with the GLC, which expedited the transition of the Location License locations to the B-Side Businesses and deprived the Company of the related revenue.

56.    In many instances, Damani and Kassam compounded the harm to the Company by arranging for Lucky Bucks to repurchase the diverted contracts at inflated purchase prices. On information and belief, Damani, Kassam and their agents used sham players to falsely increase the monthly revenue rate for the diverted locations. Because Location License contracts are priced based on a multiple of net monthly revenue, inflating monthly revenue before the repurchase of a diverted Location License contract increased the purchase price paid by Lucky Bucks to reacquire the contract.

57.     Between October 2020 and June 2021, the Company went on an acquisition spree, completing seven deals in just the first half of June 2021, with total purchase prices around $30.2 million. The two largest of these, executed on June 17 and 18, 2021, involved B-Side Business Lee Caudell, Inc., and accounted for a combined $16.6 million. As a HoldCo Board member, Kassam approved these transactions, despite his participation in Damani's scheme to artificially inflate the Location License contract purchase prices—enriching himself and Damani at the direct expense of the Company.

58.     The inflated monthly revenues of acquired locations also artificially inflated the projected revenue Lucky Bucks generated as a result of the acquisitions, which, in turn, artificially inflated the purported value of Lucky Bucks's location contracts—by far the largest asset on Lucky Bucks's balance sheet. As the former CEO of Lucky Bucks, Damani obviously knew that the Company relied on projected revenue from location contracts to value its assets and that his scheme would create the false appearance of a successfully growing business.

59.     Unsurprisingly, after being reacquired by Lucky Bucks, the purchased locations often underperformed significantly. Indeed, Ijaz expressed concern in February 2021 to Kassam, Bouskill, and others regarding such underperformance by a number of locations and observed that, in connection with quarterly financial reporting, "it will be a big disaster when they realize that we over paid by 63%."

**D.      Trive takes formal and informal control of the Company, but still involves Damani in the Company's operations, both directly and through Kassam.**

60.     In August 2020, Trive acquired all outstanding equity in Seven Aces Limited, other than shares owned directly or indirectly by Sekhri (the "Initial Trive Acquisition"). Trive thus acquired a controlling interest in Southern Star, a subsidiary of Seven Aces Limited and a publicly traded company on the Toronto Stock Exchange, which owned 70% of HoldCo—Lucky Bucks's

immediate corporate parent. Trive's investment included a $20 million "loan" to Sekhri as part of Trive's "management incentive program."

61.     On August 25, 2020, Trive purchased an additional 5% equity interest in HoldCo from Damani for $6.5 million, a below-market deal due to Damani's need for liquidity (together with the Initial Trive Acquisition, the "Trive Acquisition"). Upon completion of the Trive Acquisition, Trive secured direct and indirect control of the Company.

62.     *First,* Trive exercised de facto control over the Company through Section 5.16(b) of the August 13, 2020 TCFIII Luck LP Amended and Restated Limited Partnership Agreement (the "TCFIII Luck LP Partnership Agreement"),[4] which gave Trive the sole authority to approve almost any material corporate act, including distributions, taking on additional debt, approving budgets, purchasing assets, or issuing equity or ownership interests.

63.     *Second*, Trive caused HoldCo, Southern Star, LBVI, TCFIII Luck Acquisition LLC, and TCFIII Luck SPV LP to amend the Fourth Amended and Restated Limited Liability Company Agreement, resulting in the Fifth Amended and Restated LLC Agreement (the "HoldCo LLC Agreement"). This amendment gave Trive the right to appoint two of the three HoldCo Board members, and it appointed Sekhri and Boyden.[5] Crucially, through LBVI's ownership interest in HoldCo, Damani retained the power to appoint his proxy, Kassam, as the third Board member.

---

[4] TCFIII Luck LP Partnership Agreement § 5.16 ("Notwithstanding anything contained in this Agreement, in the [HoldCo LLC Agreement (as defined and discussed below)] or in any other agreement to the contrary, without the prior written consent of Trive Holdco, no natural person that is appointed by Southern Star as a Manager (as defined in the [HolCo LLC Agreement]) (including as Majority Manager) shall authorize, approve, consent to or otherwise permit Lucky Bucks or any of its Subsidiaries or the LB Board of Managers . . . to, directly or indirectly, take [almost any material corporate act].").

[5] As a prerequisite to appointing Sekhri and Boyden to the HoldCo Board, Trive required them to execute, in their individual capacities, side letter agreements acknowledging their obligation to obtain affirmative, written consent from Trive for the various non-ordinary course corporate actions identified in Section 5.16 of the TCFIII Luck LP Partnership Agreement. Notably, as the majority equity owner of HoldCo, Trive already had certain approval rights with respect to actions by the Company pursuant to Section 5.03 of the HoldCo LLC Agreement, which rights were materially narrower than the rights afforded to Trive under the TCFIII Luck LP Partnership Agreement and were also subject to affirmative consent by the other minority equity owner, Damani.

This allowed Damani to keep pulling strings at Lucky Bucks, despite the GLC's formal ban. Trive's appointees knew how Damani was skirting the GLC Executive Order, and they "walked around egg shells" with Kassam so as not to disturb Damani's influence in the Company's operations.

64.     *Third*, Trive inserted Thadani directly into the Company's day-to-day affairs (including operational matters controlled by Kassam). Indeed, only days after the Trive Acquisition, Thadani assured Searcy that he was talking with Sekhri nearly every day to ensure that Trive kept abreast of the actions of the Company's managers and officers. On June 9, 2021, Bouskill confirmed that Lucky Bucks's management had "open dialogue with Trive/Shravan [Thadani]. We have regular calls with Trive and Shravan [Thadani] is involved in all high level strategic decisions."

65.     Trive repeatedly affirmed its knowledge and control of the Company's operations. For instance, on June 11, 2021, in response to diligence requests from its ratings agency, Trive stated that "Trive controls Southern Star through Quantum Gaming" and, in turn, "[the] Holdco board consists of three members; two appointees from Southern Star[.]" Additionally, on June 17, 2021, in response to a question regarding who the "ultimate decision maker" is, Trive and Lucky Bucks management confirmed that "Trive is involved in all strategic decisions (with veto rights and unanimous consent required for critical items). Given the longstanding relationship between management and Trive, all decisions are made collaboratively with incentive alignment." In and around the time of the OpCo Distribution, Trive's control over the Company and involvement in its operations was also acknowledged by counsel for the Company, who stated that "it's fairly clear that Trive would qualify as an Affiliate of LB/Holdings, given its indirect ownership/control of LB/Holdings."

66.     Primarily through Thadani, Trive also played a central role in financing and evaluating Lucky Bucks's acquisition opportunities, and it often led negotiations for new deals. Recognizing Trive's influence, some sellers of location contracts bypassed Lucky Bucks entirely and approached Trive directly to initiate sales. Trive worked with Damani in assessing new deals, again knowing full well that the GLC banned Damani from doing so.

67.     For example, on October 31, 2020, representatives of a smaller Georgia COAM business reached out to Trive, offering to sell four locations for $5 million. In order to evaluate the opportunity, Thadani looped in Sekhri, Boyden, Bouskill, Ijaz and Damani. Boyden then connected with Damani to discuss the location, and Boyden recommended a cap for the transaction at 36x monthly net revenue. Thadani continued negotiating with the seller, and Lucky Bucks ultimately acquired three locations from this seller in June 2021.

68.     Trive was also deeply aware of Lucky Bucks's financial condition prior to, at the time of, and after the OpCo Distribution. Trive had weekly calls with Bouskill and Ijaz to receive updates on financial performance and acquisitions, and it received detailed financial reporting prepared by Bouskill and Ijaz, including Lucky Bucks's balance sheet for June 2021. That balance sheet, as well as those previously provided to Trive, clearly showed that Lucky Bucks's liabilities exceeded its assets even before the OpCo Distribution. As such, Trive was aware of Lucky Bucks's insolvency and its inability to pay a substantial distribution.[6]

---

[6] On December 28, 2020, with Trive's required consent under the TCFIII Luck LP Partnership Agreement, the HoldCo Board amended the October 21, 2016 Amended and Restated Operating Agreement (as amended, the "Lucky Bucks Operating Agreement"). The revised agreement, which governed at the time of the OpCo Distribution, included an exculpation clause for officers similar to that in the HoldCo LLC Agreement. However, Paragraph 6.2 made clear that exculpation did not apply to acts involving fraud, intentional or willful misconduct, willful breaches, or knowing violations of law. Paragraph 6.3 further confirmed that officers were not covered by the general waiver of fiduciary duties.

**E.**     **Trive and the HoldCo Board plan a series of financings to fund distributions to themselves at the expense of the Company and its creditors.**

69.     From the moment it took control of the Company, Trive worked to finance distributions that would ultimately double Trive's investment. First, Trive orchestrated a financing to fund the OpCo Distribution. After maximizing leverage at the OpCo level, Trive created a "Super HoldCo" to issue even more debt for an even greater return. In total, these distributions left the Company woefully insolvent and completely unable to repay its creditors.

**1.**     **Trive and the HoldCo Board defraud the Company's new lenders and authorize the OpCo Distribution.**

70.     In February 2021, just months after obtaining full strategic control over the Company, Trive began pursuing financing that would drastically increase Lucky Bucks's debt leverage. Trive's explicit purpose for this financing was to fund the OpCo Distribution for the benefit of Trive, Sekhri, Damani, and other insiders. As confirmed by a July 16, 2021 exchange between Bouskill and Trive, "***the goal was to maximize the dividend***."

71.     Spearheaded by Thadani, Trive handled most of the negotiations, rather than Lucky Bucks management. When Lucky Bucks's existing lenders showed little interest in increasing or extending the Company's credit facility, Trive tried and failed to pitch its distribution financing proposal to other lenders. Eventually, however, Trive was able to craft a story that resonated with Macquarie Capital Funding LLC ("Macquarie"), which agreed to act as administrative agent and collateral agent for itself and other lenders.

72.     For Trive, this was its "path to 1x"—recovering 100% of Trive's investment within only months of making it. Not surprisingly, Lucky Bucks's Board appointees had the same focus. Sekhri ensured that Damani was involved, again with little regard for the GLC's ban on Damani's involvement. On April 16, 2021, Sekhri sent Damani a copy of Macquarie's initial proposal for the terms of the new credit facility and continued to send Damani materials and communications

with various other potential lenders. Once Macquarie was selected, Sekhri continued to keep Damani apprised by forwarding Damani emails with updates from Macquarie on its progress in soliciting commitments from lenders.

73.    Notwithstanding the fact that Lucky Bucks's business model centered on growth through acquisitions, certain Former Officer Defendants discussed the need to *slow* acquisitions in order to increase the anticipated OpCo Distribution. On June 29, 2021, Ijaz emailed Sekhri and Bouskill regarding upcoming acquisition opportunities, and how they need to "have a chat with [Damani] sooner rather than later on this." Sekhri responded "[y]ou and [Bouskill] need to walk [Damani] through the dynamic of how every deal means a smaller dividend for him between now and when this closes in early August. You also need to discuss with him the status of the distributions post this deal getting done -- accurately model this out and show him." Far from being divorced from the operations of the Company, Damani was fully informed and consulted with regarding the Defendants' plan to pilfer the Company's assets to line their own pockets.

74.    Knowing that Macquarie was concerned about the GLC order banning Damani's involvement, Trive repeatedly hid Damani's continued involvement in Lucky Bucks. For instance, on June 9, 2021, Lucky Bucks sent responses to various diligence questions sent by Macquarie, including questions about Damani's "influence on the board" and "what policies were implemented to prevent future recurrence" of Damani's misconduct. In response, with Trive representatives on the email, Lucky Bucks responded that Damani "does not have any further influence on the board or the company. Given he is no longer affiliated with the company, there is no concern about future infractions." Similarly, on June 17, 2021, Thadani told Macquarie that "Anil [Damani] has…no operational involvement in the business." Trive knew this was false. Not

only had Trive previously worked directly with Damani on acquisitions, it also knew that Damani's puppet was not only on the Board, but also in charge of the Company's operations.

75.     Trive also misled Macquarie by deliberately withholding critical financial information. On June 21, 2021, when Macquarie requested a "revenue build on a full twelve month basis," Ijaz immediately flagged the risk, emailing Sekhri and Bouskill that they "cannot go down this path. Ryan [Bouskill] let's discuss ASAP." Sekhri instructed, "[y]ou have to hide behind the availability of the portal data." Bouskill then forwarded the request to Thadani, copying Ijaz. On information and belief, at least Bouskill and Ijaz—and possibly Sekhri—discussed the request further with Thadani. Despite having access to the data, the Defendants never provided it to Macquarie. By that point, Bouskill and Ijaz had long known that Lucky Bucks had overpaid for several Location License acquisitions and that those locations were significantly underperforming.

76.     Ultimately, on July 30, 2021, Lucky Bucks entered into a senior secured credit facility with certain lenders (collectively, the "OpCo Lenders") and Macquarie, as the administrative agent and collateral agent, in the aggregate amount of approximately $535 million (the "OpCo First Lien Credit Facility" and such agreement, the "OpCo First Lien Credit Agreement").

77.     The proceeds of the OpCo First Lien Credit Facility were used to: (i) fund the $203.6 million OpCo Distribution paid to Company insiders and related expenses; and (ii) repay Lucky Bucks's existing facility as required under its prior financing agreement. Trive had described the prior facility as "very favorable," but it stood in the way of the OpCo Distribution, which was the true intent behind the refinancing. Indeed, as noted above, communications between Trive and Bouskill confirmed that the express purpose of obtaining the OpCo First Lien Credit Facility was to "maximize the dividend."

78. On July 30, 2021, the same day as executing the OpCo First Lien Credit Agreement, Kassam, Boyden and Sekhri—the three members of the HoldCo Board—executed a written consent (the "Lucky Bucks Consent") approving a distribution of $203,599,943.53 to be made on July 30, 2021 from Lucky Bucks to HoldCo as the sole member of Lucky Bucks. On the same day, the HoldCo Board executed a second written consent (the "HoldCo Consent") approving the OpCo Distribution in the same amount to the holders of HoldCo's equity in accordance with their respective membership percentages.

79. There was no business rationale, much less a compelling one, considered by the HoldCo Board or its members in connection with approving the OpCo Distribution. In fact, there are no HoldCo Board meeting minutes, board books or materials evidencing any discussion whatsoever of the OpCo Distribution. Nor was there any consideration by the decision makers as to whether it might have been prudent to retain an independent financial advisor to review the OpCo Distribution, whether Lucky Bucks should procure a solvency opinion before issuing the OpCo Distribution, or even how the OpCo Distribution could be properly made in light of Lucky Bucks's known insolvency. Rather, the HoldCo Board's sole focus was on issuing the OpCo Distribution, regardless of the consequences to the Company.

80. Immediately after receipt of the OpCo First Lien Credit Agreement proceeds, and pursuant to the Lucky Bucks Consent, Lucky Bucks transferred $203,599,943.53 to HoldCo. Next, pursuant to the HoldCo Consent, HoldCo, with the assistance of Bouskill and Ijaz and approval from Sekhri and Thadani, wired the OpCo Distribution in the amounts set forth in the chart below (the "Initial Transfers" and, those recipients of the Initial Transfers, the "Initial Transferees"):

| Initial Transferee | Transferred Amount |
|---|---|
| Quantum Gaming | $142,523,074.90 |
| LBV27 | $50,901,098.18 |
| TCFIII Luck Acquisition LLC | $6,552,803.77 |
| TCFIII Luck SPV | $3,627,415.86 |

81.     Upon information and belief, certain of the Initial Transferees then transferred their Initial Transfers to subsequent transferees in the amounts set forth in the chart below (the "Subsequent Transfers" and, those recipients of the Subsequent Transfers, the "Subsequent Transferees"):

| Initial Transferee | Subsequent Transferee | Transferred Amount |
|---|---|---|
| Quantum Gaming | TCFIII Luck Holdings LLC | $109,227,297.70 |
| Quantum Gaming | Seven Aces Holdings | $31,628,029.63[7] |
| LBV27 | Anil Damani | $50,901,098.18 |
| TCFIII Luck Acquisition LLC | Trive Fund III | $6,552,803.77 |
| TCFIII Luck SPV | Trive Fund III-A | $3,627,415.86 |

---

[7] Upon information and belief, $1,664,633.14 of the amount distributed to Seven Aces Holdings, and ultimately Sekhri, was withheld for taxes at the Quantum Gaming level.

82.    Upon information and belief, certain of the Subsequent Transferees then transferred their Subsequent Transfers in the amounts set forth in the chart below (the "Ultimate Transfers" and, those recipients of the Ultimate Transfers, the "Ultimate Transferees"):

| Subsequent Transferee | Ultimate Transferee | Transferred Amount |
|---|---|---|
| TCFIII Luck Holdings LLC | Trive Capital Fund III LP | $109,227,297.70 |
| Seven Aces Holdings | Manu Sekhri | $31,628,029.63 |

83.    The Trive Defendants ultimately received a total of $119,407,517 from the OpCo Distribution; Damani received $50,901,098.18 from the OpCo Distribution; and Sekhri received $33,292,662.77 from the OpCo Distribution.

84.    The Lucky Bucks Consent executed by Kassam, Boyden and Sekhri stated that "based on the balance sheet of the Company as of June 30, 2021, and other information, reports and statements provided to Holdco, after giving effect to the Aggregate Distribution, the fair value of all of the Company's assets exceeds all the liabilities of the Company as of the date hereof and as of the Payment Date, in each case, calculated in accordance with Article 4 of the Act (as defined in the LLC Agreement)." The June 30, 2021 balance sheet, however, said no such thing. Rather, as Kassam, Boyden and Sekhri must have known in order to execute the Lucky Bucks Consent that stated their knowledge of the contents of the balance sheet, Lucky Bucks's liabilities far exceeded its assets.

85.    Even at the inflated value of certain Location License contracts diverted by Damani and Kassam and reacquired by Lucky Bucks, the OpCo Distribution equaled approximately 82% of Lucky Bucks's balance sheet assets as of June 30, 2021 and 83% of Lucky Bucks's balance

sheet assets as of July 31, 2021. Even without giving effect to the OpCo Distribution, Lucky Bucks's June 30, 2021 balance sheet showed approximately $248.2 million of assets and approximately $293.2 million of liabilities, for an approximately $45 million deficit. After giving effect to the OpCo First Lien Credit Agreement and the OpCo Distribution, the balance sheet showed approximately $244.5 million of assets and approximately $502.7 million of liabilities, for an approximately $258.2 million deficit. When coupled with Damani and Kassam's fraudulent scheme, Lucky Bucks was insolvent ***before*** the OpCo Distribution, and was left dramatically more insolvent after. Simply put, the Lucky Bucks Consent was false. So was a similar statement in a solvency certificate (the "<u>Solvency Certificate</u>"), also signed on July 30, 2021 by Boyden, in his capacity as Lucky Bucks's Executive Vice President of Business Development, in connection with the OpCo First Lien Credit Agreement.

86.     The OpCo Distribution represented an enormous success for Trive at the expense of the Company and its creditors. On July 29, 2021, TCM partner, Blake Bonner, underscored the significance of the OpCo Distribution for Trive, calling it the "quickest 1.0X yet or close to it" and "takes the cake for [the] largest." For Thadani, the "success" of the OpCo Distribution meant his rapid rise within Trive. Almost immediately after the OpCo Distribution was funded and paid for by the OpCo Lenders, TCM promoted Thadani to partner.

87.     Thus, after saddling a financially deteriorating company with over half a billion in debt, Trive paid itself and other insiders over $200 million, achieving a record return for Trive, all while knowing the OpCo Distribution would do nothing to further the interest of the Company, which would have insufficient capital to pay back the OpCo Lenders.

88.     Trive was not the only party that benefitted from the OpCo Distribution at the expense of the Company and the OpCo Lenders. Sekhri and Damani—*i.e.*, one of the three HoldCo

Board members who approved the OpCo Distribution and the ringleader of the scheme that looted Lucky Bucks while artificially inflating the value of its Location License assets—collectively received approximately $84.2 million of the OpCo Distribution. Additionally, in the days prior to the approval and issuance of the OpCo Distribution, Thadani stated that Trive wanted to pay transaction bonuses to certain Company employees; and after the OpCo Distribution, Thadani, copying Bouskill and Sekhri, approved those bonuses—with Ijaz and Bouskill receiving $100,000 each and Boyden and Kassam receiving $50,000 each. These were "one time" bonus based solely on the Opco Distributions.

89.     Thus, all members of the HoldCo Board (i) had a financial incentive for approving the OpCo Distribution, (ii) had knowledge of Lucky Bucks's balance sheet insolvency, and (iii) with respect to, at a minimum, Kassam, had knowledge that Lucky Bucks was being looted through Damani's scheme and Lucky Bucks's projected revenues were artificially inflated.

### 2.     Before the OpCo Distribution is even complete, Trive and the HoldCo Board begin to plan additional distributions through a "Super Holdco."

90.     The Defendants' scheme did not end with the OpCo Distribution. Rather, no later than July 1, 2021—before the OpCo First Lien Credit Agreement had even been executed— Thadani explained that Trive was already planning to saddle Lucky Bucks with even more debt that it had no ability to service through the creation of a new parent holding company that would take on a "super holdco facility…that could advance another $200-300m of proceeds to equity holders" in order to "have another 1x of return and still own the business." Further evidencing Trive's intent, on August 10, 2021, just days after the OpCo Distribution was made, Thadani asked another Trive employee to determine "***what ability we have to take cash out of the business***."

91.     Holdings was thus created and became the sole and managing member of HoldCo, which, in turn, remained the sole and managing member of Lucky Bucks. Holdings was governed

by its board of managers (the "Holdings Board"), which comprised the same individuals who had comprised the HoldCo Board: Sekhri, Boyden (both appointed by Trive) and Kassam (appointed by Damani).

92.     By October 2021, Lucky Bucks was required to increase its senior secured debt facility under the OpCo First Lien Credit Agreement to approximately $605 million in order to maintain the Company's business model. And then, in November 2021 and January 2022, Holdings—at the direction of the Holdings Board—issued $250 million in aggregate face amount of unsecured payment-in-kind notes (collectively, the "Holdings PIK Notes" and the holders of, the "Holdings PIK Noteholders"). As with the OpCo Distribution, following the issuance of the Holdings PIK Notes, Holdings made the $240 million Holdings Distributions to Trive, Damani, Kassam and other Former Officer Defendants and their related entities, dramatically overleveraging the newly-established Holdings, all in furtherance of Trive's scheme to maximize the return on its investment.

93.     Trive's preconceived plan to create Holdings and make the Holdings Distributions meant that at the time of the OpCo First Lien Credit Agreement and the subsequent funding of the OpCo Distribution, Trive deliberately intended to continue overleveraging the Company through further debt raises to fund distributions to equity holders. Indeed, Trive knew the Company had insufficient capital to repay its creditors, including the OpCo Lenders, and yet Trive intended to continue leveraging the Company regardless.

94.     In view of the foregoing, there can be no doubt that Trive orchestrated, and the HoldCo Board members authorized, the OpCo Distribution with actual intent to defraud the Company's creditors through subsequent indebtedness and distributions to insiders that would all dramatically hinder, if not outright prohibit, the Company's ability to repay its creditors.

**F.    The Defendants' schemes inevitably push Lucky Bucks into bankruptcy.**

95.    In the end, Trive's strategy of overleveraging Lucky Bucks to extract value for itself—using its control over both the HoldCo and Holdings Boards—combined with the concurrent looting by Damani, Kassam, and their accomplices, drove the Company into bankruptcy and forced the entire enterprise to seek chapter 11 protection.

96.    On June 8 and 9, 2023, saddled with unsustainable debt, the Debtors were forced to file for chapter 11 protection in the U.S. Bankruptcy Court for the District of Delaware. The filings were authorized by the Holdings Board and supported by a declaration from Boyden (the "Boyden First Day Declaration"). In that declaration, Boyden—who had detailed knowledge of the Company's finances and operations—acknowledged the OpCo First Lien Credit Facility and the OpCo Distribution, yet made only a brief, vague reference to the distribution itself. He omitted any mention of its $203 million size, the Company's insolvency at the time, the absence of a legitimate business purpose, or the crushing debt burden and insider enrichment it caused.

97.    Immediately after the commencement of the Chapter 11 Cases, an ad hoc group of the Holdings PIK Noteholders moved to convert the Holdings Chapter 11 Case, which was being jointly administered with the OpCo Chapter 11 Cases, to a chapter 7 liquidation. While the Court determined that conversion of the Holdings Chapter 11 Case may ultimately have been appropriate, the Court declined to authorize conversion at the time, instead holding the Holdings Chapter 11 Case in abeyance pending resolution of the OpCo Chapter 11 Cases.

98.    Less than two months later, on July 28, 2023, the Court entered its order confirming the OpCo Plan, which embodied an extensively negotiated equitization transaction between the Holdings-managed Company and the OpCo Lenders. This consensual outcome resulted in the heavily-impaired OpCo Lenders swapping their prepetition claims at a significant discount for equity in NewHoldCo and certain takeback second lien debt. The OpCo Lenders also invested

substantial new capital into the reorganized business. Because of these efforts, the Company emerged from bankruptcy on October 2, 2023 (the "Effective Date") with a new business plan, new management, a substantially deleveraged balance sheet and liquidity for ongoing operations.

99.     Pursuant to the terms of the OpCo Plan, the OpCo Debtors and certain third parties provided standard releases for the benefit of the "Released Parties," which included, among others, Damani and the Former Officer Defendants, defined as certain of the "Consultants" in the OpCo Plan. The releases, however, were subject to extensive negotiation among the parties and expressly excluded claims and liabilities "arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence" (the "Preserved Claims"). The Preserved Claims—along with any other claim or cause of action that was not expressly waived, relinquished, exculpated, released, compromised or settled in connection with the OpCo Plan—vested in Reorganized Lucky Bucks, which now maintains the "exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court."

100.     Shortly after the Effective Date, which followed a lengthy regulatory approval process before the GLC, the Court converted the Holdings Chapter 11 Case to a chapter 7 liquidation and appointed Marc Abrams as the chapter 7 trustee of the Holdings estate (the "Holdings Trustee"), finding that the circumstances since the confirmation hearing had not changed, and, indeed, Holdings had no prospect of reorganizing.

G.     **After the Effective Date, Reorganized Lucky Bucks's new management and the Holdings Trustee uncover the Defendants' various fraudulent schemes.**

101.    Until new management was installed after the Effective Date, the Defendants had been able to conceal their fraudulent conduct through their extensive and intricate campaign, which involved all facets of the Company's management. Indeed, until the Effective Date, the Company remained under the control of the Holdings Board, including the three managers who authorized the OpCo Distribution, certain of whom (Kassam, at a minimum) were actively looting the Company.

102.    Shortly after assuming their new roles, Reorganized Lucky Bucks's new management team became increasingly concerned by operational issues they were observing, particularly in light of the insufficient—and often inconsistent—explanation that had been provided by prior management for declining revenue. Therefore, new management undertook a comprehensive investigation into prepetition conduct by the Company's former owners, managers and employees, which ultimately led to Reorganized Lucky Bucks filing a complaint in Georgia state court (the "Georgia Complaint"), against, among others, certain of the former officers and managers of the Company, alleging claims and causes of action, including violation of Georgia's Racketeer Influenced and Corrupt Organizations ("R.I.C.O.") Act, that were preserved pursuant to the OpCo Plan.

103.    Upon his appointment, the Holdings Trustee similarly began an investigation into potential claims and causes of action on behalf of the Holdings estate, which ultimately culminated in the filing the Holdings Complaint in this Court, on September 13, 2024, against certain Trive entities, Thadani, Damani, the Former Officer Defendants and other related persons and entities. The Holdings Complaint alleges claims for intentional fraudulent transfers, improper dividends,

31

common law fraud and violations of Georgia's R.I.C.O. statute related to, among other things, the Holdings Distributions made to shareholders less than four months after the OpCo Distribution.

**H.   The Defendants' willful misconduct and actual fraud in connection with the OpCo Distribution give rise to preserved claims that are neither released by the OpCo Plan, nor exculpated in the HoldCo LLC Agreement or the Lucky Bucks Operating Agreement.**

104.   As discussed above, the releases contained in the OpCo Plan expressly excluded the Preserved Claims, which arise from or relate to "any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence" and which claims vested exclusively in Reorganized Lucky Bucks.

105.   Section 9.02(b) of the HoldCo LLC Agreement, which was operative at the time of the OpCo Distribution, exculpates managers for "any act or omission performed or omitted by such [manager] in good faith on behalf of [HoldCo]," but expressly limits such exculpation by providing that each manager of the HoldCo Board remains individually "liable for any such loss, damage or claim incurred by reason of such [manager's] fraud, willful misconduct or willful breach of this Agreement." Like the managers of HoldCo under the HoldCo LLC Agreement, Lucky Bucks officers enjoyed the benefit of an exculpation provision in the Second Amended and Restated Operating Agreement (as amended, the "Lucky Bucks Operating Agreement"), which was also operative at the time of the OpCo Distribution. But Paragraph 6.2 of the Lucky Bucks Operating Agreement similarly carves out certain conduct from the broad exculpation and provides that each officer remained liable "for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such [officer] in good faith on behalf of [Lucky Bucks]," that exculpation is expressly limited and each officer of Lucky Bucks is personally "liable for any such loss, damage or claim incurred by reason of such [officer's] (i) fraud, (ii) intentional or willful misconduct, (iii) willful breach of this Agreement, (iv) knowing violation of the law [ ]."

Additionally, Paragraph 6.3 of the Lucky Bucks Operating Agreement explicitly carves out "Officers" from the general waiver of fiduciary duties.

106.    The Defendants' conduct in connection with planning, authorizing and/or facilitating the OpCo Distribution constitutes actual fraud and/or willful misconduct. As such, none of the Defendants is shielded from the claims asserted herein by either the releases in the OpCo Plan or any exculpation of their respective fiduciary duties in the HoldCo LLC Agreement and the Lucky Bucks Operating Agreement. By its very nature, the claim for actual fraudulent transfer alleged herein arises from and/or relates to acts and/or omissions by the members of the HoldCo Board in authorizing the OpCo Distribution that constitute "actual fraud" and, therefore, such claim constitutes a Preserved Claim that is not released by the OpCo Plan.

107.    Specifically, Sekhri, Boyden and Kassam, as the managers of HoldCo, approved the OpCo Distribution, knowing that doing so was against the interests of the Company and would hinder, delay, or defraud creditors. And each such manager, along with Bouskill and Ijaz, in their capacities as officers of Lucky Bucks, and despite knowledge of the misrepresented basis and detrimental impact of the OpCo Distribution, undertook actions and/or omissions to support the approval and execution of the improper OpCo Distribution. Finally, the Trive Defendants and Damani, through their acts, directions and instructions, aided and abetted this misconduct in furtherance of their schemes to loot the Company, so as to receive a portion of the OpCo Distribution or compensation in connection therewith.

108.    *First*, in authorizing the OpCo Distribution, Sekhri, Boyden and Kassam each signed the Lucky Bucks Consent, which falsely stated that Lucky Bucks's assets exceeded its liabilities after giving effect to the OpCo Distribution based on Lucky Bucks's June 30, 2021 balance sheet. In reality, Lucky Bucks's June 30, 2021 balance sheet, prepared by Bouskill and

Ijaz, plainly showed an asset deficit of approximately $45 million, which deficit, after giving effect to the July 30, 2021 OpCo Distribution, ballooned to approximately $258.2 million. Sekhri, Boyden and Kassam did not hold a single board meeting, review any board materials, retain an independent financial advisor or obtain a solvency opinion to evaluate any legitimate Company business purpose for the OpCo Distribution before authorizing the OpCo Distribution. Instead, the HoldCo Board authorized the OpCo Distribution to enrich themselves and/or their partners in the fraudulent scheme—Trive, with respect to Sekhri and Boyden, and Damani, with respect to Kassam—without any legitimate business purpose for the Company and at the expense of its creditors. In addition, at least Kassam was also aware, through his active coordination with Damani, of the looting of Lucky Bucks through multiple schemes, including the artificial inflation of Lucky Bucks's assets through the purchase of inflated location contracts.

109.    As such, Sekhri, Boyden and Kassam, as the managers of the HoldCo Board, authorized the OpCo Distribution, with the intent to hinder, delay or defraud the Company's creditors. In so doing, Sekhri, Boyden and Kassam acted with, at a minimum, willful misconduct, such that they are not protected by the release provisions in the OpCo Plan or exculpated by the HoldCo LLC Agreement.

110.    *Second*, Sekhri, Boyden and Kassam, as senior officers of Lucky Bucks—CEO, EVP and COO, respectively—abused their positions by facilitating the OpCo Distribution for the benefit of their partners in the fraudulent scheme and their own financial self-interest. They did so with full knowledge that Lucky Bucks's liabilities exceeded its assets, both before and after giving effect to the OpCo Distribution, and that the managers of the HoldCo Board (*i.e.*, themselves) had signed a false statement to the contrary: the Lucky Bucks Consent. Boyden, in his capacity as EVP of Business Development of Lucky Bucks, also executed the false Solvency Certificate in

connection with obtaining the OpCo First Lien Credit Agreement Facility and, thereby, the funds to pay the OpCo Distribution. Again, Kassam, as COO of Lucky Bucks, was actively facilitating the looting of Lucky Bucks with Damani, including through the inflated location contract purchase scheme, and was fully aware of the harm caused to Lucky Bucks as a result.

111.    Bouskill and Ijaz (CFO and EVP of Finance, respectively) prepared Lucky Bucks's financial statements, including Lucky Bucks's June 30, 2021 balance sheet that clearly set forth Lucky Bucks's insolvency prior to the issuance of the OpCo Distribution, and distributed them to the Trive Defendants and the HoldCo Board members (Sekhri, Boyden and Kassam). Bouskill and Ijaz prepared these financial statements with the knowledge that certain COAM locations were underperforming revenue projections, which projections formed the primary basis of Lucky Bucks's already insufficient assets.

112.    Bouskill and Ijaz also (i) coordinated with Thadani and other Trive personnel in negotiating and executing the OpCo First Lien Credit Agreement to obtain financing for the express purpose of facilitating the OpCo Distribution with knowledge that the Company would be unable to repay its debt and (ii) ultimately facilitated, with the approval of Sekhri and Thadani, the wire transfers in connection with the distribution. As a reward for their participation in the OpCo Distribution, Bouskill and Ijaz each received $100,000 bonuses. In light of their extensive knowledge of Lucky Bucks's financial condition and the true purpose of the OpCo First Lien Credit Agreement, the actions and omissions of Sekhri, Boyden, Kassam, Bouskill and Ijaz, as officers of Lucky Bucks, constitute actual fraud and/or willful misconduct such that they are not protected by the release provisions in the OpCo Plan or exculpated by the Lucky Bucks Operating Agreement.

113.   *Finally*, the Trive Defendants, through their managers, officers and agents, including Thadani, authorized the OpCo Distribution by the Company pursuant to their control rights under the TCFIII Luck LP Partnership Agreement. Absent Trive's affirmative consent, Sekhri and Boyden, the majority of the HoldCo Board, were contractually prohibited from authorizing the OpCo Distribution. Trive knew of Sekhri's, Boyden's and Kassam's fiduciary duties—Trive appointed Sekhri and Boyden to the HoldCo Board and affirmatively consented to the amendment of the HoldCo LLC Agreement and Lucky Bucks Operating Agreement (as was required by the TCFIII Luck LP Partnership Agreement) after Trive's acquisition of a majority ownership interest of the Company.

114.   As specifically mandated by its control provisions, Trive authorized the OpCo Distribution which inured directly to its own financial benefit (and to the detriment of the Company's creditors), knowing that Lucky Bucks was insolvent based on its regular receipt of Lucky Bucks's financial data, including Lucky Bucks's June 30, 2021 balance sheet. Trive's motivation in planning the OpCo Distribution was clear: it wanted to "maximize the dividend," the majority of which subsequently flowed to Trive. Indeed, even before the OpCo Distribution was made, Trive was already planning what would ultimately become the Holdings Distributions in order to maximize its stripping of the Company's assets. Trive appointed Sekhri and Boyden to the HoldCo Board and required their obeisance to its wishes through the TCFIII Luck LP Partnership Agreement. Trive also provided direct financial incentives and rewards to each of Sekhri, Boyden and Kassam for their role in issuing the OpCo Distribution.

115.   Damani orchestrated a fraudulent scheme to loot Lucky Bucks's assets for Damani's and Kassam's personal gain, while simultaneously artificially inflating Lucky Bucks's projected revenue. This projected revenue formed the basis of Lucky Bucks's asset value, which,

in any event, did not exceed Lucky Bucks's liabilities. Damani also appointed Kassam to the HoldCo Board in furtherance of this fraudulent scheme, which allowed Kassam to authorize the OpCo Distribution to the personal profit of Damani (approximately $50.9 million). As such, the actions and omissions of the Trive Defendants and Damani constitute actual fraud and/or willful misconduct such that they are not protected by the release provisions in the OpCo Plan.

116.    Thus, Trive and Damani acted with, at a minimum, willful misconduct in devising the OpCo Distribution for their own benefit, including through their controlled and appointed representatives on the HoldCo Board, and, additionally in the case of Damani, by orchestrating massive operational fraud throughout the Company to aid and abet the misconduct of the Company's officers and managers, as set forth above.

## CAUSES OF ACTION

### COUNT ONE
### Avoidance and Recovery of Actual Fraudulent Transfers
### (11 U.S.C. §§ 548 and 550)
*(Against Trive Fund III, Trive Fund III-A, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, TCFIII Luck Holdings LLC, TCFIII Luck LP, Quantum Gaming, LBV27, Damani, Seven Aces Holdings and Sekhri)*

117.    Reorganized Lucky Bucks repeats and realleges each and every allegation stated in the previous Paragraphs 1 though 116 above.

118.    The OpCo Distribution was made by the Company, based on the authorization of the HoldCo Board, with the actual intent to hinder, delay or defraud the Company's creditors.

119.    The OpCo Distribution was made immediately after the incurrence of $535 million of debt by Lucky Bucks through the Prepetition OpCo First Lien Credit Agreement, which was entered into for the express purpose of making the OpCo Distribution.

120.    Defendants made numerous misstatements in order to induce the lenders into funding the OpCo Distribution. For instance, knowing that the lenders were concerned about the

extent to which Damani, the subject of the GLC Executive Order, was involved in the operations of the Company, Trive repeatedly told the lenders that Damani had no involvement. In fact, as alleged above, Trive knew that Damani was deeply involved in the operations of the Company, both directly, and through Kassam.

121.     Moreover, despite knowing that Lucky Bucks was insolvent at the time of OpCo Distribution, Sekhri, Boyden, and Kassam falsely stated in the Lucky Bucks Consent authorizing the OpCo Distribution that Lucky Bucks's assets exceeded its liabilities. Kassam in particular knew when signing the Lucky Bucks Consent that the value of the Company's assets were inflated through Damani and Kassam's fraudulent scheme to divert location contracts. Had Kassam informed lenders of the scheme or even declined to sign the fraudulent Lucky Bucks Consent, the Company would not have been able to secure funding for the OpCo Distribution. Instead, Kassam signed the Lucky Bucks Consent and received significant compensation for doing so.

122.     Defendants' fraudulent intent is also amply demonstrated by the following badges of fraud:

a) The ultimate recipients of the OpCo Distribution were insiders of the Company and included:

   i.   certain Trive Defendants, which were HoldCo's majority direct and indirect equity owners and appointed 2/3 of the HoldCo Board (Sekhri and Boyden) that approved the OpCo Distribution;

   ii.  Sekhri, who was a substantial indirect equity owner of HoldCo, through TCFIII Luck LP, member of the HoldCo Board and CEO of Lucky Bucks; and

   iii. Damani, who was the remaining HoldCo equity owner, founder and former CEO of Lucky Bucks and who appointed the remaining 1/3 of the HoldCo Board (Kassam).

b) No consideration was provided to the Company by the recipients of the OpCo Distribution.

c) Lucky Bucks was insolvent at the time of the OpCo Distribution.

d) Even crediting the Defendants with the fraudulently inflated value of Lucky Bucks's assets, the OpCo Distribution was a substantial portion of Lucky Bucks's assets, approximately 82%, at the time of the OpCo Distribution.

e) The Company had no reasonable prospect to repay the OpCo First Lien Credit Agreement debt following the OpCo Distribution.

f) Before the OpCo Distribution was even completed, Trive was already planning more ways to "take cash out of the business," which culminated in the Holdings Distributions.

123.    The OpCo Distribution initially was transferred to TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, LBV27 and Quantum Gaming, in the amounts set forth in paragraph 80.

124.    Upon information and belief, portions of the OpCo Distribution subsequently were transferred to Damani by LBV27, to Trive Fund III by TCFIII Luck Acquisition LLC, to Trive Fund III-A by TCFIII Luck SPV, to TCFIII Luck Holdings LLC by Quantum Gaming and to Seven Aces Holdings by Quantum Gaming in the amounts set forth in paragraph 81.

125.    Upon information and belief, portions of the OpCo Distribution ultimately were transferred to Trive Fund III by TCFIII Luck Holdings LLC and to Sekhri by Seven Aces Holdings, as forth in paragraph 82.

126.    Based upon the foregoing, pursuant to 11 U.S.C. 548(a)(1)(A) and 550, Reorganized Lucky Bucks is entitled to avoid and recover the value of the OpCo Distribution from Trive Fund III, Trive Fund III-A, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, TCFIII Luck Holdings LLC, TCFIII Luck LP, Quantum Gaming, LBV27, Damani, Seven Aces Holdings and Sekhri.

**COUNT TWO**
**Avoidance and Recovery of Actual Fraudulent Transfers**
**(11 U.S.C. §§ 544 and 550 and 6 Del. C. § 1304(a)(1)**
*(Against Trive Fund III, Trive Fund III-A, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC,*
*TCFIII Luck Holdings LLC, TCFIII Luck LP, Quantum Gaming, LBV27, Damani, Seven Aces*
*Holdings and Sekhri)*

127.    Reorganized Lucky Bucks repeats and realleges each and every allegation stated in the previous Paragraphs 1 though 126 above.

128.    One or more creditors of the Company, including the OpCo Lenders, held allowed or allowable claims under applicable law at the time of the OpCo Distribution and as of the Petition Date.

129.    The OpCo Distribution was made by the Company, based on the authorization of the HoldCo Board, with the actual intent to hinder, delay or defraud creditors of the Company.

130.    The OpCo Distribution was made immediately after the incurrence of $535 million of debt by Lucky Bucks through the Prepetition OpCo First Lien Credit Agreement, which was entered into for the express purpose of making the OpCo Distribution.

131.    Defendants made numerous misstatements in order to induce the lenders into funding the OpCo Distribution. For instance, knowing that the lenders were concerned about the extent to which Damani, the subject of the GLC Executive Order, was involved in the operations of the Company, Trive repeatedly told the lenders that Damani had no involvement. In fact, as alleged above, Trive knew that Damani was deeply involved in the operations of the Company, both directly, and through Kassam.

132.    Moreover, Despite knowing that Lucky Bucks was insolvent at the time of OpCo Distribution, Sekhri, Boyden, and Kassam falsely stated in the Lucky Bucks Consent authorizing the OpCo Distribution that Lucky Bucks's assets exceeded its liabilities. Kassam in particular knew when signing the Lucky Bucks Consent that the value of the Company's assets were inflated

through Damani and Kassam's fraudulent scheme to divert location contracts. Had Kassam informed lenders of the scheme or even declined to sign the fraudulent Lucky Bucks Consent, the Company would not have been able to secure funding for the OpCo Distribution. Instead, Kassam signed the Lucky Bucks Consent and received significant compensation for doing so.

133.    Defendants' fraudulent intent is also amply demonstrated by the following badges of fraud:

a) The ultimate recipients of the OpCo Distribution were insiders of the Company and included:

    i.    certain Trive Defendants, which were HoldCo's majority direct and indirect equity owners and appointed 2/3 of the HoldCo Board (Sekhri and Boyden) that approved the OpCo Distribution;

    ii.    Sekhri, who was a substantial indirect equity owner of HoldCo, through TCFIII Luck LP, member of the HoldCo Board and CEO of Lucky Bucks; and

    iii.    Damani, who was the remaining HoldCo equity owner, founder and former CEO of Lucky Bucks and who appointed the remaining 1/3 of the HoldCo Board (Kassam).

b) No consideration was provided to the Company by the recipients of the OpCo Distribution.

c) Lucky Bucks was insolvent at the time of the OpCo Distribution.

d) Even crediting the Defendants with the fraudulently inflated value of Lucky Bucks's assets, the OpCo Distribution was a substantial portion of Lucky Bucks's assets, approximately 82%, at the time of the OpCo Distribution.

e) The Company had no reasonable prospect to repay the OpCo First Lien Credit Agreement debt following the OpCo Distribution.

f) Before the OpCo Distribution was even completed, Trive was already planning more ways to "take cash out of the business," which culminated in the Holdings Distributions.

134.    The OpCo Distribution initially was transferred to TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, LBV27 and Quantum Gaming, in the amounts set forth in paragraph 80.

135.    Upon information and belief, portions of the OpCo Distribution subsequently were transferred to Damani by LBV27, to Trive Fund III by TCFIII Luck Acquisition LLC, to Trive Fund III-A by TCFIII Luck SPV, to TCFIII Luck Holdings LLC by Quantum Gaming and to Seven Aces Holdings by Quantum Gaming in the amounts set forth in paragraph 81.

136.    Upon information and belief, portions of the OpCo Distribution ultimately were transferred to Trive Fund III by TCFIII Luck Holdings LLC and to Sekhri by Seven Aces Holdings, as forth in paragraph 82.

137.    Based upon the foregoing, Reorganized Lucky Bucks is entitled to avoid and recover the value of the OpCo Distribution from Trive Fund III, Trive Fund III-A, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, TCFIII Luck Holdings LLC, TCFIII Luck LP, Quantum Gaming, LBV27, Damani, Seven Aces Holdings and Sekhri.

## COUNT THREE
### Avoidance and Recovery of Actual Fraudulent Transfers
### (11 U.S.C. §§ 544 and 550 and O.C.G.A. § 18-2-74(a)(1))
*(Against Trive Fund III, Trive Fund III-A, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, TCFIII Luck Holdings LLC, TCFIII Luck LP, Quantum Gaming, LBV27, Damani, Seven Aces Holdings and Sekhri)*

138.    Reorganized Lucky Bucks repeats and realleges each and every allegation stated in the previous Paragraphs 1 though 137 above.

139.    One or more creditors of the Company, including the OpCo Lenders, held allowed or allowable claims under applicable law at the time of the OpCo Distribution and as of the Petition Date.

140.    The OpCo Distribution was made by the Company, based on the authorization of the HoldCo Board, with the actual intent to hinder, delay or defraud creditors of the Company.

141.    The OpCo Distribution was made immediately after the incurrence of $535 million of debt by Lucky Bucks through the Prepetition OpCo First Lien Credit Agreement, which was entered into for the express purpose of making the OpCo Distribution.

142.    Defendants made numerous misstatements in order to induce the lenders into funding the OpCo Distribution. For instance, knowing that the lenders were concerned about the extent to which Damani, the subject of the GLC Executive Order, was involved in the operations of the Company, Trive repeatedly told the lenders that Damani had no involvement. In fact, as alleged above, Trive knew that Damani was deeply involved in the operations of the Company, both directly, and through Kassam.

143.    Moreover, Despite knowing that Lucky Bucks was insolvent at the time of OpCo Distribution, Sekhri, Boyden, and Kassam falsely stated in the Lucky Bucks Consent authorizing the OpCo Distribution that Lucky Bucks's assets exceeded its liabilities. Kassam in particular knew when signing the Lucky Bucks Consent that the value of the Company's assets were inflated through Damani and Kassam's fraudulent scheme to divert location contracts. Had Kassam informed lenders of the scheme or even declined to sign the fraudulent Lucky Bucks Consent, the Company would not have been able to secure funding for the OpCo Distribution. Instead, Kassam signed the Lucky Bucks Consent and received significant compensation for doing so.

144.    Defendants' fraudulent intent is also amply demonstrated by the following badges of fraud:

    a) The ultimate recipients of the OpCo Distribution were insiders of the Company and included:

        i.  certain Trive Defendants, which were HoldCo's majority direct and indirect equity owners and appointed 2/3 of the HoldCo Board (Sekhri and Boyden) that approved the OpCo Distribution;

        ii. Sekhri, who was a substantial indirect equity owner of HoldCo, through TCFIII Luck LP, member of the HoldCo Board and CEO of Lucky Bucks; and

      iii.    Damani, who was the remaining HoldCo equity owner, founder and former CEO of Lucky Bucks and who appointed the remaining 1/3 of the HoldCo Board (Kassam).

b) No consideration was provided to the Company by the recipients of the OpCo Distribution.

c) Lucky Bucks was insolvent at the time of the OpCo Distribution.

d) Even crediting the Defendants with the fraudulently inflated value of Lucky Bucks's assets, the OpCo Distribution was a substantial portion of Lucky Bucks's assets, approximately 82%, at the time of the OpCo Distribution.

e) The Company had no reasonable prospect to repay the OpCo First Lien Credit Agreement debt following the OpCo Distribution.

f) Just days after the OpCo Distribution was made from the OpCo First Lien Credit Facility, Trive looked for more ways to "take cash out of the business."

145.    The OpCo Distribution initially was transferred to TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, LBV27 and Quantum Gaming, in the amounts set forth in paragraph 80.

146.    Upon information and belief, portions of the OpCo Distribution subsequently were transferred to Damani by LBV27, to Trive Fund III by TCFIII Luck Acquisition LLC, to Trive Fund III-A by TCFIII Luck SPV, to TCFIII Luck Holdings LLC by Quantum Gaming and to Seven Aces Holdings by Quantum Gaming in the amounts set forth in paragraph 81.

147.    Upon information and belief, portions of the OpCo Distribution ultimately were transferred to Trive Fund III by TCFIII Luck Holdings LLC and to Sekhri by Seven Aces Holdings, as forth in paragraph 82.

148.    Based upon the foregoing, Reorganized Lucky Bucks is entitled to avoid and recover the value of the OpCo Distribution, as well as compensatory, punitive and exemplary damages, from Trive Fund III, Trive Fund III-A, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, TCFIII Luck Holdings LLC, TCFIII Luck LP, Quantum Gaming, LBV27, Damani, Seven Aces Holdings and Sekhri.

## COUNT FOUR
### Breach of Fiduciary Duty
### (Delaware Law)
### *(Against Sekhri, Boyden and Kassam)*

149.    Reorganized Lucky Bucks repeats and realleges each and every allegation stated in the previous Paragraphs 1 though 148 above.

150.    Pursuant to Delaware law, managers of a Delaware limited liability company owe fiduciary duties of loyalty, good faith and fair dealing to the limited liability company.

151.    At the time of the OpCo Distribution, HoldCo was a Delaware limited liability company.

152.    As alleged above, Sekhri's, Boyden's and Kassam's acts and omissions constituted willful misconduct and/or fraud.

153.    At the time of the OpCo Distribution, Sekhri, Boyden and Kassam was each a manager on the HoldCo Board and, accordingly, owed fiduciary duties to HoldCo.

154.    Sekhri, Boyden and Kassam, as the members of the HoldCo Board, breached their fiduciary duties in authorizing the OpCo Distribution by not acting in the interests of the Company, but rather in the interests of themselves and the individual or entity that appointed them as a member of the HoldCo Board. Specifically, as set forth above, each member of the HoldCo Board:

   a)  authorized the transfer of approximately $203.6 million of the Company's assets to insiders;

   b)  authorized the transfer of the OpCo Distribution in the interests of themselves and other individuals and entities other than the Company or its creditors;

   c)  authorized the transfer despite being aware of no legitimate business interest for the Company;

   d)  was aware that Lucky Bucks was insolvent at the time of the transfer;

   e)  authorized the transfer without any board meeting to discuss or consider the interests of the Company in making the transfer;

f)  authorized the transfer without any independent financial analysis on the impact of the transfer on the Company; and

g)  abused the authority granted to them as managers of the HoldCo Board to act against the interests of the Company and its creditors.

155.    Sekhri and Boyden each entered—in their individual capacity—into a side letter agreement with Trive as a prerequisite for their appointment to the HoldCo Board. These agreements required them to obtain prior written consent from Trive before voting to approve a wide array of non-ordinary course actions that went beyond the control rights provided to Trive as the majority equity owner under the HoldCo LLC Agreement—including whether the Company could incur more than $3 million in aggregate debt (here, the OpCo First Lien Credit Facility) and the issuance of any distribution or dividend outside of the normal course of business (here, the OpCo Distribution). These side letter agreements solidified Trive's virtually complete control over all material, non-ordinary course decisions of the HoldCo Board and, thus, the Company.

156.    Additionally, Kassam, at minimum, authorized the transfer with knowledge that the Company was being actively looted through his and Damani's scheme and that Lucky Bucks's anticipated revenue was artificially inflated.

157.    Moreover, the OpCo Distribution:

a)  was made for the purpose of enriching Damani, who appointed Kassam to the HoldCo Board and was the mastermind of the ongoing looting scheme;

b)  was made for the purpose of enriching Trive, which appointed Sekhri and Boyden to the HoldCo Board and, with respect to Sekhri, provided a $20 million "management incentive" loan;

c)  resulted in Sekhri receiving approximately $33.3 million of the OpCo Distribution through his interest in TCFIII Luck LP and Quantum Gaming; and

d)  resulted in Boyden and Kassam each receiving transaction bonuses of $50,000, at the direction of Trive, in connection with the OpCo Distribution.

158.     Through breaches of their respective fiduciary duties as managers of HoldCo, Sekhri, Boyden and Kassam willfully harmed HoldCo.

159.     For their willful breaches of their fiduciary duties owed to HoldCo under Delaware law and the HoldCo LLC Agreement, Sekhri, Boyden and Kassam are liable to Reorganized Lucky Bucks for compensatory damages in amounts to be determined at trial.

### COUNT FIVE
### Aiding and Abetting Breach of Fiduciary Duty
### (Delaware Law)
*(Against the Trive Defendants, Damani, Bouskill and Ijaz)*

160.     Reorganized Lucky Bucks repeats and realleges each and every allegation stated in the previous Paragraphs 1 though 159 above.

161.     Pursuant to Delaware law, aiding and abetting breach of fiduciary duty requires that (1) a fiduciary duty existed; (2) the fiduciary breached its duty; (3) the non-fiduciary knowingly participated in the breach; and (4) damages to the plaintiff resulted from the concerted actions of the defendant and the fiduciary.

162.     For the reasons set forth above and enumerated in Count Four, Sekhri, Boyden and Kassam, each a manager of HoldCo, owed fiduciary duties to HoldCo and willfully breached their fiduciary duties.

163.     The Trive Defendants, through their managers, officers and agents, including Thadani, knowingly participated in Sekhri's, Boyden's and Kassam's breaches of their fiduciary duties.

164.     Specifically, the Trive Defendants designed the OpCo Distribution, despite their regular receipt of Lucky Bucks's financial data, including Lucky Bucks's June 30, 2021 balance sheet, which clearly set forth that Lucky Bucks was insolvent prior to the incurrence of additional debt through the OpCo First Lien Credit Facility and the subsequent OpCo Distribution.

165.    Additionally, Trive appointed a majority of the HoldCo Board: Sekhri and Boyden. Not only did Trive appoint Sekhri and Boyden, it required them, as a condition of their appointment, to sign side letter agreements, pursuant to Section 5.16(c) of the TCFIII Luck LP Partnership Agreement, that provided Trive with control rights beyond those provided to Trive as majority equity owner in the HoldCo LLC Agreement.

166.    Accordingly, absent Trive's affirmative consent, Sekhri and Boyden were contractually prohibited from authorizing the OpCo Distribution. Not only did Trive architect the OpCo Distribution, appoint the majority of the HoldCo Board, provide the necessary affirmative consent for its appointees to authorize the OpCo Distribution and receive the majority of the OpCo Distribution, Trive also instructed that Boyden and Kassam receive transaction bonuses in connection with the OpCo Distribution.

167.    Damani knowingly participated in Kassam's breach of fiduciary duties by orchestrating a fraudulent scheme to loot Lucky Bucks's assets for Damani's and Kassam's personal gain. This scheme not only deprived Lucky Bucks of substantial revenue but caused it to overpay for location contracts, which imposed additional direct costs of acquisition and simultaneously artificially inflated Lucky Bucks's projected revenue, which formed the basis of Lucky Bucks's asset value, which was in any event less than Lucky Bucks's liabilities. In furtherance of this looting scheme, Damani appointed Kassam to the HoldCo Board, which allowed him to authorize the OpCo Distribution, of which approximately $50.9 million went to Damani.

168.    Bouskill and Ijaz, as the Chief Financial Officer and Executive Vice President of Finance of Lucky Bucks, respectively, with awareness of Lucky Bucks's insolvency and inflated

revenue projections through underperforming locations, knowingly participated in Sekhri's, Boyden's and Kassam's breaches of their fiduciary duties by:

    a) preparing Lucky Bucks's financial statements, including Lucky Bucks's June 30, 2021 balance sheet showing Lucky Bucks's insolvency, and providing them to Trive, Sekhri, Boyden and Kassam;

    b) coordinating with Thadani and other Trive personnel in obtaining the OpCo First Lien Credit Agreement;

    c) coordinating the wire transfers of the OpCo Distribution; and

    d) receiving, as reward for their participation in the OpCo Distribution, a $100,000 bonus each on the instruction of Thadani.

169.    Through aiding and abetting Sekhri's, Boyden's and Kassam's breaches of their fiduciary duties, the Trive Defendants, Bouskill and Ijaz willfully harmed HoldCo.

170.    For willfully aiding and abetting the breaches of fiduciary duty by Sekhri, Boyden and Kassam, the Trive Defendants, Damani, Bouskill and Ijaz are liable to Reorganized Lucky Bucks for compensatory damages, in amounts to be determined at trial.

### COUNT SIX
### Breach of Fiduciary Duty
### (Georgia Law)
*(Against Sekhri, Boyden, Kassam, Bouskill and Ijaz)*

171.    Reorganized Lucky Bucks repeats and realleges each and every allegation stated in the previous Paragraphs 1 though 170 above.

172.    Pursuant to Georgia law, officers of a Georgia limited liability company owe fiduciary duties of good faith, care and loyalty to the limited liability company.

173.    At the time of the OpCo Distribution, Lucky Bucks was a Georgia limited liability company.

174.    At the time of the OpCo Distribution, Sekhri, Boyden, Kassam, Bouskill and Ijaz was each an officer of Lucky Bucks and, accordingly, owed fiduciary duties to Lucky Bucks.

175.    Sekhri, Boyden and Kassam, as officers of Lucky Bucks, breached their fiduciary duties in by allowing and facilitating the OpCo Distribution, which did not benefit Lucky Bucks, but rather benefited only themselves and the individual or entity that appointed them as a member of the HoldCo Board. Specifically, as set forth above, Sekhri, Boyden and Kassam:

a)  allowed and facilitated the transfer of approximately $203.6 million of the Company's assets to insiders;

b)  allowed and facilitated the transfer of the OpCo Distribution in the interest of themselves and other individuals and entities other than the Company or its creditors;

c)  allowed and facilitated the transfer despite being aware of no legitimate business interest for the Company;

d)  were aware that Lucky Bucks was insolvent at the time of the transfer;

e)  allowed and facilitated the transfer without requesting any board meeting to discuss or consider the interests of the Company in making the transfer;

f)  allowed and facilitated the transfer without obtaining any independent financial analysis on the impact of the transfer on the Company; and

g)  abused the authority granted to them as officers of Lucky Bucks to act against the interests of the Company and its creditors.

176.    Sekhri approved Bouskill and Ijaz's sending the wire transfers of the OpCo Distribution.

177.    Boyden, as EVP of Business Development of Lucky Bucks, signed the false Solvency Certificate in connection with obtaining the OpCo First Lien Credit Facility necessary to pay the OpCo Distribution.

178.    Sekhri and Boyden each entered—in their individual capacity—into a side letter agreement with Trive as a prerequisite for their appointment to the HoldCo Board. These agreements required them, in their individual capacities, to obtain prior written consent from Trive before voting to approve a wide array of non-ordinary course actions that went beyond the control rights provided to Trive as the majority equity owner under the HoldCo LLC Agreement—

50

including whether the Company could incur more than $3 million in aggregate debt (here, the OpCo First Lien Credit Facility) and the issuance of any distribution or dividend outside of the normal course of business (here, the OpCo Distribution). Indeed, these side letter agreements solidified Trive's virtually complete control over all material, non-ordinary course decisions of the HoldCo Board and, thus, the Company.

179.     Kassam, at minimum, authorized the transfer with knowledge that the Company was being actively looted through his and Damani's scheme and that Lucky Bucks's anticipated revenue was artificially inflated.

180.     Moreover, the OpCo Distribution:

a)   was made for the purpose of enriching Damani, who appointed Kassam to the HoldCo Board and was the mastermind of the ongoing looting scheme;

b)   was made for the purpose of enriching Trive, which appointed Sekhri and Boyden to the HoldCo Board and, with respect to Sekhri, provided a $20 million "management incentive" loan;

c)   resulted in Sekhri receiving approximately $33.3 million of the OpCo Distribution through his interest in TCFIII Luck LP and Quantum Gaming; and

d)   resulted in Boyden and Kassam each receiving transaction bonuses of $50,000, at the direction of Trive, in connection with the OpCo Distribution.

181.     Bouskill and Ijaz, as the Chief Financial Officer and Executive Vice President of Finance, respectively, with awareness of Lucky Bucks's insolvency and inflated revenue projections through underperforming locations, actively facilitated the OpCo Distribution, including by:

a)   preparing Lucky Bucks's financial statements, including Lucky Bucks's June 30, 2021 balance sheet showing Lucky Bucks's insolvency, and providing them to Trive, Sekhri, Boyden and Kassam;

b)   coordinating with Thadani and other Trive personnel in obtaining the OpCo First Lien Credit Agreement;

c)   coordinating the wire transfers of the OpCo Distribution; and

d) receiving, as reward for their participation in the OpCo Distribution, a $100,000 bonus each on the instruction of Thadani.

182.   Through breaches of their respective fiduciary duties as officers, Sekhri, Boyden, Kassam, Bouskill and Ijaz willfully harmed the Company.

183.   For their breaches of fiduciary duties owed to the Company under Georgia law and the Lucky Bucks Operating Agreement, Sekhri, Boyden, Kassam, Bouskill and Ijaz are liable for compensatory, exemplary and punitive damages, in amounts to be determined at trial.

## COUNT SEVEN
### Attorney's Fees
### (O.C.G.A. § 13-6-11)
*(Against all Defendants)*

184.   Reorganized Lucky Bucks repeats and realleges each and every allegation stated in the previous Paragraphs 1 though 183 above.

185.   As set forth in extensive detail above in Counts One through Six, the Defendants acted in bad faith and/or caused Reorganized Lucky Bucks unnecessary trouble and expense through their actual fraud and willful misconduct.

186.   Reorganized Lucky Bucks is entitled to an award of attorneys' fees pursuant to O.C.G.A. § 13-6-11.

## COUNT EIGHT
### Punitive Damages
### (O.C.G.A. § 51-12-5.1)
*(Against all Defendants)*

187.   Reorganized Lucky Bucks repeats and realleges each and every allegation stated in the previous Paragraphs 1 though 186 above.

188.   Pursuant to O.C.G.A. § 51-12-5.1(f), the Defendants acted with a specific intent to cause harm to the Company and its creditors when undertaking the tortious conduct set forth above.

189.     Reorganized Lucky Bucks is entitled to an award of punitive damages to the maximum extent permitted by law, in an amount to be determined at trial.

### COUNT NINE
### Declaratory Judgment
### (28 U.S.C. §§ 2201 and 2202)
*(Against all Defendants)*

190.     Reorganized Lucky Bucks repeats and realleges each and every allegation stated in the previous Paragraphs 1 though 189 above.

191.     There is an actual, concrete and definite dispute concerning adverse legal interests espoused by Reorganized Lucky Bucks, on the one hand, and the Defendants, on the other hand, as to whether the Defendants' alleged acts or omissions as set forth above constitute actual fraud or willful misconduct under the applicable provisions of the OpCo Plan, the HoldCo LLC Agreement and the Lucky Bucks Operating Agreement.

192.     As extensively detailed above, the Defendants' alleged acts or omissions arising from or related to the OpCo Distribution constitute actual fraud and/or willful misconduct under the applicable provisions of the OpCo Plan, the HoldCo LLC Agreement and the Lucky Bucks Operating Agreement.

193.     As this action presents an actual controversy within the Court's jurisdiction, the Court may declare the rights and other legal relations of the parties in accordance with 28 U.S.C. § 2201(a).

194.     A declaratory judgment will resolve the legal issues involved by finalizing the controversy and offering relief from uncertainty.

195.     Accordingly, Reorganized Lucky Bucks seeks a declaratory judgment that the Defendants' alleged acts or omissions as set forth above constitute actual fraud or willful

misconduct under the applicable provisions of the OpCo Plan, the HoldCo LLC Agreement and the Lucky Bucks Operating Agreement.

## **DEMAND FOR RELIEF**

Reorganized Lucky Bucks requests that the Court:

a)      order the Defendants to return to Reorganized Lucky Bucks the full amount of the OpCo Distribution;

b)      order the Defendants to pay Reorganized Lucky Bucks compensatory, exemplary and punitive damages in an amount to be determined at trial;

c)      order the Defendants to pay Reorganized Lucky Bucks's attorney's fees, costs, and expenses of litigation to the extent allowed by law;

d)      enter an order finding that the Defendants' acts and omissions constituted actual fraud or willful misconduct under the applicable provisions of the OpCo Plan, the HoldCo LLC Agreement and the Lucky Bucks Operating Agreement; and

e)      order such other relief as the Court deems just and proper.

Dated: June 2, 2025                    Respectfully Submitted,

                                       **COLE SCHOTZ P.C.**

                                       */s/ Justin R. Alberto*
                                       Justin R. Alberto (No. 5126)
                                       Patrick J. Reilley (No. 4451)
                                       Stacy L. Newman (No. 5044)
                                       500 Delaware Avenue, Suite 1410
                                       Wilmington, DE 19801
                                       Telephone: (302) 652-3131
                                       Facsimile: (302) 652-3117
                                       Email: jalberto@coleschotz.com
                                       Email: preilley@coleschotz.com
                                       Email: snewman@coleschotz.com


                                       **REID COLLINS & TSAI LLP**

                                       William T. Reid, IV (to be admitted *pro hac vice*)
                                       Gregory S. Schwegmann (to be admitted *pro hac vice*)
                                       Jeremy H. Wells (to be admitted *pro hac vice*)
                                       1301 S. Capital of Texas Highway, Suite C300
                                       Austin, TX 78746
                                       Telephone: (512) 647-6120
                                       Facsimile: (512) 647-6129
                                       Email: wreid@reidcollins.com
                                       Email: gschwegmann@reidcollins.com
                                       Email: jwells@reidcollins.com
                                       Email: asomers@reidcollins.com

                                       Angela Somers (to be admitted *pro hac vice*)
                                       420 Lexington Avenue, Suite 2731
                                       New York, New York 10170
                                       Telephone: (212) 344-5200
                                       Facsimile: (212) 344-5299
                                       Email: asomers@reidcollins.com


                                       *Counsel to LB NewHoldCo, LLC and Lucky Bucks,*
                                       *LLC*