## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LUCKY BUCKS, LLC, *et al.*<br><br>Debtors. | Chapter 11<br>Case No. 23-10758 (KBO) |
| LB NEWHOLDCO, LLC and LUCKY BUCKS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>TRIVE CAPITAL MANAGEMENT LLC, *et al.*,<br><br>Defendants. | Adversary Proceeding<br>Adv. Proc. No. 25-50965 (KBO) |

## BRIEF IN SUPPORT OF MANAGEMENT
## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

POTTER ANDERSON & CORROON LLP
M. Blake Cleary (No. 3614)
Jesse L. Noa (No. 5973)
James R. Risener (No. 7334)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Phone:  (302) 984-6026

ALLEN OVERY SHEARMAN STERLING US LLP
C. Luckey McDowell (*pro hac vice* application pending)
Ian E. Roberts (*pro hac vice* application pending)
Jacob Fields (*pro hac vice* application pending)
2601 Olive St 17th Floor
Dallas, TX 75201
Phone:  (214) 271-5777

-and-

Samuel Cooper (*pro hac vice* application pending)
800 Capitol Street, Suite 2200
Houston, Texas, 77002
Phone:  (713) 354-4838

Dated: September 5, 2025

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................................iii-vi

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL BACKGROUND....................................................................................................2

     A.    The 2021 OpCo Refinancing and Distribution ............................................3

     B.    The Reorganized Debtors Emerge After Negotiating Broad Mutual
          Releases............................................................................................................4

     C.    After Exiting Bankruptcy, the Reorganized Debtors File Suit in
          Georgia to Recover the OpCo Distribution. ................................................5

     D.    Failing to Gain Traction in Georgia, the Reorganized Debtors Re-File
          their Claims in This Court...........................................................................7

LEGAL STANDARD.................................................................................................................9

ARGUMENT .............................................................................................................................9

     I.    The OpCo Plan Release Bars All of Reorganized Debtors' Claims ......................9

          A.    The Carveout Provision Is Inapplicable on Its Face .................................10

          B.    The Reorganized Debtors Do Not Allege the Type of Misconduct
               Encompassed by the Carveout Provision...................................................14

     II.    The Actual-Fraudulent-Transfer Claims Should Be Dismissed for Additional
          Reasons (Counts 1-3). ..........................................................................................17

          A.    The Complaint Fails to Plead the OpCo Debtors Made the Transfers
               with the Requisite Fraudulent Intent under Rule 9(b). .............................17

           B.    As a Matter of Law, the Reorganized Debtors Cannot Show "Actual
               Intent to Defraud" in Connection with Transfers that the OpCo
               Lenders Approved.......................................................................................20

     III.    The Fiduciary Duty Claims Fail for Additional, Independent Reasons (Counts
          4-6)........................................................................................................................21

          A.    Counts 4, 5 & 6 Must Be Dismissed because the HoldCo LLC
               Agreement and Lucky Bucks Operating Agreement Waived Fiduciary
               Duties and Exculpated Defendants from Liability.....................................21

    B.     Even If Fiduciary Duties Had Not Been Eliminated, None of the
Counts Would State a Plausible Claim ........................................................25

IV.    The Remaining Claims Should Be Dismissed .......................................................29

    A.     Attorney's Fees and Punitive Damages (Counts 7 & 8) ...........................29

    B.     Claim for Declaratory Judgment (Count 9). .............................................30

CONCLUSION ....................................................................................................................30

# TABLE OF AUTHORITIES

**Cases** ...................................................................................................................................................... **Page(s)**

*In re Adelphia Recovery Trust,*
    634 F.3d 678 (2d Cir. 2011) ................................................................................................................. 20

*Allen v. El Paso Pipeline GP Co., L.L.C.,*
    113 A.3d 167 (Del. Ch. 2014) .............................................................................................................. 22

*In re Allied Sys. Hldgs., Inc.,*
    556 B.R. 581 (Bankr. D. Del. 2016) .................................................................................................... 12

*Arc Gaming and Technologies, LLC v. Anil Damani, et al.,*
    No. 24-cv-131 (Super. Ct. Gwinnett County Jan. 2, 2024) ................................................................... 6

*In re Arctic Glacier International, Inc.,*
    255 F.Supp.3d 534 (D. Del. 2017), *aff'd,* 901 F.3d 162 (3d Cir. 2018) ............................................. 14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .............................................................................................................................. 9

*In re Bayou Steel BD Holdings, LLC,*
    642 B.R. 371 (Bankr. D. Del. 2022) .................................................................................................... 23

*In re Beaulieu Group, LLC,*
    No. 17-41677-BEM, 2021 WL 4469928 (Bankr. N.D. Ga. Sep. 29, 2021) ......................................... 25

*In re Best Prods. Co.,*
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) ................................................................................................... 20

*Blue Cube Spinco LLC v. Dow Chem. Co.,*
    No. N21C-01-214 PRW CCLD, 2021 WL 4453460 (Del. Super. Ct. Sept. 29, 2021) ........... 30

*Brock Built, LLC v. Blake,*
    686 S.E.2d 425 (Ct. App. Ga. 2009) ................................................................................................... 29

*Buck v. Hampton Twp. Sch. Dist.,*
    452 F.3d 256 (3d Cir. 2006) .................................................................................................................. 3

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997) ............................................................................................................... 21

*In re Charys Holding Co.,*
    No. 08-10289, 2010 WL 2774852 (Bankr. D. Del. July 14, 2010) ....................................................... 18

*In re Chin,*
    492 B.R. 117 (Bankr. E.D.N.Y. 2013) ................................................................................................. 18

*In re Cornerstone Therapeutics Inc., Stockholder Litig.*,
  115 A.3d 1173 (Del. 2015) ....................................................................................23

*In re Cred Inc.*,
  650 B.R. 803 (Bankr. D. Del. 2023) .....................................................................27

*Davis v. Abington Mem'l Hosp.*,
  765 F.3d 236 (3d Cir. 2014)...................................................................................9

*DG BF LLC v. Ray*, No. 2020-0459-MTZ, 2021 WL 776742, at *10 (Del. Ch. Mar. 1,
  2021) ....................................................................................................................23

*Dieckman v. Regency GP LP*,
  No. 11130-CB, 2021 WL 537325 (Del. Ch. Feb. 15, 2021)..................................16

*In re Direct Access Partners, LLC*,
  602 B.R. 495 (Bankr. S.D.N.Y. 2019) .............................................................18, 19

*In re Duke & King Acquisition Corp.*,
  508 B.R. 107 (Bankr. D. Minn. 2014) ...................................................................19

*In re Dunn*,
  No. ADV. SV-04-01343-KT, 2006 WL 6810930 (B.A.P. 9th Cir. Oct. 31, 2006)................20

*DuPont De Nemours, Inc. v. Hemlock Semiconductor Operations LLC*,
  No. N23C-10-261 PRW CCLD, 2024 WL 3161799 (Del. Super. Ct. June 10, 2024)...........30

*In re Fedders N. Am., Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) ......................................................................18

*In re Fruehauf Trailer Corp.*,
  444 F.3d 203 (3d Cir. 2006)...................................................................................20

*In re Hechinger Inv. Co., of Del.*,
  327 B.R. 537 (D. Del. 2005), *aff'd on other grounds*, 278 Fed. App'x 125 (3d Cir.
  2008) .....................................................................................................................18

*Heller v. Kiernan*,
  No. Civ. A. 1484-K, 2002 WL 385545 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164
  (Del. 2002) ............................................................................................................25

*J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*,
  644 S.E.2d 440 (Ct. App. Ga. 2007)......................................................................29

*Lane v. Eggleston*,
  284 F. 743 (5th Cir. 1922) .....................................................................................20

*In re Lyondell Chem. Co.*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014) ...............................20

*MKE Holdings Ltd. v. Schwartz*,
    No. CV 2018-0729-SG, 2019 WL 4723816, at *9 (Del. Ch. Sept. 26, 2019) .......................22

*In re NewStarcom Holdings, Inc.*,
    547 B.R. 106 (Bankr. D. Del. 2019) ...................................................................................27

*In re NorthEast Gas Generation, LLC*,
    639 B.R. 914 (Bankr. Del. 2022) .........................................................................................10

*Norton v. K-Sea Transp. Partners L.P.*,
    67 A.3d 354 (Del. 2013) ......................................................................................................22

*Prairie Cap. III, L.P. v. Double E Hldg. Corp.*,
    132 A.3d 35 (Del. Ch. 2015) ................................................................................................16

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002)...................................................................................................9

*In re Samson Res. Corp.*,
    No. 15-11934-BLS (Bankr. D. Del. Mar. 29, 2021) ............................................................11

*In re Shenango Group Inc.*,
    501 F.3d 338 (3d Cir. 2007)..................................................................................................10

*Stephen A. Wheat Tr. v. Sparks*,
    754 S.E.2d 640 (Ct. App. Ga. 2014) ....................................................................................29

*Stoker v. Bellemeade*,
    615 S.E.2d 1 (Ct. App. Ga. 2005), *rev'd on other grounds*, *Bellemeade v. Stoker*, 280
    Ga. 635 (Sup. Ct. 2006) .......................................................................................................24

*In re Syntax-Brillian Corp.*,
    573 F.App'x 154 (3d Cir. 2014) ...........................................................................................18

*In re Tribune Co. Fraudulent Conv. Litig.*,
    No. 11-MD-2296 (RJS), 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017), *aff'd*, 10 F.4th 147
    (2d Cir. 2021).................................................................................................................19, 21

*In re Tropicana Ent., LLC*,
    520 B.R. 455 (Bankr. D. Del. 2014) ...............................................................................15-16

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*,
    No. 3:10-CV-1842-G, 2013 WL 12124306 (N.D. Tex. Jun. 18, 2013)..................................19

*In re USDigital, Inc.*,
    443 B.R. 22 (Bankr. D. Del. 2011) .......................................................................................25

*UWork.com, Inc. v. Paragon Techs., Inc.*,
    740 S.E.2d 887 (Ct. App. Ga. 2013) ................................................................... 28

*In re Worldwide Direct, Inc.*,
    280 B.R. 819 (Bankr. D. Del. 2002) ...................................................................... 9

*Yucaipa Am. All. Fund I, LP v. SBDRE LLC*,
    No. 9151-VCP, 2014 WL 5509787 (Del. Ch. Oct. 31, 2014) ............................... 13

*In re Zohar III, Corp.*,
    No. 18-10512 (KBO), 2020 WL 3960820 (D. Del. July 13, 2020) ........................ 11

**Statutes**

6 Del. C. § 18-1101(c) .................................................................................................... 22

6 Del. C. § 18-1101(e) .................................................................................................... 23

6 Del. C. § 1304(a)(1) ..................................................................................................... 17

11 U.S.C. § 544(b) .......................................................................................................... 17

11 U.S.C. § 548(a)(1)(A) ........................................................................................... 17, 18

Fed. R. Bankr. P. 7012(b) ................................................................................................. 1

Fed. R. Civ. P. 9(b) ...................................................................................................... 2, 18

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 1

GA Code § 14–11–305 ................................................................................................... 22

GA Code § 14-11-305(1) ................................................................................................ 29

GA Code § 18-2-74(a)(1) ................................................................................................ 17

Pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b), Defendants Manu Sekhri, James Boyden, Ryan Bouskill, Hassan Ijaz and Seven Aces Holdings ULC[1] ("Seven Aces" and collectively, the "Management Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Complaint [D.I. 1] ("Complaint" or "Compl.") filed by Plaintiffs LB NewHoldCo, LLC ("NewHoldCo") and its subsidiary, Lucky Bucks, LLC ("Lucky Bucks" and, together with NewHoldCo, "Reorganized Debtors").

### PRELIMINARY STATEMENT

1.     This lawsuit arises out of the bankruptcy proceedings for Lucky Bucks and Lucky Bucks HoldCo, LLC.  Unmentioned in the current complaint is that this suit is not the first time the reorganized debtor plaintiff here has attempted to advance these claims.  In fact, only three months after the effective date of its plan of reorganization, the reorganized debtor brought an expansive lawsuit in Georgia state court making many of the same claims advanced in this action.  Notably, the Georgia action did not include any of the Management Defendants.  In fact, that action explicitly disclaimed any wrongdoing by those individuals, and Plaintiffs resisted the contention that their case properly belonged in this Court.

2.     The Plaintiffs did not fare well in the year and a half of Georgia litigation.  As a result, they now appear before this Court for an improper litigation do-over.  To disguise their after-the-fact forum shopping, the Plaintiffs added the Management Defendants for the first time in this new Complaint while merely restating the identical allegations that have been litigated— albeit unfavorably for Plaintiffs—in Georgia for the last 18 months.  These claims fail for multiple reasons:

---

[1] Seven Aces is an entity owned and controlled by Defendant Sekhri and any claims against that entity are entirely derivative of claims against Sekhri.

- **All claims are barred by the OpCo Plan Release:** The Lucky Bucks chapter 11 plan of reorganization (the "OpCo Plan") contains an expansive and extensively negotiated release that provides a complete defense to the Management Defendants, including as to all Avoidance Actions. That release excludes only claims for actual fraud, willful misconduct or gross negligence. The allegations supporting the avoidance claims and breach of fiduciary claims fail to meet this high burden. Moreover, read literally, the release preserves such claims only against the debtor and not any other parties. Even read more charitably (*i.e.*, by ignoring its plain language), the release still requires a prior judicial determination of misconduct before the Reorganized Debtors can pursue claims that purportedly fall within the release's carveout. Finally, even the limited claims Plaintiffs alleged are preserved are not adequately pleaded to avoid application of the release.

- **Counts 1-3:** the avoidance claims should be dismissed because the Complaint fails to plausibly allege actual intent to defraud creditors under Rule 9(b)'s pleading standards. The facts alleged describe a fully disclosed pro rata dividend to shareholders made with the explicit consent of the OpCo Lenders, who cannot now claim to have been defrauded.

- **Counts 4-6:** the fiduciary duty claims fail as a matter of law because the operative LLC Agreements fully waived fiduciary duties and contained broad exculpation provisions, all of which are enforceable under applicable law. The Complaint otherwise fails to state a plausible claim under either Delaware or Georgia law because the Complaint misconstrues the scope and direction of the applicable duties owed and cites conduct that cannot constitute a breach.

- **Counts 7-9:** the remaining claims for attorney fees and punitive damages fail because they are derivative of substantive claims, none of which are actionable or adequately pleaded. The request for declaratory judgment is wholly duplicative of other claims, would constitute an advisory opinion, and does not meet the requirements for declaratory relief.

## FACTUAL BACKGROUND

3.      Lucky Bucks (also referred to herein as "OpCo") owned and operated coin-operated amusement machines ("COAMs") in Georgia. Compl. ¶¶ 40-44, 70-71. Its direct parent company and sole member was Lucky Bucks HoldCo, LLC ("HoldCo"). By August 2020, Trive Capital Management LLC ("Trive"), through various entities, indirectly held 75% of HoldCo's equity, while founder Anil Damani indirectly held 25% of HoldCo. *Id.* ¶¶ 45-47, 60-63.

4.      The Management Defendants are former equity holders, directors, and officers of HoldCo and Lucky Bucks. Specifically, the Complaint alleges: Manu Sekhri and James Boyden

served as Lucky Bucks's CEO and EVP of Business Development, respectively.  Ryan Bouskill and Hassan Ijaz served as Lucky Bucks's CFO and EVP of Finance, respectively.  *Id.* ¶¶ 33-37. Sekhri and Boyden also sat on HoldCo's three-person Board of Managers (appointed by Trive), along with fellow Board Manager Tony Kassam (appointed by Anil Damani).[2]  *Id.* ¶¶ 60-65, 82-85.  In addition, Sekhri was an indirect equity owner in HoldCo and held those indirect interests through his entity, Seven Aces.  *Id.* ¶ 39.

### A.  The 2021 OpCo Refinancing and Distribution

5.      On July 30, 2021, Lucky Bucks entered a $535 million senior secured credit facility (the "OpCo First Lien Credit Agreement")[3] with certain lenders (collectively, the "OpCo Lenders").  Compl. ¶¶ 69-78.  The OpCo First Lien Credit Agreement explicitly provided that proceeds would be used to repay the Company's existing facility and fund a $203.6 million pro rata distribution to HoldCo's ultimate equity owners (the "OpCo Distribution").  *Id.* ¶¶ 70-83.

6.      Kassam, Boyden and Sekhri—as members of the HoldCo Board—executed a written consent (the "Lucky Bucks Consent") approving a $203.6 million distribution from Lucky Bucks to HoldCo.  On the same day, the HoldCo Board members executed a second written consent (the "HoldCo Consent") unanimously approving the OpCo Distribution in the same amount to the holders of HoldCo's equity in accordance with their respective membership percentages.  *Id.* ¶ 79.

7.      Over the next 18 months, Lucky Bucks Holdings LLC ("Holdings"), which was

---

[2] A true and correct copy of the Fifth Amended and Restated Limited Liability Company Agreement of Lucky Bucks HoldCo, LLC (the "HoldCo LLC Agreement") is attached as Fields Decl. Exhibit A.  On a motion to dismiss, the Court may consider "any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case."  *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal quotations omitted).

[3] A true and correct copy of the OpCo First Lien Credit Agreement is attached as Fields Decl. Exhibit B.

formed to sit as a new parent company above HoldCo, consummated two additional dividend recapitalization transactions that have been separately challenged by Holdings and are not the subject of this Complaint. Compl. ¶ 103. Nearly two years later, following a business downturn, Lucky Bucks, HoldCo, and Holdings each filed voluntary chapter 11 petitions in this Court on June 9 and June 8, 2023, respectively.

### B.  The Reorganized Debtors Emerge After Negotiating Broad Mutual Releases

8.      On July 28, 2023, the Court entered its Order[4] confirming Lucky Bucks' and HoldCo's Joint chapter 11 plan (the "<u>OpCo Plan</u>"),[5] which resulted in the OpCo Lenders receiving 100% equity in both debtors in full satisfaction of their claims.[6] On October 2, 2023 (the "<u>Effective Date</u>"), Lucky Bucks and HoldCo (n/k/a LB NewHoldCo, LLC) emerged as reorganized debtors.[7] ¶¶ 98-100.

9.      In the OpCo Plan, the Reorganized Debtors agreed to a broad release of all pre-Effective Date causes of action against any "Released Parties," defined to include the Management Defendants.[8] Specifically, Section VIII(A)(2) provides:

> Each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each of the OpCo Debtors, their respective Estates, and any Person seeking to exercise the rights of any of the OpCo Debtors or their

---

[4] See *Findings of Fact, Conclusions of Law, and Order Confirming the OpCo Debtors' Joint Chapter 11 Plan and Approving the Disclosure Statement as it Relates Thereto for Case Nos. 23-10757 and 23-10758* [D.I. 214] (the "<u>Confirmation Order</u>").

[5] *First Amended Joint Chapter 11 Plan for Lucky Bucks, LLC and Lucky Bucks HoldCo LLC*, Case No. 23-10758 (Bankr. D. Del. July 22, 2023) [D.I. 187] (as amended, the "<u>OpCo Plan</u>").

[6] OpCo Plan Art. III.B.2(b) and III.B.3(c).

[7] Shortly after the Effective Date, the Court converted Holdings' chapter 11 case to chapter 7, and Marc Abrams was subsequently appointed as the chapter 7 trustee of the Holdings estate (the "<u>Holdings Trustee</u>"). *See Order Converting Lucky Bucks Holdings LLC's Case from Chapter 11 to Chapter 7* [D.I. 5] [Case No. 23-10756 (KBO)].

[8] "Released Parties" is defined to include, among others, "the officers of each of the OpCo Debtors, the members of any board of managers of each OpCo Debtor, . . . [and] the Consultants." OpCo Plan § I(A) at 15. In turn, "Consultants" is defined to include Sekhri, Boyden, Bouskill, and Ijaz. *Id.* at 5-6.

Estates (including any successors to any of the OpCo Debtors or their Estates …)… any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise … based on, relating to, or in any manner arising from, in whole or in part, any of the OpCo Debtors (including the capital structure, ***management,*** ownership, or operations thereof), …***the Prepetition OpCo First Lien Credit Agreement***, …***any Avoidance Actions held by any of the OpCo Debtors or their Estates***, any intercompany transactions performed by any of the OpCo Debtors . . . or any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the OpCo Plan Effective Date…***other than Claims and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction***.

OpCo Plan § VIII(A)(2) (the "OpCo Plan Release") (emphases added).

10.     The Reorganized Debtors acknowledged that the OpCo Plan Release was given in exchange for valuable consideration received and was the product of "extensive" arm's-length negotiations. Compl. ¶ 99. It was also a material inducement for non-Debtor parties to enter into the pre-petition Restructuring Support Agreement ("RSA") and to support the OpCo Plan. The Management Defendants contributed substantial value in negotiating, formulating, and implementing the RSA and the OpCo Plan, and agreed to release their own potential claims against various parties. The Management Defendants also agreed to support a plan that divested them of all of their equity and agreed to enter into post-closing consulting agreements with the Reorganized Debtors. In return, the Management Defendants received one item of consideration: the comprehensive release that was included in the OpCo Plan and approved by this Court.

### C.  After Exiting Bankruptcy, the Reorganized Debtors File Suit in Georgia to Recover the OpCo Distribution.

11.     On January 2, 2024, Reorganized Lucky Bucks filed a lawsuit in Georgia state court

5

against several former Lucky Bucks managers and employees, including Damani and Kassam, for engaging in an alleged scheme to defraud the Company (the "Georgia Lawsuit").[9]  Compl. ¶ 102. Among other claims, the Georgia Lawsuit asserted fiduciary-duty and fraudulent-transfer claims and sought to recover the value of the OpCo Distribution.  *See id.* at ¶ 292.  Notably, that suit asserted no claims against the Management Defendants and made clear none of the Management Defendants were aware of, or involved in, the alleged misconduct.[10]

12.     On January 23, 2024, the Holdings Trustee filed an adversary proceeding to unwind the Chapter 11 Plan on the grounds that the OpCo Debtor had failed to disclose the existence of the claims being pursued in the Georgia Lawsuit.[11]  On August 16, 2024, the Holdings Trustee and Reorganized Lucky Bucks reached a settlement agreement to resolve that action, in which they agreed the Holdings estate would share in any recoveries on the Georgia Lawsuit's fraudulent transfer/dividend claims.[12]  *Id.*  Afterward, they began cooperating under a common interest agreement.  *See id.*

13.     Since filing its Georgia Lawsuit, Reorganized Lucky Bucks has faced a series of setbacks including the denial of a temporary restraining order, partial dismissals of its claims, and

---

[9] *See Arc Gaming and Technologies, LLC v. Anil Damani, et al.*, No. 24-cv-131 (Super. Ct. Gwinnett County Jan. 2, 2024) (the "Georgia Lawsuit").

[10] *E.g.*, Georgia Lawsuit ¶ 58 ("there is currently *no evidence that the other board members [e.g., Sekhri and Boyden] were informed* about the activities alleged in this Complaint, which were actively concealed by the [Damani] Defendants") (emphasis added); *id.* ¶ 70 ("*Unbeknownst to Lucky Bucks' board or lenders*, at some point, the Defendants set up and/or conspired with what they called the B-Side businesses to steal Lucky Bucks' location contracts and opportunities") (emphasis added); *id.* ¶ 126 (Damani and Kassam "*did not disclose to Lucky Bucks' honest employees, its board*, or its lenders that they beneficially owned or controlled the counterparties" to the fraudulent purchase agreements) (emphasis added).

[11] *See* Complaint for Revocation Or, In the Alternative, Equitable Relief, *In re Lucky Bucks, LLC, et al.*, No. 23-10758 (KBO) (Bankr. D. Del. Jan. 23, 2024) [D.I. 339].

[12] *In re Lucky Bucks Holdings LLC*, No. 23-10756 (KBO) (Bankr. D. Del. Mar. 22, 2024) [D.I. 68].

repeated requirements to replead due to pleading deficiencies.[13]

### D. Failing to Gain Traction in Georgia, the Reorganized Debtors Re-File their Claims in This Court.

14. In May 2025, Reorganized Lucky Bucks suddenly informed this Court that it planned to voluntarily dismiss the Georgia dividend claims and "transfer" them to this Court as a "new" adversary proceeding.[14] Holdings has alleged that the refiling was actually Reorganized Lucky Bucks' attempt to recut its "sharing" agreement with Holdings because any recovery in this Court—as opposed to Georgia—would not be subject to the same sharing obligation even if the same claims are asserted in each proceeding.[15]

15. On June 2, 2025, Reorganized Debtors filed this Complaint pleading avoidance claims under the Bankruptcy Code, as well as state-law claims for alleged fiduciary breaches, and seeking to recover the OpCo Distribution. The Complaint alleges that, despite knowing Lucky Bucks was insolvent and that the distribution would harm the Company and its creditors, the Management Defendants and others "approved and facilitated" the OpCo Distribution. (¶¶ 7, 84-85, 109-110, 175). Specifically with respect to the Management Defendants, the Complaint states:

16. According to the Complaint, as officers of Lucky Bucks, Ijaz and Bouskill prepared financial statements, including a June 30, 2021 balance sheet, and provided them to Trive and the HoldCo Board (Compl. ¶¶ 68, 111, 168, 181(a)).

17. The Complaint also alleges that Ijaz and Bouskill "coordinated with Trive" in

---

[13] The Management Defendants incorporate by reference the description of events in the Georgia Lawsuit as set forth more fully in the Damani Defendants' brief in support of their Motion to Dismiss.

[14] *See* Status Update Regarding Dividend Litigation, *In re Lucky Bucks, LLC, et al.*, No. 23-10758 (KBO) (Bankr. D. Del. May 30, 2025) [D.I. 403].

[15] *See* Holdings Trustee Response to Reorganized Debtors Status Update, *In re Lucky Bucks, LLC, et al.*, No. 23-10758 (KBO) (Bankr. D. Del. June 2, 2025) [D.I. 404].

negotiating and executing the OpCo First Lien Credit Agreement (*id.* ¶¶ 75, 111, 168(b)), and helped facilitate the wire transfers for the OpCo Distribution. *Id.* ¶ 80.

18.     On July 30, 2025, Kassam, Boyden and Sekhri—the three members of the HoldCo Board—executed a written consent authorizing the OpCo Distribution (the "Lucky Bucks Consent") (Compl. ¶ 78) which—according to the Complaint—falsely stated the company's assets exceeded its liabilities. They also allegedly failed to seek independent financial advice or a solvency opinion before authorizing the OpCo Distribution (¶¶ 84, 108-110, 154). The Complaint further alleges that Boyden signed a false Solvency Certificate in connection with the OpCo First Lien Credit Agreement (¶¶ 84, 85, 110, 177).

19.     As an indirect equity owner in HoldCo, Sekhri received approximately $33.3 million from the OpCo Distribution through his entity, Seven Aces (¶¶ 88, 157(c)).

20.     Following the OpCo Distribution, the Company at Trive's instruction awarded a one-time "transaction bonus" to Boyden and Kassam ($50,000 each), and to Bouskill and Ijaz ($100,000 each). *Id.* ¶ 88.

21.     On these allegations, the Complaint asserts the following claims against the Management Defendants:

- Counts 1-3: avoidance and recovery of intentional fraudulent transfers (Sekhri and Seven Aces).

- Count 4: breach of fiduciary duties under Delaware law related to their authorization of the OpCo Dividend in their capacities as HoldCo Managers (Sekhri and Boyden).

- Count 5: aiding and abetting breach of fiduciary duties for allegedly assisting in facilitating the OpCo Distribution (Bouskill and Ijaz).

- Count 6: breach of fiduciary duties under Georgia law related to authorizing and facilitating the OpCo Distribution in their capacities as officers of Lucky Bucks (Sekhri, Boyden, Bouskill, and Ijaz).

- Counts 7 & 8: attorney's fees and punitive damages (all Management Defendants).

- Count 9: declaratory judgment that defendants' alleged acts "constitute actual fraud or willful misconduct" (all Management Defendants).

## LEGAL STANDARD

22.    "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 240 (3d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 241 (quoting *Iqbal*, 556 U.S. at 678).  The Court is "not required to," and, indeed, cannot "credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).

## ARGUMENT

### I.    The OpCo Plan Release Bars All of Reorganized Debtors' Claims

23.    A confirmation order is a final judgment on the merits concerning the issues addressed in the plan of reorganization.  As such, it is "accorded full *res judicata* effect and precludes the raising of issues which could or should have been raised during the pendency of the case." *In re Worldwide Direct, Inc.*, 280 B.R. 819, 821-22 (Bankr. D. Del. 2002) (citation omitted). For that reason, "courts have held that unless a plan expressly reserves the right to litigate a specific cause of action, confirmation of the plan will bar its assertion thereafter." *Id.* at 822.

24.    Here, the OpCo Plan preserves in the Reorganized Debtor claims "other than the Claims and Causes of Action released pursuant to the releases and exculpations contained in Article VIII hereof." OpCo Plan § IV(A)(7).  The release specifically includes "any and all Causes of Action . . . that such Person would have been legally entitled to assert based on or relating to . . . any Avoidance Actions held by any of the OpCo Debtor(s) or their Estates. . ." OpCo Plan §

VII(A)(2).  The Complaint acknowledges that each of the Management Defendants is a "Released Party" for purposes of the OpCo Plan Release.  Compl. ¶ 99.  On its face, the release prohibits the claims brought in this proceeding against the Management Defendants.

25.     However, in an effort to circumvent the Release, the Complaint alleges that the claims are preserved because they fall within the provision that exempts "Claims and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction."  OpCo Plan § VIII(A)(2) (the "Carveout provision").  Of course, this is a pure legal conclusion and is owed no deference: it is for the Court to construe the provision's meaning.  *In re Shenango Group Inc.*, 501 F.3d 338, 344 (3d Cir. 2007) ("In construing a confirmed plan of reorganization, we apply contract principles.").  For the reasons below, the Carveout provision is inapplicable by its terms, and, even if it could be applied here, the Complaint pleads no conduct by the Management Debtors that would qualify for exemption.

### A.    The Carveout Provision Is Inapplicable on Its Face

26.     For two reasons, the Carveout provision's plain language prevents the Reorganized Debtors from invoking it in this case.  First, while the OpCo Plan Release broadly releases "any and all *Claims and Causes of Action*," the Carveout provision is narrower: it encompasses only "*Claims.*"  This distinction matters because the OpCo Plan defines "Claims" to mean claims "*against an OpCo Debtor*, to the extent not paid during the course of the Chapter 11 Cases."  OpCo Plan § I(A) at 4 (emphasis added).  In contrast, "*Causes of Action*" is defined more broadly to include claims against any party.  *Id.*  By definition, no claim against the Management Defendants can be a "Claim" as defined in the OpCo Plan, so the Carveout provision cannot apply.  *See, e.g.*, *In re NorthEast Gas Generation, LLC*, 639 B.R. 914, 923 (Bankr. Del. 2022) ("The parties are

sophisticated parties who negotiated and drafted the terms of the Plan . . . Where a plan (like a contract) is unambiguous, its terms must be enforced as written.").[16]

27.     Second, the Carveout provision applies only to claims premised on "actual fraud, willful misconduct, or gross negligence, in each case, _solely to the extent determined by a Final Order of a court of competent jurisdiction_."  By ignoring this condition precedent for a prior judicial determination, the Reorganized Debtors purport to invoke the Carveout provision based on *allegations of* actual fraud, willful misconduct, or gross negligence. If that interpretation were accepted, it would completely eviscerate the OpCo Release because the Reorganized Debtors could circumvent it by merely alleging any "willful" misconduct regardless of the validity of the allegations.  It also would render meaningless the OpCo Plan's injunction against commencing an action in pursuit of a released claim.[17]  Simply put, the Reorganized Debtors gave up the right to use the carveout as the basis of their own first-instance action against any Released Parties.

28.     The better reading—and the one that comports with the Carveout provision's plain language—is that the Carveout provision only becomes operative following a successful suit brought by a non-releasing third party.  Were that situation to arise and were the Reorganized Debtors able to assert an injury, they could then—and only then—bring suit against a Released Party.  This interpretation of the Carveout provision is not only consistent with the text, but it also

---

[16] In the event the Reorganized Debtors attempt to escape this plain meaning as a scrivener's error or similar grounds, the Court should reject that effort.  "[I]t [is] not the Bankruptcy Court's role to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not—nor is it appropriate for this Court to do so.  Rather, it's the court's job to enforce the clear terms of contracts."  *In re Zohar III, Corp.*, No. 18-10512 (KBO), 2020 WL 3960820, at *7 (D. Del. July 13, 2020) (internal citations omitted).

[17] Section VIII.A.5 of the OpCo Plan permanently enjoins "all Persons who have held, hold, or may hold any Claims or Causes of Action against, or Interests in, any of the OpCo Debtors that have been released, discharged, or are subject to release or exculpation hereunder… from and after the OpCo Plan Effective Date" from pursuing such claims against Released Parties.  Such provisions are enforceable to bar a plaintiffs' suit at the pleading stage.  *See In re Samson Res. Corp.*, No. 15-11934-BLS (Bankr. D. Del. Mar. 29, 2021), D.I. 11 at ¶ 36-37 (granting the motion to dismiss the adversary complaint because the plan injunction enjoined plaintiff from pursuing any pre-effective date claims or causes of action), *aff'd*, No. 20-725-RGA, 2021 WL 1174534, at *9 (D. Del. Mar. 29, 2021) (finding "the Bankruptcy Court properly held that 'the Plan Injunction enjoins Ms. Jones from pursuing the claims.…'").

supports the principle of "finality" that is the very reason the Release exists in the first place. Plaintiffs' reading—which would allow debtors to end-run the Release and the injunction provision as long as they couch their claims as involving "willful misconduct" or "gross negligence"—is incompatible with the text and would strip the parties of the value the Release and injunction provision provide, namely protection from the initiation of suit by the Releasing Parties outside of very limited circumstances.

29.     Given the unique facts of this case, this result is neither surprising nor inequitable. A related debtor—Holdings—did not release the Management Defendants, and Holdings' case was even converted to Chapter 7 with the expectation that it would pursue similar claims related to subsequent dividend recapitalization transactions.  The Carveout provision's requirement for a prior final order, therefore, was purposefully drafted to ensure that Lucky Bucks could rely on the Carveout provision if—and only if—another final order first justified it.

30.     At least one Delaware Court has examined near-identical language and agreed that such a clause allows a releasing party to sue only *after* there has been a separate judicial determination of willful misconduct or gross negligence.  *See The Official Comm. of Unsecured Creditors of Allied Sys. Hldgs., Inc.* (*In re Allied Sys. Hldgs., Inc.*), Ch. 11 Case No. 12–11564(CSS), Adv. No. 12-50947–CSS (Bankr. D. Del.).

31.     In *In re Allied,* a Chapter 11 debtor emerged under a plan of reorganization, in which its former creditor, Yucaipa, became the controlling stockholder.  The plan created an exit credit facility from a collection of other lenders.  The facility initially barred Yucaipa from participating, but it was later amended to allow Yucaipa to acquire some of Allied's debt.  The amendment contained an explicit covenant not to sue, pursuant to which Yucaipa agreed to waive all claims against co-lenders "except to the extent caused by such Lender's or Agent's gross

negligence or willful misconduct on or after the date such Restricted Sponsor Affiliate becomes a Lender hereunder *as determined by a court of competent jurisdiction by a final and non-appealable judgment*." *Yucaipa Am. All. Fund I, LP v. SBDRE LLC*, No. 9151-VCP, 2014 WL 5509787, at *10 (Del. Ch. Oct. 31, 2014).   After Allied entered bankruptcy a second time, Yucaipa asserted cross-claims against two co-lenders (Black Diamond and Spectrum), asserting contractual and fiduciary breaches related to the amended credit agreement. Invoking that covenant and the applicable limitations period, Black Diamond and Spectrum moved to dismiss Yucaipa's cross-claims.  In an oral ruling, the Court granted the motion on each ground.  With respect to the carve-out to the covenant and the prerequisite of a prior final adjudication, the Bankruptcy Court held:

> I agree that the carve out as written deals with the narrow situation of a finding at some time post signing of the covenant by a court that there's been willful misconduct or gross negligence. And ... I don't think that is done in the auspices of a lawsuit directly related between the parties, it has to come from somewhere else. It's a little vague, but I think it's fair to say it has to be a narrow exception.[18]

*Id.* at *11.

33.     Yucaipa then sued Black Diamond and Spectrum for related claims in Delaware Chancery Court, which gave collateral estoppel effect to the Bankruptcy Court's holding, stating:

> Alleging willful misconduct is not enough: Yucaipa must show the existence of a final, non-appealable judgment finding gross negligence or willful misconduct by Black Diamond [and Spectrum] *before* Yucaipa can bring suit. This holding implies that some other party, such as another Lender, must bring suit and obtain a final, non-appealable judgment before Yucaipa could file its own lawsuit.

*Yucaipa*, 2014 WL 5509787, at *12 (emphasis in original).

33.     The same logic applies here.  Because the Complaint does not allege any prior

---

[18] Transcript from hearing on Feb. 27, 2013 at 109:14-110:5 (Adv. Pro. No. 12-50947, D.I. 162).  A true and correct copy of the transcript is attached as Fields Decl. Exhibit C.

judicial determination of misconduct, it cannot invoke the Carveout provision, and the Complaint

must be dismissed.  *See e.g., In re Arctic Glacier International, Inc.*, 255 F.Supp.3d 534, 554-59

(D. Del. 2017) (affirming the bankruptcy court's interpretation of the plan releases and discharges

and decision to dismiss the claims), *aff'd*, 901 F.3d 162 (3d Cir. 2018).

> **B.**     **The Reorganized Debtors Do Not Allege the Type of Misconduct Encompassed by the Carveout Provision.**

34.     Even if the Carveout provision did allow this matter to continue, the Complaint

does not plead relevant conduct by any Management Defendants that would be encompassed by

it.  The claims preserved by the Carveout provision are the most serious forms of intentional

misconduct: "actual fraud," "willful misconduct" and "gross negligence."  Yet, the Complaint has

very little to say about the Management Defendants and none of the allegations actually pleaded

suffice to demonstrate the requisite <u>intentional</u> wrongdoing.  The only "fraud"-based counts are

the avoidance claims, but even those are not premised on "actual fraud" by any of the Management

Defendants.

35.     With respect to Sekhri and Boyden, the Complaint alleges they signed a Lucky

Bucks Consent which "falsely stated" the Company's assets exceeded liabilities.  Even crediting

the conclusory allegation of insolvency, there are no plausible allegations that Sekhri or Boyden

*knew* the Consent was false or that they actually intended to deceive creditors or lenders.  Compl.

¶¶ 84, 108-110, 154-155, 177.

36.     For Ijaz and Bouskill, the Complaint alleges even less: it merely states they

prepared financials for internal review, assisted Trive in negotiating the First Lien Credit

Agreement, were aware of certain underperforming locations, and "facilitated" the wire transfers

to pay out the OpCo Distribution.  There is no allegation they made any false statements to third

parties or had any malicious intent, much less that any third party relied on their actions.  Compl.

¶¶ 111-112, 168, 181.

37.    The Complaint fares no better to the extent it attempts to tie its generalized allegations of the "insolvency" of Lucky Bucks to the contemporaneous knowledge of any of the Management Defendants.  The Complaint merely asserts in conclusory fashion that Lucky Bucks was balance-sheet insolvent at the time of the OpCo Distribution (July 30, 2021).  The sole supporting factual allegation is the alleged existence of a single "June 30, 2021 balance sheet," purportedly showing a $45 million deficit between the Company's assets and liabilities.  But, balance-sheet insolvency is generally determined by a *fair valuation* of assets and liabilities, not merely book values, and the Complaint says nothing about which values were supposedly reflected in the June 30 balance sheet much less that any of the Management Defendants saw this balance sheet or interpreted it the same way the Complaint does.  The Complaint also fails to explain why a balance sheet from June would necessarily reflect the financial picture for July, which is when the OpCo Distribution was made.  Certainly, at no time does the Complaint allege that Lucky Bucks missed payments, defaulted, or was subject to collection actions shortly following the distribution.

38.    In fact, the Complaint itself takes a myriad of positions as to when the Company allegedly became insolvent—pleading in places that Lucky Bucks "was already rendered insolvent by the OpCo Distribution" (Compl. ¶ 8) and in other allegations blaming the combination of the OpCo Distribution and subsequent Holdings Distribution for the Company's (presumably later) insolvency.  *See* Compl. ¶ 1 (stating that the "[OpCo] distribution (*and related subsequent distributions*) rendered the Company insolvent") (emphasis added).  These sorts of conclusory and contradictory allegations are insufficient to plausibly plead insolvency, much less knowledge of insolvency, as of the date of the OpCo Distribution. *In re Tropicana Ent., LLC*, 520 B.R. 455, 472

(Bankr. D. Del. 2014) ("The Amended Complaint's recitation of the words 'insolvency' or 'financial collapse'—without more—is not enough to support a plausible claim of insolvency.").

39.     As a result, the Complaint fails to plead any of the claims preserved by the Carveout.  Fraud requires that the Complaint allege: (1) a false representation of material fact, (2) knowledge of falsity, (3) intent to induce reliance, (4) justifiable reliance, and (5) damages. *See Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015).  But there are no allegations that any Management Defendant knew any statement they made was false when made, and the Complaint reliably fails to plead materiality or reliance with respect to the few actions by the Management Defendants it even identifies.

40.     Similarly, the Delaware courts have defined "willful misconduct" to mean "intentional . . . malicious conduct or conduct designed to defraud or seek an unconscionable advantage."  *Dieckman v. Regency GP LP*, No. 11130-CB, 2021 WL 537325, at * 36 (Del. Ch. Feb. 15, 2021).  Again, however, the Complaint is devoid of any allegations the Management Defendants acted in an intentionally malicious way or sought an "unconscionable" advantage.[19]

41.     Nor do Plaintiffs recover any ground by merely intoning that they allege fraudulent transfer claims and such a claim "[b]y its very nature. . . arises from and/or relates to acts and/or omissions by the members of the HoldCo Board . . . that constitute 'actual fraud'" and therefore is not released by the OpCo Plan.  Compl. ¶ 106.  This position entirely vitiates the language of the Release.  The Release specifically includes "any Avoidance Actions held by any of the OpCo Debtors," and Counts 1 through 3 (brought pursuant to Section 548 and 544(b), respectively) are each an "Avoidance Action."  The only plausible way to give meaning to this language is to conclude that only actions involving <u>actual</u> fraud are preserved which means <u>actual</u> fraud must be

---

[19] The Complaint does not allege any defendants acted with "gross negligence."

16

pleaded, element by element, as to each defendant.  Simply intoning that the Complaint includes fraudulent transfer claims and that all such claims constitute "actual fraud" does not suffice.

## II.    The Actual-Fraudulent-Transfer Claims Should Be Dismissed for Additional Reasons (Counts 1-3).

42.    In Counts 1 through 3, the Reorganized Debtors assert claims against Sekhri and Seven Aces for avoidance and recovery of the $33.3 million OpCo Distribution as actual fraudulent transfers under the Bankruptcy Code,[20] and under Delaware's and Georgia's state fraudulent transfer laws.[21]

43.    In this context, the fraudulent transfer statutes of Delaware and Georgia are substantively similar and require the same showing for "actual fraud" as does Section 548(a)(1)(A): namely, the Complaint must plausibly plead that the debtor making the transfer did so "with *actual intent* to hinder, delay, or defraud" its creditors.  For the reasons below, the Complaint fails to do so.  These claims also fail as a matter of law because the transfers were authorized by the very entities—the OpCo Lenders—who today comprise Reorganized Lucky Bucks.

### A.    The Complaint Fails to Plead the OpCo Debtors Made the Transfers with the Requisite Fraudulent Intent under Rule 9(b).

44.    To avoid a transaction under Section 548(a)(1)(A), a plaintiff must show that the transaction was made "with actual intent to hinder, delay or defraud" creditors. Actual fraudulent

---

[20] Count 1 invokes Section 548(a)(1)(A), which empowers a trustee, or debtor-in-possession, to avoid any transfer by the debtor within two years of the petition date, upon a showing the debtor made the transfer "with actual intent to hinder, delay, or defraud" its creditors.

[21] Counts 2 and 3 are brought pursuant to Section 544(b), which authorizes a trustee, including a debtor-in-possession, to pursue any fraudulent-transfer claims that creditors could have previously asserted under state law.  *See* 6 DEL. C. § 1304(a)(1) ("[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor . . . ."); OCGA § 18-2-74(a)(1) ( "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor.").

transfer claims are subject to heightened pleading standards under Rule 9(b). *In re Charys Holding Co.*, No. 08-10289, 2010 WL 2774852, at *3 (Bankr. D. Del. July 14, 2010).

45.     The Third Circuit has held that § 548(a)(1)(A) "unambiguously focus[es] solely on the intent of the debtor." *In re Syntax-Brillian Corp.*, 573 F.App'x 154, 162 (3d Cir. 2014). Culpability or knowing participation on the part of the transferee is irrelevant under the statute for purposes of establishing this prima facie element of actual fraudulent transfer. *Id.* at 161-162.

46.     When direct evidence of fraudulent intent is unavailable, courts may rely on circumstantial evidence to infer actual fraudulent intent. *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544-45 (Bankr. D. Del. 2009). Such "badges of fraud" include: (i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits; control or dominion by the debtor over the property transferred; and (iv) secrecy or concealment of the transaction. *In re Hechinger Inv. Co., of Del.*, 327 B.R. 537, 551 (D. Del. 2005), *aff'd on other grounds*, 278 Fed. App'x 125 (3d Cir. 2008). "Because they are only evidence of the likelihood of fraud, badges of fraud are not given equal weight; and sometimes the circumstances indicate they should be given no weight at all." *In re Chin*, 492 B.R. 117, 131 (Bankr. E.D.N.Y. 2013). "[They] must be judged in the context of other evidence and in light of what reasonable implications can be drawn from it in a particular case." *In re Direct Access Partners, LLC*, 602 B.R. 495, 544 (Bankr. S.D.N.Y. 2019).

47.     While Reorganized Debtors purport to allege the existence of multiple badges of fraud, a closer look at the Complaint reveals only mundane facts about a fully disclosed pro rata dividend to shareholders following the Company's regular corporate procedures, none of which implies fraud. For example, the Complaint alleges that the equity holders who received the

transfers "were insiders of the Company" (close relationship badge), and that the transfers were not supported by consideration (lack of reasonably equivalent value badge). Compl. ¶ 122. But if these were sufficient to plead fraudulent intent, every dividend in a closely held company would qualify. *See Direct Access Partners*, 602 B.R. at 545 ("Every dividend is made without consideration for purposes of fraudulent transfer law, but that does not mean that one could or should conclude that every dividend payment is made with fraudulent intent."); *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, No. 3:10-CV-1842-G, 2013 WL 12124306, at *3 (N.D. Tex. Jun. 18, 2013) (concluding that "transfer to an insider and transfer shortly before a substantial debt was incurred" were "features of every spinoff transaction that involves debt" and were "insufficient as a matter of law to support a conclusion that the defendants actually intended to hinder, delay, or defraud").

48.     Lastly, though the Reorganized Debtors pleads in conclusory terms that Lucky Bucks was insolvent at the time of the transfers, the Court need not credit those allegations for the reasons described in section I.B., *supra*. Even if credited, this allegation would at most plead a claim for avoiding a *constructively* fraudulent transfer, which Plaintiffs do not assert. *See, e.g.*, *In re Tribune Co. Fraudulent Conv. Litig.*, No. 11-MD-2296 (RJS), 2017 WL 82391, at *14 (S.D.N.Y. Jan. 6, 2017), *aff'd*, 10 F.4th 147 (2d Cir. 2021) (finding insolvency and lack of reasonably equivalent value insufficient to support inference of actual intent when standing alone because "[t]o hold otherwise would turn every constructive fraudulent conveyance claim into an actual fraudulent conveyance claim and thereby undermine the distinction between the two claims."); *In re Duke & King Acquisition Corp.*, 508 B.R. 107, 140 (Bankr. D. Minn. 2014) (presence of three badges, including transfer to insider and insolvency, "did not ignite in common to the inference" of actual fraud; "it did not even smolder").

B.      **As a Matter of Law, the Reorganized Debtors Cannot Show "Actual Intent to Defraud" in Connection with Transfers that the OpCo Lenders Approved.**

49.     Aside from these pleading deficiencies, the OpCo Distribution cannot be deemed "fraudulent" when the OpCo Lenders—who entirely comprise the ownership of Reorganized Lucky Bucks—consented to the transfers when made.  The purpose of fraudulent-conveyance law is to prevent a debtor from wrongfully transferring its assets out of the estate to defraud creditors who otherwise could look to those assets for repayment on their claims.  *See In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006) (such laws "aim[] to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away").  But "[c]reditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by [the transfer]," and fraudulent transfer law may not be invoked for their benefit.  *In re Lyondell Chem. Co.*, 503 B.R. 348, 383-84 (Bankr. S.D.N.Y. 2014).

50.     Thus, creditors who have authorized, consented to, participated in, or ratified a transfer cannot then avoid that transfer as fraudulent because "[a] fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance." *In re Adelphia Recovery Trust*, 634 F.3d 678, 691 (2d Cir. 2011) (quoting *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994)); *see also Lane v. Eggleston,* 284 F. 743, 745 (5th Cir. 1922) (a creditor cannot "avoid [a transfer], after he has voluntarily assented to it"); *In re Dunn*, No. ADV. SV-04-01343-KT, 2006 WL 6810930, at *8 (B.A.P. 9th Cir. Oct. 31, 2006) ("A creditor who ratifies or participates in a fraudulent transfer may be estopped from attacking the transfer.").

51.     That principal clearly applies here despite the invocation of the Bankruptcy Code. Reorganized Debtors cannot disclaim the negative effects of a transaction they fully evaluated and chose to undertake.  The First Lien Credit Agreement explicitly required that a portion of the

proceeds would be used to fund the OpCo Distribution.  *See* Fields Decl. Ex. B at Preliminary

Statements, § 6.11, § 1.01.  This was known and agreed to by the lenders from the outset, which

precludes any inference of "fraud."  *See, e.g.*, *In re Tribune Co. Fraudulent Conveyance Litig.*,

No. 11-md-2296 (RJS), 2017 WL 82391, at *15 (S.D.N.Y. Jan. 6, 2017) (no inference of fraud

where leveraged buyout transaction involved "sophisticated parties" and "received widespread

publicity").

### III.    The Fiduciary Duty Claims Fail for Additional, Independent Reasons (Counts 4-6).

52.    Counts 4 and 5 assert breaches of fiduciary duties to HoldCo, a Delaware limited

liability company, under the HoldCo LLC Agreement.[22]  Count 6 asserts breaches of fiduciary

duties to Lucky Bucks, a Georgia limited liability company, under the Lucky Bucks Operating

Agreement.[23]

53.    In addition to the fact that these are released claims, all three counts must be

dismissed as a matter of law given the fiduciary duty waiver and exculpation provisions of the

HoldCo LLC Agreement and the Lucky Bucks Operating Agreement.  Even if those agreements

did not preclude Plaintiffs' claims outright (which they do), Counts 4 through 6 would still fail to

plausibly state a claim under applicable Delaware and Georgia law.

**A.    Counts 4, 5 & 6 Must Be Dismissed because the HoldCo LLC Agreement and Lucky Bucks Operating Agreement Waived Fiduciary Duties and Exculpated Defendants from Liability.**

54.    Both Delaware and Georgia law give LLCs broad latitude to limit, or even

---

[22] Specifically, Count 4 asserts claims against Sekhri and Boyden for breaching their fiduciary duties to HoldCo as HoldCo Board Managers by authorizing the OpCo Distribution.  Count 5 asserts claims against Ijaz and Bouskill for "aiding and abetting" those alleged breaches by providing internal financial projections and assisting in wire transfers.

[23] Although Plaintiffs did not include the HoldCo LLC Agreement or Lucky Bucks Operating Agreement in the Complaint, the Court may consider them at the pleading stage because the agreement is integral to the allegations contained in the Complaint.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

completely eliminate, fiduciary duties.[24]  Both companies did so here.

55.     The HoldCo LLC Agreement expressly eliminates any fiduciary duties owed by the

Board of Managers:

> None of the Managers, in their capacity as a Manager, shall, to the
> **fullest extent** permitted by applicable law, have any duties
> (fiduciary or otherwise) or liabilities to the Company or any Member
> or any other Person that is a party to, or is otherwise bound by, this
> Agreement (other than (i) as expressly set forth in this Agreement
> and (ii) as expressly set forth in any other agreement between such
> Person, on the one hand, and the Company or any of its Subsidiaries,
> on the other hand), and no implied covenants, functions,
> responsibilities, duties, obligations or liabilities shall be read into
> this Agreement or exist against any of them (other than the implied
> contractual covenant of good faith and fair dealing).

HoldCo LLC Agreement § 5.01(e).  Further, Section 9.03 clarifies that, as "Covered Persons," the

HoldCo Managers have no duty to act in the interests of HoldCo or any third parties.

56.     Under the HoldCo LLC Agreement, Sekhri and Boyden did not owe fiduciary

duties to HoldCo and were not required to act in its interests.[25]  Because they are wholly premised

on the existence of such duties, Counts 4 and 5 fail as a matter of law and must be dismissed.  *See,*

*e.g.*, *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 361 (Del. 2013) (LLC agreements may

authorize a decision maker to consider and act based on its own interests, irrespective of the

entity's interests); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 181 (Del. Ch. 2014)

---

[24] *See* 6 Del. C. § 18-1101(c) (a "member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement"); *MKE Holdings Ltd. v. Schwartz*, No. CV 2018-0729-SG, 2019 WL 4723816, at *9 (Del. Ch. Sept. 26, 2019) (a Delaware LLC "may eliminate the fiduciary duties its managers would otherwise owe.").  *See also* OCGA § 14–11–305 (fiduciary duties and liabilities of LLC members and managers "may be expanded, restricted, or eliminated by provisions in the articles of organization or a written operating agreement" subject to limitations for intentional misconduct).

[25] The Complaint at times suggests, without explanation, that HoldCo directors were duty bound to act in the interests of Lucky Bucks "or its creditors."  *Id.* ¶ 154(a)-(g).  To the extent Counts 4 or 5 are implicitly premised on duties to creditors (which is unclear), those claims fail because the Complaint pleads no conceivable basis for such a duty under Delaware law.

(upholding provision that "confers contractual discretion on the Conflicts Committee to balance the competing interests of the Partnership's various entity constituencies when determining whether a conflict-of-interest transaction is in the best interests of the Partnership").

57.     In addition to fiduciary waiver, Delaware law provides that an LLC agreement may eliminate or limit "any and all liabilities for breach of contract and breach of duties (including fiduciary duties)" except for "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." 6 *Del. C.* § 18-1101(e).  This authorization "is broad, allowing exculpation of all liabilities for breach of fiduciary duty, including the duty of loyalty."  *In re Bayou Steel BD Holdings, LLC*, 642 B.R. 371, 401 (Bankr. D. Del. 2022).  The HoldCo LLC Agreement contains an exculpatory clause that limits the liability of the Managers to this same extent.  HoldCo LLC Agreement § 9.02.[26]

58.     In light of the exculpation clause, Plaintiffs' "ability to seek monetary liability against the Director Defendants for breaches of fiduciary duty . . . is gone," and Counts 4 and 5 must be dismissed.  *Bayou Steel*, 642 B.R. at 401; *see also generally In re Cornerstone Therapeutics Inc., Stockholder Litig.*, 115 A.3d 1173 (Del. 2015) ("A plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss"); *DG BF, LLC v. Ray*, No. 2020-0459-MTZ, 2021 WL 776742, at *10 (Del. Ch. Mar. 1, 2021) (dismissing breach of fiduciary duty claims because managers were exculpated from the monetary liability sought by the plaintiffs).

59.     The same is true for Count 6, which arises under the Lucky Bucks Operating Agreement.  That agreement vests the management of the Company solely in HoldCo as the "Sole

---

[26] Any attempt to argue that fiduciary duties must exist based on the exculpation provision fails.  The exculpation provision in Section 9.02 of the HoldCo LLC Agreement does not mention fiduciary duties, and Section 9.03 explicitly disclaims any duties, including fiduciary duties, that the managers or officers may have.

Member" (§ 3.1) and expressly eliminates any fiduciary duties to Lucky Bucks:

> To the fullest extent permitted by applicable law, a Covered Person (other than Officers, employees and expressly authorized agents of the Company or any of its Subsidiaries) has no duties (including fiduciary duties), that would otherwise exist at law, in equity or otherwise, to the Company…

Operating Agreement § 6.3. A "Covered Person" is defined to include, among others, the Sole Member (*i.e.*, HoldCo) and its directors, officers, managers, and members. *Id.* § 6.2.

60.     Accordingly, Count 6 must be dismissed to the extent it purports to assert a claim for breach of fiduciary duties in connection with the management of Lucky Bucks by HoldCo or its board. *See Stoker v. Bellemeade*, 615 S.E.2d 1 (Ct. App. Ga. 2005), *rev'd on other grounds*, *Bellemeade v. Stoker*, 280 Ga. 635 (Sup. Ct. 2006) (holding that LLC members "exercised the freedom granted by the LLC Act to restrict or eliminate those [fiduciary] duties by contract and to engage in activities which competed with the LLC's business").

61.     The Complaint attempts to circumvent this clear waiver by purporting to assert fiduciary claims against Sekhri, Boyden, Bouskill, and Ijaz in their capacities as "officers" of Lucky Bucks.  Specifically, it cites to Section 4.1 of Lucky Bucks Operating Agreement, which authorizes HoldCo to appoint "Officers" who "shall possess any and all fiduciary duties that are owed by officers and other persons pursuant to the Act," (*id.*), which are not waived in Section 6.3.  Citing these provisions, the Complaint asserts Count 6 on the premise that "officers of a Georgia limited liability company owe fiduciary duties of good faith, care and loyalty to the limited liability company."  Compl. ¶ 172.

62.     This contention misstates Georgia law: nothing in the Georgia LLC Act creates fiduciary duties for "officers or other persons" as such.  Courts have observed this distinction: "[w]hile the fiduciary duties of *managers* of an LLC are set forth in the Georgia Limited Liability

Company Act, the same is not true for the officers of an LLC." *In re Beaulieu Group, LLC*, No. 17-41677-BEM, 2021 WL 4469928, at *14 (Bankr. N.D. Ga. Sep. 29, 2021). Furthermore, the LLC Act "provides defenses to liability for managers of an LLC but not for officers of an LLC, which would be incongruous if managers and officers both owed fiduciary duties to the LLC." *Id.* at *15. For that reason, under Georgia law, "officers of an LLC do *not* owe fiduciary duties to the LLC," which defeats Count 6 as a matter of law. *Id.* (emphasis added).

> **B.      Even If Fiduciary Duties Had Not Been Eliminated, None of the Counts Would State a Plausible Claim**

63.      Putting aside that the LLC Agreements preclude the existence of any fiduciary duties, the Complaint would still fail to plead a claim because it is devoid of any plausible allegations of conduct that would constitute a fiduciary breach.

> *i.      Count 4: Breach of Fiduciary Duty (Delaware Law)*

64.      Count 4 alleges that Sekhri and Boyden, acting as HoldCo Board members, violated their duties of loyalty, good faith, and fair dealing—and thereby "willfully harmed HoldCo"—by approving the OpCo Distribution. The Complaint contends they (i) knew the Company was insolvent, (ii) authorized a distribution that served insiders rather than the Company, and (iii) ignored basic safeguards by obtaining neither independent financial advice nor a solvency opinion. *See* Compl. ¶ 154 (a)-(g).

65.      Under Delaware law, a claimant must plead (i) the existence of a fiduciary duty and (ii) facts showing a breach of that duty. *Heller v. Kiernan*, No. Civ. A. 1484-K, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002). The duty of loyalty requires that directors place the interests of the entity above any personal interest not shared generally by members. *See In re USDigital, Inc.*, 443 B.R. 22, 41 (Bankr. D. Del. 2011). A viable loyalty claim

therefore must allege specific facts demonstrating disloyal or bad-faith conduct.[27]

66.     The Complaint's allegations against Sekhri and Boyden are conclusory and do not show conduct outside the protections of the business-judgment rule.  It nowhere claims that Sekhri received benefits unavailable to other equity holders, or that either defendant knowingly violated his duties.  At most, the Complaint faults them for omitting a solvency opinion or outside advice—criticisms that do not rise to a fiduciary breach.

67.     Plaintiffs assert that Sekhri and Boyden approved the distribution "despite being aware the Company was insolvent," but they allege no concrete facts establishing actual knowledge of insolvency.  The sole supporting allegation is their execution of the Lucky Bucks Consent, which stated that the Company's assets exceeded its liabilities after the OpCo Distribution.  The Complaint labels that statement false, citing the June 30, 2021 balance sheet, yet offers no facts showing that Sekhri or Boyden believed the Consent was inaccurate when signed.

68.     Instead, the pleading merely posits that Sekhri and Boyden "*must have known*" of the Company's insolvency as reflected by the June 2021 balance-sheet figures because the Consent referenced their review of that document. Compl. ¶ 84. This overlooks the Consent's explicit reliance not only on the June balance sheet but also on "*other information, reports and statements provided to HoldCo*," (*id.*), which the Complaint never addresses.  Thus, even accepting their awareness of the June balance sheet, that awareness does not plausibly imply that either defendant knew the Company was insolvent.

69.     Notably, the Complaint does not allege that Sekhri or Boyden knew of the alleged

---

[27] Plaintiffs do not attempt to allege a duty of care claim, which would fail in any event as unsupported by the pleadings.

"B-Side" fraud or that they ever misstated the Company's financial condition aside from the solvency representations, much less that they did so knowingly.  A distribution to equity holders— even one later challenged as improper—does not constitute a fiduciary breach absent particularized facts showing intentional misconduct or disloyal self-dealing.

        *ii.*        *<u>Count 5: Aiding and Abetting Breach of Fiduciary Duties (Delaware Law)</u>*

70.     In Count 5, Plaintiffs assert that, as officers of Lucky Bucks, Bouskill and Ijaz aided and abetted Sekhri's and Boyden's alleged breaches of loyalty to HoldCo by: (a) preparing Lucky Bucks's financial statements, (b) coordinating with Thadani and other Trive personnel in obtaining the OpCo First Lien Credit Agreement; (c) coordinating the wire transfers of the OpCo Distribution; and (d) receiving, as reward for their participation in the OpCo Distribution, a $100,000 bonus each on the instruction of Thadani. *Id.* ¶ 168.

71.     To state a claim for aiding and abetting breach of fiduciary duty under Delaware law, a plaintiff must plead: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants; and (4) damages proximately caused by the breach.  *In re Cred Inc*., 650 B.R. 803, 823 (Bankr. D. Del. 2023).  The "knowing participation" element of an aiding and abetting claim "requires a showing that defendant both (1) participated in the breach; and (2) knew at the time that the conduct assisted constituted a breach of fiduciary duty."  *In re NewStarcom Holdings, Inc*., 547 B.R. 106, 119 (Bankr. D. Del. 2019).  "To establish scienter, the plaintiff must demonstrate that the aider and abettor had 'actual or constructive knowledge that their conduct was legally improper."  *Id.* (internal quotations omitted).

72.     For the reasons described, Count 4 fails to state a claim for a breach of fiduciary duties by Sekhri and Boyden.  Because this is a required element to plead an aiding and abetting

claim, Count 5 likewise fails to state a claim against Bouskill and Ijaz.[28]

      *iii.*      *Count 6: Breach of Fiduciary Duties (Georgia Law)*

73.     Based on the same conduct cited above, Count 6 asserts that all four Management Defendants breached fiduciary duties to Lucky Bucks in their capacities as Lucky Bucks officers. As previously noted, however, neither the Lucky Bucks LLC agreement nor Georgia law imposes fiduciary duties on the officers of LLCs.  And the Complaint's allegations are woefully insufficient even were some duty to exist.  *See UWork.com, Inc. v. Paragon Techs., Inc.*, 740 S.E.2d 887, 896 (Ct. App. Ga. 2013) (en banc) (quotation omitted) ("It is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach.").

74.     It is undisputed that HoldCo was the managing member of Lucky Bucks and responsible for directing its operations.  In that context, the Complaint's allegations against the Management Defendants are most properly characterized as administrative acts related to the OpCo Distribution which are not sufficiently tied to the harm allegedly suffered much less to a breach of any sort of duty.  For example, the Complaint attacks Bouskill and Ijaz for preparing Lucky Bucks's financial statements (including the June 30 balance sheet) and coordinating with Thadani and other Trive personnel in obtaining the OpCo First Lien Credit Agreement.  Compl. ¶ 181.  It also criticizes Sekhri, Bouskill and Ijaz for their roles in sending the wire transfers for the OpCo Distribution.  But acts such as preparing financial statements and sending wire transfers are administrative and not fiduciary, particularly in the absence of any facts pleaded concerning lack

---

[28] Even if Count 4 had plausibly stated a primary breach by Sekhri or Boyden, Count 5 would still fail because, as described in section II, there are no allegations that Bouskill or Ijaz engaged in any wrongdoing whatsoever—much less that they did so "knowingly," as required for an aiding and abetting claim.

of good faith related to those specific acts.[29]

75.     Even the allegation that "Boyden, as EVP of Business Development of Lucky Bucks, signed the false Solvency Certificate in connection with obtaining the OpCo First Lien Credit Facility necessary to pay the OpCo Distribution," (Compl. ¶¶ 176-77), fails because it relies on nothing more than unsupported speculation that "Boyden and Sekhri must have known" the Company was insolvent (*id.* ¶ 84), which is insufficient as stated above.  And, while the Complaint notes that certain Management Defendants were paid "transaction bonuses" following the OpCo Distribution, there is no allegation that they knew those bonuses were going to be paid or that the amounts were sufficient to motivate some sort of misconduct.

76.     In sum, Count 6 fails because Reorganized Debtors have not plausibly "alleged conduct that rises to the level of fraud, bad faith or an abuse of discretion sufficient to establish a claim for breach of fiduciary duty." *Brock Built, LLC v. Blake*, 686 S.E.2d 425, 431 (Ct. App. Ga. 2009) (affirming judgment for defendant, overruled on other grounds).

## IV.    The Remaining Claims Should Be Dismissed

### A.    Attorney's Fees and Punitive Damages (Counts 7 & 8)

77.     Finally, Plaintiffs' claims for attorney's fees and punitive damages under Georgia law must also fail.  "An award of attorney fees, costs, or punitive damages is derivative of plaintiff's substantive claims." *Stephen A. Wheat Tr. v. Sparks*, 754 S.E.2d 640, 681-82 (Ct. App. Ga. 2014).  Because the Trustee has failed to plausibly plead any substantive claims, these ancillary remedies are precluded as a matter of law.  *J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*, 644 S.E.2d 440, 449 (Ct. App. Ga. 2007) ("[L]itigation costs[] and punitive damages . . . are not

---

[29] Under the Georgia LLC Act, unless otherwise modified by agreement, an LLC's managers must act (1) "[i]n a manner they believe in good faith to be in the LLC's best interests," and (2) "[w]ith the care an ordinarily prudent person in a similar position would exercise under similar circumstances." O.C.G.A. § 14-11-305(1).

recoverable since [plaintiff's] substantive claims have failed.").

**B.     Claim for Declaratory Judgment (Count 9).**

78.     Finally, the Complaint seeks a declaratory judgment "that the Defendants' alleged acts or omissions as set forth above constitute actual fraud or willful misconduct" for purposes of the OpCo Plan, the HoldCo LLC Agreement and the Lucky Bucks Operating Agreement." Compl. ¶ 195.

79.     Declaratory relief is unavailable "where a claimant merely has repackaged in the language of a declaration an adequately pleaded affirmative count." *Blue Cube Spinco LLC v. Dow Chem. Co*., No. N21C-01-214 PRW CCLD, 2021 WL 4453460, at *15 (Del. Super. Ct. Sept. 29, 2021). To survive, "a declaratory count must be 'distinct' from the affirmative counts in the complaint such that a decision on the affirmative counts would not resolve the declaratory count." *Id.* (quotation omitted); *DuPont De Nemours, Inc. v. Hemlock Semiconductor Operations LLC*, No. N23C-10-261 PRW CCLD, 2024 WL 3161799 (Del. Super. Ct. June 10, 2024) (rejecting a claim for declaratory judgment that was "wholly and completely duplicative" of affirmative claims).

80.     Here, Count 9 is wholly duplicative of Plaintiffs' other claims and merely parrots the allegations Plaintiffs make in support of their avoidance and fiduciary duty counts. Because these issues will necessarily be decided through resolution of those affirmative claims, it must be dismissed.

**CONCLUSION**

For the reasons above, the Management Defendants and Seven Aces Holdings ULC respectfully request that the Court dismiss the claims against them with prejudice.

Dated: September 5, 2025
Wilmington, DE

**POTTER ANDERSON & CORROON LLP**

*/s/ M. Blake Cleary*
M. Blake Cleary (No. 3614)
Jesse L. Noa (No. 5973)
James R. Risener (No. 7334)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Phone: (302) 984-6026
Email: bcleary@potteranderson.com
       jnoa@potteranderson.com
       jrisener@potteranderson.com

-and-

**ALLEN OVERY SHEARMAN STERLING US LLP**

C. Luckey McDowell (*pro hac vice* application pending)
Ian E. Roberts (*pro hac vice* application pending)
Jacob Fields (*pro hac vice* application pending)
2601 Olive St 17th Floor
Dallas, TX 75201
Phone: (214) 271-5777
Email: luckey.mcdowell@aoshearman.com
       ian.roberts@aoshearman.com
       jacob.fields@aoshearman.com

-and-

Samuel Cooper (*pro hac vice* application pending)
800 Capitol Street, Suite 2200
Houston, Texas, 77002
Phone: (713) 354-4838
Email: samuel.cooper@aoshearman.com

*Counsel for Manu Sekhri, James Boyden, Ryan Bouskill,*
*Hassan Ijaz, and Seven Aces Holdings ULC*

31