**<u>EXHIBIT A</u>**

**FIFTH AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT**


**of**


**LUCKY BUCKS HOLDCO, LLC**


**Dated as of October 31, 2020**




THE LIMITED LIABILITY COMPANY INTERESTS IN LUCKY BUCKS HOLDCO, LLC REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

ARTICLE I CERTAIN DEFINITIONS ............................................................................ 2

    1.01 Certain Definitions ............................................................................................ 2

    1.02 Rules of Construction ...................................................................................... 16

    1.03 Computations of Time ..................................................................................... 16

ARTICLE II THE COMPANY AND ITS MEMBERS ..................................................... 16

    2.01 Fourth Operating Agreement ........................................................................... 16

    2.02 Formation and Filings ...................................................................................... 17

    2.03 Name ................................................................................................................ 17

    2.04 Term ................................................................................................................. 17

    2.05 Business Purpose and Powers .......................................................................... 17

    2.06 Principal Place of Business .............................................................................. 17

    2.07 Registered Office and Registered Agent .......................................................... 17

    2.08 Partnership Status ............................................................................................ 18

    2.09 Ownership of Property ..................................................................................... 18

    2.10 Members .......................................................................................................... 18

    2.11 Affiliate Transactions ...................................................................................... 19

    2.12 No State-Law Partnership ................................................................................ 19

    2.13 Noncompetition; Other Business Activities ..................................................... 19

    2.14 Accountants ..................................................................................................... 20

    2.15 Qualification in Other Jurisdictions ................................................................. 20

    2.16 Gaming Laws Compliance ............................................................................... 20

    2.17 Bankruptcy of a Member ................................................................................. 22

    2.18 Set-off Right .................................................................................................... 22

ARTICLE III CAPITAL STRUCTURE; CAPITAL CONTRIBUTIONS ...................... 22

    3.01 Capital Structure .............................................................................................. 22

    3.02 Reserves ........................................................................................................... 24

    3.03 Certificates of Membership Interests ............................................................... 24

    3.04 Voting Rights ................................................................................................... 26

    3.05 Maintenance and Changes to Schedule 1 ........................................................ 26

    3.06 Initial Capital Contributions ........................................................................... 27

    3.07 Additional Capital Contributions .................................................................... 27

    3.08 No Contributions in Kind ................................................................................ 28

3.09 Adjustments to Percentage Interests of the Members upon Additional Issuances .............................................................................................. 28

3.10 No Withdrawal of Contributions ............................................................ 29

3.11 Preemptive Rights .................................................................................. 29

ARTICLE IV CAPITAL ACCOUNTS; ALLOCATIONS; DISTRIBUTIONS ........................ 30

4.01 Capital Accounts .................................................................................... 30

4.02 Book Allocations .................................................................................... 31

4.03 Allocations with Respect to Contributed Property; Agreed Value Adjustments, Depreciation Recapture and Excess Nonrecourse Liabilities ......... 33

4.04 Distributions .......................................................................................... 34

4.05 Tax Distributions ................................................................................... 34

4.06 Withholding and Other Tax Payments and Obligations ........................... 34

ARTICLE V MANAGEMENT AND GOVERNANCE OF THE COMPANY ........................ 35

5.01 Board of Managers .................................................................................. 35

5.02 Officers; Agents ...................................................................................... 42

5.03 Member Approval of Certain Matters ...................................................... 43

5.04 Certain Third Party Observation Rights .................................................. 45

ARTICLE VI TRANSFER OF MEMBERSHIP INTERESTS ........................................... 45

6.01 Limitation on Transfer ........................................................................... 45

6.02 Permitted Transfers ................................................................................ 46

6.03 Conditions to Transfers .......................................................................... 48

6.04 Additional Requirements ........................................................................ 49

6.05 Right of First Refusal ............................................................................. 49

6.06 Tag-Along Rights ................................................................................... 51

6.07 Drag-Along Rights ................................................................................. 53

6.08 Tolling .................................................................................................... 54

6.09 August 2020 MIPA .................................................................................. 54

ARTICLE VII REPURCHASE RIGHTS .................................................................... 54

7.01 Repurchase Event ................................................................................... 54

7.02 Fair Market Value Determination ........................................................... 55

ARTICLE VIII BOOKS, RECORDS, FINANCIAL AND TAX MATTERS ........................ 56

8.01 Fiscal Year ............................................................................................. 56

8.02 Maintenance of Accounts, Books and Records ........................................ 56

8.03 Preparation of Tax Returns ................................................................ 56

8.04 Bank Accounts; Temporary Investments ............................................ 56

8.05 Tax Elections ..................................................................................... 56

8.06 Tax Returns and Information; Tax Matters Member ........................... 57

8.07 Financial Statements ......................................................................... 58

8.08 Information Rights ............................................................................. 59

ARTICLE IX LIABILITY, EXCULPATION, INDEMNIFICATION AND
        INSURANCE ................................................................................ 59

9.01 Liability ............................................................................................. 59

9.02 Exculpation ........................................................................................ 59

9.03 Duties and Liabilities of Covered Persons ......................................... 60

9.04 Indemnification .................................................................................. 60

9.05 Defense Expenses .............................................................................. 61

9.06 Insurance ............................................................................................ 61

9.07 Exclusions Related to Purchase Agreements ...................................... 61

9.08 Specified Indemnitees ........................................................................ 61

ARTICLE X DISSOLUTION AND TERMINATION .......................................... 62

10.01 Events of Dissolution ....................................................................... 62

10.02 Winding-Up, Liquidation and Distribution of Assets ......................... 63

10.03 Certificate of Cancellation ............................................................... 63

10.04 Effect of Filing of Certificate of Cancellation ................................... 63

10.05 Return of Contribution Nonrecourse to Other Members .................... 63

10.06 No Action for Dissolution ................................................................. 64

ARTICLE XI REPRESENTATIONS AND WARRANTIES ................................. 64

11.01 Corporate Matters ............................................................................ 64

11.02 Enforceability ................................................................................... 64

11.03 No Conflict ....................................................................................... 65

11.04 Governmental Approvals .................................................................. 65

11.05 No Litigation .................................................................................... 65

11.06 Securities Laws ................................................................................ 65

11.07 FCPA; Prohibited Persons ................................................................ 66

11.08 Gaming Laws .................................................................................... 66

ARTICLE XII MISCELLANEOUS ........................................................................ 66

    12.01 Expenses ........................................................................................... 66

    12.02 Further Assurances............................................................................ 66

    12.03 Notices .............................................................................................. 66

    12.04 No Right to Partition......................................................................... 68

    12.05 Successors and Assigns..................................................................... 68

    12.06 Amendments; Waivers...................................................................... 68

    12.07 Governing Law; Waiver of Jury; Consent to Jurisdiction and Service of
         Process ............................................................................................. 69

    12.08 Captions ............................................................................................ 70

    12.09 Counterparts ..................................................................................... 70

    12.10 Entire Agreement .............................................................................. 70

    12.11 No Third Party Beneficiaries ........................................................... 70

    12.12 Member Estoppel Certificates.......................................................... 70

    12.13 Remedies........................................................................................... 70

    12.14 Severability ...................................................................................... 71

    12.15 Specific Performance ....................................................................... 71

    12.16 Member Resignation......................................................................... 71

List of Schedules:

Schedule 1 — Members Schedule

# FIFTH AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
### OF
## LUCKY BUCKS HOLDCO, LLC

THIS **FIFTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**, dated as of October 31, 2020, is adopted and entered into by and among Lucky Bucks Holdco, LLC, a Delaware limited liability company (the "**Company**"), and the Members (as defined below).

WHEREAS, immediately prior to the Initial Contribution (as defined below), Anil Damani ("**Damani**") was the holder, beneficially and of record, of all the issued and outstanding equity interests of Lucky Bucks, Inc., a Georgia corporation treated as an S corporation for federal and state income tax purposes ("**LBI**");

WHEREAS, prior to the QSub Election and the Conversion (in each case, as defined below), pursuant to that certain Contribution Agreement, dated as of October 3, 2016, by and between Damani and Lucky Bucks Ventures, Inc., a Georgia corporation ("**Damani Member**"), Damani contributed all of his equity interests in LBI to Damani Member in exchange for all of the equity interests thereof (the "**Initial Contribution**");

WHEREAS, following the Initial Contribution, Damani Member filed an election to treat LBI as a qualified subchapter S subsidiary (the "**QSub Election**");

WHEREAS, following the Initial Contribution and the QSub Election, LBI filed a certificate of conversion with the State of Georgia and was converted to a Georgia limited liability company (the "**Conversion**") and changed its name to Lucky Bucks, LLC;

WHEREAS, following the Initial Contribution, the QSub Election and the Conversion, Damani Member contributed all of its equity interests in Lucky Bucks to the Company in exchange for all the equity interests of the Company (the "**Second Contribution**" and together with the Initial Contribution, the "**Contributions**");

WHEREAS, following the Contributions, the QSub Election and the Conversion, Southern Star Gaming, LLC, a Delaware limited liability company ("**Quantum Member**"), the Company, Damani Member and Damani entered into that certain Membership Interest Purchase Agreement, dated as October 21, 2016 (as amended from time to time, the "**October 2016 MIPA**"), pursuant to which Damani Member sold and transferred to Quantum Member Class A Units representing fifty-one percent (51%) of the issued and outstanding Class A Units of the Company;

WHEREAS, to give effect to the transactions contemplated by the October 2016 MIPA, the Initial Operating Agreement was entered into by the parties thereto;

WHEREAS, effective as of April 9, 2018, the Second Operating Agreement was entered into by the parties thereto, which amended and restated the Initial Operating Agreement in its entirety;

WHEREAS, the Quantum Member, Company, Quantum Gaming Corp., a Delaware

corporation, which is the parent entity of Quantum Member, Damani Member and Damani entered into that certain Membership Interest Purchase Agreement, dated as of August 1, 2018 (as amended from time to time, the "**August 2018 MIPA**"), pursuant to which Damani Member sold and transferred to Quantum Member Class A Units representing an additional nine percent (9%) of the issued and outstanding Class A Units of the Company (the "**Second Equity Sale**");

WHEREAS, to give effect to the Second Equity Sale, the Third Operating Agreement was entered into by the parties thereto, which amended and restated the Second Operating Agreement in its entirety;

WHEREAS, the Company, Damani Member and Damani entered into that certain Membership Interest Purchase Agreement, dated as of July 15, 2019 (as amended from time to time, the "**July 2019 MIPA**"), pursuant to which Damani Member sold, transferred and surrendered to the Company 14.28 Class A Units, which Class A Units were terminated and cancelled (the "**Additional Equity Sale**");

WHEREAS, to give effect to the Additional Equity Sale, the Fourth Operating Agreement was entered into by the parties thereto, which amended and restated the Third Operating Agreement in its entirety;

WHEREAS, the Company, Damani Member, Damani, Quantum Member, TCFIII LLC Member and TCFIII LP Member entered into that certain Membership Interest Purchase Agreement, dated as of August 25, 2020 (as amended from time to time, the "**August 2020 MIPA**"), pursuant to which Damani Member sold, transferred and delivered 4.286 Class A Units in the aggregate to TCFIII LLC Member and TCFIII LP Member (the "**TCFIII Equity Sale**"); and

WHEREAS, in connection with the consummation of the TCFIII Equity Sale, the parties hereto desire to amend and restate the Fourth Operating Agreement in its entirety.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein and other good and valuable consideration, the parties hereto set forth their agreement as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.01 <u>Certain Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

"**Additional Capital Contributions**" has the meaning set forth in Section 3.07(a).

"**Additional Contribution Amount**" has the meaning set forth in Section 3.07(c).

"**Additional Contribution Notice**" has the meaning set forth in Section 3.07(c).

"**Additional Equity Sale**" has the meaning set forth in the recitals.

"**Affiliate**" means, with reference to a Person, any other Person that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the first Person. The term "control" shall mean the power to direct the affairs of such Person by reason of ownership of voting stock or other equity interests, by contract or otherwise. For purposes of this Agreement, it is expressly understood and agreed that neither the Company nor any of its Subsidiaries shall constitute an Affiliate of any Member with respect to any covenant in this Agreement which requires a Member to cause any of its Affiliates to take any action.

"**Affiliate Transaction**" has the meaning set forth in Section 2.11.

"**Agreed Value**" means:  (a) with respect to all property transferred to the Company as a Capital Contribution, the Fair Market Value of the property on the date it was contributed to the Company as determined by the Board of Managers; (b) with respect to the revaluation of Company property in accordance with the last sentence of Section 4.01(a), the Fair Market Value of such Company property at the time of the event requiring such revaluation as determined by the Board of Managers; and (c) with respect to all property distributed to a Member, the Fair Market Value of the property on the date it was distributed to the Member as determined by the Board of Managers.

"**Agreement**" means this Fifth Amended and Restated Limited Liability Company Agreement, as amended from time to time (and including all Schedules hereto).

"**Applicable Accounting Principles**" means either (as applicable): (a) IFRS or (b) GAAP, whichever principles are then used by the Company.

"**Approved Sale**" has the meaning set forth in Section 6.07(a).

"**Board of Managers**" has the meaning set forth in Section 5.01.

"**Business Day**" means any day that is not a Saturday, Sunday or a legal holiday on which banks are authorized or required by applicable law to be closed in Atlanta, Georgia.

"**Business Opportunity**" means an opportunity to own an interest in, or operate, provide services to, control or otherwise participate in the management of, any business or other commercial activity directly relating to owning, operating, maintaining, managing or commercially exploiting COAMs in the State of Georgia.

"**Capital Account**" means the capital account of a Member in the Company, calculated as set forth in Section 4.01(a).

"**Capital Contribution**" means, with respect to any Member, the aggregate amount of money and the Fair Market Value of any property (other than money) contributed to the capital of the Company with respect to such Member's Membership Interest, with such contributions to be properly reflected in the books and records of the Company by the Board of Managers.

"**Capital Transaction**" means the sale of assets of the Company that does not result in a Sale of the Company or a Liquidation Event.

"**Capitalized Lease**" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with the Applicable Accounting Principles, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capitalized Lease Obligations**" means, at the time any determination thereof is to be made, the amount of the liability of a Person in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with the Applicable Accounting Principles.

"**Certificate**" the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware (as the same may be amended, supplemented or modified from time to time).

"**Certificate of Membership Interest**" has the meaning set forth in Section 3.03(b).

"**Change of Control**" means, with respect to a Member, the acquisition, in a transaction or a series of related transactions, by any Person or group of Persons (other than an Affiliate or group of Affiliates of such Member) of Control of such Member or substantially all of its assets (as constituted immediately prior to such transaction or transactions).

"**Class A Units**" means the ownership interests in the Company relating to the class of limited liability company interest issued by the Company having the powers, preferences, rights, qualifications, limitations and restrictions specified in this Agreement as pertaining to the Class A Units. Except as otherwise expressly contemplated by Section 3.04, the Class A Units shall constitute voting Membership Interests.

"**COAM**" means a "Class B machine" as defined in Georgia Code, Title 50, Chapter 27, Article 3.

"**COAM Location**" means any location in the State of Georgia where the Company, Lucky Bucks or any of their respective Subsidiaries operates a COAM.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the preamble.

"**Company Exercise Period**" has the meaning set forth in Section 6.05(c).

"**Company Minimum Gain**" means, with respect to each Nonrecourse Liability of the Company, the amount of gain (of whatever character) that would be realized by the Company if it disposed of the Company property subject to such liability in a taxable transaction in full satisfaction of such liability (and for no other consideration), and by then aggregating the amounts so computed. It is further understood Company Minimum Gain shall be determined in a manner consistent with the rules of Treasury Regulation Section 1.704-2(d), including the requirement that if the book value of property (as determined for purposes of computing Net Income and Net Loss) subject to one or more Nonrecourse Liabilities differs from its adjusted tax basis, Company

Minimum Gain shall be determined with reference to such book value.

"**Company Notice**" has the meaning set forth in Section 6.05(c).

"**Contributing Member**" has the meaning set forth in Section 3.07(e).

"**Contribution Date**" has the meaning set forth in Section 3.07(c).

"**Contributions**" has the meaning set forth in the recitals.

"**Control**" means the possession, directly or indirectly, of the power to direct the management of a Person, whether through the ability to exercise voting power, by contract or otherwise; and the terms "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Conversion**" has the meaning set forth in the recitals.

"**Covered Person**" has the meaning set forth in Section 9.02(a).

"**Damages**" means all demands, claims, actions or causes of action, assessments, direct or indirect losses, damages, costs, fees, expenses, liabilities, judgments, awards, fines, sanctions, penalties, charges and amounts paid in settlement, including (a) reasonable costs, fees and expenses of attorneys, experts, accountants, appraisers, consultants, witnesses, investigators and any other agents of such Person, actually incurred in connection with any claim, demand, dispute, lawsuit, arbitration or other proceeding and (b) any reasonable costs, fee and expenses described in the foregoing clause (a) actually incurred in order to enforce a party's rights under this Agreement or any other agreement or document contemplated hereby.

"**Damani Member**" has the meaning set forth in the recitals.

"**Damani Specified Indemnitors**" means, collectively, Damani Member and each of its Affiliates (other than the Company and its Subsidiaries).

"**Depreciation**" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period for federal income tax purposes, except that if the Agreed Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Agreed Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis, provided that if the federal income tax depreciation, amortization or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Agreed Value using any reasonable method selected by the Board of Managers.  With respect to any asset of the Company for which depreciation is calculated in accordance with Treasury Regulations Section 1.704-3(d), Depreciation shall be computed in the same manner.

"**Dispute Notice**" has the meaning set forth in Section 7.02(b).

"**Drag-Along Notice**" has the meaning set forth in Section 6.07(b).

"**Dragged Holder**" has the meaning set forth in Section 6.07(b).

"**Dragging Member**" has the meaning set forth in Section 6.07(b).

"**Electronic Transmission**" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Equity Securities**" means, with regard to any Person, as applicable, (i) any capital stock, partnership, membership, joint venture or other ownership or equity interests, or other share capital of such Person, (ii) any securities of such Person directly or indirectly convertible into or exchangeable or exercisable for any capital stock, partnership, membership, joint venture or other ownership or equity interests, or other share capital (whether voting or non-voting, whether preferred, common or otherwise) of such Person or containing any profit participation features with respect to such Person, (iii) any warrants, rights or options directly or indirectly to subscribe for or to purchase any capital stock, partnership, membership, joint venture or other ownership or equity interests, other share capital of such Person or securities containing any profit participation features with respect to such Person or directly or indirectly to subscribe for or to purchase any securities directly or indirectly convertible into or exchangeable or exercisable for any capital stock, partnership, membership, joint venture or other ownership interests, other share capital of such Person or securities containing any profit participation features with respect to such Person, (iv) any share or unit appreciation rights, phantom share or unit rights, contingent interest or other similar rights relating to such Person, or (v) any Equity Securities of such Person issued or issuable with respect to the securities referred to in clauses (i) through (iv) above in connection with a combination of shares, units, recapitalization, exchange, merger, consolidation or other reorganization.  Unless the context otherwise requires, with regard to the Company, the term "Equity Securities" shall not include the Membership Interests or Units of the Company held by Members.

"**Event of Bankruptcy**" means the happening of any of the following events with respect to a Person:  making an assignment for the benefit of creditors; the voluntary or involuntary institution of proceedings to be adjudicated bankrupt or insolvent; the entry of an order for relief in any bankruptcy or insolvency proceeding; the filing of a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law; the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of the foregoing nature; commencing, consenting to or acquiescing in any proceeding seeking the appointment of a trustee, receiver, liquidator, sequestrator (or other similar official) for itself or all or any substantial part of its properties; or admitting in writing the inability to pay debts generally as they become due.

"**Event of Default**" means, with respect to Damani Member, any (i) intentional or willful breach of this Agreement that could reasonably be expected to have a materially adverse effect on the Company, any of its Subsidiaries and/or the other Members or their respective Affiliates, (ii) violation of Sections 2.13, 2.16, 11.07, or 11.08 or Article VI, (iii) prohibited or unauthorized use of any of the Company's or its Subsidiary's assets by Damani Member or its Affiliates, (iv) material breach of any other material agreement between Damani Member or any of its Affiliates,

on the one hand, and the Company, its Subsidiaries, or Quantum Member or any of its Affiliates, on the other hand (without implication that the contrary would otherwise be true, it is expressly understood and agreed that (1) each of the Restrictive Covenants Agreements constitutes such a material agreement and (2) the Separation Agreement constitutes such a material agreement) and (v) any failure by Damani Member to pay any indemnity obligation owed to any Purchaser or any of its Affiliates under any of the Purchase Agreements and such breach, default or violation contemplated by any of clauses (ii) — (v) continues for twenty (20) Business Days after Damani Member has been given written notice thereof by the Board of Managers, provided that if such a breach or violation is (x) curable, but of such a nature that it cannot reasonably be cured within such 20-day period, and (y) Damani Member in good faith begins efforts to cure it within such 20-day period and continues diligently to do so, Damani Member shall have a reasonable additional period thereafter to effect the cure, provided further that nothing herein shall limit any other Member, or the Board of Manager's ability to cause the Company, immediately (i.e., during the 20-day cure period referred to above) to seek equitable relief with respect to any such failure or violation, provided further that nothing herein shall limit Damani Member's obligation to pay Damages for such breach during such cure period.

"**Existing Credit Agreement**" has the meaning set forth in Section 6.02(a)(iv).

"**Fair Market Value**" means (i) in the case of any publicly traded security, the average of the closing sale prices thereof on the principal market on which it is traded for the last five (5) full trading days prior to the determination, and (ii) in the case of any other asset, property, Unit, Membership Interest or other Equity Security of the Company, the price, determined by the Board of Managers, at which a willing seller would sell and a willing buyer would buy such asset, property, Unit, Membership Interest or other Equity Security of the Company (as the case may be), as of the applicable valuation determination date (without taking into account events subsequent to that date) in an arm's-length transaction, with each party having full knowledge of the relevant facts, without either party having time constraints but with the expectation of concluding the purchase and sale within a reasonable time, without either party being under any compulsion to buy or sell, without discount for lack of consent or minority discount, and, assuming that (x) the parties will be bound by representations, warranties, covenants, indemnities, and undertakings that are then associated with owning the Company and (y) all regulatory, governmental and other approvals are attainable. For purposes of Article VII, the Fair Market Value of a Redeemed Member's Class A Units shall be the amount such Redeemed Member would receive with respect to such Class A Units if the Company sold all of its assets at Fair Market Value, paid or reserved for all liabilities, expenses, contingencies, obligations, indemnities and undertakings, and liquidated.

"**Family Member**" means, with respect to any Person, (x) the spouse, sibling, parent or lineal descendant of such Person and (y) all trustees and beneficiaries of any such Person that is a trust for the sole benefit of a Person or Persons listed in clause (x).

"**Financing Liens**" has the meaning set forth in Section 6.02.

"**Fiscal Year**" has the meaning set forth in Section 8.01.

"**Fourth Operating Agreement**" means that certain Fourth Amended and Restated

Limited Liability Company Agreement of the Company, dated as of July 15, 2019, by and between Damani Member and Quantum Member, as amended prior to October 31, 2020.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied. Subject to Section 1.02, all references to "GAAP" shall be to GAAP applied consistently with the principles used in the preparation of the financial statements described in Section 8.07.

"**Gaming Approval**" means any and all required approvals, authorizations, licenses, permits, consents, findings of suitability, registrations, clearances, exemptions and waivers of or from any Gaming Authority, including those relating to the receipt of or participation in revenues directly or indirectly derived therefrom (and including, but not limited to, the Gaming Licenses).

"**Gaming Authority**" means any federal, state, local, governmental, regulatory and administrative authorities, agencies, commissions, boards, bodies (including, but not limited to, the GLC) and officials responsible for or involved in the regulation of gaming or gaming activities carried on by or intended to be carried on by any Person in the United States of America (or any state therein or part thereof) which have authority over the Company, Lucky Bucks or any other Subsidiary or their respective business.

"**Gaming Laws**" means all federal, local, state, and provincial laws, judgments, decrees, orders, rules, and regulations pertaining to transacting business with a Prohibited Person or involving gambling, lotteries, sweepstakes, casinos, casino/hotels, slot or other gaming machines (including COAMs), other chance-based activities or games of skill, gaming, or gaming-related activities, including official legal interpretations of any Gaming Authority relating to any of the foregoing.

"**Gaming Licenses**" means the gaming permits and licenses required to operate COAMs in the State of Georgia held by the Company, Lucky Bucks, or any other Subsidiary (including, without limitation, any "Master license" as defined in Georgia Code, Title 50, Chapter 27, Article 3, held by Lucky Bucks).

"**GLC**" means the Georgia Lottery Corporation and each successor thereto.

"**IFRS**" means the body of pronouncements issued by the International Accounting Standards Board ("**IASB**"), including International Financial Reporting Standards and interpretations approved by the IASB, International Accounting Standards and Standing Interpretations Committee interpretations approved by the predecessor International Accounting Standards Committee, as in effect from time to time. Subject to Section 1.02, all references to "IFRS" shall be to IFRS applied consistently with the principles used in the preparation of the financial statements described in Section 8.07.

"**Indebtedness**" means, with respect to any Person, without duplication, all indebtedness of such Person for borrowed money.

"**Indemnified Losses**" has the meaning set forth in Section 9.04.

"**Independent Third Party**" means any Person who, immediately prior to a contemplated transaction, is not an Affiliate of any Member or group of Members who individually or collectively hold a Percentage Interest in excess of 5%.

"**Indirect Owner**" means with respect to a Member that is a corporation, an association, a partnership (limited or general), a joint venture, an estate, a trust, a limited liability company, a limited liability partnership or any other legal entity, any Person that, directly or indirectly, is the holder of Equity Securities of such Member or a trustee or beneficiary of a holder of Equity Securities of such Member.

"**Initial Contribution**" has the meaning set forth in the recitals.

"**Initial Operating Agreement**" means that certain Amended and Restated Limited Liability Company Agreement of the Company, dated as of October 21, 2016, by and between Damani Member and Quantum Member.

"**Initiating Notice**" has the meaning set forth in Section 7.02(a).

"**Interest Change Date**" has the meaning set forth in Section 4.02(a)(ii).

"**Investment**" means to (a) purchase or acquire any Equity Securities, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (b) make any acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including by way of merger, consolidation or other combination or (c) make, purchase, acquire or guarantee any advance, loan, extension of credit (other than trade payables in the ordinary course of business) or capital contribution to or any other investment in, any Person.

"**LBI**" has the meaning set forth in the recitals.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever having substantially the same practical effect as any of the foregoing.

"**Liquidation Event**" has the meaning set forth in Section 10.02.

"**LLC Act**" means the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101, et seq., as amended from time to time.

"**Loss Limit Allocations**" has the meaning set forth in Section 4.02(b)(vi).

"**Lucky Bucks**" means Lucky Bucks, LLC, a Georgia limited liability company.

"**Lucky Bucks Financing**" has the meaning set forth in Section 6.02.

"**Majority Approval**" has the meaning set forth in Section 5.03.

"**Majority Managers**" has the meaning set forth in Section 5.01(b).

"**Material Affiliate Transaction**" has the meaning set forth in Section 2.11.

"**Member**" means each of Quantum Member, TCFIII LLC Member, TCFIII LP Member and Damani Member for as long as such Person holds any Units together with any other Person who is (a) admitted to the Company as a Member after October 31, 2020, in accordance with the terms of this Agreement and (b) the holder of any Units.

"**Member Nonrecourse Debt**" has the meaning ascribed to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" has the meaning ascribed to the term "Partner Nonrecourse Debt Minimum Gain" in Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" has the meaning ascribed to the term "Partner Nonrecourse Deductions" in Treasury Regulations Section 1.704-2(i)(2).

"**Membership Interests**" means, with respect to each Member, such Member's limited liability company interests in the Company, including the rights of such Member to receive distributions and allocations, to vote on, consent to, or otherwise participate in any decision of the Members as provided in this Agreement; and any and all other rights, privileges and benefits to which such Member may be entitled as provided in this Agreement or the LLC Act.

"**Minority Approval**" has the meaning set forth in Section 5.03.

"**Minority Manager**" has the meaning set forth in Section 5.01(b).

"**Net Cash Flow**" means, for any Fiscal Year or other period, (i) any operating receipts of the Company for such year or period, including any receipts from a Subsidiary, less (ii) (x) any amounts required to pay the costs and expenses (including reserves) of the Company incurred for such year or period that are not paid from any Net Proceeds or Capital Contributions, or reserves thereof, (y) any debt service payments (including amortization) on any Indebtedness of the Company that are not paid from Net Proceeds or Capital Contributions, or reserves thereof, and (z) any increases in the Company's reserves, as determined by the Board of Managers in its sole discretion to be reasonably necessary to satisfy future operating expenses and debt service payments, plus (iii) any released Company reserves, as determined by the Board of Managers in its sole discretion.

"**Net Income or Net Loss**" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and

not otherwise taken into account in computing Net Income or Net Loss shall be added to such taxable income or loss;

(b)    Any expenditure of the Company described in Code Section 705(a)(2)(B) or treated as a Code Section 705(a)(2)(B) expenditure pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Income or Net Loss shall be subtracted from such taxable income or loss;

(c)    In the event the Agreed Value of any Company asset is adjusted pursuant to the last sentence of Section 4.01(a), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Loss for the Fiscal Year in which such adjustment occurs;

(d)    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Agreed Value (as reduced by Depreciation) of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Agreed Value;

(e)    In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing federal taxable income or loss, there shall be taken into account any Depreciation for such Fiscal Year or another period; and

(f)    Notwithstanding any other provision, any items which are specially allocated pursuant to Section 4.02(b) hereof shall not be taken into account in computing Net Income or Net Loss.  Nevertheless, such items shall be taken into account in adjusting Capital Accounts pursuant to Section 4.02(a) hereof.

"**Net Proceeds**" means the net proceeds (including any released reserves) of a Capital Transaction after payment of (i) the debts and liabilities of the Company or the applicable Subsidiary to the extent the Board of Managers shall (in its sole discretion) determine that debts and liabilities shall be paid or satisfied in connection with such transaction, including outstanding Indebtedness, (ii) if appropriate, the application of such proceeds to their intended use as determined by the Board of Managers in its sole discretion (*e.g.*, capital or leasehold improvements or repairs (or reserves therefor), or repayment of any outstanding loans), (iii) the payment of any and all costs and expenses incurred in connection with such transaction, including reasonable attorneys' fees and disbursements, brokerage fees, transfer or similar taxes, any and all reasonable and customary transaction costs, and, if appropriate, the costs and expenses incurred in connection with the dissolution and winding up of the Company or the applicable Subsidiary, and (iv) reserves established from time to time in such amounts and for such purposes as the Board of Managers shall determine (in its sole discretion) to be reasonably necessary to satisfy future operating expenses and debt service payments.

"**Non-Contributing Member**" has the meaning set forth in Section 3.07(e).

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations

Section 1.704-2(b)(3).

"**Notice of Election**" has the meaning set forth in Section 6.05(c).

"**Notice of Intention to Sell**" has the meaning set forth in Section 6.05(a).

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Offered Units**" has the meaning set forth in Section 6.05(a).

"**Officers**" has the meaning set forth in Section 5.02(a).

"**Organizational Documents**" means, with respect to any Person, collectively and, in each case, together with any modification of any term thereof, (a) the articles of incorporation, certificate of incorporation, certificate of limited partnership, constitution or certificate of formation of such Person, (b) the bylaws, limited liability company operating agreement, limited partnership agreement or joint venture agreement of such Person, and (c) any other constitutive, organizational or governing document of such Person, whether or not equivalent.

"**Percentage Interest**" means, at any time for any Member, the Percentage Interest of such Member set forth on **Schedule 1** attached hereto, as the same may be amended from time to time in accordance with this Agreement.  The combined Percentage Interest of all Members shall at all times equal 100%.  All adjustments to Percentage Interests calculated pursuant to the terms of this Agreement shall be calculated to the nearest one thousandth of a percent.

"**Permitted Transfer**" has the meaning set forth in Section 6.02.

"**Permitted Transferee**" has the meaning set forth in Section 6.02.

"**Permitted Transferor**" has the meaning set forth in Section 6.02.

"**Person**" means a corporation, an association, a partnership (general or limited), a joint venture, an estate, a trust, a limited liability company, a limited partnership, a limited liability partnership, any other legal entity, or an individual.

"**Prohibited Person**" shall mean any Person:

(a)     listed in the Annex to, or otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**") and/or a Person who is identified as or affiliated with a Person designated as a terrorist, or associated with terrorism or money laundering pursuant to regulations promulgated in connection with the USA Patriot Act;

(b)     that is owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(c)     with whom a regulated lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)     who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)     that is a Specially Designated National and Blocked Person on the most current list then published by OFAC;

(f)     that are directly or indirectly owned or controlled by the government of any country that is subject to an embargo or economic or trade sanctions by the United States Government or acting on behalf of a government of any country that is subject to such an embargo;

(g)     who has been convicted of, or plead guilty (or the equivalent) to, a felony, or any other crime or offense, that is reasonably likely to materially and adversely affect the operations, qualification, Gaming Approval, Gaming Licenses, suitability, or public image of the Company, any of the Subsidiaries, any Members or any of their Affiliates; or

(h)     who is otherwise identified by any governmental authority as a Person with whom any Member or the Company is prohibited from transacting business.

"**Purchase Agreements**" means, collectively, the October 2016 MIPA, the August 2018 MIPA, the July 2019 MIPA and the August 2020 MIPA (and each is individually referred to herein as a "**Purchase Agreement**").

"**Purchaser**" means Purchaser (as defined in each of the Purchase Agreements).

"**QSub Election**" has the meaning set forth in the recitals.

"**Quantum Member**" has the meaning set forth in the recitals.

"**Redeemed Member**" has the meaning set forth in Section 7.01.

"**Repurchase Event**" has the meaning set forth in Section 7.01.

"**Rescue Financing**" means any financing that is determined by the Board of Managers in good faith to be reasonably required to (a) remedy an existing, or avoid an imminent, default by the Company or any of its Subsidiaries under the Existing Credit Agreement or any other credit facility of the Company and/or any of its Subsidiaries, which default could reasonably be expected to have a material adverse effect on the Company or any of its Subsidiaries, (b) provide cash to the Company or any of its Subsidiaries so that they can continue as a going concern, avoid becoming insolvent or pay debts and/or obligations as they become due or (c) comply with applicable capital requirements under the rules or regulations of any governmental authority (including, without limitation, the GLC).

"**Restrictive Covenants Agreements**" means, collectively, (a) the Restrictive Covenants

Agreements (as defined in the October 2016 MIPA), each as amended from time to time, and (b) the Termination Restrictive Covenant Agreement.

"**Reverse Section 704(c) Allocations**" has the meaning set forth in Section 4.03(b).

"**Revised Partnership Audit Procedures**" means Code Sections 6221 through 6241, as amended by the U.S. Bipartisan Budget Act of 2015, together with any Treasury Regulations or guidance issued thereunder or successor provisions and any similar provision of state or local tax laws.

"**ROFR Exercise Period**" has the meaning set forth in Section 6.05(d).

"**ROFR Member Exercise Period**" has the meaning set forth in Section 6.05(c).

"**ROFR Offer**" has the meaning set forth in Section 6.05(b).

"**ROFR Offer Member**" has the meaning set forth in Section 6.05(a).

"**Sale of the Company**" means any transaction or series of related transactions pursuant to which any Independent Third Party shall acquire (a) Units or other Equity Securities of the Company possessing the voting power to elect a majority of the Board of Managers or the then equivalent governing body of the Company (whether by merger, consolidation, reorganization, combination, sale or Transfer of Units or other Equity Securities or otherwise) or (b) all or substantially all of the assets of the Company and its Subsidiaries determined on a consolidated basis. A Sale of the Company shall be subject to the approval or consent of Members holding a majority of the Class A Units.

"**Second Contribution**" has the meaning set forth in the recitals.

"**Second Equity Sale**" has the meaning set forth in the recitals.

"**Second Operating Agreement**" means that certain Second Amended and Restated Limited Liability Company Agreement of the Company, dated as of April 9, 2018, by and between Damani Member and Quantum Member.

"**Section 704(c) Allocations**" has the meaning set forth in Section 4.03(a).

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Securities Laws**" has the meaning set forth in Section 11.06.

"**Selling Member**" has the meaning set forth in Section 6.05(a).

"**Separation Agreement**" means that certain Separation and Release Agreement by and between the Company and Damani that was executed by Damani on May 26, 2020, and by the Company on June 2, 2020, as amended from time to time.

"**Specified Indemnitors**" means, collectively, the Damani Specified Indemnitors and the Trive Specified Indemnitors.

"**Subsidiary**" means, when used with respect to the Company, each Person (i) of which a majority of the voting power or the voting Equity Securities are owned, directly or indirectly, by the Company, or (ii) of which the Company or any other Subsidiary of the Company is a general partner or managing member.

"**Tag-Along Member**" has the meaning set forth in Section 6.06(a).

"**Tag-Along Notice**" has the meaning set forth in Section 6.06(a).

"**Tax Distribution Amount**" has the meaning set forth in Section 4.05.

"**Tax Matters Member**" has the meaning set forth in Section 8.06(b).

"**TCFIII LLC Member**" means TCFIII Luck Acquisition LLC, a Delaware limited liability company.

"**TCFIII LP Member**" means TCFIII Luck SPV LP, a Delaware limited partnership.

"**Termination Restrictive Covenant Agreement**" means that certain Non-Competition, Non-Solicitation and Non-Disclosure Agreement by Damani in favor of, and for the benefit of, the Company and its Subsidiaries and Affiliates that was executed by Damani on May 26, 2020, and by the Company on June 2, 2020, as amended from time to time.

"**Third Operating Agreement**" means that certain Third Amended and Restated Limited Liability Company Agreement of the Company, dated as of August 1, 2018, by and between Damani Member and Quantum Member, as amended prior to July 15, 2019.

"**Transfer**" means, directly or indirectly, to sell, transfer, assign, pledge, lease, hypothecate, mortgage, gift or similarly encumber or dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, lease, hypothecation, mortgage or similar encumbrance or disposition of, any Units beneficially owned by a Person or any interest in any Units beneficially owned by a Person, provided that, except as otherwise expressly set forth herein with respect to Damani Member, a Change of Control of a Member shall not be deemed to be a Transfer.  The terms "**Transferor**" and "**Transferee**" and other forms of the word "**Transfer**" shall have the correlative meanings.

"**Treasury Regulations**" means regulations and temporary regulations promulgated under the Code from time to time.

"**Trive Specified Indemnitors**" means, collectively, Quantum Member, TCFIII LLC Member, TCFIII LP Member, Trive Capital Management LLC, a Delaware limited liability company, and each of their respective Affiliates (other than the Company and its Subsidiaries).

"**UCC**" has the meaning set forth in Section 3.03(a).

"**Unit Reclassification Transaction**" has the meaning set forth in Section 3.01(a).

"**Units**" has the meaning set forth in Section 3.01(a).

"**Valuation Notice**" has the meaning set forth in Section 7.02(b).

1.02 <u>Rules of Construction</u>.

(a)    All references herein to Articles, Sections and Schedules shall be deemed to be references to Articles and Sections of, and Schedules to, this Agreement unless the context requires otherwise.  All Schedules attached hereto shall be deemed incorporated herein as if set forth in its entirety herein and, unless otherwise defined therein, all terms used in any Schedule shall have the meaning ascribed to such term in this Agreement.

(b)    Words in the singular include the plural and in the plural include the singular.  The words "including", "includes", "included" and "include", when used, are deemed to be followed by the words "without limitation".  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(c)    All accounting terms not defined in this Agreement shall have the meanings determined by, and shall be construed in conformity with, the Applicable Accounting Principles. All financial data required to be delivered to the Members pursuant to this Agreement shall be prepared in conformity with the Applicable Accounting Principles, except as otherwise specifically prescribed in this Agreement.  Unless otherwise expressly provided in this Agreement, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, and all attachments thereto and instruments incorporated therein.

(d)    Unless otherwise expressly specified herein to the contrary, any allocation, distribution or other determination to be made with respect to the Members or a group of Members "on a pro rata basis" or "ratably" shall be made in proportion to the Percentage Interests of such Members or group of Members to which such allocation, distribution or other determination is being made immediately prior to the transaction with respect to which such allocation is being made.

1.03 <u>Computations of Time</u>.  If any calendar day for any delivery, notice or other action of any kind under this Agreement falls on a day other than a Business Day, the date on which such delivery, notice or other action shall be due, required or otherwise computed shall be the next Business Day immediately following such calendar day which is not a Business Day.

ARTICLE II

THE COMPANY AND ITS MEMBERS

2.01 <u>Fourth Operating Agreement</u>. This Agreement amends, restates, supersedes and replaces the Fourth Operating Agreement in its entirety.

2.02 <u>Formation and Filings</u>.  The Members hereby confirm, ratify and approve the formation of the Company pursuant to the filing of the Certificate.  The Company and the Members hereby execute this Agreement for the purpose of continuing the affairs of the Company and the conduct of its business in accordance with the provisions of the LLC Act.  The Members hereby agree that during the term of the Company set forth in Section 2.04, the rights and obligations of the Members with respect to the Company will be determined in accordance with the terms and conditions of this Agreement and, except where the LLC Act provides that such rights and obligations specified in the LLC Act shall apply "unless otherwise provided in a limited liability company agreement" or words of similar effect and such rights and obligations are set forth in this Agreement, the LLC Act.

2.03 <u>Name</u>.  The name of the Company is "Lucky Bucks HoldCo, LLC" and all business of the Company shall be conducted in such name or such other name as the Board of Managers shall hereafter from time to time determine, provided that the name shall always contain the words "Limited Liability Company" or the letters "LLC".  The Board of Managers shall notify the Members of any change to the name of the Company as soon as reasonably practicable thereafter.

2.04 <u>Term</u>.  The term of the Company shall continue until the earlier of the dissolution, liquidation and termination of the Company pursuant to the provisions of Article X.

2.05 <u>Business Purpose and Powers</u>.

(a)     <u>Purpose</u>.  Subject to the limitations contained elsewhere in this Agreement, the purposes of the Company are to (and to the extent applicable to cause its Subsidiaries to): (i) directly, or indirectly through Subsidiaries, engage in, conduct, carry on and operate, solely within the State of Georgia pursuant to Gaming Approvals from the GLC, the business of owning, operating, maintaining, managing and commercially exploiting COAMs, (ii) engage in, conduct, carry on and oversee all business and affairs related to the Company's ownership interests in its Subsidiaries, (iii) take any and all actions necessary to support, assist, maintain or grow the operations and businesses of its Subsidiaries, and (iv) engage in or carry on any and all other lawful acts or activities necessary, convenient, desirable or incidental to the foregoing.

(b)     <u>Powers</u>.  Subject to the terms, conditions and limitations set forth in this Agreement, the Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to, or for the furtherance of, the purposes set forth in Section 2.05(a), including the powers granted by the LLC Act.

2.06 <u>Principal Place of Business</u>.  The principal place of business of the Company shall be 5820 Live Oak Parkway, #300, Norcross, Georgia 30093, or such other location as may hereafter be determined by the Board of Managers.  The Board of Managers shall notify the Members of any such change in the principal place of business of the Company as soon as reasonably practicable thereafter.  The Company shall have such additional places of business as shall be determined by the Board of Managers.

2.07 <u>Registered Office and Registered Agent</u>.  The Board of Managers shall cause the Company at all times to maintain a registered office and a registered agent for service of process in the State of Delaware, in the State of Georgia and in any other jurisdiction where the Company

is required by applicable law, regulation or contract to maintain a registered office and a registered agent for service of process. Immediately following the execution and delivery of this Agreement by the parties hereto, (a) the Company shall cause the address of its registered office in the State of Georgia to be 289 South Culver Street, Lawrenceville, Georgia 30046, and the registered agent for service of process on the Company in the State of Georgia at such registered office to be C T Corporation System and (b) each Manager is hereby authorized to execute any documents required to effectuate the change in registered office and registered agent in the State of Georgia contemplated by the immediately preceding clause (a). The Board of Managers may change any of the Company's registered offices and/or registered agents from time to time as permitted under the LLC Act or any other applicable law, regulation or contract.

2.08 <u>Partnership Status</u>.  The parties hereto intend that the Company be treated as a partnership for federal, state and local income tax purposes as of and from and after the Closing (as defined in the October 2016 MIPA) and any wholly-owned Subsidiary of the Company be treated as a disregarded entity for income tax purposes. Each Member agrees to take all reasonable actions, including execution of amendments to this Agreement and the execution or amendment of any other documents, if required for the Company to be treated as a partnership for such income tax purposes. Notwithstanding any other provision of this Agreement, no Member nor any Affiliate of any Member, nor the Company, shall take any action (including the filing of a U.S. Treasury Form 8832 Entity Classification Election) that would cause the Company to be characterized as an entity other than a partnership for federal income tax purposes, or that would cause any wholly-owned Subsidiary of the Company (other than an acquired wholly owned Subsidiary that has always been classified as a corporation) to be treated as other than a disregarded entity for federal income tax purposes, except with the approval of the Members pursuant to Section 5.03. The Tax Matters Member is hereby authorized and shall take all actions necessary to qualify the Company as a partnership for federal, state and local income tax purposes.

2.09 <u>Ownership of Property</u>.  Legal title to all assets, rights and property, whether real, personal or mixed, conveyed to, or held by the Company or its Subsidiaries shall reside in the Company or its Subsidiaries and shall be conveyed only in the name of the Company or its Subsidiaries, and no Member or any other Person, individually, shall be deemed to have any direct ownership of such assets, rights or property.

2.10 <u>Members</u>.

(a)    <u>Members</u>.  The name of each Member, and the class and number of Units held by each Member, are set forth on **<u>Schedule 1</u>** attached hereto, as the same may be amended from time to time in accordance with this Agreement.

(b)    <u>Admission of New Members</u>.  New Members may be admitted in connection with (i) the issuance of Units by the Company, subject to compliance with the applicable provisions of Article III, Section 5.03, Article XI and Section 12.06 or (ii) a Transfer of Units by a Member, subject to compliance with the applicable provisions of Article VI, Article XI and Section 12.06.

(c)    <u>Power of Members</u>.  The Members shall have the power to exercise any and all rights or powers granted to such Members pursuant to the express terms of this Agreement. Except as otherwise expressly provided by this Agreement or required by the LLC Act, no Member shall

have the power to act for or on behalf of, or to bind, the Company.

(d)    <u>Responsibility for Commitments</u>.  Other than as expressly provided for in this Agreement, neither the other Members nor the Company shall be responsible or liable for any indebtedness or obligation of a particular Member incurred either before or after the execution of this Agreement.

(e)    <u>Relationship of Parties</u>.  The relationships of the parties hereto shall be that of a limited liability company, for the sole and limited purpose of carrying on the business of the Company.  Except insofar as otherwise provided for in this Agreement, nothing herein shall be deemed to create an agency, partnership or other agreement, understanding or arrangement between or among the Members for the carrying on of business outside the scope of this Agreement, nor shall any Member have the ability to act as agent for any other Member.

2.11 <u>Affiliate Transactions</u>.  Any agreement or transaction entered into between, directly or indirectly, (i) the Company or any of its Subsidiaries, on the one hand, and (ii) any Member, an Affiliate of a Member or any Affiliate of the Company, on the other hand, including, but not limited to, any management, leasing, consulting or similar arrangement involving the payment or reimbursement of any rent, fees, costs, expenses, indemnities or similar items, or any transaction subject to or implicating Gaming Laws compliance pursuant to Section 2.16 (each such agreement or transaction, an "**Affiliate Transaction**") following October 31, 2020, shall be on an arm's length basis and in compliance with all Gaming Laws.  The Company or the applicable Member entering into an Affiliate Transaction, as the case may be, will disclose to the Members or the Company, as the case may be, on a quarterly basis any such Affiliate Transaction entered into during such quarterly period, provided that the Company or the applicable Member entering into such Affiliate Transaction will notify the Company and other Members, as the case may be, prior to the consummation of any material Affiliate Transaction (a "**Material Affiliate Transaction**").  For purposes of clarity and the avoidance of doubt, (x) any real estate transactions by a Member or an Affiliate of a Member with any owners or operators of any COAM Location are considered Material Affiliate Transactions and (y) any servicing, maintenance, or management transactions by a Member or an Affiliate of a Member with any owners or operators of any COAM Location are considered Material Affiliate Transactions.

2.12 <u>No State-Law Partnership</u>.  The Members intend the Company not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, in each case, for any purpose other than as set forth in Section 2.08 or the last sentence of this Section 2.12, and neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise.  Consistent with Section 2.08, the Members intend the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and that each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

2.13 <u>Noncompetition; Other Business Activities</u>.

(a)    Except to the extent otherwise expressly contemplated by Section 2.13(b) or in any contract or other agreement between the Company or any of its Subsidiaries, on the one hand, and

any Member or any of its Affiliates, on the other hand (including, but not limited to, the Restrictive Covenants Agreements and the Separation Agreement), (i) any Member or Affiliate of any Member may separately engage, directly or indirectly (including through an equity or profits interest in any other Person), in businesses or ventures of any nature or description without regard to whether such businesses or ventures are or may be deemed to be related to, complementary with, or competitive with the business of the Company or its Subsidiaries, and (ii) no Member or Affiliate of any Member shall be obligated to present or offer to the Company, its Subsidiaries, any Member or any of their respective Affiliates any particular investment or business opportunity, regardless of whether the Company, its Subsidiaries, such Member or such Affiliate could take advantage of such opportunity if it were to be presented to the Company, its Subsidiaries, such Member or such Affiliate, but may avail itself of any such opportunity for its own account.

(b)     Notwithstanding Section 2.13(a), neither Quantum Member, nor TCFIII LLC Member nor TCFIII LP Member may undertake a Business Opportunity unless such Member has, in writing, offered such Business Opportunity to the Company and its Subsidiaries, and to all other Members (for a pro rata participation therein in lieu of the Company and its Subsidiaries), and none of the Company or its Subsidiaries, nor any of the other Members, has committed in writing within twenty (20) Business Days to take (in the case of the Company and its Subsidiaries), or participate in (in the case of the other Members), the Business Opportunity. If none of the Company, its Subsidiaries or the other Members elect to participate, or are deemed to elect not to take or participate, in such Business Opportunity, such Member shall not be restricted from pursuing such Business Opportunity outside of the Company or its Subsidiaries and without the participation of such other Members, provided that in the event Damani Member declines such a Business Opportunity offered by such Member, Damani Member shall have the right of first refusal to negotiate in good faith with such Member for the right to manage the Business Opportunity on behalf of such Member under a mutually agreeable (in the sole discretion of each party) arm's-length management or other contract that is customary for comparable businesses or other commercial activities so long as Damani Member's management of such Business Opportunity is not in violation of any applicable laws (including, without limitation, any applicable Gaming Laws) or otherwise prohibited by any Gaming Authority or other governmental authority.

2.14 Accountants.  The Company shall engage as independent auditors for the Company a firm of independent certified public accountants approved by the Board of Managers.

2.15 Qualification in Other Jurisdictions.  The Board of Managers shall cause the Company to be qualified or registered under applicable laws of any jurisdiction in which the Company owns property or engages in activities and shall be authorized to execute, deliver and file any certificates and documents necessary to effect such qualification or registration, including, without limitation, the appointment of agents for service of process in such jurisdictions, if such qualification or registration is necessary or desirable to permit the Company to own property and engage in the Company's business in such jurisdictions.

2.16 Gaming Laws Compliance.

(a)     General. The Members acknowledge and agree that the Company and its Subsidiaries, all of the Members, and all of their respective Affiliates, and the businesses and transactions stated herein and contemplated hereby, may be governed by Gaming Laws or

otherwise subject to Gaming Approvals. The provisions of this Section 2.16 are material obligations of each of the Members and the Company. The costs and expenses of cooperation by each Member (on behalf of itself and its Affiliates) and the Company shall be at the sole cost and expense of each such Person.

(b)     <u>Gaming Authority Proceedings</u>.  The Company shall comply, and the Members agree to comply and cause their Affiliates to comply, in good faith and without undue delay with any and all Gaming Laws and requests by any Gaming Authorities including, but not limited to, cooperating with all requests, inquiries, or investigations (including background investigations, licensing procedures and other requirements) of any Government Authority arising out of or related to each of the following: (i) this Agreement, (ii) the businesses and transactions stated herein and contemplated hereby and (iii) the actions or inactions of the Company, any Subsidiary of the Company or any Covered Person.  For clarity and without limitation, such cooperation shall include the disclosure of information to Gaming Authorities that may otherwise be considered confidential.

(c)     <u>Member Gaming Laws Compliance</u>.  The Members shall (and shall cause their Affiliates to) obtain and maintain any necessary Gaming Approval required of such Member or Affiliate in connection with the business of the Company or any of its Subsidiaries, and refrain from taking or omitting to take any action that would be reasonably expected to cause the Company or any of its Subsidiaries to (i) fail to obtain or maintain any necessary Gaming Approval required of the Company or any of its Subsidiaries in connection with its business or (ii) violate any law or regulation (including, but not limited to, any Gaming Law) applicable to the business of the Company or any of its Subsidiaries, which violation would be reasonably expected to have a material adverse effect on the Company or any of its Subsidiaries.

(d)     <u>Time of the Essence</u>.  If any Gaming Law, or Gaming Authority, recommends, orders, or prescribes the Company, any of its Subsidiaries, any Member, or any of their Affiliates to perform an act (or fail to act) within a period of time, then such Member or Affiliate, or the Company or its respective Subsidiary, shall strictly comply and perform such act (or fail to act) within the time period specified by such Gaming Law or Gaming Authority. The parties understand and agree that timing is of the essence with respect to any such Member's or Affiliate's, or the Company's or its respective Subsidiary's, compliance with the time periods recommended, ordered, or prescribed by any Gaming Law or Gaming Authority, and that any such Member or Affiliate, or the Company or its respective Subsidiary shall accelerate all such acts (or failures to act) provided for or contemplated by this Agreement so as to ensure strict compliance with any and all such time periods recommended, ordered, or prescribed by any Gaming Law or Gaming Authority.

(e)     <u>Regulatory Amendments</u>.  Subject to Section 12.06(a), the Members hereby agree to amend the terms of this Agreement to the extent necessary to comply with an order of a Gaming Authority requiring amendments to this Agreement, provided that no Member shall be obliged to agree to any such amendment if such amendment, in such Member's reasonable good faith determination, would result in: (i) a material detriment to the Member's material rights or material obligations under this Agreement; (ii) a material detriment to the business or prospects of the Member or any of its Affiliates; or (iii) any material change to the principal economic benefits to be derived by the Member from this Agreement.

(f)    Dispositions Ordered by Gaming Authority.  Subject to Gaming Laws, if a Gaming Authority orders or prescribes a time period for the sale, purchase or other disposition of Units or Equity Securities of the Company held by a Member, or any distributions, disbursements, monies or other assets that may be due to any Member or Affiliate of a Member pursuant to this Agreement or any agreement, contract, obligation or other instrument, and after each Member having had the opportunity to seek reconsideration from the Gaming Authority in good faith and without undue delay (which opportunity shall not be greater than thirty (30) days from the date of such order or prescription) and cure the actions or inactions that caused such an order or prescription by Gaming Authority referred to in the preceding sentence, the Company and such Member shall in good faith comply with such time period ordered or prescribed by the Gaming Authority, provided that in the event such sale, purchase or other disposition cannot be consummated within such time period ordered or prescribed by such Gaming Authority, then, upon the written election of the affected Member, such Member shall (or shall direct the Company to) transfer, deposit or otherwise hold such Units, Equity Securities, distributions, disbursements, monies or other assets due to such Member or Affiliate in a trust account or similar financial instrument approved by such Member, which account or instrument may later be liquidated, converted, exercised, exchanged or transferred so as to ensure no depreciation, loss, or other damage to such Units, Equity Securities, disbursements, monies or other assets due to such Member or Affiliate.

2.17 Bankruptcy of a Member.  A Member shall give immediate notice to the Board of Managers upon the occurrence of any Event of Bankruptcy with respect to such Member.  A Member shall not cease to be a Member as a result of an Event of Bankruptcy with respect to such Member or as a result of any events specified in Section 18-304 of the LLC Act.

2.18 Set-off Right.    Damani Member hereby authorizes Quantum Member or the Company, as the case may be, to deduct, offset, set-off and withhold from any amounts due to Damani Member under this Agreement (including, but not limited to, pursuant to Sections 4.04, 4.05, 6.05, 6.06, 7.01, 7.02, and 10.02(d)) any and all Damages arising from an Event of Default and any amounts contemplated by any provision of any of the Purchase Agreements (including, without limitation, Sections 2.06 and 9.07 of the October 2016 MIPA and Sections 8.07 of the August 2018 MIPA and the July 2019 MIPA), and Damani Member hereby consents to the exercise of any and all such rights by Quantum Member and the Company, provided that, in the event Quantum Member or the Company exercises any such rights with respect to Damages arising from an Event of Default, Quantum Member or the Company, as applicable, shall deliver ten (10) Business Days' prior written notice thereof to Damani Member.

ARTICLE III

CAPITAL STRUCTURE; CAPITAL CONTRIBUTIONS

3.01 Capital Structure.

(a)    Units and Equity Securities.  The Membership Interests of the Members shall be represented by "Units" of the Company in accordance with the terms of this Agreement.  The Company may create and issue Equity Securities from time to time by in accordance with the terms of this Agreement.  Units and Equity Securities may, in each case, be divided into one or more types, classes or series.  Each type, class or series of Units or Equity Securities shall have the

designations, preferences, privileges, and rights, including voting rights, if any, and shall be subject to the duties, liabilities, obligations, qualifications, limitations and restrictions, in each case, as set forth in this Agreement or any amendment hereto adopted in accordance with the terms of this Agreement with respect to such type, class or series.  Unless otherwise determined by the Board of Managers, all Units issued in the Company pursuant to the terms of this Agreement (including issuances pursuant to capital calls and new issuances after October 31, 2020) shall be issued on the basis of one Unit for each $10,000 contributed (with fractional Units being issued on the same basis in the event of incremental contributions less than $10,000), irrespective of the Percentage Interest associated with the issuance of such Units.

(b)    Initial Capital Structure.  As of October 31, 2020, the capital structure of the Company shall consist solely of Class A Units held by each Member as set forth next to such Member's name on **Schedule 1** attached hereto.  The Class A Units shall have the designations, preferences, privileges and rights, including voting rights, and shall be subject to the duties, liabilities, obligations, qualifications, limitations and restrictions, set forth in this Agreement.

(c)    New Units and Equity Securities. Subject to the terms of this Agreement (including, but not limited to, Section 5.03), the Company is authorized to create and issue to any Person who is a Member or who is admitted to the Company as a Member additional Class A Units, or different types, classes or series of Units of the Company, and to create and issue to any Person different types, classes or series of Equity Securities of the Company, in each case, at such prices and on such terms and conditions as may be expressly determined and authorized by resolutions adopted by the Board of Managers (in its sole discretion), provided that the price of any such Units or other Equity Securities of the Company shall not be less than the Fair Market Value thereof on the applicable date of issuance. Such resolutions of the Board of Managers shall set forth such amendments to this Agreement as shall be necessary or reasonable in the sole judgment of the Board of Managers to effect such creation and/or issuance of such Units or other Equity Securities of the Company, and such amendments shall be binding upon all Members of the Company upon adoption by the Board of Managers.

(d)    Fair Market Value Dispute.

(i)    If the Damani Member disputes the Board of Managers' determination of Fair Market Value of any Units or other Equity Securities of the Company issued by the Company pursuant to Section 3.01(c) after October 31, 2020, Damani Member shall deliver to the Board of Managers written notice of such dispute within ten (10) Business Days after such determination by the Board of Managers (a "**FMV Dispute Notice**").  The Board of Managers and Damani Member shall then negotiate in good faith for ten (10) Business Days (or for such longer period as they mutually agree) after the delivery of the FMV Dispute Notice to the Board of Managers in an effort to reach agreement on the Fair Market Value of the Units or other Equity Securities of the Company so issued by the Company.

(ii)    If such negotiation is unsuccessful, the Board of Managers and the Damani Member shall promptly designate an independent appraiser.  No later than the fifth (5th) Business Day after appointment of the independent appraiser, each of the Board of Managers and the Damani Member shall deliver to the independent appraiser a written notice of its final determination of the Fair Market Value of such Units or other Equity Securities of the Company

so issued by the Company (each, a "**FMV Valuation Notice**").  The independent appraiser shall be instructed to determine the final Fair Market Value of the Units or other Equity Securities of the Company so issued by the Company within thirty (30) calendar days of its receipt of both FMV Valuation Notices. In making such determination, the independent appraiser (x) shall be instructed that the Fair Market Values set forth in the FMV Valuation Notices shall not be used as evidence of the actual Fair Market Value or the correctness of either the Board of Managers' or the Damani Member's determination of the Fair Market Value set forth in the FMV Valuation Notices and (y) may request additional submissions of information from the Board of Managers and/or the Damani Member (and the Board of Managers and/or the Damani Member shall promptly comply). The determination of the independent appraiser shall be final, non-appealable and binding upon the Company, the Board of Managers, the Damani Member and all other Members. The fees and expenses of the independent appraiser shall be borne equally by the Company and the Damani Member.  The Board of Managers shall make appropriate adjustments to the number of Units or other Equity Securities of the Company so issued by the Company or the purchase price therefor to reflect the final Fair Market Value thereof determined in accordance with this Section 3.01(d).

(iii)    Notwithstanding anything contained in this Section 3.01(d) to the contrary, Damani Member shall not have any right to dispute the Board of Managers' determination of Fair Market Value of any Units or other Equity Securities of the Company issued by the Company pursuant to Section 3.01(c) if any of such Units or other Equity Securities of the Company were issued to Damani Member or any of its Affiliates in such issuance by the Company.

(e)    Adjustments. The Company shall adjust the number of Units and/or Equity Securities of any type, class or series, as applicable, from time to time as may be necessary in connection with any split, reverse split, dividend, recapitalization or other reclassification of Units and/or Equity Securities of any type, class or series, as applicable (a "**Unit Reclassification Transaction**"), so as to maintain the relative Percentage Interests as calculated immediately prior to such Unit Reclassification Transaction.

3.02 Reserves.  Prior to a Liquidation Event, reserves, in amounts determined by the Board of Managers in its sole discretion to be reasonably necessary to satisfy future operating expenses and debt service payments of the Company and its Subsidiaries may be retained out of Capital Contributions, Net Proceeds, net proceeds of any financing or refinancing transaction of the Company or its Subsidiaries, or net proceeds of operating receipts of the Company and its Subsidiaries.  Upon a Liquidation Event, any reserves shall be determined, retained and distributed pursuant to the provisions of Section 10.02.

3.03 Certificates of Membership Interests.

(a)    Each Membership Interest and each of the Units representing such Membership Interest shall constitute and shall remain a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8 102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.  Notwithstanding any provision of this Agreement to the contrary, to the extent

that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of Delaware (6 Del C. § 8-101, et. seq.) (the "**UCC**"), such provision of Article 8 of the UCC shall be controlling.  The preceding sentences constitute an "opt-in" pursuant to Section 8-103(c) of the UCC.

(b)     All Membership Interests and each of the Units representing such Membership Interests may be represented by certificates as determined by the Board of Managers in accordance with the LLC Act (individually, a "**Certificate of Membership Interest**"). Each Certificate of Membership Interest shall state the name of the Company, the fact that the Company is formed under the laws of the State of Delaware as a limited liability company, the name of the Person to whom it was issued, the date of issue and the Units or Percentage Interest in the Company represented thereby, and shall be signed by an Officer and bear the legends required or contemplated by this Agreement. Each Certificate of Membership Interest outstanding prior to October 31, 2020, is hereby cancelled and shall automatically cease to be outstanding, and all Membership Interests, Units and other Equity Interests of the Company that are outstanding as of October 31, 2020, are set forth on **Schedule 1** attached hereto.

(c)     Each Certificate of Membership Interest shall bear legends substantially in the following forms:

> "THIS CERTIFICATE EVIDENCES LIMITED LIABILITY COMPANY INTERESTS IN LUCKY BUCKS HOLDCO, LLC AND CONSTITUTES A SECURITY WITHIN THE MEANING OF, AND GOVERNED BY, ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF DELAWARE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OTHER APPLICABLE JURISDICTION."

> "THE LIMITED LIABILITY COMPANY INTERESTS IN LUCKY BUCKS HOLDCO, LLC REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A FIFTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT AMONG ITS MEMBERS, AS MAY BE AMENDED FROM TIME TO TIME, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE INTERESTS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH AGREEMENT."

> "THE LIMITED LIABILITY COMPANY INTERESTS IN LUCKY BUCKS HOLDCO, LLC REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER."

(d)    Copies of Certificates of Membership Interest may be inspected and copied during normal business hours by any Member upon reasonable request, for purposes reasonably related to the limited liability company interest of that Person as a member.

(e)    If a Certificate of Membership Interest has been worn out or lost, it may be renewed on production of the worn out or lost certificate or on satisfactory proof of its loss together with such indemnity as may be required by the Board of Managers.

3.04 <u>Voting Rights</u>.    Unless otherwise specifically set forth in this Agreement, the Members who are holders of Class A Units shall be entitled to one vote per Class A Unit on all matters required to be voted on, approved of or consented to by the holders of Class A Units pursuant the terms of this Agreement.  No Member shall have any voting, approval or consent rights not expressly set forth in this Agreement. No holder of any right, title or interest in a Membership Interest or Unit who has not been admitted as a Member of the Company pursuant to the applicable provisions of this Agreement shall have any voting, approval or consent rights of any kind. Notwithstanding anything to the contrary in this Agreement, neither the Damani Member nor any of its Permitted Transferees shall have any voting rights with respect to any of their respective Units, Membership Interests or other Equity Securities of the Company; provided, however, nothing herein shall affect the rights of Damani Member pursuant to Section 5.03. Without limiting the foregoing, any Units, Membership Interests or other Equity Securities of the Company held by the Damani Member or any of its Permitted Transferees shall, for purposes of voting on, approving or consenting to any matter that is required to be voted on, approved of or consented to by the holders of any Units, Membership Interests or other Equity Securities of the Company, be excluded from the total number of Units, Membership Interests or other Equity Securities of the Company (as the case may be) outstanding at the time such matter is voted on, approved of or consented to by the holders of Units, Membership Interests or other Equity Securities of the Company (as the case may be) and shall not be counted as for, against or otherwise be taken into account in determining the outcome of such vote, such making of such approval or the granting of such consent, as applicable.

3.05 <u>Maintenance and Changes to Schedule 1</u>.

(a)    Each Member's Percentage Interest and the number and class of Units that such Member holds shall be set forth on **Schedule 1**. The Company shall, in accordance with Section 3.05(b), maintain **Schedule 1** as part of the books and records of the Company.  Except as may otherwise be required by applicable law or by this Agreement, the Company shall be entitled to treat each Member as the record holder of the number and class of Units shown on **Schedule 1** for all purposes, including the payment of any distributions and the right to vote with respect thereto, regardless of any Transfer of such Units, until such Units have been Transferred on the books of the Company in accordance with the requirements of this Agreement.

(b)    The Board of Managers, or such Person as the Board of Managers may from time to time designate, shall amend **Schedule 1** and update the Company's books and records from time to time, without the consent of any Member, to reflect: (i) the admission (by substitution or otherwise) or withdrawal of any Member in accordance with the terms of this Agreement; (ii) the Transfer of Units in accordance with Article VI; (iii) any issuance of additional Units and/or Equity Securities of the Company in accordance with the terms of this Agreement, including as a result

of any Additional Capital Contributions made by a Member; (iv) any changes to a Member's Percentage Interest pursuant to Section 3.07 and Section 3.09; (v) any Unit Reclassification Transaction or (vi) such other changes as may be expressly permitted by this Agreement.

3.06 <u>Initial Capital Contributions</u>. The initial Capital Contributions associated with each Unit or group of Units held by the Members shall be maintained in the books and records of the Company.

3.07 <u>Additional Capital Contributions</u>.

(a)    The Members shall be required to make additional Capital Contributions only to the extent and in the manner provided in this Section 3.07 ("**Additional Capital Contributions**"). No Additional Capital Contributions may be made by a Member other than in compliance with the provisions of this Section 3.07.

(b)    Each Member shall be obligated to make Additional Capital Contributions, in respect of the Class A Units, other Units and/or other Equity Securities of the Company held by such Member, at such times and in such amounts as the Board of Managers shall determine in its sole discretion, subject to the approval of the Members required by Section 5.03, if any. The Board of Managers may determine that Additional Capital Contributions are necessary from time to time to, among other things, effectuate the purposes of the Company as set forth in Section 2.05(a).

(c)    Once an Additional Capital Contribution is approved, including by the Members pursuant to Section 5.03, if applicable, the Board of Managers shall cause the Company to provide each Member with notice of the Additional Capital Contribution (the "**Additional Contribution Notice**"). The Additional Contribution Notice shall include (i) the date on which the Additional Capital Contribution is due, which date (the "**Contribution Date**") shall not be less than thirty (30) calendar days from the date such notice is delivered and (ii) the amount that must be contributed by each Member (the "**Additional Contribution Amount**"). The total amount of any Additional Capital Contribution required to be made pursuant to this Section 3.07 shall be allocated among the Members in accordance with each Member's Percentage Interest in effect at the time of the applicable Additional Contribution Notice. Each Member shall pay all of such Member's Additional Contribution Amount to the Company on or before the Contribution Date by wire transfer of immediately available funds in accordance with the wire instructions provided in the Additional Contribution Notice. Any Additional Capital Contribution made by a Member shall be contributed to the Company in exchange for additional Units of the same class, type and series as are then held by such Member. Following any Contribution Date and in connection with the payment of the Additional Contribution Amount by the Members to the Company pursuant to an Additional Contribution Notice, the Board of Managers shall cause **<u>Schedule 1</u>** and the books and records of the Company to be updated to reflect the issuance of any additional Units to such Members in connection with such payment of such Additional Contribution Amounts and any changes to Percentage Interests resulting from the application of Section 3.07(d) or Section 3.07(e) in connection with any Member's election not to fund such Member's Additional Contribution Amount pursuant to such Additional Contribution Notice.

(d)    Subject to Section 3.07(e), if any Member either elects not to make such Member's Additional Contribution Amount pursuant to an Additional Contribution Notice or to make a

Capital Contribution that is less than such Member's Additional Contribution Amount, the following adjustments, with effect from the Contribution Date, shall be made to the Percentage Interest of such Member:  such Member's Percentage Interest shall, following such Contribution Date, be adjusted so that such Member's Percentage Interest shall equal the result (expressed as a percentage) obtained by dividing (A) the sum of (x) such Member's Percentage Interest immediately prior to the Contribution Date multiplied by the Fair Market Value of all of the Equity Securities of the Company then outstanding (determined without adding to the value thereof the applicable Additional Capital Contributions to be made by all the Members on the Contribution Date specified in the applicable Additional Contribution Notice), plus (y) the amount, if any, contributed by such Member in respect of the Class A Units, other Units and/or other Equity Securities of the Company, as applicable, held by such Member pursuant to such Additional Contribution Notice as of the Contribution Date, divided by (B) the sum of (x) the Fair Market Value of all of the Equity Securities of the Company (determined without adding to the value thereof the applicable Capital Contributions to be made on the Contribution Date specified in the applicable Additional Contribution Notice) and (y) the total amount contributed by all of the Members in respect of the Class A Units, other Units and/or other Equity Securities of the Company, as applicable, held by all of the Members pursuant to such Additional Contribution Notice as of the Contribution Date.

(e)     If any Member either elects not to make such Member's Additional Contribution Amount pursuant to an Additional Contribution Notice or to make a Capital Contribution that is less than such Member's Additional Contribution Amount, then such Member shall be deemed to be a "**Non-Contributing Member**" and any Member which timely funds its entire portion of the applicable Additional Contribution Amount (a "**Contributing Member**") shall then be entitled, but not obligated, to (x) contribute an additional amount equal to the Non-Contributing Member's unsatisfied portion of the applicable Additional Contribution Amount in exchange for the issuance to such Contributing Member of Units, or fractions thereof, at the rate specified in the Additional Contribution Notice, or (y) notwithstanding anything to the contrary in this Agreement (including, but not limited to, Section 5.03), cause the Company to incur Indebtedness in the amount of all or any portion of such Non-Contributing Member's Additional Contribution Amount pursuant to commercially reasonable borrowing terms pursuant to one more loans from the Contributing Member or any other Person, provided that the right of the Contributing Member to exercise one or any combination of the options set forth in clauses (x) and (y) shall expire and no longer be available after the thirtieth (30th) calendar day following the Contribution Date.

3.08 <u>No Contributions in Kind</u>.  All Capital Contributions shall be made in cash and not in kind, unless a contribution in kind is approved by the Board of Managers.

3.09 <u>Adjustments to Percentage Interests of the Members upon Additional Issuances</u>.

(a)     To the extent a Member does not fund all of its Additional Contribution Amount as of the Contribution Date pursuant to an Additional Contribution Notice and such Member's Percentage Interest is adjusted pursuant to the terms of Section 3.07(d), then each other Member shall have its Percentage Interest recalculated as of the applicable Contribution Date pursuant to the terms of Section 3.07(d), so that after the recalculation of each Member's Percentage Interest pursuant to the terms of Section 3.07(d), the aggregate Percentage Interests of all of the Members shall equal one hundred percent (100%).

(b)    In connection with any issuance of additional Equity Securities of the Company pursuant to Section 3.01(c) (other than an issuance of additional Units to existing Members pursuant to Section 3.07(c) in connection with Additional Capital Contributions, which shall be governed by Section 3.07), the Board of Managers shall cause the Percentage Interests of all Members to be adjusted in such a manner and in such amounts as it shall deem reasonably necessary in connection with any such issuance of additional Equity Securities of the Company, provided that any such adjustments made to the Percentage Interests of existing Members shall be made to all such existing Members ratably based on such Members' then-existing Percentage Interests immediately prior to giving effect to such issuance of additional Equity Securities of the Company pursuant to Section 3.01(c).

3.10 <u>No Withdrawal of Contributions</u>.   No Member shall be entitled to withdraw any Capital Contribution or sums from its Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.   No Member shall have the right to demand or receive property of the Company.

3.11 <u>Preemptive Rights</u>.

(a)    Prior to the issuance or sale by the Company of any Units, Membership Interests or other Equity Securities of the Company (the "**New Securities**") to any Person, the Company shall offer to sell to each Member holding Class A Units (each such Member, a "**Holder**") a portion of such New Securities equal to the quotient obtained by dividing (1) the aggregate number of Units held by such Holder by (2) the aggregate number of Units outstanding prior to such issuance or sale and held by all Holders (such Holder's "**Proportional Share**"); provided, however, for the purposes of this Section 3.11 only, any Holder who is not an "accredited investor" (as such term is defined in Rule 501 promulgated under the Securities Act) shall be excluded from such offering and such excluded Holder's Units shall be excluded from the denominator in clause (2) above solely for purposes of this Section 3.11.   Each Holder shall be entitled to purchase up to such Holder's Proportional Share of such New Securities (not in any event to exceed such Holder's Proportional Share) at the same price and on other economic terms no less favorable in the aggregate than the terms on which such New Securities are proposed to be issued or sold by the Company. The purchase price for all such New Securities offered to the Holders hereunder shall be payable in cash and, subject to the rights of the Holders pursuant to Section 3.11(b), in order to exercise its purchase rights hereunder, a Holder must purchase the New Securities offered to and accepted by such Person no later than the date proposed to be issued by the Company.

(b)    In order to exercise its applicable purchase rights hereunder, a Holder must within 14 calendar days after receipt of written notice from the Company describing in reasonable detail the New Securities being offered, the purchase price thereof, the payment terms and such Holder's Proportional Share, deliver a written notice to the Company describing such Holder's election hereunder.

(c)    The Company shall be entitled, during the 120 days following expiration of the time period set forth in Section 3.11(b), to sell such New Securities which the Holders have not elected to purchase, at a price not less, and on other economic terms and conditions

not materially more favorable to the purchasers thereof, in the aggregate, than that offered to the Holders.  Any New Securities offered or sold by the Company after such 120-day period must be reoffered to the Holders if required pursuant to the terms of Section 3.11(a).

(d)     Notwithstanding anything to the contrary in Section 3.11, if the Board of Managers determines that it would be in the best interests of the Company to do so, it may issue Units, Membership Interests or other Equity Securities of the Company to any Members that would otherwise be required to be offered to the Holders under this Section 3.11 without first complying with this Section 3.11, provided that the Company shall take all steps reasonably necessary to enable the Holders as of the date of such issuance to effectively exercise their respective rights pursuant to this Section 3.11. In furtherance of the foregoing, within 15 days after such issuance, the Company shall offer each other Holder the opportunity to purchase from the Company, or, upon the written request of any Member to whom such Units, Membership Interests or other Equity Securities of the Company have been initially issued pursuant to this Section 3.11(d), from such Member, such Units, Membership Interests or other Equity Securities of the Company as such Holder would have otherwise been entitled to purchase under Section 3.11(a) in connection with such issuance on the same terms and conditions as were provided to such Members in such issuance (including, for the avoidance of doubt, with respect to price but, in the case of a purchase from a Member, adding to the price to be paid by each Holder any accretion that accrues on such Units, Membership Interests or other Equity Securities of the Company prior to the date of purchase from by such Holder from such Member), provided further that (1) the date on which the purchase thereof by such Holder from the Company or such Member shall occur will be the date set forth in such offer notice by the Company (which shall not be less than 14 days after the date of such offer notice) and (2) if any distributions are made under this Agreement in respect of such Units, Membership Interests or other Equity Securities of the Company so purchased prior to the purchase of such Units, Membership Interests or other Equity Securities of the Company by a particular subsequently subscribing other Holder, then the aggregate purchase price of such Units, Membership Interests or other Equity Securities of the Company to be paid to the Company or a Member (as the case may be) shall be reduced for such other Holder by the aggregate amount that such other Holder would have received in such distribution with respect to the Units, Membership Interests or other Equity Securities of the Company being purchased by such other Holder had such other Holder purchased such Units, Membership Interests or other Equity Securities of the Company immediately prior to such distribution.

(e)     The rights of the Members holding Class A Units under this Section 3.11 shall terminate upon the consummation of a Sale of the Company.

ARTICLE IV

CAPITAL ACCOUNTS; ALLOCATIONS; DISTRIBUTIONS

4.01 Capital Accounts.

(a)     A Capital Account shall be maintained for each Member in accordance with the rules of Treasury Regulations Sections 1.704-1(b)(2)(iv).  The Capital Account of each Member

shall be credited with: (i) the amount of any Capital Contribution made in cash by such Member; (ii) the Agreed Value (net of any liabilities the Company is considered to assume or take subject to under Code Section 752) of any Capital Contribution made in property other than cash by such Member; (iii) allocations to such Member of Net Income pursuant to Section 4.02; and (iv) any other item required to be credited for proper maintenance of capital accounts by the Treasury Regulations under Code Section 704(b). A Member's Capital Account shall be debited with: (w) the amount of any cash distributed to such Member; (x) the Agreed Value (net of liabilities that such Member is considered to assume or take subject to under Code Section 752) of any property other than cash distributed to such Member; (y) allocations to such Member of Net Loss pursuant to Section 4.02; and (z) any other item required to be debited for proper maintenance of capital accounts by the Treasury Regulations under Code Section 704(b). Each Member's Capital Account shall be adjusted as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(f) to reflect a revaluation of Company property at Agreed Value upon the occurrence of any event described in Treasury Regulation Section 1.704-1(b)(2)(iv)(f)(5)(i) or (ii) based upon the manner in which gain or loss upon a sale of all the assets of the Company for Agreed Value would be allocated.

(b)     In the event any Units are Transferred in accordance with this Agreement, the Transferee(s) of such Units shall succeed to all of the Transferor's Capital Account with respect to such Transferred Units. For purposes of Section 4.02, any allocations theretofore made to a Transferring Member with respect to Transferred Units shall be deemed to have been made to the Transferee for purposes of making future allocations.

4.02 <u>Book Allocations</u>.

(a)     <u>Allocations of Net Income and Net Loss</u>. Subject to Section 4.06(a):

(i)     Net Income or Net Loss for each Fiscal Year shall be allocated to the Members in proportion to their respective Percentage Interests.

(ii)     In the event that the Percentage Interests of the Members shall change pursuant to the terms of this Agreement, there shall be an interim closing of the books of the Company as of the close of the day of such change (the "**Interest Change Date**"). The Net Income or Net Loss of the Company for the period ending on the Interest Change Date shall be allocated to the Members in accordance with this Section 4.02(a) taking into account their respective Percentage Interests in effect prior to the Interest Change Date. The Net Income or Net Loss of the Company for any period commencing after the Interest Change Date shall be allocated to the Members in accordance with this Section 4.02(a) taking into account their respective Percentage Interests in effect after the Interest Change Date. Notwithstanding the foregoing, unless otherwise specified in the applicable agreement with respect to the change in the Percentage Interests, if the Interest Change Date is not the last day of a month, Net Income or Net Loss of the Company for the month in which the Interest Change Date occurs shall be prorated on a daily basis between the portion of the month ending on the Interest Change Date and the remainder of such month.

(b)     <u>Special Allocation Rules</u>. Notwithstanding any other provision of this Article IV:

(i)     <u>Nonrecourse Deductions</u>. The Nonrecourse Deductions for each Fiscal

Year of the Company shall be allocated among the Members in accordance with their respective Percentage Interests.

(ii)    <u>Minimum Gain Chargeback</u>.  If there is a net decrease in Company Minimum Gain or in Member Nonrecourse Debt Minimum Gain during a Company Fiscal Year, each Member shall be specially allocated items of income and gain in accordance with Treasury Regulations Section 1.704-2(f) and 1.704-2(i)(4).  It is intended that this Section 4.02(b)(ii) shall constitute a "minimum gain chargeback" described in Treasury Regulation Section 1.704-2(f) and 1.704-2(i)(4).

(iii)    <u>Limitation on Loss Allocations and Qualified Income Offset</u>.  A Member shall not be allocated items of loss or deduction to the extent such an allocation would cause or increase a deficit Capital Account balance for such Member as of the close of any taxable year in excess of the amount of such balance the Member is obligated or deemed obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) or 1.704-2(i)(5).  In determining the Capital Account balance of a Member for this purpose, adjustments, allocations and distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) shall be taken into account.  Any items of loss or deduction not allocated to a member under this Section 4.02(b)(iii) shall be allocated first, to the remaining Members with positive Capital Account balances (adjusted in accordance with the preceding sentence and after adding back each Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain determined pursuant to Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5)), in proportion to, and to the extent of, such positive Capital Account balances and thereafter, as provided in applicable Treasury Regulations.  In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4),(5) or (6), which results in a negative Capital Account balance in excess of any deficit balance which the Member is obligated or deemed obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) or 1.704-2(i)(5), items of Company income and gain (consisting of a pro rata portion of each items of Company income, including gross income, and gain) shall be allocated to such Member in an amount and manner sufficient to eliminate the excess deficit balance as quickly as possible.  This Section 4.02(b)(iii) is intended to be a "qualified income offset" described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and is to be interpreted and applied in a manner consistent therewith.

(iv)    <u>Member Nonrecourse Deductions</u>.  Any Member Nonrecourse Deductions for each Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(v)    <u>Basis Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution to a Member, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the Company property) or loss (if the adjustment decreases the basis of the Company property), and such gain or loss shall be allocated to the Members in accordance with Treasury Regulation

Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), as the case may be.

(vi)     Loss Limit Curative Allocations.   The special allocations set forth in Section 4.02(b)(iii) (the "**Loss Limit Allocations**") are intended to comply with certain requirements of Treasury Regulations Section 1.704-1(b).   Notwithstanding any other provisions of this Article IV (other than the provisions of this Section 4.02(b) and Section 4.03), the Loss Limit Allocations shall be taken into account in allocating other Net Income, Net Loss and items of income, gain, loss and deduction among the Members so, to the extent possible, the net amount of such allocations of other Net Income, Net Loss and other items and the Loss Limit Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Loss Limit Allocations had not occurred.

4.03 Allocations with Respect to Contributed Property; Agreed Value Adjustments, Depreciation Recapture and Excess Nonrecourse Liabilities.

(a)     Contributed Property.   In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income gain, loss and deduction (and any item thereof) with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take into account any variation at the time of contribution between the adjusted basis of such property to the Company for federal income tax purposes and the Agreed Value of the contributed property at the time of contribution ("**Section 704(c) Allocations**").   The Tax Matters Member shall elect the method under which Section 704(c) Allocations will be made for each item of contributed property.

(b)     Agreed Value Adjustments.   In the event the Agreed Value of any Company property is adjusted so as to differ from its adjusted basis for federal income tax purposes, such asset shall, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4), take account of any variation between the adjusted basis of such asset for federal income tax purposes and the Agreed Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder ("**Reverse Section 704(c) Allocations**").   The Tax Matters Member shall elect the method under which Reverse Section 704(c) Allocations will be made for each item of property whose Agreed Value is adjusted.

(c)     Depreciation Recapture.   Pursuant to Treasury Regulations Section 1.1245-1(e), to the extent the Company recognizes gain as a result of a sale, exchange or other disposition of Company assets which is taxable as ordinary income under Code Section 1245 or Code Section 1250, such ordinary income shall be allocated among the Members in the same proportion as the depreciation giving rise to such ordinary income was allocable among the Members.   In no event, however, shall any Member be allocated ordinary income hereunder in excess of the amount of gain allocated to the Member under this Agreement.   Any ordinary income that is not allocated to a Member due to the gain limitation described in the previous sentence shall be allocated among those Members whose shares of total gain on the sale, exchange or other disposition of the property exceed their share of depreciation from the Company assets, in proportion to their relative shares of the total allocable gain.

(d)     Excess Nonrecourse Liabilities.   For purposes of determining a Member's

proportional share of the Company's "excess nonrecourse liabilities" within the meaning of Treasury Regulation Section 1.752-3(a)(3), each Member's interest in Net Income shall be such Member's Percentage Interest.

4.04 <u>Distributions</u>.  The Company may distribute Net Cash Flow of the Company or Net Proceeds to the Members as the Board of Managers may authorize in its sole discretion or as provided by Section 4.05 and, in any event, on at least a monthly basis and to the extent necessary for any Member to satisfy debt service payments under any of its Indebtedness which has been guaranteed by the Company or any of its Subsidiaries, to the extent available therefor.  All distributions of Net Cash Flow of the Company or Net Proceeds pursuant to this Section 4.04 shall be made to the Members in accordance with their Percentage Interests at the time of the applicable distribution.  Upon a Liquidation Event, the Company shall distribute the assets and properties of the Company in accordance with the terms and conditions set forth in Section 10.02.  Damani Member acknowledges that Section 2.18 of this Agreement authorizes Quantum Member and the Company to exercise certain offset, set-off and withholding rights against amounts due to Damani Member under this Section 4.04 and hereby authorizes, agrees to and consents to the Company withholding from Damani Member and paying over to Quantum Member, without recourse to the Company, any amount payable to Damani Member pursuant to this Section 4.04 (and any such amount so withheld by the Company and paid to Quantum Member shall be treated as if such amount was so paid by the Company to Damani Member and then paid by Damani Member to Quantum Member).

4.05 <u>Tax Distributions</u>.  With respect to each Fiscal Year, (i) to the extent there is Net Cash Flow of the Company or Net Proceeds available for distribution and (ii) subject to (x) the establishment of any reserves determined by the Board of Managers, in its sole discretion, to be reasonably necessary for any contingent, conditional or unmatured liabilities or obligations of the Company or any of its Subsidiaries and (y) any restrictions set forth in any contracts, agreements or arrangements to which the Company or any of its Subsidiaries may be subject, the Company shall distribute to each Member, via one or more distributions made during such Fiscal Year or as soon as reasonably practicable after the close of such Fiscal Year, an amount of cash equal to each such Member's Tax Distribution Amount.  For each Fiscal Year, a Member's "**Tax Distribution Amount**" will be equal to the excess (if any) of (a) such Member's deemed tax liability with respect to the Company for such Fiscal Year, determined as if such Member were an individual resident in the City and State of New York, New York who would be subject to the highest effective net tax rate in respect of his or her interest in the Company for such Fiscal Year over (b) the aggregate distributions made by the Company to such Member pursuant to Section 4.04 (and including Section 10.02 as contemplated in Section 4.04) during such Fiscal Year. For this purpose, with regard to any particular type or class of income, gain, profit or revenue, the applicable tax rate will be deemed to be the highest statutory rate applicable to such specific type or class of income, gain, profit or revenue.  Any distribution made to a Member pursuant to this Section 4.05 shall be treated as an advance on amounts otherwise distributable under Section 4.04 (and including Section 10.02 as contemplated in Section 4.04) and shall otherwise reduce dollar-for-dollar any future amounts distributable under Section 4.04 (and including Section 10.02 as contemplated in Section 4.04) to such Member (it being understood and agreed for the avoidance of doubt that the amount of any such advance shall only be credited once).

4.06 <u>Withholding and Other Tax Payments and Obligations</u>.

(a)     <u>Withholding and Other Tax Payments on Receipts of (or Payments to) the Company</u>.  If the Company is required by applicable law to pay any tax, or receives proceeds in respect of which any tax has been withheld, and the Board of Managers determines, in its sole discretion, that such tax is specifically attributable to any Member (or the status of any Member), including federal or state withholding taxes, state personal property taxes, or state unincorporated business taxes, each Member to which such tax is attributable shall be treated as having received a hypothetical distribution pursuant to Section 4.04 hereof equal to the portion of such tax allocable to such Member, as determined by the Board of Managers, in its sole discretion.  If less than all of the Members are treated as receiving a hypothetical distribution under the preceding sentence, the Board of Managers may, in its sole discretion, authorize an offsetting distribution pursuant Section 4.04 hereof to the Members not treated as receiving a hypothetical distribution under the preceding sentence.  Notwithstanding Section 4.02, such hypothetical distribution shall be treated as a tax deduction and shall be specially allocated only to the Members to which it is attributable. In the event the Company receives a refund of such tax, the economic benefit of such refund shall be apportioned among the Members in a manner reasonably determined by the Board of Managers, in its sole discretion, to offset the prior operation of this Section 4.06(a) in respect of such tax.

(b)     <u>Withholding Tax on Payments by the Company</u>.  The Company is authorized to withhold from any distribution made to, or any distributive share of, any Member, any taxes required by applicable law to be withheld, and to pay over to any federal, state, local, or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local, or foreign law.  Such withheld tax shall be treated as a distribution to such Member pursuant to Section 4.04 hereof and shall be allocated to the Member with respect to which it was withheld.  The Company shall not be liable for any excess taxes withheld in respect of any Member's interest in the Company, and, in the event of over-withholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.

ARTICLE V

MANAGEMENT AND GOVERNANCE OF THE COMPANY

5.01 <u>Board of Managers</u>.

(a)     <u>General</u>. The business of the Company will be managed by a "**Board of Managers**" and the Persons (each of whom shall be a natural individual) constituting the Board of Managers will be the "managers" of the Company for all purposes under the LLC Act (each, individually, a "**Manager**"), provided that (i) the Board of Managers will have the power to act only collectively in accordance with the provisions and in the manner specified herein and (ii) notwithstanding the last sentence of Section 18-402 of the LLC Act, except as expressly provided in this Agreement or in a resolution of the Board of Managers, no individual member of the Board of Managers, in his or her capacity as such, shall have the authority to bind the Company.  Except as otherwise expressly provided in this Agreement, the Board of Managers will have the exclusive power and authority to oversee the business and affairs of the Company and to make all decisions with respect thereto in its sole discretion (including, but not limited to, the exercise of all power and authority to oversee the business and affairs of each wholly-owned Subsidiary of the Company and to make all decisions with respect such Subsidiary in its sole discretion). Except as otherwise expressly provided in this Agreement, the Board of Managers or Persons designated by the Board of

35

Managers, including Officers and agents appointed by the Board of Managers, will be the only Persons authorized to execute documents which will be binding on the Company.  To the fullest extent permitted by the LLC Act, but subject to any specific provisions of this Agreement granting rights to Members, the Board of Managers will have the power to perform any acts, statutory or otherwise, with respect to the Company or this Agreement, which would otherwise be possessed by the Members under the LLC Act, and the Members will have no power whatsoever with respect to the management of the business and affairs of the Company or its Subsidiaries.

(b)    Number; Appointments; Vacancies.

(i)    The authorized number of Managers on the Board of Managers will be three (3).  The Company and the Members shall take such actions as may be required to ensure that the number of Managers constituting the Board of Managers is at all times three (3).

(ii)    The Managers shall be appointed by the Members holding a majority of the Class A Units, provided that so long as Damani Member holds Class A Units representing a Percentage Interest less than fifty percent (50%) but at least twenty-five percent (25%), Damani Member shall have the right to appoint one (1) Manager (the "**Minority Manager**") and the other Members holding Class A Units, voting as a single class, shall have the right to appoint the other two (2) Managers (collectively, the "**Majority Managers**"), provided that such appointment of one (1) of the Majority Managers shall be subject to the approval of Damani Member, such approval not to be unreasonably withheld or delayed, provided further that such approval right of Damani Member with respect to the appointment of one (1) of the Majority Managers shall no longer exist after Damani Member has exercised such right as a disapproval (i.e., veto) in an aggregate of three (3) times. For the avoidance of doubt, upon the exercise of remedies by an applicable lender or holder of any interest in the Lucky Bucks Financing upon or following a default or event of default thereunder, the final two provisos of this Section 5.01(b)(ii) shall no longer be applicable. Notwithstanding anything herein to the contrary, in no event shall Damani or any of his relatives be a Manager. As of October 31, 2020, the Managers shall be Manu Sekhri and James Boyden (as the Majority Managers, who have been approved by, and shall not be subject to any further approval by, Damani Member) and Tony Kassam (as the Minority Manager).

(iii)    Each Manager will hold office until he or she sooner dies, becomes disabled, resigns or is removed.  The Member or Members holding the right of appointment with respect to any Manager position shall have the right to remove any such Manager and to fill any vacancy in such Manager position caused by removal, death, disability, resignation or any other reason.  Any appointment or removal of a Manager pursuant to this Section 5.01(b) shall be made by written notice to the Company and the other Members.  Each Member hereby agrees to take, without undue delay, any and all such actions as may be required to ensure the prompt appointment of a successor to fill any vacancy on the Board of Managers.

(c)    Meetings and Written Actions.

(i)    Meetings.  Regular meetings of the Board of Managers will be held with such frequency and at such times and locations as the Board of Managers may determine.  Special meetings of the Board of Managers may be held at any time when called by two (2) or more Managers.

(ii)    <u>Notice</u>.  Notice of a regular or special meeting of the Board of Managers shall be given to each Manager by the Secretary or other Officer of the Company as directed by the Board of Managers with respect to regular meetings or by the Managers calling a special meeting.  Notice shall be deemed to be reasonable and sufficient if sent to a Manager by overnight delivery, e-mail or by facsimile at least five (5) calendar days before the meeting addressed to such Manager at such Manager's usual or last known business or residential address or to give notice to such Manager in person or by telephone at least five (5) calendar days before the meeting. Notice of a meeting need not be given to any Manager if a written waiver of notice, executed by such Manager before or after the meeting, is filed with the records of the meeting, or to any Manager who attends the meeting without protesting prior thereto or at its commencement the lack of notice to such Manager.  Neither notice of a meeting nor a waiver of a notice need specify the purposes of the meeting.

(iii)    <u>Voting; Quorum</u>.  Each Manager shall be entitled to cast one (1) vote on any action to be voted upon by the Board of Managers.  No action may be taken at a meeting of the Board of Managers unless a quorum is present.  At any meeting of the Board of Managers, a majority of the full Board of Managers will constitute a quorum.  Any act taken at a meeting by a majority of a quorum of the Board of Managers shall be a valid act of the Board of Managers.

(iv)    <u>Proxies</u>.  A Manager may vote at a meeting of the Board of Managers either in person or by proxy executed in writing by such Manager.  Proxies for use at any meeting of the Board of Managers or in connection with the taking of any action by written consent will be filed with the Board of Managers, before or at the time of the meeting or execution of the written consent as the case may be.  Notwithstanding the foregoing, during any period in which there is one Minority Manager and two Majority Managers, each Majority Manager present at a meeting shall automatically and without written notice serve at such meeting as a proxy for the other Majority Manager, if such other Majority Manager is not present at the meeting.

(v)    <u>Written Actions Without a Meeting</u>.  Any action required or permitted to be taken at any meeting of the Board of Managers may be taken without a meeting if all of the Managers of the full Board of Managers consent thereto in writing or by electronic communication and such writing or writings are filed with the records of the meetings of the Board of Managers. Such consent will be treated for all purposes as the act of the Board of Managers.

(vi)    <u>Participation in Meetings by Conference Telephone</u>.  Managers may participate in a meeting of the Board of Managers by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law.  Such participation will constitute presence in person at such meeting.

(d)    <u>Manner of Acting; Reliance</u>.

(i)    Decisions of the Board of Managers will be set forth in resolutions adopted in accordance with the procedures set forth in this Section 5.01.  Such decisions will be decisions of the Company's "manager" for all purposes of the LLC Act and will be carried out by Officers or agents of the Company designated by the Board of Managers in the resolution in question or in one or more standing resolutions or with the power and authority to do so under Section 5.02.

(ii)     Except for the right to appoint a proxy pursuant to Section 5.01(c)(iii) and the delegation of authority to Officers and agents pursuant to Section 5.02, no Manager may delegate his or her rights and powers to manage and control the business and affairs of the Company.  The foregoing expressly overrides the contrary provisions of Section 18-407 of the LLC Act.

(iii)     A decision of the Board of Managers may be amended, modified or repealed in the same manner in which it was adopted or in accordance with the procedures set forth in this Section 5.01, provided that no such amendment, modification or repeal will affect any Person who has been furnished a copy of the original resolution, certified by a duly authorized officer of the Company, until such Person has been notified in writing of such amendment, modification or repeal, provided further that no such amendment, modification or repeal will invalidate actions previously authorized by such original resolution with respect to any Person if such original resolution has been relied upon by such Person.

(iv)     Members of the Board of Managers, in their capacity as Managers, shall devote such time and attention to the business of the Company as the Managers shall see fit in their sole discretion for the efficient conduct thereof.  The Board of Managers shall provide written notice to the Members of all resolutions adopted by the Board of Managers which materially impact the interest of the Members in the Company within a reasonable time following such adoption.

(v)     Any Person dealing with the Company may rely upon a certificate signed by a person authorized by the Board of Managers as to: (i) the identity of the Members, (ii) the existence or non-existence of any fact or facts that are germane to the affairs of the Company, (iii) the Persons which are authorized to execute and deliver any instrument or document of or on behalf of the Company, (iv) the authorization of any action by or on behalf of the Company by the Board of Managers or any Officer or agent acting on behalf of the Company, or (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company.

(e)     <u>No Fiduciary Duties</u>. None of the Managers, in their capacity as a Manager, shall, to the fullest extent permitted by applicable law, have any duties (fiduciary or otherwise) or liabilities to the Company or any Member or any other Person that is a party to, or is otherwise bound by, this Agreement (other than (i) as expressly set forth in this Agreement and (ii) as expressly set forth in any other agreement between such Person, on the one hand, and the Company or any of its Subsidiaries, on the other hand), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or exist against any of them (other than the implied contractual covenant of good faith and fair dealing).

(f)     <u>Expense Reimbursement</u>.  No Manager shall be entitled to any compensation with respect to his or her services as a Manager.  The Company shall reimburse each Manager for all reasonable out-of-pocket expenses which such Manager shall incur in connection with the performance of such Person's duties as a Manager (including in connection with attending the meetings of the Board of Managers).

(g)     <u>Committees</u>. The Board of Managers may, by vote of a majority of the whole Board of Managers, (i) designate, change the membership of or terminate the existence of any committee

or committees, each committee to consist of the Minority Manager, so long as the Damani Member has the right to appoint a Manager, and one (1) or more of the remaining Managers and (ii) designate one (1) or more Managers as alternate members of any such committee who may replace any absent or disqualified member at any meeting of the committee.  No committee will have the powers of the Board of Managers in the management of the business and affairs of the Company.  In the absence or disqualification of any member of such committee and his or her alternate, if any, the member or members thereof present at any meeting and not disqualified from voting, whether or not constituting a quorum, may unanimously appoint another member of the Board of Managers to act at the meeting in the place of any such absent or disqualified member.  Except as the Board of Managers may otherwise determine, any committee may make rules for the conduct of its business, but unless otherwise provided by the Board of Managers or such rules, its business will be conducted as nearly as may be in the same manner as is provided by this Agreement for the conduct of business by the Board of Managers.  Each committee will keep regular minutes of its meetings and report the same to the Board of Managers upon request.

(h)     Board of Managers Approval of Certain Matters.  Neither the Company nor any of its Subsidiaries, nor any Officer or agent on its or their behalf (under delegated authority or otherwise), nor any committee of the Board of Managers, shall be permitted to take, enter into, consummate or make, or cause to be taken, entered into, consummated or made, any of the following actions, agreements, commitments, obligations, liabilities or transactions without the approval or consent of the Board of Managers (in addition or subject to any other approval or consent that may be required pursuant to this Agreement):

(i)     create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable (including by guarantee thereof) with respect to, any Indebtedness incurred outside the ordinary course of business or in excess of $100,000 in the aggregate at any time outstanding;

(ii)     make, create, incur, assume or allow to exist any Lien upon or with respect to any part of its assets or property, whether now owned or hereafter acquired, other than (A) Liens securing Indebtedness permitted by Section 5.01(h)(i), (B) Liens with respect to the payment of taxes, assessments or other governmental charges, in each case imposed by law or arising in the ordinary course of business, for amounts that are not yet overdue for more than 30 days, (C) Liens of carriers, warehousemen, suppliers, mechanics, landlords, materialmen, repairmen or other similar Liens, in each case imposed by law or arising in the ordinary course of business, for amounts that are not yet overdue for more than 30 days, (D) pledges, deposits or other Liens made in the ordinary course of business (1) in connection with workers' compensation, unemployment insurance or other types of social security benefits (other than any Lien imposed by ERISA), (2) to secure the performance of bids, tenders, leases, sales or other trade contracts or statutory obligations or (3) made in lieu of, or to secure the performance of, surety, appeal, customs, reclamation or performance bonds (in each case not related to judgments or litigation) or (E) any interest or title of a lessor or sublessor under any lease entered into in the ordinary course of business and not in excess of $100,000 in the aggregate at any time, including any Liens arising from the filing of precautionary UCC or similar financing statements with respect thereto;

(iii)     make or own an Investment in any Person, other than (A) Investments in cash and cash equivalents in the ordinary course of business, (B) Investments consisting of

extensions of credit in the nature of accounts receivable, notes receivable or prepaid royalties and other credit extensions to customers and suppliers in the ordinary course of business, and Investments received in connection with the settlement of delinquent accounts receivables in the ordinary course of business or in connection with Events of Bankruptcy with respect to suppliers or customers, or (C) Investments constituting Indebtedness permitted by Section 5.01(h)(i) or (v) any other Investments not in excess of $250,000 in the aggregate at any time outstanding;

(iv)    sell, assign, lease, license, transfer, convey or otherwise dispose of any assets or property of the Company or any of its Subsidiaries other than dispositions of (A) inventory in the ordinary course of business, (B) equipment that is substantially worn, damaged, obsolete or no longer used or useful in the conduct of the business of the Company and its Subsidiaries, (C) leases or subleases of real property no longer used or useful in the conduct of the business of the Company and its Subsidiaries, (D) intellectual property or rights in intellectual property, in each case, that are not material to the conduct of the business of the Company and its Subsidiaries, (E) accounts receivable (including any discount and/or forgiveness thereof) or, in the case of accounts receivable in default, in connection with the collection or compromise thereof and in any event, to the extent permitted by Section 5.01(h)(iii), (F) owned or leased vehicles in the ordinary course of business, or (G) contractual rights or litigation claims (including in tort) in the ordinary course of business not in excess of $100,000;

(v)    acquire or construct any capital asset (including tangible and intangible capital assets and improvements) involving expenditures in excess of 10% of the amount originally approved by the Board of Managers;

(vi)    enter into any Affiliate Transaction whether or not in the ordinary course of business;

(vii)    enter into any employee agreement or compensation arrangement (including equity-based compensation), or any retention bonus or similar arrangement and any severance arrangement other than, in each case, in the ordinary course of business and not in excess of $65,000;

(viii)    enter into, or amend, restate, supplement or otherwise modify, any lease, indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which the Company or any of its Subsidiaries is a party or by which it or any of its properties is bound or to which it or any of its properties is subject other than, in each case, in the ordinary course of business and not in excess of $100,000 or in the case of capital or operating lease obligations, where the present value thereof is not in excess of $400,000;

(ix)    initiate any litigation, claim or other legal matter involving the Company or any of its Subsidiaries, or the settlement of any such litigation, claim or other legal matter, if the amount in controversy or to be paid, together with any other related expected financial impact, is reasonably expected to exceed $200,000 individually or in the aggregate for a series of related matters;

(x)    adopt any material Company policies including conflict of interest, investment, risk management or other similar policies;

(xi)   form, convert, dissolve, recapitalize, re-domesticate or reorganize any Subsidiary of the Company;

(xii)   change the name of, or adopt or change any fictitious or trade name used by, the Company or any of its Subsidiaries;

(xiii)   designate the Company's principal place of business, other or additional business locations, or the Company's registered offices and registered agents;

(xiv)   engage independent auditors for the Company and/or its Subsidiaries;

(xv)   make any determination required to be made by the Board of Managers in respect of Units or Equity Securities pursuant to Section 3.01, or in respect of any Certificate of Membership Interest pursuant to Section 3.03;

(xvi)   call any Additional Capital Contribution pursuant to Section 3.07 or make any determination of the Board of Managers in respect thereof pursuant to Section 3.07, Section 3.08 or Section 3.09;

(xvii)   make any determination with respect to Agreed Value, Fair Market Value, Depreciation, Net Cash Flow or Net Proceeds required, or in the discretion, of the Board of Managers pursuant to this Agreement;

(xviii)   make any determination or take any action with respect to distributions of Net Cash Flow or Net Proceeds pursuant to Section 4.04, Section 4.05 and Section 4.06 or any assets or properties of the Company and its Subsidiaries pursuant to Section 10.02, establish or increase any reserves to satisfy future operating expenses and debt service payments, or release or reduce such reserves;

(xix)   appoint the Chairman, Chief Executive Officer, President, Chief Operating Officer or Chief Financial Officer of the Company or any of its Subsidiaries, remove any such Officer or fill any vacancy in any such Officer position, or consent to any Officer's concurrent service as an officer or director of any other Person;

(xx)   take any action or make any determination reserved to the Board of Managers pursuant to Article VI with respect to Transfers or Financing Liens;

(xxi)   make or take any decision, determination, change or other action required, or in the discretion, of the Board of Managers pursuant to the provisions of Article VIII, or any decision with respect to the treatment of Company transactions in the Company's federal, state, local and foreign tax returns;

(xxii)   make any determination or take action required, or in the discretion, of the Board of Managers pursuant to the provisions of Section 9.06 in respect of indemnification and insurance;

(xxiii)   make any determination or take action required, or in the discretion, of the Board of Managers pursuant to the provisions of Article X in respect of a Liquidation Event; or

(xxiv)  make any determination or action of the Board of Managers pursuant to Section 12.02 with respect to further actions of the Company, pursuant to Section 12.06 with respect to any amendment to this Agreement or waiver of any provision of this Agreement, or pursuant to Section 12.15 with respect to the commencement of any action seeking equitable relief upon an Event of Default by Damani Member or otherwise or, except as otherwise expressly contemplated by this Agreement, any other determination to be made, or action to be taken, by the Company.

5.02  Officers; Agents.

(a)      The Board of Managers, at any time and from time to time, will have the power to appoint Officers and agents to act for the Company with such titles, if any, as the Board of Managers deems appropriate and to delegate to such Officers or agents such of the powers as are granted to the Board of Managers hereunder, including the power to execute documents on behalf of the Company, as the Board of Managers may determine, provided that no such delegation by the Board of Managers will cause the Persons constituting the Board of Managers to cease to be the "managers" of the Company within the meaning of the LLC Act.  The officers so appointed (the "**Officers**") may include persons holding titles such as Chairman, Chief Executive Officer, Chief Operating Officer, President, Chief Financial Officer, Executive Vice President, Vice President, Treasurer, Secretary or Controller.  Unless the authority of the Officer in question is limited in the document appointing such Officer or is otherwise specified by the Board of Managers, an Officer will have the same authority to act for the Company as a corresponding officer of a Delaware corporation would have to act for a Delaware corporation in the absence of a specific delegation of authority. As of October 31, 2020, there are no Officers of the Company.

(b)      Each Officer of the Company shall possess any and all fiduciary duties that are owed by officers and other persons pursuant to Section 18-1104 of the LLC Act.

(c)      An Officer need not be a Member of the Company.  Any individual may hold two or more offices of the Company.  Any individual may serve as both an Officer of the Company and an officer or director of any other Person, subject to the consent of the Board of Managers in its sole discretion.

(d)      Each Officer will hold office for the term specified in his or her written instrument of appointment, or in each case until he or she sooner dies, resigns or is removed.  An Officer may resign at any time upon written notice to the Board of Managers and such resignation will be effective upon receipt unless specified to be effective at some other time, and without in either case the necessity of its being accepted unless the resignation will so state.  An Officer may be removed by the Board of Managers with or without cause at any time.  Any vacancy in any office may, but need not, be filled by the Board of Managers.

(e)      At any time or from time to time the Board of Managers may delegate to any Officer their power to elect or appoint any other Officer or any agents, subject, however, to Section 5.01(h).

(f)      Each agent will retain his or her authority at the pleasure of the Board of Managers or the Officer then holding agent appointive power.

5.03 <u>Member Approval of Certain Matters</u>.   Neither the Company nor any of its Subsidiaries shall be permitted to take any action, enter into any agreement or consummate any transaction without the prior written consent of Members holding a majority of the Class A Units (each a "**Majority Approval**"), if such action, agreement or transaction would result in any of the following (provided that such majority of Members must include the affirmative consent of Damani Member if Damani Member then holds Class A Units representing a Percentage Interest of at least twenty-five percent (25%) or ten percent (10%), as the case may be, as set forth in this Section 5.03 (each a "**Minority Approval**")):

(a)     So long as Damani Member holds Class A Units representing a Percentage Interest of at least twenty-five percent (25%), in addition to the Majority Approval, the Minority Approval shall be required for the following (provided that Minority Approval shall not be required under Sections 5.03(a)(i), 5.03(a)(ii), 5.03(a)(v) or 5.03(a)(vi)):

(i)     the incurrence of indebtedness for borrowed money, or the guarantee or refinancing of indebtedness for borrowed money, by or on behalf of the Company or any of its Subsidiaries if the principal amount of such indebtedness exceeds, in the aggregate at any time, $500,000, excluding, however, (A) indebtedness or guaranties under, or refinancing of, the Lucky Bucks Financing, (B) indebtedness, not to exceed $500,000 in the aggregate at any time outstanding, consisting of Capitalized Lease Obligations, or the guarantee or refinancing thereof, or (C) indebtedness incurred, or guaranties made, in the ordinary course of business of the Company or any of its Subsidiaries, including, but not limited to, obligations with respect to surety and appeals bonds, performance bonds and other similar obligations, provided that in the case of any refinancing, the principal amount of the refinancing indebtedness shall not exceed the original principal amount of the indebtedness being refinanced plus fees or expenses incurred in connection with such refinancing;

(ii)     any capital expenditure by or on behalf of the Company or any of its Subsidiaries which, individually or in the aggregate, exceeds 1.5% of the Company's and its Subsidiaries' consolidated net revenue as of the 12-month period ending in the month of such expenditure;

(iii)     any action (including the filing of a U.S. Treasury Form 8832 Entity Classification Election) that would cause the Company to be characterized as an entity other than a partnership for federal income tax purposes, or that would cause any wholly-owned Subsidiary of the Company (other than an acquired wholly-owned Subsidiary that has always been classified as a corporation) to be treated as other than a disregarded entity for federal income tax purposes;

(iv)     any fundamental change in the business of the Company or any of its Subsidiaries from the business of the Company and such Subsidiaries as contemplated by Section 2.05 (including, but not limited to, any investment in or operation or conduct of any business other than such contemplated business, entering into a new line of business, or making any other material change in the purpose or business of the Company or any of its Subsidiaries);

(v)     any request or demand for, or creation of any obligation to provide, Additional Capital Contributions to the Company or any Subsidiary pursuant to Section 3.07, excluding, however, without duplication, any Additional Capital Contribution required or

demanded in connection with (A) any capital expenditure approved pursuant to Section 5.03(a)(ii), (B) any purchase, license, lease, exchange or other acquisition of assets or equity interests of any Person approved pursuant to Section 5.03(b)(iv), (C) any investment in any business, or any entry into a new line of business, approved pursuant to Section 5.03(a)(iv), or (D) any Additional Capital Contribution which, individually or in the aggregate, does not exceed $500,000 as of the 12-month period ending in the month of such Additional Capital Contribution;

(vi)    authorize, issue or sell, or enter into any contract relating to the authorization, issuance or sale of, any additional Units, other Membership Interests or any other any Equity Securities in the Company or any of its Subsidiaries to any Person, other than (A) additional Units issuable in connection with Additional Capital Contributions pursuant Section 3.07, (B) Units, other Membership Interests or any other any Equity Securities issued in connection with the conversion, exchange or exercise of any other duly issued and outstanding Equity Securities in the Company or any of its Subsidiaries in accordance with their terms or (C) Units, other Membership Interests or any other any Equity Securities issued in connection with a Sale of the Company; or

(vii)    any determination made by the Board of Managers as provided for in the definition of "Net Proceeds" in Section 1.01.

(b)    So long as Damani Member holds Class A Units representing a Percentage Interest of at least ten percent (10%), in addition to Majority Approval, Minority Approval shall be required for the following (provided that Minority Approval shall not be required under Sections 5.03(b)(ii), 5.03(b)(iii) or 5.03(b)(iv)):

(i)    an amendment to the Organizational Documents of the Company or any of its Subsidiaries (other than as permitted by Section 2.16(e), Section 3.01(c), Section 12.06(a) or Section 12.06(b));

(ii)    the creation, incurrence or assumption of any lien of any kind securing any indebtedness for borrowed money, or any guaranty of indebtedness for borrowed money, or any other action that would cause any such lien to exist or become effective upon any of the Company's or its Subsidiary's material property or assets, now owned or hereafter acquired, excluding, however, (A) liens securing the indebtedness or guaranties under, or refinancing of, the Lucky Bucks Financing, (B) liens securing indebtedness, not to exceed $1,000,000 in the aggregate at any time outstanding, consisting of Capitalized Lease Obligations, or the guarantee or refinancing thereof, or (C) liens securing indebtedness incurred, or guaranties made, in the ordinary course of business of the Company or any of its Subsidiaries, including, but not limited to, obligations with respect to surety and appeals bonds, performance bonds and other similar obligations;

(iii)    except as permitted by the terms of this Agreement or any other agreement, instrument or contract approved by the Members pursuant to this Agreement, the purchase or redemption by the Company or any of its Subsidiaries of any Units or other Equity Securities of the Company or any of its Subsidiaries from any holder of such Units or other Equity Securities;

(iv)    any purchase, license, lease, exchange or other acquisition of assets or equity interests of any Person not in the ordinary course of business and in excess of 2% of the

Company's and its Subsidiaries' consolidated net revenue as of the 12-month period ending in the month of such purchase, license, lease, exchange or acquisition; or

(v)    the approval or consent to the dissolution of the Company pursuant to Section 10.01(a).

(c)    So long as Damani Member holds Class A Units representing a Percentage Interest of at least twenty percent (20%), in addition to the Majority Approval, the Minority Approval shall be required for the authorization, issuance or sale, or entering into any contract relating to the authorization, issuance or sale of, any additional Units, other Membership Interests or any other any Equity Securities in the Company that rank senior to the senior most Units, other Membership Interests or any other Equity Securities in the Company then held by Damani Member in terms of rights, preferences and privileges with respect to the distribution of assets on liquidation, dissolution or winding-up and the making of distributions, provided that Minority Approval shall not be required under this Section 5.03(c) with respect to any authorization, issuance or sale, or entering into any contract relating to the authorization, issuance or sale of, any additional Units, other Membership Interests or any other any Equity Securities in any Rescue Financing.

(d)    Notwithstanding the foregoing or any other provision of this Agreement, upon the happening and during the continuance of an Event of Bankruptcy or Event of Default with respect to Damani Member, the Minority Approval provisions of this Section 5.03 shall have no force or effect and Damani Member shall be deemed to have waived such provisions in all respects immediately upon and during the continuation of such Event of Bankruptcy or Event of Default.

5.04 <u>Certain Third Party Observation Rights</u>.  The Members hereby consent to the Board of Managers causing the Company to grant to (i) any secured lender to the Company with indebtedness in excess of $500,000, (ii) the holder, or a group of holders, of a majority of the Class A Units or (iii) so long as Damani Member holds Class A Units representing a Percentage Interest of at least ten percent (10%), Damani Member, the right to have a reasonable number of its representatives attend, as observers, any or all meetings of the Company's Members and Board of Managers, as applicable (including any meeting of any committees thereof), and to provide to such observers the same information concerning, and access thereto, provided to such Members or Board of Managers, as applicable, provided that such observers have agreed in writing in advance to hold in confidence and trust all such information, provided further that the Company, for itself and each Member and the Board of Managers, shall retain the right to demand that any such observer must leave any such meeting, or be denied any information, if, upon advice of counsel, the applicable Members or the Board of Managers determine that such observer has a conflict of interest pertaining to a particular portion of such meeting or information, or that the attendance or dissemination to such observer could remove any privilege of confidentiality from otherwise attorney-client privileged statements or information.

ARTICLE VI

TRANSFER OF MEMBERSHIP INTERESTS

6.01 <u>Limitation on Transfer</u>.

(a)    Except as otherwise provided in this Article VI, no Member shall Transfer any Units or other Equity Securities of the Company including any profits interest, rights to receive distributions, or other similar or dissimilar right or interest. Without limiting the foregoing, Damani Member shall not permit any Indirect Owner of Damani Member to Transfer any Equity Security in Damani Member and Damani Member shall not, nor shall it permit any Indirect Owner of Damani Member to, directly or indirectly, issue any Equity Security such that upon consummation of such Transfer or issuance, there would be a Change of Control of Damani Member, provided that (i) any such Change of Control of Damani Member shall be a violation of this Agreement and constitute a Repurchase Event under Article VII and (ii) without implication that the contrary would otherwise be true, any Transfer of any Equity Securities of Damani Member by any Indirect Owner of Damani Member or any issuance of any Equity Securities of Damani Member by Damani Member shall constitute a Transfer by Damani Member of the Units and other Equity Securities of the Company held by Damani Member (in the same proportion of Equity Securities of Damani Member being so Transferred or issued (as the case may be) and such Transfer of such Units and other Equity Securities of the Company held by Damani Member shall be subject to Section 6.05.

(b)    Any proposed Transfer of any Units or other Equity Securities of the Company by any Member or other holder thereof shall be null and void unless the procedures set forth in this Article VI have been complied with.  Any purported Transfer, not otherwise specifically permitted by this Article VI shall be null and void *ab initio*, and the Company shall not register or effect such Transfer and the Member making such purported Transfer shall indemnify and hold the Company and the other Members harmless from and against any federal, state or local income taxes, or transfer taxes, including transfer gain taxes, arising as a result of, or caused directly or indirectly by, such purported Transfer.  For the avoidance of doubt, any Transfer of Units or Equity Securities of the Company by a holder made in compliance with this Article VI shall be considered a Transfer by the Transferor of the Percentage Interest to which such Units and/or Equity Securities of the Company being Transferred relate, including all rights and obligations appurtenant to such Units or Equity Securities.

6.02  Permitted Transfers.

(a)    Notwithstanding anything to the contrary in this Article VI or elsewhere in this Agreement, the requirements of this Article VI (other than Section 6.03 which shall apply subject to clause (iv) below, and Section 6.07 which shall apply as provided therein), shall not apply to the following Transfers (each a "**Permitted Transfer**"; each Transferee of a Permitted Transfer, a "**Permitted Transferee**"; and each Transferor of a Permitted Transfer, a "**Permitted Transferor**"):

(i)    in the case of a Member who is a natural person, any Transfer by such Member of all or any portion of his or her Units outright or in trust to or for the benefit of a Family Member of such Member or any personal representative, estate or executor under any will of such Member or pursuant to the laws of intestate succession, so long as the final recipient from any personal representative, estate or executor under any will or pursuant to the laws of intestate succession or pursuant to any other Transfer pursuant to this clause (i) is a Family Member of such Member or is a Person whose beneficial interests are held by Family Members of such Member;

(ii)     in the case of a Member which is not a natural person (other than a trust), any Transfer by such Member of all or any portion of its Units to, or in trust to or for the benefit of, any Person who is in Control of such Member by reason of beneficially holding Equity Securities of such Member;

(iii)     in the case of a Member which is a trust, any Transfer by such trust to the beneficiaries of such trust; or

(iv)     any Transfer by a Member to grant or create, in favor of any banking, financing or other lending institution that provides financing to the Company, any of its Subsidiaries or any Person of which the Company is a Subsidiary, any collateral assignment, pledge, lien on or security interest in such Member's Units, Membership Interest or any other Equity Securities of the Company or its Subsidiaries (individually and collectively, "**Financing Liens**") to secure indebtedness under the Existing Credit Agreement or any refinancing thereof (individually and collectively, "**Lucky Bucks Financing**"), provided that any Transfer that occurs pursuant to the Financing Liens upon the exercise of remedies upon or following a default or event of default of, under or with respect to the obligations secured by such Financing Liens, and any subsequent Transfer, shall be a Permitted Transfer, provided further that notwithstanding any other provision of this Agreement to the contrary, any Transferees pursuant to the Financing Liens, or any subsequent Transferees, shall be deemed to be Permitted Transferees and admitted as substitute Members upon their compliance with Sections 6.03(b) and 6.03(d) and the receipt of all approvals required under applicable law (including, without limitation, all Gaming Approvals). For purposes hereof, "**Existing Credit Agreement**" means that certain Credit and Security Agreement among Lucky Bucks, as borrower, the lenders named therein, as lenders, and KeyBank National Association, as the administrative agent, dated as of January 29, 2020, as amended from time to time.

(b)     Unless the context otherwise requires, in the event a Member directly Transfers a portion (but not all) of its Units or Membership Interest to a Permitted Transferee and the Permitted Transferee is admitted as a Member: (i) such initial Member and Permitted Transferee shall (A) be grouped together and considered a single Member, (B) act collectively and (C) be represented by such initial Member, who shall have the authority to represent and bind such Permitted Transferee and to receive and provide all information and notices on its behalf; (ii) with respect to Quantum Member, any references to a Member or Quantum Member shall collectively refer to Quantum Member and such Permitted Transferee; (iii) with respect to Damani Member, any references to a Member or Damani Member shall collectively refer to Damani Member and such Permitted Transferee, (iv) with respect to TCFIII LLC Member, any references to a Member or TCFIII LLC Member shall collectively refer to TCFIII LLC Member and such Permitted Transferee and (v) with respect to TCFIII LP Member, any references to a Member or TCFIII LP Member shall collectively refer to TCFIII LP Member and such Permitted Transferee.

(c)     Unless the context otherwise requires, in the event a Member Transfers its entire Membership Interest in accordance with Article VI and the Transferee is admitted to the Company as a substituted Member pursuant to Section 6.03, references to a Member, Quantum Member (if Quantum Member is the Transferor of such Membership Interest), Damani Member (if Damani Member is the Transferor of such Membership Interest), TCFIII LLC Member (if TCFIII LLC Member is the Transferor of such Membership Interest) or TCFIII LP Member (if TCFIII LP

Member is the Transferor of such Membership Interest), as applicable, in this Agreement shall mean such substituted Member, and such substituted Member shall be considered the initial Member for purposes of Section 6.02(b).  The admission of any Transferee shall be deemed effective immediately prior to the applicable Transfer.

6.03 <u>Conditions to Transfers</u>.  In addition to all other terms and conditions contained in this Agreement, no Transfers to which the provisions of Sections 6.01 and 6.02 would apply shall be completed or effective for any purpose, and no Transferee shall become a substituted Member for the Transferor, unless prior thereto:

(a)    The Transferor shall have provided to the Company and the Board of Managers, (i) at least ten (10) calendar days' prior notice of such Transfer, (ii) a certificate of the Transferor, delivered with such notice, containing a statement and representation that such Transfer is permitted under this Article VI and otherwise complies with all provisions of this Agreement (including, but not limited to, this Article VI), together with such information as is reasonably necessary for the Company to confirm such statement and representation, and (iii) such other information and documents as may be reasonably requested by the Company or the Board of Managers in order for it to make such determination;

(b)    The Transferor and Transferee shall have executed and delivered a written instrument of assignment that shall have been filed with the Company specifying the Units being assigned and setting forth that the Transferee assumes and succeeds to the Transferor's Membership Interest as a substitute Member;

(c)    The Transferor and Transferee shall have executed and acknowledged any other instruments that the Board of Managers deems reasonably necessary for substitution, including (i) the written acceptance and adoption by the Transferee of the provisions of this Agreement and, assumption by the Transferee of all obligations of the Transferor under this Agreement pursuant to a joinder to this Agreement and (ii) the agreement of the Transferor to guarantee its obligations as a Member to be performed by the Transferee or a replacement guaranty of its obligations as a Member by a Person acceptable to all Members;

(d)    The Transferee shall have agreed in writing to be bound by the terms of this Agreement and that the Units acquired by it shall be subject to the terms of this Agreement and the Transferee shall have furnished copies of all instruments effecting the Transfer and such other certificates, instruments and documents as the Company may reasonably request;

(e)    All necessary third-party consents to the Transfer shall have been obtained;

(f)    If requested by the Board of Managers in its sole judgment, the Company shall have received the opinion of counsel to the Company, at the Transferor's expense, reasonably satisfactory in form and substance to the Board of Managers, to the effect that:  (i) such Transfer would not cause the Company to cease to be classified as a partnership for federal income tax purposes, (ii) such Transfer would not violate the Securities Act or any state securities or "blue sky" laws applicable to the Company or the Equity Securities to be Transferred, (iii) such Transfer shall not impose liability or reporting obligations on the Company or any Member thereof in any jurisdiction, whether domestic or foreign, or result in the Company or any Member thereof

becoming subject to the jurisdiction of any court or governmental entity anywhere, other than the states, courts and governmental entities in which the Company is then subject to such liability, reporting obligation or jurisdiction and (iv) such other matters as the Board of Managers may reasonably request;

(g)     The Board of Managers, in its sole judgment, shall have determined that it is satisfied that the Transfer complies with all provisions of this Agreement (including, but not limited to, this Article VI); and

(h)     The Transferee shall have paid all reasonable expenses incurred by the Company (including any reasonable legal and accounting fees) in connection with such Transfer.

6.04 <u>Additional Requirements</u>.  Damani Member shall cause each of its Indirect Owners to comply with the provisions of this Article VI.

6.05 <u>Right of First Refusal</u>.

(a)     <u>Notice of Intention to Sell</u>.  Subject to the provisions of Sections 6.01 and 6.02, and Sections 6.05(g) and 6.05(h) with respect to Damani Member, if Damani Member, Quantum Member, TCFIII LLC Member or TCFIII LP Member, as applicable (in such capacity, the "**Selling Member**"), desires to Transfer any of such Member's Units, following receipt of a bona fide offer from a proposed Transferee, the Selling Member shall deliver to the Company and each of the other Members (in such capacity, the "**ROFR Offer Member**"), prompt written notice (hereinafter referred to as a "**Notice of Intention to Sell**") of the intention to Transfer and the terms and conditions of the proposed Transfer, which Notice of Intention to Sell shall state (i) the number of Units proposed to be Transferred (the "**Offered Units**"), (ii) the purchase price therefor, including a description of any non-cash consideration sufficiently detailed to permit valuation thereof, (iii) the identity of the proposed Transferee and (iv) any other material terms and conditions of the proposed Transfer, including the proposed Transfer date (which date may not be less than thirty (30) calendar days after the date of delivery of the Notice of Intention to Sell).  By delivering the Notice of Intention to Sell, the Selling Member represents and warrants to the ROFR Offer Member that: (a) the Selling Member has full right, title and interest in and to the Offered Units; (b) the Selling Member has all the necessary power and authority and has taken all necessary action to Transfer such Offered Units as contemplated by this Article VI; and (c) the Offered Units are free and clear of any and all liens other than those arising as a result of or under the terms of this Agreement.

(b)     <u>ROFR Offer</u>.  The Notice of Intention to Sell shall be accompanied by a written offer (the "**ROFR Offer**"), irrevocable until the end of the ROFR Exercise Period, to Transfer the Offered Units on the same terms and conditions as set forth in the Notice of Intention to Sell to the Company and each ROFR Offer Member, in each case, on the same terms and conditions as set forth in the Notice of Intention to Sell (except that the purchase price shall be an amount in cash equal to 100% of the cash purchase price and 100% of the Fair Market Value of any non-cash consideration set forth in the Notice of Intention to Sell).

(c)     <u>ROFR Exercise Period; Notice of Election</u>.

(i)     <u>Company Exercise Period</u>.  If Damani Member is the Selling Member, the

49

Company shall have ten (10) calendar days from the date on which it receives the applicable Notice of Intention to Sell (the "**Company Exercise Period**") to determine whether to accept the ROFR Offer to purchase all (but not less than all) of the Offered Units, provided that the Company Exercise Period shall not be deemed to have commenced until a determination of Fair Market Value of any non-cash consideration set forth in the Notice of Intention to Sell has been made in accordance with Section 6.05(b) above. If the Company desires to accept the ROFR Offer, it shall give written notice (a "**Notice of Election**") to the Selling Member of its intent to accept such ROFR Offer during the Company Exercise Period. The failure of the Company to give a Notice of Election to the Selling Member by the end of the Company Exercise Period shall constitute a waiver of the Company's right of first refusal under this Section 6.05 with respect to the Transfer of Offered Units subject to the applicable Notice of Intention to Sell, but shall not affect its rights with respect to any future Transfers.

(ii)     ROFR Member Exercise Period. If Quantum Member, TCFIII LLC Member or TCFIII LP Member is the Selling Member, or if the Company does not elect to accept the ROFR Offer during the Company Exercise Period, then the Company shall promptly provide the Selling Member and the ROFR Offer Members written notice thereof (the "**Company Notice**"). Each ROFR Offer Member shall have ten (10) calendar days from the date on which it receives the Company Notice (the "**ROFR Member Exercise Period**") to determine whether to accept the ROFR Offer to purchase all or any portion of the Offered Units. If a ROFR Offer Member desires to accept the ROFR Offer, it shall deliver a Notice of Election to the Selling Member of its intent to accept such ROFR Offer during the ROFR Member Exercise Period that states the maximum number of Offered Units such ROFR Offer Member is willing to purchase (each such ROFR Offer Member who so timely delivers a Notice of Election to the Selling Member is referred to herein as an "**Exercising Member**"). The failure of a ROFR Offer Member to give a Notice of Election to the Selling Member by the end of the ROFR Member Exercise Period shall constitute a waiver of such ROFR Offer Member's right of first refusal under this Section 6.05 with respect to the Transfer of Offered Units subject to the applicable Notice of Intention to Sell but shall not affect its rights with respect to any future Transfers. The Offered Units shall be allocated among each of the Exercising Members in an amount equal to the product of (i) the number of Offered Units multiplied by (ii) the quotient of (1) the aggregate number of Units owned on the date of the Notice of Intention to Sell by each Exercising Member divided by (2) the aggregate number of Units owned on the date of the Notice of Intention to Sell by all Exercising Members, with such allocation being repeated in respect of any Offered Units until either all Exercising Members have been allocated the maximum number of Offered Units which they have stated they are willing to purchase pursuant to their respective Notice of Election or until all Offered Units have been so allocated among them. Notwithstanding the foregoing, the Exercising Members shall be entitled to allocate the Offered Units in any other manner as may be agreeable to them, provided that no Exercising Member shall be allocated fewer Offered Units than such Exercising Member would be entitled to purchase by operation of the preceding sentence unless such Exercising Member has consented thereto in writing.

(d)     Transfer to the ROFR Offer Member. In the event that one or more Exercising Members elect to purchase all of the Offered Units, the Selling Member shall Transfer to the Exercising Members the respective Offered Units being purchased by each of them during the sixty (60) calendar day period immediately following the expiration of the last to occur of the Company Exercise Period or the ROFR Member Exercise Period, as applicable (the "**ROFR**

**Exercise Period**"), provided that such date of closing shall be extended to the extent necessary to obtain any required regulatory approvals (but in no event shall such date be greater than one hundred eighty (180) calendar days after the expiration of the ROFR Exercise Period).

(e)      Transfer to Proposed Transferee.  In the event that one or more Exercising Members do not elect to purchase all of the Offered Units or there are no Exercising Members, then, provided the Selling Member has also complied with the provisions of Section 6.01 and 6.03, to the extent applicable, the Selling Member may Transfer all (but not less than all) of the Offered Units to the prospective Transferee identified in the Notice of Intention to Sell on the same terms and conditions set forth therein, during the sixty (60) calendar day period immediately following the expiration of the ROFR Exercise Period, provided that such date of closing shall be extended to the extent necessary to obtain any required regulatory approvals (but in no event shall such date be greater than one hundred eighty (180) calendar days after the expiration of the ROFR Exercise Period).  Any Offered Units not Transferred within such period will be subject to the provisions of this Section 6.05 upon any subsequent Transfer.  If the Offered Units represent all of the Selling Member's Units in the Company, the intangible rights appurtenant to the Units shall also transfer to the Transferee.

(f)      Lock-up Period.  Notwithstanding anything contained in this Agreement to the contrary, Damani Member may not Transfer any Units or other Equity Securities of the Company during the Restricted Period if Damani's Percentage Interest would be less than 20% after such Transfer. "**Restricted Period**" means the period commencing on October 31, 2020, and ending on the earlier to occur of (i) February 25, 2025, or (ii) the consummation of a Sale of the Company.

(g)      Limitation on Damani Member.  Damani Member shall not have the right to be a ROFR Offer Member, receive a ROFR Offer or purchase Offered Units pursuant to this Section 6.05 unless Damani Member holds Class A Units representing a Percentage Interest of at least twenty-five percent (25%).

(h)      Termination of Damani Member's Rights under this Section 6.05.  In the event of the occurrence and continuation of an Event of Default by Damani Member, Damani Member's right to be a ROFR Offer Member, receive a ROFR Offer or purchase Offered Units pursuant to this Section 6.05, shall terminate.

Notwithstanding anything contained in this Section 6.05 to the contrary, this Section 6.05 shall not apply with respect to (a) any Transfer of any Units, Membership Interests or other Equity Securities of the Company to a Permitted Transferee or (b) any Transfer of any Units, Membership Interests or other Equity Securities of the Company that would constitute a Sale of the Company.

6.06 Tag-Along Rights.

(a)      Subject to the provisions of Sections 6.01, 6.02, 6.05 and 6.07 hereof, if at any time (i) Quantum Member, TCFIII LLC Member or TCFIII LP Member is the Selling Member pursuant to Section 6.05 and one or more Exercising Members have not elected to purchase all of the Offered Units or there are no Exercising Members or (ii) a proposed Transfer by Quantum Member, TCFIII LLC Member or TCFIII LP Member would constitute a Sale of the Company in which a Drag-Along Notice is not delivered pursuant to Section 6.07, then (1) in the case of the

immediately preceding clause (i), the Initiating Member's Notice of Intention to Sell shall also constitute such Initiating Member's Tag-Along Notice for purposes of this Section 6.06 and such Tag-Along Notice shall be deemed to have been delivered upon expiration of the ROFR Member Exercise Period or (2) in the case of the immediately preceding clause (ii), Quantum Member, TCFIII LLC Member or TCFIII LP Member (as the case may be) shall deliver written notice to Damani Member at least ten (10) calendar days prior to a proposed Transfer that will constitute such a Sale of the Company specifying in reasonable detail the Units so proposed to be Transferred by it and the price and other terms and conditions of such proposed Transfer (a "**Tag-Along Notice**"). For purposes of this Section 6.06, (I) "**Sale Units**" means, with respect to a particular Tag-Along Notice, the Units of the Initiating Member specified in such Tag-Along Notice that are proposed to be Transferred by the Initiating Member, (II) "**Initiating Member**" means, with respect to a particular Tag-Along Notice, the applicable Member who delivers or is deemed to have delivered such Tag-Along Notice and (III) "**Tag-Along Member**" means each Member (other than the Initiating Member).

(b)     Within ten (10) calendar days of delivery of the Tag-Along Notice by the Initiating Member, each Tag-Along Member shall, by written notice to the Initiating Member have the opportunity and right to sell to the proposed Transferee in such proposed Transfer (upon the same terms and conditions as the Initiating Member, subject to Section 6.06(c)) up to that number of Units owned by such Tag-Along Member as shall equal the product of (x) a fraction, the numerator of which is the number of Sale Units and the denominator of which is the aggregate number of Units owned of record as of the date of the Tag-Along Notice by the Initiating Member, <u>multiplied</u> by (y) the number of Units owned of record by the Tag-Along Member as of the date of the Tag-Along Notice. Such written notice shall state the aggregate number of Units that such Tag-Along Member proposes to include in such Transfer.

(c)     If a Tag-Along Member exercises its rights pursuant to this Section 6.06, then the Initiating Member will attempt to obtain the same agreements and commitments from the proposed Transferee for the benefit of such Tag-Along Member as the Initiating Member obtained from the proposed Transferee in respect of its Transfer. To the extent the Initiating Member cannot obtain such agreements and commitments from such proposed Transferee, the Initiating Member and such Tag-Along Member shall reduce the number of Units being sold by the Initiating Member and such Tag-Along Member such that the Initiating Member and such Tag-Along Member sells a number of Units as is determined by multiplying (x) a fraction, the numerator of which is equal to the number of Units the Initiating Member, on the one hand, or such Tag-Along Member, on the other hand, would have sold if the Initiating Member had obtained such agreements and commitments from such proposed Transferee, and the denominator of which is equal to the total number of Units that would have been sold by the Initiating Member and such Tag-Along Member if the Initiating Member had obtained such agreements and commitments from such proposed Transferee, <u>times</u> (y) the total number of Units that such proposed Transferee is in fact acquiring from the Initiating Member and such Tag-Along Member.

(d)     The closing of the Transfer of the Units with respect to which rights have been exercised by a Tag-Along Member pursuant to this Section 6.06 is subject to, and will take place concurrently with, the closing of the Transfer of the Sale Units to the proposed Transferee.  At such closing, each Tag-Along Member shall deliver to the proposed Transferee, free and clear of all liens, the Units to be sold by such Tag-Along Member and shall receive in exchange therefor,

the consideration to be paid by the proposed Transferee in respect of such Units as described in the Tag-Along Notice.

Notwithstanding anything contained in this Section 6.06 to the contrary, this Section 6.06 shall not apply with respect to any Transfer of any Units, Membership Interests or other Equity Securities of the Company to a Permitted Transferee. Additionally, if (i) a proposed Transfer by Quantum Member, TCFIII LLC Member or TCFIII LP Member (as the case may be) will constitute a Sale of the Company, (ii) such proposed Transfer will involve a competitive sale process and (iii) Damani Member indicates in writing to Quantum Member, TCFIII LLC Member or TCFIII LP Member (as the case may be) that Damani Member has a bona fide interest in acquiring all of the Units, Membership Interests or other Equity Securities of the Company proposed to be so Transferred by Quantum Member, TCFIII LLC Member or TCFIII LP Member (as the case may be), then Quantum Member, TCFIII LLC Member or TCFIII LP Member (as the case may be) will allow Damani Member to participate in such competitive sale process with the other proposed acquirers subject to the terms and conditions imposed on such other proposed acquirers.

6.07 <u>Drag-Along Rights</u>.

(a)     In the event that the Members holding a majority of the Class A Units approve a Sale of the Company to an Independent Third Party (including, but not limited to, a Sale of the Company that would result from a Transfer of Units subject to Section 6.06) (an "**Approved Sale**"), each Member shall vote for, consent to and raise no objections against such Approved Sale. If the Approved Sale is structured as a merger or consolidation, each Member hereby agrees to waive any dissenters' rights, appraisal rights or similar rights in connection with such merger or consolidation.

(b)     In the event of an Approved Sale, the Members holding a majority of the Class A Units (as applicable, the "**Dragging Member**" or "**Dragging Members**") may elect to trigger the obligations of the other Members and holders of Units or other Equity Securities of the Company (the "**Dragged Holders**") to sell their Units and other Equity Securities of the Company in accordance with the terms of this Section 6.07 by providing the Dragged Holders with written notice (a "**Drag-Along Notice**") of the Approved Sale which notice shall set forth the terms and conditions of the Approved Sale.  Upon the receipt of a Drag-Along Notice, each Member shall agree to sell all of its, his or her Units and any other Equity Securities of the Company (provided that, in the case of an Approved Sale involving less than all of the outstanding Units and other Equity Securities of the Company, the Units and other Equity Securities of the Company to be sold by the Dragging Member and each Dragged Holder will be reduced ratably based on its, his or her Percentage Interest) on the terms and conditions approved by the Members holding a majority of the Class A Units, provided that such terms and conditions do not disproportionately affect a Member relative to the other Members of the same class or series of Units or disproportionately affect one class or series of Units relative to the other classes or series of Units.  Each Member shall take all reasonably necessary actions in connection with the consummation of the Approved Sale as requested by the Board of Managers, including the execution of such agreements and such instruments and other actions reasonably necessary to consummate the transaction.

(c)     Each of the Dragging Members and the Dragged Holders will bear their respective

pro rata share (based upon their pro rata shares of the aggregate net proceeds resulting from an Approved Sale) of any reasonable costs incurred by or on behalf of the Company in connection with an Approved Sale to the extent such costs are not otherwise paid by the Company or the acquiring party. Costs incurred by the Dragging Member or any Dragged Holder on its own behalf in connection with an Approved Sale shall not be considered costs of an Approved Sale. To the extent that an Approved Sale contains deferred consideration, earnouts, adjustments or indemnification obligations of the Members participating in the Approved Sale, such obligations shall be no less favorable to the Dragged Holders than on a pro rata basis for all Members (based upon their pro rata shares of the aggregate net proceeds resulting from an Approved Sale) including any indemnification escrow, holdback or similar agreement. In no event shall the indemnification obligations of any Dragged Holder exceed the proceeds allocable to such Dragged Holder as a result of such Approved Sale except in the case of fraud or willful misconduct of such Dragged Holder.

(d)    In the event any Dragged Holder fails to comply with its obligations under this Section 6.07, the Board of Managers shall be deemed to have been irrevocably appointed as the attorney-in-fact of the Dragged Holder so failing, with full power and authority to take all such actions and execute and deliver all such documents in the name and on behalf of the Dragged Holder so failing to consummate the Approved Sale.

(e)    The Approved Sale shall be structured in a manner in which the proposed acquirer in such Approved Sale shall purchase or acquire all (or, if less than all Units then outstanding are being sold in such Approved Sale, a portion equal to the same percentage of the total Units then outstanding that are being sold in such Approved Sale) of the equity interests of any entity that is a corporation or is treated as a corporation for federal tax purposes and holds equity of Quantum Member or TCFIII LP Member for an amount equal to the consideration that would have been received by Quantum Member or TCFIII LP Member (as the case maybe) had the Units being sold in such Approved Sale been sold to such proposed acquirer and the Company received all consideration therefor and distributed all such consideration pursuant to Section 4.04 (as adjusted to reflect any cash or other assets held by Quantum Member or TCFIII LP Member (as the case may be)).

6.08 <u>Tolling</u>.    All time periods specified in this Article VI are subject to reasonable extension for the purpose of complying with requirements of law or regulation, subject to the 180-day limits set forth in Section 6.05(d) and Section 6.05(e).

6.09 <u>August 2020 MIPA</u>.    Notwithstanding anything contained in this Agreement to the contrary, nothing contained in this Article VI shall apply to the Transfer of Class A Units pursuant to the August 2020 MIPA.

ARTICLE VII

REPURCHASE RIGHTS

7.01 <u>Repurchase Event</u>.    Upon the occurrence of (A) a Change of Control with respect to

Damani Member, including, but not limited to, by reason of any Transfer of any Equity Security in Damani Member by any Indirect Owner of Damani Member or the issuance of any Equity Security by any Indirect Owner of Damani Member or (B) an Event of Default arising from any breach or default by Damani Member or any of its Affiliates of any indemnity obligations owed to any Purchaser or any of its Affiliates under any of the Purchase Agreements in excess of $500,000 individually or in the aggregate (each of (A) and (B), a "**Repurchase Event**"), the Company shall have the right, but not the obligation, to redeem from Damani Member (as such, the "**Redeemed Member**"), within a reasonable period of time, all Units held by the Redeemed Member for the Fair Market Value of such Units, which shall be determined pursuant to this Article VII. The Board of Managers shall have the right, but not the obligation, to cause the Company to assign its rights under this Article VII to the Members (other than the Redeemed Member) who hold all other Class A Units, ratably according to the number of such Units held.

7.02 <u>Fair Market Value Determination</u>.

(a)    The Board of Managers shall determine the Fair Market Value of the Units of the Redeemed Member in good faith and shall provide the Redeemed Member with a reasonably detailed written summary of the analysis used by the Board of Managers to determine such amount (the notice setting forth such Fair Market Value delivered to such Redeemed Member is referred to herein as the "**Initiating Notice**"). If the Redeemed Member disagrees with the Board of Managers' determination of Fair Market Value, such Redeemed Member shall deliver to the Board of Managers written notice of such dispute within ten (10) Business Days of its receipt of the Initiating Notice (a "**Dispute Notice**"). The Dispute Notice shall set forth the initial determination of such Redeemed Member of the Fair Market Value of the Units. The Board of Managers and the Redeemed Member shall then negotiate in good faith for ten (10) Business Days (or for such longer period as they mutually agree) in an effort to reach agreement on the Fair Market Value of the Units.

(b)    If such negotiation is unsuccessful, the Board of Managers and the Redeemed Member shall promptly designate an independent appraiser. No later than the fifth (5th) Business Day after appointment of the independent appraiser, each of the Board of Managers and the Redeemed Member shall deliver to the independent appraiser a written notice of its final determination of the Fair Market Value of the Units (each, a "**Valuation Notice**"). The independent appraiser shall be instructed to determine the final Fair Market Value of the Units within thirty (30) calendar days of its receipt of both Valuation Notices. In making such determination, the independent appraiser (x) shall be instructed that the initial determinations of the Fair Market Value set forth in the Initiating Notice and the Dispute Notice shall not be used as evidence of the actual Fair Market Value or the correctness of either the Board of Managers' or the Redeemed Member's determination of the Fair Market Value set forth in the Valuation Notice and (y) may request additional submissions of information from the Board of Managers and/or the Redeemed Member (and the Board of Managers and/or the Redeemed Member shall promptly comply). The opinion of the independent appraiser shall be binding upon the Company, the Board of Managers and the Redeemed Member. The fees and expenses of the independent appraiser shall be borne equally by the Company and the Redeemed Member.

(c)    <u>Closing of Redemption</u>. Within a reasonable time following the final determination of the Fair Market Value of the Units, not to exceed thirty (30) calendar days, the parties shall take

all commercially reasonable actions necessary and appropriate to consummate the repurchase of the Units by the Company.

## ARTICLE VIII

## BOOKS, RECORDS, FINANCIAL AND TAX MATTERS

8.01 <u>Fiscal Year</u>.   The fiscal year of the Company for tax purposes shall end on December 31 of each year (a "**Fiscal Year**").  The Board of Managers may change the Fiscal Year (without the consent of any Member) at any time and from time to time.

8.02 <u>Maintenance of Accounts, Books and Records</u>.  The Company shall keep full and accurate books of account and other records of the Company and its Subsidiaries at its principal place of business including minutes of proceedings, written consents, internal management documents, reports of operations, reports of adverse developments, copies of any management letters and communications with Members or Managers and any other information required pursuant to Section 18-305(a) of the LLC Act.

8.03 <u>Preparation of Tax Returns</u>.  The Board of Managers shall cause all Company tax returns to be timely filed with the applicable government authorities within allowable time periods, including extensions, and shall use reasonable efforts to provide such tax returns in a timely manner (and consistent with Section 8.06(b)) to the Members with the necessary information, including Schedule K-1 s, with respect to the operations of the Company to allow the Members to file their own tax returns.  The Board of Managers shall in good faith make all decisions with respect to the treatment of Company transactions in the Company's federal, state, local and foreign tax returns.

8.04 <u>Bank Accounts; Temporary Investments</u>.   All receipts, funds and income of the Company shall be deposited in the name of the Company in such bank account or accounts of a commercial bank, savings and loan association or other financial institution as the Board of Managers from time to time shall determine.  Withdrawals from said banks shall be made on the signature of such Persons designated by the Board of Managers, and there shall be no commingling of the moneys and funds of the Company with moneys and funds of any other entity or Person. Notwithstanding the foregoing, the Board of Managers on behalf of the Company shall be authorized to invest Company funds not needed for Company purposes temporarily in United States Treasury obligations, money market funds, certificates of deposit, bankers' acceptances, or any other similar money market instruments or funds (including those issued or managed by an Affiliate of a Member) and such other similar money market instruments or funds and such other short term investments as the Board of Managers shall select.

8.05 <u>Tax Elections</u>.  For United States federal, state or local income tax purposes, the Company shall make any elections determined by the Board of Managers from time to time. Notwithstanding the foregoing, it is intended the Company be treated as a partnership for federal income tax purposes and neither the Company nor any Member shall make any election (for tax purposes or otherwise) inconsistent with such treatment without the prior written approval of the Board of Managers.

8.06 <u>Tax Returns and Information; Tax Matters Member</u>.

(a)    The Company shall cause its certified public accountants to prepare all of the tax returns of the Company and its Subsidiaries and shall cause the same to be filed in a timely manner. The Company shall furnish to each Member a copy of each such tax return.

(b)    The Member holding a majority of the Class A Units shall be the "tax matters partner" of the Company as provided in the regulations pursuant to Code Section 6231 as in effect prior to its amendment by the Revised Partnership Audit Procedures and shall be the "partnership representative" of the Company for any taxable period subject to the provisions of Code Section 6223, as amended by the Revised Partnership Audit Procedures (in each such capacity, the "**Tax Matters Member**").  Each Member hereby approves of such designation and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be deemed necessary or appropriate to evidence such approval.  To the extent and in the manner provided by the Code and the Treasury Regulations, the Tax Matters Member shall have all of the rights, duties, powers and obligations provided for in Code Sections 6221 through 6234 as in effect prior to its amendment by the Revised Partnership Audit Procedures with respect to the Company with respect to tax years beginning on or before December 31, 2017.

(c)    Except as expressly provided in this Agreement, each Member shall be considered to have retained such rights (and obligations, if any) as are provided for under the Code or any other applicable law with respect to any examination, proposed adjustment or proceeding relating to Company tax items.  The Tax Matters Member shall notify the other Members, within ten (10) calendar days after it receives notice from the governmental authorities, of any administrative proceeding with respect to an examination of, or proposed adjustment to, any Company or any Subsidiary tax items in excess of $50,000.  In the event that the other Members notify the Tax Matters Member of their intention to represent themselves, or to obtain independent counsel and other advisors to represent them, solely at their own expense, in connection with any such examination, proceeding or proposed adjustment, the Tax Matters Member agrees to supply the other Members and their counsel and other advisors, as the case may be, with copies of all written communications received by the Tax Matters Member from the governmental authorities with respect thereto.

(d)    Upon the Transfer of any Units by a Member permitted by this Agreement or any other event with respect to which adjustments to the tax basis of the Company assets would be permitted if the Company had a valid Section 754 election in effect, the Tax Matters Member shall cause the Company, at the written request of the Transferor or other affected Member, to make a timely election under Code Section 754.  The Company shall pay the costs of making such election, but the Board of Managers may (in its sole discretion) require the Member with respect to which an adjustment is made to the basis of the Company's assets pursuant to Code Section 743 to reimburse the Company's out-of-pocket expenses paid to outside service providers in connection with such basis adjustment.  The Board of Managers may (in its sole discretion and in lieu of reimbursement of the Company pursuant to preceding sentence) treat the Member otherwise required to reimburse the Company's out-of-pocket expenses under the preceding sentence as having received a hypothetical distribution pursuant to Section 4.04 hereof equal to the amount of such out-of-pocket expenses.  Notwithstanding Section 4.02, such hypothetical distribution shall be treated as a tax deduction and shall be specially allocated only to the Member to which it is

attributable.

(e)     The Tax Matters Member may appoint a designated individual pursuant to Treasury Regulation Section 301.6223-1(b)(3) (or any successor regulation). The Tax Matters Member, in its sole discretion, may cause the Company to elect out of the application of Code Section 6221(a) as in effect for any taxable year beginning after December 31, 2017, if possible.  If such election out is not made, each Member shall indemnify and hold harmless the Company from and against any liability with respect to the Member's proportionate share of any imputed underpayment as calculated under Code Section 6225(b) as in effect for taxable years beginning after December 31, 2017, including interest and penalties, resulting in liability of the Company, regardless of whether such Member is a Member of the Company in an "adjustment year" (as defined in Code Section 6225(d)(2) as in effect for taxable years beginning after December 31, 2017).  The Tax Matters Member, in its sole discretion, may cause the Company to elect the application of Code Section 6226 as in effect for its taxable years beginning after December 31, 2017 (the "**Section 6226 Election**"), in the event that it receives a "notice of final partnership adjustment" that would otherwise permit collection of a deficiency of tax from the Company, for a relevant year.  If the Tax Matters Member causes the Company to make the Section 6226 Election, the Members covenant to take into account, report, and pay the tax liability and any interest and penalties related to any adjustment, determined in accordance with Code Section 6226 and any Treasury Regulations adopted therewith (the "**Section 6226 Adjustments**"), to their items for the reviewed year, whether or not such Member owns any Units or remains a Member in the year of any such statement.  Any Member which fails to report and/or pay its share of tax liability and interest and penalties related to such Section 6226 Adjustments on its U.S. federal income tax return for its relevant taxable year shall indemnify and hold harmless the Company and the other Members against any tax, interest and penalties collected from the Company as a result of such Member's inaction.  The foregoing covenants and indemnification obligations of the Members described in this Section 8.06(e) shall survive indefinitely and shall not terminate, without regard to any transfer of a Member's interest, withdrawal as a Member, or liquidation, dissolution or termination of the Company.  The Members shall have no claim against the Company or the Tax Matters Member for any form of damages or liability as a result of actions taken by the Tax Matters Member under this Section 8.06(e).

8.07 <u>Financial Statements</u>.

(a)     <u>Annual Statements</u>.  Not later than ninety (90) calendar days after the end of each Fiscal Year, the Company shall make available to each Member an audited consolidated balance sheet for the Company and its Subsidiaries and an audited consolidated statement of operations for the Company and its Subsidiaries and a statement of each Member's Capital Account as at the end of, and for, such Fiscal Year, prepared in accordance with the Applicable Accounting Principles.

(b)     <u>Quarterly Statements</u>.  Not later than forty-five (45) calendar days after the end of each fiscal quarter, the Company shall make available to each Member (x) unaudited consolidated statements of operations of the Company and its Subsidiaries for such fiscal quarter and for the entire current Fiscal Year through the end of such fiscal quarter and (y) an unaudited consolidated balance sheet of the Company and its Subsidiaries as at the end of such fiscal quarter, prepared in accordance with the Applicable Accounting Principles, except such statements shall not include footnotes.

(c)    Other Financial Information. The Company shall also make available to each Member any other financial reports or materials prepared for and provided to the Board of Managers.

(d)    Provision of Information.  Subject to Section 8.08, the financial statements, reports and other information referenced in this Section 8.07 shall be available upon request by a Member, in which case the Company shall provide such Member or its representative with reasonable access to such financial statements, reports and other information at the Company's principal office during normal business hours, provided that the requesting Member hereby agrees that such financial statements, reports and other information (including any copies thereof) shall constitute confidential information, remain property of the Company and shall not be removed from the Company's principal office under any circumstance.

8.08 Information Rights.

(a)    For so long as any Member and its Affiliates collectively own a Percentage Interest of at least 10%, such Member and its advisors shall have (i) access to the types of information provided for in Section 18-305(a) of the LLC Act, (ii) access to any other information of the Company and its Subsidiaries reasonably necessary to allow such Member to exercise any of its rights under this Agreement and (iii) access to all other books, records and other information of the Company and its Subsidiaries that such Member may reasonably request.  From and after the time that a Member and its Affiliates collectively own a Percentage Interest of less than 10%, such Member and its advisors shall only have (a) access to the types of information provided for in Section 18-305(a) of the LLC Act and (b) access to any other information of the Company and its Subsidiaries reasonably necessary to allow such Member to exercise any of its rights under this Agreement.

(b)    If any Member desires to exercise its rights under Section 8.08(a), it shall provide reasonable advance notice to the Board of Managers, which notice shall identify in reasonable detail the types of information that such Member requests to access.  The Board of Managers shall act reasonably in responding to any request and may comply with such request by providing such Member an opportunity to examine the applicable documents in person during normal business hours or by providing copies.  Such Member shall reimburse the Company for any reasonable out-of-pocket costs incurred by the Company in connection with such requests.

ARTICLE IX

LIABILITY, EXCULPATION, INDEMNIFICATION AND INSURANCE

9.01 Liability.  A Member shall not have any personal liability whatsoever in such capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company or to any third parties for any debt, obligation or other liability of the Company, whether arising in contract, tort or otherwise, except as otherwise provided in this Agreement, the LLC Act and any other applicable law.

9.02 Exculpation.

(a)    For purposes of this Agreement, "**Covered Person**" means (x) any Manager, any

Member, any Affiliate of a Member, and any of their respective officers, directors, shareholders, partners, members, trustees, beneficiaries, employees or agents and (y) any Officer, committee member, employee or expressly authorized agent of the Company or its Subsidiaries.

(b)     No Covered Person shall be liable to the Company, its Affiliates or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company or any Affiliate, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's fraud, willful misconduct or willful breach of this Agreement.  There shall be, and each Covered Person shall be entitled to, a presumption such Covered Person acted in good faith and any action taken by a Covered Person as required pursuant to the Lucky Bucks Financing shall be deemed to have been taken in good faith and shall not constitute a willful breach of this Agreement.

(c)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

9.03  Duties and Liabilities of Covered Persons.  To the fullest extent permitted by law, a Covered Person (other than Officers, employees and expressly authorized agents) has no duties (including fiduciary duties), that would otherwise exist at law, in equity or otherwise, to the Company, its Affiliates or to any other Covered Person except as expressly provided by this Agreement or any other written agreement with the Company.  A Covered Person acting under this Agreement shall not be liable to the Company, its Affiliates or to any other Covered Person for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.  Whenever in this Agreement a Covered Person (other than Officers, employees and expressly authorized agents) is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall (i) unless expressly provided to the contrary, be entitled to make such decision in its sole and absolute discretion, (ii) be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and (iii) have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person (other than Officers, employees and expressly authorized agents) is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other applicable law.

9.04  Indemnification.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and

any amounts expended in settlement of any claims (collectively, "**Indemnified Losses**") incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company, its Subsidiaries or their respective Affiliates, except that no Covered Person shall be entitled to be indemnified in respect of any Indemnified Losses incurred by such Covered Person by reason of fraud, willful misconduct or willful breach of this Agreement with respect to such acts or omissions, provided that any indemnity under this Section 9.04 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof There shall be, and each Covered Person shall be entitled to, a presumption that such Covered Person acted in good faith.  The termination of any proceeding by settlement shall not be deemed evidence that a Covered Person acted in a manner which did not constitute good faith or that constituted fraud, gross negligence or willful misconduct.

9.05 <u>Defense Expenses</u>.  To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined the Covered Person is not entitled to be indemnified as authorized in Section 9.04 hereof.

9.06 <u>Insurance</u>.  The Company may purchase and maintain insurance, to the extent and in such amounts as the Board of Managers shall, in its sole discretion, deem reasonable, on behalf of Covered Persons and such other Persons as the Board of Managers shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company, its Subsidiaries or their respective Affiliates or such indemnities, regardless of whether the Company would have the power to indemnify such person or entity against such liability under the provisions of this Agreement.  The Board of Managers may, in its sole discretion, cause the Company to enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations and containing such other procedures regarding indemnification as are appropriate.

9.07 <u>Exclusions Related to Purchase Agreements</u>.  Notwithstanding any provision of this Agreement, the organizational documents of Lucky Bucks, the LLC Act or the Georgia Business Corporation Code, Damani Member hereby expressly acknowledges and agrees that the obligations of Damani Member and its Affiliates under the Purchase Agreements and the other Transaction Documents (and as defined in each of the Purchase Agreements) shall in no event or circumstance be or constitute, directly or indirectly, Indemnified Losses under this Article IX or any similar provisions of the organizational documents of Lucky Bucks, the LLC Act or the Georgia Business Corporation Code, at any time, and Damani Member, for itself and its Affiliates, hereby disclaims, waives and forever releases such indemnification rights or claims arising therefrom.

9.08 <u>Specified Indemnitees</u>.  It is expressly acknowledged and agreed that certain Covered Persons (the "**Specified Indemnitees**") may have certain rights to indemnification, advancement of expenses and/or insurance provided by one or more of the Specified Indemnitors. The Company hereby agrees and acknowledges, on behalf of itself and each of its Subsidiaries, that (a) the

Company and its Subsidiaries are the indemnitors of first resort with respect to the Specified Indemnitees (i.e., their respective obligations to a Specified Indemnitee are primary and any obligations of any of the Specified Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by a Specified Indemnitee are secondary), (b) the Company and its Subsidiaries shall be required to advance the full amount of expenses incurred by any of the Specified Indemnitees, as required by and subject to the terms of the organizational documents of the Company or its applicable Subsidiary (or any other agreement between the Company or any of its Subsidiaries, on the one hand, and any Specified Indemnitee, on the other hand), without regard to any rights any Specified Indemnitee may have against any of the Specified Indemnitors and (c) the Company, on behalf of itself and each of its Subsidiaries, irrevocably waives, relinquishes and releases the Specified Indemnitors from any and all claims against the Specified Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof (except to the extent that any Specified Indemnitee is not entitled to such indemnification or advancement of expenses under the organizational documents of the Company or its applicable Subsidiary or insurance coverage on account of any act or omission committed by such Specified Indemnitee at the request or instruction of the Specified Indemnitor (or any Affiliate thereof) with which such Specified Indemnitee is affiliated). The Company further agrees, on behalf of itself and each of its Subsidiaries, that (i) no advancement or payment by any of the Specified Indemnitors on behalf of a Specified Indemnitee with respect to any claim for which such Specified Indemnitee has sought indemnification from the Company or any of its Subsidiaries shall affect the foregoing, (ii) the applicable Specified Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Specified Indemnitee against the Company or its applicable Subsidiary and (iii) the Company and its Subsidiaries shall reimburse the applicable Specified Indemnitors for the advancements or payments actually made to any of the Specified Indemnitees (but only to the extent the applicable Specified Indemnitee is actually entitled to indemnification hereunder). The Specified Indemnitors shall be third-party beneficiaries of this Section 9.08 and shall have the right to enforce this Section 9.08.

## ARTICLE X

## DISSOLUTION AND TERMINATION

10.01 <u>Events of Dissolution</u>.  The Company shall be dissolved upon the earliest to occur of the following:

(a)    the approval or consent of Members holding a majority of the Class A Units (subject to the Minority Approval pursuant to Section 5.03(b)(v), if applicable); or

(b)    the consummation of the Sale of the Company (as defined in clause (b) of the definition of Sale of the Company).

Dissolution of the Company shall be effective on the day on which the event described in Section 10.01 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 10.02 and the Certificate of Formation shall have been cancelled as provided Section 10.03 and Section 10.04.

10.02 <u>Winding-Up, Liquidation and Distribution of Assets</u>.  If the Company is dissolved pursuant to Section 10.01, the Company shall be liquidated and wound up in accordance with the LLC Act (a "**Liquidation Event**") and the following provisions:

(a)     The financial officers of the Company shall be directed to prepare a balance sheet, income statement and statement of cash flows of the Company in accordance with the Applicable Accounting Principles as of the date of dissolution and for the period ended on such date, which financial statements shall be reported upon by the Company's independent public accountants.

(b)     The Board of Managers shall cause the assets, properties and business of the Company to be liquidated as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice.  Notwithstanding the foregoing, if it is determined by the Board of Managers not to sell all or any portion of the properties and assets of the Company, such properties and assets shall be distributed in kind in the order of priority set forth in Section 10.02(d), provided that the Fair Market Value of such properties and assets, as determined in good faith by the Board of Managers, shall be used in determining the extent and amount of a distribution in kind of such properties and assets in lieu of actual cash proceeds of any sale or other disposition thereof.

(c)     Net Income or Net Loss of the Company for the year of liquidation shall be credited or charged to the Capital Accounts of the Members in accordance with the allocation provisions set forth in Section 4.02.

(d)     The assets of the Company shall be applied and distributed as follows, and in the following order or priority:

(i)     *First*, to the satisfaction of all debts and liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof), including the expenses of liquidation, and including the setting up of any reserves determined by the Board of Managers to be reasonably necessary for any contingent, conditional or unmatured liabilities or obligations of the Company; and

(ii)     *Second*, the remaining assets of the Company shall be applied and distributed to the Members in accordance with their Percentage Interests.

10.03 <u>Certificate of Cancellation</u>.  When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, a certificate of cancellation as required by the LLC Act shall be executed and filed by the Board of Managers with the Secretary of State of the State of Delaware.

10.04 <u>Effect of Filing of Certificate of Cancellation</u>.  Upon the filing of a certificate of cancellation with the Secretary of State of the State of Delaware, the existence of the Company shall cease.

10.05 <u>Return of Contribution Nonrecourse to Other Members</u>.  Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contributions.  If the Company property

remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Contributions of one or more Members, such Member or Members shall have no recourse against any other Member.

10.06 <u>No Action for Dissolution</u>.  Each Member acknowledges that irreparable damage would be done to the goodwill and reputation of the Company if any Member should take any action to dissolve or liquidate the Company, other than the dissolution or liquidation of the Company pursuant to Section 10.01.  This Agreement has been drafted carefully to provide fair treatment of all parties and equitable payment in liquidation of the Membership Interests of all Members.  Accordingly, notwithstanding any other provision of this Agreement and any provision of applicable law that otherwise so empowers the Company, the Members, the Board of Managers, any Manager or any other Person, except for dissolution and liquidation pursuant to Section 10.01, neither the Company, the Members, the Board of Managers, any Manager nor any other Person shall be authorized or empowered, nor shall they permit the Company, without the prior written consent of Members holding a majority of the Class A Units, to take or fail to take any action that would cause the Company to suffer an Event of Bankruptcy, or to take action in furtherance thereof, or, to the fullest extent permitted by applicable law, dissolve or liquidate the Company (whether by the institution of legal action or otherwise).

ARTICLE XI

REPRESENTATIONS AND WARRANTIES

Each Member hereby represents and warrants to the Company and the other Members (and each Person admitted to the Company as a Member (by substitution or otherwise) shall represent and warrant as a condition to its admission) as follows:

11.01 <u>Corporate Matters</u>.  If such Member is not a natural Person:  (i) such Member is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation and has all requisite power and authority to own its property and carry on its business as currently owned and carried on, (ii) such Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder, (iii) such Member has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and (iv) such Member has taken all corporate, partnership or limited liability company action necessary for the authorization, execution, delivery and performance of this Agreement.

11.02 <u>Enforceability</u>.  This Agreement has been duly authorized, executed and delivered by such Member and (assuming the due authorization, execution and delivery by the other parties hereto) constitutes the legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights, general equitable principles and an implied covenant of good faith and fair dealing.  No consents or approvals are required from any governmental authority or other Person for such Member to enter into this Agreement, except those that have been previously obtained and remain in effect.

11.03 <u>No Conflict</u>.  Neither the execution, delivery, and performance of this Agreement, nor the consummation by such Member of the transactions contemplated hereby, (i) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member, (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the governing instruments of such Member, or of any material agreement or instrument to which such Member is a party or by which such Member is or may be bound or to which any of its material properties or assets is subject, (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Member is a party or by which such Member is or may be bound, or (iv) will result in the creation or imposition of any lien upon any of the material properties or assets of such Member.

11.04 <u>Governmental Approvals</u>.  Any registration, declaration, or filing with, or consent, approval, license, permit, or other authorization or order by, any governmental or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance and performance by such Member under this Agreement or the consummation by such Member of any transaction contemplated hereby has been completed, made, or obtained on or before the October 31, 2020 (or the admission of the Member by substitution or otherwise), as applicable.

11.05 <u>No Litigation</u>.  There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Member, threatened against or affecting such Member or any of its properties, assets, or businesses in any court or before or by any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator that could, if adversely determined (or, in the case of an investigation could lead to any action, suit, or proceeding, that if adversely determined could), reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the financial condition of such Member; and such Member has not received any currently effective notice of any default, and such Member is not in default, under any applicable order, writ, injunction, decree, permit, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator that could reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the financial condition of such Member.

11.06 <u>Securities Laws</u>.

(a)     Such Member is an accredited investor as defined in Regulation D under the Securities Act and has acquired its Membership Interest in the Company based upon its own investigation, and the exercise by such Member of its rights and the performance of its obligations under this Agreement will be based upon its own investigation, analysis, and expertise.  Such Member's acquisition of its Membership Interest in the Company has been made for its own account for investment, and not a view, to the sale, public offering, or distribution thereof within the meaning of the Securities Act or any other applicable federal or state securities laws, rules or

regulations ("**Securities Laws**").

(b)      Such Member is a sophisticated investor possessing an expertise in analyzing the benefits and risks associated with acquiring investments that are similar to the acquisition of its Membership Interests in the Company. Such Member acknowledges it is aware its Membership Interest in the Company has not been registered under the Securities Act or under any other Securities Laws in reliance upon exemptions contained therein.

(c)      Such Member acknowledges the Company will not and has no obligation to register any Membership Interest in the Company under the Securities Act or other Securities Laws.

(d)      Neither such Member, nor any officer or director or manager of any member of such Member is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act, except for those covered by Rule 506(d)(2) or (d)(3) under the Securities Act.

(e)      Such Member understands and acknowledges its representations and warranties contained herein are being relied upon by the Company, the other Members and the constituent owners of such other Members as the basis for exemption of the issuance of Membership Interests in the Company from registration requirements of the Securities Act and other Securities Laws.

11.07 <u>FCPA; Prohibited Persons</u>.  Such Member is aware of the U.S. Foreign Corrupt Practices Act of 1977, as amended, and any other relevant regulations promulgated thereunder or in connection therewith, the Executive Order and Prohibited Persons regulations, orders and reporting requirements and agrees to notify the Company and the Board of Managers as soon as reasonably practicable following any notice regarding any investigation or violation thereof.

11.08 <u>Gaming Laws</u>.  Such Member and, to the actual knowledge of such Member, its Affiliates and their respective Indirect Owners are in compliance with all Gaming Laws, Gaming Approvals and Gaming Licenses of any Gaming Authority applicable or issued to such Person.

ARTICLE XII

MISCELLANEOUS

12.01 <u>Expenses</u>.  Each Member shall bear all of its own expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel and accountants.

12.02 <u>Further Assurances</u>.  Each Member agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be required by applicable law or as, in the reasonable judgment of the Board of Managers, may be necessary or advisable to carry out the intent and purposes of this Agreement.

12.03 <u>Notices</u>.  Any and all notices, requests, consents, waivers or demands or other communications permitted or required to be made under this Agreement shall be in writing, and

shall be delivered (a) personally (with signed confirmation of receipt), (b) by nationally recognized overnight courier service (with signed confirmation of receipt), (c) by registered or certified mail, return receipt requested, (d) by facsimile (with acknowledgement of receipt) or (e) by Electronic Transmission.  All such notices, requests, consents, waivers or demands or other communications shall be deemed delivered when received or rejected.  Notices, requests, consents, waivers or demands or other communications directed to a Member shall be delivered to the Member's last address contained in the Company's records, and any Member may change such Member's address in the Company's records by providing the Company with written notice of such change given in conformity with the terms of this Section 12.03.  Notices, requests, consents, waivers or demands or other communications directed to the Company or the Board of Managers shall be addressed as follows:

If to the Company:

Lucky Bucks Holdco, LLC
5820 Live Oak Pkwy #300
Norcross, GA 30093
Attention: Board of Managers
E-mail: board@luckybucksga.com

with a copy (which will not constitute notice) to:

c/o Trive Capital
2021 McKinney Avenue, Suite 1200
Dallas, TX 75201
Attention:  Steve Yoost
E-mail:  steveyoost@trivecapital.com

and

Greenberg Traurig LLP
77 W Wacker Drive, Suite 3100
Chicago, IL 60601
Attention:  Todd A. Mazur
E-mail:  mazurt@gtlaw.com

If to Damani Member:

2299 Perimeter Park Dr #110
Atlanta, GA 30341
Attention:  Anil Damani
Facsimile: (404) 581-5507
E-mail:  anil@27invest.com

with a copy (which will not constitute notice) to:

Krevolin & Horst, LLC

> 1201 W Peachtree St., NE
> Suite 3250
> Atlanta, GA 30309
> Attention:  Michael G. Karamat
> Facsimile: (404) 812-3101
> E-mail: karamat@khlawfirm.com

If to Quantum Member, TCFIII LLC Member or TCFIII LP Member:

> c/o Trive Capital
> 2021 McKinney Avenue, Suite 1200
> Dallas, TX 75201
> Attention:  Steve Yoost
> E-mail:  steveyoost@trivecapital.com

with a copy (which will not constitute notice) to:

> Greenberg Traurig LLP
> 77 W Wacker Drive, Suite 3100
> Chicago, IL 60601
> Attention:  Todd A. Mazur
> E-mail:  mazurt@gtlaw.com

12.04 <u>No Right to Partition</u>.  The Members, on behalf of themselves, their respective Affiliates, successors and assigns, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Company or any asset of the Company, or any interest which is considered to be Company property, regardless of the manner in which title to such property may be held.

12.05 <u>Successors and Assigns</u>.  Subject to the restrictions on Transfers set forth herein, this Agreement and each and every provision hereof shall be binding upon and shall inure to the benefit of the Members, their respective successors, successors-in-title, heirs and permitted assigns, and each and every successor-in-interest to any Member, whether such successor acquires such interest by way of gift, purchase, foreclosure, or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement.

12.06 <u>Amendments; Waivers</u>.

(a)     No provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and Members holding a majority of the Class A Units (subject to the Minority Approval set forth in Section 5.03(b)(i), if applicable), which amendment or modification shall be binding upon the Company and each Member of the Company, provided that any amendment or modification to this Agreement that would have a disproportionate and material adverse effect on the economic interests of a single Member relative to all the other Members shall require the prior written approval of such Member that is so disproportionately and materially adversely affected.

(b)      Notwithstanding Section 12.06(a), (i) amendments to this Agreement (including Section 4.04 and **Schedule 1**) in connection with any new issuance (including pursuant to Section 3.01(c) hereof or any Additional Capital Contributions), redemption, repurchase or Transfer of any Units or other Equity Securities of the Company, in each case, may be made by the Board of Managers as expressly contemplated by this Agreement (including pursuant to Section 3.01(c)) without the consent of or execution by the Members (including Damani Member) and (ii) no amendment to this Agreement may require a Member to make a Capital Contribution or loan to the Company, or adversely affect the limited liability of a Member, without the consent of such Member.

(c)      Any provision of this Agreement may be waived if, and only if, such waiver is in writing and approved by the Board of Managers and signed by the Member against whom the waiver is to be effective, provided that the Board of Managers may not waive compliance of an obligation on the part of the Company, the Board of Managers or any of their Affiliates without the prior written consent of Members holding a majority of the Class A Units (including Damani Member if the Class A Units held by such Member represent a Percentage Interest of at least ten percent (10%)).  The failure of any Member to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

12.07 Governing Law; Waiver of Jury; Consent to Jurisdiction and Service of Process.

(a)      Governing Law.  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the internal laws of the State of Delaware, without reference to the rules regarding conflict or choice of laws of such state.

(b)      WAIVER OF JURY.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

(c)      Consent to Jurisdiction and Service of Process.  Any claim or cause of action based upon or arising out of this Agreement or the transactions contemplated hereby or arising out of or relating to this Agreement, or the breach, termination or validity thereof (an "**Action**"), shall be instituted in any state or federal court in the State of Delaware.  Each party agrees not to assert, by way of motion, as a defense or otherwise, in any such Action, any claim that it is not subject

personally to the jurisdiction of such courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper or that this Agreement, the agreements contemplated hereby or the subject matter hereof or thereof may not be enforced in or by such court. Each party further irrevocably submits to the exclusive jurisdiction of any such court in any such Action. Any and all service of process, summons, notice or other document by registered mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage prepaid, to the address set forth in Section 12.03 shall be effective service of process for any Action brought in any such court. Nothing contained herein shall operate, or shall be deemed to operate, to preclude any party hereto from bringing suit or taking other legal action against any other party hereto in any other jurisdiction to collect on such other party's obligations to such party as determined by said court or to enforce a judgment or other court ruling in favor of such party.

12.08 <u>Captions</u>. Titles or captions of Sections contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

12.09 <u>Counterparts</u>. This Agreement may be executed in several counterparts, all of which together shall for all purposes constitute one Agreement, binding on all the Members and the Company notwithstanding that all the Members have not signed the same counterpart. Delivery of an executed counterpart of a signature page by facsimile or Electronic Transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

12.10 <u>Entire Agreement</u>. This Agreement represents the entire agreement of the parties with respect to the subject matter hereof and supersedes any and all prior agreements, writings or understandings between the parties with respect to the subject matter hereof (including, without limitation, the Fourth Operating Agreement).

12.11 <u>No Third Party Beneficiaries</u>. This Agreement shall inure to the benefit of and be binding upon the parties hereto, and where expressly stated, their Affiliates, and their respective successors and permitted assigns and, with respect to benefits, the Covered Persons and the Specified Indemnitors. Nothing contained in this Agreement, express or implied, is intended to or shall confer upon any Person any rights under this Agreement (other than (x) the Members, other holders of Units or Equity Securities of the Company, Permitted Transferees and, where expressly stated, any of their respective Affiliates, and all of their successors and permitted assigns, (y) the Company and the Covered Persons and (z) the Specified Indemnitors).

12.12 <u>Member Estoppel Certificates</u>. Upon the written request of the Board of Managers, each Member shall, within fifteen (15) calendar days of its receipt of such request, execute and deliver a written statement certifying to the actual knowledge of the certifying Member that: (i) such Member is not in default hereunder, except as specified in such statement and (ii) no event has occurred which with the passage of time or the giving of notice, or both, would ripen into a default hereunder with respect to such Member, except as specified in such statement. Such written statement may be relied upon by the Company, the Board of Managers, prospective purchasers, investors or lenders.

12.13 <u>Remedies</u>. Except as otherwise provided herein, no remedy herein conferred or

reserved is intended to be exclusive of any other available remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every remedy under this Agreement or now or hereafter existing at law or in equity.

12.14 <u>Severability</u>.  If any part or parts of this Agreement shall be held to be unenforceable to its or their full extent, then it is the intention of the parties hereto that such part or parts shall be enforced to the full extent permitted under applicable law, and in any event, that all other parts of this Agreement shall remain valid and fully enforceable as if the unenforceable part or parts had never been a part hereof.

12.15 <u>Specific Performance</u>.  Each Member acknowledges and agrees its respective remedies at law for a breach or threatened breach of any of the provisions of this Agreement would be inadequate and, in recognition of that fact, agrees, in the event of a breach or threatened breach by a Member of the provisions of this Agreement, in addition to any remedies at law, the Company and the Board of Managers shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

12.16 <u>Member Resignation</u>. No Member shall have the power or right to resign from the Company prior to the dissolution and winding up of the Company pursuant to Article X without the prior written consent of the Board of Managers (which consent may be withheld by the Board of Managers in its sole discretion). Upon a Transfer of all of a Member's Units in a Transfer permitted by this Agreement, subject to the provisions of Sections 6.01, 6.02 and 6.03 and any other applicable provision of this Agreement, such Member shall cease to be a Member. Notwithstanding that payment on account of a permitted resignation may be made after the effective time of such resignation, any completely resigning Member will not be considered a Member for any purpose after the effective time of such complete resignation, and, in the case of a partial resignation, such Member's Capital Account (and corresponding voting and other rights) shall be reduced for all other purposes hereunder upon the effective time of such partial resignation.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto hereby execute this Agreement of the Company as of the day and year first above written.

**LUCKY BUCKS HOLDCO, LLC**

By:_____
Name:  James Boyden
Its:  Manager

**SOUTHERN STAR GAMING, LLC**

By:  Quantum Gaming Corp.
Its:  Managing Member


By: _____
Name: Conner Searcy
Its: Authorized Signatory

**TCFIII LUCK ACQUISITION LLC**


By:_____
Name:  Conner Searcy
Its:  Manager

**TCFIII LUCK SPV LP**

By: Trive Capital Fund III GP LLC
Its:  General Partner

By: Trive Capital Holdings LLC
Its:  Managing Member


By:_____
Name: Conner Searcy
Title: Managing Partner

**LUCKY BUCKS VENTURES, INC.**

By: _____
Name:  Anil Damani
Title:  President

*Signature Page to Fifth Amended and Restated LLC Agreement of Lucky Bucks HoldCo, LLC*

IN WITNESS WHEREOF, the parties hereto hereby execute this Agreement of the Company as of the day and year first above written.

**LUCKY BUCKS HOLDCO, LLC**

By:_____
Name:  James Boyden
Its:  Manager

**SOUTHERN STAR GAMING, LLC**

By:  Quantum Gaming Corp.
Its:  Managing Member

By: _____
Name: Conner Searcy
Its: Authorized Signatory

**TCFIII LUCK ACQUISITION LLC**

By:_____
Name:  Conner Searcy
Its:  Manager

**TCFIII LUCK SPV LP**

By: Trive Capital Fund III GP LLC
Its:  General Partner

By: Trive Capital Holdings LLC
Its:  Managing Member

By: _____
Name: Conner Searcy
Title: Managing Partner

**LUCKY BUCKS VENTURES, INC.**

By: _____
Name:  Anil Damani
Title:  President

*Signature Page to Fifth Amended and Restated LLC Agreement of Lucky Bucks HoldCo, LLC*

IN WITNESS WHEREOF, the parties hereto hereby execute this Agreement of the Company as of the day and year first above written.

**LUCKY BUCKS HOLDCO, LLC**

By:_____
Name:  James Boyden
Its:  Manager

**SOUTHERN STAR GAMING, LLC**

By:  Quantum Gaming Corp.
Its:  Managing Member

By: _____
Name: Conner Searcy
Its: Authorized Signatory

**TCFIII LUCK ACQUISITION LLC**

By:_____
Name:  Conner Searcy
Its:  Manager

**TCFIII LUCK SPV LP**

By: Trive Capital Fund III GP LLC
Its:  General Partner

By: Trive Capital Holdings LLC
Its:  Managing Member

By:_____
Name: Conner Searcy
Title: Managing Partner

**LUCKY BUCKS VENTURES, INC.**

By: _____
Name:  Anil Damani
Title:  President

*Signature Page to Fifth Amended and Restated LLC Agreement of Lucky Bucks HoldCo, LLC*

**<u>SCHEDULE 1</u>**

**<u>MEMBERS SCHEDULE</u>**

| Name of Member | Number of Class A Units | Percentage Interest |
|---|---|---|
| Southern Star Gaming, LLC | 60 | 70.00% |
| Lucky Bucks Ventures, Inc. | 21.434 | 25.00% |
| TCFIII Acquisition LLC | 2.758834 | 3.2184% |
| TCFIII Luck SPV LP | 1.527166 | 1.7816% |
| **Totals:** | 85.72 | 100% |