**<u>EXHIBIT B</u>**

*Execution Version*

**CREDIT AGREEMENT**

by and among

**LUCKY BUCKS, LLC,**
as Borrower,

**MACQUARIE CAPITAL FUNDING LLC**,
as Administrative Agent, Collateral Agent, L/C Issuer and Swing Line Lender,

**KEYBANK NATIONAL ASSOCIATION,**
as L/C Issuer,

**THE LENDERS PARTY HERETO FROM TIME TO TIME**,

and

**MACQUARIE CAPITAL (USA) INC.**

and

**KEYBANC CAPITAL MARKETS INC.,**
as Joint Lead Arrangers and Bookrunners

Dated as of July 30, 2021

<u>Table of Contents</u>

<u>Page</u>

ARTICLE I

Definitions and Accounting Terms

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Other Interpretive Provisions | 91 |
| Section 1.03 | Accounting Terms | 92 |
| Section 1.04 | Rounding | 92 |
| Section 1.05 | References to Agreements, Laws, Etc. | 92 |
| Section 1.06 | Times of Day | 92 |
| Section 1.07 | Timing of Payment or Performance | 92 |
| Section 1.08 | Currency Equivalents Generally | 92 |
| Section 1.09 | Certain Calculations and Tests | 93 |
| Section 1.10 | Interest Rates; Eurocurrency Notification | 96 |
| Section 1.11 | Divisions | 96 |

ARTICLE II

The Commitments and Credit Extensions

| | | |
|---|---|---|
| Section 2.01 | The Loans | 97 |
| Section 2.02 | Borrowings, Conversions and Continuations of Loans | 97 |
| Section 2.03 | Letters of Credit | 99 |
| Section 2.04 | Swing Line Facility | 106 |
| Section 2.05 | Prepayments | 109 |
| Section 2.06 | Termination or Reduction of Commitments | 117 |
| Section 2.07 | Repayment of Loans | 118 |
| Section 2.08 | Interest | 118 |
| Section 2.09 | Fees | 119 |
| Section 2.10 | Computation of Interest and Fees | 119 |
| Section 2.11 | Evidence of Indebtedness | 120 |
| Section 2.12 | Payments Generally | 120 |
| Section 2.13 | Sharing of Payments | 122 |
| Section 2.14 | Incremental Credit Extensions | 122 |
| Section 2.15 | Extensions of Term Loans and Revolving Credit Commitments | 126 |
| Section 2.16 | Defaulting Lenders | 128 |
| Section 2.17 | Permitted Debt Exchanges | 131 |
| Section 2.18 | Refinancing Facilities | 133 |
| Section 2.19 | Cash Collateral | 134 |

ARTICLE III

Taxes, Increased Costs Protection and Illegality

| | | |
|---|---|---|
| Section 3.01 | Taxes | 135 |
| Section 3.02 | Inability to Determine Rates | 139 |

Section 3.03    Increased Cost and Reduced Return; Capital Adequacy; Reserves on
               Eurocurrency Rate Loans ........................................................................ 140
Section 3.04    Funding Losses ...................................................................................... 141
Section 3.05    Matters Applicable to All Requests for Compensation ............................. 141
Section 3.06    Replacement of Lenders under Certain Circumstances ............................ 142
Section 3.07    Survival .................................................................................................. 143
Section 3.08    Benchmark Replacement Setting ............................................................ 143

ARTICLE IV

Conditions Precedent to Credit Extensions

Section 4.01    Closing Date Conditions ........................................................................ 147
Section 4.02    Conditions to Subsequent Credit Extensions .......................................... 149

ARTICLE V

Representations and Warranties

Section 5.01    Existence, Qualification and Power; Compliance with Laws .................... 150
Section 5.02    Authorization; No Contravention ............................................................ 150
Section 5.03    Governmental Authorization; Other Consents .......................................... 150
Section 5.04    Binding Effect ........................................................................................ 151
Section 5.05    Financial Statements; No Material Adverse Effect .................................. 151
Section 5.06    Litigation ................................................................................................ 151
Section 5.07    Ownership of Property; Liens .................................................................. 151
Section 5.08    Environmental Compliance ..................................................................... 152
Section 5.09    Taxes ...................................................................................................... 152
Section 5.10    Compliance with ERISA ........................................................................ 152
Section 5.11    Subsidiaries; Capital Stock .................................................................... 153
Section 5.12    Margin Regulations; Investment Company Act ........................................ 153
Section 5.13    Disclosure ............................................................................................... 153
Section 5.14    Intellectual Property; Licenses, Etc. ........................................................ 154
Section 5.15    Solvency ................................................................................................. 154
Section 5.16    Collateral Documents ............................................................................. 154
Section 5.17    Use of Proceeds ...................................................................................... 154
Section 5.18    Sanctions and Anti-Corruption Laws ...................................................... 155
Section 5.19    Labor Matters ......................................................................................... 155
Section 5.20    Gaming Matters ...................................................................................... 155
Section 5.21    No Default ............................................................................................... 155

ARTICLE VI

Affirmative Covenants

Section 6.01    Financial Statements .............................................................................. 156
Section 6.02    Certificates; Other Information ............................................................... 157
Section 6.03    Notices ................................................................................................... 158
Section 6.04    Maintenance of Existence ....................................................................... 159
Section 6.05    Maintenance of Properties ...................................................................... 159
Section 6.06    Maintenance of Insurance ....................................................................... 159

Section 6.07 Compliance with Laws.................................................................................. 160
Section 6.08 Books and Records...................................................................................... 160
Section 6.09 Inspection Rights........................................................................................ 160
Section 6.10 Covenant to Guarantee Secured Obligations and Give Security.............. 160
Section 6.11 Use of Proceeds.......................................................................................... 161
Section 6.12 Further Assurances and Post-Closing Covenants...................................... 161
Section 6.13 Designation of Restricted and Unrestricted Subsidiaries.......................... 161
Section 6.14 Payment of Taxes....................................................................................... 162
Section 6.15 Lender Calls................................................................................................ 162
Section 6.16 Maintenance of Ratings.............................................................................. 162
Section 6.17 Anti-Terrorism; Sanctions; Anti-Corruption............................................. 162
Section 6.18 Changes in Fiscal Year............................................................................... 163
Section 6.19 Nature of Business ...................................................................................... 163

## ARTICLE VII

### Negative Covenants

Section 7.01 Liens............................................................................................................ 163
Section 7.02 [Reserved] ................................................................................................... 163
Section 7.03 Indebtedness............................................................................................... 163
Section 7.04 Merger and Consolidation.......................................................................... 171
Section 7.05 Limitation on Sales of Assets and Subsidiary Stock.................................. 173
Section 7.06 Restricted Payments & Modification of Subordinated Indebtedness
Documents ................................................................................................. 175
Section 7.07 Holding Company Status............................................................................ 183
Section 7.08 Limitation on Restrictions on Distributions from Restricted Subsidiaries
and Negative Pledges ................................................................................ 183
Section 7.09 Financial Covenant..................................................................................... 186
Section 7.10 Affiliate Transactions................................................................................. 186
Section 7.11 Amendments of Material Documents ......................................................... 190

## ARTICLE VIII

### Events of Default and Remedies

Section 8.01 Events of Default ........................................................................................ 190
Section 8.02 Remedies Upon Event of Default ............................................................... 193
Section 8.03 Exclusion of Immaterial Subsidiaries ........................................................ 193
Section 8.04 Application of Funds................................................................................... 194
Section 8.05 Permitted Holders' Right to Cure .............................................................. 195
Section 8.06 Gaming Requirements................................................................................. 196
Section 8.07 Restrictions Under Gaming Laws ............................................................... 196

## ARTICLE IX

### Administrative Agent and Other Agents

Section 9.01 Appointment and Authorization of Agents ................................................. 197
Section 9.02 Delegation of Duties .................................................................................. 198
Section 9.03 Liability of Agents ..................................................................................... 198

Section 9.04    Reliance by Agents and Lead Arrangers ...................................................... 199
Section 9.05    Notice of Default .............................................................................................. 199
Section 9.06    Credit Decision; Disclosure of Information by Agents ............................. 200
Section 9.07    Indemnification of Agents .............................................................................. 200
Section 9.08    Agents in their Individual Capacities ........................................................... 201
Section 9.09    Successor Agents .............................................................................................. 201
Section 9.10    Administrative Agent May File Proofs of Claim ........................................ 201
Section 9.11    Collateral and Guaranty Matters ................................................................... 202
Section 9.12    Other Agents; Arrangers and Managers ...................................................... 203
Section 9.13    Appointment of Supplemental Administrative Agents ............................. 204
Section 9.14    Withholding Tax ............................................................................................... 204
Section 9.15    Secured Cash Management Obligations; Secured Hedge Agreements ...... 205
Section 9.16    Certain ERISA Matters .................................................................................... 205
Section 9.17    Erroneous Payments ........................................................................................ 206

ARTICLE X

Miscellaneous

Section 10.01    Amendments, Etc. ........................................................................................... 208
Section 10.02    Notices and Other Communications; Facsimile Copies ........................... 212
Section 10.03    No Waiver; Cumulative Remedies ............................................................... 214
Section 10.04    Attorney Costs and Expenses ....................................................................... 214
Section 10.05    Indemnification by the Borrower .................................................................. 215
Section 10.06    Payments Set Aside ........................................................................................ 216
Section 10.07    Successors and Assigns ................................................................................. 216
Section 10.08    Confidentiality ................................................................................................ 224
Section 10.09    Setoff ................................................................................................................ 225
Section 10.10    Counterparts ................................................................................................... 226
Section 10.11    Integration ....................................................................................................... 226
Section 10.12    Survival of Representations and Warranties ............................................. 226
Section 10.13    Severability ...................................................................................................... 226
Section 10.14    GOVERNING LAW, JURISDICTION, SERVICE OF PROCESS ............. 227
Section 10.15    WAIVER OF RIGHT TO TRIAL BY JURY ................................................ 227
Section 10.16    Binding Effect ................................................................................................. 228
Section 10.17    Judgment Currency ........................................................................................ 228
Section 10.18    Lender Action .................................................................................................. 228
Section 10.19    USA PATRIOT Act .......................................................................................... 228
Section 10.20    Obligations Absolute ..................................................................................... 229
Section 10.21    No Advisory or Fiduciary Responsibility ................................................... 229
Section 10.22    Acknowledgment and Consent to Bail-In of Affected Financial
                 Institutions ...................................................................................................... 230
Section 10.23    Acknowledgement Regarding Any Supported QFCs ............................... 230
Section 10.24    Acknowledgment of Intercreditor Agreements ........................................ 230
Section 10.25    Gaming Matters .............................................................................................. 231

**SCHEDULES**

Schedule 1.01A — Loan Documents
Schedule 1.01B — Existing Investments
Schedule 1.01C — Existing Liens
Schedule 2.01(A) — Initial Term Commitments
Schedule 2.01(B) — Revolving Credit Commitments
Schedule 5.06 — Litigation
Schedule 5.11 — Subsidiaries
Schedule 5.22 — Material Real Property
Schedule 6.12 — Post-Closing Covenants
Schedule 7.03 — Existing Indebtedness
Schedule 7.05(a) — Asset Dispositions
Schedule 7.07 — Holdings Investments
Schedule 7.10 — Affiliate Transactions
Schedule 10.02 — Administrative Agent's Office, Certain Addresses for Notices

**EXHIBITS**

form of

Exhibit A — Committed Loan Notice
Exhibit B — Swing Line Loan Notice
Exhibit C-1 — Term Note
Exhibit C-2 — Revolving Credit Note
Exhibit C-3 — Swing Line Note
Exhibit D-1 — Closing Date Certificate
Exhibit D-2 — Compliance Certificate
Exhibit E — Assignment and Assumption
Exhibit F — Guaranty
Exhibit G — Security Agreement
Exhibit H — Discounted Prepayment Option Notice
Exhibit I — Lender Participation Notice
Exhibit J — Discounted Voluntary Prepayment Notice
Exhibit K — Pari Passu Intercreditor Agreement
Exhibit L — United States Tax Compliance Certificates
Exhibit M — Junior Lien Intercreditor Agreement
Exhibit N — Solvency Certificate
Exhibit O — Secured Party Joinder
Exhibit P — Global Intercompany Note and Subordination Agreement
Exhibit Q — Perfection Certificate

## CREDIT AGREEMENT

This **CREDIT AGREEMENT** is entered into as of July 30, 2021 (the "<u>Agreement</u>"), by and among **LUCKY BUCKS, LLC,** a Georgia limited liability company (the "<u>Borrower</u>"), **MACQUARIE CAPITAL FUNDING LLC**, as Administrative Agent, Collateral Agent, Swing Line Lender and an L/C Issuer, each other L/C Issuer and each lender from time to time party hereto (collectively, the "<u>Lenders</u>" and individually, a "<u>Lender</u>").

## PRELIMINARY STATEMENTS

**WHEREAS**, the Borrower has requested that the Lenders extend credit directly to or on behalf of the Borrower in the form of (i) Initial Term Loans (as defined below) in an initial aggregate principal amount equal to $500,000,000 and (ii) a Revolving Credit Facility (as defined below) in an initial aggregate principal amount of $35,000,000.

**WHEREAS**, the proceeds of the Initial Term Loans and the Initial Revolving Borrowing (as defined below) (to the extent permitted in accordance with the definition of "Permitted Initial Revolving Borrowing"), together with cash on hand at the Borrower and its Subsidiaries (as defined below), will be used by the Borrower on the Closing Date (i) to finance the Closing Distribution and Transactions, (ii) to pay any Transaction Expenses (as defined below), (iii) to pay for the Closing Date Refinancing (as defined below), and (iv) to fund certain original issue discount or upfront fees and for working capital and general corporate purposes.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

Definitions and Accounting Terms

Section 1.01    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Acceptable Discount</u>" has the meaning specified in <u>Section 2.05(d)(iii)</u>.

"<u>Acceptance Date</u>" has the meaning specified in <u>Section 2.05(d)(ii)</u>.

"<u>Accounting Changes</u>" has the meaning specified in the definition of "IFRS."

"<u>Acquired Indebtedness</u>" means with respect to any Person (x) Indebtedness (1) of any other Person or any of its Subsidiaries existing at the time such other Person becomes a Restricted Subsidiary, or (2) assumed in connection with the acquisition of assets from such other Person, in each case whether or not Incurred by such other Person in connection with such other Person becoming a Restricted Subsidiary of the Borrower or such acquisition or (3) of a Person at the time such Person merges with or into or consolidates or otherwise combines with the Borrower or any Restricted Subsidiary and (y) Indebtedness secured by a Lien encumbering any asset acquired by such Person.  Acquired Indebtedness shall be deemed to have been Incurred, with respect to <u>clause (x)(1)</u> of the preceding sentence, on the date such Person becomes a Restricted Subsidiary and, with respect to <u>clause (x)(2)</u> of the preceding sentence, on the date of consummation of such acquisition of assets and, with respect to <u>clause (x)(3)</u> of the preceding sentence, on the date of the relevant merger, amalgamation, consolidation or other combination.

"Additional Assets" means:

(1)    any property or assets (other than Capital Stock) used or to be used by the Borrower, a Restricted Subsidiary or otherwise useful in a Similar Business (it being understood that capital expenditures on property or assets already used in a Similar Business or to replace any property or assets that are the subject of such Asset Disposition shall be deemed an investment in Additional Assets);

(2)    the Capital Stock of a Person that is engaged in a Similar Business and becomes a Restricted Subsidiary as a result of the acquisition of such Capital Stock by the Borrower or a Restricted Subsidiary; or

(3)    Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary.

"Additional Lender" has the meaning specified in Section 2.14(e).

"Administrative Agent" means, subject to Section 9.13, Macquarie and any of its Affiliates selected by Macquarie to act as administrative agent for any of the facilities provided hereunder), in its capacity as administrative agent under the Loan Documents, or any successor administrative agent appointed in accordance with Section 9.09.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to any specified Person, any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this Agreement, "control" or "controls", when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Affiliate Transaction" has the meaning specified in Section 7.10(a).

"Affiliated Lender" means, at any time, any Lender that is an Affiliate of the Borrower (other than the Borrower or any of its Subsidiaries).

"Agent-Related Persons" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"Agents" means, collectively, the Administrative Agent, the Collateral Agent, and the Supplemental Administrative Agents (if any).

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement.

"Agreement Currency" has the meaning specified in Section 10.16.

"Anti-Corruption Laws" means the United States Foreign Corrupt Practices Act of 1977, as amended ("FCPA") and any other laws, rules or regulations relating to the prohibition of bribery or corruption issued, administered or enforced by any Governmental Authority having jurisdiction over Holdings, the Borrower or any of the Restricted Subsidiaries.

"Anti-Terrorism Laws" means all applicable laws and regulations or ordinances relating to terrorism or money laundering in any jurisdiction in which Holdings, the Borrower or any of the Restricted Subsidiaries is located or is doing business, including Executive Order No. 13224, the USA PATRIOT Act, the Bank Secrecy Act of 1970, and the Money Laundering Control Act of 1986 (i.e., 18 USC. §§ 1956 and 1957).

"Applicable Discount" has the meaning specified in Section 2.05(d)(iii).

"Applicable Lending Office" means for any Lender, such Lender's office, branch or affiliate designated for Eurocurrency Rate Loans, Base Rate Loans, L/C Advances or Letters of Credit, as applicable, as notified to the Administrative Agent, any of which offices may be changed by such Lender.

"Applicable Percentage" means, at any time (a) with respect to any Lender with a Commitment of any Class, the percentage equal to a fraction the numerator of which is the amount of such Lender's Commitment of such Class at such time and the denominator of which is the aggregate amount of all Commitments of such Class of all Lenders (*provided* that (i) in the case of Section 2.16 when a Defaulting Lender shall exist, "Applicable Percentage" with respect to the Revolving Credit Facility shall be determined by disregarding any Defaulting Lender's Revolving Credit Commitment and (ii) if the Revolving Credit Commitments have terminated or expired, the Applicable Percentages of the Lenders shall be determined based upon the Revolving Credit Commitments most recently in effect) and (b) with respect to the Loans of any Class, a percentage equal to a fraction the numerator of which is such Lender's Outstanding Amount of the Loans of such Class and the denominator of which is the aggregate Outstanding Amount of all Loans of such Class.

"Applicable Proceeds" has the meaning specified in Section 2.05(b)(ii)(A).

"Applicable Rate" means a percentage per annum equal to:

(a)     for Eurocurrency Rate Loans that are Initial Term Loans, 5.50% and for Base Rate Loans that are Initial Term Loans, 4.50%,

(b)     for Eurocurrency Rate Loans that are Revolving Credit Loans, 5.50% and for Base Rate Loans that are Revolving Credit Loans, 4.50%

(c)     for letter of credit fees, 5.50%, and

(d)     (i) until delivery of financial statements and a related Compliance Certificate for the first full fiscal quarter commencing after the Closing Date pursuant to Section 6.01, for Commitment Fees, 0.50% and (ii) thereafter, the percentages per annum set forth in the table below, based upon the Consolidated First Lien Secured Leverage Ratio as set forth in the most recent Compliance Certificate received by the Administrative Agent pursuant to Section 6.02(a):

| Pricing Level | Consolidated First Lien Secured Leverage Ratio | Commitment Fees |
|---|---|---|
| I | > 4.50:1.00 | 0.50% |
| II | ≤ 4.50:1.00 | 0.375% |

Any increase or decrease in the Applicable Rate pursuant to clause (d) above resulting from a change in the Consolidated First Lien Secured Leverage Ratio shall become effective as of the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 6.02(a).

If (i) Borrower fails to deliver the financial statements that are required to be delivered pursuant to Section 6.01(a) or 6.01(b) or the Compliance Certificate required to be delivered pursuant to Section 6.02(a), within the times specified in Section 6.01(a), Section 6.01(b) or Section 6.02(a), as applicable, or (ii) an Event of Default is continuing, the Applicable Rate shall be deemed to be set at Level I from the date of any such failure to deliver until the Borrower delivers such financial statements or Compliance Certificate, as applicable, in the case of clause (i) or until such Event of Default is no longer continuing, in the case of clause (ii), or the Required Revolving Credit Lenders have otherwise agreed that such setting the Applicable Rate at Level I is no longer applicable.

Notwithstanding anything to the contrary contained above in this definition or elsewhere in this Agreement, if it is subsequently determined that the Consolidated First Lien Secured Leverage Ratio set forth in any Compliance Certificate delivered to the Administrative Agent is inaccurate for any reason and the result thereof is that the Lenders received interest or fees for any period based on an Applicable Rate that is less than that which would have been applicable had the Consolidated First Lien Secured Leverage Ratio been accurately determined, then, for all purposes of this Agreement, the "Applicable Rate" for any day occurring within the period covered by such Compliance Certificate shall retroactively be deemed to be the relevant percentage as based upon the accurately determined Consolidated First Lien Secured Leverage Ratio for such period, and any shortfall in the interest or fees theretofore paid by the Borrower for the relevant period pursuant to Section 2.09 as a result of the miscalculation of the Consolidated First Lien Secured Leverage Ratio shall be deemed to be (and shall be) due and payable under the relevant provisions of Section 2.09, as applicable, at the time the interest or fees for such period were required to be paid pursuant to such Section, in accordance with the terms of this Agreement); *provided* that, notwithstanding the foregoing, unless an Event of Default described in Section 8.01(f) has occurred and is continuing with respect to the Borrower (in which case, such shortfall shall be due and payable immediately), such shortfall shall be due and payable five (5) Business Days following the determination described above.

Notwithstanding the foregoing, the Applicable Rate in respect of any Class of Extended Revolving Credit Commitments and any Incremental Term Loans, Extended Term Loans or Revolving Credit Loans made pursuant to any Extended Revolving Credit Commitments shall be the applicable percentages per annum set forth in the relevant Incremental Facility Amendment or Extension Offer.

"Appropriate Lender" means, at any time, (a) with respect to Loans of any Class, the Lenders of such Class and (b) with respect to any Letters of Credit, (i) the relevant L/C Issuer and (ii) the Revolving Credit Lenders.

"Approved Commercial Bank" means a commercial bank with a consolidated combined capital and surplus of at least $5.0 billion.

"Approved Foreign Bank" has the meaning specified in the definition of "Cash Equivalents."

"Approved Fund" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"Asset Disposition" means:

(a)    the voluntary sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Leaseback Transaction) of the Borrower or any of its Restricted Subsidiaries (each referred to in this definition as a "disposition"); or

(b)    the issuance or sale of Capital Stock of any Restricted Subsidiary (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with Section 7.03 hereof or directors' qualifying shares and shares issued to foreign nationals as required under applicable law), whether in a single transaction or a series of related transactions;

in each case, other than:

(1)    a disposition by the Borrower or a Restricted Subsidiary to the Borrower or a Restricted Subsidiary, including pursuant to any Intercompany License Agreement ("Intercompany Dispositions"); *provided* that any such disposition by the Borrower and the Guarantors to Subsidiaries that are non-Loan Parties shall not exceed the Non-Guarantor Sublimit (*less* any such amount of the Non-Guarantor Sublimit used for Intercompany Investments and Ratio Debt);

(2)    a disposition of cash, Cash Equivalents or Investment Grade Securities, including any marketable securities portfolio owned by the Borrower and its Subsidiaries on the Closing Date; *provided* that, for the avoidance of doubt, such dispositions shall be set forth on Schedule 7.05(a) to the extent required under Section 7.05(a);

(3)    a disposition of inventory, goods or other assets (including Settlement Assets) in the ordinary course of business or consistent with past practice or held for sale or no longer used in the ordinary course of business, including any disposition of disposed, abandoned or discontinued operations;

(4)    a disposition of obsolete, worn-out, uneconomical, negligible, immaterial, damaged, non-core or surplus property, equipment or other assets or property, equipment or other assets that are no longer economically practical or commercially desirable to maintain or used or useful in the business of the Borrower and the Restricted Subsidiaries whether now or hereafter owned or leased or acquired in connection with an acquisition or used or useful in the conduct of the business of the Borrower and the Restricted Subsidiaries (including by conveying, selling, assigning, transferring, licensing or sublicensing, ceasing to enforce, allowing the lapse, abandonment or invalidation of or discontinuing the use, prosecution or maintenance of, putting into the public domain or other disposition of any IP Rights that are, in the reasonable judgment of the Borrower or the Restricted Subsidiaries, no longer used or useful, or economically practicable to maintain, or in respect of which the Borrower or any Restricted Subsidiary determines in its reasonable judgment that such action or inaction is desirable);

(5)     transactions permitted under <u>Section 7.04(a)</u> hereof or a transaction that constitutes a Change of Control;

(6)     an issuance of Capital Stock by a Restricted Subsidiary to the Borrower or to another Restricted Subsidiary or as part of or pursuant to an equity incentive or compensation plan approved by the Board of Directors;

(7)     any dispositions of Capital Stock, properties or assets in a single transaction or series of related transactions with a fair market value (as determined in good faith by the Borrower) of less than the greater of $14,000,000 and 10.0% of LTM EBITDA;

(8)     any Restricted Payment that is permitted to be made, and is made, under <u>Section 7.06</u> and the making of any Permitted Payment or Permitted Investment;

(9)     dispositions in connection with Permitted Liens, Permitted Intercompany Activities, Permitted IPO Reorganization and Permitted Tax Restructuring;

(10)     dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or consistent with past practice or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(11)     conveyances, sales, assignments, transfers, licenses, sublicenses, cross-licenses or other dispositions of any IP Rights or other general intangibles and licenses, sublicenses, cross-licenses, leases or subleases of other property, in each case, in the ordinary course of business or consistent with past practice or pursuant to a services, research or development agreement in which the counterparty to such agreement receives a license in any IP Rights that result from such agreement;

(12)     the lease, assignment, license, sublease or sublicense of any real or personal property in the ordinary course of business or consistent with industry practice;

(13)     foreclosure, condemnation, expropriation, forced disposition or any similar action with respect to any property or other assets or the granting of Liens not prohibited by this Agreement;

(14)     the sale, discount or other disposition (with or without recourse, and on customary or commercially reasonable terms and for credit management purposes) of inventory, accounts receivable or notes receivable arising in the ordinary course of business or consistent with past practice, or the conversion or exchange of accounts receivable for notes receivable;

(15)     any issuance or sale of Capital Stock in, or Indebtedness or other securities of, an Unrestricted Subsidiary or any other disposition of Capital Stock, Indebtedness or other securities of an Unrestricted Subsidiary or an Immaterial Subsidiary (other than, in each case, any Unrestricted Subsidiary the primary assets of which are cash or Cash Equivalents);

(16)     any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Borrower or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired, or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in

connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(17)     (i) dispositions of property to the extent that such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased, or other assets of comparable or greater value or usefulness to the business (as determined by the Borrower), (ii) dispositions of property to the extent that the proceeds of such disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually promptly purchased) and (iii) to the extent allowable under Section 1031 of the Code or comparable law or regulation, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(18)     (i) any disposition of Securitization Assets or Receivables Assets, or participations therein, in connection with any Qualified Securitization Financing or Receivables Facility permitted hereunder or (ii) the disposition of an account receivable in connection with the collection or compromise thereof in the ordinary course of business or consistent with past practice;

(19)     any financing transaction with respect to property constructed, acquired, leased, renewed, relocated, expanded, replaced, repaired, maintained, upgraded or improved (including any reconstruction, refurbishment, renovation and/or development of real property) by the Borrower or any Restricted Subsidiary after the Closing Date, including Sale and Leaseback Transactions and asset securitizations, permitted by this Agreement;

(20)     sales, transfers or other dispositions of Investments in joint ventures or similar entities, to the extent required by, or made pursuant to customary buy/sell arrangements between the parties set forth in the joint venture arrangements or other similar binding arrangements;

(21)     any surrender or waiver of contractual rights or the settlement, release, surrender or waiver of contractual, tort, litigation or other claims of any kind;

(22)     the unwinding of any Cash Management Obligations or Hedging Obligations;

(23)     transfers of property or assets subject to Casualty Events upon receipt of the net proceeds of such Casualty Event; *provided* that any Cash Equivalents received by the Borrower or any of the Restricted Subsidiaries in respect of such Casualty Event shall be deemed to be Net Available Cash of an Asset Disposition and such Net Available Cash shall be applied in accordance with Section 2.05(b)(ii);

(24)     any sale of property or assets, if the acquisition of such property or assets was financed with Excluded Contributions and the proceeds of such sale are used to make a Restricted Payment pursuant to Section 7.06(b)(xii)(b) hereof;

(25)     dispositions of (i) assets (including Capital Stock) acquired in a transaction after the Closing Date, which assets are not useful in the core or principal business of the Borrower and the Restricted Subsidiaries or (ii) assets (including Capital Stock) made in connection with the approval of any applicable antitrust authority or otherwise necessary or advisable in the reasonable determination of the Borrower to consummate any

acquisition, *provided* that, in each case, such disposition shall have been consummated within 365 days of such acquisition;

(26)    any disposition in connection with the Transactions;

(27)    any disposition of non-revenue producing assets to a Person who is providing services related to such assets, the provision of which have been or are to be outsourced by the Borrower or any Restricted Subsidiary to such Person;

(28)    any Sale and Leaseback Transactions not prohibited under Section 7.03 hereof;

(29)    dispositions of non-core assets or lines of business acquired in connection with a Permitted Acquisition or other Permitted Investment or disposition required to obtain anti-trust approval made to obtain the approval of an anti-trust authority of a Permitted Acquisition or other Permitted Investment to the extent applicable, and any other disposition to comply with any order of an agency, authority or other regulatory body or any applicable law or regulation;

(30)    any disposition of assets not constituting Collateral of less than the greater of $35,000,000 and 25.0% of LTM EBITDA.

"Asset Disposition Percentage" has the meaning specified in Section 2.05(b)(ii)(A).

"Assignees" has the meaning specified in Section 10.07(b).

"Assignment and Assumption" means (a) an Assignment and Assumption substantially in the form of Exhibit E and (b) in the case of any assignment of Term Loans in connection with a Permitted Debt Exchange conducted in accordance with Section 2.17, such form of assignment (if any) as may have been requested by the Administrative Agent in accordance with Section 2.17(a)(viii) or, in each case, any other form (including electronic documentation generated by MarkitClear or other electronic platform) approved by the Administrative Agent.

"Attorney Costs" means and includes all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"Auto-Extension Letter of Credit" has the meaning specified in Section 2.03(b)(iii).

"Available Amount" has the meaning specified in Section 7.06(a).

"Availability Period" means, with respect to the Revolving Credit Facility, the period from and after the Closing Date to but excluding the earlier of the Maturity Date for the Revolving Credit Facility and the date of termination of the Revolving Credit Commitments in accordance with the provisions of this Agreement.

"Available Incremental Amount" has the meaning specified in Section 2.14(a).

"Available Tenor" has the meaning specified in Section 3.08(f).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Event" means, with respect to any Person, such Person or its parent entity becomes (other than via an Undisclosed Administration) the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, *provided* that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, *provided, further*, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person or its parent entity.

"Base Rate" means an interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the highest of: (a) the Prime Rate in effect on such day; (b) ½ of 1.00% per annum above the Federal Funds Rate in effect on such day; and (c) the Eurocurrency Rate for Dollar deposits for a one (1) month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day), after giving effect to any applicable "floor" plus 1.00%.  Any change in the Base Rate for Dollar-denominated Loans due to a change in the Prime Rate, the Federal Funds Rate or the Eurocurrency Rate shall be effective from and including the Closing Date of such change in the Prime Rate, the Federal Funds Rate or the Eurocurrency Rate, respectively.  If the Base Rate is being used as an alternate rate of interest pursuant to Section 3.02 (for the avoidance of doubt, only until an amendment to the applicable rate of interest has become effective in accordance with the terms of this Agreement), then the Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above.  For the avoidance of doubt, with respect to the Initial Term Loans only, if the Base Rate as determined pursuant to the foregoing would be less than 1.75%, such rate shall be deemed to be 1.75% for purposes of this Agreement.

"Base Rate Loan" means a Loan that bears interest at a rate based on the Base Rate.

"Benchmark" has the meaning specified in Section 3.08(f).

"Benchmark Replacement" has the meaning specified in Section 3.08(f).

"Benchmark Replacement Conforming Changes" has the meaning specified in Section 3.08(f).

"Benchmark Transition Event" has the meaning specified in Section 3.08(f).

"Beneficial Ownership Certificate" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board of Directors" means (1) with respect to the Borrower or any corporation, the board of directors or managers, as applicable, of the corporation, or any duly authorized committee thereof; (2) with respect to any partnership, the board of directors or other governing body of the general partner, as applicable, of the partnership or any duly authorized committee thereof; (3) with respect to a limited liability company, the managing member or members or any duly authorized controlling committee thereof; and (4) with respect to any other Person, the board or any duly authorized committee of such Person serving a similar function.   Whenever any provision requires any action or determination to be made by, or any approval of, a Board of Directors, such action, determination or approval shall be deemed to have been taken or made if approved by a majority of the directors on any such Board of Directors (whether or not such action or approval is taken as part of a formal board meeting or as a formal board approval). Unless the context requires otherwise, Board of Directors means the Board of Directors of the Borrower.

"Borrower" has the meaning specified in the introductory paragraph to this Agreement.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowing" means Loans of the same Class, Type and currency, made, converted or continued on the same date and, in the case of Eurocurrency Rate Loans, as to which a single Interest Period is in effect.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; *provided* that when used in connection with a Eurocurrency Rate Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"Business Successor" means (i) any former Subsidiary of Borrower and (ii) any Person that, after the Closing Date, has acquired, merged or consolidated with a Subsidiary of Borrower (that results in such Subsidiary ceasing to be a Subsidiary of Borrower), or acquired (in one transaction or a series of transactions) all or substantially all of the property and assets or business of a Subsidiary or assets constituting a business unit, line of business or division of a Subsidiary of Borrower.

"can pay their Stated Liabilities and Identified Contingent Liabilities as they mature" has the meaning specified in the definitions of "Solvent" and "Solvency."

"Capital Stock" of any Person means any and all shares of, rights to purchase or acquire, warrants, options or depositary receipts for, or other equivalents of, or partnership or other interests in

(however designated), equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into, or exchangeable for, such equity.

"Capitalized Lease Obligation" means an obligation that is required to be classified and accounted for as a capitalized lease (and, for the avoidance of doubt, not a straight-line or operating lease) for financial reporting purposes in accordance with IFRS.  The amount of Indebtedness represented by such obligation will be the capitalized amount of such obligation at the time any determination thereof is to be made as determined in accordance with IFRS, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in conformity with IFRS, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"Cash Collateral" has the meaning specified in Section 2.03(f).

"Cash Collateralize" has the meaning specified in Section 2.03(f).

"Cash Equivalents" means any of the following types of Investments, to the extent owned by Borrower or any Restricted Subsidiary:

(1)     U.S. Dollars or any other foreign currency held by Borrower and its Restricted Subsidiaries from time to time in the ordinary course of business or consistent with past practice;

(2)     securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (*provided* that the full faith and credit obligation of the United States is pledged in support thereof), with maturities of thirty-six (36) months or less from the date of acquisition;

(3)     certificates of deposit, time deposits, eurodollar time deposits, overnight bank deposits, demand deposits or bankers' acceptances having maturities of not more than two years from the date of acquisition thereof issued by any lender or by any bank, trust company or any other financial institution (a) whose commercial paper is rated at least "A-2" or the equivalent thereof by S&P or at least "P-2" or the equivalent thereof by Moody's (or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Borrower) or (b) having combined capital and surplus in excess of $100,000,000;

(4)     repurchase obligations for underlying securities of the types described in clauses (2), (3), (7) and (8) entered into with any bank meeting the qualifications specified in clause (3) above;

(5)     securities with maturities of two years or less from the date of acquisition backed by standby letters of credit issued by any Person meeting the qualifications in clause (3) above;

(6)     commercial paper and variable or fixed rate notes issued by any Person meeting the qualifications specified in clause (3) above (or by the parent company thereof) maturing within two years after the date of creation thereof, or if no rating is available in respect of the commercial paper or variable or fixed rate notes, the issuer of which has an equivalent rating in respect of its long-term debt;

(7)     marketable short-term money market and similar securities, having a rating of at least "P-2" or "A-2" from either S&P or Moody's, respectively, (or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Borrower);

(8)     readily marketable direct obligations issued by any state, province, commonwealth or territory of the United States of America or any political subdivision, taxing authority or any agency or instrumentality thereof, rated BBB- (or the equivalent) or better by S&P or Baa3 (or the equivalent) or better by Moody's(or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Borrower) with maturities of not more than two years from the date of acquisition;

(9)     readily marketable direct obligations issued by any foreign government or any political subdivision, taxing authority or agency or instrumentality thereof, with a rating of "BBB-" or higher from S&P or "Baa3" or higher by Moody's or the equivalent of such rating by such rating organization (or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Borrower) with maturities of not more than two years from the date of acquisition;

(10)     Investments with average maturities of twenty-four (24) months or less from the date of acquisition in money market funds with a rating of "A" or higher from S&P or "A-2" or higher by Moody's or the equivalent of such rating by such rating organization (or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Borrower);

(11)     with respect to any Foreign Subsidiary:  (i) obligations of the national government of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business provided such country is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers' acceptance of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business provided such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "Approved Foreign Bank"), and in each case with maturities of not more than 270 days from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(12)     Indebtedness or Preferred Stock issued by Persons with a rating of "BBB-" or higher from S&P or "Baa3" or higher from Moody's (or, if at the time, neither S&P

nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Borrower) with maturities of twenty-four (24) months or less from the date of acquisition;

(13)    bills of exchange issued in the United States of America, Canada, the United Kingdom, Japan or a member state of the European Union eligible for rediscount at the relevant central bank and accepted by a bank (or any dematerialized equivalent);

(14)    investments in industrial development revenue bonds that (i) "re-set" interest rates not less frequently than quarterly, (ii) are entitled to the benefit of a remarketing arrangement with an established broker dealer and (iii) are supported by a direct pay letter of credit covering principal and accrued interest that is issued by any bank meeting the qualifications specified in clause (3) above;

(15)    Cash Equivalents or instruments similar to those referred to in the clauses above denominated in U.S. Dollars;

(16)    any investment company, money market, enhanced high yield, pooled or other investment fund investing 90.0% or more of its assets in instruments of the types specified in the clauses above;

(17)    for purposes of clause (2) of the definition of "Asset Disposition," any marketable securities portfolio owned by Borrower and its Subsidiaries on the Closing Date; and

(18)    credit card receivables and debit card receivables in the ordinary course of business or consistent with past practice, so long as such are considered cash equivalents under IFRS and are so reflected on Borrower's balance sheet.

In the case of Investments by any Foreign Subsidiary that is a Restricted Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents shall also include (a) investments of the type and maturity described in the clauses above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (b) other short-term investments utilized by Foreign Subsidiaries that are Restricted Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in the clauses above and in this paragraph.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (1) above, *provided* that such amounts are converted into any currency listed in clause (1) as promptly as practicable and in any event within 10 Business Days following the receipt of such amounts. For the avoidance of doubt, any items identified as Cash Equivalents under this definition (other than clause (17) above) will be deemed to be Cash Equivalents for all purposes under this Agreement regardless of the treatment of such items under IFRS.

"Cash Management Bank" means (x) any Lender, any Agent, Lead Arranger or any Affiliate of the foregoing on the Closing Date or at the time it provides any treasury, depository, credit or debit card, purchasing card, and/or cash management services or automated clearing house transfers of funds to Borrower or any Restricted Subsidiary or conducting any automated clearing house transfers of funds and (y) any other Person designated by the Borrower by written notice to the Administrative Agent that enters into any treasury, depository, credit or debit card, purchasing card, and/or cash management

services or automated clearing house transfers of funds to Borrower or any Restricted Subsidiary or conducting any automated clearing house transfers of funds; *provided* that, in the case of this clause (y), such Person shall have appointed the Administrative Agent and the Collateral Agent as its agents under the applicable Loan Documents and agreed to be bound by the provisions of Article IX in favor of the Agent as if it were a Lender and shall have been deemed to have made the representations and warranties set forth in Section 9.06 in favor of the Agents, in each case, pursuant to a writing substantially in the form of Exhibit O or otherwise reasonably satisfactory to the Borrower and the Administrative Agent.

"Cash Management Obligations" means obligations in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements, electronic fund transfer, treasury services and cash management services, including controlled disbursement services, working capital lines, lines of credit, overdraft facilities, foreign exchange facilities, deposit and other accounts and merchant services, or other cash management arrangements or any automated clearing house arrangements, (2) other obligations in respect of netting or setting off arrangements, credit, debit or purchase card programs, stored value card and similar arrangements and (3) obligations in respect of any other services related, ancillary or complementary to the foregoing (including any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services, corporate credit and purchasing cards and related programs or any automated clearing house transfers of funds).

"Casualty Event" means any event that gives rise to the receipt by Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, assets or real property (including any improvements thereon) to replace or repair such equipment, assets or real property.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means:

(1)    at any time prior to the consummation of an IPO, the Permitted Holders shall cease to control and own, directly or indirectly, of record and beneficially (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act or any successor provisions) more than 50.0% of the voting interests (for the election of directors) in the outstanding voting securities having ordinary voting power for the election of directors of Borrower;

(2)    at any time following the consummation of an IPO, Borrower becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) any "person" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Closing Date), other than one or more Permitted Holders or a

-14-

Parent Entity, that is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date) of more than 50.0% of the total voting power of the Voting Stock of Borrower; *provided* that (x) so long as Borrower is a Subsidiary of any Parent Entity (and such Parent Entity shall have provided "know your customer" information reasonably requested by the Administrative Agent and the Lenders and such Parent Entity is not a Sanctioned Person), no Person shall be deemed to be or become a beneficial owner of more than 50.0% of the total voting power of the Voting Stock of Borrower unless such Person shall be or become a beneficial owner of more than 50.0% of the total voting power of the Voting Stock of such Parent Entity (other than a Parent Entity that is a Subsidiary of another Parent Entity) and (y) any Voting Stock of which any Permitted Holder is the beneficial owner shall not in any case be included in any Voting Stock of which any such Person is the beneficial owner; or

(3)      Holdings shall fail to beneficially own, directly, 100% of the issued and outstanding Capital Stock of the Borrower.

Notwithstanding the foregoing, a Change in Control shall be deemed not to have occurred pursuant to clauses (1) or (2) above at any time if the Permitted Holders have, at such time, directly or indirectly, the right or the ability, by voting power, contract or otherwise, to elect or designate for election at least a majority of the board of directors of Borrower.

Notwithstanding the preceding or any provision of Section 13d-3 of the Exchange Act, (i) a Person or group shall not be deemed to beneficially own Voting Stock subject to a stock or asset purchase agreement, merger agreement, option agreement, warrant agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the acquisition of the Voting Stock in connection with the transactions contemplated by such agreement, (ii) if any group includes one or more Permitted Holders, the issued and outstanding Voting Stock of Borrower owned, directly or indirectly, by any Permitted Holders that are part of such group shall not be treated as being beneficially owned by such group or any other member of such group for purposes of determining whether a Change of Control has occurred, (iii) a Person or group will not be deemed to beneficially own the Voting Stock of another Person as a result of its ownership of Voting Stock or other securities of such other Person's parent entity (or related contractual rights) unless it owns 50.0% or more of the total voting power of the Voting Stock entitled to vote for the election of directors of such parent entity having a majority of the aggregate votes on the board of directors (or similar body) of such parent entity and (iv) the right to acquire Voting Stock (so long as such Person does not have the right to direct the voting of the Voting Stock subject to such right) or any veto power in connection with the acquisition or disposition of Voting Stock will not cause a party to be a beneficial owner.

"Charges" has the meaning provided in the definition of "Consolidated EBITDA."

"Class" (a) when used with respect to Lenders, refers to whether such Lenders hold a particular Class of Commitments or Loans, (b) when used with respect to Commitments, refers to whether such Commitments are Revolving Credit Commitments, Initial Term Commitments, Extended Revolving Credit Commitments that are designated as an additional Class of Commitments, or commitments in respect of any Incremental Term Loans that are designated as an additional Class of Term Loans and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Revolving Credit Loans, Swing Line Loans, Initial Term Loans, Extended Term Loans that are designated as an additional Class of Term Loans, Incremental Term Loans that are designated as an additional Class of Term Loans and any Loans made pursuant to any other Class of Commitments.

"Closing Date" means the date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"<u>Closing Date Audited Financial Statements</u>" means the audited financial statements of the Borrower and its Subsidiaries, consisting of the consolidated balance sheet of the Borrower and the related statements of income and retained earnings, stockholders' equity and cash flow for the year then ended as of (i) December 31, 2019 and (ii) December 31, 2020.

"<u>Closing Date Certificate</u>" means a certificate of a Responsible Officer of the Borrower substantially in the form attached as <u>Exhibit D-1</u> hereto.

"<u>Closing Date Pro Forma Financial Statements</u>" means a *pro forma* consolidated balance sheet of the Borrower and the related statements of income as of the twelve (12)-month period ended March 31, 2021, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (in the case of the consolidated balance sheet) or at the beginning of such period (in the case of the consolidated related statements of income), as applicable, which need not be prepared in compliance with Regulation S-X or include adjustments for purchase accounting.

"<u>Closing Date Refinancing</u>" means (a) the repayment in full of the principal amount, accrued and unpaid interest, fees, premium, if any, and other amounts under the Existing Credit Agreement, other than contingent obligations not then due and payable and that by their terms survive the termination of the Existing Credit Agreement and, to the extent applicable, existing letters of credit outstanding under the Existing Credit Agreement that on the Closing Date will be grandfathered into, or backstopped by, the Initial Revolving Borrowing as set forth herein or cash collateralized in a manner satisfactory to the issuing banks thereof, (b) the termination of all commitments to extend credit under each of the Existing Credit Agreement, and (c) the defeasance, discharge, release or termination of any Liens, security interests and guarantees, as applicable, in connection with the repayments and terminations set forth in <u>clauses (a)</u> and <u>(b)</u> above.

"<u>Closing Date Unaudited Financial Statements</u>" means the unaudited consolidated financial statements of the Borrower and its Subsidiaries consisting of the balance sheet of the Borrower and the related statements of income for the fiscal quarter ended March 31, 2021.

"<u>Closing Distribution</u>" means those certain distributions on or shortly after the Closing Date from the Borrower to Holdings and from there to direct or indirect equity holders of Holdings in an aggregate amount not to exceed $203,599,943.53.

"<u>COAM Location</u>" means each location at which any coin operated amusement machine, video gaming terminal or similar distributed gaming machine, including any bona fide coin operated amusement "Class B machine" as defined in O.C.G.A. Title 50, Chapter 27, Article 3, is located.

"<u>COAM Operating Contracts</u>" means, collectively, those certain exclusive agreements for the placement of coin operated amusement machines, video gaming terminals or similar distributed gaming machines entered into from time to time by and between the Borrower (or any of its Restricted Subsidiaries) and the owner of (i) a COAM Location or (ii) potential COAM Location, or otherwise assigned to or acquired by Borrower (or any of its Restricted Subsidiaries), which set forth the terms of use for the operation of coin operated amusement machines, video gaming terminals or similar distributed gaming machines described therein.

"<u>Code</u>" means the U.S. Internal Revenue Code of 1986, as amended.

"<u>Collateral</u>" means all the "Collateral" as defined in the Collateral Documents and all other property of whatever kind and nature pledged or charged as collateral under any Collateral Document, and shall include the Mortgaged Properties.

"Collateral Agent" means Macquarie, in its capacity as collateral agent under any of the Loan Documents, or any successor collateral agent appointed in accordance with Section 9.09.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)       the Collateral Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date pursuant to Section 4.01(a)(iii) or (ii) thereafter pursuant to Section 6.10, Section 6.12 or the Collateral Documents, in each case, duly executed by each Loan Party that is a party thereto;

(b)       all Secured Obligations shall have been unconditionally Guaranteed, jointly and severally, by (i) Holdings, (ii) the Borrower (except as to its own primary Obligations) and (iii) each Restricted Subsidiary of the Borrower that is a Material Subsidiary (other than any Excluded Subsidiary), including as of the Closing Date those that are listed on Schedule 5.11 and indicated as a "Subsidiary Guarantor" (the Persons identified in clauses (i) through (iii), the "Guarantors");

(c)       the Secured Obligations and the Guarantees shall have been secured pursuant to, the Security Agreement or other applicable Collateral Document by a valid and perfected security interest subject to no other Liens (other than Permitted Liens) in all Capital Stock (other than Excluded Equity) held directly by Holdings, the Borrower or any Guarantor in any Wholly Owned Subsidiary, in each case, subject to no Liens other than Permitted Liens;

(d)       except to the extent otherwise provided hereunder or under any Collateral Document, the Secured Obligations and the Guarantees shall have been secured by a perfected security interest (other than in the case of mortgages, to the extent such security interest may be perfected by delivering certificated securities and instruments, filing personal property financing statements or other similar documentation, or in the case of IP Rights, to the extent such security interest may be perfected by making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office, as applicable) in, and mortgages on, substantially all tangible and intangible assets of Holdings, the Borrower and each other Guarantor (including, without limitation, accounts receivable, inventory, equipment, investment property, chattel paper and documents, intellectual property, intercompany receivables, instruments, letter of credit rights, commercial tort claims, other general intangibles (including contract rights), and proceeds of the foregoing but excluding real property (other than with respect to Material Real Property), Excluded Property and IP Rights subsisting outside the United States), in each case, with the priority required by the Collateral Documents; *provided* that security interests in real property shall be limited to the Mortgaged Properties;

(e)       in the event any Guarantor is added that is organized in a Covered Jurisdiction other than the United States, such Loan Party shall grant a perfected lien on substantially all of its assets (other than (i) Excluded Property and (ii) IP Rights subsisting outside of the United States) pursuant to arrangements reasonably agreed between the Administrative Agent and the Borrower subject to customary limitations in such Covered Jurisdiction to be reasonably agreed to between the Administrative Agent and the Borrower; and

(f)       the Collateral Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property required to be delivered pursuant to Section 4.01(a)(iii) (if applicable), Section 6.10, and/or Section 6.12, as applicable, duly executed and delivered by the record owner of such property, (ii) a title insurance policy for such Mortgaged Property (or marked-up title insurance commitment having the effect of a title insurance policy) (the "Mortgage Policies"), in an amount reasonably acceptable to the Collateral Agent, insuring the Lien of each such Mortgage as a valid first priority Lien on the property described therein, free of any other Liens except Permitted Liens, together

with such endorsements, coinsurance and reinsurance as the Collateral Agent may reasonably request and to the extent available in each applicable jurisdiction, (iii) a Survey with respect to each Mortgaged Property, *provided*, *however*, that a Survey shall not be required to the extent that (A) an existing survey together with an "affidavit of no change" satisfactory to the Title Company is delivered to the Collateral Agent and the Title Company and (B) the Title Company removes the standard survey exception and provides reasonable and customary survey-related endorsements and other coverages in the applicable Mortgage Policy, (iv) a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the applicable Loan Party relating thereto), (v) a copy of, or a certificate as to coverage under, and a declaration page relating to, any flood insurance policies required by Section 6.06 hereof, each of which (A) shall be endorsed or otherwise amended to name the Collateral Agent as mortgagee and loss payee, (B) shall (1) identify the addresses of each property located in a special flood hazard area, (2) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (3) provide that the insurer will give the Collateral Agent thirty (30) days written notice of cancellation, non-renewal or change in coverage and (4) shall be otherwise in form and substance reasonably satisfactory to the Collateral Agent, (vi) if reasonably requested by the Collateral Agent, a legal opinion regarding due authorization, execution and enforceability of such Mortgage from counsel to the Borrower in form and substance reasonably acceptable to the Collateral Agent, and (vii) such existing abstracts, existing appraisals, and other documents as the Collateral Agent may reasonably request with respect to any such Mortgaged Property.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in particular assets if and for so long as the Administrative Agent and the Borrower agree in writing that the cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance or surveys in respect of such assets (including adverse tax consequences) outweighs the benefits to be obtained by the Lenders therefrom.

The Administrative Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(A)     Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents and, to the extent appropriate in the applicable jurisdiction, as agreed between the Administrative Agent and the Borrower;

(B)     the Collateral and Guarantee Requirement shall not apply to any Excluded Property;

(C)     no deposit account control agreement, securities account control agreement or other control agreements or control arrangements shall be required with respect to any deposit account, securities account or other asset specifically requiring perfection through control agreements;

(D)     no actions in any jurisdiction other than the Covered Jurisdictions or that are necessary to comply with the Laws of any jurisdiction other than the Covered Jurisdictions shall be required in order to create any security interests in assets located, titled, registered or filed outside of the Covered Jurisdictions and no actions in any jurisdiction shall be required in order to create any security interests in IP Rights, subsisting outside the United States (it being understood that there shall be no security agreements, pledge agreements, or share charge (or mortgage) agreements governed under the Laws of any jurisdiction other than the Covered Jurisdictions);

(E)     general statutory limitations, financial assistance, corporate benefit, capital maintenance rules, fraudulent preference, "thin capitalization" rules, retention of title claims and similar principle may limit the ability of a Foreign Subsidiary to provide a Guarantee or Collateral or may require that the Guarantee or Collateral be limited by an amount or otherwise, in each case as reasonably determined by the Borrower in consultation with the Administrative Agent;

(F)     no stock certificates of Immaterial Subsidiaries or Unrestricted Subsidiaries shall be required to be delivered to the Collateral Agent; and

(G)     no actions (except for the filing of UCC financing statements) shall be required with respect to letter of credit rights, except to the extent constituting a supporting obligation for other Collateral as to which perfection is accomplished by the filing of a UCC financing statement or equivalent.

"Collateral Documents" means, collectively, the Security Agreement, the Mortgages, collateral assignments, Security Agreement Supplements, the Perfection Certificate, security agreements, pledge agreements, perfection certificates or other similar agreements or documents delivered to the Collateral Agent and the Lenders pursuant to Section 4.01(a)(iii), Section 6.10 or Section 6.12, the Guaranty and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Collateral Agent for the benefit of the Secured Parties.

"Commitment" means a Term Commitment, a Revolving Credit Commitment, or an Extended Revolving Credit Commitment.

"Commitment Fee" has the meaning provided in Section 2.09(a).

"Commitment Letter" means that certain Credit Facilities Commitment Letter, dated as of June 30, 2021, by and among the Borrower, MCUSA, Macquarie, KeyBanc Capital Markets Inc. and KeyBank National Association.

"Committed Loan Notice" means a notice of (a) a Term Borrowing, (b) a Revolving Credit Borrowing, (c) a conversion of Loans from one Type to the other, or (d) a continuation of Eurocurrency Rate Loans pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A.

"Commodity Exchange Act" means the U.S. Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compensation Period" has the meaning specified in Section 2.12(c)(ii).

"Compliance Certificate" means a certificate substantially in the form of Exhibit D-2.

"Consolidated Cash Interest Expense" shall mean, for any period, the Consolidated Interest Expense excluding any non-cash interest expense of the Borrower and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with IFRS.

"Consolidated Depreciation and Amortization Expense" means, with respect to any Person for any period, the total amount of depreciation and amortization expense and capitalized fees, including amortization or write-off of (i) goodwill, software and intangible assets and non-cash organization costs, (ii) deferred financing and debt issuance fees, costs and expenses, (iii) capitalized expenditures (including Capitalized Software Expenditures), customer acquisition costs and incentive payments, media development costs, conversion costs and contract acquisition costs, the amortization of original issue discount resulting from the issuance of Indebtedness at less than par and amortization of favorable or unfavorable lease assets or liabilities and (iv) capitalized fees related to any Qualified Securitization Financing or Receivables Facility, of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with IFRS and any write down of assets or asset value carried on the balance sheet.

"Consolidated EBITDA" means, with respect to any Person for any period, the Consolidated Net Income of such Person and its Restricted Subsidiaries for such period (determined in accordance with the applicable provisions of Section 1.09 hereof):

(1)     increased (without duplication) by:

    (a)     Fixed Charges of such Person and its Restricted Subsidiaries for such period (including (w) non-cash rent expense, (x) net losses or any obligations on any Hedging Obligations or other derivative instruments, (y) bank, letter of credit and other financing fees and (z) costs of surety bonds in connection with financing activities, plus amounts excluded from the definition of "Consolidated Interest Expense" and any non-cash interest expense), to the extent deducted (and not added back) in computing Consolidated Net Income; plus

    (b)     (x) income Taxes and similar tax expenses (including, without limitation, foreign, federal, state, local, provincial, territorial, local, unitary, franchise, excise, withholding and similar taxes (including any future taxes or other levies which replace or are intended to be in lieu of such taxes) paid or accrued during such period, including penalties and interest related thereto or arising from any tax examination), (y) without duplication, any distributions made to a Parent Entity with respect to the foregoing in accordance with Section 7.06(b)(xxiv) and (z) the net tax expense associated with any adjustments made pursuant to the definition of "Consolidated Net Income" in each case, to the extent deducted (and not added back) in computing Consolidated Net Income; plus

    (c)     Consolidated Depreciation and Amortization Expense of such Person and its Restricted Subsidiaries for such period to the extent deducted (and not added back) in computing Consolidated Net Income; plus

    (d)     any (x) Transaction Expenses and (y) fees, costs, expenses or charges (other than Consolidated Depreciation and Amortization Expense, but including, but not limited to rationalization, tax, legal and other expenses) related to any actual, proposed or contemplated Equity Offering (including any expense relating to enhanced accounting functions or other transaction costs associated with becoming a public company, including Public Company Costs), Permitted Acquisition,

Permitted Investment, IPO, Restricted Payment, acquisition, disposition, consolidation, restructuring, recapitalization or the incurrence or repayment of Indebtedness, subsidiary designation, or investment, whether consummated or not and whether or not permitted to be incurred by this Agreement (including a refinancing thereof) (whether or not successful and including any such transaction consummated prior to the Closing Date), including (i) without limitation, such legal, accounting and other professional fees, travel expenses or other expenses or charges (including rating agency fees, consulting fees and other related expenses and/or letter of credit or similar fees) related to the foregoing and offering or incurrence of, or ongoing administration of this Agreement, the Facilities, and other credit facilities, any Securitization Fees, any other Indebtedness permitted to be Incurred under this Agreement or any Equity Offering, and (ii) any amendment, waiver or other modification of this Agreement, Receivables Facilities, Securitization Facilities, any other credit facilities, any Securitization Fees, any other Indebtedness or any Equity Offering, in each case, whether or not consummated, to the extent deducted (and not added back) in computing Consolidated Net Income; plus

(e)     the amount of any charge, expense, cost, accrual, reserve or loss of any kind (collectively, "Charges") attributable to or associated with any (x) restructuring, integration, strategic or new initiatives, business optimization activities or other operating improvements, cost savings, cost rationalization programs, operating expense reductions, synergies and/or similar initiatives, and (y) retention, recruiting, relocation, signing bonuses, Charges in connection with a single or one-time event (including without limitation, in connection with facility openings, pre-openings, closings, reconfigurations and/or consolidations), contract termination Charges, stock option and other equity-based compensation expenses, any Charges associated with any stock subscription or shareholder agreement or any employee benefit trust, severance costs, any Charges associated with any modification of any pension or post-retirement employee benefit plan, indemnities and expenses, including, without limitation, any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company (including, for the avoidance of doubt, Public Company Costs); *provided* that the amount added to Consolidated EBITDA pursuant to clause (e)(x) and clause (g) shall not exceed 35.0% of Consolidated EBITDA (calculated after giving effect to the addbacks made pursuant to clause (e)(x) and clause (g)); plus

(f)     any other non-cash charges, write-downs, write-offs, expenses, losses, increase in expenses or items reducing Consolidated Net Income for such period including (i) deferred revenue and related deferred costs and deferred compensation, (ii) non-cash losses on non-cash asset retirement costs, non-cash expense relating to the vesting of warrants, the sale of assets and any write-offs or write-downs, deferred revenue or impairment charges, including such charges, write-downs, write-offs, expenses, losses or other items pushed down to the Borrower and its Restricted Subsidiaries), (iii) impairment charges, amortization (or write offs) of financing costs (including debt discount, debt issuance costs and commissions and other fees associated with Indebtedness, including this Agreement) of such Person and its Subsidiaries and/or (iv) the impact of acquisition method accounting adjustment and any non-cash write-up, write-down or write-off with respect to re-valuing assets, inventory (including any impact of changes to inventory valuation policy

methods) or other inventory adjustments and liabilities in connection with the Transactions or any Investment, deferred revenue or any effects of adjustments resulting from the application of purchase accounting, purchase price accounting (including any step-up in inventory and loss of profit on the acquired inventory) (*provided* that if any such non-cash charge, write-down, expense, loss or item represents an accrual or reserve for potential cash items in any future period, (A) the Borrower may elect not to add back such non-cash charge, expense or loss in the current period and (B) to the extent the Borrower elects to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA when paid), or other items classified by the Borrower as special items less other non-cash items of income increasing Consolidated Net Income (excluding any amortization of a prepaid cash item that was paid in a prior period or such non-cash item of income to the extent it represents a receipt of cash in any future period); plus

(g)    (i) *pro forma* adjustments, including *pro forma* "run rate" synergies, cost savings, operating improvements and initiatives, operating expense reductions and other synergies (in each case, net of amounts actually realized) related to the Transactions that are reasonably identifiable, factually supportable and projected by the Borrower in good faith to result from actions that have been either taken or initiated, with respect to which substantial steps have been taken or initiated within twenty-four (24) months after the Closing Date and (ii) *pro forma* adjustments, including *pro forma* "run rate" cost savings, operating improvements and initiatives, operating expense reductions, and other synergies (in each case net of amounts actually realized) related to acquisitions (including the commencement of activities constituting a business), investments, strategic or new initiatives or related to restructuring initiatives, cost savings initiatives and other initiatives and actions that are reasonably identifiable and projected by the Borrower in good faith to result from actions that have either been taken or initiated, with respect to which substantial steps have been taken or are that are expected to be taken or initiated within twenty-four (24) months after the date of consummation of such acquisition, investment, strategic or new initiatives or the initiation of such restructuring initiative, cost savings initiative or other initiatives, in both cases; *provided* that the amount added to Consolidated EBITDA pursuant to this <u>clause (g)</u> and <u>clause (e)(x)</u> shall not exceed 35.0% of Consolidated EBITDA (calculated after giving effect to the addbacks made pursuant to this <u>clause (g)</u> and <u>clause (e)(x)</u>); plus

(h)    any costs or expenses incurred by the Borrower or a Restricted Subsidiary or a Parent Entity pursuant to any management equity plan, stock option plan, phantom equity plan, profits interests or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto), employment, termination or severance agreement, or any stock subscription or equityholder agreement, and any costs or expenses in connection with the roll-over, acceleration or payout of Capital Stock held by management, in each case to the extent that such costs or expenses are non-cash or otherwise funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of an issuance of Capital Stock (other than Disqualified Stock) of the Borrower; plus

(i)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period

to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to clause (2) below for any previous period and not added back; plus

(j)      any net loss included in the Consolidated Net Income attributable to non-controlling or minority interests pursuant to the application of IFRS 10; plus

(k)      the amount of any non-controlling or minority interest Charges; plus

(l)      unrealized or realized losses due to foreign exchange adjustments including, without limitation, losses and expenses in connection with currency and exchange rate fluctuations, and unrealized or realized losses or other obligations from hedging activities or other derivative instruments; plus

(m)      with respect to any joint venture, an amount equal to the proportion of those items described in clauses (b) and (c) above relating to such joint venture corresponding to the Borrower's and the Restricted Subsidiaries' proportionate share of such joint venture's Consolidated Net Income (determined as if such joint venture were a Restricted Subsidiary) to the extent deducted (and not added back) in computing Consolidated Net Income; plus

(n)      the amount of any costs or expenses relating to payments made to stock appreciation or similar rights, stock option, restricted stock, phantom equity, profits interests or other interests or rights holders of the Borrower or any of its Subsidiaries or any Parent Entity in connection with, or as a result of, any distribution being made to equityholders of such Person or any of its Subsidiaries or any Parent Entities, which payments are being made to compensate such holders as though they were equityholders at the time of, and entitled to share in, such distribution; plus

(o)      (i) adjustments and add backs set forth in (x) the financial model provided to the Lead Arrangers on June 21, 2021, and (y) any other quality of earnings analysis prepared by independent registered public accountants of recognized national standing (or any other accounting firm reasonably acceptable to the Administrative Agent) and delivered to the Administrative Agent in connection with any Permitted Acquisition or Permitted Investment and (ii) adjustments and add backs consistent with Regulation S-X; plus

(p)      the amount of any management, monitoring, consulting, transaction, deal or advisory fees payable and related indemnities, charges and expenses pursuant to any Sponsor management agreement and payments made to the Sponsor for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities and payments to outside directors of the Borrower (or its direct or indirect parent companies), in each case, to the extent permitted to be paid under this Agreement; plus

(q)      to the extent deducted in the calculation of Consolidated Net Income, earn-out obligations and other post-closing obligations to sellers (including deferred purchase price, transaction tax benefit payments or to the extent accounted for as bonuses or otherwise) incurred in connection any of the Transactions and/or any acquisition or other investment (including any acquisition or other investment

consummated prior to the Closing Date) or adjustments thereof, which is paid or accrued during the applicable period; plus

(r)    fees, costs and expenses associated with litigation and settlement thereof, in each case, whether or not consummated, to the extent deducted (and not added back) in computing Consolidated Net Income; plus

(s)    the aggregate amount of "run rate" profits pursuant to contracts entered into on or after the first date of the applicable Test Period projected by the Borrower, in good faith, as if such contracted pricing (including any "scheduled" or "fixed" pricing) was applicable (at the contracted rate and calculated based on an assumed margin determined by the Borrower to be a reasonable good faith estimate of the actual costs (including increased overhead costs) associated with such recurring contracts) during the entire Test Period; plus

(t)    *pro forma* adjustment resulting from the application of IFRS 15 or any comparable regulation and costs and expenses in connection therewith; plus

(u)    to the extent not otherwise included in Consolidated Net Income, proceeds of business interruption insurance in an amount representing the earnings for the applicable period that such proceeds are intended to replace (whether or not then received so long as the Borrower in good faith expects to receive such proceeds within the next four (4) fiscal quarters, and net of any amount so added back in a prior period to the extent not so reimbursed within the applicable four (4)-quarter period); plus

(v)    charges attributable to, and payments of, legal settlements, fines, judgments or orders (in each case, except to the extent reflecting any amounts not paid in prior periods that would not have been added back to Consolidated EBITDA pursuant to the definition thereof at such time if appropriately paid);

and

(2)    decreased (without duplication) by non-cash gains increasing Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period (other than non-cash gains relating to the application of IFRS 16) and unrealized or realized gains due to foreign exchange adjustments including, without limitation, gains in connection with currency and exchange rate fluctuations, and unrealized or realized gains or other obligations from hedging activities or other derivative instruments.

"Consolidated First Lien Indebtedness" means the Consolidated Total Indebtedness that is secured by a Lien on the Collateral of the Borrower and its Restricted Subsidiaries on an *pari passu* priority basis (but without regard to the control of remedies) with the Lien securing the Secured Obligations.

"Consolidated First Lien Secured Leverage Ratio" means, as of any date of determination, the ratio of (x) the Consolidated First Lien Indebtedness as of such date to (y) LTM EBITDA (in each case, determined in accordance with the applicable provisions of Section 1.09 hereof).

"Consolidated Interest Expense" means, with respect to any Person for any period, without duplication, the total interest expense (including that attributable to capital leases) of such Person and its

Restricted Subsidiaries for such period, determined on a consolidated basis net of any interest income, which shall be determined on a cash basis only and solely in respect of Indebtedness of the type described in the definition of "Consolidated Total Indebtedness" (and including commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net cash costs (less net cash payments) under Swap Contracts) and excluding, for the avoidance of doubt, (a) any non-cash interest expense and any capitalized interest, whether paid or accrued, (b) the amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (c) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses, (d) any expenses resulting from discounting of indebtedness in connection with the application of recapitalization accounting or purchase accounting, (e) penalties or interest related to taxes and any other amounts of non-cash interest resulting from the effects of acquisition method accounting or pushdown accounting, (f) the accretion or accrual of, or accrued interest on, discounted liabilities (other than Indebtedness) during such period, (g) non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under hedging agreements or other derivative instruments pursuant to IFRS 9, (h) any one-time cash costs associated with breakage in respect of Swap Contracts for interest rates, (i) any payments with respect to make whole premiums or other breakage costs of any Indebtedness, (j) all non-recurring interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations, all as calculated on a consolidated basis in accordance with IFRS, (k) expensing of bridge, arrangement, structuring, commitment or other financing fees, and any expenses and fees in connection with any modification of Indebtedness, (l) fees and expenses (including any penalties and interest relating to Taxes but excluding any bona fide interest expense) associated with the consummation of the Transactions, (m) agency fees paid to the administrative agents and collateral agents under any credit facilities or other debt instruments or documents, (n) fees (including any ticking fees) and expenses (including any penalties and interest relating to Taxes) associated with any Investment not prohibited by this Agreement or the issuance of equity interests or Indebtedness (in each case excluding any bona fide interest expense), and (o) any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, all as calculated on a consolidated basis in accordance with IFRS.

"Consolidated Net Income" means, with respect to any Person for any period, the net income (loss) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with IFRS; *provided, however*, that there will not be included in such Consolidated Net Income (in each case, determined in accordance with the applicable provisions of Section 1.09 hereof):

(1)     any net income (loss) of any Person if such Person is not a Restricted Subsidiary (including any net income (loss) from investments recorded in such Person under the equity method of accounting), except that the Borrower's receipts from any such Person for such period will be included in such Consolidated Net Income up to the aggregate amount of cash or Cash Equivalents actually distributed (or to the extent converted into cash or Cash Equivalents) by such Person during such period to the Borrower or a Restricted Subsidiary as a dividend or other distribution or return on investment;

(2)     solely for the purpose of determining the amount available for Restricted Payments under Section 7.06(a) hereof, any net income (loss) of any Restricted Subsidiary (other than the Guarantors) if such Subsidiary is subject to restrictions, directly or indirectly, on the payment of dividends or the making of distributions by such Restricted Subsidiary, directly or indirectly, to the Borrower or a Guarantor by operation of the terms of such Restricted Subsidiary's articles, charter or any agreement, instrument, judgment, decree, order, statute or governmental rule or regulation applicable to such Restricted Subsidiary or its stockholders (other than (a) restrictions that have been waived or otherwise released (or such Person reasonably believes such restriction could be waived or released and is using commercially reasonable efforts to pursue such waiver or release), (b) restrictions pursuant

to this Agreement or other similar indebtedness, and (c) restrictions specified in Section 7.08(b)(xiii)(i)), except that Borrower's equity in the net income of any such Restricted Subsidiary for such period will be included in such Consolidated Net Income up to the aggregate amount of cash or Cash Equivalents actually distributed (or to the extent converted, or having the ability to be converted, into cash or Cash Equivalents) by such Restricted Subsidiary during such period to the Borrower or another Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend to another Restricted Subsidiary, to the limitation contained in this clause);

(3)     any gain (or loss) (a) in respect of facilities no longer used or useful in the conduct of the business of the Borrower or the Restricted Subsidiaries, abandoned, closed, disposed or discontinued operations (excluding held for sale discontinued operations until actually disposed of) other than in the ordinary course of business, (b) on disposal, abandonment or discontinuance of disposed, abandoned, closed or discontinued operations, and (c) attributable to asset dispositions, abandonments, sales or other dispositions of any asset (including pursuant to any Sale and Leaseback Transaction) or the sale of other dispositions of any equity interests of any Person (other than in the ordinary course of business, as determined in good faith by a Responsible Officer) or the designation of an Unrestricted Subsidiary other than in the ordinary course of business;

(4)     (a) any extraordinary, exceptional, unusual or nonrecurring loss, charge or expense, Transaction Expenses, Public Company Costs, restructuring and duplicative running costs, restructuring charges or reserves (whether or not classified as restructuring expense on the consolidated financial statements), relocation costs, start-up or initial costs for any project or new production line, division or new line of business, integration and facilities' or bases' opening costs, facility consolidation and closing costs, severance costs and expenses, one-time charges (including compensation charges), payments made pursuant to the terms of change in control agreements that the Borrower or a Subsidiary or a Parent Entity had entered into with employees of the Borrower, any of its Subsidiaries or a Parent Entity, costs relating to pre-opening, opening and conversion costs for facilities, losses, costs related to facility or property disruptions or shutdowns, signing, retention and completion bonuses (including management bonus pools), recruiting costs, costs incurred in connection with any strategic or cost savings initiatives, transition costs, contract terminations, litigation and arbitration fees, costs and charges, expenses in connection with one-time rate changes, costs incurred with acquisitions, investments and dispositions (including travel and out-of-pocket costs, human resources costs (including relocation bonuses), litigation and arbitration costs, charges, fees and expenses (including payments of legal settlements, fines, judgements or orders), management transition costs, advertising costs, losses associated with temporary decreases in work volume and expenses related to maintain underutilized personnel) and non-recurring product and intellectual property development, other business optimization expenses or reserves (including costs and expenses relating to business optimization programs and new systems design and costs or reserves associated with improvements to IT and accounting functions), retention charges (including charges or expenses in respect of incentive plans), system establishment costs and implementation costs) and operating expenses attributable to the implementation of strategic or cost-savings initiatives, and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments) and professional, legal, accounting, consulting and other service fees incurred with any of the foregoing and (b) any charge, expense, cost, accrual or reserve of any kind associated with acquisition related litigation and settlements thereof;

(5)     (a) at the election of the Borrower with respect to any quarterly period, the cumulative effect of a change in law, regulation or accounting principles and changes as a result of the adoption or modification of accounting policies, (b) subject to the last sentence of the definition of "IFRS," the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period (including any impact resulting from accounting changes) and (c) any costs, charges, losses, fees or expenses in connection with the implementation or tracking of such changes or modifications specified in the foregoing clauses (a) and (b);

(6)     (a) any equity-based or non-cash compensation or similar charge, cost or expense or reduction of revenue, including any such charge, cost, expense or reduction arising from any grant of stock, stock appreciation or similar rights, stock options, restricted stock, phantom equity, profits interests or other interests, or other rights or equity- or equity based incentive programs ("equity incentives"), any income (loss) associated with the equity incentives or other long-term incentive compensation plans (including under deferred compensation arrangements of the Borrower or any Parent Entity or Subsidiary and any positive investment income with respect to funded deferred compensation account balances), roll-over, acceleration or payout of Capital Stock by employees, directors, officers, managers, contractors, consultants, advisors or business partners (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower or any Parent Entity or Subsidiary, and any cash awards granted to employees of the Borrower and its Subsidiaries in replacement for forfeited awards, (b) any non-cash losses realized in such period in connection with adjustments to any employee benefit plan due to changes in estimates, actuarial assumptions, valuations, studies or judgments or non-cash compensation expense resulting from the application of IFRS 2 and (c) any net pension or post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, amortization of such amounts arising in prior periods, amortization of the unrecognized obligation (and loss or cost) existing at the date of initial application of IAS 19, and any other item of a similar nature;

(7)     any income (loss) from the extinguishment, conversion or cancellation of Indebtedness, Hedging Obligations or other derivative instruments (including deferred financing costs written off, premiums paid or other expenses incurred);

(8)     any unrealized or realized gains or losses in respect of any Hedging Obligations or any ineffectiveness recognized in earnings related to hedge transactions or the fair value of changes therein recognized in earnings for derivatives that do not qualify as hedge transactions;

(9)     any fees, losses, costs, expenses or charges incurred during such period (including any transaction, retention bonus or similar payment and earn outs), or any amortization thereof for such period, in connection with (a) any acquisition, recapitalization, Investment, Asset Disposition, disposition, dividend, issuance or repayment of Indebtedness (including such fees, expense or charges related to the offering, issuance and rating of the Loans, other securities and any of the Facilities), issuance of Capital Stock, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of the Loans, other securities and any of the Facilities), in each case, including the Transactions, any such transaction consummated prior to, on or after the Closing Date and any such transaction undertaken but not completed, and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful (including, for the avoidance of doubt, the effects of expensing

all transaction-related expenses in accordance with IFRS 3 and any adjustments resulting from the application of IFRS 9) and (b) complying with the requirements under, or making elections permitted by, the documentation governing any Indebtedness;

(10)    any unrealized or realized gain or loss resulting in such period from currency translation increases or decreases or transaction gains or losses, including those related to currency remeasurements of Indebtedness (including any net loss or gain resulting from Hedging Obligations for currency risk), intercompany balances, other balance sheet items, Hedging Obligations or other obligations of the Borrower or any Restricted Subsidiary owing to the Borrower or any Restricted Subsidiary and any other realized or unrealized foreign exchange gains or losses relating to the translation of assets and liabilities denominated in foreign currencies;

(11)    any unrealized or realized income (loss) or non-cash expense attributable to movement in mark-to-market valuation of foreign currencies, Indebtedness or derivative instruments pursuant to IFRS;

(12)    any non-cash increase in expenses (including expenses pushed down to the Borrower and its Restricted Subsidiaries) (a) resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods) or other inventory adjustments or (b) due to recapitalization accounting or to purchase accounting associated with the Transactions or any other acquisition or the amortization or write-off of any amounts thereof (including, without limitation, with respect to inventory, property and equipment, leases, software, goodwill, intangible assets, in-process research and development, deferred revenue (including deferred costs related thereto and deferred rent) and debt line items thereof, resulting from the application of acquisition method accounting, recapitalization accounting or purchase accounting, as the case may be, in relation to the Transactions or any consummated acquisition (by merger, consolidation, amalgamation or otherwise), joint venture investment or other Investment or the amortization or write-off or write-down of any amounts thereof;

(13)    any impairment charge, write-off or write-down, including impairment charges, write-offs or write-downs related to bad debt expense, intangible assets, long-lived assets, goodwill, investments in debt or equity securities (including any losses with respect to the foregoing in bankruptcy, insolvency or similar proceedings) and investments recorded using the equity method or as a result of a change in law or regulation and the amortization of intangibles arising pursuant to IFRS;

(14)    (a) accruals and reserves (including contingent liabilities) that are established or adjusted in connection with the Transactions or within eighteen (18) months after the closing of any acquisition or disposition that are established or adjusted as a result of such acquisition or disposition in accordance with IFRS, or changes as a result of adoption or modification of accounting policies and (b) earn-out, non-compete and contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments;

(15)    any income (loss) related to any realized or unrealized gains and losses resulting from Hedging Obligations or embedded derivatives that require similar accounting treatment (including embedded derivatives in customer contracts), and the application of IFRS 9 and its related pronouncements or mark to market movement of other financial instruments;

(16)     any non-cash expenses, accruals or reserves related to adjustments to historical tax exposures and any deferred tax expense associated with tax deductions or net operating losses arising as a result of the Transactions, or the release of any valuation allowances related to such item;

(17)     the amount of loss or discount on sale of Securitization Assets, Receivables Assets and related assets in connection with a Qualified Securitization Financing or Receivables Facility; and

(18)     (i) payments to third parties in respect of research and development, including amounts paid upon signing, success, completion and other milestones and other progress payments, to the extent expensed, (ii) at the election of the Borrower with respect to any quarterly period, effects of adjustments to accruals and reserves during a period relating to any change in the methodology of calculating reserves for returns, rebates and other chargebacks (including government program rebates), and (iii) at the election of the Borrower with respect to any quarterly period, an amount equal to the net change in deferred revenue at the end of such period from the deferred revenue at the end of the previous period.

In addition, to the extent not already excluded (or included, as applicable) in the Consolidated Net Income of such Person and its Restricted Subsidiaries, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall be increased by the amount of: (i) any expenses, charges or losses that are reimbursed by indemnification or other reimbursement provisions in connection with any investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder, or, so long as the Borrower has made a determination that it reasonably expects that such amount will in fact be paid or reimbursed within 365 days of the date of such evidence (net of any amount so added back in a prior period to the extent not so reimbursed within the applicable 365-day period), (ii) to the extent covered by insurance (including business interruption insurance) and actually reimbursed, or, so long as the Borrower has made a determination that it reasonably expects that such amount will in fact be paid or reimbursed by the insurer and only to the extent that such amount is in fact reimbursed within 365 days of the date of such evidence (net of any amount so added back in a prior period to the extent not so reimbursed within the applicable 365-day period), expenses, charges or losses with respect to liability or Casualty Events or business interruption and (iii) the amount of distributions actually made to any Parent Entity of such Person in respect of such period in accordance with Section 7.06(b)(xxiv) as though such amounts had been paid as taxes directly by such Person for such periods.

"Consolidated Secured Indebtedness" means the Consolidated Total Indebtedness that is secured by a Lien on the Collateral of the Borrower and its Restricted Subsidiaries.

"Consolidated Total Indebtedness" means, with respect to the Borrower and its Restricted Subsidiaries, as of any date of determination, an amount equal to, on a consolidated basis and determined in accordance with IFRS, (a) the aggregate principal amount of outstanding third-party Indebtedness for borrowed money (excluding Indebtedness with respect to Cash Management Obligations and intercompany Indebtedness as of such date), *plus* (b) Capitalized Lease Obligations and the aggregate principal amount of Purchase Money Obligations (but excluding therefrom outstanding COAM vendor financings in an aggregate principal amount of up to $7.5 million), *plus* (c) unreimbursed drawings under letters of credit of the Borrower and its Restricted Subsidiaries outstanding on such date to the extent not reimbursed within three (3) Business Days of the drawing thereof (*provided* that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Indebtedness until five (5) Business Days after such amount is drawn), *plus* (d) the undrawn Reserved Indebtedness Amount (to the extent included in clause (a) above), *minus* (e) the aggregate amount of Unrestricted Cash included on the consolidated

balance sheet of the Borrower and its Restricted Subsidiaries as of the end of the most recent fiscal period for which consolidated financial statements have been or are required to be delivered pursuant to <u>Section 6.01(a)</u> or <u>6.01(b)</u>, which shall not be less than $0 (*provided* that the cash proceeds of any proposed incurrence of Indebtedness shall not be included in this <u>clause (e)</u> for purposes of calculating the Interest Coverage Ratio, the Consolidated Total Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio or the Consolidated First Lien Secured Leverage Ratio, as applicable) with such *pro forma* adjustments as are consistent with the *pro forma* adjustments set forth in <u>Section 1.09</u>.  For the avoidance of doubt, Consolidated Total Indebtedness shall exclude Indebtedness in respect of any Hedging Obligations, operating leases, undrawn letters of credit, any earnout, contingent obligation, holdback or similar deferred purchase price consideration to the extent such earnout, contingent obligation, holdback or similar deferred purchase price obligations are no more than five (5) Business Days past due and payable and if not recognized as debt on the consolidated balance sheet of the Borrower in accordance with IFRS and any Receivables Facility or Securitization Facility.

"<u>Consolidated Total Leverage Ratio</u>" means, as of any date of determination, the ratio of (x) Consolidated Total Indebtedness as of such date to (y) LTM EBITDA (in each case, determined in accordance with the applicable provisions of <u>Section 1.09</u> hereof).

"<u>Consolidated Total Senior Secured Leverage Ratio</u>" means, as of any date of determination, the ratio of (x) the Consolidated Secured Indebtedness as of such date to (y) LTM EBITDA (in each case, determined in accordance with the applicable provisions of <u>Section 1.09</u> hereof).

"<u>Consolidated Working Capital</u>" means, at any date, the excess of (a) the sum of (i) all amounts (other than cash and Cash Equivalents) that would, in conformity with IFRS, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries at such date and (ii) long-term accounts receivable over (b) the sum of (i) all amounts that would, in conformity with IFRS, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries on such date and (ii) long-term deferred revenue, but excluding, without duplication, (a) the current portion of any Funded Debt or other long-term liabilities, (b) all Indebtedness consisting of Revolving Credit Loans and L/C Obligations to the extent otherwise included therein, (c) the current portion of interest, (d) the current portion of current and deferred income taxes, (e) the current portion of any Capitalized Lease Obligations, (f) deferred revenue arising from cash receipts that are earmarked for specific projects, (g) the current portion of deferred acquisition costs and (h) current accrued costs associated with any restructuring or business optimization (including accrued severance and accrued facility closure costs).

"<u>Contingent Obligations</u>" means, with respect to any Person, any obligation of such Person guaranteeing in any manner, whether directly or indirectly, any Non-Financing Lease Obligation, dividend or other obligation that does not constitute Indebtedness ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>"), including any obligation of such Person, whether or not contingent:

  (1) to purchase any such primary obligation or any property constituting direct or indirect security therefor;

  (2) to advance or supply funds:

    (a) for the purchase or payment of any such primary obligation; or

    (b) to maintain the working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)    to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Contract Consideration" has the meaning specified in the definition of "Excess Cash Flow."

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"control," "controls," "controlling" and "controlled" have the meanings specified in the definition of "Affiliate."

"Controlled Investment Affiliate" means, as to any Person, any other Person, which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making direct or indirect equity or debt investments in the Borrower and/or other companies.

"Covered Entity" means any of the following:

(i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §252.82(b);

(ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §47.3(b); or

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §382.2(b).

"Covered Party" shall have the meaning provided in Section 10.21.

"Covered Jurisdiction" means the United States (and each State thereof and the District of Columbia) and the jurisdiction of organization of any Restricted Subsidiary that becomes a Guarantor pursuant to the last sentence of the definition of "Guarantor."

"Credit Agreement Refinanced Debt" has the meaning specified in the definition of "Credit Agreement Refinancing Indebtedness."

"Credit Agreement Refinancing Indebtedness" means (a) Permitted Pari Passu Refinancing Debt, (b) Permitted Junior Refinancing Debt, or (c) Permitted Unsecured Refinancing Debt obtained pursuant to a Refinancing Amendment, in each case, issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) in exchange for, or to extend, renew, replace or refinance, in whole or part, existing Term Loans, Incremental Term Loans, Refinancing Term Loans, Revolving Credit Loans, Incremental Revolving Credit Commitments or Refinancing Revolving Credit Loans hereunder (including any successive Credit Agreement Refinancing Indebtedness) ("Credit Agreement Refinanced Debt"); *provided* that (i) such extending, renewing or refinancing Indebtedness is in an original aggregate principal amount not greater than (A) the aggregate principal amount of the Credit Agreement Refinanced Debt, plus (B) accrued, capitalized and unpaid interest thereon, any fees, premiums (including any makewhole), accrued interest associated therewith, or other reasonable amount paid, and fees, costs and expenses, commissions or underwriting discounts incurred in connection

therewith, (ii) the terms applicable to such Credit Agreement Refinancing Indebtedness comply with the Required Debt Terms and (iii) such Credit Agreement Refinanced Debt (other than contingent indemnification obligations not yet accrued and payable and Letters of Credit that have been Cash Collateralized or back-stopped or as to which other arrangements reasonably satisfactory to the Administrative Agent and the applicable L/C Issuer have been made) shall be repaid, defeased or satisfied and discharged, and (unless otherwise agreed by all Lenders holding such Credit Agreement Refinanced Debt) all accrued interest, fees and premiums (if any) in connection therewith shall be paid on the date such Credit Agreement Refinancing Indebtedness is issued, incurred or obtained.

"Credit Extension" means each of the following:  (a) a Borrowing and (b) an L/C Credit Extension.

"Cumulative Consolidated Net Income" means, for any period, Consolidated Net Income for such period, taken as a single accounting period.  Cumulative Consolidated Net Income shall not be less than $0.

"Cure Amount" has the meaning specified in Section 8.05.

"Cure Period" has the meaning specified in 8.05.

"Cure Right" has the meaning specified in Section 8.05.

"Customary Intercreditor Agreement" means (a) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank equal in priority to the Liens on the Collateral securing the Secured Obligations (but without regard to the control of remedies), a customary intercreditor agreement (which may take the form of a "waterfall" or similar provision) (x) substantially in the form attached as Exhibit K, together with any changes thereto which are reasonably acceptable to the Administrative Agent or (y) in form and substance reasonably acceptable to the Administrative Agent and the Borrower, which agreement shall provide, *inter alia*, that the Liens on the Collateral securing such other Indebtedness to the extent validly perfected and not subject to other Liens ranking senior to the Liens securing such Indebtedness but junior to the Liens securing the Secured Obligations shall rank equal in priority to the Liens on the Collateral securing the Secured Obligations (but without regard to the control of remedies) and (b) to the extent executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank junior to the Liens on the Collateral securing the Secured Obligations, a customary intercreditor agreement (x) substantially in the form attached as Exhibit M, together with any changes thereto which are reasonably acceptable to the Administrative Agent or (y) in form and substance reasonably acceptable to the Administrative Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Secured Obligations.

"Daily Simple SOFR" has the meaning specified in Section 3.08(f).

"Debt Fund Affiliate" means an Affiliated Lender that is a bona fide debt fund or investment vehicle that is primarily engaged in, or advises funds or other investment vehicles that are primarily engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its business, and whose managers have fiduciary duties to the investors in such fund or investment vehicle independent of or in addition to, their fiduciary duties to the Borrower or any of its Subsidiaries.

"Debtor Relief Laws" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium,

rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Declined Proceeds" has the meaning specified in Section 2.05(b)(v).

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means, solely during the occurrence and continuance of (x) a Specified Default and (y) any other Event of Default, an interest rate equal, (a) with respect to any overdue principal for any Loan, the applicable interest rate for such Loan plus 2.00% per annum and (b) with respect to any other overdue amount (including overdue interest), the interest rate applicable to Base Rate Loans that are Term Loans plus 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws and which shall be payable, in the case of clause (x), as set forth in this Agreement (unless waived by the Required Lenders) and, in the case of clause (y), upon the election of the Required Lenders.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans required to be funded by it, (ii) fund any portion of its participations in Letters of Credit or Swing Line Loans, as applicable, required to be funded by it or (iii) pay over to the Administrative Agent, the L/C Issuer, the Swing Line Lender or any other Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or the Administrative Agent, the L/C Issuer, the Swing Line Lender or any other Lender in writing that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan cannot be satisfied), (c) has failed, within three (3) Business Days after request by the Administrative Agent, the L/C Issuer, the Swing Line Lender or any other Lender, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations to fund prospective Loans and participations in then outstanding Letters of Credit or Swing Line Loans, as applicable, under this Agreement, *provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Administrative Agent's, L/C Issuer's, Swing Line Lender's or other Lender's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) after the date of this Agreement, has become the subject of a Bankruptcy Event.

"Designated Non-Cash Consideration" means the fair market value (as determined in good faith by the Borrower) of non-cash consideration received by the Borrower or any of its Restricted Subsidiaries in connection with an Asset Disposition that is so designated as Designated Non-Cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of cash or Cash Equivalents received in connection with a subsequent payment, redemption, retirement, sale or other disposition of such Designated Non-Cash Consideration.  A particular item of Designated Non-Cash Consideration will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise disposed of in compliance with Section 7.05 hereof.

"Designated Preferred Stock" means Preferred Stock of the Borrower or a Parent Entity (other than Disqualified Stock) (a) that is issued for cash (other than to the Borrower or a Subsidiary of the

Borrower or an employee stock ownership plan or trust established by the Borrower or any such Subsidiary for the benefit of their employees to the extent funded by the Borrower or such Subsidiary) and (b) that is designated as "Designated Preferred Stock" pursuant to an Officer's Certificate of the Borrower at or prior to the issuance thereof, the Net Cash Proceeds of which are excluded from the calculation set forth in Section 7.06(a) hereof.

"Discount Range" has the meaning specified in Section 2.05(d)(ii).

"Discounted Prepayment Option Notice" has the meaning specified in Section 2.05(d)(ii).

"Discounted Voluntary Prepayment" has the meaning specified in Section 2.05(d)(i).

"Discounted Voluntary Prepayment Notice" has the meaning specified in Section 2.05(d)(v).

"Disinterested Director" means, with respect to any Affiliate Transaction, a member of the Board of Directors having no material direct or indirect financial interest in or with respect to such Affiliate Transaction.  A member of the Board of Directors shall be deemed not to have such a financial interest by reason of such member's holding Capital Stock of the Borrower or any options, warrants or other rights in respect of such Capital Stock.

"Disqualification Event" means, with respect to any Lender:

(a)    the failure of such Lender to timely file (i) any application requested of such Lender by the Georgia Lottery Corporation in writing in connection with any licensing required by the Gaming Laws for such Lender to be a lender to the Borrower hereunder, or (ii) any application or other papers required by the Gaming Laws in connection with the determination of suitability of such Lender as a lender to the Borrower hereunder;

(b)    the withdrawal by such Lender (except where requested or permitted by the Georgia Lottery Corporation or permitted by the Gaming Laws) of any such application or other papers required by the Gaming Laws, unless such withdrawal occurs prior to the applicable deadline to timely file any such application or other papers; or

(c)    any final determination by the Georgia Lottery Corporation pursuant to the Gaming Laws, as the case may be, (i) that such Lender is "unsuitable" as a lender to the Borrower hereunder, (ii) that such Lender shall be "disqualified" as a lender to the Borrower hereunder, or (iii) denying the issuance to such Lender of any license or other approval required under the Gaming Laws to be held by such Lender as a result of such Lender being a party to this Agreement.

"Disqualified Lenders" means (i) such banks, financial institutions, other institutional lenders (or related funds of such institutional lenders) and investors or other Persons separately identified in writing by the Borrower or the Sponsor to the Administrative Agent prior to June 30, 2021, (ii) competitors of the Borrower or any of its Subsidiaries identified in writing from time to time by email from the Borrower or the Sponsor to the Administrative Agent, or (iii) in the case of clauses (i) and (ii), any of their affiliates (other than affiliates of persons referenced in clause (ii) above that are bona fide debt investment funds primarily engaged in, or that advise funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, notes, bonds or similar extensions of credit or securities in the ordinary course of its business and whose managers have fiduciary duties to the investors therein independent of or in addition to their duties to such bank, financial institution, other institutional lender or competitor, as applicable) that are (A) identified by the Borrower or any of its

Subsidiaries or the Sponsor in writing from time to time or (B) reasonably identifiable on the basis of such affiliates' name; *provided* that any additional designation permitted by the foregoing shall not become effective until three (3) Business Days following delivery to the Administrative Agent by email; *provided, further*, that in no event shall any notice given pursuant to this definition apply to retroactively disqualify any Person who previously acquired and continues to hold, or who has contracted to acquire, any Loans, Commitments or participations prior to the receipt of such notice.  For the avoidance of doubt, the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Lenders and shall not be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Lender or have any liability with respect to or arising out of any assignment or participation to or disclosure of confidential information to, a Disqualified Lender.  The Administrative Agent shall be permitted, upon request of any Lender or Participant, to make available the list of Disqualified Lenders upon request by the inquiring Lender or disclose to such inquiring Lender or Participant whether such specific potential Assignee or Participant is on the list of Disqualified Lenders.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event:

      (1)     matures or is mandatorily redeemable for cash or in exchange for Indebtedness pursuant to a sinking fund obligation or otherwise; or

      (2)     is or may become (in accordance with its terms) upon the occurrence of certain events or otherwise redeemable or repurchasable for cash or in exchange for Indebtedness at the option of the holder of the Capital Stock in whole or in part,

in each case on or prior to the earlier of (a) the Stated Maturity of the Loans or (b) the date on which there are no Loans outstanding; *provided, however*, that (i) only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock and (ii) any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Borrower to repurchase such Capital Stock upon the occurrence of a change of control or asset sale (howsoever defined or referred to) shall not constitute Disqualified Stock if any such redemption or repurchase obligation is subject to compliance by the relevant Person with Section 7.06 hereof; *provided, however*, that if such Capital Stock is issued to any future, current or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) (excluding the Permitted Holders (but not excluding any future, current or former employee, director, officer, manager, contractor, consultant or advisor) or Immediate Family Members), of the Borrower, any of its Subsidiaries, any Parent Entity or any other entity in which the Borrower or a Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors (or the compensation committee thereof) or any other plan for the benefit of current, former or future employees (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower or its Subsidiaries or by any such plan to such employees (or their respective Controlled Investment Affiliates or Immediate Family Members), such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

      "do not have Unreasonably Small Capital" has the meaning specified in the definitions of "Solvent" and "Solvency."

      "Dollar" and "$" mean lawful money of the United States.

"<u>Dollar Equivalent</u>" means, on any date of determination, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount in any other currency, the equivalent in Dollars of such amount, determined by the Administrative Agent or the L/C Issuer, as applicable, pursuant to <u>Section 1.08</u> using the Exchange Rate with respect to such currency at the time in effect under the provisions of such Section.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is not a Foreign Subsidiary.

"<u>Early Opt-in Effective Date</u>" has the meaning specified in <u>Section 3.08(f)</u>.

"<u>Early Opt-in Election</u>" has the meaning specified in <u>Section 3.08(f)</u>.

"<u>EEA Financial Institution</u>" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Effective Yield</u>" means, with respect to any term loan facility or other term loans, as of any date of determination, the sum of (a) the higher of (i) the Eurocurrency Rate on such date for a deposit in Dollars with a maturity of three (3) months and (ii) the Eurocurrency Rate "floor," if any, with respect thereto as of such date, (b) the Applicable Rate (or other applicable margin) as of such date for Eurocurrency Rate Loans (or other loans that accrue interest by reference to a similar reference rate) without giving effect to any pricing step-downs and (c) the amount of original issue discount and upfront fees paid and payable (which shall be deemed to constitute like amounts of original issue discount) thereon (converted to yield assuming a four-year average life and without any present value discount or, if less, the remaining life to maturity, and assuming that the commitments under any such facility that is a revolving facility are fully drawn), but excluding the effect of any amendment, arrangement, structuring, commitment, underwriting, syndication and any similar fees payable to any lead arranger (or its Affiliates) in connection with the commitment or syndication of such Indebtedness, consent fees paid to consenting lenders, prepayment premiums, ticking or commitment fees on undrawn commitments, call protection and any other fees not paid or payable generally to all lenders by the Borrower in the primary syndication of such term loan facility or other term loans; *provided*, that the amounts set forth in <u>clauses (a)</u> and <u>(b)</u> above for any term loans that are not incurred under this Agreement shall be based on the stated interest rate basis for such term loans.

"<u>Eligible Assignee</u>" means any Assignee permitted by and consented to in accordance with <u>Section 10.07(b)</u>.

"<u>Environment</u>" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"<u>Environmental Laws</u>" means any and all applicable Laws relating to pollution, the protection of the environment, natural resources or to the generation, transport, storage, use, treatment,

Release or threat of Release of any Hazardous Materials or, relating to human health and safety with respect to exposure to Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Loan Party or any of its respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure of any Person to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement to the extent liability is assumed or imposed with respect to any of the foregoing.

"Equity Offering" means (x) a sale of Capital Stock (other than through the issuance of Disqualified Stock or Designated Preferred Stock or an Excluded Contribution) other than (a) offerings registered on Form S-8 (or any successor form) under the Securities Act or any similar offering in other jurisdictions or other equity securities of the Borrower or any Parent Entity and (b) issuances of Capital Stock to any Subsidiary of the Borrower or the Borrower or (y) a cash equity contribution to the Borrower or any of its Restricted Subsidiaries.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is under common control with any Loan Party and is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA with respect to a Pension Plan, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (d) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan, notification of any Loan Party or ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA or in endangered or critical status, within the meaning of Section 305 of ERISA; (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (h) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code); or (i) the occurrence of a non-exempt prohibited transaction with respect to any Pension Plan maintained or contributed to by any Loan Party (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to any Loan Party.

"Erroneous Payment" has the meaning specified in Section 9.17(a).

"Erroneous Payment Corresponding Loan Amount" has the meaning specified in Section 9.17(c).

"Erroneous Payment Recipient" has the meaning specified in Section 9.17(a).

"Erroneous Payment Return Deficiency" has the meaning specified in Section 9.17(c).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurocurrency Rate" means,

(a)        for any Interest Period with respect to any Eurocurrency Rate Loan (i) the rate per annum equal to the London Interbank Offered Rate ("LIBOR"), as administered by the IBA (or any other Person that takes over the administration of such rate) for the applicable currency for a period equal in length to such Interest Period as displayed on the applicable Bloomberg page or screen that displays such rate (or, in the event such rate does not appear on a Bloomberg page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion at approximately 11:00 a.m., London time, on the day that is two (2) Business Days prior to the first day of such Interest Period (unless market practice differs in the relevant market where LIBOR is to be determined, in which case the date of quotation will be determined by the Administrative Agent in accordance with market practices in such market (and if quotations would normally be given on more than one day, then the date of quotation will be the last of those days)) (the "LIBOR Screen Rate"); *provided* that if such page or service ceases to be available, the Administrative Agent may specify another page or service displaying the relevant rate after consultation with the Borrower, *multiplied* by (ii) Statutory Reserves; *provided* that the Eurocurrency Rate shall not be less than (x) 0.00% with respect to Revolving Credit Loans and (y) 0.75% per annum with respect to Initial Term Loans; and

(b)        for any rate calculation with respect to a Base Rate Loan on any date, (i) the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined on the day that is two (2) Business Days prior to the first day of the applicable Interest Period (unless market practice differs in the relevant market where LIBOR is to be determined, in which case the date of quotation will be determined by the Administrative Agent in accordance with market practices in such market (and if quotations would normally be given on more than one day, then the date of quotation will be the last of those days)) for U.S. Dollar deposits with a term of one (1) month commencing that day, *multiplied* by (ii) Statutory Reserves;

*provided* that, in each case, to the extent a comparable or successor rate is approved pursuant to the provisions of Section 3.02, (x) "LIBOR" shall mean such successor rate, and (y) for the avoidance of doubt, the rate floors set forth in the second proviso to clause (a) above shall apply with respect to such successor rate, *mutatis mutandis*.

"Event of Default" has the meaning specified in Section 8.01.

"Excess Cash Flow" means, with respect to the Borrower and the Restricted Subsidiaries, for any period, an amount equal to the excess of:

(a)        the sum, without duplication, of:

(i)        Consolidated Net Income of the Borrower and the Restricted Subsidiaries for such period;

(ii)    an amount equal to the amount of all non-cash charges (including depreciation and amortization) to the extent deducted in arriving at such Consolidated Net Income;

(iii)    decreases in Consolidated Working Capital for such period (other than any such decreases arising from acquisitions by the Borrower and the Restricted Subsidiaries completed during such period or the application of purchase accounting);

(iv)    an amount equal to the aggregate net non-cash loss on Asset Dispositions or other dispositions of property or assets by the Borrower and the Restricted Subsidiaries during such period (other than Asset Dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income;

(v)    cash receipts in respect of Swap Contracts during such period to the extent not otherwise included in Consolidated Net Income; and

(vi)    amounts previously deducted pursuant to clause (b) below or from Excess Cash Flow pursuant to Section 2.05(b)(i) that in each case were based on amounts to be expended in the future that were not so expected within the applicable time period (if any); over

(b)    the sum, without duplication (including without duplication of any amounts deducted from Excess Cash Flow pursuant to Section 2.05(b)(i)), of:

(i)    an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income and cash charges to the extent included in arriving at such Consolidated Net Income;

(ii)    without duplication of amounts deducted pursuant to clause (ix) below in prior fiscal years, the amount of capital expenditures or acquisitions (including Permitted Acquisitions) made in cash during such period, except to the extent that such capital expenditures or acquisitions (including Permitted Acquisitions) were financed with the proceeds of an incurrence or issuance of Funded Debt (other than a revolving line of credit) of the Borrower or its Restricted Subsidiaries or equity contributions received by the Borrower or a Subsidiary from a Parent Entity;

(iii)    the aggregate amount of all principal payments of Indebtedness of the Borrower and its Restricted Subsidiaries (including (A) the principal component of Capitalized Lease Obligations and (B) the amount of repayments of Term Loans pursuant to Section 2.07(a) and any mandatory prepayment of Term Loans pursuant to Section 2.05(b) to the extent required due to an Asset Disposition that resulted in an increase to such Consolidated Net Income and not in excess of the amount of such increase but excluding (X) all other prepayments of Term Loans, (Y) all prepayments under the Revolving Credit Facility and (Z) all prepayments in respect of any other revolving credit facility, except, in the case of clause (Z), to the extent there is an equivalent permanent reduction in commitments thereunder) made during such period, except to the extent financed with the proceeds of an incurrence or issuance of other Funded Debt (other than a revolving line of credit) of the Borrower or its Restricted Subsidiaries or equity contributions received by the Borrower or a Subsidiary from a Parent Entity;

(iv)       an amount equal to the aggregate net non-cash gain on Asset Dispositions by the Borrower and its Restricted Subsidiaries during such period (other than Asset Dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income;

(v)        increases in Consolidated Working Capital for such period (other than any such increases arising from acquisitions by the Borrower and its Restricted Subsidiaries completed during such period or the application of purchase accounting);

(vi)       cash payments by the Borrower and its Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and its Restricted Subsidiaries other than Indebtedness (including such Indebtedness specified in clause (b)(iii) above);

(vii)      without duplication of amounts deducted pursuant to clause (ix) below in prior periods, the amount of Investments made during such period pursuant to Section 7.06(b) (other than those under clauses (a)(i), (c)(ii), (d) or (e) of the definition of "Permitted Investments") except to the extent that such Investments and acquisitions were financed with the proceeds of an incurrence or issuance of Funded Debt (other than a revolving line of credit) of the Borrower or its Restricted Subsidiaries or equity contributions received by the Borrower or a Subsidiary from a Parent Entity;

(viii)     the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by the Borrower and its Restricted Subsidiaries during such period that are required to be made in connection with any prepayment of Indebtedness except to the extent that such amounts were financed with the proceeds of an incurrence or issuance of Funded Debt (other than a revolving line of credit) of the Borrower or its Restricted Subsidiaries or equity contributions received by the Borrower or a Subsidiary from a Parent Entity;

(ix)       without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate consideration contemplated to be paid in cash by the Borrower or any of the Restricted Subsidiaries pursuant to binding contracts, commitments, letters of intent or purchase orders (the "Contract Consideration") entered into during such period, relating to Permitted Investments (other than those under clauses (a)(i), (c)(ii), (d) or (e) of the definition of "Permitted Investments," but including in joint ventures), capital expenditures or acquisitions (including Permitted Acquisitions) to be consummated or made during the period of four consecutive fiscal quarters of the Borrower following the end of such period except to the extent intended to be financed with the proceeds of an incurrence or issuance of other Indebtedness of the Borrower or its Restricted Subsidiaries or equity contributions received by the Borrower or a Subsidiary from a Parent Entity; provided that to the extent the aggregate amount utilized to finance such Permitted Investments, capital expenditures or acquisitions (including Permitted Acquisitions) during such period of four consecutive fiscal quarters (excluding such payments financed with long term Indebtedness for borrowed money (other than a revolving line of credit)) is less than the Contract Consideration, the amount of such shortfall, shall be added to the calculation of Excess Cash Flow at the end of such period of four consecutive fiscal quarters;

(x)        the amount of cash taxes (including penalties and interest) paid or tax reserves set aside or payable (without duplication) in such period to the extent they exceed

-40-

the amount of tax expense deducted in determining Consolidated Net Income for such period; and

(xi)    cash expenditures in respect of Swap Contracts during such fiscal year to the extent not deducted in arriving at such Consolidated Net Income.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended.

"Exchange Rate" means, on any day, for purposes of determining the Dollar Equivalent of any currency other than Dollars, the rate at which such other currency may be exchanged into Dollars at the time of determination on such day on the Reuters WRLD Page for such currency.  In the event that such rate does not appear on any Reuters WRLD Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower, or, in the absence of such an agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about such time as the Administrative Agent shall elect after determining that such rates shall be the basis for determining the Exchange Rate, on such date for the purchase of Dollars for delivery two Business Days later, *provided* that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"Excluded Accounts" means (1) payroll, healthcare and other employee wage and benefit accounts, (2) tax accounts, including without limitation, sales tax accounts, (3) fiduciary or trust accounts, and (4) the funds or property held in or maintained for such purposes in any such accounts described in clauses (1) through (3) above.

"Excluded Contribution" means Net Cash Proceeds or property or assets received by the Borrower as capital contributions to the equity (other than through the issuance of Disqualified Stock or Designated Preferred Stock) of the Borrower after the Closing Date or from the issuance or sale (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Borrower or any Subsidiary of the Borrower for the benefit of their employees to the extent funded by the Borrower or any Restricted Subsidiary) of Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Borrower.

"Excluded Equity" means Capital Stock (i) of any Unrestricted Subsidiary, any Immaterial Subsidiary (except to the extent a Lien thereon can be perfected by the filing of a UCC financing statement (or analogous procedures under applicable Laws in the relevant Covered Jurisdiction)) and/or any non-Wholly Owned Subsidiary (to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto (other than the Borrower or any wholly-owned Restricted Subsidiary of the Borrower) under the terms of any applicable organizational documents, joint venture agreement or shareholders' agreement), (ii) of any Subsidiary acquired pursuant to a Permitted Investment financed with Indebtedness permitted pursuant to Section 7.03(b)(v)(x) if such Capital Stock is pledged and/or mortgaged as security for such Indebtedness and if and for so long as the terms of such Indebtedness prohibit the creation of any other Lien on such Capital Stock, (iii) that is voting Capital Stock in excess of 65.0% of the issued and outstanding voting Capital Stock of any CFC or any FSHCO (for the avoidance of doubt, no non-voting Capital Stock of any CFC or any FSHCO shall be Excluded Equity), (iv) that is Capital Stock owned by any CFC or any FSHCO, (v) of any Subsidiary with respect to which the Administrative Agent and the Borrower have determined in their reasonable judgment and agreed in writing that the costs of providing a pledge of such Capital Stock or perfection thereof (including adverse tax consequences) outweighs the benefits to be obtained by the Secured Parties therefrom, (vi) of any not-for-profit

subsidiaries, special purpose entities (including any special purpose entity used to effect a Qualified Securitization Financing) and (vii) of any Subsidiary organized outside the United States the pledge of which is prohibited by applicable Laws or which would reasonably be expected to result in a violation or breach of, or conflict with, fiduciary duties of such Subsidiary's officers, directors or managers after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code of any applicable jurisdiction or other applicable law.

"Excluded Property" means (i) any fee-owned real property that is not a Material Real Property and any leasehold interests in real property (it being understood and agreed that no action shall be required with respect to creation or perfection of security interests with respect to such leasehold interests, including to obtain landlord waivers, estoppels or collateral access letters)), (ii) motor vehicles, aircraft, aircraft engines, and other assets subject to certificates of title, to the extent a Lien thereon cannot be perfected by the filing of a UCC financing statement (or analogous procedures under applicable Laws in the relevant Covered Jurisdiction), letter of credit rights to the extent a Lien thereon cannot be perfected by the by the filing of a UCC financing statement (or analogous procedures under applicable Laws in the relevant Covered Jurisdiction), and commercial tort claims with a value of less than $10,000,000 in the aggregate, (iii) property or assets for which a pledge thereof or a security interest therein is prohibited by applicable law, rule or regulation, of any applicable jurisdiction or other applicable law or which would require governmental (including regulatory) consent, approval, license or authorization to provide such pledge thereof or security interest therein unless such consent, approval, license or authorization has been received, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other similar applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC or other similar applicable law notwithstanding such prohibition, (iv) margin stock, (v) any cash and cash equivalents, deposit accounts, commodities accounts and securities accounts (including securities entitlements and related assets) (but, in each case, not including assets perfected by the filing of a UCC financing statement or the proceeds of assets otherwise constituting Collateral), (vi) any segregated funds held in escrow, defeasance, redemption or disbursements accounts for the benefit of an unaffiliated third party (other than the Borrower or a Guarantor) solely to the extent such funds are to be used for Permitted Acquisitions or other similar Investments, dispositions, Restricted Payments or other transactions permitted under this Agreement subject to the reasonable consent of the Administrative Agent, (vii) any lease, license or other agreements, contracts or any property subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or the grant of a security interest therein would violate or invalidate such lease, license or agreement, purchase money, capitalized lease or similar arrangement, or create a right of termination or payment in favor of any other party thereto (other than a Borrower or any wholly-owned Restricted Subsidiary of the Borrower) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code or other similar applicable Law, other than the proceeds and receivables thereof the assignment of which is expressly deemed effective under the Uniform Commercial Code or other similar applicable Law notwithstanding such prohibition, (viii) any intent-to-use trademark or service mark application in the United States prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, only to the extent, if any, that, and solely during the period, if any, in which, the grant, attachment, or enforcement of a security interest therein would impair the validity or enforceability of such intent-to-use trademark or service mark application under applicable U.S. federal law, (ix) Excluded Equity, (x) any governmental licenses or state or local franchises, charters or authorizations (including, for the avoidance of doubt, any Master Licenses), to the extent a security interest in any such licenses, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or other similar applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code or other similar applicable law notwithstanding such prohibition, (xi) the assets of any CFC or FSHCO, (xii) any assets to the extent a security interest in such assets would result in material

adverse tax consequences to the Borrower or any of its Subsidiaries as reasonably determined by the Borrower, in consultation with (but without the consent of) the Administrative Agent, (xiii) Excluded Accounts and the funds or other property held in or maintained in any such Excluded Accounts and (xiv) any assets with respect to which the Borrower and the Administrative Agent reasonably agree in writing that the cost and/or burden of obtaining or perfecting such security are excessive in relation to the benefits to the Lenders afforded thereby.

"Excluded Subsidiary" means (a) each Subsidiary listed on Schedule 5.11 and indicated as an "Excluded Subsidiary", (b) any Subsidiary that is prohibited by applicable Law, rule or regulation or by any contractual obligation existing on the Closing Date or on the date such Subsidiary is acquired (so long as in respect of any such contractual obligation, such prohibition is not incurred in contemplation of such acquisition and only for so long as such restriction is continuing) from guaranteeing the Secured Obligations or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guarantee unless such consent, approval, license or authorization has been received, (c) any Foreign Subsidiary, (d) any Restricted Subsidiary acquired pursuant to a Permitted Acquisition or other Permitted Investment that, at the time of such Permitted Acquisition or other Permitted Investment, has assumed secured Indebtedness permitted under this Agreement not incurred in contemplation of such Permitted Acquisition or other Permitted Investment and each Restricted Subsidiary that is a Subsidiary thereof that guarantees such Indebtedness, in each case, to the extent and so long as such secured Indebtedness prohibits such Subsidiary from becoming a Guarantor (*provided* that each such Restricted Subsidiary shall cease to be an Excluded Subsidiary under this clause (d) if such secured Indebtedness is repaid or becomes unsecured, if such Restricted Subsidiary ceases to be an obligor with respect to such secured Indebtedness or such prohibition no longer exists, as applicable), (e) any Immaterial Subsidiary or Unrestricted Subsidiary, (f) not-for-profit Subsidiaries, (g) special purpose entities (including any entity used to effect any Qualified Securitization Financing), (h) any non-Wholly Owned Subsidiary (unless the Borrower elects otherwise pursuant to the definition of "Guarantor"), (i)(i) any direct or indirect Domestic Subsidiary of a direct or indirect Foreign Subsidiary that is a CFC and (ii) any FSHCO, (j) JV Entities, (k) any Subsidiary that is an "investment company" under the Investment Company Act of 1940, as amended, (l) any Restricted Subsidiary, the provision of a Guarantee by which would reasonably be expected to result in material adverse tax consequences to the Borrower or any of the Restricted Subsidiaries, as reasonably determined by the Borrower, in consultation with the Administrative Agent, (m) any broker-dealer Subsidiaries and (n) any other Subsidiary with respect to which the Administrative Agent and the Borrower reasonably agree that the cost, burden or other consequences (including any tax consequences) of providing a Guarantee outweighs, or is excessive in relation to the value afforded thereby; *provided, however*, that, subject to the consent of the Administrative Agent (such consent not to be unreasonably withheld, delayed or conditioned) any Restricted Subsidiary that would otherwise constitute an Excluded Subsidiary hereunder that elects to become a Guarantor pursuant to the definition thereof shall no longer constitute an Excluded Subsidiary.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and solely to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest pursuant to the Collateral Documents to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such related Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"Excluded Taxes" means any of the following Taxes imposed on or, with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient's being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, any U.S. federal withholding Tax that is imposed on amounts payable to such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect at the time such Lender acquires such interest in the Loan or Commitment (or designates a new lending office), in each case of such acquisition or designation, other than pursuant to a request by the Borrower under Section 3.06, except to the extent that such Lender (or its assignor, if any) was entitled, immediately before the designation of a new lending office (or assignment), to receive additional amounts or indemnity from the Borrower with respect to such withholding Tax pursuant to Section 3.01, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(f) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Existing Credit Agreement" means that certain Credit and Security Agreement, dated as of January 29, 2020, by and among the Borrower, the guarantors party thereto, KeyBank National Association, as administrative agent and the lenders party thereto from time to time (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"Expiring Credit Commitment" has the meaning specified in Section 2.04(g).

"Extended Revolving Credit Commitment" has the meaning specified in Section 2.15(a).

"Extended Term Loans" has the meaning specified in Section 2.15(a).

"Extension" has the meaning specified in Section 2.15(a).

"Extension Offer" has the meaning specified in Section 2.15(a).

"Facility" means a Class of Term Loans or a Revolving Credit Facility, as the context may require.

"Fair Value" has the meaning specified in the definitions of "Solvent" and "Solvency."

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCA" has the meaning specified in Section 3.08(a).

"FCPA" has the meaning specified in the definition of "Anti-Corruption Laws."

"Federal Funds Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; *provided* that if the Federal

Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Bank of New York's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Fee Letter" means that certain Credit Facilities Fee Letter, dated as of June 30, 2021, by and among the Borrower, MCUSA, Macquarie, KeyBanc Capital Markets Inc. and KeyBank National Association.

"Financial Covenant" has the meaning set forth in Section 7.09.

"Financial Covenant Event of Default" has the meaning set forth in Section 8.01(b).

"Fixed Charges" means, with respect to any Person for any period, the sum of: (without duplication):

(a)      Consolidated Interest Expense of such Person for such period; plus

(b)      all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Preferred Stock of any Restricted Subsidiary of such Person during such period; plus

(c)      all cash dividends, or other distributions paid (excluding items eliminated in consolidation) on any series of Disqualified Stock of such Person during such period.

"Flood Insurance Laws" means, collectively, (i) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" has the meaning specified in Section 3.08(f).

"Foreign Lender" has the meaning specified in Section 3.01(f)(ii).

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to or by, or entered into with, any Loan Party or any Restricted Subsidiary with respect to employees outside the United States.

"Foreign Subsidiary" means a Subsidiary (which may be a corporation, limited liability company, partnership or other legal entity) organized under the laws of a jurisdiction outside the United States, other than any such entity that is (whether as a matter of law, pursuant to an election by such entity or otherwise) treated as a partnership in which the Borrower or any Restricted Subsidiary that is a Loan Party is a partner or as a branch of the Borrower or any Restricted Subsidiary that is a Loan Party for United States income tax purposes.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Exposure" means, at any time there is a Defaulting Lender, (a) with respect to an L/C Issuer, such Defaulting Lender's L/C Exposure other than any such L/C Exposure reallocated to

other Lenders or Cash Collateralized in accordance with the terms hereof and (b) with respect to the Swing Line Lender, such Defaulting Lender's *pro rata* share of Swing Line Loans other than Swing Line Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"Fronting Fee" has the meaning specified in Section 2.03(h).

"FSHCO" means any direct or indirect Subsidiary of the Borrower that has no material assets other than (x) Capital Stock or (y) Capital Stock and Indebtedness, in each case of one or more direct or indirect CFCs or other entities described in this definition.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funded Debt" means all Indebtedness of the Borrower and the Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"Gaming Authority" means, in any jurisdiction in which the Borrower or any of its Subsidiaries manages or conducts any gaming or gambling business or activities, the applicable gaming board, commission, or other governmental gaming regulatory body or agency (including the Georgia Lottery Corporation) which (a) has, or may at any time after the Closing Date have, jurisdiction over the gaming businesses or gaming activities of Holdings, the Borrower or any of its Subsidiaries or (b) is, or may at any time after the Closing Date be, responsible for interpreting, administering and enforcing the Gaming Laws.

"Gaming Laws" means all applicable constitutions, treaties, laws, rates, regulations and orders and statutes pursuant to which any Gaming Authority possesses regulatory, licensing or permit authority over gaming, gambling or casino activities and all rules, rulings, orders, ordinances and regulations of any Gaming Authority applicable to the gambling and gaming businesses or activities of Holdings, the Borrower or any of its Subsidiaries in any jurisdiction, as in effect from time to time (including, without limitation, (a) O.C.G.A. Title 50, Chapter 27, Article 3, (b) all rules and regulations adopted or promulgated thereunder, including Georgia Lottery Corporation Rules 13.1 and 13.2 and (c) any successor statute or other laws relating to gaming in the State of Georgia) and the policies, interpretations and administration thereof by the Gaming Authorities.

"Global Intercompany Note" collectively, (a) any Global Intercompany Note and Subordination Agreement delivered by the Loan Parties pursuant to Section 6.10 and substantially in the form of Exhibit P and (b) each other supplement delivered in connection therewith.

"Governmental Authority" means the government of the United States, any other nation or government, any state, provincial, country, territorial or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (includes any supra-national bodies such as the European Union or the European Central Bank).

"Governmental Authorization" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with any Governmental Authority.

"Granting Lender" has the meaning specified in Section 10.07(h).

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person, including any such obligation, direct or indirect, contingent or otherwise, of such Person:

(1)    to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise); or

(2)    entered into primarily for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part);

*provided*, *however*, that the term "Guarantee" will not include (x) endorsements for collection or deposit in the ordinary course of business or consistent with past practice and (y) standard contractual indemnities or product warranties provided in the ordinary course of business, and *provided, further*, that the amount of any Guarantee shall be deemed to be the lower of (i) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (ii) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guarantee or, if such Guarantee is not an unconditional guarantee of the entire amount of the primary obligation and such maximum amount is not stated or determinable, the amount of such guaranteeing Person's maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.  The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantors" has the meaning specified in the definition of "Collateral and Guarantee Requirement."  For avoidance of doubt, the Borrower in its sole discretion may cause any Restricted Subsidiary (including any non-Wholly Owned Subsidiary) that is not a Guarantor to Guarantee the Secured Obligations by causing such Restricted Subsidiary to execute and deliver to the Administrative Agent a Guaranty Supplement (as defined in the Guaranty) and to satisfy the Collateral and Guarantee Requirement, and any such Restricted Subsidiary shall thereafter be a Guarantor, Loan Party and Subsidiary Guarantor (and not an Excluded Subsidiary), hereunder for all purposes; *provided* that if such Restricted Subsidiary is not organized in an existing Covered Jurisdiction, the jurisdiction or organization of such Restricted Subsidiary shall be reasonably satisfactory to the Collateral Agent (taking into account any imposition of fiduciary duties and/or if acting as Collateral Agent or entering into Loan Documents with Persons in such jurisdiction is prohibited by applicable Law or would expose the Collateral Agent, in its capacity as such, to material additional liabilities or political risk).

"Guaranty" means, collectively, (a) the Guaranty substantially in the form of Exhibit F and (b) each other guaranty and guaranty supplement delivered pursuant to Section 6.10.

"Hazardous Materials" means all explosive or radioactive substances or wastes, and all other chemicals, pollutants, contaminants, substances or wastes of any nature regulated pursuant to any Environmental Law due to their dangerous or deleterious properties or characteristics, including petroleum

or petroleum distillates, friable asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, per- or polyflouroalkyl substances and toxic mold.

"Hedge Bank" means (x) any Person that is a Lender, an Agent, Lead Arranger or an Affiliate of the foregoing on the Closing Date, or at the time it enters into a Swap Contract with the Borrower or any Restricted Subsidiary and (y) any other Person designated by the Borrower with notice to the Administrative Agent that enters into a Swap Contract with the Borrower or any Restricted Subsidiary; *provided* that, in the case of this clause (y), such Person shall have appointed the Administrative Agent and the Collateral Agent as its agents under the applicable Loan Documents and agreed to be bound by the provisions of Article IX in favor of the Agent as if it were a Lender and shall have been deemed to have made the representations and warranties set forth in Section 9.06 in favor of the Agents, in each case, pursuant to a writing substantially in the form of Exhibit O or otherwise reasonably satisfactory to the Borrower and the Administrative Agent.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, commodity swap agreement, commodity cap agreement, commodity collar agreement, foreign exchange contracts, currency swap agreement or similar agreement providing for the transfer or mitigation of interest rate, commodity price or currency risks either generally or under specific contingencies.

"Holdings" means Lucky Bucks HoldCo, LLC, a Delaware limited liability company.

"Honor Date" has the meaning specified in Section 2.03(c)(i).

"IBA" has the meaning specified in Section 1.10(a).

"Identified Contingent Liabilities" has the meaning specified in the definitions of "Solvent" and "Solvency."

"IFRS" means the body of pronouncements issued by the International Accounting Standards Board, including International Financial Reporting Standards and interpretations approved by the IASB, as in effect from time to time (except as may be specifically set forth herein), applied on a basis consistent with the past accounting practices and procedures of the Borrower. If there occurs a change in IFRS and such change would cause a change in the method of calculation of any standards, terms or measures (including all computations of amounts and ratios) used in this Agreement (an "Accounting Change"), then the Borrower may elect that such standards, terms or measures shall be calculated as if such Accounting Change had not occurred.

"Immaterial Subsidiary" means, at any date of determination, each Restricted Subsidiary of the Borrower that (i) has not guaranteed any other Indebtedness of the Borrower and (ii) together with all other Immaterial Subsidiaries (as determined in accordance with IFRS), has Total Assets and LTM EBITDA of less than 5.0% of Total Assets and Consolidated EBITDA, respectively, in each case measured at the end of the most recent fiscal period for which consolidated financial statements have been or are required to be delivered pursuant to Section 6.01(a) or 6.01(b) on a *pro forma* basis giving effect to any acquisitions or dispositions of companies, division or lines of business since such financial statement date or the start of such four quarter period, as applicable, and on or prior to the date of acquisition of such Subsidiary.

"Immediate Family Members" means, with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law

(including adoptive relationships, the estate of such individual and such other individuals above) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Increased Amount" has the meaning specified in Section 7.01(b).

"Incremental Facilities" has the meaning specified in Section 2.14(a).

"Incremental Facility Amendment" has the meaning specified in Section 2.14(e).

"Incremental Facility Closing Date" has the meaning specified in Section 2.14(e).

"Incremental Incurrence Test" has the meaning specified in Section 2.14(a).

"Incremental Revolving Credit Commitments" has the meaning specified in Section 2.14(a).

"Incremental Revolving Lender" has the meaning specified in Section 2.14(e).

"Incremental Term Loans" has the meaning specified in Section 2.14(a).

"Incur" means issue, create, assume, enter into any Guarantee of, incur, extend or otherwise become liable for; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary and the terms "Incurred," "Incurring" and "Incurrence" have meanings correlative to the foregoing and any Indebtedness pursuant to any revolving credit or similar facility shall only be "Incurred" at the time any funds are borrowed thereunder.

"Indebtedness" means, with respect to any Person on any date of determination (without duplication):

(1)     the principal of indebtedness of such Person for borrowed money;

(2)     the principal of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)     all reimbursement obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments (the amount of such obligations being equal at any time to the aggregate then undrawn and unexpired amount of such letters of credit or other instruments plus the aggregate amount of drawings thereunder that have not been reimbursed) (except to the extent such reimbursement obligations relate to trade payables and such obligations are satisfied within 30 days of Incurrence);

(4)     the principal component of all obligations of such Person to pay the deferred and unpaid purchase price of property (except trade payables or similar obligations, including accrued expenses owed, to a trade creditor), which purchase price is due more than one year after the date of placing such property in service or taking final delivery and title thereto;

(5)     Capitalized Lease Obligations of such Person;

(6)    the principal component of all obligations, or liquidation preference, of such Person with respect to any Disqualified Stock or, with respect to any Restricted Subsidiary, any Preferred Stock (but excluding, in each case, any accrued dividends);

(7)    the principal component of all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided*, *however*, that the amount of such Indebtedness will be the lesser of (a) the fair market value of such asset at such date of determination (as determined in good faith by the Borrower) and (b) the amount of such Indebtedness of such other Persons;

(8)    Guarantees by such Person of the principal component of Indebtedness of the type referred to in clauses (1), (2), (3), (4), (5) and (9) hereof of other Persons to the extent guaranteed by such Person; and

(9)    to the extent not otherwise included in this definition, net obligations of such Person under Hedging Obligations (the amount of any such obligations to be equal at any time to the net payments under such agreement or arrangement giving rise to such obligation that would be payable by such Person at the termination of such agreement or arrangement);

with respect to clauses (1), (2), (3), (4), (5) and (9) above, if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with IFRS.

The amount of Indebtedness of any Person at any time in the case of a revolving credit or similar facility shall be the total amount of funds borrowed and then outstanding.  The amount of any Indebtedness outstanding as of any date shall be (a) the accreted value thereof in the case of any Indebtedness issued with original issue discount and (b) the principal amount of Indebtedness, or liquidation preference thereof, in the case of any other Indebtedness.  Indebtedness shall be calculated without giving effect to the effects of IFRS 9 and related pronouncements to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

Notwithstanding the foregoing, in no event shall the following constitute Indebtedness:

(i)    Contingent Obligations Incurred in the ordinary course of business or consistent with past practice, other than Guarantees or other assumptions of Indebtedness;

(ii)    Cash Management Obligations;

(iii)    any lease, concession or license of property (or Guarantee thereof) which would be considered an operating lease under IFRS, Non-Financing Lease Obligations, Sale and Leaseback Transactions or any prepayments of deposits received from clients or customers in the ordinary course of business or consistent with past practice;

(iv)    obligations under any license, permit or other approval (or Guarantees given in respect of such obligations) incurred prior to the Closing Date or in the ordinary course of business or consistent with past practice;

(v)    in connection with the purchase by the Borrower or any Restricted Subsidiary of any business, any deferred or prepaid revenue, post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or

-50-

such payment depends on the performance of such business after the closing; *provided*, *however*, that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid in a timely manner;

(vi)    for the avoidance of doubt, any obligations in respect of workers' compensation claims, early retirement or termination obligations, pension fund obligations or contributions or similar claims, obligations or contributions or social security or wage Taxes;

(vii)    obligations under or in respect of Qualified Securitization Financing or Receivables Facilities;

(viii)    deferred obligations owing to the Permitted Holders pursuant to management agreements in effect on the Closing Date;

(ix)    Indebtedness of any Parent Entity appearing on the balance sheet of the Borrower solely by reason of push down accounting under IFRS;

(x)    Capital Stock (other than in the case of clause (6) above, Disqualified Stock or Preferred Stock of a Restricted Subsidiary); or

(xi)    amounts owed to dissenting stockholders (including in connection with, or as a result of, exercise of dissenters' or appraisal rights and the settlement of any claims or action (whether actual, contingent or potential)), pursuant to or in connection with a consolidation, amalgamation, merger or transfer of assets that complies with Section 7.04 hereof.

"Indemnified Liabilities" has the meaning specified in Section 10.05.

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or in respect of any payment made by or on account of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 10.05.

"Independent Financial Advisor" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing; *provided, however*, that such firm or appraiser is not an Affiliate of the Borrower.

"Information" has the meaning specified in Section 10.08.

"Initial Agreement" has the meaning specified in Section 7.08(b)(xv).

"Initial Revolving Borrowing" means one or more borrowings of Revolving Credit Loans or issuances or deemed issuances of Letters of Credit on the Closing Date as specified in the definition of the term "Permitted Initial Revolving Borrowing."

"Initial Term Commitment" means, as to any Lender, its obligation to make an Initial Term Loan to the Borrower on the Closing Date pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01(A) under the caption "Initial Term Commitment" or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto as of the Closing Date, as applicable.  The initial aggregate amount of the Initial Term Commitments is $500,000,000.

"Initial Term Lender" means, at any time, any Lender that has an Initial Term Commitment or an Initial Term Loan at such time.

"Initial Term Loan" means (i) a Loan made pursuant to Section 2.01(a)(i). Initial Term Loans made pursuant to Section 2.01(a) on the Closing Date shall be deemed to constitute one Class of Loans for all purposes hereunder.

"Intellectual Property" means all U.S. and non-U.S. (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress, and other source identifiers, designs and domain names, (c) copyrights, (d) design rights, inventions, original works of authorship, trade secrets, confidential information, know-how and all other intellectual property rights and interests, whether registered or unregistered and (e) all registrations and applications for registration therefor.

"Intercompany Dispositions" has the meaning assigned to it in clause (b)(1) of the definition of "Asset Disposition."

"Intercompany Investments" has the meaning assigned to it in clause (a) of the definition of "Permitted Investments."

"Intercompany License Agreement" means any cost sharing agreement, commission or royalty agreement, license or sublicense agreement, distribution agreement, services agreement, IP Rights assignment or transfer agreement, any related agreements or similar agreements, in each case where all parties to such agreement are one or more of the Borrower or a Restricted Subsidiary.

"Interest Coverage Ratio" means the ratio of (a) LTM EBITDA as of such date to (b) Consolidated Cash Interest Expense as of such date (in each case, determined in accordance with the applicable provisions of Section 1.09 hereof).

"Interest Payment Date" means (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Facility under which such Loan was made; *provided* that if any Interest Period for a Eurocurrency Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date of the Facility under which such Loan was made.

"Interest Period" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one (1), three (3) or six (6) months thereafter, or to the extent agreed to by each Lender of such Eurocurrency Rate Loan, twelve (12) months or such other period as selected by the Borrower in its Committed Loan Notice; *provided* that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the Maturity Date of the Facility under which such Loan was made.

"Investment" means, with respect to any Person, (a) all investments by such Person in other Persons (including Affiliates) in the form of any advances, loans or other extensions of credit (excluding (i) accounts receivable, trade credit, advances or extensions of credit to customers, suppliers, future, present or former employees, directors, officers, managers, contractors, consultants or advisors (or their respective Controlled Investment Affiliates or Immediate Family Members) of any Person in the ordinary course of business or consistent with past practice, (ii) any debt or extension of credit represented by a bank deposit other than a time deposit, (iii) intercompany advances arising from cash management, tax and accounting operations and (iv) intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms)) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or the Incurrence of a Guarantee of any obligation of, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such other Persons and all other items that are or would be classified as investments on a balance sheet prepared in accordance with IFRS and (b) any purchase or other acquisition (other than purchases or other acquisitions of inventory, materials and equipment in the ordinary course of business and capital expenditures), of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; *provided* that endorsements of negotiable instruments and documents in the ordinary course of business or consistent with past practice will not be deemed to be an Investment.

For purposes of Sections 6.13 and 7.06 hereof:

(1)      "Investment" will include the portion of the fair market value of the net assets of a Restricted Subsidiary to be designated as an Unrestricted Subsidiary (at the time that such Restricted Subsidiary is designated an Unrestricted Subsidiary) equal to the Borrower's proportionate equity interest in such Restricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Borrower will be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to (a) the Borrower's "Investment" in such Subsidiary at the time of such redesignation less (b) the portion of the fair market value of the net assets (as determined by the Borrower in good faith) of such Subsidiary at the time that such Subsidiary is so redesignated a Restricted Subsidiary equal to the Borrower's proportionate equity interest in such Subsidiary;

(2)      any property transferred to or from an Unrestricted Subsidiary will be valued at its fair market value at the time of such transfer, in each case as determined by the Borrower in good faith; and

(3)      if the Borrower or any Restricted Subsidiary issues, sells or otherwise disposes of Capital Stock of a Person that is a Restricted Subsidiary such that, after giving effect hereto, such Person is no longer a Restricted Subsidiary, any investment by the Borrower or any Restricted Subsidiary in such Person remaining after giving effect thereto shall not be deemed to be an Investment at such time.

The amount of any Investment outstanding at any time shall be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash and Cash Equivalents by the Borrower or a Restricted Subsidiary in respect of such Investment to the extent such amounts do not increase any other baskets under this Agreement.

"Investment Grade Securities" means:

(1)      securities issued or directly and fully Guaranteed or insured by the United States or Canadian government or any agency or instrumentality thereof (other than Cash Equivalents);

(2)　securities issued or directly and fully guaranteed or insured by the Canadian, United Kingdom or Japanese governments, a member state of the European Union, or any agency or instrumentality thereof (other than Cash Equivalents);

(3)　debt securities or debt instruments with a rating of "BBB-" or higher from S&P or "Baa3" or higher by Moody's or the equivalent of such rating by such rating organization or, if no rating of Moody's or S&P then exists, the equivalent of such rating by any other Nationally Recognized Statistical Rating Organization, but excluding any debt securities or instruments constituting loans or advances among the Borrower and its Subsidiaries;

(4)　investments in any fund that invests exclusively in investments of the type described in clauses (1), (2) and (3) above which fund may also hold cash and Cash Equivalents pending investment or distribution; and

(5)　corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"IP Rights" has the meaning specified in Section 5.14.

"IPO" means any transaction whereby, or upon the consummation of which, a Parent Entity of the Borrower's or the Borrower's common equity interests are, or may thereafter be, offered or sold (whether through an initial primary underwritten public offering or otherwise) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act, or to the equivalent registration documents filed with the equivalent authority in the applicable foreign jurisdiction.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"Judgment Currency" has the meaning specified in Section 10.17.

"JV Entity" means any joint venture of the Borrower or any Restricted Subsidiary that is not a Subsidiary.

"L/C Advance" means, with respect to each Revolving Credit Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Percentage.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the applicable Honor Date or refinanced as a Revolving Credit Borrowing.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"L/C Exposure" means, at any time, the sum of (a) the undrawn portion of the Outstanding Amount of all Letters of Credit at such time and (b) the Outstanding Amount of all L/C Borrowings in respect of Letters of Credit that have not yet been reimbursed by or on behalf of the Borrower at such time. The L/C Exposure of any Revolving Credit Lender at any time shall be its Applicable Percentage of the aggregate L/C Exposure at such time.

"L/C Issuer" means (i) Macquarie, (ii) KeyBank National Association and (iii) any other Lender (or any of its Affiliates) that becomes an L/C Issuer in accordance with Section 2.03(j) or Section 10.07(j); in the case of each of clauses (i) through (iv) above, in its capacity as an issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder.

"L/C Issuer Sublimit" means with respect to (i) Macquarie, on the Closing Date, $2,857,142.86, (ii) KeyBank National Association on the Closing Date, $7,142,857.14, and (iii) with respect to any other L/C Issuer, such amount as may be mutually agreed between the Borrower and such L/C Issuer and notified in writing to the Administrative Agent by such parties.

"L/C Obligation" means, as at any date of determination, the aggregate maximum amount then available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts in respect of Letters of Credit, including all L/C Borrowings.  For all purpose under this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, the "Outstanding Amount" of such Letter of Credit shall be deemed to be the amount so remaining available to be drawn.

"Latest Letter of Credit Expiration Date" means, for Letters of Credit under the Revolving Credit Facility, the date that is five (5) Business Days prior to the scheduled Maturity Date then in effect for the Revolving Credit Facility.

"Latest Maturity Date" means, at any date of determination, the latest Maturity Date applicable to any Loan or Commitment hereunder at such time, including the latest maturity date of any Extended Revolving Credit Commitment, Extended Term Loan or Incremental Term Loan, in each case as extended in accordance with this Agreement from time to time.

"Laws" means, collectively, all international, foreign, federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"LCT Election" has the meaning specified in Section 1.09(a).

"LCT Public Offer" has the meaning specified in Section 1.09(a).

"LCT Test Date" has the meaning specified in Section 1.09(a).

"Lead Arrangers" means MCUSA and KeyBanc Capital Markets Inc., each in its capacity as joint lead arranger and joint bookrunner in respect of the credit facilities provided herein.

"Lender" has the meaning specified in the introductory paragraph to this Agreement and, as the context requires, includes an L/C Issuer and the Swing Line Lender, and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."

"Lender Participation Notice" has the meaning specified in Section 2.05(d)(iii).

"Letter of Credit" means any letter of credit issued hereunder.  A Letter of Credit may only be a standby letter of credit.

"<u>Letter of Credit Application</u>" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the relevant L/C Issuer.

"<u>Letter of Credit Sublimit</u>" means an amount equal to the lesser of (a) $10,000,000 and (b) the aggregate amount of the Revolving Credit Commitments.

"<u>LIBOR</u>" has the meaning assigned to it in the definition of "Eurocurrency Rate."

"<u>LIBOR Screen Rate</u>" has the meaning assigned to it in the definition of "Eurocurrency Rate."

"<u>License Revocation</u>" means the revocation, failure to renew or suspension of, or the appointment of a receiver, supervisor, conservator or similar official with respect to, any casino, gambling or gaming license issued by any Gaming Authority covering any casino or gaming operations of the Borrower or any of its Subsidiaries, in each case other than in connection with a disposition permitted under <u>Section 7.04</u>.

"<u>Lien</u>" means any mortgage, pledge, security interest, encumbrance, lien, hypothecation or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof); *provided* that in no event shall Non-Financing Lease Obligations be deemed to constitute a Lien.

"<u>Limited Condition Transaction</u>" means (1) any Investment or acquisition (whether by merger, amalgamation, consolidation or other business combination or the acquisition of Capital Stock, assets or otherwise and which may include, for the avoidance of doubt, a transaction that may constitute a Change of Control), whose consummation is not conditioned on the availability of, or on obtaining, third party financing; (2) any redemption, repurchase, defeasance, satisfaction and discharge or repayment of Indebtedness, Disqualified Stock or Preferred Stock requiring irrevocable notice in advance of such redemption, repurchase, defeasance, satisfaction and discharge or repayment; and (3) any dividend or distribution declared by the Borrower or any of its Restricted Subsidiaries following an initial public offering of such entity.

"<u>Loan</u>" means an extension of credit by a Lender to the Borrower under <u>Article II</u> in the form of a Term Loan, a Revolving Credit Loan (including any Incremental Term Loans, any Extended Term Loans or loans made pursuant to Extended Revolving Credit Commitments) or a Swing Line Loan, as the context may require.

"<u>Loan Documents</u>" means, collectively, (i) this Agreement, (ii) the Notes, (iii) each Guaranty, (iv) the Collateral Documents, (v) each Letter of Credit Application, (vi) any Customary Intercreditor Agreement and (vii) any Global Intercompany Note, in each case as amended.

"<u>Loan Parties</u>" means, collectively, (i) the Borrower, (ii) Holdings and (iii) each other Guarantor.

"<u>Local Time</u>" means local time in New York City, with respect to the times for (i) the determination of "Dollar Equivalent" and (ii) the receipt and sending of notices by and to and the disbursement by or payment to the Administrative Agent, any L/C Issuer or Lender with respect to Loans and Letters of Credit denominated in Dollars.

"<u>LTM EBITDA</u>" means Consolidated EBITDA of the Borrower and its Restricted Subsidiaries measured for the period of the most recent four consecutive fiscal quarters ending prior to the date of such determination for which consolidated financial statements have been or are required to be

delivered pursuant to Section 6.01(a) or 6.01(b), in each case with such *pro forma* adjustments giving effect to such Indebtedness, acquisition or Investment, as applicable, since the start of such four quarter period and as are consistent with the *pro forma* adjustments set forth in Section 1.09.

"Macquarie" means Macquarie Capital Funding LLC, or any successor thereof.

"MCUSA" means Macquarie Capital (USA) Inc., or any successor thereof.

"Management Advances" means loans or advances made to, or Guarantees with respect to loans or advances made to, future, present or former employees, directors, officers, managers, contractors, consultants or advisors (or their respective Controlled Investment Affiliates or Immediate Family Members) of any Parent Entity, the Borrower or any Restricted Subsidiary not exceeding the greater of $5,000,000 and 5.0% of LTM EBITDA in the aggregate outstanding at the time of incurrence.

"Management Stockholders" means the members of management of the Borrower (or any Parent Entity) or its Subsidiaries who are holders of Capital Stock of the Borrower or of any Parent Entity on the Closing Date or become holders of such Capital Stock.

"Master Agreement" has the meaning specified in the definition of "Swap Contract."

"Master License" has the meaning specified in Section 5.20.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations or condition (financial or otherwise) of the Borrower, (b) the business, assets, operations or condition (financial or otherwise) of the Borrower and its Restricted Subsidiaries, taken as a whole, (c) the material rights and remedies (taken as a whole) of the Administrative Agent, the Collateral Agent or the Lenders under the Loan Documents (other than due to the action or inaction of the Administrative Agent, the Collateral Agent or the Lenders) or (d) the ability of the Borrower and the Guarantors, taken as a whole, to perform their payment obligations under the Loan Documents.

"Material Intellectual Property" means any Intellectual Property owned by the Borrower and its Subsidiaries that is material to the business of Borrower and the Restricted Subsidiaries after giving effect to any designation of an Unrestricted Subsidiary, taken as a whole (whether owned as of the Closing Date or thereafter acquired).

"Material Real Property" means (a) any fee interest in real property owned by a Loan Party on the Closing Date, having a fair market value (determined as of the Closing Date) equal to or in excess of $2,500,000, as set forth on Schedule 5.22 and (b) any fee interest in real property acquired by any Loan Party following the Closing Date located in the United States with a fair market value (determined as of the date such real property is acquired (or the date of substantial completion or any material improvement thereon or new construction thereof)) equal to or in excess of $5,000,000.

"Material Subsidiary" means, at any date of determination, each Restricted Subsidiary of the Borrower that is not an Immaterial Subsidiary (but including, in any case, any Restricted Subsidiary that has been designated as a Material Subsidiary as provided in, or has been designated as an Immaterial Subsidiary in a manner that does not comply with, the definition of "Immaterial Subsidiary").

"Maturity Date" means (a) with respect to the Revolving Credit Facility, the fifth (5th) anniversary of the Closing Date (and, with respect to any Extended Revolving Credit Commitments, the maturity date applicable to such Extended Revolving Credit Commitments in accordance with the terms hereof), (b) with respect to Initial Term Loans, the sixth (6th) anniversary of the Closing Date, or (c) with

respect to any (i) Extended Term Loan, the maturity date applicable to such Extended Term Loan in accordance with the terms hereof or (ii) Incremental Term Loan, the maturity date applicable to such Incremental Term Loan in accordance with the terms hereof; *provided* that if any such day is not a Business Day, the Maturity Date shall be the Business Day immediately preceding such day.

"Maximum Tender Condition" has the meaning specified in Section 2.17(b).

"MFN Adjustment" has the meaning specified in Section 2.14(b).

"MFN Qualifying Term Loans" means term loans that (w) are in the form of syndicated term loans (other than Qualifying Bridge Loans), (x) mature on or before the first (1st) anniversary of the Maturity Date of the Initial Term Loans, (y) are *pari passu* in right of security with the Initial Term Loans, and (z) have an aggregate principal amount in excess of the greater of (A) $50.0 million and (B) 50.0% of LTM EBITDA.

"Minimum Collateral Amount" means, at any time, (i) with respect to Cash Collateral consisting of cash or deposit account balances, an amount equal to 100% of the Fronting Exposure of all L/C Issuers with respect to Letters of Credit issued and outstanding at such time and (ii) otherwise, an amount determined by the Administrative Agent and the L/C Issuers in their sole discretion.

"Minimum Extension Condition" has the meaning specified in Section 2.15(b).

"Minimum Tender Condition" has the meaning specified in Section 2.17(b).

"Minimum Tranche Amount" has the meaning specified in Section 2.15(b).

"Moody's" means Moody's Investors Service, Inc. or any of its successors or assigns that is a Nationally Recognized Statistical Rating Organization.

"Mortgage" means, collectively, the deeds of trust, trust deeds, deeds of hypothecation, security deeds, immovable hypothecs, and mortgages creating and evidencing a Lien on a Mortgaged Property made by the Loan Parties in favor or for the benefit of the Collateral Agent on behalf of the Secured Parties in form and substance reasonably satisfactory to the Collateral Agent, and any other mortgages executed and delivered pursuant to Section 4.01 and Section 6.10 and/or Section 6.12, as applicable.

"Mortgage Policies" has the meaning specified in paragraph (f) of the definition of "Collateral and Guarantee Requirement."

"Mortgaged Property" means each Material Real Property which shall be subject to a Mortgage delivered pursuant to Section 4.01, Section 6.10 and/or Section 6.12, as applicable.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the immediately preceding six (6) years, has made or been obligated to make contributions.

"Nationally Recognized Statistical Rating Organization" means a nationally recognized statistical rating organization within the meaning of Rule 436 under the Securities Act.

"Net Available Cash" with respect to any Asset Disposition or Casualty Event (as applicable) means cash proceeds received (including any cash proceeds received from the sale or other

disposition of any non-cash consideration received in any Asset Disposition, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to the properties or assets that are the subject of such Asset Disposition or received in any other non-cash form) therefrom, in each case net of:

(1)     all legal, accounting, consulting, investment banking, survey costs, title and recording expenses, title insurance premiums, payments made in order to obtain a necessary consent or required by applicable law, brokerage and sales commissions, relocation expenses, commissions, premiums (including tender premiums), defeasance costs, underwriting discounts, fees, costs and expenses (including original issue discount, upfront fees or similar fees) in connection with such transaction;

(2)     all Taxes paid, reasonably estimated to be payable, Tax reserves set aside or payable or accrued as a liability under IFRS (including, for the avoidance of doubt, any income, withholding and other Taxes payable as a result of the distribution or deemed distribution of such proceeds to the Borrower or any of its Subsidiaries, transfer taxes, deed or mortgage recording taxes and Taxes that would be payable in connection with any repatriation of such proceeds), as a consequence of such transaction, including distributions made in accordance with Section 7.06(b)(xxiv) or any transactions occurring or deemed to occur to effectuate a payment under this Agreement;

(3)     in the case of any Asset Disposition of assets that do not constitute Collateral, all payments made on any Indebtedness which is secured by any assets subject to such transaction, in accordance with the terms of any Lien upon such assets, or which by applicable law is required to be repaid out of the proceeds from such transaction;

(4)     all distributions and other payments required to be made to non-controlling interest or minority interest holders (other than any Parent Entity, the Borrower or any of its respective Subsidiaries) in Subsidiaries or joint ventures as a result of such transaction;

(5)     all costs associated with unwinding any related Hedging Obligations in connection with such transaction;

(6)     the deduction of appropriate amounts required to be provided by the seller as a reserve, in accordance with IFRS, against any liabilities associated with the assets disposed of in such transaction and retained by the Borrower or any Restricted Subsidiary after such transaction, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction;

(7)     any portion of the purchase price from such transaction placed in escrow, whether for the satisfaction of any indemnification obligations in respect of such transaction, as a reserve for adjustments to the purchase price associated with any such transaction or otherwise in connection with such transaction; and

(8)     the amount of any liabilities (other than Indebtedness in respect of this Agreement and any other Indebtedness secured on an equal or junior priority basis with the foregoing) directly associated with such asset being sold and retained by the Borrower or any of its Restricted Subsidiaries.

"Net Cash Proceeds," with respect to any issuance or sale of Capital Stock, means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement

agents' fees, listing fees, discounts or commissions and brokerage, consultant and other fees and charges actually Incurred in connection with such issuance or sale and net of Taxes paid or reasonably estimated to be actually payable as a result of such issuance or sale (including, for the avoidance of doubt, any income, withholding and other Taxes payable as a result of the distribution of such proceeds to the Borrower and after taking into account any available tax credit or deductions and any tax sharing agreements, and including any distributions made in accordance with Section 7.06(b)(xxiv)).

"Net Short Lender" has the meaning specified in Section 10.01.

"Non-Consenting Lender" has the meaning specified in Section 3.06(d).

"Non-Expiring Credit Commitment" has the meaning specified in Section 2.04(g).

"Non-Extension Notice Date" has the meaning specified in Section 2.03(b)(iii).

"Non-Financing Lease Obligation" means any other lease obligation that is not required to be accounted for as a financing or capital lease in accordance with IFRS.  For the avoidance of doubt, an operating lease shall be considered a Non-Financing Lease Obligation.

"Non-Guarantor Sublimit" means the greater of (x) $25,000,000 and (y) 25.0% of LTM EBITDA.

"Non-Loan Party" means any Restricted Subsidiary that is not a Borrower or Guarantor.

"Note" means a Term Note, a Revolving Credit Note or a Swing Line Note, as the context may require.

"NYFRB" means the Federal Reserve Bank of New York.

"Obligations" means any principal, interest (including Post-Petition Interest and fees accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Borrower or any Guarantor whether or not a claim for Post-Petition Interest or fees is allowed in such proceedings), penalties, fees, expenses, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness.

"Offered Loans" has the meaning specified in Section 2.05(d)(iii).

"Officer" means, with respect to any Person, (1) the Chairman of the Board of Directors, the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President, the Treasurer, any Assistant Treasurer, any Managing Director, the Secretary or any Assistant Secretary (a) of such Person or (b) if such Person is owned or managed by a single entity, of such entity, or (2) any other individual designated as an "Officer" for the purposes of this Agreement by the Board of Directors of such Person.

"Officer's Certificate" means, with respect to any Person, a certificate signed by one Officer of such Person.

"Organization Documents" means (a) with respect to any corporation or company, the certificate or articles of incorporation, the memorandum and articles of association, any certificates of change of name and/or the bylaws; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint

venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Applicable Indebtedness" has the meaning specified in Section 2.05(b)(ii)(C).

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan, Letter of Credit or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06).

"Outstanding Amount" means (a) with respect to any Loan on any date, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments thereof (including any refinancing of outstanding Unreimbursed Amounts under Letters of Credit or L/C Borrowings as a Revolving Credit Borrowing) occurring on such date; and (b) with respect to any Letter of Credit, Unreimbursed Amount, L/C Borrowing or L/C Obligations on any date, the Dollar Equivalent of the outstanding amount thereof on such date after giving effect to any related L/C Credit Extension occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding Unreimbursed Amounts under related Letters of Credit (including any refinancing of outstanding Unreimbursed Amounts under related Letters of Credit or related L/C Credit Extensions as a Revolving Credit Borrowing) or any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"Overnight Rate" shall mean, for any day, the rate comprised of both overnight federal funds and overnight eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Parent Entity" means any direct or indirect parent of the Borrower.

"Parent Entity Expenses" means:

(1)       fees, costs and expenses (including all legal, accounting and other professional fees, costs and expenses) Incurred or paid by any Parent Entity in connection with reporting obligations under or otherwise Incurred or paid in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, this Agreement or any other agreement or instrument relating to the Loans, the Guarantees or any other Indebtedness of the Borrower or any Restricted Subsidiary, including in respect of any reports filed or delivered with respect to the Securities Act, Exchange Act or the rules and regulations promulgated thereunder;

-61-

(2)      customary salary, bonus, severance, indemnity, insurance (including premiums therefor) and other benefits payable to any employee, director, officer, manager, contractor, consultant or advisor of any Parent Entity or other Persons under its articles, charter, by-laws, partnership agreement or other organizational documents or pursuant to written agreements with any such Person;

(3)      obligations of any Parent Entity in respect of director and officer insurance (including premiums therefor) to the extent relating to the Borrower and its Subsidiaries;

(4)      (x) general corporate operating and overhead fees, costs and expenses (including all legal, accounting and other professional fees, costs and expenses) and following the first public offering of the Borrower's Capital Stock or the Capital Stock of any Parent Entity, listing fees and other costs and expenses attributable to being a publicly traded company of any Parent Entity and (y) other operational expenses of any Parent Entity related to the ownership or operation of the business of the Borrower or any of its Restricted Subsidiaries in an aggregate amount not to exceed the greater of (I) $5,000,000 and (II) 5.0% of LTM EBITDA in any fiscal year;

(5)      expenses Incurred by any Parent Entity in connection with (i) any offering, sale, conversion or exchange of Capital Stock or Indebtedness (whether or not consummated or successful) and, after the consummation of an initial public offering, any Public Company Costs and (ii) any related compensation paid to employees, directors, officers, managers, contractors, consultants or advisors (or their respective Controlled Investment Affiliates or Immediate Family Members) of such Parent Entity;

(6)      amounts payable pursuant to any management services or similar agreements or the management services provisions in an investor rights agreement or other equityholders' agreement (including any amendment thereto or replacement thereof so long as any such amendment or replacement is not materially disadvantageous in the reasonable determination of the Borrower to the Lenders when taken as a whole, as compared to the management services or similar agreements as in effect immediately prior to such amendment or replacement), solely to the extent such amounts are not paid directly by the Borrower or its Subsidiaries;

(7)      amounts required to permit any Parent Entity to pay franchise and similar taxes, and other fees and expenses of such Parent Entity, in each case, required to maintain the corporate or other organizational existence of such Parent Entity; and

(8)      amounts to finance Investments that would otherwise be permitted to be made pursuant to Section 7.06 hereof if made by the Borrower or a Restricted Subsidiary; *provided* that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment, (B) such Parent Entity shall, immediately following the closing thereof, cause (1) all property acquired (whether assets or equity interests) to be contributed to the capital of the Borrower or one of its Restricted Subsidiaries or (2) the merger, consolidation or amalgamation of the Person formed or acquired into the Borrower or one of its Restricted Subsidiaries (to the extent not prohibited by Section 7.04 hereof) in order to consummate such Investment, (C) such Parent Entity and its Affiliates (other than the Borrower or a Restricted Subsidiary) receives no consideration or other payment in connection with such transaction except to the extent the Borrower or a Restricted Subsidiary could have given such consideration or made such payment in compliance with this Agreement and such consideration or other payment is included as a Restricted Payment under this Agreement, (D) any property received by the Borrower shall not increase amounts available for Restricted Payments pursuant to Section 7.06(a) hereof and (E) such

Investment shall be deemed to be made by the Borrower or such Restricted Subsidiary pursuant to a provision of Section 7.06 hereof or pursuant to the definition of "Permitted Investments."

"Pari Passu Indebtedness" means Indebtedness of the Borrower which ranks equally in right of payment and security to the Secured Obligations or of any Guarantor if such Indebtedness ranks equally in right of payment and security to the Guaranty of the Secured Obligations.

"Participant" has the meaning specified in Section 10.07(e).

"Participant Register" has the meaning specified in Section 10.07(e).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding six (6) years.

"Perfection Certificate" means that certain Perfection Certificate, dated as of the Closing Date, executed and delivered by the Borrower on behalf of the Borrower and each of the Grantors (as defined in the Security Agreement) existing on the Closing Date, substantially in the form of Exhibit Q, and each other perfection certificate or supplement thereof executed and delivered pursuant to Section 6.10.

"Permitted Alternative Incremental Facilities Debt" has the meaning specified in Section 7.03(b)(xx).

"Permitted Acquisition" means the purchase or other acquisition of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, or equity interests in a Person that, upon the consummation thereof, will be a Restricted Subsidiary of the Borrower (including as a result of a merger or consolidation); *provided* that (i) except in the case of a Limited Condition Transaction (in which case, compliance with this clause (i) shall be determined in accordance with Section 1.09(a)), immediately before and immediately after giving *pro forma* effect to any such purchase or other acquisition, no Event of Default shall have occurred and be continuing, (ii) after giving effect to any such purchase or other acquisition, the Borrower shall be in compliance with the covenant in Section 6.18 and (iii) to the extent required by, and subject to the limitations set forth in the Collateral and Guarantee Requirement, (A) the property, assets and businesses acquired in such purchase or other acquisition shall become Collateral and (B) any such newly created or acquired Restricted Subsidiary (other than an Excluded Subsidiary) shall become Guarantors, in each case in accordance with Section 6.10.

"Permitted Asset Swap" means the concurrent purchase and sale or exchange of assets used or useful in a Similar Business or a combination of such assets and cash, Cash Equivalents between the Borrower or any of the Restricted Subsidiaries and another Person; *provided* that any cash or Cash Equivalents received in excess of the value of any cash or Cash Equivalents sold or exchanged must be applied in accordance with Section 7.05 hereof.

"Permitted Debt Exchange" has the meaning specified in Section 2.17(a).

"Permitted Debt Exchange Notes" has the meaning specified in Section 2.17(a).

"Permitted Debt Exchange Offer" has the meaning specified in Section 2.17(a).

"Permitted Holders" means, collectively, (i) the Sponsor, (ii) the Management Stockholders (including any Management Stockholders holding Capital Stock through an equityholding vehicle) and rollover equity investors, (iii) any heirs, executors, administrators, testamentary trustees, legatees or beneficiaries of a person identified in clause (ii) above, (iv) any trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only a person identified in clause (ii) above, his or her spouse, parents, siblings, members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants), (v) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing, any Permitted Plan or any Person or group that becomes a Permitted Holder specified in the last sentence of this definition are members and any member of such group; *provided* that, in the case of such group and without giving effect to the existence of such group or any other group, Persons referred to in subclauses (i) through (iv), collectively, have beneficial ownership of more than 50.0% of the total voting power of the Voting Stock of the Borrower or any Parent Entity held by such group and (vi) any Permitted Plan. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control, the Event of Default resulting from which is waived in accordance with the requirements of this Agreement, will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"Permitted Initial Revolving Borrowing" means one or more Borrowings of Revolving Credit Loans in an aggregate amount of up to $15,000,000 to pay any Transaction Expenses, and for ordinary course working capital requirements and general corporate purposes (including without limitation, for Permitted Acquisitions and other Permitted Investments and permitted dividends, capital expenditures and other distributions on account of the capital stock of the Borrower and any other use not prohibited by this Agreement but not, for the avoidance of doubt, to fund the Closing Distribution).

"Permitted Intercompany Activities" means any transactions between or among the Borrower and the Restricted Subsidiaries that are entered into in the ordinary course of business or consistent with past practice of the Borrower and the Restricted Subsidiaries and, in the reasonable determination of the Borrower are necessary or advisable in connection with the ownership or operation of the business of the Borrower and the Restricted Subsidiaries, including (i) payroll, cash management, purchasing, insurance and hedging arrangements; (ii) management, technology and licensing arrangements; and (iii) customary loyalty and rewards programs.

"Permitted Investments" means (in each case, by the Borrower or any of the Restricted Subsidiaries):

(a)    Investments in (i) a Restricted Subsidiary (including the Capital Stock of, or guarantees of obligations of, a Restricted Subsidiary) or the Borrower or (ii) a Person (including the Capital Stock of any such Person) that will, upon the making of such Investment, become a Restricted Subsidiary (collectively, "Intercompany Investments"); *provided* that the aggregate amount of Investments pursuant to this clause (a) in Persons that are not or do not become Loan Parties shall not exceed the Non-Guarantor Sublimit (*less* any such amount of the Non-Guarantor Sublimit used for Intercompany Dispositions and Ratio Debt).

(b)    Investments in another Person if such Person is engaged, directly or through entities that will be Restricted Subsidiaries, in any Similar Business and as a result of such Investment such other Person, in one transaction or a series of transactions, is merged, amalgamated, consolidated or otherwise combined with or into, or transfers or conveys all or substantially all its assets (or such division, business unit, product line or business) to, or is liquidated into, the Borrower or a Restricted Subsidiary that is a Loan Party, and any Investment held by such Person; *provided* that such Investment was not acquired

by such Person in contemplation of such acquisition, merger, amalgamation, consolidation, combination, transfer or conveyance;

(c)    (i) Permitted Acquisitions and (ii) any Investment held by a Restricted Subsidiary acquired pursuant to a Permitted Acquisition at the time of such Permitted Acquisition; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, amalgamation, consolidation, combination, transfer or conveyance; *provided*, *further*, that the aggregate amount of Investments in Persons pursuant to this clause (c) that are not or do not become Loan Parties shall not exceed the greater of $25,000,000 and 25.0% of LTM EBITDA; *provided* that the foregoing limitation shall not apply in the event that, after giving *pro forma* effect to the applicable Permitted Acquisition, 75.0% of Consolidated EBITDA of the target is or will become attributable to the Loan Parties;

(d)    Investments in cash, Cash Equivalents or Investment Grade Securities;

(e)    Investments in receivables owing to the Borrower or any Restricted Subsidiary created or acquired in the ordinary course of business or consistent with past practice;

(f)    Investments in payroll, travel, entertainment, relocation, moving related and similar advances that are made in the ordinary course of business or consistent with past practice;

(g)    Management Advances;

(h)    Investments (including debt obligations and equity interests) (a) received in settlement, compromise or resolution of debts created in the ordinary course of business or consistent with past practice, (b) in exchange for any other Investment or accounts receivable, endorsements for collection or deposit and trade arrangements, (c) as a result of foreclosure, perfection or enforcement of any Lien, (d) in satisfaction of judgments or (e) pursuant to any plan of reorganization or similar arrangement including upon the bankruptcy or insolvency of a debtor or litigation, arbitration or other disputes or otherwise with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(i)    Investments made as a result of the receipt of promissory notes or other non-cash consideration (including earn-outs) from a sale or other disposition of property or assets, including an Asset Disposition;

(j)    Investments existing or pursuant to binding commitments, agreements or arrangements in effect on the Closing Date; *provided* that any such Investment in an outstanding amount in excess of $2,500,000 shall be listed on Schedule 1.01B and (b) any modification, replacement, renewal, reinvestment or extension of Investments existing on the Closing Date; provided that the amount of any such Investment may not be increased except (i) as required by the terms of such Investment or binding commitment as in existence on the Closing Date (including in respect of any unused commitment), plus any accrued but unpaid interest (including any accretion of interest, original issue discount or the issuance of pay-in-kind securities) and premium payable by the terms of such Indebtedness thereon and fees and expenses associated therewith as of the Closing Date or (ii) as otherwise permitted under this Agreement;

(k)    Hedging Obligations, including any terminations or unwinding thereof, which transactions or obligations are not prohibited by Section 7.03 hereof;

(l)    pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business or Liens otherwise described in the definition of "Permitted Liens" or made in connection with Liens permitted under Section 7.01 hereof;

(m)       any Investment to the extent made using Capital Stock of the Borrower (other than Disqualified Stock) or Capital Stock of any Parent Entity or any Unrestricted Subsidiary (other than an Unrestricted Subsidiary whose only material assets are Cash and Cash Equivalents) as consideration;

(n)       any transaction to the extent constituting an Investment that is permitted and made in accordance with Section 7.10(b) hereof (except those described in Sections 7.10(b)(i), (iii), (vii), (viii) and (xiii));

(o)       Investments consisting of (i) asset purchases (including acquisitions of inventory, supplies, materials, equipment and similar assets) or (ii) licenses, sublicenses, cross-licenses, leases, subleases, assignments, transfers, contributions or other Investments of IP Rights or other intangibles or services in the ordinary course of business pursuant to any joint research or development, joint venture, strategic alliance or marketing arrangements with other Persons or any Intercompany License Agreement and any other Investments made in connection therewith;

(p)       (i) Guarantees of Indebtedness not prohibited by Section 7.03 hereof and (other than with respect to Indebtedness) guarantees, keepwells and similar arrangements in the ordinary course of business or consistent with past practice, and (ii) performance guarantees and Contingent Obligations with respect to obligations that are permitted by this Agreement;

(q)       Investments consisting of earnest money deposits required in connection with a purchase agreement, or letter of intent, or other acquisitions to the extent not otherwise prohibited by this Agreement;

(r)       Investments of a Restricted Subsidiary acquired after the Closing Date or of an entity merged or amalgamated into or consolidated with the Borrower or merged or amalgamated into or consolidated with a Restricted Subsidiary after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation, or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(s)       contributions to a "rabbi" trust for the benefit of any employee, director, officer, manager, contractor, consultant, advisor or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Borrower, and Investments relating to non-qualified deferred payment plans in the ordinary course of business or consistent with past practice;

(t)       Investments in joint ventures and similar entities and Unrestricted Subsidiaries having a fair market value, when taken together with all other Investments made pursuant to this clause (t) that are at that time outstanding, not to exceed the greater of $25,000,000 and 25.0% of LTM EBITDA at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value), plus the amount of any returns (including dividends, payments, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) in respect of such Investments received by the Borrower or a Restricted Subsidiary (without duplication for purposes of Section 7.06 of any amounts applied pursuant to Section 7.06(a)) with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value; *provided*, *however*, that if any Investment pursuant to this clause (t) is made in any Person that is not the Borrower or a Restricted Subsidiary at the date of the making of such Investment and such person becomes the Borrower or a Restricted Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (a)(i) or (a)(ii) above and shall cease to have been made pursuant to this clause (t);

(u)        additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (u) that are at that time outstanding, not to exceed the greater of $40,000,000 and 40.0% of LTM EBITDA (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value) plus unused amounts pursuant to Section 7.06(b)(xvi)(i) and Section 7.06(b)(xxi), plus the amount of any returns (including dividends, payments, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) in respect of such Investments received by the Borrower or a Restricted Subsidiary (without duplication for purposes of Section 7.06 of any amounts applied pursuant to Section 7.06(a)); *provided* that if such Investment is in Capital Stock of a Person that subsequently becomes the Borrower or a Restricted Subsidiary, such Investment shall thereafter be deemed permitted under clauses (c)(i) or (c)(ii) above and shall not be included as having been made pursuant to this clause (u);

(v)        Investments in connection with a Qualified Securitization Financing or a Receivables Facility;

(w)        Investments by an Unrestricted Subsidiary entered into prior to the day such Unrestricted Subsidiary is redesignated as a Restricted Subsidiary as described under Section 6.13;

(x)        Investments consisting of commissions advances to producers that may not be earned through personal production and that may be earned over time or written off by the Borrower as unearned salary;

(y)        guaranty and indemnification obligations arising in connection with surety bonds issued in the ordinary course of business or consistent with past practice;

(z)        Investments (a) consisting of purchases and acquisitions of assets or services in the ordinary course of business or consistent with past practice, (b) made in the ordinary course of business or consistent with past practice in connection with obtaining, maintaining or renewing client, franchisee and customer contacts and loans, (c)(i) advances, loans, extensions of credit (including the creation of receivables) or (ii) prepayments made to, and guarantees with respect to obligations of, franchisees, distributors, suppliers, lessors, licensors and licensees, in each case in the ordinary course of business or consistent with past practice or (d) received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business or consistent with past practice;

(aa)        Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business or consistent with past practice;

(bb)        Investments consisting of endorsements for collection or deposit and trade arrangements with customers (or any comparable or similar provisions in other applicable jurisdictions) in the ordinary course of business or consistent with past practice;

(cc)        non-cash Investments in connection with tax planning and reorganization activities, Investments in connection with any Permitted Intercompany Activities, Permitted IPO Reorganization and Permitted Tax Restructuring and related transactions;

(dd)        Investments made from casualty insurance proceeds in connection with the replacement, substitution, restoration or repair of assets on account of a Casualty Event; and

(ee)    so long as no Default or Event of Default shall have occurred and is continuing or would result therefrom, any other Investment so long as, immediately after giving pro forma effect to the Investment and the incurrence of any Indebtedness the net proceeds of which are used to make such Investment, the Consolidated Total Leverage Ratio shall be no greater than 3.75:1.00.

"Permitted IPO Reorganization" means any transaction taken by the Borrower or any of its Restricted Subsidiaries in connection with and reasonably related to consummating an initial public offering, so long as, after giving effect thereto, there is no material adverse impact on the value of the Collateral, taken as a whole.

"Permitted Junior Refinancing Debt" means secured Indebtedness incurred by the Borrower in the form of loans or notes and Guarantees with respect thereto by the Borrower or any Restricted Subsidiary that is a Loan Party; *provided* that (i) such Indebtedness is secured by the Collateral on a junior basis to the Secured Obligations and the obligations in respect of any Permitted Pari Passu Refinancing Debt, is subject to a Customary Intercreditor Agreement, and is not secured by any property or assets of the Borrower and its Restricted Subsidiaries other than the Collateral and (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness in respect of Term Loans, Incremental Term Loans, Refinancing Term Loans, Revolving Credit Loans, Incremental Revolving Credit Commitment, or Refinancing Revolving Credit Loans.

"Permitted Liens" means with respect to any Person:

(a)    Liens on assets or property of a Restricted Subsidiary that is not a Guarantor securing Indebtedness and other Obligations of such Restricted Subsidiary that is not a Guarantor;

(b)    pledges, deposits or Liens (a) in connection with workmen's compensation laws, payroll taxes, unemployment insurance laws, employers' health tax and other social security laws or similar legislation or other insurance related obligations (including in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto), (b) securing liability, reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instruments) for the benefit of insurance carriers under insurance or self-insurance arrangements or otherwise supporting the payments of items set forth in the foregoing clause (a), or (c) in connection with bids, tenders, completion guarantees, contracts, leases, utilities, licenses, public or statutory obligations, or to secure the performance of bids, trade contracts, government contracts and leases, statutory obligations, surety, stay, indemnity, warranty, release, judgment, customs, appeal, performance bonds, guarantees of government contracts, return of money bonds, bankers' acceptance facilities and obligations of a similar nature (including those to secure health, safety and environmental obligations), and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, or as security for contested taxes or import or customs duties or for the payment of rent, or other obligations of like nature, in each case incurred in the ordinary course of business or consistent with past practice;

(c)    Liens with respect to outstanding motor vehicle fines and Liens imposed by law or regulation, including carriers', warehousemen's, mechanics', landlords', suppliers', materialmen's, repairmen's, architects', construction contractors' or other similar Liens, in each case (i) for amounts not overdue for a period of more than 60 days or, if more than 60 days overdue, are unfiled (or if filed have been discharged or stayed) and no other action has been taken to enforce such Liens or (ii) that are bonded or being contested in good faith by appropriate proceedings;

(d)    Liens for Taxes, assessments or other governmental charges which are not yet due and payable or which are being contested in good faith by appropriate proceedings; *provided* that appropriate reserves to the extent required pursuant to IFRS (or other applicable accounting principles)

have been made in respect thereof; or for property Taxes on property of the Borrower or one of its Subsidiaries has determined to abandon if such abandonment is otherwise permitted hereunder, and the sole recourse for such Tax is to such property;

(e)        encumbrances, charges, ground leases, easements (including reciprocal easement agreements), survey exceptions, restrictions, encroachments, protrusions, by-law, regulation, zoning restrictions or reservations of, or rights of others for, licenses, rights of way, servitudes, sewers, electric lines, drains, telegraph, telephone and cable television lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects and irregularities in title and similar encumbrances) as to the use of real properties, exceptions shown on any Mortgage Policy, or Liens incidental to the conduct of the business of such Person or to the ownership of its properties, including servicing agreements, development agreements, site plan agreements, subdivision agreements, facilities sharing agreements, cost sharing agreements and other similar agreements, charges or encumbrances, which do not in the aggregate materially interfere with the ordinary course conduct of the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(f)        Liens (a) securing Hedging Obligations or Cash Management Obligations and the costs thereof; (b) that are rights of set-off, rights of pledge or other bankers' Liens (i) relating to treasury, depository and cash management services or any automated clearing house transfers of funds in the ordinary course of business or consistent with past practice, (ii) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any of its Subsidiaries or consistent with past practice or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business or consistent with past practice; (c) on cash accounts securing Indebtedness and other Obligations permitted to be Incurred under Section 7.03(b)(viii)(v) with financial institutions; (d) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business or consistent with past practice and not for speculative purposes; and/or (e) (i) of a collection bank arising under Section 4-210 of the UCC or any comparable or successor provision on items in the course of collection and (ii) in favor of a banking or other financial institution or electronic payment service providers arising as a matter of law encumbering deposits (including the right of set-off) arising in the ordinary course of business in connection with the maintenance of such accounts and (iii) arising under customary general terms and conditions of the account bank in relation to any bank account maintained with such bank and attaching only to such account and the products and proceeds thereof, which Liens, in any event, do not secure any Indebtedness;

(g)        leases, licenses, subleases and sublicenses and Liens on the property covered thereby (including real property and IP Rights) entered into in the ordinary course of business, consistent with past practice or which do not (x) interfere in any material respect with the business of the Borrower or any Restricted Subsidiary, taken as a whole or (y) secure any Indebtedness;

(h)        Liens securing or otherwise arising out of judgments, decrees, attachments, orders or awards not giving rise to an Event of Default under Section 8.01(g) hereof;

(i)        Liens (i) securing Capitalized Lease Obligations, or Purchase Money Obligations, or securing the payment of all or a part of the purchase price of, or securing Indebtedness or other Obligations Incurred to finance or refinance the acquisition, improvement or construction of, assets or property acquired or constructed in the ordinary course of business; *provided* that (a) the aggregate principal amount of Indebtedness secured by such Liens is otherwise permitted to be Incurred under this Agreement and (b) any such Liens may not extend to any assets or property of the Borrower or any Restricted Subsidiary other than assets and property affixed or appurtenant thereto and accessions, additions,

improvements, proceeds, dividends or distributions thereof, including after-acquired property that is (A) affixed or incorporated into the property or assets covered by such Lien, (B) after-acquired property or assets subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property or assets and (C) the proceeds and products thereof and customary security deposits; *provided* that individual financings of equipment provided by one lender may be cross-collateralized to other financings of equipment provided by such lender; and (ii) any interest or title of a lessor, sublessor, franchisor's, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under any Capitalized Lease Obligations or Non-Financing Lease Obligations;

(j)      Liens arising from UCC financing statements, including precautionary financing statements (or similar filings) regarding operating leases or consignments entered into by the Borrower and the Restricted Subsidiaries;

(k)      Liens existing on the Closing Date, including any Liens securing any Refinancing Indebtedness of any Indebtedness secured by such Liens; *provided* that any Lien securing Indebtedness or other obligations in excess of $2,500,000 shall be listed on Schedule 1.01C;

(l)      Liens on property, other assets or shares of stock of a Person at the time such Person becomes a Subsidiary (or at the time the Borrower or a Subsidiary acquires such property, other assets or shares of stock, including any acquisition by means of a merger, amalgamation, consolidation or other business combination transaction with or into the Borrower or any Restricted Subsidiary); *provided*, *however*, that such Liens are not created, Incurred or assumed in anticipation of or in connection with such other Person becoming a Subsidiary (or such acquisition of such property, other assets or stock); *provided*, *further*, that such Liens are limited to all or part of the same property, other assets or stock (plus property and assets affixed or appurtenant thereto and additions, improvements, accessions, proceeds, dividends or distributions thereof, including after-acquired property that is (i) affixed or incorporated into the property or assets covered by such Lien, (ii) after-acquired property or assets subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property or assets and (iii) the proceeds and products thereof) that secured (or, under the written arrangements under which such Liens arose, could secure) the Obligations relating to any Indebtedness or other obligations to which such Liens relate;

(m)      Liens securing Obligations relating to any Indebtedness or other Obligations of the Borrower or such Restricted Subsidiary owing to the Borrower or another Restricted Subsidiary, or Liens in favor of the Borrower or any Restricted Subsidiary or the Administrative Agent;

(n)      Liens securing Refinancing Indebtedness Incurred to refinance Indebtedness that was previously so secured, and permitted to be secured under this Agreement; *provided* that any such Lien is limited to all or part of the same property or assets (plus property and assets affixed or appurtenant thereto and additions, improvements, accessions, proceeds, dividends or distributions thereof, including after-acquired property that is (i) affixed or incorporated into the property or assets covered by such Lien, (ii) after-acquired property or assets subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property or assets and (iii) the proceeds and products thereof) that secured (or, under the written arrangements under which the original Lien arose, could secure) the Obligations relating to the Indebtedness or other obligations being refinanced or is in respect of property or assets that is or could be the security for or subject to a Permitted Lien hereunder and such Liens have equal or lesser priority than the Liens in respect of the Indebtedness being refinanced;

(o)      (a) mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by any government, statutory or regulatory authority, developer, landlord or other third party on property which the Borrower or any Restricted Subsidiary does not own in

fee, but has easement rights over, or on any leased property and subordination or similar arrangements relating thereto and (b) any condemnation or eminent domain proceedings affecting any real property;

(p)        any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture securing financing arrangement, joint venture or similar arrangement pursuant to any joint venture securing financing arrangement, joint venture or similar agreement;

(q)        Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets;

(r)        Liens arising out of conditional sale, title retention, hire purchase, consignment or similar arrangements for the sale or purchase of goods entered into in the ordinary course of business or consistent with past practice;

(s)        Liens securing the Secured Obligations and the Guarantees;

(t)        Liens securing Indebtedness and other Obligations under Section 7.03(b)(v) hereof; *provided* that if such Indebtedness is assumed, such Liens shall only be permitted if such Liens are (1) limited to all or part of the same property or assets, including Capital Stock (plus property and assets affixed or appurtenant thereto and additions, improvements, accessions, proceeds, dividends or distributions thereof, including after-acquired property that is (i) affixed or incorporated into the property or assets covered by such Lien, (ii) after-acquired property or assets subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property or assets and (iii) the proceeds and products thereof) acquired, or of any Person acquired or merged, consolidated or amalgamated with or into the Borrower or any Restricted Subsidiary, in any transaction to which such Indebtedness or other Obligation relates, and (2) solely in the case of Acquired Indebtedness, not created in contemplation of any such transaction to which such Indebtedness relates;

(u)        Liens securing Indebtedness and other Obligations under Section 7.03(a) or Sections 7.03(b)(vii)(i), (xi), (xiv) or (xx) hereof (*provided* that, (w) in the case of Section 7.03(b)(vii)(i), the related Indebtedness represented by such Capitalized Lease Obligations, Purchase Money Obligations or other obligations shall not be secured by any property, equipment or assets of the Borrower or any Restricted Subsidiary other than the property, equipment or assets so acquired, leased, expanded, constructed, installed, replaced, repaired or improved and any proceeds therefrom and other than assets and property affixed or appurtenant thereto and accessions, additions, improvements, proceeds, dividends or distributions thereof, including after-acquired property that is (i) affixed or incorporated into the property or assets covered by such Lien, (ii) after-acquired property or assets subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property or assets and (iii) the proceeds and products thereof, (x) in the case of Section 7.03(b)(xi), such Liens cover only the assets of such Non-Loan Party or assets that do not constitute Collateral and (y) in each case, only to the extent permitted to be secured thereby; *provided*, *further*, that, in the event that the Liens granted pursuant to this clause (u) with respect to Indebtedness incurred pursuant to Section 7.03(b)(xiv) and Section 7.03(b)(xx) are Liens on the Collateral, then the holders of the obligations secured by such Liens, or their duly appointed agent, shall become party to a Customary Intercreditor Agreement;

(v)        Liens on Excluded Property of the Borrower or any Guarantor securing Indebtedness or other Obligations of the Borrower and/or any Guarantor in an aggregate amount not in excess of $5,000,000;

(w)      Liens on Capital Stock or other securities or assets of any Unrestricted Subsidiary that secure Indebtedness or other obligations of such Unrestricted Subsidiary;

(x)      Liens deemed to exist in connection with Investments permitted under clause (4) of the definition of "Cash Equivalents";

(y)      Liens on (i) goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any Restricted Subsidiary or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments and (ii) specific items of inventory of other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or documentary letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(z)      Liens on vehicles or equipment of the Borrower or any Restricted Subsidiary in the ordinary course of business or consistent with past practice;

(aa)      Liens on assets or securities deemed to arise in connection with and solely as a result of the execution, delivery or performance of contracts to sell such assets or securities if such sale is otherwise permitted by this Agreement;

(bb)      (a) Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto, and (b) Liens, pledges, deposits made or other security provided to secure liabilities to, or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefits of), insurance carriers in the ordinary course of business or consistent with past practice;

(cc)      Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement permitted under this Agreement;

(dd)      Liens (i) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted under this Agreement to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment (including any letter of intent or purchase agreement with respect to such Investment), and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in an asset sale, in each case, solely to the extent such Investment or sale, transfer, lease or other disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ee)      Liens securing Indebtedness and other Obligations in an aggregate principal amount not to exceed the greater of (a) $40,000,000 and (b) 40.0% of LTM EBITDA at the time Incurred; *provided*, *further*, that, in the event that the Liens granted pursuant to this clause (ee) are Liens on the Collateral, then such Liens shall rank junior in priority to the Liens on the Collateral securing the Secured Obligations (unless such Indebtedness is otherwise permitted under the terms of this Agreement to be secured by Liens ranking *pari passu* to the Liens on Collateral securing the Secured Obligations) and the holders of the obligations secured by such Liens, or their duly appointed agent, shall become party to a Customary Intercreditor Agreement;

(ff)      Liens then existing with respect to assets of an Unrestricted Subsidiary on the day such Unrestricted Subsidiary is redesignated as a Restricted Subsidiary as described under Section 6.13 hereof;

(gg)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 7.03 hereof; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreement;

(hh)     Liens arising in connection with a Qualified Securitization Financing or a Receivables Facility;

(ii)     Settlement Liens;

(jj)     rights of recapture of unused real property in favor of the seller of such property set forth in customary purchase agreements and related arrangements with any government, statutory or regulatory authority;

(kk)     the rights reserved to or vested in any Person or government, statutory or regulatory authority by the terms of any lease, license, grant or permit held by the Borrower or any Restricted Subsidiary or by a statutory provision, to terminate any such lease, license, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(ll)     restrictive covenants affecting the use to which real property may be put and Liens or covenants restricting or prohibiting access to or from lands abutting on controlled access highways or covenants affecting the use to which lands may be put; *provided* that such Liens or covenants do not interfere with the ordinary conduct of the business of the Borrower or any Restricted Subsidiary;

(mm)     Liens on property, assets or Permitted Investments used to defease or to satisfy or discharge Indebtedness; *provided* that such defeasance, satisfaction or discharge is not prohibited by this Agreement;

(nn)     Liens relating to escrow arrangements securing Indebtedness, including (i) Liens on escrowed proceeds from the issuance of Indebtedness for the benefit of the related holders of debt securities or other Indebtedness (or the underwriters, arrangers, trustee or collateral agent thereof) and (ii) Liens on cash or Cash Equivalents set aside at the time of the incurrence of any Indebtedness, in either case to the extent such cash or Cash Equivalents prefund the payment of interest or premium or discount on such Indebtedness (or any costs related to the issuance of such Indebtedness) and are held in an escrow account or similar arrangement to be applied for such purpose;

(oo)     Liens arising in connection with any Permitted Intercompany Activities;

(pp)     Liens incurred to cash collateralize letters of credit incurred in the ordinary course of business or consistent with past practice;

(qq)     Liens arising in connection with a permitted Sale and Leaseback Transaction; *provided* that such Liens extend only to the assets sold and leased back thereunder; and

(rr)     with respect to any Foreign Subsidiary, other Liens and privileges arising mandatorily by law.

For purposes of this definition, the term Indebtedness shall be deemed to include interest on such Indebtedness including interest which increases the principal amount of such Indebtedness.  In the event that a Permitted Lien meets the criteria of more than one of the types of Permitted Liens (at the time of incurrence or at a later date), the Borrower in its sole discretion may divide, classify or from time to time reclassify all or any portion of such Permitted Lien in any manner that complies with Section 7.01 hereof

and such Permitted Lien shall be treated as having been made pursuant only to the clause or clauses of this definition to which such Permitted Lien has been classified or reclassified; *provided* that Liens incurred pursuant to clause (s) of this definition may not be reclassified.

"Permitted Pari Passu Refinancing Debt" means any secured Indebtedness incurred by the Borrower in the form of loans or notes and Guarantees with respect thereto by the Borrower or any Restricted Subsidiary that is a Loan Party; *provided* that (i) such Indebtedness is secured by the Collateral on a *pari passu* basis with the Secured Obligations, is subject to a Customary Intercreditor Agreement, and is not secured by any property or assets of the Borrower or the Restricted Subsidiaries other than the Collateral and (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness in respect of Term Loans, Incremental Term Loans, Refinancing Term Loans, Revolving Credit Loans, Incremental Revolving Credit Commitments, or Refinancing Revolving Credit Loans.

"Permitted Payments" has the meaning specified in Section 7.06(b).

"Permitted Plan" means any employee benefits plan of the Borrower or any of its Affiliates and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan.

"Permitted Tax Restructuring" means any reorganizations, intercompany investments and other activities related to Tax planning and reorganization (as determined by the Borrower in good faith) entered into prior to, on or after the Closing Date so long as, in each case, after giving effect thereto, the security interest of the Lenders in the Collateral, taken as a whole, is not impaired in any material respect and such Permitted Tax Restructuring is not otherwise materially adverse to the Lenders; *provided* that, in each case, after giving effect to such Permitted Tax Restructuring, the Borrower and the Restricted Subsidiaries otherwise comply with Section 6.10.

"Permitted Unsecured Refinancing Debt" means unsecured Indebtedness incurred by the Borrower in the form of loans or notes and Guarantees with respect thereto by the Borrower or any Restricted Subsidiary that is a Loan Party; *provided* that such Indebtedness constitutes Credit Agreement Refinancing Indebtedness in respect of Term Loans, Incremental Term Loans, Refinancing Term Loans, Revolving Credit Loans, Incremental Revolving Credit Commitments, or Refinancing Revolving Credit Loans.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, government or any agency or political subdivision thereof or any other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) other than a Foreign Plan, established or maintained by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Plan Asset Regulations" means 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"Platform" has the meaning specified in Section 6.02.

"Post-Petition Interest" means any interest or entitlement to fees or expenses or other charges that accrue after the commencement of any bankruptcy or insolvency proceeding, whether or not a claim therefor is allowed or allowable in any such bankruptcy or insolvency proceeding.

"Preferred Stock" as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"Present Fair Salable Value" has the meaning specified in the definitions of "Solvent" and "Solvency."

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. (as determined by the Administrative Agent) or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the FRB in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by the Administrative Agent) or any similar release by the FRB (as reasonably determined by the Administrative Agent).  Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Principal Amount" means the stated or principal amount of each Loan.

"Proposed Discounted Prepayment Amount" has the meaning specified in Section 2.05(d)(ii).

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Company Costs" means, as to any Person, costs associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith and costs relating to compliance with the provisions of the Securities Act and the Exchange Act or other comparable body of laws, rules or regulations, as companies with listed equity, directors' compensation, fees and expense reimbursement, costs relating to enhanced accounting functions and investor relations, stockholder meetings and reports to stockholders, directors' and officers' insurance and other executive costs, legal and other professional fees, listing fees and other transaction costs, in each case to the extent arising solely by virtue of the listing of such Person's equity securities on a national securities exchange or issuance of public debt securities.

"Public Lender" has the meaning specified in Section 6.02.

"Purchase Money Obligations" means any Indebtedness Incurred to finance or refinance the acquisition, leasing, expansion, construction, installation, replacement, repair or improvement of property (real or personal), equipment or assets (including Capital Stock), and whether acquired through the direct acquisition of such property or assets or the acquisition of the Capital Stock of any Person owning such property or assets, or otherwise.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 10.23.

"Qualified Capital Stock" means any Capital Stock of the Borrower that is not Disqualified Stock.

"<u>Qualified Person</u>" means any Person that is reasonably acceptable to the Administrative Agent, other than (a) to the extent required by applicable Gaming Laws, any Lender that is the subject of a Disqualification Event, (b) any Defaulting Lender, or (c) any Disqualified Lender.

"<u>Qualified Securitization Financing</u>" means any Securitization Facility that meets the following conditions: (i) the Board of Directors shall have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and its Restricted Subsidiaries, (ii) all sales of Securitization Assets by the Borrower or any Restricted Subsidiary to the Securitization Subsidiary or, in the case of a Securitization Subsidiary, to any other Person are made for fair consideration (as determined in good faith by the Borrower) and (iii) the financing terms, covenants, termination events and other provisions thereof shall be fair and reasonable terms (as determined in good faith by the Borrower) and (iv) the obligations under the Securitization Facility are non-recourse to the Borrower and its Restricted Subsidiaries but may include Standard Securitization Undertakings.

"<u>Qualifying Bridge Loans</u>" means customary bridge loans with a maturity date of no longer than one year that are convertible or exchangeable into other instruments that do not mature prior to the maturity date of or have a shorter Weighted Average Life to Maturity prior to the then outstanding Term Loans (but, for the avoidance of doubt, not any loans, securities or other debt which are exchanged for or otherwise replace such bridge loans).

"<u>Qualifying Lenders</u>" has the meaning specified in <u>Section 2.05(d)(iv)</u>.

"<u>Qualifying Loans</u>" has the meaning specified in <u>Section 2.05(d)(iv)</u>.

"<u>Ratio Debt</u>" has the meaning specified in <u>Section 7.03(a)</u>.

"<u>Ratio Debt Starter Amount</u>" has the meaning specified in <u>Section 7.03(a)</u>.

"<u>Receivables Assets</u>" means (a) any accounts receivable owed to the Borrower or a Restricted Subsidiary subject to a Receivables Facility and the proceeds thereof and (b) all collateral securing such accounts receivable, all contracts and contract rights, guarantees or other obligations in respect of such accounts receivable, all records with respect to such accounts receivable and any other assets customarily transferred together with accounts receivable in connection with a non-recourse accounts receivable factoring arrangement.

"<u>Receivables Facility</u>" means an arrangement between the Borrower or a Subsidiary and a commercial bank, an asset based lender or other financial institution or an Affiliate thereof pursuant to which (a) the Borrower or such Subsidiary, as applicable, sells (directly or indirectly) to such commercial bank, asset based lender or other financial institution (or such Affiliate) Receivables Assets and (b) the obligations of the Borrower or such Restricted Subsidiary, as applicable, thereunder are non-recourse (except for Securitization Repurchase Obligations) to the Borrower and such Subsidiary and (c) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by the Borrower) and may include Standard Securitization Undertakings, and shall include any guaranty in respect of such arrangements.

"<u>Recipient</u>" means (a) the Administrative Agent, (b) any Lender and (c) any L/C Issuer as applicable.

"<u>refinance</u>" means refinance, refund, replace, renew, repay, modify, restate, defer, substitute, supplement, reissue, resell, extend or increase (including pursuant to any defeasance or discharge

mechanism) and the terms "<u>refinances</u>," "<u>refinanced</u>" and "<u>refinancing</u>" as used for any purpose in this Agreement shall have a correlative meaning.

"<u>Refinancing Amendment</u>" means an amendment to this Agreement in form and substance reasonably satisfactory to the Administrative Agent (solely to the extent required by the definition of "Required Debt Terms" or <u>Section 2.18</u>) and the Borrower executed by each of (a) the Borrower, (b) the Administrative Agent and (c) each Lender and Additional Lender that agrees to provide any portion of the Credit Agreement Refinancing Indebtedness being incurred pursuant thereto.

"<u>Refinancing Indebtedness</u>" means Indebtedness that is Incurred to refund, refinance, replace, exchange, renew, repay or extend (including pursuant to any defeasance or discharge mechanism) any Indebtedness (or unutilized commitment in respect of Indebtedness) existing on the Closing Date or Incurred (or established) in compliance with this Agreement (including Indebtedness of the Borrower that refinances Indebtedness of any Restricted Subsidiary and Indebtedness of any Restricted Subsidiary that refinances Indebtedness of the Borrower or another Restricted Subsidiary) including Indebtedness that refinances Refinancing Indebtedness, and Indebtedness incurred pursuant to a commitment that refinances any Indebtedness or unutilized commitment; *provided*, *however*, that:

(1)     (a) such Refinancing Indebtedness does not mature prior to, and has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the remaining Weighted Average Life to Maturity of, the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced, replaced, exchanged, renewed, repaid or extended (or requires no or nominal payments in cash (other than interest payments) prior to the date that is 91 days after the maturity date of the Initial Term Loans); and (b) to the extent such Refinancing Indebtedness refinances Subordinated Indebtedness, such Refinancing Indebtedness is Subordinated Indebtedness, and is subordinated to the Secured Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being refinanced;

(2)     Refinancing Indebtedness shall not include:

(i)     Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of the Borrower or a Guarantor; or

(ii)     Indebtedness, Disqualified Stock or Preferred Stock of the Borrower or a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of an Unrestricted Subsidiary;

(3)     such Refinancing Indebtedness is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the sum of (x) the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) of the Indebtedness being refinanced plus (y) an amount equal to any unutilized commitment relating to the Indebtedness being refinanced or otherwise then outstanding under a Facility or other financing arrangement being refinanced to the extent the unutilized commitment being refinanced could be drawn in compliance with <u>Section 7.03</u> hereof immediately prior to such refinancing, plus (z) accrued and unpaid interest, dividends, premiums (including tender premiums), defeasance costs, underwriting discounts, fees, costs and expenses (including original issue discount, upfront fees or similar fees) in connection with such refinancing;

(4)      if the Indebtedness being refunded, refinanced, replace, exchanged, renewed, repaid or extended is secured by a Lien on the Collateral such Refinancing Indebtedness may be unsecured or secured by a Lien on the same collateral as such Indebtedness (pursuant to substantially similar collateral documentation), (a) in the case of any such Indebtedness being so refinanced that is secured by a Lien on the Collateral that ranks *pari passu* with the Lien securing the Obligations, that is *pari passu* with or junior to the Lien securing the Obligations and (b) in the case of any such Indebtedness being so refinanced that is secured by a Lien ranking junior to the lien securing the Collateral, that is junior to the Lien securing the Obligations, in each case provided that the holders of the obligations secured by such Liens, or their duly appointed agent, shall become party to a Customary Intercreditor Agreement; and

(5)      without duplication with <u>clauses (1)</u> through <u>(4)</u> above, if such Refinancing Indebtedness is Incurred to refinance any Credit Agreement Refinancing Indebtedness (or any successive Refinancing Indebtedness in respect thereto permitted under <u>Section 7.03(b)(i)</u>), then the terms of such Refinancing Indebtedness shall also comply with <u>clause (c)</u> of the definition of "Required Debt Terms" (regardless of whether such Refinancing Indebtedness is Credit Agreement Refinancing Indebtedness).

"<u>Refinancing Revolving Credit Commitments</u>" means one or more tranches of Revolving Credit Commitments hereunder that result from a Refinancing Amendment.

"<u>Refinancing Revolving Credit Loans</u>" means one or more tranches of Revolving Credit Loans that result from a Refinancing Amendment.

"<u>Refinancing Term Loans</u>" means one or more tranches of Term Loans that result from a Refinancing Amendment.

"<u>Refunding Capital Stock</u>" has the meaning specified in <u>Section 7.06(b)(ii)</u>.

"<u>Register</u>" has the meaning specified in <u>Section 10.07(d)</u>.

"<u>Regulated Bank</u>" means an Approved Commercial Bank that is (i) a U.S. depository institution the deposits of which are insured by the Federal Deposit Insurance Corporation; (ii) a corporation organized under section 25A of the U.S. Federal Reserve Act of 1913; (iii) a branch, agency or commercial lending company of a foreign bank operating pursuant to approval by and under the supervision of the Board under 12 CFR part 211; (iv) a non-U.S. branch of a foreign bank managed and controlled by a U.S. branch referred to clause (iii); or (v) any other U.S. or non-U.S. depository institution or any branch, agency or similar office thereof supervised by a bank regulatory authority in any jurisdiction.

"<u>Regulation S-X</u>" means Regulation S-X under the Securities Act.

"<u>Rejection Notice</u>" has the meaning specified in <u>Section 2.05(b)(v)</u>.

"<u>Release</u>" means any release, spill, emission, discharge, disposal, leaking, pumping, pouring, dumping, emptying, injection, or leaching into the Environment.

"<u>Relevant Governmental Body</u>" has the meaning specified in <u>Section 3.08(f)</u>.

"<u>Reportable Event</u>" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"<u>Repricing Transaction</u>" means any (i) voluntary repayment, prepayment, refinancing, conversion or replacement of all or a portion of the Initial Term Loans with the proceeds of broadly syndicated secured term loans denominated in Dollars that are secured by liens on the Collateral on an equal priority basis with the liens on the Collateral securing the Initial Term Loans the primary purpose of which is to reduce the Effective Yield applicable to the Initial Term Loans (and such Effective Yield is reduced) or (ii) any amendment the primary purpose of which is to reduce the Effective Yield applicable to the Initial Term Loans that reduces the Effective Yield of the Initial Term Loans, including, in each case, as may be effected by an amendment of any provisions of this Agreement relating to the Applicable Rate or the Base Rate or Eurocurrency Rate "floors" for, or Effective Yield of, the Initial Term Loans; *provided* that a "Repricing Transaction" shall not include any repayment, prepayment, refinancing, replacement or amendment in connection with (w) a Change of Control, (x) a Transformative Disposition, (y) an initial public offering or (z) a Transformative Acquisition.

"<u>Request for Credit Extension</u>" means (a) with respect to a Borrowing, conversion or continuation of Term Loans or Revolving Credit Loans, a Committed Loan Notice and (b) with respect to an L/C Credit Extension, a Letter of Credit Application.

"<u>Required Debt Terms</u>" means, (a) in respect of any Refinancing Term Loans (in addition to the applicable terms under <u>clause (c)</u> below), any Refinancing Term Loans do not mature prior to the maturity date of or have a shorter Weighted Average Life to Maturity prior to the Facility being refinanced (without giving effect to any amortization or prepayments on outstanding Term Loans), (b) in respect of any Refinancing Revolving Credit Commitments (in addition to the applicable terms under <u>clause (c)</u> below), any Refinancing Revolving Credit Commitment does not mature prior to the maturity date of or have scheduled amortization or commitment reductions prior to the maturity date of the Revolving Credit Commitments being refinanced, and (ii) if such Refinancing Revolving Credit Commitments contain any financial maintenance covenants, such financial maintenance covenants shall be added for the benefit of the Revolving Credit Lenders, and (c) in respect of any Credit Agreement Refinancing Indebtedness: (i) to the extent secured by the Collateral, a Customary Intercreditor Agreement is entered into, (ii) such Indebtedness shall have the same guarantors as the Indebtedness being refinanced unless such guarantors substantially concurrently guarantee the Secured Obligations, (iii) such Indebtedness is secured by the same assets as the Indebtedness being refinanced unless such assets substantially concurrently secure the Secured Obligations, (iv) subject to <u>Section 2.14</u>, the other terms and conditions (excluding pricing, interest rate margins, rate floors, "most favored nations" provisions, discounts, fees, premiums and prepayment or redemption terms and provisions which shall be determined by the Borrower) of such Indebtedness shall either, at the option of the Borrower, (x) reflect market terms and conditions (taken as a whole) at the time of incurrence, issuance or effectiveness (as determined by the Borrower in good faith) or (y) not be materially more restrictive on the Borrower and its Restricted Subsidiaries (when taken as whole) than the terms and conditions of this Agreement (when taken as a whole) (except, in the case of each of <u>clauses (x)</u> and <u>(y)</u> above, for covenants or other provisions applicable only to periods after the Latest Maturity Date of any Facility remaining outstanding after giving effect to the incurrence or issuance of such Indebtedness) (it being understood that to the extent any covenant is added for the benefit of (A) any Refinancing Term Loans, no consent shall be required from the Administrative Agent or any Lender to the extent that such covenant is also added for the benefit of any Facility remaining outstanding after the incurrence or issuance of such Refinancing Term Loans (as determined by the Borrower in good faith) or (B) any Refinancing Revolving Credit Loans, no consent shall be required from the Administrative Agent or any Lender to the extent that such covenant is also added for the benefit of each Revolving Credit Facility remaining outstanding after the incurrence of such Refinancing Revolving Credit Loans), (v) such Indebtedness shall be (A) contractually subordinated to the Initial Term Loans or Revolving Credit Commitments, as applicable, and on the same basis, if the Indebtedness being refinanced was contractually subordinated to the Initial Term Loans or Revolving Credit Commitments in right of payment, and/or (B) secured by Liens junior to the Liens securing the Secured Obligations, if the Indebtedness being refinanced was secured by

Liens junior to the Liens securing the Secured Obligations, (vi) if such Indebtedness is in the form of term loans secured by the Collateral on a *pari passu* basis with the Initial Term Loans, then such Indebtedness may share on a *pro rata* or less than *pro rata* (but not greater than *pro rata*) basis in mandatory prepayments of the Term Loans, and (vii) if such Indebtedness is in the form of notes, such Indebtedness does not mature prior to the maturity date of or have a shorter Weighted Average Life to Maturity or have mandatory redemption features (other than customary asset sale, insurance and condemnation proceeds events, an IPO, change of control offers, "excess cash flow" sweeps or events of default) that could result in redemptions of such Indebtedness prior to the maturity date of the Indebtedness that is being refinanced (without giving effect to any amortization or prepayments on outstanding Term Loans, as applicable).

"Required Lenders" means, as of any date of determination, Lenders holding more than 50.0% of the sum of the (a) Total Outstandings (with the aggregate Outstanding Amount of each Lender's Revolving Credit Exposure and participation in Swing Line Loans being deemed "held" by such Lender for purposes of this definition), (b) aggregate unused Term Commitments and (c) aggregate unused Revolving Credit Commitments; *provided* that the unused Term Commitment and unused Revolving Credit Commitment of, and the portion of the Total Outstandings held or deemed held by any Defaulting Lender or Disqualified Lender shall be excluded for all purposes of making a determination of Required Lenders.

"Required Revolving Credit Lenders" means, as of any date of determination, Lenders having more than 50.0% in the aggregate of the Revolving Credit Commitments plus after the termination of the Revolving Credit Commitments, the Revolving Credit Exposure of all Lenders; *provided* that the Revolving Credit Commitment and the Revolving Credit Exposure of any Defaulting Lender or Disqualified Lender shall be excluded for all purposes of making a determination of Required Revolving Credit Lenders.

"Reserved Indebtedness Amount" has the meaning specified in Section 7.03(c)(ix).

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer or other similar officer or director of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Casualty Event" has the meaning specified in Section 2.05(b)(vi).

"Restricted Disposition" has the meaning specified in Section 2.05(b)(vi).

"Restricted Investment" means any Investment other than a Permitted Investment.

"Restricted Payment" has the meaning specified in Section 7.06(a).

"Restricted Subsidiary" means any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"Retained Declined Proceeds" has the meaning specified in Section 2.05(b)(v).

"Revolving Credit Borrowing" means a borrowing consisting of Revolving Credit Loans of the same Class, Type and currency, made, converted or continued on the same date and, in the case of Eurocurrency Rate Loans, as to which a single Interest Period is in effect.

"Revolving Credit Commitment" means with respect to each Lender, the commitment, if any, of such Lender to make Revolving Credit Loans and to acquire participations in Letters of Credit and Swing Line Loans, expressed as an amount representing the maximum possible aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.06 and (b) increased from time to time pursuant to Section 2.14.  The initial amount of each Lender's Revolving Credit Commitment on the Closing Date is set forth on Schedule 2.01(B) of this Agreement, or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Revolving Credit Commitment, as the case may be.  The initial aggregate amount of the Lenders' Revolving Credit Commitments on the Closing Date is $35,000,000.

"Revolving Credit Commitment Increase" has the meaning specified in Section 2.14(a).

"Revolving Credit Exposure" means, at any time for any Lender, the sum of (a) the Outstanding Amount of the Revolving Credit Loans of such Lender outstanding at such time, (b) the L/C Exposure and (c) except with respect to the calculation of the Commitment Fee pursuant to Section 2.09(a), the Applicable Percentage of participations in Swing Line Obligations of such Lender.

"Revolving Credit Facility" means the Revolving Credit Commitments and the extension of credit made thereunder.

"Revolving Credit Lender" means a Lender with a Revolving Credit Commitment or, if the Revolving Credit Commitments have terminated or expired, a Lender with Revolving Credit Exposure.

"Revolving Credit Loan" means a Loan made pursuant to Section 2.01(b).

"Revolving Credit Note" means a promissory note of the Borrower payable to any Revolving Credit Lender or its registered assigns, in substantially the form of Exhibit C-2 hereto with appropriate insertions, evidencing the aggregate Indebtedness of the Borrower to such Revolving Credit Lender resulting from the Revolving Credit Loans made by such Revolving Credit Lender under the Revolving Credit Facility.

"S&P" means Standard & Poor's Investors Ratings Services or any of its successors or assigns that is a Nationally Recognized Statistical Rating Organization.

"Sale and Leaseback Transaction" means any arrangement providing for the leasing by the Borrower or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"Sanctioned Country" means, at any time, a country or territory which is itself the subject or target of any comprehensive economic Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, any Person that is the target of Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union or its member states, or Her Majesty's Treasury of

the United Kingdom, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned 50.0% or more, or where relevant under Sanctions, Controlled, by any such Person or Persons described in clauses (a) or (b), directly or indirectly.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union or its member states, or Her Majesty's Treasury of the United Kingdom.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Secured Cash Management Obligations" means Cash Management Obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank.

"Secured Hedge Agreement" means any Swap Contract that is entered into by and between the Borrower (or any Person that merges into the Borrower) or any Restricted Subsidiary and any Hedge Bank.

"Secured Obligations" means all (w) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party or other Subsidiary arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, expenses and other amounts that accrue after the commencement by or against any Loan Party or any other Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, expenses and other amounts are allowed claims in such proceeding, (x) obligations of any Loan Party or any other Restricted Subsidiary arising under any Secured Hedge Agreement (other than, with respect to any Guarantor, Excluded Swap Obligations of such Guarantor) and (y) Secured Cash Management Obligations.  Without limiting the generality of the foregoing, the Secured Obligations of the Loan Parties under the Loan Documents (and of any of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, Letter of Credit commissions, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts, in each case, payable by any Loan Party or any other Subsidiary under any Loan Document and (b) the obligation of any Loan Party or any other Subsidiary to reimburse any amount in respect of any of the foregoing that the Administrative Agent, the Collateral Agent, or any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party or such Subsidiary.

"Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent, the Lead Arranger, the Lenders, the L/C Issuers, the Hedge Banks, the Cash Management Banks, the Supplemental Administrative Agent and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.01(c).

"Securities Act" means the U.S. Securities Act of 1933, as amended.

"Securitization Asset" means (a) any accounts receivable, mortgage receivables, loan receivables, royalty, franchise fee, license fee, patent or other revenue streams and other rights to payment or related assets and the proceeds thereof and (b) all collateral securing such receivable or asset, all contracts and contract rights, guarantees or other obligations in respect of such receivable or asset, lockbox accounts and records with respect to such account or asset and any other assets customarily transferred (or in respect

of which security interests are customarily granted) together with accounts or assets in connection with a securitization, factoring or receivable sale transaction.

"Securitization Facility" means any of one or more securitization, financing, factoring or sales transactions, as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, pursuant to which the Borrower or any of the Restricted Subsidiaries sells, transfers, pledges or otherwise conveys any Securitization Assets (whether now existing or arising in the future) to a Securitization Subsidiary or any other Person.

"Securitization Fees" means distributions or payments made directly or by means of discounts with respect to any Securitization Asset or Receivables Asset or participation interest therein issued or sold in connection with, and other fees, expenses and charges (including commissions, yield, interest expense and fees and expenses of legal counsel) paid in connection with, any Qualified Securitization Financing or Receivables Facility.

"Securitization Repurchase Obligation" means any obligation of a seller of Securitization Assets or Receivables Assets in a Qualified Securitization Financing or a Receivables Facility to repurchase or otherwise make payments with respect to Securitization Assets or Receivables Assets arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Securitization Subsidiary" means any Subsidiary of the Borrower in each case formed for the purpose of and that solely engages in one or more Qualified Securitization Financings or Receivables Facilities and other activities reasonably related thereto or another Person formed for this purpose.

"Security Agreement" means, collectively, the Security Agreement executed by the Loan Parties party thereto on the Closing Date substantially in the form of Exhibit G and as supplemented by any Security Agreement Supplement executed and delivered pursuant to Section 6.10.

"Security Agreement Supplement" means a supplement to the Security Agreement as contemplated by such Security Agreement.

"Settlement" means the transfer of cash or other property with respect to any credit or debit card charge, check or other instrument, electronic funds transfer, or other type of paper-based or electronic payment, transfer, or charge transaction for which a Person acts as a processor, remitter, funds recipient or funds transmitter in the ordinary course of its business.

"Settlement Asset" means any cash, receivable or other property, including a Settlement Receivable, due or conveyed to a Person in consideration for a Settlement made or arranged, or to be made or arranged, by such Person or an Affiliate of such Person.

"Settlement Indebtedness" means any payment or reimbursement obligation in respect of a Settlement Payment.

"Settlement Lien" means any Lien relating to any Settlement or Settlement Indebtedness (and may include, for the avoidance of doubt, the grant of a Lien in or other assignment of a Settlement Asset in consideration of a Settlement Payment, Liens securing intraday and overnight overdraft and automated clearing house exposure, and similar Liens).

"Settlement Payment" means the transfer, or contractual undertaking (including by automated clearing house transaction) to effect a transfer, of cash or other property to effect a Settlement.

"Settlement Receivable" means any general intangible, payment intangible, or instrument representing or reflecting an obligation to make payments to or for the benefit of a Person in consideration for a Settlement made or arranged, or to be made or arranged, by such Person.

"Similar Business" means (a) any businesses, services or activities engaged in by the Borrower or any of its Subsidiaries on the Closing Date, (b) any businesses, services and activities engaged in by the Borrower or any of its Subsidiaries that are related, complementary, incidental, ancillary or similar to any of the foregoing or are extensions or developments of any thereof and (c) a Person conducting a business, service or activity specified in clauses (a) and (b), and any Subsidiary thereof. For the avoidance of doubt, any Person that invests in or owns Capital Stock or Indebtedness of another Person that is engaged in a Similar Business shall be deemed to be engaged in a Similar Business.

"SOFR" has the meaning specified in Section 3.08(f).

"Solvent" and "Solvency" means with respect to any Person on any date of determination, that on such date (a) the Fair Value and the Present Fair Salable Value of the assets of such Person and its Subsidiaries taken as a whole exceed their Stated Liabilities and Identified Contingent Liabilities; (b) such Person and its Subsidiaries taken as a whole do not have Unreasonably Small Capital; and (c) such Person and its Subsidiaries taken as a whole can pay their Stated Liabilities and Identified Contingent Liabilities as they mature.  For purposes of the foregoing, (i) "Fair Value" means the amount at which the assets (both tangible and intangible), in their entirety, of a Person and its Subsidiaries taken as a whole would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act; (ii) "Present Fair Salable Value" means the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets (both tangible and intangible) of a Person and its Subsidiaries taken as a whole are sold on a going concern basis with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated; (iii) "Stated Liabilities" means the recorded liabilities (including contingent liabilities that would be recorded in accordance with IFRS) of a Person and its Subsidiaries taken as a whole, determined in accordance with IFRS consistently applied; (iv) "Identified Contingent Liabilities" means the maximum estimated amount of liabilities reasonably likely to result from pending litigation, asserted claims and assessments, guaranties, uninsured risks and other contingent liabilities of a Person and its Subsidiaries taken as a whole (including all fees and expenses related thereto but exclusive of such contingent liabilities to the extent reflected in Stated Liabilities), as identified and explained in terms of their nature and estimated magnitude by responsible officers of such Person; (v) "can pay their Stated Liabilities and Identified Contingent Liabilities as they mature" means a Person and its Subsidiaries taken as a whole have sufficient assets and cash flow to pay their respective Stated Liabilities and Identified Contingent Liabilities as those liabilities mature or (in the case of contingent liabilities) otherwise become payable; and (vi) "do not have Unreasonably Small Capital" means a Person and its Subsidiaries taken as a whole have sufficient capital to ensure that it is a going concern.

"SPC" has the meaning specified in Section 10.07(h).

"Specified Default" means the occurrence of an Event of Default under Section 8.01(a) or Section 8.01(f).

"Specified Representations" means the representations and warranties of the Borrower and the other Loan Parties set forth in (i) Sections 5.01(a) and 5.01(c) (solely as relating to organizational

existence of the Loan Parties), (ii) Sections 5.01(b)(ii), 5.02(a), and 5.04 (solely as relating to power and authority, due authorization, execution, delivery and enforceability, in each case, related to, the borrowing under, guaranteeing under, performance of, and granting of security interests in the Collateral pursuant to the Loan Documents), (iii) Section 5.15 (relating to the Solvency of the Borrower and its Subsidiaries as of the Closing Date after giving effect to the Transactions), (iv) Section 5.12 (relating to FRB margin regulations and the Investment Company Act of 1940, as amended), (v) Section 5.01(d) (relating to the USA PATRIOT Act), (vi) Section 5.18 (limited to the use of proceeds of the Loans on the applicable date), (vii) Section 5.02(b)(i) (relating to no conflicts with Organization Documents) and (viii) Section 5.16 (relating to the creation, validity, priority and perfection of the security interests in the Collateral) (subject to the proviso in Section 4.01(i)).

"Sponsor" means, individually or collectively, any fund, partnership, co-investment vehicles and/or similar vehicles or accounts, in each case managed or advised by Trive Capital Management, LLC or its Affiliates or any of their respective successors, but not including any portfolio operating companies of any of the foregoing.

"Standard Securitization Undertakings" means representations, warranties, covenants, guarantees and indemnities entered into by the Borrower or any Subsidiary of the Borrower which the Borrower has determined in good faith to be customary in a Securitization Facility or Receivables Facility, including those relating to the servicing of the assets of a Securitization Subsidiary, it being understood that any Securitization Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking or, in the case of a Receivables Facility, a non-credit related recourse accounts receivable factoring arrangement.

"Stated Liabilities" has the meaning specified in the definitions of "Solvent" and "Solvency."

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision, but shall not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"Statutory Reserves" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the FRB and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the FRB). Eurocurrency Rate Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the FRB) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to the Administrative Agent or any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Indebtedness" means, with respect to any person, any Indebtedness (whether outstanding on the Closing Date or thereafter Incurred), which is expressly subordinated in right of payment to the Secured Obligations pursuant to a written agreement.

"Subsidiary" means, with respect to any Person:

(1)     any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; or

(2)     any partnership, joint venture, limited liability company or similar entity of which:

(a)     more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership interests or otherwise; and

(b)     such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity; or

(3)     at the election of the Borrower, any partnership, joint venture, limited liability company or similar entity of which such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

Unless otherwise specified, "Subsidiary" shall mean any Subsidiary of the Borrower.

"Subsidiary Guarantor" means, collectively, the Subsidiaries of the Borrower that are Guarantors.

"Successor Company" has the meaning specified in Section 7.04(a)(ii)(A).

"Supplemental Administrative Agent" has the meaning specified in Section 9.13(a) and "Supplemental Administrative Agents" shall have the corresponding meaning.

"Supported QFC" has the meaning assigned to it in Section 10.23.

"Survey" means a survey of any Mortgaged Property (and all improvements thereon) which is (a) (i) prepared by a surveyor or engineer licensed to perform surveys in the jurisdiction where such Mortgaged Property is located, (ii) dated (or redated) not earlier than six (6) months prior to the date of delivery thereof unless there shall have occurred within six (6) months prior to such date of delivery any exterior construction on the site of such Mortgaged Property or any easement, right of way or other interest in the Mortgaged Property has been granted or become effective through operation of law or otherwise with respect to such Mortgaged Property which, in either case, can be depicted on a survey, in which events, as applicable, such survey shall be dated (or redated) after the completion of such construction or if such construction shall not have been completed as of such date of delivery, not earlier than 20 days prior to such date of delivery, or after the grant or effectiveness of any such easement, right of way or other interest in the Mortgaged Property, (iii) certified by the surveyor (in a manner reasonably acceptable to the Administrative Agent) to the Administrative Agent, the Collateral Agent and the Title Company, (iv) complying in all respects with the minimum detail requirements of the American Land Title Association as such requirements are in effect on the date of preparation of such survey, (v) sufficient for the Title Company to remove all standard survey exceptions from the Mortgage Policy relating to such Mortgaged Property and issue the endorsements of the type required by paragraph (f) of the definition of "Collateral and Guarantee Requirement" and (vi) otherwise reasonably acceptable to the Administrative Agent.

"Swap Contract" means (a) any and all Hedging Obligations, whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark to market value(s) for such Swap Contracts, as determined by the Hedge Bank (or the Borrower, if no Hedge Bank is party to such Swap Contract) in accordance with the terms thereof and in accordance with customary methods for calculating mark-to-market values under similar arrangements by the Hedge Bank (or the Borrower, if no Hedge Bank is party to such Swap Contract).

"Swing Line Borrowing" means a borrowing of a Swing Line Loan pursuant to Section 2.04.

"Swing Line Facility" means the swing line loan facility made available by the Swing Line Lenders pursuant to Section 2.04.

"Swing Line Lender" means Macquarie, in its capacity as provider of Swing Line Loans or any successor swing line lender hereunder.

"Swing Line Loan" has the meaning specified in Section 2.04(a).

"Swing Line Loan Notice" means a notice of a Swing Line Borrowing pursuant to Section 2.04(b), which, if in writing, shall be substantially in the form of Exhibit B or such other form as approved by the Swing Line Lender (including any form on an electronic platform or electronic transmission system as shall be approved by the Swing Line Lender), appropriately completed and signed by a Responsible Officer of the Borrower.

"Swing Line Note" means a promissory note of the Borrower payable to the Swing Line Lender or its registered assigns, in substantially the form of Exhibit C-3 hereto, evidencing the aggregate Indebtedness of the Borrower to the Swing Line Lender resulting from the Swing Line Loans.

"Swing Line Obligations" means, as at any date of determination, the aggregate principal amount of all Swing Line Loans outstanding.

"Swing Line Sublimit" means an amount equal to the lesser of (a) $5,000,000 and the (b) aggregate amount of the Revolving Credit Commitments.  The Swing Line Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"Taxes" means any and all present or future taxes, levies, imposts, deductions, charges, duties, assessments, fees and withholdings and any charges of a similar nature (including backup withholding, interest, additions to tax, penalties and other liabilities with respect thereto) that are imposed by any Governmental Authority or other taxing authority.

"Term Borrowing" means a Borrowing in respect of a Class of Term Loans.

"Term Commitments" means an Initial Term Commitment or a commitment in respect of any Incremental Term Loans or any combination thereof, as the context may require.

"Term Lenders" means the Initial Term Lenders, the Lenders with Incremental Term Loans and the Lenders with Extended Term Loans.

"Term Loan Standstill Period" has the meaning specified in Section 8.01(b).

"Term Loans" means the Initial Term Loans, the Incremental Term Loans and the Extended Term Loans.

"Term Note" means a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit C-1 hereto with appropriate insertions, evidencing the aggregate Indebtedness of the Borrower to such Term Lender resulting from any Class of Term Loans made by such Term Lender.

"Term SOFR" has the meaning specified in Section 3.08(f).

"Test Period" means, at any date of determination, the most recently completed four consecutive fiscal quarters of the Borrower ending on or prior to such date for which financial statements have been or are required to be delivered pursuant to Section 6.01(a) or 6.01(b); or, if earlier, are internally available to the Borrower; provided that with respect to the calculation of (i) Applicable Rate and (ii) compliance with Section 7.09, in each case, internally available financial statements shall be disregarded with respect to this definition and such calculations shall instead be based on the financial statements for the most recent period of four consecutive fiscal quarters for which financial statements have been or are required to have been delivered pursuant to Section 6.01(a) or (b), as applicable.

"Threshold Amount" means the greater of $20,000,000 and 20.0% of LTM EBITDA.

"Title Company" means any reputable nationally recognized title insurance company as reasonably acceptable to the Administrative Agent which shall be retained by Borrower to issue the Mortgage Policies.

"Total Assets" means, as of any date, the total consolidated assets of the Borrower and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of the Borrower and its Restricted Subsidiaries, determined on a pro forma basis.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"Transaction Expenses" means any fees, costs and expenses (including (x) all legal, accounting and other professional fees, costs and expenses and (y) underwriting fees, costs and expenses (including original issue discount, upfront fees or similar fees)) incurred or paid by the Borrower or any Restricted Subsidiary in connection with the Transactions.

"Transactions" means the execution, delivery and initial borrowings under the Credit Agreement, the Closing Distribution, the Closing Date Refinancing and the consummation of any other transaction in connection with the foregoing.

"Transformative Acquisition" means any merger, acquisition (or series of related acquisitions within a period of 90 days), restricted payment, dissolution or consolidation or investment, in any such case made by the Borrower or any Restricted Subsidiary that (a) is not permitted by the terms of the Loan Documents immediately prior to the consummation of such acquisition or (b) if permitted by the terms of the Loan Documents immediately prior to the consummation of such acquisition, would not provide the Borrower and the Restricted Subsidiaries with adequate flexibility under the Loan Documents for the continuation and/or expansion of their combined operations following such consummation, as determined by the Borrower acting in good faith.

"Transformative Disposition" means any disposition by any the Borrower or any Restricted Subsidiary that (a) is not permitted by the terms of the Loan Documents immediately prior to the consummation of such disposition or (b) if permitted by the terms of the Loan Documents immediately prior to the consummation of such disposition, would not provide the Borrower and the Restricted Subsidiaries with adequate flexibility under the Loan Documents for the continuation and/or expansion of its operations following such consummation, as determined by the Borrower acting in good faith.

"Treasury Capital Stock" has the meaning specified in Section 7.06(b)(ii).

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"Undisclosed Administration" means in relation to a Lender or its parent company the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such Lender or such parent company is subject to home jurisdiction supervision if applicable law requires that such appointment is not to be publicly disclosed.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution

"United States" and "U.S." mean the United States of America.

"United States Tax Compliance Certificate" has the meaning specified in Section 3.01.

"Unreimbursed Amount" has the meaning specified in Section 2.03(c)(i).

"Unrestricted Cash" means an amount equal to the greater of (a) the cash and Cash Equivalents of the Borrower and its Restricted Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries and (b) zero; *provided* that the amount described in this definition shall exclude Vault Cash.

"Unrestricted Incremental Amount" has the meaning specified in Section 2.14(a).

"Unrestricted Subsidiary" means

(1)    any Subsidiary of the Borrower that at the time of determination is an Unrestricted Subsidiary (as designated by the Borrower in the manner provided in the succeeding paragraph); and

(2)    any Subsidiary of an Unrestricted Subsidiary.

The Borrower may designate any Subsidiary of the Borrower (including any newly acquired or newly formed Subsidiary or a Person becoming a Subsidiary of the Borrower through merger, consolidation or other business combination transaction, or Investment therein) to be an Unrestricted Subsidiary only if:

(1)    at the time of such designation, such Subsidiary or any of its Subsidiaries does not own any Capital Stock or Indebtedness of, or own or hold any Lien on any property of, the Borrower or any other Subsidiary of the Borrower which is not a Subsidiary of the Subsidiary to be so designated or otherwise an Unrestricted Subsidiary;

(2)    such designation and the Investment, if any, of the Borrower in such Subsidiary complies with Section 7.06 hereof; and

(3)    at the time of such designation no Default or Event of Default shall have occurred and be continuing (or would result therefrom).

"U.S. Special Resolution Regime" shall have the meaning provided in Section 10.23.

"USA PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"Vault Cash" means any cash that is (a) maintained in any coin operated amusement machine, video game terminal, redemption machine and/or any cash cartridge associated therewith, (b) in any locked cash cartridge while in transit between operating locations of the Borrower and/or any Restricted Subsidiary and/or any coin operated amusement machine or video game terminal location and/or (c) in any cash vault at any operating location of the Borrower and/or any Restricted Subsidiary.

"Voluntary Prepayment Amount" has the meaning specified in Section 2.14(a).

"Voting Stock" of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled to vote in the election of directors.

"Weighted Average Life to Maturity" when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient (in number of years) obtained by dividing: (1) the sum of the products obtained by multiplying (a) the number of years (calculated to the

nearest one-twelfth) from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock, by (b) the amount of such payment, by (2) the sum of all such payments; *provided* that, for purposes of determining the Weighted Average Life to Maturity of any Indebtedness, the effects of any prepayments or amortization made on such Indebtedness prior to the date of such determination will be disregarded.

"Wholly Owned Subsidiary" of any specified Person means a Subsidiary of such Person, all of the Capital Stock of which (other than directors' qualifying shares or shares required by any applicable law or regulation to be held by a Person other than such Person) is owned by such Person.

"Withdrawal Liability" means the liability of a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution  or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02      Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)      (i) The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)      Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)      The term "including" is by way of example and not limitation.

(iv)      The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(d)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03    Accounting Terms.

(a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with IFRS except as otherwise specifically prescribed herein.  Notwithstanding anything to the contrary above or elsewhere in this Agreement, all obligations of any Person that are required to be treated as operating leases for purposes of IFRS shall be accounted for as operating leases (and not be treated as financing or capital lease obligations or Indebtedness) for purposes of all financial definitions, calculations and deliverables under this Agreement or any other Loan Document (including the calculation of Capitalized Lease Obligation, Consolidated Cash Interest Expense, Consolidated EBITDA, Interest Coverage Ratio, Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio or Consolidated Total Leverage Ratio, LTM EBITDA and Indebtedness) (whether or not such operating lease obligations were in effect on such date).

(b)     Where reference is made to "the Borrower and its Restricted Subsidiaries on a consolidated basis" or similar language, such consolidation shall not include any Subsidiaries of the Borrower other than Restricted Subsidiaries.

Section 1.04    Rounding.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07    Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

Section 1.08    Currency Equivalents Generally.

(a)     For purposes of determining compliance with Sections 7.01, 7.03 and 7.06 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Lien, Indebtedness or Investment is incurred; provided that for the avoidance of doubt, the foregoing

provisions of this Section 1.08 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

(b)        For purposes of determining compliance under Sections 7.05 and 7.06, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrower's annual financial statements delivered pursuant to Section 6.01(a); *provided* that the foregoing shall not be deemed to apply to the determination of any amount of Indebtedness.

(c)        For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the Dollar Equivalent of the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the Exchange Rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

Section 1.09        Certain Calculations and Tests.

(a)        When calculating the availability under any basket or ratio under this Agreement or compliance with any provision of this Agreement in connection with any Limited Condition Transaction and any actions or transactions related thereto (including acquisitions, Investments, the incurrence, issuance or assumption of Indebtedness and the use of proceeds thereof, the incurrence or creation of Liens, repayments, Restricted Payments and Asset Dispositions), in each case, at the option of the Borrower (the Borrower's election to exercise such option, an "LCT Election"), the date of determination for availability under any such basket or ratio and whether any such action or transaction is permitted (or any requirement or condition therefor is complied with or satisfied (including as to the absence of any continuing Default or Event of Default)) under this Agreement shall be deemed to be the date (the "LCT Test Date") either (a) the definitive agreement for such Limited Condition Transaction is entered into (or, if applicable, the date of delivery of an irrevocable declaration of a Restricted Payment or similar event), or (b) solely in connection with an acquisition to which the United Kingdom City Code on Takeovers and Mergers applies, the date on which a "Rule 2.7 announcement" of a firm intention to make an offer (or equivalent announcement in another jurisdiction) (an "LCT Public Offer") in respect of a target of a Limited Condition Transaction and, in each case, if, after giving *pro forma* effect to the Limited Condition Transaction and any actions or transactions related thereto (including acquisitions, Investments, the incurrence, issuance or assumption of Indebtedness and the use of proceeds thereof, the incurrence or creation of Liens, repayments, Restricted Payments and Asset Dispositions) and any related *pro forma* adjustments, the Borrower or any of its Restricted Subsidiaries would have been permitted to take such actions or consummate such transactions on the relevant LCT Test Date in compliance with such ratio, test or basket (and any related requirements and conditions), such ratio, test or basket (and any related requirements and conditions) shall be deemed to have been complied with (or satisfied) for all purposes (in the case of Indebtedness, for example, whether such Indebtedness is committed, issued, assumed or incurred at the LCT Test Date or at any time thereafter); *provided* that (a) if financial statements for one or more subsequent fiscal quarters shall have become available, the Borrower may elect, in its sole discretion, to redetermine all such ratios, tests or baskets on the basis of such financial statements, in which case, such date of redetermination shall thereafter be the applicable LCT Test Date for purposes of such ratios, tests or baskets, (b) except as contemplated in the foregoing clause (a), compliance with such ratios, test or baskets (and any related requirements and

conditions) shall not be determined or tested at any time after the applicable LCT Test Date for such Limited Condition Transaction and any actions or transaction related thereto (including acquisitions, Investments, the incurrence, issuance or assumption of Indebtedness and the use of proceeds thereof, the incurrence or creation of Liens, repayments, Restricted Payments and Asset Dispositions) and (c) Consolidated Interest Expense for purposes of the Interest Coverage Ratio will be calculated using an assumed interest rate as reasonably determined by the Borrower.

For the avoidance of doubt, if the Borrower has made an LCT Election, (1) if any of the ratios, tests or baskets for which compliance was determined or tested as of the LCT Test Date would at any time after the LCT Test Date have been exceeded or otherwise failed to have been complied with as a result of fluctuations in any such ratio, test or basket, including due to fluctuations in EBITDA or total assets of the Borrower or the Person subject to such Limited Condition Transaction, such baskets, tests or ratios will not be deemed to have been exceeded or failed to have been complied with as a result of such fluctuations; (2) if any related requirements and conditions (including as to the absence of any continuing Default or Event of Default) for which compliance or satisfaction was determined or tested as of the LCT Test Date would at any time after the LCT Test Date not have been complied with or satisfied (including due to the occurrence or continuation of an Default or Event of Default), such requirements and conditions will not be deemed to have been failed to be complied with or satisfied (and such Default or Event of Default shall be deemed not to have occurred or be continuing); and (3) in calculating the availability under any ratio, test or basket in connection with any action or transaction unrelated to such Limited Condition Transaction following the relevant LCT Test Date and prior to the earlier of the date on which such Limited Condition Transaction is consummated or the date that the definitive agreement or date for redemption, purchase or repayment specified in an irrevocable notice for such Limited Condition Transaction is terminated, expires or passes (or, if applicable, the irrevocable notice is terminated, expires or passes or, as applicable, the offer in respect of an LCT Public Offer for, such acquisition is terminated), as applicable, without consummation of such Limited Condition Transaction, any such ratio, test or basket shall be determined or tested giving *pro forma* effect to such Limited Condition Transaction.

(b)     Notwithstanding anything to the contrary herein, in the event an item of Indebtedness (or any portion thereof) is incurred or issued, any Lien is incurred or other transaction is undertaken in reliance on a ratio basket based exceptions, thresholds and baskets, such ratio(s) shall be calculated with respect to such incurrence, issuance or other transaction without giving effect to amounts being utilized under any other basket under the same covenant (other than a ratio basket based on the Interest Coverage Ratio, Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio or Consolidated Total Leverage Ratio) on the same date. Each item of Indebtedness that is incurred or issued, each Lien incurred and each other transaction undertaken will be deemed to have been incurred, issued or taken first, to the extent available, pursuant to the relevant Interest Coverage Ratio, Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio or Consolidated Total Leverage Ratio test.

(c)     Notwithstanding anything to the contrary herein, (i) in the event an item of Indebtedness (or any portion thereof) is incurred or issued, any Lien is incurred or other transaction is undertaken in reliance on a ratio basket based on an Interest Coverage Ratio, Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio or Consolidated Total Leverage Ratio, such ratio(s) shall be calculated without regard to the incurrence of any Revolving Credit Loan or Letter of Credit Incurred or issued, as applicable, immediately prior to or in connection therewith; and (ii) any calculation or measure that is determined with reference to the Borrower's financial statements (including Consolidated EBITDA, Consolidated Interest Expense, Consolidated Net Income, Interest Coverage Ratio, Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio and Consolidated Total Leverage Ratio) may be determined with reference to the financial

statements of a Parent Entity delivered in accordance with the requirements set forth in the penultimate paragraph of Section 6.01.

(d)    For purposes of making the computations and determinations referred to in this Agreement that are based on, or incorporate, a determination of Consolidated Net Income, Consolidated EBITDA, LTM EBITDA and/or Consolidated Total Indebtedness, any Investments, acquisitions, dispositions, mergers, consolidations, operational changes, business expansions and disposed or discontinued operations that have been made by the Borrower or any of its Restricted Subsidiaries, during the reference period (or, other than for purposes of the Financial Covenant or Applicable Rate, subsequent to the reference period and on or prior to or simultaneously with the date of such computation) shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, consolidations, operational changes, business expansions and disposed or discontinued operations (and the change in any associated fixed charge obligations and the change in Consolidated Net Income and/or Consolidated EBITDA (or any respective component thereof) resulting therefrom) had occurred on the first day of the reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, operational change, business expansion or disposed or discontinued operation that would have required adjustment pursuant to this definition, then the applicable computations shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, merger, consolidation or disposed operation had occurred at the beginning of the applicable reference period.

(e)    For purposes of this Agreement, whenever *pro forma* effect is to be given to a transaction (including the Transactions), the *pro forma* calculations shall be made in good faith by a responsible financial or chief accounting officer of the Borrower (and may include, for the avoidance of doubt, cost savings, operating expense reductions and synergies resulting from such transaction which is being given *pro forma* effect, subject to and without duplication of the applicable limitations and other terms of the definition of "Consolidated EBITDA"). If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect), the interest on such Indebtedness shall be calculated as if the rate in effect on the date such Indebtedness was incurred had been the applicable rate for the reference period (taking into account any Hedging Obligations applicable to such Indebtedness). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with IFRS. For purposes of making the computations referred to in the preceding paragraphs, interest on any Indebtedness under a revolving credit facility computed with a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the reference period except as set forth in the first paragraph of this definition. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower may designate.

(f)    Notwithstanding anything to the contrary herein, for purposes of the covenants described in <u>Article VII</u>, if any Indebtedness, Lien, Investment, Disposition, Restricted Payment or payment of Subordinated Indebtedness (or a portion thereof) would be permitted pursuant to one or more provisions described in each applicable Section, the Borrower may divide and classify such Indebtedness, Lien, Investment, Disposition, Restricted Payment or payment of Subordinated Indebtedness (or a portion thereof) in any manner that complies with the covenants set forth in such Section, and may later divide and reclassify any such Indebtedness, Lien, Investment, Disposition, Restricted Payment or payment of Subordinated Indebtedness so long as the Indebtedness, Lien, Investment, Disposition, Restricted Payment or payment of Subordinated Indebtedness (as so redivided and/or reclassified) would be permitted to be made in reliance on the applicable exception as of the date of such redivision or reclassification.

Section 1.10    <u>Interest Rates; Eurocurrency Notification</u>.

(a)    The interest rate on Eurocurrency Rate Loans is determined by reference to the Eurocurrency Rate, which is derived from the London interbank offered rate.  The London interbank offered rate is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market.  In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to ICE Benchmark Administration Limited (together with any successor to ICE Benchmark Administration Limited, the "<u>IBA</u>") for purposes of the IBA setting the London interbank offered rate.  On March 5, 2021, the IBA stated that as a result of its not having access to input data necessary to calculate LIBOR settings on a representative basis beyond the intended cessation dates set forth in the table below, it would have to cease publication of all thirty-five (35) LIBOR settings immediate after such date:

| LIBOR Currency | LIBOR Settings | Date |
|---|---|---|
| USD | 1-week, 2-month | December 31, 2021 |
| USD | All other settings (i.e., Overnight/Spot Next, 1-month, 3-month, 6-month and 12-month) | June 30, 2023 |
| GBP, EUR, CHF, JPY | All settings | December 31, 2021 |

(b)    The IBA did not identified any successor administrator in its announcement.  In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of the London interbank offered rate.  Upon the occurrence of a Benchmark Transition Event or an Early Opt-In Election, <u>Section 3.08</u> provides a mechanism for determining an alternative rate of interest.  The Administrative Agent will promptly notify the applicable parties as and when required by <u>Section 3.08</u>, of any change to the reference rate upon which the interest rate on Eurocurrency Rate Loans is based.  However, the Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the London interbank offered rate or other rates in the definition of "Eurocurrency Rate" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation, (i) any such alternative, successor or replacement rate implemented pursuant to <u>Section 3.08</u>, whether upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, and (ii) the implementation of any Benchmark Replacement Conforming Changes pursuant to <u>Section 3.08</u>, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the Eurocurrency Rate or have the same volume or liquidity as did the London interbank offered rate prior to its discontinuance or unavailability other than, in each case, to the extent of the Administrative Agent's gross negligence, bad faith or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision).  Nothing in this Section shall constitute a representation or warranty by the Borrower or any of its Restricted Subsidiaries nor can it constitute the basis of any Default or Event of Default.

Section 1.11    <u>Divisions</u>.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to be a disposition of such asset, right, obligation or liability from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by

the holders of its equity interests at such time.

## ARTICLE II

### The Commitments and Credit Extensions

Section 2.01    The Loans.

(a)    The Initial Term Loans.

(i)    Subject to the terms and conditions set forth herein, each Lender with an Initial Term Commitment as set forth on Schedule 2.01(A) severally agrees to make to the Borrower a single loan denominated in Dollars in a principal amount equal to such Lender's Initial Term Commitment on the Closing Date.

(ii)    Initial Term Loans made pursuant to Section 2.01(a)(i) on the Closing Date shall be deemed to constitute one Class of Loans for all purposes hereunder.  Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be reborrowed.  Initial Term Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

(b)    The Revolving Credit Borrowings.  Subject to the terms and conditions set forth herein, each Revolving Credit Lender severally agrees to make (or cause its Applicable Lending Office to make) Revolving Credit Loans from time to time during the Availability Period in Dollars in an aggregate principal amount that will not result in such Lender's Revolving Credit Exposure exceeding such Lender's Revolving Credit Commitment.  Within the limits of each Lender's Revolving Credit Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01(b), prepay under Section 2.05, and reborrow under this Section 2.01(b).  Revolving Credit Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

Section 2.02    Borrowings, Conversions and Continuations of Loans.

(a)    Each Term Borrowing, each Revolving Credit Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's irrevocable written notice, on behalf of the Borrower, to the Administrative Agent; *provided*, that such borrowing notice may be conditional with respect to a transaction wherein such borrowed funds are to be applied (but in any event subject to or any applicable breakage indemnity provision).  Each such notice must be received by the Administrative Agent substantially in the form attached hereto as Exhibit A, (i) in the case of a Eurocurrency Rate Loan, not later than 12:00 p.m., Local Time, three (3) Business Days before the date of the proposed Borrowing, or (ii) in the case of a Base Rate Loan, not later than 12:00 p.m., Local Time, one (1) Business Day before the date of the proposed Borrowing.  Each notice by the Borrower pursuant to this Section 2.02(a) must be by hand delivery, telecopy or electronic transmission to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower.  Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof.  Except as provided in Section 2.03(c), each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a Term Borrowing, a Revolving Credit Borrowing, a conversion of Loans from one Type to the other, or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the Class and principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing

Loans are to be converted, (v) if applicable, the duration of the Interest Period with respect thereto and (vi) the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.02(b).  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or fail to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made or continued as, or converted to Base Rate Loans.  Any such automatic conversion or continuation shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans.  If the Borrower requests a Borrowing of, conversion to, or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice, but fail to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.  For the avoidance of doubt, the Borrower and Lenders acknowledge and agree that any conversion or continuation of an existing Loan shall be deemed to be a continuation of that Loan with a converted interest rate methodology and not a new Loan.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its Applicable Percentage of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Appropriate Lender of the details of any automatic conversion or continuation described in Section 2.02(a).  In the case of each Borrowing, each Appropriate Lender shall make (or cause its Applicable Lending Office to make) the amount of its Loan available to the Administrative Agent by wire transfer in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m., Local Time on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall make all requested funds so received available to the Borrower designated in the Committed Loan Notice in like funds as received by the Administrative Agent by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower; *provided* that if, on the date the Committed Loan Notice with respect to such Borrowing is given by the Borrower, there are L/C Borrowings outstanding, then the proceeds of such Borrowing shall be applied first, to the payment in full of any such L/C Borrowings, and second, to the Borrower as provided above.

(c)    Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan unless the Borrower pays the amount due, if any, under Section 3.04 in connection therewith.  If an Event of Default has occurred and is continuing and, the Administrative Agent, at the request of the Required Lenders (or, solely with respect to the Revolving Credit Facility, at the request of the Required Revolving Credit Facility Lenders), so notifies the Borrower, then so long as such Event of Default is continuing: (i) no Loans may be converted to or continued as Eurocurrency Rate Loans, (ii) no outstanding Loans may be continued for an Interest Period of more than one month's duration and (iii) unless repaid, each Eurocurrency Rate Loan shall be converted to a Base Rate Loan at the end of the Interest Period applicable thereto.

(d)    The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such interest rate.  The determination of the Eurocurrency Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)    Anything in clauses (a) to (d) above to the contrary notwithstanding, after giving effect to all Term Borrowings and Revolving Credit Borrowings, all conversions of Term Loans and Revolving Credit Loans from one Type to the other, and all continuations of Term Loans and Revolving Credit Loans as the same Type, there shall not be more than ten (10) Interest Periods in effect at any time for all Borrowings of Eurocurrency Rate Loans.

Section 2.03       Letters of Credit.

(a)       The Letter of Credit Commitments.

(i)       Subject to the terms and conditions set forth herein, (1) each L/C Issuer agrees, in reliance upon the agreements of the Revolving Credit Lenders set forth in this Section 2.03, (x) from time to time on any Business Day during the Availability Period for the Revolving Credit Facility, to issue Letters of Credit denominated in Dollars for the account of the Borrower (*provided* that any Letter of Credit may be for the benefit of any Subsidiary of the Borrower) and to amend or extend Letters of Credit previously issued by it, in accordance with Section 2.03(b), and (y) to honor drafts under the Letters of Credit and (2) the Revolving Credit Lenders severally agree to participate in Letters of Credit issued pursuant to this Section 2.03; *provided* that no L/C Issuer shall be obligated to make any L/C Credit Extension with respect to any Letter of Credit, and, except in the case of the following clause (w), no Lender shall be obligated to participate in any Letter of Credit if immediately after giving effect to such L/C Credit Extension, (w) the aggregate L/C Exposure in respect of Letters of Credit issued by such L/C Issuer would exceed such L/C Issuer's L/C Issuer Sublimit, (x) the aggregate L/C Exposure would exceed the Letter of Credit Sublimit or (y) the Revolving Credit Exposure of any Lender would exceed such Lender's Revolving Credit Commitment.   Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)       An L/C Issuer shall be under no obligation to issue any Letter of Credit (and, in the case of clauses (B) and (C), shall not issue any Letter of Credit) if:

(A)       any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing such Letter of Credit, or any Law applicable to such L/C Issuer or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or direct that such L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon such L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date (for which such L/C Issuer is not otherwise compensated hereunder);

(B)       subject to Section 2.03(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve (12) months after the date of issuance or last renewal, except to the extent Cash Collateralized or back-stopped or as to which other arrangements reasonably satisfactory to the applicable L/C Issuer have been made (it being understood that the participations of the Revolving Credit Lenders in any undrawn Letter of Credit shall in any event terminate on the Latest Letter of Credit Expiration Date);

(C)       the expiry date of such requested Letter of Credit would occur after the Latest Letter of Credit Expiration Date, except to the extent Cash Collateralized or back-stopped or as to which other arrangements reasonably satisfactory to the applicable L/C Issuer have been made (it being understood that the participations of the Revolving Credit Lenders in any undrawn Letter of Credit shall in any event terminate on the Latest Letter of Credit Expiration Date);

(D)     the issuance of such Letter of Credit would violate any Laws binding upon such L/C Issuer;

(E)     the issuance would violate any policies or procedures of such L/C Issuer;

(F)     the face amount of such Letter of Credit (together with all other Letters of Credit issued by such L/C Issuer and outstanding at such time) shall exceed the L/C Issuer Sublimit applicable to such L/C Issuer; or

(G)     the Letter of credit is not a standby letter of credit.

(iii)    An L/C Issuer shall be under no obligation to amend any Letter of Credit if (A) such L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(iv)    Letter of Credit Reporting.  On a monthly basis, each L/C Issuer shall deliver to the Administrative Agent a complete list of outstanding Letters of Credit issued by such L/C Issuer.

(b)     Procedures for Issuance and Amendment of Letters of Credit; Auto Extension Letters of Credit.

(i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower hand delivered or telecopied (or transmitted by electronic communication, if arrangements for doing so have been approved by the L/C Issuer) to the L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrower.  Such Letter of Credit Application must be received by the relevant L/C Issuer and the Administrative Agent not later than 1:00 p.m., Local Time, at least three (3) Business Days prior to the proposed issuance date or date of amendment, as the case may be; or, in each case, such later date and time as the relevant L/C Issuer may agree in a particular instance in its sole discretion.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the relevant L/C Issuer:  (a) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (b) the amount thereof; (c) the expiry date thereof; (d) the name and address of the beneficiary thereof; (e) the documents to be presented by such beneficiary in case of any drawing thereunder; (f) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (g) such other matters as the relevant L/C Issuer may reasonably request.  If requested by the L/C Issuer, the Borrower also shall submit a letter of credit application on the L/C Issuer's standard form in connection with any request for a Letter of Credit.  In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the relevant L/C Issuer (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day); (3) the nature of the proposed amendment; and (4) such other matters as the relevant L/C Issuer may reasonably request.

(ii)    Promptly after receipt of any Letter of Credit Application, the relevant L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof.  Upon receipt by the relevant L/C Issuer of confirmation from the Administrative Agent that the requested issuance or amendment is permitted in accordance with the terms hereof, then, subject to the terms and

conditions hereof, such L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrower or enter into the applicable amendment, as the case may be.  Immediately upon the issuance of each Letter of Credit, each Revolving Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, acquire from the relevant L/C Issuer a risk participation in such Letter of Credit in an amount equal to the product of such Revolving Credit Lender's Applicable Percentage times the amount of such Letter of Credit.

(iii)    If the Borrower so requests in any applicable Letter of Credit Application, the relevant L/C Issuer shall agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); *provided* that any such Auto-Extension Letter of Credit must permit the relevant L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued.  Unless otherwise directed by the relevant L/C Issuer, the Borrower shall not be required to make a specific request to the relevant L/C Issuer for any such extension.  Once an Auto-Extension Letter of Credit has been issued, the applicable Lenders shall be deemed to have authorized (but may not require) the relevant L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than the Latest Letter of Credit Expiration Date; *provided* that the relevant L/C Issuer shall not permit any such extension if (A) the relevant L/C Issuer has determined that it would have no obligation at such time to issue such Letter of Credit in its extended form under the terms hereof (by reason of the provisions of Section 2.03(a)(ii) or otherwise), or (B) it has received notice (which may be by telephone, followed promptly in writing, or in writing) on or before the day that is five (5) Business Days before the Non-Extension Notice Date from the Administrative Agent or any Revolving Credit Lender, as applicable, or the Borrower that one or more of the applicable conditions specified in Section 4.02 is not then satisfied.

(iv)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the relevant L/C Issuer will also deliver to the Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)    Drawings and Reimbursements; Funding of Participations.

(i)    Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the relevant L/C Issuer shall notify promptly the Borrower and the Administrative Agent thereof.  On the Business Day immediately following the Business Day on which the Borrower shall have received notice of any payment by an L/C Issuer under a Letter of Credit (or, if the Borrower shall have received such notice later than 1:00 p.m. on any Business Day, on the second (2nd) succeeding Business Day) (such date of payment, an "Honor Date"), the Borrower shall reimburse such L/C Issuer through the Administrative Agent in Dollars in an amount equal to the Dollar Equivalent of such drawing using the Exchange Rate in relation to Dollars in effect on the Honor Date.  If the Borrower fails to so reimburse such L/C Issuer on the Honor Date (or if any such reimbursement payment is required to be refunded to the Borrower for any reason), then, in the case of each L/C Borrowing, the Administrative Agent shall promptly notify the applicable L/C Issuer and each Appropriate Lender of the Honor Date, the amount of the unreimbursed drawing in Dollars (the "Unreimbursed Amount"), and the amount of such Appropriate Lender's Applicable Percentage thereof.  In the event that the Borrower does not reimburse the L/C Issuer on the Business Day following the date it receives notice of the Honor Date (or, if the Borrower shall have received such notice later than 1:00 p.m. on any Business Day, on the second (2nd) succeeding Business Day), the Borrower shall be deemed to have requested a

Revolving Credit Borrowing denominated in Dollars of Base Rate Loans to be disbursed on such date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Base Rate Loans but subject to the amount of the unutilized portion of the Revolving Credit Commitments, and subject to the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice). Any notice given by an L/C Issuer or the Administrative Agent pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice. For the avoidance of doubt, if any drawing occurs under a Letter of Credit and such drawing is not reimbursed on the same day, such drawing shall, without duplication, accrue interest at the rate applicable to Base Rate Loans under the Revolving Credit Facility until the date of reimbursement.

(ii)     Each Revolving Credit Lender (including any such Lender acting as an L/C Issuer) shall upon any notice pursuant to Section 2.03(c)(i) make funds available to the Administrative Agent in Dollars for the account of the relevant L/C Issuer at the Administrative Agent's Office for payments in an amount equal to its Applicable Percentage of any Unreimbursed Amount in respect of a Letter of Credit not later than 1:00 p.m., New York City time, on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.03, each Revolving Credit Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrower in such amount. The Administrative Agent shall remit the funds so received to the relevant L/C Issuer.

(iii)    With respect to any Unreimbursed Amount in respect of a Letter of Credit that is not fully refinanced by a Revolving Credit Borrowing of Base Rate Loans because the conditions set forth in Section 4.02 cannot be satisfied or for any other reason, the Borrower shall be deemed to have incurred from the relevant L/C Issuer an L/C Borrowing in Dollars in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate. In such event, each Revolving Credit Lender's payment to the Administrative Agent for the account of the relevant L/C Issuer pursuant to Section 2.03(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.03.

(iv)    Until each Revolving Credit Lender funds its Revolving Credit Loan or L/C Advance pursuant to this Section 2.03(c) to reimburse the relevant L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Revolving Credit Lender's Applicable Percentage of such amount shall be solely for the account of the relevant L/C Issuer.

(v)     Each Revolving Credit Lender's obligation to make Revolving Credit Loans or L/C Advances to reimburse an L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the relevant L/C Issuer, a Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default; or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided* that each Revolving Credit Lender's obligation to make Revolving Credit Loans (but not L/C Advances) pursuant to this Section 2.03(c) is subject to the conditions set forth in Section 4.02 (other than delivery by the Borrower of a Committed Loan Notice). No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrower to reimburse the relevant L/C Issuer for the amount of any payment made by such L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)     If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the relevant L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(ii), such L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such L/C Issuer at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.  A certificate of the relevant L/C Issuer submitted to any Revolving Credit Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.03(c)(vi) shall be conclusive absent demonstrable error.

(vii)     If, at any time after an L/C Issuer has made a payment under any Letter of Credit and has received from any Revolving Credit Lender such Lender's L/C Advance in respect of such payment in accordance with this Section 2.03(c), the Administrative Agent receives for the account of such L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to each Revolving Credit Lender its Applicable Percentage thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's L/C Advance was outstanding) in the same funds as those received by the Administrative Agent.

(viii)     If any payment received by the Administrative Agent for the account of an L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by such L/C Issuer in its discretion), each Revolving Credit Lender shall pay to the Administrative Agent for the account of such L/C Issuer its Applicable Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the Federal Funds Rate.

(d)     Obligations Absolute.  The obligation of the Borrower to reimburse the relevant L/C Issuer for each drawing under each Letter of Credit issued by it and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other agreement or instrument relating thereto;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that any Loan Party may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the relevant L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)     any payment by the relevant L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of

Credit; or any payment made by the relevant L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)     any exchange, release or nonperfection of any Collateral, or any release or amendment or waiver of or consent to departure from the Guaranty or any other guarantee, for all or any of the Secured Obligations of any Loan Party in respect of such Letter of Credit; or

(vi)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Loan Party;

*provided* that the foregoing shall not excuse any L/C Issuer from liability to the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are waived by the Borrower to the extent permitted by applicable Law) suffered by the Borrower that are caused by such L/C Issuer's gross negligence, bad faith or willful misconduct as determined by a court of competent jurisdiction when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.

(e)     Role of L/C Issuers.  Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, the relevant L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the L/C Issuers, any Agent-Related Person nor any of the respective correspondents, participants or assignees of any L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Required Lenders or the Required Revolving Credit Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence, bad faith or willful misconduct as determined by a court of competent jurisdiction; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Letter of Credit Application.  The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided* that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as they may have against the beneficiary or transferee at law or under any other agreement.  None of the L/C Issuers, any Agent-Related Person, nor any of the respective correspondents, participants or assignees of any L/C Issuer, shall be liable or responsible for any of the matters described in clauses (i) through (iii) of this Section 2.03(e); *provided* that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against an L/C Issuer, and such L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower caused by such L/C Issuer's willful misconduct, bad faith or gross negligence as determined by a court of competent jurisdiction or such L/C Issuer's willful or grossly negligent failure as determined by a court of competent jurisdiction to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, each L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no L/C Issuer shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(f)     Cash Collateral.  (i) If any Event of Default occurs and is continuing and the Administrative Agent or the Required Revolving Credit Lenders or Required Lenders, as applicable, require the Borrower to Cash Collateralize the L/C Obligations pursuant to Section 8.02(c) or (ii) an Event of Default set forth under Section 8.01(f) (with respect to the Borrower) or (g) occurs and is continuing, then the Borrower shall Cash Collateralize the then Outstanding Amount of all L/C Obligations (in an amount equal to such Outstanding Amount plus any accrued or unpaid fees thereon determined as of the date such Cash Collateral is provided).  For purposes hereof, "Cash Collateralize" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the relevant L/C Issuer and the Revolving Credit Lenders, as collateral for the L/C Obligations, cash or deposit account balances in the relevant currencies in an amount equal to the L/C Exposure (determined as of the date of such Event of Default) ("Cash Collateral") pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant L/C Issuer (which documents are hereby consented to by the Lenders).  Derivatives of such term have corresponding meanings.  The Borrower hereby grants to the Administrative Agent, for the benefit of the L/C Issuers and the Revolving Credit Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account.  Interest or profits, if any, on such investments shall accumulate in such account.  Cash Collateral shall be maintained in accounts satisfactory to the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Revolving Credit Lenders and may be invested in readily available Cash Equivalents at its sole discretion.  If at any time the Administrative Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Administrative Agent (on behalf of the Secured Parties) or that the total amount of such funds is less than the L/C Exposure, the Borrower will, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited and held in the deposit accounts specified by the Administrative Agent, an amount equal to the excess of (a) such L/C Exposure over (b) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent reasonably determines to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Law, to reimburse the relevant L/C Issuer.  To the extent the amount of any Cash Collateral exceeds the L/C Exposure plus costs incidental thereto and so long as no other Event of Default has occurred and is continuing, the excess shall be refunded to the Borrower.  If such Event of Default is cured or waived and no other Event of Default is then occurring and continuing, the amount of any Cash Collateral (including any accrued interest thereon) shall be refunded to the Borrower.

(g)     Letter of Credit Fees.  The Borrower shall pay to the Administrative Agent in Dollars for the account of each Revolving Credit Lender (except Defaulting Lenders) in accordance with its Applicable Percentage, a Letter of Credit fee for each Letter of Credit issued pursuant to this Agreement equal to the product of (i) Applicable Rate for Letter of Credit fees and (ii) the Dollar Equivalent of the daily maximum amount then available to be drawn under such Letter of Credit.  Such letter of credit fees shall be computed on a quarterly basis in arrears.  Such letter of credit fees shall be due and payable on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Latest Letter of Credit Expiration Date or the termination of the respective Letter of Credit and thereafter on demand.  If there is any change in the Applicable Rate during any quarter, the daily maximum amount of each Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(h)     Fronting Fee and Documentary and Processing Charges Payable to L/C Issuers.  The Borrower shall pay directly to each L/C Issuer for its own account a fronting fee (a "Fronting Fee") in Dollars with respect to each Letter of Credit issued by it equal to 0.125% per annum of the Dollar Equivalent of the daily maximum amount then available to be drawn under such Letter of Credit.  Such fronting fees

shall be computed on a quarterly basis in arrears. Such fronting fees shall be due and payable on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Latest Letter of Credit Expiration Date or the termination of the respective Letter of Credit and thereafter on demand. In addition, the Borrower shall pay directly to each L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable within ten (10) Business Days of demand and are nonrefundable.

(i)        Conflict with Letter of Credit Application. Notwithstanding anything else to the contrary in any Letter of Credit Application, in the event of any conflict between the terms hereof and the terms of any Letter of Credit Application, the terms hereof shall control.

(j)        Addition of an L/C Issuer. A Revolving Credit Lender (or any of its Subsidiaries or affiliates) may become an additional L/C Issuer hereunder pursuant to a written agreement among the Borrower, the Administrative Agent and such Revolving Credit Lender. The Administrative Agent shall notify the Revolving Credit Lenders of any such additional L/C Issuer.

(k)        Applicability of ISP. Unless otherwise expressly agreed by the L/C Issuer and the Borrower when a Letter of Credit is issued, the rules of the ISP shall apply to each Letter of Credit.

(l)        [Reserved].

(m)        Replacement of L/C Issuer. Any L/C Issuer may be replaced with another Revolving Credit Lender (or an Affiliate of a Revolving Credit Lender) at any time by written agreement among the Borrower, the Administrative Agent, the Required Revolving Credit Lenders, and the successor L/C Issuer. The Administrative Agent shall notify the Revolving Credit Lenders of any such replacement of such L/C Issuer. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced L/C Issuer. From and after the effective date of any such replacement, (i) the successor L/C Issuer shall have all the rights and obligations of the applicable L/C Issuer under this Agreement with respect to Letters of Credit to be issued thereafter, and (ii) references herein to the term "L/C Issuer" shall be deemed to refer to such successor or to any previous L/C Issuer, or to such successor L/C Issuer and all previous L/C Issuers, as the context shall require. After the replacement of an L/C Issuer hereunder, the replaced L/C Issuer shall remain a party hereto and shall continue to have all the rights and obligations of an L/C Issuer under this Agreement with respect to Letters of Credit issued by it prior to such replacement but shall not be required to issue additional Letters of Credit.

Section 2.04        Swing Line Facility.

(a)        Swing Line Loans. Subject to the terms and conditions set forth herein, the Swing Line Lender agrees to make Loans in Dollars to the Borrower (each such Loan, a "Swing Line Loan"), from time to time on any Business Day during the period beginning on the Business Day after the Closing Date and until the Maturity Date of the Revolving Credit Facility in an aggregate principal amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans when aggregated with the Revolving Credit Exposure of the Lender acting as the Swing Line Lender may exceed the amount of such Swing Line Lender's Revolving Credit Commitment; *provided* that, after giving effect to any Swing Line Loan, (i) the aggregate Revolving Credit Exposure shall not exceed the aggregate Revolving Credit Commitments and (ii) the aggregate Outstanding Amount of the Revolving Credit Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed such Lender's Revolving Credit Commitment then in effect; *provided*, *further*, that

the Borrower shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan. Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04. Each Swing Line Loan shall be a Base Rate Loan. Immediately upon the making of a Swing Line Loan, each Revolving Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Lender's Applicable Percentage of the aggregate Revolving Credit Commitments times the amount of such Swing Line Loan.

(b)      Borrowing Procedures. Each Swing Line Borrowing shall be made upon the Borrower's irrevocable written notice to the Swing Line Lender and the Administrative Agent by Swing Line Loan Notice; *provided*, that such borrowing notice may be conditional with respect to a transaction wherein such borrowed funds are to be applied. Each such notice must be received by the Swing Line Lender and the Administrative Agent not later than 12:00 p.m., Local Time on the requested date of the proposed Borrowing (which shall be a Business Day) and shall specify (i) the principal amount to be borrowed, which principal amount shall be a minimum of $500,000 (and any amount in excess of $500,000 shall be in integral multiples of $50,000) and (ii) the requested date of the proposed Borrowing, which shall be a Business Day. Promptly after receipt by the Swing Line Lender of any Swing Line Loan Notice, the Swing Line Lender will confirm with the Administrative Agent that the Administrative Agent has also received such Swing Line Loan Notice and, if not, the Swing Line Lender will notify the Administrative Agent of the contents thereof. Unless the Swing Line Lender has received notice from the Administrative Agent (including at the request of any Revolving Credit Lender) prior to 2:00 p.m. Local Time on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the first proviso to the first sentence of Section 2.04(a), or (B) that one or more of the applicable conditions specified in Section 4.02 is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender will, not later than 4:00 p.m. Local Time on the date of the proposed Borrowing specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrower. Notwithstanding anything to the contrary contained in this Section 2.04 or elsewhere in this Agreement, the Swing Line Lender shall not be obligated to make any Swing Line Loan at a time when a Revolving Credit Lender is a Defaulting Lender unless the Swing Line Lender has entered into arrangements reasonably satisfactory to it and the Borrower to eliminate the Swing Line Lender's Fronting Exposure (after giving effect to Section 2.16(c)) with respect to such Defaulting Lender's participation in such Swing Line Loans, including by Cash Collateralizing, or obtaining a backstop letter of credit from an issuer reasonably satisfactory to the Swing Line Lender to support, such Defaulting Lender's Applicable Percentage of the outstanding Swing Line Loans.

(c)      Refinancing of Swing Line Loans.

(i)      The Swing Line Lender at any time in its sole discretion may request, on behalf of the Borrower (which hereby irrevocably authorizes such Swing Line Lender to so request on its behalf), that each Revolving Credit Lender make a Base Rate Loan in an amount equal to such Lender's Applicable Percentage of the amount of Swing Line Loans then outstanding. Such request shall be made in writing (which written request shall be deemed to be a Committed Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the aggregate Revolving Credit Commitments and the conditions set forth in Section 4.02. The Swing Line Lender shall furnish the Borrower with a copy of the applicable Committed Loan Notice promptly after delivering such notice to the Administrative Agent. Each Revolving Credit Lender shall make an amount equal to its Applicable Percentage of the amount specified in such Committed Loan Notice available to the Administrative Agent in same day funds for the account of the Swing Line Lender at the Administrative Agent's Office for Dollar-

denominated payments not later than 1:00 p.m. Local Time on the day specified in such Committed Loan Notice, whereupon, subject to Section 2.04(c)(ii) each Revolving Credit Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrower in such amount. The Administrative Agent shall remit the funds so received to the Swing Line Lender.

(ii)    If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Credit Borrowing in accordance with Section 2.04(c)(i) the request for Base Rate Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Revolving Credit Lenders fund its risk participation in the relevant Swing Line Loan and each Revolving Credit Lender's payment to the Administrative Agent for the account of the Swing Line Lender pursuant to Section 2.04(c)(i) shall be deemed payment in respect of such participation.

(iii)    If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the Swing Line Lender any amount required to be paid by the Lender pursuant to the foregoing provisions of this Section 2.04(c) by the time specified in Section 2.04(c)(i) the Swing Line Lender shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the Federal Funds Rate from time to time in effect, plus any reasonable administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing.  A certificate of the Swing Line Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)    Each Revolving Credit Lender's obligation to make Revolving Credit Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.04(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, the Borrower or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided* that each Revolving Credit Lender's obligation to make Revolving Credit Loans pursuant to this Section 2.04(c) (but not to purchase and fund risk participations in Swing Line Loans) is subject to the conditions set forth in Section 4.02.  No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrower to repay Swing Line Loans, together with interest as provided herein.

(d)    Repayment of Participations.

(i)    At any time after any Revolving Credit Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Lender its Applicable Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

(ii)    If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Revolving Credit Lender shall pay to the Swing Line Lender its Applicable Percentage of such payment on demand of the Administrative Agent plus

interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Rate. The Administrative Agent will make such demand upon the request of the Swing Line Lender.

(e)     Interest for Account of Swing Line Lender. The Administrative Agent (on behalf of the Swing Line Lender) shall be responsible for invoicing the Borrower for interest on the Swing Line Loans. Until each Revolving Credit Lender funds its Base Rate Loan, Eurocurrency Rate Loan or risk participation pursuant to this Section 2.04 to refinance such Lender's Applicable Percentage of any Swing Line Loan, interest in respect of such Applicable Percentage shall be solely for the account of the Swing Line Lender.

(f)     Payments Directly to Swing Line Lender. The Borrower shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Administrative Agent for the benefit of the Swing Line Lender.

(g)     Provisions Related to Extended Revolving Credit Commitments. If the maturity date shall have occurred in respect of any tranche of Revolving Credit Commitments (the "Expiring Credit Commitment") at a time when another tranche or tranches of Revolving Credit Commitments is or are in effect with a longer maturity date (each a "Non-Expiring Credit Commitment"), then with respect to each outstanding Swing Line Loan, if consented to by the applicable Swing Line Lender, on the earliest occurring maturity date, such Swing Line Loan shall be deemed reallocated to the tranche or tranches of the Non-Expiring Credit Commitments on a *pro rata* basis; *provided* that (x) to the extent that the amount of such reallocation would cause the aggregate credit exposure to exceed the aggregate amount of such Non-Expiring Credit Commitments, immediately prior to such reallocation the amount of Swing Line Loans to be reallocated equal to such excess shall be repaid or Cash Collateralized and (y) notwithstanding the foregoing, if a Default or Event of Default has occurred and is continuing, the Borrower shall still be obligated to pay Swing Line Loans allocated to the Revolving Credit Lenders holding the Expiring Credit Commitments at the maturity date of the Expiring Credit Commitment or if the Loans have been accelerated prior to the maturity date of the Expiring Credit Commitment. Upon the maturity date of any tranche of Revolving Credit Commitments, the sublimit for Swing Line Loans may be reduced as agreed between the Swing Line Lender and the Borrower, without the consent of any other Person.

(h)     Replacement of Swing Line Lender. The Swing Line Lender may be replaced at any time by written agreement among the Borrower, the Administrative Agent the replaced Swing Line Lender and the successor Swing Line Lender. The Administrative Agent shall notify the Lenders of any such replacement of a Swing Line Lender. From and after the effective date of any such replacement, (x) the successor Swing Line Lender shall have all the rights and obligations of the replaced Swing Line Lender under this Agreement with respect to Swing Line Loans made thereafter and (y) references herein to the term "Swing Line Lender" shall be deemed to refer to such successor or to any previous Swing Line Lender, or to such successor and all previous Swing Line Lenders, as the context shall require. After the replacement of a Swing Line Lender hereunder, the replaced Swing Line Lender shall remain a party hereto and shall continue to have all the rights and obligations of a Swing Line Lender under this Agreement with respect to Swing Line Loans made by it prior to its replacement, but shall not be required to make additional Swing Line Loans.

(i)     Resignation of the Swing Line Lender. Subject to the appointment and acceptance of a successor Swing Line Lender, the Swing Line Lender may resign as a Swing Line Lender at any time upon thirty days' prior written notice to the Administrative Agent, the Borrower and the Lenders, in which case, such Swing Line Lender shall be replaced in accordance with Section 2.04(h) above.

Section 2.05     Prepayments.

(a)     <u>Optional Prepayments</u>.

(i)     The Borrower may, upon notice to the Administrative Agent by the Borrower, at any time or from time to time, voluntarily prepay any Borrowing (other than Swing Line Loans) of any Class in whole or in part without premium or penalty (except as set forth in <u>Section 2.05(a)(iv)</u>); *provided* that (1) such notice must be received by the Administrative Agent not later than 12:00 p.m., New York City time (A) three (3) Business Days prior to any date of prepayment of Eurocurrency Rate Loans and (B) one (1) Business Day prior to any date of prepayment of Base Rate Loans and (2) any prepayment of Eurocurrency Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid. The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein; *provided*, that such notice may be conditional with respect to the consummation of a transaction that is the source of funds for such repayment). Any prepayment of a Eurocurrency Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to <u>Section 3.04</u>. Each prepayment of the Loans pursuant to this <u>Section 2.05(a)</u> shall be applied to the installments thereof as directed by the Borrower (it being understood and agreed that if the Borrower does not so direct at the time of such prepayment, such prepayment shall be applied against the scheduled repayments of Term Loans of the relevant Class under <u>Section 2.07</u> in direct order of maturity) and shall be paid to the Appropriate Lenders in accordance with their respective Applicable Percentages.

(ii)     The Borrower may, upon, subject to <u>clause (iii)</u> below, written notice to the Swing Line Lender (with a copy to the Administrative Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; *provided* that (1) such notice must be received by the Swing Line Lender and the Administrative Agent, not later than 12:00 p.m. New York City time on the date of the prepayment, and (2) any such prepayment shall be in a minimum principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(iii)     Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under <u>Section 2.05(a)</u> if such prepayment would have resulted from a refinancing of all of the Facilities, which refinancing shall not be consummated or shall otherwise be delayed.

(iv)     In the event that the Borrower (x) makes any prepayment of any Class of Initial Term Loans in connection with any Repricing Transaction or (y) effects any amendment of this Agreement resulting in a Repricing Transaction with respect to any Class of Initial Term Loans, in each case prior to the six (6) month anniversary of the Closing Date, the Borrower shall pay a premium in an amount equal to 1.00% of (A) in the case of clause (x), the amount of such Initial Term Loans being prepaid or (B) in the case of clause (y), the aggregate amount of the applicable Initial Term Loans being amended outstanding immediately prior to such amendment, in each case to the Administrative Agent, for the ratable account of each of the applicable Initial Term Lenders.

(b)     <u>Mandatory Prepayments</u>.

(i)       Within ten (10) Business Days after financial statements have been delivered pursuant to Section 6.01(a) and the related Compliance Certificate has been delivered pursuant to Section 6.02(a), commencing with the fiscal year ending December 31, 2021, the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans equal to (A) 75.0% (such percentage as it may be reduced as described below, the "ECF Percentage") of Excess Cash Flow, if any, for the fiscal year covered by such financial statements, to the extent Excess Cash Flow for such period exceeds an amount equal to the greater of $5,000,000 and 5.0% of LTM EBITDA and then, only to the extent in excess of such amount; *provided*, that for any fiscal year, any Excess Cash Flow amount that is prepaid by the Borrower and that is in excess of the amount of Excess Cash Flow that is required to be paid by the Borrower for such fiscal year shall, at the Borrower's sole option, be carried forward to subsequent fiscal years; *minus* at the Borrower's option, (B) the sum of (i) all voluntary prepayments of Term Loans (including any payments made pursuant to Section 2.05(a) or (d) or Section 3.06) during such fiscal year (and, without duplication of any deduction with respect to any other fiscal year, at the Borrower's option, following the last day of such fiscal year and on or prior to such required prepayment date) (including any debt buyback or prepayments at a discount to par under such facilities, with credit given for the actual amount of the cash payment), (ii) all voluntary prepayments of Revolving Credit Loans during such fiscal year (and, without duplication of any deduction with respect to any other fiscal year, at the Borrower's option, following the last day of such fiscal year and on or prior to such required prepayment date) to the extent the Revolving Credit Commitments are permanently reduced by the amount of such payments and (iii) any capital expenditures (to the extent the amounts are to be used for capital expenditures, including any of the foregoing for which an agreement (or commitment or binding letter of intent) then exists), in each case, made during such fiscal year (and, without duplication of any deduction with respect to any other fiscal year, at the Borrower's option, following the last day of such fiscal year and on or prior to such required prepayment date), in the case of each of the immediately preceding clauses (i), (ii), and (iii), to the extent such prepayments and redemptions are not funded with the proceeds of Funded Debt (other than revolving indebtedness); *provided* that (x) the ECF Percentage shall be 50.0% if the Consolidated First Lien Secured Leverage Ratio (after giving effect to any prepayment of Loans after such year as contemplated above in clause (B)) as of the last day of the fiscal year covered by such financial statements was equal to or less than 4.25:1.00, (y) the ECF Percentage shall be 25.0% if the Consolidated First Lien Secured Leverage Ratio (after giving effect to any prepayment of Loans after such year as contemplated above in clause (B)) as of the last day of the fiscal year covered by such financial statements was equal to or less than 3.75:1.00 and (z) the ECF Percentage shall be 0.0% if the Consolidated First Lien Secured Leverage Ratio (after giving effect to any prepayment of Loans after such year as contemplated above in clause (B)) as of the last day of the fiscal year covered by such financial statements was equal to or less than 3.25:1.00.

(ii)      (A) Subject to Section 2.05(b)(ii)(B), and any Customary Intercreditor Agreement, if following the Closing Date (x) the Borrower or any Restricted Subsidiary consummates any non-ordinary course sale, transfer or other disposition of property or assets permitted by Section 7.05(a) and clauses (7) though (28) of the definition of "Asset Disposition," or (y) any Casualty Event occurs, which in the aggregate results in the realization or receipt by the Borrower or such Restricted Subsidiary of Net Available Cash in excess of $5,000,000 in any given fiscal year in the case of each of a single Asset Disposition or Casualty Event or series of related Asset Dispositions or Casualty Events, the Borrower shall make a prepayment, in accordance with Section 2.05(b)(ii)(C), of an aggregate principal amount of Term Loans equal to 100.0% (such percentage as it may be reduced as described below, the "Asset Disposition Percentage") of such Net Available Cash (the "Applicable Proceeds") realized or received (only to the extent of the amount in excess of $5,000,000 in such fiscal year); *provided* that no such prepayment shall be required pursuant to this Section 2.05(b)(ii)(A) (I) with respect to such portion of such Net Available Cash that the

Borrower intends to reinvest in accordance with Section 2.05(b)(ii)(B), (II) until the aggregate amount of Net Available Cash is reinvested in accordance with Section 2.05(b)(ii)(B) within the time periods set forth therein or (III) with respect to such portion of such Net Available Cash that is used to repay Other Applicable Indebtedness as permitted under Section 2.05(b)(ii)(C).

(B)    With respect to any Applicable Proceeds realized or received with respect to any Asset Disposition or any Casualty Event, at the option of the Borrower, (x) the Borrower and the Restricted Subsidiaries may reinvest (including capital expenditures) an amount equal to all or any portion of such Applicable Proceeds in (i) Additional Assets (including by means of an investment in Additional Assets by a Restricted Subsidiary) or (ii) in any one or more businesses (*provided* such business will be a Restricted Subsidiary) within eighteen (18) months (or six (6) months after the eighteen (18) month period following receipt of such Applicable Proceeds if a contractual commitment to reinvest is entered into within eighteen (18) months, so long as such reinvestment is actually completed within six (6) months after the end of such reinvestment period) following receipt of such Applicable Proceeds, (y) such Applicable Proceeds shall be deemed to have been reinvested in assets used or useful in the business of the Borrower or any Restricted Subsidiary (including pursuant to a Permitted Acquisition, Investment or capital expenditure) pursuant to any such investment occurring in the sixty (60) days preceding the date of receipt of such Applicable Proceeds or (z) to the extent the property or assets subject to such Asset Disposition or Casualty Event are the property or assets of any Subsidiaries that are non-Loan Parties, use any Applicable Proceeds to permanently repay Indebtedness of any Subsidiaries that are non-Loan Parties; *provided* that in the case of clause (x) or (y) above, if any Applicable Proceeds are not so reinvested by the deadline specified in clause (x) or (y) above, as applicable, or if in the case of clause (x), (y) or (z) above any such Applicable Proceeds are no longer intended to be or cannot be so reinvested or used to repay Indebtedness at any time after delivery of a notice of reinvestment election, an amount equal to such Applicable Proceeds shall be applied, in accordance with Section 2.05(b)(ii)(C), to the prepayment of the Term Loans as set forth in this Section 2.05.

(C)    On each occasion that the Borrower must make a prepayment of the Term Loans pursuant to this Section 2.05(b)(ii), the Borrower shall, within ten (10) Business Days after the date of realization or receipt of such Applicable Proceeds (or, in the case of prepayments required pursuant to Section 2.05(b)(ii)(B), within ten (10) Business Days of the deadline specified in clause (x) or (y) thereof, as applicable, or of the date the Borrower reasonably determines that such Applicable Proceeds are no longer intended to be or cannot be so reinvested or used to repay Indebtedness, as the case may be), make a prepayment, in accordance with Section 2.05(b)(v) below, of the principal amount of Term Loans in an amount equal to such Applicable Proceeds realized or received; *provided*, *further*, that with respect to any prepayment required by Section 2.05(b)(ii)(A), the Borrower may use a portion of such Applicable Proceeds to prepay or repurchase Indebtedness secured by the Collateral on a *pari passu* basis with the Liens securing the Secured Obligations (the "Other Applicable Indebtedness") to the extent required pursuant to the terms of the documentation governing such Other Applicable Indebtedness, in which case, the amount of prepayment required to be made with respect to such Applicable Proceeds pursuant to this Section 2.05(b)(ii)(C) shall be deemed to be the amount equal to the product of (x) the amount of such Applicable Proceeds required to be repaid and (y) a fraction, the numerator of which is the outstanding principal amount of Term Loans required to be prepaid pursuant to this Section 2.05(b)(ii)(C) and the denominator of which is the sum of the outstanding principal amount of such Other Applicable Indebtedness required to be prepaid pursuant to the terms of the documents governing such Other Applicable Indebtedness and the

outstanding principal amount of Term Loans required to be prepaid pursuant to this paragraph (for the avoidance of doubt, amounts described in this clause (y) in the calculation of such fraction shall be deemed to refer to then outstanding principal amount of such Indebtedness subject to such prepayment requirement, prior to giving effect to any reduction in the amount thereof as the result of such prepayment) and to the extent that the holders of Other Applicable Indebtedness do not accept such prepayment or repurchase, the amount that would otherwise be used to prepay or repurchase such Other Applicable Indebtedness shall be applied to prepayment of the Term Loans in accordance with Section 2.05(b)(v) below.

(iii)    If, following the Closing Date, the Borrower or any Restricted Subsidiary incurs or issues any (A) Refinancing Term Loans, (B) Refinancing Indebtedness with respect to Indebtedness permitted pursuant to Section 7.03(b)(i) or (C) Indebtedness not expressly permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans equal to 100.0% of all Net Available Cash received therefrom (x) in the case of (A) or (B), concurrently with the receipt of such Net Available Cash or (y) in the case of (C) on or prior to the date which is one (1) Business Day after the receipt of such Net Available Cash.  If the Borrower obtains any Refinancing Revolving Credit Commitments, the Borrower shall, concurrently with the receipt thereof, terminate Revolving Credit Commitments in an equivalent amount pursuant to Section 2.06.

(iv)    Each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied on a *pro rata* basis to each Class of Term Loans and within each Class of Term Loans, to the remaining installments thereof *pro rata* in direct order of maturity pursuant to Section 2.07; *provided* that any mandatory prepayment pursuant to clauses (i), (ii) and (iii) of this Sections 2.05(b) shall be applied on a *pro rata* basis to each Class of Initial Term Loans and, except to the extent a lesser prepayment is required pursuant to the applicable Incremental Facility Amendment or Extension Offer with respect to any applicable Class of Incremental Term Loans or Extended Term Loans, any Incremental Term Loans and Extended Term Loans.  Each such prepayment of any Class of Term Loans shall be paid to the Lenders in accordance with their respective Applicable Percentages subject to clause (v) of this Section 2.05(b).

(v)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (i), (ii), and (iii) of this Section 2.05(b) prior to 12:00 p.m. at least three (3) Business Day prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's prepayment notice and of such Appropriate Lender's Applicable Percentage of the prepayment with respect to any Class of Term Loans.  Each Appropriate Lender may reject all or a portion of its Applicable Percentage of any mandatory prepayment (such declined amounts, the "Declined Proceeds") of Term Loans required to be made pursuant to clauses (i) or (ii) of this Section 2.05(b) by providing written notice (each, a "Rejection Notice") to the Administrative Agent and the Borrower no later than 5:00 p.m. one (1) Business Day prior to the date of such prepayment.  Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory prepayment of Term Loans to be rejected by such Lender.  If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Term Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory repayment of Term Loans.  Any Declined Proceeds shall be retained by the Borrower ("Retained Declined Proceeds").

(vi)    Notwithstanding any other provision of this <u>Section 2.05(b)</u>, (i) to the extent that any or all of the Net Available Cash of any Asset Disposition by a Foreign Subsidiary otherwise giving rise to a prepayment pursuant to <u>Section 2.05(b)(ii)</u> (a "<u>Restricted Disposition</u>"), the Net Available Cash of any Casualty Event of a Foreign Subsidiary (a "<u>Restricted Casualty Event</u>") or Excess Cash Flow attributable to Foreign Subsidiaries would be prohibited, delayed or restricted by applicable local law from being distributed or otherwise transferred to the Borrower, the realization or receipt of the portion of such Net Available Cash or Excess Cash Flow so affected will not be taken into account in measuring the Borrower's obligation to repay Term Loans at the times provided in <u>Section 2.05(b)(i)</u>, or the Borrower shall not be required to make a prepayment at the time provided in <u>Section 2.05(b)(ii)</u>, as the case may be, for so long, but only so long, as the applicable local law will not permit such distribution or transfer (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions available under the applicable local law to permit such repatriation), and once distribution or transfer of any of such affected Net Available Cash or Excess Cash Flow is permitted under the applicable local law, the amount of such Net Available Cash or Excess Cash Flow permitted to be distributed or transferred (net of additional Taxes payable or reserved against as a result thereof) will be promptly (and in any event not later than three (3) Business Days after such distribution or transfer is permitted) taken into account in measuring the Borrower's obligation to repay the Term Loans pursuant to this <u>Section 2.05(b)</u> to the extent provided herein, and (ii) to the extent that the Borrower has determined in good faith that repatriation of any or all of the Net Available Cash of any Restricted Disposition or any Restricted Casualty Event or Excess Cash Flow, in each case attributable to Foreign Subsidiaries, would have (x) an adverse tax consequence as determined by the Borrower in good faith (including any withholding tax and taking into account any foreign tax credit or benefit received in connection with such repatriation) or (y) would be material constituent document restrictions (as a result of minority ownership by third parties) and other material agreements (so long as any prohibition is not created in contemplation of such prepayment), the amount of the Net Available Cash or Excess Cash Flow so affected shall not be taken into account in measuring the Borrower's obligation to repay Term Loans pursuant to this <u>Section 2.05(b)</u>. Notwithstanding the foregoing, (x) the Borrower and its Foreign Subsidiaries will undertake to use commercially reasonable efforts for one year to overcome or eliminate any such restrictions (subject to the considerations above and as determined in the Borrower's reasonable business judgment) to make the relevant prepayment and (y) any prepayments required after application of the above provision shall be net of any costs, expenses or Taxes (other than any Taxes already taken into account in the definition of "Net Available Cash" or "Excess Cash Flow," as applicable) incurred by the Borrower or any of its Affiliates and arising as a result of compliance with immediately preceding <u>clause (x)</u>.

(vii)    If for any reason the aggregate Revolving Credit Exposures of all Lenders at any time exceeds the aggregate Revolving Credit Commitments then in effect (including, for the avoidance of doubt, as a result of currency fluctuations or the termination of such Revolving Credit Commitments on the Maturity Date with respect thereto), the Borrower shall promptly prepay or cause to be promptly prepaid Revolving Credit Loans and Swing Line Loans and/or Cash Collateralize the L/C Obligations in an aggregate amount equal to such excess; *provided* that the Borrower shall not be required to Cash Collateralize the L/C Obligations pursuant to this <u>Section 2.05(b)(vii)</u> unless after the prepayment in full of the Revolving Credit Loans and Swing Line Loans, the aggregate Revolving Credit Exposures exceed the aggregate Revolving Credit Commitments.

(c)    <u>Interest, Funding Losses, Etc</u>.  All prepayments under this <u>Section 2.05</u> shall be accompanied by all accrued interest thereon in the currency in which such Loan is denominated, together with, in the case of any such prepayment of a Eurocurrency Rate Loan on a date other than the last day of

an Interest Period therefor, any amounts owing in respect of such Eurocurrency Rate Loan pursuant to Section 3.04.

Notwithstanding any of the other provisions of this Section 2.05, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurocurrency Rate Loans is required to be made under this Section 2.05, prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.05 in respect of any such Eurocurrency Rate Loan prior to the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit with the Administrative Agent in the currency in which such Loan is denominated the amount of any such prepayment otherwise required to be made hereunder until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.05. Such deposit shall constitute cash collateral for the Eurocurrency Rate Loans to be so prepaid, *provided* that the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this Section 2.05.

(d)     Discounted Voluntary Prepayments.

(i)     Notwithstanding anything to the contrary set forth in this Agreement (including Section 2.13) or any other Loan Document, the Borrower shall have the right at any time and from time to time to prepay one or more Classes of Term Loans to the Lenders at a discount to the par value of such Loans and on a non *pro rata* basis (each, a "Discounted Voluntary Prepayment") pursuant to the procedures described in this Section 2.05(d), *provided* that (A) no proceeds from Revolving Credit Loans shall be used to consummate any such Discounted Voluntary Prepayment, (B) any Discounted Voluntary Prepayment shall be offered to all Term Lenders of such Class on a *pro rata* basis, (C) [reserved] and (D) the Borrower shall deliver to the Administrative Agent, together with each Discounted Prepayment Option Notice, a certificate of a Responsible Officer of the Borrower (1) stating that no Specified Default with respect to the Borrower has occurred and is continuing or would result from the Discounted Voluntary Prepayment, (2) stating that each of the conditions to such Discounted Voluntary Prepayment contained in this Section 2.05(d) has been satisfied and (3) specifying the aggregate principal amount of Term Loans of any Class offered to be prepaid pursuant to such Discounted Voluntary Prepayment.

(ii)     To the extent the Borrower seeks to make a Discounted Voluntary Prepayment, the Borrower will provide written notice to the Administrative Agent substantially in the form of Exhibit H hereto (each, a "Discounted Prepayment Option Notice") that the Borrower desires to prepay Term Loans of one or more specified Classes in an aggregate principal amount specified therein by the Borrower (each, a "Proposed Discounted Prepayment Amount"), in each case at a discount to the par value of such Loans as specified below. The Proposed Discounted Prepayment Amount of any Loans shall not be less than $5,000,000. The Discounted Prepayment Option Notice shall further specify with respect to the proposed Discounted Voluntary Prepayment (A) the Proposed Discounted Prepayment Amount for Loans to be prepaid, (B) a discount range (which may be a single percentage) selected by the Borrower with respect to such proposed Discounted Voluntary Prepayment equal to a percentage of par of the principal amount of the Loans to be prepaid (the "Discount Range"), and (C) the date by which Lenders are required to indicate their election to participate in such proposed Discounted Voluntary Prepayment, which shall be at least five Business Days from and including the date of the Discounted Prepayment Option Notice (the "Acceptance Date").

(iii)     Upon receipt of a Discounted Prepayment Option Notice, the Administrative Agent shall promptly notify each applicable Lender thereof. On or prior to the Acceptance Date,

each such Lender may specify by written notice substantially in the form of <u>Exhibit I</u> hereto (each, a "<u>Lender Participation Notice</u>") to the Administrative Agent (A) a maximum discount to par (the "<u>Acceptable Discount</u>") within the Discount Range (for example, a Lender specifying a discount to par of 20.0% would accept a purchase price of 80.0% of the par value of the Loans to be prepaid) and (B) a maximum principal amount (subject to rounding requirements specified by the Administrative Agent) of the Term Loans to be prepaid held by such Lender with respect to which such Lender is willing to permit a Discounted Voluntary Prepayment at the Acceptable Discount ("<u>Offered Loans</u>").  Based on the Acceptable Discounts and principal amounts of the Term Loans to be prepaid specified by the Lenders in the applicable Lender Participation Notice, the Administrative Agent, in consultation with the Borrower, shall determine the applicable discount for such Term Loans to be prepaid (the "<u>Applicable Discount</u>"), which Applicable Discount shall be (A) the percentage specified by the Borrower if the Borrower has selected a single percentage pursuant to <u>Section 2.05(d)(ii)</u> for the Discounted Voluntary Prepayment or (B) otherwise, the highest Acceptable Discount at which the Borrower can pay the Proposed Discounted Prepayment Amount in full (determined by adding the Outstanding Amount of Offered Loans commencing with the Offered Loans with the highest Acceptable Discount); *provided, however*, that in the event that such Proposed Discounted Prepayment Amount cannot be repaid in full at any Acceptable Discount, the Applicable Discount shall be the lowest Acceptable Discount specified by the Lenders that is within the Discount Range.  The Applicable Discount shall be applicable for all Lenders who have offered to participate in the Discounted Voluntary Prepayment and have Qualifying Loans.  Any Lender with outstanding Term Loans to be prepaid whose Lender Participation Notice is not received by the Administrative Agent by the Acceptance Date shall be deemed to have declined to accept a Discounted Voluntary Prepayment of any of its Loans at any discount to their par value within the Applicable Discount.

(iv)     The Borrower shall make a Discounted Voluntary Prepayment by prepaying those Term Loans to be prepaid (or the respective portions thereof) offered by the Lenders ("<u>Qualifying Lenders</u>") that specify an Acceptable Discount that is equal to or greater than the Applicable Discount ("<u>Qualifying Loans</u>") at the Applicable Discount, *provided* that if the aggregate proceeds required to prepay all Qualifying Loans (disregarding any interest payable at such time) would exceed the amount of aggregate proceeds required to prepay the Proposed Discounted Prepayment Amount, such amounts in each case calculated by applying the Applicable Discount, the Borrower shall prepay such Qualifying Loans ratably among the Qualifying Lenders based on their respective principal amounts of such Qualifying Loans (subject to rounding requirements specified by the Administrative Agent).  If the aggregate proceeds required to prepay all Qualifying Loans (disregarding any interest payable at such time) would be less than the amount of aggregate proceeds required to prepay the Proposed Discounted Prepayment Amount, such amounts in each case calculated by applying the Applicable Discount, the Borrower shall prepay all Qualifying Loans.

(v)     Each Discounted Voluntary Prepayment shall be made within five (5) Business Days of the Acceptance Date (or such later date as the Administrative Agent shall reasonably agree, given the time required to calculate the Applicable Discount and determine the amount and holders of Qualifying Loans), without premium or penalty (but subject to <u>Section 3.04</u>), upon irrevocable notice substantially in the form of <u>Exhibit J</u> hereto (each a "<u>Discounted Voluntary Prepayment Notice</u>"), delivered to the Administrative Agent no later than 12:00 p.m., New York City time, three (3) Business Days prior to the date of such Discounted Voluntary Prepayment, which notice shall specify the date and amount of the Discounted Voluntary Prepayment and the Applicable Discount determined by the Administrative Agent.  Upon receipt of any Discounted Voluntary Prepayment Notice, the Administrative Agent shall promptly notify each relevant Lender thereof. If any Discounted Voluntary Prepayment Notice is given, the amount specified in such notice shall

be due and payable to the applicable Lenders, subject to the Applicable Discount on the applicable Loans, on the date specified therein together with accrued interest (on the par principal amount) to but not including such date on the amount prepaid.  The par principal amount of each Discounted Voluntary Prepayment of a Term Loan shall be applied ratably to reduce the remaining installments of such Class of Term Loans (as applicable).

(vi)    To the extent not expressly provided for herein, each Discounted Voluntary Prepayment shall be consummated pursuant to procedures (including as to timing, rounding, minimum amounts, Type and Interest Periods and calculation of Applicable Discount in accordance with Section 2.05(d)(ii) above) established by the Administrative Agent and the Borrower, each acting reasonably.

(vii)    Prior to the delivery of a Discounted Voluntary Prepayment Notice, (A) upon written notice to the Administrative Agent, the Borrower may withdraw or modify its offer to make a Discounted Voluntary Prepayment pursuant to any Discounted Prepayment Option Notice and (B) no Lender may withdraw its offer to participate in a Discounted Voluntary Prepayment pursuant to any Lender Participation Notice unless the terms of such proposed Discounted Voluntary Prepayment have been modified by the Borrower after the date of such Lender Participation Notice.

(viii)    Nothing in this Section 2.05(d) shall require the Borrower to undertake any Discounted Voluntary Prepayment.

Section 2.06    Termination or Reduction of Commitments.

(a)    Optional.  The Borrower may at any time without premium or penalty, upon written notice to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class; *provided* that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $1,000,000 and (iii) the Borrower shall not terminate or reduce any Class of Revolving Credit Commitments if, after giving effect to any concurrent repayment of the Revolving Credit Loans of such Class, the aggregate Revolving Credit Exposure of all Lenders in respect of the Revolving Credit Facility (excluding the portion of such Class of Revolving Credit Exposures attributable to outstanding Letters of Credit or to Swing Line Obligations, as applicable, if and to the extent that the Borrower has made arrangements satisfactory to the Administrative Agent and the L/C Issuer or the Swing Line Lender, as applicable, with respect to such Letters of Credit or Swing Line Obligations, as applicable, and such L/C Issuer or Swing Line Lender, as applicable, has released the Revolving Credit Lenders from their participation obligations with respect to such Letters of Credit or Swing Line Obligations, as applicable) would exceed the aggregate Revolving Credit Commitments.  The amount of any such Commitment reduction shall not be applied to the Letter of Credit Sublimit or the Swing Line Sublimit unless, after giving effect to any reduction of the Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit, as applicable, exceeds the amount of the Revolving Credit Facility, in which case such applicable sublimit shall be automatically reduced by the amount of such excess.  The Borrower may, upon irrevocable written notice to the Administrative Agent and each applicable L/C Issuer, reduce the Letter of Credit Sublimit (with each L/C Issuer's Letter of Credit Sublimit to be reduced pro rata); provided that, after giving effect to such reduction, the Letter of Credit Sublimit of each L/C Issuer shall not be less than the aggregate principal amount of the L/C Obligations as of the date of such reduction under Letters of Credit issued by such L/C Issuer.  The Borrower may, upon irrevocable written notice to the Administrative Agent and the Swing Line Lender, reduce the Swing Line Sublimit. Notwithstanding the foregoing, the Borrower may rescind or postpone any notice of termination of the Commitments if such termination would

have resulted from a refinancing, which refinancing shall not be consummated or otherwise shall be delayed.

(b)    <u>Mandatory</u>.  The Initial Term Commitment of each Term Lender shall be automatically and permanently reduced to $0 upon the making of such Initial Term Lender's Term Loans pursuant to <u>Section 2.01(a)</u>.  The Revolving Credit Commitments shall terminate on the Maturity Date therefor.  The Extended Revolving Credit Commitments shall terminate on the respective maturity dates applicable thereto.

(c)    <u>Application of Commitment Reductions; Payment of Fees</u>.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of unused Commitments of any Class under this <u>Section 2.06</u>.  Upon any reduction of unused Commitments of any Class, the Commitment of each Lender of such Class shall be reduced by such Lender's Applicable Percentage of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in <u>Section 3.06</u>).  All Commitment Fees accrued until the Closing Date of any termination of the Revolving Credit Commitments shall be paid on the Closing Date of such termination.

Section 2.07    <u>Repayment of Loans</u>.

(a)    <u>Term Loans</u>.  The Borrower shall repay to the Administrative Agent for the ratable account of the Term Lenders holding Initial Term Loans (i) on the last Business Day of each March, June, September and December, commencing with the second full fiscal quarter to occur after the Closing Date, an aggregate principal amount equal to 1.25% of the aggregate principal amount of the Initial Term Loans funded on the Closing Date and (ii) on the Maturity Date for the Initial Term Loans, the aggregate principal amount of all Initial Term Loans outstanding on such date; *provided* that payments required by <u>Section 2.07(a)(i)</u> above shall be reduced as a result of the application of prepayments in accordance with <u>Section 2.05</u>.  In the event any Incremental Term Loans or Extended Term Loans are made, such Incremental Term Loans or Extended Term Loans, as applicable, shall be repaid by the Borrower in the amounts and on the dates set forth in the definitive documentation with respect thereto and on the applicable Maturity Date thereof.

(b)    <u>Revolving Credit Loans</u>.  The Borrower shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders on the Maturity Date for the Revolving Credit Facility the principal amount of each of its Revolving Credit Loans outstanding on such date in the currency in which such Revolving Credit Loan is denominated (which for the avoidance of doubt shall be Dollars).

(c)    <u>Swing Line Loans</u>.  The Borrower shall repay to the Swing Line Lender each Swing Line Loan on the earlier to occur of (i) the date that is five (5) Business Days after such Swing Line Loan is made and (ii) the Maturity Date for the Revolving Credit Facility (although Swing Line Loans may thereafter be reborrowed, in accordance with the terms and conditions hereof, if there are one or more Classes of Revolving Credit Commitments which remain in effect at such time).

Section 2.08    <u>Interest</u>.

(a)    Subject to the provisions of <u>Section 2.08(b)</u>, (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)     The Borrower shall pay interest on past due amounts under this Agreement at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand to the fullest extent permitted by and subject to applicable Laws, including in relation to any required additional agreements.

(c)     Interest on each Loan shall be due and payable in the currency in which such Loan is denominated in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09     Fees.  In addition to certain fees described in Sections 2.03(g) and (h):

(a)     Commitment Fee.  The Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender under the Revolving Credit Facility a commitment fee in Dollars (the "Commitment Fee") at a per annum rate equal to the Applicable Rate on the actual daily amount by which the Revolving Credit Commitment of such Revolving Credit Lender exceeds the Revolving Credit Exposure of such Lender.  The Commitment Fee for the Revolving Credit Facility shall accrue at all times from the Closing Date until the Maturity Date for the Revolving Credit Facility, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the last Business Day of each March, June, September and December, commencing with the second (2nd) such date to occur after the Closing Date, and on the Maturity Date for the Revolving Credit Facility.

(b)     Other Fees.  The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

Section 2.10     Computation of Interest and Fees.

(a)     All computations of interest for Base Rate Loans when the Base Rate is determined by the Prime Rate shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on such Loan, or any portion thereof, for the day on which such Loan or such portion is paid; *provided* that any such Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(b)     For the purposes of this Agreement, whenever interest is to be calculated on the basis of a period of time other than a calendar year, the annual rate of interest to which each rate of interest determined pursuant to such calculation is equivalent for the purposes of the *Interest Act* (Canada) is such rate as so determined multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by the number of days used in the basis of such determination.

(c)     The parties acknowledge and agree that all calculations of interest under the Loan Documents are to be made on the basis of the nominal interest rate described herein and not on the basis of effective yearly rates or on any other basis which gives effect to the principle of deemed reinvestment of

interest. The parties acknowledge that there is a material difference between the stated nominal interest rates and the effective yearly rates of interest and that they are capable of making the calculations required to determine such effective yearly rates of interest.

Section 2.11    Evidence of Indebtedness.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by one or more entries in the Register. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Secured Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the Register, the Register shall be conclusive in the absence of demonstrable error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender or its registered assigns, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    In addition to the accounts and records referred to in Section 2.11(a), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records and, in the case of the Administrative Agent, entries in the Register, evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swing Line Loans. In the event of any conflict between the Register and the accounts and records of any Lender in respect of such matters, the Register shall be conclusive in the absence of demonstrable error.

Section 2.12    Payments Generally.

(a)    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds not later than 2:00 p.m., Local Time, on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office. All payments received by the Administrative Agent after 2:00 p.m., Local Time, shall (in the sole discretion of the Administrative Agent) be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. All payments under each Loan Document of principal or interest in respect of any Loan (or of any breakage indemnity in respect of any Loan) shall be made in the currency of such Loan, and, except as otherwise expressly set forth in any Loan Document, all other payments under each Loan Document shall be made in Dollars.

(b)    If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurocurrency Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)    Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled

thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then:

(i)     if the Borrower failed to make such payment, then the applicable Lender agrees to pay to the Administrative Agent forthwith on demand the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, it being understood that nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder; and

(ii)     if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "Compensation Period") at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.  When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at the interest rate applicable to such Loan.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent demonstrable error.

(d)     If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)     The obligations of the Lenders hereunder to make Loans and to fund participations in Letters of Credit and Swing Line Loans are several and not joint.  The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(f)     Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)      Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.04. If the Administrative Agent receives funds for application to the Secured Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Applicable Percentage of the sum of (a) the Outstanding Amount of all Loans outstanding at such time and (b) the Outstanding Amount of all L/C Obligations outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Secured Obligations then owing to such Lender.

Section 2.13      Sharing of Payments.  If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Loans made by it, or its participations in L/C Obligations and Swing Line Loans, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them and/or such subparticipations in the participations in L/C Obligations or Swing Line Loans held by them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, *pro rata* with each of them; *provided* that (x) if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon and (y) the provisions of this Section 2.13 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in L/C Obligations to any assignee or participant.   The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of demonstrable error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Secured Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Secured Obligations purchased.

Section 2.14      Incremental Credit Extensions.

(a)      At any time and from time to time, subject to the terms and conditions set forth herein, the Borrower or any Subsidiary Guarantor may, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request to increase the amount of any Class of Initial Term Loans or add one or more additional tranches of term loans, including delayed draw term loans (any such Initial Term Loans or additional tranche of term loans, the "Incremental

Term Loans") and/or one or more increases in the Revolving Credit Commitments (a "Revolving Credit Commitment Increase" or, the "Incremental Revolving Credit Commitments"; together with the Incremental Term Loans, the "Incremental Facilities") in Dollars by the Borrower and the Lenders providing such Incremental Facilities; *provided* that, subject to the Limited Condition Transaction provisions hereunder, at the time of the incurrence of any such Incremental Facility, no Default or Event of Default shall have occurred and be continuing or would exist after giving effect thereto.  Each Incremental Facility shall be in an integral multiple of $1,000,000 and be in an aggregate principal amount that is not less than $5,000,000 in case of Incremental Term Loans or $5,000,000 in case of Incremental Revolving Credit Commitments, *provided* that such amount may be less than the applicable minimum amount if such amount represents all the remaining availability hereunder as set forth above.  Notwithstanding anything to the contrary herein, the aggregate amount of all Incremental Facilities (determined at the time of incurrence), together with the aggregate principal amount of all Permitted Alternative Incremental Facilities Debt, shall not exceed the sum of (i) the greater of (x) $75,000,000 and (y) 75.0% of LTM EBITDA (less (1) the aggregate principal amount of all Incremental Facilities and all Permitted Alternative Incremental Facilities Debt that has been incurred in reliance on this clause (i) prior to the applicable date of incurrence and (2) the aggregate amount of Indebtedness incurred pursuant to the Ratio Debt Starter Amount as of such date of determination), in each case, after giving effect to any permitted reclassification of the amounts incurred pursuant to this clause (i) as being incurred pursuant to clause (iii) below or other applicable reclassification of the Ratio Debt Starter Amount (such amount, the "Incremental Starter Amount") plus (ii) (I) (x) the aggregate amount of all voluntary prepayments (including any payments made pursuant to Section 2.05(a) or (d) or Section 3.06), repurchases and debt buy-backs made by the Borrower or any Restricted Subsidiary pursuant to "Dutch Auction" procedures and open market purchases permitted hereunder (in each case, to the extent of the actual amount of cash paid), of any Term Loans, Incremental Term Loans, Permitted Alternative Incremental Facilities Debt secured by a Lien ranking *pari passu* with the Lien securing the Secured Obligations and/or voluntary prepayments of Revolving Credit Loans, any other Loans incurred under Incremental Revolving Credit Commitments to the extent accompanied by permanent reductions of the Revolving Credit Commitments or Incremental Revolving Credit Commitments, as applicable, (y) the amount of any voluntary prepayment of any Credit Agreement Refinancing Indebtedness previously applied to the prepayment of any Term Loans and/or any Incremental Term Loan and/or voluntary prepayments of Revolving Credit Loans to the extent accompanied by any permanent reduction of the Revolving Credit Commitments or the commitments under any Incremental Revolving Credit Commitments and (z) the cash amount paid in respect of any reduction in the outstanding principal amount of the Term Loans and/or any loans outstanding under any Incremental Term Loan, *provided* that for each of clauses (x), (y) and (z), the relevant prepayment or assignment and purchase is not funded with long term Indebtedness (other than revolving Indebtedness), including any Indebtedness incurred pursuant to clause (iii) below; and (II) without duplication with clause (I) above, in the case of an Incremental Facility (that is being incurred using the Unrestricted Incremental Amount) that serves to effectively extend the maturity of the Initial Term Loans, the Revolving Credit Facility and/or any other Incremental Facility, an amount equal to the portion of the Initial Term Loans, the Revolving Credit Facility and/or any other Incremental Facilities to be replaced with such Incremental Facility (such amount under this clause (ii), the "Voluntary Prepayment Amount" and, together with the Incremental Starter Amount, the "Unrestricted Incremental Amount") plus (iii) the maximum aggregate principal amount that can be incurred, after (except as otherwise specified) giving effect to the incurrence of any Incremental Facility or Permitted Alternative Incremental Facilities Debt pursuant to this clause (iii) (which shall assume that the full amounts of any Incremental Revolving Credit Commitment and any Incremental Facility in the form of a delayed draw term facility, established at such time are fully drawn) and the use of proceeds thereof, on a *pro forma* basis, without causing (I) in the case of any Incremental Facility or Permitted Alternative Incremental Facilities Debt which is secured by a Lien ranking *pari passu* with the Lien securing the Secured Obligations, the Consolidated First Lien Secured Leverage Ratio to exceed the greater of (x) 4.75:1.00 or (y) to the extent such Incremental Facility or Permitted Alternative Incremental Facilities Debt is incurred in connection with a Permitted Acquisition or other Permitted Investment, the Consolidated First

Lien Secured Leverage Ratio immediately prior to the consummation of such Permitted Acquisition or other Permitted Investment and the incurrence of such Indebtedness on a *pro forma* basis, (II) in the case of any Incremental Facility or Permitted Alternative Incremental Facilities Debt which is secured by a Lien ranking junior to the Lien securing the Secured Obligations, the Consolidated Total Senior Secured Leverage Ratio to exceed the greater of (x) 5.00:1.00 or (y) to the extent such Incremental Facility or Permitted Alternative Incremental Facilities Debt is incurred in connection with a Permitted Acquisition or other Permitted Investment, the Consolidated Total Senior Secured Leverage Ratio immediately prior to the consummation of such Permitted Acquisition or other Permitted Investment and the incurrence of such Indebtedness on a *pro forma* basis or (III) in the case of any Incremental Facility or Permitted Alternative Incremental Facilities Debt which is unsecured or is secured by Liens other than Liens on the Collateral, at the election of the Borrower, the Consolidated Total Leverage Ratio to exceed the greater of (1) 5.00:1.00 or (2) to the extent such Incremental Facility or Permitted Alternative Incremental Facilities Debt is incurred in connection with a Permitted Acquisition or other Permitted Investment, the Consolidated Total Leverage Ratio immediately prior to the consummation of such Permitted Acquisition or other Permitted Investment and the incurrence of such Indebtedness on a *pro forma* basis; *provided* that to the extent the proceeds of any Incremental Facility is used to repay indebtedness, the Borrower may give *pro forma* effect to the repayment of such indebtedness; *provided*, *further*, that in the case of a Limited Condition Transaction, the testing thereof may be done in accordance with <u>Section 1.09</u>; *provided*, *further*, that, for the avoidance of doubt, the cash proceeds of any proposed Incremental Facility are not netted from Indebtedness for purposes of calculating the Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio or the Consolidated Total Leverage Ratio (*provided* that to the extent the proceeds of any such Incremental Facility are to be used to repay Indebtedness, it shall not limit the Borrower's ability to give *pro forma* effect to such repayment of Indebtedness) (this <u>clause (iii)</u>, the "<u>Incremental Incurrence Test</u>" and the amount calculated pursuant to <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u>, the "<u>Available Incremental Amount</u>"); *provided* that (x) any amounts incurred under the Incremental Starter Amount and the Voluntary Prepayment Amount, concurrently with, or in a single transaction or series of related transactions with, amounts incurred under the Incremental Incurrence Test amount will not count as Indebtedness for the purposes of calculating the applicable ratio in the Incremental Incurrence Test amount, and (y) any portion of any Incremental Facilities incurred in reliance on the Incremental Starter Amount or the Voluntary Prepayment Amount shall be automatically reclassified as incurred under the Incremental Incurrence Test amount at such time as the Borrower meets the applicable Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio or the Consolidated Total Leverage Ratio.

(b)     Any Incremental Term Loans (other than Refinancing Term Loans) (i) shall have pricing, interest rate margins (including "most favored nation" provisions), discounts, premiums, rate floors, currencies and fees and, subject to <u>clauses (ii)</u> and <u>(iii)</u>, amortization schedule and other terms, in each case, as determined by the Borrower and the Lenders thereunder (*provided* that, if the Effective Yield of any Incremental Term Loans incurred in reliance on the Incremental Incurrence Test and/or the Voluntary Prepayment Amount that are MFN Qualifying Term Loans (determined as of the initial funding date for such Incremental Term Loan) exceeds the Effective Yield of the Initial Term Loans immediately prior to the effectiveness of the applicable Incremental Facility Amendment by more than 0.50% per annum, the Applicable Rate and/or, as set forth below, the interest rate floor relating to such Initial Term Loans shall be adjusted such that the Effective Yield of such Initial Term Loans is equal to the Effective Yield of such Incremental Term Loans <u>minus</u> 0.50% per annum, it being understood and agreed that the relative rate differentials in any pricing grid specified in the Applicable Rate shall continue to be maintained (the foregoing, including all qualifications and exceptions thereto, collectively, the "<u>MFN Adjustment</u>"); *provided*, *further*, that any increase in Effective Yield with respect to the Initial Term Loans due to the application of an interest rate floor to any Incremental Term Loan greater than the interest rate floor applicable to the applicable Initial Term Loans shall be effected solely through an increase in the interest rate floor applicable to such Initial Term Loans, (ii) any Incremental Term Loan (other than Qualifying Bridge Loans) shall not have a final maturity date earlier than the Maturity Date applicable to the Initial

Term Loans, (iii) any Incremental Term Loan (other than Qualifying Bridge Loans) shall not have a Weighted Average Life to Maturity that is shorter than the remaining Weighted Average Life to Maturity of the Initial Term Loans (without giving effect to any prepayments or amortization), (iv) shall not be guaranteed by any person other than the Loan Parties and, to the extent secured, shall not be secured by any assets other than the Collateral (*provided* that in the case of any Incremental Term Loan that is funded into escrow, such Incremental Term Loan may be secured by the applicable funds and related assets held in escrow (and the proceeds thereof) until such Incremental Term Loan is released from escrow), and (v) for purposes of voluntary and mandatory prepayments, shall, unless less favorable treatment is otherwise agreed by the Lenders providing such Incremental Term Loans, share ratably in (or, if junior in right of payment or as to security, on a junior basis with respect to the Initial Term Loans) any voluntary and mandatory prepayments of the Initial Term Loans.

(c)    Any Incremental Revolving Credit Commitments (other than Refinancing Revolving Credit Commitments) (i) for purposes of mandatory prepayments, shall be treated the same as the Revolving Credit Commitments, (ii) shall have the same maturity date as the Revolving Credit Commitments, and (iii) shall require no scheduled amortization or mandatory commitment reduction prior to the final Maturity Date applicable to the Revolving Credit Commitments, and shall otherwise be on the exact same terms and pursuant to the exact same documentation applicable to the Revolving Credit Commitments (it being understood that, if required to consummate an Revolving Credit Commitment Increase, the pricing, interest rate margins, rate floors and undrawn fees on the Revolving Credit Commitments being increased may be increased for all Revolving Credit Lenders of the Revolving Credit Commitments being increased, but additional upfront or similar fees may be payable to the Lenders participating in the Revolving Credit Commitment Increase without any requirement to pay such amounts to any existing Revolving Credit Lenders)).

(d)    Any Incremental Term Loan or any Incremental Revolving Credit Commitment shall be on terms and pursuant to documentation to be determined by the Borrower and the Lenders providing such Incremental Term Loans or Incremental Revolving Credit Commitments; *provided* that any Incremental Term Loan that is secured on a junior priority basis or that is unsecured shall be documented outside of the Loan Documents and, if secured, subject to a Customary Intercreditor Agreement (which, to the extent such Indebtedness is funded into escrow, may be effective (or entered into) only immediately after the proceeds thereof are released from such escrow); *provided*, *further*, that, to the extent such terms and documentation are not consistent with the Initial Term Loans or the initial Revolving Credit Commitment, as the case may be (except to the extent permitted under this Section 2.14), they shall (except for covenants or other provisions applicable only to the periods after the Latest Maturity Date of all of the initial Facilities extended on the Closing Date) either, at the option of the Borrower, (x) reflect market terms and conditions (taken as a whole) at the time of (subject to Section 1.09(a)) incurrence or effectiveness (as determined by the Borrower in good faith) or (y) be reasonably satisfactory to the Administrative Agent (it being understood to the extent that any covenant is added for the benefit of (A) any Incremental Term Loan, no consent shall be required from the Administrative Agent or any Lender to the extent that such covenant is also added for the benefit of the Initial Term Loans or (B) any Incremental Revolving Credit Commitment, no consent shall be required from the Administrative Agent or any Lender to the extent that such covenant is also added for the benefit of the initial Revolving Credit Commitment).

(e)    Each notice from the Borrower pursuant to this Section 2.14 shall set forth the requested amount and proposed terms of the relevant Incremental Term Loans and/or Incremental Revolving Credit Commitments. The Borrower may (but is not obligated to) seek commitments in respect of the Incremental Facilities from existing Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and from additional banks, financial institutions and other institutional lenders or investors who will become Lenders in connection therewith, including Affiliated Lenders ("Additional Lenders") that elects to extend Incremental Term Loans or Incremental Revolving Credit

Commitments; *provided* that the restrictions applicable to Affiliated Lenders set forth under Section 10.07 shall apply to commitments in respect of Incremental Facilities. If not already a Lender, such Additional Lender shall become a Lender under this Agreement pursuant to an amendment (an "Incremental Facility Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, such Additional Lender, the Administrative Agent and, in the case of any Incremental Revolving Credit Commitments and each L/C Issuer and the Swing Line Lender; *provided* that the Administrative Agent's, any L/C Issuer's and/or the Swing Line Lender's consent shall only be required if such consent would be required pursuant to Section 10.07 and such consent shall not be unreasonably withheld, conditioned or delayed or otherwise pursuant to Section 10.01. No Incremental Facility Amendment shall require the consent of any Lenders other than the Additional Lenders with respect to such Incremental Facility Amendment. No Lender shall be obligated to provide any Incremental Term Loans or Incremental Revolving Credit Commitments, unless it so agrees. An Incremental Facility Amendment may, without the consent of any other Lenders, effect such amendments to any Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to effect the provisions of this Section 2.14. The effectiveness of any Incremental Facility Amendment shall be subject to the satisfaction on the date thereof (each, an "Incremental Facility Closing Date") of each of the conditions set forth in Section 4.02 (it being understood that (x) all references to "the date of such Credit Extension" in Section 4.02 shall be deemed to refer to the Incremental Facility Closing Date and (y) if the proceeds of such Incremental Facility are to be used, in whole or in part, to finance a Limited Condition Transaction, (A) the only representations and warranties that will be required to be true and correct in all material respects as of the applicable Incremental Facility Closing Date shall be the Specified Representations and (B) subject to the Limited Condition Transaction provisions hereunder, no Default or Event of Default shall have occurred and Section 4.02(b) shall not apply). The proceeds of any Incremental Term Loans will be used only for working capital needs and other general corporate purposes (including, without limitation, capital expenditures, acquisitions and investments, working capital and/or purchase price adjustments, restricted payments, prepayments of Subordinated Indebtedness and related fees and expenses) and for any other purposes not prohibited by this Agreement. Upon each increase in the Revolving Credit Commitments pursuant to this Section 2.14, each Revolving Credit Lender immediately prior to such increase will automatically and without further act be deemed to have assigned to each Lender providing a portion of the Incremental Revolving Credit Commitment (each, an "Incremental Revolving Lender") in respect of such increase, and each such Incremental Revolving Lender will automatically and without further act be deemed to have assumed, a portion of such Revolving Credit Lender's participations hereunder in outstanding Letters of Credit such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding participations hereunder in Letters of Credit held by each Revolving Credit Lender (including each such Incremental Revolving Lender) will equal the percentage of the aggregate Revolving Credit Commitments of all Revolving Credit Lenders represented by such Revolving Credit Lender's Revolving Credit Commitment. Additionally, if any Revolving Credit Loans are outstanding at the time any Incremental Revolving Credit Commitments are established, the Revolving Credit Lenders immediately after effectiveness of such Incremental Revolving Credit Commitments shall purchase and assign at par such amounts of the Revolving Credit Loans outstanding at such time as the Administrative Agent may require such that each Revolving Credit Lender holds its Applicable Percentage of all Revolving Credit Loans outstanding immediately after giving effect to all such assignments. The Administrative Agent and the Lenders hereby agree that the minimum borrowing, *pro rata* borrowing and *pro rata* payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

Section 2.15        Extensions of Term Loans and Revolving Credit Commitments.

(a)        Notwithstanding anything to the contrary in this Agreement, pursuant to one or more offers (each, an "Extension Offer") made from time to time by the Borrower to all Lenders of any Class of Term Loans or any Class of Revolving Credit Commitments, in each case on a *pro rata* basis

(based on the aggregate outstanding principal amount of the respective Term Loans or Revolving Credit Commitments of the applicable Class) and on the same terms to each such Lender, the Borrower is hereby permitted to consummate from time to time transactions with individual Lenders that accept the terms contained in such Extension Offers to extend the maturity date of each such Lender's Term Loans and/or Revolving Credit Commitments of the applicable Class and otherwise modify the terms of such Term Loans and/or Revolving Credit Commitments pursuant to the terms of the relevant Extension Offer (including, without limitation, by increasing the interest rate or fees payable in respect of such Term Loans and/or Revolving Credit Commitments (and related outstandings) and/or modifying the amortization schedule in respect of such Lender's Term Loans and/or changes in call protection, prepayment premiums, rate floors, "most favored nation" provisions and redemption provisions) (each, an "Extension," and each group of Term Loans or Revolving Credit Commitments, as applicable, in each case as so extended, as well as the original Term Loans and the original Revolving Credit Commitments (in each case not so extended), being a separate Class of Term Loans from the Class of Term Loans from which they were converted, and any Extended Revolving Credit Commitments shall constitute a separate Class of Revolving Credit Commitments from the Class of Revolving Credit Commitments from which they were converted, it being understood that an Extension may be in the form of an increase in the amount of any other then outstanding Class of Term Loans or Revolving Credit Commitments otherwise satisfying the criteria set forth below), so long as the following terms are satisfied: (i) except as to interest rates, rate floors, fees and final maturity (which shall be determined by the Borrower and set forth in the relevant Extension Offer), the Revolving Credit Commitment of any Revolving Credit Lender that agrees to an extension with respect to such Revolving Credit Commitment extended pursuant to an Extension (an "Extended Revolving Credit Commitment"), and the related outstandings, shall be a Revolving Credit Commitment (or related outstandings, as the case may be) with the same terms as the original Class of Revolving Credit Commitments (and related outstandings); *provided* that at no time shall there be Revolving Credit Commitments hereunder (including Extended Revolving Credit Commitments and any original Revolving Credit Commitments) which have more than three different maturity dates, (ii) except as to interest rates, rate floors, fees, "most favored nation" provisions, amortization, final maturity date, premium, redemption provisions, required prepayment dates and participation in prepayments (which shall, subject to immediately succeeding clauses (iii), (iv) and (v), be determined between the Borrower and set forth in the relevant Extension Offer), the Term Loans of any Term Lender that agrees to an extension with respect to such Term Loans extended pursuant to any Extension ("Extended Term Loans") shall have the same terms as the Class of Term Loans subject to such Extension Offer, (iii) the final maturity date of any Extended Term Loans (other than Qualifying Bridge Loans) shall be no earlier than the then Latest Maturity Date hereunder and the amortization schedule applicable to Term Loans pursuant to Section 2.07(a) for periods prior to the Maturity Date for Initial Term Loans may not be increased, (iv) the Weighted Average Life to Maturity of any Extended Term Loans (other than Qualifying Bridge Loans) shall be no shorter than the remaining Weighted Average Life to Maturity of the Term Loans extended thereby, (v) any Extended Term Loans may participate on a *pro rata* basis or a less than *pro rata* basis (but not greater than a *pro rata* basis) in any voluntary or mandatory repayments or prepayments hereunder, in each case as specified in the respective Extension Offer, (vi) if the aggregate principal amount of the Class of Term Loans (calculated on the face amount thereof) or Revolving Credit Commitments, as the case may be, in respect of which Term Lenders or Revolving Credit Lenders, as the case may be, shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans or Revolving Credit Commitments of such Class, as the case may be, offered to be extended by the Borrower pursuant to such Extension Offer, then the Term Loans or Revolving Credit Commitments of such Class, as the case may be, of such Term Lenders or Revolving Credit Lenders, as the case may be, shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Term Lenders or Revolving Credit Lenders, as the case may be, have accepted such Extension Offer, (vii) all documentation in respect of such Extension shall be consistent with the foregoing, (viii) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower and (ix) the Minimum Tranche Amount shall be satisfied unless waived by the Administrative

Agent. No Lender shall be obligated to extend its Term Loans or Revolving Credit Commitments unless it so agrees and each Lender under the Class being extended shall have the opportunity to participate in such Extension on the same terms and conditions as each other Lender under such Class.

(b)    With respect to all Extensions consummated by the Borrower pursuant to this Section 2.15, (i) such Extensions shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 2.05 and (ii) no Extension Offer is required to be in any minimum amount or any minimum increment, *provided* that (x) the Borrower may at its election specify as a condition (a "Minimum Extension Condition") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Offer in the Borrower's sole discretion and may be waived by the Borrower) of Term Loans or Revolving Credit Commitments (as applicable) of any or all applicable Classes be tendered, (y) no Class of Extended Term Loans shall be in a Dollar Equivalent amount of less than $10,000,000 and (z) no Class of Extended Revolving Credit Commitments shall be in a Dollar Equivalent amount of less than $5,000,000 (each amount in clause (y) and (z) above, the "Minimum Tranche Amount"), unless such Minimum Tranche Amount is waived by the Administrative Agent. The Administrative Agent and the Lenders hereby consent to the transactions contemplated by this Section 2.15 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Term Loans and/or Extended Revolving Credit Commitments on the such terms as may be set forth in the relevant Extension Offer) and hereby waive the requirements of any provision of this Agreement (including, without limitation, Sections 2.05, 2.12 and 2.13) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.15.

(c)    No consent of any Lender or the Administrative Agent shall be required to effectuate any Extension, other than (A) the consent of each Lender agreeing to such Extension with respect to one or more of its Term Loans and/or Revolving Credit Commitments (or a portion thereof) and (B) with respect to any Extension of any Class of Revolving Credit Commitments, the consent of the relevant L/C Issuer (if such L/C Issuer is being requested to issue letters of credit with respect to the Class of Extended Revolving Credit Commitments). All Extended Term Loans, Extended Revolving Credit Commitments and all obligations in respect thereof shall be Secured Obligations under this Agreement and the other Loan Documents that are secured by the Collateral on a *pari passu* basis with all other applicable Secured Obligations under this Agreement and the other Loan Documents. The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents with the Borrower as may be necessary in order to establish new Classes in respect of Revolving Credit Commitments or Term Loans so extended and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Classes, in each case on terms consistent with this Section 2.15. Without limiting the foregoing, in connection with any Extensions the respective Loan Parties shall (at their expense) amend (and the Administrative Agent is hereby directed to amend) any Mortgage that has a maturity date prior to the then Latest Maturity Date so that such maturity date is extended to the then Latest Maturity Date (or such later date as may be advised by local counsel to the Administrative Agent).

(d)    In connection with any Extension, the Borrower shall provide the Administrative Agent at least five (5) Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and shall agree to such procedures (including, without limitation, regarding timing, rounding and other adjustments and to ensure reasonable administrative management of the credit facilities hereunder after such Extension), if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this Section 2.15.

Section 2.16    Defaulting Lenders.

(a)     Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of "Required Lenders" and "Required Revolving Credit Lenders" and in Section 10.01.

(ii)     Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.09 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a *pro rata* basis of any amounts owing by such Defaulting Lender to any L/C Issuer or Swing Line Lender hereunder; *third*, to Cash Collateralize the L/C Issuers' Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.19; *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released *pro rata* in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) Cash Collateralize the L/C Issuers' future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with Section 2.19; *sixth*, to the payment of any amounts owing to the Lenders, the L/C Issuers or Swing Line Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the L/C Issuers or Swing Line Lenders against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or Unreimbursed Amounts in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and Unreimbursed Amounts owed to, all Lenders that are not Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of, or Unreimbursed Amounts owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in L/C Obligations and Swing Line Loans are held by the Lenders *pro rata* in accordance with the Commitments under the applicable Facility without giving effect to clause (iv) below.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.16 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     Certain Fees.

(A)     No Defaulting Lender shall be entitled to receive any Commitment Fee for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be

required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)       Each Defaulting Lender shall be entitled to receive Fronting Fees for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Percentage of the stated amount of Letters of Credit for which it has provided Cash Collateral pursuant to <u>Section 2.19</u>.

(C)       With respect to any Fronting Fee not required to be paid to any Defaulting Lender pursuant to <u>clauses (A)</u> or <u>(B)</u> above, the Borrower shall (x) pay to each Revolving Credit Lender that is not a Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in L/C Obligations or Swing Line Loans that has been reallocated to such Revolving Credit Lender pursuant to <u>clause (iv)</u> below, (y) pay to each L/C Issuer and Swing Line Lender, as applicable, the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such L/C Issuer's or Swing Line Lender's Fronting Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

(iv)       <u>Reallocation of Participations to Reduce Fronting Exposure</u>.  All or any part of such Defaulting Lender's participation in L/C Obligations and Swing Line Loans shall be reallocated among the Lenders that are not Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that such reallocation does not cause the aggregate Revolving Credit Exposure of any Lender that is not a Defaulting Lender to exceed such Lender's Revolving Credit Commitment.  No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Lender that is not a Defaulting Lender as a result of such Lender's increased exposure following such reallocation.

(v)       <u>Cash Collateral, Repayment of Swing Line Loans</u>.  If the reallocation described in <u>clause (iv)</u> above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under law, (x) *first*, prepay Swing Line Loans in an amount equal to any Swing Line Lender's Fronting Exposure and (y) *second*, Cash Collateralize any L/C Issuer's Fronting Exposure in accordance with the procedures set forth in <u>Section 2.19</u>.

(b)       <u>Defaulting Lender Cure</u>.  If the Borrower, the Administrative Agent and each Swing Line Lender and L/C Issuer agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit and Swing Line Loans to be held *pro rata* by the Lenders in accordance with the Commitments under the applicable Facility (without giving effect to <u>clause (iv)</u> above, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)      New Swing Line Loans / Letters of Credit.  So long as any Lender is a Defaulting Lender, (i) the Swing Line Lender shall not be required to fund any Swing Line Loans unless it is satisfied that it will have no Fronting Exposure after giving effect to such Swing Line Loan and (ii) no L/C Issuer shall be required to issue, extend, renew or increase any Letter of Credit unless it is satisfied that it will have no Fronting Exposure after giving effect thereto.

Section 2.17      Permitted Debt Exchanges.

(a)      Notwithstanding anything to the contrary contained in this Agreement, pursuant to one or more offers (each, a "Permitted Debt Exchange Offer") made from time to time by the Borrower to all Term Lenders (other than, with respect to any Permitted Debt Exchange Offer that constitutes an offering of securities, any Lender that, if requested by the Borrower, is unable to certify that it is (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (ii) an institutional "accredited investor" (as defined in Rule 501 under the Securities Act) or (iii) not a "U.S. person" (as defined in Rule 902 under the Securities Act)) with outstanding Term Loans of a particular Class (but not, for the avoidance of doubt, to Term Lenders of each Class), the Borrower may from time to time consummate one or more exchanges of such Term Loans for Indebtedness (in the form of senior secured, senior unsecured, senior subordinated, or subordinated notes or loans) (such Indebtedness, "Permitted Debt Exchange Notes" and each such exchange, a "Permitted Debt Exchange"), so long as the following conditions are satisfied:

(i)      each such Permitted Debt Exchange Offer shall be made on a *pro rata* basis to the Term Lenders (other than, with respect to any Permitted Debt Exchange Offer that constitutes an offering of securities, any Lender that, if requested by the Borrower, is unable to certify that it is (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), (ii) an institutional "accredited investor" (as defined in Rule 501 under the Securities Act) or (iii) not a "U.S. person" (as defined in Rule 902 under the Securities Act)) of each applicable Class based on their respective aggregate principal amounts of outstanding Term Loans under each such Class;

(ii)      the aggregate principal amount (calculated on the face amount thereof) of such Permitted Debt Exchange Notes shall not exceed the aggregate principal amount (calculated on the face amount thereof) of Term Loans so refinanced, except by an amount equal to any fees, expenses, commissions, underwriting discounts and premiums payable in connection with such Permitted Debt Exchange;

(iii)      the stated final maturity of such Permitted Debt Exchange Notes is not earlier than the Latest Maturity Date for the Class or Classes of Term Loans being exchanged, and such stated final maturity is not subject to any conditions that could result in such stated final maturity occurring on a date that precedes such latest maturity date (it being understood that acceleration or mandatory repayment, prepayment, redemption or repurchase of such Permitted Debt Exchange Notes upon the occurrence of an event of default, a change in control, an event of loss or an asset disposition shall not be deemed to constitute a change in the stated final maturity thereof);

(iv)      such Permitted Debt Exchange Notes are not required to be repaid, prepaid, redeemed, repurchased or defeased, whether on one or more fixed dates, upon the occurrence of one or more events or at the option of any holder thereof (except, in each case, upon the occurrence of an event of default, a change in control, an event of loss or an asset disposition) prior to the Latest Maturity Date for the Class or Classes of Term Loans being exchanged, *provided* that, notwithstanding the foregoing, scheduled amortization payments (however denominated, including scheduled offers to repurchase) of such Permitted Debt Exchange Notes shall be permitted so long as the Weighted Average Life to Maturity of such Indebtedness shall be longer than the remaining Weighted Average Life to Maturity of the Class or Classes of Term Loans being exchanged;

(v)      no Restricted Subsidiary is a borrower or guarantor with respect to such Indebtedness unless such Restricted Subsidiary is or substantially concurrently becomes a Loan Party;

(vi)      if such Permitted Debt Exchange Notes are secured, such Permitted Debt Exchange Notes are secured on a *pari passu* basis or junior priority basis to the Secured Obligations and (A) such Permitted Debt Exchange Notes are not secured by any assets not securing the Secured Obligations unless such assets substantially concurrently secure the Secured Obligations and (B) the beneficiaries thereof (or an agent on their behalf) shall have entered into a Customary Intercreditor Agreement with the Administrative Agent;

(vii)      the terms and conditions of such Permitted Debt Exchange Notes (excluding pricing and optional prepayment or redemption terms or covenants or other provisions applicable only to periods after the Maturity Date of the Class or Classes of Term Loans being exchanged) reflect market terms and conditions at the time of incurrence or issuance as reasonably determined by the Borrower in good faith;

(viii)      all Term Loans exchanged under each applicable Class by the Borrower pursuant to any Permitted Debt Exchange shall automatically be cancelled and retired by the Borrower on date of the settlement thereof (and, if requested by the Administrative Agent, any applicable exchanging Lender shall execute and deliver to the Administrative Agent an Assignment and Assumption, or such other form as may be reasonably requested by the Administrative Agent, in respect thereof pursuant to which the respective Lender assigns its interest in the Term Loans being exchanged pursuant to the Permitted Debt Exchange to the Borrower for immediate cancellation), and accrued and unpaid interest on such Term Loans shall be paid to the exchanging Lenders on the date of consummation of such Permitted Debt Exchange, or, if agreed to by the Borrower and the Administrative Agent, the next scheduled Interest Payment Date with respect to such Term Loans (with such interest accruing until the date of consummation of such Permitted Debt Exchange);

(ix)      if the aggregate principal amount of all Term Loans (calculated on the face amount thereof) of a given Class tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof of the applicable Class actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of such Class offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrower shall exchange Term Loans under the relevant Class tendered by such Lenders ratably up to such maximum based on the respective principal amounts so tendered, or, if such Permitted Debt Exchange Offer shall have been made with respect to multiple Classes without specifying a maximum aggregate principal amount offered to be exchanged for each Class, and the aggregate principal amount of all Term Loans (calculated on the face amount thereof) of all Classes tendered by Lenders in respect of the relevant Permitted Debt Exchange Offer (with no Lender being permitted to tender a principal amount of Term Loans which exceeds the principal amount thereof actually held by it) shall exceed the maximum aggregate principal amount of Term Loans of all relevant Classes offered to be exchanged by the Borrower pursuant to such Permitted Debt Exchange Offer, then the Borrower shall exchange Term Loans across all Classes subject to such Permitted Debt Exchange Offer tendered by such Lenders ratably up to such maximum amount based on the respective principal amounts so tendered;

(x)      all documentation in respect of such Permitted Debt Exchange shall be consistent with the foregoing, and all written communications generally directed to the Lenders in connection

therewith shall be in form and substance consistent with the foregoing and made in consultation with the Borrower and the Administrative Agent; and

(xi)    any applicable Minimum Tender Condition or Maximum Tender Condition, as the case may be, shall be satisfied or waived by the Borrower.

Notwithstanding anything to the contrary herein, no Lender shall have any obligation to agree to have any of its Loans or Commitments exchanged pursuant to any Permitted Debt Exchange Offer.

(b)    With respect to all Permitted Debt Exchanges effected by the Borrower pursuant to this Section 2.17, such Permitted Debt Exchange Offer shall be made for not less than $10,000,000 in aggregate principal amount of Term Loans, *provided* that subject to the foregoing the Borrower may at its election specify (A) as a condition (a "Minimum Tender Condition") to consummating any such Permitted Debt Exchange that a minimum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Borrower's discretion) of Term Loans of any or all applicable Classes be tendered and/or (B) as a condition (a "Maximum Tender Condition") to consummating any such Permitted Debt Exchange that no more than a maximum amount (to be determined and specified in the relevant Permitted Debt Exchange Offer in the Borrower's discretion) of Term Loans of any or all applicable Classes will be accepted for exchange. The Administrative Agent and the Lenders hereby acknowledge and agree that the provisions of Sections 2.05, 2.06 and 2.13 do not apply to the Permitted Debt Exchange and the other transactions contemplated by this Section 2.17 and hereby agree not to assert any Default or Event of Default in connection with the implementation of any such Permitted Debt Exchange or any other transaction contemplated by this Section 2.17.

(c)    In connection with each Permitted Debt Exchange, the Borrower shall provide the Administrative Agent at least five (5) Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and the Borrower and the Administrative Agent, acting reasonably, shall mutually agree to such procedures as may be necessary or advisable to accomplish the purposes of this Section 2.17; *provided* that the terms of any Permitted Debt Exchange Offer shall provide that the date by which the relevant Lenders are required to indicate their election to participate in such Permitted Debt Exchange shall be not less than five (5) Business Days following the date on which the Permitted Debt Exchange Offer is made. The Borrower shall provide the final results of such Permitted Debt Exchange to the Administrative Agent no later than three (3) Business Days prior to the proposed date of effectiveness for such Permitted Debt Exchange (or such shorter period agreed to by the Administrative Agent in its sole discretion) and the Administrative Agent shall be entitled to conclusively rely on such results.

(d)    The Borrower shall be responsible for compliance with, and hereby agrees to comply with, all applicable securities and other laws in connection with each Permitted Debt Exchange, it being understood and agreed that (i) neither the Administrative Agent nor any Lender assumes any responsibility in connection with the Borrower's compliance with such laws in connection with any Permitted Debt Exchange and (ii) each Lender shall be solely responsible for its compliance with any applicable "insider trading" laws and regulations to which such Lender may be subject under the Exchange Act.

Section 2.18    Refinancing Facilities.

(a)    At any time after the Closing Date, the Borrower may obtain, from any Lender or any Additional Lender (to the extent agreed to by such Lender or Additional Lender in its sole discretion), Credit Agreement Refinancing Indebtedness in respect of all or any portion of the Term Loans, Revolving Credit Loans and/or Revolving Credit Commitments then outstanding under this Agreement (which will be

-133-

deemed to include any then outstanding Incremental Term Loans under any Incremental Facilities or any Incremental Revolving Credit Commitments then outstanding under this Agreement (or any Revolving Credit Loans outstanding pursuant thereto)) or any then outstanding Refinancing Term Loans or any then outstanding Refinancing Revolving Credit Loans or Refinancing Revolving Credit Commitments, in each case, pursuant to a Refinancing Amendment, together with any applicable Customary Intercreditor Agreement or other customary subordination agreement; *provided* that such Credit Agreement Refinancing Indebtedness (i) will, to the extent secured, rank *pari passu* or junior in right of payment and of security with the other Loans and Commitments hereunder; *provided* that no Credit Agreement Refinancing Indebtedness shall be secured by any assets not securing the Secured Obligations (but for the avoidance of doubt, such Credit Agreement Refinancing Indebtedness may be unsecured), (ii) will, to the extent permitted by the definition of "Credit Agreement Refinancing Indebtedness," have such pricing, interest rate margins (including "MFN" provisions), rate floors, discounts, fees, premiums and prepayment or redemption provisions and terms as may be agreed by the Borrower and the Lenders or Additional Lenders with respect thereto, (iii) will, to the extent in the form of Refinancing Revolving Credit Loans or Refinancing Revolving Credit Commitments, participate in the payment, borrowing, participation and commitment reduction provisions herein on a *pro rata* basis with any then outstanding Revolving Credit Loans and Revolving Credit Commitments, except that the Borrower shall be permitted to permanently repay and terminate commitments of any such Class on a better than a *pro rata* basis as compared to any other Class with a later maturity date than such Class and (iv) will, to the extent in the form of Refinancing Revolving Credit Loans or Refinancing Revolving Credit Commitments and unless the Required Revolving Credit Lenders shall have consented thereto, have terms and conditions (other than interest rate margins and commitment fees) identical to those applicable to the Revolving Credit Commitments and Revolving Credit Loans being refinanced. The effectiveness of any Refinancing Amendment shall be subject to, to the extent reasonably requested by the Administrative Agent, receipt by the Administrative Agent of reaffirmation agreements and board resolutions, officers' certificates and legal opinions consistent with those delivered on the Closing Date. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Refinancing Amendment. Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Credit Agreement Refinancing Indebtedness incurred pursuant thereto (including any amendments necessary to treat the Loans and Commitments subject thereto as Refinancing Term Loans, Refinancing Revolving Credit Loans or Refinancing Revolving Credit Loan Commitments, as applicable) and any Indebtedness being replaced or refinanced with such Credit Agreement Refinancing Indebtedness shall be deemed permanently reduced and satisfied in all respects. Subject to Section 10.07, any Refinancing Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, to effect the provisions of this Section.

(b)    This Section 2.18 shall supersede any provisions of Section 10.01 to the contrary.

Section 2.19    Cash Collateral.

(a)    Obligation to Cash Collateralize. At any time that there shall exist a Defaulting Lender under the Revolving Credit Facility, within one (1) Business Day following the written request of the Administrative Agent or any L/C Issuer (with a copy to the Administrative Agent), the Borrower shall Cash Collateralize the L/C Issuers' Fronting Exposure with respect to such Defaulting Lender (determined after giving effect to Section 2.16(a)(iv) and any Cash Collateral provided by such Defaulting Lender) in an amount not less than the Minimum Collateral Amount.

(b)    Grant of Security Interest. The Borrower, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to the Administrative Agent, for the benefit of the L/C Issuers, and agrees to maintain, a first priority security interest in all such Cash Collateral as security

for the Defaulting Lender's obligation to fund participations in respect of L/C Obligations, to be applied pursuant to clause (c) below.  If at any time the Administrative Agent reasonably determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent and the L/C Issuers as herein provided, or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the Borrower will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency, in each case after giving effect to any Cash Collateral provided by the Defaulting Lender.

(c)     Application.     Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under this Section or Section 2.16 in respect of Letters of Credit shall be applied to the satisfaction of the Defaulting Lender's obligation to fund participations in respect of L/C Obligations (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) for which the Cash Collateral was so provided, prior to any other application of such property as may otherwise be provided for herein.

(d)     Termination of Requirement.     Cash Collateral (or the appropriate portion thereof) provided to reduce any L/C Issuer's Fronting Exposure shall no longer be required to be held as Cash Collateral pursuant to this Section following (i) the elimination of the applicable Fronting Exposure (including by the termination of Defaulting Lender status of the applicable Revolving Credit Lender), or (ii) the determination by the Administrative Agent and each L/C Issuer that there exists excess Cash Collateral; *provided* that, subject to Section 2.16, the Person providing Cash Collateral and each L/C Issuer may agree that Cash Collateral shall be held to support future anticipated Fronting Exposure or other obligations and provided further that to the extent that such Cash Collateral was provided by the Borrower, such Cash Collateral shall remain subject to the security interest granted pursuant to the Loan Documents.

## ARTICLE III

Taxes, Increased Costs Protection and Illegality

Section 3.01     Taxes.

(a)     Except as required by applicable law, any and all payments by or with respect to any obligation of the Borrower (the term Borrower under this Article III being deemed to include any Subsidiary for whose account a Letter of Credit is issued) or any Guarantor to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes; *provided* that if any applicable law (as determined in the good faith discretion of the applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent then (i) if such Tax is an Indemnified Tax, the sum payable by the Borrower or applicable Guarantor shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 3.01) any Recipient receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall be entitled to make such deductions and withholdings, and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law. In addition, and without duplication of any amounts payable pursuant to Section 3.01(a), the Loan Parties agree to pay, or at the option of the Administrative Agent timely reimburse it for, all Other Taxes.

(b)     Without duplication of any amounts payable pursuant to Section 3.01(a), the Loan Parties agree to jointly and severally indemnify each Agent and each Lender, within 10 Business Days after written demand therefor, for (i) the full amount of any Indemnified Taxes (including any Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable or paid by such

Agent and such Lender or required to be withheld or deducted from a payment to such Recipient and (ii) any reasonable out-of-pocket expenses arising therefrom or with respect thereto, in each case, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; *provided*, *however*, that the Borrower shall not be required to indemnify any Agent or Lender pursuant to this Section 3.01(b) for any interest, penalties or expenses to the extent resulting from such Agent's or such Lender's failure to notify the Borrower of such possible indemnification claim within one hundred and eighty (180) days after such Agent or such Lender, as applicable, receives written notice from the applicable Governmental Authority of the specific Tax assessment or deficiency claim giving rise to such indemnification claim.  A copy of a receipt or any other document evidencing payment delivered to the Borrower by a Recipient, or by the Administrative Agent on its own behalf or on behalf of a Recipient, shall be conclusive absent manifest error. If any Lender or Agent determines, in its reasonable discretion, that it has received a refund in respect of any Indemnified Taxes as to which indemnification or additional amounts have been paid to it by a Borrower or any Guarantor pursuant to this Section 3.01, it shall reasonably promptly pay an amount equal to such refund after it is determined that such refund pertains to Indemnified Taxes (but only to the extent of indemnity payments made, or additional amounts paid, by a Borrower or any Guarantor under this Section 3.01 with respect to the Indemnified Taxes giving rise to such refund plus any interest included in such refund by the relevant taxing authority attributable thereto) to the Borrower or the applicable Guarantor, net of all reasonable out-of-pocket expenses (including Taxes) of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant taxing authority with respect to such refund); *provided* that the Borrower or the Guarantor, upon the request of the Lender or Agent, as the case may be, agrees promptly to return an amount equal to the amount paid over pursuant to this sentence (plus any applicable interest, additions to Tax or penalties) to such party in the event such party is required to repay such refund to the relevant taxing authority.  Such Lender or Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (*provided* that such Lender or Agent may delete any information therein that such Lender or Agent deems confidential). Notwithstanding anything to the contrary in this paragraph (b), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (b) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  Nothing herein contained shall oblige any Lender or Agent to claim any Tax refund or to make available its Tax returns or disclose any information relating to its Tax affairs or any computations in respect thereof.

(c)    As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.01, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)    Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a) or (b) with respect to such Lender it will, if requested by the Borrower, use reasonable efforts (subject to legal and regulatory restrictions), at Borrower's expense, to designate another Applicable Lending Office for any Loan or Letter of Credit affected by such event; *provided* that such efforts are made on terms that, in the judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no material economic, Taxes, legal or regulatory disadvantage, and *provided*, *further*, that nothing in this Section 3.01(d) shall affect or postpone any of the Secured Obligations of any Loan Party or the rights of such Lender pursuant to Section 3.01(a) or (b).

(e)        Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(e) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)        <u>Status of the Lenders:</u> (i) Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law, or reasonably requested by the Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under any Loan Document.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any documentation specifically referenced below) expired, obsolete or inaccurate in any respect, deliver reasonably promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or reasonably promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(ii)        Without limiting the generality of the foregoing, each Lender that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent, and if applicable, the assigning Lender (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) on or before the date on which it becomes a party to this Agreement (or, in the case of (x) a Participant, on or before the date on which such Participant purchases the related participation and (y) an assignee, on or before the effective date of such assignment), on or before the date on which it becomes a party to this Agreement two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding. Each Lender that is not a "United States person" as defined in Section 7701(a)(30) of the Code (a "<u>Foreign Lender</u>") shall, to the extent it is legally able to do so, deliver to the Borrower and the Administrative Agent, and if applicable, the assigning Lender (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) on or before the date on which it becomes a party to this Agreement (or, in the case of (x) a Participant, on or before the date on which such Participant purchases the related participation and (y) an assignee, on or before the effective date of such assignment), and from time to time thereafter when required by Law or upon the reasonable request of the Borrower or the Administrative Agent (or, in the case of a Participant, the Lender from which the related participation shall have been purchased), two properly completed and duly signed copies of whichever of the following is applicable:

(A)    an executed copy of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (with respect to eligibility for benefits under any income tax treaty), or successor and related applicable forms, as the case may be, certifying to such Foreign Lender's entitlement as of such date to an exemption from or reduction of United States withholding tax with respect to payments to be made under any Loan Document,

(B)    Internal Revenue Service Form W-8ECI (or any successor forms),

(C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) or the Code, (x) a certificate, in substantially the applicable form of Exhibit L (any such certificate a "United States Tax Compliance Certificate"), or any other form approved by the Administrative Agent and Borrower, to the effect that such Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Lender's conduct of a U.S. trade or business and (y) two properly completed and duly executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(D)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a Lender that has granted a participation), two properly completed and duly executed copies of Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by Internal Revenue Service Form W-8ECI, W-8BEN or W-8BEN-E, as applicable (or any successor forms), United States Tax Compliance Certificate, Internal Revenue Service Form W-9, Form W-8IMY (or other successor forms) and/or any other required information from each beneficial owner, as applicable (*provided* that, if the Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)    any other form prescribed by applicable U.S. federal income tax Laws (including the United States Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, U.S. federal withholding tax on any payments to such Lender under the Loan Documents.

(F)    Further, each Foreign Lender agrees, (i) to the extent legally able to do so, to deliver to the Borrower and the Administrative Agent, and if applicable, the assigning Lender (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased), from time to time, an executed copy of the applicable Form W-8 or successor and related applicable forms or certificates, on or before the date that any such form or certificate, as the case may be, expires or becomes obsolete or invalid in accordance with applicable U.S. laws and regulations, and (ii) to notify promptly the Borrower and the Administrative Agent (or, in the case of a Participant, the Lender from which the related participation shall have been purchased) if it is no longer able to deliver, or if it is required to withdraw or cancel, any form or certificate previously delivered by it pursuant to this Section 3.01(f).

(iii)    In addition, but without duplication of the covenant as to United States withholding tax contained in Section 3.01(f)(i) and (ii), any Lender that is entitled to an exemption from or

reduction of withholding Tax under the law of the jurisdiction(s) in which the Borrower is organized, or any treaty to which any such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by applicable law, such properly completed and executed original documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate; *provided* that the completion, execution and submission of such documentation shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(iv)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their FATCA obligations, to determine whether such Lender has or has not complied with such Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this <u>clause (iv)</u>, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Notwithstanding any other provision of this <u>clause (f)</u>, a Lender shall not be required to deliver any documentation that such Lender is not legally eligible to deliver. Each Lender authorizes the Administrative Agent to deliver to the Borrower and to any successor Agent any documentation provided by the Lender to the Agent pursuant to this <u>Section 3.01(f)</u>.

(g)     The Administrative Agent shall provide the Borrower with two properly completed and duly executed copies of, if it is a United States person (as defined in Section 7701(a)(30) of the Code), Internal Revenue Service Form W-9 certifying that it is exempt from U.S. federal backup withholding, and, if it is not a United States person, (1) Internal Revenue Service Form W-8ECI with respect to payments to be received by it as a beneficial owner and (2) Internal Revenue Service Form W-8IMY (together with any required accompanying documentation) with respect to payments to be received by it on behalf of the Lenders, and shall update such forms periodically upon the reasonable request of the Borrower, and whenever a lapse in time or change in circumstances renders any such form or documentation expired, obsolete or inaccurate in any material respect, or promptly notify the Borrower in writing of its legal ineligibility to do so.  Notwithstanding any other provision of this <u>clause (g)</u>, the Administrative Agent shall not be required to deliver any form that such Administrative Agent is not legally eligible to deliver.

(h)     For the purposes of this Section 3.01, the term "Lender" includes any L/C Issuer and the Swing Line Lender and the term "applicable law" includes FATCA.

Section 3.02     <u>Inability to Determine Rates</u>.  If, after the Closing Date, either the Administrative Agent or the Required Lenders reasonably determine that for any reason adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan denominated in any currency, or the Required Lenders (excluding for all purposes of this <u>Section 3.02</u> only, the portion of the Total Outstandings and unused Commitments that are not available for Loans in such currency) determine that the Eurocurrency Rate for

any requested Interest Period with respect to such proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that deposits are not being offered to banks in the applicable London interbank Eurodollar, or other applicable market, for the applicable amount and the Interest Period of such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain Eurocurrency Rate Loans in such currency shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.03     Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurocurrency Rate Loans.

(a)     If any Lender determines that as a result of any Change in Law, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Loan or issuing or participating in Letters of Credit, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.03(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes indemnifiable under Section 3.01, (ii) Excluded Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" or (iii) Excluded Taxes described in clause (a) of the definition of "Excluded Taxes" to the extent such Taxes are imposed on or measured by such Lender's net income or profits (or are franchise Taxes imposed in lieu thereof) or (iv) reserve requirements contemplated by Section 3.03(c)), then from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.05), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)     If any Lender determines that as a result of any Change in Law regarding capital adequacy or liquidity requirements or any change therein or in the interpretation thereof, in each case after the date hereof, or compliance by such Lender (or its Applicable Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.05), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within fifteen (15) days after receipt of such demand.

(c)     The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including eurocurrency funds or deposits, additional interest on the unpaid principal amount of each Eurocurrency Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of demonstrable error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Eurocurrency Rate Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent demonstrable error) which in each case shall be due and payable on each date on which interest is payable on such Loan, *provided* that the Borrower shall have

received at least fifteen (15) days' prior notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender.  If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days after receipt of such notice.

(d)        Subject to Section 3.05(b), failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.03 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)        If any Lender requests compensation under this Section 3.03, then such Lender will, if requested by the Borrower, use reasonable efforts to designate another Applicable Lending Office for any Loan or Letter of Credit affected by such event; *provided* that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory disadvantage; and *provided*, *further*, that nothing in this Section 3.03(e) shall affect or postpone any of the Secured Obligations of the Borrower or the rights of such Lender pursuant to Section 3.03(a), (b), (c) or (d).

Section 3.04        Funding Losses.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)        any continuation, conversion, payment or prepayment of any Eurocurrency Rate Loan on a day other than the last day of the Interest Period for such Loan; or

(b)        any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan (other than a Base Rate Loan) on the date or in the amount notified by the Borrower;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.04, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

Section 3.05        Matters Applicable to All Requests for Compensation.

(a)        Any Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of demonstrable error.  In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)        With respect to any Lender's claim for compensation under Section 3.02, Section 3.03 or Section 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under Section 3.03, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such

Lender to make or continue Eurocurrency Rate Loans from one Interest Period to another, or to convert Base Rate Loans into Eurocurrency Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.05(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)    If the obligation of any Lender to make or continue any Eurocurrency Rate Loan from one Interest Period to another, or to convert Base Rate Loans into Eurocurrency Rate Loans shall be suspended pursuant to Section 3.05(b) hereof, such Lender's Eurocurrency Rate Loans denominated in Dollars shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such Eurocurrency Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02, Section 3.03 or Section 3.04 hereof that gave rise to such conversion no longer exist:

(i)    to the extent that such Lender's Eurocurrency Rate Loans denominated in Dollars have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's Eurocurrency Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)    all Loans denominated in Dollars that would otherwise be made or continued from one Interest Period to another by such Lender as Eurocurrency Rate Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into Eurocurrency Rate Loans shall remain as Base Rate Loans.

(d)    If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, Section 3.03 or Section 3.04 hereof that gave rise to the conversion of such Lender's Eurocurrency Rate Loans denominated in Dollars pursuant to this Section 3.05 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted to Eurocurrency Rate Loans, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurocurrency Rate Loans and by such Lender are held *pro rata* (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments.

Section 3.06    Replacement of Lenders under Certain Circumstances.

(a)    If at any time (i) any Lender requests reimbursement for amounts owing pursuant to Section 3.01 or Section 3.03 as a result of any condition described in such Sections or any Lender ceases to make Eurocurrency Rate Loans as a result of any condition described in Section 3.02 or Section 3.03, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on prior written notice to the Administrative Agent and such Lender, (x) terminate (which termination may be on a non-*pro rata* basis) the applicable Commitments of such Lender, and repay (which repayment may be on a non-*pro rata* basis) all obligations of the Borrower owing to such Lender relating to the applicable Loans and participations held by such Lender as of such termination date or (y) replace such Lender by requiring such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (with the assignment fee to be paid by the Borrower in such instance) all of its rights and obligations under this Agreement (or, with respect to clause (iii) above, all of its rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver or amendment) to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and *provided, further*, that (A) in the case of any such assignment resulting from a claim for compensation under

Section 3.03 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to the applicable departure, waiver or amendment of the Loan Documents.

(b)      Any Lender being replaced pursuant to Section 3.06(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans and participations in L/C Obligations and Swing Line Loans (*provided* that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register) and (ii) deliver Notes, if any, evidencing such Loans to the Borrower or Administrative Agent.  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitments and outstanding Loans and participations in L/C Obligations and Swing Line Loans, (B) all obligations of the Loan Parties owing to the assigning Lender relating to the Loan Documents and participations so assigned shall be paid in full by the assignee Lender or the Loan Parties (as applicable) to such assigning Lender concurrently with such assignment and assumption, any amounts owing to the assigning Lender (other than a Defaulting Lender) under Section 3.04 as a consequence of such assignment and, in the case of an assignment of Term Loans in connection with a Repricing Transaction, the premium, if any, that would have been payable by the Borrower on such date pursuant to Section 2.05(a)(iv) if such Lender's Term Loans subject to such assignment had been prepaid on such date shall have been paid by the Borrower to the assigning Lender and (C) upon such payment and, if so requested by the assignee Lender, the assignor Lender shall deliver to the assignee Lender the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.

(c)      Notwithstanding anything to the contrary contained above, any Lender that acts as an L/C Issuer may not be replaced hereunder at any time that it has any Letter of Credit outstanding hereunder unless arrangements reasonably satisfactory to such L/C Issuer (including the furnishing of a back-up standby letter of credit in form and substance, and issued by an issuer reasonably satisfactory to such L/C Issuer, or the depositing of cash collateral into a cash collateral account in amounts and pursuant to arrangements reasonably satisfactory to such L/C Issuer) have been made with respect to each such outstanding Letter of Credit and the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 9.09.

(d)      In the event that (i) the Borrower or the Administrative Agent have requested that the Lenders (A) consent to an extension of the Maturity Date of any Class of Loans as permitted by Section 2.15, (B) consent to a departure or waiver of any provisions of the Loan Documents or (C) agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 10.01 or all the Lenders with respect to a certain Class of the Loans and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "Non-Consenting Lender."

Section 3.07      Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Secured Obligations hereunder and any assignment of rights by or replacement of a Lender or L/C Issuer.

Section 3.08      Benchmark Replacement Setting.  Notwithstanding anything to the contrary herein or in any other Loan Document:

(a)    Replacing USD LIBOR.  On March 5, 2021 the Financial Conduct Authority ("FCA"), the regulatory supervisor of the IBA, announced in a public statement the future cessation or loss of representativeness of overnight/Spot Next, 1-month, 3-month, 6-month and 12-month USD LIBOR tenor settings.  On the earlier of (i) the date that all Available Tenors of USD LIBOR have either permanently or indefinitely ceased to be provided by the IBA or have been announced by the FCA pursuant to public statement or publication of information to be no longer representative and (ii) the Early Opt-in Effective Date, if the then-current Benchmark is LIBOR, the Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any setting of such Benchmark on such day and all subsequent settings without any amendment to, or further action or consent of any other party to this Agreement or any other Loan Document.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(b)    Replacing Future Benchmarks.  Upon the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  At any time that the administrator of the then-current Benchmark has permanently or indefinitely ceased to provide such Benchmark or such Benchmark has been announced by the regulatory supervisor for the administrator of such Benchmark pursuant to public statement or publication of information to be no longer representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored, the Borrower may revoke any request for a borrowing of, conversion to or continuation of Loans to be made, converted or continued that would bear interest by reference to such Benchmark until the Borrower's receipt of notice from the Administrative Agent that a Benchmark Replacement has replaced such Benchmark, and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to Base Rate Loans.  During the period referenced in the foregoing sentence, the component of Base Rate based upon the Benchmark will not be used in any determination of Base Rate.

(c)    Benchmark Replacement Conforming Changes.  In connection with the implementation and administration of a Benchmark Replacement, the Administrative Agent will have the right, in its reasonable discretion and after consultation with the Borrower, to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(d)    Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section.  The parties hereto shall each use commercially reasonable efforts to ensure that the implementation hereunder of a Benchmark Replacement does not result in a deemed exchange of any loans for purposes of Treasury Regulations Section 1.1001-3 (or any successor provisions).

(e)    <u>Unavailability of Tenor of Benchmark</u>. At any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or LIBOR), then the Administrative Agent may remove any tenor of such Benchmark that is unavailable or non-representative for Benchmark (including Benchmark Replacement) settings and (ii) the Administrative Agent may reinstate any such previously removed tenor for Benchmark (including Benchmark Replacement) settings.

(f)    <u>Definitions</u>. As used in this <u>Section 3.08</u>:

"<u>Available Tenor</u>" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

"<u>Benchmark</u>" shall mean, initially, LIBOR; <u>provided</u> that if a replacement of the Benchmark has occurred pursuant to this <u>Section 3.08</u>, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate.  Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

"<u>Benchmark Replacement</u>" shall mean, for any Available Tenor:

(i)    for purposes of <u>Section 3.08(a)</u>, the first alternative set forth below that can be determined by the Administrative Agent:

(A)    the sum of: (x) Term SOFR and (y) 0.11448% (11.448 basis points) for an Available Tenor of one-month's duration, 0.26161% (26.161 basis points) for an Available Tenor of three-months' duration, and 0.42826% (42.826 basis points) for an Available Tenor of six-months' duration; or

(B)    the sum of: (x) Daily Simple Term SOFR and (y) the spread adjustment selected or recommended by the Relevant Governmental Body for the replacement of the tenor of LIBOR with a SOFR-based rate having approximately the same length as the interest payment period specified in <u>Section 3.08(a)</u>; and

(ii)    for purposes of <u>Section 3.08(b)</u>, the sum of (A) the alternate benchmark rate and (B) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by the Administrative Agent and the Borrower as the replacement for such Available Tenor of such Benchmark giving due consideration to any evolving or then-prevailing market convention, including any applicable recommendations made by the Relevant Governmental Body, for U.S. dollar-denominated syndicated credit facilities at such time;

<u>provided</u> that, if the Benchmark Replacement as determined pursuant to <u>clause (i)</u> or <u>(ii)</u> above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"<u>Benchmark Replacement Conforming Changes</u>" shall mean, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of

borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, the applicability of statutory reserve adjustment provisions, and other technical, administrative or operational matters) that the Administrative Agent reasonably determines, in consultation with the Borrower, may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent reasonably determines, in consultation with the Borrower, that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent reasonably determines, in consultation with the Borrower, that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent reasonably determines, in consultation with the Borrower, is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Transition Event" shall mean, with respect to any then-current Benchmark other than LIBOR, the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors of the Federal Reserve System, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that (a) such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark or (b) all Available Tenors of such Benchmark are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"Daily Simple SOFR" shall mean, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for Dollar-denominated syndicated business loans; provided, that if the Administrative Agent reasonably determines that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Early Opt-in Effective Date" shall mean, with respect to any Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.

"Early Opt-in Election" shall mean the occurrence of:

(i)    a notification by the Administrative Agent to (or the request by the Borrower to the Administrative Agent to notify) each of the other parties hereto that at least five (5) currently outstanding U.S. dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review); and

-146-

(ii)    the joint election by the Administrative Agent and the Borrower to trigger a fallback from LIBOR and the provision by the Administrative Agent of written notice of such election to the Lenders.

"Floor" shall mean the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to LIBOR.

"Relevant Governmental Body" shall mean the Federal Reserve Board or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board or the NYFRB, or any successor thereto.

"SOFR" shall mean a rate per annum equal to the secured overnight financing rate for such Business Day published by the NYFRB (or a successor administrator of the secured overnight financing rate) on the website of the NYFRB, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

"Term SOFR" shall mean, for the applicable corresponding tenor, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

## ARTICLE IV

### Conditions Precedent to Credit Extensions

Section 4.01    Closing Date Conditions.  The effectiveness of this Agreement and the obligation of each Lender to make a Credit Extension on the Closing Date shall be subject to satisfaction or waiver of the following conditions precedent:

(a)    Loan Documents.  The Administrative Agent (or its counsel) shall have received counterparts of each of the following), in each case properly executed by a Responsible Officer of the signing Loan Party, each in form and substance reasonably satisfactory to the Administrative Agent:

(i)    this Agreement, duly executed by each of the parties listed on the signature pages hereto;

(ii)    the Guaranty, duly executed by each of the parties listed on the signature pages thereto; and

(iii)    each Collateral Document and other Loan Document set forth on Schedule 1.01A required to be executed on the Closing Date, duly executed by each Loan Party party thereto and each of the other parties listed on the signature pages thereto;

(b)    Notes.  The Administrative Agent shall have received Notes executed by the Borrower in favor of each Lender that has requested a Note at least five (5) Business Days in advance of the Closing Date.

(c)    Secretary's Certificate.  The Administrative Agent shall have received, (i) a certificate from each Loan Party, signed by a Responsible Officer of such Loan Party, and attested to by the secretary, any assistant secretary or other officer of such Loan Party, together with (x) copies of the

certificate or articles of incorporation and by-laws (or other equivalent organizational documents), as applicable, of such Loan Party, (y) the resolutions of such Loan Party referred to in such certificate, and (z) a signature and incumbency certificate to the officers of such persons executing the Loan Documents, in each case, in form and substance reasonably satisfactory to the Administrative Agent, and (ii) certificates of good standing or status (to the extent that such concepts exist) from the applicable secretary of state (or equivalent authority) of the jurisdiction of organization or formation of each Loan Party.

(d)     Fees and Expenses.  All fees required to be paid on the Closing Date pursuant to the Fee Letter and reasonable out-of-pocket expenses required to be paid on the Closing Date pursuant to the Commitment Letter, and with respect to expenses, to the extent invoiced at least three (3) Business Days prior to the Closing Date (except as otherwise reasonably agreed by the Borrower), shall, upon the initial Borrowing of the Initial Term Loans, have been, or will be substantially simultaneously, paid (which amounts may be offset against the proceeds of the Facilities).

(e)     Committed Loan Notice.  The Administrative Agent shall have received a Committed Loan Notice or Letter of Credit Application, as applicable, relating to each Credit Extension to be made on the Closing Date.

(f)     Legal Opinion.  Customary legal opinions from Shearman & Sterling LLP, counsel to the Loan Parties, and Dentons US LLP, Georgia counsel to the Loan Parties, in each case addressed to the Agents and the Lenders on the Closing Date and in form and substance reasonably satisfactory to the Administrative Agent.

(g)     KYC; USA PATRIOT Act; Beneficial Ownership Certificate.  The Administrative Agent, the Lenders and the Lead Arrangers shall have received, at least three (3) Business Days prior to the Closing Date, all documentation and other information about the Borrower and each other Loan Party as has been reasonably requested by the Administrative Agent. the Lenders or the Lead Arrangers in writing at least ten (10) Business Days prior to the Closing Date and that the Administrative Agent, the Lenders or the Lead Arrangers reasonably determine is required by United States regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act and a Beneficial Ownership Certificate to the extent expressly required under the Beneficial Ownership Regulation.

(h)     Representations and Warranties. The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects, in each case, on the Closing Date; *provided* that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on the Closing Date.

(i)     Collateral and Guarantee Requirement. The Administrative Agent shall have received evidence that all other actions, recordings and filings that the Administrative Agent or Collateral Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent and Collateral Agent (including, without limitation, receipt of duly executed payoff letters and UCC-3 termination statements).  Each document (including any UCC (or similar) financing statement and/or intellectual property security agreement required by any Collateral Document or under applicable Law to be filed, registered or recorded in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral required to be delivered pursuant to such Collateral

Document, shall have been executed and delivered and, if applicable, be in proper form for filing, registration or recordation.

(j)     Closing Date Refinancing.  Prior to or substantially concurrently with the initial funding of the Loans on the Closing Date, the Closing Date Refinancing shall have been consummated.

(k)     Closing Date Certificate.  The Administrative Agent shall have received a Closing Date Certificate.

(l)     No Material Adverse Effect.  Since December 31, 2020, there shall have been no Material Adverse Effect.

(m)     Solvency Certificate.  The Administrative Agent shall have received a certificate from a senior authorized financial executive or officer with equivalent duties of the Borrower substantially in the form of Exhibit N hereto (or, at the option of the Borrower, a third party opinion as to the solvency of the Borrower and its Subsidiaries on a consolidated basis issued by a nationally recognized firm).

(n)     Financial Statements.  The Lead Arrangers shall have received the Closing Date Audited Financial Statements, the Closing Date Unaudited Financial Statements and the Closing Date Pro Forma Financial Statements.

(o)     No Default or Event of Default. No Default or Event of Default shall exist, or would result from the funding of the Initial Term Loans and Initial Revolving Borrowing, if applicable.

(p)     Insurance. The Administrative Agent shall have received evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect and, except as set forth in Schedule 6.12, that the Administrative Agent and Collateral Agent has been named as loss payee and additional insured under each United States insurance policy with respect to such insurance as to which the Administrative Agent shall have requested to be so named.

For purposes of determining whether the Closing Date has occurred, each Lender that has executed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to the Administrative Agent or such Lender, as the case may be.  The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

Section 4.02     Conditions to Subsequent Credit Extensions.  The obligation of each Lender to honor any Request for Credit Extension after the Closing Date is subject to satisfaction (or waiver in accordance with Section 10.01) of the following conditions precedent (provided that the below shall be subject to Section 2.14 with respect to incurrences under the Incremental Facilities):

(a)     The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension; *provided* that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(b)      No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(c)      The Administrative Agent and, if applicable, the relevant L/C Issuer or the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)      Each Request for Credit Extension (other than (i) a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Eurocurrency Rate Loans or (ii) a Credit Extension of Incremental Term Loans in connection with a Limited Condition Transaction) submitted by the Borrower shall be deemed to be a representation and warranty that the applicable conditions specified in <u>Sections 4.02(a)</u> and, if applicable, <u>(b)</u> have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V

### Representations and Warranties

The Borrower represents and warrants to the Agents and the Lenders, at the time of each Credit Extension that:

Section 5.01      <u>Existence, Qualification and Power; Compliance with Laws</u>. Each Loan Party and each other Restricted Subsidiary (a) is a Person duly incorporated, organized or formed, and validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws (including the USA PATRIOT Act, Anti-Corruption Laws, Anti-Terrorism Laws, anti-money laundering laws and Sanctions), orders, writs, injunctions, decrees and orders applicable to it or its properties, except in such instances in which such Laws or orders, writs, injunctions, decrees or orders are being contested in good faith by appropriate proceedings and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in <u>clause (a)</u> (other than with respect to Holdings and the Borrower), <u>(b)(i)</u>, <u>(c)</u>, <u>(d)</u> or <u>(e)</u>, to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02      <u>Authorization; No Contravention</u>.    The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, (a) have been duly authorized by all necessary corporate or other organizational action and (b) do not and will not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or require any payment to be made under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, (iii) result in the creation of any Lien (other than under the Loan Documents) or (iv) violate any material Law; except (in the case of <u>clauses (b)(ii)</u> and <u>(b)(iv)</u>), to the extent that such conflict, breach, contravention, payment or violation could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.03      <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or

-150-

any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or for the consummation of the Transactions, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.04    Binding Effect.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

Section 5.05    Financial Statements; No Material Adverse Effect.

(a)    (i) The Closing Date Audited Financial Statements and the Closing Date Unaudited Financial Statements fairly and accurately present in all material respects the financial condition of the Persons set forth therein, in accordance with IFRS subject, in the case of the Closing Date Unaudited Financial Statements, to normal and recurring year-end adjustments and the absence of notes (none of which are material, individually or in the aggregate); and

(ii)    the Closing Date Pro Forma Financial Statements have been prepared in good faith, after giving effect to the Transactions as if the Transactions had occurred as of the date set forth therein (in the case of the balance sheet) and at the beginning of the period set forth therein (in the case of the statement of income).

(b)    Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Each Lender and the Administrative Agent hereby acknowledges and agrees that the Borrower and its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in IFRS or the interpretation thereof, and that such restatements will not result in a Default under the Loan Documents.

Section 5.06    Litigation.  Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any Restricted Subsidiary or against any of their properties or revenues that either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07    Ownership of Property; Liens.  Each Loan Party and each of its Subsidiaries has good and valid title to, or valid leasehold interests in, or easements or other limited property interests in, all property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize

-151-

such assets for their intended purposes, Permitted Liens and any Liens and privileges arising mandatorily by Law and, in each case, except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.08    Environmental Compliance.  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    there are no pending or, to the knowledge of the Borrower, threatened claims, actions, suits, notices of violation, notices of potential responsibility or proceedings by or against Holdings, the Borrower or any Subsidiary alleging potential liability or responsibility for violation of, or otherwise relating to, any Environmental Law;

(b)    (i) there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any other Subsidiary; and (ii) there has been no Release of Hazardous Materials by any of the Loan Parties or any other Subsidiary at, on, under or from any location in a manner which would reasonably be expected to give rise to any remediation obligation or liability under Environmental Laws;

(c)    neither Holdings, the Borrower nor any of its Subsidiaries is undertaking, or has completed, either individually or together with other persons, any investigation, remediation obligation or response action relating to any actual or threatened Release of Hazardous Materials at any location, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law;

(d)    all Hazardous Materials transported from any property currently or, to the knowledge of Holdings, the Borrower or its Subsidiaries, formerly owned or operated by any Loan Party or any other Subsidiary for off-site disposal have been disposed of in compliance with all Environmental Laws;

(e)    none of the Loan Parties nor any other Subsidiary has contractually assumed any liability or obligation under or relating to any Environmental Law;

(f)    none of the Loan Parties is subject to any remediation obligation or Environmental Liability; and

(g)    the Loan Parties and each other Subsidiary and their respective businesses, operations and properties are and have been in compliance with all Environmental Laws.

Section 5.09    Taxes.  Holdings, the Borrower and each Restricted Subsidiary have timely filed all federal, provincial, state, municipal, foreign and other Tax returns and reports required to be filed, and have timely paid all federal, provincial, state, municipal, foreign and other Taxes levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with IFRS and, except for failures to file or pay as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 5.10    Compliance with ERISA.

(a)    Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws and applicable foreign laws, respectively.

(b)      (i) No ERISA Event or similar event with respect to a Foreign Plan has occurred or is reasonably expected to occur; (ii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 *et seq.* or 4243 of ERISA with respect to a Multiemployer Plan; and (iii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this <u>Section 5.10</u>, as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.11      <u>Subsidiaries; Capital Stock</u>.

(a)      As of the Closing Date, neither Holdings, the Borrower nor any other Loan Party has any Subsidiaries other than those specifically disclosed in <u>Schedule 5.11</u>, and all of the outstanding Capital Stock in Holdings, the Borrower and its Subsidiaries have been validly issued, are fully paid and, in the case of Capital Stock representing corporate interests, nonassessable and, on the Closing Date, all Capital Stock owned directly or indirectly by Holdings, the Borrower or any other Loan Party are owned free and clear of all Liens except (i) those created under the Collateral Documents, (ii) those Liens permitted under <u>Section 7.01</u>.

(b)      As of the Closing Date, <u>Schedule 5.11</u> (a) sets forth the name and jurisdiction of organization or incorporation of each Subsidiary, (b) sets forth the ownership interest of Holdings, the Borrower and any of their Subsidiaries in each of their Subsidiaries, including the percentage of such ownership, (c) identifies each Subsidiary as either a Subsidiary Guarantor or an Excluded Subsidiary (and the reason such Subsidiary is an Excluded Subsidiary), and (d) identifies each Person the Capital Stock of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

Section 5.12      <u>Margin Regulations; Investment Company Act</u>.

(a)      No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings or drawings under any Letter of Credit will be used for any purpose that violates Regulation U or Regulation X of the FRB.

(b)      None of the Borrower, any Person controlling the Borrower or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

Section 5.13      <u>Disclosure</u>.  No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party to any Agent, any Lead Arranger or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole is incorrect in any material respect when furnished or contains, when furnished any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements and updates thereto); *provided* that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time such information was furnished; it being understood that (i) such projections are as to future events and are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower, (ii) no assurance can be given that any particular projections will be realized and that actual results during the period or

periods covered by any such projections may differ significantly from the projected results and (iii) such differences may be material.  As of the Closing Date, the information included in any Beneficial Ownership Certificate is true and correct in all material respects.

Section 5.14    Intellectual Property; Licenses, Etc.  Each of the Loan Parties and the other Restricted Subsidiaries owns, or has a license or possesses a valid and enforceable right to use, all of the trademarks, service marks, trade names, domain names, together with the goodwill associated with the foregoing, copyrights, patents, patent rights, technology, software, know-how, data, database rights, design rights and other intellectual property rights (collectively, "IP Rights") that are used in or necessary for the operation of their respective businesses as currently conducted, and, to the knowledge of the Borrower, without violation of the rights of any Person, except to the extent such failures or violations, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the conduct of the respective business of any Loan Party or other Restricted Subsidiary as currently conducted does not infringe, misappropriate or otherwise violate any IP Rights held by any other Person, except to the extent any non-compliance, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  No written claim or litigation regarding any IP Rights is pending or, to the knowledge of Borrower, threatened in writing against any Loan Party or other Restricted Subsidiary, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties and the other Restricted Subsidiaries has complied with all applicable Laws relating to the privacy and security of personal information or personal data, except to the extent any non-compliance, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  There has been no security breach or incident, unauthorized access or disclosure, or other compromise of any of the Loan Parties' or the other Restricted Subsidiaries' information technology assets and equipment, computers, information technology systems, networks, hardware, software, websites, applications, data and databases, including the data and information of their respective customers and employees or collected, maintained, processed or stored by or on behalf of the Loan Parties or the other Restricted Subsidiaries, except to the extent any such incident, access, disclosure or other compromise, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.15    Solvency.  On the Closing Date after giving effect to the Transactions, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.16    Collateral Documents.  The Collateral Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on and security interests in, the Collateral described therein and to the extent intended to be created thereby, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent required by any Collateral Document), the Liens created by such Collateral Documents will constitute so far as possible under relevant Law and to the extent required by any Collateral Document fully perfected first-priority Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than Permitted Liens.

Section 5.17    Use of Proceeds.  The proceeds of the Term Loans and the Revolving Loans will be used in accordance with Section 6.11; *provided* that the proceeds of any Incremental Facility may be used for any purpose agreed to by the lenders thereof to the extent not otherwise in violation of this Agreement.

Section 5.18        Sanctions and Anti-Corruption Laws.

(a)        Each Loan Party will maintain in effect and enforce policies and procedures that are reasonably designed to promote compliance by the Loan Parties and their respective directors, officers, employees and agents with the FCPA and other applicable anti-corruption laws.

(b)        Each of Holdings, the Borrower and its Subsidiaries is in compliance, in all material respects, with all applicable Sanctions. No Borrowing or Letter of Credit, or direct or, to the knowledge of the Borrower, indirect use of proceeds, will be used to fund any activities or business of or with any Sanctioned Person or in any Sanctioned Country, or in any other manner that would violate or result in the violation by any Loan Party of any Sanctions applicable to any party hereto.

(c)        None of (I) the Borrower or any other Loan Party and (II) the Restricted Subsidiaries that are not Loan Parties or any director, manager, officer, employee or, to the knowledge of the Borrower, agent of Holdings, the Borrower or any of their Restricted Subsidiaries, in each case, is a Sanctioned Person or operating from, organized, or resident in a Sanctioned Country.

(d)        No part of the proceeds of any Loan or any Letter of Credit will be used for any improper payments, directly or, to the knowledge of the Borrower, indirectly, to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, or any other party (if applicable) in order to obtain, retain or direct business or obtain any improper advantage, in violation of applicable Anti-Corruption Laws.

Section 5.19        Labor Matters. Except those that, in the aggregate, would not reasonably be expected to have a Material Adverse Effect, as of the Closing Date, (i) there are no strikes, lockouts or other labor disputes against any Loan Party pending or, to the knowledge of the Borrower, threatened and (ii) the hours worked by and payments made to employees of the Loan Parties have not violated the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. The execution, delivery and performance by each Loan Parties of the Loan Documents to which they are a party and the consummation of the financing contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement by which any Loan Party is bound.

Section 5.20        Gaming Matters. Each Loan Party and each other Restricted Subsidiary is in compliance in all material respects with all Gaming Laws, the rules and regulations promulgated thereunder and all written policies of all Gaming Authorities, in each case to the extent applicable to such Person. The Borrower holds at least one valid Class B Master License, issued by the Georgia Lottery Corporation (each, a "Master License", and collectively, the "Master Licenses"), and the Borrower and its Subsidiaries hold all other licenses and permits that are necessary to their respective businesses. The Master Licenses are in good standing with the Georgia Lottery Corporation.

Section 5.21        No Default. No event or condition has occurred and is continuing that is a Default or an Event of Default.

Section 5.22        Real Property. Schedule 5.22 sets forth a true, complete and correct list of all Material Real Property owned by Borrower or any of its Restricted Subsidiaries as of the Closing Date, including a brief description thereof.

**ARTICLE VI**

Affirmative Covenants

From and after the Closing Date and for so long as any Lender shall have any Commitment hereunder, any Loan or other Secured Obligation shall remain unpaid or unsatisfied (other than contingent indemnification obligations not yet due and payable, obligations under Secured Hedge Agreements and Secured Cash Management Obligations), or any Letter of Credit shall remain outstanding (other than Letters of Credit that have been Cash Collateralized or as to which other arrangements reasonably satisfactory to the Administrative Agent and the applicable L/C Issuer have been made), the Borrower shall and shall cause each Restricted Subsidiary and, other than in the case of Sections 6.01, 6.02 (other than clauses (c) and (f) thereof), 6.13, 6.15 and 6.16, Holdings to:

Section 6.01    Financial Statements.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    Annual Financials.  Commencing with the fiscal year ending December 31, 2021, within one hundred and twenty (120) days after the end of each fiscal year of the Borrower (and within one hundred and fifty (150) days of the end of the fiscal year ending December 31, 2021), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flow for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with IFRS, audited and accompanied by (i) a report and opinion of an independent registered public accounting firm of nationally recognized standing or other accounting firm reasonably acceptable to the Administrative Agent (it being understood that RSM US LLP is reasonably acceptable to the Administrative Agent), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any qualification (for the avoidance of doubt, excluding an emphasis of the matter or explanatory paragraph) as to "going concern" (other than any "going concern" qualification with respect to or as a result of (x) an upcoming maturity date under any Indebtedness or (y) actual or prospective breach of the covenant in Section 7.09 or any other financial covenant in the documentation evidencing any Indebtedness) or any qualification or exception as to the scope of such audit, and (ii) a customary management discussion and analysis (in form reasonably acceptable to the Administrative Agent) of the financial performance of the Borrower and its Subsidiaries;

(b)    Quarterly Financials.  Commencing with the first fiscal quarter ending after the Closing Date, within sixty (60) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (i) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) consolidated statements of cash flows for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with IFRS, subject only to normal year-end adjustments and the absence of footnotes; and

(c)    Reconciliation.  Simultaneously with the delivery of each set of consolidated financial statements referred to in Section 6.01(a) and (b) above, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 6.01 may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable consolidated financial statements of any direct or indirect parent of the Borrower that, directly or indirectly, holds all of the Capital Stock of the Borrower or (B) the Borrower's (or any direct or indirect parent thereof, as applicable) Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, to the extent such information relates to a parent of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to the Borrower (or such parent), on the one hand, and the information relating to the Borrower and its Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion an independent registered public accounting firm of nationally recognized standing, which report and opinion, subject to the same exceptions set forth above in Section 6.01, shall be prepared in accordance with generally accepted auditing standards.

Any information required to be delivered pursuant to Section 6.01(a) or 6.01(b) shall not be required to include acquisition method accounting adjustments relating to the Transactions (if applicable) or any Permitted Investment to the extent it is not practicable to include any such adjustments in such financial statement.

Section 6.02     Certificates; Other Information. Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)     Compliance Certificate. No later than five (5) Business Days after the delivery of the financial statements referred to in Section 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)     SEC Filings. Promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which the Borrower files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)     Material Notices. Promptly after the furnishing thereof, copies of any material requests or material notices received by any Loan Party or any of its Restricted Subsidiaries (other than in the ordinary course of business) that could reasonably be expected to result in a Material Adverse Effect;

(d)     Other Required Information. Together with the delivery of the financial statements pursuant to Section 6.01(a), (i) a report setting forth the information required by Section 4(b) of the Security Agreement or confirming that there has been no change in such information since the Closing Date or the date of the last Compliance Certificate, (ii) a description of each event, condition or circumstance during the last fiscal quarter covered by such Compliance Certificate requiring a prepayment under Section 2.05(b), (iii) a list of Subsidiaries that identifies each Subsidiary as a Material Subsidiary or an Immaterial Subsidiary as of the date of delivery of such Compliance Certificate or a confirmation that there is no change in such information since the later of the Closing Date or the date of the last such list and (iv) such other information required by the Compliance Certificate;

(e)     Annual Budget. Prior to the consummation of an IPO, concurrently with the delivery of any financial statements under Section 6.01(a) above, an annual budget for such fiscal year in form customarily prepared by the Borrower; and

(f)    <u>Additional Information</u>.  Promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Material Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request; *provided* that none of Holdings, the Borrower nor any other Restricted Subsidiary will be required to disclose or permit the inspection or discussion of any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective contractors) is prohibited by law, or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Documents required to be delivered pursuant to <u>Section 6.01(a)</u> and <u>(b)</u>, <u>Section 6.02(a)</u>, or <u>Section 6.02(c)</u> may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on <u>Schedule 10.02</u>; or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (<u>i.e.</u>, soft copies) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Lead Arranger will make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "<u>Platform</u>") and (b) certain of the Lenders (each, a "<u>Public Lender</u>") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that it shall use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Lead Arranger, the L/C Issuer and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its Affiliates or any of their respective securities for purposes of United States Federal and state securities laws (*provided, however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in <u>Section 10.08</u>); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Lead Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

Section 6.03    <u>Notices</u>.  Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent for prompt further distribution to each Lender:

(a)    of the occurrence of any Default, which notice shall specify the nature thereof, the period of existence thereof and what action Holdings or the Borrower proposes to take with respect thereto;

-158-

(b)        any litigation or governmental proceeding (including, without limitation, pursuant to any Environmental Laws) pending against Holdings, the Borrower or any of the Subsidiaries that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect;

(c)        of the occurrence of any ERISA Event or similar event with respect to a Foreign Plan that could reasonably be expected to have a Material Adverse Effect; and

(d)        of receipt by Holdings, the Borrower or any other Loan Party of any material adverse communications from any Governmental Authority with respect to any Loan Party (including but not limited to (w) any written communication to such Loan Party from any Gaming Authority advising it of any material violation or material non-compliance with any Gaming Law, (y) any written notice of the Georgia Lottery Corporation's intention to revoke or not renew any Master License and (z) any other written communication received from the Georgia Lottery Corporation or other Governmental Authority that could reasonably be expected to have a Material Adverse Effect).

Section 6.04        Maintenance of Existence.  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization or incorporation and (b) take all reasonable action to maintain all rights, privileges (including its good standing), permits, corporate franchises and licenses necessary or desirable in the normal conduct of its business, except in the case of clauses (a) (other than with respect to Holdings and the Borrower) and (b), (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) pursuant to a transaction permitted by Section 7.04 or Section 7.05.

Section 6.05        Maintenance of Properties.  Except if the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, (b) maintain, protect, preserve and renew all of its IP Rights and (c) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto with respect to tangible properties in accordance with prudent industry practice.

Section 6.06        Maintenance of Insurance.  Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and its Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons.  If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by applicable Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) upon request, deliver to the Administrative Agent evidence of such compliance in form reasonably acceptable to the Administrative Agent.  Any such insurance (excluding business interruption insurance) maintained in the United States or Canada shall name the Collateral Agent as additional insured or loss payee, as applicable.

Section 6.07        Compliance with Laws.

(a)        Comply in all respects with the requirements of all Laws (including all Gaming Laws) and all orders, writs, injunctions, decrees and judgments applicable to Holdings, the Borrower or any Subsidiary Guarantor or to their business or property (including without limitation Environmental Laws, ERISA, Anti-Corruption Laws and Sanctions), except if the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

(b)        Without limiting the foregoing, maintain and keep in full force and effect all licenses or permits necessary or material to the operation of the businesses of Holdings, the Borrower and its Subsidiaries (including, for the avoidance of doubt, any Master License or other material gaming licenses), and upon request of the Administrative Agent, furnish to the Administrative Agent evidence of renewal of any Master License and any and all other material licenses and permits on the date of or prior to the expiration thereof.

Section 6.08        Books and Records.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with IFRS consistently applied shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or such Subsidiary, as the case may be.

Section 6.09        Inspection Rights.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties and to discuss its affairs, finances and accounts with its directors, managers, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.09 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; provided, further, that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 6.09, none of Holdings, the Borrower or any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Section 6.10        Covenant to Guarantee Secured Obligations and Give Security.  At the Borrower's expense, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including upon the formation or acquisition of any new direct or indirect Wholly Owned Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party, the designation in accordance with Section 6.13 of any existing direct or indirect Wholly Owned Subsidiary as a Restricted Subsidiary or any Excluded Subsidiary ceasing to be an Excluded Subsidiary and within sixty (60) days after such formation, acquisition, designation or occurrence or such longer period as the Administrative Agent may agree in its reasonable discretion (a) cause each such Restricted Subsidiary to deliver any and all certificates representing Capital Stock (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement,

accompanied by undated stock powers or other appropriate instruments of transfer executed in blank, (if applicable) instruments evidencing the Indebtedness held by such Restricted Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Collateral Agent, and execute and deliver the Global Intercompany Note (in the case of the first such Restricted Subsidiary) or a supplement thereto; and (b) take and cause such Restricted Subsidiary and each direct or indirect parent of such Restricted Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action may be necessary in the reasonable opinion of the Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected first priority Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law).

Section 6.11    <u>Use of Proceeds</u>.  Use the proceeds of any Credit Extension (a) on the Closing Date, whether directly or indirectly, in a manner consistent with the uses set forth in the Preliminary Statements to this Agreement and (b) after the Closing Date, whether directly or indirectly, for working capital, capital expenditures, other general corporate purposes (including the financing of Permitted Acquisitions, other Permitted Investments, working capital and/or purchase price adjustments, prepayments of Indebtedness and related fees and expenses, and dividends and other distributions permitted under this Agreement) and any other use not prohibited by this Agreement.

Section 6.12    <u>Further Assurances and Post-Closing Covenants</u>.

(a)    Promptly upon reasonable request by the Administrative Agent or the Collateral Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) subject to the limitations set forth in the Collateral and Guarantee Requirement, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of this Agreement and the Collateral Documents; *provided, however*, that except as set forth in <u>clause (e)</u> of the Collateral and Guarantee Requirement, notwithstanding anything to the contrary contained in this Agreement, nothing in this Agreement or any other Loan Document shall require the Borrower or Loan Party (A) to make any filings or take any actions to record or to perfect the Collateral Agent's lien on or security interest in (x) any IP Rights other than UCC filings and the filing of documents effecting the recordation of security interests in the United States Copyright Office and United States Patent and Trademark Office or (y) any IP Rights subsisting outside of the United States or (B) to reimburse the Administrative Agent for any costs or expenses incurred in connection with making such filings or taking any other such action.

(b)    Within the time periods specified on <u>Schedule 6.12</u> hereto (as each may be extended by the Administrative Agent in its reasonable discretion), complete such undertakings as are set forth on <u>Schedule 6.12</u> hereto.

Section 6.13    <u>Designation of Restricted and Unrestricted Subsidiaries</u>.  Comply with the terms and conditions set forth in this Agreement with respect to designations of Restricted Subsidiaries and Unrestricted Subsidiaries, including:

(a)    The Borrower may designate any Restricted Subsidiary to be an Unrestricted Subsidiary if (i) no Default or Event of Default shall have occurred and be continuing (or would result therefrom), (ii) the Investment resulting from such designation would be permitted in accordance with the terms of this Agreement and (iii) the Restricted Subsidiary otherwise meets the requirements set forth in

the definition of "Unrestricted Subsidiary." If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate fair market value of such Restricted Subsidiary at the time it is designated as an Unrestricted Subsidiary shall be treated as an Investment by the Borrower at such time of designation and shall reduce the amount available for Restricted Payments pursuant to Section 7.06 or under one or more clauses of the definition of "Permitted Investments," as determined by the Borrower. Notwithstanding the foregoing, no Subsidiary may be designated an Unrestricted Subsidiary if such Subsidiary owns any Material Intellectual Property.

(b)    Any designation of a Subsidiary of the Borrower as an Unrestricted Subsidiary shall be evidenced to the Administrative Agent by an Officer's Certificate certifying that such designation complies with the preceding conditions and was permitted by Section 7.06.

(c)    The Borrower may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that such designation shall be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation shall be permitted only if (1) such Indebtedness is permitted under Section 7.03 (including pursuant to Section 7.03(b)(v) treating such redesignation as an acquisition for the purpose of such clause (v)), calculated on a *pro forma* basis as if such designation had occurred at the beginning of the applicable reference period; and (2) no Default or Event of Default shall have occurred and be continuing (or would result therefrom). Any such designation by the Borrower shall be evidenced to the Administrative Agent by an Officer's Certificate certifying that such designation complies with the preceding conditions.

Section 6.14    Payment of Taxes. Pay and discharge or cause to paid and discharged all Taxes imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case on a timely basis, and all lawful claims which, if unpaid, may reasonably be expected to become a lien or charge upon any properties of Holdings, the Borrower or any of the Restricted Subsidiaries not otherwise permitted under this Agreement; *provided* that neither Holdings, the Borrower nor any of the Restricted Subsidiaries shall be required to pay or cause to be paid any such Tax or claim which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with IFRS, or which would not reasonably be expected, individually or in the aggregate, to constitute a Material Adverse Effect.

Section 6.15    Lender Calls. The Borrower shall hold a conference call (at a time mutually agreed upon by the Borrower and the Administrative Agent but, in any event, no earlier than the Business Day following the delivery of applicable financial information pursuant to Sections 6.01(a) and (b) above) with all Lenders who choose to attend such conference call to discuss the results of the previous fiscal quarter; *provided* that notwithstanding the foregoing, the requirement set forth in this Section 6.15 may be satisfied with an earnings call held for the benefit of the Borrower's securities holders that is open to the Lenders.

Section 6.16    Maintenance of Ratings. Use commercially reasonable efforts to obtain and to maintain public corporate credit facility ratings in respect of the Initial Term Loans and corporate family ratings in respect of the Borrower, in each case, from Moody's and S&P; *provided*, *however*, in each case, that the Borrower shall not be required to obtain or maintain any specific rating.

Section 6.17    Anti-Terrorism; Sanctions; Anti-Corruption. Comply in all material respects with all applicable Sanctions, Anti-Corruption Laws and Anti-Terrorism Laws, and not (i) repay the Loans, or make any other payment to any Lender, using funds or properties of Holdings, the Borrower or any Restricted Subsidiaries that are, to the knowledge of the Borrower, the property of any Person that is the subject or target of applicable Sanctions or that are, to the knowledge of the Borrower, beneficially owned, directly or indirectly, by any Person that is the subject or target of applicable Sanctions, in each

case, that would cause a violation of Anti-Terrorism Laws or applicable Sanctions or any other applicable Law by any Person participating in the Loans or Letters of Credit, or (ii) to the knowledge of the Borrower, permit any Person that is the subject or target of Sanctions to have any direct or indirect interest in Holdings, the Borrower or any of the Subsidiaries, with the result that the investment in Holdings, the Borrower or any of the Subsidiaries (whether directly or knowingly indirectly) or the Loans made by the Lenders would be in violation of any applicable Sanctions.

Section 6.18    Changes in Fiscal Year.  Maintain its fiscal year, except with the consent of the Administrative Agent and subject to such amendments to this Agreement as the Borrower and Administrative Agent shall reasonably agree are necessary or appropriate in connection with such change (and the parties hereto hereby authorize the Borrower and the Administrative Agent to make any such amendments to this Agreement as they jointly deem necessary to give effect to the foregoing).

Section 6.19    Nature of Business.  Engage only in any material lines of business substantially similar to those lines of business conducted by the Borrower and its Restricted Subsidiaries on the Closing Date or any business reasonably related, complementary or ancillary thereto.

## ARTICLE VII

### Negative Covenants

From and after the Closing Date and for so long as any Lender shall have any Commitment hereunder, any Loan or other Secured Obligation shall remain unpaid or unsatisfied (other than contingent indemnification obligations not yet due and payable, obligations under Secured Hedge Agreements and Secured Cash Management Obligations), or any Letter of Credit shall remain outstanding (other than Letters of Credit that have been Cash Collateralized or as to which other arrangements reasonably satisfactory to the Administrative Agent and the applicable L/C Issuer have been made):

Section 7.01    Liens.

(a)    The Borrower shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create, Incur or permit to exist any Lien on any asset or property of the Borrower or any Restricted Subsidiary, unless such Lien is a Permitted Lien.

(b)    With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the Incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness.  The "Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness with the same terms, accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies or increases in the value of property securing Indebtedness.

Section 7.02    [Reserved].

Section 7.03    Indebtedness.

(a)    The Borrower shall not, and shall not permit any of the Restricted Subsidiaries to, Incur any Indebtedness (including Acquired Indebtedness); *provided*, *however*, that the Borrower and any of the Restricted Subsidiaries may Incur additional senior, senior subordinated, unsecured or subordinated Indebtedness (including  Acquired  Indebtedness)  (the  Indebtedness  incurred  pursuant  to  this

Section 7.03(a), "Ratio Debt") for any purpose, in an aggregate principal amount equal to the sum of (1) any unused portion of the Incremental Starter Amount (the "Ratio Debt Starter Amount") and (2) additional unlimited amounts, if on the date of such Incurrence and after giving *pro forma* effect thereto (including *pro forma* application of the proceeds thereof) and after giving effect to any Permitted Acquisition or other Permitted Investment consummated in connection therewith, any Indebtedness repaid with the proceeds thereof and any other acquisition, disposition, debt incurrence, debt retirement and other appropriate *pro forma* adjustments and all other appropriate *pro forma* adjustments (but excluding the cash proceeds of any such Indebtedness and without giving effect to any amount incurred simultaneously under (x) the Incremental Starter Amount, (y) any other fixed dollar incurrence basket or (z) the Revolving Credit Facility), (A) if such Indebtedness is secured by a Lien on the Collateral that is *pari passu* with the Liens securing the Initial Term Loans, the Consolidated First Lien Secured Leverage Ratio for the most recently ended Test Period does not exceed the greater of (x) 4.75:1.00 or, (y) to the extent such Indebtedness is incurred in connection with any Permitted Acquisition or other Permitted Investment, the Consolidated First Lien Secured Leverage Ratio immediately prior to such Permitted Acquisition or other Permitted Investment, (B) if such Indebtedness is secured by a Lien on the Collateral that is junior to the Liens securing the Initial Term Loans, the Consolidated Total Senior Secured Leverage Ratio for the most recently ended Test Period does not exceed the greater of (x) 5.00:1.00 and, to the extent such Indebtedness is incurred in connection with any Permitted Acquisition or other Permitted Investment, the Consolidated Total Senior Secured Leverage Ratio immediately prior to such Permitted Acquisition or other Permitted Investment, or (C) if such Indebtedness is secured by assets not constituting Collateral or is unsecured, the Consolidated Total Leverage Ratio for the most recently ended Test Period does not exceed the greater of 5.00:1.00 and, to the extent such Indebtedness is incurred in connection with any Permitted Acquisition or other Permitted Investment, the Consolidated Total Leverage Ratio immediately prior to such Permitted Acquisition or other Permitted Investment and the incurrence of such Indebtedness on a *pro forma* basis; *provided*, *further*, that to the extent so utilized, such incurrence pursuant to Section 7.03(a)(1) above shall reduce, dollar for dollar, the availability under the Incremental Starter Amount for all other purposes; *provided*, *further*, that (w) the Borrower may elect to incur Ratio Debt pursuant to clause (2) prior to utilization of the Ratio Debt Starter Amount and regardless of whether there is capacity under the Ratio Debt Starter Amount in its sole discretion, and if both the Ratio Debt Starter Amount and clause (2) are available and the Borrower does not make an election, the Borrower will be deemed to have elected clause (2), (x) any amounts incurred under the Ratio Debt Starter Amount, concurrently with, or in a single transaction or series of related transactions with, amounts incurred under clause (2) will not count as Indebtedness for the purposes of calculating the applicable ratio in clause (2), (y) any portion of any Ratio Debt incurred in reliance on the Ratio Debt Starter Amount shall be automatically reclassified as incurred under clause (2) at such time as the Borrower meets the applicable Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio or the Consolidated Total Leverage Ratio, as applicable, and (z) Ratio Debt may be incurred without giving effect to any amount incurred substantially simultaneously or contemporaneously therewith under the Revolving Credit Facility; *provided, further*, that (A) the terms and conditions of such Indebtedness (excluding pricing, interest rate margins, rate floors, discounts, premiums, fees, and optional prepayment or redemption terms and provisions which shall be determined by the Borrower) either, at the option of the Borrower, (x) reflect market terms and conditions (taken as a whole) at the time of incurrence, issuance or effectiveness, as the case may be, of such Indebtedness (as determined by the Borrower in good faith) or (y) are not materially more restrictive on the Borrower and its Restricted Subsidiaries (taken as a whole) than the terms and conditions of this Agreement (taken as a whole) (except, in the case of each of clauses (x) and (y) for covenants, terms and conditions or other provisions applicable only to periods after the Latest Maturity Date of any Facility) (it being understood that to the extent that any covenant is added for the benefit of any such Indebtedness, the terms and conditions of such Indebtedness will be deemed not to be more restrictive than the terms and conditions of this Agreement if such covenant is also added for the benefit of all applicable initial Facilities extended on the Closing Date), (B) if such Indebtedness is secured by the Collateral, such Indebtedness shall be subject to a Customary Intercreditor Agreement (which, to the extent

-164-

such Indebtedness is funded into escrow, may be effective (or entered into) only immediately after the proceeds thereof are released from such escrow), (C) if such Ratio Debt is in the form of MFN Qualifying Term Loans, then the MFN Adjustment shall be made to the Initial Term Loans to the same extent as required under Section 2.14(b) with respect to the incurrence of Incremental Term Loans and (D) the aggregate principal amount of Ratio Debt incurred by Restricted Subsidiaries that are not or do not become Loan Parties shall not exceed the Non-Guarantor Sublimit (*less* any such amount of the Non-Guarantor Sublimit used for Intercompany Investments and Intercompany Dispositions).

(b)　　Section 7.03(a) shall not prohibit the Incurrence of the following Indebtedness;

(i)　　Indebtedness of Borrower and any of the Restricted Subsidiaries under the Loan Documents, including any refinancing thereof incurred under Section 2.18, Indebtedness incurred under Section 2.14, Section 2.15 or Section 2.17, and in each case, any Refinancing Indebtedness thereof (or successive Refinancing Indebtedness thereof);

(ii)　　Guarantees by the Borrower or any Restricted Subsidiary of Indebtedness or other obligations of Borrower or any Restricted Subsidiary so long as the Incurrence of such Indebtedness or other obligations is not prohibited by the terms of this Agreement;

(iii)　　Indebtedness of Borrower to any Restricted Subsidiary or Indebtedness of a Restricted Subsidiary to Borrower or any Restricted Subsidiary; *provided* that Indebtedness owed by any Loan Party incurred pursuant to this clause (iii) shall be subordinated in right of payment to the Secured Obligations on terms reasonably satisfactory to the Administrative Agent (*provided* that, for the avoidance of doubt, a Global Intercompany Note shall be reasonably satisfactory); *provided*, *further*, that:

(A)　　any subsequent issuance or transfer of Capital Stock or any other event which results in any such Indebtedness being beneficially held by a Person other than the Borrower or a Restricted Subsidiary; and

(B)　　any sale or other transfer of any such Indebtedness to a Person other than the Borrower or a Restricted Subsidiary,

shall be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Borrower or such Restricted Subsidiary, as the case may be;

(iv)　　Indebtedness represented by (i) any Indebtedness outstanding on the Closing Date (except to the extent required to be repaid pursuant to the Closing Date Refinancing); *provided* that any such Indebtedness in a principal amount in excess of $2,500,000 is set forth on Schedule 7.03, (ii) Refinancing Indebtedness Incurred in respect of any Indebtedness described in clause (iv)(i) and (iii) Management Advances;

(v)　　Indebtedness of (x) the Borrower or any Restricted Subsidiary incurred or issued to finance a Permitted Acquisition or other similar Investment permitted under this Agreement or (y) Persons that are acquired by the Borrower or any Restricted Subsidiary in accordance with the terms of this Agreement or merged into, amalgamated or consolidated with the Borrower or a Restricted Subsidiary in accordance with the terms of the this Agreement (including designating an Unrestricted Subsidiary as a Restricted Subsidiary); *provided* that (x) subject to the Limited Condition Transaction provisions hereunder, immediately before and after giving effect to such incurrence, issuance or assumption, no Default or Event of Default has occurred and is continuing, (y) if such Indebtedness is Acquired Indebtedness, such Indebtedness is only the obligation of the

Person being acquired or such Person's Subsidiaries and such Indebtedness was not created in contemplation of such acquisition, and (z) with respect to such Indebtedness under clause (x), (1) the Borrower is in compliance with the terms under clauses (A) through (C) of the last proviso in Section 7.03(a), and (2) after giving *pro forma* effect to such acquisition, merger, amalgamation or consolidation, the Borrower would be permitted to incur such Indebtedness pursuant to clause (2) of the first proviso in Section 7.03(a), in each case of clauses (1) and (2) above, as if such Indebtedness consisted of Ratio Debt incurred pursuant to Section 7.03(a);

(vi)    Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes);

(vii)    the incurrence of (i) Indebtedness (including Indebtedness represented by Capitalized Lease Obligations or Purchase Money Obligations) Incurred to finance the purchase, lease, expansion, construction, installation, replacement, repair or improvement of property (real or personal), equipment or other assets, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this subclause (i) and then outstanding, does not exceed the greater of (x) $25,000,000 and (y) 25.0% of LTM EBITDA at the time of Incurrence and any Refinancing Indebtedness in respect thereof and (ii) arising out of Sale and Leaseback Transactions in an aggregate outstanding principal amount, which does not exceed the greater of (a) $10,000,000 and (b) 10.0% of LTM EBITDA at the time of incurrence, and any Refinancing Indebtedness in respect thereof;

(viii)    Indebtedness in respect of (i) workers' compensation claims, health, disability or other employee benefits, property, casualty or liability insurance, self-insurance obligations, customer guarantees, performance, indemnity, surety, judgment, bid, appeal, advance payment (including progress premiums), customs, value added or other tax or other guarantees or other similar bonds, instruments or obligations and completion guarantees and warranties or relating to liabilities, obligations or guarantees Incurred in the ordinary course of business or consistent with past practice; (ii) the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or consistent with past practice; (iii) customer deposits and advance payments (including progress premiums) received from customers for goods or services purchased in the ordinary course of business or consistent with past practice; (iv) letters of credit, bankers' acceptances, discounted bills of exchange, discounting or factoring of receivables or payables for credit management purposes, warehouse receipts, guarantees or other similar instruments or obligations issued or entered into, or relating to liabilities or obligations Incurred in the ordinary course of business or consistent with past practice; (v) Cash Management Obligations and (vi) Settlement Indebtedness;

(ix)    Indebtedness arising from agreements providing for guarantees, indemnification, obligations in respect of earn-outs, deferred purchase price or other adjustments of purchase price or, in each case, similar obligations, in each case, Incurred or assumed in connection with the acquisition or disposition of any business, assets, a Person (including any Capital Stock of a Subsidiary) or Investment (other than Guarantees of Indebtedness Incurred by any Person acquiring or disposing of such business, assets, Person or Investment for the purpose of financing such acquisition or disposition);

(x)    Indebtedness in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (x) and then outstanding, will not exceed 100.0% of the Net Cash Proceeds received by the Borrower from the issuance or sale (other than to a Restricted Subsidiary) of its Capital Stock or otherwise

contributed to the equity (in each case, other than through the issuance of Disqualified Stock, Designated Preferred Stock or an Excluded Contribution or Cure Amount, and without duplication with any amount of such contributed equity added to the Available Amount) of the Borrower, in each case, subsequent to the Closing Date, and any Refinancing Indebtedness in respect thereof; *provided*, *however*, that (i) any such Net Cash Proceeds that are so received or contributed shall not increase the amount available for making Restricted Payments to the extent the Borrower and its Restricted Subsidiaries Incur Indebtedness in reliance thereon and (ii) any Net Cash Proceeds that are so received or contributed shall be excluded for purposes of Incurring Indebtedness pursuant to this clause (x) to the extent such Net Cash Proceeds or cash have been applied to make Restricted Payments;

(xi)      Indebtedness of (i) Non-Loan Parties in an aggregate principal amount not to exceed the greater of (x) $30,000,000 and (y) 30.0% of LTM EBITDA at the time of incurrence, and any Refinancing Indebtedness in respect thereof and (ii) joint ventures in an aggregate principal amount not to exceed the greater of (x) $25,000,000 and (y) 25.0% of LTM EBITDA at the time of incurrence, and any Refinancing Indebtedness in respect thereof;

(xii)      (i) Indebtedness issued by Borrower or any of its Subsidiaries to any future, present or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any of its Subsidiaries or any Parent Entity (or permitted transferees, assigns, estates, or heirs of such employee, director, contractor or consultant), in each case to finance the purchase or redemption of Capital Stock of the Borrower or any Parent Entity that is permitted by Section 7.06 hereof and (ii) Indebtedness consisting of obligations under deferred compensation or any other similar arrangements incurred in the ordinary course of business, consistent with past practice or in connection with the Transactions, any Investment or any acquisition (by merger, consolidation, amalgamation or otherwise);

(xiii)      Indebtedness of Borrower or any of the Restricted Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case Incurred in the ordinary course of business or consistent with past practice;

(xiv)      Indebtedness in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (xiv) and then outstanding, will not exceed the greater of (a) $40,000,000 and (b) 40.0% of LTM EBITDA and, any Refinancing Indebtedness in respect thereof; *provided* that, if secured by a Lien on the Collateral, Indebtedness incurred pursuant to this clause (xiv) may be secured on a *pari passu* or junior basis to the Liens securing the Facilities; *provided*, *further*, that if such Lien on Collateral is secured on a *pari passu* basis to the Liens securing the Facilities, then such Lien shall be incurred pursuant to clause (ee) of the definition of "Permitted Liens";

(xv)      Indebtedness in respect of any Qualified Securitization Financing or any Receivables Facility;

(xvi)      any obligation, or guaranty of any obligation, of Borrower or any Restricted Subsidiary to reimburse or indemnify a Person extending credit to customers of the Borrower or a Restricted Subsidiary incurred in the ordinary course of business or consistent with past practice for all or any portion of the amounts payable by such customers to the Person extending such credit;

(xvii)      Indebtedness to a customer to finance the acquisition of any equipment necessary to perform services for such customer; *provided* that the terms of such Indebtedness are consistent

-167-

with those entered into with respect to similar Indebtedness prior to the Closing Date, including, if so consistent, that (1) the repayment of such Indebtedness is conditional upon such customer ordering a specific amount of goods or services and (2) such Indebtedness does not bear interest or provide for scheduled amortization or maturity;

(xviii)   Indebtedness of Borrower or any of the Restricted Subsidiaries arising pursuant to any Permitted Intercompany Activities, Permitted IPO Reorganization and Permitted Tax Restructuring or related transaction;

(xix)    [reserved];

(xx)     (i) Indebtedness (in the form of senior secured, senior unsecured, senior subordinated, or subordinated notes (issued in a public offering, Rule 144A offering or other private placement or a bridge financing in lieu of the foregoing) or loans) (such Indebtedness incurred pursuant to this clause (xx) being referred to as "Permitted Alternative Incremental Facilities Debt") incurred or issued by Borrower or any Restricted Subsidiary to the extent that the Borrower could establish such Permitted Alternative Incremental Facilities Debt under the Unrestricted Incremental Amount or satisfy the Incremental Incurrence Test were such Permitted Alternative Incremental Facilities Debt an Incremental Facility, and such Indebtedness shall be deemed to be incurred in reliance on Section 2.14 and, solely to the extent incurred in reliance on the Unrestricted Incremental Amount, result in a dollar-for-dollar reduction of the amount of Indebtedness that may be incurred under the Unrestricted Incremental Amount; *provided* that (A) upon the effectiveness of such Indebtedness, subject to the Limited Condition Transaction provisions hereunder, no Default or Event of Default has occurred and is continuing or shall result therefrom, (B) such Indebtedness shall not mature earlier than the Maturity Date applicable to the Initial Term Loans (other than Qualifying Bridge Loans), (C) as of the date of the incurrence of such Indebtedness, the Weighted Average Life to Maturity of such Indebtedness shall not be shorter than that of the Term Loans (without giving effect to any prepayments), (D) no Subsidiary is an obligor with respect to such Indebtedness unless such Subsidiary is a Loan Party which shall have previously or substantially concurrently guaranteed the Secured Obligations, except, solely in the case of notes, such notes may be issued by a Guarantor that is a corporation, (E) the other terms and conditions of such Indebtedness (excluding pricing, interest rate margins, rate floors, most favored nation provisions, discounts, premiums, fees and prepayment or redemption terms and provisions, which shall be determined by the Borrower) either, at the option of the Borrower, (x) reflect market terms and conditions (taken as a whole) at the time of incurrence, issuance or effectiveness of such Indebtedness (as determined by the Borrower in good faith) or are reasonably acceptable to the Administrative Agent or (y) are not materially more restrictive on the Borrower and its Restricted Subsidiaries (when taken as a whole) than the terms and conditions of this Agreement (when taken as a whole) (as determined by the Borrower in good faith) (except, in the case of either clause (x) or (y), for covenants or other provisions applicable only to periods after the Latest Maturity Date applicable to the Initial Term Loans) (it being understood that (A) to the extent that any covenant is added for the benefit of any such Indebtedness, the terms and conditions of such Indebtedness shall be deemed not to be more restrictive than the terms and conditions of this Agreement if such covenant is also added for the benefit of all Facilities hereunder, and (B) no consent shall be required from the Administrative Agent for terms or conditions that are not market terms or are more restrictive than this Agreement if such terms are added to this Agreement), (F) in the case of any such secured Indebtedness, such Indebtedness shall not be secured by any assets that are not Collateral (*provided* that in the case of any such secured Indebtedness that is funded into escrow, such Indebtedness may be secured by the applicable funds and related assets held in escrow (and the proceeds thereof) until such Indebtedness is released from escrow) and shall be subject to a Customary Intercreditor Agreement (which, to the extent such Indebtedness is funded into escrow,

may be effective (or entered into) only immediately after the proceeds thereof are released from such escrow), (G) if such Permitted Alternative Incremental Facilities Debt is in the form of MFN Qualifying Term Loans, then the MFN Adjustment shall be made to the Initial Term Loans to the same extent as required under Section 2.14(b) with respect to the incurrence of Incremental Term Loans, and (H) any Indebtedness incurred pursuant to this clause (xx)(i) in the form of notes (other than to the extent such Indebtedness constitutes Qualifying Bridge Loans) shall not have any mandatory prepayment or redemption features (other than customary asset sale events, insurance and condemnation proceeds events, IPO, change of control offers, and excess cash flow sweeps or events of default) that could result in prepayments or redemptions of such Indebtedness prior to the Latest Maturity Date applicable to the Initial Term Loans and (ii) any Refinancing Indebtedness incurred under the foregoing clause (xx)(i);

(xxi)   seller paper or other indebtedness incurred to finance the payment of earn-out obligations with respect to Permitted Acquisitions or other Permitted Investments in an amount not to exceed the greater of (a) $10,000,000 and (b) 10.0% of LTM EBITDA;

(xxii)   trade letters of credit in an amount not to exceed the greater of (a) $5,000,000 and (b) 5.0% of LTM EBITDA at any one time outstanding; and

(xxiii)   Disqualified Stock so long as on a *pro forma* basis either (a) the Consolidated Total Leverage Ratio for the most recently ended Test Period does not exceed the greater of 5.50:1.00 or (b) the Interest Coverage Ratio is greater than or equal to 2.00 to 1.00.

(c)   For purposes of determining compliance with, and the outstanding principal amount of any particular Indebtedness Incurred pursuant to and in compliance with, this Section 7.03:

(i)   in the event that all or any portion of any item of Indebtedness meets the criteria of more than one of the types of Indebtedness described in Sections 7.03(a) and (b), the Borrower, in its sole discretion, will classify, and may from time to time reclassify, such item of Indebtedness (or any portion thereof) and only be required to include the amount and type of such Indebtedness in Section 7.03(a) or in one of the clauses of Section 7.03(b);

(ii)   additionally, all or any portion of any item of Indebtedness may later be reclassified as having been Incurred pursuant to any type of Indebtedness described in Sections 7.03(a) and (b) so long as such Indebtedness is permitted to be Incurred pursuant to such provision and any related Liens are permitted to be incurred at the time of reclassification (it being understood that any Indebtedness incurred pursuant to one of the clauses of Section 7.03(b) shall cease to be deemed incurred or outstanding for purposes of such clause but shall be deemed incurred for the purposes of Section 7.03(a) from and after the first date on which the Borrower or the Restricted Subsidiaries could have incurred such Indebtedness under Section 7.03(a) without reliance on such clause);

(iii)   all Indebtedness under this Agreement shall be deemed to have been incurred under Section 7.03(b)(i) and such Indebtedness shall at all times be deemed incurred under such clause and shall not be reclassified;

(iv)   in the case of any Refinancing Indebtedness, when measuring the outstanding amount of such Indebtedness, such amount shall not include the aggregate amount of accrued and unpaid interest, dividends, premiums (including tender premiums), defeasance costs, underwriting discounts, fees, costs and expenses (including original issue discount, upfront fees or similar fees) in connection with such refinancing;

(v)      Guarantees of, or obligations in respect of letters of credit, bankers' acceptances or other similar instruments relating to, or Liens securing, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness shall not be included;

(vi)     [reserved];

(vii)    the principal amount of any Disqualified Stock of Borrower or a Restricted Subsidiary, or Preferred Stock of a Restricted Subsidiary, will be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof;

(viii)   Indebtedness permitted by this <u>Section 7.03</u> need not be permitted solely by reference to one provision permitting such Indebtedness but may be permitted in part by one such provision and in part by one or more other provisions of this <u>Section 7.03</u> permitting such Indebtedness;

(ix)     for all purposes under this Agreement, including for purposes of calculating the Interest Coverage Ratio, the Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio or the Consolidated Total Leverage Ratio, as applicable, in connection with the incurrence, issuance or assumption of any Indebtedness pursuant to <u>Sections 7.03(a)</u> or <u>(b)</u> or the incurrence or creation of any Lien pursuant to the definition of "Permitted Liens," the Borrower may elect, at its option, to treat all or any portion of the committed amount of any Indebtedness (and the issuance and creation of letters of credit and bankers' acceptances thereunder) which is to be incurred (or any commitment in respect thereof) or secured by such Lien, as the case may be (any such committed amount elected until revoked as described below, the "<u>Reserved Indebtedness Amount</u>"), as being incurred as of such election date, and, if such Interest Coverage Ratio, the Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Leverage Ratio or other provision of this Agreement, as applicable, is complied with (or satisfied) with respect thereto on such election date, any subsequent borrowing or reborrowing thereunder (and the issuance and creation of letters of credit and bankers' acceptances thereunder) will be deemed to be permitted under this <u>Section 7.03</u> or the definition of "Permitted Liens," as applicable, whether or not the Interest Coverage Ratio, the Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio, the Consolidated Total Leverage Ratio or other provision of this Agreement, as applicable, at the actual time of any subsequent borrowing or reborrowing (or issuance or creation of letters of credit or bankers' acceptances thereunder) is complied with (or satisfied) for all purposes (including as to the absence of any continuing Default or Event of Default); provided that for purposes of subsequent calculations of the Interest Coverage Ratio, the Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio, the Consolidated Total Leverage Ratio or other provision of this Agreement, as applicable, the Reserved Indebtedness Amount shall be deemed to be outstanding, whether or not such amount is actually outstanding, for so long as such commitments are outstanding or until the Borrower revokes an election of a Reserved Indebtedness Amount;

(x)      [reserved];

(xi)     notwithstanding anything in this <u>Section 7.03</u> to the contrary, in the case of any Indebtedness incurred to refinance Indebtedness initially incurred in reliance on a clause of <u>Section 7.03(b)</u> measured by reference to a percentage of LTM EBITDA at the time of incurrence, if such refinancing would cause the percentage of LTM EBITDA restriction to be exceeded if calculated based on the percentage of LTM EBITDA on the date of such refinancing, such

percentage of LTM EBITDA restriction shall not be deemed to be exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced, plus accrued and unpaid interest, dividends, premiums (including tender premiums), defeasance costs, underwriting discounts, fees, costs and expenses (including original issue discount, upfront fees or similar fees) in connection with such refinancing; and

(xii)    the amount of Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the liability in respect thereof determined in accordance with IFRS.

(d)    Accrual of interest, accrual of dividends, the accretion of accreted value, the accretion or amortization of original issue discount, the payment of interest in the form of additional Indebtedness, the payment of dividends in the form of additional shares of Preferred Stock or Disqualified Stock or the reclassification of commitments or obligations not treated as Indebtedness due to a change in IFRS, will not be deemed to be an Incurrence of Indebtedness for purposes of this Section 7.03.

(e)    If at any time an Unrestricted Subsidiary becomes a Restricted Subsidiary, any Indebtedness of such Subsidiary shall be deemed to be Incurred by a Restricted Subsidiary of the Borrower as of such date (and, if such Indebtedness is not permitted to be Incurred as of such date under this Section 7.03, the Borrower shall be in default of this Section 7.03).

(f)    For purposes of determining compliance with any U.S. Dollar-denominated restriction on the incurrence of Indebtedness, the U.S. Dollar equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (a) the principal amount of such Indebtedness being refinanced plus (b) the aggregate amount of accrued and unpaid interest, dividends, premiums (including tender premiums), defeasance costs, underwriting discounts, fees, costs and expenses (including original issue discount, upfront fees or similar fees) in connection with such refinancing.

(g)    Notwithstanding any other provision of this Section 7.03, the maximum amount of Indebtedness that the Borrower or a Restricted Subsidiary may Incur pursuant to this Section 7.03 shall not be deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies.  The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated that is in effect on the date of such refinancing.

(h)    The Borrower shall not, and shall not permit any Guarantor to Incur any Indebtedness (including Acquired Indebtedness) that is subordinated or junior in right of payment to any Indebtedness of the Borrower or such Guarantor, as the case may be, unless such Indebtedness is expressly subordinated in right of payment to the Secured Obligations or such Guarantor's Guarantee to the extent and in the same manner as such Indebtedness is subordinated to other Indebtedness of the Borrower or such Guarantor, as the case may be.

Section 7.04    Merger and Consolidation:

(a)    The Borrower will not consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person, unless either:

(i)    the Borrower is the surviving Person, or

(ii)    if the Borrower is not the surviving Person,

(A)    the resulting, surviving or transferee Person (the "Successor Company") will be a Person organized or existing under the laws of the jurisdiction of the Borrower or the United States of America, any State of the United States or the District of Columbia or any territory thereof and the Successor Company will expressly assume all obligations of the Borrower hereunder;

(B)    immediately after giving effect to such transaction (and treating any Indebtedness that becomes an obligation of the applicable Successor Company or any Subsidiary of the applicable Successor Company as a result of such transaction as having been incurred by the applicable Successor Company or such Subsidiary at the time of such transaction), no Event of Default shall have occurred and be continuing

(C)    immediately after giving *pro forma* effect to such transaction, either (a) the Consolidated Total Leverage Ratio for the most recently ended Test Period does not exceed 5.00:1.00 or (b) the Consolidated Total Leverage Ratio of the Borrower and the Restricted Subsidiaries would not be higher than it was immediately prior to giving effect to such transaction;

(D)    the Administrative Agent shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act reasonably requested by the Lenders, including a beneficial ownership certificate; and

(E)    the Administrative Agent shall have received all other documentation, deliverables and other information as the Administrative Agent may reasonably request.

(b)    For purposes of this Section 7.04, the sale, lease, conveyance, assignment, transfer or other disposition of all or substantially all of the properties and assets of one or more Subsidiaries of the Borrower, which properties and assets, if held by the Borrower instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Borrower on a consolidated basis, shall be deemed to be a transfer of all or substantially all of the properties and assets of the Borrower.

(c)    Notwithstanding any other provision of this Section 7.04, Permitted Acquisitions or other similar Investments permitted under this Agreement, in each case, consummated as mergers, acquisitions, consolidations or other forms of combination are permitted.

(d)    Notwithstanding any other provision of this Section 7.04, (i) any Restricted Subsidiary may consolidate, amalgamate or otherwise combine with, merge into or transfer all or part of its properties and assets to the Borrower or a Subsidiary Guarantor, (ii) any Restricted Subsidiary may consolidate, amalgamate or otherwise combine with, merge into or transfer all or part of its properties and assets to any other Restricted Subsidiary and (iii) the Borrower and the Restricted Subsidiaries may complete any disposition permitted under this Agreement, Permitted Investment, Permitted IPO Reorganization or Permitted Tax Restructuring.

(e)    The foregoing provisions (other than the requirements of <u>Section 7.04(b)</u>) shall not apply to the creation of a new Subsidiary as a Restricted Subsidiary of the Borrower.

(f)    No Subsidiary Guarantor may consolidate with or merge or amalgamate with or into, or convey, transfer or lease all or substantially all its assets, in one or a series of related transactions, to any Person, unless:

(i)    the other Person is the Borrower or any Restricted Subsidiary that is Guarantor or becomes a Guarantor concurrently with the transaction; or

(ii)    (A) either (x) the Borrower or a Subsidiary Guarantor is the continuing Person or (y) the resulting, surviving or transferee Person expressly assumes all of the obligations of such Guarantor under its Guarantee of the Secured Obligations, this Agreement and the Collateral Documents; and (B) immediately after giving effect to the transaction, no Event of Default shall have occurred and be continuing; or

(iii)    the transaction constitutes a sale, disposition (including by way of consolidation, merger or amalgamation) or transfer of such Guarantor or the sale, disposition, conveyance, transfer or lease of all or substantially all of the assets of such Guarantor (in each case other than to the Borrower or a Restricted Subsidiary) otherwise permitted by this Agreement.

(g)    Notwithstanding any other provision of this <u>Section 7.04</u>, any Subsidiary Guarantor may (a) consolidate, amalgamate or otherwise combine with, merge into or transfer all or part of its properties and assets to another Subsidiary Guarantor or the Borrower, (b) consolidate, amalgamate or otherwise combine with or merge into an Affiliate incorporated or organized for the purpose of changing the legal domicile of such Guarantor, reincorporating such Guarantor in another jurisdiction, or changing the legal form of such Guarantor, (c) convert into a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor, (d) liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and (e) complete any disposition permitted under this Agreement, Permitted Acquisition, Permitted Investment, Permitted IPO Reorganization or Permitted Tax Restructuring. Notwithstanding anything to the contrary in this <u>Section 7.04</u>, the Borrower may contribute Capital Stock of any or all of its Subsidiaries to any Subsidiary Guarantor.

(h)    Any reference herein to a merger, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, limited partnership or trust, or an allocation of assets to a series of a limited liability company, limited partnership or trust (or the unwinding of such a division or allocation), as if it were a merger, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company, limited partnership or trust shall constitute a separate Person hereunder (and each division of any limited liability company, limited partnership or trust that is a Subsidiary, Restricted Subsidiary, Unrestricted Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 7.05    <u>Limitation on Sales of Assets and Subsidiary Stock</u>.

(a)    The Borrower shall not, and shall not permit any of the Restricted Subsidiaries to, make any Asset Disposition other than dispositions contemplated on the Closing Date unless (*provided* that any such dispositions in a principal amount in excess of $2,500,000 is set forth on <u>Schedule 7.05(a)</u>):

(i)        The Borrower or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise) at least equal to the fair market value (such fair market value to be determined on the date of contractually agreeing to such Asset Disposition), as determined in good faith by the Borrower, of the shares and assets subject to such Asset Disposition (including, for the avoidance of doubt, if such Asset Disposition is a Permitted Asset Swap);

(ii)        any such Asset Disposition, or series of related Asset Dispositions (except to the extent the Asset Disposition is a Permitted Asset Swap) with a purchase price in excess of the greater of $10,000,000 and 10.0% of LTM EBITDA, at least 75.0% of the consideration from such Asset Disposition, together with all other Asset Dispositions since the Closing Date (on a cumulative basis), (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise) received by the Borrower or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; and

(iii)        the Borrower complies with Section 2.05(b)(ii).

(b)        For the purposes of Section 7.05(a)(ii) hereof, the following shall be deemed to be cash:

(i)        the assumption by the transferee of Indebtedness or other liabilities contingent or otherwise of the Borrower or a Restricted Subsidiary (other than Subordinated Indebtedness of the Borrower or a Subsidiary Guarantor) and the release of the Borrower or such Restricted Subsidiary from all liability on such Indebtedness or other liability in connection with such Asset Disposition;

(ii)        securities, notes or other obligations received by the Borrower or any Restricted Subsidiary from the transferee that are converted by the Borrower or such Restricted Subsidiary into cash or Cash Equivalents, or by their terms are required to be satisfied for cash and Cash Equivalents (to the extent of the cash or Cash Equivalents received), in each case, within 270 days following the closing of such Asset Disposition;

(iii)        any Capital Stock or assets of the kind referred to in Section 2.05(b)(ii)(B)(i) and (ii);

(iv)        Indebtedness of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Asset Disposition, to the extent that the Borrower and each other Restricted Subsidiary are released from any Guarantee of payment of such Indebtedness in connection with such Asset Disposition;

(v)        consideration consisting of Indebtedness of the Borrower (other than Disqualified Stock or Subordinated Indebtedness) received after the Closing Date from Persons who are not the Borrower or any Restricted Subsidiary; and

(vi)        any Designated Non-Cash Consideration received by the Borrower or any Restricted Subsidiary in such Asset Dispositions having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this Section 7.05 that is at that time outstanding, not to exceed the greater of $10,000,000 and 10.0% of LTM EBITDA (with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value).

Notwithstanding the foregoing, in no event shall any Loan Party be permitted to dispose of any Material Intellectual Property, whether as a disposition, Investment, Restricted Payment or otherwise in the ordinary course of such Loan Party's business, either directly or indirectly, to any Unrestricted Subsidiary; *provided* that Loan Parties shall be permitted to grant non-exclusive licenses to any Unrestricted Subsidiary in the ordinary course of business.

Section 7.06    <u>Restricted Payments & Modification of Subordinated Indebtedness Documents</u>.

(a)    The Borrower shall not, and shall not permit any of its Restricted Subsidiaries, directly or indirectly, to:

(i)    declare or pay any dividend or make any distribution on or in respect of the Borrower or any Restricted Subsidiary's Capital Stock (including any such payment in connection with any merger, amalgamation or consolidation involving the Borrower or any of its Restricted Subsidiaries) except:

(A)    dividends, payments or distributions payable in Capital Stock of the Borrower (other than Disqualified Stock) or in options, warrants or other rights to purchase such Capital Stock of the Borrower; and

(B)    dividends, payments or distributions payable to the Borrower or a Restricted Subsidiary (and, in the case of any such Restricted Subsidiary making such dividend or distribution, to holders of its Capital Stock other than the Borrower or another Restricted Subsidiary on no more than a *pro rata* basis);

(ii)    purchase, repurchase, redeem, retire or otherwise acquire or retire for value any Capital Stock of the Borrower or any Parent Entity held by Persons other than the Borrower or a Restricted Subsidiary;

(iii)    purchase, repurchase, redeem, defease or otherwise acquire or retire for value, or make any scheduled repayment (other than regularly scheduled payments of interest and fees) or scheduled sinking fund payment with respect to, any Subordinated Indebtedness, or

(iv)    make any Restricted Investment (any such dividend, distribution, payment, purchase, redemption, repurchase, defeasance, other acquisition, retirement or Restricted Investment referred to in <u>clauses (i)</u> through <u>(iv)</u> above are referred to herein as a "<u>Restricted Payment</u>"), unless at the time of such Restricted Payment, the aggregate amount of such Restricted Payment and all other Restricted Payments made subsequent to the Closing Date (and not returned or rescinded) (including Permitted Payments made pursuant to <u>Section 7.06(b)(i)</u> (without duplication) and <u>(vii)</u>, but excluding all other Restricted Payments permitted by <u>Section 7.06(b)</u>) is less than the sum of (without duplication) (the sum of the amounts in <u>clauses (1)</u> through <u>(7)</u> below, the "<u>Available Amount</u>"); *provided* that subject to the Limited Condition Transaction provisions, (1) immediately after giving *pro forma* effect to such transaction, no Event of Default shall have occurred and be continuing, and (2) in the case of Restricted Payments (other than an Restricted Investment), immediately after giving *pro forma* effect to the payment of any such Restricted Payment, the Consolidated Total Leverage Ratio shall be no greater than 4.00:1.00:

(1)    50.0% of Cumulative Consolidated Net Income of the Borrower and the Restricted Subsidiaries for the period from the first day of the first full fiscal quarter commencing after the Closing Date until the last day of the then-

most recent fiscal quarter or fiscal year of the Borrower, as applicable, for which financial statements have been delivered pursuant to Section 6.01 (such amount, the "Growth Amount");

(2)    100.0% of the aggregate amount of cash, and the fair market value of property or assets or marketable securities, received by the Borrower from the issue or sale of its Capital Stock (other than Disqualified Stock or Designated Preferred Stock) or as a result of a merger or consolidation with another Person subsequent to the Closing Date or otherwise contributed to the equity (other than through the issuance of Disqualified Stock or Designated Preferred Stock) of the Borrower or a Restricted Subsidiary (including the aggregate principal amount of any Indebtedness of the Borrower or a Restricted Subsidiary contributed to the Borrower or a Restricted Subsidiary for cancellation) or that becomes part of the capital of the Borrower or a Restricted Subsidiary through consolidation or merger subsequent to the Closing Date and, in each case, contributed to the Borrower (other than (w) Net Cash Proceeds or property or assets or marketable securities received from an issuance or sale of such Capital Stock to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Borrower or any Subsidiary of the Borrower for the benefit of its employees to the extent funded by the Borrower or any Restricted Subsidiary, (x) cash or property or assets or marketable securities to the extent that any Restricted Payment has been made from such proceeds in reliance on Section 7.06(b)(vi) hereof, and (y) Excluded Contributions and Cure Amounts);

(3)    100.0% of the aggregate amount of cash, and the fair market value of property or assets or marketable securities, received by the Borrower or any Restricted Subsidiary from the issuance or sale (other than to the Borrower or a Restricted Subsidiary or an employee stock ownership plan or trust established by the Borrower or any Subsidiary of the Borrower for the benefit of their employees to the extent funded by the Borrower or any Restricted Subsidiary) by the Borrower or any Restricted Subsidiary subsequent to Closing Date of any Indebtedness or Disqualified Stock or Designated Preferred Stock that has been converted into or exchanged for Capital Stock of the Borrower (other than Disqualified Stock or Designated Preferred Stock) plus, without duplication, the amount of any cash, and the fair market value of property or assets or marketable securities, received by the Borrower or any Restricted Subsidiary upon such conversion or exchange and, in each case, contributed to the Borrower;

(4)    100.0% of the aggregate amount received in cash and the fair market value of marketable securities or other property received by means of: (i) the sale or other disposition (other than to the Borrower or a Restricted Subsidiary) of, or other returns, profits, distributions and similar amounts on Investments from, Restricted Investments made by the Borrower or its Restricted Subsidiaries and repurchases and redemptions of, or cash distributions or cash interest received in respect of, such Investments from the Borrower or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by the Borrower or its Restricted Subsidiaries, in each case after the Closing Date; or (ii) the sale or other disposition (other than to the Borrower or a Restricted Subsidiary) of the Capital Stock of an Unrestricted Subsidiary or a JV Entity or a dividend, payment or distribution from an Unrestricted Subsidiary or a JV Entity (other than to the extent of the amount of

the Investment that constituted a Permitted Investment and will increase the amount available under the applicable clause of the definition of "Permitted Investment") or a dividend, payment or distribution from a Person that is not a Restricted Subsidiary after the Closing Date (other than to the extent of the amount of the Investment that constituted a Permitted Investment and will increase the amount available under the applicable clause of the definition of "Permitted Investment"), in each case of clause (i) and clause (ii), only to the extent such Investments were originally made using the Available Amount;

(5)     in the case of the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary or the merger, amalgamation or consolidation of an Unrestricted Subsidiary into the Borrower or a Restricted Subsidiary or the transfer of all or substantially all of the assets of an Unrestricted Subsidiary to the Borrower or a Restricted Subsidiary after the Closing Date, the fair market value of the Investment in such Unrestricted Subsidiary (or the assets transferred), as determined in good faith by the Borrower, at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary or at the time of such merger, amalgamation or consolidation or transfer of assets (after taking into consideration any Indebtedness associated with the Unrestricted Subsidiary so designated or merged, amalgamated or consolidated or Indebtedness associated with the assets so transferred) and only to the extent such Investment was originally made using the Available Amount, other than to the extent of the amount of the Investment that constituted a Permitted Investment and will increase the amount available under the applicable clause of the definition of "Permitted Investment" below;

(6)     the greater of $35,000,000 and 35.0% of LTM EBITDA; and

(7)     Retained Declined Proceeds.

(b)     Section 7.06(a) will not prohibit any of the following (collectively, "Permitted Payments"):

(i)     the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement or the redemption, repurchase or retirement of Indebtedness if, at the date of any redemption notice, such payment would have complied with the provisions of this Agreement as if it were and is deemed at such time to be a Restricted Payment at the time of such notice;

(ii)     (a) any prepayment, purchase, repurchase, redemption, defeasance, discharge or other acquisition or retirement of Capital Stock, including any accrued and unpaid dividends thereon ("Treasury Capital Stock") or Subordinated Indebtedness made by exchange (including any such exchange pursuant to the exercise of a conversion right or privilege in connection with which cash is paid in lieu of the issuance of fractional shares) for, or out of the proceeds of the substantially concurrent sale of, Capital Stock of the Borrower (other than Disqualified Stock or Designated Preferred Stock) or a contribution to the equity of the Borrower (other than through the issuance of Disqualified Stock or Designated Preferred Stock or through an Excluded Contribution or Cure Amount) ("Refunding Capital Stock") (b) the declaration and payment of dividends on Treasury Capital Stock out of the proceeds of the substantially concurrent sale or issuance of such Treasury Capital Stock (other than to a Subsidiary of the Borrower or to an employee stock ownership plan or any trust established by the Borrower or any of its Subsidiaries); and (c) if

immediately prior to the retirement of Treasury Capital Stock, the declaration and payment of dividends thereon was permitted under Section 7.06(b)(xiii) hereof, the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Capital Stock of a Parent Entity) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Treasury Capital Stock immediately prior to such retirement;

(iii)    any prepayment, purchase, repurchase, exchange, redemption, defeasance, discharge or other acquisition or retirement of Subordinated Indebtedness made by exchange for, or out of the proceeds of the substantially concurrent sale of, Refinancing Indebtedness permitted to be Incurred pursuant to Section 7.03 hereof; *provided* that such Refinancing Indebtedness is also Subordinated Indebtedness;

(iv)    any prepayment, purchase, repurchase, exchange, redemption, defeasance, discharge or other acquisition or retirement of Preferred Stock of the Borrower or a Restricted Subsidiary made by exchange for, or out of the proceeds of the substantially concurrent sale of, Preferred Stock of the Borrower or a Restricted Subsidiary, as the case may be, that, in each case, is permitted to be Incurred pursuant to Section 7.03 hereof;

(v)    any prepayment, purchase, repurchase, redemption, defeasance, discharge or other acquisition or retirement of Subordinated Indebtedness of the Borrower or a Restricted Subsidiary:

(A)    to the extent required by the agreement governing such Subordinated Indebtedness, following the occurrence of (A) a Change of Control (or other similar event described therein as a "change of control") or (B) an Asset Disposition (or other similar event described therein as an "asset disposition" or "asset sale") but only if the Borrower shall have first complied with the terms described under Section 2.05 and shall not be in default of Section 8.01(i) hereof, as applicable; or

(B)    consisting of Acquired Indebtedness (other than Indebtedness Incurred (x) to provide all or any portion of the funds utilized to consummate the transaction or series of related transactions pursuant to which such Person became a Restricted Subsidiary or was otherwise acquired by the Borrower or a Restricted Subsidiary or (y) otherwise in connection with or contemplation of such acquisition);

(vi)    a Restricted Payment to pay for the prepayment, purchase, repurchase, redemption, defeasance, discharge, retirement or other acquisition of Capital Stock (other than Disqualified Stock) of the Borrower or of any Parent Entity held by any future, present or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliate or Immediate Family Members) of the Borrower, any of its Subsidiaries or of any Parent Entity (or permitted transferees, assigns, estates, trusts or heirs of such employee, director, officer, manager, contractor, consultant or advisor or their respective Controlled Investment Affiliates or Immediate Family Members) either pursuant to any management equity plan, stock option plan, phantom equity plan or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto), employment, termination or severance agreement, or any stock subscription or equityholder agreement (including, for the avoidance of doubt, any principal and interest payable on any Indebtedness issued by the Borrower or any Parent Entity in connection with such prepayment, purchase, repurchase, redemption, defeasance, discharge, retirement or other acquisition), including any Capital Stock rolled over, accelerated or paid out by or to any employee, director, officer, manager,

-178-

contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any of its Subsidiaries or any Parent Entity in connection with any transaction; *provided, however*, that the aggregate Restricted Payments made under this clause (vi) do not exceed the greater of $2,500,000 and 2.5% of LTM EBITDA in any calendar year (with unused amounts in any calendar year being carried over to succeeding calendar years); *provided, further*, that such amount in any calendar year may be increased by an amount not to exceed:

> (A) the cash proceeds from the sale of Capital Stock (other than Disqualified Stock, Designated Preferred Stock, Excluded Contributions or Cure Amounts) of the Borrower and, to the extent contributed to the capital of the Borrower, the cash proceeds from the sale of Capital Stock of any Parent Entity, in each case to any future, present or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any of its Subsidiaries or any Parent Entity that occurred after the Closing Date, to the extent the cash proceeds from the sale of such Capital Stock have not otherwise been applied to the payment of Restricted Payments by virtue of Section 7.06(a) hereof; *plus*

> (B) the cash proceeds of key man life insurance policies received by the Borrower or any of its Restricted Subsidiaries after the Closing Date (or any Parent Entity to the extent contributed to the Borrower); *less*

> (C) the amount of any Restricted Payments made in previous calendar years pursuant to clauses (A) and (B) of this Section 7.06(b)(vi);

and *provided, further,* that (i) cancellation of Indebtedness owing to the Borrower or any Restricted Subsidiary from any future, present or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower or its Restricted Subsidiaries or any Parent Entity in connection with a repurchase of Capital Stock of the Borrower or any Parent Entity and (ii) the repurchase of Capital Stock deemed to occur upon the exercise of options, warrants or similar instruments if such Capital Stock represents all or a portion of the exercise price thereof and payments, in lieu of the issuance of fractional shares of such Capital Stock or withholding to pay other taxes payable in connection therewith, in the case of each of clauses (i) and (ii), will not be deemed to constitute a Restricted Payment for purposes of this Section 7.06 or any other provision of this Agreement;

> (vii) the declaration and payment of dividends on Disqualified Stock of the Borrower or any of its Restricted Subsidiaries or Preferred Stock of a Restricted Subsidiary, issued in accordance with the terms of Section 7.03 hereof;

> (viii) payments made or expected to be made by the Borrower or any Restricted Subsidiary in respect of withholding or similar taxes payable in connection with the exercise or vesting of Capital Stock or any other equity award by any future, present or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower or any Restricted Subsidiary or any Parent Entity and purchases, repurchases, redemptions, defeasances or other acquisitions or retirements of Capital Stock deemed to occur upon the exercise, conversion or exchange of stock options, warrants, equity-based awards or other rights in respect thereof if such Capital Stock represents a portion of the exercise price thereof or payments in respect of withholding or similar taxes payable upon exercise or vesting thereof;

(ix)     dividends, loans, advances or distributions to any Parent Entity or other payments by the Borrower or any Restricted Subsidiary in amounts equal to (without duplication):

(A)     the amounts required for any Parent Entity to pay any Parent Entity Expenses;

(B)     amounts constituting or to be used for purposes of making payments to the extent specified in Sections 7.10(b)(ii), (iv), (x), (xi), (xii), (xiv) and (xviii); or

(x)     (a) so long as no Event of Default has occurred and is continuing (or would result therefrom), the declaration and payment of dividends on the common stock or common equity interests of the Borrower or any Parent Entity (and any equivalent declaration and payment of a distribution of any security exchangeable for such common stock or common equity interests to the extent required by the terms of any such exchangeable securities and any Restricted Payment to any such Parent Entity to fund the payment by such Parent Entity of dividends on such entity's Capital Stock), following a public offering of such common stock or common equity interests (or such exchangeable securities, as applicable), in an amount in any fiscal year not to exceed an aggregate amount equal to 7.0% of the amount of net cash proceeds received by or contributed to the Borrower or any of its Restricted Subsidiaries from any such public offering; or (b) in lieu of all or a portion of the dividends permitted by clause (a), any prepayment, purchase, repurchase, redemption, defeasance, discharge, retirement or other acquisition of the Capital Stock of the Borrower or any Parent Entity (and any equivalent declaration and payment of a distribution of any security exchangeable for such common stock or common equity interests to the extent required by the terms of any such exchangeable securities and any Restricted Payment to any such Parent Entity to fund the payment by such Parent Entity of dividends on such entity's Capital Stock) for aggregate consideration that, when taken together with dividends permitted by clause (a), does not exceed the amount contemplated by clause (a);

(xi)     payments by the Borrower, or loans, advances, dividends or distributions to any Parent Entity to make payments, to holders of Capital Stock of the Borrower or any Parent Entity in lieu of the issuance of fractional shares of such Capital Stock, *provided*, *however*, that any such payment, loan, advance, dividend or distribution shall not be for the purpose of evading any limitation of this Section 7.06 or otherwise to facilitate any dividend or other return of capital to the holders of such Capital Stock (as determined in good faith by the Borrower);

(xii)     Restricted Payments that are made (a) in an amount not to exceed the amount of Excluded Contributions or (b) in an amount equal to the amount of net cash proceeds from an asset sale or disposition in respect of property or assets acquired, if the acquisition of such property or assets was financed with Excluded Contributions; *provided* that the amount of Restricted Payments permitted pursuant to this clause (b) shall not exceed the original amount of Excluded Contributions that were used to finance the acquisition or such property or assets;

(xiii)     (i) the declaration and payment of dividends on Designated Preferred Stock of the Borrower or any of its Restricted Subsidiaries issued after the Closing Date; (ii) the declaration and payment of dividends to a Parent Entity in an amount sufficient to allow the Parent Entity to pay dividends to holders of its Designated Preferred Stock issued after the Closing Date; and (iii) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock; *provided*, *however*, that, in the case of clause (ii), the amount of dividends declared and paid to a Person pursuant to such clause shall not exceed the cash proceeds received by the Borrower or the aggregate amount contributed in cash to the equity of the Borrower (other than through the issuance of Disqualified Stock, a Cure Amount or an Excluded Contribution of the Borrower), from the

issuance or sale of such Designated Preferred Stock; *provided, further*, in each case, that for the most recently ended four fiscal quarters for which consolidated financial statements have been or are required to be delivered pursuant to Section 6.01(a) or 6.01(b) immediately preceding the date of issuance of such Designated Preferred Stock or declaration of such dividends on such Refunding Capital Stock, after giving effect to such payment on a *pro forma* basis the Borrower would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the test set forth in Section 7.03(a) hereof;

(xiv)    distributions or payments of Securitization Fees, sales contributions and other transfers of Securitization Assets or Receivables Assets and purchases of Securitization Assets or Receivables Assets pursuant to a Securitization Repurchase Obligation, in each case in connection with a Qualified Securitization Financing or Receivables Facility;

(xv)    the Closing Distribution and any fees, costs and expenses (including all legal, accounting and other professional fees, costs and expenses) related thereto, including Transaction Expenses, or used to fund amounts owed to Affiliates in connection with the Transactions (including dividends to any Parent Entity to permit payment by such Parent Entity of such amounts);

(xvi)    (i) so long as no Event of Default has occurred and is continuing (or would result therefrom), Restricted Payments (including loans or advances) in an aggregate amount outstanding at the time made not to exceed the greater of $25,000,000 and 25.0% of LTM EBITDA at such time minus amounts reallocated to clause (u) of the definition of "Permitted Investments" or to Section 7.03(xiv), and (ii) so long as no Default or Event of Default has occurred and is continuing (or would result therefrom), any Restricted Payments, so long as, immediately after giving *pro forma* effect to the payment of any such Restricted Payment and the incurrence of any Indebtedness the net proceeds of which are used to make such Restricted Payment, the Consolidated Total Leverage Ratio shall be no greater than 3.25:1.00;

(xvii)    mandatory redemptions of Disqualified Stock permitted to be issued hereunder;

(xviii)    so long as no Default or Event of Default has occurred and is continuing (or would result therefrom), the prepayment, purchase, redemption, defeasance, repurchase, exchange or other acquisition or retirement of Subordinated Indebtedness, so long as, immediately after giving *pro forma* effect to the payment of any such Restricted Payment and the incurrence of any Indebtedness the net proceeds of which are used to make such Restricted Payment, the Consolidated Total Leverage Ratio shall be no greater than 3.75:1.00;

(xix)    payments or distributions to dissenting stockholders pursuant to applicable law (including in connection with, or as a result of, exercise of dissenters' or appraisal rights and the settlement of any claims or action (whether actual, contingent or potential)), pursuant to or in connection with a merger, amalgamation, consolidation or transfer of assets that complies with Section 7.04 hereof;

(xx)    Restricted Payments to a Parent Entity to finance Investments that would otherwise be permitted to be made pursuant to this Section 7.06 if made by the Borrower; *provided* that (a) such Restricted Payment shall be made substantially concurrently with the closing of such Investment, (b) such Parent Entity shall, promptly following the closing thereof, cause (1) all property acquired (whether assets or Capital Stock) to be contributed to the capital of the Borrower or one of its Restricted Subsidiaries or (2) the merger or amalgamation of the Person formed or acquired into the Borrower or one of its Restricted Subsidiaries (to the extent not prohibited by

Section 7.04 hereof) to consummate such Investment, (c) such Parent Entity and its Affiliates (other than the Borrower or a Restricted Subsidiary) receives no consideration or other payment in connection with such transaction except to the extent the Borrower or a Restricted Subsidiary could have given such consideration or made such payment in compliance with this Agreement, (d) any property received by the Borrower shall not increase amounts available for Restricted Payments pursuant to Section 7.06(a), except to the extent the fair market value at the time of such receipt of such property exceeds the Restricted Payment made pursuant to this clause (xx) and (e) such Investment shall be deemed to be made by the Borrower or such Restricted Subsidiary pursuant to another provision of this Section 7.06 (other than pursuant to Section 7.06(b)(xiii)) or pursuant to the definition of "Permitted Investment" (other than pursuant to clause (l) thereof);

(xxi)    so long as no Event of Default has occurred and is continuing, prepayments, purchases or redemptions of Subordinated Indebtedness in an aggregate amount outstanding at the time made not to exceed the greater of $25,000,000 and 25.0% of LTM EBITDA at such time minus amounts reallocated to clause (u) of the definition of "Permitted Investments";

(xxii)    conversions of Subordinated Indebtedness into Common Stock or other Qualified Capital Stock;

(xxiii)    refinancing or exchanges of any Subordinated Indebtedness (including Subordinated Indebtedness assumed in connection with a Permitted Acquisition or other similar Investment permitted under this Agreement (and not incurred in contemplation thereof)) for like or other Subordinated Indebtedness; and

(xxiv)    payments or distributions to enable the direct and indirect equity owners of Borrower to pay their respective income or similar Tax liabilities attributable to the Borrower and its Subsidiaries in respect of any taxable period for which the Borrower is a partnership, a disregarded entity or other pass-through entity for U.S. federal income tax purposes (other than any such entity that is directly or indirectly wholly-owned by a C-corporation for U.S. federal income tax and/or applicable state or local income tax purposes), the income or similar Tax liabilities of any direct or indirect owner of the Borrower arising from its direct or indirect interest in the Borrower and its Subsidiaries (in the case of Unrestricted Subsidiaries, solely with respect to amounts actually distributed or paid to the Borrower), computed by multiplying the net overall taxable income of the Borrower and its Subsidiaries with a composite rate calculated as the sum total of (x) the highest marginal combined federal, state, and local tax rate of a corporation organized in New York, New York, multiplied by 70% (or, other percentage of the Borrower at such time directly or indirectly owned by Quantum Gaming Corp. and other "blocker" entities treated as C-corporations for US tax purposes) and (y) the highest marginal combined federal, state, and local tax rate of an individual residing in New York, New York multiplied by 30% (or, other percentage of the Borrower directly or indirectly owned by entities other than Quantum Gaming Corp. or other entities that are not "blocker" entities treated as C-corporations for U.S. tax purposes), taking into account the character of the income and the deductibility of state and local income taxes and taking into account any loss carryovers, *provided* that any amounts so distributed shall be without duplication of any such taxes paid or withheld (e.g., under Section 1446 of the Code) by the Borrower or its Subsidiaries with respect to the same taxable income.

(c)    The Borrower shall not, and shall not permit any of the Restricted Subsidiaries, directly or indirectly, to amend, modify or change any term or condition of documents evidencing Subordinated Indebtedness in a manner that violates the applicable subordination agreement or such document evidencing Subordinated Indebtedness in a manner that is material and adverse to the Lenders.

(d)        [Reserved].

(e)        The amount of all Restricted Payments (other than cash) shall be the fair market value on the date of such Restricted Payment of the asset(s) or securities proposed to be paid, transferred or issued by the Borrower or such Restricted Subsidiary, as the case may be, pursuant to such Restricted Payment.  The fair market value of any cash Restricted Payment shall be its face amount, and the fair market value of any non-cash Restricted Payment, property or assets other than cash shall be determined conclusively by the Borrower acting in good faith.

(f)        Notwithstanding the foregoing, in no event shall any Loan Party be permitted to dispose of any Material Intellectual Property, whether as a disposition, Investment, Restricted Payment or otherwise in the ordinary course of such Loan Party's business, either directly or indirectly, to any Unrestricted Subsidiary; *provided* that Loan Parties shall be permitted to grant non-exclusive licenses to any Unrestricted Subsidiary in the ordinary course of business.

Section 7.07        Holding Company Status.  The Borrower shall cause Holdings not to engage in any business activities other than (i) direct ownership of the Capital Stock of the Borrower, (ii) activities incidental to the maintenance of its organizational existence (including the ability to incur fees, costs and expenses relating to such maintenance and performance of activities relating to its officers, directors, managers and employees and those of its Subsidiaries), (iii) performance of its obligations under the Loan Documents, (iv) the participation in tax, accounting, cash management and other administrative matters as a member of a consolidated group of companies including its Subsidiaries and the Borrower and its Subsidiaries, (v) the performance of obligations under and compliance with its Organization Document or any applicable Law, (vi) the incurrence and payment of its operating and business expenses and any Taxes for which it may be liable, (vii) the issuance, sale or repurchase of its Capital Stock and the receipt of capital contributions as and to the extent permitted by this Agreement, (viii) making capital contributions, (ix) activities otherwise permitted by this Agreement, (x) Investments existing as of the Closing Date and pursuant to binding commitments, agreements or arrangements in effect on the Closing Date which, to the extent in an amount in excess of $25,000, are listed on Schedule 7.07, and (xi) activities incidental to the businesses or activities described in clauses (i) through (ix) above.

Section 7.08        Limitation on Restrictions on Distributions from Restricted Subsidiaries and Negative Pledges.

(a)        The Borrower shall not, and shall not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(i)        to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation;

(ii)        pay dividends or make any other distributions in cash or otherwise on its Capital Stock or pay any Indebtedness or other obligations owed to the Borrower or any Restricted Subsidiary;

(iii)        make any loans or advances to the Borrower or any Restricted Subsidiary; or

(iv)        sell, lease or transfer any of its property or assets to the Borrower or any Restricted Subsidiary;

*provided* that (x) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill requirements to) loans or advances made to the Borrower or any Restricted Subsidiary to other Indebtedness Incurred by the Borrower or any Restricted Subsidiary shall not be deemed to constitute such an encumbrance or restriction.

(b)     Section 7.08(a) shall not prohibit:

(i)     any encumbrance or restriction pursuant to any agreement or instrument, in each case, in effect at or entered into on the Closing Date in connection with the Transactions;

(ii)     any encumbrance or restriction pursuant to this Agreement, the Collateral Documents and the Guarantees;

(iii)     any encumbrance or restriction pursuant to an agreement or instrument of a Person or relating to any Capital Stock or Indebtedness of a Person, entered into on or before the date on which such Person was acquired by or merged, amalgamated, consolidated or otherwise combined with or into the Borrower or any Restricted Subsidiary, or was designated as a Restricted Subsidiary or on which such agreement or instrument is assumed by the Borrower or any Restricted Subsidiary in connection with an acquisition of assets (other than Capital Stock or Indebtedness Incurred as consideration in, or to provide all or any portion of the funds utilized to consummate, the transaction or series of related transactions pursuant to which such Person became a Restricted Subsidiary or was acquired by the Borrower or was merged, amalgamated, consolidated or otherwise combined with or into the Borrower or any Restricted Subsidiary or entered into in contemplation of or in connection with such transaction) and outstanding on such date; *provided* that, for the purposes of this clause (iii), if another Person is the Successor Company, any Subsidiary thereof or agreement or instrument of such Person or any such Subsidiary shall be deemed acquired or assumed by the Borrower or any Restricted Subsidiary when such Person becomes the Successor Company;

(iv)     any encumbrance or restriction:

(A)     that restricts in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license or similar contract or agreement, or the assignment or transfer of any lease, license or other contract or agreement;

(B)     contained in mortgages, pledges, charges or other security agreements permitted under this Agreement and the Collateral Documents or securing Indebtedness of the Borrower or a Restricted Subsidiary permitted under this Agreement and the Collateral Documents to the extent such encumbrances or restrictions restrict the transfer or encumbrance of the property or assets subject to such mortgages, pledges, charges or other security agreements;

(C)     contained in any trading, netting, operating, construction, service, supply, purchase, sale or other agreement to which the Borrower or any of its Restricted Subsidiaries is a party entered into in the ordinary course of business or consistent with past practice; *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Restricted Subsidiary that are subject to such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Borrower or such Restricted Subsidiary or the assets or property of another Restricted Subsidiary; or

-184-

(D)     pursuant to customary provisions restricting dispositions of real property interests set forth in any reciprocal easement agreements of the Borrower or any Restricted Subsidiary;

(v)     any encumbrance or restriction pursuant to Purchase Money Obligations and Capitalized Lease Obligations permitted under this Agreement and the Collateral Documents, in each case, that impose encumbrances or restrictions on the property so acquired;

(vi)     any encumbrance or restriction imposed pursuant to an agreement entered into for the direct or indirect sale or disposition to a Person of all or substantially all the Capital Stock or assets of the Borrower or any Restricted Subsidiary (or the property or assets that are subject to such restriction) pending the closing of such sale or disposition;

(vii)     customary provisions in leases, licenses, equityholder agreements, joint venture agreements, organizational documents and other similar agreements and instruments;

(viii)     encumbrances or restrictions arising or existing by reason of applicable law or any applicable rule, regulation or order, or required by any regulatory authority;

(ix)     any encumbrance or restriction on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business or consistent with past practice;

(x)     any encumbrance or restriction pursuant to Hedging Obligations;

(xi)     other Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be Incurred or issued subsequent to the Closing Date pursuant to the provisions of Section 7.03 that impose restrictions solely on the Foreign Subsidiaries party thereto or their Subsidiaries;

(xii)     restrictions created in connection with any Qualified Securitization Financing or Receivables Facility that, in the good faith determination of the Borrower, are necessary or advisable to effect such Securitization Facility or Receivables Facility;

(xiii)     any encumbrance or restriction arising pursuant to an agreement or instrument (which, if it relates to any Indebtedness, shall only be permitted if such Indebtedness is permitted to be Incurred pursuant to the provisions of Section 7.03 hereof) if (i) the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to the Lenders than (a) the encumbrances and restrictions contained in the this Agreement, together with the security documents associated therewith or (b) in comparable financings (as determined in good faith by the Borrower) or (ii) either (a) the Borrower determines at the time of entry into such agreement or instrument that such encumbrances or restrictions will not adversely affect, in any material respect, the Borrower's ability to make principal or interest payments on the Secured Obligations or (b) such encumbrance or restriction applies only during the continuance of a default in respect of a payment relating to such agreement or instrument;

(xiv)     any encumbrance or restriction existing by reason of any Lien permitted under Section 7.01 hereof; or

(xv)     any encumbrance or restriction pursuant to an agreement or instrument effecting a refinancing of Indebtedness Incurred pursuant to, or that otherwise refinances, an agreement or

instrument referred to in clauses (i) to (xiv) of this Section 7.08(b) or this clause (xv) (an "Initial Agreement") or contained in any amendment, supplement or other modification to an agreement referred to in clauses (i) to (xiv) of this Section 7.08(b) or this clause (xv); *provided*, *however*, that the encumbrances and restrictions with respect to such Restricted Subsidiary contained in any such agreement or instrument are no less favorable in any material respect to the Lenders taken as a whole than the encumbrances and restrictions contained in the Initial Agreement or Initial Agreements to which such refinancing or amendment, supplement or other modification relates (as determined in good faith by the Borrower).

Section 7.09    Financial Covenant.  Except with the written consent of the Required Revolving Credit Lenders and subject to Section 8.05, the Borrower shall not permit the Consolidated First Lien Secured Leverage Ratio as of the last day of any Test Period (commencing with the last day of the second (2nd) full fiscal quarter of the Borrower after the Closing Date) to be greater than 7.75:1.00. Notwithstanding the foregoing, this Section 7.09 shall only be tested when the sum of (i) the Outstanding Amount of Letters of Credit (other than Letters of Credit (x) that remain undrawn in an amount not to exceed $10,000,000 in the aggregate or (y) that are Cash Collateralized in an amount equal to the Outstanding Amount thereof) and (ii) the Outstanding Amount of Revolving Credit Loans (including Swing Line Loans) exceeds 35.0% of the Revolving Credit Commitments as of the last day of such Test Period; *provided* that Revolving Credit Loans originally borrowed on the Closing Date to pay Transaction Expenses shall be excluded from such calculation for the first two (2) full fiscal quarter periods ending after the Closing Date (the "Financial Covenant").

Section 7.10    Affiliate Transactions.

(a)    The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to enter into or conduct any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of the Borrower (an "Affiliate Transaction") involving aggregate value in excess of the greater of $5,000,000 and 5.0% of LTM EBITDA unless:

(i)    the terms of such Affiliate Transaction taken as a whole are not materially less favorable to the Borrower or such Restricted Subsidiary, as the case may be, than those that could be obtained in a comparable transaction at the time of such transaction or the execution of the agreement providing for such transaction in arm's length dealings with a Person who is not such an Affiliate; and

(ii)    in the event such Affiliate Transaction involves an aggregate value in excess of the greater of $1,000,000 and 1.0% of LTM EBITDA, the terms of such transaction have been approved by a majority of the members of the Board of Directors.

Any Affiliate Transaction shall be deemed to have satisfied the requirements set forth in Section 7.10(a)(ii) if such Affiliate Transaction is approved by a majority of the Disinterested Directors, if any.

(b)    Section 7.10(a) shall not apply to:

(i)    any Restricted Payment or other transaction permitted to be made or undertaken pursuant to Section 7.06 hereof (including Permitted Payments), or any Permitted Investment;

(ii)    any Management Advances and any waiver or transaction with respect thereto;

(iii)    any transaction between or among the Borrower and any Restricted Subsidiary (or entity that becomes a Restricted Subsidiary as a result of such transaction), or between or among Restricted Subsidiaries;

(iv)    the payment of compensation, fees, costs and expenses to, and indemnities (including under insurance policies) and reimbursements, employment and severance arrangements, and employee benefit and pension expenses provided on behalf of, or for the benefit of, future, current or former employees, directors, officers, managers, contractors, consultants, distributors or advisors (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower or any Restricted Subsidiary (whether directly or indirectly including through any Person owned or controlled by any of such employees, directors, officers, managers, contractors, consultants, distributors or advisors (or their respective Controlled Investment Affiliates or Immediate Family Members));

(v)    the entry into and performance of obligations of the Borrower or any of its Restricted Subsidiaries under the terms of any transaction arising out of, and any payments pursuant to or for purposes of funding, any agreement or instrument in effect as of or on the Closing Date or entered into on or about the Closing Date in connection with the Transactions (*provided* that any such Affiliate Transaction in a principal amount in excess of $2,500,000 is set forth on Schedule 7.10), as these agreements and instruments may be amended, modified, supplemented, extended, renewed or refinanced from time to time in accordance with the other terms of this Section 7.10 or to the extent not more disadvantageous to the Lenders in any material respect in the reasonable determination of the Borrower when taken as a whole as compared to the applicable agreement as in effect on the Closing Date or when entered into in connection with the Transactions, as applicable;

(vi)    any transaction effected as part of a Qualified Securitization Financing or Receivables Facility, any disposition or acquisition of Securitization Assets, Receivables Assets or related assets in connection with any Qualified Securitization Financing or Receivables Facility;

(vii)    transactions with customers, vendors, clients, joint venture partners, suppliers, contractors, distributors or purchasers or sellers of goods or services, in each case in the ordinary course of business or consistent with past practice, which are fair to the Borrower or the relevant Restricted Subsidiary, in the reasonable determination of the Borrower, or are on terms, taken as a whole, that are not materially less favorable as might reasonably have been obtained at such time from an unaffiliated party;

(viii)    any transaction between or among the Borrower or any Restricted Subsidiary and any Person (including a joint venture or an Unrestricted Subsidiary) that is an Affiliate of the Borrower or similar entity solely because the Borrower or a Restricted Subsidiary or any Affiliate of the Borrower or a Restricted Subsidiary or any Affiliate of any Permitted Holder owns an equity interest in or otherwise controls such Affiliate or similar entity;

(ix)    issuances, sales or transfers of Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Borrower or any of the Restricted Subsidiaries or options, warrants or other rights to acquire such Capital Stock and the granting of registration and other customary rights (and the performance of the related obligations) in connection therewith or any contribution to capital of the Borrower or any Restricted Subsidiary;

(x)    the payment of financial advisory, monitoring, management, consulting, oversight and similar fees (including refinancing, subsequent transaction and termination fees) under any

management agreement in an amount not to exceed the greater of $2,500,000 and 2.5% of LTM EBITDA in any fiscal year and expenses and indemnities of the Sponsor and to directors (with no restrictions on the payment of such advisory, monitoring, management, consulting, oversight and similar fees or the payment of such expenses and indemnities);

(xi)    payment to any Permitted Holder of all out of pocket expenses Incurred by such Permitted Holder in connection with its direct or indirect investment in the Borrower and its Subsidiaries;

(xii)    the Transactions and the payment of all fees, costs and expenses (including all legal, accounting and other professional fees, costs and expenses) related to the Transactions, including Transaction Expenses;

(xiii)    transactions in which the Borrower or any Restricted Subsidiary, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of Section 7.10(a)(i) hereof;

(xiv)    the existence of, or the performance by the Borrower or any Restricted Subsidiary of its obligations under the terms of, any equityholders, investor rights or similar agreement (including any registration rights agreement or purchase agreements related thereto) to which it is party as of the Closing Date and any similar agreement that it (or any Parent Entity) may enter into thereafter; *provided*, *however*, that the existence of, or the performance by the Borrower or any Restricted Subsidiary (or any Parent Entity) of its obligations under any future amendment to any such existing agreement or under any similar agreement entered into after the Closing Date will only be permitted under this clause to the extent that the terms of any such amendment or new agreement are not otherwise, when taken as a whole, more disadvantageous to the Lenders in any material respect in the reasonable determination of the Borrower than those in effect on the Closing Date;

(xv)    any purchases by the Borrower's Affiliates of Indebtedness or Disqualified Stock of the Borrower or any of the Restricted Subsidiaries the majority of which Indebtedness or Disqualified Stock is purchased by Persons who are not the Borrower's Affiliates;

(xvi)    (x) investments by Affiliates in securities or loans of the Borrower or any of its Restricted Subsidiaries (and payment of reasonable out-of-pocket expenses incurred by such Affiliates in connection therewith) so long as the investment is being offered by the Borrower or such Restricted Subsidiary generally to other non-affiliated third party investors on the same or more favorable terms and (y) payments to Affiliates in respect of securities or loans of the Borrower or any of its Restricted Subsidiaries contemplated in the foregoing subclause (x) or that were acquired from Persons other than the Borrower and its Restricted Subsidiaries, in each case, in accordance with the terms of such securities or loans;

(xvii)    payments by any Parent Entity, the Borrower and its Restricted Subsidiaries pursuant to any tax sharing agreement to the extent permitted by Section 7.06(b)(xxiv);

(xviii)    payments, Indebtedness and Disqualified Stock (and cancellation of any thereof) of the Borrower and its Restricted Subsidiaries and Preferred Stock (and cancellation of any thereof) of any Restricted Subsidiary to any future, current or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any of its Subsidiaries or any of its Parent Entities

pursuant to any management equity plan, stock option plan, phantom equity plan or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto), employment, termination or severance agreement, or any stock subscription or equityholder agreement with any such employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) that are, in each case, approved by the Borrower in good faith;

(xix)    any management equity plan, stock option plan, phantom equity plan or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto), employment, termination or severance agreement, or any stock subscription or equityholder agreement between the Borrower or its Restricted Subsidiaries and any distributor, employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) approved by the reasonable determination of the Borrower or entered into in connection with the Transactions;

(xx)    any transition services arrangement, supply arrangement or similar arrangement entered into in connection with or in contemplation of the disposition of assets or Capital Stock in any Restricted Subsidiary permitted under Section 7.05 hereof or entered into with any Business Successor, in each case, that the Borrower determines in good faith is either fair to the Borrower or otherwise on customary terms for such type of arrangements in connection with similar transactions;

(xxi)    transactions entered into by an Unrestricted Subsidiary with an Affiliate prior to the day such Unrestricted Subsidiary is redesignated as a Restricted Subsidiary under Section 6.13 and pledges of Capital Stock of Unrestricted Subsidiaries;

(xxii)    (i) any lease entered into between the Borrower or any Restricted Subsidiary, as lessee, and any Affiliate of the Borrower, as lessor and (ii) any operational services arrangement entered into between the Borrower or any Restricted Subsidiary and any Affiliate of the Borrower, in each case, which is approved as being on arm's length terms by the reasonable determination of the Borrower;

(xxiii)    any IP Rights licenses or sublicenses or research or development agreements in the ordinary course of business or consistent with past practice;

(xxiv)    the payment of fees, costs and expenses related to registration rights and indemnities provided to equityholders pursuant to equityholders, investor rights, registration rights or similar agreements;

(xxv)    any Permitted Intercompany Activities, Permitted Tax Restructuring, Permitted IPO Reorganization and Intercompany License Agreements; and

(xxvi)    transfer pricing or shared services agreements and intercompany loans in connection therewith.

(c)    In addition, if the Borrower or any of its Restricted Subsidiaries (i) purchases or otherwise acquires assets or properties from a Person which is not an Affiliate, the purchase or acquisition by an Affiliate of the Borrower of an interest in all or a portion of the assets or properties acquired shall not be deemed an Affiliate Transaction (or cause such purchase or acquisition by the Borrower or a Restricted Subsidiary to be deemed an Affiliate Transaction) or (ii) sells or otherwise disposes of assets or other properties to a Person who is not an Affiliate, the sale or other disposition by an Affiliate of the Borrower

of an interest in all or a portion of the assets or properties sold shall not be deemed an Affiliate Transaction (or cause such sale or other disposition by the Borrower or a Restricted Subsidiary to be deemed an Affiliate Transaction).

Section 7.11    Amendments of Material Documents.  The Borrower shall not, nor shall the Borrower permit any Loan Party to, amend or modify its organizational documents in a manner that is materially adverse to the Lenders (in their capacities as such) without obtaining the prior written consent of the Administrative Agent; *provided* that, for the avoidance of doubt, it is understood and agreed that the Borrower and/or any Loan Party may amend or modify its organizational documents to effect a change to its respective organizational form and/or consummate any other transaction that is permitted under Section 7.04.

## ARTICLE VIII

### Events of Default and Remedies

Section 8.01    Events of Default.  The occurrence and continuance of any of the following events referred to in any of clauses (a) through (k) inclusive of this Section 8.01 shall constitute an "Event of Default":

(a)    Non-Payment.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document.

(b)    Specific Covenants.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Sections 6.03(a), 6.04 (solely with respect to the Borrower), or Article VII (other than Section 7.09) or Section 7.09; *provided* that (i) a Default or an Event of Default in respect of Section 7.09 (a "Financial Covenant Event of Default") shall not occur until the earlier of (x) the expiration of the Cure Period and (y) the date on which the Borrower notifies the Administrative Agent that the Cure Right shall not be exercised with respect to such breach, and then shall occur only if the Cure Amount has not been received on or prior to such date and (ii) a Financial Covenant Event of Default (or in each case, under any revolving facility that constitutes a Refinancing Indebtedness thereof) shall not constitute a Default or an Event of Default with respect to any Term Loans and any Incremental Revolving Credit Commitments if such Incremental Revolving Lenders shall have agreed not to have the benefit of the Financial Covenant unless and until the Required Revolving Credit Lenders have declared all amounts outstanding under the Revolving Credit Facility to be immediately due and payable and all outstanding Revolving Credit Commitments to be immediately terminated, in each case in accordance with this Agreement and such declaration has not been rescinded on or before such date (the "Term Loan Standstill Period").

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof by the Administrative Agent or the Required Lenders; *provided* that the Administrative Agent shall not be entitled to notify the Borrower of a Default under this Section 8.01(c) for actions taken and reported by the Borrower to the Administrative Agent and the Lenders pursuant to a notice provided by the Borrower to the Administrative Agent more than two years prior to such notice of Default and no Default or Event of Default can occur as a result thereof; *provided* that such two year limitation shall not apply if (i) the Administrative Agent has commenced any remedial action in respect of

any such Event of Default or (ii) any Loan Party had actual knowledge of such Default or Event of Default and failed to notify to Administrative Agent as required hereby.

(d)    <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party or any Restricted Subsidiary herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made and such incorrect or misleading representation, warranty, certification or statement of fact, if capable of being cured, remains so incorrect or misleading for thirty (30) days after the earlier of (x) any Loan Party having actual knowledge thereof and (y) Borrower's receipt of written notice from the Administrative Agent with respect thereto.

(e)    <u>Cross-Default</u>.  Any Loan Party or any Restricted Subsidiary (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount exceeding the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than (i) with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and (ii) any event requiring prepayment pursuant to customary asset sale events, insurance and condemnation proceeds events, change of control offers events and excess cash flow and indebtedness sweeps), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, all such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem all such Indebtedness to be made, prior to its stated maturity; *provided* that this <u>clause (e)(B)</u> shall not apply to secured Indebtedness that becomes due (or requires an offer to purchase) as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided*, *further*, that (x) such failure is unremedied and is not waived by the required holders of such Indebtedness and (y) for the avoidance of doubt, any event or condition set forth under this <u>paragraph (e)</u> shall not, until the expiration of any applicable grace period or the delivery of notice by the applicable holder or holders of such Indebtedness, constitute a Default or an Event of Default for purposes of this Agreement; provided, further, that no such failure with respect to any such Indebtedness that constitutes seller debt, earnouts, holdbacks, deferred acquisition consideration or similar obligations shall result in an Event of Default unless and until expiration of any dispute resolution process and, so long as any judgment rendered against any Loan Party or its Restricted Subsidiaries has been appealed in good faith and stayed pending such appeal, rendering of a final non-appealable judgment by a court of competent jurisdiction with respect to such failure with respect to such Indebtedness.

(f)    <u>Insolvency Proceedings, Etc</u>.  Except with respect to any dissolution or liquidation of a Restricted Subsidiary expressly permitted by <u>Section 7.04</u> in connection with the consummation of a Permitted IPO Reorganization or Permitted Tax Restructuring, any Loan Party or any of the Restricted Subsidiaries institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material

part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days; or an order for relief is entered in any such proceeding.

(g)     Judgments.  There is entered against any Loan Party or any Restricted Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) days after such judgment becomes final.

(h)     Invalidity of Loan Documents.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or Section 7.05) or as a result of acts by the Administrative Agent in the sole control of the Administrative Agent or, omissions by the Administrative Agent in the sole control of the Administrative Agent or the payment in full of all the Obligations and termination of all Commitments, ceases to be in full force and effect or ceases to create a valid and perfected lien on a material portion the Collateral covered thereby other than Collateral having a fair market value not exceeding $5,000,000; or any Loan Party contests in writing the validity or enforceability of any material provision of any Collateral Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Collateral Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Collateral Document.

(i)     Change of Control.  There occurs any Change of Control.

(j)     ERISA Event.  An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to have a Material Adverse Effect.

(k)     Gaming License.  (i) The Borrower or any Restricted Subsidiary (except in connection with a disposition permitted under Section 7.04) fails to apply to renew its Master License during the applicable period for renewal thereof, and its Master License has lapsed as a result; or (ii) the Master License held by the Borrower or any Restricted Subsidiary is surrendered by such Person, or such Person is suspended from receiving revenue under the Master License for more than forty-five (45) consecutive days; or (iii) a determination of the Georgia Lottery Corporation to revoke or not renew the Master License held by the Borrower or any Restricted Subsidiary is affirmed in a final and non-appealable decision by a court or other judicial body of competent jurisdiction; or (iv) there shall have been a License Revocation (other than with respect to a Master License) by any Gaming Authority in one or more jurisdictions in which the Borrower or any of its Restricted Subsidiaries conducts business, which License Revocation (in the aggregate with any other such License Revocations then in effect) relates to operations of Borrower and/or the Restricted Subsidiaries that in the most recent Test Period accounted for twenty percent (20%) or more of the Consolidated EBITDA of the Borrower and its Restricted Subsidiaries, *provided*, *however*, that such License Revocation continues for at least forty-five (45) consecutive days after the earlier of (x) the date of cessation of the affected operations as a result of such License Revocation and (y) the date that none of the Borrower nor any of its Restricted Subsidiaries receive the net cash flows generated by any such operations.

Notwithstanding anything to the contrary contained herein, any "Default" under this Section 8.01 will not constitute an "Event of Default" until the Loan Parties do not cure such "Default" within the time period (if any) specified in the applicable clauses of this Section 8.01 after receipt of any required notice provided for therein to the extent such clauses of Section 8.01 provide for such cure periods; *provided* that the Administrative Agent and other Secured Parties shall not be entitled to assert the occurrence or continuance

of a Default or Event of Default and to notify the Borrower of a Default or Event of Default under this Section 8.01 with respect to any action, occurrence or event that occurred at least two (2) years prior to such assertion or notice so long as such action, occurrence or event was disclosed by the Borrower to the Administrative Agent and the Lenders pursuant to a written notice provided by the Borrower to the Administrative Agent at least two (2) years prior to such assertion or notice of Default and no Default or Event of Default can occur as a result thereof; *provided* that such two (2) year limitation shall not apply if (i) the Administrative Agent has commenced any remedial action in respect of any such Event of Default prior to the end of such two (2) year period or (ii) any Loan Party had actual knowledge of such Default or Event of Default and failed to notify to Administrative Agent as required hereby.

Section 8.02    Remedies Upon Event of Default.  If any Event of Default occurs and is continuing, the Administrative Agent may, and shall, at the request of the Required Lenders, take any or all of the following actions (or, if a Financial Covenant Event of Default occurs and is continuing and prior to the expiration of the Term Loan Standstill Period, if the only Events of Default then having occurred and continuing are pursuant to a Financial Covenant Event of Default, at the request of the Required Revolving Credit Lenders under the Revolving Credit Facility only, and in such case only with respect to the Revolving Credit Commitments, Revolving Credit Loans, L/C Obligations, any Letters of Credit and L/C Credit Extensions):

(a)    declare the commitment of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)    require that the Borrower Cash Collateralizes the L/C Obligations (in an amount equal to the then Outstanding Amount thereof); and

(d)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an Event of Default under Section 8.01(f), the obligation of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

Section 8.03    Exclusion of Immaterial Subsidiaries.  Solely for the purpose of determining whether a Default has occurred under clause (f) or (g) of Section 8.01, any reference in any such clause to any Restricted Subsidiary or Loan Party shall be deemed not to include any Subsidiary that is an Immaterial Subsidiary or at such time could, upon designation by the Borrower, become an Immaterial Subsidiary affected by any event or circumstances referred to in any such clause unless the Total Assets and LTM EBITDA of such Subsidiary together with the Total Assets and LTM EBITDA, respectively, of all other Subsidiaries affected by such event or circumstance referred to in such clause, shall exceed 5.0% of the Total Assets and LTM EBITDA, respectively, of the Borrower and its Restricted Subsidiaries (in each case of Total Assets measured at the end of the most recent fiscal period for which consolidated financial statements have been or are required to be delivered pursuant to Section 6.01(a) or 6.01(b) on a

*pro forma* basis giving effect to any acquisitions or dispositions of companies, division or lines of business since such financial statement date or the start of such four quarter period, as applicable, and on or prior to the date of acquisition of such Subsidiaries).

      Section 8.04     Application of Funds.  If the circumstances described in Section 2.12(g) have occurred, or after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), including in any bankruptcy or insolvency proceeding, any amounts received on account of the Secured Obligations (and proceeds of Collateral) shall be applied by the Administrative Agent, subject to any Customary Intercreditor Agreement then in effect, in each case, in the following order:

      First, to payment of that portion of the Secured Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to each Agent in its capacity as such;

      Second, to payment of that portion of the Secured Obligations constituting fees, indemnities and other amounts (other than principal, interest, and obligations under Secured Hedge Agreements and Secured Cash Management Obligations) payable to the Lenders (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

      Third, to payment of that portion of the Secured Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

      Fourth, to payment of that portion of the Secured Obligations constituting unpaid principal, Unreimbursed Amounts or face amounts of the Revolving Credit Loans, Swing Line Loans, L/C Borrowings and Swap Termination Value under Secured Hedge Agreements and Secured Cash Management Obligations and for the account of the L/C Issuers, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

      Fifth, to the payment of all other Secured Obligations that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Secured Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

      Last, the balance, if any, after all of the Secured Obligations have been paid in full, to the Borrower or as otherwise required by Law.

      Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fourth above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Secured Obligations, if any, in the order set forth above and, if no Secured Obligations remain outstanding, to the Borrower.

Notwithstanding the foregoing, (a) amounts received from the Borrower or any Guarantor that is not a "Eligible Contract Participant" (as defined in the Commodity Exchange Act) shall not be applied to the obligations that are Excluded Swap Obligations (it being understood, that in the event that any amount is applied to Secured Obligations other than Excluded Swap Obligations as a result of this clause (a), to the extent permitted by applicable law, the Administrative Agent shall make such adjustments as it determines are appropriate to distributions pursuant to clause Fourth above from amounts received from "Eligible Contract Participants" to ensure, as nearly as possible, that the proportional aggregate recoveries with respect to obligations described in clause Fourth above by the holders of any Excluded Swap Obligations are the same as the proportional aggregate recoveries with respect to other obligations pursuant to clause Fourth above) and (b) Secured Cash Management Obligations and Obligations under Secured Hedge Agreements shall be excluded from the application described above if the Administrative Agent has not received written notice thereof, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank.  Each Cash Management Bank and Hedge Bank not a party to this Agreement that has given the notice contemplated by the preceding sentence shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of Article IX hereof for itself and its Affiliates as if a "Lender" party hereto.

Section 8.05        Permitted Holders' Right to Cure.

(a)        Notwithstanding anything to the contrary contained in Section 8.01(b), in the event that the Borrower fails to comply with the requirement of the Financial Covenant as of the last day of the any Test Period, any of the Permitted Holders shall have the right, during the period beginning at the start of any fiscal quarter in which the Borrower determines that a breach of the Financial Covenant may occur, until the expiration of the fifteenth (15th) Business Day (the "Cure Period") after the date on which financial statements with respect to the applicable Test Period in which the Financial Covenant is being measured are required to be delivered pursuant to Section 6.01, to make a direct or indirect equity investment in the Borrower in cash in the form of common Capital Stock (or other Qualified Capital Stock reasonably acceptable to the Administrative Agent) (the "Cure Right"), and upon the receipt by the Borrower of Net Cash Proceeds pursuant to the exercise of the Cure Right (the "Cure Amount"), the Financial Covenant shall be recalculated, giving effect to a *pro forma* increase to Consolidated EBITDA for such Test Period in an amount equal to such Cure Amount; *provided* that (x) such *pro forma* adjustment to Consolidated EBITDA shall be given solely for the purpose of determining the existence of a Default or an Event of Default under the Financial Covenant with respect to any Test Period that includes the fiscal quarter for which such Cure Right was exercised and not for any other purpose under any Loan Document (including for purposes of determining pricing, mandatory prepayments and the availability or amount permitted pursuant to any covenant under Article VII) for the quarter with respect to which such Cure Right was exercised and (y) there shall be no reduction in Indebtedness in connection with any Cure Amounts for determining compliance with Section 7.09 and no Cure Amounts will reduce (or count towards) the Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio or the Consolidated Total Leverage Ratio for purposes of any calculation thereof for the fiscal quarter with respect to which such Cure Right was exercised.

(b)        If, after the exercise of the Cure Right and the recalculations pursuant to clause (a) above, the Borrower shall then be in compliance with the requirements of the Financial Covenant during such Test Period (including for purposes of Section 4.02), the Borrower shall be deemed to have satisfied the requirements of the Financial Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable Default or Event of Default under Section 8.01 that had occurred shall be deemed cured; *provided* that (i) the Cure Right may be exercised on no more than five (5) occasions, (ii) in each four consecutive fiscal quarter period, there shall be at least two (2) fiscal quarters in respect of which no Cure Right is exercised, and (iii) with respect

to any exercise of the Cure Right, the Cure Amount shall not be given effect in an amount greater than the amount required to cause the Borrower to be in compliance with the Financial Covenant.

Notwithstanding anything herein to the contrary, prior to the expiration of the Cure Period (x) the Lenders shall not be permitted to exercise any rights then available as a result of an Event of Default under Article VII on the basis of a breach of the Financial Covenant so as to enable the Borrower to consummate its Cure Rights as permitted under this Section 8.05 and (y) the Lenders shall not be required to make any Credit Extension, unless and until the Borrower has received the Cure Amount required to cause the Borrower to be in compliance with the Financial Covenant or all existing Events of Default are waived or cured.

Section 8.06    Gaming Requirements.

(a)    The rights of the Lenders to assign interests or grant participations in any Loan, Commitment, Obligation, or other interests of the Lenders hereunder shall be subject to the approval of all applicable Gaming Authorities, to the extent required by applicable Gaming Laws.

(b)    Upon the occurrence of a Disqualification Event with respect to any Lender, the Borrower shall have the right (in its sole discretion) to remove such Lender as a party to this Agreement.  In the event the Borrower elects to remove such Lender, the Borrower shall:

(i)    prepay the Loans and other Obligations owing to such Lender without premium or penalty (except as set forth in Section 3.04) and terminate its Commitments in accordance with the requirements of this Agreement governing prepayments; or

(ii)    require such Lender to execute and deliver an Assignment and Assumption covering such Lender's interest in its Loans and other Obligations, and its Commitments, in favor of one or more Eligible Assignees at an aggregate purchase price equal to the amount of the Loans and other Obligations owing to such Lender (without a prepayment premium or penalty except as set forth in Section 3.04); provided, however, that such Lender shall assign its interests at a lower price if the Borrower pays the difference required to make the aggregate purchase price equal to such amount, it being understood that in no event shall any Lender be required to assign its interests in the Loans and other Obligations at an aggregate purchase price which is less than the aggregate amount of Loans and other Obligations owing to such Lender (without a prepayment premium or penalty except as set forth in Section 3.04).

Section 8.07    Restrictions Under Gaming Laws.

(a)    Notwithstanding any other provision of this Agreement or any other Loan Document to the contrary, all rights, remedies and powers provided in this Agreement and the other Loan Documents, including with respect to the Collateral, may be exercised only to the extent, and in the manner, that the exercise thereof does not violate applicable Gaming Laws and only to the extent that all approvals required by applicable Gaming Laws for the exercise thereof, including prior approvals (if any), are obtained from the applicable Gaming Authorities.  In addition, all provisions of this Agreement and the other Loan Documents, including with respect to the Collateral, are subject to all applicable mandatory provisions of the Gaming Laws and to be limited solely to the extent necessary to not render the provisions of this Agreement and the other Loan Documents invalid or unenforceable, in whole or in part.  The Lenders and the Administrative Agent agree and confirm that they have not taken and do not intend to take any interest in any Excluded Property.  The parties acknowledge and agree that the provisions of this clause (a) shall not be for the benefit of Holdings, the Borrower or any of its Restricted Subsidiaries.

(b)     Subject to <u>Section 8.02</u>, the Borrower acknowledges and agrees that, upon the occurrence of an Event of Default:

(i)     the Administrative Agent and the Lenders, in furtherance of the exercise of their rights and remedies hereunder, may retain (or may instruct the Borrower to retain, and upon such instruction the Borrower shall retain) Qualified Persons in possession of all licenses, permits and approvals required by applicable Gaming Laws to operate and manage the business of the Borrower and its Restricted Subsidiaries;

(ii)     any (x) collection of, sale of, foreclosure upon or other action with respect to the Collateral and (y) assignment and/or sale of some or all of the COAM Operating Contracts of the Loan Parties and their Restricted Subsidiaries to a third party purchaser duly licensed in accordance with applicable Gaming Laws, may (in each case under the foregoing <u>clauses (x)</u> and <u>(y)</u>) be made or conducted at the direction of the Administrative Agent by or with the assistance of any such Qualified Person in accordance with the terms and conditions of the Loan Documents, all at the expense of the Borrower; *provided* that any such sale or foreclosure shall at all times comply with all applicable Gaming Laws; and

(iii)     the Loan Parties shall provide the Administrative Agent with all assistance requested by the Administrative Agent to collect amounts payable by the Georgia Lottery Corporation and to consummate any collection, sale, foreclosure or assignment of Collateral and/or COAM Operating Contracts, and shall immediately pay over to the Administrative Agent any proceeds received by the Loan Parties in connection with any such collection, sale, foreclosure or assignment, for application pursuant to the terms hereof.

## ARTICLE IX

### Administrative Agent and Other Agents

Section 9.01     <u>Appointment and Authorization of Agents</u>.

(a)     Each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Collateral Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of the Loan Documents and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

(b)     Each L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each such L/C Issuer shall have all of the benefits and immunities (i) provided to the Agents in this Article IX with respect to any acts taken or omissions suffered by such L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and the applications and agreements for letters of credit pertaining to such Letters of Credit as fully as if the term "Agent" as used in this Article IX and in the definition of "Agent-Related Person" included such L/C Issuer with respect to such acts or omissions, and (ii) as additionally provided herein with respect to such L/C Issuer.

(c)     The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacities as a Lender, L/C Issuer (if applicable) and a potential Hedge Bank or Cash Management Bank) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest, charge or other Lien created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02     Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through Affiliates, agents, employees or attorneys-in-fact, such sub-agents as shall be deemed necessary by the Administrative Agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence, bad faith or willful misconduct.

Section 9.03     Liability of Agents.  No Agent-Related Person shall (a) be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby, including their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent (except for its own gross negligence, bad faith or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), or (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the

agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.  No Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that such Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), or in the absence of its own gross negligence, bad faith or willful misconduct.

Section 9.04        Reliance by Agents and Lead Arrangers.

(a)        Each Agent and Lead Arranger shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, request, consent, certificate, instrument, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent or Lead Arranger and shall not incur any liability for relying thereon.  Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)        For purposes of determining compliance with the conditions specified in Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 9.05        Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default."  The Administrative Agent will notify the Lenders of its receipt of any such notice.  Subject to the other provisions of this Article IX, the Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders (or, if a Financial Covenant Event of Default occurs and is continuing and prior to the expiration of the Term Loan Standstill Period, if the only Events of Default then having occurred and continuing are pursuant to a Financial Covenant Event of Default, the Required Revolving Credit Lenders under the Revolving Credit Facility only, and in such case only with respect to the Revolving Credit Commitments, Revolving Credit Loans, L/C Obligations, Letters of Credit and L/C Credit Extensions) in accordance with Article VIII; *provided* that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such

action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 9.06    <u>Credit Decision; Disclosure of Information by Agents</u>.  Each Lender acknowledges that no Agent-Related Person or Lead Arranger has made any representation or warranty to it, and that no act by any Agent or Lead Arranger hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person or Lead Arranger to any Lender as to any matter, including whether Agent-Related Persons or Lead Arrangers have disclosed material information in their possession.  Each Lender represents to each Agent and Lead Arranger that it has, independently and without reliance upon any Agent-Related Person or Lead Arranger and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 9.07    <u>Indemnification of Agents</u>.    Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), *pro rata*, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it in its capacity as an Agent-Related Person; *provided* that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence, bad faith or willful misconduct, as determined by the final judgment of a court of competent jurisdiction; *provided* that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence, bad faith or willful misconduct for purposes of this <u>Section 9.07</u>.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this <u>Section 9.07</u> applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, if any.  The undertaking in this <u>Section 9.07</u> shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

Section 9.08    Agents in their Individual Capacities.  Macquarie and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Capital Stock in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though Macquarie were not the Administrative Agent, Swing Line Lender or an L/C Issuer hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, Macquarie or its Affiliates may receive information regarding any Loan Party or any Affiliate of a Loan Party (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them.  With respect to its Loans, Macquarie shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent, the Swing Line Lender or an L/C Issuer hereunder, and the terms "Lender" and "Lenders" include Macquarie in its individual capacity.

Section 9.09    Successor Agents.  The Administrative Agent may resign as the Administrative Agent and Collateral Agent upon ten (10) days' notice to the Borrower and the Lenders.  If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which appointment of a successor agent shall require the consent of the Borrower at all times other than during the existence of an Event of Default under Section 8.01(f) or (g) (which consent of the Borrower shall not be unreasonably withheld, conditioned or delayed).  If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent, the resigning Administrative Agent may appoint, after consulting with the Borrower and the Lenders, a successor agent from among the Lenders.  Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and Collateral Agent and the term "Administrative Agent" shall mean such successor administrative agent and/or supplemental administrative agent, as the case may be (and the term "Collateral Agent" shall mean such successor collateral agent and/or supplemental agent, as described in Section 9.01(c)), and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent and Collateral Agent shall be terminated.  After the retiring Administrative Agent's resignation hereunder as the Administrative Agent and Collateral Agent, the provisions of this Article IX and Section 10.04 and Section 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent and Collateral Agent under this Agreement.  If no successor agent has accepted appointment as the Administrative Agent and Collateral Agent by the date which is thirty (30) days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent and Collateral Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above (except that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed).  Upon the acceptance of any appointment as the Administrative Agent and Collateral Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to any Mortgages, and such other security agreements, instruments or notices, as may be necessary or desirable, or as the Required Lenders  may reasonably request, in order to (a) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (b) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, the Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent and Collateral Agent, and the retiring Administrative Agent and Collateral Agent shall, to the extent not previously discharged, be discharged from its duties and obligations under the Loan Documents.

Section 9.10    Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment,

composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Swing Line Lender, the L/C Issuers and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent hereunder) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)    any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due to the Administrative Agent under <u>Section 2.09</u> and <u>Section 10.04</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.11    <u>Collateral and Guaranty Matters</u>.  The Lenders irrevocably agree:

(a)    that any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document shall be automatically released (i) upon termination of the Aggregate Commitments and payment in full of all Secured Obligations (other than (x) obligations under Secured Hedge Agreements not yet due and payable, (y) Secured Cash Management Obligations not yet due and payable and (z) contingent indemnification obligations not yet accrued and payable), the expiration or termination of all Letters of Credit (other than Letters of Credit that have been Cash Collateralized or back-stopped or as to which other arrangements reasonably satisfactory to the Administrative Agent and the applicable L/C Issuer have been made), (ii) at the time the property subject to such Lien is transferred as part of or in connection with any transfer permitted hereunder (including any Asset Disposition permitted hereunder) or under any other Loan Document to any Person other than any other Loan Party (*provided* that in the event of a transfer of assets from a Loan Party to another Loan Party organized in a different jurisdiction, the Collateral Agent shall, upon request of the Borrower or any other Loan Party, release such Lien if such transferee Loan Party takes all actions reasonably necessary to grant a Lien in such transferred assets to the Collateral Agent (to the extent required by the Collateral and Guarantee Requirement)), (iii) subject to <u>Section 10.01</u>, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to <u>clause (c)</u> below or (v) if the property subject to such Lien becomes Excluded Property;

(b)    to release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such

property that is a Permitted Lien under <u>clauses (i)</u> or <u>(l)</u> (in the case of <u>clause (l)</u>, upon the reasonable request of the Borrower, to the extent required by the terms of the agreements governing such Permitted Lien) of the definition thereof; and

        (c)     if any Subsidiary Guarantor ceases to be a Restricted Subsidiary, or becomes an Excluded Subsidiary, in each case as a result of a transaction permitted hereunder or designation permitted hereunder (as certified in writing delivered to the Administrative Agent by a Responsible Officer of the Borrower) (*provided* that the release of any Subsidiary Guarantor from its obligations under the Loan Documents solely as a result of such Subsidiary Guarantor becoming an Excluded Subsidiary of the type described in <u>clause (i)</u> or <u>(k)</u> of the definition thereof shall only be permitted if such Subsidiary Guarantor becomes such an Excluded Subsidiary pursuant to a transaction with a third party that is not otherwise an Affiliate of the Borrower and such transaction was not for the primary purpose of releasing the Guarantee of such Subsidiary Guarantor, and, in the case of an Excluded Subsidiary of the type described in <u>clause (i)</u> of the definition thereof, only if such Subsidiary Guarantor ceases to be a Restricted Subsidiary), such Subsidiary shall automatically be released from its Obligations under the Loan Documents, and all security interests created by the Collateral Documents in Collateral owned by such Subsidiary shall be automatically released.

        Notwithstanding anything contained herein to the contrary, upon request by the Administrative Agent at any time, the Required Lenders shall confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this <u>Section 9.11</u> (in each case, to the extent such release or subordination is permitted hereunder); *provided* that the absence of such confirmation shall not affect in any way the validity of the automatic releases of security interest or Guaranty contemplated by this Agreement or the Administrative Agent's obligations to comply with the provisions of the immediately following sentence. In each case as specified in this <u>Section 9.11</u>, the Administrative Agent will promptly (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request (i) to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents (including the filing of termination statements or the return of pledged collateral), or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this <u>Section 9.11</u>; *provided* that prior to any such request, the Borrower shall have in each case delivered to the Administrative Agent written request therefor and, to the extent requested by the Administrative Agent, a certificate of the Borrower to the effect that the release of such Guarantor or Collateral, as applicable, is in compliance with the Loan Documents. Each of the Lenders irrevocably authorizes the Administrative Agent to rely on any such certificate without independent investigation and release its interests in any Collateral or release any Guarantor from its obligations under the Loan Documents pursuant to this <u>Section 9.11</u> (including, in each case of the foregoing, by filing applicable termination statements and/or returning pledged Collateral); it being acknowledged and agreed by each Secured Party that the Administrative Agent, in its capacity as such, shall have no liability with respect to relying on such certificate and taking actions to evidence such release.

        Section 9.12     <u>Other Agents; Arrangers and Managers</u>. None of the Lenders, the Agents, the Lead Arrangers or other Persons identified on the facing page or signature pages of this Agreement as a "co-arranger" shall have any obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such. Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the Agents, Lead Arrangers, Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or

not taking action hereunder. Each Lead Arranger shall be an intended third party beneficiary of the provisions of this Agreement applicable thereto.

Section 9.13    Appointment of Supplemental Administrative Agents.

(a)    It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "Supplemental Administrative Agent" and, collectively, as "Supplemental Administrative Agents").

(b)    In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Section 10.04 and Section 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)    Should any instrument in writing from any Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent. In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

Section 9.14    Withholding Tax. To the extent required by any applicable Law, the Administrative Agent may deduct or withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective), such Lender shall indemnify and hold harmless the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties,

additions to Tax or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.14.  The agreements in this Section 9.14 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations.  For the avoidance of doubt, (1) the term "Lender" shall, for purposes of this Section 9.14, include any L/C Issuer and the Swing Line Lender and (2) this Section 9.14 shall not limit or expand the obligations of the Borrower or any Guarantor under Section 3.01 or any other provision of this Agreement.

Section 9.15    Secured Cash Management Obligations; Secured Hedge Agreements. Except as otherwise expressly set forth herein or in any Collateral Document, no Cash Management Bank or Hedge Bank that obtains the benefits of Section 8.04, any Guaranty or any Collateral by virtue of the provisions hereof or of any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this Article IX to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Secured Cash Management Obligations or Obligations arising under Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may reasonably request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

Section 9.16    Certain ERISA Matters.  (a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans  with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable, and the conditions of such exemption have been satisfied, with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset

Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the Collateral or the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

Section 9.17    Erroneous Payments.  (a) If the Administrative Agent notifies a Lender, L/C Issuer or Secured Party, or any Person who has received funds on behalf of a Lender, L/C Issuer or Secured Party (any such Lender, L/C Issuer, Secured Party or other recipient, a "Erroneous Payment Recipient") that the Administrative Agent has determined in its sole discretion that any funds received by such Erroneous Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Erroneous Payment Recipient (whether or not known to such Lender, L/C Issuer, Secured Party or other Erroneous Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Erroneous Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender, L/C Issuer or Secured Party shall (or, with respect to any Erroneous Payment Recipient who received such funds on its behalf, shall cause such Erroneous Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Erroneous Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of the Administrative Agent to any Erroneous Payment Recipient under this clause (a) shall be conclusive, absent manifest error.  If an Erroneous Payment Recipient receives any payment, prepayment or repayment of principal, interest, fees, distribution or otherwise and does not receive a corresponding payment notice or payment advice, such payment, prepayment or repayment shall be presumed to be in error absent written confirmation from the Administrative Agent to the contrary.

(b)        Each Lender, L/C Issuer or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender, L/C Issuer or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender, L/C Issuer or Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(c)        For so long as an Erroneous Payment (or portion thereof) has not been returned by any Erroneous Payment Recipient who received such Erroneous Payment (or portion thereof) (such unrecovered amount, an "Erroneous Payment Return Deficiency") to the Administrative Agent after demand therefor in accordance with immediately preceding clause (a), (i) the Administrative Agent may elect, in its sole discretion on written notice to such Lender, L/C Issuer or Secured Party, that all rights and claims of such Lender, L/C Issuer or Secured Party with respect to the Loans or other Obligations owed to such Person up to the amount of the corresponding Erroneous Payment Return Deficiency in respect of such Erroneous Payment (the "Erroneous Payment Corresponding Loan Amount") shall immediately vest in the Administrative Agent upon such election, and after such election, the Administrative Agent (x) may reflect its ownership interest in Loans in a principal amount equal to the Corresponding Loan Amount in the Register, and (y) upon five (5) Business Days' written notice to such Lender, L/C Issuer or Secured Party, may sell such Loan (or portion thereof) in respect of the Erroneous Payment Corresponding Loan Amount, and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by such Lender, L/C Issuer or Secured Party shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender, L/C Issuer or Secured Party (and/or against any Erroneous Payment Recipient that receives funds on its behalf), and (ii) each party hereto agrees that, except to the extent that the Administrative Agent has sold such Loan, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of such Lender, L/C Issuer or Secured Party with respect to the Erroneous Payment Return Deficiency.  For the avoidance of doubt, no vesting or sale pursuant to the foregoing clause (i) will reduce the Commitments of any Lender or L/C Issuer and such Commitments shall remain available in accordance with the terms of this Agreement.

(d)        The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.

(e)        No Erroneous Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(f)        Each party's obligations, agreements and waivers under this Section 9.17 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender or L/C Issuer, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE X

Miscellaneous

Section 10.01    Amendments, Etc.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Administrative Agent, Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a)    extend or increase the Commitment of any Lender without the written consent of each Lender directly and adversely affected thereby (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default or Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)    postpone any date scheduled for, or reduce the amount of, or forgive, any payment of principal or interest under Section 2.07 or Section 2.08, fees or other amounts or extend scheduled amortization payments or final maturity or the date for the payment of other interest or fees, without the written consent of each Lender directly and adversely affected thereby (it being understood that an amendment, modification or waiver of, or consent to departure from, any condition precedent, covenant, Event of Default, waiver of (or amendment to the terms of) any mandatory prepayment of the Term Loans, waiver of default interest, waiver of the MFN Adjustment or mandatory reduction of the Commitments shall not constitute a postponement, reduction or forgiveness of any date scheduled for the payment of principal, interest or other fees or amounts or an extension of any maturity date);

(c)    reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby, it being understood that any change to the definition of "Consolidated First Lien Secured Leverage Ratio" or in the component definitions thereof shall not constitute a reduction in the rate of interest or fees; *provided* that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate", to waive any obligation of the Borrower to pay interest at the Default Rate or to waive the MFN Adjustment;

(d)    change any provision of this Section 10.01 or the definitions of "Required Lenders," or "Required Revolving Credit Lenders" without the written consent of each Lender;

(e)    release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; *provided* that any transaction permitted under Section 7.04 or Section 7.05 shall not be subject to this clause (e) to the extent such transaction does not result in the release of all or substantially all of the Collateral;

(f)    release all or substantially all of the Guarantees in any transaction or series of related transactions, without the written consent of each Lender; *provided* that any transaction permitted under Section 7.04 or Section 7.05 shall not be subject to this clause (f) to the extent such transaction does not result in the release of all or substantially all of the Guarantees;

(g)    subordinate the Liens on the Collateral for the benefit of any of the Lenders (in its capacity as a Secured Party hereunder) in respect of any of its Obligations to any other Lien in respect of

any Indebtedness without the prior written consent of each Lender adversely affected thereby; *provided* that the consent of each Revolving Credit Lender will be required for the subordination of the priority of all Liens securing the Secured Obligations with respect to the Revolving Credit Facilities to Liens securing any other Indebtedness (subject to Permitted Liens); or

(h)     effectuate any payment subordination with respect to the Obligations owing to any Lender without the prior written consent of each Lender adversely effected thereby;

(i)     change any provision of Sections 2.05(b)(iv), 2.13 or 8.04 that would alter the *pro rata* sharing and payment waterfall provisions without the written consent of each Lender directly and adversely affected thereby;

(j)     affect the rights or duties of, or any fees or other amounts payable to, the Swing Line Lender under this Agreement or any other Loan Document without the written consent of the Swing Line Lender;

and *provided, further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by each L/C Issuer in addition to the Lenders required above, affect the rights or duties of a L/C Issuer under this Agreement or any Letter of Credit Application relating to any Letter of Credit issued or to be issued by it; (ii) [reserved]; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (iv) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (v) any amendment or waiver that by its terms affects the rights or duties of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) will require only the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto if such Class of Lenders were the only Class of Lenders; (vi) the consent of the Required Revolving Credit Lenders (and no other Lenders) shall be necessary to amend or waive the terms and provisions of Sections 7.09, 8.01(b)(ii) and 8.05 (and related definitions as used in such Sections, but not as used in other Sections of this Agreement); and (vii) the consent of the Required Revolving Credit Lenders and the Required Lenders shall be necessary to permit the Borrower to incur additional Indebtedness that is *pari passu* with or senior to the Revolving Credit Facility or Swing Line Facility in right of payment and with respect to security. Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans, the Revolving Credit Loans, the Incremental Term Loans, if any, and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and, if applicable, the Required Revolving Credit Lenders; *provided* that for the avoidance of doubt, the consent of the Required Revolving Credit Lenders shall be required with respect to any amendment that permits the Loan Parties to incur Indebtedness that ranks *pari passu* with or senior to the Revolving Credit Facility in right of security and payment.

Notwithstanding anything to the contrary contained in this Section 10.01, any guarantees, collateral documents, security documents, intercreditor agreements and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended, supplemented, modified, terminated or waived with the consent of the Administrative Agent (in its sole discretion) at the request of

the Borrower without the need to obtain the consent of any Lender if such amendment, supplement or waiver is not, in the reasonable determination of the Administrative Agent, materially adverse to the Lenders and is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to correct or cure ambiguities, errors, inconsistencies, omissions, mistakes or defects (including to correct or cure incorrect cross references or similar inaccuracies), (iii) to effect administrative changes of a technical or immaterial nature or (iv) to cause such guarantee, collateral document, security document, intercreditor agreement or other document to be consistent with this Agreement and the other Loan Documents. Furthermore, with the consent of the Administrative Agent (in its sole discretion) at the request of the Borrower (without the need to obtain any consent of any Lender), any Loan Document may be amended (x) to correct or cure ambiguities, errors inconsistencies, omissions, mistakes or defects, (y) to effect administrative changes of a technical or immaterial nature or (z) to correct or cure incorrect cross references or similar inaccuracies.  The Loan Parties and the Lenders hereby expressly indemnify the Administrative Agent if it relies on this provision in accordance with the terms of <u>Section 9.07</u> or <u>Section 10.05</u>, as applicable, in each case, without regard to any exceptions for bad faith, gross negligence or willful misconduct.

Notwithstanding anything in this <u>Section 10.01</u> to the contrary, (a) technical and conforming modifications (including to create a "fungible" class of term loans or to permit a delayed draw term facility) to the Loan Documents may be made with the consent of the Borrower and the Administrative Agent to the extent necessary (i) to integrate any Incremental Facilities, Refinancing Revolving Credit Commitments, Refinancing Term Loans, Extended Term Loans or Extended Revolving Credit Commitments, (ii) to integrate or make administrative modifications with respect to borrowings and issuances of Letters of Credit and (iii) to integrate terms or conditions from any Incremental Facility Amendment that are more restrictive than this Agreement in accordance with <u>Section 2.14(e)</u>, (b) without the consent of any Lender or L/C Issuer, the Loan Parties, the Administrative Agent or the Collateral Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into (x) any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties to give effect to, or protect any security interest for benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law or this Agreement or in each case to otherwise enhance the rights or benefits of any Lender under any Loan Document or (y)  any applicable intercreditor agreement contemplated by this Agreement, in each case with the holders of Indebtedness permitted by this Agreement to be secured by the Collateral and (c) the Administrative Agent and the Borrower may amend and modify this Agreement and the other Loan Documents without the approval or consent of any other party to (x) effect a permitted Repricing Transaction, other than any Lender holding Term Loans subject to such Repricing Transaction that will continue as a Lender in respect of the repriced Class of Term Loans or modified Loans, (y) integrate necessary or appropriate modifications (as the Borrower and the Administrative Agent shall reasonably agree) with respect to changes in the fiscal year of the Borrower in accordance with <u>Section 7.12</u> and (z) integrate necessary or appropriate modifications (as the Borrower and the Administrative Agent shall reasonably agree) with respect to a Permitted Tax Restructuring.  Without limitation of the foregoing, the Borrower may, without the consent of any Lenders, upon delivery to the Administrative Agent (i) increase the interest rates (including any interest rate margins or interest rate floors), fees and other amounts payable to any Class or Classes of Lenders hereunder, (ii) increase, expand and/or extend the call protection provisions and any "most favored nation" provisions benefiting any Class or Classes of Lenders hereunder (including, for the avoidance of doubt, the provisions of <u>Section 2.05(a)(iv)</u> and <u>2.14(b)(ii)</u> hereof) and/or (iii) without the consent of any other party other than the Administrative Agent (provided that any such amendment or modification shall not become effective unless the Lenders have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment), amend or modify any

other provisions hereunder or add any other provisions hereunder or under any other Loan Document in a manner, as reasonably determined by the Administrative Agent in its sole discretion and the Borrower, to be more favorable to the then-existing Lenders or Class or Classes of Lenders, in each case in connection with the issuance or incurrence of any Incremental Facilities or other Indebtedness permitted hereunder, where the terms of any such Incremental Facilities or other Indebtedness are more favorable to the lenders thereof than the corresponding terms applicable to other Loans or Commitments then existing hereunder, and it is intended that one or more then-existing Classes of Loans or Commitments under this Agreement share in the benefit of such more favorable terms in order to comply with the provisions hereof relating to the incurrence of such Incremental Facilities or other Indebtedness or to create a fungible tranche of Loans.

Notwithstanding anything to the contrary herein, in connection with any determination as to whether the Required Lenders have (A) consented (or not consented) to any amendment or waiver of any provision of this Agreement or any other Loan Document or any departure by any Loan Party therefrom, (B) otherwise acted on any matter related to any Loan Document, or (C) directed or required by the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, any Lender (including its Affiliates for purposes hereof) (other than (x) any Lender that is a Regulated Bank and (y) any Revolving Credit Lender as of the Closing Date, and in each case including each of their Affiliates) that, as a result of its interest in any total return swap, total rate of return swap, credit default swap or other derivative contract (other than any such total return swap, total rate of return swap, credit default swap or other derivative contract entered into pursuant to bona fide market making activities), has a net short position with respect to the Loans and/or Commitments (each, a "Net Short Lender") shall have no right to vote any of its Loans and Commitments and shall otherwise be treated as a Disqualified Lender and shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Net Short Lenders. For purposes of determining whether a Lender has a "net short position" on any date of determination: (i) derivative contracts with respect to the Loans and Commitments and such contracts that are the functional equivalent thereof shall be counted at the notional amount thereof in Dollars, (ii) notional amounts in other currencies shall be converted to the dollar equivalent thereof by such Lender in a commercially reasonable manner consistent with generally accepted financial practices and based on the prevailing conversion rate (determined on a mid-market basis) on the date of determination, (iii) derivative contracts in respect of an index that includes any of the Borrower or other Loan Parties or any instrument issued or guaranteed by any of the Borrower or other Loan Parties shall not be deemed to create a short position with respect to the Loans and/or Commitments, so long as (x) such index is not created, designed, administered or requested by such Lender and (y) the Borrower and other Loan Parties and any instrument issued or guaranteed by any of the Borrower or other Loan Parties, collectively, shall represent less than 5.0% of the components of such index, (iv) derivative transactions that are documented using either the 2014 ISDA Credit Derivatives Definitions or the 2003 ISDA Credit Derivatives Definitions (collectively, the "ISDA CDS Definitions") shall be deemed to create a short position with respect to the Loans and/or Commitments if such Lender is a protection buyer or the equivalent thereof for such derivative transaction and (x) the Loans or the Commitments are a "Reference Obligation" under the terms of such derivative transaction (whether specified by name in the related documentation, included as a "Standard Reference Obligation" on the most recent list published by Markit, if "Standard Reference Obligation" is specified as applicable in the relevant documentation or in any other manner), (y) the Loans or the Commitments would be a "Deliverable Obligation" under the terms of such derivative transaction or (z) any of the Borrower or other Loan Parties (or its successor) is designated as a "Reference Entity" under the terms of such derivative transactions, and (v) credit derivative transactions or other derivatives transactions not documented using the ISDA CDS Definitions shall be deemed to create a short position with respect to the Loans and/or Commitments if such transactions are functionally equivalent to a transaction that offers the Lender protection in respect of the Loans or the Commitments, or as to the credit quality of any of the Borrower or other Loan Parties other than, in each case, as part of an index so long as (x) such index is not created, designed, administered or requested by such Lender and (y) the Borrower and other Loan Parties and any

instrument issued or guaranteed by any of the Borrower or other Loan Parties, collectively, shall represent less than 5.0% of the components of such index. In connection with any such determination, each Lender (including its Affiliates for purposes hereof) (other than (x) any Lender that is a Regulated Bank and (y) any Revolving Credit Lender as of the Closing Date, and in each case including each of their Affiliates) shall promptly notify the Administrative Agent in writing that it is a Net Short Lender, or shall otherwise be deemed to have represented and warranted to the Borrower and the Administrative Agent that it is not a Net Short Lender (it being understood and agreed that the Administrative Agent shall be entitled to rely on each such representation and deemed representation and shall have no duty to (x) inquire as to or investigate the accuracy of any such representation or deemed representation or (y) otherwise ascertain or monitor whether any Lender, Eligible Assignee or Participant or prospective Lender, Eligible Assignee or Participant is a Net Short Lender or make any calculations, investigations or determinations with respect to any derivative contracts and/or net short positions). Without limiting the foregoing, the Administrative Agent shall not (A) be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to the Net Short Lenders or (B) have any liability with respect to or arising out of any assignment or participation of Loans to any Net Short Lender).

Notwithstanding anything herein to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent that by its terms requires the consent of all the Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended, or the maturity of any of its Loans may not be extended, the rate of interest on any of its Loans may not be reduced and the principal amount of any of its Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, waiver or consent requiring the consent of all the Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than the other affected Lenders shall require the consent of such Defaulting Lender.

Section 10.02    Notices and Other Communications; Facsimile Copies.

(a)    General.  Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower, the Administrative Agent, an L/C Issuer or the Swing Line Lender, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(ii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrower, the Administrative Agent, the L/C Issuers and the Swing Line Lender.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit

in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(b)), when delivered; *provided* that notices and other communications to the Administrative Agent, the L/C Issuer or the Swing Line Lender pursuant to Article II shall not be effective until actually received by such Person during the person's normal business hours.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)     Electronic Communications.  Notices and other communications to the Lenders, the L/C Issuers or the Swing Line Lender hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender, any L/C Issuer or the Swing Line Lender pursuant to Article II if such Lender, L/C Issuer or the Swing Line Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Agent-Related Persons (collectively, the "Agent Parties") have any liability to the Loan Parties, any Lender, any L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party; *provided, however*, that in no event shall any Agent Party have any liability to any Loan Party, any Lender, any L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.  Each of the Borrower, the Administrative Agent, any L/C Issuer may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower, the

Administrative Agent and the L/C Issuers.  In addition, each Lender agrees to notify the Administrative Agents from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or their securities for purposes of United States Federal or state securities laws.

(e)    Reliance by Agents and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence, bad faith or willful misconduct.

(f)    Notice to other Loan Parties.  The Borrower agrees that notices to be given to any other Loan Party under this Agreement or any other Loan Document may be given to the Borrower in accordance with the provisions of this Section 10.02 with the same effect as if given to such other Loan Party in accordance with the terms hereunder or thereunder.

Section 10.03    No Waiver; Cumulative Remedies.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04    Attorney Costs and Expenses.  The Borrower agrees (a) if the Closing Date occurs, to pay or reimburse the Administrative Agent and the Lead Arrangers for all reasonable and documented or invoiced out-of-pocket costs and expenses associated with the syndication of the Initial Term Loans and Revolving Credit Loans and the preparation, execution and delivery, administration, amendment, modification, waiver and/or enforcement of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), including all reasonable and documented or invoiced Attorney Costs of Latham & Watkins LLP (and any other counsel retained with the Borrower's consent (such consent not to be unreasonably withheld, conditioned or delayed)) and one local and foreign counsel in each relevant jurisdiction, and (b) to pay or reimburse the Administrative Agent, the Lead Arrangers and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all costs and expenses incurred in connection with any workout or restructuring in respect of the Loans, all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and, in the case of legal fees, limited to all Attorney Costs of one counsel for all such Persons, taken as a whole, (and, in the case of an actual or perceived conflict of interest, where such Person affected by such conflict informs the Borrowers of such conflict and thereafter retains

its own counsel, of another firm of counsel for such affected Person)).  The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by any Agent.  The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations.  All amounts due under this Section 10.04 shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

Section 10.05    Indemnification by the Borrower.  Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold harmless, without duplication, each Agent-Related Person, each Lender, each L/C Issuer, the Lead Arrangers, and their respective Affiliates, directors, officers, employees, counsel, agents, advisors, and other representatives and successors of any of the foregoing (collectively, the "Indemnitees") from and against any and all losses, liabilities, damages, claims, and reasonable and documented or invoiced out-of-pocket fees and expenses, joint and several, (including reasonable and documented or invoiced out-of-pocket Attorney Costs of one counsel for all Indemnitees, taken as a whole, and, if necessary, one firm of local counsel in each appropriate jurisdiction for all Indemnitees taken as a whole (which may include a single special counsel acting in multiple jurisdictions) for all Indemnitees (and, in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnitee)) of any such Indemnitee arising out of or relating to any claim, any litigation, any investigation or other proceeding (including any inquiry or investigation of the foregoing) (regardless of whether such Indemnitee is a party thereto and whether or not such proceedings are brought by the Borrower, its equity holders, its Affiliates, creditors or any other third person) that relates to the Transactions, including the financing contemplated hereby and the use of proceeds of the Facilities, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment, Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by an L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), or (c) any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, under or from any property currently or to the extent arising from the former ownership or operation of the Borrower, any Subsidiary or any other Loan Party, formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liability related in any way to the Borrower, any Subsidiary or any other Loan Party, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (w) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its controlled Affiliates or controlling Persons or any of the officers, directors, employees, agents, advisors, members or other representatives or successors of any of the foregoing, in each case who are involved in or aware of the Transactions (as determined by a court of competent jurisdiction in a final and non-appealable decision), (x) a material breach of the Loan Documents, Commitment Letter or Fee Letter by such Indemnitee or one of its Affiliates (as determined by a court of competent jurisdiction in a final and non-appealable decision), or (y) disputes solely between and among

-215-

such Indemnitees to the extent such disputes do not arise from any act or omission of Holdings, the Borrower, Restricted Subsidiaries or any of their Affiliates (other than with respect to a claim against an Indemnitee acting in its capacity as an Agent or Lead Arranger or similar role under the Loan Documents, unless such claim arose from the gross negligence, bad faith or willful misconduct of such Indemnitee). No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement. No Indemnitee nor any Loan Party shall have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); *provided* that nothing contained in this sentence shall limit the Borrower's indemnification obligations under the Loan Documents to the extent such special, punitive, indirect or consequential damages are included in any third-party claim in connection with which any Indemnitee is entitled to indemnification hereunder. In the case of an investigation, litigation or other proceeding to which the indemnity in this <u>Section 10.05</u> applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, managers, partners, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. All amounts due under this <u>Section 10.05</u> shall be paid within ten (10) Business Days after demand therefor; *provided, however*, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification or contribution rights with respect to such payment pursuant to the express terms of this <u>Section 10.05</u>. The agreements in this <u>Section 10.05</u> shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this <u>Section 10.05</u> shall not apply to Taxes other than Taxes that represent liabilities, obligations, losses, damages, etc., with respect to a non-Tax claim.

Section 10.06    <u>Payments Set Aside</u>. To the extent that any payment by or on behalf of a Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate.

Section 10.07    <u>Successors and Assigns</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that, except as otherwise provided herein (including without limitation as permitted under <u>Section 7.04</u>), neither Holdings, the Borrower nor any of its Subsidiaries may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of <u>Section 10.07(e)</u>, (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 10.07(g)</u> or (iv) to an SPC in accordance with the provisions of <u>Section 10.07(h)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the

extent provided in Section 10.07(e), the Lead Arrangers to the extent provided in Sections 9.04, 9.06, 9.12, 10.07 and 10.21, and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees ("Assignees") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans (including for purposes of this Section 10.07(b), participations in L/C Obligations and in Swing Line Loans) at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A)    the Borrower, *provided* that, no consent of the Borrower shall be required for an assignment (1) of any Term Loans to any other Lender, any Affiliate of a Lead Arranger or Lender or any Approved Fund, (2) of any Revolving Credit Loans, Revolving Credit Commitment or Revolving Credit Exposure to any other Revolving Credit Lender, any Affiliate of a Revolving Credit Lender or any Approved Fund of a Revolving Credit Lender, (3) of any Term Loans, Revolving Credit Loans, Revolving Credit Commitment or Revolving Credit Exposure, if Specified Default has occurred and is continuing, to any Assignee or (4) to any of the Sponsor, Affiliates of the Sponsor, the Borrower or any of its Subsidiaries, to the extent any such assignments are made in accordance with all other applicable terms of this Agreement; *provided*, *further*, that such consent shall be deemed to have been given if the Borrower has not responded within (x) in the case of Term Loans, ten (10) Business Days after notice by the Administrative Agent and (y) in the case of Revolving Credit Loans, Revolving Credit Commitment or Revolving Credit Exposure, fifteen (15) Business Days after notice by the Administrative Agent;

(B)    the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment to another Lender, an Affiliate of a Lead Arranger or Lender or an Approved Fund;

(C)    each L/C Issuer at the time of such assignment, *provided* that no consent of such L/C Issuers shall be required for any assignment of a Term Loan;

(D)    the Swing Line Lender, *provided* that no consent of such Swing Line Lender shall be required for any assignment of a Term Loan.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 (in the case of the Revolving Credit Facility) or $1,000,000 (in the case of a Term Loan) (or an integral multiple of $1,000,000 in excess thereof) unless the Borrower and the Administrative Agent otherwise consents, *provided* that (1) no such consent of the Borrower shall be required if a Specified of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption;

(C)      the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, all documentation and other information reasonably required under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act and a Beneficial Ownership Certificate to the extent expressly required under the Beneficial Ownership Regulation and any documentation required by Section 3.01(f);

(D)      the Assignee shall not be a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person), a Disqualified Lender or, except to the extent permitted pursuant to Section 2.17 or Section 10.07(k), Holdings, the Borrower or any of its Subsidiaries;

(E)      the Assignee shall not be a Defaulting Lender.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-*pro rata* basis.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans and participations in Letters of Credit and Swing Line Loans in accordance with its *pro rata* share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)      Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d) and receipt by the Administrative Agent from the parties to each assignment of a processing and recordation fee of $3,500 (*provided* that (i) the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and (ii) such fee shall not be applicable in the case of an assignment to an Affiliate of the assigning Lender or to an Affiliate of a Lead Arranger), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement (including, for the avoidance of doubt, any rights and obligations pursuant to Section 3.01), and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.03, 3.04, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note (if any), the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and

obligations in accordance with Section 10.07(e).  For greater certainty, any assignment by a Lender pursuant to this Section 10.07 shall not in any way constitute or be deemed to constitute a novation, discharge, recession, extinguishment or substitution of the existing Indebtedness and any Indebtedness so assigned shall continue to be the same obligation and not a new obligations.

(d)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest amounts) and currencies of the Loans, L/C Obligations (specifying the Unreimbursed Amounts), L/C Borrowings, owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent demonstrable error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Agent, any Lead Arranger and any Lender (but in the case of any Lender solely with respect to such Lender's outstanding Loans or Commitments) at any reasonable time and from time to time upon reasonable prior written notice.  No assignment shall be effective unless recorded in the Register.  The parties hereto agree and intend that the Secured Obligations shall be treated as being in registered form for the purposes of the Code (including Sections 163(f), 871(h)(2), 881(c)(2), and 4701 of the Code and any United States Treasury Regulations or proposed United States Treasury Regulations thereunder).

(e)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, Disqualified Lender or a Defaulting Lender) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations or Swing Line Loans) owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Sections 10.01(a), (b), (c), (d), (e) or (f) that directly affects such Participant.  Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.03 and 3.04 (through the applicable Lender), provided that each Participant shall be subject to the requirements and limitations of such Sections (including Sections 3.01(f) and (g) and Sections 3.05 and 3.06) (it being understood that the Participant shall deliver the forms described in Section 3.01(f) solely to the participating Lender), to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(b).  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; provided that such Participant complies with Section 2.13 as though it were a Lender.  Any Lender that sells participations shall maintain a register on which it enters the name and the address of each Participant and the principal and stated interest amounts of each Participant's participation interest in the Commitments and/or Loans (or other rights or obligations under the Loan Documents) held by it (the "Participant Register").  The entries in the Participant Register shall be conclusive, absent demonstrable error, and the Borrower and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation interest as the owner thereof for all purposes notwithstanding any notice to the contrary.  In maintaining the Participant Register, such Lender shall be acting as the non-fiduciary agent of the Borrower solely for purposes of applicable United States federal income tax law and undertakes no duty,

responsibility or obligation to the Borrower (without limitation, in no event shall such Lender be a fiduciary of the Borrower for any purpose).  No Lender shall have any obligation to disclose all or any portion of a Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) or proposed Section 1.163-5(b) of the United States Treasury Regulations or, if different, under Sections 871(h) or 881(c) of the Code (or, in each case, any amended or successor version).  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)     A Participant shall not be entitled to receive any greater payment under Sections 3.01, 3.03 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent or except to the extent such entitlement to a greater payment results from a Change in Law after the Participant became a Participant.

(g)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefit of Sections 3.01, 3.03 and 3.04, subject to the requirements and limitations of such Sections (including Sections 3.01(f) and (g) and Sections 3.05 and 3.06 (it being understood that the SPC shall deliver the forms described in Section 3.01(f) solely to the Granting Lender, it being understood that copies of such forms may be required to be included (and, if so, will be included) as part of a non-U.S. Lender's IRS Form W-8IMY provided to the Administrative Agent or the Borrower)), to the same extent as if such SPC were a Lender, but neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.03 or 3.04) except to the extent any entitlement to greater amounts results from a Change in Law after the grant to the SPC occurred, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.  Any Granting Lender shall maintain a register with respect to any grant described in this clause (h) on which it enters the name and the address of each SPC and the principal and interest amounts of each SPC's interest in the granted Commitments and/or Loans (or other

rights or obligations with respect thereto), which shall be maintained in a manner similar to any Participant Register described in Section 10.07(e), *mutatis mutandis*.

(i)        Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)        Notwithstanding anything to the contrary contained herein, any L/C Issuer or Swing Lien Lender may, upon thirty (30) days' notice to the Borrower and the Lenders, resign as an L/C Issuer or Swing Lien Lender, respectively; *provided* that on or prior to the expiration of such 30-day period with respect to such resignation, the relevant L/C Issuer or Swing Line Lender shall have identified, in consultation with the Borrower, a successor L/C Issuer or Swing Line Lender willing to accept its appointment as successor L/C Issuer or Swing Line Lender, as applicable.  In the event of any such resignation of an L/C Issuer or Swing Line Lender, the Borrower shall be entitled to appoint from among the Lenders willing to accept such appointment a successor L/C Issuer or Swing Line Lender, as applicable; *provided* that no failure by the Borrower to appoint any such successor shall affect the resignation of the relevant L/C Issuer or Swing Line Lender, as the case may be.  If an L/C Issuer resigns as an L/C Issuer, it shall retain all the rights and obligations of an L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as an L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)).  If the Swing Line Lender resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans, Eurocurrency Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c).

(k)        Any Lender may, so long as (i) no proceeds of Revolving Credit Loans are applied to fund the consideration for any such assignment and (ii) no Event of Default has occurred and is then continuing, at any time, assign all or a portion of its rights and obligations with respect to Term Loans under this Agreement to the Borrower or any of its Subsidiaries through (x) "Dutch Auctions" open to all Term Lenders in accordance with procedures of the type described in Section 2.17 or (y) notwithstanding Section 2.05(d) or Section 2.17 or any other provision in this Agreement, open market purchase on a non-*pro rata* basis; *provided* that in connection with assignments pursuant to this clause (k):

(i)        the assigning Lender and the Borrower or such Subsidiary, as applicable, shall execute and deliver to the Administrative Agent an Assignment and Assumption in form and substance reasonably satisfactory to the Administrative Agent and all parties to the relevant repurchases shall render customary "big boy" disclaimer letters or any such disclaimers shall be incorporated into the terms of the Assignment and Assumption;

(ii)        if the Borrower or any of its Subsidiaries (other than the Borrower) is the assignee, upon such assignment, transfer or contribution, the Borrower or such Subsidiary shall automatically be deemed to have contributed the principal amount of such Term Loans, plus all accrued and unpaid interest thereon, to the Borrower;

(iii)    if the assignee is the Borrower (including through contribution or transfers set forth in clause (ii) above), (a) the principal amount of such Term Loans, along with all accrued and unpaid interest thereon, so contributed, assigned or transferred to the Borrower shall be deemed automatically cancelled and extinguished on the date of such contribution, assignment or transfer, (b) the aggregate outstanding principal amount of Term Loans of the remaining Term Lenders shall reflect such cancellation and extinguishing of the Term Loans then held by the Borrower and (c) the Borrower shall promptly provide notice to the Administrative Agent of such contribution, assignment or transfer of such Term Loans, and the Administrative Agent, upon receipt of such notice, shall reflect the cancellation of the applicable Term Loans in the Register;

(iv)    in the case of "Dutch Auctions", any offer to purchase or take by assignment any Loans by the Borrower shall have been made to all Lenders within any Class of any Facility (but not, for the avoidance of doubt, to each Class of Facility) *pro rata*;

(v)    the assigning Lenders waive any rights to bring actions against the Administrative Agent; and

(vi)    the Administrative Agent (x) shall not be required to serve as the auction agent for, or have any other obligations to participate in (other than mechanical administrative duties), or facilitate any, "Dutch Auction" unless it is reasonably satisfied with the terms and restrictions of such auction and (y) shall not have any obligation to participate in, arrange, sell or otherwise facilitate, and will have no liability in connection with, any open market repurchases by the Borrower or any of its Restricted Subsidiaries.

(l)    Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender so long as no proceeds of Revolving Credit Loans are applied to fund the consideration for any such assignment; *provided* that:

(i)    no Affiliated Lender (other than a Debt Fund Affiliate) shall have any right to (x) attend or participate in (including, in each case, by telephone) any meeting (including "Lender only" meetings) or discussions (or portion thereof) among the Administrative Agent or any Lender to which representatives of the Borrower are not then present or invited thereto, (y) receive any information or material prepared by the Administrative Agent or any Lender or any communication by or among the Administrative Agent and one or more Lenders or any other material which is "Lender only", except to the extent such information or materials have been made available to the Borrower or its representatives (and in any case, other than the right to receive notices of prepayments and other administrative notices in respect of its Term Loans required to be delivered to Lenders pursuant to Article II) or receive any advice of counsel to the Administrative Agent or (z) make any challenge to the Administrative Agent's or any other Lender's attorney-client privilege on the basis of its status as a Lender;

(ii)    except with respect to any amendment, modification, waiver, consent or other action or any plan of reorganization or liquidation (a) that requires the consent of all Lenders, all Lenders directly and adversely affected or specifically such Lender, (b) that alters the applicable Affiliated Lender's *pro rata* share of any payments given to all Lenders, or (c) affects the applicable Affiliated Lender (in its capacity as a Lender) in a manner that is disproportionate to the effect on any Lender in the same Class, the Term Loans held by the applicable Affiliated Lender (other than a Debt Fund Affiliate) shall be disregarded in both the numerator and denominator in the calculation of any Required Lender vote (and, in the case of a plan of reorganization or liquidation that does not affect the applicable Affiliated Lender in a manner that is adverse to such Affiliated Lender

relative to other Lenders, such Affiliated Lender shall be deemed to have voted its interest in the Term Loans in the same proportion as the other Lenders in the same Class) (and shall be deemed to have been voted in the same percentage as all other applicable Lenders voted if necessary to give legal effect to this paragraph) (but, in any event, in connection with any amendment, modification, waiver, consent or other action, shall be entitled to any consent fee, calculated as if all of the applicable Affiliated Lender's Term Loans had voted in favor of any matter for which a consent fee or similar payment is offered);

(iii)    no such acquisition by an Affiliated Lender (other than a Debt Fund Affiliate) shall be permitted if, after giving effect to such acquisition, the aggregate principal amount of Term Loans of any Class held by Affiliated Lenders (other than Debt Fund Affiliates) would exceed 25.0% of the aggregate principal amount of all Term Loans, of such Class outstanding at the time of such purchase; *provided* that to the extent any assignment to an Affiliated Lender (other than a Debt Fund Affiliate) would result in the aggregate principal amount of the applicable Term Loans held by Affiliated Lenders (other than Debt Fund Affiliates) exceeding such 25.0% threshold at the time of such purchase, the purchase of such excess amount will be void *ab initio*;

(iv)    Affiliated Lenders may not purchase Revolving Credit Loans or Revolving Credit Facility Commitments; and

(v)    the assigning Lender and the Affiliated Lender shall execute and deliver to the Administrative Agent an Assignment and Assumption in form and substance reasonably satisfactory to the Administrative Agent, which shall clearly identify the Affiliated Lender as an "Affiliated Lender" and contain a customary "big boy" representation; *provided* that no representation as to the absence of any material non-public information shall be required; *provided, further*, that an Affiliated Lender that is a Debt Fund Affiliate will not be subject to the limitations in this clause.

Each Affiliated Lender agrees to notify the Administrative Agent promptly (and in any event within ten (10) Business Days) if it acquires any Person who is also a Lender, and each Lender agrees to notify the Administrative Agent promptly (and in any event within ten (10) Business Days) if it becomes an Affiliated Lender.

(m)    Notwithstanding anything in Section 10.01 or the definition of "Required Lenders," or "Required Revolving Credit Lenders" to the contrary, for purposes of determining whether the Required Lenders and Required Revolving Credit Lenders (in respect of a Class of Loans) have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action (other than a Debt Fund Affiliate) with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, or subject to Section 10.07(l)(ii), any plan of reorganization pursuant to the U.S. Bankruptcy Code, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, no Affiliated Lender (other than a Debt Fund Affiliate) shall have any right to consent (or not consent), otherwise act or direct or require the Administrative Agent or any Lender to take (or refrain from taking) any such action (other than any such amendment, waiver, consent, modification or other action that requires the consent of each Lender, each affected Lender, affects such Affiliated Lender as compared to other Lenders in a disproportionately adverse manner or that deprives such Affiliated Lender of its *pro rata* share of any payments to which it is entitled, as to which items each Affiliated Lender shall have the right to vote, consent, act or direct or require the Administrative Agent to take (or refrain from taking) action) and:

(i)        all Loans held by any Affiliated Lenders (other than a Debt Fund Affiliate) shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders and Required Revolving Credit Lenders (in respect of a Class of Loans) have taken any actions; and

(ii)       all Loans held by Affiliated Lenders (other than a Debt Fund Affiliate) shall be deemed to be not outstanding for all purposes of calculating whether all Lenders have taken any action unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on other Lenders.

(n)        Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, each Affiliated Lender (other than a Debt Fund Affiliate) hereby agrees that if a proceeding under any Debtor Relief Law shall be commenced by or against Holdings, the Borrower or any other Loan Party at a time when such Lender is an Affiliated Lender (other than a Debt Fund Affiliate), such Affiliated Lender irrevocably authorizes and empowers the Administrative Agent to vote on behalf of such Affiliated Lender with respect to the Loans held by such Affiliated Lender in any manner in the Administrative Agent's sole discretion, unless the Administrative Agent instructs such Affiliated Lender to vote, in which case such Affiliated Lender shall vote with respect to the Loans held by it as the Administrative Agent directs; *provided* that such Affiliated Lender shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the Administrative Agent) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Obligations held by such Affiliated Lender in a disproportionately adverse manner to such Affiliated Lender than the proposed treatment of similar Obligations held by Lenders that are not Affiliated Lenders.

(o)        Notwithstanding anything in Section 10.01 or the definition of "Required Lenders" to the contrary, for purposes of determining whether the Required Lenders have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (ii) otherwise acted on any matter related to any Loan Document or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, all Loans held by Debt Fund Affiliates may not account for more than 49.9% (*pro rata* among such Debt Fund Affiliates) of the Loans of consenting Lenders included in determining whether the Required Lenders have consented to any action pursuant to Section 10.01.

(p)        Notwithstanding anything to the contrary contained herein, the Sponsor or any non-Debt Fund Affiliate are permitted (but not required) to contribute, directly or indirectly, such Term Loans to the Borrower or any of its Restricted Subsidiaries for purposes of cancellation of such Indebtedness, which shall be deemed to be an equity contribution that builds the amount available under Section 7.06(a)(iv)(2) by an amount equal to the fair market value of the Term Loans so cancelled (but in no event shall such fair market value exceed par); *provided* that if the fair market value of such Term Loans cannot be ascertained by the Borrower, the fair market value shall be deemed to be the purchase price of such Term Loans paid by the Sponsor or such non-Debt Fund Affiliate.

Section 10.08      Confidentiality. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information and to not use or disclose such information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, investment advisors and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and on a need-to-know basis); (b) to the extent requested by any Governmental Authority, to any pledgee referred to in Section 10.07(g); (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (in which case such Agent or Lender agrees (except with respect to any audit or examination conducted by bank

accountants or any regulatory authority including any self-regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, rule or regulation, to inform the applicable Loan Party promptly thereof prior to disclosure and upon the reasonable request of any Loan Party cooperate with the Loan Party to obtain a protective order or similar confidential treatment); (d) to any other party to this Agreement; (e) subject to an agreement containing provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), to any pledgee referred to in Section 10.07(i), counterparty to a Swap Contract or Qualified Securitization Financing, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement; (f) with the written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08; (h) to any Governmental Authority or examiner regulating any Lender; (i) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender); or (j) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder (including for the purpose of establishing a "due diligence" defense). In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the Credit Extensions. For the purposes of this Section 10.08, "Information" means all information received from any Loan Party or its Affiliates or its Affiliates' directors, managers, officers, employees, trustees, investment advisors or agents, relating to the Borrower or any of its Subsidiaries or their business, including, without limitation, information delivered pursuant to Section 6.01, 6.02 or 6.03 hereof, other than any such information that is (i) publicly available to any Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08, (ii) independently developed by any Agent or any Lender without the use of any Information and not in breach of this Section 10.08, or (iii) to the extent received from a third party that is not, to the knowledge of any Agent or any Lender, subject to contractual or fiduciary confidentiality obligations owed to any Loan Party or any Subsidiaries or other Affiliates thereof.

Section 10.09     Setoff. In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates and each L/C Issuer and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness (in any currency) at any time owing by, such Lender and its Affiliates or such L/C Issuer and its Affiliates, as the case may be, to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or such L/C Issuer and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness. Notwithstanding anything to the contrary contained herein, no Lender or its Affiliates and no L/C Issuer or its Affiliates shall have a right to set off and apply any deposits held or other Indebtedness owing by such Lender or its Affiliates or such L/C Issuer or its Affiliates, as the case may be, to or for the credit or the account of any Subsidiary of a Loan Party that is a Foreign Subsidiary or a FSHCO. Each Lender and L/C Issuer agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender or L/C Issuer, as the case may be; *provided* that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Administrative

Agent, each Lender and each L/C Issuer under this <u>Section 10.09</u> are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, such Lender and such L/C Issuer may have.

Section 10.10    <u>Counterparts</u>.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Agents may also require that any such documents and signatures delivered by telecopier or other electronic transmission be confirmed by a manually signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or other electronic transmission.  The words "execution," "signed," "signature," and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.11    <u>Integration</u>.  This Agreement, together with the other Loan Documents and the Fee Letter, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.12    <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.  The provisions of <u>Sections 10.14</u> and <u>10.15</u> shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

Section 10.13    <u>Severability</u>.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this <u>Section 10.13</u>, if and to the extent that the enforceability of any provision in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, the Swing Line Lender or the L/C Issuer, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.14    <u>GOVERNING LAW, JURISDICTION, SERVICE OF PROCESS</u>.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED THEREIN).

(b)    EXCEPT AS SET FORTH IN THE FOLLOWING PARAGRAPH, ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE (*PROVIDED* THAT IF NONE OF SUCH COURTS CAN AND WILL EXERCISE SUCH JURISDICTION, SUCH EXCLUSIVITY SHALL NOT APPLY), AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE BORROWER, EACH AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS.  THE BORROWER, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION (I) FOR PURPOSES OF ENFORCING A JUDGMENT, (II) IN CONNECTION WITH EXERCISING REMEDIES AGAINST THE COLLATERAL IN A JURISDICTION IN WHICH SUCH COLLATERAL IS LOCATED, (III) IN CONNECTION WITH ANY PENDING BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDING IN SUCH JURISDICTION OR (IV) TO THE EXTENT THE COURTS REFERRED TO IN THE PREVIOUS PARAGRAPH DO NOT HAVE JURISDICTION OVER SUCH LEGAL ACTION OR PROCEEDING OR THE PARTIES OR PROPERTY SUBJECT THERETO.

Section 10.15    <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 10.15</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 10.16    <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by the Loan Parties, the Administrative Agent, the Swing Line Lender and the L/C Issuers and the Administrative Agent shall have been notified by each Lender, L/C Issuer and Swing Line Lender that each such Person has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, each Agent, L/C Issuer, Swing Line Lender and any other Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by <u>Section 7.04</u>.

Section 10.17    <u>Judgment Currency</u>.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "<u>Judgment Currency</u>") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "<u>Agreement Currency</u>"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

Section 10.18    <u>Lender Action</u>.  The Lenders and each other holder of an Obligation under a Loan Document shall act collectively through the Administrative Agent for any right or remedy against any Loan Party under any of the Loan Documents (other than set-off rights) in each case with respect to the Collateral or any other property of any Loan Party.  Without limiting the delegation of authority to the Administrative Agent set forth herein, only the Required Lenders (or, if applicable, the Required Revolving Credit Facility Lenders) shall have the authority to direct the Administrative Agent with respect to the exercise of rights and remedies hereunder and under the other Loan Documents (including with respect to alleging the existence or occurrence of, and exercising rights and remedies as a result of, any Default or Event of Default) with respect to (i) the Loans and (ii) any Collateral, and (ii) any other property of any Loan Party.  Any such rights and remedies arising under the Loan Documents shall not be exercised other than through the Administrative Agent.  Each Lender agrees that it shall not, and hereby waives any right to, take or institute any actions or proceedings, judicial or otherwise, for any such right or remedy under any Loan Document against any Loan Party or any past, present, or future Subsidiary of any Loan Party concerning any Collateral, or any other property of any Loan Party or any past, present or future Loan Party other than through the Administrative Agent; *provided* that, for the avoidance of doubt, this sentence may be enforced against any Secured Party by the Required Lenders, any Agent or the Borrower (or any of its Affiliates) and each Secured Party expressly acknowledge that this sentence shall be available as a defense of the Borrower (or any of its Affiliates) in any such action, proceeding or remedial procedure.  Each Lender, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Secured Obligations, to have agreed to the foregoing provisions.

Section 10.19    <u>USA PATRIOT Act</u>.  Each Lender hereby notifies the Borrower that, pursuant to the requirements of the USA PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies the Borrower and the Guarantors, which

information includes the name and address of the Borrower and the Guarantors and other information that will allow such Lender to identify the Borrower and the Guarantors in accordance with the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 10.20    <u>Obligations Absolute</u>.

To the fullest extent permitted by applicable Law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)    any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

(b)    any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(c)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)    any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

(e)    any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)    any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

Section 10.21    <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lead Arrangers are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent and the Lead Arrangers, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent, each Lender and each Lead Arranger is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates, or any other Person and (B) neither the Administrative Agent, nor any Lender or any Lead Arranger has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, each Lender and each Lead Arranger and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and neither the Administrative Agent nor any Lead Arranger has any obligation to disclose any of such interests to the Borrower or any of its Affiliates.  To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent, each Lender and the Lead Arrangers with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.22    Acknowledgment and Consent to Bail-In of Affected Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable: (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Authority.

Section 10.23    Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Obligations or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

Section 10.24    Acknowledgment of Intercreditor Agreements.  The Lenders and the other Secured Parties hereby irrevocably authorize and instruct the Administrative Agent and the Collateral Agent to, without any further consent of any Lender or any other Secured Party, enter into (or acknowledge

and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify any Customary Intercreditor Agreement, with the collateral agent or other representatives of the holders of Indebtedness that is to be secured by a Lien on the Collateral that not prohibited (including with respect to priority) under this Agreement and to subject the Liens on the Collateral securing the Secured Obligations to the provisions thereof (any of the foregoing, an "Specified Intercreditor Agreement"). The Lenders and the other Secured Parties irrevocably agree that (x) the Collateral Agent may rely exclusively on a certificate of a Responsible Officer of the Borrower as to whether any such other Liens are not prohibited and (y) any Specified Intercreditor Agreement entered into by the Administrative Agent and/or the Collateral Agent shall be binding on the Secured Parties, and each Lender and the other Secured Parties hereby agrees that it will take no actions contrary to the provisions of, if entered into and if applicable, any Specified Intercreditor Agreement. No Lender is nor shall it be deemed to be a fiduciary of any kind for any other Lender or any other Person. The foregoing provisions are intended as an inducement to any provider of any Indebtedness not prohibited by Section 7.03 hereof to extend credit to the Loan Parties and such persons are intended third-party beneficiaries of such provisions.

Section 10.25    <u>Gaming Matters</u>.    Notwithstanding any other provision of this Agreement, each Loan Party expressly authorizes each of the Administrative Agent and each Lender to, upon the request of any Gaming Authority (including the Georgia Lottery Corporation), cooperate with such Gaming Authority in connection with the administration of its regulatory jurisdiction over the Borrower and its Subsidiaries, including, without limitation, any applicable legal or regulatory restrictions, the provision of such documents or other information as may be requested by such Gaming Authority in accordance with the Gaming Laws relating to the Administrative Agent, any of the Lenders, any Loan Party or the Loan Documents.  Subject to the foregoing authorization, the Administrative Agent and each Lender shall provide the Borrower notice of any such request (prior to the release of such documents and other information to the extent reasonably practicable) and shall use commercially reasonable efforts to cooperate with the Borrower and its Subsidiaries (at the sole cost of the Borrower) with respect to any efforts to protect such documents or other information requested from public disclosure under any Open Records Act exceptions, including, but not limited to, those exceptions under O.C.G.A. §50-18-72.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**LUCKY BUCKS, LLC**,
a Georgia limited liability company,
as the Borrower

By: _____
Name:     James Boyden
Title:     Executive Vice President of Business
          Development

**MACQUARIE CAPITAL FUNDING LLC**,
as Administrative Agent, Collateral Agent, Lender, L/C
Issuer and Swing Line Lender

By: _____
Name: Jeff Abt
Title: Authorized Signatory

By: _____
Name: Ayesha Farooqi
Title: Authorized Signatory

[*Signature Page to Credit Agreement*]

**KEYBANK NATIONAL ASSOCIATION,**
as Revolving Credit Lender and L/C Issuer


By:
Name: Brian P. Fox
Title:  Senior Vice President

[*Signature Page to Credit Agreement*]

**Schedule 1.01A**

Collateral Documents and Other Loan Documents

1. Security Agreement
2. Perfection Certificate

**Schedule 1.01B**

Existing Investments

Lucky Bucks, LLC is owed $6,740,263.96 from Lucky Bucks HoldCo, LLC as at June 30, 2021. This amount is not documented by a written agreement but is on the books and records of Lucky Bucks, LLC.

**Schedule 1.01C**

Existing Liens

None.

**Schedule 2.01(A)**

Initial Term Commitments

| Lender | Initial Term Commitments |
|---|---|
| Macquarie Capital Funding LLC | $500,000,000 |
| **TOTAL** | **$500,000,000** |

**Schedule 2.01(B)**

Revolving Credit Commitments

| Lender | Revolving Commitment |
|---|---|
| KeyBank National Association | $25,000,000 |
| Macquarie Capital Funding LLC | $10,000,000 |
| **TOTAL** | **$35,000,000** |

**Schedule 5.06**

Litigation

As disclosed in the Company's financial statements, in January 2015, Ultra Group of Companies, Inc. filed suit against Anil Damani, Lucky Bucks, Inc. (now Lucky Bucks) and AM/PM Management, Inc. in the Superior Court of Cobb County, Georgia (Case ID# 2015-0014131-CV) making claims against Lucky Bucks, Inc. (now Lucky Bucks) for usurpation of corporate opportunities (plaintiff dismissed this claim without prejudice on September 15, 2015), tortious interference with contractual relations, tortious interference with business relations, violation of the Georgia computer systems protection act, violation of the Georgia trade secrets act, conversion, accounting, civil RICO, and injunctive relief. The parties have conducted discovery, but there are a few discovery issues that remain outstanding. No settlement amounts can be determined at this time. Lucky Bucks, LLC is entitled to indemnification for all damages relating to any claims arising from the above-mentioned litigation.

**Schedule 5.11**

Subsidiaries

| Borrower/Subsidiaries | Jurisdiction of Incorporation/Formation | Record Owner | Percent of Equity Interests Owned by Record Owner | Subsidiary Guarantor or Excluded Subsidiary |
|---|---|---|---|---|
| Lucky Bucks, LLC | Georgia | Lucky Bucks HoldCo, LLC | 100% | N/A |
| Lucky Bucks HoldCo, LLC | Delaware | Southern Star Gaming, LLC | 70% | N/A |
| | | TCFIII Luck SPV LP | 1.7816% | |
| | | TCFIII Luck Acquisition LLC | 3.2184% | |
| | | Lucky Bucks Ventures, Inc. | 25% | |

**Schedule 5.22**

Material Real Property

None.

**Schedule 6.12**

Post-Closing Covenants

Within 60 days after the Closing Date (or such later date as the Administrative Agent may reasonably agree, without the need for Lender consent), deliver insurance endorsements with respect to each insurance policy referenced in Section 4.01(p) of the Agreement, naming the Administrative Agent and Collateral Agent as loss payee and additional insured, as applicable.

**Schedule 7.03**

Existing Indebtedness

None.

**Schedule 7.05(a)**

Asset Dispositions

None.

**Schedule 7.07**

Holdings Investments

Lucky Bucks HoldCo, LLC is owed the following as at June 30, 2021:

| Debtor/Grantor | Issuer of Instrument | Principal Amount of Instrument | Maturity Date |
|---|---|---|---|
| Lucky Bucks HoldCo, LLC | Southern Star Gaming, LLC | $4,660,264.00 | Payable on demand. |
| Lucky Bucks HoldCo, LLC | Lucky Bucks Ventures, Inc. | $2,055,000.00 | Payable on demand. |
| Lucky Bucks HoldCo, LLC | AKS Amusements Inc | $40,714.41 | September 19, 2021 |
| Lucky Bucks HoldCo, LLC | Georgia Winner, LLC | $262,460.36 | September 13, 2022 |

**Schedule 7.10**

Affiliate Transactions

Lucky Bucks, LLC is owed $6,740,263.96 from Lucky Bucks HoldCo, LLC as at June 30, 2021. This amount is not documented by a written agreement, but is on the books and records of Lucky Bucks, LLC.

**Schedule 10.02**

Administrative Agent's Office, Certain Addresses for Notices

**If to Macquarie Capital Funding LLC as:**

<u>Administrative Agent or Collateral Agent</u>

Macquarie Capital Funding LLC
c/o Cortland Capital Market Services LLC
225 W. Washington St., 9th floor
Chicago, IL 60606
Attention: Agency Services – Macquarie
Telephone: (855) 657-6589
Facsimile: (312) 376-0751
Email: MacCap@alterdomus.com

With copy to:

Macquarie Capital Funding LLC
125 West 55th Street
New York, NY 10019
Attention: Macquarie Capital Debt Capital Markets Middle Office
Phone: (212) 231-0466 / (212) 231-0494
Facsimile: (212) 231-6518
Email: MacCap.DCMAdmin@macquarie.com

With a copy (which shall not constitute notice) to:

Latham & Watkins, LLP
12670 High Bluff Drive
San Diego, CA 92130
Attention: Brett P. Rosenblatt
Phone: (858) 523-5401
Email: brett.rosenblatt@lw.com

<u>Swing Line Lender</u>

Macquarie Capital Funding LLC
c/o Cortland Capital Market Services LLC
225 W. Washington St., 9th floor
Chicago, IL 60606
Attention: Agency Services – Macquarie
Telephone: (855) 657-6589
Facsimile: (312) 376-0751
Email: MacCap@alterdomus.com

With copy to:

Macquarie Capital Funding LLC
125 West 55th Street

New York, NY 10019
Attention: Macquarie Capital Debt Capital Markets Middle Office
Phone: (212) 231-0466 / (212) 231-0494
Facsimile: (212) 231-6518
Email: MacCap.DCMAdmin@macquarie.com

L/C Issuer

Macquarie Capital Funding LLC
125 West 55th Street
New York, NY 10019
Attention: Macquarie Capital Debt Capital Markets Middle Office
Telephone: (212) 231-0494 / (212) 231-0466
Facsimile: (212) 231-6518
Email: COGMODDCMLCS@macquarie.com

**If to KeyBank National Association as L/C Issuer:**

KeyBank National Association
4900 Tiedeman Road
Brooklyn, OH 44144
Attention: Key Agency Services
Telephone: (216) 813-4816
Email: donna_l_boening@keybank.com

**If to the Borrower:**

Lucky Bucks, LLC
5820 Live Oak Parkway, Suite 300
Norcross, GA 30071
Attention: Manu Sekhri
Email: manu@sekhri.ca

with a copy to:

Shearman & Sterling LLP
599 Lexington Avenue, Room 1046
New York, NY 10022
Attention: Michael Steinberg
Phone: (212) 848-8213
Email: michael.steinberg@shearman.com

and a copy to:

Trive Capital Management, LLC
2021 McKinney Avenue, Suite 1200
Dallas, TX 75201
Attention: Shravan Thadani
Email: shravanthadani@trivecapital.com

**EXHIBIT A**

**[FORM OF] COMMITTED LOAN NOTICE**

[_____], 2021

Macquarie Capital Funding LLC,
as Administrative Agent under the Credit Agreement
referred to below

c/o Cortland Capital Market Services LLC
225 W. Washington St., 9th floor
Chicago, IL 60606
Attention: Agency Services – Macquarie
Telephone:  855-657-6589
Facsimile:  312-376-0751
Email:  MacCap@alterdomus.com

**Copy to:**
Macquarie Capital Funding LLC
125 West 55th Street
New York, NY 10019
Attention:  Macquarie Capital Debt Capital Markets Middle Office
Phone:  (212) 231-0466 / (212) 231-0494
Facsimile:  (212) 231-6518
Email:  MacCap.DCMAdmin@macquarie.com

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent and each L/C Issuer and Lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned hereby gives you notice irrevocably pursuant to Section 2.02(a) of the Credit Agreement, on behalf of the Borrower, and hereby requests a [Borrowing] [conversion] [continuation] (the "Proposed [Borrowing] [Conversion] [Continuation]") under the Credit Agreement and sets forth below the information relating to such Proposed [Borrowing] [Conversion] [Continuation]:

1.  The Business Day of the Proposed [Borrowing] [Conversion] [Continuation] is _____, 20[__].[1]

---

[1]    Each such notice must be received by the Administrative Agent with respect to Revolving Credit Loans or Term Loans, (i) in the case of a Eurocurrency Rate Loan, not later than 12:00 p.m., Local Time, three (3) Business Days before the date of the proposed Borrowing, or (ii) in the case of a Base Rate Loan, not later than 12:00 p.m., Local Time, one (1) Business Day before the date of the proposed Borrowing.

2.   The Facility under which the Proposed [Borrowing] [Conversion] [Continuation] is requested is the _____ Facility.[2]

3.   The Type of Loans comprising the Proposed [Borrowing] [Conversion] [Continuation] is [Base Rate Loans] [Eurocurrency Rate Loans].

4.   The aggregate amount and currency of the Proposed [Borrowing] [Conversion] [Continuation] is $ _____.[3]

5.   [The location and number of the Borrower's account to which funds are to be disbursed is:

    Bank:  _____
    ABA #:  _____
    Account #:  _____
    Account Name:  _____ ]

6.   [The initial Interest Period for each Eurocurrency Rate Loan made as part of the Proposed Borrowing is _____ month[s].]

[The undersigned hereby represents and warrants to the Administrative Agent and the Lenders that the conditions to lending specified in <u>Section 4.02</u> of the Credit Agreement will be satisfied or waived as of the date of the Proposed Borrowing set forth above.][4]

**[*Signature Pages Follow*]**

---

[2]     Insert Class of proposed Borrowing, conversion or continuation.

[3]     Must be a minimum of $1 million or a whole multiple of $500,000 in excess thereof for Eurocurrency Rate Loans and a minimum of $500,000 or a whole multiple of $100,000 in excess thereof for Base Rate Loans.

[4]     To include for Borrowings other than (x) for a conversion of Loans to the other Type, or a continuation of Eurocurrency Rate Loans or (y) a Credit Extension of Incremental Term Loans in connection with a Limited Condition Transaction.

Very truly yours,

**LUCKY BUCKS, LLC**,
as Borrower
By: _____
Name:
Title:

[*Signature Page to Committed Loan Notice*]

**EXHIBIT B**

**[FORM OF] SWING LINE LOAN NOTICE**

[_____], 2021

Macquarie Capital Funding LLC,
as Administrative Agent under the Credit Agreement
referred to below

c/o Cortland Capital Market Services LLC
225 W. Washington St., 9th floor
Chicago, IL 60606
Attention: Agency Services – Macquarie
Telephone:  855-657-6589
Facsimile:  312-376-0751
Email:  MacCap@alterdomus.com

**Copy to:**
Macquarie Capital Funding LLC
125 West 55th Street
New York, NY 10019
Attention:  Macquarie Capital Debt Capital Markets Middle Office
Phone:  (212) 231-0466 / (212) 231-0494
Facsimile:  (212) 231-6518
Email:  MacCap.DCMAdmin@macquarie.com

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent and each L/C Issuer and Lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned hereby gives you notice irrevocably pursuant to Section 2.04(b) of the Credit Agreement, on behalf of the Borrower, and hereby requests a Borrowing (the "Proposed Borrowing") under the Credit Agreement and sets forth below the information relating to such Proposed Borrowing:

1.   The Business Day of the Proposed Borrowing is _____, 20[__].[1]

2.   The Facility under which the Proposed Borrowing is requested is the Swing Line Facility.

3.   The Type of Loans comprising the Proposed Borrowing is Base Rate Loans.

---

[1]      Each such notice must be received by the Administrative Agent with respect Swing Line Loans not later than 12:00 p.m., Local Time, on the requested date of the proposed Borrowing (which shall be a Business Day).

4.   The aggregate amount and currency of the Proposed Borrowing is $ _____[2].

5.   [The location and number of the Borrower's account to which funds are to be disbursed is:

        Bank:   _____

        ABA #:   _____

        Account #:   _____

        Account Name:   _____ ]

      The undersigned hereby represents and warrants to the Administrative Agent and the Lenders that the conditions to lending specified in <u>Section 4.02</u> of the Credit Agreement will be satisfied or waived as of the date of the Proposed Borrowing set forth above.

**[*Signature Pages Follow*]**

---

[2]   Must be a minimum of $500,000 or a whole multiple of $50,000 in excess thereof.

Very truly yours,

**LUCKY BUCKS, LLC**,
as Borrower
By: _____
Name:
Title:

**EXHIBIT C-1**

**[FORM OF] TERM NOTE**

$_____                                                    Dated _____, 202_

      **FOR VALUE RECEIVED**, the undersigned, Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), HEREBY PROMISES TO PAY _____ or its registered assigns (the "Note Holder") for the account of its Applicable Lending Office the principal amount of the Initial Term Loan on the dates and in the amounts specified in the Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among the Borrower, the Note Holder and certain other Lenders from time to time party thereto, Macquarie Capital Funding LLC, as Administrative Agent, Collateral Agent, Swing Line Lender and an L/C Issuer, and each other L/C Issuer and from time to time party thereto, owing to the Note Holder by the Borrower. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

      The Borrower promises to pay interest on the unpaid principal amount of the Initial Term Loan from the date of such Initial Term Loan until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Credit Agreement.

      Both principal and interest are payable in lawful money of the U.S. to the Administrative Agent at such office and in the manner specified in the Credit Agreement. The Initial Term Loan owing to the Note Holder by the Borrower and the maturity thereof, and all payments made on account of principal thereof, shall be recorded by the Note Holder and, prior to any transfer hereof, endorsed on Schedule 1 hereto, which is part of this promissory note (the "Term Note"); *provided*, that the failure of the Note Holder to make any such recordation or endorsement shall not affect the Obligations of the Borrower under this Term Note.

      This Term Note is one of the "Notes" referred to in, and is entitled to the benefits of, the Credit Agreement. The Credit Agreement, among other things, (i) provides for the making of the Initial Term Loan by the Note Holder to the Borrower in an amount not to exceed the U.S. dollar amount first above mentioned, the indebtedness of the Borrower resulting from such Initial Term Loan being evidenced by this Term Note, and (ii) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified. The Obligations of the Borrower under this Term Note and the other Loan Documents and the Obligations of the other Loan Parties under the Loan Documents, are secured by the Collateral as provided in the Loan Documents. The Borrower, for itself and its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Term Note.

      This Term Note may not be transferred or assigned by the Note Holder to any Person except in compliance with the terms of the Credit Agreement. The rights evidenced by this Note to receive principal and interest may only be transferred if the transfer is registered on a record of ownership and the transferee is identified as the owner of an interest in the obligation pursuant to Section 10.07 of the Credit Agreement. This Term Note may not at any time be endorsed to, or to the order of, bearer.

      Sections 10.14 (*Governing Law, Jurisdiction, Service of Process*) and 10.15 (*Waiver of Right to Trial by Jury*) of the Credit Agreement are hereby incorporated by reference, *mutatis mutandis.*

*[Signature Pages Follow]*

Very truly yours,

**LUCKY BUCKS, LLC,**
as Borrower
By: _____
Name:
Title:

[*Signature Page to Term Note*]

**SCHEDULE 1**

**LOANS AND PAYMENTS OF PRINCIPAL**

| Date | Amount of Loan | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made By |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**EXHIBIT C-2**

**[FORM OF] REVOLVING CREDIT NOTE**

$\underline{\hspace{3cm}}$                                                              Dated _____, 202\_

  **FOR VALUE RECEIVED**, the undersigned, Lucky Bucks, LLC, a Georgia limited liability company (the "<u>Borrower</u>"), HEREBY PROMISES TO PAY _____ or its registered assigns (the "<u>Note Holder</u>") for the account of its Applicable Lending Office the unpaid principal amount of the Revolving Credit Loan and L/C Advance on the dates and in the amounts specified in the Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>") among the Borrower, the Note Holder and certain other Lenders from time to time party thereto, Macquarie Capital Funding LLC, as Administrative Agent, Collateral Agent, Swing Line Lender and an L/C Issuer, and each other L/C Issuer from time to time party thereto, owing to the Note Holder by the Borrower.  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

  The Borrower promises to pay interest on the unpaid principal amount of each Revolving Credit Loan and L/C Advance from the date of such Revolving Credit Loan or L/C Advance, as the case may be, until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Credit Agreement.

  Both principal and interest are payable in lawful money of the U.S. to the Administrative Agent, at such office and in the manner specified in the Credit Agreement.  Each Revolving Credit Loan and L/C Advance owing to the Note Holder by the Borrower, and all payments made on account of principal thereof, shall be recorded by the Note Holder and, prior to any transfer hereof, endorsed on Schedule 1 hereto, which is part of this promissory note (the "<u>Revolving Credit Note</u>"); *provided*, that the failure of the Note Holder to make any such recordation or endorsement shall not affect the Obligations of the Borrower under this Revolving Credit Note.

  This Revolving Credit Note is one of the "Notes" referred to in, and is entitled to the benefits of, the Credit Agreement.  The Credit Agreement, among other things, (i) provides for the making of Revolving Credit Loans or L/C Advances by the Note Holder to or for the benefit of the Borrower from time to time in an aggregate amount not to exceed at any time outstanding the U.S. dollar amount first above mentioned, the indebtedness of the Borrower resulting from each such Revolving Credit Loan and L/C Advance being evidenced by this Revolving Credit Note, and (ii) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified.  The Obligations of the Borrower under this Revolving Credit Note and the other Loan Documents and the Obligations of the other Loan Parties under the Loan Documents, are secured by the Collateral as provided in the Loan Documents.

  The Borrower, for itself and its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Revolving Credit Note.

  This Revolving Credit Note may not be transferred or assigned by the Note Holder to any Person except in compliance with the terms of the Credit Agreement.  The rights evidenced by this Note to receive principal and interest may only be transferred if the transfer is registered on a record of ownership and the transferee is identified as the owner of an interest in the obligation pursuant to Section 10.07 of the Credit Agreement.  This Revolving Credit Note may not at any time be endorsed to, or to the order of, bearer.

Sections 10.14 (*Governing Law, Jurisdiction, Service of Process*) and 10.15 (*Waiver of Right to Trial by Jury*) of the Credit Agreement are hereby incorporated by reference, *mutatis mutandis.*

[*Signature Pages Follow*]

Very truly yours,

**LUCKY BUCKS, LLC,**
as Borrower
By: _____
    Name:
    Title:

## SCHEDULE 1

**LOANS AND PAYMENTS OF PRINCIPAL**

| Date | Amount of Loan | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made By |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**EXHIBIT C-3**

**[FORM OF] SWING LINE NOTE**

$_____                                                    Dated _____, 202_

      **FOR VALUE RECEIVED**, the undersigned, Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), HEREBY PROMISES TO PAY _____ or its registered assigns (the "Note Holder") for the account of its Applicable Lending Office the principal amount of each Swing Line Loan from time to time made by the Note Holder to the Borrower under that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among the Borrower, the Note Holder and certain other Lenders from time to time party thereto, Macquarie Capital Funding LLC, as Administrative Agent, Collateral Agent, Swing Line Lender and an L/C Issuer, and each other L/C Issuer and from time to time party thereto, owing to the Note Holder by the Borrower.  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

      The Borrower promises to pay interest on the unpaid principal amount of each Swing Line Loan from the date of such Swing Line Loan until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Credit Agreement.

      Both principal and interest are payable in lawful money of the U.S. to the Administrative Agent, at such office and in the manner specified in the Credit Agreement.  The Swing Line Loan owing to the Note Holder by the Borrower, and all payments made on account of principal thereof, shall be recorded by the Note Holder and, prior to any transfer hereof, endorsed on Schedule 1 hereto, which is part of this promissory note (the "Swing Line Note"); *provided*, that the failure of the Note Holder to make any such recordation or endorsement shall not affect the Obligations of the Borrower under this Swing Line Note.

      This Swing Line Note is one of the "Notes" referred to in, and is entitled to the benefits of, the Credit Agreement.  The Credit Agreement, among other things, (i) provides for the making of Swing Line Loans by the Note Holder to the Borrower from time to time in an aggregate amount not to exceed at any time outstanding the U.S. dollar amount first above mentioned, the indebtedness of the Borrower resulting from such Swing Line Loan being evidenced by this Swing Line Note, and (ii) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified.  The Obligations of the Borrower under this Swing Line Note and the other Loan Documents and the Obligations of the other Loan Parties under the Loan Documents, are secured by the Collateral as provided in the Loan Documents.  The Borrower, for itself and its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Swing Line Note.

      This Swing Line Note may not be transferred or assigned by the Note Holder to any Person except in compliance with the terms of the Credit Agreement.  The rights evidenced by this Note to receive principal and interest may only be transferred if the transfer is registered on a record of ownership and the transferee is identified as the owner of an interest in the obligation pursuant to Section 10.07 of the Credit Agreement.  This Swing Line Note may not at any time be endorsed to, or to the order of, bearer.

      Sections 10.14 (*Governing Law, Jurisdiction, Service of Process*) and 10.15 (*Waiver of Right to Trial by Jury*) of the Credit Agreement are hereby incorporated by reference, *mutatis mutandis*.

[*Signature Pages Follow*]

Very truly yours,

**LUCKY BUCKS, LLC,**
as Borrower
By: _____
Name:
Title:

[*Signature Page to Swing Line Note*]

**SCHEDULE 1**

**LOANS AND PAYMENTS OF PRINCIPAL**

| Date | Amount of Loan | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made By |
|------|----------------|-------------------------------------|--------------------------|------------------|
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |
|      |                |                                     |                          |                  |

**[FORM OF] CLOSING DATE CERTIFICATE**

[ ● ], 2021

   This Closing Date Certificate (this "<u>Certificate</u>") is delivered pursuant to <u>Section 4.01(k)</u> of that certain Credit Agreement, dated as of the date hereof (the "<u>Credit Agreement</u>"), by and among Lucky Bucks, LLC, a Georgia limited liability Company (the "<u>Borrower</u>"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent, each L/C Issuer party thereto and each Lender party thereto. Capitalized terms used but not defined herein have the meanings given to such terms in the Credit Agreement.

   The undersigned, being a Responsible Officer of the Borrower, solely in such capacity and not in any individual capacity (and without personal liability) hereby certifies on behalf of the Borrower, on the date hereof, as follows:

   (a)  Each of the representations and warranties of the Borrower and each other Loan Party contained in <u>Article V</u> of the Credit Agreement or any other Loan Document is true and correct in all material respects on and as of the date hereof; *provided* that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided, further*, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

   (b)  No Default or Event of Default exists or will exist immediately after giving effect to the Transactions contemplated on the Closing Date.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has signed this Certificate to be effective as of the date first written above.

**LUCKY BUCKS, LLC**,
a Georgia limited liability company

By: _____
     Name:
     Title:

[Signature Page to Closing Date Certificate]

**EXHIBIT D-2**

**[FORM OF] COMPLIANCE CERTIFICATE**

Financial Statement Date: _____

To        Macquarie Capital Funding LLC, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent, Collateral Agent and Swing Line Lender and each L/C Issuer and Lender from time to time party thereto.  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to Section 6.02(a) of the Credit Agreement, the undersigned, in his/her capacity as a Responsible Officer of the Borrower, certifies as follows:

*[Use following paragraph 1 for fiscal year-end financial statements]*

1.        [Attached hereto as Schedule I is the consolidated balance sheet of the Borrower and its Subsidiaries as at the fiscal year ended [_____] (the "Financial Statement Date"), and the related consolidated statements of income or operations, stockholders' equity and cash flow for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with IFRS, audited and accompanied by (i) a report and opinion of an independent registered public accounting firm of nationally recognized standing,[1] which report and opinion has been prepared in accordance with generally accepted auditing standards and shall not be subject to any qualification (for the avoidance of doubt, excluding an emphasis of the matter or explanatory paragraph) as to "going concern" (other than any "going concern" qualification with respect to, or as a result of (x) an upcoming maturity date under any Indebtedness or (y) any actual or prospective breach of the covenant in Section 7.09 of the Credit Agreement or any other financial covenant in the documentation evidencing any Indebtedness or any qualification or exception as to the scope of such audit, and (ii) a customary management discussion and analysis (in form and substance reasonably acceptable to the Administrative Agent) of the financial performance of the Borrower and its Subsidiaries.]

*[Use following paragraph 1 for fiscal quarter-end financial statements]*

1.        [Attached hereto as Schedule I is the consolidated balance sheet of the Borrower and its Subsidiaries as at the fiscal quarter ended [_____] (the "Financial Statement Date"), and the related (i) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) consolidated statements of cash flows for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the

---

[1]        Or other accounting firm reasonably acceptable to the Administrative Agent (it being understood that RSM US LLP is reasonably acceptable to the Administrative Agent).

corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and each of which fairly present in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with IFRS, subject only to normal year-end adjustments and the absence of footnotes.]

2.      [Attached hereto as <u>Schedule II</u> are the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries from the consolidated financial statements referred to in paragraph l above.][2]

3.      Attached hereto as <u>Schedule III</u> are: (i) certifications and descriptions of each event, condition or circumstance during the fiscal quarter ending [____][3] requiring a mandatory prepayment under <u>Section 2.05(b)</u> of the Credit Agreement and (ii) a list of Subsidiaries that identifies each Subsidiary as a Material Subsidiary or an Immaterial Subsidiary as of the date hereof or confirmation that there is no change in such information since the later of the Closing Date or the date of the last such list.

4.      [Attached hereto as <u>Schedule IV</u> is a correct calculation of the Financial Covenant contained in <u>Section 7.09</u> of the Credit Agreement, calculated on a consolidated basis for Borrower and its Restricted Subsidiaries for the relevant period ended on the Financial Statement Date.][4]

5.      To my knowledge, during such fiscal period, except as otherwise disclosed to the Administrative Agent in writing pursuant to the Credit Agreement, no Default or Event of Default has occurred and is continuing [except as specified on <u>Annex A</u> attached hereto].[5]

6.      Attached hereto as <u>Schedule V</u> are copies of each material correspondence and/or report provided to the Georgia Lottery Corporation during such fiscal period pursuant to applicable Law.

*[Signature Page Follows]*

---

[2]      Only include to the extent there are Unrestricted Subsidiaries and to the extent adjustments are necessary to eliminate the accounts of such Unrestricted Subsidiaries from the consolidated financial statements.

[3]      The last fiscal quarter covered by this Compliance Certificate.

[4]      To be included to the extent Financial Covenant is in effect pursuant to Section 7.09 of the Credit Agreement.

[5]      If unable to provide the foregoing certification, fully describe the reasons therefor, the circumstances thereof, the covenants or conditions which have not been performed/observed and any action taken or proposed to be taken with respect thereto on Annex A attached hereto.

**IN WITNESS WHEREOF**, the undersigned, in his/her capacity as a Responsible Officer of the Borrower, has executed this certificate for and on behalf of the Borrower and has caused this certificate to be delivered as of the first date stated above.

**LUCKY BUCKS, LLC**,
as Borrower

By: _____
Name:
Title:

**SCHEDULE I TO COMPLIANCE CERTIFICATE**

*Consolidated Balance Sheet for the Financial Statement Date*

[*See Attached*]

**SCHEDULE II TO COMPLIANCE CERTIFICATES**

*Reconciliation Financial Statements*

[*See Attached* / *N/A*]

# SCHEDULE III TO COMPLIANCE CERTIFICATE

### *Certifications Regarding Mandatory Prepayments*

[*Paragraph 3(i) of Compliance Certificate*]

1.      [Section 2.05(b)(i):  The Excess Cash Flow for the Test Period ended on the Computation Date was $[  ]⁶ .  The ECF Percentage is [  ]%.  [Excess Cash Flow for the Computation Period does not exceed the threshold which would require a prepayment pursuant to Section 2.05(b)(i) of the Credit Agreement.]  [Excess Cash Flow for the Computation Period does exceed the threshold which requires a prepayment pursuant to Section 2.05(b)(i) of the Credit Agreement in an amount equal to $[  ]]⁷].⁸

2.      [Section 2.05(b)(ii):  During the Test Period ended on the Computation Date, neither the Borrower nor any of its Restricted Subsidiaries has received any Net Cash Proceeds from any Asset Disposition or suffered any Casualty Event, in each case other than any Asset Disposition or Casualty Event of property or assets acquired with the proceeds of Qualified Capital Stock, which would require a prepayment pursuant to Section 2.05(b)(ii) of the Credit Agreement (after giving effect to any permitted reinvestment period).]⁹

3.      [Section 2.05(b)(iii):  During such fiscal period, neither the Borrower nor any of its Restricted Subsidiaries has received any Net Available Cash from any issuance or incurrence by the Borrower or any of its Restricted Subsidiaries of (A) Refinancing Term Loans, (B) Refinancing Indebtedness with respect to Indebtedness permitted pursuant to <u>Section 7.03(b)(i)</u> of the Credit Agreement, or (C) Indebtedness not expressly permitted to be incurred or issued pursuant to <u>Section 7.03</u> of the Credit Agreement, which would in each case require a mandatory repayment pursuant to <u>Section 2.05(b)(iii)</u> of the Credit Agreement.]¹⁰

---

⁶      "Computation Period" shall mean the most recently ended Test Period covered by the financial statements accompanying this Compliance Certificate, and the "Computation Date" shall mean the last date of the Computation Period.

⁷      If Excess Cash Flow does exceed the threshold, please describe the same and state the amount to be paid within ten (10) Business Days of this Compliance Certificate.

⁸      To only be included for Compliance Certificates delivered pursuant to Section 6.01(a) of the Credit Agreement beginning with the fiscal year ending December 31, 2021.

⁹      If the Borrower and any of its Restricted Subsidiaries has received any Net Available Cash from any from any Asset Disposition, the certificate should describe same and state the date of each receipt thereof and the amount of Net Available Cash received on each such date, together with sufficient information as to mandatory repayments and/or reinvestments thereof to determine compliance with Section 2.05(b)(ii) of the Credit Agreement, together with a statement that the Borrower is in compliance with the requirements of said Section 2.05(b)(ii).

¹⁰      If the Borrower and any of its Restricted Subsidiaries has received any Net Available Cash from any issuance or incurrence by the Borrower and any of its Restricted Subsidiaries of Refinancing Term Loans, Refinancing Indebtedness with respect to Indebtedness permitted pursuant to Section 7.03(b)(i) of the Credit Agreement or Indebtedness (other than Indebtedness permitted to be incurred or issued pursuant to Section 7.03 of the Credit Agreement), the certificate should describe same and state the date of each receipt thereof and the amount of Net Available Cash received on each such date, together with sufficient information as to mandatory repayments thereof to determine compliance with Section 2.05(b)(iii) of the Credit Agreement, together with a statement that the Borrower is in compliance with the requirements of said Section 2.05(b)(iii).

## SCHEDULE III TO COMPLIANCE CERTIFICATE

### *Subsidiaries*

*[Paragraph 3(ii) of Compliance Certificate]*

[Select one]

[What follows is a list of Material and Immaterial Subsidiaries (each identified as such) of the Borrower as of the date hereof:

     1.

     2.]

-or-

[There has been no change to the list of Material and Immaterial Subsidiaries of the Borrower since [the Closing Date] [the date of the last such list provided pursuant to the Compliance Certificate dated _____]][11]

---

[11]     Insert the later of the two dates.

**SCHEDULE IV TO COMPLIANCE CERTIFICATE**

*Financial Covenant Calculations*

[*See Attached / N/A*]

**SCHEDULE V TO COMPLIANCE CERTIFICATE**

*Material Correspondence and/or Reports to Georgia Lottery Corporation*

[*See Attached*]

**EXHIBIT E**

**[FORM OF] ASSIGNMENT AND ASSUMPTION**


This Assignment and Assumption (this "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "<u>Assignor</u>") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "<u>Assignee</u>"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.


For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] in respect of the Commitments and Loans identified below [including, without limitation, Letters of Credit and Swing Line Loans, as applicable)][5] and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "<u>Assigned Interest</u>"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor. The benefit of each Collateral Document shall be maintained in favor of each Assignee.


1.      Assignor[s]:     _____

                        _____

---

[1]      For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

[2]      For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

[3]      Select as appropriate.

[4]      Include bracketed language if there are either multiple Assignors or multiple Assignees.

[5]      Include only if assignment is of Revolving Credit Commitments.

2.      Assignee[s]:    _____

_____

        [for each Assignee, indicate [Affiliate][Approved Fund] of [*identify Lender*]]

3.      <u>Borrower</u>:  Lucky Bucks, LLC, a Georgia limited liability company

4.      <u>Administrative Agent</u>:  Macquarie Capital Funding LLC, as the Administrative Agent under the Credit Agreement

6.      <u>Credit Agreement</u>:  Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among Lucky Bucks, LLC, a Georgia limited liability company (the "<u>Borrower</u>"), the Lenders and L/C Issuers from time to time party thereto and Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent.

7.      Assigned Interest:

| Assignor[s] [6] | Assignee[s] [7] | Commitment/ Loans Assigned [8] | Aggregate Amount of Commitment/ Loans of such Class for all Lenders [9] | Amount of Commitment/ Loans of such Class Assigned | Percentage Assigned of Commitment/ Loans of such Class [10] |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  | $[   ] | $[   ] | _____% |
|  |  |  | $[   ] | $[   ] | _____% |
|  |  |  | $[   ] | $[   ] | _____% |

8.      Effective  Date:  _____,  20__  [TO  BE  INSERTED  BY  ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

*[Signature Pages Follow]*

        The terms set forth in this Assignment and Assumption are hereby agreed to:

**ASSIGNOR**
[NAME OF ASSIGNOR]

---

[6]      List each Assignor, as appropriate.

[7]      List each Assignee, as appropriate.

[8]      Fill in Class of Commitment/Loans being assigned.

[9]      Amounts in this column and in the column immediately to the right to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.  "All Lenders" refers to all Lenders under the applicable Class.

[10]      Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders under the applicable Class.

By: _____
Name:
Title:

**ASSIGNEE**
[NAME OF ASSIGNEE]

By: _____
Name:
Title:

**CONSENTED TO AND ACCEPTED:**

[**MACQUARIE CAPITAL FUNDING LLC**, as Administrative Agent

By: _____
Name:
Title:

By: _____
Name:
Title:]^11

[**MACQUARIE CAPITAL FUNDING LLC**, as Swing Line Lender

By: _____
Name:
Title:

By: _____
Name:
Title:]^12

[**MACQUARIE CAPITAL FUNDING LLC**, as an L/C Issuer

By: _____
Name:
Title:

By: _____
Name:
Title:

**KEYBANK, NATIONAL ASSOCIATION**, as an L/C Issuer

---

11    Include if Administrative Agent consent required under Section 10.07(b) of the Credit Agreement.

12    Include if Swing line Lender consent required under Section 10.07(b) of the Credit Agreement.

By: _____
Name:
Title:

**[   ]**, as an L/C Issuer

By: _____
Name:
Title:][13]

---

[13] Include if  L/C Issuer consent required under Section 10.07(b) of the Credit Agreement.

[Consented to:

**LUCKY BUCKS, LLC**, as
Borrower

By: _____
Name:
Title:] [14]

---

[14]    Include if Borrower consent required under Section 10.07(b) of the Credit Agreement.

**ANNEX 1 TO ASSIGNMENT AND ASSUMPTION**

**STANDARD TERMS AND CONDITIONS FOR**

**ASSIGNMENT AND ASSUMPTION**

1.      Representations and Warranties.

1.1.    Assignor.  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Sections 10.07(b)(i) and (b)(ii) of the Credit Agreement (subject to such consents, if any, as may be required under Section 10.07(b)(i) of the Credit Agreement) and is not a Disqualified Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the][such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the][such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 6.01 of the Credit Agreement, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vii) attached to this Assignment and Assumption is all documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by it; and (b) agrees that (i) it will, independently and without reliance upon the Administrative Agent, the Collateral Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date.

3.        <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. The words "execution," "signed," "signature," and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. <u>Sections 10.14</u> (*Governing Law, Jurisdiction, Service of Process*) and <u>10.15</u> (*Waiver of Right to Trial by Jury*) of the Credit Agreement are hereby incorporated by reference, *mutatis mutandis.*

**EXHIBIT F**

**[FORM OF] GUARANTY**

dated as of

July 30, 2021

among

**LUCKY BUCKS, LLC**
as a Guarantor,

**LUCKY BUCKS HOLDCO, LLC**
as a Guarantor,

**CERTAIN SUBSIDIARIES OF LUCKY BUCKS, LLC PARTY HERETO FROM TIME TO TIME,**
as Guarantors,

and

**MACQUARIE CAPITAL FUNDING LLC,**
as Collateral Agent

# TABLE OF CONTENTS

**Page**

## ARTICLE I

## DEFINITIONS

SECTION 1.01.  Credit Agreement........................................................................................ 3
SECTION 1.02.  Other Defined Terms .................................................................................. 3

## ARTICLE II

## GUARANTY

SECTION 2.01.  Guaranty and Keepwell ............................................................................... 4
SECTION 2.02.  Guaranty of Payment .................................................................................. 5
SECTION 2.03.  No Limitations ............................................................................................ 5
SECTION 2.04.  Reinstatement .............................................................................................. 6
SECTION 2.05.  Agreement To Pay; Subrogation................................................................ 6
SECTION 2.06.  Information .................................................................................................. 6
SECTION 2.07.  Representations and Warranties.................................................................. 7
SECTION 2.08.  No Setoff or Deductions; Taxes; Payments ............................................... 7
SECTION 2.09.  Guarantee Limitations................................................................................ 7

## ARTICLE III

## SUBROGATION AND SUBORDINATION

SECTION 3.01.  Contribution and Subrogation..................................................................... 7
SECTION 3.02.  Subordination............................................................................................... 7

## ARTICLE IV
## MISCELLANEOUS

SECTION 4.01.  Notices ........................................................................................................ 8
SECTION 4.02.  Waivers; Amendment ................................................................................. 8
SECTION 4.03.  Collateral Agent's Fees and Expenses, Indemnification ............................ 8
SECTION 4.04.  Successors and Assigns ............................................................................... 9
SECTION 4.05.  Survival of Representations and Warranties................................................ 9
SECTION 4.06.  Counterparts; Effectiveness; Several Agreement ....................................... 9
SECTION 4.07.  Severability ................................................................................................. 10
SECTION 4.08.  Right of Set-Off .......................................................................................... 10
SECTION 4.09.  Governing Law; Jurisdiction; Service of Process ...................................... 10
SECTION 4.10.  WAIVER OF JURY TRIAL........................................................................ 10
SECTION 4.11.  Headings ...................................................................................................... 10
SECTION 4.12.  Security Interest Absolute........................................................................... 10
SECTION 4.13.  Termination or Release ............................................................................... 11
SECTION 4.14.  Additional Guarantors................................................................................. 11
SECTION 4.15.  Excluded Swap Obligations Limitation ...................................................... 11

**EXHIBIT**
EXHIBIT I    –    Form of Guaranty Supplement

**SCHEDULE**
Schedule 1.01    –    Guarantee Limitations

# GUARANTY

This **GUARANTY** (this "Guaranty") dated as of July 30, 2021, by and among **LUCKY BUCKS, LLC**, a Georgia limited liability company (the "Borrower"), as a Guarantor (except as to its own primary Obligations), **LUCKY BUCKS HOLDCO, LLC**, a Delaware limited liability company ("Holdings"), as a Guarantor, certain Subsidiaries of the Borrower from time to time party hereto, as Guarantors, and **MACQUARIE CAPITAL FUNDING LLC** ("Macquarie"), as Collateral Agent.

## PRELIMINARY STATEMENTS

**WHEREAS**, reference is made to that certain Credit Agreement, dated as of the date hereof (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Borrower, Macquarie, as Administrative Agent and Collateral Agent, each L/C Issuer and the Lenders from time to time party thereto.

**WHEREAS**, the Lenders have agreed to extend credit to the Borrower, and the Cash Management Banks and the Hedge Banks may from time to time extend credit to the Borrower and its Subsidiaries in the form of Secured Cash Management Obligations and Secured Hedge Agreements, respectively, subject to the terms and conditions set forth in the Credit Agreement. The obligations of the Lenders to extend such credit and of the Cash Management Banks and the Hedge Banks to enter into the Secured Cash Management Obligations and the Secured Hedge Agreements, respectively, are conditioned upon, among other things, the execution and delivery of this Agreement (as defined below).

**WHEREAS**, each Guarantor will derive substantial benefits from the extension of credit to the Borrower pursuant to the Credit Agreement and is willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit, the Hedge Banks to enter into Secured Hedge Agreements and the Cash Management Banks to enter into agreements giving rise to Secured Cash Management Obligations.

**ACCORDINGLY**, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01.    Credit Agreement.

(a)    Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Credit Agreement.

(b)    The rules of construction specified in Article I of the Credit Agreement also apply to this Agreement.

SECTION 1.02.    Other Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"Agreement" means this Guaranty.

"Claiming Party" has the meaning assigned to such term in Section 3.01.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Contributing Party" has the meaning assigned to such term in Section 3.01.

"Credit Agreement" has the meaning assigned to such term in the preliminary statement of this Agreement.

"Guarantee Limitations" means the limitations set forth in Section 2.09 and those principles set forth on Schedule 1.01, as such schedule may be updated from time to time in accordance with Section 2.09.

"Guarantor" means (a) except as to its own primary Obligations as a counterparty or direct obligor with respect to any Secured Cash Management Obligations and/or Secured Hedge Agreements, each Restricted Subsidiary of the Borrower that becomes a party to this Agreement after the Closing Date, (b) Holdings and (c) except as to its own primary Obligations, the Borrower; *provided* that notwithstanding anything to the contrary, no Excluded Subsidiary (as defined in the Credit Agreement) shall be required to be a Guarantor.

"Guaranty" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Guaranty Supplement" means an instrument in or substantially in the form of Exhibit I hereto.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation is incurred or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Termination Date" means the date of payment in full in cash of all Secured Obligations (other than (x) obligations under Secured Hedge Agreements not yet due and payable, (y) Secured Cash Management Obligations not yet due and payable and (z) contingent indemnification obligations and other contingent obligations not yet accrued and payable), the expiration or termination of all Letters of Credit (other than Letters of Credit that have been Cash Collateralized or back-stopped or as to which other arrangements reasonably satisfactory to the Administrative Agent and the applicable L/C Issuer have been made) and the expiration or termination of the Aggregate Commitments of the Lenders.

## ARTICLE II

## GUARANTY

SECTION 2.01.    Guaranty and Keepwell.

(a)    Subject to Section 2.09, each Guarantor absolutely, irrevocably and unconditionally guarantees, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, to the Collateral Agent, for the benefit of the Secured Parties, the due and punctual payment and performance of the Secured Obligations.  Each of the Guarantors further agrees that, subject to Section 2.09, the Secured Obligations may be extended or renewed, in whole or in part, without notice

to or further assent from it, and that it will remain bound upon its guarantee notwithstanding any extension or renewal of any such Secured Obligation.  Each of the Guarantors waives presentment to, demand of payment from and protest to the Borrower or any other Guarantor of any of the Secured Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment.

(b)      Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 2.01(b) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 2.01(b), or otherwise under this Guaranty, voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 2.01(b) shall remain in full force and effect until the termination of this Guaranty in accordance with <u>Section 4.13</u>.  Each Qualified ECP Guarantor intends that this Section 2.01(b) constitutes, and this Section 2.01(b) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 2.02.   <u>Guaranty of Payment</u>.  Each of the Guarantors further agrees that its guarantee hereunder constitutes a guarantee of payment when due and not of collection, and waives any right to require that any resort be had by the Collateral Agent or any other Secured Party to any security held for the payment of the Secured Obligations, or to any balance of any deposit account or credit on the books of the Collateral Agent or any other Secured Party in favor of the Borrower or any other Person.

SECTION 2.03.   <u>No Limitations</u>.

(a)      Except for termination of a Guarantor's obligations hereunder as expressly provided in <u>Section 4.13</u> and the Guarantee Limitations and except as provided in the definition of "Secured Obligations" with respect to Excluded Swap Obligations, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense (other than a defense of payment in full in cash of all the Secured Obligations) or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Secured Obligations, or otherwise.  Without limiting the generality of the foregoing, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by (i) the failure of the Collateral Agent or any other Secured Party to assert any claim or demand or to enforce any right or remedy under the provisions of any Loan Document or otherwise; (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, any Loan Document or any other agreement, including with respect to any other Guarantor under this Agreement; (iii) the release, non-perfection, impairment, exchange or substitution of any security held by the Collateral Agent or any other Secured Party for the Secured Obligations; (iv) any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations; or (v) any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the payment in full in cash of all the Secured Obligations).  Each Guarantor expressly authorizes the Secured Parties to take and hold security for the payment and performance of the Secured Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other Guarantors or obligors upon or in respect of the Secured Obligations, all without affecting the obligations of any Guarantor hereunder.

(b)    To the fullest extent permitted by applicable Law, each Guarantor waives any defense based on or arising out of any defense of the Borrower or any other Guarantor or the unenforceability of the Secured Obligations, or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower or any other Guarantor, other than the occurrence of the Termination Date or the termination of such Guarantor's obligations hereunder as expressly provided in <u>Section 4.13</u>. The Collateral Agent and the other Secured Parties may in accordance with the terms of the Collateral Documents, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Secured Obligations, make any other accommodation with the Borrower or any other Guarantor or exercise any other right or remedy available to them against the Borrower or any other Guarantor, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Termination Date, or the termination of such Guarantor's obligations hereunder as expressly provided in <u>Section 4.13</u>, has occurred.  To the fullest extent permitted by applicable Law, each Guarantor waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against the Borrower or any other Guarantor, as the case may be, or any security.

(c)    Each Guarantor, and by its acceptance of this Agreement, the Collateral Agent and each other Secured Party, hereby confirms that it is the intention of all such Persons that this Agreement and the Secured Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Secured Obligations of each Guarantor hereunder.  To effectuate the foregoing intention, the Collateral Agent, the other Secured Parties and the Guarantors hereby irrevocably agree that the Secured Obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Secured Obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

(d)    Each Guarantor acknowledges that it will receive indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in this Agreement are knowingly made in contemplation of such benefits.

SECTION 2.04.   <u>Reinstatement</u>.   Each of the Guarantors agrees that its guarantee hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Secured Obligation, is rescinded or must otherwise be restored by the Collateral Agent or any other Secured Party upon the bankruptcy, insolvency or reorganization of the Borrower, any other Guarantor or otherwise.

SECTION 2.05.   <u>Agreement To Pay; Subrogation</u>.  In furtherance of the foregoing and not in limitation of any other right that the Collateral Agent or any other Secured Party has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Borrower or any other Guarantor to pay any Secured Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will forthwith pay, or cause to be paid, to the Collateral Agent for distribution to the Secured Parties in cash the amount of such unpaid Secured Obligation.  Upon payment by any Guarantor of any sums to the Collateral Agent as provided above, all rights of such Guarantor against the Borrower or any other Guarantor arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subject to Article III.

SECTION 2.06.   <u>Information</u>.  Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's and each other Guarantor's financial condition and assets, and of

all other circumstances bearing upon the risk of nonpayment of the Secured Obligations, and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that none of the Collateral Agent or the other Secured Parties will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

SECTION 2.07.  <u>Representations and Warranties</u>. Each Guarantor hereby represents and warrants that this Agreement (i) has been duly executed and delivered by such Guarantor and (ii) constitutes a legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

SECTION 2.08.  <u>No Setoff or Deductions; Taxes; Payments</u>. Each Guarantor shall make all payments hereunder in accordance with Section 3.01 of the Credit Agreement. The obligations of the Guarantor under this paragraph shall survive the payment in full of the Secured Obligations and termination of this Guaranty.

SECTION 2.09.  <u>Guarantee Limitations</u>.

(a)   The obligations of each Guarantor under its Guarantee hereunder shall be limited to an aggregate amount equal to the largest amount that would not render such Guarantee subject to avoidance under Section 548 of the Bankruptcy Code or any comparable provisions of applicable Law.

(b)   The obligations of each Guarantor under its Guarantee hereunder shall be further limited by the limitations set forth for its applicable jurisdiction of organization in Schedule 1.01, as such schedule may be updated from time to time as set forth in the relevant Guaranty Supplement.

SECTION 2.10.  <u>Enforcement of Guarantees</u>. Notwithstanding anything herein to the contrary, no claims will be made under any of the Guarantees hereunder, and, for the avoidance of doubt, no security will be enforceable, unless and until an Event of Default shall have occurred and be continuing and the obligations under the Credit Agreement shall have been accelerated, in accordance with the terms thereof.

# ARTICLE III

# SUBROGATION AND SUBORDINATION

SECTION 3.01.  <u>Contribution and Subrogation</u>. Each Guarantor (a "<u>Contributing Party</u>") agrees (subject to <u>Section 3.02</u>) that, in the event a payment shall be made by any other Guarantor hereunder in respect of any Secured Obligation (the "<u>Claiming Party</u>"), the Contributing Party shall indemnify the Claiming Party in an amount equal to the amount of such payment, in each case multiplied by a fraction of which the numerator shall be the net worth of the Contributing Party on the date hereof and the denominator shall be the aggregate net worth of all the Contributing Parties together with the net worth of the Claiming Party on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to <u>Section 4.14</u>, the date of the Guaranty Supplement hereto executed and delivered by such Guarantor).  Any Contributing Party making any payment to a Claiming Party pursuant to this <u>Section 3.01</u> shall be subrogated to the rights of such Claiming Party to the extent of such payment.

SECTION 3.02.  <u>Subordination</u>.

(a)   Notwithstanding any provision of this Agreement to the contrary, all rights of the Guarantors under <u>Section 3.01</u> and all other rights of indemnity, contribution or subrogation under

applicable Law or otherwise shall be fully subordinated to the Secured Obligations until the occurrence of the Termination Date or the termination of such Guarantor's obligations hereunder as expressly provided in <u>Section 4.13</u>.  No failure on the part of the Borrower or any Guarantor to make the payments required by <u>Section 3.01</u> (or any other payments required under applicable Law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder.

(b)    Each Guarantor hereby agrees that upon the occurrence and during the continuance of an Event of Default and after notice from the Collateral Agent, all Indebtedness owed by it to the Borrower or to any Subsidiary of the Borrower shall be fully subordinated to the Secured Obligations until the occurrence of the Termination Date or the termination of such Guarantor's obligations hereunder as expressly provided in <u>Section 4.13</u>.

**ARTICLE IV**
**<u>MISCELLANEOUS</u>**

SECTION 4.01.    <u>Notices</u>.  All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 10.02 of the Credit Agreement.  All communications and notices hereunder to any Guarantor shall be given to it in care of the Borrower as provided in Section 10.02 of the Credit Agreement.

SECTION 4.02.    <u>Waivers; Amendment</u>.

(a)    No failure or delay by the Collateral Agent, any other Agent, any L/C Issuer or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Collateral Agent, any other Agent, the L/C Issuers and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this <u>Section 4.02</u>, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Collateral Agent, any other Agent, any Lender or any L/C Issuer may have had notice or knowledge of such Default at the time.  No notice or demand on any Guarantor in any case shall entitle any Guarantor to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Guarantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.01 of the Credit Agreement.

SECTION 4.03.    <u>Collateral Agent's Fees and Expenses, Indemnification</u>.

(a)    The parties hereto agree that the Collateral Agent shall be entitled to reimbursement of its expenses incurred hereunder as provided in Section 10.04 of the Credit Agreement as if such section was set out in full herein *mutatis mutandis* (without any duplication of amounts reimbursed under such Section 10.04).

(b)    Without limitation of its indemnification obligations under the other Loan Documents, each Guarantor agrees to indemnify the Collateral Agent and the other Indemnitees (as defined in Section 10.05 of the Credit Agreement) in accordance with Section 10.05 of the Credit Agreement (as if such section was set out in full herein *mutatis mutandis*) (without any duplication of amounts paid pursuant to such Section 10.05).

(c)    Any such amounts payable as provided hereunder shall be additional Secured Obligations guaranteed hereby and secured by the other Collateral Documents.  The provisions of this Section 4.03 shall remain operative and in full force and effect regardless of the termination of this Agreement or any other Loan Document, the consummation of the transactions contemplated hereby, the repayment of any of the Secured Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Collateral Agent or any other Secured Party.  All amounts due under this Section 4.03 shall be payable within ten (10) Business Days of written demand therefor setting forth such amounts in reasonable detail.

SECTION 4.04.    Successors and Assigns.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Guarantor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

SECTION 4.05.    Survival of Representations and Warranties.  All representations and warranties made hereunder or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Collateral Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that the Collateral Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Secured Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

SECTION 4.06.    Counterparts; Effectiveness; Several Agreement.

(a)    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.  The words "execution," "signed," "signature," and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(b)    This Agreement shall become effective as to any Guarantor when a counterpart hereof executed on behalf of such Guarantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon such Guarantor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of such Guarantor, the Collateral Agent and the other Secured Parties and their respective successors and assigns, except that no Guarantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except as expressly contemplated by this Agreement or the Credit Agreement.  This Agreement shall be

construed as a separate agreement with respect to each Guarantor and may be amended, modified, supplemented, waived or released with respect to any Guarantor without the approval of any other Guarantor and without affecting the obligations of any other Guarantor hereunder.

SECTION 4.07.    Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 4.08.    Right of Set-Off.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates and each L/C Issuer and its Affiliates is authorized at any time and from time to time, without prior notice to any Guarantor, any such notice being waived by each Guarantor to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness (in any currency) at any time owing by, such Lender and its Affiliates or such L/C Issuer and its Affiliates, as the case may be, to or for the credit or the account of the respective Guarantor against any and all Secured Obligations owing to such Lender and its Affiliates or such L/C Issuer and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent, Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Secured Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness.  Notwithstanding anything to the contrary contained herein, none of each Agent and its Affiliates, each Lender and its Affiliates and each L/C Issuer and its Affiliates shall have a right to set off and apply any deposits held or other Indebtedness owing by such Agent or its Affiliates, such Lender or its Affiliates or such L/C Issuer or its Affiliates, as the case may be, to or for the credit or the account of any Subsidiary of a Guarantor which is a Foreign Subsidiary or a FSHCO. Each Lender and L/C Issuer agrees promptly to notify the relevant Guarantor and the Collateral Agent after any such set off and application made by such Lender or L/C Issuer, as the case may be; *provided*, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of each Lender and each L/C Issuer under this Section 4.08 are in addition to other rights and remedies (including other rights of setoff) that the Collateral Agent, such L/C Issuer and such Lender may have.

SECTION 4.09.    Governing Law; Jurisdiction; Service of Process.    Section 10.14 (*Governing Law, Jurisdiction, Service of Process*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis.*

SECTION 4.10.    WAIVER OF JURY TRIAL.  Section 10.15 (*Waiver of Right to Trial by Jury*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis.*

SECTION 4.11.    Headings.  Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Agreement.

SECTION 4.12.    Guaranty Absolute.  To the fullest extent permitted by applicable Law, all rights of the Collateral Agent hereunder and all obligations of each Guarantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document, any other agreement or instrument, (c) any release or amendment or waiver of or consent under or departure from any guarantee guaranteeing all or any of the Secured Obligations or (d) any other circumstance that might otherwise

constitute a defense available to, or a discharge of, any Guarantor in respect of the Secured Obligations or this Agreement.

SECTION 4.13.    <u>Termination or Release</u>.

(a)    This Agreement and the Guarantees made herein shall automatically terminate with respect to all Secured Obligations upon the Termination Date.

(b)    Guarantees made hereunder shall automatically be released in accordance with Section 9.11 of the Credit Agreement.

(c)    In connection with any termination or release pursuant to paragraph (a) or (b) of this <u>Section 4.13</u>, the Collateral Agent shall promptly (and each Lender and each L/C Issuer irrevocably and unconditionally authorizes the Collateral Agent to), execute and deliver to any Guarantor, at such Guarantor's expense, all documents that such Guarantor shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this <u>Section 4.13</u> shall be without recourse to or warranty by the Collateral Agent.

SECTION 4.14.    <u>Additional Guarantors</u>.  Any Person required to become party to this Agreement pursuant to Section 6.10 of the Credit Agreement may do so by executing and delivering a Guaranty Supplement and such Person shall become a Guarantor hereunder with the same force and effect as if originally named as a Guarantor herein.  The execution and delivery of any such instrument shall not require the consent of any other Guarantor hereunder.  The rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor as a party to this Agreement.

SECTION 4.15.    <u>Excluded Swap Obligations Limitation</u>.  Notwithstanding anything in this Guaranty to the contrary, no Guarantor shall be required to make any payment pursuant to this Guaranty to any party, and the right of set-off provided in <u>Section 4.08</u> shall not apply with respect to any Guarantor, in each case, with respect to Excluded Swap Obligations, if any, of such Guarantor.

SECTION 4.16.    <u>Gaming Laws</u>.  Each of Sections 8.06 (*Gaming Requirements*), 8.07 (*Restrictions Under Gaming Laws*) and 10.25 (*Gaming Matters*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis*.

[*Signature Pages Follow*]

-11-

WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**LUCKY BUCKS, LLC**
a Georgia limited liability company
as Guarantor

By: _____
      Name:
      Title:

**LUCKY BUCKS HOLDCO, LLC**
a Delaware limited liability company
as Guarantor

By: _____
      Name:
      Title:

**MACQUARIE CAPITAL FUNDING LLC,**
as Collateral Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[Signature Page to Guaranty]

**EXHIBIT I**
**TO THE GUARANTY**

FORM OF
GUARANTY SUPPLEMENT

SUPPLEMENT NO. [__] (this "<u>Guaranty Supplement</u>"), dated as of [_____], to the Guaranty dated as of July 30, 2021, by and among LUCKY BUCKS, LLC, a Georgia limited liability company (the "<u>Borrower</u>"), LUCKY BUCKS HOLDCO, LLC, a Delaware limited liability company, certain Subsidiaries of the Borrower from time to time party thereto and MACQUARIE CAPITAL FUNDING LLC ("<u>Macquarie</u>"), as Collateral Agent (as defined below).

A.      Reference is made to (i) that certain Credit Agreement dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among the Borrower, Macquarie, as administrative agent (in such capacity, and together with its successors and permitted assigns, the "<u>Administrative Agent</u>"), collateral agent (in such capacity, and together with its successors and permitted assigns, the "<u>Collateral Agent</u>"), the lenders from time to time party thereto (collectively, the "<u>Lenders</u>") and the L/C issuers from time to time party thereto (collectively, the "<u>L/C Issuers</u>") and (ii) the Guaranty referred to therein (such Guaranty, as in effect on the date hereof and as it may hereafter be as amended, restated, amended and restated, supplemented or otherwise modified from time to time, together with this Guaranty Supplement, being the "<u>Guaranty</u>").  The capitalized terms defined in the Guaranty or in the Credit Agreement and not otherwise defined herein are used herein as therein defined.

B.      The Guarantors have entered into the Guaranty in order to induce the Lenders to make Loans and the L/C Issuers to issue Letters of Credit and the Hedge Banks to enter into Secured Hedge Agreements and Cash Management Banks to enter into Secured Cash Management Obligations.  Section 4.14 of the Guaranty provides that Persons required to become Guarantors under the Guaranty pursuant to Section 6.10 of the Credit Agreement may do so by execution and delivery of an instrument in the form of this Guaranty Supplement.  The undersigned (the "<u>New Guarantor</u>") is executing this Guaranty Supplement in accordance with the requirements of the Credit Agreement to become a Guarantor under the Guaranty in order to induce the Lenders to make Loans and the L/C Issuers to issue Letters of Credit, the Hedge Banks to enter into Secured Hedge Agreements from time to time and the Cash Management Banks to enter into agreements giving rise to Secured Cash Management Obligations from time to time.

Accordingly, the Collateral Agent and the New Guarantor agree as follows:

SECTION 1.  <u>Secured Obligations Under the Guaranty</u>.  In accordance with Section 4.14 of the Guaranty, the New Guarantor by its signature below becomes a Guarantor and, if applicable, a Qualified ECP Guarantor under the Guaranty with the same force and effect as if originally named therein as a Guarantor and the New Guarantor hereby agrees to all the terms and provisions of the Guaranty applicable to it as a Guarantor thereunder.  Each reference to a "Guarantor" in the Guaranty shall be deemed to include the New Guarantor and each reference in any other Loan Document to a "Guarantor" or a "Loan Party" shall also be deemed to include the New Guarantor.  The Guaranty is hereby incorporated herein by reference.

SECTION 2.  <u>Representations and Warranties</u>.  The New Guarantor represents and warrants to the Collateral Agent and the other Secured Parties that this Guaranty Supplement (i) has been duly authorized, executed and delivered by it and (ii) constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

SECTION 3.  Delivery by Facsimile; Electronic Transmission.  This Guaranty Supplement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Guaranty Supplement shall be effective as delivery of an original executed counterpart of this Guaranty Supplement.  The words "execution," "signed," "signature," and words of like import herein shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 4.  Governing Law.  Section 10.14 (*Governing Law, Jurisdiction, Service of Process*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis.*

SECTION 5.  Affirmation.  Except as expressly supplemented hereby, the Guaranty shall remain in full force and effect.

SECTION 6.  Severability.  If any provision of this Guaranty Supplement is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Guaranty Supplement shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 7.  Notice.  All communications and notices hereunder shall be in writing and given as provided in Section 4.01 of the Guaranty.

SECTION 8.  Reimbursement.  The New Guarantor agrees to reimburse the Collateral Agent for its reasonable out-of-pocket expenses in connection with this Guaranty Supplement, including the reasonable and documented fees, other charges and disbursements of counsel for the Collateral Agent in accordance with the terms of the Credit Agreement.

SECTION 9.  Guarantee Limitations.  Schedule 1.01 of the Guaranty is hereby supplemented with the principles set forth in Schedule 1.01 hereto, if any, and such principles shall become part of Schedule 1.01 of the Guaranty and the Guarantee Limitations.

SECTION 10.  Gaming Laws.  Each of Sections 8.06 (*Gaming Requirements*), 8.07 (*Restrictions Under Gaming Laws*) and 10.25 (*Gaming Matters*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis.*

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, the New Guarantor and the Collateral Agent have duly executed this Guaranty Supplement as of the day and year first above written.

**[NAME OF ADDITIONAL GUARANTOR]**

By: _____
    Name:
    Title:

**MACQUARIE CAPITAL FUNDING LLC,**
as Collateral Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**SCHEDULE 1.01**

**GUARANTEE LIMITATIONS SUPPLEMENT**

None.

**EXHIBIT G**

**[FORM OF] SECURITY AGREEMENT**

dated as of July 30, 2021

among

**LUCKY BUCKS, LLC,**

**LUCKY BUCKS HOLDCO, LLC,**

**THE OTHER GRANTORS PARTY HERETO FROM TIME TO TIME**

and

**MACQUARIE CAPITAL FUNDING LLC**
as Collateral Agent

# TABLE OF CONTENTS

———————————

PAGE

Section 1.  *Definitions.* ........................................................................................................... 1
Section 2.  *Grant of Transaction Liens.* ................................................................................. 6
Section 3.  *General Representations and Warranties* ........................................................... 8
Section 4.  *Further Assurances; General Covenants* ............................................................ 9
Section 5.  *Recordable Intellectual Property* ........................................................................ 11
Section 6.  *Investment Property* ............................................................................................ 11
Section 7.  *Commercial Tort Claims.* .................................................................................... 13
Section 8.  *Cash Collateral Accounts.* .................................................................................. 13
Section 9.  *Operation of Collateral Accounts.* ..................................................................... 13
Section 10.  *Transfer of Record Ownership* ......................................................................... 14
Section 11.  *Right to Vote Securities* .................................................................................... 14
Section 12.  *Remedies* ........................................................................................................... 15
Section 13.  *Application of Proceeds* .................................................................................... 16
Section 14.  *Fees and Expenses; Indemnification* ................................................................ 17
Section 15.  *Authority to Administer Collateral* ................................................................... 17
Section 16.  *Limitation on Duty in Respect of Collateral* ..................................................... 18
Section 17.  *General Provisions Concerning the Collateral Agent.* ...................................... 18
Section 18.  *Termination of Transaction Liens; Release of Collateral* ................................. 19
Section 19.  *Additional Guarantors and Grantors* ............................................................... 19
Section 20.  *Additional Secured Obligations.* ...................................................................... 20
Section 21.  *Notices.* ............................................................................................................. 20
Section 22.  *No Implied Waivers; Remedies Not Exclusive* .................................................. 20
Section 23.  *Successors and Assigns* .................................................................................... 20
Section 24.  *Amendments and Waivers* ................................................................................. 20
Section 25.  *Choice of Law* .................................................................................................... 20
Section 26.  *Waiver of Jury Trial* .......................................................................................... 20
Section 27.  *Severability* ....................................................................................................... 20
Section 28.  *Intercreditor Matters* ....................................................................................... 21

**SCHEDULES**:

| | |
|---|---|
| **Schedule 1** | Equity Interests in Subsidiaries and Affiliates Owned by Original Grantors |
| **Schedule 2** | Other Investment Property Owned by Original Grantors |
| **Schedule 4A** | Patents |
| **Schedule 4B** | Trademarks |
| **Schedule 4C** | Copyrights |
| **Schedule 7A** | Filing Offices / Jurisdiction of Organization |
| **Schedule 7B** | Prior Legal Names |
| **Schedule 8** | Changes in Structure |
| **Schedule 9** | Acquired Property |
| **Schedule 10** | Commercial Tort Claims |

**EXHIBITS**:

| | |
|---|---|
| **Exhibit A** | Security Agreement Supplement |
| **Exhibit B** | Copyright Security Agreement |
| **Exhibit C** | Patent Security Agreement |
| **Exhibit D** | Trademark Security Agreement |

# SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of July 30, 2021 (such Security Agreement, as amended, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), is entered into by and among LUCKY BUCKS, LLC, a Georgia limited liability company (the "**Borrower**"), LUCKY BUCKS HOLDCO, LLC, a Delaware limited liability company ("**Holdings**"), the SUBSIDIARY GUARANTORS (as defined below) from time to time party hereto (such Subsidiary Guarantors, Holdings and the Borrower, collectively, the "**Grantors**"), and MACQUARIE CAPITAL FUNDING LLC ("**Macquarie**"), as collateral agent (the "**Collateral Agent**").

## RECITALS

**WHEREAS**, the Borrower has entered into that certain Credit Agreement, dated as of the date hereof (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among the Borrower, Macquarie, as Administrative Agent and Collateral Agent, each L/C Issuer and the Lenders from time to time party thereto;

**WHEREAS**, each of Holdings and the Borrower will guarantee the Secured Obligations (as defined below), as provided in the Guaranty;

**WHEREAS**, the Borrower is willing to cause the Subsidiary Guarantors to guarantee the Secured Obligations, as provided in the Guaranty;

**WHEREAS**, each Grantor is willing to secure the Secured Obligations (including their respective guaranties) by granting Liens on the respective Collateral owned by it to the Collateral Agent, for the benefit of the Secured Parties (as defined below), as provided for herein and in the other Collateral Documents;

**WHEREAS**, the obligations of the Lenders to make Loans and participate in Letters of Credit, and the obligations of each L/C Issuer to issue Letters of Credit, under the Credit Agreement are conditioned upon, among other things, the execution and delivery of this Agreement and the Guaranty;

**WHEREAS**, the obligations of the Cash Management Banks and the Hedge Banks to enter into the Secured Cash Management Obligations and the Secured Hedge Agreements, respectively, are conditioned upon, among other things, the execution and delivery of this Agreement and the Guaranty; and

**WHEREAS**, upon any foreclosure or other enforcement of the Collateral Documents, subject to the terms of the Credit Agreement, the net proceeds of the relevant Collateral are to be received by, or paid over to, the Collateral Agent and applied as provided herein;

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. *Definitions.*

(a)    *Terms Defined in Credit Agreement.*  Terms defined in the Credit Agreement and not otherwise defined in <u>subsections (b)</u> or <u>(c)</u> of this Section have, as used herein, the respective meanings provided for therein.

(b)    *Terms Defined in the UCC*.  As used herein, each of the following terms has the meaning specified in the UCC (as defined below) (and if defined in more than one Article of the UCC, shall have the meaning given in Article 9 thereof): Account, Authenticate, Certificated Security, Chattel Paper, Commodity Account, Commodity Customer, Deposit Account, Document, Entitlement Holder, Equipment, Financial Asset, Fixtures, General Intangibles, Goods, Instrument, Inventory, Investment Property, Proceeds, Record, Securities Account, Securities Intermediary, Security, Security Entitlement, Supporting Obligations and Uncertificated Security.

(c)    *Additional Definitions*.  The following additional terms, as used herein, have the following meanings:

"**Agreement**" has the meaning given to such term in the recitals hereto.

"**Borrower**" has the meaning given to such term in the recitals hereto.

"**Cash Collateral Account**" has the meaning specified in Section 8.

"**Collateral**" has the meaning specified therefor in Section 2 of this Agreement.

"**Collateral Agent**" has the meaning given to such term in the recitals hereto.

"**Control**" means, when used with respect to any Security or Security Entitlement, the meaning specified in UCC Section 8-106.

"**Copyright License**" means any written agreement now or hereafter in existence to which a Grantor is a party granting to any Grantor, or pursuant to which any Grantor grants to any other Person, an exclusive right to use, copy, reproduce, distribute, prepare derivative works, display or publish any records or other materials on which a Copyright is in existence or may come into existence, including any agreement identified in Schedule 1 to any Copyright Security Agreement.

"**Copyright Security Agreement**" means a Copyright Security Agreement, substantially in the form of Exhibit B, executed and delivered by a Grantor in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Copyrights**" means all of the following: (i) all copyrights under the Laws of the United States (whether or not the underlying works of authorship have been published), all registrations and recordings thereof, and all applications for copyrights under the Laws of the United States, including registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, including those described in Schedule 1 to any Copyright Security Agreement, (ii) all renewals of any of the foregoing, (iii) all claims for, and rights to sue for, past or future infringements of any of the foregoing, and (iv) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing, including damages and payments for past or future infringements thereof.

"**Credit Agreement**" has the meaning given to such term in the recitals hereto.

"**Depository Bank**" means a bank at which a Cash Collateral Account is maintained.

2

"**Enforcement Notice**" means a notice delivered to the Collateral Agent (which the Collateral Agent agrees to promptly forward to the Borrower) by the Required Lenders, the Required Revolving Credit Lenders or the Administrative Agent at any time after the maturity of the applicable Loans has been accelerated pursuant to Article VIII of the Credit Agreement and/or the principal of the applicable Loans shall not have been paid at maturity, in each case directing the Collateral Agent to exercise one or more specific rights or remedies under the Collateral Documents.

"**Equity Interest**" means (i) in the case of a corporation, any shares of its capital stock, (ii) in the case of a limited liability company, any membership interest therein, (iii) in the case of a partnership, any partnership interest (whether general or limited) therein, (iv) in the case of any other business entity, any participation or other interest in the equity thereof, (v) any warrant, option or other right to acquire any Equity Interest described in this definition or (vi) any Security Entitlement in respect of any Equity Interest described in this definition.

"**Georgia Lottery Corporation**" means the Georgia Lottery Corporation and any successor or other Governmental Authority that has jurisdiction to regulate the gaming business of any Grantor and their Subsidiaries.

"**GLC License Holder Subsidiary**" means any Subsidiary of Holdings that is licensed by or holds a Master License issued by the Georgia Lottery Corporation.

"**Grantors**" has the meaning given to such term in the recitals hereto.

"**Guarantee**" means, with respect to each Guarantor, its guarantee of the Secured Obligations under the Guaranty.

"**Guarantors**" means Holdings, the Borrower (except with respect to its own Secured Obligations) and each Subsidiary Guarantor.

"**Holdings**" has the meaning given to such term in the recitals hereto.

"**Intellectual Property**" means all (i) Patents; (ii) Trademarks; (iii) Copyrights; (iv) all intellectual property rights in computer software, programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, together with any and all maintenance rights, service rights, programming rights, hosting rights, test rights, improvement rights, renewal rights to the extent arising under applicable Law and any intellectual property rights in substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing; (v) all confidential and proprietary information (whether or not reduced to a writing or other tangible form), including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, and all other similar intellectual and industrial property, including, without limitation, industrial designs and mask works; (vi) all registrations and applications for registration for any of the foregoing, together with all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof; (vii) all rights in the foregoing provided by international treaties or conventions and all rights corresponding thereto to the extent arising under applicable Law throughout the world; and (viii) any and all claims for damages, other payments and/or injunctive relief for past, present and future

3

infringement, dilution, misappropriation or violation with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages, payments or other relief.

"**Intellectual Property Filing**" means (i) with respect to any Patent or Trademark, in each case constituting Recordable Intellectual Property, the filing of the applicable Patent Security Agreement or Trademark Security Agreement with the United States Patent and Trademark Office, together with an appropriately completed recordation form, and (ii) with respect to any Copyright or exclusive Copyright License, in each case constituting Recordable Intellectual Property, the filing of the applicable Copyright Security Agreement with the United States Copyright Office, together with an appropriately completed recordation form, in each case sufficient to record the Transaction Lien granted to the Collateral Agent in such Recordable Intellectual Property.

"**Intellectual Property Security Agreement**" means a Copyright Security Agreement, a Patent Security Agreement or a Trademark Security Agreement.

"**LLC Interest**" means a membership interest or similar interest in a limited liability company.

"**Macquarie**" has the meaning given to such term in the recitals hereto.

"**Master License**" has the meaning given to such term in the Credit Agreement.

"**Original Grantor**" means any Grantor that has granted a Lien on any of its assets hereunder as of the Closing Date.

"**own**" refers to the possession of sufficient rights in property to grant a security interest therein as contemplated by UCC Section 9-203, and "**acquire**" refers to the acquisition of any such rights.

"**Partnership Interest**" means a partnership interest, whether general or limited.

"**Patent License**" means any written agreement now or hereafter in existence to which a Grantor is a party granting to any Grantor, or pursuant to which any Grantor grants to any other Person, any license right under any patent or patent application.

"**Patents**" means (i) all letters patent and design letters patent of the United States and all applications for letters patent or design letters patent of the United States, including applications in the United States Patent and Trademark Office or agency of the United States, any State or any political subdivision thereof, including those described in Schedule 1 to any Patent Security Agreement, (ii) all reissues, divisions, continuations, continuations in part, revisions and extensions of any of the foregoing, (iii) all claims for, and rights to sue for, past or future infringements of any of the foregoing and (iv) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing, including damages and payments for past or future infringements thereof.

"**Patent Security Agreement**" means a Patent Security Agreement, substantially in the form of Exhibit C, executed and delivered by a Grantor in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Permitted Liens**" means any Liens on the Collateral permitted to be created or assumed or to exist pursuant to the Credit Agreement or any other Collateral Documents.

4

"**Pledged**", when used in conjunction with any type of asset, means at any time an asset of such type that is included (or that creates rights that are included) in the Collateral at such time.  For example, "Pledged Equity Interest" means an Equity Interest that is included in the Collateral at such time.

"**Recordable Intellectual Property**" means (i) any Patent filed with the United States Patent and Trademark Office and owned by a Grantor, (ii) any Trademark filed with the United States Patent and Trademark Office and owned by a Grantor, (iii) any Copyright filed with the United States Copyright Office and owned by a Grantor or exclusively licensed to a Grantor, and (iv) all rights in or under any of the foregoing to the extent arising under applicable Law, in each case with respect to the foregoing clauses (i) through (iv), for the avoidance of doubt, excluding any Patent, Trademark or Copyright, or any related rights under any Patent License, Trademark License or Copyright License or other rights arising under applicable Law, in each case, to the extent subsisting outside of the United States, and excluding any Excluded Property.

"**Secured Obligations**" has the meaning given to such term in the Credit Agreement.

"**Secured Parties**" has the meaning given to such term in the Credit Agreement.

"**Secured Party Requesting Notice**" means, at any time, a Secured Party that has, at least five (5) Business Days prior thereto, delivered to the Collateral Agent (with a copy to the Borrower) a written notice (i) stating that it holds one or more Secured Obligations and wishes to receive copies of the notices referred to in Section 18(e) and (ii) setting forth its address, facsimile number and e-mail address to which copies of such notices should be sent.

"**Security Agreement Supplement**" means a Security Agreement Supplement, substantially in the form of Exhibit A, signed and delivered to the Collateral Agent for the purpose of adding a Subsidiary as a party hereto pursuant to Section 20 and/or adding additional property to the Collateral.

"**Subsidiary Guarantors**" means each Subsidiary of the Borrower party to the Guaranty, and each Subsidiary that shall, at any time after the date hereof, become a "Guarantor" pursuant to Section 6.10 of the Credit Agreement or Section 4.14 of the Guaranty.

"**Trademark License**" means any written agreement now or hereafter in existence to which a Grantor is a party granting to any Grantor, or pursuant to which any Grantor grants to any other Person, any license right to use any trademark.

"**Trademark Security Agreement**" means a Trademark Security Agreement, substantially in the form of Exhibit D, executed and delivered by a Grantor in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Trademarks**" means:  (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos, brand names, trade dress, and all other similar source or business identifiers, and the rights in any of the foregoing which arise under applicable Law, (ii) the goodwill of the business symbolized exclusively thereby or associated with each of them, (iii) all registrations and applications in connection therewith, including registrations and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State or political subdivision thereof, including those described in Schedule 1 to any Trademark Security Agreement, (iv) all renewals of any of the foregoing, (v) all claims for, and rights to sue for, past or future infringements of any of the foregoing and (vi) all income, royalties, damages and payments now or hereafter

5

due or payable with respect to any of the foregoing, including damages and payments for past or future infringements thereof.

"**Transaction Liens**" has the meaning given to such term in Section 2 hereto.

"**UCC**" has the meaning given to such term in the Credit Agreement.

(d)     *Terms Generally.*  The definitions of terms herein (including those incorporated by reference to the UCC or to another document) apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  The words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**".  The word "**will**" shall be construed to have the same meaning and effect as the word "**shall**".  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "**herein**", "**hereof**" and "**hereunder**", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement and (v) the word "**property**" shall be construed to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 2.  *Grant of Transaction Liens.*

(a)     The Borrower, Holdings and each other Grantor listed on the signature pages hereof, in order to secure its Secured Obligations, hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest (the "**Transaction Liens**") in the following property of the Borrower, Holdings or such other Grantor, as the case may be, whether now owned or existing or hereafter acquired or arising and regardless of where located (the "**Collateral**"):

(i)     all Accounts;

(ii)     all Chattel Paper;

(iii)     all Deposit Accounts;

(iv)     all Documents;

(v)     all Equipment;

(vi)     all General Intangibles (including any contractual rights and any Equity Interests in other Persons that do not constitute Investment Property);

(vii)     all Instruments;

(viii)     all Intellectual Property registered, applied-for or otherwise subsisting in the United States;

(ix)　　all Inventory;

(x)　　all Investment Property;

(xi)　　all Fixtures;

(xii)　　all books and records (including customer lists, credit files, computer programs, printouts and other computer materials and records) pertaining to any Collateral;

(xiii)　　ownership interests in (1) all Cash Collateral Accounts, (2) all Financial Assets credited to Cash Collateral Accounts from time to time and all Security Entitlements in respect thereof, (3) all cash held in Cash Collateral Accounts from time to time and (4) all other money in the possession of the Collateral Agent;

(xiv)　　all Commercial Tort Claims (including those described on Schedule 10 hereto, as it may be supplemented from time to time); and

(xv)　　all Proceeds of the Collateral described in the foregoing clauses (i) through (xiv);

*provided* that notwithstanding the foregoing, the term "Collateral" shall not include any Excluded Property (and no Grantor shall be deemed to have granted a security interest hereby in such Excluded Property).  For the avoidance of doubt, no actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the Laws of any non-U.S. jurisdiction other than, at the option of the Borrower (if it shall elect to do so in its sole discretion), and subject to a request from, or the agreement of, the Collateral Agent, such agreements granting security interests in the assets constituting Collateral of any subsequently acquired or organized direct wholly-owned Foreign Subsidiary that is a Restricted Subsidiary of the Borrower (subject to the Excluded Property provisions of the Credit Agreement)).

Notwithstanding anything herein to the contrary, in no event shall the Grantors be required (nor shall the Collateral Agent be authorized, with respect to the succeeding clauses (i) and (ii)) (i) to perfect the pledges and security interests described herein by any means other than through (a) filings pursuant to the UCC or other applicable law in the office of the secretary of state (or similar central filing office) of the relevant state(s) (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement or equivalent), (b) Intellectual Property Filings in the United States Copyright Office or the United States Patent and Trademark Office with respect to Intellectual Property constituting Collateral, or (c) delivery to the Collateral Agent to be held in its possession of all Collateral consisting of stock certificates representing Pledged Certificated Security (with accompanying stock transfer forms executed in blank) (*provided* that in no event shall the delivery of stock certificates (or equivalent) of non-Subsidiaries be required to be delivered), and all Collateral consisting of debt instruments (with accompanying transfer forms executed in blank) (*provided* that in no event shall the delivery of debt instruments to the extent evidencing any "third party" indebtedness for borrowed money in a principal amount (individually) of less than $3,750,000 be required to be delivered), (ii) to enter into any control agreement with respect to any deposit account, securities account (including Security Entitlements and related assets), or commodities account or (iii)  to enter into any source code escrow arrangement or file, prosecute, patent or register any Intellectual Property.

(b)     With respect to each right to payment or performance included in the Collateral from time to time, the Transaction Lien granted therein includes a continuing security interest in (i) any Supporting Obligation that supports such payment or performance and (ii) any Lien that (x) secures such right to payment or performance or (y) secures any such Supporting Obligation.

(c)     The Transaction Liens are granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or transfer or in any way affect or modify, any obligation or liability of any Grantor with respect to any of the Collateral or any transaction in connection therewith.

(d)     Notwithstanding anything to the contrary herein, the Grantors make no representations or warranties hereunder, and the covenant hereunder shall not apply, in respect of the Excluded Property; *provided* that the representations, warranties and covenants hereunder shall apply in respect of any property at the time, and to the extent, such property ceases to constitute an Excluded Property.

Section 3.  *General Representations and Warranties.*  Each Original Grantor represents and warrants that:

(a)     Such Grantor, as of the Closing Date, is duly organized, validly existing and in good standing under the Laws of the jurisdiction identified as its jurisdiction of organization set forth on Schedule 7A.

(b)     Schedule 1 lists all Equity Interests in Subsidiaries and Affiliates owned by such Grantor as of the Closing Date.  Except as set forth on Schedule 1, such Grantor holds all such Equity Interests directly (*i.e.*, not through a Subsidiary, a Securities Intermediary or any other Person).

(c)     Schedule 2 lists, as of the Closing Date, all Securities owned by such Grantor (except Securities evidencing Equity Interests in Subsidiaries and Affiliates).

(d)     All Pledged Equity Interests owned by such Grantor are owned by it free and clear of any Lien other than (i) the Transaction Liens and (ii) Permitted Liens.  All shares of capital stock included in such Pledged Equity Interests (including shares of capital stock in respect of which such Grantor owns a Security Entitlement) have been duly authorized and validly issued and are fully paid and (if applicable) non-assessable.  None of such Pledged Equity Interests is subject to any option to purchase or similar right of any Person.

(e)     This Agreement and the security interest in the Collateral of each Grantor (i) have been validly created, (ii) will have attached to each item of such Collateral as of the Closing Date (or, if such Grantor first obtains rights thereto on a later date, will attach on such later date) and (iii) when so attached, will secure all such Grantor's Secured Obligations, in each case, to the extent a security interest therein can be created under the UCC.

(f)     [Reserved].

(g)     When UCC financing statements describing the Collateral as "all personal property" or "all assets" have been filed in the offices specified for such Grantor in Schedule 7A (as supplemented by written notice to the Collateral Agent from time to time), the Transaction Liens will constitute a perfected security interest in the Collateral owned by such Grantor to the extent that a security interest therein may be perfected by filing pursuant to the UCC, prior to all Liens and rights of others therein except Permitted Liens.  When, in addition to the filing of such UCC financing statements and except for any filings required under the Laws of a jurisdiction outside the United States with respect to Recordable Intellectual Property, the applicable

8

Intellectual Property Filings have been made with respect to such Grantor's Recordable Intellectual Property (including any future filings required pursuant to Section 4(a) and Section 5(a)), the Transaction Liens will constitute perfected security interests in all right, title and interest of such Grantor in its Recordable Intellectual Property to the extent that security interests therein may be perfected by such filings, prior to all Liens and rights of others therein except Permitted Liens.  Except for (i) the filing of such UCC financing statements and (ii) such Intellectual Property Filings, no registration, recordation or filing with any governmental body, agency or official is required in connection with the execution or delivery of the Collateral Documents or is necessary for the validity or enforceability thereof or for the perfection or due recordation of the Transaction Liens or for the enforcement of the Transaction Liens.

(h)    Attached hereto as:

(i)    Schedule 4A is a schedule setting forth, with respect to each Grantor, as of the Closing Date, a complete and correct list of all Patents owned by such Grantors and issued or applied for issuance with the United States Patent and Trademark Office, including the name of the registered owner, and patent or application number of each such Patent.

(ii)    Schedule 4B is a schedule setting forth, with respect to each Grantor, as of the Closing Date, a complete and correct list of all Trademarks owned by such Grantor and registered or applied for registration with the United States Patent and Trademark Office, including the name of the registered owner and the registration or application number of each such Trademark.

(iii)    Schedule 4C is a schedule setting forth, with respect to each Grantor, as of the Closing Date, a complete and correct list of (a) all Copyrights and copyright applications owned by such Grantor registered with the United States Copyright Office and (b) all exclusive Copyright Licenses granted to such Grantor with respect to Copyrights registered with the United States Copyright Office, including in each case the name of the registered owner, title and the registration number of each such Copyright or copyright application.

(i)    Attached hereto as Schedule 7A is a complete and correct list, as of the Closing Date, of the exact legal name (within the meaning of Section 9-503 of the UCC) of each Grantor as it appears in its respective certificate of incorporation or equivalent organizational document, along with the type of entity of each Grantor, the jurisdiction of formation of each Grantor and such Grantor's chief executive office address.

(j)    Attached hereto as Schedule 7B is a complete and correct list, as of the Closing Date, of each other legal name that any Grantor has had within the last five years, together with the date of the relevant change.

(k)    Attached hereto as Schedule 8 is a complete and correct list, as of the Closing Date, of any fundamental changes in structure of each Grantor from the last five years.

(l)    Attached hereto as Schedule 9 is a complete and correct list, as of the Closing Date, of all transactions entered into by the Original Grantors in which property constituting Collateral was acquired from another Person on and after October 21, 2016; *except* for the transactions in which (i) property was sold to the Grantor by another Person in the ordinary course of such other Person's business, (ii) property acquired with respect to which the Transaction Liens are to be perfected by taking possession or control thereof and (iii) property acquired that has an aggregate fair market value not exceeding $5,000,000.

9

Section 4. *Further Assurances; General Covenants.* Each Grantor covenants as follows:

(a)    Subject to the other terms and conditions hereof, such Grantor will, from time to time, at the Borrower's expense, execute, deliver, file and record any statement, assignment, instrument, document, agreement or other paper and take any other action (including any Intellectual Property Filing and any filing of financing or continuation statements under the UCC) that from time to time is reasonably necessary, and that the Collateral Agent reasonably requests in writing, in order to:

(i)    create, preserve, perfect, confirm or validate the Transaction Liens on such Grantor's Collateral;

(ii)    enable the Collateral Agent and the other Secured Parties to obtain the full benefits of the Collateral Documents; or

(iii)    enable the Collateral Agent to exercise and enforce any of its rights, powers and remedies with respect to any of such Grantor's Collateral;

*provided, however*, notwithstanding anything to the contrary herein or in any other Loan Document, no Grantor shall have any obligation to make any filings or take any other actions to record or perfect a security interest granted or purported to be granted by such Grantor to the Collateral Agent hereunder in any Intellectual Property or any other Collateral in a jurisdiction outside of the United States of America (including, for clarity, to reimburse Collateral Agent for any costs or expenses incurred in connection with taking any such actions).

To the extent permitted by applicable Law and this Agreement, such Grantor authorizes the Collateral Agent to file or record financing statements (including transmitting utility filings) and other filing or recording documents or instruments with respect to the Collateral without the signature of such Grantor in such form and in such offices as the Collateral Agent reasonably determines appropriate to perfect the security interests of the Collateral Agent under this Agreement. Such Grantor authorizes the Collateral Agent to use collateral descriptions such as "all personal property" or "all assets", in each case "whether now owned or hereafter acquired", words of similar import or any other description the Collateral Agent, in its reasonable discretion, so chooses in any such financing statements. Such Grantor agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement for filing or recording purposes. The Borrower will pay the costs of, or incidental to, any Intellectual Property Filings and any recording or filing of any financing or continuation statements or other documents recorded or filed pursuant hereto.

(b)    Such Grantor will furnish to the Collateral Agent prompt written notice of any change in (i) its legal name, (ii) its jurisdiction of organization or other location (determined as provided in UCC Section 9-307) or the location of its chief executive office or principal place of business, (iii) its identity or form of organization or (iv) its federal Taxpayer Identification Number. No later than twenty (20) Business Days (or such longer period as the Collateral Agent may reasonably agree) after any change referred to in the preceding sentence, such Grantor shall confirm to the Collateral Agent (and, as and when available, provide any information reasonably requested by the Collateral Agent) that all filings have been made under the UCC (or that such Grantor has provided to the Collateral Agent all information required or reasonably requested by the Collateral Agent in order for it to make such filings), and all other actions have been taken, that are required so that such change will not at any time adversely affect the validity, perfection or priority of any Transaction Lien on any of the Collateral.

10

(c)     Such Grantor will, reasonably promptly upon request, provide to the Collateral Agent all information and evidence concerning such Grantor's Collateral that the Collateral Agent may reasonably request from time to time to enable it to enforce the provisions of the Collateral Documents.

Section 5.  *Recordable Intellectual Property.*  Each Grantor covenants as follows:

(a)     As of the Closing Date (in the case of an Original Grantor) or on the date on which it signs and delivers its first Security Agreement Supplement (in the case of any other Grantor), such Grantor will have signed and delivered (in the case of an Original Grantor) or will sign and deliver (in the case of any other Grantor) to the Collateral Agent Intellectual Property Security Agreements with respect to all Recordable Intellectual Property included in the Collateral on the applicable date.  Within thirty (30) days after the end of each fiscal year of the Borrower thereafter, it will sign and deliver to the Collateral Agent an Intellectual Property Security Agreement covering any Recordable Intellectual Property included in the Collateral on such date that is not covered by any previous Intellectual Property Security Agreement so signed and delivered by it.  In each case, it will promptly make (or provide to the Collateral Agent all information required or reasonably requested by the Collateral Agent for it to make) all Intellectual Property Filings necessary to record the Transaction Liens on such Recordable Intellectual Property.

(b)     Such Grantor will notify the Collateral Agent if any application or registration relating to any Recordable Intellectual Property owned or licensed by it becomes abandoned or dedicated to the public, or of any material adverse decision in any proceeding in the United States Copyright Office, the United States Patent and Trademark Office or any court (excluding any ordinary course office action or other correspondence in connection with the filing or prosecution of any Recordable Intellectual Property) regarding such Grantor's ownership of such Recordable Intellectual Property, its right to register or patent the same, or its right to keep and maintain the same, unless such Grantor determines, in such Grantor's reasonable business judgment, that its use or the pursuit or maintenance of such Recordable Intellectual Property is no longer necessary, useful or advisable in the conduct of such Grantor's business or the loss thereof would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.  *Investment Property.*  Each Grantor represents, warrants and covenants as follows:

(a)     *Certificated Securities.*  As of the Closing Date (in the case of an Original Grantor) or on the date on which it signs and delivers its first Security Agreement Supplement (in the case of any other Grantor), such Grantor will have delivered (in the case of an Original Grantor) or will deliver (in the case of any other Grantor) to the Collateral Agent as Collateral hereunder all certificates representing Pledged Certificated Securities then owned by such Grantor.  Thereafter, whenever such Grantor acquires any other certificate representing a Pledged Certificated Security, or if any of the Collateral is or shall become evidenced or represented by any Certificated Security, such Grantor will reasonably promptly deliver such certificate to the Collateral Agent as Collateral hereunder.  The provisions of this subsection are subject to the limitations in the Credit Agreement and in Section 6(e) in the case of voting Equity Interests in any Foreign Subsidiary, CFC, or FSHCO, as applicable.

(b)     *Uncertificated Securities*.  Upon the occurrence and during the continuation of an Event of Default, promptly, upon the request of the Collateral Agent, with respect to any Collateral in which any Grantor has any right, title or interest and that constitutes an Uncertificated Security, such Grantor will cause the issuer thereof either (i) to register the Collateral Agent as the registered owner of such security or (ii) to agree in an authenticated record with such Grantor and the Collateral Agent that such issuer will comply with instructions with respect to such security originated by the Collateral Agent without further consent of

11

such Grantor, such authenticated record to be in form and substance reasonably satisfactory to the Collateral Agent.  Upon the occurrence and during the continuation of an Event of Default, with respect to any Collateral in which any Grantor has any right, title or interest and that is not an Uncertificated Security, promptly upon the request of the Collateral Agent, such Grantor will notify each such issuer of Pledged Equity Interests that such Pledged Equity Interests are subject to the security interest granted hereunder.  The provisions of this subsection are subject to the limitations in the Credit Agreement and in Section 6(e) in the case of voting Equity Interests in any Foreign Subsidiary, CFC, or FSHCO, as applicable.

(c)    *Perfection as to Certificated Securities.*  As applicable, when such Grantor delivers the certificate representing any Pledged Certificated Security owned by it to the Collateral Agent, together with an effective endorsement (as defined in UCC Sections 8-102(a)(ii) and 8-107), including an appropriate stock power, (i) the Transaction Lien on such Pledged Certificated Security will be perfected, subject to no Liens, other than Permitted Liens, and (ii) the Collateral Agent will have Control of such Pledged Certificated Security.

(d)    *Delivery of Pledged Certificates*.  All Pledged Certificated Securities when delivered to the Collateral Agent, will be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Collateral Agent.

(e)    *Foreign Subsidiaries; CFCs; FSHCOs.*  A Grantor will not be obligated to comply with the provisions of this Section at any time with respect to any voting Equity Interest in a Foreign Subsidiary or any CFC or FSHCO, as applicable, if and to the extent (but only to the extent) that such voting Equity Interest is excluded from the Transaction Liens at such time pursuant to the Credit Agreement or the proviso at the end of Section 2(a) and/or the comparable provisions of one or more Security Agreement Supplements.

Section 7.  *Commercial Tort Claims.*  Each Grantor represents, warrants and covenants as follows:

(a)    In the case of an Original Grantor, Schedule 10 accurately describes each Commercial Tort Claim with a value in excess of $3,750,000 with respect to which such Original Grantor is the claimant as of the Closing Date.  In the case of any other Grantor, Schedule 10 to its first Security Agreement Supplement will accurately describe each Commercial Tort Claim with a value in excess of $3,750,000 with respect to which such Grantor is the claimant as of the date on which it signs and delivers such Security Agreement Supplement.

(b)    If any Grantor acquires a Commercial Tort Claim with a value in excess of $3,750,000 after the Closing Date (in the case of an Original Grantor) or the date on which it signs and delivers its first Security Agreement Supplement (in the case of any other Grantor), such Grantor will reasonably promptly deliver to the Collateral Agent a supplement to Schedule 10 containing a specific description of such Commercial Tort Claim, and shall sign and deliver to the Collateral Agent any customary document, and take all other action, in each case as may be reasonably requested by the Collateral Agent, for the purpose of granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in such Commercial Tort Claim (to the extent not constituting Excluded Property).

Section 8.  *Cash Collateral Accounts.*

(a)    If and when required under the terms of the Credit Agreement and/or this Agreement, the Collateral Agent will establish with respect to each Grantor an account (its "**Cash Collateral Account**"), in the name and under the exclusive control of the Collateral Agent, into which all amounts owned by such

Grantor that are to be deposited therein pursuant to the Loan Documents shall be deposited from time to time.  Each Cash Collateral Account will be operated as provided in this Section and Section 9.

(b)    The Collateral Agent shall deposit the following amounts, as and when received by it, in the Borrower's Cash Collateral Account:

(i)    each amount required by Section 2.03(f) of the Credit Agreement to be deposited therein; and

(ii)    each amount realized or otherwise received by the Collateral Agent with respect to assets of the Borrower upon any exercise of remedies pursuant to any Collateral Document.

(c)    The Collateral Agent shall deposit in the Cash Collateral Account of each Grantor (other than the Borrower) each amount realized or otherwise received by the Collateral Agent with respect to assets of such Grantor upon any exercise of remedies pursuant to any Collateral Document.

(d)    The Collateral Agent shall maintain such records and/or establish such sub-accounts as shall be required to enable it to identify the amounts held in each Cash Collateral Account from time to time pursuant to each clause of subsection (b) and subsection (c) above, as applicable.

(e)    Notwithstanding anything herein to the contrary, any Cash Collateral Account established pursuant to Section 2.03(f) of the Credit Agreement shall be governed by the terms and conditions of such section of the Credit Agreement.

Section 9.  *Operation of Cash Collateral Accounts.*

(a)    Funds held in any Cash Collateral Account may, until withdrawn, be invested and reinvested in such Cash Equivalents as the relevant Grantor shall determine in its sole discretion; *provided* that, if an Event of Default shall have occurred and be continuing and an Enforcement Notice is in effect the Collateral Agent may select such Cash Equivalents.

(b)    If an Event of Default shall have occurred and be continuing, and an Enforcement Notice is in effect, the Collateral Agent may (or may direct any applicable Grantor to) (i) retain, or instruct the relevant Securities Intermediary or Depository Bank to retain, all cash and investments then held in any Cash Collateral Account, (ii) liquidate, or instruct the relevant Securities Intermediary or Depository Bank to liquidate, any or all investments held therein and/or (iii) withdraw any amounts held therein and apply such amounts as provided in Section 13.

(c)    If immediately available cash on deposit in any Cash Collateral Account is not sufficient to make any distribution or withdrawal required or permitted to be made pursuant hereto, the Collateral Agent will cause (or may direct any applicable Grantor to cause) to be liquidated, as promptly as practicable, such investments held in or credited to such Cash Collateral Account as shall be required to obtain sufficient cash to make such distribution or withdrawal and, notwithstanding any other provision hereof, such distribution or withdrawal shall not be made until such liquidation has taken place.

Section 10.  *Transfer of Record Ownership.*  At any time when an Event of Default shall have occurred and be continuing, but subject to Sections 12(e) and (f) and one (1) Business Day's prior written notice to the Borrower, the Collateral Agent may (and to the extent that action by it is required, the relevant Grantor, if directed to do so by the Collateral Agent, will as promptly as practicable) cause each of the

Pledged Equity Interests (or any portion thereof specified in such direction) to be transferred of record into the name of the Collateral Agent or its nominee. Each Grantor will take any and all actions reasonably requested by the Collateral Agent to facilitate compliance with this Section. If the provisions of this Section are implemented, Section 6(b) shall not thereafter apply to any Pledged Equity Interests that is registered in the name of the Collateral Agent or its nominee. The Collateral Agent will promptly give to the Borrower and the relevant Grantor copies of any notices and other communications received by the Collateral Agent with respect to Pledged Equity Interests registered in the name of the Collateral Agent or its nominee.

Section 11. *Right to Vote Securities.* (a) Unless an Event of Default shall have occurred and be continuing and the Collateral Agent shall have provided at least one (1) Business Day's prior written notice to the Grantors that their rights under this Section 11 are being suspended, each Grantor will have the right to vote and to give consents, ratifications and waivers with respect to any Pledged Equity Interests owned by it and the Financial Asset underlying any Pledged Security Entitlement owned by it, and the Collateral Agent will, upon receiving a written request from such Grantor, deliver to such Grantor or as specified in such request such proxies, powers of attorney, consents, ratifications and waivers in respect of any such Pledged Equity Interests that is registered in the name of the Collateral Agent or its nominee or any such Pledged Security Entitlement as to which the Collateral Agent or its nominee is the Entitlement Holder, in each case as shall be specified in such request and be in form and substance reasonably satisfactory to the Collateral Agent. Unless an Event of Default shall have occurred and be continuing and the Collateral Agent shall have provided at least one (1) Business Day's prior written notice to the Grantors that their rights under this Section 11 are being suspended, the Collateral Agent will have no right to take any action which the owner of a Pledged Partnership Interest or Pledged LLC Interest is entitled to take with respect thereto, except the right to receive payments and other distributions to the extent provided herein.

(b)    Subject to Sections 12(e) and (f), if an Event of Default shall have occurred and be continuing and the Collateral Agent shall have provided at least one (1) Business Day's prior written notice to the Grantors that their rights under this Section 11 are being suspended, the Collateral Agent will have the right to the extent permitted by Law (and, in the case of a Pledged Partnership Interest or Pledged LLC Interest, by the relevant partnership agreement, limited liability company agreement, operating agreement or other governing document) to vote, to give consents, ratifications and waivers and to take any other action with respect to the Pledged Investment Property, the other Pledged Equity Interests (if any) and the Financial Assets underlying the Pledged Security Entitlements, with the same force and effect as if the Collateral Agent were the absolute and sole owner thereof, and each Grantor will take all such action as the Collateral Agent may reasonably request from time to time to give effect to such right; *provided* that the Collateral Agent shall have the right but not the obligation, from time to time, during the continuation of an Event of Default to permit the Grantors to exercise such rights.

(c)    AFTER ANY AND ALL EVENTS OF DEFAULT HAVE BEEN CURED OR WAIVED, (I) EACH GRANTOR SHALL HAVE THE RIGHT TO EXERCISE THE VOTING, MANAGERIAL AND OTHER CONSENSUAL RIGHTS AND POWERS THAT IT WOULD OTHERWISE BE ENTITLED TO EXERCISE PURSUANT TO THE LOAN DOCUMENTS AND TO RECEIVE AND RETAIN THE PAYMENTS, PROCEEDS, DIVIDENDS, DISTRIBUTIONS, MONIES, COMPENSATION, PROPERTY, ASSETS, INSTRUMENTS OR RIGHTS THAT IT WOULD BE AUTHORIZED TO RECEIVE AND RETAIN PURSUANT TO THE LOAN DOCUMENTS; AND (II) PROMPTLY FOLLOWING ANY REQUEST THEREFOR FROM ANY GRANTOR AFTER SUCH CURE OR WAIVER, (A) THE COLLATERAL AGENT SHALL REPAY AND DELIVER TO EACH GRANTOR ALL CASH AND MONIES THAT SUCH GRANTOR IS ENTITLED TO RETAIN PURSUANT TO THE LOAN DOCUMENTS WHICH HAVE NOT BEEN APPLIED TO THE REPAYMENT OF THE

14

SECURED OBLIGATIONS AND (B) AS APPLICABLE, THE COLLATERAL AGENT SHALL RESTORE THE RECORD OWNERSHIP OF ANY SUCH COLLATERAL TO EACH GRANTOR.

Section 12. *Remedies.* (a) If an Event of Default shall have occurred and be continuing, and the Collateral Agent has the right to enforce remedies pursuant to Section 8.02 of the Credit Agreement, the Collateral Agent may exercise (or cause its sub-agents to exercise) any or all of the remedies available to it (or to such sub-agents) under the Collateral Documents (for the avoidance of doubt, subject to any notice requirement set forth in the Credit Agreement or the Collateral Documents) and the Gaming Laws.

(b)    Without limiting the generality of the foregoing, if an Event of Default shall have occurred and be continuing and the Collateral Agent has the right to enforce remedies pursuant to Section 8.02 of the Credit Agreement the Collateral Agent may exercise on behalf of the Secured Parties all the rights of a secured party under the UCC (whether or not in effect in the jurisdiction where such rights are exercised) with respect to any Collateral and, in addition, the Collateral Agent may (and may direct any applicable Grantor to), without being required to give any notice, except as herein provided or as may be required by mandatory provisions of Law, withdraw all cash held in the Cash Collateral Accounts and apply such cash as provided in Section 13 and, if there shall be no such cash or if such cash shall be insufficient to pay all the Secured Obligations in full, sell, lease, license or otherwise dispose of the Collateral or any part thereof. Notice of any such sale or other disposition shall be given to the relevant Grantor(s) as required by Section 15.

(c)    Without limiting the generality of the foregoing, if an Event of Default shall have occurred and be continuing and the Collateral Agent has the right to enforce remedies pursuant to Section 8.02 of the Credit Agreement:

(i)    the Collateral Agent may license or sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any Intellectual Property constituting Collateral, to the extent licensable and/or sublicensable, on such terms and conditions and in such manner as the Collateral Agent shall in its reasonable discretion determine; *provided* that such licenses or sublicenses do not breach or conflict with or result in the termination of, or give rise to any right of acceleration, modification or cancellation under, any existing license or other agreement to which Grantor is a party and of which the Collateral Agent shall have received a copy; and

(ii)    the Collateral Agent may (without assuming any obligation or liability thereunder), at any time and from time to time, in its reasonable discretion, enforce against any licensee or sublicensee all rights and remedies of any Grantor in, to and under any of its Intellectual Property constituting Collateral and take or refrain from taking any action under any thereof.

(d)    Without limiting the generality of the foregoing, if an Event of Default shall have occurred and be continuing, each Grantor will, if requested to do so by the Collateral Agent, promptly notify (and such Grantor authorizes the Collateral Agent so to notify) each account debtor in respect of any of its Accounts that such Accounts have been assigned to the Collateral Agent hereunder, and that any payments due or to become due in respect of such Accounts are to be made directly to the Collateral Agent or its designee.

(e)    Notwithstanding anything herein to the contrary, no security will be enforceable, unless and until an Event of Default shall have occurred and be continuing and an Enforcement Notice is in effect.

(f)    FOR THE AVOIDANCE OF DOUBT, THE EXERCISE OF RIGHTS AND REMEDIES WITH RESPECT TO ANY PLEDGED EQUITY INTERESTS OF A GLC LICENSE HOLDER SUBSIDIARY OWNED BY A GRANTOR SHALL REMAIN LIMITED BY, AND SUBJECT TO, THE REQUIREMENTS OF ANY AND ALL APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, THE RULES AND REGULATIONS OF THE GEORGIA LOTTERY CORPORATION).

Section 13.  *Application of Proceeds.*  (a) If an Event of Default shall have occurred and be continuing, the Collateral Agent shall (or may direct any applicable Grantor to), in its reasonable discretion, either hold as collateral for the Secured Obligations or at any time apply in whole or in part (i) any cash held in the Cash Collateral Accounts and (ii) the proceeds of any sale or other disposition of all or any part of the Collateral, as set forth in Section 8.04 of the Credit Agreement; *provided* that Collateral owned by a Grantor and any proceeds thereof shall be applied only to the extent permitted by the limitation in Section 2.09 of the Guaranty.  The Collateral Agent may make such distributions hereunder in cash or in kind or, on a ratable basis, in any combination thereof.

(b)    If at any time any portion of any monies collected or received by the Collateral Agent would, but for the provisions of this Section 13(b), be payable pursuant to Section 13(a) in respect of a Secured Obligation, the Collateral Agent shall not apply any monies to pay such Secured Obligation but instead shall request the holder thereof, at least ten (10) days before each proposed distribution hereunder, to notify the Collateral Agent as to the maximum amount of such Secured Obligation if then ascertainable (*e.g.*, in the case of a letter of credit, the maximum amount available for subsequent drawings thereunder).  If the holder of such Secured Obligation does not notify the Collateral Agent of the maximum ascertainable amount thereof at least two (2) Business Days before such distribution, such holder will not be entitled to share in such distribution.  If such holder does so notify the Collateral Agent as to the maximum ascertainable amount thereof, the Collateral Agent will allocate to such holder a portion of the monies to be distributed in such distribution, calculated as if such Secured Obligation were outstanding in such maximum ascertainable amount.  However, the Collateral Agent will not apply such portion of such monies to pay such Secured Obligation, but instead will hold such monies or invest such monies in Cash Equivalents.  All such monies and Cash Equivalents and all proceeds thereof will constitute Collateral hereunder, but will be subject to distribution in accordance with this Section 13(b) rather than Section 13(a).  The Collateral Agent will hold all such monies and Cash Equivalents and the net proceeds thereof in trust and will apply the amount so held in trust as required by Section 8.04 of the Credit Agreement.  If (i) the holder of such Secured Obligation shall advise the Collateral Agent that no portion thereof remains in as a Secured Obligation and (ii) the Collateral Agent still holds any amount held in trust pursuant to this Section 13(b) in respect of such Secured Obligation (after paying all amounts payable pursuant to the preceding sentence), such remaining amount will be applied by the Collateral Agent in the order of priorities set forth in Section 8.04 of the Credit Agreement.

(c)    In making the payments and allocations required by this Section, the Collateral Agent may rely upon information supplied to it pursuant to Section 18(c).  All distributions made by the Collateral Agent pursuant to this Section shall be final (except in the event of manifest error) and the Collateral Agent shall have no duty to inquire as to the application by any Secured Party of any amount distributed to it.

Section 14.  *Fees and Expenses; Indemnification.*  Each of the Grantors agrees that Sections 3.01, 10.04 and 10.05 of the Credit Agreement will apply, *mutatis mutandis*, with respect to the execution, delivery and performance of this Agreement and the other Collateral Documents (including in connection with any payments hereunder or thereunder), including without limitation (and without any duplication of amounts paid under the Credit Agreement) any and all reasonable out-of-pocket expenses, including transfer taxes and reasonable and documented fees and expenses of counsel and other experts, that the Collateral Agent

16

may incur in connection with (x) the administration or enforcement of the Collateral Documents, including such expenses as are incurred to preserve the value of the Collateral or the validity, perfection, rank or value of any Transaction Lien, (y) the collection, sale or other disposition of any Collateral or (z) the exercise by the Collateral Agent of any of its rights or powers under the Collateral Documents.

Section 15. *Authority to Administer Collateral.*  Each Grantor irrevocably appoints the Collateral Agent its true and lawful attorney, with full power of substitution, in the name of such Grantor, any Secured Party or otherwise, for the sole use and benefit of the Secured Parties, but at the Borrower's expense, to the extent permitted by Law to exercise, at any time and from time to time while an Event of Default shall have occurred and be continuing, and the Collateral Agent has the right to enforce remedies pursuant to Section 8.02 of the Credit Agreement, all or any of the following powers with respect to all or any of such Grantor's Collateral:

> (a)      to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due upon or by virtue thereof,

> (b)      to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto,

> (c)      to sell, lease, license or otherwise dispose of the same or the proceeds or avails thereof, as fully and effectually as if the Collateral Agent were the absolute owner thereof, and

> (d)      to extend the time of payment of any or all thereof and to make any allowance or other adjustment with reference thereto;

*provided* that, except in the case of Collateral that is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Collateral Agent will give the relevant Grantor at least ten (10) days' prior written notice of the time and place of any public sale thereof or the time after which any private sale or other intended disposition thereof will be made.  Any such notice shall (i) contain the information specified in UCC Section 9-613, (ii) be Authenticated and (iii) be sent to the parties required to be notified pursuant to UCC Section 9-611(c); *provided* that, if the Collateral Agent fails to comply with this sentence in any respect, its liability for such failure shall be limited to the liability (if any) imposed on it as a matter of Law under the UCC.

Section 16. *Limitation on Duty in Respect of Collateral.*  Beyond the exercise of reasonable care in the custody and preservation thereof, the Collateral Agent will have no duty as to any Collateral in its possession or control or in the possession or control of any sub-agent or bailee or any income therefrom or as to the preservation of rights against prior parties or any other rights pertaining thereto.  The Collateral Agent will be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equal to that which it accords its own property, and will not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of any act or omission of any sub-agent or bailee selected by the Collateral Agent in good faith, except to the extent that such liability arises from the Collateral Agent's gross negligence, bad faith or willful misconduct or from the Collateral Agent's breach of its obligations under this Agreement.

Section 17. *Gaming Laws.*  Each of Sections 8.07 (*Restrictions Under Gaming Laws*) and 10.25 (*Gaming Matters*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis*.

17

Section 18. *General Provisions Concerning the Collateral Agent.*

(a)     The provisions of Article IX of the Credit Agreement shall inure to the benefit of the Collateral Agent, and shall be binding upon all Grantors and all Secured Parties, in connection with this Agreement and the other Collateral Documents.  Without limiting the generality of the foregoing, (i) the Collateral Agent shall not be subject to any fiduciary or other implied duties, regardless of whether an Event of Default has occurred and is continuing and/or an Enforcement Notice is in effect, (ii) the Collateral Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Collateral Documents that the Collateral Agent is required in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.01 of the Credit Agreement), and (iii) except as expressly set forth in the Loan Documents, the Collateral Agent shall not have any duty to disclose, and shall not be liable for any failure to disclose, any information relating to the Borrower that is communicated to or obtained by the Collateral Agent or any of its Affiliates in any capacity. The Collateral Agent shall not be responsible for the existence, genuineness or value of any Collateral or for the validity, perfection, priority or enforceability of any Transaction Lien, whether impaired by operation of Law or by reason of any action or omission to act on its part under the Collateral Documents. The Collateral Agent shall be deemed not to have knowledge of any Event of Default unless and until an Enforcement Notice is given to the Collateral Agent by the Borrower or a Secured Party with respect thereto.

(b)     *Sub-Agents and Related Parties*.  The Collateral Agent may perform any of its duties and exercise any of its rights and powers through one or more sub-agents appointed by it.  The Collateral Agent and any such sub-agent may perform any of its duties and exercise any of its rights and powers through its Agent-Related Persons.  The exculpatory provisions of Section 16 and this Section shall apply to any such sub-agent and to the Agent-Related Persons of the Collateral Agent and any such sub-agent.

(c)     *Information as to Secured Obligations and Actions by Secured Parties.*  For all purposes of the Collateral Documents, including determining the amounts of the Secured Obligations or whether any action has been taken under any Collateral Document, the Collateral Agent will be entitled to rely on information from (i) its own records for information as to the Secured Parties, their Secured Obligations and actions taken by them, (ii) any Secured Party for information as to its Secured Obligations and actions taken by it, to the extent that the Collateral Agent has not obtained such information from its own records, and (iii) the Borrower, to the extent that the Collateral Agent has not obtained information from the foregoing sources.

(d)     *Refusal to Act*.  The Collateral Agent may refuse to act on any notice, consent, direction or instruction from any Secured Parties or any agent, trustee or similar representative thereof that, in the Collateral Agent's good faith opinion, (i) is contrary to Law or the provisions of any Collateral Document, (ii) may expose the Collateral Agent to liability (unless the Collateral Agent shall have been indemnified, to its reasonable satisfaction, for such liability by the Secured Parties that gave such notice, consent, direction or instruction) or (iii) is unduly prejudicial to Secured Parties not joining in such notice, consent, direction or instruction.

(e)     *Copies of Certain Notices*.  Within two (2) Business Days after it receives or sends any notice referred to in this subsection, the Collateral Agent shall send to the Lenders and each Secured Party Requesting Notice copies of any certificate designating additional obligations as Secured Obligations received by the Collateral Agent pursuant to Section 21 and any notice given by the Collateral Agent to any Grantor, or received by it from any Grantor, pursuant to Section 12, 13, 15 or 19.

Section 19. *Termination of Transaction Liens; Release of Collateral.*  The Transaction Liens granted by each Grantor shall automatically terminate in accordance with Section 9.11 of the Credit Agreement.  Subject to Section 9.11 of the Credit Agreement, upon any termination of a Transaction Lien or release or subordination of Collateral pursuant to this Section 19, the Collateral Agent will promptly (without the vote or consent of any other Secured Party, in such capacity and each Lender irrevocably authorizes the Collateral Agent to), at the expense of the relevant Grantor, execute and deliver to such Grantor such documents, and take such other actions, as such Grantor shall reasonably request to evidence the termination of such Transaction Lien or the release or subordination of such Collateral, as the case may be.  In connection with any such termination, release or subordination, the Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any certificate of the Borrower or the applicable Grantor.

Section 20. *Additional Grantors.*  Any Subsidiary may become a party hereto by signing and delivering to the Collateral Agent a Security Agreement Supplement, whereupon such Subsidiary shall become a "Grantor" as defined herein.

Section 21. *Additional Secured Obligations.*  The Borrower may from time to time designate its (or any Restricted Subsidiary's) Cash Management Obligations or Hedge Obligations, in each case under an agreement with a Cash Management Bank or a Hedge Bank, as additional Secured Obligations for purposes of the Loan Documents by delivering to the Collateral Agent a certificate signed by a financial officer that (i) identifies such Secured Cash Management Obligations or Secured Hedge Agreement, specifying the name and address of the parties thereto, the notional principal amount thereof and the expiration date thereof, and (ii) states that the Borrower's (or any Restricted Subsidiary's) obligations thereunder are designated as Secured Obligations for purposes of the Loan Documents.

Section 22. *Notices.*  Each notice, request or other communication given to any party hereunder shall be given in accordance with Section 10.02 of the Credit Agreement, and in the case of any such notice, request or other communication to a Grantor other than the Borrower, shall be given to it in care of the Borrower.

Section 23. *No Implied Waivers; Remedies Not Exclusive.*  No failure by the Collateral Agent or any Secured Party to exercise, and no delay in exercising and no course of dealing with respect to, any right or remedy under any Collateral Document shall operate as a waiver thereof; nor shall any single or partial exercise by the Collateral Agent or any Secured Party of any right or remedy under any Loan Document preclude any other or further exercise thereof or the exercise of any other right or remedy.  The rights and remedies specified in the Loan Documents are cumulative and are not exclusive of any other rights or remedies provided by Law.

Section 24. *Successors and Assigns.*  This Agreement is for the benefit of the Collateral Agent and the Secured Parties.  If all or any part of any Secured Party's interest in any Secured Obligation is assigned or otherwise transferred to a permitted assignee, the transferor's rights hereunder, to the extent applicable to the obligation so transferred, shall be automatically transferred with such obligation.  This Agreement shall be binding on the Grantors and the Collateral Agent and their respective successors and permitted assigns.

Section 25. *Amendments and Waivers.*  Neither this Agreement nor any provision hereof may be waived, amended, modified or terminated except pursuant to an agreement or agreements in writing entered into by the Collateral Agent, with the consent of such Lenders as are required to consent thereto under Section 10.01 of the Credit Agreement and the Borrower (if any).  No such waiver, amendment or modification shall be binding upon any Grantor, except with its written consent.

Section 26.    *Counterparts.*    Section 10.10 (*Counterparts*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis.*

Section 27.    *Choice of Law.*  Section 10.14 (*Governing Law, Jurisdiction, Service of Process*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis.*

Section 28.    *Waiver of Jury Trial.*    Section 10.15 (*Waiver of Right to Trial by Jury*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis.*

Section 29.    *Severability.*  If any provision of any Collateral Document is invalid or unenforceable in any jurisdiction, then, to the fullest extent permitted by Law, (i) the other provisions of the Collateral Documents shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Collateral Agent and the Secured Parties in order to carry out the intentions of the parties thereto as nearly as may be possible and (ii) the invalidity or unenforceability of such provision in such jurisdiction shall not affect the validity or enforceability thereof in any other jurisdiction.

*[Remainder of page intentionally blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**LUCKY BUCKS, LLC**,
as Borrower and a Grantor

By: _____
Name:
Title:

**LUCKY BUCKS HOLDCO, LLC**,
as Holdings and a Grantor

By: _____
Name:
Title:

**MACQUARIE CAPITAL FUNDING LLC,**
as Collateral Agent

By: _____
Name:
Title:


By: _____
Name:
Title:

[Signature Page – Security Agreement]

**EXHIBIT A**
**to Security Agreement**

## SECURITY AGREEMENT SUPPLEMENT

SECURITY AGREEMENT SUPPLEMENT dated as of _____, ____, between [*NAME OF GRANTOR*] (the "**Grantor**") and MACQUARIE CAPITAL FUNDING LLC, as Collateral Agent (the "**Collateral Agent**").

WHEREAS, Lucky Bucks, LLC, a Georgia limited liability company (the "**Borrower**"), the Guarantors party thereto and Macquarie Capital Funding LLC, as Collateral Agent, are parties to that certain Security Agreement, dated as of July 30, 2021 (as heretofore amended and/or supplemented, the "**Security Agreement**") under which the Borrower and the Guarantors secure certain of their respective obligations (the "**Secured Obligations**");

WHEREAS, [*Name of Grantor*] [desires to become] [is] a party to the Security Agreement as a Grantor thereunder;[1] and

WHEREAS, terms defined in the Security Agreement (or whose definitions are incorporated by reference in Section 1 of the Security Agreement) and not otherwise defined herein have, as used herein, the respective meanings provided for therein;

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    *Grant of Transaction Liens*.  (a) In order to secure its Secured Obligations, the Grantor hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in the following property of the Grantor, whether now owned or existing or hereafter acquired or arising and regardless of where located (the "**New Collateral**"):

[*describe property being added to the Collateral, including exclusions*][2]

(b)    With respect to each right to payment or performance included in the Collateral from time to time, the Transaction Lien granted therein includes a continuing security interest in (i) any Supporting Obligation that supports such payment or performance and (ii) any Lien that (x) secures such right to payment or performance or (y) secures any such Supporting Obligation.

(c)    The foregoing Transaction Liens are granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or transfer or in any way affect or modify, any

---

[1]  If the Grantor is the Borrower, delete this recital.

[2]  If the Grantor is not already a party to the Security Agreement, clauses (i) through (xii) of, and the proviso to, Section 2(a) of the Security Agreement (modified to replace references to "Original Grantor" with the Grantor) may be appropriate.

A-1

obligation or liability of the Grantor with respect to any of the New Collateral or any transaction in connection therewith.

2.    *Delivery of Collateral*.  Concurrently with delivering this Security Agreement Supplement to the Collateral Agent, the Grantor is complying with the provisions of Section 6 of the Security Agreement with respect to Investment Property, in each case if and to the extent included in the New Collateral at such time.

3.    *Party to Security Agreement*.  Upon executing and delivering this Security Agreement Supplement to the Collateral Agent, the Grantor will become a party to the Security Agreement and will thereafter have all the rights and obligations of a Grantor thereunder and be bound by all the provisions thereof as fully as if the Grantor were one of the original parties thereto.[3] The Grantor authorizes the Collateral Agent to file or record financing statements (including transmitting utility filings) and other filing or recording documents or instruments with respect to the Collateral without the signature of the Grantor in such form and in such offices as the Collateral Agent determines appropriate to perfect the security interests of the Collateral Agent under this Security Agreement Supplement.  The Grantor authorizes the Collateral Agent to use collateral descriptions such as "all personal property" or "all assets", in each case "whether now owned or hereafter acquired", words of similar import or any other description the Collateral Agent, in its reasonable discretion, so chooses in any such financing statements.  The Grantor agrees that a carbon, photographic, photostatic or other reproduction of this Security Agreement Supplement or of a financing statement is sufficient as a financing statement for filing and recording purposes.

4.    *Representations and Warranties*.  (a) The Grantor is duly organized, validly existing and in good standing under the Laws of [jurisdiction of organization].

(a)    [Reserved].

(b)    The execution and delivery of this Security Agreement Supplement by the Grantor and the performance by it of its obligations under the Security Agreement as supplemented hereby are within its corporate or other powers, have been duly authorized by all necessary corporate or other action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable Law or regulation or of its organizational documents, or of any agreement, judgment, injunction, order, decree or other instrument binding upon it or result in the creation or imposition of any Lien (except a Transaction Lien) on any of its assets.

(c)    The Security Agreement as supplemented hereby constitutes a valid and binding agreement of the Grantor, enforceable in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, fraudulent conveyance or other similar Laws affecting creditors' rights generally and (ii) general principles of equity.

(d)    Each of the representations and warranties set forth in Sections 3 through 10 of the Security Agreement is true as applied to the Grantor and the New Collateral.  For purposes of the foregoing sentence, references in said Sections to a "Grantor" shall be deemed to refer to the

---

[3] Delete Section 3 if the Grantor is already a party to the Security Agreement.

A-2

Grantor, references to Schedules to the Security Agreement shall be deemed to refer to the corresponding Schedules to this Security Agreement Supplement, references to "Collateral" shall be deemed to refer to the New Collateral, and references to the "Closing Date" shall be deemed to refer to the date on which the Grantor signs and delivers this Security Agreement Supplement.

5.    *Counterparts, Governing Law and Waiver of Jury Trial.*    Each of Section 10.10 (*Counterparts*), Section 10.14 (*Governing Law, Jurisdiction, Service of Process*) and Section 10.15 (*Waiver of Right to Trial by Jury*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis*.

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement Supplement to be duly executed by their respective authorized officers as of the day and year first above written.

[*NAME OF GRANTOR*]

By:    _____
      Name:
      Title:

MACQUARIE CAPITAL FUNDING LLC, as Collateral Agent

By:    _____
      Name:
      Title:

By:    _____
      Name:
      Title:

A-3

**[Schedules to the Security Agreement Supplement to be added]**

**EXHIBIT B**
**to Security Agreement**

## COPYRIGHT SECURITY AGREEMENT

WHEREAS, [*NAME OF GRANTOR*], a _____ corporation[1] (herein referred to as the "**Grantor**") owns, or in the case of licenses is a party to, the Copyright Collateral (as defined below);

WHEREAS, Lucky Bucks, LLC, a Georgia limited liability company (the "**Borrower**"), the Lenders party thereto, and Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent, are parties to that certain Credit Agreement, dated as of July 30, 2021 (as amended from time to time, the "**Credit Agreement**"); and

WHEREAS, pursuant to that certain Security Agreement, dated as of July 30, 2021 (as amended and/or supplemented from time to time, the "**Security Agreement**") among the Borrower, the Guarantors party thereto and Macquarie Capital Funding LLC, as Collateral Agent for the Secured Parties referred to therein (in such capacity, together with its successors in such capacity, the "**Grantee**"), the Grantor has secured certain of its obligations (its "**Secured Obligations**") by granting to the Grantee for the benefit of such Secured Parties a continuing security interest (the "**Transaction Liens**") in certain personal property of the Grantor, including all right, title and interest of the Grantor in, to and under the Copyright Collateral (as defined below);

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby grants to the Grantee, to secure its Secured Obligations, a continuing security interest in all of the Grantor's right, title and interest in, to and under the following to the extent it constitutes Collateral (including giving effect to the proviso in Section 2(a) thereof) (all of the following items, to the extent constituting Collateral, being herein collectively referred to as the "**Copyright Collateral**"), whether now owned or existing or hereafter acquired or arising:

(i)      each U.S. Copyright registration or application therefor owned by the Grantor and identified in <u>Schedule 1</u> hereto;

(ii)     each exclusive Copyright License granted to such Grantor with respect to Copyright registered with the United States Copyright Office and identified in Schedule 1 hereto; and

(iii)    all Proceeds of the foregoing.

---

[1] Modify as needed if the Grantor is not a corporation.

This Copyright Security Agreement shall not constitute a grant of a security interest in any property to the extent that and for as long as such property is excluded as Collateral by the terms of the Security Agreement, including in any Excluded Property.

The foregoing security interest has been granted under the Security Agreement.  The Grantor acknowledges and affirms that the rights and remedies of the Grantee with respect to the security interest in the Copyright Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  In the event of a conflict between the Security Agreement and this Copyright Security Agreement, the terms of the Security Agreement shall control to the extent of the conflict.

Upon termination of the Transaction Liens in the Copyright Collateral pursuant to the Security Agreement, the security interests granted hereby shall automatically terminate and be released, and the Grantee will, at the expense of the Grantor, execute and deliver to the Grantor such documents, and take such other actions, as the Grantor shall reasonably request to evidence the termination of the security interests granted hereby.

Capitalized terms used but not defined herein but defined in the Security Agreement are used herein with the respective meanings provided for therein.

Each of Section 10.10 (*Counterparts*), Section 10.14 (*Governing Law, Jurisdiction, Service of Process*) and Section 10.15 (*Waiver of Right to Trial by Jury*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis*.

IN WITNESS WHEREOF, the Grantor has caused this Copyright Security Agreement to be duly executed by its officer thereunto duly authorized as of the ___ day of _____, ____.

[*NAME OF GRANTOR*]


By: _____
Name:
Title:

Acknowledged:

MACQUARIE CAPITAL FUNDING LLC
as Collateral Agent


By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

Schedule 1
to Copyright
Security Agreement

**[*NAME OF GRANTOR*]**

## U.S. COPYRIGHT REGISTRATIONS

| Registration No. | Registration Date | Title | Expiration Date |
| --- | --- | --- | --- |

## U.S. COPYRIGHT APPLICATIONS

| Case No. | Serial No. | Country | Date | Filing Title |
| --- | --- | --- | --- | --- |

## EXCLUSIVE COPYRIGHT LICENSES

| Name of Agreement | Parties Licensor/Licensee | Date of Agreement | Subject Matter |
| --- | --- | --- | --- |

**EXHIBIT C**
**to Security Agreement**

## PATENT SECURITY AGREEMENT

WHEREAS, [*NAME OF GRANTOR*], a _____ corporation[1] (herein referred to as the "**Grantor**") owns, the Patent Collateral (as defined below);

WHEREAS, Lucky Bucks, LLC, a Georgia limited liability company (the "**Borrower**"), the Lenders party thereto, and Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent, are parties to that certain Credit Agreement, dated as of July 30, 2021 (as amended from time to time, the "**Credit Agreement**"); and

WHEREAS, pursuant to that certain Security Agreement, dated as of July 30, 2021 (as amended and/or supplemented from time to time, the "**Security Agreement**") among the Borrower, the Guarantors party thereto and Macquarie Capital Funding LLC, as Collateral Agent for the Secured Parties referred to therein (in such capacity, together with its successors in such capacity, the "**Grantee**"), the Grantor has secured certain of its obligations (its "**Secured Obligations**") by granting to the Grantee for the benefit of such Secured Parties a continuing security interest (the "**Transaction Liens**") in certain personal property of the Grantor, including all right, title and interest of the Grantor in, to and under the Patent Collateral (as defined below);

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby grants to the Grantee, to secure its Secured Obligations, a continuing security interest in all of the Grantor's right, title and interest in, to and under the following to the extent it constitutes Collateral (including giving effect to the proviso in Section 2(a) thereof) (all of the following items, to the extent constituting Collateral being herein collectively referred to as the "**Patent Collateral**"), whether now owned or existing or hereafter acquired or arising:

(i)     each U.S. Patent owned by the Grantor and identified in <u>Schedule 1</u> hereto; and

(ii)     all Proceeds of the foregoing.

This Patent Security Agreement shall not constitute a grant of a security interest in any property to the extent that and for as long as such property is excluded as Collateral by the terms of the Security Agreement, including in any Excluded Property.

The foregoing security interest has been granted under the Security Agreement. The Grantor acknowledges and affirms that the rights and remedies of the Grantee with respect to the security interest in the Patent Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. In the event of a conflict

---

[1] Modify as needed if the Grantor is not a corporation.

C-1

between the Security Agreement and this Patent Security Agreement, the terms of the Security Agreement shall control to the extent of the conflict.

Upon termination of the Transaction Liens in the Patent Collateral pursuant to the Security Agreement, the security interests granted hereby shall automatically terminate and be released, and the Grantee will, at the expense of the Grantor, execute and deliver to the Grantor such documents, and take such other actions, as the Grantor shall reasonably request to evidence the termination of the security interests granted hereby.

Capitalized terms used but not defined herein but defined in the Security Agreement are used herein with the respective meanings provided for therein.

Each of Section 10.10 (*Counterparts*), Section 10.14 (*Governing Law, Jurisdiction, Service of Process*) and Section 10.15 (*Waiver of Right to Trial by Jury*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis*.

IN WITNESS WHEREOF, the Grantor has caused this Patent Security Agreement to be duly executed by its officer thereunto duly authorized as of the ____ day of _____, ____.

[*NAME OF GRANTOR*]

By: _____

Name:
Title:

C-2

Acknowledged:

MACQUARIE CAPITAL FUNDING LLC
as Collateral Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**[*NAME OF GRANTOR*]**

### U.S. PATENTS AND DESIGN PATENTS

| Patent No. | Issued | Expiration | Country | Title |
| --- | --- | --- | --- | --- |

### U.S. PATENT APPLICATIONS

| Case No. | Serial No. | Country | Date | Filing Title |
| --- | --- | --- | --- | --- |

EXHIBIT D
to Security Agreement

## TRADEMARK SECURITY AGREEMENT

WHEREAS, [*NAME OF GRANTOR*], a _____ corporation[1] (herein referred to as the "**Grantor**") owns, the Trademark Collateral (as defined below);

WHEREAS, Lucky Bucks, LLC, a Georgia limited liability company (the "**Borrower**"), the Lenders party thereto, and Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent, are parties to that certain Credit Agreement, dated as of July 30, 2021 (as amended from time to time, the "**Credit Agreement**"); and

WHEREAS, pursuant to that certain Security Agreement, dated as of July 30, 2021 (as amended and/or supplemented from time to time, the "**Security Agreement**") among the Borrower, the Guarantors party thereto and Macquarie Capital Funding LLC, as Collateral Agent for the Secured Parties referred to therein (in such capacity, together with its successors in such capacity, the "**Grantee**"), the Grantor has secured certain of its obligations (its "**Secured Obligations**") by granting to the Grantee for the benefit of such Secured Parties a continuing security interest (the "**Transaction Liens**") in certain personal property of the Grantor, including all right, title and interest of the Grantor in, to and under the Trademark Collateral (as defined below);

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby grants to the Grantee, to secure its Secured Obligations, a continuing security interest in all of the Grantor's right, title and interest in, to and under the following to the extent it constitutes Collateral (including giving effect to the proviso in Section 2(a) thereof) (all of the following items, to the extent constituting Collateral being herein collectively referred to as the "**Trademark Collateral**"), whether now owned or existing or hereafter acquired or arising:

      (i)    each U.S. Trademark registration and application thereof owned by the Grantor and identified in <u>Schedule 1</u> hereto, and all of the goodwill of the business exclusively connected with the use of, or symbolized by, each Trademark; and

      (ii)    all Proceeds of the foregoing.

This Trademark Security Agreement shall not constitute a grant of a security interest in any property to the extent that and for as long as such property is excluded as Collateral by the terms of the Security Agreement, including in any Excluded Property.

The foregoing security interest has been granted under the Security Agreement. The Grantor acknowledges and affirms that the rights and remedies of the Grantee with respect to the security interest

---

[1] Modify as needed if the Grantor is not a corporation.

D-1

in the Trademark Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  In the event of a conflict between the Security Agreement and this Trademark Security Agreement, the terms of the Security Agreement shall control to the extent of the conflict.

Upon termination of the Transaction Liens in the Trademark Collateral pursuant to the Security Agreement, the security interests granted hereby shall automatically terminate and be released, and the Grantee will, at the expense of the Grantor, execute and deliver to the Grantor such documents, and take such other actions, as the Grantor shall reasonably request to evidence the termination of the security interests granted hereby.

Capitalized terms used but not defined herein but defined in the Security Agreement are used herein with the respective meanings provided for therein.

Each of Section 10.10 (*Counterparts*), Section 10.14 (*Governing Law, Jurisdiction, Service of Process*) and Section 10.15 (*Waiver of Right to Trial by Jury*) of the Credit Agreement is hereby incorporated by reference, *mutatis mutandis*.

IN WITNESS WHEREOF, the Grantor has caused this Trademark Security Agreement to be duly executed by its officer thereunto duly authorized as of the ____ day of _____, ____.

[*NAME OF GRANTOR*]

By: _____
       Name:
       Title:

Acknowledged:

MACQUARIE CAPITAL FUNDING LLC
as Collateral Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**Schedule 1**
**to Trademark**
**Security Agreement**

**[*NAME OF GRANTOR*]**


### U.S. TRADEMARK REGISTRATIONS

| **TRADEMARK** | **REG. NO.** | **REG. DATE** |
|---|---|---|


### U.S. TRADEMARK APPLICATIONS

| **TRADEMARK** | **REG. NO.** | **REG. DATE** |
|---|---|---|

EXHIBIT H

[FORM OF] DISCOUNTED PREPAYMENT OPTION NOTICE

Date: _____, 20__

To:     **MACQUARIE CAPITAL FUNDING LLC**, as Administrative Agent

Ladies and Gentlemen:

This Discounted Prepayment Option Notice is delivered to you pursuant to Section 2.05(d)(ii) of that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent and each L/C Issuer and Lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Borrower hereby notifies you that, effective as of [      ], 20[  ], pursuant to Section 2.05(d)(ii) of the Credit Agreement, the Borrower hereby notifies each Lender that they are seeking:

1.      to prepay [Initial Term] [Incremental Term] [Extended Term] Loans at a discount in an aggregate principal amount of $[    ][1] (the "Proposed Discounted Prepayment Amount");

2.      a percentage discount to the par value of the principal amount of [Initial Term] [Incremental Term] [Extended Term] Loans [greater than or equal to [   ]% of par value but less than or equal to [  ]% of par value] [equal to [   ]% of par value] (the "Discount Range");[2] and

3.      a Lender Participation Notice on or before [        ], 20[  ][3], as determined pursuant to Section 2.05(d)(iii) of the Credit Agreement (the "Acceptance Date").

The Borrower expressly agrees that this Discounted Prepayment Option Notice is subject to the provisions of Section 2.05(d) of the Credit Agreement.

The Borrower hereby represents and warrants to the Administrative Agent on behalf of the Administrative Agent and the Lenders as follows:

1.      No Event of Default under Section 8.01(a) or under Section 8.01(f) of the Credit Agreement (in each case, with respect to the Borrower) has occurred and is continuing or would result from the Discounted Voluntary Prepayment.

---

[1]      Insert amount that is minimum of $5,000,000.

[2]      The Borrower may specify different Discount Ranges for Initial Term Loans, Incremental Term Loans and Extended Term Loans.

[3]      Insert date (a Business Day) that is at least five Business Days after date of the Discounted Prepayment Option Notice.

2.      Each of the other conditions to such Discounted Voluntary Prepayment contained in Section 2.05(d) of the Credit Agreement has been satisfied.

The Borrower respectfully requests that Administrative Agent promptly notify each of the Lenders party to the Credit Agreement of this Discounted Prepayment Option Notice.

[*Signature Pages Follow*]

**IN WITNESS WHEREOF**, the undersigned has executed this Discounted Prepayment Option Notice as of the date first above written.

**LUCKY BUCKS, LLC**,
as Borrower

By: _____
Name:
Title:

[Signature Page to Discounted Prepayment Option Notice]

**EXHIBIT I**

**[FORM OF] LENDER PARTICIPATION NOTICE**

Date: _____, 20__

To:    MACQUARIE CAPITAL FUNDING LLC, as Administrative Agent

c/o Cortland Capital Market Services LLC
225 W. Washington St., 9th floor
Chicago, IL 60606
Attention: Agency Services – Macquarie
Telephone: (855) 657-6589
Facsimile: (312) 376-0751
Email: MacCap@alterdomus.com

With copy to:

Macquarie Capital Funding LLC
125 West 55th Street
New York, NY 10019
Attention: Macquarie Capital Debt Capital Markets Middle Office
Phone: (212) 231-0466 / (212) 231-0494
Facsimile: (212) 231-6518
Email: MacCap.DCMAdmin@macquarie.com

Ladies and Gentlemen:

Reference is made to (a) that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent and each L/C Issuer and Lender from time to time party thereto and (b) that certain Discounted Prepayment Option Notice, dated [       ], 20[  ], from the Borrower (the "Discounted Prepayment Option Notice"). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement or the Discounted Prepayment Option Notice, as applicable.

The undersigned Lender hereby gives you notice, pursuant to Section 2.05(d)(iii) of the Credit Agreement, that it is willing to accept a Discounted Voluntary Prepayment on Loans held by such Lender:

1.      in a maximum aggregate principal amount of

a.      [$[   ] of Initial Term Loans]

b.      [$[   ] of Incremental Term Loans] [$[   ] of Extended Term Loans] ([collectively,] the "***Offered Loans***"), and

2.       at a percentage discount to par value of the principal amount of [Initial Term] [Incremental Term] [Extended Term] Loans equal to [    ]%[    ][1] of par value (the "***Acceptable Discount***").[2]

The undersigned Lender expressly agrees that this offer is subject to the provisions of Section 2.05(d) of the Credit Agreement. Furthermore, conditioned upon the Applicable Discount determined pursuant to Section 2.05(d)(iii) of the Credit Agreement being a percentage of par value less than or equal to the Acceptable Discount, the undersigned Lender hereby expressly consents and agrees to a prepayment of its [Initial Term] [Incremental Term] [Extended Term] Loans pursuant to Section 2.05(d) of the Credit Agreement in an aggregate principal amount equal to the Offered Loans, as such principal amount may be reduced if the aggregate proceeds required to prepay Qualifying Loans (disregarding any interest payable in connection with such Qualifying Loans) would exceed the amount of aggregate proceeds required to prepay the Proposed Discounted Prepayment Amount for the relevant Discounted Voluntary Prepayment, and acknowledges and agrees that such prepayment of its Loans will be allocated at par value.

*[Signature Pages Follow]*

---

[1]       Insert amount within Discount Range.

[2]       Lender may specify different Acceptable Discounts for Initial Term Loans, Extended Term Loans and Incremental Term Loans.

     **IN WITNESS WHEREOF**, the undersigned has executed this Lender Participation Notice as of the date first above written.

[NAME OF LENDER]


By: _____
Name:
Title:


[By: _____
Name:
Title:]<sup>3</sup>

---

<sup>3</sup>     If a second signature is required.

**EXHIBIT J**

**[FORM OF] DISCOUNTED VOLUNTARY PREPAYMENT NOTICE**

Date: _____, 20__

To:    MACQUARIE CAPITAL FUNDING LLC, as Administrative Agent

Ladies and Gentlemen:

This Discounted Voluntary Prepayment Notice is delivered to you pursuant to Section 2.05(d)(v) of that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent and each L/C Issuer and Lender from time to time party thereto.  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Borrower hereby irrevocably notifies you that, pursuant to Section 2.05(d)(v) of the Credit Agreement, the Borrower will make a Discounted Voluntary Prepayment to each Lender with Qualifying Loans, which shall be made:

1.    on or before [      ], 20[  ][1], as determined pursuant to Section 2.05(d)(v) of the Credit Agreement,

2.    in the aggregate principal amount of

a.    [$[   ] of Initial Term Loans]

b.    [$[   ] of Incremental Term Loans] [$[   ] of Extended Term Loans], and

3.    at a percentage discount to the par value of the principal amount of the [Initial Term] [Incremental Term] [Extended Term] Loans equal to [   ]% of par value (the "Applicable Discount").

The Borrower expressly agrees that this Discounted Voluntary Prepayment Notice is irrevocable and is subject to the provisions of Section 2.05(d) of the Credit Agreement.

The Borrower hereby represents and warrants to the Administrative Agent on behalf of the Administrative Agent and the Lenders as follows:

---

[1]    Insert date (a Business Day) that is at least three Business Days after the date of this Notice and no later than five Business Days after the Acceptance Date (or such later date as the Administrative Agent shall reasonably agree, given the time required to calculate the Applicable Discount and determine the amount and holders of Qualifying Loans).  Note that this Notice should be delivered no later than 12:00 p.m. New York City time, three Business Days prior to the date of such Discounted Voluntary Prepayment.

1.      No Event of Default under <u>Section 8.01(a)</u> or under <u>Section 8.01(f)</u> of the Credit Agreement (in each case, with respect to the Borrower) has occurred and is continuing or would result from the Discounted Voluntary Prepayment.

2.      Each of the other conditions to such Discounted Voluntary Prepayment contained in Section 2.05(d) of the Credit Agreement has been satisfied.

The Borrower agrees that if prior to the date of the Discounted Voluntary Prepayment, any representation or warranty made herein by it will not be true and correct as of the date of the Discounted Voluntary Prepayment as if then made, it will promptly notify the Administrative Agent in writing of such fact, who will promptly notify each participating Lender.  After such notification, any participating Lender may revoke its Lender Participation Notice within two Business Days of receiving such notification.

The Borrower respectfully requests that Administrative Agent promptly notify each of the Lenders party to the Credit Agreement of this Discounted Voluntary Prepayment Notice.

[*Signature Pages Follow*]

**IN WITNESS WHEREOF**, the undersigned has executed this Discounted Voluntary Prepayment Notice as of the date first above written.

**LUCKY BUCKS, LLC**,
as Borrower


By _____
Name:
Title:

**[FORM OF]**

**PARI PASSU INTERCREDITOR AGREEMENT**

Among

LUCKY BUCKS, LLC,

the other Grantors party hereto,

MACQUARIE CAPITAL FUNDING LLC,
as Credit Agreement Collateral Agent, Administrative Agent and Authorized Representative for the Credit Agreement Secured Parties,

[_____],
as Initial Additional Collateral Agent and Initial Additional Authorized Representative

and

each additional Authorized Representative and Collateral Agent from time to time party hereto

dated as of [_____], 20[__]

PARI PASSU INTERCREDITOR AGREEMENT dated as of [_____] (as amended, supplemented or otherwise modified from time to time, this "**Agreement**"), among LUCKY BUCKS, LLC, a Georgia limited liability company ("**Borrower**"), the other Grantors (as defined below) party hereto, MACQUARIE CAPITAL FUNDING LLC, as collateral agent for the Credit Agreement Secured Parties (as defined below) (in such capacity and together with its successors and permitted assigns in such capacity, the "**Credit Agreement Collateral Agent**") and as Administrative Agent and Authorized Representative for the Credit Agreement Secured Parties, [_____], as Authorized Representative for the Initial Additional First Lien Secured Parties (as defined below) (in such capacity and together with its successors and permitted assigns in such capacity, the "**Initial Additional Authorized Representative**") and [_____] as [collateral agent] for the Initial Additional First Lien Secured Parties (in such capacity and together with its successors in such capacity, the "**Initial Additional Collateral Agent**"), and each additional Authorized Representative and Additional First Lien Collateral Agent (as defined below) from time to time party hereto for the Additional First Lien Secured Parties of the Series with respect to which it is acting in such capacity.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Credit Agreement Collateral Agent, the Administrative Agent (for itself and on behalf of the Credit Agreement Secured Parties), the Initial Additional Authorized Representative (for itself and on behalf of the Initial Additional First Lien Secured Parties), the Initial Additional Collateral Agent (for itself and on behalf of the Initial Additional First Lien Secured Parties), and each additional Authorized Representative (for itself and on behalf of the other Additional First Lien Secured Parties of the applicable Series) and each Additional First Lien Collateral Agent agree as follows:

## ARTICLE 1
### DEFINITIONS

Section 1.01.  *Certain Defined Terms.*  Capitalized terms used but not otherwise defined herein have the meanings set forth in the Credit Agreement or, if defined in the UCC, the meanings specified therein.  As used in this Agreement, the following terms have the meanings specified below:

"**Additional First Lien Collateral Agent**" means (x) the Initial Additional Collateral Agent and (y) with respect to each other Series of Additional First Lien Obligations incurred following the date hereof, the person serving as collateral agent (or the equivalent) for such Series of Additional First Lien Obligations and named as such in the applicable Joinder Agreement delivered pursuant to Section 5.13 hereof, together with its successors in such capacity.

"**Additional First Lien Documents**" means, with respect to any Series of Additional First Lien Obligations, the notes, indentures, credit agreements, security documents and other operative agreements evidencing or governing such Additional First Lien Obligations, including the Initial Additional First Lien Documents and each other agreement entered into for the purpose of securing any Series of Additional First Lien Obligations.

Exhibit K-2

"**Additional First Lien Obligations**" means (x) the Initial Additional First Lien Obligations and (y) with respect to any Senior Class Debt incurred after the date hereof that is secured by a Senior Lien on the Collateral and that is intended to constitute Additional First Lien Obligations in accordance with Section 5.13 (and as to which the requirements of Section 5.13 have been satisfied), (a) all principal of, and interest (including, without limitation, any Post-Petition Interest) payable with respect to, such Senior Class Debt, (b) all other amounts payable to the related Additional First Lien Secured Parties under the related Additional First Lien Documents and (c) any renewals or extensions of the foregoing.

"**Additional First Lien Secured Party**" means the holders of any Additional First Lien Obligations and any Authorized Representative and Collateral Agent with respect thereto, and shall include the Initial Additional First Lien Secured Parties.

"**Administrative Agent**" means Macquarie Capital Funding LLC and its successors and permitted assigns, in its capacity as administrative agent under the Credit Agreement.

"**Agreement**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Applicable Authorized Representative**" means, with respect to any Shared Collateral, (i) until the earlier of (x) the Discharge of Credit Agreement Secured Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Authorized Representative for the Credit Agreement Secured Obligations and (ii) from and after the earlier of (x) the Discharge of Credit Agreement Secured Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Major Non-Controlling Authorized Representative.

"**Applicable Collateral Agent**" means, as of any date, (i) until the earlier of (x) the Discharge of Credit Agreement Secured Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Credit Agreement Collateral Agent and (ii) from and after the earlier of (x) the Discharge of the Credit Agreement Secured Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Collateral Agent (including the Initial Additional Collateral Agent, if applicable) for the Series of First Lien Obligations represented by the Major Non-Controlling Authorized Representative.

"**Authorized Representative**" means (i) in the case of any Credit Agreement Secured Obligations or the Credit Agreement Secured Parties, the Administrative Agent, (ii) in the case of the Initial Additional First Lien Obligations or the Initial Additional First Lien Secured Parties, the Initial Additional Authorized Representative and (iii) in the case of any Series of Additional First Lien Obligations or Additional First Lien Secured Parties that become subject to this Agreement after the date hereof, the Authorized Representative named for such Series in the applicable Joinder Agreement.

"**Bankruptcy Case**" has the meaning assigned to such term in Section 2.05(b).

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended.

"**Bankruptcy Distribution**" has the meaning assigned to such term in <u>Section 2.01(b)</u> hereof.

"**Bankruptcy Law**" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"**Borrower**" has the meaning assigned to such term in the introductory paragraph hereof.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**Collateral**" means all assets and properties subject to Liens created pursuant to any First Lien Security Document to secure one or more Series of First Lien Obligations.

"**Collateral Agent**" means (i) in the case of any Credit Agreement Secured Obligations, the Credit Agreement Collateral Agent, (ii) in the case of the Initial Additional First Lien Obligations, the Initial Additional Collateral Agent and (iii) in the case of any Series of Additional First Lien Obligations that become subject to this Agreement after the date hereof, each Additional First Lien Collateral Agent as identified by such Series' Senior Class Debt Representative in the applicable Joinder Agreement.

"**Controlling Secured Parties**" means, with respect to any Shared Collateral, the Series of First Lien Secured Parties whose Authorized Representative is the Applicable Authorized Representative for such Shared Collateral.

"**Credit Agreement**" means that certain Credit Agreement dated as of July 30, 2021 (as amended, restated, supplemented or otherwise modified, Refinanced or replaced from time to time), among the Borrower, the lenders thereto from time to time, the Administrative Agent, the Credit Agreement Collateral Agent and the other parties thereto.

"**Credit Agreement Collateral Agent**" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"**Credit Agreement Secured Obligations**" means the "Secured Obligations" as defined in the Credit Agreement.

"**Credit Agreement Secured Parties**" means the "Secured Parties" as defined in the Credit Agreement Security Agreement.

"**Credit Agreement Security Agreement**" means the Security Agreement, dated as of July 30, 2021, among the Borrower, the other grantors identified therein and the Credit Agreement Collateral Agent.

"**DIP Financing**" has the meaning assigned to such term in <u>Section 2.05(b)</u>.

"**DIP Financing Liens**" has the meaning assigned to such term in <u>Section 2.05(b)</u>.

"**DIP Lenders**" has the meaning assigned to such term in <u>Section 2.05(b)</u>.

"**Discharge**" means, with respect to any Shared Collateral and any Series of First Lien Obligations, that such Series of First Lien Obligations is no longer secured by such Shared Collateral pursuant to the terms of the applicable Secured Credit Documents. The term "**Discharged**" shall have a corresponding meaning.

"**Discharge of Credit Agreement Secured Obligations**" means, with respect to any Shared Collateral, the Discharge of the Credit Agreement Secured Obligations with respect to such Shared Collateral; *provided* that the Discharge of Credit Agreement Secured Obligations shall not be deemed to have occurred in connection with a Refinancing of such Credit Agreement Secured Obligations with additional First Lien Obligations secured by such Shared Collateral under an Additional First Lien Document which has been designated in writing by the Administrative Agent (under the Credit Agreement so Refinanced) to the Applicable Collateral Agent and each other Authorized Representative as the "Credit Agreement" for purposes of this Agreement.

"**Enforcement Action**" has the meaning assigned to such term in <u>Section 2.01(b)</u> hereof.

"**Event of Default**" means an "Event of Default" as defined in any Secured Credit Document.

"**First Lien Obligations**" means, collectively, (i) the Credit Agreement Secured Obligations and (ii) each Series of Additional First Lien Obligations (including the Initial Additional First Lien Obligations).

"**First Lien Secured Parties**" means (i) the Credit Agreement Secured Parties and (ii) the Additional First Lien Secured Parties with respect to each Series of Additional First Lien Obligations (including the Initial Additional First Lien Secured Parties).

"**First Lien Security Documents**" means the Credit Agreement Security Agreement, the Initial Additional First Lien Security Agreement, the other "Collateral Documents" (as defined in the Credit Agreement), the other ["Collateral Documents"] (as defined in the Initial Additional First Lien Credit Agreement) and each other agreement entered into in favor of the Applicable Collateral Agent for the purpose of securing any Series of First Lien Obligations.

"**Georgia Lottery Corporation**" means the Georgia Lottery Corporation and any successor or other Governmental Authority that has jurisdiction to regulate the gaming business of any Grantor and their Subsidiaries.

"**Grantors**" means the Borrower, Lucky Bucks Holdco, LLC, a Delaware limited liability company and each Subsidiary of the Borrower which has granted a security interest pursuant to any First Lien Security Document to secure any Series of First Lien Obligations. The Grantors existing on the date hereof are set forth in <u>Annex I</u> hereto.

"**Impairment**" has the meaning assigned to such term in <u>Section 1.03</u>.

"**Initial Additional Authorized Representative**" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"**Initial Additional Collateral Agent**" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"**Initial Additional First Lien Credit Agreement**" means [that certain Credit Agreement dated as of [_____], 20[__] (as amended, restated, supplemented or otherwise modified, Refinanced or replaced from time to time), among the Borrower, the lenders thereto from time to time, the Initial Additional Authorized Representative, the Initial Additional Collateral Agent and the other parties thereto.]

"**Initial Additional First Lien Documents**" means the Initial Additional First Lien Credit Agreement and any notes, security documents and other operative agreements evidencing or governing such indebtedness, including the Initial Additional First Lien Security Agreement and any other agreement entered into for the purpose of securing the Initial Additional First Lien Obligations.

"**Initial Additional First Lien Obligations**" means the ["Obligations"] (as defined in the Initial Additional First Lien Credit Agreement), and any other monetary obligations with respect thereto pursuant to the Initial Additional First Lien Documents.

"**Initial Additional First Lien Secured Parties**" means the holders of any Initial Additional First Lien Obligations, the Initial Additional Collateral Agent and the Initial Additional Authorized Representative.

"**Initial Additional First Lien Security Agreement**" means the ["Security Agreement"] as defined in the Initial Additional First Lien Credit Agreement.

"**Insolvency or Liquidation Proceeding**" means:

(1)     any case or proceeding commenced by or against the Borrower or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Borrower or any other Grantor, any receivership or assignment for the benefit of creditors relating to the Borrower or any other Grantor or any similar case or proceeding relative to the Borrower or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Borrower or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)     any other proceeding of any type or nature in which substantially all claims of creditors of the Borrower or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

Exhibit K-6

"**Intervening Creditor**" shall have the meaning assigned to such term in <u>Section 2.01(b)</u>.

"**Joinder Agreement**" means a supplement to this Agreement substantially in the form of <u>Annex II</u> hereof required to be delivered by an Authorized Representative to the Applicable Collateral Agent pursuant to <u>Section 5.13</u> hereof in order to establish an additional Series of Additional First Lien Obligations and become Additional First Lien Secured Parties hereunder.

"**Lien**" means (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Major Non-Controlling Authorized Representative**" means, with respect to any Shared Collateral, the Authorized Representative of the Series of Additional First Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of Additional First Lien Obligations with respect to such Shared Collateral; *provided*, that if there are two outstanding Series of Additional First Lien Obligations which have an equal outstanding principal amount, the Series of Additional First Lien Obligations with the earlier maturity date shall be considered to have the larger outstanding principal amount for purposes of this definition and if such Series of Additional First Lien Obligations have the same final maturity date, the Major Non-Controlling Authorized Representative shall be determined by vote of the holders of such Series of Additional First Lien Obligations constituting a majority of the amount of such Series of Additional First Lien Obligations; *provided*, *further*, *however*, that in the event the Major Non-Controlling Authorized Representative becomes the Applicable Authorized Representative pursuant to clause (ii) of the definition thereof, it shall thereafter be deemed the Applicable Authorized Representative and no longer the Major Non-Controlling Authorized Representative.

"**Non-Controlling Authorized Representative**" means, at any time with respect to any Shared Collateral, any Authorized Representative that is not the Applicable Authorized Representative at such time with respect to such Shared Collateral.

"**Non-Controlling Authorized Representative Enforcement Date**" means, with respect to any Non-Controlling Authorized Representative, the date which is 150 days (throughout which 150-day period such Non-Controlling Authorized Representative was the Major Non-Controlling Authorized Representative) after the occurrence of both (i) an Event of Default (under and as defined in the Additional First Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative) *and* (ii) the Applicable Collateral Agent's and each other Authorized Representative's receipt of written notice from such Non-Controlling Authorized Representative certifying that (x) such Non-Controlling Authorized Representative is the Major Non-Controlling Authorized Representative and that an Event of Default (under and as defined in the Additional First Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative) has occurred and is continuing and (y) the First Lien Obligations of the Series with respect to which such Non-Controlling Authorized Representative is the Authorized Representative are currently due and payable in full (whether as

a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Additional First Lien Document; *provided* that the Non-Controlling Authorized Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any Shared Collateral (1) at any time the Applicable Authorized Representative or the Applicable Collateral Agent has commenced and is diligently pursuing any enforcement action with respect to such Shared Collateral or (2) at any time the Grantor which has granted a security interest in such Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"**Non-Controlling Secured Parties**" means, with respect to any Shared Collateral, the First Lien Secured Parties which are not Controlling Secured Parties with respect to such Shared Collateral.

"**Other Intercreditor Payment**" has the meaning assigned to such term in Section 2.01(b) hereof.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, government or any agency or political subdivision thereof or any other entity.

"**Plan of Reorganization**" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement or restructuring proposed in or in connection with any Insolvency or Liquidation Proceeding.

"**Possessory Collateral**" means any Shared Collateral in the possession of the Applicable Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction. Possessory Collateral includes, without limitation, any Certificated Securities, Promissory Notes, Instruments, and Chattel Paper, in each case, delivered to or in the possession of the Applicable Collateral Agent under the terms of the First Lien Security Documents. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meaning assigned to them in the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Shared Collateral.

"**Post-Petition Interest**" means interest (including interest accruing at the default rate specified in the applicable Secured Credit Documents or Additional First Lien Documents), fees, expenses and other amounts that pursuant to the Secured Credit Documents or Additional First Lien Documents, as the case may be, continue to accrue or become due after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other amounts are allowed or allowable, voided or subordinated under any Bankruptcy Law or other applicable law or in any such Insolvency or Liquidation Proceeding.

"**Proceeds**" has the meaning assigned to such term in Section 2.01(b) hereof.

"**Refinance**" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other

indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part, whether pursuant to one or more agreements), including by adding or replacing lenders, creditors, agents, the Borrower and/or the guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "**Refinanced**" and "**Refinancing**" have correlative meanings.

"**Restricted Assets**" means all licenses, permits, franchises, approvals or other authorizations from any Governmental Authority (as defined in the Credit Agreement) from time to time granted to or otherwise held by Borrower or any other Grantor to the extent the same constitute "Excluded Property" under (and as defined in) any First Lien Security Documents or are similarly carved out from the granting clause or the collateral thereunder.

"**Sale Proceeds**" means (i) the proceeds from the sale of Borrower or one or more of the Grantors as a going concern or from the sale of the Restricted Assets as a going concern, (ii) the proceeds from another sale or disposition of (x) any assets of the Grantors that include any Restricted Assets or (y) any assets of the Grantors that benefit from any Restricted Assets or (iii) any other economic value (whether in the form of cash or otherwise) received or distributed that is associated with the Restricted Assets.

"**Secured Credit Document**" means (i) the Credit Agreement and each Loan Document (as defined in the Credit Agreement) and (ii) each Additional First Lien Document (including the Initial Additional First Lien Documents).

"**Senior Class Debt**" shall have the meaning assigned to such term in <u>Section 5.13</u>.

"**Senior Class Debt Parties**" shall have the meaning assigned to such term in <u>Section 5.13</u>.

"**Senior Class Debt Representative**" shall have the meaning assigned to such term in <u>Section 5.13</u>.

"**Senior Lien**" means the Liens on the Collateral in favor of the First Lien Secured Parties under the First Lien Security Documents.

"**Series**" means (a) with respect to the First Lien Secured Parties, each of (i) the Credit Agreement Secured Parties (in their capacities as such), (ii) the Initial Additional First Lien Secured Parties (in their capacities as such) and (iii) the Additional First Lien Secured Parties that become subject to this Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Additional First Lien Secured Parties) and (b) with respect to any First Lien Obligations, each of (i) the Credit Agreement Secured Obligations, (ii) the Initial Additional First Lien Obligations and (iii) the Additional First Lien Obligations incurred pursuant to any Additional First Lien Document, which pursuant to any Joinder Agreement, are to be represented hereunder by a common Authorized Representative (in its capacity as such for such Additional First Lien Obligations).

"**Shared Collateral**" means, at any time, Collateral in which the holders of two or more Series of First Lien Obligations (or their respective Authorized Representatives or Collateral

Exhibit K-9

Agents) hold a valid and perfected security interest at such time.  If more than two Series of First Lien Obligations are outstanding at any time and the holders of less than all Series of First Lien Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of First Lien Obligations that hold a valid and perfected security interest in such Collateral at such time and shall not constitute Shared Collateral for any Series which does not have a valid and perfected security interest in such Collateral at such time.

"**Subsidiary**" has the meaning given to such term in the Credit Agreement.

"**Uniform Commercial Code**" or "**UCC**" means, unless otherwise specified, the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Shared Collateral.

Section 1.02.  *Terms Generally.*  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, restated, amended and restated, supplemented or otherwise modified, (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (e) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (f) the term "or" is not exclusive.

Section 1.03.  *Impairments.*  It is the intention of the First Lien Secured Parties of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Secured Parties of any other Series) bear the risk of (a) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have an enforceable security interest in any of the Collateral securing any other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of any other Series of First Lien Obligations or (b) the existence of any Collateral for any other Series of First Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (a) or (b) with respect to any

Exhibit K-10

Series of First Lien Obligations, an "**Impairment**" of such Series).  In the event of any Impairment with respect to any Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including, without limitation, the right to receive distributions in respect of such Series of First Lien Obligations pursuant to Section 2.01) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment.  Additionally, in the event the First Lien Obligations of any Series are modified pursuant to applicable law (including, without limitation, pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the First Lien Security Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

## ARTICLE 2
### PRIORITIES AND AGREEMENTS WITH RESPECT TO SHARED COLLATERAL, RESTRICTED ASSETS AND SALE PROCEEDS

Section 2.01.  *Priority of Claims.*  (a) Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.03), each First Lien Secured Party hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

(b)      Anything contained herein or in any of the Secured Credit Documents to the contrary notwithstanding (but subject to Section 1.03), if an Event of Default has occurred and is continuing and (i) the Applicable Collateral Agent or any First Lien Secured Party is taking action to enforce rights in respect of any Shared Collateral or any Restricted Assets or Sale Proceeds (an "**Enforcement Action**") in accordance with the agreements governing the relevant Series of First Lien Obligations, (ii) any distribution (whether or not constituting Shared Collateral, Restricted Assets or Sale Proceeds or the proceeds thereof) from the Borrower, any other Grantor or any of their respective bankruptcy estates on account of or in exchange for such party's claims under any First Lien Security Document is made to the Applicable Collateral Agent or any First Lien Secured Party in connection with and as a result of any Insolvency or Liquidation Proceeding of the Borrower or any Grantor (a "**Bankruptcy Distribution**") or (iii) the Applicable Collateral Agent or any First Lien Secured Party receives any payment in respect of First Lien Obligations pursuant to any intercreditor agreement (other than this Agreement) with respect to any Shared Collateral or any Restricted Assets or Sale Proceeds (an "**Other Intercreditor Payment**"), then the proceeds of (A) any such Enforcement Action, (B) any such Bankruptcy Distribution and/or (C) any such Other Intercreditor Payment (subject, in the case of each of clauses (A), (B) and (C), to the sentence immediately following) (all proceeds described in the preceding clauses (A), (B) and (C), and all proceeds thereof being collectively referred to as "**Proceeds**"), shall be applied:

(i)      FIRST, to the payment of all reasonable costs and expenses, on a ratable basis, incurred by each Collateral Agent (in its capacity as such) in connection with such

collection or sale or otherwise in connection with this Agreement, any other Secured Credit Document or any of the First Lien Obligations, including all court costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Secured Credit Document,

(ii)     SECOND, subject to Section 1.03, to the extent Proceeds remain after the application pursuant to the preceding clause (i), to the payment in full of the First Lien Obligations of each Series on a ratable basis; *provided* that following the commencement of any Insolvency or Liquidation Proceeding of the Borrower or any Grantor, solely as among the holders of First Lien Obligations and solely for purposes of this clause SECOND and not any Secured Credit Documents, in the event the value of the Shared Collateral is not sufficient for the entire amount of Post-Petition Interest on the First Lien Obligations to be allowed under Sections 506(a) and (b) of the Bankruptcy Code or any other applicable provision of the Bankruptcy Code or other Bankruptcy Law in such Insolvency or Liquidation Proceeding, the amount of First Lien Obligations of each Series of First Lien Obligations shall include only the maximum amount of Post-Petition Interest on the First Lien Obligations allowable under Sections 506(a) and (b) of the Bankruptcy Code or any other applicable provision of the Bankruptcy Code or other Bankruptcy Law in such Insolvency or Liquidation Proceeding, and

(iii)     THIRD, any balance of such Proceeds remaining after the application pursuant to the preceding clauses (i) and (ii), to the Borrower and the other Grantors or their successors or assigns, as their interests may appear, or to whosoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct.

If, despite the provisions of this Section 2.01(b), any First Lien Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this Section 2.01(b), such First Lien Secured Party shall hold such payment or recovery in trust for the benefit of all First Lien Secured Parties for distribution in accordance with this Section 2.01(b).

Notwithstanding the foregoing, with respect to any Shared Collateral for which a third party (other than a First Lien Secured Party) has a lien or security interest that is junior in priority to the security interest of any Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of First Lien Obligations (such third party an "**Intervening Creditor**"), the value of any Shared Collateral or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(c)     It is acknowledged that the First Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priorities set forth in Section 2.01 or the provisions of this Agreement defining the relative rights of the First Lien Secured Parties of any Series.

Exhibit K-12

(d)    Notwithstanding anything in this Agreement or any other First Lien Security Documents to the contrary, Collateral consisting of Cash Collateral (as defined in the Credit Agreement (or any equivalent successor provision)) pledged to secure Credit Agreement Secured Obligations consisting of L/C Obligations (as defined in the Credit Agreement (or any equivalent successor provision)), or otherwise held in an account consisting solely of Cash Collateral pursuant to Section 2.03(f) of the Credit Agreement (or any equivalent successor provision) or otherwise, shall in each case be applied as specified in such Section of the Credit Agreement and will not constitute Shared Collateral.

(e)    For the avoidance of doubt, any amounts to be distributed pursuant to this <u>Section 2.01</u> shall be distributed by the applicable Collateral Agent to the following agents for further distribution to its related First Lien Secured Parties: (i) in the case of any amount representing payment with respect to any Credit Agreement Secured Obligation, to the Credit Agreement Collateral Agent, (ii) in the case of any amount representing payment with respect to the Initial Additional First Lien Obligations, to the Initial Additional Collateral Agent, and (iii) in the case of any amount representing payment with respect to any Additional First Lien Obligation, to the applicable Additional First Lien Collateral Agent for the corresponding Additional First Lien Documents, in each case for application in accordance with the applicable Secured Credit Documents.

Section 2.02.    *Actions with Respect to Shared Collateral, Restricted Assets or Sale Proceeds; Prohibition on Contesting Liens.*  (a) With respect to any Shared Collateral, Restricted Assets or Sale Proceeds, (i) only the Applicable Collateral Agent shall act or refrain from acting with respect to the Shared Collateral, Restricted Assets or Sale Proceeds (including with respect to any intercreditor agreement with respect to any Shared Collateral, Restricted Assets or Sale Proceeds), and then only on the instructions of the Applicable Authorized Representative, (ii) the Applicable Collateral Agent shall not follow any instructions with respect to such Shared Collateral, Restricted Assets or Sale Proceeds (including with respect to any intercreditor agreement with respect to any Shared Collateral, Restricted Assets or Sale Proceeds) from any Non-Controlling Authorized Representative (or any other First Lien Secured Party other than the Applicable Authorized Representative) and (iii) no Non-Controlling Authorized Representative or other First Lien Secured Party (other than the Applicable Authorized Representative) shall, or shall instruct the Applicable Collateral Agent to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral, Restricted Assets or Sale Proceeds (including with respect to any intercreditor agreement with respect to any Shared Collateral, Restricted Assets or Sale Proceeds), whether under any First Lien Security Document, applicable law or otherwise, it being agreed that only the Applicable Collateral Agent, acting on the instructions of the Applicable Authorized Representative and in accordance with the applicable First Lien Security Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral, Restricted Assets or Sale Proceeds. Notwithstanding the equal priority of the Liens as provided for in <u>Section 2.01(a)</u>, the Applicable Collateral Agent (acting on the instructions of the Applicable Authorized Representative) may deal with the Shared Collateral, Restricted Assets or Sale Proceeds as if such Applicable Authorized Representative had a senior Lien on such Collateral. No Non-Controlling Authorized Representative or Non-

Controlling Secured Party will contest, protest or object to any foreclosure proceeding or action brought by the Applicable Collateral Agent, Applicable Authorized Representative or Controlling Secured Party or any other exercise by the Applicable Collateral Agent, Applicable Authorized Representative or Controlling Secured Party of any rights and remedies relating to the Shared Collateral, Restricted Assets or Sale Proceeds, or to cause the Applicable Collateral Agent to do so. The foregoing shall not be construed to limit the rights and priorities of any First Lien Secured Party, Collateral Agent or Authorized Representative with respect to any collateral not constituting Shared Collateral.

(b)    Each of the Authorized Representatives agrees that it will not accept any Lien on any collateral for the benefit of any Series of First Lien Obligations other than pursuant to the First Lien Security Documents (except (i) for funds deposited for the discharge or defeasance of any Additional First Lien Document and (ii) pursuant to Section 2.03(f) of the Credit Agreement (or any equivalent successor provision)), and by executing this Agreement (or a Joinder Agreement), each Authorized Representative and the Series of First Lien Secured Parties for which it is acting hereunder agree to be bound by the provisions of this Agreement and the other First Lien Security Documents applicable to it.

(c)    FOR THE AVOIDANCE OF DOUBT, EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT THE EXERCISE OF RIGHTS AND REMEDIES WITH RESPECT TO ANY PLEDGED EQUITY INTERESTS OF A GLC LICENSE HOLDER SUBSIDIARY (EACH AS DEFINED IN THE CREDIT AGREEMENT SECURITY AGREEMENT) OWNED BY A GRANTOR SHALL REMAIN LIMITED BY, AND SUBJECT TO, THE REQUIREMENTS OF ANY AND ALL APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, THE RULES AND REGULATIONS OF THE GEORGIA LOTTERY CORPORATION).

Section 2.03. *No Interference; Payment Over.* (a) Each of the First Lien Secured Parties agrees that (i) it will not (and hereby waives any right to) challenge, question or contest, or support any other Person in challenging, questioning or contesting, in any proceeding (including any Insolvency or Liquidation Proceeding) (x) the perfection, priority, validity, attachment or enforceability of any Lien held by or on behalf of any of the First Lien Secured Parties in all or any part of the Shared Collateral, (y) the validity or enforceability of any First Lien Obligations of any Series or any First Lien Security Document or (z) the validity or enforceability of the priorities, rights or duties established by, or any other provision of, this Agreement; (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Shared Collateral by any Collateral Agent, (iii) except as provided in Section 2.02, it shall have no right to (A) direct any Collateral Agent or any other First Lien Secured Party to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any intercreditor agreement) or (B) consent to the exercise by any Collateral Agent or any other First Lien Secured Party of any right, remedy or power with respect to any Shared Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against any Collateral Agent or any other First Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and no Collateral Agent, nor any Applicable Authorized

Exhibit K-14

Representative or any other First Lien Secured Party shall be liable for any action taken or omitted to be taken by such Collateral Agent, such Applicable Authorized Representative or other First Lien Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement, (v) it will not seek, and hereby waives any right, to have any Shared Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; *provided* that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent, any Authorized Representative or any other First Lien Secured Party to enforce this Agreement.

(a)    Each First Lien Secured Party hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral or shall realize any proceeds or any other payment as contemplated by Section 2.01(b)(ii) hereof, pursuant to or on account of any First Lien Security Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement or in contravention of this Agreement), at any time prior to the Discharge of each Series of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Secured Parties and promptly transfer such Shared Collateral, proceeds or payment, as the case may be, to the Applicable Collateral Agent, to be distributed in accordance with the provisions of <u>Section 2.01</u> hereof.

Section 2.04.   *Automatic Release of Liens.*   (a) If, at any time the Applicable Collateral Agent, acting in accordance with this Agreement and the applicable Secured Credit Documents, forecloses upon or otherwise exercises remedies against any Shared Collateral resulting in a sale, transfer or disposition thereof, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of each Collateral Agent for the benefit of each Series of First Lien Secured Parties upon such Shared Collateral will automatically be released and discharged upon final conclusion of any sale, transfer or disposition as and when, but only to the extent, such Liens of the Applicable Collateral Agent on such Shared Collateral are released and discharged; *provided* that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to <u>Section 2.01</u> hereof.

(b)    [reserved].

(c)    Each Authorized Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Applicable Collateral Agent to evidence and confirm any release of Shared Collateral provided for in this Section.

Section 2.05.   *Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.* (a) This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against the Borrower or any of its Subsidiaries.

Exhibit K-15

(b)    If the Borrower and/or any other Grantor shall become subject to a case (a "**Bankruptcy Case**") under the Bankruptcy Code or any other applicable Bankruptcy Law and shall, as debtor(s)-in possession, move for approval of financing ("**DIP Financing**") to be provided by one or more lenders (the "**DIP Lenders**") under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law or the use of cash collateral under Section 363 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, each First Lien Secured Party agrees that it will raise no objection to any such financing or to the Liens on the Shared Collateral securing the same ("**DIP Financing Liens**") or to any use of cash collateral that constitutes Shared Collateral, unless the Applicable Authorized Representative, shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein, in each case so long as (A) the First Lien Secured Parties of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-a-vis all the other First Lien Secured Parties (other than any Liens of the First Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any First Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-a-vis the First Lien Secured Parties as set forth in this Agreement (other than any Liens of the First Lien Secured Parties constituting DIP Financing Liens), (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.01 of this Agreement, and (D) if any First Lien Secured Parties are granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.01 of this Agreement); *provided* that the First Lien Secured Parties of each Series shall have a right to object to (x) the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Secured Parties of such Series or its Authorized Representative that shall not constitute Shared Collateral and (y) any aspect of a DIP Financing relating to any provision or content of a plan of reorganization or any similar dispositive restructuring plan other than to the extent such provision or content provides for payment of the DIP Financing in full; and *provided, further*, that the First Lien Secured Parties receiving adequate protection shall not object to any other First Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such First Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

(c)    If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a Plan of Reorganization or similar dispositive restructuring plan, then, to the extent the debt obligations distributed on account of the First Lien Obligations are secured by Liens upon the same

property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

Section 2.06. *Reinstatement.*  In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement or avoidance of a preference or fraudulent transfer under Title 11 of the United Stated Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article 2 shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash.

Section 2.07. *Insurance.*  As between the First Lien Secured Parties, the Applicable Collateral Agent, acting at the direction of the Applicable Authorized Representative, shall have the right to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral.

Section 2.08. *Refinancings.*  The First Lien Obligations of any Series may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the refinancing transaction under any Secured Credit Document) of any First Lien Secured Party of any other Series, all without affecting the priorities provided for herein or the other provisions hereof; *provided* that the Authorized Representative and the Collateral Agent acting on behalf of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness.

Section 2.09. *Collateral Agent as Gratuitous Bailee for Perfection.* (a) The Applicable Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral that is in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First Lien Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.  Pending delivery to the Applicable Collateral Agent, each other Authorized Representative agrees to hold any Shared Collateral constituting Possessory Collateral, from time to time in its possession, as gratuitous bailee for the benefit of each other First Lien Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.

(b)    The duties or responsibilities of the Applicable Collateral Agent and each other Authorized Representative under this Section 2.09 shall be limited solely to holding any Shared Collateral constituting Possessory Collateral as gratuitous bailee for the benefit of each other First Lien Secured Party for purposes of perfecting the Lien held by such First Lien Secured Parties therein.

Section 2.10. *Transfer of Pledged Collateral and Control.*  Prior to the Discharge of Credit Agreement Secured Obligations, any collateral access agreement, any issuer control agreement or

any deposit account, security account or other control agreement, as required by the terms of any First Lien Security Document, shall be in favor of the Credit Agreement Collateral Agent.  The Credit Agreement Collateral Agent hereby agrees that upon the Discharge of Credit Agreement Secured Obligations, to the extent permitted by applicable law, upon the written request of the Major Non-Controlling Authorized Representative (with all costs and expenses in connection therewith to be for the account of the Major Non-Controlling Authorized Representative and to be paid by the Grantors in accordance with the terms of the applicable Secured Credit Documents):

(a)     the Credit Agreement Collateral Agent shall, without recourse or warranty, take commercially reasonable steps to transfer the possession and control of any Possessory Collateral then in its possession or control, to the Applicable Collateral Agent, except in the event and to the extent (i) such Collateral is sold, liquidated, or otherwise disposed of by any of the Credit Agreement Secured Parties or by a Grantor as provided herein in full or partial satisfaction of any of the Credit Agreement Secured Obligations or (ii) it is otherwise required by any order of any court or other governmental authority or applicable law; and

(b)     in connection with the terms of any deposit account, security account or other control agreement, collateral access agreement or issuer control agreement, the Credit Agreement Collateral Agent shall notify the other parties thereto that its rights thereunder have been assigned to the Applicable Collateral Agent (to the extent such assignment is not prohibited by the terms of such agreement) and shall confirm to such parties that the Applicable Collateral Agent is thereafter the "Agent" or "Secured Party" (or other comparable term) as such term is used in any such agreement and is otherwise entitled to the rights of the secured party under such agreement.

## ARTICLE 3
### EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

Section 3.01.    *Determinations with Respect to Amounts of Liens and Obligations.* Whenever the Applicable Collateral Agent or any Authorized Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of any Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of any Series, it may request that such information be furnished to it in writing by each other Authorized Representative or Collateral Agent and shall be entitled to make such determination on the basis of the information so furnished; *provided, however*, that if an Authorized Representative or a Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Applicable Collateral Agent or Authorized Representative shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon an officer's certificate of the Borrower.  The Applicable Collateral Agent and each Authorized Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Secured Party or any other person as a result of such determination.

## ARTICLE 4
THE APPLICABLE AUTHORIZED REPRESENTATIVE AND THE APPLICABLE COLLATERAL AGENT

Section 4.01.  *Appointment and Authority.*

(a)     Each of the First Lien Secured Parties hereby irrevocably appoints the Applicable Authorized Representative and the Applicable Collateral Agent to act on its behalf hereunder and authorizes each of them to take such actions on its behalf and to exercise such powers as are delegated to them by the terms hereof or of the applicable Secured Credit Documents, including for purposes of enforcing any and all Liens on Shared Collateral granted by any Grantor to secure any of the First Lien Obligations, together with such powers and discretion as are reasonably incidental thereto.

(b)     Each Non-Controlling Secured Party acknowledges and agrees that the Applicable Authorized Representative and the Applicable Collateral Agent shall be entitled, for the benefit of the First Lien Secured Parties, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Security Documents, without regard to any rights to which the Non-Controlling Secured Parties would otherwise be entitled as a result of the First Lien Obligations held by them.  Without limiting the foregoing, each Non-Controlling Secured Party agrees that none of the Applicable Collateral Agent, the Applicable Authorized Representative or any other First Lien Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation. Each of the First Lien Secured Parties waives any claim it may now or hereafter have against the Applicable Collateral Agent or the Authorized Representative of any other Series of First Lien Obligations or any other First Lien Secured Party of any other Series arising out of (i) any actions which the Applicable Collateral Agent, any Authorized Representative or any First Lien Secured Party takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with this Agreement or the First Lien Security Documents or any other agreement related thereto or to the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations, (ii) any election by any Authorized Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.05, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law by, the Borrower or any of its Subsidiaries, as debtor-in-possession.  Notwithstanding any other provision of this Agreement, no Collateral Agent or Authorized Representative shall (i) accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the Uniform Commercial Code of any jurisdiction, without the consent of each Authorized Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral

or (ii) "credit bid" for or purchase (other than for cash) Shared Collateral at any public, private or judicial foreclosure upon such Shared Collateral, without the consent of each Authorized Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral.

(c)    Each Authorized Representative and each Collateral Agent acknowledges and agrees that upon execution and delivery of a Joinder Agreement substantially in the form of <u>Annex II</u> by an additional Senior Class Debt Representative, the relevant Additional First Lien Collateral Agent, the Applicable Collateral Agent and each Grantor in accordance with <u>Section 5.13</u>, the Applicable Collateral Agent will continue to act in its capacity as Applicable Collateral Agent in respect of the then existing Authorized Representatives and such additional Authorized Representative.

(d)    Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on the Applicable Collateral Agent or the Applicable Authorized Representative to any Non-Controlling Secured Party or give any Non-Controlling Secured Party the right to direct the Applicable Collateral Agent or the Applicable Authorized Representative, except that the Applicable Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with <u>Section 2.01</u> hereof.

Section 4.02.  *Rights as a First Lien Secured Party.*  The Person serving as the Applicable Collateral Agent hereunder shall have the same rights and powers in its capacity as a First Lien Secured Party under any Series of First Lien Obligations that it holds as any other First Lien Secured Party of such Series and may exercise the same as though it were not the Applicable Collateral Agent, and the term "First Lien Secured Party" or "First Lien Secured Parties" or (as applicable) "Credit Agreement Secured Party", "Credit Agreement Secured Parties", "Additional First Lien Secured Party" or "Additional First Lien Secured Parties" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Applicable Collateral Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Applicable Collateral Agent hereunder and without any duty to account therefor to any other First Lien Secured Party.

Section 4.03.    *Exculpatory Provisions.*    The Applicable Collateral Agent and the Applicable Authorized Representative shall not have any duties or obligations except those expressly set forth herein and in the applicable First Lien Security Documents.  Without limiting the generality of the foregoing, the Applicable Collateral Agent and the Applicable Authorized Representative:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether an "Event of Default" has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the applicable First Lien Security Documents that the Applicable Collateral Agent is required to exercise as directed in writing by the Applicable Authorized

Representative; *provided* that such Person shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose such Person to liability, or that is contrary to this Agreement, any applicable First Lien Security Document or applicable law;

(c)    shall not, except as expressly set forth herein and in the applicable First Lien Security Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by such Person or any of its Affiliates in any capacity;

(d)    shall not be liable for any action taken or not taken by it (i) in the case of the Applicable Collateral Agent, with the consent or at the request of the Applicable Authorized Representative or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and nonappealable judgment or (iii) in reliance on a certificate of a Responsible Officer of the Borrower stating that such action is permitted by the terms of this Agreement. The Applicable Collateral Agent and the Applicable Authorized Representative shall be deemed not to have knowledge of any Event of Default under any Series of First Lien Obligations unless and until written notice describing such Event of Default is received by such Person from the Borrower; and

(e)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other First Lien Security Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other First Lien Security Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the First Lien Security Documents, (v) the value or the sufficiency of any Collateral for any Series of First Lien Obligations, or (vi) the satisfaction of any condition set forth in any Secured Credit Document, other than to confirm receipt of items expressly required to be delivered to such Collateral Agent or Authorized Representative.

Section 4.04.  *Reliance.*  Each of the Applicable Collateral Agent and the Applicable Authorized Representative shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Each of the Applicable Collateral Agent and the Applicable Authorized Representative also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  Each of the Applicable Collateral Agent and the Applicable Authorized Representative may consult with legal counsel (who may be counsel for the Borrower or any of its Subsidiaries), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Exhibit K-21

Section 4.05.  *Delegation of Duties.*  Each of the Applicable Collateral Agent and the Applicable Authorized Representative may perform any and all of its duties and exercise its rights and powers hereunder or under any applicable First Lien Security Document by or through one or more sub-agents appointed by such Person.  Each of the Applicable Collateral Agent and the Applicable Authorized Representative and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties (as defined in the Credit Agreement).  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Applicable Collateral Agent and the Applicable Authorized Representative and any such sub-agent.

Section 4.06.  *Non-Reliance on Applicable Collateral Agent, Applicable Authorized Representative and Other First Lien Secured Parties.*  Each First Lien Secured Party acknowledges that it has, independently and without reliance upon the Applicable Collateral Agent, the Applicable Authorized Representative or any other Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the applicable Secured Credit Documents.  Each First Lien Secured Party also acknowledges that it will, independently and without reliance upon the Applicable Collateral Agent, the Applicable Authorized Representative or any other Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any applicable Secured Credit Document or any related agreement or any document furnished hereunder or thereunder.

# ARTICLE 5
## MISCELLANEOUS

Section 5.01.  *Notices.*  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)       if to the Credit Agreement Collateral Agent, to it at:

Macquarie Capital Funding LLC
c/o Cortland Capital Market Services
225 W. Washington St, 9th floor
Chicago, Illinois 60606
Attention: Agency Services – Macquarie
Telephone: 855-657-6589
Facsimile: 312-376-0751
Electronic Mail: MacCap@alterdomus.com

Copy to:

Macquarie Capital Funding LLC
125 West 55th Street

Exhibit K-22

New York, NY 10019
Attention: Macquarie Capital Debt Capital Markets Middle Office
Telephone: (212) 231-0466 / (212) 231-0494
Facsimile: (212) 231-6518
Electronic Mail: MacCap.DCMAdmin@macquarie.com

(b)      if to the Authorized Representative for the Credit Agreement Secured Parties, to it at:

Macquarie Capital Funding LLC
c/o Cortland Capital Market Services
225 W. Washington St, 9th floor
Chicago, Illinois 60606
Attention: Agency Services – Macquarie
Telephone: 855-657-6589
Facsimile: 312-376-0751
Electronic Mail: MacCap@alterdomus.com

Copy to:

Macquarie Capital Funding LLC
125 West 55th Street
New York, NY 10019
Attention: Macquarie Capital Debt Capital Markets Middle Office
Telephone: (212) 231-0466 / (212) 231-0494
Facsimile: (212) 231-6518
Electronic Mail: MacCap.DCMAdmin@macquarie.com

(c)      if to the Initial Additional Authorized Representative, to it at

[    ][1]

(d)      if to the Initial Additional Collateral Agent to it at

[    ][2]

(e)      if to any other additional Authorized Representative, to it at the address set forth in the applicable Joinder Agreement.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any

---

[1] To be updated.

[2] To be updated.

Exhibit K-23

party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by telecopy or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this <u>Section 5.01</u> or in accordance with the latest unrevoked direction from such party given in accordance with this <u>Section 5.01</u>.  As agreed to in writing among the Applicable Collateral Agent and each Authorized Representative from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

Section 5.02. *Waivers; Amendment; Joinder Agreements.*  (a) No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement) except pursuant to an agreement or agreements in writing entered into by each Authorized Representative and each Collateral Agent (and with respect to any such termination, waiver, amendment or modification which by the terms of this Agreement requires the Borrower's consent or which increases the obligations or reduces the rights of the Borrower or any other Grantor, with the consent of the Borrower).

(c)    Notwithstanding the foregoing, without the consent of any First Lien Secured Party, any Authorized Representative and Collateral Agent may become a party hereto by execution and delivery of a Joinder Agreement in accordance with <u>Section 5.13</u> of this Agreement and upon such execution and delivery, such Authorized Representative and Collateral Agent and the Additional First Lien Secured Parties and Additional First Lien Obligations of the Series for which each such Authorized Representative and Collateral Agent is acting shall be subject to the terms hereof and the terms of the other First Lien Security Documents applicable thereto.

(d)    Notwithstanding the foregoing, without the consent of any other Authorized Representative or First Lien Secured Party, the Applicable Collateral Agent may, at the expense of the Grantors, effect amendments and modifications to this Agreement to the extent necessary to reflect the incurrence of any Additional First Lien Obligations in compliance with the Credit Agreement and each Additional First Lien Document.

Section 5.03. *Parties in Interest.*  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, as well as the

other First Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

Section 5.04. *Survival of Agreement.* All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

Section 5.05. *Counterparts.* This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement. Each Collateral Agent may also require that any such documents and signatures delivered by telecopier or other electronic transmission be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or other electronic transmission. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 5.06. *Severability.* Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 5.07. *Governing Law; Jurisdiction.* This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

Section 5.08. *Submission to Jurisdiction Waivers; Consent to Service of Process.* Each Collateral Agent and each Authorized Representative, on behalf of itself and the First Lien Secured Parties of the Series for whom it is acting, irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding arising out of or relating to this Agreement and the First Lien Security Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York, the United States District Court for the Southern District of New York, and appellate courts from any thereof;

Exhibit K-25

(b)     consents that any such action or proceeding may be brought in such courts and waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient forum and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Authorized Representative) at the address referred to in <u>Section 5.01</u>;

(d)     agrees that nothing herein shall affect the right of any other party hereto (or any First Lien Secured Party) to effect service of process in any other manner permitted by law or shall limit the right of any party hereto (or any First Lien Secured Party) to sue in any other jurisdiction; and

(e)     waives, to the maximum extent permitted by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 5.08</u> any indirect, consequential or punitive damages (as opposed to direct or actual damages).

Section 5.09.     *Waiver of Jury Trial.*     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

Section 5.10.     *Headings.*     Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 5.11.     *Conflicts.*     In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any of the other First Lien Security Documents or Additional First Lien Documents the provisions of this Agreement shall control.

Section 5.12.     *Provisions Solely to Define Relative Rights.*     The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties in relation to one another.  None of the Borrower, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (*provided* that nothing in this Agreement (other than <u>Sections 2.04</u>, <u>2.05</u>, <u>2.08</u>, <u>2.09</u> or <u>Article 5</u>) is intended to or will amend, waive or otherwise modify the provisions of the Credit Agreement or any Additional First Lien Documents), and none of the Borrower or any other Grantor may rely on the terms hereof (other than <u>Sections 2.04</u>, <u>2.05</u>, <u>2.08</u>, <u>2.09</u> or <u>Article 5</u>). Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.

Section 5.13.     *Additional Senior Debt.*     To the extent, but only to the extent permitted by the provisions of the Credit Agreement and the Additional First Lien Documents, the Borrower or

any Grantor may incur Additional First Lien Obligations.  Any such additional class or series of Additional First Lien Obligations (the "**Senior Class Debt**") may be secured by a Lien and may be guaranteed by the Grantors on a senior basis, in each case under and pursuant to the Additional First Lien Documents, if and subject to the condition that the Authorized Representative of any such Senior Class Debt (each, a "**Senior Class Debt Representative**") acting on behalf of the holders of such Senior Class Debt and the Additional First Lien Collateral Agent of any such Senior Class Debt acting on behalf of the holders of such Senior Class Debt (such Additional First Lien Collateral Agent together with the Senior Class Debt Representative and the holders in respect of any such Senior Class Debt being referred to as the "**Senior Class Debt Parties**"), become parties to this Agreement by satisfying the conditions set forth in clauses (i) through (iv) of the immediately succeeding paragraph.

In order for a Senior Class Debt Representative and Additional First Lien Collateral Agent to become a party to this Agreement,

(i)     such Senior Class Debt Representative, such Additional First Lien Collateral Agent and each Grantor shall have executed and delivered a Joinder Agreement substantially in the form of Annex II (with such changes as may be reasonably approved by the Applicable Collateral Agent and such Senior Class Debt Representative) pursuant to which such Senior Class Debt Representative becomes an Authorized Representative and such Additional First Lien Collateral Agent becomes a Collateral Agent hereunder, and the Senior Class Debt in respect of which each such Senior Class Debt Representative is the Authorized Representative and such Additional First Lien Collateral Agent is the Collateral Agent and the related Senior Class Debt Parties become subject hereto and bound hereby; it being understood that the executed Joinder Agreement shall be promptly delivered to the Applicable Collateral Agent and the Applicable Collateral Agent shall acknowledge such instrument;

(ii)     the Borrower shall have delivered to the Applicable Collateral Agent true and complete copies of each of the Additional First Lien Documents relating to such Senior Class Debt, certified as being true, correct and complete by a Responsible Officer of the Borrower;

(iii) all filings, recordations and/or amendments or supplements to the First Lien Security Documents necessary or desirable in the reasonable judgment of the Applicable Collateral Agent to confirm and perfect the Liens securing the relevant obligations relating to such Senior Class Debt shall have been made, executed and/or delivered (or, with respect to any such filings or recordations, acceptable provisions to perform such filings or recordings have been taken in the reasonable judgment of the Applicable Collateral Agent), and all fees and taxes in connection therewith shall have been paid (or acceptable provisions to make such payments have been taken in the reasonable judgment of the Applicable Collateral Agent); and

(iv)     the Additional First Lien Documents, as applicable, relating to such Senior Class Debt shall provide, in a manner reasonably satisfactory to the Applicable Collateral Agent, that each Senior Class Debt Party with respect to such Senior Class Debt will be

subject to and bound by the provisions of this Agreement in its capacity as a Senior Class Debt Party of such Senior Class Debt.

Section 5.14.  *Integration.*  This Agreement together with the other Secured Credit Documents and the First Lien Security Documents represents the agreement of each of the Grantors and the First Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, any Collateral Agent, or any other First Lien Secured Party relative to the subject matter hereof not set forth or referred to herein or in the other Secured Credit Documents or the First Lien Security Documents.

Section 5.15.  *Further Assurances.*  Each Grantor will do or cause to be done all acts and things that are required, or that the Applicable Collateral Agent may reasonably request, to assure and confirm that the Applicable Collateral Agent holds, for the benefit of the First Lien Secured Parties, duly created and enforceable and perfected Liens on the Shared Collateral, in each case as contemplated by (and to the extent required by) the Secured Credit Documents.

Section 5.16.  *Authorized Representatives and Collateral Agents.*

(a)    Each of the Authorized Representative under the Credit Agreement, the Initial Additional Authorized Representative and the Initial Additional Collateral Agent is executing and delivering this Agreement solely in its capacity as such and pursuant to directions set forth in the Credit Agreement or the Initial Additional First Lien Credit Agreement, as applicable; and in so doing, neither the Authorized Representative under the Credit Agreement nor the Initial Additional Authorized Representative nor the Initial Additional Collateral Agent shall be responsible for the terms or sufficiency of this Agreement for any purpose. Each of the Authorized Representative under the Credit Agreement, the Initial Additional Authorized Representative and the Initial Additional Collateral Agent shall not have duties or obligations under or pursuant to this Agreement other than such duties expressly set forth in this Agreement as duties on its part to be performed or observed.  In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, each of the Authorized Representative under the Credit Agreement, the Initial Additional Authorized Representative and the Initial Additional Collateral Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the Credit Agreement or the Initial Additional First Lien Credit Agreement, as applicable.

(b)    For purposes of determining whether the conditions precedent under this Agreement have been satisfied, and prior to executing and delivering any amendment or document of any kind, taking any action or releasing any Shared Collateral as required by the terms of this Agreement, including pursuant to Sections 2.04(a) and (c) hereof, the Initial Additional Authorized Representative and the Initial Additional Collateral Agent shall be entitled to receive and conclusively rely upon an ["Opinion of Counsel"] and ["Officer's Certificate"] (as such terms are defined in the Initial Additional First Lien Credit Agreement) to the effect that any such document, action or release is authorized or not expressly prohibited hereunder and under the Initial Additional First Lien Credit Agreement, the Initial Additional First Lien Security Agreement, the other Initial Additional First Lien Documents and the other applicable First Lien Security Documents.  The Initial Additional Authorized Representative and the Initial Additional Collateral

Agent shall not at any time be deemed or imputed to have any knowledge of or receipt of any notices, information, correspondence or materials in the possession of or given to any other Authorized Representative or Collateral Agent acting under any other Series of First Lien Obligations.

Section 5.17. *Acknowledgement of this Agreement as a Subordination Agreement.* This Agreement shall be applicable both before and after the commencement of any Insolvency or Liquidation Proceeding and all converted or succeeding cases in respect thereof. Each of the parties hereto acknowledges and agrees that the provisions of this Agreement are intended to be and shall be enforceable as a "subordination agreement" under Section 510(a) of the Bankruptcy Code.

*[Remainder of this page intentionally left blank]*

Exhibit K-29

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**MACQUARIE CAPITAL FUNDING LLC,**
as Credit Agreement Collateral Agent,

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

**MACQUARIE CAPITAL FUNDING LLC,**
as Administrative Agent and as Authorized Representative for the Credit Agreement Secured Parties,

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

[Signature Page to Pari Passu Intercreditor Agreement]

[    ],
solely in its capacity as Initial
Additional Authorized Representative
and Initial Additional Collateral Agent


By: _____
    Name:
    Title:

[Signature Page to Pari Passu Intercreditor Agreement]

**Acknowledged and agreed to by:**

**LUCKY BUCKS, LLC**

By: _____
      Name:
      Title:

**LUCKY BUCKS HOLDCO, LLC**

By: _____
      Name:
      Title:

**[OTHER GRANTORS]**

By: _____
      Name:
      Title:

**ANNEX I**

**Grantors[3]**

1.  LUCKY BUCKS, LLC
2.  LUCKY BUCKS HOLDCO, LLC
3.  [OTHER GRANTORS]

---

[3] NTD – To be further updated.

## ANNEX II

[FORM OF] REPRESENTATIVE SUPPLEMENT NO. [ ] dated as of [____], 20[__] ("**Representative Supplement**") to the PARI PASSU INTERCREDITOR AGREEMENT dated as of [_____], 20[__] (the "**Pari Passu Intercreditor Agreement**"), among LUCKY BUCKS, LLC, a Georgia limited liability company (the "**Borrower**"), the other Grantors party thereto (each a "**Grantor**"), MACQUARIE CAPITAL FUNDING LLC, as Credit Agreement Collateral Agent and as Administrative Agent and Authorized Representative for the Credit Agreement Secured Parties, and [    ], solely in its capacity as Initial Additional Collateral Agent and as Initial Additional Authorized Representative, and the additional Authorized Representatives and Collateral Agents from time to time a party thereto.

A.    Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Pari Passu Intercreditor Agreement.

B.    As a condition to the ability of the Borrower or any Grantor to incur Additional First Lien Obligations and to secure such Senior Class Debt with the Senior Lien, in each case under and pursuant to the First Lien Security Documents, the Senior Class Debt Representative in respect of such Senior Class Debt is required to become an Authorized Representative under, the Additional First Lien Collateral Agent on behalf of the holders of such Senior Class Debt is required to become a Collateral Agent under and such Senior Class Debt and the Senior Class Debt Parties in respect thereof are required to become subject to and bound by, the Pari Passu Intercreditor Agreement.  Section 5.13 of the Pari Passu Intercreditor Agreement provides that such Senior Class Debt Representative may become an Authorized Representative under, such Additional First Lien Collateral Agent may become a Collateral Agent under and such Senior Class Debt and such Senior Class Debt Parties may become subject to and bound by, the Pari Passu Intercreditor Agreement, pursuant to the execution and delivery by the Senior Class Debt Representative and the Additional First Lien Collateral Agent of an instrument in the form of this Representative Supplement and the satisfaction of the other conditions set forth in Section 5.13 of the Pari Passu  Intercreditor Agreement. The undersigned Senior Class Debt Representative (the "**New Representative**") and the undersigned Additional First Lien Collateral Agent (the "**New Collateral Agent**") are executing this Representative Supplement in accordance with the requirements of the Pari Passu Intercreditor Agreement.

Accordingly, the New Representative and the New Collateral Agent agree as follows:

SECTION 1.   In accordance with Section 5.13 of the Pari Passu Intercreditor Agreement, the New Representative by its signature below becomes an Authorized Representative under, the New Collateral Agent on behalf of the Senior Class Debt Parties of such Senior Class Debt by its signature below becomes a Collateral Agent under and the related Senior Class Debt and Senior Class Debt Parties become subject to and bound by, the Pari Passu Intercreditor Agreement with the same force and effect as if the New Representative had originally been named therein as an Authorized Representative and the New Collateral Agent had originally been named therein as a Collateral Agent, and the New Representative and the New Collateral Agent, on behalf of themselves and such Senior Class Debt Parties, hereby agree to all the terms and provisions of the Pari Passu  Intercreditor Agreement applicable to them as an Authorized Representative or Collateral Agent, as applicable, and to the Senior Class Debt Parties that they represent as

34

Additional First Lien Secured Parties.  Each reference to an "**Authorized Representative**" in the Pari Passu Intercreditor Agreement shall be deemed to include the New Representative and each reference to a "**Collateral Agent**" in the Pari Passu Intercreditor Agreement shall be deemed to include the New Collateral Agent.  The Pari Passu Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.  Each of the New Representative and the New Collateral Agent represents and warrants to the Borrower and the other Grantors, each Authorized Representative, each Collateral Agent and the other First Lien Secured Parties that (i) it has full power and authority to enter into this Representative Supplement, in its capacity as [agent] [trustee], (ii) this Representative Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms hereof and (iii) the Additional First Lien Documents relating to such Senior Class Debt provide that, upon its entry into this Representative Supplement, the Senior Class Debt Parties in respect of such Senior Class Debt will be subject to and bound by the provisions of the Pari Passu Intercreditor Agreement as Additional First Lien Secured Parties.

SECTION 4.  This Representative Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Representative Supplement shall become effective when the Applicable Collateral Agent shall have received a counterpart of this Representative Supplement that bears the signature of each of the New Representative and the New Collateral Agent.  Delivery of an executed signature page to this Representative Supplement by facsimile or electronic transmission shall be effective as delivery of a manually signed counterpart of this Representative Supplement. The Applicable Collateral Agent may also require that any such documents and signatures delivered by telecopier or other electronic transmission be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or other electronic transmission.  The words "execution," "signed," "signature," and words of like import in this Representative Supplement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 5.  Except as expressly supplemented hereby, the Pari Passu Intercreditor Agreement shall remain in full force and effect.

**SECTION 6.  THIS REPRESENTATIVE SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

SECTION 7.  In case any one or more of the provisions contained in this Representative Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained

herein and in the Pari Passu Intercreditor Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 8.   All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the Pari Passu Intercreditor Agreement.   All communications and notices hereunder to the New Representative or the New Collateral Agent shall be given to it at the address set forth below its signature hereto.

IN WITNESS WHEREOF, the New Representative and the New Collateral Agent have duly executed this Representative Supplement to the Pari Passu Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE],
as [      ] for the holders of [            ],

By:   _____
      Name:
      Title:

Address for notices:

      _____

      _____

      attention of:   _____

      Telecopy:   _____

[NAME OF NEW COLLATERAL
AGENT], as [      ] for the holders of
[            ],

By:   _____
      Name:
      Title:

Address for notices:

      _____

36

_____

attention of: _____

Telecopy: _____

Acknowledged by:

[LUCKY BUCKS, LLC,]

By: _____
     Name:
     Title:

Acknowledged by:

[_____], as Applicable
        Collateral Agent


By: _____
        Name:
        Title:

**EXHIBIT L-1**

**[FORM OF] UNITED STATES TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Not Treated As Partnerships For
U.S. Federal Income Tax Purposes)


Reference is made to that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent and each L/C Issuer and Lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (v) no payment under any Loan Document is effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or becomes obsolete or inaccurate, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made by the Borrower or the Administrative Agent to the undersigned, or in either of the two calendar years preceding each such payment.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned has duly executed this certificate on the day _____ of _____, 20__.

[NAME OF FOREIGN LENDER]

By: _____
Name:
Title:

**EXHIBIT L-2**

**[FORM OF] UNITED STATES TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Treated As Partnerships For
U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent and each L/C Issuer and Lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) neither the undersigned nor any of its direct or indirect partners/members ("Applicable Partners/Members") is a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of the Applicable Partners/Members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, (v) none of the Applicable Partners/Members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) no payment in connection with any Loan Document is effectively connected with the undersigned's or any of the Applicable Partners'/Members' conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of the Applicable Partners/Members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such Applicable Partner's/Member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or becomes obsolete or inaccurate, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding each such payment.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned has duly executed this certificate on the day _____ of _____, 20__.

[NAME OF FOREIGN LENDER]

By: _____
Name:
Title:

**EXHIBIT L-3**

**[FORM OF] UNITED STATES TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Not Treated As Partnerships For
U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent and each L/C Issuer and Lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) and Section 10.07(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (v) no payment in connection with any Loan Document is effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or becomes obsolete or inaccurate, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding each such payment.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned has duly executed this certificate on the day _____ of _____, 20__.

[NAME OF FOREIGN PARTICIPANT]

By: _____

Name:

Title:

**EXHIBIT L-4**

**[FORM OF] UNITED STATES TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Treated As Partnerships For
U.S. Federal Income Tax Purposes)

Reference is made to that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent and each L/C Issuer and Lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(f) and Section 10.07(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) neither the undersigned nor any of its direct or indirect partners/members ("Applicable Partners/Members") is a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of the Applicable Partners/Members is a ten percent shareholder of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, (v) none of the Applicable Partners/Members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) no payment in connection with any Loan Document is effectively connected with the undersigned's or any of the Applicable Partners'/Members' conduct of a U.S. trade or business.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of the Applicable Partners/Members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such Applicable Partner's/Member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or becomes obsolete or inaccurate, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding each such payment.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned has duly executed this certificate on the day _____ of _____, 20__.

[NAME OF FOREIGN PARTICIPANT]

By: _____

Name:

Title:

**[FORM OF]**

**JUNIOR LIEN INTERCREDITOR AGREEMENT**

LUCKY BUCKS, LLC,

the other Grantors party hereto,

MACQUARIE CAPITAL FUNDING LLC,
as First Lien Collateral Agent and First Lien Administrative Agent for the First Lien Secured
Parties and as First-Priority Collateral Agent,

[_____],
as Initial Other First-Priority Collateral Agent for the Initial Other First-Priority Secured Parties

and

[_____],

as Second Lien Collateral Agent and Second-Priority Collateral Agent for the Second-Priority
Secured Parties

[_____], 20[__]

## TABLE OF CONTENTS

PAGE

### ARTICLE 1

DEFINITIONS. ...................................................................................................................1

Section 1.01.  *Defined Terms* ........................................................................................1
Section 1.02.  *Terms Generally* ...................................................................................11

### ARTICLE 2

LIEN PRIORITIES. ............................................................................................................12

Section 2.01.  *Subordination of Liens* .........................................................................12
Section 2.02.  *Prohibition on Contesting Liens* ..........................................................12
Section 2.03.  *No New Liens* ........................................................................................13
Section 2.04.  *Perfection of Liens* ...............................................................................13
Section 2.05.  *Nature of Obligations* ..........................................................................13

### ARTICLE 3

ENFORCEMENT ................................................................................................................14

Section 3.01.  *Exercise of Remedies* ...........................................................................14
Section 3.02.  *Cooperation* .........................................................................................16
Section 3.03.  *Second-Priority Collateral Agent and Second-Priority Secured
Parties Waiver* ......................................................................................17
Section 3.04.  *Actions upon Breach* ............................................................................17

### ARTICLE 4

PAYMENTS .......................................................................................................................17

Section 4.01.  *Application of Proceeds* ........................................................................17
Section 4.02.  *Payments Over* .....................................................................................18

### ARTICLE 5

OTHER AGREEMENTS .......................................................................................................18

Section 5.01.  *Releases* ...............................................................................................18
Section 5.02.  *Insurance* .............................................................................................20
Section 5.03.  *Amendments to First-Priority Documents and Second-Priority
Documents* .............................................................................................20
Section 5.04.  *Rights As Unsecured Creditors* ............................................................22
Section 5.05.  *First-Priority Collateral Agent as Gratuitous Bailee/Agent for
Perfection* .............................................................................................22
Section 5.06.  *Second-Priority Collateral Agent as Gratuitous Bailee/Agent  for
Perfection* .............................................................................................24
Section 5.07.  *When Discharge of First-Priority Obligations Deemed to Not Have
Occurred* ..............................................................................................26
Section 5.08.  *No Release Upon Discharge of First-Priority Obligations* ..................26
Section 5.09.  *Purchase Option.* ..................................................................................26

i

## ARTICLE 6

INSOLVENCY OR LIQUIDATION PROCEEDINGS.................................................................27

Section 6.01.  *Financing Issues* ...................................................................................27
Section 6.02.  *Relief from the Automatic Stay* ..........................................................29
Section 6.03.  *Adequate Protection*..............................................................................29
Section 6.04.  *Preference Issues* ...................................................................................29
Section 6.05.  *Application* ..............................................................................................30
Section 6.06.  *506(c) Claims* ........................................................................................30
Section 6.07.  *Separate Grants of Security and Separate Classifications; Plans of Reorganization* ..........................................................................................30
Section 6.08.  *Section 1111(b)(2) Waiver* ..................................................................31
Section 6.09.  *Asset Sales* ..............................................................................................31
Section 6.10.  *Reorganization Securities; Voting* ....................................................31
Section 6.11.  *Post-Petition Interest* ...........................................................................32

## ARTICLE 7

RELIANCE; WAIVERS; ETC ....................................................................................................32

Section 7.01.  *Reliance*...................................................................................................32
Section 7.02.  *No Warranties or Liability* ..................................................................32
Section 7.03.  *Obligations Unconditional*.................................................................33

## ARTICLE 8

MISCELLANEOUS ...................................................................................................................33

Section 8.01.  *Conflicts* ..................................................................................................33
Section 8.02.  *Continuing Nature of this Agreement; Severability* .......................33
Section 8.03.  *Amendments; Waivers* ..........................................................................34
Section 8.04.  *Information Concerning Financial Condition of the Company and the Subsidiaries* ......................................................................................35
Section 8.05.  *Subrogation*............................................................................................35
Section 8.06.  *Application of Payments* ......................................................................36
Section 8.07.  *Consent to Jurisdiction; Waivers* ......................................................36
Section 8.08.  *Notices*.....................................................................................................36
Section 8.09.  *Further Assurances* ...............................................................................37
Section 8.10.  *Governing Law*.......................................................................................37
Section 8.11.  *Binding on Successors and Assigns* ..................................................37
Section 8.12.  *Specific Performance*............................................................................37
Section 8.13.  *Section Titles* ..........................................................................................37
Section 8.14.  *Counterparts* ..........................................................................................37
Section 8.15.  *Authorization*.........................................................................................38
Section 8.16.  *No Third Party Beneficiaries; Successors and Assigns* .................38
Section 8.17.  *Effectiveness*...........................................................................................38
Section 8.18.  *First-Priority Representatives and Second-Priority Representatives*..................38
Section 8.19.  *Relative Rights* .......................................................................................39
Section 8.20.  *Second-Priority Collateral Agent* ......................................................39
Section 8.21.  *Joinder Requirements* ...........................................................................39

Section 8.22.    *Intercreditor Agreements* ......................................................................40

<u>Exhibits</u>

Exhibit A        Form of Joinder Agreement (Other First-Priority Obligations)
Exhibit B        Form of Joinder Agreement (Other Second-Priority Obligations)

## JUNIOR LIEN INTERCREDITOR AGREEMENT

JUNIOR LIEN INTERCREDITOR AGREEMENT dated as of [_____], 20[__], among MACQUARIE CAPITAL FUNDING LLC ("**MACQUARIE**"), as First Lien Collateral Agent, First Lien Administrative Agent and First-Priority Collateral Agent, [    ], as Initial Other First-Priority Collateral Agent, and [_____], as Second Lien Collateral Agent and Second-Priority Collateral Agent.

A.    Lucky Bucks, LLC, a Georgia limited liability company (the "**Borrower**" or the "**Company**"), the lenders and L/C issuers from time to time party thereto, and Macquarie, as administrative agent and collateral agent, are party to that certain Credit Agreement dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or modified from time to time in accordance with the terms of this Agreement, the "**Initial First Lien Credit Agreement**"). The Obligations of the Borrower under the Initial First Lien Credit Agreement and the other First Lien Documents constitute First Lien Obligations hereunder.

B.    [The Borrower, the guarantors identified therein, and [    ], as [collateral agent], are parties to that certain [Credit Agreement], dated as of [_____] (as amended, restated, amended and restated, supplemented or otherwise modified, Refinanced or replaced from time to time), (the "**Initial Other First Lien [Indenture][Credit Agreement]**").]

C.    The Borrower and [other parties] are parties to [insert description of initial second lien financing agreement] (as amended, restated, amended and restated, supplemented or otherwise modified, Refinanced or replaced from time to time), (the "**Initial Second Lien [Indenture][Credit Agreement]**"). The Obligations of the Borrower under the Initial Second Lien [Indenture][Credit Agreement] and the other Second Lien Documents constitute Second Lien Obligations hereunder.

Accordingly, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

ARTICLE 1
DEFINITIONS.

Section 1.01.  *Defined Terms*.  As used in this Agreement, the following terms have the meanings specified below:

"**Agreement**" shall mean this Junior Lien Intercreditor Agreement, as amended, restated, amended and restated, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended.

"**Bankruptcy Law**" shall mean the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"**Borrower**" shall have the meaning set forth in the recitals.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a day that is a legal holiday under the laws of the State of New York or on which banking institutions in the State of New York are required or authorized by law or other governmental action to close.

"**Common Collateral**" shall mean all of the assets of any Grantor, whether real, personal or mixed, constituting both First-Priority Collateral and Second-Priority Collateral.

"**Company**" shall have the meaning set forth in the recitals.

"**Comparable Second-Priority Collateral Document**" shall mean, in relation to any Common Collateral subject to any Lien created under any First-Priority Collateral Document, those Second-Priority Collateral Documents that create a Lien on the same Common Collateral, granted by the same Grantor.

"**Deposit Account**" shall have the meaning set forth in the Uniform Commercial Code.

"**Deposit Account Collateral**" shall mean that part of the Common Collateral (if any) comprised of or contained in Deposit Accounts or Securities Accounts.

"**DIP Financing**" shall have the meaning set forth in Section 6.01(a).

"**Discharge**" shall mean, with respect to any Common Collateral and any Series (or, if applicable, all then-outstanding Series) of First-Priority Obligations or of Second-Priority Obligations, as applicable, that such Series (or, if applicable, all such Series) of First-Priority Obligations or of Second-Priority Obligations is no longer secured by such Common Collateral pursuant to the terms of the First-Priority Collateral Documents or Second-Priority Collateral Documents, as applicable.

"**Discharge of First-Priority Obligations**" shall mean at any applicable time, except to the extent otherwise provided in Section 5.07, the Discharge of all First-Priority Obligations then outstanding at such time; *provided* that the Discharge of First-Priority Obligations shall not be deemed to have occurred if the applicable payments are made with the proceeds of other First-Priority Obligations that constitute an exchange or replacement for or a Refinancing of such First-Priority Obligations.

"**Financing Documents**" shall mean the First Lien Documents, the Initial Other First-Priority Documents, the Other First-Priority Documents, the Second Lien Documents and the Other Second-Priority Documents.

"**First Lien Administrative Agent**" shall mean the administrative agent for the First Lien Claimholders, together with its successors or co-agents in substantially the same capacity as may, from time to time, be appointed pursuant to the First Lien Credit Agreement. As of the date hereof, Macquarie shall be the First Lien Administrative Agent.

"**First Lien Claimholders**" shall mean the holders of any First Lien Obligations, including the First Lien Administrative Agent and the First Lien Collateral Agent.

"**First Lien Collateral**" shall mean all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First Lien Obligations.

"**First Lien Collateral Agent**" shall mean the collateral agent for the First Lien Claimholders, together with its successors or co-agents in substantially the same capacity as may, from time to time, be appointed pursuant to the First Lien Credit Agreement. As of the date hereof, Macquarie shall be the First Lien Collateral Agent.

"**First Lien Collateral Agreement**" shall mean (a) the Security Agreement dated as of July 30, 2021, among the Company, as borrower, the grantors identified therein and the First Lien Collateral Agent, as amended, restated, amended and restated, supplemented, replaced or otherwise modified from time to time and (b) any other collateral agreement entered into from time to time in respect of any First Lien Credit Agreement and designated by the Company as a "First Lien Collateral Agreement," as amended, restated, amended and restated, supplemented or other modified from time to time.

"**First Lien Collateral Documents**" shall mean the First Lien Collateral Agreement and any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any First Lien Obligations, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**First Lien Credit Agreement**" shall mean the Initial First Lien Credit Agreement, as amended, restated, amended and restated, supplemented, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, Refinanced, extended or otherwise modified from time to time, including any agreement extending the maturity thereof, Refinancing, replacing or otherwise restructuring all or any portion of the indebtedness under such agreement or agreements or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof (including in this definition any Refinancing, replacement, restructuring or new debt facility designated by the Company as a "First Lien Credit Agreement" pursuant to Section 8.03).

"**First Lien Documents**" shall mean (a) the First Lien Credit Agreement and the First Lien Collateral Documents and (b) any other related document or instrument executed and delivered pursuant to any First Lien Document described in clause (a) above evidencing or governing any obligations thereunder, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**First Lien Intercreditor Agreement**" shall mean that certain Pari Passu Intercreditor Agreement, dated as of [_____], 20[__], by and among the Company, the other Grantors party thereto, the First Lien Collateral Agent and the Initial Other First-Priority Collateral Agent and each additional Other First-Priority Collateral Agent from time to time party there, as amended, restated, amended and restated or otherwise modified from time to time.

"**First Lien Obligations**" shall mean all Obligations of the Company and other obligors under the First Lien Credit Agreement or any of the other First Lien Documents, and all other obligations to pay principal, premium, if any, and interest (including any interest accruing after

the commencement of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such proceeding) when due and payable, and all other amounts due or to become due under or in connection with the First Lien Documents and the performance of all other Obligations of the obligors thereunder to the First Lien Secured Parties under the First Lien Documents, according to the respective terms thereof (*provided* that First Lien Obligations shall exclude any such obligations the incurrence of which was not permitted under each First-Priority Document and each Second-Priority Document extant at the time of the incurrence or issuance thereof).

"**First Lien Secured Parties**" shall mean the holders of any First Lien Obligations, including the First Lien Administrative Agent and the First Lien Collateral Agent.

"**First-Priority Collateral**" shall mean the First Lien Collateral, the Initial Other First-Priority Collateral and all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Other First-Priority Obligations (other than the First Lien Obligations and the Initial Other First-Priority Obligations).

"**First-Priority Collateral Agent**" shall mean such agent or trustee as is designated "**First-Priority Collateral Agent**" by First-Priority Secured Parties pursuant to the terms of the First Lien Intercreditor Agreement (if then in effect) and the First-Priority Documents; it being understood that as of the date of this Agreement, the First Lien Collateral Agent shall be so designated First-Priority Collateral Agent.

"**First-Priority Collateral Documents**" shall mean (a) the First Lien Collateral Documents, (b) the Initial Other First-Priority Collateral Documents, and (c) any documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Other First-Priority Obligations, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**First-Priority Documents**" shall mean (a) the First Lien Documents, (b) the Initial Other First-Priority Documents and (c) any Other First-Priority Documents, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**First-Priority Obligations**" shall mean (a) the First Lien Obligations, (b) the Initial Other First-Priority Obligations and (c) the Other First-Priority Obligations (if any) (*provided* that First-Priority Obligations shall exclude any such obligations the incurrence of which was not permitted under each First-Priority Document and each Second-Priority Document extant at the time of the incurrence or issuance thereof).

"**First-Priority Representatives**" shall mean (a) in the case of the First Lien Obligations, the First Lien Collateral Agent, (b) in the case of the Initial Other First-Priority Obligations, the Initial Other First-Priority Collateral Agent, and (c) in the case of any Series of Other First-Priority Obligations, the Other First-Priority Representative with respect thereto. The term "**First-Priority Representatives**" shall include the First-Priority Collateral Agent as the context requires.

"**First-Priority Secured Parties**" shall mean (a) the First Lien Secured Parties, (b) the Initial Other First-Priority Secured Parties and (c) the Other First-Priority Secured Parties, including the First-Priority Representatives.

"**Georgia Lottery Corporation**" shall mean the Georgia Lottery Corporation and any successor or other Governmental Authority (as defined in the Initial First Lien Credit Agreement) that has jurisdiction to regulate the gaming business of any Grantor and their Subsidiaries.

"**Grantors**" shall mean the Company, Lucky Bucks Holdco, LLC, a Delaware limited liability company and each of the Subsidiaries of the Company that has executed and delivered a First-Priority Collateral Document or a Second-Priority Collateral Document.

"**Initial First Lien Credit Agreement**" shall have the meaning set forth in the recitals.

"**Initial Other First-Priority Collateral**" shall mean all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Initial Other First-Priority Obligations.

"**Initial Other First-Priority Collateral Agent**" shall mean [      ], in its capacity as collateral agent under the Initial Other First Lien [Indenture][Credit Agreement], and its successors and permitted assigns in such capacity.

"**Initial Other First-Priority Collateral Documents**" shall mean the Initial Other First-Priority Security Agreement and any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Initial Other First-Priority Obligations, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Initial Other First Lien [Indenture][Credit Agreement]**" shall have the meaning set forth in the recitals.

"**Initial Other First-Priority Documents**" shall mean (a) the Initial Other First Lien [Indenture][Credit Agreement] and the Initial Other First-Priority Security Agreement and (b) any other related document or instrument executed and delivered pursuant to any Initial Other First-Priority Document described in clause (a) above evidencing or governing any obligations thereunder, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Initial Other First-Priority Obligations**" shall mean the "[Obligations]" (as defined in the Initial Other First Lien [Indenture][Credit Agreement]), and all other obligations to pay principal, premium, if any, and interest (including any interest accruing after the commencement of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such proceeding) when due and payable, and all other amounts due or to become due under or in connection with the Initial Other First-Priority Documents and the performance of all other Obligations of the obligors thereunder to the Initial Other First-Priority Secured Parties under the Initial Other First-Priority Documents, according to the respective terms thereof (*provided* that Initial Other First-Priority Obligations shall exclude any such obligations the incurrence of which was not permitted under each First-Priority Document and each Second-Priority Document extant at the time of the incurrence or issuance thereof).

"**Initial Other First-Priority Secured Parties**" shall mean the Persons holding the Initial Other First-Priority Obligations, including the Initial Other First-Priority Collateral Agent.

"**Initial Other First-Priority Security Agreement**" shall mean the "[Security Agreement]" as defined in the Initial Other First Lien [Indenture][Credit Agreement] and any other documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Initial Other First-Priority Obligations, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Initial Second Lien [Indenture][Credit Agreement]**" shall have the meaning set forth in the recitals.

"**Insolvency or Liquidation Proceeding**" shall mean (1) any case commenced by or against the Borrower or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Borrower or any other Grantor, any receivership or assignment for the benefit of creditors relating to the Borrower or any other Grantor or any similar case or proceeding relative to the Borrower or any other Grantor or its creditors, as such, in each case whether or not voluntary; (2) any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Borrower or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or (3) any other proceeding of any type or nature in which substantially all claims of creditors of the Borrower or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"**Joinder Agreement**" shall mean a Joinder Agreement substantially in the form of Exhibit A or Exhibit B, as applicable, hereto.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Macquarie**" shall have the meaning set forth in the preamble.

"**Obligations**" shall mean any principal, interest (including any interest accruing after the commencement of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such proceeding), penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any indebtedness.

"**Other First-Priority Collateral Agent**" shall mean, with respect to any Series of Other First-Priority Obligations, any Other First-Priority Representative that acts in the capacity of a collateral agent with respect thereto.

"**Other First-Priority Documents**" shall mean each of the agreements, documents and instruments providing for, evidencing or securing any Other First-Priority Obligations and any other related document or instrument executed or delivered pursuant to any Other First-Priority Document at any time or otherwise evidencing or securing any indebtedness arising under any

Other First-Priority Document, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Other First-Priority Obligations**" shall mean any indebtedness or Obligations (other than First Lien Obligations and the Initial Other First-Priority Obligations) of the Grantors that are to be secured with a Lien on the Common Collateral senior to the Liens securing the Second Lien Obligations and are designated by the Company as Other First-Priority Obligations hereunder and all other obligations to pay principal, premium, if any, and interest (including any interest accruing after the commencement of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such proceeding) when due and payable, and all other amounts due or to become due under or in connection with the Other First-Priority Documents and the performance of all other Obligations of the obligors thereunder to the Other First-Priority Secured Parties under the Other First-Priority Documents, according to the respective terms thereof (*provided* that Other First-Priority Obligations shall exclude any such obligations the incurrence of which was not permitted under each First-Priority Document and each Second-Priority Document extant at the time of the incurrence or issuance thereof); *provided further*, however, that the requirements set forth in Section 8.21 shall have been satisfied.

"**Other First-Priority Representative**" shall mean, with respect to any Series of Other First-Priority Obligations or any separate facility within such Series, the Person elected, designated or appointed as the administrative agent, trustee, collateral agent or other representative of such Series or facility by or on behalf of the holders of such Series or facility, and its respective successors in substantially the same capacity as may from time to time be appointed.

"**Other First-Priority Secured Parties**" shall mean the Persons holding Other First-Priority Obligations, including the Other First-Priority Representatives.

"**Other Second-Priority Collateral Agent**" shall mean, with respect to any Series of Other Second-Priority Obligations, any Other Second-Priority Representative that acts in the capacity of a collateral agent with respect thereto.

"**Other Second-Priority Documents**" shall mean each of the agreements, documents and instruments providing for, evidencing or securing any Other Second-Priority Obligations and any other related document or instrument executed or delivered pursuant to any Other Second-Priority Document at any time or otherwise evidencing or securing any indebtedness arising under any Second-Priority Obligations, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Other Second-Priority Obligations**" shall mean any indebtedness or Obligations (other than the Second Lien Obligations) of the Grantors that are to be secured on a basis junior to the First Lien Obligations and are designated by the Company as Other Second-Priority Obligations hereunder, and all other obligations to pay principal, premium, if any, and interest (including any interest accruing after the commencement of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such proceeding) when due and payable, and all other amounts due or to become due under or in connection with the Other Second-Priority Obligations and the performance of all other Obligations of the obligors thereunder to the Other Second-Priority Secured Parties under the Other Second-Priority Documents, according to the respective terms

thereof (*provided* that Other Second-Priority Obligations shall exclude any such obligations the incurrence of which was not permitted under each First-Priority Document and each Second-Priority Document extant at the time of the incurrence or issuance thereof); *provided*, *further*, *however*, that the requirements set forth in <u>Section 8.21</u> shall have been satisfied.

"**Other Second-Priority Representative**" shall mean, with respect to any Series of Other Second-Priority Obligations or any separate facility within such Series, the Person elected, designated or appointed as the administrative agent, trustee, collateral agent or other representative of such Series or facility by or on behalf of the holders of such Series or facility, and its respective successors in substantially the same capacity as may from time to time be appointed.

"**Other Second-Priority Secured Parties**" shall mean the Persons holding Other Second-Priority Obligations, including the Other Second-Priority Representatives.

"**Person**" shall mean any individual ,corporation ,partnership, joint venture, association, join-stock company, trust, unincorporated organization, limited liability company, government or any agency or political subdivision thereof or any other entity.

"**Plan of Reorganization**" shall mean any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any Insolvency or Liquidation Proceeding.

"**Pledged Collateral**" shall mean the Common Collateral in the possession or control of the First-Priority Collateral Agent (or its agents or bailees), to the extent that possession or control thereof is necessary to perfect a Lien thereon under the Uniform Commercial Code.

"**Purchase Event**" shall have the meaning set forth in <u>Section 5.09</u>.

"**Recovery**" shall have the meaning set forth in <u>Section 6.04</u>.

"**Refinance**" shall mean, in respect of any indebtedness and any agreement governing any such indebtedness, to refinance, extend, increase, renew, defease, amend, restate, amend and restate, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for or refinancing of, such indebtedness in whole or in part, including by adding or replacing lenders, creditors, agents, obligors, grantors and/or guarantors, and including, in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated.  "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Restricted Assets**" shall mean all licenses, permits, franchises, approvals or other authorizations from any Governmental Authority (as defined in the Initial First Lien Credit Agreement) from time to time granted to or otherwise held by the Borrower or any other Grantor to the extent the same constitute "Excluded Property" under (and as defined in) any First Lien Documents or any Second Lien Documents or are similarly carved out from the granting clause or the collateral thereunder.

"**Sale Proceeds**" shall mean (i) the proceeds from the sale of the Borrower or one or more of the Grantors as a going concern or from the sale of the Restricted Assets as a going concern, (ii)

the proceeds from another sale or disposition of (x) any assets of the Grantors that include any Restricted Assets or (y) any assets of the Grantors that benefit from any Restricted Assets or (iii) any other economic value (whether in the form of cash or otherwise) received or distributed that is associated with the Restricted Assets.

"**Second Lien Claimholders**" shall mean the holders of any Second Lien Obligations, including the Second Lien [Trustee][Administrative Agent] and the Second Lien Collateral Agent.

"**Second Lien Collateral**" shall mean all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Second Lien Obligations.

"**Second Lien Collateral Agent**" shall mean the collateral agent for the Second Lien Claimholders, together with its successors or co-agents in substantially the same capacity as may, from time to time, be appointed pursuant to the Initial Second Lien [Indenture][Credit Agreement]. As of the date hereof, [_____] shall be the Second Lien Collateral Agent.

"**Second Lien Collateral Agreement**" shall mean (a) the "Security Agreement" as defined in the Initial Second Lien [Indenture][Credit Agreement], and (b) any other collateral agreement entered into from time to time in respect of any Second Lien [Indenture][Credit Agreement] and designated by the Company as a "Second Lien Collateral Agreement," as amended, restated, amended and restated, supplemented or other modified from time to time.

"**Second Lien Collateral Documents**" shall mean the Second Lien Collateral Agreement and any documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Second Lien Obligations, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Second Lien Documents**" shall mean (a) the Second Lien [Indenture][Credit Agreement] and the Second Lien Collateral Documents and (b) any other related document or instrument executed and delivered pursuant to any Second Lien Document described in clause (a) above evidencing or governing any Obligations thereunder, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Second Lien [Indenture][Credit Agreement]**" shall mean the Initial Second Lien [Indenture][Credit Agreement], as amended, restated, amended and restated, supplemented, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, Refinanced, extended or otherwise modified from time to time, including any agreement extending the maturity thereof, Refinancing, replacing or otherwise restructuring all or any portion of the indebtedness under such agreement or agreements or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof, (including in this definition any Refinancing, replacement, restructuring or new debt facility designated by the Company as a "Second Lien [Indenture][Credit Agreement]" pursuant to Section 8.03).

"**Second Lien Obligations**" shall mean all Obligations of the Company and other obligors under the Initial Second Lien [Indenture][Credit Agreement] or any of the other Second Lien Documents, and all other obligations to pay principal, premium, if any, and interest (including any

interest accruing after the commencement of any Insolvency or Liquidation Proceeding, regardless of whether allowed or allowable in such proceeding) when due and payable, and all other amounts due or to become due under or in connection with the Second Lien Documents and the performance of all other Obligations of the obligors thereunder to the Second Lien Secured Parties under the Second Lien Documents, according to the respective terms thereof (*provided* that Second Lien Obligations shall exclude any such obligations the incurrence of which was not permitted under each First-Priority Document and each Second-Priority Document extant at the time of the incurrence or issuance thereof).

"**Second Lien Secured Parties**" shall mean the holders of any Second Lien Obligations, including the Second Lien [Trustee][Administrative Agent] and the Second Lien Collateral Agent.

"**Second Lien [Trustee][Administrative Agent]**" shall mean [_____], in its capacity as [indenture trustee][administrative agent] under the Second Lien [Indenture][Credit Agreement] and the Second Lien Collateral Documents, and its permitted successors in such capacity.

"**Second-Priority Collateral**" shall mean the Second Lien Collateral and all of the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Other Second-Priority Obligations.

"**Second-Priority Collateral Agent**" shall mean such agent or trustee as is designated "**Second-Priority Collateral Agent**" by Second-Priority Secured Parties pursuant to the terms of any applicable intercreditor agreement among the Second-Priority Secured Parties (if then in effect) or by Second-Priority Secured Parties holding a majority in principal amount of the Second-Priority Obligations then outstanding (if no such intercreditor agreement is then in effect); it being understood that as of the date of this Agreement, the Second Lien Collateral Agent shall be so designated Second-Priority Collateral Agent.

"**Second-Priority Collateral Documents**" shall mean (a) the Second Lien Collateral Documents and (b) any documents now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure any Other Second-Priority Obligations, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Second-Priority Documents**" shall mean (a) the Second Lien Documents and (b) the Other Second-Priority Documents.

"**Second-Priority Obligations**" shall mean (a) the Second Lien Obligations, (b) the Other Second-Priority Obligations and (c) all other Obligations in respect of, or arising under, the Second-Priority Documents, including all fees and expenses of the collateral agent for any Other Second-Priority Obligations and shall include all interest and fees, which but for the filing of a petition in bankruptcy with respect to the Company or any Grantor, would have accrued on such obligations, whether or not a claim for such interest or fees is allowed in such proceeding (*provided* that Second-Priority Obligations shall exclude any such obligations the incurrence of which was not permitted under each First-Priority Document and each Second-Priority Document extant at the time of the incurrence or issuance thereof).

"**Second-Priority Representatives**" shall mean (a) in the case of the Second Lien Obligations, the Second Lien Collateral Agent and (b) in the case of any Series of Other Second-Priority Obligations, the Other Second-Priority Representative with respect thereto. The term "**Second-Priority Representatives**" shall include the Second-Priority Collateral Agent as the context requires. For purposes of this definition, no Discharge of Second Lien Obligations with respect to the Second Lien Obligations under the Second Lien [Indenture][Credit Agreement] and the Second Lien Documents relating thereto shall be deemed to have occurred if any of the Company or any other Grantor enters into any Refinancing of the Second Lien [Indenture][Credit Agreement], and, in the case of any such Refinancing, the Second Lien Collateral Agent under such Second Lien [Indenture][Credit Agreement] shall continue as the Second-Priority Representative for all purposes hereof.

"**Second-Priority Secured Parties**" shall mean (a) the Second Lien Secured Parties and (b) the Other Second-Priority Secured Parties, including the Second-Priority Representatives.

"**Secured Parties**" shall mean the First-Priority Secured Parties and the Second-Priority Secured Parties.

"**Securities Account**" shall have the meaning set forth in the Uniform Commercial Code.

"**Series**" shall mean (a) the First Lien Obligations, Initial Other First-Priority Obligations and each series of Other First-Priority Obligations, each of which shall constitute a separate Series of First-Priority Obligations, except that to the extent that the First Lien Obligations, the Initial Other First-Priority Obligations and/or any one or more series of such Other First-Priority Obligations (i) are secured by identical collateral held by a common collateral agent and (ii) have their security interests documented by a single set of security documents, such First Lien Obligations, the Initial Other First-Priority Obligations and/or each such series of Other First-Priority Obligations shall collectively constitute a single Series, and (b) the Second Lien Obligations and each series of Other Second-Priority Obligations, each of which shall constitute a separate Series of Second-Priority Obligations, except that to the extent that the Second Lien Obligations and/or any one or more series of such Other Second-Priority Obligations (i) are secured by identical collateral held by a common collateral agent and (ii) have their security interests documented by a single set of security documents, such Second Lien Obligations and/or each such series of Other Second-Priority Obligations shall collectively constitute a single Series.

"**Standstill Period**" shall have the meaning set forth in Section 3.01(f).

"**Subsidiary**" shall have the meaning given to such term in the Initial First Lien Credit Agreement.

"**Uniform Commercial Code**" or "**UCC**" shall mean, unless otherwise specified, the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Common Collateral.

Section 1.02.  *Terms Generally*.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include,"

"includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented, otherwise modified or permitted to be Refinanced or replaced in accordance with the terms hereof, in each case to the extent so Refinanced or replaced, in accordance with this Agreement, (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections shall be construed to refer to Sections of this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

ARTICLE 2

LIEN PRIORITIES.

Section 2.01.  *Subordination of Liens*.  Notwithstanding the date, time, manner or order of filing or recordation of any document or instrument or grant, attachment or perfection of any Liens granted to the Second-Priority Secured Parties on the Common Collateral or of any Liens granted to the First-Priority Secured Parties on the Common Collateral (or any actual or alleged defect in any of the foregoing), and notwithstanding any provision of the UCC, or any applicable law or the Second-Priority Documents or the First-Priority Documents or any other circumstance whatsoever (including any non-perfection of any Lien purporting to secure the First-Priority Obligations and/or the Second-Priority Obligations), each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, hereby agrees that: (a) any Lien on the Common Collateral securing any First-Priority Obligations now or hereafter held by or on behalf of any First-Priority Secured Parties or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall have priority over and be senior in all respects and prior to any Lien on the Common Collateral securing any Second-Priority Obligations and (b) any Lien on the Common Collateral securing any Second-Priority Obligations now or hereafter held by or on behalf of any Second-Priority Secured Parties or any agent or trustee therefor regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Common Collateral securing any First-Priority Obligations.  All Liens on the Common Collateral securing any First-Priority Obligations shall be and remain senior in all respects and prior to all Liens on the Common Collateral securing any Second-Priority Obligations for all purposes, whether or not such Liens securing any First-Priority Obligations are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.

Section 2.02.  *Prohibition on Contesting Liens*.  Each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, and each First-Priority Representative, for itself and on behalf of each applicable First-Priority Secured Party, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, perfection, priority or enforceability of (a) a Lien securing any First-Priority Obligations held (or purported

Exhibit M-12

to be held) by or on behalf of any of the First-Priority Secured Parties or any agent or trustee therefor in any First-Priority Collateral or (b) a Lien securing any Second-Priority Obligations held (or purported to be held) by or on behalf of any Second-Priority Secured Party in the Common Collateral, as the case may be; *provided*, *however*, that nothing in this Agreement shall be construed to prevent or impair the rights of any First-Priority Secured Party or any agent or trustee therefor to enforce this Agreement (including the priority of the Liens securing the First-Priority Obligations as provided in <u>Section 2.01</u>) or any of the First-Priority Documents.

Section 2.03.  *No New Liens*.  So long as the Discharge of First-Priority Obligations has not occurred, the parties hereto agree that if any Second-Priority Representative shall hold any Lien on any assets of the Company or any other Grantor securing any Second-Priority Obligations that are not also subject to the senior and prior Lien in respect of the First-Priority Obligations under the First-Priority Documents, such Second-Priority Representative shall notify the First-Priority Collateral Agent promptly upon becoming aware thereof and, upon demand by the First-Priority Collateral Agent or the Company, will either (i) release such Lien or (ii) assign such Lien to the First-Priority Collateral Agent (and/or its designee) as security for the applicable First-Priority Obligations (and, in the case of an assignment, each Second-Priority Representative may retain a junior lien on such assets subject to the terms hereof).  Each Second-Priority Representative agrees that, after the date hereof, if it shall hold any Lien on any assets of the Company or any other Grantor securing any Second-Priority Obligations that are not also subject to the Lien in favor of each other Second-Priority Representative, such Second-Priority Representative shall notify any other Second-Priority Representative promptly upon becoming aware thereof.

Section 2.04.  *Perfection of Liens*.  Subject to <u>Section 5.05</u>, none of the First-Priority Secured Parties shall be responsible for perfecting and maintaining the perfection of Liens with respect to the Common Collateral for the benefit of the Second-Priority Secured Parties.  The provisions of this Agreement are intended solely to govern the respective Lien priorities as between the First-Priority Secured Parties and the Second-Priority Secured Parties and shall not impose on the First-Priority Secured Parties or the Second-Priority Secured Parties or any agent or trustee therefor any obligations in respect of the disposition of proceeds of any Common Collateral which would conflict with prior perfected claims therein in favor of any other Person or any order or decree of any court or governmental authority or any applicable law.

Section 2.05.  *Nature of Obligations*.  The priorities of the Liens provided in <u>Section 2.01</u> shall not be altered or otherwise affected by (a) any Refinancing of the First-Priority Obligations or the Second-Priority Obligations or (b) any action or inaction which any of the First-Priority Secured Parties or the Second-Priority Secured Parties may take or fail to take in respect of the Common Collateral.  Each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Parties, agrees and acknowledges that (i) a portion of the First-Priority Obligations may be revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (ii) the terms of the First-Priority Collateral Documents and the First-Priority Obligations may be amended, restated, amended and restated, supplemented or otherwise modified, and the First-Priority Obligations, or a portion thereof, may be Refinanced from time to time and (iii) the aggregate amount of the First-Priority Obligations may be increased, in each case, without notice to or consent by the Second-Priority Collateral Agents or the Second-Priority

Secured Parties and without affecting the provisions hereof, except as otherwise expressly set forth herein.  As between the Company and the Grantors, the foregoing provisions will not limit or otherwise affect the obligations of the Company and the Grantors contained in any Second-Priority Document with respect to the incurrence of additional First-Priority Obligations.

## ARTICLE 3
### ENFORCEMENT

Section 3.01.  *Exercise of Remedies*.

(a)     So long as the Discharge of First-Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, (i) no Second-Priority Representative or any Second-Priority Secured Party will (w) file or commence any Insolvency or Liquidation Proceeding against the Company or any other Grantor, (x) exercise or seek to exercise any rights or remedies (including setoff) with respect to any Common Collateral in respect of any applicable Second-Priority Obligations or any Restricted Assets or any Sale Proceeds, institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object to any foreclosure proceeding or action brought with respect to the Common Collateral or any Restricted Assets or any Sale Proceeds by the First-Priority Collateral Agent or any First-Priority Secured Party in respect of the First-Priority Obligations, the exercise of any right by the First-Priority Collateral Agent or any First-Priority Secured Party (or any agent or sub-agent on their behalf) in respect of the First-Priority Obligations under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any Second-Priority Representative or any Second-Priority Secured Party either is a party or may have rights as a third party beneficiary, or any other exercise by any such party, of any rights and remedies relating to the Common Collateral or any Restricted Assets or any Sale Proceeds under the First-Priority Documents or otherwise in respect of First-Priority Obligations, or (z) object to the forbearance by the First-Priority Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Common Collateral in respect of First-Priority Obligations or any Restricted Assets or any Sale Proceeds and (ii) except as otherwise provided herein, the First-Priority Collateral Agent and the First-Priority Secured Parties shall have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Common Collateral, Restricted Assets or any Sale Proceeds without any consultation with or the consent of any Second-Priority Representative or any Second-Priority Secured Party; *provided*, *however*, that (A) in any Insolvency or Liquidation Proceeding commenced by or against the Company or any other Grantor, each Second-Priority Representative may file a claim or statement of interest with respect to the applicable Second-Priority Obligations and (B) each Second-Priority Representative may take any action (not adverse to the prior Liens on the Common Collateral securing the First-Priority Obligations, or the rights of the First-Priority Collateral Agent or the First-Priority Secured Parties to exercise remedies in respect thereof) in order to create, prove, perfect, preserve or protect (but not enforce) its rights in, and perfection and priority of its Lien on, the Common Collateral. In exercising rights and remedies with respect to the First-Priority Collateral, the First-Priority Collateral Agent and the First-Priority Secured Parties may enforce the provisions of the First-Priority Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole

discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Common Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b)    So long as the Discharge of First-Priority Obligations has not occurred, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that it will not, in its capacity as a Secured Party, take or receive any Common Collateral, Restricted Assets or Sale Proceeds or any proceeds of Common Collateral, Restricted Assets or Sale Proceeds in connection with the exercise of any right or remedy (including setoff) with respect to any Common Collateral, Restricted Assets or any Sale Proceeds in respect of the applicable Second-Priority Obligations. Without limiting the generality of the foregoing, unless and until the Discharge of First-Priority Obligations has occurred, except as expressly provided in the proviso in clause (ii) of Section 3.01(a), the sole right of the Second-Priority Representatives and the Second-Priority Secured Parties with respect to the Common Collateral, Restricted Assets and Sale Proceeds is to hold a Lien on the Common Collateral in respect of the applicable Second-Priority Obligations pursuant to the Second-Priority Documents, as applicable, for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First-Priority Obligations has occurred.

(c)    Subject to the proviso in clause (ii) of Section 3.01(a), (i) each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, agrees that no Second-Priority Representative or Second-Priority Secured Party will take any action that would hinder any exercise of remedies undertaken by the First-Priority Collateral Agent or the First-Priority Secured Parties with respect to the Common Collateral, the Restricted Assets and the Sale Proceeds under the First-Priority Documents, including any sale, lease, exchange, transfer or other disposition of the Common Collateral, the Restricted Assets and the Sale Proceeds, whether by foreclosure or otherwise, and (ii) each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby waives any and all rights it or any Second-Priority Secured Party may have as a junior lien creditor or otherwise to object to the manner in which the First-Priority Collateral Agent or the First-Priority Secured Parties seek to enforce or collect the First-Priority Obligations or the Liens granted in any of the First-Priority Collateral, regardless of whether any action or failure to act by or on behalf of the First-Priority Collateral Agent or First-Priority Secured Parties is adverse to the interests of the Second-Priority Secured Parties.

(d)    Each Second-Priority Representative hereby acknowledges and agrees that no covenant, agreement or restriction contained in any applicable Second-Priority Document shall be deemed to restrict in any way the rights and remedies of the First-Priority Collateral Agent or the First-Priority Secured Parties with respect to the First-Priority Collateral, the Restricted Assets and the Sale Proceeds as set forth in this Agreement and the First-Priority Documents.

(e)    Subject to the proviso in clause (ii) of Section 3.01(a) and the following Sections 3.01(f) and (g), until the Discharge of the First-Priority Obligations, the First-Priority Collateral Agent shall have the exclusive right to exercise any right or remedy with respect to the

Common Collateral and shall have the exclusive right to determine and direct the time, method and place for exercising such right or remedy or conducting any proceeding with respect thereto.

(f)    Notwithstanding the provisions of <u>Section 3.01</u> above but subject in all cases to <u>Sections 3.01(g)</u> and <u>4.02</u>, the Second-Priority Collateral Agent may enforce any of its rights and exercise any of its remedies (subject to the limitations set forth in this clause (f) with respect to such actions) with respect to the Second-Priority Collateral after a period of 180 consecutive days has elapsed since the date on which the Second-Priority Collateral Agent has delivered to the First-Priority Collateral Agent written notice of the acceleration or non-payment at the final stated maturity of the indebtedness then outstanding under any Second-Priority Documents (the "**Standstill Period**"); *provided, however*, that (i) notwithstanding the expiration of the Standstill Period or anything herein to the contrary, in no event shall the Second-Priority Collateral Agent or any other Second-Priority Secured Party enforce or exercise any rights or remedies with respect to any Common Collateral if the First-Priority Collateral Agent or any other First-Priority Secured Party shall have commenced, and shall be diligently pursuing (or shall have sought or requested relief from or modification of the automatic stay or any other stay in any insolvency or liquidation proceeding to enable the commencement and pursuit thereof) the enforcement or exercise of any rights or remedies with respect to all or a material portion of such Second-Priority Collateral (prompt written notice thereof shall be given to the Second-Priority Collateral Agent by the applicable First-Priority Representative) and (ii) after the expiration of the Standstill Period, so long as no First-Priority Representative has commenced any action to enforce the Liens securing the First-Priority Obligations on all or any material portion of the Second-Priority Collateral, the Second-Priority Secured Parties (or the Second-Priority Collateral Agent on their behalf) may, subject to the provisions of <u>Article 7</u>, enforce the Liens securing the Second-Priority Obligations with respect to all or any portion of the Common Collateral to the extent permitted hereunder.  If the Second-Priority Collateral Agent or any other Second-Priority Secured Party exercises any rights or remedies with respect to the Second-Priority Collateral in accordance with the immediately preceding sentence of this paragraph and thereafter the First-Priority Collateral Agent or any other First-Priority Secured Party commences (or attempts to commence or give notice of its intent to commence) the exercise of any of its rights or remedies with respect to the Second-Priority Collateral (including seeking relief from the automatic stay or any other stay in any proceeding under Bankruptcy Law), the Standstill Period shall recommence and the Second-Priority Collateral Agent and each other Second-Priority Secured Party shall rescind any such rights or remedies already exercised with respect to the Common Collateral.

(g)    FOR THE AVOIDANCE OF DOUBT, EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT THE EXERCISE OF RIGHTS AND REMEDIES WITH RESPECT TO ANY PLEDGED EQUITY INTERESTS OF A GLC LICENSE HOLDER SUBSIDIARY (EACH AS DEFINED IN THE FIRST LIEN COLLATERAL AGREEMENT) OWNED BY A GRANTOR SHALL REMAIN LIMITED BY, AND SUBJECT TO, THE REQUIREMENTS OF ANY AND ALL APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, THE RULES AND REGULATIONS OF THE GEORGIA LOTTERY CORPORATION).

Section 3.02.   *Cooperation*.  Subject to the proviso in clause (ii) of <u>Section 3.01(a)</u>, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that, unless and until the Discharge of First-Priority Obligations has occurred, it will

not commence, or join with any Person (other than the First-Priority Secured Parties and the First-Priority Collateral Agent upon the request thereof) in commencing, any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it in the Common Collateral under any of the applicable Second-Priority Documents or otherwise in respect of the applicable Second-Priority Obligations.

Section 3.03.  *Second-Priority Collateral Agent and Second-Priority Secured Parties Waiver*.  The Second-Priority Collateral Agent and the Second-Priority Secured Parties hereby waive any claim they may now or hereafter have against the First-Priority Collateral Agent or any First-Priority Secured Parties arising out of (i) any actions which the First-Priority Collateral Agent (or any of its representatives) takes or omits to take (including actions with respect to the creation, perfection or continuation of Liens on any Common Collateral, actions with respect to the foreclosure upon, disposition, release or depreciation of, or failure to realize upon, any of the Common Collateral, the Restricted Assets or the Sale Proceeds and actions with respect to the collection of any claim for all or any part of the Obligations from any account debtor, guarantor or any other party) in accordance with any relevant First-Priority Collateral Documents or any other agreement related thereto, or to the collection of the Obligations or the valuation, use, protection or release of any security for the Obligations, (ii) any election by the First-Priority Collateral Agent (or any of its agents), in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code, or (iii) subject to <u>Article 6</u>, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code by the Company or any of its Subsidiaries, as debtor-in-possession.

Section 3.04.  *Actions upon Breach*.  Should any Second-Priority Representative or any Second-Priority Secured Party, contrary to this Agreement, in any way, take, attempt to take or threaten to take any action with respect to the Common Collateral, the Restricted Assets or the Sale Proceeds (including any attempt to realize upon or enforce any remedy with respect to this Agreement) or fail to take any action required by this Agreement, the First-Priority Collateral Agent or any First-Priority Representative or any other First-Priority Secured Party (in its or their own name or in the name of the Company or any other Grantor) may obtain relief against such Second-Priority Representative or such Second-Priority Secured Party by injunction, specific performance or other appropriate equitable relief. Each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby (i) agrees that the First-Priority Secured Parties' damages from the actions of the Second-Priority Representatives or any Second-Priority Secured Party may at that time be difficult to ascertain and may be irreparable and waives any defense that the First-Priority Secured Parties cannot demonstrate damage or be made whole by the awarding of damages and (ii) irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the First-Priority Collateral Agent, any First-Priority Representative or any other First-Priority Secured Party.

ARTICLE 4

PAYMENTS

Section 4.01.  *Application of Proceeds*.  After an Event of Default under (and as defined in) any First-Priority Document has occurred, and until such Event of Default is cured or waived, so long as the Discharge of First-Priority Obligations has not occurred, the Common Collateral or

proceeds thereof, Sale Proceeds or Restricted Assets received in connection with the sale, transfer or other disposition of, or collection on, such Common Collateral, the Restricted Assets or the Grantors as a going concern upon the exercise of remedies, and any Common Collateral, proceeds thereof, Sale Proceeds or Restricted Assets or distribution in respect of Common Collateral, the Restricted Assets or Sale Proceeds in any Insolvency or Liquidation Proceeding, shall be applied by the First-Priority Collateral Agent to the First-Priority Obligations in such order as specified in the relevant First-Priority Document (subject to the First Lien Intercreditor Agreement) until the Discharge of First-Priority Obligations has occurred. Upon the Discharge of First-Priority Obligations, the First-Priority Collateral Agent shall deliver promptly to the Second-Priority Collateral Agent any Common Collateral or proceeds thereof held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Second-Priority Collateral Agent, in such order as specified in the relevant Second-Priority Documents (and subject to any other applicable intercreditor agreement among the Second-Priority Secured Parties). Without limiting the generality of the foregoing, it is the intention of the parties hereto that no amount of any Sale Proceeds will in any event be allocated to any Restricted Assets, and no Second Priority Representative, Second Priority Collateral Agent or other Second-Priority Secured Party will, in any forum (including in any Insolvency or Liquidation Proceeding), assert that any amount of any Sale Proceeds should be allocated to any Restricted Assets.

Section 4.02.    *Payments Over*.  Any Common Collateral or proceeds thereof received by any Second-Priority Representative or any Second-Priority Secured Party in connection with the exercise of any right or remedy (including setoff) relating to the Common Collateral, Restricted Assets or Sale Proceeds (or any distribution in respect of the Common Collateral, Restricted Assets or Sale Proceeds, whether or not expressly characterized as such) prior to the Discharge of the First-Priority Obligations shall be segregated and held in trust for the benefit of and forthwith paid over to the First-Priority Collateral Agent (and/or its designees) for the benefit of the applicable First-Priority Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The First-Priority Collateral Agent is hereby authorized to make any such endorsements as agent for any Second-Priority Representative or any such Second-Priority Secured Party. This authorization is coupled with an interest and is irrevocable.

## ARTICLE 5
### OTHER AGREEMENTS

Section 5.01.    *Releases*.

(a)    If, at any time any Grantor, the First-Priority Collateral Agent or the holder of any First-Priority Obligation delivers notice to each Second-Priority Representative that any specified Common Collateral (including all or substantially all of the equity interests of a Grantor or any of its Subsidiaries) is sold, transferred or otherwise disposed of (x) by the owner of such Common Collateral in a transaction not prohibited by any First-Priority Document or (y) otherwise to the extent the First-Priority Collateral Agent has consented to such sale, transfer or disposition, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the Second-Priority Secured Parties upon such Common Collateral will automatically be released and discharged as and when, but only to the extent, such Liens on such Common

Collateral securing First-Priority Obligations are released and discharged. Upon delivery to each Second-Priority Representative of a notice from the First-Priority Collateral Agent or the Company stating that any release of Liens securing or supporting the First-Priority Obligations has become effective (or shall become effective upon each First-Priority Representative's release), whether in connection with a sale of such assets by the relevant owner pursuant to the preceding clauses or otherwise, each Second-Priority Representative will promptly execute and deliver such instruments, releases, termination statements or other documents confirming such release on customary terms (and the Company hereby agrees to deliver any such documents reasonably requested by the First-Priority Collateral Agent in connection therewith). In the case of the sale or disposition of all or substantially all of the equity interests of a Grantor or any of its Subsidiaries, the guarantee in favor of the Second-Priority Secured Parties, if any, made by such Grantor or Subsidiary will automatically be released and discharged as and when, but only to the extent, the guarantee by such Grantor or Subsidiary of First-Priority Obligations is released and discharged.

(b)     Each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby irrevocably constitutes and appoints the First-Priority Collateral Agent and any officer or agent of the First-Priority Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of each Second-Priority Representative or such holder or in the First-Priority Collateral Agent's own name, from time to time in the First-Priority Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.01, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Section 5.01, including any termination statements, endorsements or other instruments of transfer or release.

(c)     Unless and until the Discharge of First-Priority Obligations has occurred, each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby consents to the application, whether prior to or after a default, of proceeds of Common Collateral and Sale Proceeds to the repayment of First-Priority Obligations pursuant to the First-Priority Documents; *provided* that nothing in this Section 5.01(c) shall be construed to prevent or impair the rights of the Second-Priority Representatives or the Second-Priority Secured Parties to receive proceeds in connection with the Second-Priority Obligations not otherwise in contravention of this Agreement.

(d)     Notwithstanding anything to the contrary in any Second-Priority Collateral Document, in the event the terms of a First-Priority Collateral Document and a Second-Priority Collateral Document each require any Grantor (i) to make payment in respect of any item of Common Collateral, (ii) to deliver or afford control over any item of Common Collateral to (to the extent such control can be afforded only to one person under applicable law), or deposit any item of Common Collateral with, (iii) to register ownership of any item of Common Collateral in the name of or make an assignment of ownership of any Common Collateral or the rights thereunder to, (iv) to cause any securities intermediary, commodity intermediary or other Person acting in a similar capacity to agree to comply, in respect of any item of Common Collateral, with instructions or orders from, or to treat, in respect of any item of Common Collateral, as the entitlement holder, (v) to hold any item of Common Collateral in trust for (to the extent such item of Common Collateral cannot be held in trust for multiple parties under applicable law), (vi) to obtain the agreement of a bailee or other third party to hold any item of Common Collateral for the benefit

of or subject to the control of or, in respect of any item of Common Collateral, to follow the instructions of or (vii) to obtain the agreement of a landlord with respect to access to leased premises where any item of Common Collateral is located or waivers or subordination of rights with respect to any item of Common Collateral in favor of, in any case, both the First-Priority Collateral Agent and any Second-Priority Representative or Second-Priority Secured Party, such Grantor may, until the applicable Discharge of First-Priority Obligations has occurred, comply with such requirement under the applicable Second-Priority Collateral Document as it relates to such Common Collateral by taking any of the actions set forth above only with respect to, or in favor of, the First-Priority Collateral Agent; provided that, notwithstanding anything to the contrary, any action or compliance with respect to the foregoing by any Grantor shall not cause or result in a default or event of default to exist under any First-Priority Document or any Second-Priority Document.

Section 5.02.  *Insurance*.  Unless and until the Discharge of First-Priority Obligations has occurred, the First-Priority Collateral Agent and the First-Priority Secured Parties shall have the sole and exclusive right, subject to the rights of the Grantors under the First-Priority Documents, to adjust settlement for any insurance policy covering the Common Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral. Unless and until the Discharge of First-Priority Obligations has occurred, all proceeds of any such policy and any such award if in respect of the Common Collateral shall be paid, subject to the rights of the Grantors under the First-Priority Documents, (a) first, prior to the occurrence of the Discharge of First-Priority Obligations, to the First-Priority Collateral Agent for the benefit of First-Priority Secured Parties pursuant to the terms of the First-Priority Documents, subject to the First Lien Intercreditor Agreement, (b) second, after the occurrence of the Discharge of First-Priority Obligations, to the Second-Priority Collateral Agent for the benefit of the Second-Priority Secured Parties pursuant to the terms of the applicable Second-Priority Documents (subject to any applicable intercreditor agreement among the Second-Priority Secured Parties) and (c) third, if no Second-Priority Obligations are outstanding, to the owner of the subject property, such other person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. If any Second-Priority Representative or any Second-Priority Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the First-Priority Collateral Agent in accordance with the terms of <u>Section 4.02</u>.

Section 5.03.  *Amendments to Second-Priority Documents*.

(a)  So long as the Discharge of the First-Priority Obligations has not occurred, without the prior written consent of the First-Priority Collateral Agent, no Second-Priority Document may be amended, restated, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second-Priority Document, would (1) require any scheduled payment of principal (including pursuant to a sinking fund obligation) prior to the maturity date thereof or accelerate any date upon which a scheduled payment of principal or interest is due, in each case with respect to any indebtedness outstanding thereunder, (2) shorten the maturity date applicable to any indebtedness incurred thereunder, (3) add or modify (or have the effect of a modification of) any mandatory prepayment or mandatory redemption provision or redemption at the option of the holders thereof in a manner that is more favorable to the holders of the applicable indebtedness, (4) reduce the capacity to incur First-

Priority Obligations to an amount less than the aggregate principal amount of indebtedness (including revolving commitments) under the First-Priority Documents on the day of any such amendment, restatement, supplement, modification or Refinancing, (5) restrict the ability of the Grantors to grant liens consistent with the terms of the First-Priority Documents or (6) be prohibited by or inconsistent with any of the terms of this Agreement or any other First-Priority Document. Unless otherwise agreed to by the First-Priority Collateral Agent, each Grantor agrees that each applicable Second-Priority Collateral Document shall include language substantially the same as the following paragraph (or language to similar effect approved by the First-Priority Collateral Agent, such approval not to be unreasonably withheld or delayed):

> "Notwithstanding anything herein to the contrary, (i) the liens and security interests granted to the [insert the relevant Second-Priority Representative] for the benefit of the [Second-Priority Secured Parties] pursuant to this Agreement are expressly subject and subordinate to the liens and security interests granted to (a) Macquarie Capital Funding LLC, as collateral agent (and its permitted successors), pursuant to the Security Agreement dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Lucky Bucks, LLC, the grantors party thereto and Macquarie Capital Funding LLC, as collateral agent, (b) [   ], as collateral agent (and its permitted successors), pursuant to the Security Agreement dated as of [_____], 20[__] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among Lucky Bucks, LLC, the grantors party thereto and [   ], as collateral agent or (c) any agent or trustee for any Other First-Priority Secured Parties and (ii) the exercise of any right or remedy by the [insert the relevant Second-Priority Representative] hereunder or the application of proceeds (including insurance proceeds and condemnation proceeds) of any Common Collateral is subject to the limitations and provisions of the Junior Lien Intercreditor Agreement dated as of [_____], 20[__] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Junior Lien Intercreditor Agreement**"), by and among Macquarie Capital Funding LLC, in its capacity as the First Lien Collateral Agent and First Lien Administrative Agent, [   ], as Initial Other First-Priority Collateral Agent, and [_____], in its capacity as the Second Lien Collateral Agent.  In the event of any conflict between the terms of the Junior Lien Intercreditor Agreement and the terms of this Agreement, the terms of the Junior Lien Intercreditor Agreement shall govern."

(b)    In the event that the First-Priority Collateral Agent or the First-Priority Secured Parties enter into any amendment, waiver or consent in respect of or replace any of the First-Priority Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First-Priority Collateral Document or changing in any manner the rights of the First-Priority Collateral Agent, the First-Priority Secured

Parties, the Company or any other Grantor thereunder (including the release of any Liens in First-Priority Collateral and/or the release of any Grantor of its guarantee of the First-Priority Obligations), then such amendment, waiver or consent shall apply automatically to any comparable provision of each Comparable Second-Priority Collateral Document without the consent of any Second-Priority Representative or any Second-Priority Secured Party and without any action by any Second-Priority Representative, Second-Priority Secured Party, the Company or any other Grantor; *provided*, *however*, that (x) no such amendment, waiver or consent shall have the effect of removing assets subject to the Lien of any Second Priority Collateral Document, except to the extent that a release of such Lien is provided for in Section 5.01 hereof, (y) no such amendment, waiver or consent shall impose additional material obligations on or impair the rights, privileges and immunities of any Second-Priority Representative or Second Priority Collateral Agent without such person's written consent and (z) written notice of such amendment, waiver or consent shall have been given to each Second-Priority Representative within ten (10) Business Days after the effectiveness of such amendment, waiver or consent; provided that the failure to give such notice shall not affect the effectiveness and validity of any such amendment, waiver or consent.

(c)     Notwithstanding the foregoing, without the consent of any Secured Party, any First-Priority Representative and any Second-Priority Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with and compliance with Section 8.21 of this Agreement and, upon such execution and delivery, such First-Priority Representative, the First-Priority Secured Parties and the First-Priority Obligations and/or such Second-Priority Representative, the Second-Priority Secured Parties and the Second-Priority Obligations, as applicable, shall be subject to the terms hereof.

Section 5.04.   *Rights As Unsecured Creditors*.   Notwithstanding anything to the contrary in this Agreement, the Second-Priority Representatives and the Second-Priority Secured Parties may exercise rights and remedies as an unsecured creditor against the Company or any Subsidiary of the Company that has guaranteed the Second-Priority Obligations in accordance with the terms of the applicable Second-Priority Documents and applicable law, so long as such rights and remedies do not violate (or are otherwise not prohibited by) this Agreement. Nothing in this Agreement shall prohibit the receipt by any Second-Priority Representative or any Second-Priority Secured Party of the required payments of interest and principal so long as such receipt is not the direct or indirect result of the exercise by any Second-Priority Representative or any Second-Priority Secured Party of rights or remedies as a secured creditor in respect of Common Collateral, Restricted Assets or Sale Proceeds or enforcement in contravention of this Agreement of any Lien in respect of Second-Priority Obligations held by any of them. In the event any Second-Priority Representative or any Second-Priority Secured Party becomes a judgment lien creditor in respect of Common Collateral as a result of its enforcement of its rights as an unsecured creditor in respect of Second-Priority Obligations, such judgment lien shall be subordinated to the Liens securing First-Priority Obligations on the same basis as the other Liens securing the Second-Priority Obligations are so subordinated to such Liens securing First-Priority Obligations under this Agreement. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First-Priority Collateral Agent or the First-Priority Secured Parties may have with respect to the First-Priority Collateral, Restricted Assets or Sale Proceeds.

Section 5.05.   *First-Priority Collateral Agent as Gratuitous Bailee/Agent for Perfection*.

(a)      The First-Priority Collateral Agent agrees to hold the Pledged Collateral that is part of the Common Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee and/or gratuitous agent for the benefit of each Second-Priority Representative and any assignee solely for the purpose of perfecting the security interest granted in such Pledged Collateral pursuant to the Second-Priority Collateral Documents, subject to the terms and conditions of this Section 5.05.

(b)      The First-Priority Collateral Agent agrees to hold the Deposit Account Collateral (if any) that is part of the Common Collateral and controlled by the First-Priority Collateral Agent as gratuitous bailee and/or gratuitous agent for the benefit of each Second-Priority Representative and any assignee solely for the purpose of perfecting the security interest granted in such Deposit Account Collateral pursuant to the Second-Priority Collateral Documents, subject to the terms and conditions of this Section 5.05.

(c)      In the event that the First-Priority Collateral Agent (or its agent or bailees) has Lien filings against intellectual property that is part of the Common Collateral that are necessary for the perfection of Liens in such Common Collateral, the First-Priority Collateral Agent agrees to hold such Liens as gratuitous bailee and/or gratuitous agent for the benefit of each Second-Priority Representative and any assignee solely for the purpose of perfecting the security interest granted in such Liens pursuant to the Second-Priority Collateral Documents, subject to the terms and conditions of this Section 5.05.

(d)      Except as otherwise specifically provided herein (including Sections 3.01 and 4.01), until the Discharge of First-Priority Obligations has occurred, the First-Priority Collateral Agent shall be entitled to deal with the Pledged Collateral in accordance with the terms of the First-Priority Documents as if the Liens under the Second-Priority Collateral Documents did not exist. The rights of the Second-Priority Representatives and the Second-Priority Secured Parties with respect to such Pledged Collateral shall at all times be subject to the terms of this Agreement.

(e)      The First-Priority Collateral Agent shall have no obligation whatsoever to any Second-Priority Representative or any Second-Priority Secured Party to assure that the Pledged Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any Person or any rights pertaining to the Common Collateral except as expressly set forth in this Section 5.05. The duties or responsibilities of the First-Priority Collateral Agent under this Section 5.05 shall be limited solely to holding the Pledged Collateral as gratuitous bailee and/or gratuitous agent for the benefit of each Second-Priority Representative for purposes of perfecting the Lien held by the Second-Priority Secured Parties.

(f)      The First-Priority Collateral Agent shall not have by reason of the Second-Priority Collateral Documents or this Agreement or any other document a fiduciary relationship in respect of any Second-Priority Representative or any Second-Priority Secured Party and the Second-Priority Representatives and the Second-Priority Secured Parties hereby waive and release the First-Priority Collateral Agent from all claims and liabilities arising pursuant to the First-Priority Collateral Agent's role under this Section 5.05, as gratuitous bailee and/or gratuitous agent with respect to the Common Collateral.

(g)     Upon the Discharge of First-Priority Obligations, the First-Priority Collateral Agent shall deliver to the Second-Priority Collateral Agent, at the Company's reasonable expense, to the extent that it is legally permitted to do so, the Pledged Collateral (if any) and the Deposit Account Collateral (if any) that is part of the Common Collateral together with any necessary endorsements (or otherwise allow the Second-Priority Collateral Agent to obtain control of such Pledged Collateral and Deposit Account Collateral) or as a court of competent jurisdiction may otherwise direct. The Company shall take such further action as is required to effectuate the transfer contemplated hereby (or, in the case of the Deposit Account Collateral, use commercially reasonable efforts to effectuate the transfer contemplated hereby) and shall indemnify the First-Priority Collateral Agent for any loss or damage suffered by the First-Priority Collateral Agent as a result of such transfer except for any loss or damage suffered by the First-Priority Collateral Agent as a result of its own willful misconduct or gross negligence. The First-Priority Collateral Agent has no obligation to follow instructions from any Second-Priority Representative in contravention of this Agreement.

(h)     Neither the First-Priority Collateral Agent nor the First-Priority Secured Parties shall be required to marshal any present or future collateral security for the Company's or its Subsidiaries' obligations to the First-Priority Collateral Agent or the First-Priority Secured Parties under the First-Priority Documents or the First-Priority Collateral Documents or any assurance of payment in respect thereof or to resort to such collateral security or other assurances of payment in any particular order, and all of their rights in respect of such collateral security or any assurance of payment in respect thereof shall be cumulative and in addition to all other rights, however existing or arising.

(i)     The agreement of the First-Priority Collateral Agent to act as gratuitous bailee and/or gratuitous agent pursuant to this <u>Section 5.05</u> is intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-104(a)(2) and 9-313(c) of the UCC.

Section 5.06.   *Second-Priority Collateral Agent as Gratuitous Bailee/Agent for Perfection*.

(a)     Upon the Discharge of First-Priority Obligations, the Second-Priority Collateral Agent agrees to hold the Pledged Collateral that is part of the Common Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee and/or gratuitous agent for the benefit of the other Second-Priority Representatives and any assignee solely for the purpose of perfecting the security interest granted in such Pledged Collateral pursuant to the applicable Second-Priority Collateral Document, subject to the terms and conditions of this <u>Section 5.06</u>.

(b)     Upon the Discharge of First-Priority Obligations, the Second-Priority Collateral Agent agrees to hold the Deposit Account Collateral (if any) that is part of the Common Collateral and controlled by the Second-Priority Collateral Agent as gratuitous bailee and/or gratuitous agent for the benefit of other Second-Priority Representatives and any assignee solely for the purpose of perfecting the security interest granted in such Deposit Account Collateral pursuant to the applicable Second-Priority Collateral Document, subject to the terms and conditions of this <u>Section 5.06</u>.

(c)     In the event that the Second-Priority Collateral Agent (or its agent or bailees) has Lien filings against intellectual property that is part of the Common Collateral that are necessary for the perfection of Liens in such Common Collateral, upon the Discharge of First-Priority Obligations, the Second-Priority Collateral Agent agrees to hold such Liens as gratuitous bailee and/or gratuitous agent for the benefit of other Second-Priority Representatives and any assignee solely for the purpose of perfecting the security interest granted in such Liens pursuant to the applicable Second-Priority Collateral Document, subject to the terms and conditions of this Section 5.06.

(d)     The Second-Priority Collateral Agent, in its capacity as gratuitous bailee and/or gratuitous agent, shall have no obligation whatsoever to the other Second-Priority Representatives to assure that the Pledged Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any Person or any rights pertaining to the Common Collateral except as expressly set forth in this Section 5.06.  The duties or responsibilities of the Second-Priority Collateral Agent under this Section 5.06 upon the Discharge of First-Priority Obligations shall be limited solely to holding the Pledged Collateral as gratuitous bailee and/or gratuitous agent for the benefit of other Second-Priority Representatives for purposes of perfecting the Lien held by the applicable Second-Priority Secured Parties.

(e)     The Second-Priority Collateral Agent shall not have by reason of the Second-Priority Collateral Documents or this Agreement or any other document a fiduciary relationship in respect of the other Second-Priority Representatives (or the Second-Priority Secured Parties for which such other Second-Priority Representatives are agent) and the other Second-Priority Representatives hereby waive and release the Second-Priority Collateral Agent from all claims and liabilities arising pursuant to the Second-Priority Collateral Agent's role under this Section 5.06, as gratuitous bailee and/or gratuitous agent with respect to the Common Collateral.

(f)     In the event that the Second-Priority Collateral Agent shall cease to be so designated the Second-Priority Collateral Agent pursuant to the definition of such term, the then Second-Priority Collateral Agent shall deliver to the successor Second-Priority Collateral Agent (at the Company's expense), to the extent that it is legally permitted to do so, the Pledged Collateral (if any) and the Deposit Account Collateral (if any) together with any necessary endorsements (or otherwise allow the successor Second-Priority Collateral Agent to obtain control of such Pledged Collateral and Deposit Account Collateral) or as a court of competent jurisdiction may otherwise direct, and such successor Second-Priority Collateral Agent shall perform all duties of the Second-Priority Collateral Agent as set forth herein. The Company shall take such further action as is required to effectuate the transfer contemplated hereby (or, in the case of the Deposit Account Collateral, use commercially reasonable efforts to effectuate the transfer contemplated hereby) and shall indemnify the Second-Priority Collateral Agent for any loss or damage suffered by the Second-Priority Collateral Agent as a result of such transfer except for any loss or damage suffered by the Second-Priority Collateral Agent as a result of its own willful misconduct or gross negligence. The Second-Priority Collateral Agent has no obligation to follow instructions from the successor Second-Priority Collateral Agent in contravention of this Agreement.

(g)     The agreement of the Second-Priority Collateral Agent to act as gratuitous bailee and/or gratuitous agent pursuant to this Section 5.06 is intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-104(a)(2) and 9-313(c) of the UCC.

Section 5.07. *When Discharge of First-Priority Obligations Deemed to Not Have Occurred*. If, at any time after the Discharge of First-Priority Obligations has occurred, the Company incurs and designates any other First-Priority Obligations, or the Company or any Grantor enters into any Refinancing of any First-Priority Document evidencing a First-Priority Obligation, which Refinancing is permitted hereby and by the terms of the Second-Priority Documents, then such Discharge of First-Priority Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of First-Priority Obligations), and the obligations under such Refinancing of the First-Priority Document shall automatically be treated as First-Priority Obligations for all purposes of this Agreement, and the applicable agreement governing such Other First-Priority Obligations shall automatically be treated as a First-Priority Document (and, upon designation by the Company thereof, the "**First Lien Credit Agreement**" hereunder) for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Common Collateral set forth herein and the granting by the First-Priority Collateral Agent of amendments, waivers and consents hereunder. Upon receipt of notice of such designation or Refinancing (including the identity of the new First-Priority Collateral Agent), each Second-Priority Representative shall promptly (i) enter into such documents and agreements (at the expense of the Company), including amendments or supplements to this Agreement, as the Company or such new First-Priority Collateral Agent shall reasonably request in writing in order to provide the new First-Priority Representative the rights of the First-Priority Collateral Agent contemplated hereby and (ii) to the extent then held by any Second-Priority Representative, deliver to the First-Priority Collateral Agent the Pledged Collateral that is Common Collateral together with any necessary endorsements (or otherwise allow such First-Priority Collateral Agent to obtain possession or control of such Pledged Collateral).

Section 5.08. *No Release Upon Discharge of First-Priority Obligations*. Notwithstanding any other provisions contained in this Agreement, if a Discharge of First-Priority Obligations occurs, the second-priority Liens on the Second-Priority Collateral securing the Second-Priority Obligations will not be released, except to the extent such Second-Priority Collateral or any portion thereof was disposed of in order to repay the First-Priority Obligations secured by such Second-Priority Collateral (including as contemplated under <u>Section 6.09</u> below) or otherwise as permitted under the First-Priority Documents and the Second-Priority Documents, as applicable.

Section 5.09. *Purchase Option*. Without prejudice to the enforcement of the First-Priority Secured Parties' remedies, the First-Priority Secured Parties agree that following (a) the acceleration of the First-Priority Obligations in accordance with the terms of all First-Priority Documents or (b) the commencement of an Insolvency or Liquidation Proceeding (each, a "**Purchase Event**"), within thirty (30) days of the Purchase Event, one or more of the Second-Priority Secured Parties may request, and the First-Priority Secured Parties hereby offer the Second-Priority Secured Parties the option, to purchase all, but not less than all, of the aggregate amount of outstanding First-Priority Obligations outstanding at the time of purchase at par, plus any premium that would be applicable upon prepayment of the First-Priority Obligations and including all accrued and unpaid interest and fees and expenses as of the date of closing of such purchase, in accordance with the relevant First-Priority Documents, without warranty or representation or recourse (except for customary representations and warranties required to be

made by assigning lenders pursuant to any assignment agreement required under any of the First Lien Documents, Initial Other First-Priority Documents, and Other First-Priority Documents).  In connection with such purchase, all issued and undrawn letters of credit constituting First-Priority Obligations shall be cancelled, replaced or cash collateralized in an amount not less than 103% of the face amount thereof by the purchasing Second-Priority Secured Parties, or the purchasing Second-Priority Secured Parties shall have provided other similar credit support satisfactory to each relevant issuer; *provided* that at such time as all such letters of credit have been cancelled, expired or been fully drawn, as the case may be, and after all applications described above have been made, any excess cash collateral deposited as described above shall be returned to the respective purchasers.  If such right is exercised, the parties shall endeavor to close promptly thereafter but in any event within ten (10) Business Days of the request.  If one or more of the Second-Priority Secured Parties exercise such purchase right, it shall be exercised pursuant to documentation mutually acceptable to each of the applicable selling First-Priority Secured Parties and the purchasing Second-Priority Secured Parties. If none of the Second-Priority Secured Parties exercise such right within the time periods set forth above, the First-Priority Secured Parties shall have no further obligations pursuant to this <u>Section 5.09</u> for such Purchase Event and may take any further actions in their sole discretion in accordance with the First-Priority Documents and this Agreement.  The Borrower and each First-Priority Representative hereby consents to any assignment pursuant to this <u>Section 5.09</u> to the extent it has a consent or similar approval right under the assignment provisions of the relevant First-Priority Documents.

## ARTICLE 6
### INSOLVENCY OR LIQUIDATION PROCEEDINGS.

Section 6.01.  *Financing Issues*.

(a)    If the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First-Priority Collateral Agent shall desire to permit (or not object to) the use of cash collateral or to permit (or not object to) the Company or any other Grantor to obtain financing under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision in any Bankruptcy Law ("**DIP Financing**"), then each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that it will raise no (i) objection to (and will not otherwise contest or join with or support any third party opposing, objecting to or contesting) such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection therewith (except to the extent expressly permitted by the proviso in clause (ii) of <u>Section 3.01(a)</u> and <u>Section 6.03</u>) and, to the extent the Liens securing the First-Priority Obligations under the First-Priority Documents are subordinated or *pari passu* with such DIP Financing, will subordinate (and will be deemed to have subordinated) its Liens on the Common Collateral to (x) such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second-Priority Obligations are so subordinated to Liens securing First-Priority Obligations under this Agreement, subject to clause (b) of this <u>Section 6.01</u>, (y) any "carve-out" or administrative charge for professional and United States trustee fees agreed to by the First-Priority Representatives and (z) all adequate protection liens granted to the First-Priority Secured Parties with respect to any Common Collateral, (ii) objection to (and will not otherwise contest or join with or support any third party

opposing, objecting to or contesting) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of First-Priority Obligations made by the First-Priority Collateral Agent or any holder of First-Priority Obligations, (iii) objection to (and will not otherwise contest or join with or support any third party opposing, objecting to or contesting) any lawful exercise by any holder of First-Priority Obligations of the right to credit bid First-Priority Obligations at any sale in foreclosure of First-Priority Collateral, (iv) objection to (and will not otherwise contest or join with or support any third party opposing, objecting to or contesting) any other request for judicial relief made in any court by any holder of First-Priority Obligations relating to the lawful enforcement of any Lien on First-Priority Collateral or (v) objection to (and will not otherwise contest or join with or support any third party opposing, objecting to or contesting) any order relating to a sale, transfer or disposition of assets of any Grantor for which the First-Priority Collateral Agent has consented that provides, to the extent the sale, transfer or disposition is to be free and clear of Liens, that the Liens securing the First-Priority Obligations and the Second-Priority Obligations will attach to the proceeds of the sale (to the extent such proceeds are not applied to repay the First-Priority Obligations) on the same basis of priority as the Liens securing the First-Priority Collateral rank to the Liens securing the Second-Priority Collateral in accordance with this Agreement.

(b)     Notwithstanding the foregoing, the provisions of clause (i) of Section 6.01(a) shall only be applicable as to the Second-Priority Secured Parties with respect to any use of cash collateral or DIP Financing to the extent that: (i) the Second-Priority Representatives retain their Liens with respect to the Common Collateral that existed as of the date of the commencement of the applicable Insolvency or Liquidation Proceeding (including proceeds thereof arising after the commencement of such Insolvency or Liquidation Proceeding (to the extent such proceeds are not applied to repay the First-Priority Obligations)) and (ii) such DIP Financing is secured by Liens equal or senior to Liens securing First Lien Obligations.

(c)     Until the Discharge of First-Priority Obligations has occurred, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that none of them shall assert a claim under section 507(b) of the Bankruptcy Code.

(d)     Notwithstanding any other provision hereof to the contrary, each Second-Priority Representative and each Second-Priority Collateral Agent, for itself and on behalf of the Second-Priority Secured Parties represented by it, agrees that (A) without the consent of the First Lien Secured Parties, none of such Second-Priority Representative or such Second-Priority Collateral Agent, the Second-Priority Secured Parties represented by it or any agent or the trustee on behalf of any of them shall, for any purpose during any Insolvency or Liquidation Proceeding or otherwise, support, endorse, propose or submit, whether directly or indirectly, any valuation of any of the Grantors or their respective assets that allocates or ascribes any value whatsoever to any of the Restricted Assets and (B) without the consent of the First-Lien Secured Parties, none of such Second-Priority Representative or such Second-Priority Collateral Agent, the Second-Priority Secured Parties represented by it or any agent or trustee on behalf of any of them shall for any purpose during any Insolvency or Liquidation Proceeding or otherwise challenge, dispute or object, whether directly or indirectly, to any valuation of any of the Grantors or their respective assets, or otherwise take any position with respect to such valuation, that is proposed, supported or otherwise arises in any Insolvency or Liquidation Proceeding, on grounds that such valuation does not allocate or ascribe adequate or appropriate value to any of the Restricted Assets.

Section 6.02. *Relief from the Automatic Stay*.   Until the Discharge of First-Priority Obligations has occurred, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding or take any action in respect of the Common Collateral, without the prior written consent of the First-Priority Collateral Agent.

Section 6.03. *Adequate Protection*.   Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, agrees that none of them shall object or contest (or support any other Person objecting to or contesting) (a) any request by the First-Priority Collateral Agent or the First-Priority Secured Parties for adequate protection, (b) any objection by the First-Priority Collateral Agent or the First-Priority Secured Parties to any motion, relief, action or proceeding based on the First-Priority Collateral Agent's or the First-Priority Secured Parties' claiming a lack of adequate protection or (c) the payment of interest, fees, expenses or other amounts of the First-Priority Collateral Agent, any First-Priority Representative or any other First-Priority Secured Party under Section 506(b) or 506(c) of Title 11 of the United States Code or any similar provisions of any other Bankruptcy Law. Notwithstanding the foregoing, in any Insolvency or Liquidation Proceeding, (i) if the First-Priority Secured Parties (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any DIP Financing or use of cash collateral under Section 363 or Section 364 of Title 11 of the United States Code or any similar provisions of any other Bankruptcy Law, then each Second-Priority Representative, on behalf of itself and any applicable Second-Priority Secured Party, may seek or request adequate protection in the form of a replacement Lien on such additional collateral, which Lien is subordinated to the Liens securing the First-Priority Obligations and such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second-Priority Obligations are so subordinated to the Liens securing First-Priority Obligations under this Agreement and (ii) in the event any Second-Priority Representative, on behalf of itself or any applicable Second-Priority Secured Party, seeks or requests adequate protection and such adequate protection is granted in the form of additional collateral, then such Second-Priority Representative, on behalf of itself or each such Second-Priority Secured Party, agrees that the First-Priority Representatives shall also be granted a senior Lien on such additional collateral as security for the applicable First-Priority Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Second-Priority Obligations shall be subordinated to the Liens on such collateral securing the First-Priority Obligations and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the First-Priority Secured Parties as adequate protection on the same basis as the other Liens securing the Second-Priority Obligations are so subordinated to such Liens securing First-Priority Obligations under this Agreement.

Section 6.04. *Preference Issues*.   If any First-Priority Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Company or any other Grantor (or any trustee, receiver or similar person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "**Recovery**"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the First-Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First-Priority Secured Parties shall remain entitled to the benefits of this Agreement until a Discharge of First-Priority Obligations with respect to all such recovered amounts and shall have

all rights hereunder until such time. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. Each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby agrees that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

Section 6.05.  *Application*.  This Agreement shall be applicable prior to and after the commencement of any Insolvency or Liquidation Proceeding. All references herein to any Grantor shall apply to any trustee for such Person and such Person as debtor in possession. The relative rights as to the Common Collateral and proceeds thereof, Restricted Assets and proceeds and Sale Proceeds shall continue after the filing thereof on the same basis as prior to the date of the petition, subject to any court order approving the financing of, or use of cash collateral by, any Grantor.

Section 6.06.  *506(c) Claims*.  Until the Discharge of First-Priority Obligations has occurred, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, will not assert or enforce any claim under Section 506(c) of the United States Bankruptcy Code senior to or on a parity with the Liens securing the First-Priority Obligations for costs or expenses of preserving or disposing of any Common Collateral.

Section 6.07.  *Separate Grants of Security and Separate Classifications; Plans of Reorganization*.

(a)    Each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, acknowledges and agrees that (i) the grants of Liens pursuant to the First-Priority Collateral Documents and the Second-Priority Collateral Documents constitute two separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Common Collateral, the Second-Priority Obligations are fundamentally different from the First-Priority Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First-Priority Secured Parties and the Second-Priority Secured Parties in respect of the Common Collateral constitute a single class of claims (rather than separate classes of senior and junior secured claims), then each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party, hereby acknowledges and agrees that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Grantors in respect of the Common Collateral (with the effect being that, to the extent that the aggregate value of the Common Collateral, Restricted Assets and Sale Proceeds is sufficient (for this purpose ignoring all claims held by the Second-Priority Secured Parties), the First-Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, fees and expenses (whether or not allowed or allowable) before any distribution is made in respect of the Second-Priority Obligations, with each Second-Priority Representative, for itself

and on behalf of each applicable Second-Priority Secured Party, hereby acknowledging and agreeing to turn over to the First-Priority Collateral Agent amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second-Priority Secured Parties).

(b)    Each Second-Priority Representative, for itself and on behalf of each applicable Second-Priority Secured Party (whether in the capacity of a secured creditor or an unsecured creditor) shall not propose, vote in favor of, or otherwise directly or indirectly support any plan of reorganization that is inconsistent with the priorities or other provisions of this Agreement other than with the prior written consent of the First-Priority Collateral Agent, unless such plan (i) satisfies the First-Priority Obligations in full in cash (other than any letters of credit issued thereunder which shall have been terminated or cash collateralized in accordance with the provisions of the applicable First-Priority Collateral Document) upon the consummation thereof or (ii) is proposed or supported by the number of First Priority Secured Parties required under Section 1126(c) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law.

Section 6.08.    *Section 1111(b)(2) Waiver*.  Each Second-Priority Representative, for itself and on behalf of the other Second-Priority Secured Parties, waives any claim it may hereafter have against any First-Priority Secured Party arising out of the election by any First-Priority Secured Party of the application to the claims of any First-Priority Secured Party of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any sale, use or lease, cash collateral or DIP Financing arrangement or out of any grant of a security interest in connection with the Common Collateral in any Insolvency or Liquidation Proceeding.

Section 6.09.    *Asset Sales*.  Each Second-Priority Representative agrees, for and on behalf of itself and the applicable Second-Priority Secured Parties represented thereby, that it (i) will not oppose any sale or other disposition consented to by the First-Priority Collateral Agent or any First-Priority Representative of any Common Collateral pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency or Liquidation Proceeding), so long as the Second-Priority Representative, for the benefit of the Second-Priority Secured Parties, shall retain a Lien on the proceeds of such sale or other disposition (to the extent such proceeds of such sale or other disposition are not applied to repay the First-Priority Obligations or otherwise in accordance with this Agreement) and (ii) shall not have any right to credit bid in any disposition of Common Collateral in accordance with Sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code or otherwise, unless such credit bid contemplates the payment in full in cash of all First Lien Obligations on the closing of such disposition.

Section 6.10.    *Reorganization Securities; Voting*.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a Plan of Reorganization or similar dispositive restructuring plan, on account of both the First-Priority Obligations and the Second-Priority Obligations, then, to the extent the debt obligations distributed on account of the First-Priority Obligations and on account of the Second-Priority Obligations are secured by Liens upon the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

Section 6.11.  *Post-Petition Interest.*  Each Second-Priority Secured Party shall not oppose or seek to challenge any claim by any First-Priority Secured Party for allowance in any Insolvency or Liquidation Proceeding of First-Priority Obligations consisting of claims for post-petition interest, fees, costs, expenses, and/or other charges, under Section 506(b) of the Bankruptcy Code (or any similar provision of any other Bankruptcy Law) or otherwise, to the extent of the value of the Lien of the First-Priority Representative on behalf of the First-Priority Secured Parties on the First-Priority Collateral (for this purpose ignoring all claims and Liens held by the Second-Priority Secured Parties on the Common Collateral).

ARTICLE 7
RELIANCE; WAIVERS; ETC

Section 7.01.  *Reliance.*  Other than any reliance on the terms of this Agreement, each First-Priority Representative, on behalf of itself and each applicable First-Priority Secured Party (other than the First Lien Administrative Agent and the First Lien Collateral Agent), acknowledges that it and the applicable First-Priority Secured Parties (other than the First Lien Administrative Agent and the First Lien Collateral Agent) have, independently and without reliance on the Second-Priority Collateral Agent or any Second-Priority Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the applicable First-Priority Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the applicable First-Priority Documents or this Agreement.  Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party (other than the Second Lien [Trustee][Administrative Agent], the Second Lien Collateral Agent and any trustee or collateral agent acting as an Other Second-Priority Representative), acknowledges that it and the applicable Second-Priority Secured Parties (other than the Second Lien [Trustee][Administrative Agent] and the Second Lien Collateral Agent and any trustee or collateral agent acting as an Other Second-Priority Representative) have, independently and without reliance on the First-Priority Collateral Agent or any First-Priority Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the applicable Second-Priority Documents, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decision in taking or not taking any action under the applicable Second-Priority Documents or this Agreement.

Section 7.02.  *No Warranties or Liability.*  Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, acknowledges and agrees that neither the First-Priority Collateral Agent nor any First-Priority Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First-Priority Documents, the ownership of any Common Collateral or the perfection or priority of any Liens thereon. Neither the First-Priority Collateral Agent nor any First-Priority Secured Party shall have any duty to any Second-Priority Representative or any Second-Priority Secured Party to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Company or any Subsidiary thereof (including the Second-Priority Documents), regardless of any knowledge thereof that they may have or be charged with. Except as expressly set forth in this Agreement, the First-Priority Collateral Agent, the First-Priority Secured Parties, the Second-Priority Representatives and the Second-Priority Secured Parties have

not otherwise made to each other, nor do they hereby make to each other, any warranties, express or implied, nor do they assume any liability to each other with respect to (a) the enforceability, validity, value or collectibility of any of the Second-Priority Obligations, the First-Priority Obligations or any guarantee or security which may have been granted to any of them in connection therewith, (b) the Company's or any other Grantor's title to or right to transfer any of the Common Collateral or (c) any other matter except as expressly set forth in this Agreement.

Section 7.03. *Obligations Unconditional*.   All rights, interests, agreements and obligations of the First-Priority Collateral Agent and the First-Priority Secured Parties, and the Second-Priority Representatives and the Second-Priority Secured Parties, respectively, hereunder shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any First-Priority Documents or any Second-Priority Documents;

(b)    any change in the time, manner or place of payment of, or in any other terms of, all or any of the First-Priority Obligations or Second-Priority Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of the First Lien Credit Agreement or any other First-Priority Document or of the terms of the Second Lien [Indenture][Credit Agreement] or any other Second-Priority Document;

(c)    any exchange of any security interest in any Common Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First-Priority Obligations or Second-Priority Obligations or any guarantee thereof;

(d)    the commencement of any Insolvency or Liquidation Proceeding in respect of the Company or any other Grantor; or

(e)    any other circumstances that otherwise might constitute a defense available to, or a discharge of, the Company or any other Grantor in respect of the First-Priority Obligations, or of any Second-Priority Representative or any Second-Priority Secured Party in respect of this Agreement.

## ARTICLE 8
### MISCELLANEOUS

Section 8.01.  *Conflicts*.  Subject to Section 8.19, in the event of any conflict between the terms of this Agreement and the terms of any First-Priority Document or any Second-Priority Document, the terms of this Agreement shall govern. Notwithstanding any other term or provision set forth in this Agreement, nothing herein shall require the First-Priority Collateral Agent, the Initial Other First-Priority Collateral Agent or any of the First-Priority Secured Parties to take any action that would violate any applicable laws.

Section 8.02.  *Continuing Nature of this Agreement; Severability*.  Subject to Section 5.07 and Section 6.04, this Agreement shall continue to be effective until the Discharge of First-Priority

Obligations shall have occurred. This is a continuing agreement of lien subordination and the First-Priority Secured Parties may continue, at any time and without notice to each Second-Priority Representative or any Second-Priority Secured Party, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company, any of its Subsidiaries or any other Grantor constituting First-Priority Obligations in reliance hereon. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding, any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 8.03.    *Amendments; Waivers*.    No amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Second-Priority Representative (or its authorized agent), each First-Priority Representative (or its authorized agent) and, in the case of any amendment that increases the obligations, or otherwise adversely affects any right, of the Company hereunder, the Company, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Notwithstanding anything in this Section 8.03 to the contrary, this Agreement may be amended from time to time at the request of the Company, at the Company's expense, and without the consent of any First-Priority Representative, any Second-Priority Representative, any First-Priority Secured Party or any Second-Priority Secured Party or any other Person then party thereto, but in each case subject to Section 8.21, to (i) add other parties holding Other First-Priority Obligations (or any agent or trustee therefor) and Other Second-Priority Obligations (or any agent or trustee therefor) in each case to the extent such Obligations are not prohibited by any First-Priority Document or any Second-Priority Document, (ii) in the case of Other Second-Priority Obligations, (a) establish that the Lien on the Common Collateral securing such Other Second-Priority Obligations shall be junior and subordinate in all respects to all Liens on the Common Collateral securing any First-Priority Obligations and shall share in the benefits of the Common Collateral equally and ratably with or junior to all Liens on the Common Collateral securing any Second-Priority Obligations (subject to the terms of the applicable Second-Priority Documents and the First Lien Intercreditor Agreement), and (b) provide to the holders of such Other Second-Priority Obligations (or any agent or trustee thereof) the comparable rights and benefits (including any improved rights and benefits that have been consented to by the First-Priority Collateral Agent) as are provided to the holders of Second-Priority Obligations under this Agreement (subject to the terms of the applicable Second-Priority Documents), (iii) in the case of Other First-Priority Obligations, (a) establish that the Lien on the Common Collateral securing such Other First-Priority Obligations shall be superior in all respects to all Liens on the Common Collateral securing any Second-Priority Obligations and shall share in the benefits of the Common Collateral equally and ratably with all Liens on the Common Collateral securing any First-Priority Obligations (subject to the terms of the applicable First-Priority Documents), and (b) provide to the holders of such Other First-Priority Obligations (or any agent or trustee thereof) the comparable rights and benefits as are provided to the holders of First-Priority Obligations under this Agreement (subject to the terms of the applicable First-Priority Documents), in each case so long as such modifications are not prohibited by any First-Priority Document or any Second-Priority Document and (iv) give effect to any Refinancing of any Obligations. In furtherance thereof, the Company may designate hereunder in writing

obligations as a First Lien Credit Agreement (and any Person operating in such capacity thereunder as a First Lien Administrative Agent or First Lien Collateral Agent), a Second Lien Document (and any Person operating in such capacity thereunder as a Second Lien Collateral Agent), Other First-Priority Obligations (and any Person operating in such capacity thereunder as an Other First-Priority Representative) or Other Second-Priority Obligations (and any Person operating in such capacity thereunder as an Other Second-Priority Representative), and may specify that any such obligations constitute a Refinancing of any existing series of Obligations, if the incurrence of such obligations and related Liens (including the priority thereof) is not prohibited under each of the Financing Documents and this Agreement. Any such additional party and each First-Priority Representative and Second-Priority Representative shall be entitled to rely on the determination of an officer of the Company that such modifications are not prohibited by any First-Priority Document or any Second-Priority Document if such determination is set forth in an officer's certificate delivered to such party, the First-Priority Collateral Agent and each Second-Priority Representative. At the request (and sole expense) of the Company, without the consent of any First-Priority Secured Party or Second-Priority Secured Party, each of the First-Priority Collateral Agent, the Second-Priority Collateral Agent and each other First-Priority Representative and Second-Priority Representative shall execute and deliver an acknowledgment and confirmation of such permitted modifications and/or enter into an amendment, a restatement or a supplement of this Agreement to facilitate such permitted modifications (it being understood that such actions shall not be required for the effectiveness of any such modifications).

Section 8.04.    *Information Concerning Financial Condition of the Company and the Subsidiaries*.  The First-Priority Collateral Agent, the First-Priority Secured Parties, each Second-Priority Representative and the Second-Priority Secured Parties shall each be responsible for keeping themselves informed of (a) the financial condition of the Company and the Subsidiaries of the Company and all endorsers and/or guarantors of the Second-Priority Obligations or the First-Priority Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Second-Priority Obligations or the First-Priority Obligations; provided that nothing in this <u>Section 8.04</u> shall impose a duty on any Second-Priority Representative to keep itself informed beyond that which may be required by its applicable Second-Priority Documents. The First-Priority Collateral Agent, the First-Priority Secured Parties, each Second-Priority Representative and the Second-Priority Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that the First-Priority Collateral Agent, any First-Priority Secured Party, any Second-Priority Representative or any Second-Priority Secured Party, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it or they shall be under no obligation (w) to make, and the First-Priority Collateral Agent, the First-Priority Secured Parties, the Second-Priority Representatives and the Second-Priority Secured Parties shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

Section 8.05.    *Subrogation*.  Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, hereby waives any rights of subrogation it may

acquire as a result of any payment hereunder until the Discharge of First-Priority Obligations has occurred.

Section 8.06. *Application of Payments*.    Except as otherwise provided herein, all payments received by the First-Priority Secured Parties may be applied, reversed and reapplied, in whole or in part, to such part of the First-Priority Obligations as the First-Priority Secured Parties, in their sole discretion, deem appropriate, consistent with the terms of the First-Priority Documents and the First Lien Intercreditor Agreement. Except as otherwise provided herein, each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, assents to any such extension or postponement of the time of payment of the First-Priority Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security that may at any time secure any part of the First-Priority Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

Section 8.07. *Consent to Jurisdiction; Waivers.*    The parties hereto irrevocably and unconditionally agree that any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against any party hereto, or any affiliate of thereof, in any way relating to this Agreement or the transactions relating hereto, shall be tried and litigated only in the courts of the State of New York sitting in Borough of Manhattan, and in the United States District Court of the Southern District of New York, and any appellate court from any thereof.  The parties hereto irrevocably and unconditionally submit to the exclusive jurisdiction of any state or federal court located in the Borough of Manhattan, New York, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and consent that all service of process may be made by registered mail directed to such party as provided in <u>Section 8.08</u> for such party.  Service so made shall be deemed to be completed three days after the same shall be posted as aforesaid.  The parties hereto waive any objection to any action instituted hereunder in any such court based on forum non conveniens, and any objection to the venue of any action instituted hereunder in any such court.  EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO IN CONNECTION WITH THE SUBJECT MATTER HEREOF.

Section 8.08. *Notices*.  All notices to the First-Priority Secured Parties and the Second-Priority Secured Parties permitted or required under this Agreement may be sent to the First-Priority Collateral Agent, the Second-Priority Collateral Agent, or any other First-Priority Representative or Second-Priority Representative as provided in the First Lien Credit Agreement, the Second Lien [Indenture][Credit Agreement], the relevant First-Priority Document or the relevant Second-Priority Document, as applicable. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each

Exhibit M-36

party, at such other address as may be designated by such party in a written notice to all of the other parties. Each First-Priority Representative hereby agrees to promptly notify each Second-Priority Representative upon payment in full in cash of all indebtedness under the applicable First-Priority Documents (except for contingent indemnities and cost and reimbursement obligations to the extent no claim therefor has been made).

Section 8.09.  *Further Assurances*.  Each of the Second-Priority Representatives, on behalf of itself and each applicable Second-Priority Secured Party, and each of the First-Priority Representatives, on behalf of itself and each applicable First-Priority Secured Party, agrees that each of them shall take such further action and shall execute and deliver to the First-Priority Collateral Agent and the First-Priority Secured Parties such additional documents and instruments (in recordable form, if requested) as the First-Priority Collateral Agent or the First-Priority Secured Parties may reasonably request (and at the Company's expense) to effectuate the terms of and the lien priorities contemplated by this Agreement.

Section 8.10.  *Governing Law*.  THIS AGREEMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY PRINCIPLE OF CONFLICTS OF LAW THAT COULD REQUIRE THE APPLICATION OF ANY OTHER LAW.

Section 8.11.  *Binding on Successors and Assigns*.  This Agreement shall be binding upon the First-Priority Collateral Agent, the other First-Priority Representatives, the First-Priority Secured Parties, the Second-Priority Representatives, the Second-Priority Secured Parties, the Company, the Company's Subsidiaries party hereto and their respective permitted successors and assigns.

Section 8.12.  *Specific Performance*.  The First-Priority Collateral Agent may demand specific performance of this Agreement. Each Second-Priority Representative, on behalf of itself and each applicable Second-Priority Secured Party, hereby irrevocably (x) waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the First-Priority Collateral Agent and (y) agrees that, in connection with the forgoing, the First-Priority Collateral Agent may seek an affirmative injunction to enforce the Agreement without a requirement to post a bond in connection therewith.

Section 8.13.  *Section Titles*.  The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

Section 8.14.  *Counterparts*.  This Agreement may be executed in one or more counterparts, including by means of facsimile or in portable document format (pdf), each of which shall be an original and all of which shall together constitute one and the same document. Each party hereto may also require that any such documents and signatures delivered by telecopier or other electronic transmission be confirmed by a manually signed original thereof; provided that

the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or other electronic transmission. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 8.15.   *Authorization*.   By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement. Each First-Priority Representative represents and warrants that this Agreement is binding upon the applicable First-Priority Secured Parties for which such First-Priority Representative is acting. Each Second-Priority Representative represents and warrants that this Agreement is binding upon the applicable Second-Priority Secured Parties for which such Second-Priority Representative is acting.

Section 8.16.   *No Third Party Beneficiaries; Successors and Assigns*.   This Agreement and the rights and benefits hereof shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and permitted assigns and shall inure to the benefit of each of, and be binding upon, the holders of First-Priority Obligations and Second-Priority Obligations. No other Person shall have or be entitled to assert rights or benefits hereunder.

Section 8.17.   *Effectiveness*.   This Agreement shall become effective when executed and delivered by the parties hereto. This Agreement shall be effective both before and after the commencement of any Insolvency or Liquidation Proceeding. All references to the Company or any other Grantor shall include the Company or any other Grantor as debtor and debtor-in-possession and any receiver or trustee for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.

Section 8.18.   *First-Priority Representatives and Second-Priority Representatives*.   It is understood and agreed that (a) Macquarie is entering into this Agreement in its capacity as First Lien Collateral Agent under the First Lien Credit Agreement, and the provisions of Article IX of the First Lien Credit Agreement applicable to the First Lien Collateral Agent thereunder shall also apply to it as First-Priority Collateral Agent and First Lien Collateral Agent hereunder, (b) [ ] is entering into this Agreement in its capacity as Initial Other First-Priority Collateral Agent under the Initial Other First Lien [Indenture][Credit Agreement], and the provisions of Section [trustee/agent as representative of holders of obligations] of the Initial Other First Lien [Indenture][Credit Agreement] applicable to the Initial Other First-Priority Collateral Agent thereunder shall also apply to it as Initial Other First-Priority Collateral Agent and Initial Other First-Priority Collateral Agent hereunder, (c) [_____] is entering into this Agreement in its capacity as Second Lien Collateral Agent under the Second Lien [Indenture][Credit Agreement], and the provisions of Section [trustee/agent as representative of holders of obligations] of the Second Lien [Indenture][Credit Agreement] applicable to the Second Lien Collateral Agent thereunder shall also apply to it as Second-Priority Collateral Agent and Second Lien Collateral Agent hereunder and (d) each Other Second-Priority Representative and Other Second-Priority

Collateral Agent is entering into this Agreement in its respective capacities under its respective Other Second-Priority Documents, and the corresponding provisions of such Other Second-Priority Documents applicable to such Other Second-Priority Representative and such Other Second-Priority Collateral Agent shall also apply to it as Other Second-Priority Representative and Other Second-Priority Collateral Agent hereunder.

Section 8.19.  *Relative Rights*.  Notwithstanding anything in this Agreement to the contrary (except to the extent contemplated by Sections 5.01 and 5.03(b)), nothing in this Agreement is intended to or will (a) amend, waive or otherwise modify the provisions of the First Lien Credit Agreement, the Second Lien [Indenture][Credit Agreement] or any other First-Priority Document or Second-Priority Document entered into in connection with the First Lien Credit Agreement, the Second Lien [Indenture][Credit Agreement] or any other First-Priority Document or Second-Priority Document or permit the Company or any Subsidiary of the Company to take any action, or fail to take any action, to the extent such action or failure would otherwise constitute a breach of, or default under, the First Lien Credit Agreement, the Second Lien [Indenture][Credit Agreement] or any other First-Priority Document or Second-Priority Document entered into in connection with the First Lien Credit Agreement, the Second Lien [Indenture][Credit Agreement] or any other First-Priority Document or Second-Priority Document, (b) change the relative priorities of the First-Priority Obligations or the Liens granted under the First-Priority Documents on the Common Collateral (or any other assets) as among the First-Priority Secured Parties, (c) otherwise change the relative rights of the First-Priority Secured Parties in respect of the Common Collateral as among such First-Priority Secured Parties as set forth in the First Lien Intercreditor Agreement and the First-Priority Documents or (d) obligate the Company or any Subsidiary of the Company to take any action, or fail to take any action, that would otherwise constitute a breach of, or default under, the First Lien Credit Agreement, the Second Lien [Indenture][Credit Agreement] or any other First-Priority Document or Second-Priority Document entered into in connection with the First Lien Credit Agreement, the Second Lien [Indenture][Credit Agreement] or any other First-Priority Document or Second-Priority Document.

Section 8.20.  *Second-Priority Collateral Agent*.  The Second-Priority Collateral Agent is executing and delivering this Agreement solely in its capacity as such and pursuant to directions set forth in the Second Lien [Indenture][Credit Agreement]; and in so doing, the Second-Priority Collateral Agent shall not be responsible for the terms or sufficiency of this Agreement for any purpose.  The Second-Priority Collateral Agent shall not have duties or obligations under or pursuant to this Agreement other than such duties expressly set forth in this Agreement as duties on its part to be performed or observed.  In entering into this Agreement, or in taking (or forbearing from) any action under or pursuant to this Agreement, the Second-Priority Collateral Agent shall have and be protected by all of the rights, immunities, indemnities and other protections granted to it under the Second Lien [Indenture][Credit Agreement] and, as applicable, the Second Lien Collateral Agreement.

Section 8.21.  *Joinder Requirements*.  The Company may designate additional obligations as Other First-Priority Obligations or Other Second-Priority Obligations pursuant to this Section 8.21 if (x) the incurrence of such obligations is not prohibited by any First-Priority Document or Second-Priority Document then in effect and (y) the Company shall have delivered an officer's certificate to each First-Priority Representative and each Second-Priority Representative certifying the same.  If not so prohibited, the Company shall (i) notify each First-Priority Representative and

each Second-Priority Representative in writing of such designation and (ii) cause the applicable new First-Priority Representative or Second-Priority Representative to execute and deliver to each other First-Priority Representative and Second-Priority Representative, a Joinder Agreement substantially in the form of Exhibit A or Exhibit B, as applicable, hereto.

Section 8.22.    *Intercreditor Agreements.*

(a)    Each party hereto agrees that the First-Priority Secured Parties (as among themselves) and the Second-Priority Secured Parties (as among themselves) may each enter into intercreditor agreements (or similar arrangements, including, in the case of the First-Priority Secured Parties, the First Lien Intercreditor Agreement) with the applicable First-Priority Representatives or Second-Priority Representatives, as the case may be, governing the rights, benefits and privileges as among the First-Priority Secured Parties or as among the Second-Priority Secured Parties, as the case may be, in respect of any or all of the Common Collateral, this Agreement and the other First-Priority Collateral Documents or the other Second-Priority Collateral Documents, as the case may be, including as to application of proceeds of any Common Collateral, voting rights, control of any Common Collateral and waivers with respect to any Common Collateral, in each case so long as the terms thereof do not violate or conflict with the provisions of this Agreement or the other First-Priority Collateral Documents or Second-Priority Collateral Documents, as the case may be. In any event, if a respective intercreditor agreement (or similar arrangement) exists, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement or any other First-Priority Collateral Document or Second-Priority Collateral Document, and the provisions of this Agreement and the other First-Priority Collateral Documents and Second-Priority Collateral Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, restated, amended and restated, modified or otherwise supplemented from time to time in accordance with the terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)).

(b)    In addition, in the event that the Company or any Subsidiary thereof incurs any Obligations secured by a Lien on any Common Collateral that is junior to Liens thereon securing any First-Priority Obligations or Second-Priority Obligations, as the case may be, and such Obligations are not designated by the Company as Second-Priority Obligations, then the First-Priority Collateral Agent and/or Second-Priority Collateral Agent shall upon the request of the Company enter into an intercreditor agreement with the agent or trustee for the creditors with respect to such secured Obligations to reflect the relative Lien priorities of such parties with respect to the relevant portion of the Common Collateral and governing the relative rights, benefits and privileges as among such parties in respect of such Common Collateral, including as to application of the proceeds of such Common Collateral, voting rights, control of such Common Collateral and waivers with respect to such Common Collateral, in each case, so long as such secured Obligations are not prohibited by, and the terms of such intercreditor agreement do not violate or conflict with, the provisions of this Agreement or any of the First-Priority Documents or Second-Priority Documents, as the case may be. If any such intercreditor agreement (or similar arrangement) is entered into, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement or any First-Priority Documents, and the provisions of this Agreement, the First-Priority Documents and the Second-Priority Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be

amended, restated, amended and restated, modified or otherwise supplemented from time to time in accordance with the respective terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)).

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**MACQUARIE CAPITAL FUNDING LLC,**
as First Lien Collateral Agent, First Lien Administrative Agent and First-Priority Collateral Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[    ],
    as Initial Other First-Priority Collateral Agent

By: _____
    Name:
    Title:

**[_____],**
    as Second Lien Collateral Agent and Second-Priority Collateral Agent

By: _____
    Name:
    Title:

Exhibit M-42

## ACKNOWLEDGMENT

The Grantors each hereby acknowledge that they have received a copy of the foregoing Junior Lien Intercreditor Agreement and consent thereto, agree to recognize all rights granted thereby to the First Lien Collateral Agent, and the other First-Priority Secured Parties, and the Second Lien Collateral Agent, and the other Second-Priority Secured Parties, and waive the provisions of Section 9-615(a) of the UCC in connection with the application of proceeds of Common Collateral in accordance with the provisions of the Junior Lien Intercreditor Agreement; *provided*, *however*, that the foregoing shall not, without the consent of Company, impair the rights of any Grantor under the First-Priority Documents or the Second-Priority Documents. The Grantors each further acknowledge and agree that they are not an intended beneficiary or third party beneficiary under the foregoing Junior Lien Intercreditor Agreement, as amended, restated, supplemented or otherwise modified from time to time.

**[Signatures on following pages]**

**Acknowledged as of the date first written above:**

Grantors:

**LUCKY BUCKS, LLC**

By: _____
     Name:
     Title:

**LUCKY BUCKS HOLDCO, LLC**

By: _____
     Name:
     Title:

**[OTHER GRANTORS]**

By: _____
     Name:
     Title:

**Annex I**

## List of Grantors[1]

1. LUCKY BUCKS, LLC
2. LUCKY BUCKS HOLDCO, LLC
3. [OTHER GRANTORS]

---

[1] NTD – To be further updated.

**EXHIBIT A**
**Joinder Agreement**

JOINDER AGREEMENT
(Other First-Priority Obligations)

JOINDER AGREEMENT (this "**Agreement**") dated as of [_____], [____], by [_____] (the "**New Representative**"), as an Other First-Priority Representative and [[_____] (the "**New Collateral Agent**")][2], as an Other First-Priority Collateral Agent.

This Agreement is supplemental to that certain Junior Lien Intercreditor Agreement, dated as of [_____], 20[__] (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Junior Lien Intercreditor Agreement**"), by and among MACQUARIE CAPITAL FUNDING LLC ("**Macquarie**"), as First Lien Collateral Agent, First Lien Administrative Agent and First-Priority Collateral Agent, [      ], as Initial Other First-Priority Collateral Agent, and [_____], as Second Lien Collateral Agent and Second-Priority Collateral Agent.  This Agreement has been entered into to record the accession of the New Representative[s] as Other First-Priority Representative[s] under the Junior Lien Intercreditor Agreement [and to record the accession of the New Collateral Agent as an Other First-Priority Collateral Agent under the Junior Lien Intercreditor Agreement].

ARTICLE I
**Definitions**

SECTION 1.01   Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Junior Lien Intercreditor Agreement.

ARTICLE II
**Accession**

SECTION 2.01   [The][/Each] New Representative agrees to become, with immediate effect, a party to and agrees to be bound by the terms of, the Junior Lien Intercreditor Agreement as an Other First-Priority Representative as if it had originally been party to the Junior Lien Intercreditor Agreement as an Other First-Priority Representative.

SECTION 2.02   [The New Collateral Agent agrees to become, with immediate effect, a party to and agrees to be bound by the terms of, the Junior Lien Intercreditor Agreement as an Other First-Priority Collateral Agent as if it had originally been party to the Junior Lien Intercreditor Agreement as an Other First-Priority Collateral Agent.]

SECTION 2.03   The New Representative[s] and the New Collateral Agent confirm[s] that their address details for notices pursuant to the Junior Lien Intercreditor Agreement [is][/are] as follows: [_____].

---

[2]To be included if applicable.

SECTION 2.04  [Reserved].

SECTION 2.05  [_____] [is][/are] acting in the capacities of Other First-Priority Representative[s] and [_____] is acting in its capacity as Other First-Priority Collateral Agent solely for the Secured Parties under [_____].

## ARTICLE III
## **Miscellaneous**

SECTION 3.01  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

SECTION 3.02  This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement. Each party hereto may also require that any such documents and signatures delivered by telecopier or other electronic transmission be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or other electronic transmission. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[INSERT SIGNATURE BLOCKS, INCLUDING ACKNOWLEDGEMENT BY GRANTORS]

**EXHIBIT B**
**Joinder Agreement**

JOINDER AGREEMENT
(Other Second-Priority Obligations)

JOINDER AGREEMENT (this "**Agreement**") dated as of [_____], [____], among [_____] (the "**New Representative**"), as an Other Second-Priority Representative and [_____] (the "**New Collateral Agent**")[3], as an Other Second-Priority Collateral Agent.

This Agreement is supplemental to that certain Junior Lien Intercreditor Agreement, dated as of [_____], 20[__] (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Junior Lien Intercreditor Agreement**"), by and among MACQUARIE CAPITAL FUNDING LLC ("**Macquarie**"), as First Lien Collateral Agent, First Lien Administrative Agent and First-Priority Collateral Agent, [    ], as Initial Other First-Priority Collateral Agent, and [_____], as Second Lien Collateral Agent and Second-Priority Collateral Agent. This Agreement has been entered into to record the accession of the New Representative[s] as Other Second-Priority Representative[s] under the Junior Lien Intercreditor Agreement [and to record the accession of the New Collateral Agent as an Other Second-Priority Collateral Agent under the Junior Lien Intercreditor Agreement].

ARTICLE I
**Definitions**

SECTION 1.01  Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Junior Lien Intercreditor Agreement.

ARTICLE II
**Accession**

SECTION 2.01  [The][/Each] New Representative agrees to become, with immediate effect, a party to and agrees to be bound by the terms of, the Junior Lien Intercreditor Agreement as an Other Second-Priority Representative as if it had originally been party to the Junior Lien Intercreditor Agreement as an Other Second-Priority Representative.

SECTION 2.02  [The New Collateral Agent agrees to become, with immediate effect, a party to and agrees to be bound by the terms of, the Junior Lien Intercreditor Agreement as an Other Second-Priority Collateral Agent as if it had originally been party to the Junior Lien Intercreditor Agreement as an Other Second-Priority Collateral Agent.]

SECTION 2.03  The New Representative[s] and the New Collateral Agent confirm[s] that their address details for notices pursuant to the Junior Lien Intercreditor Agreement [is][/are] as follows: [_____].

---

[3]To be included if applicable.

SECTION 2.04  [Reserved].

SECTION 2.05  [_____] [is][/are] acting in the capacities of Other Second-Priority Representative[s] and [_____] is acting in its capacity as Other Second-Priority Collateral Agent solely for the Secured Parties under [_____].

SECTION 2.06  [_____] [is][/are] entering this Agreement and the Junior Lien Intercreditor Agreement in its capacities as Other Second-Priority Representative[s] and [_____] is entering into this Agreement and the Junior Lien Intercreditor Agreement in its capacity as Other Second-Priority Collateral Agent.  In so acting, [_____] shall be entitled to all of the rights, privileges and immunities granted to it under the Junior Lien Intercreditor Agreement as if such rights, privileges and immunities were set forth in this Agreement.

ARTICLE III
**Miscellaneous**

SECTION 3.01  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

SECTION 3.02  This Agreement may be executed in counterparts, each of which shall constitute an original but all of which shall be taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement. Each party hereto may also require that any such documents and signatures delivered by telecopier or other electronic transmission be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or other electronic transmission. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[INSERT SIGNATURE BLOCKS, INCLUDING ACKNOWLEDGEMENT
BY GRANTORS]

**EXHIBIT N**

**[FORM OF] SOLVENCY CERTIFICATE**

July 30, 2021

Reference is made to that certain Credit Agreement, dated as of July 30, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), Macquarie Capital Funding LLC, as Administrative Agent and Collateral Agent and each L/C Issuer and Lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned, the Executive Vice President of the Borrower, in such capacity only and not in an individual capacity (and without personal liability), hereby certifies, and based upon facts and circumstances as they exist as of the date hereof (and disclaiming any responsibility for changes in such fact and circumstances after the date hereof), as follows on behalf of the Borrower:

As of the date hereof and after giving effect to the Transactions and the incurrence of the Indebtedness and Obligations being incurred in connection with the Credit Agreement and use of proceeds thereof, that (a) each of the Fair Value and the Present Fair Saleable Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Stated Liabilities and Identified Contingent Liabilities; (b) the Borrower and its Subsidiaries taken as a whole do not have Unreasonably Small Capital; and (c) the Borrower and its Subsidiaries taken as a whole can pay their Stated Liabilities and Identified Contingent Liabilities as they mature.

For purposes of this Solvency Certificate, the terms "Fair Value", "Present Fair Saleable Value", "Stated Liabilities", "Identified Contingent Liabilities", "Can pay their Stated Liabilities and Contingent Liabilities as they mature" and "Do not have Unreasonably Small Capital" shall have the respective meanings ascribed to such terms in the definition of "Solvent" in the Credit Agreement.

*[Signature Pages Follow]*

**LUCKY BUCKS, LLC,**
as Borrower

By: _____
Name:
Title: Executive Vice President

**EXHIBIT O**

**[FORM OF] SECURED PARTY JOINDER NOTICE**

[_], 20[_]

Macquarie Capital Funding LLC,
as Administrative Agent and Collateral Agent

c/o Cortland Capital Market Services LLC
225 W. Washington St., 9th floor
Chicago, IL 60606
Attention: Agency Services – Macquarie
Telephone:  855-657-6589
Facsimile:  312-376-0751
Email:  MacCap@alterdomus.com

**Copy to:**
Macquarie Capital Funding LLC
125 West 55th Street
New York, NY 10019
Attention:  Macquarie Capital Debt Capital Markets Middle Office
Phone:  (212) 231-0466 / (212) 231-0494
Facsimile:  (212) 231-6518
Email:  MacCap.DCMAdmin@macquarie.com

Re: Designation of [Secured Cash Management Obligations] [Secured Hedge Agreement]

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as of July 30, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), the Lenders and L/C Issuers from time to time party thereto and Macquarie Capital Funding LLC, as administrative agent (in such capacity, the "Administrative Agent") and collateral agent (in such capacity, the "Collateral Agent").  Capitalized terms used herein but not defined herein shall have the respective meanings ascribed to such terms in the Credit Agreement.

The Borrower hereby designates (i) [Obligations under]¹ that certain [   ], by and among [   ] (the "Qualified Counterparty") and [   ] (the "Specified [Cash Management] [Hedge] Agreement") as ["Secured Cash Management Obligations"] [a "Secured Hedge Agreement"] under the Credit Agreement and (ii) the Qualified Counterparty as a "[Cash Management Bank] [Hedge Bank]" under the Credit Agreement solely with respect to the Specified [Cash Management] [Hedge] Agreement.

The Qualified Counterparty (i) hereby appoints the Administrative Agent and the Collateral Agent, as its agent under, and in accordance with the terms of, the Loan Documents, (ii) agrees to be bound by the provisions of Article IX of the Credit Agreement in favor of the Agent as if it were a Lender, including without limitation Section 9.03 thereof, and Section 9.07 of the Credit Agreement and (iii) hereby makes each of the

---

¹ NTD: Include for Secured Cash Management Obligations

acknowledgements, agreements, representations and warranties as set forth in <u>Section 9.06</u> of the Credit Agreement as if it were a Lender.

The Administrative Agent hereby agrees to the foregoing and accepts (i) [Obligations under][2] the Specified [Cash Management] [Hedge] Agreement as [Secured Cash Management Obligations] [a Secured Hedge Agreement] for purposes of the Loan Documents and (ii) the Qualified Counterparty as a "[Cash Management Bank] [Hedge Bank]" solely with respect to the Specified [Cash Management] [Hedge] Agreement.

This letter agreement shall be a "Loan Document" for all purposes of the Credit Agreement, and the other Loan Documents and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.  This letter agreement may be executed by one or more of the parties to this letter agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this letter agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this letter agreement. The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this letter agreement and the transactions contemplated hereby shall be deemed to include electronic signatures and contract formations on electronic platforms, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

*[Remainder of Page Intentionally Blank; Signature Pages Follow]*

---

[2] NTD: Include for Secured Cash Management Obligations

Sincerely,

**LUCKY BUCKS, LLC,**
a Georgia limited liability company

By: _____
Name:
Title:

[ _____ ],
as Qualified Counterparty

By: _____
Name:
Title:

Agreed to by:

**MACQUARIE CAPITAL FUNDING LLC,**
as Administrative Agent and Collateral Agent

By: _____
Name:
Title:


By: _____
Name:
Title:

EXHIBIT P

[FORM OF] GLOBAL INTERCOMPANY NOTE

AND SUBORDINATION AGREEMENT

New York, New York
[　], 20[　]

FOR VALUE RECEIVED, each of the undersigned, to the extent a borrower from time to time (each, in such capacity, a "Payor") from any other entity listed on the signature pages hereto, hereby promises to pay on demand to the order of such other entity listed below (each, in such capacity, a "Payee"), in lawful money of the United States of America, or in such other currency as agreed to by such Payor and such Payee, in immediately available funds, at such location in the United States of America or in such other jurisdiction as a Payee shall from time to time designate, the unpaid principal amount of all loans and advances made by such Payee to such Payor, including, without limitation, as reflected on the books and records of the Borrower referred to below.  Each Payor promises also to pay interest on the unpaid principal amount of all such loans in like money at said location from the date of such loans until paid at such rate per annum as shall be agreed upon from time to time by such Payor and the applicable Payee.

This Global Intercompany Note ("Note") is being issued in connection with that certain Credit Agreement (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), dated as of July 30, 2021 among Lucky Bucks, LLC, a Georgia limited liability company (the "Borrower"), the Lenders from time to time party thereto, the L/C Issuers from time to time party thereto, Macquarie Capital Funding LLC, as administrative agent (in such capacity, together with its successors in such capacity, "Administrative Agent") and as collateral agent (in such capacity, together with its successors in such capacity, "Collateral Agent"), and the other parties party thereto.  Capitalized terms used but not defined herein have the meanings assigned to them in the Credit Agreement.

Each Payee hereby acknowledges and agrees that, solely upon the occurrence and during the continuation of an Event of Default, the Collateral Agent may exercise all rights of the Payees under this Note and as provided in the Credit Agreement and the Security Agreement with respect to this Note.

Anything in this Note to the contrary notwithstanding, the indebtedness evidenced by this Note owed by any Payor that is a Loan Party to any Payee shall be subordinate and junior in right of payment, to the extent and in the manner hereinafter set forth and as permitted by applicable law, to all Obligations (as defined in the Credit Agreement, the "Senior Credit Facility Obligations") of such Payor under the Credit Agreement and the other Loan Documents, including, without limitation, where applicable, under such Payor's guarantee of the Senior Credit Facility Obligations under the Credit Agreement; provided that each Payor may make payments to the applicable Payee unless an Event of Default pursuant to Section 8.01(f) of the Credit Agreement shall have occurred and be continuing or an acceleration of the Senior Credit Facility Obligations pursuant to Section 8.02 of the Credit Agreement shall have occurred after the occurrence of any other Event of Default and

such Event of Default shall be continuing and such Payor shall have received notice from the Administrative Agent (provided that no such notice shall be required to be given in the case of any Event of Default arising under Section 8.01(f) of the Credit Agreement):

    (i)    If an Event of Default pursuant to Section 8.01(f) of the Credit Agreement has occurred and is continuing or, after the occurrence of any other Event of Default and such Event of Default shall be continuing, an acceleration of the Senior Credit Facility Obligations pursuant to Section 8.02 of the Credit Agreement shall have occurred and such Payor shall have received notice from the Administrative Agent (provided that no such notice shall be required to be given in the case of any Event of Default arising under Section 8.01(f) of the Credit Agreement), then, (x) the holders of Senior Credit Facility Obligations shall be paid in full in respect of all amounts constituting Senior Credit Facility Obligations before any Payee is entitled to receive (whether directly or indirectly), or make any demands for, any payment on account of this Note and (y) until the holders of Senior Credit Facility Obligations are paid in full in respect of all amounts constituting Senior Credit Facility Obligations (other than contingent obligations not yet due and payable, obligations under Secured Hedge Agreements and Secured Cash Management Obligations), any payment or distribution to which such Payee would otherwise be entitled in respect of this Note (other than debt securities of such Payor that are subordinated, to at least the same extent as this Note, to the payment of all Senior Credit Facility Obligations then outstanding (such securities being hereinafter referred to as "Restructured Debt Securities")) shall be made to, prior to the payment in full of the Senior Credit Facility Obligations (other than contingent obligations not yet due and payable, obligations under Secured Hedge Agreements and Secured Cash Management Obligations), the Administrative Agent for the benefit of the Secured Parties for application to the Senior Credit Facility Obligations.

    (ii)    If any payment or distribution of any character, whether in cash, securities or other property (other than Restructured Debt Securities), in respect of this Note shall (despite these subordination provisions) be received by any Payee in violation of clause (i) prior to the payment in full of the Senior Credit Facility Obligations (other than contingent obligations not yet due and payable, obligations under Secured Hedge Agreements and Secured Cash Management Obligations), such payment or distribution shall be held in trust for the benefit of, and shall be paid over or delivered to, the Administrative Agent for application to the Senior Credit Facility Obligations.

To the fullest extent permitted by law, no present or future holder of Senior Credit Facility Obligations shall be prejudiced in its right to enforce the subordination of this Note by any act or failure to act on the part of any Payor or by any act or failure to act on the part of such holder or any trustee or agent for such holder. Each Payee and each Payor hereby agree that the subordination of this Note is for the benefit of the holders of Senior Credit Facility Obligations and their respective trustees and agents, and the Administrative Agent, on behalf of itself and the Secured Parties that it represents, may proceed to enforce the subordination provisions herein. The Administrative Agent and the Secured Parties are intended third party beneficiaries of this Note; provided that, for the avoidance of doubt, this Note may be amended by the Payors and the Payees without the consent of such third party beneficiaries (including, without limitation, to add additional third party

beneficiaries or Senior Credit Facility Obligations) so long as such amendment would not be prohibited by the terms of the Senior Credit Facility Obligations; provided, further, that the immediately preceding paragraph may not be amended in a manner adverse to the holders of the Senior Credit Facility Obligations without the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed).

The indebtedness evidenced by this Note owed by any Payor that, at the time of determination, is not a Loan Party shall not be subordinated to, and shall rank *pari passu* in right of payment with, any other obligation of such Payor.

Nothing contained in the subordination provisions set forth above is intended to or will impair, as between each Payor and each Payee, the obligations of such Payor, which are absolute and unconditional, to pay to such Payee the principal of and interest on the indebtedness evidenced by this Note as and when due and payable in accordance with its terms, or is intended to or will affect the relative rights of such Payee and other creditors of such Payor other than the holders of Senior Credit Facility Obligations.

Each Payor and Payee acknowledges that this Note is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, which will be effective before, during and after the commencement of any proceeding or action under Debtor Relief Laws. All references in this Note to any Payor or Payee will include such Person as a debtor-in-possession and any receiver or trustee for such Person in any proceeding or action under Debtor Relief Laws.

Each Payee is hereby authorized to record all loans and advances made by it to any Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting prima facie evidence of the accuracy of the information contained therein.

Each Payor hereby waives (to the extent permitted by applicable law) presentment, demand, protest or notice of any kind in connection with this Note. Except to the extent of any taxes required by law to be withheld, all payments under this Note shall be made without offset, counterclaim or deduction of any kind.

For the avoidance of doubt, this Note shall not in any way replace, novate, or affect the principal amount of, any intercompany loan outstanding between any Payor and any Payee prior to the execution hereof, and to the extent permitted by applicable law, from and after the date hereof, each such intercompany loan shall be deemed to incorporate the terms set forth in this Note to the extent applicable and shall be deemed to be evidenced by this Note together with any documents executed prior to the date hereof in connection with such intercompany indebtedness.

From time to time after the date hereof, additional subsidiaries of the Borrower may become parties hereto (as Payor and/or Payee, as the case may be) by executing a counterpart signature page to this Note (each additional subsidiary, an "Additional Party"). Upon delivery of such counterpart signature page to the Payees, notice of which is hereby waived by the other Payors, each Additional Party shall be a Payor and/or a Payee, as the case may be, and shall be as fully a party hereto as if such Additional Party were an original signatory hereof. Each Payor expressly agrees that its

obligations arising hereunder shall not be affected or diminished by the addition or release of any other Payor or Payee hereunder.  This Note shall be fully effective as to any Payor or Payee that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Payor or Payee hereunder.

Any subsidiary of the Borrower that is a party to this Note, which ceases to be a Subsidiary of the Borrower (the "Former Subsidiary"), shall be automatically released from the rights and obligations under this Note, provided, that, at the time of such release, any existing balances between the Former Subsidiary and the remaining parties hereto have been paid in full or settled.

To ensure that the obligations evidenced by this Note are treated as in "registered form" within the meaning of Section 163(f) of the Internal Revenue Code of 1986, as amended, each Borrower or its respective successor (acting solely for this purpose as an agent of each Payor) shall maintain, at its address for receipt of notices pursuant to Section 10.02 of the Credit Agreement, a register (the "Register") for the recordation of the name and address of each endorsee, assignee or other transferee of interests, rights, and obligations hereunder and the commitment of, and principal amount of the loan owing to, each such Payee.

THIS NOTE AND ANY CLAIMS, CONTROVERSIES, DISPUTES, OR CAUSES OF ACTION (WHETHER ARISING UNDER CONTRACT LAW, TORT LAW OR OTHERWISE) BASED UPON OR RELATING TO THIS NOTE, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW PRINCIPLES THAT WOULD APPLY THE LAWS OF ANOTHER JURISDICTION.

Section 10.10 (*Counterparts*) of the Credit Agreement is hereby incorporated as if fully set forth herein, *mutatis mutandis*.

[*Signature Pages Follow*]

**LUCKY BUCKS, LLC**

By: _____
        Name:
        Title:

**[ ]**

By: _____
        Name:
        Title:

[Signature Page to Global Intercompany Note and Subordination Agreement]

## ALLONGE

This Allonge is attached to and made a part of that certain Global Intercompany Note and Subordination Agreement, dated as of [    ], 20[    ] (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Intercompany Note</u>") issued by Lucky Bucks, LLC, a Georgia limited liability company, and certain of its subsidiaries in favor of the Payees referred to therein.  Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Intercompany Note.

Each Payee hereby assigns and transfers its rights under the Intercompany Note:

Pay to the order of _____.

Dated as of _____, _____

*[Signature Pages Follow]*

**LUCKY BUCKS, LLC**

By:  _____
         Name:
         Title:

**[  ]**

By:  _____
         Name:
         Title:

[Signature Page to Allonge]

**EXHIBIT Q**

**[FORM OF] PERFECTION CERTIFICATE**

July 30, 2021

In connection with a proposed transaction by and among LUCKY BUCKS HOLDCO, LLC, a Delaware limited liability company ("Holdings"), LUCKY BUCKS, LLC, a Georgia limited liability company (the "Debtor") and MACQUARIE CAPITAL FUNDING LLC, as collateral agent and administrative agent ("Administrative Agent"), the Debtor hereby certifies on behalf of itself and Holdings (the Debtor and Holdings, together, the "Grantors") as follows:

## I.    CURRENT INFORMATION

**A.    Legal Names, Organizations, Jurisdictions of Organization and Organizational Identification Numbers**.  The full and exact legal name (as it appears in each respective certificate or articles of incorporation, limited liability membership agreement or similar organizational documents, in each case as amended to date), the type of organization, the jurisdiction of organization (or formation, as applicable), and the organizational identification number (not tax i.d. number) of the Debtor and each other Grantor are as follows:

| Name of Debtor/Grantor | Type of Organization | Jurisdiction of Organization/ Formation | Organizational Identification Number |
|---|---|---|---|
| Lucky Bucks, LLC | [_____] | [_____] | [_____] |
| Lucky Bucks Holdco, LLC | [_____] | [_____] | [_____] |

**B.    Chief Executive Offices and Mailing Addresses**.  The chief executive office address and the preferred mailing address (if different than chief executive office) of the Debtor and each other Grantor are as follows:

| Name of Debtor/Grantor | Address of Chief Executive Office | Mailing Address |
|---|---|---|
| Lucky Bucks, LLC | [_____] | [_____] |
| Lucky Bucks Holdco, LLC | [_____] | [_____] |

**C.    Special Debtors and Former Article 9 Debtors.**  None of the Grantors is: (i) a transmitting utility (as defined in Section 9-102(a)(80)), (ii) primarily engaged in farming operations (as defined in Section 9-102(a)(35)), (iii) a trust, (iv) a foreign air carrier within the meaning of the federal aviation act of 1958, as amended, (v) a branch or agency of a bank which bank is not organized under the law of the United States or any state thereof or (vi) located (within the meaning of Section 9-307) in the Commonwealth of Puerto Rico.

**D.    Trade Names/Assumed Names.**  Set forth below is each trade name or assumed name currently used by the Debtor or any other Grantor or by which the Debtor or any Grantor is known or is transacting any business:

Debtor/Grantor          Trade/Assumed Name


[_____]            [_____]


**E.    Changes in Names, Jurisdiction of Organization or Corporate Structure.**  Except as set forth below, neither the Debtor nor any other Grantor has changed its name, jurisdiction of organization or its corporate structure in any way (e.g. by merger, consolidation, change in corporate form, change in jurisdiction of organization or otherwise) within the past five (5) years:

Debtor/Grantor                  Date of Change        Description of Change
[_____]                    [_____]          [_____]


**F.    Prior Addresses.**  Except as set forth below, neither the Debtor nor any other Grantor has changed its chief executive office, or principal residence if the Debtor or a particular Grantor is a natural person, within the past five (5) years:

Debtor/Grantor                  Prior Address/City/State/Zip Code

[_____]                    [_____]


**G.    Acquisitions of Equity Interests or Assets.**  Except as set forth below, neither the Debtor nor any Grantor has acquired the equity interests of another entity or substantially all the assets of another entity within the past five (5) years:

| Debtor/Grantor | Date of Acquisition | Description of Acquisition including full legal name of seller and seller's jurisdiction of organization and seller's chief executive office |
|---|---|---|
| [_____] | [_____] | [_____] |


**H.    Corporate Ownership and Organizational Structure.**  Attached as Exhibit A hereto is a true and correct chart showing the ownership relationship of the Debtor and all of its affiliates.

## II.    INFORMATION REGARDING CERTAIN COLLATERAL

### A.    Investment Related Property

1.    **Equity Interests.**  Set forth below is a list of all equity interests owned by the Debtor and each Grantor together with the type of organization which issued such equity interests (e.g. corporation, limited liability company, partnership or trust):

| Debtor/Grantor | Issuer | Organization Type | # of Shares Owned | Total Shares Outstanding | % of Interest Pledged | Certificate No. (indicate if uncertificated) | Par Value |
|---|---|---|---|---|---|---|---|
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |

2.    **Securities Accounts.**  Set forth below is a list of all securities accounts in which the Debtor or any other Grantor customarily maintains securities or other assets:

| Debtor/Grantor | Type of Account | Name & Address of Financial Institutions |
|---|---|---|
| [          ] | [          ] | [          ] |

3.    **Deposit Accounts.**  Set forth below is a list of all bank accounts (checking, savings, money market or the like):

| Debtor/Grantor | Type of Account | Name & Address of Financial Institutions |
|---|---|---|
| [          ] | [          ] | [          ] |

4.    **Debt Securities & Instruments.**  Set forth below is a list of all debt securities and instruments owed to the Debtor or any other Grantor in the principal amount of greater than $25,000:

| Debtor/Grantor | Issuer of Instrument | Principal Amount of Instrument | Maturity Date |
|---|---|---|---|
| [          ] | [          ] | $[          ] | [          ] |

### B.    Intellectual Property.  Set forth below is a list of all copyrights, patents, and trademark, all applications and licenses thereof and other intellectual property owned or used, or hereafter adopted, held or used, by the Debtor and each other Grantor:

### 1.    Copyrights, Copyright Applications and Copyright Licenses

| Debtor/Grantor | Title | Filing Date/Issued Date | Status | Application/ Registration No. |
|---|---|---|---|---|

[_____]        [_____]  [_____]            [_____]  [_____]

### 2.    Patents, Patent Applications and Patent Licenses

| Debtor/Grantor | Title | Filing Date/Issued Date | Status | Application/ Registration No. |
|---|---|---|---|---|
| [_____] | [_____] | [_____] | [_____] | [_____] |

### 3.    Trademarks, Trademark Applications and Trademark Licenses

| Debtor/Grantor | Title | Filing Date/Issued Date | Status | Application/ Registration No. |
|---|---|---|---|---|
| [_____] | [_____] | [_____] | [_____] | [_____] |

**C.    Tangible Personal Property in Possession of Warehousemen, Bailees and Other Third Parties.** Except as set forth below, no persons (including, without limitation, warehousemen and bailees) other than the Debtor or any other Grantor have possession of any material amount of tangible personal property of the Debtor or any other Grantor:

| Debtor/Grantor | Address/City/State/Zip Code | County | Description of Assets and Value |
|---|---|---|---|
| [_____] | [_____] | [_____] | [_____] |

**D.    Real Estate Related UCC Collateral**

### 1.    **Fixtures**.  Set forth below are all the locations where the Debtor or any other Grantor owns or leases any real property:

| Debtor/Grantor | Address/City/State/Zip Code | County | Owned or Leased |
|---|---|---|---|
| [_____] | [_____] | [_____] | [_____] |

### 2.    **"As Extracted" Collateral**.  Set forth below are all the locations where the Debtor or any other Grantor owns, leases or has an interest in any wellhead or minehead:

iv

| Debtor/Grantor | Address/City/State/Zip Code | County |
|---|---|---|
| [_____] | [_____] | [_____] |

 

 

**3.**     **Timber to be Cut**.  Set forth below are all locations where the Debtor or any other Grantor owns goods that are timber to be cut:

| Debtor/Grantor | Address/City/State/Zip Code | County |
|---|---|---|
| [_____] | [_____] | [_____] |

## III.   AUTHORITY TO FILE FINANCING STATEMENTS

The undersigned, on behalf of the Debtor and each other Grantor, hereby authorizes the Administrative Agent to file financing or continuation statements, and amendments thereto, in all jurisdictions and with all filing offices as the Administrative Agent may determine, in its sole discretion, are necessary or advisable to perfect the security interest granted or to be granted to the Administrative Agent under the Credit Agreement.  Such financing statements may describe the collateral in the same manner as described in the Credit Agreement or may contain an indication or description of collateral that describes such property in any other manner as the Administrative Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the collateral granted to the Administrative Agent, including, without limitation, describing such property as "all assets" or "all personal property."

IN WITNESS WHEREOF, the undersigned hereto has caused this Perfection Certificate to be executed as of the date first written above by its officer thereunto duly authorized.

**LUCKY BUCKS, LLC**

By: _____
    Name:
    Title:

**LUCKY BUCKS HOLDCO, LLC**

By: _____
    Name:
    Title:

**EXHIBIT A**

[Attached]