**<u>EXHIBIT D</u>**

**Lucky Bucks, LLC**
(a Georgia Limited Liability Company)

## SECOND AMENDED AND RESTATED OPERATING AGREEMENT

THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT (this "**Agreement**"), dated as of December 28, 2020, is made by Lucky Bucks HoldCo, LLC, a Delaware limited liability company (the "**Sole Member**"), and Lucky Bucks, LLC, a Georgia limited liability company (the "**Company**"). Capitalized terms used but not defined herein have the meaning ascribed to them in the HoldCo LLCA (as defined below).

WHEREAS, the parties hereto desire to amend and restate the Prior Agreement (as defined below) in its entirety as set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein and other good and valuable consideration, the parties hereto set forth their agreement as follows:

### ARTICLE 1

### DEFINITIONS

1.1    Definitions.    As used herein, the following terms shall have the following meanings:

"**Act**" means the Georgia Limited Liability Company Act, as amended from time to time.

"**Affiliate**" means, with reference to a Person, any other Person that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the first Person.  The term "control" shall mean the power to direct the affairs of such Person by reason of ownership of voting stock or other equity interests, by contract or otherwise.  The term "Affiliated" has a meaning correlative thereto.

"**Applicable Accounting Principles**" means either (as applicable): (a) IFRS or (b) GAAP, whichever principles are then used by the Company as determined by the Sole Member (but taking account of any terms of the Company's senior secured credit facility then in effect that may require the Company to use IFRS or GAAP (as the case may be) (if any)).

"**Articles of Organization**" means the Articles of Organization of the Company as filed with the Secretary of State of the State of Georgia, as the same may be amended or restated from time to time.

"**COAM**" means a "Class B machine" as defined in Georgia Code, Title 50, Chapter 27, Article 3.

"**Equity Securities**" means, with regard to any Person, as applicable, (i) any capital stock, partnership, membership, joint venture or other ownership or equity interests, or other share capital of such Person, (ii) any securities of such Person directly or indirectly convertible

into or exchangeable or exercisable for any capital stock, partnership, membership, joint venture or other ownership or equity interests, or other share capital (whether voting or non-voting, whether preferred, common or otherwise) of such Person or containing any profit participation features with respect to such Person, (iii) any warrants, rights or options directly or indirectly to subscribe for or to purchase any capital stock, partnership, membership, joint venture or other ownership or equity interests, other share capital of such Person or securities containing any profit participation features with respect to such Person or directly or indirectly to subscribe for or to purchase any securities directly or indirectly convertible into or exchangeable or exercisable for any capital stock, partnership, membership, joint venture or other ownership interests, other share capital of such Person or securities containing any profit participation features with respect to such Person, (iv) any share or unit appreciation rights, phantom share or unit rights, contingent interest or other similar rights relating to such Person, or (v) any Equity Securities of such Person issued or issuable with respect to the securities referred to in clauses (i) through (iv) above in connection with a combination of shares, units, recapitalization, exchange, merger, consolidation or other reorganization.  Unless the context otherwise requires, with regard to the Company, the term "Equity Securities" shall not include the Membership Interests of the Company held by the Sole Member.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Gaming Approval**" means any and all required approvals, authorizations, licenses, permits, consents, findings of suitability, registrations, clearances, exemptions and waivers of or from any Gaming Authority, including those relating to the receipt of or participation in revenues directly or indirectly derived therefrom (and including, but not limited to, the Gaming Licenses).

"**Gaming Authority**" means any federal, state, local, governmental, regulatory and administrative authorities, agencies, commissions, boards, bodies (including, but not limited to, the Georgia Lottery Corporation) and officials responsible for or involved in the regulation of gaming or gaming activities carried on by or intended to be carried on by any Person in the United States of America (or any state therein or part thereof) which have authority over the Company, the Sole Member or any of their respective Subsidiaries or businesses.

"**Gaming Laws**" means all federal, local, state, and provincial laws, judgments, decrees, orders, rules, and regulations pertaining to transacting business with a Prohibited Person or involving gambling, lotteries, sweepstakes, casinos, casino/hotels, slot or other gaming machines (including COAMs), other chance-based activities or games of skill, gaming, or gaming-related activities, including official legal interpretations of any Gaming Authority relating to any of the foregoing.

"**Gaming Licenses**" means the gaming permits and licenses required to operate COAMs in the State of Georgia held by the Company, the Sole Member, or any other Subsidiary (including, without limitation, any "Master license" as defined in Georgia Code, Title 50, Chapter 27, Article 3).

2

"**HoldCo LLCA**" means that certain Fifth Amended and Restated Limited Liability Company Agreement of the Sole Member dated as of October 31, 2020, as amended from time to time.

"**IFRS**" means the body of pronouncements issued by the International Accounting Standards Board ("**IASB**"), including International Financial Reporting Standards and interpretations approved by the IASB, International Accounting Standards and Standing Interpretations Committee interpretations approved by the predecessor International Accounting Standards Committee, as in effect from time to time.

"**Membership Interest**" means the interest of a member in the Company, including, without limitation, interests in items of income, gain, loss, deduction, and credit, rights to distributions (liquidating or otherwise), allocations, information and management of the business and affairs of the Company, and rights to appoint, remove, designate or direct officers, employees, agents and other authorized persons, and to vote on, consent to or approve actions by the company or its members, all in accordance with the provisions of this Agreement and the Act.  The Membership Interest of the Sole Member shall be expressed as a percentage interest and, as of the date hereof, shall be 100%.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Person**" means a corporation, an association, a partnership (general or limited), a joint venture, an estate, a trust, a limited liability company, a limited partnership, any other legal entity, or an individual.

"**Prior Agreement**" means that certain Amended and Restated Operating Agreement of the Company, effective as of October 21, 2016, by and between the Company and the Sole Member.

"**Prohibited Person**" shall mean any Person:

(a)     listed in the Annex to, or otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order") and/or a Person who is identified as or affiliated with a Person designated as a terrorist, or associated with terrorism or money laundering pursuant to regulations promulgated in connection with the USA Patriot Act;

(b)     that is owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(c)     with whom a regulated lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

3

(d)     who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)     that is a Specially Designated National and Blocked Person on the most current list then published by OFAC;

(f)     that are directly or indirectly owned or controlled by the government of any country that is subject to an embargo or economic or trade sanctions by the United States Government or acting on behalf of a government of any country that is subject to such an embargo;

(g)     who has been convicted of, or plead guilty (or the equivalent) to, a felony, or any other crime or offense, that is reasonably likely to materially and adversely affect the operations, qualification, Gaming Approval, Gaming Licenses, suitability, or public image of the Company, any of its Subsidiaries or members or any of their Affiliates; or

(h)     who is otherwise identified by any Governmental Authority as a Person with whom Company or any of its members is prohibited from transacting business.

"**Subsidiary**" means, when used with respect to the Company, each Person (i) of which a majority of the voting power or the voting Equity Securities are owned, directly or indirectly, by the Company, or (ii) of which the Company or any other Subsidiary of the Company is a general partner or managing member.

## ARTICLE 2

## FORMATION AND BUSINESS OF COMPANY

2.1     <u>Name</u>.  The name of the Company is "Lucky Bucks, LLC."

2.2     <u>Formation</u>.  On December 29, 2011 (the "**Formation Date**"), the Company was incorporated as a Georgia corporation named "Lucky Bucks, Inc."

2.3     <u>Conversion</u>.  On October 12, 2016, the Company, in accordance with the Act, converted from a Georgia corporation named "Lucky Bucks, Inc." into a Georgia limited liability company named "Lucky Bucks, LLC."  The Company shall hold all of its property in the name of the Company and not in the name of its Sole Member.

2.4     <u>Business of the Company</u>.  The purpose of the Company is to exercise all powers permitted under the Act and perform all acts which may be necessary, convenient or incidental to the foregoing.

2.5     <u>Principal Place of Business</u>.  The principal office of the Company shall be located at 5820 Live Oak Parkway, #300, Norcross, Georgia 30093 or at such other place as may be determined by the Sole Member.

2.6     <u>Registered Agent</u>.  The registered agent of the Company is, as of the date hereof, Hassan Ijaz. The registered agent of the Company may be changed from time to time as

designated by the Sole Member.

2.7    <u>Term</u>.  The term of the Company shall be deemed to have commenced on the Formation Date and shall continue in perpetuity, unless sooner dissolved upon the occurrence of any of the events specified in <u>Section 7.1</u> hereof.

2.8    <u>Gaming Laws Compliance</u>.  The Sole Member acknowledges and agrees that the Company and its Subsidiaries, as well as the Sole Member, and all of their respective Affiliates, and the businesses and transactions stated herein and contemplated hereby, may be governed by Gaming Laws or otherwise subject to Gaming Approvals.  The provisions of this Section 2.8 are material obligations of each of the Sole Member and the Company and are intended to conform the Company's obligations to those of the Sole Member and its members and their respective Affiliates with respect to the subject matter of this Section 2.8. The costs and expenses of cooperation of the Sole Member (on behalf of itself and its Affiliates) and the Company shall be at the sole cost and expense of each such Person. In furtherance of the foregoing, the Company shall comply, and the Sole Member agrees to comply and cause its Affiliates to comply, in good faith and without undue delay with any and all Gaming Laws and requests by any Gaming Authorities, including, but not limited to, cooperating with all requests, inquiries, or investigations (including background investigations, licensing procedures and other requirements) of any Government Authority arising out of or related to each of the following: (i) this Agreement, (ii) the businesses and transactions stated herein and contemplated hereby and (iii) the actions or inactions of the Company, any Subsidiary of the Company or any Covered Person.  For clarity and without limitation, such cooperation shall include the disclosure of information to Gaming Authorities that may otherwise be considered confidential.

## ARTICLE 3

## MANAGEMENT AND RELATED MATTERS

3.1    <u>Management</u>.  The management of the Company shall be vested solely in the Sole Member, who shall have all powers to control and manage the business and affairs of the Company and may exercise all powers of the Company, provided that the Sole Member may, at any time and from time to time, delegate such power to Officers as provided by Article 4 hereof. All instruments, contracts, agreements and documents shall be valid and binding on the Company if executed by the Sole Member.  Any action requiring the vote, consent, approval or action of the Sole Member may be taken by a consent in writing, setting forth the action so taken, by the Sole Member.

3.2    <u>Records and Information</u>. The Company shall maintain accurate books and records showing the Company's receipts and expenditures, assets and liabilities, and profits and losses, as required by the Sole Member from time to time.  The Company shall produce such reports as the Sole Member shall request from time to time, and it shall maintain such books and records at the Company's principal office or at such other places, within or without the State of Georgia, as the Sole Member shall from time to time determine.

3.3    <u>Sole Member's Approval of Certain Matters</u>.  Neither the Company nor any of its Subsidiaries, nor any Officer or agent on its or their behalf (under delegated authority or otherwise), shall be permitted to take, enter into, consummate or make, or cause to be taken,

5

entered into, consummated or made, any of the actions, agreements, commitments, obligations, liabilities or transactions set forth in Sections 5.01(h) and 5.03 of the HoldCo LLCA (which such sections shall apply herein mutatis mutandis), without the written approval or consent of the Sole Member (in addition or subject to any other approval or consent that may be required pursuant to this Agreement).

## ARTICLE 4

## OFFICERS

4.1     General Provisions.  The Sole Member shall have the right, but not the obligation, to appoint one or more persons to serve as officers of the Company (individually, an "**Officer**" and collectively, the "**Officers**"), and who, in such capacity, shall act for and on behalf of the Company as authorized agents subject to the authorization of the Sole Member.  Each person appointed as an Officer shall serve at the pleasure of the Sole Member and the Sole Member shall be deemed to have delegated to each Officer the duties and authority as the Sole Member may prescribe from time to time.  Such appointment shall be evidenced by a written instrument naming each person appointed as an Officer.  The delegation of authority by the Sole Member as herein contemplated shall be revocable, at any time and for any reason, by the Sole Member who shall have sole and absolute discretion. Each Officer of the Company shall possess any and all fiduciary duties that are owed by officers and other persons pursuant to the Act. As of December 28, 2020, the Officers are as follows: (a) James Boyden, Executive Vice President of Business Development, (b) Shafik (Tony) Kassam, Chief Operating Officer and (c) Hassan Ijaz, Executive Vice President of Finance.

4.2     Term. Each such Officer shall hold office for the term stated in the written instrument of appointment or until such Officer's death, resignation or removal in the manner hereinafter provided.

4.3     Resignation and Removal of Officers. An Officer may resign at any time by providing written notice of such resignation to the Sole Member subject to compliance with all applicable laws.  Such resignation shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Company, and unless otherwise specified therein, no acceptance of such resignation shall be necessary to make the resignation effective.  The Sole Member may remove an Officer at any time, with or without cause.

4.4     Officer Vacancies. The Sole Member, at its discretion, may fill any vacancy created by death, resignation or removal of an Officer from his or her office.

4.5     Officer's Compensation. Any salaries and other compensation of the Officers shall be fixed from time to time by the Sole Member.

## ARTICLE 5

## FINANCIAL MATTERS

5.1     Deposits.  All funds of the Company shall be deposited in an account or accounts in such banks, trust companies or other depositories as the Sole Member may select.

5.2     <u>Financial Records</u>. All financial records shall be maintained and reported using the Applicable Accounting Principles, consistently applied, and as required by the HoldCo LLCA.

5.3     <u>Fiscal Year</u>. The fiscal year of the Company shall begin on the first day of January and end on the last day of December each year, unless otherwise determined by the Sole Member, or as required by the HoldCo LLCA.

5.4     <u>Agreements, Consents, Checks, Etc</u>. All agreements, consents, checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company shall be signed by the Sole Member or those persons authorized from time to time by the Sole Member.

5.5     <u>Transactions with the Sole Member</u>.  Except as provided in the Act, the Sole Member may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for, and transact other business with, the Company and has the same rights and obligations with respect to any such matter as a person who is not the Sole Member.  Furthermore, except as provided in the Act, the Company may guarantee and/or provide collateral for any obligations of the Sole Member (or, in turn, any member of the Sole Member) upon the written consent of the Sole Member.

5.6     <u>Capital Contributions</u>. The Sole Member shall contribute such cash and other assets to the capital of the Company as it determines to be appropriate, provided that the Sole Member shall not be required to make any contributions to the Company.

5.7     <u>Tax Matters</u>. The Company shall be treated as a "disregarded entity" under applicable law for federal income tax purposes and for any applicable state tax law purpose and that the activities of the Company be deemed to be activities of the Sole Member for such tax law purposes. All provisions of the Certificate of Formation and this Agreement are to be construed so as to preserve that tax status.  The Sole Member is hereby authorized to file any necessary elections with any tax authorities and shall be required to file any necessary tax returns on behalf of the Company with any such tax authorities for periods during which it is the Sole Member of the Company. All items of income, gain, loss, deduction and credit of the Company (including, without limitation, items not subject to federal or state income tax) shall be treated for federal and all relevant state income tax purposes as items of income, gain, loss, deduction and credit of the Sole Member.

5.8     <u>Distributions</u>. Subject to the Act, cash, securities and/or other property or assets of the Company shall be distributed to the Sole Member at such times, and in such amounts, as the Sole Member shall determine from time to time.

5.9     <u>Pledge of Membership Interests</u>.  Any provision to the contrary contained in this Agreement, the Articles of Organization or any agreement to which the Company or the Sole Member is a party or otherwise bound notwithstanding, the Membership Interests (for purposes hereof, "membership interests" shall be deemed to be inclusive of "limited liability company interests" under the Act) issued hereunder or covered hereby and all associated rights and powers may be pledged or assigned to any lender or lenders (or an agent therefor) as collateral for the indebtedness, liabilities and obligations of the Company and/or any of its subsidiaries or

affiliates to such lender or lenders, and any such pledged or assigned Membership Interests and all associated rights and powers shall be subject to such lender's or lenders' rights under any collateral documentation governing or pertaining to such pledge or assignment.  The pledge or assignment of such Membership Interests shall not, except as otherwise may result due to an exercise of rights and remedies under such collateral documentation, cause the Sole Member to cease to be the Sole Member or to have the power to exercise any rights or powers of the Sole Member and, except as provided in such collateral documentation, such lender or lenders shall not have any liability solely as a result of such pledge or assignment.  Without limiting the generality of the foregoing, the right of such lender or lenders (or an agent therefor) to enforce and exercise their rights and remedies under such collateral documentation hereby is acknowledged by the Sole Member and any such action taken in accordance therewith shall be valid and effective for all purposes under this Agreement, the Articles of Organization (in each case, regardless of any restrictions or procedures otherwise herein or therein contained) and applicable law (including the Act), and any assignment, sale or other disposition of the membership interests by such lender or lenders (or an agent therefor) pursuant to any such collateral documentation in connection with the exercise of any such lender's or lenders' rights and powers shall be valid and effective for all purposes, including, without limitation, under the Act, this Agreement, the Articles of Organization and other applicable law, to transfer all right, title and interest (and rights and powers) of the Sole Member to itself, any other lender or any other person or entity, including a nominee, an agent or a purchaser at a foreclosure (each an "**Assignee**") in accordance with such collateral documentation and applicable law (including, without limitation, the rights and powers to participate in the management of the business and the business affairs of the Company, to replace, appoint, direct and substitute the Sole Member, to vote as a "member", to amend and restate this Agreement, to access information and review the Company's books and records, to compel dissolution, to share profits and losses, to receive, cause and declare distributions, and to receive allocation of income, gain, loss, deduction, credit or similar items, and all other economic, control and "member status" rights) and such Assignee shall automatically (without further requirements) be the Sole Member of the Company with all rights and powers of the Sole Member and as a "member" under the Act.  No such assignment, sale or other disposition shall constitute an event of dissolution or withdrawal under Article 7 or any other provision hereunder or otherwise.  Further, no lender or any such Assignee shall be liable for the obligations of the Sole Member assignor to make contributions.  The Sole Member approves all of the foregoing and the Sole Member agrees that no further approval, consent, notice or other action shall be required for the exercise of any rights or remedies under such collateral documentation (except as may be expressly provided in such collateral documentation).

5.10    <u>Membership Interests</u>.  The Company shall have one class of Membership Interests.  The Company will not issue any certificates to evidence ownership of the Membership Interests.

5.11    <u>Transfer of Membership Interest</u>.  The Sole Member may transfer or assign all or a portion of its Membership Interest in the Company.  Upon a transfer of the Sole Member's entire interest in the Company, such transferee or assignee shall become the "Sole Member" for all purposes of this Agreement.  Upon a transfer or assignment of less than the Sole Member's entire Membership Interest in the Company, the Sole Member and such transferee or assignee shall amend this Agreement to reflect that there is more than one member.

# ARTICLE 6

## LIABILITY, EXCULPATION, INDEMNIFICATION AND INSURANCE

6.1    <u>Liability</u>.  The Sole Member shall not have any personal liability whatsoever in such capacity as the Sole Member, whether to the Company, to the creditors of the Company or to any third parties for any debt, obligation or other liability of the Company, whether arising in contract, tort or otherwise, except as otherwise provided in this Agreement, the Act and any other applicable law.

6.2    <u>Exculpation</u>.

(a)    For purposes of this Agreement, "**Covered Person**" means (x) the Sole Member, any current or former Affiliate of the Sole Member and any of their respective current or former officers, directors, managers, shareholders, partners, members, trustees, beneficiaries, employees or agents, and (y) any current or former Officer, employee or expressly authorized agent of the Company or any of its Subsidiaries.

(b)    To the fullest extent permitted by applicable law, no Covered Person shall be liable to the Company, its Affiliates or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company or any Affiliate, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's (i) fraud, (ii) intentional or willful misconduct, (iii) willful breach of this Agreement, (iv) knowing violation of law or (v) in addition to the foregoing, if such Covered Person is or was an Officer, employee or expressly authorized agent of the Company or any of its Subsidiaries, gross negligence, violation of law or breach of any of such Covered Person's fiduciary duties owed to the Company or any of its Subsidiaries in such Covered Person's capacity as such an Officer, employee or expressly authorized agent of the Company or any of its Subsidiaries. There shall be, and each Covered Person shall be entitled to, a presumption that such Covered Person acted in good faith.

(c)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters such Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to the Sole Member might properly be paid.

6.3    <u>Duties and Liabilities of Covered Persons</u>. To the fullest extent permitted by applicable law, a Covered Person (other than Officers, employees and expressly authorized agents of the Company or any of its Subsidiaries) has no duties (including fiduciary duties), that would otherwise exist at law, in equity or otherwise, to the Company, its Affiliates or to any other Covered Person except as expressly provided by this Agreement or any other written agreement with the Company.  A Covered Person acting under this Agreement shall not be liable to the Company, its Affiliates or to any other Covered Person for its good faith reliance on the

9

provisions of this Agreement.  The provisions of this Agreement, to the extent they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Sole Member to replace such other duties and liabilities of such Covered Person.  Whenever in this Agreement a Covered Person (other than Officers, employees and expressly authorized agents of the Company or any of its Subsidiaries) is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall (i) unless expressly provided to the contrary, be entitled to make such decision in its sole and absolute discretion, (ii) be entitled to consider only such interests and factors as such Covered Person desires, including its own interests and (iii) have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person (other than Officers, employees and expressly authorized agents of the Company or any of its Subsidiaries) is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other applicable law

6.4     Indemnification.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Indemnified Losses**") incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company, its Subsidiaries or their respective Affiliates, except that no Covered Person shall be entitled to be indemnified in respect of any Indemnified Losses incurred by such Covered Person by reason of such Covered Person's (a) fraud, (b) intentional or willful misconduct, (c) willful breach of this Agreement, (d) knowing violation of law or (e) in addition to the foregoing, if such Covered Person is or was an Officer, employee or expressly authorized agent of the Company or any of its Subsidiaries, gross negligence, violation of law or breach of any of such Covered Person's fiduciary duties owed to the Company or any of its Subsidiaries in such Covered Person's capacity as such an Officer, employee or expressly authorized agent of the Company or any of its Subsidiaries, provided that any indemnity under this Section 6.4 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.  There shall be, and each Covered Person shall be entitled to, a presumption that such Covered Person acted in good faith. The termination of any proceeding by settlement shall not be deemed evidence that a Covered Person acted in a manner which did not constitute good faith or that such Covered Person is not otherwise entitled to indemnification under this Section 6.4.

6.5     Defense Expenses. To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined the Covered Person is not entitled to be indemnified as authorized in Section 6.4 hereof.

6.6     Insurance.  The Company may purchase and maintain insurance, to the extent and in such amounts as the Sole Member shall, in its sole discretion, deem reasonable, on behalf of Covered Persons and such other Persons as the Sole Member shall determine, against any

liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company, its Subsidiaries or their respective Affiliates or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.  The Sole Member may, in its sole discretion, cause the Company to enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations and containing such other procedures regarding indemnification as are appropriate.

6.7    <u>Specified Indemnitors</u>. It is expressly acknowledged and agreed that certain Covered Persons (the "**Specified Indemnitees**") may have certain rights to indemnification, advancement of expenses and/or insurance provided by one or more of the Specified Indemnitors (as defined below). The Company hereby agrees and acknowledges, on behalf of itself and each of its Subsidiaries, that (a) the Company and its Subsidiaries are the indemnitors of first resort with respect to the Specified Indemnitees (i.e., their respective obligations to a Specified Indemnitee are primary and any obligations of any of the Specified Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by a Specified Indemnitee are secondary), (b) the Company and its Subsidiaries shall be required to advance the full amount of expenses incurred by any of the Specified Indemnitees, as required by and subject to the terms of the organizational documents of the Company or its applicable Subsidiary (or any other agreement between the Company or any of its Subsidiaries, on the one hand, and any Specified Indemnitee, on the other hand), without regard to any rights any Specified Indemnitee may have against any of the Specified Indemnitors and (c) the Company, on behalf of itself and each of its Subsidiaries, irrevocably waives, relinquishes and releases the Specified Indemnitors from any and all claims against the Specified Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof (except to the extent that any Specified Indemnitee is not entitled to such indemnification or advancement of expenses under the organizational documents of the Company or its applicable Subsidiary or insurance coverage on account of any act or omission committed by such Specified Indemnitee at the request or instruction of the Specified Indemnitor (or any Affiliate thereof) with which such Specified Indemnitee is affiliated). The Company further agrees, on behalf of itself and each of its Subsidiaries, that (i) no advancement or payment by any of the Specified Indemnitors on behalf of a Specified Indemnitee with respect to any claim for which such Specified Indemnitee has sought indemnification from the Company or any of its Subsidiaries shall affect the foregoing, (ii) the applicable Specified Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Specified Indemnitee against the Company or its applicable Subsidiary and (iii) the Company and its Subsidiaries shall reimburse the applicable Specified Indemnitors for the advancements or payments actually made to any of the Specified Indemnitees (but only to the extent the applicable Specified Indemnitee is actually entitled to indemnification hereunder). The Specified Indemnitors shall be third-party beneficiaries of this Section 6.7 and shall have the right to enforce this Section 6.7. "**Specified Indemnitors**" means, collectively, the Sole Member and each of its direct and indirect Affiliates (other than the Company and its Subsidiaries).

## ARTICLE 7

## DISSOLUTION

7.1     <u>Dissolution</u>.  The Company shall dissolve, and its affairs shall be wound up, upon the decision of the Sole Member. The Company shall not be dissolved upon, and its affairs shall not be wound up after, the occurrence of any event that, pursuant to the Act, terminated the continued membership of the Sole Member, or upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of the Sole Member and upon the occurrence of any such event, the Company shall be continued without dissolution and the personal representative (as defined in the Act) of the terminated Sole Member shall be obligated to continue the Company and act in the capacity as the  Sole Member under this Agreement, either directly or through the appointment of a nominee or designee, effective as of the occurrence of the event that terminated the continued membership of the Sole Member. The Sole Member acknowledges that irreparable damage would be done to the goodwill and reputation of the Company, and to its Affiliates and financing sources, if any action to dissolve or liquidate the Company should be taken other than pursuant to this <u>Section 7.1</u>. Accordingly, notwithstanding any provision of applicable law to the contrary, the Sole Member, for itself and its successors and assigns, hereby waives and renounces the right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Company, or to take, or cause to be taken, any action in furtherance thereof.

7.2     <u>Distributions upon Dissolution</u>.  Upon the dissolution of the Company pursuant to <u>Section 7.1</u> hereof, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and the Sole Member, and the Sole Member shall not take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs, provided that all covenants contained in this Agreement and obligations provided for in this Agreement shall continue to be fully binding upon the Sole Member until such time as the property of the Company has been distributed pursuant to this <u>Section 7.2</u> and the Articles of Organization have been cancelled pursuant to the Act and this Agreement.  The Sole Member shall be responsible for overseeing the winding up and dissolution of the Company.  Upon the dissolution of the Company pursuant to <u>Section 7.1</u> hereof, the Sole Member shall take full account of the Company's liabilities and assets and shall cause the assets or the proceeds from the sale thereof, to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, to the Sole Member, after paying or making reasonable provision for all of the Company's creditors to the extent required by Section 605 of the Act.

7.3     <u>Certificate of Cancellation</u>.  Upon completion of the winding up and liquidation of the Company in accordance with <u>Section 7.2</u> hereof, the Sole Member shall promptly cause to be executed and filed a certificate of cancellation in accordance with the Act and the laws of any other jurisdictions in which the Sole Member deems such filing necessary or advisable.

## ARTICLE 8

## MISCELLANEOUS

8.1     <u>Severability</u>.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

8.2     <u>Governing Law</u>.  The laws of the State of Georgia shall govern the validity of this Agreement and the construction of its terms, without reference to its choice of laws principles.

8.3     Construction.  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their collective mutual intent, this Agreement shall be construed as if drafted jointly by the parties hereto, and no rule of strict construction shall be applied against any Person.

8.4     Headings.  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

8.5     Amendments. This Agreement may be altered, amended or repealed, or a new agreement may be adopted, upon the written consent of the Sole Member and the Company. This Agreement constitutes the entire agreement among the parties hereto solely with respect to the subject matter hereof and supersedes all prior agreements and understandings among the parties hereto solely with respect to such subject matter (including, without limitation, the Prior Agreement in its entirety).

8.6     Binding Effect; No Third Party Beneficiaries.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and where expressly stated, their Affiliates, and their respective successors and permitted assigns and, with respect to benefits, the Covered Persons and the Specified Indemnitors.  Nothing contained in this Agreement, express or implied, is intended to or shall confer upon any Person any rights, interest or claims hereunder, nor shall any Person be entitled to any benefits under or on account of this Agreement as a third party beneficiary (other than to the (x) Sole Member of the Company (or any Person to which the Membership Interests of the Sole Member are permitted to be transferred) and (y) the Company, the Covered Persons and the Specified Indemnitors).

8.7     Counterparts. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature shall create a valid and binding obligation of the party executing such signature page (or on whose behalf such signature is executed) with the same force and effect as if such signature and such signature page were an original thereof.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned hereby make this Agreement as of the date first above written.

**SOLE MEMBER:**

LUCKY BUCKS HOLDCO, LLC

By: _____
    James Boyden, Manager

**COMPANY:**

LUCKY BUCKS, LLC

By:  Lucky Bucks Holdco, LLC
Its:  Sole Member

By: _____
    James Boyden, Manager