# EXHIBIT H

Fulton County Superior Court
***EFILED***MH
Date: 6/5/2025 2:42 PM
Che Alexander, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| **Arc Gaming and Technologies, LLC f/k/a Lucky Bucks, LLC,** | |
| Plaintiff, | |
| v. | **CIVIL ACTION FILE** |
| **Anil Damani,** | **NO. 24CV000131** |
| **Tony Kassam,** | |
| **Imran Ali,** | |
| **Al Amin Sayani,** | |
| **Derrick Smith,** | |
| **Jonathan Howard,** | |
| **Arnaldo "Johnathan Linares" Perez,** | |
| **Shakeel Haque,** | |
| **Anand Vaswani,** | |
| **Mohibul Motin,** | |
| **Muhammad Chisti,** | |
| **Angel Amusements, LLC,** | |
| **Dynamic Gaming, LLC,** | |
| **Unique Amusement, LLC,** | |
| **AKS Amusements, Inc.,** | |
| **Advance Amusement, LLC,** | |
| **Klass Amusement, LLC,** | |
| **Prestige Amusement, LLC,** | |
| **Lee Caudell, Inc.,** | |
| **Pinball Amusement, LLC,** | |
| **Peak Amusement, LLC** | |
| **Meyersgold, LLC, and** | |
| **Blue Georgia 1000, Inc.,** | |
| **Georgia Winners, LLC, and** | |
| **Klass Entertainment Group, LLC,** | |
| Defendants. | |

**<u>SECOND AMENDED COMPLAINT[1]</u>**

---

[1] Attached to this Second Amended Complaint is a redlined version of the changes to the First Amended Complaint (attached hereto as Exhibit 1), which will have no impact on the pending Motions to Dismiss filed by the named Defendants.

This action involves an organized criminal conspiracy of former owners and employees of the Lucky Bucks Arc Gaming and Technologies, LLC f/k/a Lucky Bucks, LLC ("Lucky Bucks" or "Plaintiff"), who conspired amongst themselves and a number of strawmen, shell companies, and competing businesses they controlled to loot Lucky Bucks once it became clear that Lucky Bucks was headed toward bankruptcy.

Lucky Bucks holds a master license from the Georgia Lottery Corporation ("GLC") to operate skill-based, coin-operated amusement machines ("COAM"), a heavily regulated industry. Lucky Bucks was originally founded and owned by Defendant Anil Damani. Once the GLC barred Damani from having an active role in the operation of Lucky Bucks (because of prior violations of Georgia COAM laws), he and his lieutenants, including Defendants Tony Kassam, Imran Ali, Al-Amin Sayani, and Derrick Smith, concocted a number of schemes to loot Lucky Bucks and extract as much value for themselves as possible. They, in conjunction with other members of the board of managers and Lucky Bucks' equity owners, borrowed hundreds of millions of dollars, a substantial portion of which was then immediately distributed to themselves, among others, through dividends. When Lucky Bucks could not borrow another penny and the business was leveraged to the hilt, their criminal schemes forced Lucky Bucks and its parent corporations into bankruptcy, where Lucky Bucks was eventually turned over to its creditors. Amazingly, even after Lucky Bucks emerged from bankruptcy under new ownership, several of the individual Defendants continued to loot Lucky Bucks from the inside for the benefit of the criminal organization.

The criminal conspiracy involved a number of different schemes that varied in their levels of sophistication. The most critical scheme involved a number of competing businesses, including Defendants Angel Amusements, LLC, Dynamic Gaming, LLC, Unique Amusement, LLC, AKS

Amusement, LLC, Advance Amusement, LLC, Klass Amusement, LLC, Klass Entertainment, LLC, Prestige Amusement, LLC, Lee Caudell, Inc., Pinball Amusement, LLC, Peak Amusement, LLC, Meyers Gold, LLC, Georgia Winners, LLC, Blue Georgia 1000, Inc., Klass Entertainment Group, LLC (collectively, the "B-Side businesses" or "Defendant entities"), most of which were nominally owned by strawmen or shell entities, that the members of the conspiracy referred to as the "B-Side" of Lucky Bucks. These B-Side businesses, including Defendants Peak, Unique, Georgia Winners, and Lee Caudell, were then funneled valuable license contracts that should have belonged to Lucky Bucks; were operated using Lucky Bucks' employees, equipment and resources; and, in some cases, these B-Side businesses, including Lee Caudell, Peak, AKS, Georgia Winners, and Klass Amusement, sold customer contracts back to Lucky Bucks at a massive and unjustified markup.

Not all of the crimes were so sophisticated, however. For instance, Defendants Smith, Howard, Ali, Kassam, and Sayani orchestrated the theft of expensive COAM machines and parts belonging to Lucky Bucks by chiseling off the serial numbers, loading them onto trucks, and selling or transferring them to the B-Side businesses and other unknown actors. It is difficult to catalogue the number of crimes and schemes that the defendants committed while systematically looting Lucky Bucks, and it is likely that the full extent of their illicit activities will never be uncovered. Much of the information proving the details of the scheme and the mental states of the participants is exclusively in the possession of the Defendants. For instance, Plaintiff is unable, without discovery, to trace the money flowing from the scheme or to follow the trail of the stolen equipment and locations.

It is important to stress that this is not a business divorce or "normal" civil case brought by a business against former employees who are competing with it. The individual Defendants,

including Damani, Kassam, Ali, Sayani, Smith, Howard, Linares, Haque, Vaswani, Motin, and Chisti, knowingly engaged in extensive criminal misconduct and took numerous steps to conceal and hide their activities, such as communicating exclusively using the Signal messaging app (the "Signal App") and other largely untraceable methods, by deleting files and business records from Lucky Bucks' computer systems, and by compartmentalizing the communication channels with the lower-level Lucky Bucks' employees they exploited as part of the scheme. But despite their efforts, Lucky Bucks' new managers, with help from forensic IT specialists and cooperative lower-level employees who helped carry out the schemes, have been able to recover many of the deleted files and communications and piece together most of what happened under the prior management. Much of the evidence will come directly from testimony by lower-level participants in the crimes who have "flipped" on the criminal enterprise or who had a falling out with the participants.

Ultimately, this case is about holding Defendants accountable for their systematic looting of Lucky Bucks for their own benefit, which unfair and illegal actions forced Lucky Bucks into bankruptcy and have substantially harmed its commercial operations. Accordingly, Lucky Bucks demands: the return of its money, valuable location contracts, machines and equipment that Defendants have stolen; all available damages Lucky Bucks has suffered as a result of Defendants' actions; Lucky Bucks' attorneys' fees and costs incurred in having to bring this action; and punitive damages, which are more than justified given the breathtaking scope of Defendants' conspiracy.

## I.  <u>PARTIES</u>

1.      **Arc Gaming and Technologies LLC f/k/a Lucky Bucks, LLC ("Lucky Bucks")** is a Georgia limited liability company with its primary place of business at 5820 Live Oak Parkway, Suite 300, Norcross, Georgia 30093. Lucky Bucks reorganized and emerged from Chapter 11 bankruptcy in 2023 with a new management team and board of managers.

2.      **Anil Damani** is the founder and former owner of Lucky Bucks and its former corporate affiliates. On information and belief, Damani resides in Gwinnett County, Georgia. From its founding until 2020, Damani was the CEO of Lucky Bucks and controlled virtually all aspects of its COAM operations in Georgia. In June 2020, pursuant to a consent settlement with the GLC (described below in further detail), Damani was forbidden from having any role in the business operations of Lucky Bucks. Nevertheless, Damani continued to direct the actions of his co-conspirators from behind the scenes.

3.      **Shafik "Tony" Kassam** was the Chief Operating Officer of Lucky Bucks until October 11, 2023. After Damani was barred by the GLC settlement from being involved in Lucky Bucks' business operation, Kassam was ultimately responsible for and controlled every aspect of Lucky Bucks' COAM operations in Georgia, including as a member of the Lucky Bucks board. On information and belief, Defendant Kassm resides in Gwinnett County.

4.      **Imran Ali** was Lucky Bucks' Director of Operations until August 28, 2023. Ali was Kassam's second in command at Lucky Bucks after Damani's formal exit, and he gave directions directly to many of the lower-level members of the criminal conspiracy. On information and belief, Ali now formally works for another company owned by Damani, Fusion Gaming. He also designed and controlled many of Lucky Bucks' various IT systems, and he has both accessed and attempted to access those systems after his separation from Lucky Bucks. Ali resides at 6326 Long Island Court, Sandy Springs, GA 30328 in Fulton County.

5.      **Al Amin Sayani** was an employee in the Lucky Bucks dispatch department until October 16, 2023, when he was terminated by Lucky Bucks' new management. He was initially hired by one of Damani's other businesses, it is unclear when exactly he became a Lucky Bucks

employee. Sayani's last known address is 1728 Sentinel View Drive, Lawrenceville, Georgia 30043 in Gwinnett County.

6. **Derrick Smith** was a manager of lower-level Lucky Bucks' employees on the operations side, including technicians and warehouse staff, until he resigned on October 16, 2023. While employed by Lucky Bucks, Smith reported directly to Ali. Smith resided at 925 Canterbury Road, Apt. 1014, Atlanta, Georgia 30324 in Fulton County at the time of the relevant conduct set forth in this Amended Complaint. On information and belief, he has since moved to Houston, Texas.

7. **Arnaldo "Johnathan Linares" Perez ("Linares")** was an independent contractor who was a dispatcher, technician, and manager of lower-level Lucky Bucks' employees. Linares reported directly to Smith in connection with his work for Lucky Bucks. Linares' last known address is 405 Padens Valley Court, Lawrenceville, Georgia 30044 in Gwinnett County.

8. **Jonathan Howard** was a dispatcher and manager of lower-level Lucky Bucks' employees. Howard reported directly to Smith. Lucky Bucks' current management terminated his employment on October 16, 2023. Howard's last known address is 767 Lost Creek Circle, Stone Mountain, Georgia 30088 in DeKalb County.

9. **Shakeel Haque** was a sales representative at Lucky Bucks until he was officially terminated by current management on January 3, 2024. Haque reported directly to Kassam when he was employed at Lucky Bucks. His job was to identify opportunities for Lucky Bucks to obtain new customers and close the sales. He was also responsible for ensuring that existing customers would renew their contracts with Lucky Bucks. Haque's last known address was 411 Gael Way, Woodstock, Georgia 30188 in Cherokee County.

10.     **Anand Vaswani** was a sales representative at Lucky Bucks until he resigned on September 19, 2023. Vaswani reported directly to Kassam when he was employed at Lucky Bucks. His job was to identify opportunities for Lucky Bucks to obtain new customers. He was also responsible for ensuring that existing customers would renew their contracts with Lucky Bucks. Vaswani's last known address is 2083 Pinnacle Point Drive, Norcross, Georgia 30071 in Gwinnett County.

11.     **Mohubil Motin** is the nominal owner of Blue Georgia, Inc., a shell company that was used to funnel proceeds from at least one of the schemes at issue in this case back to the Lucky Bucks' employees who were participants in the scheme. Motin is a close friend and former roommate of Vaswani. He used to reside at 2083 Pinnacle Point Drive, Norcross, Georgia 30071 in Gwinnett County, but his current place of residence is unknown to Lucky Bucks.

12.     **Mohammad Chisti** was the straw owner and front man for Georgia Winners, LLC. Although Georgia Winners was paid millions of dollars by Lucky Bucks, Chisti kept only a small portion of the money, which was instead diverted to Blue Georgia for the benefit of the other Defendants, including, on information and belief, Defendants Damani, Kassam, Ali, Haque, Anand, and Motin. Chisti gave sworn deposition testimony in an arbitration proceeding before the GLC (between Lucky Bucks and Georgia Winners) that detailed his role as a straw man in several of the rackets alleged in this Amended Complaint, as well as the roles of Damani, Kassam, Haque, Motin and Vaswani.

13.     **Angel Amusements, LLC ("Angel")** is a Georgia limited liability company that holds the COAM master license ending in number 15063. Angel is one of the competing B-Side businesses used in the criminal scheme. Angel operates out of a warehouse located at 5500 Oakbrook Parkway, Suite 120, Norcross, Georgia 30093. Angel's registered agent is Suraiya

Jalali, who may be served at the same address, according to the Georgia Secretary of State's website.

14.     **Dynamic Gaming, LLC ("Dynamic")** is a Georgia limited liability company that holds the COAM master license ending in number 16017. Dynamic is one of the competing B-Side businesses used in the criminal scheme. Dynamic operates out of a warehouse located at 5500 Oakbrook Parkway, Suite 200, Norcross, Georgia 30093. According to the Georgia Lottery Corporation, Dynamic's headquarters is located at 47 Woods Creek Drive, Suwanee, Georgia 30024, which is a single-family residence. The residence is owned by Eshan Huddani, who lower-level Lucky Bucks' employees were told was the "contact" for Dynamic. Upon information and belief, Huddani is either an unwitting straw man or he is a knowing participant in the criminal enterprise. Discovery will show which of those two possibilities is the case. Dynamic may be served through its registered agent, the law firm of Krevolin & Horst, at 1201 West Peachtree Street, Suite 3250, Atlanta, Georgia 30309.

15.     **Unique Amusement, LLC ("Unique")** is a Georgia limited liability company that holds the COAM master license ending in number 15080. Unique is one of the competing B-Side businesses used in the criminal scheme. On June 9, 2020, Lucky Bucks, at the direction of Defendants, sold a master license to Unique in exchange for $400,000, an amount far below the market value of that license. Further, Unique utilized Lucky Bucks' employees, parts, and equipment for its own benefit. Unique operates out of a warehouse located at 5600 Oakbrook Parkway, Suite 150, Norcross, Georgia 30093. Unique may be served through its registered agent, Zain Kapadia, at 7000 Central Parkway, Suite 1100, Atlanta, Georgia 30328.

16.     **AKS Amusements, Inc. ("AKS")** is a Georgia Corporation that holds the COAM master license ending in number 15021. AKS is one of the competing B-Side businesses used in

the criminal scheme. On June 17, 2020, Lucky Bucks, at the direction of Defendants, sold a master license to AKS in exchange for $300,000, an amount far below the market value of that license. Further, AKS utilized Lucky Bucks' employees, parts, and equipment for its own benefit. According to the Secretary of State's website, Parimal Kirankumar Patel is the nominal CEO of AKS. Upon information and belief, Patel is either an unwitting straw man or he is a knowing participant in the criminal enterprise. Discovery will show which of those two possibilities is the case. AKS operates out of a warehouse located at 6030 Dawson Blvd., Suite D, Norcross, Georgia 30093. AKS may be served on its registered agent, Nizar Janmohammad, at 3250 Peachtree Industrial Boulevard, Suite 203, Duluth, Georgia 30096.

17.     **Advance Amusement, LLC ("Advance")** is a Georgia limited liability company that holds the COAM master license ending in number 17015. Advance is one of the competing B-Side businesses used in the criminal scheme that received a disproportionately high number of location contracts formerly belonging to Lucky Bucks. Advance operates out of a warehouse located at 6050 Dawson Boulevard, Suite K, Norcross, Georgia 30093. Advance may be served on its registered agent, Fayaz Bardai, at the same address.

18.     **Klass Amusement, LLC ("Klass Amusement")** is a Georgia limited liability company that holds the COAM master license ending in number 15077. Klass Amusement is one of the competing B-Side businesses used in the criminal scheme that received a disproportionate number of location contracts formerly belonging to Lucky Bucks. Further, Klass Amusement utilized Lucky Bucks' employees, parts, and equipment for its own benefit. Klass Amusement operates out of a warehouse located at 6500 McDonough Drive, Suite B7, Norcross, Georgia 30093. Klass Amusement may be served through its registered agent, the law firm of Krevolin & Horst, at 1201 West Peachtree Street, Suite 3250, Atlanta, Georgia 30309.

19.    **Prestige Amusement, LLC ("Prestige")** is a Georgia limited liability company that holds the COAM master license ending in number 15039. Prestige is one of the competing B-Side businesses used in the criminal scheme. Upon information and belief, one of Ali's relatives is the nominal owner of Prestige, but Prestige is actually owned and controlled by Ali and the other Defendants. Prestige received an $850,000 deposit from Lucky Bucks that was written off shortly thereafter without cause. Further, Prestige utilized Lucky Bucks' employees, parts, and equipment for its own benefit. Prestige operates out of a warehouse located at 6050 Dawson Blvd, Suite Q, Norcross, Georgia 30093. According to the GLC, Prestige has a principal address of 5675 Jimmy Carter Boulevard, Suite 110, Norcross, Georgia 30071. According to the Secretary of State's website, Prestige may be served through its registered agent, Michael Karamat of the law firm Krevolin & Horst, at 1201 West Peachtree Street, Suite 3250, Atlanta, Georgia 30309.

20.    **Lee Caudell, Inc. ("Lee Caudell")** is a Georgia Corporation that holds the COAM master license ending in number 15199. Lee Caudell is one of the competing B-Side businesses used in the criminal scheme. Lee Caudell operates out of a warehouse at a currently unknown location. Lee Caudell is one of the competing B-Side businesses used in the criminal scheme that received a disproportionate number of location contracts formerly belonging to Lucky Bucks. Further, on information and belief, Lee Caudell utilized Lucky Bucks' employees, parts, and equipment for its own benefit. According to the GLC, Lee Caudell has a principal place of business located at 2974 Asteria Drive, Duluth, Georgia 30097, which is a single-family residence. Lee Caudell may be served through its registered agent, Naveed Masood, at 4260 Woodward Walk Lane, Suwanee, Georgia 30024. According to the Secretary of State's website, Masood is the nominal CEO of Lee Caudell. Masood is either an unwitting straw man or he is a knowing

participant in the criminal enterprise. Discovery will show which of those two possibilities is the case.

21.     **Pinball Amusement, LLC ("Pinball")** is a Georgia limited liability company that holds the COAM master license ending in number 15123. Pinball is one of the competing B-Side businesses used in the criminal scheme. On December 14, 2020, Lucky Bucks, at the direction of Defendants, sold a master license to Pinball in exchange for $300,000, an amount far below the market value of that license. On information and belief, Pinball also utilized Lucky Bucks' employees, parts, and equipment for its own benefit. According to the GLC, Pinball's principal place of business is at 4260 Woodward Walk Lane, Suwanee, Georgia 30024, which is a single-family residence. This address is the same one on file for Naveed Masood, the registered agent and nominal CEO of Lee Caudell. According to the Secretary of State's website, Pinball may be served on its registered agent, Michael Karamat of the law firm Krevolin & Horst, at 1201 West Peachtree Street, Suite 3250, Atlanta, Georgia 30309.

22.     **Peak Amusement, LLC ("Peak")** is a Georgia limited liability company that holds the COAM master license ending in 15164. On December 1, 2021, Lucky Bucks, at the direction of Defendants, sold a master license to Peak, a B-Side company, in exchange for $300,000, an amount far below the market value of that license. Peak has a principal place of business located at 6030 Unity Drive, Suite B, Norcross, Georgia 30071. Peak may be served on its registered agent, Aslam Gilani, at the same address as its principal place of business according to the Georgia Secretary of State's web page.

23.     **Meyersgold, LLC ("Meyersgold")** is a Georgia limited liability company with its principal place of business at 227 Sandy Springs PL #D496, Sandy Springs, Georgia 30328. Meyersgold was an entity controlled by Defendants that was used to make side payments to lower-

level participants in the criminal enterprise, including Lucky Bucks' technicians and warehouse workers. Meyersgold may be served on its registered agent, Rob Hassett of Hassett Law Group, at 2090 Dunwoody Club Drive, Suite 106-242, Atlanta, Georgia 30350.

24.    **Blue Georgia 1000, Inc. ("Blue Georgia")** was a Georgia corporation with its principal place of business located at 2083 Pinnacle Pointe Drive, Norcross, Georgia 30071. Blue Georgia was a straw entity through which money flowed, indirectly, from Lucky Bucks to members of the criminal conspiracy. On information and belief, Blue Georgia had no operations and merely served as a conduit for funds designed to conceal that money from Lucky Bucks was ultimately flowing to some of the other Defendants.

25.    **Georgia Winners, LLC ("Georgia Winners")** is a Georgia limited liability company that holds or held the COAM master license ending in number 15328. The license held by Georgia Winners was "purchased" from Lucky Bucks far below the market rate in exchange for a promissory note that was never repaid. Chisti volunteered to be, and was, the straw owner and front man for Georgia Winners. Although Georgia Winners was paid millions of dollars by Lucky Bucks, Chisti kept only a small portion of the money, which was instead diverted to Blue Georgia for the benefit of the other Defendants, including Damani, Kassam, Ali, Haque, Vaswani, and Motin. Georgia Winners can be served on its registered agent, Andy Pierce of the Law Firm Krevolin & Horst, at 1201 West Peachtree Street, Suite 3250, Atlanta, Georgia 30309.

26.    **Klass Entertainment Group, LLC ("Klass Entertainment")** is a Georgia limited liability company with its principal place of business located at 2299 Perimeter Park Drive, Atlanta, Georgia 30341. The address for Klass Entertainment is the same one as for the 27th Investment Group, another of Damani's companies. Klass Entertainment stole money from Lucky Bucks under the guise of services, which money was, on information and belief, diverted to other

Defendants. Klass Entertainment may be served via its registered agent, Pegah Firoozi, at the address for its principal place of business.

## II. <u>OTHER RELEVANT ENTITIES AND INDIVIDUALS</u>

27.    **Magua Benson** is an attorney for Lucky Bucks during the relevant time frame. A truthful affidavit from Benson is attached as **Exhibit A**.

28.    **Jamila Davis** worked for Lucky Bucks as the Risk and Regulatory Compliance Manager who assisted Lucky Bucks with handling disputes related to its location contracts. A truthful affidavit from Davis is attached as **Exhibit B**.

29.    **Dean Mosher** was hired by Lucky Bucks as an Operations Manager in November 2023. Mosher visited previous Lucky Bucks locations in November and December 2023. A truthful affidavit from Mosher is attached as **Exhibit C**.

30.    **Scott Ferguson** was hired by Lucky Bucks to perform consulting services in November 2023. Ferguson visited previous Lucky Bucks locations in November and December 2023. A truthful affidavit from Ferguson is attached as **Exhibit D**.

31.    **William "Alex" Stump** is a Lucky Bucks technician who worked extensively for the criminal enterprise, primarily at the direct instruction of Defendants Smith and Linares. Stump declined an offer to work for Defendants' competing businesses after he was pretextually fired, but he has been rehired by Lucky Bucks' new management. Stump's Signal communications with members of the criminal conspiracy have been recovered from his old cellphone by forensic technicians. A truthful affidavit from Stump, which attaches various Signal logs, is attached as **Exhibit E**.

32.     **Alex Essig** is a Lucky Bucks technician who worked extensively for the criminal enterprise, primarily at the direction of Defendants Howard and Smith. He continues to be a Lucky Bucks employee. A truthful affidavit from Alex Essig is attached as **Exhibit F**.

33.     **Adam Essig** is a Lucky Bucks technician who worked extensively for the criminal enterprise, primarily at the direction of Defendants Howard and Smith. He declined an offer to work directly for Defendants' competing businesses. He was able to recover a portion of his Signal communications with Defendants. He remains a Lucky Bucks employee. A truthful affidavit from Adam Essig is attached as **Exhibit G**.

34.     **Toby "Hassan" Collins** is a Lucky Bucks dispatcher who previously worked as a technician. He did work for the criminal enterprise, including, on one occasion, delivering a group of COAM machines to a gas station in Alabama using a U-Haul truck. Collins discussed the work he did for the criminal enterprise directly with Defendants Kassam and Ali, and he expressly told them that he did not want to be involved in anything illegal. As a result of his expressions of concern, Defendants eventually stopped using him as part of their schemes. He continues to work for Lucky Bucks. A truthful affidavit from Collins is attached as **Exhibit H**.

35.     **Marquail Dinkins** is a Lucky Bucks technician who did work for the criminal enterprise while employed by Lucky Bucks. He went to work for a different (non-COAM) business operated by Defendants in Texas, but he has recently been rehired as a Lucky Bucks employee. A truthful affidavit from Dinkins is attached as **Exhibit I**.

36.     **Theodore James Theisen** is a Senior Managing Director of Ankura Consulting Group, LLC who performed forensic searches and reviews of fifty devices at the Lucky Bucks headquarters. A truthful affidavit from Theisen is attached as **Exhibit J**.

37.     **Jason Cristal** is the Managing Director of Robbins Alloy Belinfante Littlefield LLC who performed a financial analysis of Lucky Bucks' accounting system and QuickBooks. A truthful affidavit from Cristal is attached as **Exhibit K**.

38.     **Harshad Parashare** is the founder and CEO of Para Share LLC, a company that coordinates in-person shows and tours locally, nationally, and internationally. A truthful affidavit from Parashare is attached as **Exhibit L**.

39.     **Janelle Hall** is the Human Resources Manager at Lucky Bucks. A truthful affidavit from Hall is attached as **Exhibit M**.

40.     **Christian Hazim** is the manager of Lucky Bucks' warehouse. At the direction of Defendants, he helped facilitate the theft of gaming machines and parts by stripping identifying materials from them and preparing them to be stolen. He also directly observed other Lucky Bucks' employees doing the same thing, including removing manufacturers' serial number plates from COAM machines. After he expressed discomfort, Defendants stopped involving him in their theft of machines and instead relied on other Lucky Bucks warehouse workers. A truthful affidavit from Hazim is attached as **Exhibit N**.

### III. <u>JURISDICTION AND VENUE</u>

41.     This Court has jurisdiction over this matter pursuant to Ga. Const. Art. VI, § IV and O.C.G.A. §§ 15-6-8(1), (2).

42.     Venue is proper in Fulton County because one or more of Defendants reside in Fulton County. The Defendants have acted as joint tortfeasors and criminal conspirators, and thus, they may all be sued in any county in which one of the joint tortfeasors resides. *See* Ga. Const. Art. VI, § II, ¶ IV.

## IV. <u>OVERVIEW OF THE COAM BUSINESS IN GEORGIA</u>

43.     COAM machines are skill-based amusement machines that somewhat resemble the digital slot machines that can be found in casinos throughout the United States. Unlike slot machines, however, the players' skill is a determining factor in the outcome of the games. Further, under Georgia law, COAM machines are not gambling devices, and cash prizes are illegal. Instead, COAM machines must be located in businesses that derive the majority of their income from the sale of goods and services, and those businesses are permitted to reward winners nearly exclusively with merchandise from their stores or gift cards.

44.     COAM machines, particularly modern ones, are expensive, with some of them costing in excess of $15,000 a piece when fully equipped.

45.     The COAM business is regulated by the GLC, which has licenses for two types of machines—Class A and Class B licenses. Class A licenses apply to traditional arcade games, jukeboxes and the like, whereas the type of COAM machines described above and at issue in this case require Class B COAM licenses to operate.

46.     There are three types of Class B COAM licenses, two of which are at issue in this case—master licenses and location licenses.[2]

47.     Master license holders are permitted to buy, own, and service COAM machines throughout the state of Georgia. Location license holders are allowed to physically host the COAM machines owned by a master license holder at a specific location that is set forth in the license.

48.     Under Georgia law, every location license holder must operate pursuant to a written, exclusive contract with a master license holder that must have a term longer than one year.

---

[2] The other type of Class B license is a manufacturer's license, which allows a business to manufacture and sell COAM machines, software and parts.

Master license holders are not permitted to hold locations licenses or have an interest in a location under contract with it. *See* O.C.G.A. § 50-27-87(a)(4).

49.     Master license holders are generally responsible for maintenance and service of their COAM machines. GLC has taken the position that it is illegal for one master license holder to service and maintain COAM machines owned by a different master license holder.

50.     Contracts between master license holders and location license holders are typically multi-year contracts, and as noted above, they must be exclusive (*i.e.*, a location license holder cannot contract with two different master license holders). In order for a location license holder to cancel the contract and change to another master license holder, GLC must be submitted a "no-dispute" or "change in master" form. If either party disputes the permissibility of removing the existing master license holder's COAM machines or the change to a new master license holder, they can demand arbitration before the GLC.

51.     Pursuant to Georgia law, revenue generated by COAM machines is split equally between the location license holder and master license holder, after providing a portion to the GLC to fund scholarships and pre-K services. The percentages cannot be modified by contract.

52.     It is illegal for a master license holder to provide "inducements" in the form of cash payments, a higher share of the revenue, or other benefits to location license holders in exchange for entering into a contract. *See* O.C.G.A. § 50-27-87.1. An example of such illegal inducements would be if a master license holder were to purchase real estate and offer a location license holder a discount on rent in exchange for hosting the master license holder's COAM machines on the premises.

53.     Every legal COAM machine in Georgia is connected via a computer system to Intralot, a contractor for the GLC. The Intralot computer system tracks all COAM play and

revenue, and each master license holder can log into the Intralot system to track the revenue for each machine at each location under contract with it.

54.     All revenue earned by COAM machines is collected by location license holders, deposited into a separate account, and then transmitted directly to the GLC electronically every week. GLC then transmits the net revenue owed to the location license holder and the master license holder by electronic wire transfer.

55.     Master licenses and contracts are generally transferrable, subject to the approval of the GLC. Thus, master license holders often acquire "routes" of COAM location license contracts from other master license holders, and they often purchase the other master license itself as part of the transaction.

56.     Because only a limited number of master licenses have been issued by GLC, master licenses have become extremely valuable. If sold on the open market today, which is of questionable legality, a "naked" master license (*i.e.*, one that did not come along with any location contracts) would sell for in excess of $3,000,000.

57.     Contracts with location license holders are the most valuable assets of master license holders, as they are generally the exclusive source of revenue for the business.

58.     The expiration dates of location contracts are extremely competitively sensitive because contract expiration is one of the few times when it is possible for a different master license holder to win away the business. Master license holders keep that information secret, and it cannot be obtained from the GLC pursuant to an Open Records Act request.

59.     Location contracts are typically sold at a multiple of the historical monthly revenue earned by the COAM machines at the location. So, a contract with a location that generates more

revenue per machine (or has more machines) is more valuable than a contract with a location where the machines generate less revenue.

## V. <u>FACTUAL ALLEGATIONS</u>

### A.    Lucky Bucks' History

60.    Upon information and belief, Lucky Bucks and its former corporate affiliates were formed in 2011 by Damani. Over the next several years, it grew to be one of the largest master license holders in the state. In the mid-2010s, Damani sold the majority of his equity interest in Lucky Bucks' corporate affiliates to an investor. Until Lucky Bucks' bankruptcy in 2023, Damani retained a significant minority equity interest in Lucky Bucks via his ownership in Lucky Bucks' former parent company.

61.    Lucky Bucks' initial growth was fueled almost entirely by acquisitions. As part of these acquisitions, Lucky Bucks often acquired master licenses in addition to the location contracts. Accordingly, by 2020, Lucky Bucks held at least six master licenses.

62.    According to the GLC, Damani was also able to grow the business, in part, by offering illegal inducements to a location license holder.

63.    This culminated with GLC notifying Lucky Bucks that it intended to revoke its master license on May 8, 2020. That notification resulted in an administrative proceeding between Lucky Bucks and the GLC.

64.    On June 2, 2020, a GLC hearing officer approved a settlement in the administrative proceeding, and the hearing officer issued an executive order setting forth the terms under which Lucky Bucks would keep its master license. The hearing officer specifically found that Damani violated two provisions of Georgia's COAM laws.

65.    The executive order required Damani to "resign as an officer" and "relinquish all operational control over the business and operations of [Lucky Bucks]." Damani was permitted to

19

retain his equity ownership in Lucky Bucks' former parent holding company, but the order required that his shares be converted to non-voting shares.

66.     After Damani was barred from participating in Lucky Bucks' operation, he signed a 5-year non-competition agreement with Lucky Bucks. Even though Damani resigned as an officer, he was permitted to retain his equity ownership in Lucky Bucks' former parent holding company, Lucky Bucks Holdco LLC ("HoldCo"). His non-compete agreement also allowed him to retain his substantial ownership interest in Lucky Bucks.

67.     After Damani was barred from participating in Lucky Bucks' operation, control of Lucky Bucks' COAM operations in Georgia fell to Kassam, who was named Chief Operating Officer. Lucky Bucks was managed through HoldCo's board of managers, of which Kassam was a member. Even though Damani was barred from participating in the operations of Lucky Bucks, he was heavily involved with Kassam, including taking part in an effort to create a new holding company that bled millions of dollars from Lucky Bucks. In fact, Damani appointed Kassam as the manager of Lucky Bucks' three-person board of managers.

68.     Damani remained involved in the effort to steal Lucky Bucks locations and location contracts via the APAs between Lucky Bucks and B-side entities whereby Damani was updated on developments and timing even though Damani was to have no operational control over Lucky Bucks and had been banned from holding any office at Lucky Bucks by GLC. Damani assisted in this scheme to present acquisition targets to Lucky Bucks, and other individuals kept Damani updated behind-the-scenes by forwarding him emails with the Company's investment bankers and the prospective noteholders.

69.     Another example of Damani's involvement: on October 31, 2020, representatives of a smaller Georgia COAM business reached out to Trive Capital Management ("TCM"), a

middle-market private equity fund that owns or controls several entities, including Southern Star Gaming LLC, which held shares of Lucky Bucks Holdings, offering to sell four locations for $5,000,000. In order to evaluate the opportunity, Damani was looped into this sale—despite the GLC's ban on Damani's exercise of operational control over the business, which Shravan Thadani ("Thadani"), a Managing Director at TCM in charge of TCM's investment in Lucky Bucks, knew about.

70.     As another example, on November 9, 2021, Ijaz asked Sekhri and Bouskill for a call at Thadani's request, explaining that Thadani "would like to discuss the path forward relating to acquisitions given that we might not be able to raise money in the near term. He also hinted that maybe we should include Anil [Damani] in this discussion as well." The reason Thadani wanted Damani to participate in the discussion is that Damani was the one primarily responsible for introducing new merger and acquisition opportunities—even after he was banned from being involved in Lucky Bucks' operations. The use of strawmen and inflated player revenue explains how Lucky Bucks had overpaid by between 50% and 63% for acquisitions from certain B-Side companies, including Unique.

71.     From mid-2021 to early 2022, Lucky Bucks entered into a senior secured credit facility in the aggregate amount of approximately $535,000,000, which was increased to $610,000,000 in October 2021.

72.     Prior to incurring obligations under these credit facilities, Lucky Bucks disclosed that a substantial portion of the proceeds of the debt would be used to fund distributions to shareholders, including Damani and Kassam. In other words, Damani and Kassam admitted that the distributions would be funded by the newly incurred debt, rather than Lucky Bucks' legitimate net earnings.

73.     In July 2021, Lucky Bucks issued a cash dividend of approximately $200,000,000 to Lucky Bucks' shareholders with the proceeds of the financings. Of that amount, more than $50,000,000 was distributed to Damani and more than $500,000 was distributed to Kassam. Again, these dividends were paid for by further saddling Lucky Bucks with debt, rather than from Lucky Bucks' legitimate net earnings.

74.     In August 2021—just a month after Lucky Bucks made its improper July dividend distributions—the "super holdco" plan was devised.

75.     The plan was to create a new holding company ("Holdings") which would sit above Lucky Bucks and HoldCo. Holdings was formed and immediately saddled with additional debt to finance even more dividends.

76.     Holdings' only asset would be its indirect ownership of Lucky Bucks shares (via its ownership of HoldCo shares).

77.     By 2022, Lucky Bucks and its affiliates had taken on hundreds of millions of dollars' worth of debt, substantial portions of which were used to fund the massive distributions. By the end of 2022, Lucky Bucks owed its creditors over $500,000,000.

78.     By mid-2022, Lucky Bucks began to report deteriorating operational performance, citing, among other things, macroeconomic challenges and increased regulatory enforcement within the COAM industry.

79.     In June 2023, Lucky Bucks and its corporate affiliates filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. During the pendency of the bankruptcy, Kassam remained in complete control of Lucky Bucks' COAM operations in Georgia.

80.     Lucky Bucks emerged from bankruptcy in October 2023 pursuant to a reorganization plan approved by the Delaware bankruptcy court. Under the plan, Lucky Bucks emerged as a separate entity indirectly owned by its former lenders. Lucky Bucks has no ongoing relationship with or ownership by its former parent holding company, which is still in bankruptcy.

81.     Shortly before the plan was approved, Kassam formally resigned from Lucky Bucks. Lucky Bucks' new owners quickly hired new, professional management to oversee operations following Lucky Bucks' emergence from bankruptcy.

82.     Pursuant to the Chapter 11 plan, Lucky Bucks preserved all claims it had against Defendants for gross negligence, willful misconduct, and actual fraud.

83.     Within a few weeks, it became apparent to new management that the prior management had been involved in serious willful misconduct and actual fraud. Over the next several months, Lucky Bucks engaged forensic investigators, including former FBI agents, to collect and analyze the digital evidence left behind by the prior management, and to secure Lucky Bucks' physical and digital assets. Lucky Bucks also engaged counsel to interview the remaining employees and to analyze documentary, digital, and other evidence.

84.     That investigation uncovered the organized criminal conspiracy detailed in this Amended Complaint, as well as the extensive efforts that Defendants took to conceal their illegal and fraudulent activities.

**B.      The Theft of Location Contracts**

85.     As noted above, the most valuable assets of a COAM master license holder are its contracts with location license holders.

86.     At some point, Vaswani, Haque, Damani, Kassam, and Chisti set up and/or conspired to steal Lucky Bucks' location contracts and give them to the B-Side businesses.

87.    The B-Side businesses that were recipients of Lucky Bucks' location contracts included Dynamic, Angel, Prestige, Klass Amusement, Peak, Unique, AKS, Lee Caudell, and Pinball.

88.    Vaswani, Haque, Damani, Kassam, and Chisti used many different B-Side businesses, including Georgia Winners, Peak, AKS, Unique, Lee Caudell, and Klass Amusement, as a means to disguise from Lucky Bucks' lenders and the GLC the existence of a systematic effort to loot Lucky Bucks of location contracts and to conceal Damani's involvement.

89.    Defendants utilized multiple B-Side businesses because it would have been obvious what was going on if all of the contracts stolen from Lucky Bucks had gone to a single competing master license holder.

90.    The theft of location contracts was accomplished by two principal means. First, the individual defendants who nominally worked for Lucky Bucks would use the trade secret and confidential information regarding the expiration date of Lucky Bucks' location contracts to target those locations for poaching by the B-Side businesses, including Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS. Kassam would cause Lucky Bucks not to dispute the non-renewal or early termination of location contracts that were being poached by the B-Side businesses.

91.    A prime example of the manner in which this scheme worked can be found in the deposition testimony of Chisti. In 2019, Damani and Kassam recruited Chisti to "purchase" one of the dormant master licenses that Lucky Bucks had acquired through acquisition. (*See* **Exhibit A**). Many of Damani's communications with Chisti were made through WhatsApp, another secure messaging application. Chisti and Georgia Winners retained those communications

and produced copies of them to Lucky Bucks as part of an unrelated arbitration. This arbitration has since been dismissed without prejudice.

92.    Damani and Kassam told Chisti that he would merely be a "paper" owner, and that he would have no role in the operations of Georgia Winners.

93.    Chisti and Haque pooled $400,000 and gave it to 27th Investment Group, another one of Damani's companies, in 2019.

94.    Although the transaction was documented as a "loan," the real purpose of the transaction was the "purchase" of a master license from Lucky Bucks. The value of the license was actually more than $800,000 at the time, double what Chisti and Haque purportedly "paid."

95.    Eventually, Damani and Kassam caused Lucky Bucks to enter into an agreement to "sell" Georgia Winners a master license in exchange for $400,000.

96.    Chisti and Georgia Winners did not actually pay Lucky Bucks for the master license, however. Instead, Georgia Winners provided a $400,000 promissory note to Lucky Bucks at the closing of the transaction.

97.    The majority of the money owed under that promissory note was never paid to Lucky Bucks.

98.    Damani and Kassam told Chisti that he would receive 10% of the revenue, with the remaining 90% being given to members of the criminal conspiracy through Blue Georgia, a shell company set up by another straw man, Motin.

99.    Chisti signed stacks of blank checks drawn on the account of Georgia Winners and gave them to Vaswani, which were used to pay expenses and to funnel money from Georgia Winners to Defendants.

100.    Over the next several months, Vaswani and Haque secured six location contracts for Georgia Winners. At least four of those six locations were under contract with Lucky Bucks immediately before they contracted with Georgia Winners, and three of those location contracts were sold back to Lucky Bucks for millions of dollars after approximately a year.

101.    Defendants used the trade secret and confidential information regarding the expiration dates of the contracts described above to target them for Georgia Winners, which was one of the B-Side businesses.

102.    Chisti signed the paperwork he was brought by Defendants in connection with these sales on behalf of Georgia Winners.

103.    The operations of Georgia Winners, including for these locations, were managed by Kassam, Ali, Haque, and Vaswani, who communicated with each other and Chisti through a Signal group chat about Georgia Winners business. Chisti and Georgia Winners produced copies of the Signal group chat to Lucky Bucks in an arbitration.

104.    Defendants' actions in stealing location contracts were not limited to the Georgia Winners scheme.

105.    Historically, even if Lucky Bucks did not dispute a location license holder's right to switch to a new master license holder, Lucky Bucks would simply decline to respond to the inquiry from GLC, which would have the practical effect of delaying the transition by at least nine months. (*See* **Exhibit B**).

106.    In contrast to that practice, and as part of the scheme, Kassam instructed Lucky Bucks' employees, including Ms. Davis, to file "no dispute" forms with GLC when location license holders desired to switch from Lucky Bucks to one of the B-Side businesses. This enabled

the location license holders to switch to a new B-Side master license holder much more quickly than would otherwise have been the case, to Lucky Bucks' substantial detriment.

107.    In the first quarter of 2023, Lucky Bucks lost 58 locations. Of those 58 locations, 48 had COAM machines when a Lucky Bucks contractor later visited them in June and July.

108.    Of those 48 locations, 21 of them were under contract with one of the known Defendant B-Side master license holders at the time of the visits, including Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS. The testimony provided by Chisti shows the way the scheme worked, and on information and belief, the locations obtained by Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS were obtained in a similar manner (*i.e.*, they were targeted by Damani, Kassam, and Ali making use of Lucky Bucks' trade secret and confidential contract termination date records).

109.    That trend continued through the end of 2023. In December 2023, Lucky Bucks' employees and agents visited 46 locations whose contracts with Lucky Bucks had terminated between April and November 2023. Of the locations visited, 33 had COAM machines present at the time of the visit. (*See* **Exhibits C** and **D**).

110.    Of those 33 locations, 21 of them, *nearly two-thirds*, were under contract with three of Defendant B-Side businesses—Advance (5), Lee Caudell (5), and Klass (11). Of the other 12 locations, one master license holder had a contract with two locations, and no other master license holder had a contract with more than a single location.

111.    During the visits to these locations in the second half of 2023, a number of the store owners told current Lucky Bucks' employees and agents that they had been told that Lucky Bucks was "going out of business" or had "gone bankrupt," and that they needed to switch to a new master license holder.

112.    The competing B-Side businesses, including Peak, Unique, Georgia Winners, and Lee Caudell, still retain a large number of location contracts that were stolen from Lucky Bucks, and they are receiving the ongoing master license holder share of the revenue generated by them directly from the GLC.

113.    Upon information and belief, the total revenue from the stolen location contracts amounts to over $1,000,000 per month that is being directed to the Defendant B-Side businesses, including Defendants Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS, and ultimately to the individual Defendants, including Damani, Kassam, Vaswani, and Haque, and their unknown co-conspirators and pawns.

114.    Not content simply to steal location contracts using Lucky Bucks' trade secret and confidential information, and to usurp corporate opportunities for new location contracts, all for the benefit of the B-Side businesses, on several occasions, Defendants took that scheme one step further—they would then "sell" those locations back to Lucky Bucks at an inflated purchase price.

115.    On information and belief, the purchase price for those locations were based on revenues that had been fraudulently inflated by Defendants, including Lee Caudell, Peak, AKS, Georgia Winners, and Klass Amusement, likely through the use of sham players who increased the playing volume. Chisti testified that he believed that revenues were inflated based on fraudulent players.

116.    The use of sham players also explains why Ijaz and Bouskill identified that Lucky Bucks had overpaid by between 50% and 63% for acquisitions from certain B-Side companies, including Unique.

117.    After purchasing the locations, many of them substantially under-performed their represented revenues.

118.    Since 2020, Defendants caused Lucky Bucks to enter into similar asset purchase agreements ("APA") with AKS, Klass Amusement, Peak, Lee Caudell, Prestige, and Unique, among others, including multiple purchases with several of these Defendants. Some of these asset purchases were priced at over $10,000,000 each, and almost all of them had purchase prices over $1,000,000.

119.    On information and belief, at least a portion of the purchase prices specified in the APAs were based on fraudulently inflated revenues for some of the locations being purchased.

120.    For example, in April 2022, Chisti informed Ijaz that Georgia Winners, at Damani's direction, "setup ghetto locations hardly doing $20000 a month and then they work with operators of locations to pump money to show higher sales and sell these locations back to lucky bucks on much higher margins."

121.    In September 2022, a different Georgia master license holder emailed Kassam explaining that he had "become aware of an elaborate scheme whereby an [Master License Holder] can inflate the value of low performing COAM locations in order to sell them to another [Master License Holder] at a price far exceeding their actual value. Their method involves falsely inflating revenue at the location for a period of several months, so the location will appear to be lucrative."

122.    On information and belief, Defendants used other, non-defendant sham master license holders as part of this racket, including, among others, Goldstar Coin Operating, LLC, and Aarya Ventures, LLC.

123.    The following are details involving Lucky Bucks' master and location contracts that were sold to or bought back from Georgia Winners, Lee Caudell, Peak, AKS, Unique, and Klass Amusement:

a.  On June 25, 2020, Lucky Bucks "sold" a Master License to Georgia Winners. It was never paid for that Master License.

b.  On November 24, 2020, Lucky Bucks entered into an Asset Purchase Agreement with Lee Caudell to purchase locations for a total $1,133,508.60.

c.  On January 25, 2021, Lucky Bucks purchased location contracts for $3,043,606.46 from Lee Caudell.

d.  On January 28, 2021, Lucky Bucks purchased a location contract from Lee Caudell for $518,000.

e.  On February 1, 2021, Lucky Bucks sold location contracts to Peak for $300,000.

f.  On March 17, 2021, Lucky Bucks purchased location contracts from AKS for $390,750.85.

g.  On May 9, 2021, Vaswani directed Chisti to sell two locations to Lucky Bucks.

h.  On May 25, 2021, Lucky Bucks sold location contracts to Unique for $979,419.60.

i.  On June 17, 2021, Lucky Bucks bought location contracts from Lee Caudell for $8,433,953.57.

j.  The very next day, Lucky Bucks bought more location contracts from Lee Caudell for $8,166,046.43.

k.  On August 6, 2021, Defendants caused Georgia Winners and Lucky Bucks to enter into an APA whereby Georgia Winners sold three of the

locations it had "obtained" back to Lucky Bucks in exchange for $5,654,007.18, although a portion of that consideration was withheld pursuant to an earn-out provision.

l.  On November 1, 2021, Lucky Bucks purchased location contracts from Klass Amusement for $14,573,620.55.

m.  On February 11, 2022, Lucky Bucks purchased location contracts from Klass Amusement for $2,122,342.73.

n.  On March 22, 2022, Peak sold the same location contracts it had "purchased" from Lucky Bucks back to Lucky Bucks for $2,667,125.97.

124.    On information and belief, some of the master licensee entities used by Defendants were later either renamed, or they "sold" their master licenses to other shell companies for purposes of preventing detection of the criminal enterprise by effectively "laundering" those licenses.

## C.    The COAM Machine Theft Racket

125.    Smith, Howard, Ali, Kassam, and Sayani devised a scheme whereby they would simply steal COAM machines purchased by and belonging to Lucky Bucks. Upon information and belief, Damani was also aware of, and profited from, this scheme.

126.    Rather than being labeled with an indication of the delivery location and a list of keys and locks for the machine, as would be typical, these stripped-down machines would be marked simply with an "X" drawn on a sheet of paper. For that reason, the machines were often referred to as "X Cabinets" or "X-cabs" by Lucky Bucks' employees, including Defendants Smith, Linares, and Howard. (*See* **Exhibit E**). These X Cabinets had a market value exceeding $10,000 each.

127. Once Smith, Howard, Ali, Kassam, and/or Sayani decided to steal and sell a batch of COAM machines owned by Lucky Bucks, Smith, Linares, or Howard would instruct warehouse workers or technicians, including Christian Hazim, Alex Essig, Adam Essig, William Stump, and Marquail Dinkins, to strip the machines of anything that could be used to identify it as belonging to Lucky Bucks, including the manufacturers' serial number plates.

128. Once the X Cabinets had been prepared, they would either be loaded onto trucks for delivery or left in the warehouse for a purchaser or someone else to pick up after hours.

129. Often, Smith or Ali would arrange for Lucky Bucks equipment to be delivered to a B-Side business. (*See* **Exhibit F**).

130. At the time that new management took over Lucky Bucks, a truck full of X Cabinets that had not yet been delivered was sitting in the Lucky Bucks parking lot.

131. Upon information and belief, many, but not all, of the stolen COAM machines were sold outside the state of Georgia by Defendants Smith, Howard, Ali, Kassam, and Sayani. Lucky Bucks was not paid for those machines.

132. Many of the stolen COAM machines were simply stolen and given to the B-Side businesses.

133. Lucky Bucks was not paid for any of the stolen COAM machines. In fact, Lucky Bucks accounting records do not show the receipt of any revenue from the sale of COAM machines, in part because only licensed manufacturers are permitted to sell COAM machines in Georgia.

134. Upon information and belief, Howard was primarily tasked with organizing and delivering the stolen machines that were sold by Defendants Smith, Howard, Ali, Kassam, and Sayani out of state.

135.     During his first week of work for Lucky Bucks, Toby "Hassan" Collins was instructed to deliver a number of COAM machines to a gas station in Alabama using a U-Haul truck rented by Kassam. Collins understood this to be work for the B-Side, but he does not know who owned those machines.

136.     Lucky Bucks does not have any legitimate business interests in Alabama, and, as far as current management can tell, the financial records do not show the receipt of any revenue from any Alabama gas stations.

137.     While delivering the machines in Alabama, Collins was approached by a police officer who informed him that COAM machines are illegal under Alabama law. He told the police officer, truthfully, that they were not his machines and that he had just been hired to deliver them. The police officer let him deliver the machines without incident.

138.     Upon returning to Georgia, Collins confronted Kassam and told him that he did not want to be involved in any illegal activities. Kassam reassured him that it was not illegal to deliver COAM machines to Alabama, and he further told Collins (falsely) that he would never put him in a position to break the law.

139.     In other words, Kassam was fully aware that Lucky Bucks' employees were transporting stolen COAM machines across state lines for "under-the-table" sales. He also knew that Lucky Bucks was not being paid for the stolen machines.

140.     Upon information and belief, former Lucky Bucks employee Christopher Moyer delivered at least three truckloads of X Cabinets to locations in Tennessee at the direction of certain Defendants, likely Smith, Linares, or Howard.

141.    Some of the stolen COAM machines were, after having been stolen, sold or given to unknown master license holders in the state of Georgia who are friends or acquaintances of the individual Defendants, or strawmen affiliated with the B-Side businesses.

142.    For example, Marquail Dinkins, at either Smith's or Howard's direction, would deliver batches of 10 to 20 X Cabinets to someone he perceived as a friend of some of the individual Defendants at a location very nearby the Lucky Bucks warehouse. The warehouses of the B-Side businesses are all very near the Lucky Bucks warehouse. The same individual (the "friend") identified by Dinkins would also occasionally pick up small batches of X Cabinets using his own truck. Discovery will permit Dinkins to identify the "friend" as one of the nominal B-Side business owners.

143.    Beyond those sold or otherwise given away by Defendants, some of the stolen COAM machines were simply used by Defendants, including Smith, Kassam, Linares, Ali, Howard, and Sayani, for their competing B-Side businesses.

144.    For example, Stump delivered X Cabinets to warehouses belonging to Defendant B-Side businesses several times per month.

145.    As an example, on October 19, 2022, Stump was instructed by Linares to pick up three expensive IGT machines from the Lucky Bucks warehouse and install them at 612 Rockbridge Road SW in Lilburn, Georgia.

146.    That location was previously under contract with Lucky Bucks, and the location contract expired that same month. The location is now under contract with Angel.

147.    The following screenshot from Stump's Signal chat with Linares documents what Stump did that day:



148.    Linares instructed Stump to come "straight to me" about the machines he installed for Angel, and instructed that Stump should not check the machines out through his Lucky Bucks inventory group:



149.    On information and belief, Defendants were responsible for the location license holder not renewing its contract with Lucky Bucks after it expired. On further information and belief, certain individual Defendants encouraged that location license holder to enter into a new contract with Angel.

150.    In other words, the contract for a Lucky Bucks location was stolen and given to Angel, the machines purportedly "owned" by Angel at that location were stolen from the Lucky Bucks warehouse, loaded onto a Lucky Bucks truck, and then installed by a Lucky Bucks employee who was being paid for his labor by Lucky Bucks at the time.

151.     The three machines Stump installed for Angel had a market value of well over $10,000 each.

152.     Lucky Bucks' financial records do not reflect any revenue from the sale of COAM machines to Angel (or anyone else) in October 2022. As such, there is no evidence that Angel purchased the COAM machines from Lucky Bucks.

153.     Lucky Bucks either did not maintain inventory records or those records were destroyed or stolen by Smith, Howard, Ali, Linares, Kassam, and Sayani, so it is unclear exactly how many COAM machines were stolen by Defendants. Nevertheless, the value of the stolen machines likely exceeds $10,000,000 based on the quantities of X Cabinets that were directly prepared, observed, or delivered by employees who remain with Lucky Bucks.

**D.     The Theft of Services Racket**

154.     While Adam Essig was employed by Lucky Bucks, Smith asked him to work as a technician for the B-Side businesses, including Angel, Dynamic, and Klass Amusement. (*See* **Exhibit G**). Until December 2022, Adam Essig worked for the B-Side businesses while being paid by Lucky Bucks.

155.     While Tony Collins was employed by Lucky Bucks, Smith, Kassam, and Ali asked him to work as a technician for the B-Side businesses. Collins regularly worked for the B-Side businesses while being paid by Lucky Bucks. (*See* **Exhibit H**).

156.     While Alex Essig was employed by Lucky Bucks, Smith asked him to work as a technician for the B-Side businesses, including Angel, Klass Amusement, Unique, Prestige, and Fusion Gaming. While doing work for the B-Side businesses, Essig was paid by Lucky Bucks.

157.     In December 2022, Smith asked also Marquail Dinkins to work for the B-side businesses while Dinkins was still employed by Lucky Bucks. (*See* **Exhibit I**).

158.    Linares, Smith, Kassam, Howard, and Ali had multiple technicians, including Stump, Adam Essig, Alex Essig, and Dinkins, do work for Klass Amusement, Prestige, Dynamic, Unique, and Angel while working on the clock and getting paid by Lucky Bucks.

159.    Dynamic, Angel, Prestige, Klass Amusement, Peak, Unique, AKS, Lee Caudell, and Pinball (all of which were B-Side businesses) were referenced in a Signal group chat between Stump and other Lucky Bucks' employees and management, including Smith and Linares, through which Defendants coordinated the use of Lucky Bucks technicians, parts, and equipment to service the B-Side locations.

160.    At the same time that Linares, Smith, Kassam, and Ali directed Lucky Bucks' technicians to do work for Klass Amusement, Prestige, Dynamic, Unique, and Angel, Meyersgold paid Lucky Bucks' technicians extra money.

161.    On the following dates, while working on the clock for Lucky Bucks and being paid by Lucky Bucks, and at the direction of Linares, Smith, and/or Prestige, Stump delivered equipment to Prestige: October 3, 2022; October 6, 2022; October 12, 2022; October 17, 2022; October 20, 2022; October 25, 2022; October 26, 2022; November 3, 2022; November 4, 2022; November 8, 2022; November 11, 2022; November 18, 2022; November 23, 2022; November 25, 2022; December 1, 2022; December 19, 2022; December 21, 2022; December 23, 2022; January 3, 2023; January 5, 2023; January 16, 2023; January 18, 2023; January 19, 2023; and January 20, 2023.

162.    On the following dates, while working on the clock for Lucky Bucks and being paid by Lucky Bucks, and at the direction of Smith, Linares, and/or Unique, Stump delivered equipment to Unique: October 7, 2022; November 9, 2022; November 18, 2022; December 22, 2022; January 3, 2022; and January 20, 2023.

163.    On the following dates, while working for Lucky Bucks and being paid on the clock by Lucky Bucks, and at the direction of Smith and/or Linares, Stump delivered equipment to Klass Amusement: October 6, 2022; November 23, 2022; and December 1, 2022.

164.    Ultimately, Stump was fired from Lucky Bucks and offered a full-time job with the B-Side. He understood this to be common practice at Lucky Bucks.

165.    Defendants also used Lucky Bucks' employees, particularly technicians, to carry on the work of their competing B-Side businesses. As noted above, these employees were given their direction through encrypted Signal group chats.

166.    The "inventory" Signal group chats for Defendant B-Side businesses recovered from Stump's phone show participants and former (or "banned") participants of each group. For example, the following screenshot shows the identities of current and banned members of the inventory group chat for Dynamic:



167.    At a minimum, the following Defendants, all former Lucky Bucks' employees or contractors, were members of the Dynamic group chat at one point in time: Howard, Smith, Linares.

168.    On information and belief, Damani, Kassam, Ali, and/or Sayani were also members of one or more of the Signal group chats, but they used "me" or aliases as their identifier rather than their actual names.

169.    While he was employed at Lucky Bucks, Howard used a Lucky Bucks computer on which he installed the Signal program. Former FBI agents retained by Lucky Bucks have been able to recover the text portion of Howard's Signal communications (both sent and received) from that computer, but not images of the messages or any images that were sent through Signal as part of the conversations. (*See* **Exhibit J**).

170.    From Howard's Signal messages, it is clear that Ali was ultimately managing customer relationships for the competing B-Side businesses and directing Linares regarding work that needed to be done for them.

171.    For example, on February 26, 2023, Linares instructed "Anthony" to service a machine at 1814 Highway 11S in Covington, Georgia, on behalf of Unique. The message instructed "Anthony" to "Call Imran before going." When questioned about whether he had completed the job, "Anthony" indicated that he had "called Imran like it said and got no answer" and therefore did not complete the job.

172.    Two days later, Linares sent the same message to "Karife Tech," again with an instruction to "Call Imran before going."

173.    Smith, Kassam, and Ali directed Lucky Bucks' employees to remove any clothing that could identify them as Lucky Bucks' employees while doing work for the B-Side businesses. For instance, Linares instructed Stump as follows:



174.    These Lucky Bucks' employees were also instructed to use Lucky Bucks trucks, trailers, parts, tools, and other equipment to complete jobs for Defendant B-Side business.

175.    The Lucky Bucks' employees who did this work for the B-Side business were paid extra money on the side, typically $500 per month, through Meyersgold.

176.    Upon information and belief, Meyersgold is owned or controlled by Ali.

177.    Stump's and Howard's Signal group chats detail an extensive amount of work done for the B-Side businesses by employees on the clock for Lucky Bucks.

178.    The Signal conversations are backed up by corroborating evidence recovered by forensic consultants, including former FBI agents.

179.    For instance, Stump's truck had a GPS tracking system installed on it that would communicate to a Lucky Bucks IT system named "Nextraq."

180.    The Nextraq system would maintain a database of the GPS tracking information. The Nextraq system would also send email alerts to Ali whenever an employee's truck was stopped at a particular location for an extended period of time.

181.    The GPS tracking data for Stump's truck was deleted from the Nextraq system, but the emails to Ali remained on Lucky Bucks' email server when new management took over.

182.    On information and belief, Defendants deleted, or caused the deletion of, the Nextraq database information for Stump's truck before they left Lucky Bucks (or did so surreptitiously after they left) in order to destroy evidence of their crimes.

183.    On information and belief, there was no legitimate business reason to delete the GPS data for Stump's truck from the database.

184.    From the period of December 1, 2022, through January 21, 2023, there were 70 unique Nextraq email alerts sent to Ali that directly correlate with Signal chat entries reflecting an address to which Stump was directed to perform installations, removals, or service for the B-Side businesses.

185.    The email alerts were sent either on the same day or the day after the Signal communications with which they correspond.

186.    An analysis of the latitudes and longitudes of the locations of the stops in the email alerts place Stump's truck within 200 feet of the locations at which he would be expected from the addresses in the Signal chats.

187.    At the time of these 70 stops, none of the locations was under a contract with Lucky Bucks, and there was no legitimate business reason for a Lucky Bucks employee to be doing work at those locations.

188.    Based on the Signal chat groups from which the messages were pulled and the content of the messages, Stump (and his Lucky Bucks truck) made these 70 stops for the purpose of doing work for Prestige, Klass Amusement, Unique, Dynamic, AKS, and Angel.

189.    A preliminary analysis of Signal chats and email alerts for other technicians suggests that Ali received similar alerts indicating that other Lucky Bucks technicians, including Joncarlos Herrera and Marco Alvarez, were routinely making stops at locations that were not under contract with Lucky Bucks. Those technicians were using Lucky Bucks trucks and being paid by Lucky Bucks at the time of those stops.

190.    As with the Nextraq data for Stump's truck, the Nextraq data for Herrera's and Alvarez's trucks was deleted from the system.

191.    In addition to the lower-level employees discussed above, the individual Defendants who were employees of Lucky Bucks (Kassam, Ali, Sayani, Howard, Smith, Vaswani, and Haque) did extensive work for the competing B-Side businesses while they were on the clock and being paid by Lucky Bucks.

192.    For example, Kassam, Ali, and Sayani participated in weekly virtual meetings with Damani and a number of employees of Damani's other business, which operates under various entities under the "27th Group" umbrella.

193.    These weekly recurring meetings typically took place in the middle of the workday.

194.    Kassam, Ali, and Sayani received invitations to the meetings through their Lucky Bucks email addresses. Screenshots from a sample meeting found in the mailbox of Kassam are below, and they show that Damani, Kassam, Ali, and Sayani all participated in a virtual meeting on Thursday, December 8, 2022:

| | |
|---|---|
| **Organizer:** | Tony Kassam[tony@luckybucksga.com] |
| **From:** | Emad Vaid[emad@27invest.com] |
| **Attendees:** | Imran Ali; Valerie Martin; Anil Damani; Prem Kaushal; AlAmin Sayani; Mina Patel; Emad Vaid; Donna Anthony; Tony Kassam; Dipika Patel; Ozan Bayar; Application d29ade6f-9257-45cb-883c-01ad3a6f6d20; Laura Andrea Maldonado Marquez; Pegah Firoozl |
| **Importance:** | Normal |
| **Subject:** | Meeting (RecurringMeeting)/Thread Id: 19:meeting_ZmMxOTg3MGYtZmEzMC00MGI1LTg1MzktM2UyZThlZmVkMzAz @thread.v2/Communication Id: 3b9b2c17-bf52-4aaf-9311-281a8fbd0cfd/Imran Ali (Guest),Valerie Martin,Anil Damani,Prem Kaushal,AlAmin Sayani (Guest),Mina Pate... |
| **Start Time:** | Thur 12/8/2022 2:25:44 PM (UTC-05:00) |
| **End Time:** | Thur 12/8/2022 3:07:53 PM (UTC-05:00) |
| **Required Attendees:** | Imran Ali; Valerie Martin; Anil Damani; Prem Kaushal; AlAmin Sayani; Mina Patel; Emad Vaid; Donna Anthony; Tony Kassam; Dipika Patel; Ozan Bayar; Application d29ade6f-9257-45cb-883c-01ad3a6f6d20; Laura Andrea Maldonado Marquez; Pegah Firoozl |

[12/8/2022 7:32:51 PM (UTC)] imran@luckybucksga.com joined.
[12/8/2022 7:59:11 PM (UTC)] imran@luckybucksga.com left.
[12/8/2022 7:34:52 PM (UTC)] alamin@luckybucksga.com joined.
[12/8/2022 7:59:14 PM (UTC)] alamin@luckybucksga.com left.
[12/8/2022 7:42:43 PM (UTC)] valerie@27invest.com joined.
[12/8/2022 7:59:14 PM (UTC)] valerie@27invest.com left.
[12/8/2022 7:25:43 PM (UTC)] mina@27thproperties.com joined.
[12/8/2022 7:59:04 PM (UTC)] mina@27thproperties.com left.
[12/8/2022 7:50:28 PM (UTC)] emad@27invest.com joined.
[12/8/2022 7:59:09 PM (UTC)] emad@27invest.com left.
[12/8/2022 7:30:44 PM (UTC)] donna@27invest.com joined.
[12/8/2022 7:59:10 PM (UTC)] donna@27invest.com left.
[12/8/2022 7:26:12 PM (UTC)] tony@luckybucksga.com joined.
[12/8/2022 7:59:19 PM (UTC)] tony@luckybucksga.com left.

[12/8/2022 7:50:33 PM (UTC)] anil@27invest.com joined.
[12/8/2022 8:07:50 PM (UTC)] anil@27invest.com left.

195.    There was no legitimate business reason for Kassam, Ali, and Sayani to be meeting

with Damani and employees of his other companies each week during work hours, particularly

given that Damani had been barred from participating in Lucky Bucks' operations by the GLC more than two years earlier.

196.    On information and belief, the purpose of these weekly meetings was to plan, coordinate, and manage the various rackets described in this Amended Complaint.

197.    Although Linares was nominally an independent contractor, he billed Lucky Bucks for 40 hours of work nearly every week during 2022, at a time when he was spending most of his time working for the B-Side businesses. According to the 1099 form that he was issued that year, Linares was paid $54,000 by Lucky Bucks in 2022.

**E.    The Theft of Money Racket**

198.    Defendants also used the competing B-Side businesses as a way to simply steal money from Lucky Bucks.

199.    For example, on July 14, 2022, Lucky Bucks transferred $850,000 to Prestige as an "exclusivity" deposit for an asset purchase pursuant to a signed letter of intent. (*See* **Exhibit K**).

200.    No assets were ever purchased from Prestige subsequent to this "deposit," however, and in December 2022, the individual Defendants caused Lucky Bucks to write off the entire amount of this transfer as a loss.

201.    In other words, Lucky Bucks transferred $850,000 to Prestige at the direction of the individual Defendants in exchange for an exclusive right to purchase a number of location contracts (from themselves). The individual Defendants then simply let Prestige keep the money by failing to complete the transaction for no legitimate reason.

202.    As another example, on July 14, 2021, in a series of four separate, smaller transactions, Lucky Bucks paid $200,000 to "Klass Entertainment," purportedly for "advertising and marketing." These payments were allegedly for "sponsorships" of various charitable events.

203.    As an example, one of the alleged sponsorships was for the "Rahul Deshpande Recital" in August 2019 which was coordinated by Para Share LLC, which coordinates in-person shows and tours. On August 1, 2019, Klass Entertainment issued a $45,000 invoice to Lucky Bucks for a "Gold package" sponsorship.

204.    However, Harshad Parashare, Para Share's founder and CEO, did not recall ever receiving a sponsorship of $10,000 or more in connection with a Para Share event, let alone the $45,000 for which Klass Entertainment invoiced Lucky Bucks on August 1, 2019. (**Exhibit L**).

205.    Further, Parashare reviewed Para Share's accounting records back through its inception, which did not reflect that any money was paid by, or received from, Lucky Bucks, Klass Entertainment, or any of the named Defendants.[3]

206.    Upon information and belief, Klass Entertainment never provided any marketing or advertising services to Lucky Bucks. Rather, Defendants simply stole $200,000 from Lucky Bucks by laundering it through Klass Entertainment, another affiliate associated with Damani.

207.    On information and belief, Damani was instrumental in facilitating many, if not all, of the sham sponsorship payments.

208.    On information and belief, the $200,000 payment was broken into smaller transactions to avoid detection by honest Lucky Bucks' employees and others.

F.    **The Employee Theft Racket**

209.    Not content to steal contracts, machines, services, and money from Lucky Bucks, Defendants, including Smith and Howard, also stole (or attempted to steal) Lucky Bucks' technicians and warehouse employees to work for their B-Side businesses.

---

[3] Parashare provided his affidavit before Chisti or Georgia Winners were added as Defendants in this matter, and they are not referenced in that affidavit.

210. Defendants would hire more technicians than were necessary for Lucky Bucks' business and would cause Lucky Bucks to pay for their training and initial work. Defendants would then use methods to have the trained employees go to work for the B-Side businesses instead of Lucky Bucks.

211. For some employees, this simply took the form of soliciting them to work for the B-Side businesses. For others, when they resisted the solicitations, Defendants would generate pretexts for firing the employees.

212. Once the employee had been fired from Lucky Bucks, Smith or Howard would catch them in the parking lot or text them with an offer to work for the B-Side businesses.

213. Defendants attempted to employ this strategy with Stump. He was fired by Smith based on a minor accident that resulted from the failure of the brakes on his truck. Immediately after his firing, Smith tried to hire Stump for the B-Side businesses, but he declined the offer. Stump has since been rehired by Lucky Bucks.

214. A number of former Lucky Bucks' employees or contractors are now (or were at one time) working for the B-Side businesses, including Rayshon Knight, Kevin Salley, Christopher Moyer, Cameron Rhodes, and Jancarlos Herrera, among others.

## G. Defendants' Unauthorized Access to Lucky Bucks' IT Systems

215. Lucky Bucks maintains a shared network drive on which documents necessary for its business operations are stored.

216. Among the files saved on the shared network drive are several spreadsheets that summarize the identities and key terms of Lucky Bucks' contracts with location license holders.

217. The shared network drive is only accessible using unique usernames and passwords that were provided to Lucky Bucks' employees through a company-owned Microsoft account.

218.    This system was originally set up by Sayani and Ali, whose accounts had privileges as administrators.

219.    Long after their employment with Lucky Bucks had ended, both Sayani and Ali used their unique usernames and passwords to access files on the Lucky Bucks shared network drive that contain trade secret and confidential information.

220.    In October 2023, Ankura was hired by the Lucky Bucks to conduct a cyber investigation into activity impacting Lucky Bucks and its assets.

221.    Ankura deployed a Software-as-a-Service (SaaS) management tool called Obsidian Security to analyze Lucky Bucks' Microsoft 365 ("M365") logs. Ankura observed and preserved M365 activity associated with Sayani's account that occurred after his departure from Lucky Bucks.

222.    Specifically, on November 6, 2023, Ali accessed Microsoft Excel files on the Lucky Bucks network drive titled "LB Ops Active Contracts Sheet," "Ops Workbook," "Continuity-Feb_Final," and "Weekly Stats."

223.    That same day, Ali also accessed a filed titled "LB Logins & Passwords" that contained various passwords and login credentials for Lucky Bucks' IT systems that Ali had created.

224.    On November 17, 2023, Sayani accessed Microsoft Excel files on the Lucky Bucks network drive titled "LB Logins & Passwords.xlsx," "LB Ops Active Contract Sheet – TK_07052023," "Ops Workbook," "LB Master 03_16_2022_TK," and "Clusters Current."

225.    Sayani attempted to login on a subsequent occasion, but Lucky Bucks' new management had blocked his access by that point.

226.     The files improperly accessed by Ali and Sayani without authorization from Lucky Bucks contain trade secret and confidential information belonging to Lucky Bucks, including the identities of, and key terms of Lucky Bucks' contracts with, location license holders, *i.e.*, the dates on which those contracts expire.

227.     The key terms of Lucky Bucks' contracts with location license holders are confidential trade secret information because those terms are not publicly available through legitimate means and contain information that is commercially valuable within the COAM marketplace.

228.     Of particular importance are the expiration dates for the various location contracts, which vary from contract to contract, because contract expiration is one of the only times that a master license holder can seek to obtain the business of a location without penalty to the location license holder, which must otherwise wait a minimum of nine months before resuming COAM activities with a new master license holder.

229.     The time at which an expiring contract must be terminated before it automatically renews is also critical secret information.

230.     The terms of expiration and expiration dates of Lucky Bucks' location contracts are not publicly available, and they cannot be obtained from GLC using an Open Records Act request.

**H.     Damani, Kassam, Ali, Sayani, Vaswani, Haque, and Howard Breach their Agreements with Lucky Bucks**

231.     Sayani and Haque executed non-compete, non-solicitation, and confidentiality agreements with Lucky Bucks. (*See* **Exhibit M)**.

232.     Sayani's agreement provided that:

    a.   Sayani would maintain the confidentiality of Lucky Bucks' confidential and propriety business information; and

    b.   Sayani would not accept other employment, occupation, or consulting activity, nor would he engage in activities that conflicted with his obligations to Lucky Bucks.

233.   Similarly, Haque's agreement stated as follows:

    a.   Haque would not, during his employment or for two years thereafter, solicit Lucky Bucks' employees or customers;

    b.   Haque would maintain the confidentiality of Lucky Bucks' confidential and propriety business information;

    c.   Haque would refrain from interfering with Lucky Bucks' contracts and business relationships, including, but not limited to, Lucky Bucks' customer or client contracts or relationships; and

    d.   Haque would not, either during his employment or for 18 months thereafter, work for, obtain or plan to obtain an interest in, or affiliate with any other COAM business within a defined geographical territory.

234.   Kassam, Howard, Vaswani, and Ali also executed substantially similar non-compete, non-solicitation, and confidentiality agreements with Lucky Bucks, in accordance with Lucky Bucks' standard practice.

235.   However, on information and belief, Defendants either removed all copies of those documents before they resigned, or they instructed other members of the conspiracy to do so after they resigned. As a result, Lucky Bucks does not have copies of the executed versions of their non-compete agreements.

236.   Linares executed an independent contractor agreement with Lucky Bucks, which provided, in relevant part, that he would maintain the confidentiality of Lucky Bucks' confidential

and proprietary information, and that misuse of such information would irreparably harm Lucky Bucks.

237.    In 2016, Damani also executed an employment agreement with Lucky Bucks that contained non-compete, non-solicitation, and confidentiality provisions. On information and belief, the non-compete, non-solicitation, and confidentiality terms of that agreement were substantially similar to those contained in Haque's employment agreement.

238.    In 2020, as a part of his settlement with the GLC and Lucky Bucks' former parent company, Damani entered into a Separation Agreement and General Release (the "Separation Agreement") with Lucky Bucks that became effective on or about May 26, 2020.

239.    Damani's Separation Agreement provided that the terms of his 2016 employment agreement were ratified, reaffirmed, and reincorporated into the Separation Agreement. Further, Exhibit A to the Separation Agreement was a Non-Competition, Non-Solicitation, and Non-Disclosure Agreement that provided that:

> a.  Damani would not, directly or indirectly, compete with Lucky Bucks; and
>
> b.  Damani would not, directly or indirectly, hire or solicit Lucky Bucks' employees or customers.

240.    By participating in Defendants' conspiracy to loot Lucky Bucks, including through their work for the B-Side business, solicitation of Lucky Bucks' employees and customers, and theft and disclosure of Lucky Bucks' trade secrets, Damani, Kassam, Ali, Sayani, Vaswani, Haque, and Howard each breached their contractual obligations to Lucky Bucks, thereby causing Lucky Bucks substantial harm.

# VI. <u>LEGAL THEORIES</u>

## COUNT I—VIOLATIONS OF GEORGIA'S RICO ACT
### <u>(Against All Defendants)</u>

241.    By undertaking the actions alleged in this Amended Complaint, Defendants, and other unknown members of the conspiracy and criminal enterprise, committed, conspired to commit, and/or attempted to commit the following predicate crimes:

      a.   Theft by Taking, in violation of O.C.G.A. § 16-8-2;

      b.   Theft by Deception, in violation of O.C.G.A. § 16-8-3;

      c.   Theft of Services, in violation of O.C.G.A. § 16-8-5;

      d.   Theft by Receiving Stolen Property, in violation of O.C.G.A. § 16-8-7;

      e.   Theft of Trade Secrets, in violation of O.C.G.A. § 16-8-13; and

      f.   Use of an Article with an Altered Identification Mark, in violation of O.C.G.A. § 16-9-70(b).

## A.    Theft of Trade Secrets (O.C.G.A. § 16-8-13)

242.    Kassam, Ali, Sayani, Haque, and Vaswani directly and indirectly, stole Lucky Bucks' trade secrets, including customer lists and the expiration dates and renewal terms of location contracts, in order to unfairly compete with Lucky Bucks by exploiting that confidential information to allow the Defendant B-Side businesses to systematically target Lucky Bucks' customers.

243.    Lucky Bucks' trade secret customer lists and contract terms, particularly the renewal terms and expiration dates, are confidential, non-publicly accessible via proper means, and protected via various security measures implemented by Lucky Bucks to ensure that their confidentiality is maintained.

244.    As a result of Kassam, Ali, Sayani, Haque, and Vaswani's concerted effort to target Lucky Bucks' location contract holders using Lucky Bucks' trade secrets, a disproportionately high number of those locations are now under contract with B-Side businesses, including Klass Amusement, Advance, and Lee Caudell.

245.    On information and belief, the B-Side businesses, including Klass Amusement, Advance, and Lee Caudell, are directly or indirectly controlled by or acting in concert with the individual Defendants.

246.    As examples of Defendants' theft of Lucky Bucks' trade secrets, Ali and Sayani violated O.C.G.A. § 16-8-13 by accessing Lucky Bucks' Office365 and SharePoint accounts without authorization after their employment ended to take Lucky Bucks' trade secrets, including customer lists and confidential location contracts.

    a.   After Sayani's termination from Lucky Bucks, he accessed his Lucky Bucks' Office365 and SharePoint accounts externally. Sayani accessed the following files via Lucky Bucks' SharePoint on November 2, 2023: "OPS Workbook.xlsx" and "LB Ops Active Contract Sheet – TK_07052023.xlsx."

    b.   Later, on November 17, 2023, Sayani accessed Lucky Bucks' SharePoint account for the following files: ""Clusters Current.xlsx", "OPS Workbook.xlsx", "LB Ops Active Contract Sheet-TK_07052023.xlsx", "LB Master 03 _16 _2022 _ TK.xlsx", and "LB Logins & Passwords.xlsx".

    c.   On November 6, 2023, Ali accessed Microsoft Excel files on the Lucky Bucks network drive titled "LB Ops Active Contracts Sheet," "Ops Workbook," "Continuity-Feb_Final," and "Weekly Stats."

    d.   That same day, Ali also accessed a file titled "LB Logins & Passwords" that contained various passwords and login credentials for Lucky Bucks IT systems that Ali had created.

247.    The documents and spreadsheets improperly accessed by Sayani and Ali contain confidential and trade secret lists of Lucky Bucks' location contracts, as well as summaries of key secret contractual terms, including the expiration date of the contracts.

248.    Kassam, Ali, Haque, and Vaswani, improperly used the same confidential files and trade secret information to target location contracts for the B-Side businesses, including Georgia Winners, while they were still employed by Lucky Bucks.

## B.    Theft by Taking (O.C.G.A. § 16-8-2)

249.    Smith, Howard, Ali, Kassam, and Sayani committed theft by taking by coordinating, directing, or otherwise participating in the preparation and distribution of the X Cabinets—COAM machines belonging to Lucky Bucks—and Lucky Bucks' parts and equipment to various entities, including the B-Side businesses.

250.    Once Defendants Smith, Howard, Ali, Kassam, and/or Sayani decided to steal or sell a batch of X Cabinets, Smith, Linares, or Howard would instruct warehouse workers or technicians to strip the machines of anything that could be used to identify it as belonging to Lucky Bucks, including the manufacturers' serial number plates.

251.    Once the X Cabinets had been prepared, they would either be loaded onto trucks for delivery or left in the warehouse for a purchaser or someone else to pick up after hours. Importantly, *Lucky Bucks was not paid for any of the stolen machines*, even if they were "sold" to

someone else. Often, Smith or Ali would arrange for Lucky Bucks' equipment to be delivered to a B-Side business.

252.    Many of the X Cabinets were provided to the B-Side businesses, either for free or for compensation paid to the Lucky Bucks' employees who stole them.

253.    For example, Dinkins, at the direction of either Smith or Howard, would deliver batches of 10 to 20 X Cabinets to someone he perceived as a friend of some of the individual Defendants at a location very nearby the Lucky Bucks warehouse. The warehouses of the B-Side businesses are all very near the Lucky Bucks warehouse.

254.    Beyond those sold or otherwise given away by Defendants, some of the X Cabinets were simply used by Defendants, including Smith, Kassam, Linares, Ali, Howard, and Sayani, for the competing B-Side businesses.

255.    As another example, Stump delivered stolen X-Cabinets to warehouses belonging to Defendant B-Side businesses several times per month. Specifically, Stump delivered stolen X-Cabinets to warehouses belonging to Unique, Prestige, Klass Amusement, AKS, and Dynamic during his initial employment with Lucky Bucks. He was falsely told that the B-Side business had purchased the stolen X-Cabinets from Lucky Bucks.

256.    As a further example, below are copies of true and correct digital photos of a stolen COAM Machine that was in use by Klass Amusement at a location formerly under contract with Lucky Bucks. Lucky Bucks has no records of ever selling any COAM machines to Klass Amusement or receiving any money for any such machines. The serial number proves that this machine is one that was purchased by Lucky Bucks, but there is no record of Lucky Bucks having sold the machine to Klass Amusement or received any money for such sale. These photos were taken in January 2024.





257.    These are only a sample of pictures that Lucky Bucks has of stolen machines that were in use by B-Side businesses.

258.    The COAM machines in the pictures above were physically taken from Lucky Bucks without any compensation to Lucky Bucks with the intent to deprive Lucky Bucks of the ownership of them. The same is true with respect to the other COAM machines and X-Cabinets referred to throughout this Amended Complaint.

259.    Kassam, Ali, Smith, Howard, and Linares personally directed and orchestrated the physical theft of these machines from Lucky Bucks.

260.    Similarly, by way of another example, on October 19, 2022, Stump was instructed by Linares to pick up three expensive IGT machines from the Lucky Bucks warehouse and install them at 612 Rockbridge Road SW in Lilburn, Georgia.

261.    That location was previously under contract with Lucky Bucks, and the location contract expired that same month. The location is now under contract with Angel.

262.    Linares instructed Stump to come "straight to me" about the machines he installed for Angel and instructed that Stump should not check the machines out through his Lucky Bucks inventory group. There is no evidence that Angel ever purchased those machines from Lucky Bucks.

263.    As another example, on December 23, 2022, Linares told Stump to drop off at Klass Amusement a blank Lucky Bucks COAM machine that he was told to pick up and not log.

## C.    Theft of Services (O.C.G.A. § 16-8-5)

264.    Linares, Smith, Kassam, Howard, and Ali had multiple technicians, including Stump, Adam Essig, Alex Essig, and Dinkins, do work for, at a minimum, Klass Amusement, Prestige, Dynamic, Unique, Lee Caudell, Peak, AKS, Pinball, and Angel while working on the clock and getting paid by Lucky Bucks.

265.    Linares, Smith, Kassam, Howard, and Ali, through Meyersgold, paid the Lucky Bucks technicians for the work performed for the B-Side businesses.

266.    As an example, on October 6, 2022, Stump clocked into Lucky Bucks, picked up a Lucky Bucks trailer, and picked up gaming machines from Klass Amusement to take to a Klass Amusement customer.

267.    As another example, on November 4, 2022, Linares directed Stump to prioritize a Prestige job over his Lucky Bucks work.

268.    As another example, on November 8, 2022, Linares directed Stump to conduct a Dynamic job using a Lucky Bucks' trailer.

269.    As another example, while working on the clock for Lucky Bucks and being paid by Lucky Bucks, and at the direction of Linares, Smith, and/or Prestige, Stump delivered equipment to Prestige at least 24 times between October 2022 and January 2023.

270.    As another example, while working on the clock for Lucky Bucks and being paid by Lucky Bucks, and at the direction of Smith, Linares, and/or Unique, Stump delivered equipment to Unique at least six times between October 2022 and January 2023.

271.    As another example, while working for Lucky Bucks and being paid on the clock by Lucky Bucks, at the direction of Smith and/or Linares, Stump delivered equipment to Klass Amusement at least three times between October and December 2022.

272.    As another example, in November 2021, Smith asked Adam Essig to work as a technician for the B-Side businesses, including Angel, Dynamic, and Klass Amusement. Until December 2022, Adam Essig worked for the B-Side businesses while being paid by Lucky Bucks.

273.    As another example, Smith, Kassam, and Ali asked Collins to work as a technician for the B-Side businesses. Collins regularly worked for the B-Side businesses while being paid by Lucky Bucks.

274.    As another example, Smith asked Alex Essig to work as a technician for the B-Side businesses, including Angel, Klass Amusement, Unique, Prestige, and Fusion Gaming. While doing work for the B-Side businesses, Alex Essig would be paid by Lucky Bucks.

275.    As another example, in December 2022, Smith asked Dinkins to work with the B-Side businesses.

276.    These are all examples, and the Signal logs contained in Exhibit E and the affidavit itself, contain many other specific examples, by date and time, of Lucky Bucks' employees (including Stump himself) doing work for the B-Side businesses while being paid by Lucky Bucks.

277.    The Signal logs and affidavits also document that Ali, Howard, Haque, Vaswani, and Linares were doing work for B-Side businesses at the same time as they were being paid for their time by Lucky Bucks.

278.    The Signal logs and affidavits show that every single B-Side Defendant named in this Amended Complaint that has or had a master license obtained services stolen from Lucky Bucks on at least one occasion.

279.    The object of Linares, Smith, Kassam, Howard, and Ali's theft of services was to obtain money. Specifically, many of the employees whose services were stolen desired to obtain money from both Lucky Bucks and from Meyersgold as double payment for their time. The former Lucky Bucks' employees and contractors who are Defendants in this case desired to obtain money from both Lucky Bucks (in the form of their salaries or compensation) and from the B-Side businesses, many of which could not have operated without the services provided by Lucky Bucks' employees and contractors.

**D.    Theft by Receiving Stolen Property (O.C.G.A. § 16-8-7)**

280.    Defendants also committed the crime of theft by receiving stolen property, in violation of O.C.G.A. § 16-8-7.

281.    As an example, at the direction of Linares, Smith, and/or Prestige, Stump delivered Lucky Bucks' equipment to Prestige to which Prestige had no entitlement or right at least 22 times between October 2022 and January 2023.

282.    As another example, at the direction of Smith, Linares, and/or Unique, Stump delivered Lucky Bucks' equipment to Unique to which Unique had no entitlement or right at least six times between October 2022 and January 2023.

283.    As another example, at the direction of Smith and/or Linares, Stump delivered Lucky Bucks' equipment to Klass Amusement to which Klass Amusement had no entitlement or right at least three times between October and December 2022.

284.    In each of the foregoing instances, Defendants knew or should have known that the Lucky Bucks property at issue was stolen.

285.    The pictures in paragraphs 139, 248, and 283 also show that Angel, Klass Amusement, and Pinball received stolen property, *i.e.*, COAM Machines.

286.    If Defendants did not physically take the COAM Machines from Lucky Bucks such that they are liable for theft by taking, in the alternative, they are liable for theft by receiving stolen property.

287.    By receiving, disposing of, or retaining stolen property which they knew or should have known were stolen, with no intent of restoring that property to Lucky Bucks, Defendants have committed the offense of theft by receiving stolen property, in violation of O.C.G.A. § 16-8-7(b)

**E.    Use of an Article with an Altered Identification Mark (O.C.G.A. § 16-9-70(b))**

288.    Smith, Ali, Kassam, Sayani, and Howard committed the offense of use of an article with an altered identification mark by stripping Lucky Bucks' COAM machines (the X Cabinets) of their identifying markers, including serial numbers, before distributing those machines to the B-Side businesses and other unknown entities.

289.    More specifically, Defendants, including Smith, Ali, Kassam, Sayani, and Howard, would instruct warehouse workers or technicians, including Hazim, Alex Essig and Dinkins, to

strip COAM machines of anything that could be used to identify it as belonging to Lucky Bucks, including often removing the manufacturers' serial number plates.

290.   Many of these X Cabinets were delivered to the B-Side businesses, including Unique, Prestige, and Klass Amusement, which had warehouses very near to Lucky Bucks.

291.   For example, below are photos that were taken from a location that was formerly under contract with Lucky Bucks. The photos depict an X-Cabinet that had the exterior serial number removed, the results of which can be observed in the photos. This particular X-Cabinet bears a label indicating that the master license holder was Pinball, which has master license number 00015123 from the GLC. Although the exterior serial number had been removed, the employees of the location opened the X-Cabinet, which revealed another serial number on the inside that whoever prepared the X-Cabinet had failed to remove. That interior serial number proves that the machine is one that was purchased by Lucky Bucks. Lucky Bucks has no record of the machines having been sold to Pinball, or of Lucky Bucks having received any money for the sale of COAM machines to Pinball. The pictures were taken in January 2024.





292.    By preparing, distributing, and using the X Cabinets, which had their serial numbers removed to hide the fact that those machines properly belonged to Lucky Bucks, Defendants violated O.C.G.A. § 16-9-70(b).

**F.    Theft by Deception (O.C.G.A. § 16-8-3)**

293.    Defendants committed the offense of theft by deception by obtaining property from Lucky Bucks, including master licenses, location license contracts, COAM machines, parts, and equipment, by deceitful or artful means.

294.    As an example, between 2020 and 2022, Kassam, Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS orchestrated purchase and sales of Lucky Bucks' master licenses and location licenses at unfair prices.

a.   On November 24, 2020, Lucky Bucks as the buyer entered into an APA with Lee Caudell, the seller, to purchase locations for $1,133,508.60.

b.   Later, on June 17, 2021, Lucky Bucks bought location contracts from Lee Caudell for $8,433,953.57.

c.   The very next day, Lucky Bucks bought more location contracts from Lee Caudell for $8,166,046.43.

d.   On January 25, 2021, Lucky Bucks purchased from Lee Caudell location licenses for $3,043,606.46.

e.   On January 28, 2021, Lucky Bucks purchased a location license from Lee Caudell for $518,000.

f.   On February 1, 2021, Lucky Bucks sold location contracts to Peak for $300,000.

g.  Approximately one year later, on March 22, 2022, Peak sold those same location contracts back to Lucky Bucks for $2,667,125.97, nearly nine times for what Lucky Bucks sold them for.

h.  On March 17, 2021, Lucky Bucks purchased location contracts from AKS for $390,750.85.

i.  On May 25, 2021, Lucky Bucks sold location contracts to Unique for $979,419.60.

j.  On November 1, 2021, Lucky Bucks purchased location contracts from Klass Amusement for $14,573,620.55.

k.  On February 11, 2022, Lucky Bucks purchased location licenses from Klass Amusement for $2,122,342.73.

295.    In each of the foregoing purchases/sales, Defendants concealed that Defendants were not engaging in an arms' length transaction, but were in fact manipulating Lucky Bucks to enter into commercially disadvantageous agreements via the individual Defendants who were then corrupt managers of Lucky Bucks.

296.    On information and belief, Defendants used deceptive means to manipulate the price that Lucky Bucks would pay for location contracts, including the use of fraudulently increased player numbers to drive up the sale price.

297.    Defendants repeatedly affirmed that the transactions were being entered into in good faith, which Defendants knew was not true at the time the misrepresentations or material omissions were made, with the intent of deceiving Lucky Bucks.

298.    This was precisely what occurred with respect to the Georgia Winners scheme described in paragraphs 91–103 orchestrated by Damani, Kassam, Ali, Haque, Vaswani, Motin, and Chisti, in which Georgia Winners and Blue Georgia were also involved.

299.    Defendants also deceived Lucky Bucks into paying for purported "sponsorships" via Klass Entertainment, which sponsorships were never purchased. On information and belief, Defendants, including Damani, simply pocketed the money.

300.    As an example, on July 14, 2021, in a series of four separate, smaller transactions, Lucky Bucks paid $200,000 to "Klass Entertainment," purportedly for "advertising and marketing." These payments were purportedly for "sponsorships" of various charitable events.

301.    The address for Klass Entertainment is the same one as for the 27th Investment Group, another of Damani's companies. There is no evidence that Klass Entertainment ever provided any marketing or advertising services to Lucky Bucks. Rather, the full amount of the money paid to Klass Entertainment was not used for charitable sponsorships, and the criminal enterprise simply stole $200,000 from Lucky Bucks by transferring it to Klass Entertainment.

302.    There are multiple similar invoices that were submitted to Lucky Bucks and approved by Kassam from Klass entertainment. The invoices were fabrications and not for services or sponsorships actually purchased by Lucky Bucks. On information and belief, Klass Entertainment is beneficially owned or controlled by Damani and Kassam.

303.    In addition, Defendants stole COAM Machines by lying to Lucky Bucks' employees, such as Stump, Dinkins, and Alex Essig. Specifically, Howard, Smith and Linares falsely told them that the COAM machines had been sold to the B-Side businesses and other individuals when in fact Lucky Bucks did not receive any payment or compensation for them.

Thus, in the alternative to the COAM machines having been physically stolen, they were stolen by deception.

304.    By intentionally creating or confirming Lucky Bucks' impressions as to existing facts or past events material to the APAs and ownership of COAM machines, which impressions Defendants knew to be false, Defendants violated O.C.G.A. § 16-8-3.

## G.    Defendants Violated Georgia's RICO Act via Their Coordinated Efforts to Steal from Lucky Bucks

305.    Through their coordinated efforts to steal from Lucky Bucks through a pattern of racketeering activity—the commission of the predicate acts described above—Defendants violated O.C.G.A. § 16-14-4(a).

306.    Defendants further violated O.C.G.A. § 16-14-4(a) through their coordinated efforts by obtaining control of Lucky Bucks' COAM operations in Georgia via the corrupt individual Defendants who were also Lucky Bucks managers.

307.    Defendants additionally violated O.C.G.A. § 16-14-4(b) through their association with, and participation in, the criminal enterprise described above, for which the common purpose was to systematically steal from Lucky Bucks for Defendants' benefit.

308.    Defendants also violated O.C.G.A. § 16-14-4(c) by conspiring together to violate the RICO Act in order to steal from Lucky Bucks.

309.    As alleged herein, Linares, Smith, Ali, Howard, Damani, Kassam, and Sayani began this scheme to steal Lucky Bucks' location contracts, money, equipment, property, and employees.

310.    As evidenced by the Signal chats for Angel, Unique, AKS, Klass Amusement, Dynamic, Lee Caudell, Prestige, and Pinball involving individual Linares, Smith, Ali, Howard, Kassam, and Sayani, the coordinated effort to buy and sell Lucky Bucks' location contracts and

licenses, it is clear that these Defendants formed an enterprise in fact pursuant to O.C.G.A. § 16-14-3(3) and engaged in theft of trade secrets, theft by taking, theft of services, theft by deception, and theft by receiving stolen property via the methods described above.

311.    Based on the lengths taken by Linares, Smith, Ali, Howard, Kassam, and Sayani via means, including Signal chats, WhatsApp messages, and private conversations, to conceal their theft of location contracts, licenses, equipment, and services of Lucky Bucks' technicians, the Linares, Smith, Ali, Howard, Kassam, and Sayani worked to steal from Lucky Bucks.

312.    Lucky Bucks is entitled to remedial orders that prevent the individual and entity Defendants from continuing to engage in racketeering activity pursuant to O.C.G.A. §§ 16-14-6(a) and (b).

313.    Between 2020 and 2023, Defendants each participated in the aforementioned acts in furtherance of their enterprise as described herein.

314.    Lucky Bucks is entitled to an award of actual damages, treble damages, punitive damages, and attorneys' fees against Defendants pursuant to O.C.G.A. § 16-14-6(c).

## COUNT II—BREACH OF FIDUCIARY DUTY
### (Against Ali)

315.     In his role as Lucky Bucks' Director of Operations, Ali was authorized to act on Lucky Bucks' behalf as its agent, in which role he undeniably owed Lucky Bucks fiduciary duties to his employer, Lucky Bucks, under the common law of Georgia, including the duty of loyalty and care.

316.    Ali also owed fiduciary duties to Lucky Bucks as a result of his employment agreement, which required him to maintain the confidentiality of Lucky Bucks' confidential information, and to refrain from competing with Lucky Bucks by working for Lucky Bucks' competitors, such as the B-Side businesses.

317.    Ali violated his fiduciary duties to Lucky Bucks through his participation in Defendants' conspiracy, including:

      a.    arranging for stolen Lucky Bucks equipment to be delivered to B-Side businesses;

      b.    coordinating the sale of location contracts from Georgia Winners to Lucky Bucks at a large markup after those same locations had been stolen from Lucky Bucks;

      c.    usurping Lucky Bucks' corporate opportunities for the B-Side businesses;

      d.    providing services directly for Lucky Bucks' competitors, in direct contravention to the best interest of Lucky Bucks, including by managing customer relationships for the B-Side businesses; and

      e.    accessing Lucky Bucks' computer systems after his employment ended to steal Lucky Bucks' trade secrets for Defendants' use and benefit.

318.    By causing Lucky Bucks to engage in self-dealing transactions that were unfair and detrimental to Lucky Bucks, Ali breached his fiduciary duty of loyalty to Lucky Bucks.

319.    The self-dealing transactions were not entirely fair to Lucky Bucks.

320.    Lucky Bucks has suffered damage as a result of Ali's breaches of fiduciary duty described above. Accordingly, Lucky Bucks has a right to recover damages from Ali.

# COUNT III—FRAUD
## (Against Damani, Kassam, Ali, Sayani, Smith, Howard, Linares, Haque, Klass Entertainment, Chisti, and Georgia Winners)

**A.     Anil Damani**

321.     Damani made material misrepresentations and omissions in his dealings with Lucky Bucks.

322.     In 2019, Damani, while he was still running Lucky Bucks, recruited Chisti to "purchase" a dormant master license and establish Georgia Winners as a B-Side business.

323.     Communications kept by Chisti that were produced in an arbitration show the involvement of Damani, Kassam, Ali, Haque, and Vaswani in the scam.

324.     Chisti was a straw man, and Georgia Winners was controlled by Damani, Kassam, Ali, Haque, and Vaswani.

325.     Negotiations for the fraudulent transaction began in spring of 2019 and continued during the time Damani was being investigated, and later ousted from Lucky Bucks, by the GLC.

326.     Chisti was promised 12.5% of revenue for lending his name and good credit to the venture, while the other 87.5% was directed to the criminal conspiracy through Blue Georgia, a shell company set up by Motin (whose alias is Sam Lamosine).

327.     Damani caused Lucky Bucks to enter into an agreement to "sell" Georgia Winners a master license.

328.     Georgia Winners, under the direction of Damani, never paid for the master license; instead, it provided a $400,000 promissory note at closing. Although Damani assured Chisti he would make payments on that promissory note, payments eventually ceased.

329.     Damani fraudulently directed the proceeds paid by Chisti for the purchase of the license to himself or another entity under his control through the promissory note deception.

330. By 2021, Georgia Winners had six location licenses. However, Chisti never sought location licenses, because Damani, Kassam, Ali, Haque, and Vaswani handled the day-to-day operations and payments for Georgia Winners and the solicitation of location licenses.

331. In an APA dated August 6, 2021, Lucky Bucks entered into an asset purchase agreement, orchestrated by Damani, Kassam, Ali, Haque, and Vaswani, whereby Lucky Bucks would pay over $5,000,000 to Georgia Winners.

332. Damani did not disclose that he had a secret economic ownership interest in Georgia Winners.

333. Damani conspired with and aided and abetted the frauds committed by Kassam and Ali against Lucky Bucks.

334. Damani's misrepresentations, omissions, and fraudulent concealment were knowing and intentional.

335. Lucky Bucks relied on Damani's misrepresentations and omissions, which were made through others, to conceal his improper involvement with Georgia Winners' transactions with Lucky Bucks.

336. As a result, Lucky Bucks entered into sham agreements through which it either overpaid, or through which it was underpaid, to Defendants' benefit.

337. Lucky Bucks is entitled to recover damages caused by Damani's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**B.    Tony Kassam**

338. Kassam made material misrepresentations and omissions in his role as a manager and officer of Lucky Bucks.

339. Kassam took part in the fraudulent Georgia Winners APA transactions with Damani, Ali, Haque, Vaswani, and Chisti, described above, while running Lucky Bucks.

340.     The sales data for these locations were fraudulently inflated by Blue Georgia, the shell company that conspired with Kassam.

341.     Kassam, acting in a management capacity for Lucky Bucks at this time, was in possession of the login information and password for Georgia Winners's COAM portal with the GLC.

342.     Through this portal, Kassam was able to watch the day-to-day sales and revenue of Georgia Winners.

343.     Before the sale to Lucky Bucks, the daily sales of the locations held by Georgia Winners jumped three-fold.

344.     In his role running Lucky Bucks, Kassam chose not to examine a glaring red flag, but instead allowed the misrepresentation of the value of the locations. As a result, Lucky Bucks bought those locations at fraudulently inflated prices. He did so knowingly and intentionally, because he had a secret undisclosed economic interest in Georgia Winners and the other B-Side businesses.

345.     Kassam also omitted his involvement in Defendants' conspiracy, including his involvement with the B-Side Defendants, in connection with the submission of "No Dispute" notices.

346.     By omitting his involvement and ordering the submission of "No Dispute" notices for locations that wished to end their relationship with Lucky Bucks in favor of the B-Side businesses, Kassam induced Lucky Bucks to allow those locations to switch master license holders early, to Lucky Bucks' detriment.

347.     Kassam's material misrepresentations and omissions were knowing and intentional.

348. Lucky Bucks relied on Kassam's material misrepresentations and omissions.

349. Between 2020 and 2022, Kassam, in conjunction with Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS, orchestrated purchase and sales of Lucky Bucks' master licenses and location contracts at unfair prices, including the following examples:

a. On November 24, 2020, Lucky Bucks entered into an APA to purchase locations from Lee Caudell for $1,133,508.60.

b. Later, on June 17, 2021, Lucky Bucks bought location contracts from Lee Caudell for $8,433,953.57.

c. The very next day, Lucky Bucks bought more location contracts from Lee Caudell for $8,166,046.43.

d. On January 25, 2021, Lucky Bucks purchased location licenses from Lee Caudell for $3,043,606.46.

e. On January 28, 2021, Lucky Bucks purchased a location license from Lee Caudell for $518,000.

f. On February 1, 2021, Lucky Bucks sold location contracts to Peak for $300,000. Approximately one year later, on March 22, 2022, Peak sold those same location contracts back to Lucky Bucks for $2,667,125.97, nearly nine times for what Lucky Bucks sold them for.

g. On March 17, 2021, Lucky Bucks purchased location contracts from AKS for $390,750.85.

h. On May 25, 2021, Lucky Bucks sold location contracts to Unique for $979,419.60.

      i.    On November 1, 2021, Lucky Bucks purchased location contracts from Klass Amusement for $14,573,620.55.

      j.    On February 11, 2022, Lucky Bucks purchased location licenses from Klass Amusement for $2,122,342.73.

350.    Lucky Bucks entered into transactions with other entity Defendants and permitted Kassam to remain employed, due to the material misrepresentations and omissions he made, thereby allowing Kassam and the other Defendants to continue stealing from Lucky Bucks.

351.    Lucky Bucks also refrained from earlier investigation of Kassam's illegal competition and theft as a result of Kassam's fraudulent concealment of the existence of the B-Side businesses and his relationship to them.

352.    Lucky Bucks is entitled to recover damages caused by Kassam's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**C.    Imran Ali**

353.    Ali made material misrepresentations and omissions in his dealings with Lucky Bucks.

354.    Specifically, Ali, who was an employee of Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for the B-Side businesses, including Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, Pinball, and Georgia Winners.

355.    As an example, Ali was actively working for Georgia Winners, in coordination with Damani, Kassam, Haque, Vaswani, and Chisti, while he was employed by Lucky Bucks. In connection with his Georgia Winners work, Ali helped to facilitate the sale of location contracts to Lucky Bucks based on fraudulently inflated player numbers.

356.    Lucky Bucks relied upon the valuation of these location contracts given Ali's representations that he was an honest employee and efforts to conceal his involvement with Georgia Winners.

357.    Ali also concealed that he and the other Defendants were actively stealing COAM machines from Lucky Bucks for the benefit of the B-Side businesses and other unknown entities.

358.    In addition, Ali concealed his involvement in the theft of services racket described above, in which he coordinated the use of Lucky Bucks' technicians, who were on the clock and being paid by Lucky Bucks, to provide services to the B-Side Defendants and other entities using the Signal app.

359.    Further, on information and belief, Ali controlled Meyersgold, which was used to pay the technicians for their B-Side work.

360.    Ali took other affirmative steps to avoid discovery of his misconduct, such as: communicating via the Signal app; telling technicians who performed work for the B-Side not to disclose his activities to honest Lucky Bucks' employees; and, on information and belief, removing or destroying, or causing the removal or destruction of, his employment agreement.

361.    Ali's material misrepresentations and omissions were knowing and intentional.

362.    Lucky Bucks relied on Ali's material representations that he was an honest employee of Lucky Bucks, as well as his material omissions concerning his involvement in Defendants' schemes.

363.    Ultimately, Lucky Bucks entered into transactions with the entity Defendants and permitted Ali to remain employed in reliance on the material misrepresentations and omissions made by him.

364.    Lucky Bucks also refrained from earlier investigation of Ali's illegal competition and theft as a result of Ali's fraudulent concealment of the existence of the B-Side businesses and his relationship to Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, Pinball, and Georgia Winners.

365.    Lucky Bucks is entitled to recover damages caused by Ali's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**D.    Al Amin Sayani**

366.    Sayani made material misrepresentations and omissions in his dealings with Lucky Bucks.

367.    Specifically, Sayani, who was an employee of Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for the B-Side businesses and stealing from Lucky Bucks in coordination with other Defendants.

368.    As an example, Sayani was involved in the ongoing theft of COAM machines and services from Lucky Bucks, which thefts benefited the other Defendants, including Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

369.    Sayani also took affirmative steps to conceal his affiliation with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball, such as communicating via the Signal app and telling technicians who performed work for the B-Side not to disclose his activities to honest Lucky Bucks' employees.

370.    Sayani's material misrepresentations and omissions were knowing and intentional.

371.    Lucky Bucks relied on Ali's material misrepresentations and omissions given his repeated representations that he was an honest employee of Lucky Bucks.

372.    Lucky Bucks permitted Sayani to remain employed in reliance on the material misrepresentations and omissions he made, thereby allowing Sayani and the other Defendants to continue stealing from Lucky Bucks.

373.    Lucky Bucks also refrained from earlier investigation of Defendants' illegal competition and theft as a result of Sayani's fraudulent concealment of the existence his relationships with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

374.    Lucky Bucks is entitled to recover damages caused by Sayani's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**E.    Derrick Smith**

375.    Smith made material misrepresentations and omissions in his dealings with Lucky Bucks.

376.    Specifically, Smith, who was an employee of Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for the B-Side businesses and stealing from Lucky Bucks.

377.    As an example, Smith asked Adam Essig to work as a technician for the B-Side businesses, including Angel, Dynamic, and Klass Amusement, to Lucky Bucks' detriment.

378.    Smith also concealed his affiliation with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball by taking affirmative steps to avoid discovery of his misconduct, such as communicating via the Signal app and telling technicians who performed work for the B-Side not to disclose his activities to honest Lucky Bucks' employees.

379.    Smith's material misrepresentations and omissions were knowing and intentional.

380.     Lucky Bucks relied on Smith's material misrepresentations and omissions given his repeated representations that he was an honest employee of Lucky Bucks.

381.     Lucky Bucks permitted Smith to remain employed in reliance on the material misrepresentations and omissions he made, thereby allowing Smith and the other Defendants to continue stealing from Lucky Bucks.

382.     Lucky Bucks also refrained from earlier investigation of Smith's illegal competition and theft as a result of Smith's fraudulent concealment of his relationships with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

383.     Lucky Bucks is entitled to recover damages caused by Smith's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

## F.     Jonathan Howard

384.     Howard made material misrepresentations and concealed material facts in his dealings with Lucky Bucks.

385.     Specifically, Howard, affirmatively represented that he was an honest employee, when, in fact, he was doing work for the B-Side businesses and stealing from Lucky Bucks.

386.     Additionally, Howard concealed his affiliation with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball. Howard also took affirmative steps to avoid discovery of his misconduct, such as communicating via the Signal app and telling technicians who performed work for the B-Side not to disclose his activities to honest Lucky Bucks' employees.

387.     Howard's material misrepresentations and omissions were knowing and intentional.

388.     Lucky Bucks relied on Howard's material misrepresentations and omissions given his repeated representations that he was an honest employee of Lucky Bucks.

389.     Lucky Bucks permitted Howard to remain employed in reliance on the material misrepresentations and omissions he made, thereby allowing Howard and the other Defendants to continue stealing from Lucky Bucks.

390.     Lucky Bucks also refrained from earlier investigation of Defendants' illegal competition and theft as a result of Howard's fraudulent concealment of the existence of his work for the B-Side business, specifically, Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

391.     Lucky Bucks is entitled to recover damages caused by Howard's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

## G.     Arnaldo "Johnathan Linares" Perez

392.     Linares made material misrepresentations and concealed material facts in his dealings with Lucky Bucks.

393.     Specifically, Linares, who was a contractor for Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for the B-Side businesses and stealing from Lucky Bucks.

394.     Linares also concealed his affiliation with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball, and took other affirmative steps to avoid discovery of his misconduct, such as communicating via the Signal app.

395.     Linares' material misrepresentations and omissions were knowing and intentional.

396.     Lucky Bucks relied on Linares' material misrepresentations and omissions given his repeated representations that he was an honest contractor for Lucky Bucks.

397.     Lucky Bucks permitted Linares to remain employed in reliance on the material misrepresentations and omissions he made, thereby allowing Linares and the other Defendants to continue stealing from Lucky Bucks.

398.    Lucky Bucks also refrained from earlier investigation of Defendants' illegal competition and theft as a result of Linares' fraudulent concealment of the existence of his relationship to Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

399.    Lucky Bucks is entitled to recover damages caused by Linares' fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**H.    Shakeel Haque**

400.    Haque made material misrepresentations and concealed material facts in his dealings with Lucky Bucks.

401.    Specifically, Haque, who was an employee of Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for Defendants and stealing from Lucky Bucks.

402.    Haque also concealed his affiliation with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, Pinball, and Georgia Winners, and took other affirmative steps to avoid discovery of his misconduct, such as communicating via the Signal app and telling technicians who performed work for the B-Side to not disclose his activities to honest Lucky Bucks' employees.

403.    Kassam, Ali, Haque and Vaswani also took part in a scheme where they collectively helped cause Georgia Winners and Lucky Bucks to enter into an APA whereby Georgia Winners sold three of the locations back to Lucky Bucks in exchange for $5,654,007.18, which amount was vastly inflated. Indeed, after Lucky Bucks purchased the location contracts, they dramatically underperformed what had been represented as their monthly revenue despite no significant changes to the locations.

404.    Haque's material misrepresentations and omissions were knowing and intentional.

405.    Lucky Bucks relied on Haque's material misrepresentations and omissions given his repeated representations that he was an honest contractor for Lucky Bucks.

406.    Lucky Bucks permitted Haque to remain employed in reliance on the material misrepresentations and omissions he made, thereby allowing Haque and the other Defendants to continue stealing from Lucky Bucks.

407.    Lucky Bucks also refrained from earlier investigation of Defendants' illegal competition and theft as a result of Linares' fraudulent concealment of the existence of his relationship to Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

408.    Lucky Bucks is entitled to recover damages caused by Haque's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

## I.    Anand Vaswani

409.    Vaswani made material misrepresentations and concealed material facts in his dealings with Lucky Bucks.

410.    Specifically, Vaswani, who was an employee of Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for Defendants and stealing from Lucky Bucks.

411.    Vaswani also concealed his affiliation with Georgia Winners and took other affirmative steps to avoid discovery of his misconduct, such as communicating via the Signal app with Chisti, who believed Haque was acting as a representative of Lucky Bucks based on Haque's representations.

412.    Vaswani took part in the Georgia Winners scheme detailed above and was in charge of directing Chisti on exactly what he needed to do.

413.    Vaswani ran the back-office operations for Georgia Winners while operating as a sales representative for Lucky Bucks.

414.    Further, Vaswani maneuvered Chisti and directed him on how to fill out official forms required by the GLC, and even the company's W-9.

415.    Vaswani also started Blue Georgia, along with Motin, and managed its accounting and payments. Blue Georgia received 87.5% of the profits from Georgia Winners, which Vaswani was silently running. Vaswani also controlled the bank account for Blue Georgia.

416.    While working for Lucky Bucks, and under a non-compete and non-solicitation agreement, Vaswani used Blue Georgia to bring locations to Georgia Winners.

417.    While employed by Lucky Bucks, Vaswani signed the original location contracts for Georgia Winners in 2019, which were eventually sold to Lucky Bucks in 2021 at a falsely inflated rate.

418.    Vaswani's material misrepresentations and omissions were knowing and intentional.

419.    Lucky Bucks relied upon the valuation of these location contracts given Vaswani's affirmative representations that he was an honest employee, as well as his efforts to conceal his involvement in the APAs with Georgia Winners.

420.    As a result, Lucky Bucks was harmed because Lucky Bucks paid more for the locations based on the fraudulently inflated numbers.

421.    Lucky Bucks is entitled to recover damages caused by Vaswani's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**J.    Klass Entertainment**

422.    Klass Entertainment made material misrepresentations and omissions in its dealings with Lucky Bucks.

423. As an example, on July 14, 2021, in a series of four separate, smaller transactions, Lucky Bucks paid $200,000 to "Klass Entertainment," purportedly for "advertising and marketing." These payments were allegedly for "sponsorships" of various charitable events.

424. As an example, one of the alleged sponsorships was for the "Rahul Deshpande Recital" in August 2019 that was coordinated by Para Share LLC, which coordinates in person shows and tours. On August 1, 2019, Klass Entertainment issued a $45,000 invoice to Lucky Bucks for a "Gold package" sponsorship for that event.

425. However, Harshad Parashare, Para Share's founder and CEO, did not recall ever receiving a sponsorship of $10,000 or more in connection with a Para Share event, let alone the $45,000 for which Klass Entertainment invoiced Lucky Bucks on August 1, 2019.

426. Further, Parashare reviewed Para Share LLC's accounting records back through its inception, which did not reflect that any money was paid by, or received from, Lucky Bucks, Klass Entertainment, or any of the named Defendants.

427. On information and belief, all of the other "sponsorship" invoices submitted by Klass Entertainment to Lucky Bucks were false and fraudulent.

428. In issuing sham invoices to Lucky Bucks for such purported sponsorships, Klass Entertainment made material misrepresentations to Lucky Bucks.

429. Lucky Bucks relied on those misrepresentations because it had no reason to suspect that Klass Entertainment would not provide the funds to the respective events for which Lucky Bucks had purchased sponsorships.

430. As a result, Lucky Bucks was harmed because Lucky Bucks received nothing as a result of the sham sponsorships.

431.     Lucky Bucks is entitled to recover damages caused by Klass Entertainment's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

## K.     Mohammad Chisti and Georgia Winners

432.     Chisti and Georgia Winners, made material misrepresentations and omissions in their dealings with Lucky Bucks.

433.     In 2019, Damani, while he was still running Lucky Bucks, recruited Chisti to "purchase" a dormant master license and establish Georgia Winners as a B-Side business.

434.     Communications kept by Chisti that were produced in an arbitration show the involvement of Damani, Kassam, Ali, Haque, and Vaswani in the scam.

435.     In reality, Chisti was a straw man, and Georgia Winners was controlled by Damani, Kassam, Ali, Haque, and Vaswani.

436.     Negotiations for the fraudulent transaction began in spring of 2019 and continued during the time Damani was being investigated, and later ousted from Lucky Bucks, by the GLC.

437.     Chisti was promised 12.5% of revenue for lending his name and good credit to the venture, while the other 87.5% was directed to the criminal conspiracy through Blue Georgia, a shell company set up by Motin.

438.     Chisti affirmatively represented that he was in charge of Georgia Winners by holding himself out as Georgia Winners' owner, in which role he signed blank checks that would then be used by Damani, Kassam, Ali, Haque, and Vaswani. Chisti also executed agreements on behalf of Georgia Winners, including APAs with Lucky Bucks.

439.     Damani caused Lucky Bucks to enter into an agreement to "sell" Georgia Winners a master license, which sale required Chisti's participation as Georgia Winners' signatory.

440.    Georgia Winners, under the direction of Damani, never paid for the master license; instead, it provided a $400,000 promissory note at closing. Although Damani assured Chisti he would make payments on that promissory note, payments eventually ceased.

441.    By 2021, Georgia Winners had six location licenses. However, Chisti never sought location licenses, because Damani, Kassam, Ali, Haque, and Vaswani handled the day-to-day operations and payments for Georgia Winners and the solicitation of location licenses.

442.    On August 6, 2021, Lucky Bucks entered into an APA with Georgia Winners, orchestrated by Damani, Kassam, Ali, Haque, and Vaswani, whereby Lucky Bucks would pay over $5,000,000 to Georgia Winners. Chisti executed that APA on behalf of Georgia Winners.

443.    Chisti's and Georgia Winners' misrepresentations, omissions, and fraudulent concealment were knowing and intentional.

444.    Lucky Bucks relied on Chisti's and Georgia Winners' misrepresentations and omissions, which were made through others to conceal the improper involvement of Damani, Kassam, Ali, Haque, and Vaswani.

445.    As a result, Lucky Bucks entered into sham agreements with Georgia Winners through which it either overpaid, or through which it was underpaid, to Defendants' benefit.

446.    Lucky Bucks is entitled to recover damages caused by Chisti's and Georgia Winners' fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

### COUNT IV—COMPUTER THEFT (O.C.G.A. § 16-9-93(a)) (Against Sayani and Ali)

447.    In November 2023, Sayani and Ali each committed the offense of computer theft by accessing Lucky Bucks' computer network with knowledge that such use was without authority and with the intention of taking Lucky Bucks' property and using that property for Defendants' benefit.

448.    Specifically, on November 17, 2023, Sayani accessed Microsoft Excel files on the Lucky Bucks network drive titled "LB Logins & Passwords.xlsx," "LB Ops Active Contract Sheet – TK_07052023," "Ops Workbook," "LB Master 03_16_2022_TK," and "Clusters Current."

449.    Sayani attempted to log in on a subsequent occasion, but Lucky Bucks' new management had blocked his access by that point.

450.    As for Ali, on November 6, 2023, he accessed Microsoft Excel files on the Lucky Bucks network drive titled "LB Ops Active Contracts Sheet," "Ops Workbook," "Continuity-Feb_Final," and "Weekly Stats."

451.    That same day, Ali also accessed a file titled "LB Logins & Passwords" that contained various passwords and login credentials for Lucky Bucks IT systems that Ali had created.

452.    Sayani's and Ali's employment with Lucky Bucks had ended—and with it their authorization to access Lucky Bucks' computer system—prior to November 2023.

453.    During Sayani's and Ali's unauthorized access of Lucky Bucks' computer system, they accessed files that disclose the identity and terms of Lucky Bucks' contracts with individual location license holders, in addition to other files that would be useful for the competing B-Side businesses, such as route clusters.

454.    Sayani's and Ali's unauthorized access has caused damage to Lucky Bucks by forcing it to spend money on, *inter alia*, security audits and other protective measures.

455.    Further, on information and belief, Defendants have continued to use the confidential information contained in the files accessed by Sayani and Ali to unfairly compete with Lucky Bucks, including with respect to Lucky Bucks' location contracts, for Defendants' benefit.

456.    Lucky Bucks is entitled to recover the damages caused by Sayani's and Ali's unauthorized access pursuant to O.C.G.A. § 16-9-93(g).

## COUNT V—BREACH OF CONTRACT
### (Against Damani, Kassam, Ali, Sayani, Smith, Howard, Linares, Haque, and Vaswani)

457.    Sayani and Haque executed non-compete, non-solicitation, and confidentiality agreements with Lucky Bucks.

458.    Sayani's agreement provided that:

a.  Sayani would maintain the confidentiality of Lucky Bucks confidential and propriety business information; and

b.  Sayani would not accept other employment, occupation, or consulting activity, nor would he engage in activities that conflicted with his obligations to Lucky Bucks.

459.    Similarly, Haque's agreement stated as follows:

a.  Haque would not, during his employment or for two years thereafter, solicit Lucky Bucks' employees or customers;

b.  Haque would maintain the confidentiality of Lucky Bucks confidential and propriety business information;

c.  Haque would refrain from interfering with Lucky Bucks' contracts and business relationships, including, but not limited to, Lucky Bucks' customer or client contracts or relationships; and

d.  Haque would not, either during his employment or for 18 months thereafter, work for, obtain or plan to obtain an interest in, or affiliate with any other COAM business within a defined geographical territory.

460.    Kassam, Ali, Howard, Vaswani also executed substantially similar non-compete, non-solicitation, and confidentiality agreements with Lucky Bucks, in accordance with Lucky Bucks' standard practice. However, on information and belief, Defendants either removed all copies of those documents before Kassam, Howard, Vaswani, and Ali resigned, or they instructed other members of the conspiracy to do so.

461.    Linares executed an independent contractor agreement with Lucky Bucks, which provided, in relevant part, that he would maintain the confidentiality of Lucky Bucks' confidential and proprietary information, and that misuse of such information would irreparably harm Lucky Bucks.

462.    By participating in Defendants' conspiracy, including with respect to the theft of Lucky Bucks' trade secrets, the solicitation of Lucky Bucks's customers using Lucky Bucks' confidential information, the solicitation of Lucky Bucks' employees to perform work for the B-Side businesses, the work performed for the competing B-Side businesses, and the theft of Lucky Bucks' location contracts, COAM machines, parts, and equipment, Kassam, Ali, Sayani, Smith, Howard, Linares, Haque, Vaswani, and Damani each breached their agreements with Lucky Bucks.

463.    As a result of those breaches, Lucky Bucks has been substantially harmed.

464.    The breaches of contract described by each of the Lucky Bucks above have damaged, and, unless enjoined, will continue to damage the Lucky Bucks. Lucky Bucks is also entitled to recover damages caused by the foregoing breaches.

## COUNT VI—ATTORNEY'S FEES PURSUANT TO O.C.G.A. § 13-6-11
## <u>(Against All Defendants)</u>

465.    As their conduct described above shows, Defendants have acted in bad faith and have caused Lucky Bucks to incur unnecessary trouble and expense within the meaning of O.C.G.A. § 13-6-11.

466.    Accordingly, Defendants are liable to Lucky Bucks for its attorneys' fees and costs of litigation.

## COUNT VII—PUNITIVE DAMAGES
## <u>(Against All Defendants)</u>

467.    Defendants acted with a specific intent to cause harm to Lucky Bucks when undertaking the tortious conduct described above.

468.    Defendants' actions constitute willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

469.    Lucky Bucks is entitled to an award of punitive damages against Defendants in an amount to be determined at trial.

## <u>DEMAND FOR RELIEF</u>

Lucky Bucks demands that the Court:

i.     Grant a trial by jury on all claims so triable;

ii.    Order Defendants to return all property in their possession that was stolen from Lucky Bucks, including but not limited to, COAM machines, parts, location contracts, and equipment, pursuant to O.C.G.A. § 16-4-6(a)(1);

iii.   Order that the individual Defendants be permanently forbidden from participating in the COAM business in Georgia, either directly or indirectly through agents, entities, or strawmen, pursuant to O.C.G.A. § 16-4-6(a)(2);

iv.    Revoke all Class B COAM master licenses issued by the GLC to any entity controlled by Defendants pursuant to O.C.G.A. § 16-4-6(a)(4);

v.    Revoke the corporate charters of all entities that Defendants organized under the laws of this state, pursuant to O.C.G.A. § 16-4-6(a)(5);

vi.    Order Defendants to pay Lucky Bucks compensatory, exemplary, treble and punitive damages in an amount to be determined at trial;

vii.    Order Defendants to pay Lucky Bucks' attorneys' fees, costs, and expenses of litigation, pursuant to O.C.G.A. § 13-6-11 and O.C.G.A. § 16-4-6(c); and

viii.    Order any and all other relief as the Court deems just and proper.

Respectfully submitted, this 5th day of June, 2025.

*/s/ Joshua Mayes*
Ryan Teague
Georgia Bar No. 701321
rteague@robbinsfirm.com
Joshua Mayes
Georgia Bar No. 143107
jmayes@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Chuck Boring
Georgia Bar No. 065131
cboring@robbinsfirm.com
Michael D. Forrest
Georgia Bar No. 974300
mforrest@robbinsfirm.com
Macy McFall
Georgia Bar No. 411457
mmcfall@robbinsfirm.com
Fanny Chac
Georgia Bar No. 175192
fchac@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

*Counsel for Arc Gaming and Technologies, LLC f/k/a Lucky Bucks, LLC*

# Exhibit 1

Fulton County Superior Court ***EFILED***P M Date: 10/23/2024 6:12 PM Che Alexander, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA**

**Arc Gaming and Technologies, ~~EEC~~ LLC f/k/a Lucky Bucks, ~~EEC~~LLC,**

    Plaintiff,~~CIVIL ACTION FILE~~

~~v.                                   NO. 24cv000131~~

v.                                    CIVIL  ACTION  FILE

**Anil Damani,**                    NO. 24CV000131
**Tony Kassam,**
**Imran Ali,**
**A1 Amin Sayani,**
**Derrick Smith,**
**Jonathan Howard,**
**Arnaldo "Johnathan Linares" Perez, Shakeel Haque,**
**Anand Vaswani,**
**Mohibul Motin,**
**Muhammad Chisti,**
**Angel Amusements, ~~EEC~~LLC,**
**Dynamic Gaming, ~~EEC~~LLC,**
**Unique Amusement, ~~EEC~~LLC,**
**AKS Amusements, Inc.,**
**Advance Amusement, ~~EEC~~LLC,**
**Klass Amusement, ~~EEC~~LLC,**
**Prestige Amusement, ~~EEC~~LLC,**
**Lee Caudell, Inc.,**
**Pinball Amusement, ~~EEC~~LLC,**
**Peak Amusement, ~~EEC~~ LLC Meyersgold, ~~EEC~~LLC, and Blue Georgia 1000, Inc.,**
**Georgia Winners, ~~EEC~~LLC, and Klass Entertainment Group, ~~EEC~~LLC,**

    Defendants.

1

## ~~FIRST~~ **SECOND AMENDED COMPLAINT**

This ~~emergency~~ action involves an organized criminal conspiracy of former owners and employees of the ~~Lucky Bucks~~ Arc Gaming and Technologies, LLC f/k/a Lucky Bucks, LLC ("Lucky Bucks" or "Plaintiff"), who conspired amongst themselves and a number of strawmen, shell companies,

and competing businesses they controlled to loot Lucky Bucks once it became clear that Lucky Bucks was headed toward bankruptcy.

Lucky Bucks holds a master license from the Georgia Lottery Corporation ("GLC") to operate skill-based, coin-operated amusement machines ("COAM"), a heavily regulated industry. Lucky Bucks was originally founded and owned by Defendant Anil Damani. Once the GLC barred Damani from having an active role in the operation of Lucky Bucks (because of prior violations of Georgia COAM laws), he and his lieutenants, including Defendants Tony Kassam, Imran Ali, Al-Amin Sayani, and Derrick Smith, concocted a number of schemes to loot Lucky Bucks and extract as much value for themselves as possible. They, in conjunction with other members of the board of managers and Lucky Bucks' equity owners, borrowed hundreds of millions of dollars, a substantial portion of which was then immediately distributed to themselves, among others, through dividends. When Lucky Bucks could not borrow another penny and the business was leveraged to the hilt, their criminal schemes forced Lucky Bucks and its parent corporations into bankruptcy, where Lucky Bucks was eventually turned over to its creditors. Amazingly, even after Lucky Bucks emerged from bankruptcy under new ownership, several of the individual Defendants continued to loot Lucky Bucks from the inside for the benefit of the criminal organization.

The criminal conspiracy involved a number of different schemes that varied in their levels of sophistication. The most critical scheme involved a number of competing businesses, including Defendants Angel Amusements, LLC, Dynamic Gaming, LLC, Unique Amusement, LLC, AKS Amusement, LLC, Advance Amusement, LLC, Klass Amusement, LLC, Klass Entertainment, LLC, Prestige Amusement, LLC, Lee Caudell, Inc., Pinball Amusement, LLC, Peak Amusement, LLC, Meyers Gold, LLC, Georgia Winners, LLC, Blue Georgia 1000, Inc., Klass Entertainment

Group, LLC (collectively, the "B-Side businesses" or "Defendant entities"), most of which were nominally owned by strawmen or shell entities, that the members of the conspiracy referred to as the "B-Side" of

Lucky Bucks. These B-Side businesses, including Defendants Peak, Unique, Georgia Winners, and Lee Caudell, were then funneled valuable license contracts that should have belonged to Lucky Bucks; were operated using Lucky Bucks' employees, equipment and resources; and, in some cases, these B-Side businesses, including Lee Caudell, Peak, AKS, Georgia Winners, and Klass Amusement, sold customer contracts back to Lucky Bucks at a massive and unjustified markup.

Not all of the crimes were so sophisticated, however. For instance, Defendants Smith, Howard, Ali, Kassam, and Sayani orchestrated the theft of expensive COAM machines and parts belonging to Lucky Bucks by chiseling off the serial numbers, loading them onto trucks, and selling or transferring them to the B-Side businesses and other unknown actors. It is difficult to catalogue the number of crimes and schemes that the defendants committed while systematically looting Lucky Bucks, and it is likely that the full extent of their illicit activities will never be uncovered. Much of the information proving the details of the scheme and the mental states of the participants is exclusively in the possession of the Defendants. For instance, Plaintiff is unable, without discovery, to trace the money flowing from the scheme or to follow the trail of the stolen equipment and locations.

It is important to stress that this is not a business divorce or "normal" civil case brought by a business against former employees who are competing with it. The individual Defendants, including Damani, Kassam, Ali, Sayani, Smith, Howard, Linares, Haque, Vaswani, Motin, and Chisti, knowingly engaged in extensive criminal misconduct and took numerous steps to conceal and hide their activities, such as communicating exclusively using the Signal messaging app (the "Signal App") and other largely untraceable methods, by deleting files and business records from Lucky Bucks' computer systems, and by compartmentalizing the communication channels with the lower-level Lucky Bucks' employees they exploited as part of the scheme. But despite their efforts, Lucky Bucks' new managers, with help from forensic IT specialists and cooperative lower- level employees who helped carry out the schemes, have

been able to recover many of the deleted files and communications and piece together most of what happened under the prior management. Much of the evidence will come directly from testimony by lower-level participants in the crimes who have "flipped" on the criminal enterprise or who had a falling out with the participants.

Ultimately, this case is about holding Defendants accountable for their systematic looting of Lucky Bucks for their own benefit, which unfair and illegal actions forced Lucky Bucks into bankruptcy and have substantially harmed its commercial operations. Accordingly, Lucky Bucks demands: the return of its money, valuable location contracts, machines and equipment that Defendants have stolen; all available damages Lucky Bucks has suffered as a result of Defendants' actions; ~~the return of fraudulent and illegal dividends distributed by Lucky Bucks;~~ Lucky Bucks' attorneys' fees and costs incurred in having to bring this action; and punitive damages, which are more than justified given the breathtaking scope of Defendants' conspiracy.

## I.  PARTIES

1.  **Arc Gaming and Technologies LLC f/k/a Lucky Bucks, LLC ("Lucky Bucks")** is a Georgia limited liability company with its primary place of business at 5820 Live Oak Parkway, Suite 300, Norcross, Georgia, 30093. Lucky Bucks reorganized and emerged from Chapter 11 bankruptcy in 2023 with a new management team and board of managers.

2.  **Anil Damani** is the founder and former owner of Lucky Bucks and its former corporate affiliates. On information and belief, Damani resides in Gwinnett County, Georgia. From its founding until 2020, Damani was the CEO of Lucky Bucks and controlled virtually all aspects of its COAM operations in Georgia. In June 2020, pursuant to a consent settlement with the GLC (described below in further detail), Damani was forbidden from having any role in the business operations of Lucky Bucks. Nevertheless, Damani continued to direct the actions of his coconspirators from behind the scenes.

3.     **Shafik "Tony" Kassam** was the Chief Operating Officer of Lucky Bucks until October 11, 2023. After Damani was barred by the GLC settlement from being involved in Lucky Bucks' business operation, Kassam was ultimately responsible for and controlled every aspect of Lucky Bucks' COAM operations in Georgia, including as a member of the Lucky Bucks board. ~~Kassam was the direct recipient of over $500,000 of distributions from Lucky Bucks while he managed the Company.~~ On information and belief, Defendant Kassm resides in Gwinnett County.

4.     **Imran Ali** was Lucky Bucks' Director of Operations until August 28, 2023. Ali was Kassam's second in command at Lucky Bucks after Damani's formal exit, and he gave directions directly to many of the lower-level members of the criminal conspiracy. On information and belief, Ali now formally works for another company owned by Damani, Fusion Gaming. He also designed and controlled many of Lucky Bucks' various IT systems, and he has both accessed and attempted to access those systems after his separation from Lucky Bucks. Ali resides at 6326 Long Island Court, Sandy Springs, GA 30328 in Fulton County.

5.     **A1 Amin Sayani** was an employee in the Lucky Bucks dispatch department until October 16, 2023, when he was terminated by Lucky Bucks' new management. He was initially hired by one of Damani's other businesses, it is unclear when exactly he became a Lucky Bucks employee. Sayani's last known address is 1728 Sentinel View Drive, Lawrenceville, Georgia 30043 in Gwinnett County.

6.     **Derrick Smith** was a manager of lower-level Lucky Bucks' employees on the operations side, including technicians and warehouse staff, until he resigned on October 16, 2023. While employed by Lucky Bucks, Smith reported directly to Ali. Smith resided at 925 Canterbury Road, Apt. 1014, Atlanta, Georgia 30324 in Fulton County at the time of the relevant conduct set forth in this Amended Complaint. On information and belief, he has since moved to Houston, Texas.

7.     **Arnaldo "Johnathan Linares" Perez ("Linares")** was an independent contractor who

was a dispatcher, technician, and manager of lower-level Lucky Bucks' employees. Linares reported directly to Smith in connection with his work for Lucky Bucks. Linares' last known address is 405 Padens Valley Court, Lawrenceville, Georgia 30044 in Gwinnett County.

8.      **Jonathan Howard** was a dispatcher and manager of lower-level Lucky Bucks' employees. Howard reported directly to Smith. Lucky Bucks' current management terminated his employment on October 16, 2023. Howard's last known address is 767 Lost Creek Circle, Stone Mountain, Georgia 30088 in Dekalb DeKalb County.

9.      **Shakeel Haque** was a sales representative at Lucky Bucks until he was officially terminated by current management on January 3, 2024. Haque reported directly to Kassam when he was employed at Lucky Bucks. His job was to identify opportunities for Lucky Bucks to obtain new customers and close the sales. He was also responsible for ensuring that existing customers would renew their contracts with Lucky Bucks. Haque's last known address was 411 Gael Way, Woodstock, Georgia 30188 in Cherokee County.

10.     **Anand Vaswani** was a sales representative at Lucky Bucks until he resigned on September 19, 2023. Vaswani reported directly to Kassam when he was employed at Lucky Bucks. His job was to identify opportunities for Lucky Bucks to obtain new customers. He was also responsible for ensuring that existing customers would renew their contracts with Lucky Bucks. Vaswani's last known address is 2083 Pinnacle Point Drive, Norcross, Georgia 30071 in Gwinnett County.

11.     **Mohubil Motin** is the nominal owner of Blue Georgia, Inc., a shell company that was used to funnel proceeds from at least one of the schemes at issue in this case back to the Lucky Bucks' employees who were participants in the scheme. Motin is a close friend and former roommate of Vaswani. He used to reside at 2083 Pinnacle Point Drive, Norcross, Georgia 30071 in Gwinnett County, but his current place of residence is unknown to Lucky Bucks.

12.     **Mohammad Chisti** was the straw owner and front man for Georgia Winners, LLC. Although Georgia Winners was paid millions of dollars by Lucky Bucks, Chisti kept only a small portion of the money, which was instead diverted to Blue Georgia for the benefit of the other Defendants, including, on information and belief, Defendants Damani, Kassam, Ali, Haque, Anand, and Motin. Chisti gave sworn deposition testimony in an arbitration proceeding before the GLC (between Lucky Bucks and Georgia Winners) that detailed his role as a straw man in several of the rackets alleged in this Amended Complaint, as well as the roles of Damani, Kassam, Haque, Motin and Vaswani.

13.     **Angel Amusements, LLC ("Angel")** is a Georgia limited liability company that holds the COAM master license ending in number 15063. Angel is one of the competing B-Side businesses used in the criminal scheme. Angel operates out of a warehouse located at 5500 Oakbrook Parkway, Suite 120, Norcross, Georgia 30093. Angel's registered agent is Suraiya Jalali, who may be served at the same address, according to the Georgia Secretary of State's website.

14.     **Dynamic Gaming, LLC ("Dynamic")** is a Georgia limited liability company that holds the COAM master license ending in number 16017. Dynamic is one of the competing B-Side businesses used in the criminal scheme. Dynamic operates out of a warehouse located at 5500 Oakbrook Parkway, Suite 200, Norcross, Georgia 30093. According to the Georgia Lottery Corporation, Dynamic's headquarters is located at 47 Woods Creek Drive, Suwanee, Georgia 30024, which is a single-family residence. The residence is owned by Eshan Huddani, who lower-level Lucky Bucks' employees were told was the "contact" for Dynamic. Upon information and belief, Huddani is either an unwitting straw man or he is a knowing participant in the criminal enterprise. Discovery will show which of those two possibilities is the case. Dynamic may be served through its registered agent, the law firm of Krevolin & Horst, at 1201 West Peachtree Street, Suite 3250, Atlanta, Georgia 30309.

15.     **Unique Amusement, LLC ("Unique")** is a Georgia limited liability company that holds

the COAM master license ending in number 15080. Unique is one of the competing B-Side businesses used in the criminal scheme. On June 9, 2020, Lucky Bucks, at the direction of Defendants, sold a master license to Unique in exchange for $400,000, an amount far below the market value of that license. Further, Unique utilized Lucky Bucks' employees, parts, and equipment for its own benefit. Unique operates out of a warehouse located at 5600 Oakbrook Parkway, Suite 150, Norcross, Georgia 30093. Unique may be served through its registered agent, Zain Kapadia, at 7000 Central Parkway, Suite 1100, Atlanta, Georgia 30328.

16.    **AKS Amusements, Inc. ("AKS")** is a Georgia Corporation that holds the COAM master license ending in number 15021. AKS is one of the competing B-Side businesses used in the criminal scheme. On June 17, 2020, Lucky Bucks, at the direction of Defendants, sold a master license to AKS in exchange for $300,000, an amount far below the market value of that license. Further, AKS utilized Lucky Bucks' employees, parts, and equipment for its own benefit. According to the Secretary of State's website, Parimal Kirankumar Patel is the nominal CEO of

AKS. Upon information and belief, Patel is either an unwitting straw man or he is a knowing participant in the criminal enterprise. Discovery will show which of those two possibilities is the case. AKS operates out of a warehouse located at 6030 Dawson Blvd., Suite D, Norcross, Georgia 30093. AKS may be served on its registered agent, Nizar Janmohammad, at 3250 Peachtree Industrial Boulevard, Suite 203, Duluth, Georgia 30096.

17.    **Advance Amusement, LLC ("Advance")** is a Georgia limited liability company that holds the COAM master license ending in number 17015. Advance is one of the competing B-Side businesses used in the criminal scheme that received a disproportionately high number of location contracts formerly belonging to Lucky Bucks. Advance operates out of a warehouse located at 6050 Dawson Boulevard, Suite K, Norcross, Georgia 30093. Advance may be served on its registered agent,

Fayaz Bardai, at the same address.

18.    **Klass Amusement, LLC ("Klass Amusement")** is a Georgia limited liability company that holds the COAM master license ending in number 15077. Klass Amusement is one of the competing B-Side businesses used in the criminal scheme that received a disproportionate number of location contracts formerly belonging to Lucky Bucks. Further, Klass Amusement utilized Lucky Bucks' employees, parts, and equipment for its own benefit. Klass Amusement operates out of a warehouse located at 6500 McDonough Drive, Suite B7, Norcross, Georgia 30093. Klass Amusement may be served through its registered agent, the law firm of Krevolin & Horst, at 1201 West Peachtree Street, Suite 3250, Atlanta, Georgia 30309.

19.    **Prestige Amusement, LLC ("Prestige")** is a Georgia limited liability company that holds the COAM master license ending in number 15039. Prestige is one of the competing B-Side businesses used in the criminal scheme. Upon information and belief, one of All's relatives is the nominal owner of Prestige, but Prestige is actually owned and controlled by ~~Ali~~ All and the other Defendants. Prestige received an $850,000 deposit from Lucky Bucks that was written off shortly thereafter without cause. Further, Prestige utilized Lucky Bucks' employees, parts, and equipment for its own benefit. Prestige operates out of a warehouse located at 6050 Dawson Blvd, Suite Q, Norcross, Georgia 30093. According to the GLC, Prestige has a principal address of 5675 Jimmy Carter Boulevard, Suite 110, Norcross, Georgia 30071. According to the Secretary of State's website, Prestige may be served through its registered agent, Michael Karamat of the law firm Krevolin & Horst, at 1201 West Peachtree Street, Suite 3250, Atlanta, Georgia 30309.~~20.~~

20.    **Lee Caudell, Inc. ("Lee Caudell")** is a Georgia Corporation that holds the COAM master license ending in number 15199. Lee Caudell is one of the competing B-Side businesses used in the criminal scheme. Lee Caudell operates out of a warehouse at a currently unknown location. Lee Caudell is

one of the competing B-Side businesses used in the criminal scheme that received a disproportionate number of location contracts formerly belonging to Lucky Bucks. Further, on information and belief, Lee Caudell utilized Lucky Bucks' employees, parts, and equipment for its own benefit. According to the GLC, Lee Caudell has a principal place of business located at 2974 Asteria Drive, Duluth, Georgia 30097, which is a single-family residence. Lee Caudell may be served through its registered agent, Naveed Masood, at 4260 Woodward Walk Lane, Suwanee, Georgia 30024. According to the Secretary of State's website, Masood is the nominal CEO of Lee Caudell. Masood is either an unwitting straw man or he is a knowing participant in the criminal enterprise. Discovery will show which of those two possibilities is the case.

21.   **Pinball Amusement, LLC ("Pinball")** is a Georgia limited liability company that holds the COAM master license ending in number 15123. Pinball is one of the competing B-Side businesses used in the criminal scheme. On December 14, 2020, Lucky Bucks, at the direction of

Defendants, sold a master license to Pinball in exchange for $300,000, an amount far below the market value of that license. On information and belief, Pinball also utilized Lucky Bucks' employees, parts, and equipment for its own benefit. According to the GLC, Pinball's principal place of business is at 4260 Woodward Walk Lane, Suwanee, Georgia 30024, which is a singlefamily residence. This address is the same one on file for Naveed Masood, the registered agent and nominal CEO of Lee Caudell. According to the Secretary of State's website, Pinball may be served on its registered agent, Michael Karamat of the law firm Krevolin & Horst, at 1201 West Peachtree Street, Suite 3250, Atlanta, Georgia ~~30300~~30309.

22.   **Peak Amusement, LLC ("Peak")** is a Georgia limited liability company that holds the COAM master license ending in 15164. On December 1, 2021, Lucky Bucks, at the direction of Defendants, sold a master license to Peak, a B-Side company, in exchange for $300,000, an amount far below the market value of that license. Peak has a principal place of business located at 6030 Unity Drive, Suite B, Norcross, Georgia 30071. Peak may be served on its registered agent, Aslam Gilani, at the same

address as its principal place of business according to the Georgia Secretary of State's web page.

23.     **Meyersgold, LLC ("Meyersgold")** is a Georgia limited liability company with its principal place of business at 227 Sandy Springs PL #D496, Sandy Springs, Georgia 30328. Meyersgold was an entity controlled by Defendants that was used to make side payments to lower- level participants in the criminal enterprise, including Lucky Bucks' technicians and warehouse workers. Meyersgold may be served on its registered agent, Rob Hassett of Hassett Law Group, at 2090 Dunwoody Club Drive, Suite 106-242, Atlanta, Georgia 30350.

24.     **Blue Georgia 1000, Inc. ("Blue Georgia")** was a Georgia corporation with its principal place of business located at 2083 Pinnacle Pointe Drive, Norcross, Georgia 30071. Blue

Georgia was a straw entity through which money flowed, indirectly, from Lucky Bucks to members of the criminal conspiracy. On information and belief, Blue Georgia had no operations and merely served as a conduit for funds designed to conceal that money from Lucky Bucks was ultimately flowing to some of the other Defendants.

25.     **Georgia Winners, LLC ("Georgia Winners")** is a Georgia limited liability company that holds or held the COAM master license ending in number 15328. The license held by Georgia Winners was "purchased" from Lucky Bucks far below the market rate in exchange for a promissory note that was never repaid. Chisti volunteered to be, and was, the straw owner and front man for Georgia Winners. Although Georgia Winners was paid millions of dollars by Lucky Bucks, Chisti kept only a small portion of the money, which was instead diverted to Blue Georgia for the benefit of the other Defendants, including Damani, Kassam, Ali, Haque, Vaswani, and Motin. Georgia Winners can be served on its registered agent, Andy Pierce of the Law Firm Krevolin & Horst, at 1201 West Peachtree Street, Suite 3250, Atlanta, Georgia ~~30300~~30309.

26.     **Klass Entertainment Group, LLC ("Klass Entertainment")** is a Georgia limited

liability company with its principal place of business located at 2299 Perimeter Park Drive, Atlanta, Georgia 30341. The address for Klass Entertainment is the same one as for the 27th Investment Group, another of Damani's companies. Klass Entertainment stole money from Lucky Bucks under the guise of services, which money was, on information and belief, diverted to other Defendants. Klass Entertainment may be served via its registered agent, Pegah Firoozi, at the address for its principal place of business.

## II.  OTHER RELEVANT ENTITIES AND INDIVIDUALS

27.     ~~Magua~~ **Magna** Benson is an attorney for Lucky Bucks during the relevant time frame. A truthful affidavit from Benson is attached as **Exhibit A.**

28.     **Jamila Davis** worked for Lucky Bucks as the Risk and Regulatory Compliance Manager who assisted Lucky Bucks with handling disputes related to its location contracts. A truthful affidavit from Davis is attached as **Exhibit B.**

29.     **Dean Mosher** was hired by Lucky Bucks as an Operations Manager in November 2023. Mosher visited previous Lucky Bucks locations in November and December 2023. A truthful affidavit from Mosher is attached as **Exhibit C.**

30.     **Scott Ferguson** was hired by Lucky Bucks to perform consulting services in November 2023. Ferguson visited previous Lucky Bucks locations in November and December 2023. A truthful affidavit from Ferguson is attached as **Exhibit D.**

31.     **William "Alex" Stump** is a Lucky Bucks technician who worked extensively for the criminal enterprise, primarily at the direct instruction of Defendants Smith and Linares. Stump declined an offer to work for Defendants' competing businesses after he was pretextually fired, but he has been rehired by Lucky Bucks' new management. Stump's Signal communications with members of the criminal conspiracy have been recovered from his old cellphone by forensic technicians. A truthful affidavit from Stump, which attaches various Signal logs, is attached as **Exhibit E.**

32. **Alex Essig** is a Lucky Bucks technician who worked extensively for the criminal enterprise, primarily at the direction of Defendants Howard and Smith. He continues to be a Lucky Bucks employee. A truthful affidavit from Alex Essig is attached as **Exhibit F.**

33. **Adam Essig** is a Lucky Bucks technician who worked extensively for the criminal enterprise, primarily at the direction of Defendants Howard and Smith. He declined an offer to work directly for Defendants' competing businesses. He was able to recover a portion of his Signal communications with Defendants. He remains a Lucky Bucks employee. A truthful affidavit from Adam Essig is attached as **Exhibit G.**

34. **Toby "Hassan" Collins** is a Lucky Bucks dispatcher who previously worked as a technician. He did work for the criminal enterprise, including, on one occasion, delivering a group of COAM machines to a gas station in Alabama using a U-Haul truck. Collins discussed the work he did for the criminal enterprise directly with Defendants Kassam and Ali, and he expressly told them that he did not want to be involved in anything illegal. As a result of his expressions of concern, Defendants eventually stopped using him as part of their schemes. He continues to work for Lucky Bucks. A truthful affidavit from Collins is attached as **Exhibit H.**

35. **Marquail Dinkins** is a Lucky Bucks technician who did work for the criminal enterprise while employed by Lucky Bucks. He went to work for a different (non-COAM) business operated by Defendants in Texas, but he has recently been rehired as a Lucky Bucks employee. A truthful affidavit from Dinkins is attached as **Exhibit I.**

36. **Theodore ~~James~~ Janies Theisen** is a Senior Managing Director of Ankura Consulting Group, LLC who performed forensic searches and reviews of fifty devices at the Lucky Bucks headquarters. A truthful affidavit from Theisen is attached as **Exhibit J.**

37. **Jason Cristal** is the Managing Director of Robbins Alloy Belinfante Littlefield LLC who

performed a financial analysis of Lucky Bucks' accounting system and QuickBooks. A truthful affidavit from Cristal is attached as **Exhibit K.**

38.    **Harshad Parashare** is the founder and CEO of Para Share LLC, a company that coordinates in-person shows and tours locally, nationally, and internationally. A truthful affidavit from Parashare is attached as **Exhibit L.**

39.    **Janelle Hall** is the Human Resources Manager at Lucky Bucks. A truthful affidavit from ~~Mosher~~ Hall is attached as **Exhibit M.**

40.    **Christian Hazim** is the manager of Lucky Bucks' warehouse. At the direction of Defendants, he helped facilitate the theft of gaming machines and parts by stripping identifying materials from them and preparing them to be stolen. He also directly observed other Lucky Bucks' employees doing the same thing, including removing manufacturers' serial number plates from COAM machines. After he expressed discomfort, Defendants stopped involving him in their theft of machines and instead relied on other Lucky Bucks warehouse workers. A truthful affidavit from Hazim is attached as **Exhibit** N.

### III.  JURISDICTION AND VENUE

41.    This Court has jurisdiction over this matter pursuant to Ga. Const. Art. VI, § IV and O.C.G.A. §§ 15-6-8(1), (2).

42.    Venue is proper in Fulton County because one or more of Defendants reside in Fulton County. The Defendants have acted as joint tortfeasors and criminal conspirators, and thus, they may all be sued in any county in which one of the joint tortfeasors resides. *See* Ga. Const. Art. VI, §11,**]** IV.

### IV.  OVERVIEW OF THE ~~COAM~~ **COAM** BUSINESS IN GEORGIA

43.    COAM machines are skill-based amusement machines that somewhat resemble the digital slot machines that can be found in casinos throughout the United States. Unlike slot machines, however, the players' skill is a determining factor in the outcome of the games. Further, under Georgia law, COAM

machines are not gambling devices, and cash prizes are illegal. Instead, COAM machines must be located in businesses that derive the majority of their income from the sale of goods and services, and those businesses are permitted to reward winners nearly exclusively with merchandise from their stores or gift cards.

44.     COAM machines, particularly modern ones, are expensive, with some of them costing in excess of $15,000 a piece when fully equipped.

45.     The COAM business is regulated by the GLC, which has licenses for two types of machines—Class A and Class B licenses. Class A licenses apply to traditional arcade games, jukeboxes and the like, whereas the type of COAM machines described above and at issue in this case require Class B COAM licenses to operate.

46.     There are three types of Class B COAM licenses, two of which are at issue in this case—master licenses and location licenses.[1]

47.     Master license holders are permitted to buy, own, and service COAM machines throughout the state of Georgia. Location license holders are allowed to physically host the COAM machines owned by a master license holder at a specific location that is set forth in the license.

48.     Under Georgia law, every location license holder must operate pursuant to a written, exclusive contract with a master license holder that must have a term longer than one year. Master license holders are not permitted to hold locations licenses or have an interest in a location under contract with it. *See* O.C.G.A. § 50-27-87(a)(4).

49.     Master license holders are generally responsible for maintenance and service of their COAM machines. GLC has taken the position that it is illegal for one master license holder to service and maintain COAM machines owned by a different master license holder.

---

[1] The other type of Class B license is a manufacturer's license, which allows a business to manufacture and sell COAM machines, software and parts.

50.    Contracts between master license holders and location license holders are typically multi-year contracts, and as noted above, they must be exclusive *(i.e.,* a location license holder cannot contract with two different master license holders). In order for a location license holder to cancel the contract and change to another master license holder, GLC must be submitted a "no-dispute" or "change in master" form. If either party disputes the permissibility of removing the existing master license holder's COAM machines or the change to a new master license holder, they can demand arbitration before the GLC.

51.    Pursuant to Georgia law, revenue generated by COAM machines is split equally between the location license holder and master license holder, after providing a portion to the GLC to fund scholarships and pre-K services. The percentages cannot be modified by contract.

52.    It is illegal for a master license holder to provide "inducements" in the form of cash payments, a higher share of the revenue, or other benefits to location license holders in exchange for entering into a contract. *See* O.C.G.A. § 50-27-87.1. An example of such illegal inducements would be if a master license holder were to purchase real estate and offer a location license holder a discount on rent in exchange for hosting the master license holder's COAM machines on the premises.

53.    Every legal COAM machine in Georgia is connected via a computer system to Intralot, a contractor for the GLC. The Intralot computer system tracks all COAM play and revenue, and each master license holder can log into the Intralot system to track the revenue for each machine at each location under contract with it.

54.    All revenue earned by COAM machines is collected by location license holders, deposited into a separate account, and then transmitted directly to the GLC electronically every week. GLC then transmits the net revenue owed to the location license holder and the master license holder by electronic wire transfer.

55.    Master licenses and contracts are generally transferrable, subject to the approval of the GLC. Thus, master license holders often acquire "routes" of COAM location license contracts from other

master license holders, and they often purchase the other master license itself as part of the transaction.

56.    Because only a limited number of master licenses have been issued by GLC, master licenses have become extremely valuable. If sold on the open market today, which is of questionable legality, a "naked" master license *(i.e.,* one that did not come along with any location contracts) would sell for in excess of $3,000,000.

57.    Contracts with location license holders are the most valuable assets of master license holders, as they are generally the exclusive source of revenue for the business.

58.    The expiration dates of location contracts are extremely competitively sensitive because contract expiration is one of the few times when it is possible for a different master license holder to win away the business. Master license holders keep that information secret, and it cannot be obtained from the GLC pursuant to an Open Records Act request.

59.    Location contracts are typically sold at a multiple of the historical monthly revenue earned by the COAM machines at the location. So, a contract with a location that ~~that~~ generates more revenue per machine (or has more machines) is more valuable than a contract with a location where the machines generate less revenue.

## V.    FACTUAL ALLEGATIONS

### A.    Lucky Bucks' History

60.    Upon information and belief, Lucky Bucks and its former corporate affiliates were formed in 2011 by Damani. Over the next several years, it grew to be one of the largest master license holders in the state. In the mid-2010s, Damani sold the majority of his equity interest in Lucky Bucks' corporate affiliates to an investor. Until Lucky Bucks' bankruptcy in 2023, Damani retained a significant minority equity interest in Lucky Bucks via his ownership in Lucky Bucks' former parent company.

61.    Lucky Bucks' initial growth was fueled almost entirely by acquisitions. As part of these

acquisitions, Lucky Bucks often acquired master licenses in addition to the location contracts. Accordingly, by 2020, Lucky Bucks held at least 6 six master licenses.

62.    According to the GLC, Damani was also able to grow the business, in part, by offering illegal inducements to a location license holder.

63.    This culminated with GLC notifying Lucky Bucks that it intended to revoke its master license on May 8, 2020. That notification resulted in an administrative proceeding between Lucky Bucks and the GLC.

64.    On June 2, 2020, a GLC hearing officer approved a settlement in the administrative proceeding, and the hearing officer issued an executive order setting forth the terms under which Lucky Bucks would keep its master license. The hearing officer specifically found that Damani violated two provisions of Georgia's COAM laws.

65.    The executive order required Damani to "resign as an officer" and "relinquish all operational control over the business and operations of [Lucky Bucks]." Damani was permitted to retain his equity ownership in Lucky Bucks' former parent holding company, but the order required that his shares be converted to non-voting shares.

66.    After Damani was barred from participating in Lucky Bucks' operation, he signed a 5-year non-competition agreement with Lucky Bucks. Even though Damani resigned as an officer, he was permitted to retain his equity ownership in Lucky Bucks' former parent holding company, Lucky Bucks Holdco LLC ("HoldCo"). His non-compete agreement also allowed him to retain his substantial ownership interest in Lucky Bucks.

67.    After Damani was barred from participating in Lucky Bucks' operation, control of Lucky Bucks' COAM operations in Georgia fell to Kassam, who was named Chief Operating Officer. Lucky Bucks was managed through HoldCo's board of managers, of which Kassam was a member. Even though

Damani was barred from participating in the operations of Lucky Bucks, he was heavily involved with Kassam, including taking part in an effort to create a new holding company that bled millions of dollars from Lucky Bucks. In fact, Damani appointed Kassam as the manager of Lucky Bucks' three-person board of managers.

68.    Damani remained involved in the effort to steal Lucky Bucks locations and location contracts via the APAs between Lucky Bucks and B-side entities whereby Damani was updated on developments and timing even though Damani was to have no operational control over Lucky Bucks and had been banned from holding any office at Lucky Bucks by GLC. Damani assisted in this scheme to present acquisition targets to Lucky Bucks, and other individuals kept Damani updated behind-the-scenes by forwarding him emails with the Company's investment bankers and the prospective noteholders.

69.    Another example of Damani's involvement: on October 31, 2020, representatives of a smaller Georgia COAM business reached out to Trive Capital Management ("TCM"), a middle-market private equity fund that owns or controls several entities, including Southern Star Gaming LLC, which held shares of Lucky Bucks Holdings, offering to sell four locations for $5,000,000. In order to evaluate the opportunity, Damani was looped into this sale—despite the GLC's ban on Damani's exercise of operational control over the business, which Shravan Thadani ("Thadani"), a Managing Director at TCM in charge of TCM's investment in Lucky Bucks, knew about.

70.    As another example, on November 9, 2021, Ijaz asked Sekhri and Bouskill for a call at Thadani's request, explaining that Thadani "would like to discuss the path forward relating to acquisitions given that we might not be able to raise money in the near term. He also hinted that maybe we should include Anil [Damani] in this discussion as well." The reason Thadani wanted Damani to participate in the discussion is that Damani was the one primarily responsible for introducing new merger and acquisition opportunities—even after he was banned from being involved in Lucky Bucks' operations. The use of

strawmen and inflated player revenue explains how Lucky Bucks had overpaid by between 50% and 63% for acquisitions from certain B-Side companies, including Unique.

71.    From mid-2021 to early 2022, Lucky Bucks entered into a senior secured credit facility in the aggregate amount of approximately $535,000,000, which was increased to $610,000,000 in October 2021.

72.    Prior to incurring obligations under these credit facilities, Lucky Bucks disclosed that a substantial portion of the proceeds of the debt would be used to fund distributions to shareholders, including Damani and Kassam. In other words, Damani and Kassam admitted that the distributions would be funded by the newly incurred debt, rather than Lucky Bucks' legitimate net earnings.

73.    In July 2021, Lucky Bucks issued a cash dividend of approximately $200,000,000 to Lucky Bucks' shareholders with the proceeds of the financings. Of that amount, more than $50,000,000 was distributed to Damani and more than $500,000 was distributed to Kassam. Again, these dividends were paid for by further saddling Lucky Bucks with debt, rather than from Lucky Bucks' legitimate net earnings.

74.    In August 2021—just a month after Lucky Bucks made its improper July dividend distributions—the "super holdco" plan was devised.

75.    The plan was to create a new holding company ("Holdings") which would sit above Lucky Bucks and HoldCo. Holdings was formed and immediately saddled with additional debt to finance even more dividends.

76.    Holdings' only asset would be its indirect ownership of Lucky Bucks shares (via its ownership of HoldCo shares).

77.    By 2022, Lucky Bucks and its affiliates had taken on hundreds of millions of dollars' worth of debt, substantial portions of which were used to fund the massive distributions. By the end of

2022, Lucky Bucks owed its creditors over $500,000,000.

78.     By mid-2022, Lucky Bucks began to report deteriorating operational performance, citing, among other things, macroeconomic challenges and increased regulatory enforcement within the COAM industry.

79.     In June 2023, Lucky Bucks and its corporate affiliates filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. During the pendency of the bankruptcy, Kassam remained in complete control of Lucky Bucks' COAM operations in Georgia.

80.     Lucky Bucks emerged from bankruptcy in October 2023 pursuant to a reorganization plan approved by the Delaware bankruptcy court. Under the plan, Lucky Bucks emerged as a separate entity indirectly owned by its former lenders. Lucky Bucks has no ongoing relationship with or ownership by its former parent holding company, which is still in bankruptcy.

81.     Shortly before the plan was approved, Kassam formally resigned from Lucky Bucks. Lucky Bucks' new owners quickly hired new, professional management to oversee operations following Lucky Bucks' emergence from bankruptcy.

82.     Pursuant to the Chapter 11 plan, Lucky Bucks preserved all claims it had against Defendants for gross negligence, willful misconduct, and actual fraud.

83.     Within a few weeks, it became apparent to new management that the prior management had been involved in serious willful misconduct and actual fraud. Over the next several months, Lucky Bucks engaged forensic investigators, including former FBI agents, to collect and analyze the digital evidence left behind by the prior management, and to secure Lucky Bucks' physical and digital assets. Lucky Bucks also engaged counsel to interview the remaining employees and to analyze documentary, digital, and other evidence.

84.     That investigation uncovered the organized criminal conspiracy detailed in this Amended

Complaint, as well as the extensive efforts that Defendants took to conceal their illegal and fraudulent activities.

**B.      The Theft of Location Contracts**

85.      As noted above, the most valuable assets of a COAM master license holder are its contracts with location license holders.

86.      At some point, Vaswani, Haque, Damani, Kassam, and Chisti set up and/or conspired to steal Lucky Bucks' location contracts and give them to the B-Side businesses.

87.      The B-Side businesses that were recipients of Lucky Bucks' location contracts included Dynamic, Angel, Prestige, Klass Amusement, Peak, Unique, AKS, Lee Caudell, and Pinball.

88.      Vaswani, Haque, Damani, Kassam, and Chisti used many different B-Side businesses, including Georgia Winners, Peak, AKS, Unique, Lee Caudell, and Klass Amusement, as a means to disguise from Lucky Bucks' lenders and the GLC the existence of a systematic effort to loot Lucky Bucks of location contracts and to conceal Damani's involvement.

89.      Defendants utilized multiple B-Side businesses because it would have been obvious what was going on if all of the contracts stolen from Lucky Bucks had gone to a single competing master license holder.

90.      The theft of location contracts was accomplished by two principal means. First, the individual defendants who nominally worked for Lucky Bucks would use the trade secret and confidential information regarding the expiration date of Lucky Bucks' location contracts to target those locations for poaching by the B-Side businesses, including Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS. Kassam would cause Lucky Bucks not to dispute the non-renewal or early termination of location contracts that were being poached by the B-Side businesses.

91.      A prime example of the manner in which this scheme worked can be found in the

deposition testimony of Chisti. In 2019, Damani and Kassam recruited Chisti to "purchase" one of the dormant master licenses that Lucky Bucks had acquired through acquisition. *(See* **Exhibit A).** Many of Damani's communications with Chisti were made through WhatsApp, another secure messaging application. Chisti and Georgia Winners retained those communications and produced copies of them to Lucky Bucks as part of an unrelated arbitration. This arbitration has since been dismissed without prejudice.

92.     Damani and Kassam told Chisti that he would merely be a "paper" owner, and that he would have no role in the operations of Georgia Winners.

93.     Chisti and Haque pooled $400,000 and gave it to 27th Investment Group, another one of Damani's companies, in 2019.

94.     Although the transaction was documented as a "loan," the real purpose of the transaction was the "purchase" of a master license from Lucky Bucks. The value of the license was actually more than $800,000 at the time, double what Chisti and Haque ~~purported~~ purportedly "paid."

95.     Eventually, Damani and Kassam caused Lucky Bucks to enter into an agreement to "sell" Georgia Winners a master license in exchange for $400,000.

96.     Chisti and Georgia Winners did not actually pay Lucky Bucks for the master license, however. Instead, Georgia Winners provided a $400,000 promissory note to Lucky Bucks at the closing of the transaction.

97.     The majority of the money owed under that promissory note was never paid to Lucky Bucks.

98.     Damani and Kassam told Chisti that he would receive 10% of the revenue, with the remaining 90% being given to members of the criminal conspiracy through Blue Georgia, a shell company set up by another straw man, Motin.

99.     Chisti signed stacks of blank checks drawn on the account of Georgia Winners and gave them to Vaswani, which were used to pay expenses and to funnel money from Georgia Winners to Defendants.

100.    Over the next several months, Vaswani and Haque secured six location contracts for Georgia Winners. At least four of those six locations were under contract with Lucky Bucks immediately before they contracted with Georgia Winners, and three of those location contracts were sold back to Lucky Bucks for millions of dollars after approximately a year.

101.    Defendants used the trade secret and confidential information regarding the expiration dates of the contracts described above to target them for Georgia Winners, which was one of the B-Side businesses.

102.    Chisti signed the paperwork he was brought by Defendants in connection with these sales on behalf of Georgia Winners.

103.    The operations of Georgia Winners, including for these locations, were managed by Kassam, Ali, Haque, and Vaswani, who communicated with each other and Chisti through a Signal group chat about Georgia Winners business. Chisti and Georgia Winners produced copies of the Signal group chat to Lucky Bucks in an arbitration.

104.    Defendants' actions in stealing location contracts were not limited to the Georgia Winners scheme.

105.    Historically, even if Lucky Bucks did not dispute a location license holder's right to switch to a new master license holder, Lucky Bucks would simply decline to respond to the inquiry from GLC, which would have the practical effect of delaying the transition by at least nine months. *(See* **Exhibit B).**

106.    In contrast to that practice, and as part of the scheme, Kassam instructed Lucky Bucks '

employees, including Ms. Davis, to file "no dispute" forms with GLC when location license holders desired to switch from Lucky Bucks to one of the B-Side businesses. This enabled the location license holders to switch to a new B-Side master license holder much more quickly than would otherwise have been the case, to Lucky Bucks' substantial detriment.

107.    In the first quarter of 2023, Lucky Bucks lost 58 locations. Of those 58 locations, 48 had COAM machines when a Lucky Bucks contractor later visited them in June and July.

108.    Of those 48 locations, 21 of them were under contract with one of the known Defendant B-Side master license holders at the time of the visits, including Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS. The testimony provided by Chisti shows the way the scheme worked, and on information and belief, the locations obtained by Prestige, Lee

Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS were obtained in a similar manner (z'.e., they were targeted by Damani, Kassam, and Ali making use of Lucky Bucks' trade secret and confidential contract termination date records).

109.    That trend continued through the end of 2023. In December 2023, Lucky Bucks' employees and agents visited 46 locations whose contracts with Lucky Bucks had terminated between April and November 2023. Of the locations visited, 33 had COAM machines present at the time of the visit. *(See* **Exhibits C** and **D).**

110.    Of those 33 locations, 21 of them, *nearly two-thirds,* were under contract with three of Defendant B-Side businesses—Advance (5), Lee Caudell (5), and Klass (11). Of the other 12 locations, one master license holder had a contract with 2 two locations, and no other master license holder had a contract with more than a single location.

111.    During the visits to these locations in the second half of 2023, a number of the store owners told current Lucky Bucks' employees and agents that they had been told that Lucky Bucks was

"going out of business" or had "gone bankrupt," and that they needed to switch to a new master license holder.

112.    The competing B-Side businesses, including Peak, Unique, Georgia Winners, and Lee Caudell, still retain a large number of location contracts that were stolen from Lucky Bucks, and they are receiving the ongoing master license holder share of the revenue generated by them directly from the GLC.

113.    Upon information and belief, the total revenue from the stolen location contracts amounts to over $1,000,000 per month that is being directed to the Defendant B-Side businesses, including Defendants Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS, and ultimately to the individual Defendants, including Damani, Kassam, Vaswani, and Haque, and their unknown co-conspirators and pawns.

114.    Not content simply to steal location contracts using Lucky Bucks' trade secret and confidential information, and to usurp corporate opportunities for new location contracts, all for the benefit of the B-Side businesses, on several occasions, Defendants took that scheme one step further—they would then "sell" those locations back to Lucky Bucks at an inflated purchase price.

115.    On information and belief, the purchase price for those locations were based on revenues that had been fraudulently inflated by Defendants, including Lee Caudell, Peak, AKS, Georgia Winners, and Klass Amusement, likely through the use of sham players who increased the playing volume. Chisti testified that he believed that revenues were inflated based on fraudulent players.

116.    The use of sham players also explains why Ijaz and Bouskill identified that Lucky Bucks had overpaid by between 50% and 63% for acquisitions from certain B-Side companies, including Unique.

117.    After purchasing the locations, many of them substantially under-performed their represented revenues.

118.    Since 2020, Defendants caused Lucky Bucks to enter into similar asset purchase

agreements ("APA") with AKS, Klass Amusement, Peak, Lee Caudell, Prestige, and Unique, among others, including multiple purchases with several of these Defendants. Some of these asset purchases were priced at over $10,000,000 each, and almost all of them had purchase prices over $1,000,000.

119.    On information and belief, at least a portion of the purchase prices specified in the APAs were based on fraudulently inflated revenues for some of the locations being purchased.

120.    For example, in April 2022, Chisti informed Ijaz that Georgia Winners, at Damani's direction, "setup ghetto locations hardly doing $20000 a month and then they work with operators of locations to pump money to show higher sales and sell these locations back to lucky bucks on much higher margins."

121.    In September 2022, a different Georgia master license holder emailed Kassam explaining that he had "become aware of an elaborate scheme whereby an [Master License Holder] can inflate the value of low performing COAM locations in order to sell them to another [Master License Holder] at a price far exceeding their actual value. Their method involves falsely inflating revenue at the location for a period of several months, so the location will appear to be lucrative."

122.    On information and belief, Defendants used other, non-defendant sham master license holders as part of this racket, including, among others, Goldstar Coin Operating, LLC, and Aarya Ventures, LLC.

123.    The following are details involving Lucky Bucks' master and location contracts that were sold to or bought back from Georgia Winners, Lee Caudell, Peak, AKS, Unique, and Klass Amusement:

    a.  On June 25, 2020, Lucky Bucks "sold" a Master License to Georgia Winners. It was never paid for that Master License.

    b.  On November 24, 2020, Lucky Bucks entered into an Asset Purchase Agreement with Lee Caudell to purchase locations for a total $1,133,508.60.

c.  On January 25, 2021, Lucky Bucks purchased location contracts for $3,043,606.46 from Lee Caudell.

d.  On January 28, 2021, Lucky Bucks purchased a location contract from Lee Caudell for $518,000.

e.  On February 1, 2021, Lucky Bucks sold location contracts to Peak for $300,000.

f.  On March 17, 2021, Lucky Bucks purchased location contracts from ~~AKSfor AKS for~~ $390,750.85.

g.  On May 9, 2021, Vaswani directed Chisti to sell two locations to Lucky Bucks.

h.  On May 25, 2021, Lucky Bucks sold location contracts to Unique for $979,419.60.

i.  On June 17, 2021, Lucky Bucks bought location contracts from Lee Caudell for $8,433,953.57.

j.  The very next day, Lucky Bucks bought more location contracts from Lee Caudell for $8,166,046.43.

k.  On August 6, 2021, Defendants caused Georgia Winners and Lucky Bucks to enter into an APA whereby Georgia Winners sold three of the locations it had "obtained" back to Lucky Bucks in exchange for $5,654,007.18, although a portion of that consideration was withheld pursuant to an earn-out provision.

l.  On November 1, 2021, Lucky Bucks purchased location contracts from Klass Amusement for $14,573,620.55.

m.  On February 11, 2022, Lucky Bucks purchased location contracts from Klass

Amusement for $2,122,342.73.

n.  On March 22, 2022, Peak sold the same location contracts it had "purchased"

from Lucky Bucks back to Lucky Bucks for $2,667,125.97.

124.  On information and belief, some of the master licensee entities used by Defendants were

later either renamed, or they "sold" their master licenses to other shell companies for purposes of

preventing detection of the criminal enterprise by effectively "laundering" those licenses.

## C.    The COAM Machine Theft Racket

125.  Smith, Howard, Ali, Kassam, and Sayani devised a scheme whereby they would simply

steal COAM machines purchased by and belonging to Lucky Bucks. Upon information and belief, Damani

was also aware of, and profited from, this scheme.

126.  Rather than being labeled with an indication of the delivery location and a list of keys and

locks for the machine, as would be typical, these stripped-down machines would be marked simply with an

"X" drawn on a sheet of paper. For that reason, the machines were often referred to as "X Cabinets" or "X-

cabs" by Lucky Bucks ' employees, including Defendants Smith, Linares, and Howard. *(See* **Exhibit E).**

These X Cabinets had a market value exceeding $10,000 each.

127.  Once Smith, Howard, Ali, Kassam, and/or Sayani decided to steal and sell a batch of

COAM machines owned by Lucky Bucks, Smith, Linares, or Howard would instruct warehouse workers

or technicians, including Christian Hazim, Alex Essig, Adam Essig, William Stump, and Marquail

Dinkins, to strip the machines of anything that could be used to identify it as belonging to Lucky Bucks,

including the manufacturers' serial number plates.

128.  Once the X Cabinets had been prepared, they would either be loaded onto trucks for

delivery or left in the warehouse for a purchaser or someone else to pick up after hours.

129.  Often, Smith or Ali would arrange for Lucky Bucks equipment to be delivered to a B-Side

business. *(See* **Exhibit F).**

130.    At the time that new management took over Lucky Bucks, a truck full of X Cabinets that had not yet been delivered was sitting in the Lucky Bucks parking lot.

131.    Upon information and belief, many, but not all, of the stolen COAM machines were sold outside the state of Georgia by Defendants Smith, Howard, Ali, Kassam, and Sayani. Lucky Bucks was not paid for those machines.

132.    Many of the stolen COAM machines were simply stolen and given to the B-Side businesses.

133.    Lucky Bucks was not paid for any of the stolen COAM machines. In fact, Lucky Bucks accounting records do not show the receipt of any revenue from the sale of COAM machines, in part because only licensed manufacturers are permitted to sell COAM machines in Georgia.

134.    Upon information and belief, Howard was primarily tasked with organizing and delivering the stolen machines that were sold by Defendants Smith, Howard, Ali, Kassam, and Sayani out of state.

135.    During his first week of work for Lucky Bucks, Toby "Hassan" Collins was instructed to deliver a number of COAM machines to a gas station in Alabama using a U-Haul truck rented by Kassam. Collins understood this to be work for the B-Side, but he does not know who owned those machines.

136.    Lucky Bucks does not have any legitimate business interests in Alabama, and, as far as current management can tell, the financial records do not show the receipt of any revenue from any Alabama gas stations.

137.    While delivering the machines in Alabama, Collins was approached by a police officer who informed him that COAM machines are illegal under Alabama law. He told the police officer, truthfully, that they were not his machines and that he had just been hired to deliver them. The police officer let him deliver the machines without incident.

138.    Upon returning to Georgia, Collins confronted Kassam and told him that he did not want to be involved in any illegal activities. Kassam reassured him that it was not illegal to deliver COAM machines to Alabama, and he further told Collins (falsely) that he would never put him in a position to break the law.

139.    In other words, Kassam was fully aware that Lucky Bucks' employees were transporting stolen COAM machines across state lines for "under-the-table" sales. He also knew that Lucky Bucks was not being paid for the stolen machines.

140.    Upon information and belief, former Lucky Bucks employee Christopher Moyer delivered at least three truckloads of X Cabinets to locations in Tennessee at the direction of certain Defendants, likely Smith, Linares, or Howard.

141.    Some of the stolen COAM machines were, after having been stolen, sold or given to unknown master license holders in the state of Georgia who are friends or acquaintances of the individual Defendants, or strawmen affiliated with the B-Side businesses.

142.    For example, Marquail Dinkins, at either Smith's or Howard's direction, would deliver batches of 10 to 20 X Cabinets to someone he perceived as a friend of some of the individual Defendants at a location very nearby the Lucky Bucks warehouse. The warehouses of the B-Side businesses are all very near the Lucky Bucks warehouse. The same individual (the "friend") identified by Dinkins would also occasionally pick up small batches of X Cabinets using his own truck. Discovery will permit Dinkins to identify the "friend" as one of the nominal B-Side business owners.

143.    Beyond those sold or otherwise given away by Defendants, some of the stolen COAM machines were simply used by Defendants, including Smith, Kassam, Linares, Ali, Howard, and Sayani, for their competing B-Side businesses.

144.    For example, Stump delivered X Cabinets to warehouses belonging to Defendant B-Side

businesses several times per month.

145.    As an example, on October 19, 2022, Stump was instructed by Linares to pick up three expensive IGT machines from the Lucky Bucks warehouse and install them at 612 Rockbridge Road SW in Lilburn, Georgia.

146.    That location was previously under contract with Lucky Bucks, and the location contract expired that same month. The location is now under contract with Angel.

147.    The following screenshot from Stump's Signal chat with Linares documents what Stump did that day:



l to come "straight to me" about the machines he installed for

Angel, and not check the machines out through his Lucky Bucks inventory

group

but first come see me
Od 19, 2022 14:47:07

Shouldn't i drop off this machine atAA first?
straight to me
Oct19, 2022 14:47:28



149.    On information and belief, Defendants were responsible for the location license holder not renewing its contract with Lucky Bucks after it expired. On further information and belief, certain individual Defendants encouraged that location license holder to enter into a new contract with Angel.

150.    In other words, the contract for a Lucky Bucks location was stolen and given to Angel, the machines purportedly "owned" by Angel at that location were stolen from the Lucky Bucks warehouse, loaded onto a Lucky Bucks truck, and then installed by a Lucky Bucks employee who was being paid for his labor by Lucky Bucks at the time.

151.    The three machines Stump installed for Angel had a market value of well over $10,000 each.

152.    Lucky Bucks' financial records do not reflect any revenue from the sale of COAM machines to Angel (or anyone else) in October 2022. As such, there is no evidence that Angel purchased the COAM machines from Lucky Bucks.

153.    Lucky Bucks either did not maintain inventory records or those records were destroyed or stolen by Smith, Howard, Ali, Linares, Kassam, and Sayani, so it is unclear exactly how many COAM machines were stolen by Defendants. Nevertheless, the value of the stolen machines likely exceeds $10,000,000 based on the quantities of X Cabinets that were directly prepared, observed, or delivered by employees who remain with Lucky Bucks.

**D.      The Theft of Services Racket**

154.    While Adam Essig was employed by Lucky Bucks, Smith asked him to work as a technician for the B-Side businesses, including Angel, Dynamic, and Klass Amusement. *(See* **Exhibit G).** Until December 2022, Adam Essig worked for the B-Side businesses while being paid by Lucky Bucks.

155.    While Tony Collins was employed by Lucky Bucks, Smith, Kassam, and Ali asked him to work as a technician for the B-Side businesses. Collins regularly worked for the B-Side businesses while being paid by Lucky Bucks. *(See* **Exhibit H).**

156.    While Alex Essig was employed by Lucky Bucks, Smith asked him to work as a technician for the B-Side businesses, including Angel, Klass Amusement, Unique, Prestige, and Fusion Gaming. While doing work for the B-Side businesses, Essig was paid by Lucky Bucks.

157.    In December 2022, Smith asked also Marquail Dinkins to work for the B-side businesses while Dinkins was still employed by Lucky Bucks. *(See* **Exhibit I).**

158.    Linares, Smith, Kassam, Howard, and Ali had multiple technicians, including Stump,

Adam Essig, Alex Essig, and Dinkins, do work for Klass Amusement, Prestige, Dynamic, Unique, and Angel while working on the clock and getting paid by Lucky Bucks.

159.    Dynamic, Angel, Prestige, Klass Amusement, Peak, Unique, AKS, Lee Caudell, and Pinball (all of which were B-Side businesses) were referenced in a Signal group chat between Stump and other Lucky Bucks-' employees and management, including Smith and Linares, through which Defendants coordinated the use of Lucky Bucks technicians, parts, and equipment to service the B-Side locations.

160.    At the same time that Linares, Smith, Kassam, and Ali directed Lucky Bucks' technicians to do work for Klass Amusement, Prestige, Dynamic, Unique, and Angel, Meyersgold paid Lucky Bucks' technicians extra money.

161.    On the following dates, while working on the clock for Lucky Bucks and being paid by Lucky Bucks, and at the direction of Linares, Smith, and/or Prestige, Stump delivered equipment to Prestige: October 3, 2022; October 6, 2022; October 12, 2022; October 17, 2022; October 20, 2022; October 25, 2022; October 26, 2022; November 3, 2022; November 4, 2022; November 8, 2022; November 11, 2022; November 18, 2022; November 23, 2022; November 25, 2022; December 1, 2022; December 19, 2022; December 21, 2022; December 23, 2022; January 3, 2023; January 5, 2023; January 16, 2023; January 18, 2023; January 19, 2023; and January 20, 2023.

162.    On the following dates, while working on the clock for Lucky Bucks and being paid by Lucky Bucks, and at the direction of Smith, Linares, and/or Unique, Stump delivered equipment to Unique: October 7, 2022; November 9, 2022; November 18, 2022; December 22, 2022; January 3, 2022; and January 20, 2023.

163.    On the following dates, while working for Lucky Bucks and being paid on the clock by Lucky Bucks, and at the direction of Smith and/or Linares, Stump delivered equipment to Klass Amusement: October 6, 2022; November 23, 2022; and December 1, 2022.

164. Ultimately, Stump was fired from Lucky Bucks and offered a full-time job with the B-Side. He understood this to be common practice at Lucky Bucks.

165. Defendants also used Lucky Bucks' employees, particularly technicians, to carry on the work of their competing B-Side businesses. As noted above, these employees were given their direction through encrypted Signal group chats.

166. The "inventory" Signal group chats for Defendant B-Side businesses recovered from Stump's phone show participants and former (or "banned") participants of each group. For example, the following screenshot shows the identities of current and banned members of the inventory group chat for Dynamic:



167. At a minimum, the following Defendants, all former Lucky Bucks' employees or contractors, were members of the Dynamic group chat at one point in time: Howard, Smith, Linares.

168. On information and belief, Damani, Kassam, Ali, and/or Sayani were also members of one or more of the Signal group chats, but they used "me" or aliases as their identifier rather than their actual names.

169.    While he was employed at Lucky Bucks, Howard used a Lucky Bucks computer on which he installed the Signal program. Former FBI agents retained by Lucky Bucks have been able to recover the text portion of Howard's Signal communications (both sent and received) from that computer, but not images of the messages or any images that were sent through Signal as part of the conversations. *(See* **Exhibit** J).

170.    From Howard's Signal messages, it is clear that Ali was ultimately managing customer relationships for the competing B-Side businesses and directing Linares regarding work that needed to be done for them.

171.    For example, on February 26, 2023, Linares instructed "Anthony" to service a machine at 1814 Highway IIS in Covington, Georgia, on behalf of Unique. The message instructed "Anthony" to "Call Imran before going." When questioned about whether he had completed the job, "Anthony" indicated that he had "called Imran like it said and got no answer" and therefore did not complete the job.

172.    Two days later, Linares sent the same message to "Karife Tech," again with an instruction to "Call Imran before going."

173.    Smith, Kassam, and Ali directed Lucky Bucks' employees to remove any clothing that could identify them as Lucky Bucks' employees while doing work for the B-Side businesses.

For instance, Linares instructed Stump as follows:



174.    These Lucky Bucks-' employees were also instructed to use Lucky Bucks trucks, trailers, parts, tools, and other equipment to complete jobs for Defendant B-Side business.

175.    The Lucky Bucks-' employees who did this work for the B-Side business were paid extra money on the side, typically $500 per month, through Meyersgold.

176.    Upon information and belief, Meyersgold is owned or controlled by Ali.

177.    Stump's and Howard's Signal group chats detail an extensive amount of work done for the B-Side businesses by employees on the clock for Lucky Bucks.

178.    The Signal conversations are backed up by corroborating evidence recovered by forensic consultants, including former FBI agents.

179.    For instance, Stump's truck had a GPS tracking system installed on it that would communicate to a Lucky Bucks IT system named "Nextraq."

180.    The Nextraq system would maintain a database of the GPS tracking information. The Nextraq system would also send email alerts to Ali whenever an employee's truck was stopped at a particular location for an extended period of time.

181.    The GPS tracking data for Stump's truck was deleted from the Nextraq system, but the

emails to Ali remained on Lucky Bucks' email server when new management took over.

182.   On information and belief, Defendants deleted, or caused the deletion of, the Nextraq database information for Stump's truck before they left Lucky Bucks (or did so surreptitiously after they left) in order to destroy evidence of their crimes.

183.   On information and belief, there was no legitimate business reason to delete the GPS data for Stump's truck from the database.

184.   From the period of December 1, 2022, through January 21, 2023, there were 70 unique Nextraq email alerts sent to Ali that directly correlate with Signal chat entries reflecting an address to which Stump was directed to perform installations, removals, or service for the B-Side businesses.

185.   The email alerts were sent either on the same day or the day after the Signal communications with which they correspond.

186.   An analysis of the latitudes and longitudes of the locations of the stops in the email alerts place Stump's truck within 200 feet of the locations at which he would be expected from the addresses in the Signal chats.

187.   At the time of these 70 stops, none of the locations was under a contract with Lucky Bucks, and there was no legitimate business reason for a Lucky Bucks employee to be doing work at those locations.

188.   Based on the Signal chat groups from which the messages were pulled and the content of the messages, Stump (and his Lucky Bucks truck) made these 70 stops for the purpose of doing work for Prestige, Klass Amusement, Unique, Dynamic, AKS, and Angel.

189.   A preliminary analysis of Signal chats and email alerts for other technicians suggests that Ali received similar alerts indicating that other Lucky Bucks technicians, including Joncarlos Herrera and Marco Alvarez, were routinely making stops at locations that were not under contract with Lucky Bucks.

Those technicians were using Lucky Bucks trucks and being paid by Lucky Bucks at the time of those stops.

190.    As with the Nextraq data for Stump's truck, the Nextraq data for Herrera's and Alvarez's trucks was deleted from the system.

191.    In addition to the lower-level employees discussed above, the individual Defendants who were employees of Lucky Bucks (Kassam, Ali, Sayani, Howard, Smith, Vaswani, and Haque) did extensive work for the competing B-Side businesses while they were on the clock and being paid by Lucky Bucks.

192.    For example, Kassam, Ali, and Sayani participated in weekly virtual meetings with Damani and a number of employees of Damani's other business, which operates under various entities under the "27th Group" umbrella.

193.    These weekly recurring meetings typically took place in the middle of the workday.

194.    Kassam, Ali, and Sayani received invitations to the meetings through their Lucky Bucks email addresses. Screenshots from a sample meeting found in the mailbox of Kassam are below, and they show that Damani, Kassam, Ali, and Sayani all participated in a virtual meeting on Thursday, December 8, 2022:

| | |
|---|---|
| **Organizer:** | Tony Kassam[tony@luckybucksga.com] |
| **From:** | Emad Vaid[emad@27invest.com] |
| **Attendees:** | Imran Ali; Valerie Martin; Anil Damani: Prem Kaushal; AlAmin Sayani; Mina Patel; Emad Vaid; Donna Anthony; Tony Kassam; Dipika Patel; Ozan Bayar; Application d29ade6f-9257-45cb-883c-01ad3a6f6d20; Laura Andrea Maldonado Marquez; Pegah Firoozl |
| **Importance:** | Normal |
| **Subject:** | Meeting (RecurringMeeting)/Thread Id: 19:meeting_ZmMxOTg3MGYtZmEzMCOOMGl1LTg1MzktM2UyZThlZinVkMzAz @thread.v2/Communication Id: 3b9b2c17-bf52-4aaf-9311-281 aSfbdOcfd/Imran Ali (Guest),Valerie Martin,Anil Damani,Prem Kaushal,AlAmin Sayani (Guest),Mina Pate... |
| **Start Time:** | Thur 12/8/2022 2:25:44 PM (UTC-05:00) |
| **End Time:** | Thur 12/8/2022 3:07:53 PM (UTC-05:00) |
| **Required Attendees:** | Imran Ali; Valerie Martin; Anil Damani; Prem Kaushal; AlAmin Sayani; Mina Patel; Emad Vaid; Donna Anthony; Tony Kassam; Dipika Patel; Ozan Bayar; Application d29ade6f-9257-45cb-883c-01ad3a6f6d20; Laura Andrea Maldonado Marquez; Pegah Firoozl |

[12/8/2022  7:32:51 PM (UTC)] imran@luckybucksga.conn joined.
[12/8/2022  7:59:11 PM (UTC)] imran@luckybucksga.conn left.
[12/8/2022  7:34:52 PM (UTC)j alamin@luckybucksga.com joined.
[12/8/2022  7:59:14 PM (UTC)] alamin@luckybucksga.com left.
[12/8/2022  7:42:43 PM (UTC)] valerie@27invest.com joined.
[12/8/2022  7:59:14 PM (UTC)] valerie@27invest.com left.
[12/8/2022  7:25:43 PM (UTC)] mina@27thproperties.com joined.
[12/8/2022  7:59:04 PM (UTC)] mina@27thproperties.com left.
[12/8/2022  7:50:28 PM (UTC)] emad@27invest.com joined.
[12/8/2022  7:59:09 PM (UTC)] emad@27invest.com left.
[12/8/2022  7:30:44 PM (UTC)] donna@27invest.com joined.
[12/8/2022  7:59:10 PM (UTC)] donna@27invest.com left.
[12/8/2022  7:26:12 PM (UTC)] tony@luckybucksga.com joined.
[12/8/2022  7:59:19 PM (UTC)] tony@luckybucksga.com left.

[12/8/2022 7:50:33 PM (UTC)j anil@27invest.com joined.
[12/8/2022 8:07:50 PM (UTC)] anil@27invest.com left.

195.    There was no legitimate business reason for Kassam, Ali, and Sayani to be meeting

with Damani and employees of his other companies each week during work hours, particularly

given that Damani had been barred from participating in Lucky Bucks' operations by the GLC more than two years earlier.

196.    On information and belief, the purpose of these weekly meetings was to plan, coordinate, and manage the various rackets described in this Amended Complaint.

197.    Although Linares was nominally an independent contractor, he billed Lucky Bucks for 40 hours of work nearly every week during 2022, at a time when he was spending most of his time working for the B-Side businesses. According to the 1099 form that he was issued that year, Linares was paid $54,000 by Lucky Bucks in 2022.

**E.      The Theft of Money Racket**

198.    Defendants also used the competing B-Side businesses as a way to simply steal money from Lucky Bucks.

199.    For example, on July 14, 2022, Lucky Bucks transferred $850,000 to Prestige as an "exclusivity" deposit for an asset purchase pursuant to a signed letter of intent. *(See* **Exhibit K).**

200.    No assets were ever purchased from Prestige subsequent to this "deposit," however, and in December 2022, the individual Defendants caused Lucky Bucks to write off the entire amount of this transfer as a loss.

201.    In other words, Lucky Bucks transferred $850,000 to Prestige at the direction of the individual Defendants in exchange for an exclusive right to purchase a number of location contracts (from themselves). The individual Defendants then simply let Prestige keep the money by failing to complete the transaction for no legitimate reason.

202.    As another example, on July 14, 2021, in a series of four separate, smaller transactions, Lucky Bucks paid $200,000 to "Klass Entertainment," purportedly for "advertising and marketing." These payments were allegedly for "sponsorships" of various charitable events.

203.    As an example, one of the alleged sponsorships was for the "Rahul Deshpande Recital" in August 2019 which was coordinated by Para Share LLC, which coordinates in-person shows and tours. On August 1, 2019, Klass Entertainment issued a $45,000 invoice to Lucky Bucks for a "Gold package" sponsorship.

204.    However, Harshad Parashare, Para Share's founder and CEO, did not recall ever receiving a sponsorship of $10,000 or more in connection with a Para Share event, let alone the $45,000 for which Klass Entertainment invoiced Lucky Bucks on August 1, 2019. **(Exhibit L).**

205.    Further, Parashare reviewed Para Share's accounting records back through its inception, which did not reflect that any money was paid by, or received from, Lucky Bucks, Klass Entertainment, or any of the named Defendants.[2]

206.    Upon information and belief, Klass Entertainment never provided any marketing or advertising services to Lucky Bucks. Rather, Defendants simply stole $200,000 from Lucky Bucks by laundering it through Klass Entertainment, another affiliate associated with Damani.

207.    On information and belief, Damani was instrumental in facilitating many, if not all, of the sham sponsorship payments.

208.    On information and belief, the $200,000 payment was broken into smaller transactions to avoid detection by honest Lucky Bucks' employees and others.

F.    **The Employee Theft Racket**

209.    Not content to steal contracts, machines, services, and money from Lucky Bucks, Defendants, including Smith and Howard, also stole (or attempted to steal) Lucky Bucks' technicians and warehouse employees to work for their B-Side businesses.

210.    Defendants would hire more technicians than were necessary for Lucky Bucks' business

---

[2] Parashare provided his affidavit before Chisti or Georgia Winners were added as Defendants in this matter, and they are not referenced in that affidavit.

and would cause Lucky Bucks to pay for their training and initial work. Defendants would then use methods to have the trained employees go to work for the B-Side businesses instead of Lucky Bucks.

211.    For some employees, this simply took the form of soliciting them to work for the B-Side businesses. For others, when they resisted the solicitations, Defendants would generate pretexts for firing the employees.

212.    Once the employee had been fired from Lucky Bucks, Smith or Howard would catch them in the parking lot or text them with an offer to work for the B-Side businesses.

213.    Defendants attempted to employ this strategy with Stump. He was fired by Smith based on a minor accident that resulted from the failure of the ~~breaks~~ brakes on his truck. Immediately after his firing, Smith tried to hire Stump for the B-Side businesses, but he declined the offer. Stump has since been rehired by Lucky Bucks.

214.    A number of former Lucky Bucks' employees or contractors are now (or were at one time) working for the B-Side businesses, including Rayshon Knight, Kevin Salley, Christopher Moyer, Cameron Rhodes, and Jancarlos Herrera, among others.

G.    **Defendants' Unauthorized Access to Lucky Bucks' IT Systems**

215.    Lucky Bucks maintains a shared network drive on which documents necessary for its business operations are stored.

216.    Among the files saved on the shared network drive are several spreadsheets that summarize the identities and key terms of Lucky Bucks' contracts with location license holders.

217.    The shared network drive is only accessible using unique usernames and passwords that were provided to Lucky Bucks' employees through a company-owned Microsoft account.

218.    This system was originally set up by Sayani and Ali, whose accounts had privileges as administrators.

219.    Long after their employment with Lucky Bucks had ended, both Sayani and Ali used their unique usernames and passwords to access files on the Lucky Bucks shared network drive that contain trade secret and confidential information.

220.    In October 2023, Ankura was hired by the Lucky Bucks to conduct a cyber investigation into activity impacting Lucky Bucks and its assets.

221.    Ankura deployed a Software-as-a-Service (SaaS) management tool called Obsidian Security to analyze Lucky Bucks' Microsoft 365 ("M365") logs. Ankura observed and preserved M365 activity associated with Sayani's account that occurred after his departure from Lucky Bucks.

222.    Specifically, on November 6, 2023, Ali accessed Microsoft Excel files on the Lucky Bucks network drive titled "LB Ops Active Contracts Sheet," "Ops Workbook," "Continuity- Feb_Final," and "Weekly Stats."

223.    That same day, Ali also accessed a filed titled "LB Logins & Passwords" that contained various passwords and login credentials for Lucky Bucks' IT systems that Ali had created.

224.    On November 17, 2023, Sayani accessed Microsoft Excel files on the Lucky Bucks network drive titled "LB Logins & Passwords.xlsx," "LB Ops Active Contract Sheet - TK_07052023," "Ops Workbook," "LB Master 03_16_2022_TK," and "Clusters Current."

225.    Sayani attempted to login on a subsequent occasion, but Lucky Bucks' new management had blocked his access by that point.

226.    The files improperly accessed by All and Sayani without authorization from Lucky Bucks contain trade secret and confidential information belonging to Lucky Bucks, including the identities of, and key terms of Lucky Bucks' contracts with, location license holders, *i.e.,* ~~that~~ the dates on which those contracts expire.

227.    The key terms of Lucky Bucks' contracts with location license holders are confidential

trade secret information because those terms are not publicly available through legitimate means and contain information that is commercially valuable within the COAM marketplace.

228.    Of particular importance are the expiration dates for the various location contracts, which vary from contract to contract, because contract expiration is one of the only times that a master license holder can seek to obtain the business of a location without penalty to the location license holder, which must otherwise wait a minimum of nine months before resuming COAM activities with a new master license holder.

229.    The time at which an expiring contract must be terminated before it automatically renews is also critical secret information.

230.    The terms of expiration and expiration dates of Lucky Bucks' location contracts are not publicly available, and they cannot be obtained from GLC using an Open Records Act request.

**H.    Damani, Kassam, Ali, Sayani, Vaswani, Haque, and Howard Breach their Agreements with Lucky Bucks**

231.    Sayani and Haque executed non-compete, non-solicitation, and confidentiality agreements with Lucky Bucks. *{See* **Exhibit M).**

232.    Sayani's agreement provided that:

   a.  Sayani would maintain the confidentiality of Lucky Bucks' confidential and propriety business information; and

   b.  Sayani would not accept other employment, occupation, or consulting activity, nor would he engage in activities that conflicted with his obligations to Lucky Bucks.

233.    Similarly, Hague's agreement stated as follows:

   a.  Hague would not, during his employment or for two years thereafter, solicit Lucky Bucks' employees or customers;

    b.   Hague would maintain the confidentiality of Lucky Bucks' confidential and propriety business information;

    c.   Hague would refrain from interfering with Lucky Bucks' contracts and business relationships, including, but not limited to, Lucky Bucks' customer or client contracts or relationships; and

    d.   Hague would not, either during his employment or for 18 months thereafter, work for, obtain or plan to obtain an interest in, or affiliate with any other COAM business within a defined geographical territory.

234.    Kassam, Howard, Vaswani, and Ali also executed substantially similar non-compete, non-solicitation, and confidentiality agreements with Lucky Bucks, in accordance with Lucky Bucks' standard practice.

235.    However, on information and belief, Defendants either removed all copies of those documents before they resigned, or they instructed other members of the conspiracy to do so after they resigned. As a result, Lucky Bucks does not have copies of the executed versions of their non-compete agreements.

236.    Linares executed an independent contractor agreement with Lucky Bucks, which provided, in relevant part, that he would maintain the confidentiality of Lucky Bucks' confidential and proprietary information, and that misuse of such information would irreparably harm Lucky Bucks.

237.    In 2016, Damani also executed an employment agreement with Lucky Bucks that contained non-compete, non-solicitation, and confidentiality provisions. On information and belief, the non-compete, non-solicitation, and confidentiality terms of that agreement were substantially similar to those contained in Hague's employment agreement.

238.    In 2020, as a part of his settlement with the GLC and Lucky Bucks' former parent

company, Damani entered into a Separation Agreement and General Release (the "Separation Agreement") with Lucky Bucks that became effective on or about May 26, 2020.

239.    Damani's Separation Agreement provided that the terms of his 2016 employment agreement were ratified, reaffirmed, and reincorporated into the Separation Agreement. Further, Exhibit A to the Separation Agreement was a Non-Competition, Non-Solicitation, and Non-Disclosure Agreement that provided that:

    a.   Damani would not, directly or indirectly, compete with Lucky Bucks; and

    b.   Damani would not, directly or indirectly, hire or solicit Lucky Bucks' employees or customers.

240.    By participating in Defendants' conspiracy to loot Lucky Bucks, including through their work for the B-Side business, solicitation of Lucky Bucks' employees and customers, and theft and disclosure of Lucky Bucks' trade secrets, Damani, Kassam, Ali, Sayani, Vaswani, Hague, and Howard each breached their contractual obligations to Lucky Bucks, thereby causing Lucky Bucks substantial harm.

## VI. ~~VI.~~ L I ( ; A L THEORIES

### COUNT I—VIOLATIONS OF GEORGIA'S RICO ACT
### (Against All Defendants)

241.    By undertaking the actions alleged in this Amended Complaint, Defendants, and other unknown members of the conspiracy and criminal enterprise, committed, conspired to commit, and/or attempted to commit the following predicate crimes:

    a.   Theft by Taking, in violation of O.C.G.A. § 16-8-2;

    b.   Theft by Deception, in violation of O.C.G.A. § 16-8-3;

    c.   Theft of Services, in violation of O.C.G.A. § 16-8-5;

    d.   Theft by Receiving Stolen Property, in violation of O.C.G.A. § 16-8-7;

  e. Theft of Trade Secrets, in violation of O.C.G.A. § 16-8-13; and

  f. Use of an Article with an Altered Identification Mark, in violation of O.C.G.A. § 16-9-70(b).

**A. Theft of Trade Secrets (O.C.G.A. § 16-8-13)**

  242. Kassam, Ali, Sayani, Haque, and Vaswani directly and indirectly, stole Lucky Bucks' trade secrets, including customer lists and the expiration dates and renewal terms of location contracts, in order to unfairly compete with Lucky Bucks by exploiting that confidential information to allow the Defendant B-Side businesses to systematically target Lucky Bucks' customers.

  243. Lucky Bucks' trade secret customer lists and contract terms, particularly the renewal terms and expiration dates, are confidential, non-publicly accessible via proper means, and protected via various security measures implemented by Lucky Bucks to ensure that their confidentiality is maintained.

  244. As a result of Kassam, All, Sayani, Haque, and Vaswani's concerted effort to target Lucky Bucks' location contract holders using Lucky Bucks' trade secrets, a disproportionately high number of those locations are now under contract with B-Side businesses, including Klass Amusement, Advance, and Lee Caudell.

  245. On information and belief, the B-Side businesses, including Klass Amusement, Advance, and Lee Caudell, are directly or indirectly controlled by or acting in concert with the individual Defendants.

  246. As examples of Defendants' theft of Lucky Bucks' trade secrets, Ali and Sayani violated O.C.G.A. § 16-8-13 by accessing Lucky Bucks' Office365 and SharePoint accounts without authorization after their employment ended to take Lucky Bucks' trade secrets, including customer lists and confidential location contracts.

   a. After Sayani's termination from Lucky Bucks, he accessed his Lucky Bucks'

Office365 and SharePoint accounts externally. Sayani accessed the following files via Lucky Bucks' SharePoint on November 2, 2023: "OPS Workbook.xlsx" and "LB Ops Active Contract Sheet - TK_07052023 .xlsx."

    b.   Later, on November 17, 2023, Sayani accessed Lucky Bucks' SharePoint account for the following files: ""Clusters Current.xlsx", "OPS Workbook.xlsx", "LB Ops Active Contract Sheet- TK_07052023 .xlsx", "LB Master 03 _16 _2022 _ TK.xlsx", and "LB Logins & Passwords.xlsx".

    c.   On November 6, 2023, Ali accessed Microsoft Excel files on the Lucky Bucks network drive titled "LB Ops Active Contracts Sheet," "Ops Workbook," "Continuity-Feb_Final," and "Weekly Stats."

    d.   That same day, Ali also accessed a ~~filed~~ file titled "LB Logins & Passwords" that contained various passwords and login credentials for Lucky Bucks IT systems that Ali had created.

247. The documents and spreadsheets improperly accessed by Sayani and Ali contain confidential and trade secret lists of Lucky Bucks' location contracts, as well as summaries of key secret contractual terms, including the expiration date of the contracts.

248. Kassam, Ali, Haque, and Vaswani, improperly used the same confidential files and trade secret information to target location contracts for the B-Side businesses, including Georgia Winners, while they were still employed by Lucky Bucks.

**B.    Theft by Taking (O.C.G.A. § 16-8-2)**

249. Smith, Howard, Ali, Kassam, and Sayani committed theft by taking by coordinating,

directing, or otherwise participating in the preparation and distribution of the X Cabinets—COAM machines belonging to Lucky Bucks—and Lucky Bucks' parts and equipment to various entities, including the B-Side businesses.

250.    Once Defendants Smith, Howard, Ali, Kassam, and/or Sayani decided to steal or sell a batch of X Cabinets, Smith, Linares, or Howard would instruct warehouse workers or technicians to strip the machines of anything that could be used to identify it as belonging to Lucky Bucks, including the manufacturers' serial number plates.

251.    Once the X Cabinets had been prepared, they would either be loaded onto trucks for delivery or left in the warehouse for a purchaser or someone else to pick up after hours. Importantly, *Lucky Bucks was not paid for any of the stolen machines,* even if they were "sold" to someone else. Often, Smith or Ali would arrange for Lucky Bucks' equipment to be delivered to a B-Side business.

252.    Many of the X Cabinets were provided to the B-Side businesses, either for free or for compensation paid to the Lucky Bucks ' employees who stole them.

253.    For example, Dinkins, at the direction of either Smith or Howard, would deliver batches of 10 to 20 X Cabinets to someone he perceived as a friend of some of the individual Defendants at a location very nearby the Lucky Bucks warehouse. The warehouses of the B-Side businesses are all very near the Lucky Bucks warehouse.

254.    Beyond those sold or otherwise given away by Defendants, some of the X Cabinets were simply used by Defendants, including Smith, Kassam, Linares, Ali, Howard, and Sayani, for the competing B-Side businesses.

255.    As another example, Stump delivered stolen X-Cabinets to warehouses belonging to Defendant B-Side businesses several times per month. Specifically, Stump delivered stolen X-Cabinets to warehouses belonging to Unique, Prestige, Klass Amusement, AKS, and Dynamic during his initial

employment with Lucky Bucks. He was falsely told that the B-Side business had purchased the stolen X-Cabinets from Lucky Bucks.

256.    As a further example, below are copies of true and correct digital photos of a stolen COAM Machine that was in use by Klass Amusement at a location formerly under contract with Lucky Bucks. Lucky Bucks has no records of ever selling any COAM machines to Klass Amusement or receiving any money for any such machines. The serial number proves that this machine is one that was purchased by Lucky Bucks, but there is no record of Lucky Bucks having sold the machine to Klass Amusement or received any money for such sale. These photos were taken in January 2024.



257.     These are only a sample of pictures that Lucky Bucks has of stolen machines that were in use by B-Side businesses.

258.     The COAM machines in the pictures above were physically taken from Lucky Bucks without any compensation to Lucky Bucks with the intent to deprive Lucky Bucks of the ownership of them. The same is true with respect to the other COAM machines and X-Cabinets referred to throughout this Amended Complaint.

259.     Kassam, Ali, Smith, Howard, and Linares personally directed and orchestrated the

physical theft of these machines from Lucky Bucks.

260.    Similarly, by way of another example, on October 19, 2022, Stump was instructed by Linares to pick up three expensive IGT machines from the Lucky Bucks warehouse and install them at 612 Rockbridge Road SW in Lilbum, Georgia.

261.    That location was previously under contract with Lucky Bucks, and the location contract expired that same month. The location is now under contract with Angel.

262.    Linares instructed Stump to come "straight to me" about the machines he installed for Angel and instructed that Stump should not check the machines out through his Lucky Bucks inventory group. There is no evidence that Angel ever purchased those machines from Lucky Bucks.

263.    As another example, on December 23, 2022, Linares told Stump to drop off at Klass Amusement a blank Lucky Bucks COAM machine that he was told to pick up and not log.

## C.    Theft of Services (O.C.G.A. § 16-8-5)

264.    Linares, Smith, Kassam, Howard, and Ali had multiple technicians, including Stump, Adam Essig, Alex Essig, and Dinkins, do work for, at a minimum, Klass Amusement, Prestige, Dynamic, Unique, Lee Caudell, Peak, AKS, Pinball, and Angel while working on the clock and getting paid by Lucky Bucks.

265.    Linares, Smith, Kassam, Howard, and Ali, through Meyersgold, paid the Lucky Bucks technicians for the work performed for the B-Side businesses.

266.    As an example, on October 6, 2022, Stump clocked into Lucky Bucks, picked up a Lucky Bucks trailer, and picked up gaming machines from Klass Amusement to take to a Klass Amusement customer.

267.    As another example, on November 4, 2022, Linares directed Stump to prioritize a Prestige job over his Lucky Bucks work.

268.    As another example, on November 8, 2022, Linares directed Stump to conduct a Dynamic job using a Lucky Bucks' trailer.

269.    As another example, while working on the clock for Lucky Bucks and being paid by Lucky Bucks, and at the direction of Linares, Smith, and/or Prestige, Stump delivered equipment to Prestige at least 24 times between October 2022 and January 2023.

270.    As another example, while working on the clock for Lucky Bucks and being paid by Lucky Bucks, and at the direction of Smith, Linares, and/or Unique, Stump delivered equipment to Unique at least six times between October 2022 and January 2023.

271.    As another example, while working for Lucky Bucks and being paid on the clock by Lucky Bucks, at the direction of Smith and/or Linares, Stump delivered equipment to Klass Amusement at least three times between October and December 2022.

272.    As another example, in November 2021, Smith asked Adam Essig to work as a technician for the B-Side businesses, including Angel, Dynamic, and Klass Amusement. Until December 2022, Adam Essig worked for the B-Side businesses while being paid by Lucky Bucks.

273.    As another example, Smith, Kassam, and Ali asked Collins to work as a technician for the B-Side businesses. Collins regularly worked for the B-Side businesses while being paid by Lucky Bucks.

274.    As another example, Smith asked Alex Essig to work as a technician for the B-Side businesses, including Angel, Klass Amusement, Unique, Prestige, and Fusion Gaming. While doing work for the B-Side businesses, Alex Essig would be paid by Lucky Bucks.

275.    As another example, in December 2022, Smith asked Dinkins to work with the B-Side businesses.

276.    These are all examples, and the Signal logs contained in Exhibit E and the affidavit itself, contain many other specific examples, by date and time, of Lucky Bucks' employees (including Stump

himself) doing work for the B-Side businesses while being paid by Lucky Bucks.

277.    The Signal logs and affidavits also document that Ali, Howard, Haque, Vaswani, and Linares were doing work for B-Side businesses at the same time as they were being paid for their time by Lucky Bucks.

278.    The Signal logs and affidavits show that every single B-Side Defendant named in this Amended Complaint that has or had a master license obtained services stolen from Lucky Bucks on at least one occasion.

279.    The object of Linares, Smith, Kassam, Howard, and Ali's theft of services was to obtain money. Specifically, many of the employees whose services were stolen desired to obtain money from both Lucky Bucks and from Meyersgold as double payment for their time. The former Lucky Bucks' employees and contractors who are Defendants in this case desired to obtain money from both Lucky Bucks (in the form of their salaries or compensation) and from the B-Side businesses, many of which could not have operated without the services provided by Lucky Bucks' employees and contractors.

**D.    Theft by Receiving Stolen Property (O.C.G.A. § 16-8-7)**

280.    Defendants also committed the crime of theft by receiving stolen property, in violation of O.C.G.A. § 16-8-7.

281.    As an example, at the direction of Linares, Smith, and/or Prestige, Stump delivered Lucky Bucks' equipment to Prestige to which Prestige had no entitlement or right at least 22 times between October 2022 and January 2023.

282.    As another example, at the direction of Smith, Linares, and/or Unique, Stump delivered Lucky Bucks' equipment to Unique to which Unique had no entitlement or right at least six times between October 2022 and January 2023.

283.    As another example, at the direction of Smith and/or Linares, Stump delivered Lucky

Bucks' equipment to Klass Amusement to which Klass Amusement had no entitlement or right at least three times between October and December 2022.

284.    In each of the foregoing instances, Defendants knew or should have known that the Lucky Bucks property at issue was stolen.

285.    The pictures in paragraphs 139, 248, and 283 also show that Angel, Klass Amusement, and Pinball received stolen property, *i.e.,* COAM Machines.

286.    If Defendants did not physically take the COAM Machines from Lucky Bucks such that they are liable for theft by taking, in the alternative, they are liable for theft by receiving stolen property.

287.    By receiving, disposing of, or retaining stolen property which they knew or should have known were stolen, with no intent of restoring that property to Lucky Bucks, Defendants have committed the offense of theft by receiving stolen property, in violation of O.C.G.A. § 16-8-7(b)

**E.    Use of an Article with an Altered Identification Mark (O.C.G.A. § 16-9-70(b))**

288.    Smith, Ali, Kassam, Sayani, and Howard committed the offense of use of an article with an altered identification mark by stripping Lucky Bucks' COAM machines (the X Cabinets) of their identifying markers, including serial numbers, before distributing those machines to the B-Side businesses and other unknown entities.

289.    More specifically, Defendants, including Smith, Ali, Kassam, Sayani, and Howard, would instruct warehouse workers or technicians, including Hazim, Alex Essig and Dinkins, to strip COAM machines of anything that could be used to identify it as belonging to Lucky Bucks, including often removing the manufacturers' serial number plates.

290.    Many of these X Cabinets were delivered to the B-Side businesses, including Unique, Prestige, and Klass Amusement, which had warehouses very near to Lucky Bucks.

291.    For example, below are photos that were taken from a location that was formerly under

contract with Lucky Bucks. The photos depict an X-Cabinet that had the exterior serial number removed, the results of which can be observed in the photos. This particular X-Cabinet bears a label indicating that the master license holder was Pinball, which has master license number 00015123 from the GLC. Although the exterior serial number had been removed, the employees of the location opened the X-Cabinet, which revealed another serial number on the inside that whoever prepared the X-Cabinet had failed to remove. That interior serial number proves that the machine is one that was purchased by Lucky Bucks. Lucky Bucks has no record of the machines having been sold to Pinball, or of Lucky Bucks having received any money for the sale of COAM machines to Pinball. The pictures were taken in January 2024.





292.    By preparing, distributing, and using the X Cabinets, which had their serial numbers removed to hide the fact that those machines properly belonged to Lucky Bucks, Defendants violated O.C.G.A. § 16-9-70(b).

**F.    Theft by Deception (O.C.G.A. § 16-8-3)**

293.    Defendants committed the offense of theft by deception by obtaining property from Lucky Bucks, including master licenses, location license contracts, COAM machines, parts, and equipment, by deceitful or artful means.

294.    As an example, between 2020 and 2022, Kassam, Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS orchestrated purchase and sales of Lucky Bucks' master licenses and location licenses at unfair prices.

    a.    On November 24, 2020, Lucky Bucks as the buyer entered into an APA with Lee Caudell, the seller, to purchase locations for $1,133,508.60.

    b.    Later, on June 17, 2021, Lucky Bucks bought location contracts from Lee Caudell for $8,433,953.57.

    c.    The very next day, Lucky Bucks bought more location contracts from Lee Caudell for $8,166,046.43.

    d.    On January 25, 2021, Lucky Bucks purchased from Lee Caudell location licenses for $3,043,606.46.

    e.    On January 28, 2021, Lucky Bucks purchased a location license from Lee Caudell for $518,000.

    f.    On February 1, 2021, Lucky Bucks sold location contracts to Peak for $300,000.

    g.    Approximately one year later, on March 22, 2022, Peak sold those same

location contracts back to Lucky Bucks for $2,667,125.97, nearly nine times for what Lucky Bucks sold them for.

h.   On March 17, 2021, Lucky Bucks purchased location contracts from AKSfor $390,750.85.

i.   On May 25, 2021, Lucky Bucks sold location contracts to Unique for $979,419.60.

j.   On November 1, 2021, Lucky Bucks purchased location contracts from Klass Amusement for $14,573,620.55.

k.   On February 11, 2022, Lucky Bucks purchased location licenses from Klass Amusement for $2,122,342.73.

295.   In each of the foregoing purchases/sales, Defendants concealed that Defendants were not engaging in an arms' length transaction, but were in fact manipulating Lucky Bucks to enter into commercially disadvantageous agreements via the individual Defendants who were then corrupt managers of Lucky Bucks.

296.   On information and belief, Defendants used deceptive means to manipulate the price that Lucky Bucks would pay for location contracts, including the use of fraudulently increased player numbers to drive up the sale price.

297.   Defendants repeatedly affirmed that the transactions were being entered into in good faith, which Defendants knew was not true at the time the misrepresentations or material omissions were made, with the intent of deceiving Lucky Bucks.

298.   This was precisely what occurred with respect to the Georgia Winners scheme described in paragraphs 91-103 orchestrated by Damani, Kassam, Ali, Haque, Vaswani, Motin, and Chisti, in which Georgia Winners and Blue Georgia were also involved.

299.    Defendants also deceived Lucky Bucks into paying for purported "sponsorships" via Klass Entertainment, which sponsorships were never purchased. On information and belief, Defendants, including Damani, simply pocketed the money.

300.    As an example, on July 14, 2021, in a series of four separate, smaller transactions, Lucky Bucks paid $200,000 to "Klass Entertainment," purportedly for "advertising and marketing." These payments were purportedly for "sponsorships" of various charitable events.

301.    The address for Klass Entertainment is the same one as for the 27th Investment Group, another of Damani's companies. There is no evidence that Klass Entertainment ever provided any marketing or advertising services to Lucky Bucks. Rather, the full amount of the money paid to Klass Entertainment was not used for charitable sponsorships, and the criminal enterprise simply stole $200,000 from Lucky Bucks by transferring it to Klass Entertainment.

302.    There are multiple similar invoices that were submitted to Lucky Bucks and approved by Kassam from Klass entertainment. The invoices were fabrications and not for services or sponsorships actually purchased by Lucky Bucks. On information and belief, Klass Entertainment is beneficially owned or controlled by Damani and Kassam.

303.    In addition, Defendants stole COAM Machines by lying to Lucky Bucks ' employees, such as Stump, Dinkins, and Alex Essig. Specifically, Howard, Smith and Linares falsely told them that the COAM machines had been sold to the B-Side businesses and other individuals when in fact Lucky Bucks did not receive any payment or compensation for them.

Thus, in the alternative to the COAM machines having been physically stolen, they were stolen by deception.

304.    By intentionally creating or confirming Lucky Buck's Bucks' impressions as to existing facts or past events material to the APAs and ownership of COAM machines, which impressions

Defendants knew to be false, Defendants violated O.C.G.A. § 16-8-3.

## G. Defendants Violated Georgia's RICO Act via Their Coordinated Efforts to Steal from Lucky Bucks

305.    Through their coordinated efforts to steal from Lucky Bucks through a pattern of racketeering activity—the commission of the predicate acts described above—Defendants violated O.C.G.A. § 16-14-4(a).

306.    Defendants further violated O.C.G.A. § 16-14-4(a) through their coordinated efforts by obtaining control of Lucky Bucks' COAM operations in Georgia via the corrupt individual Defendants who were also Lucky Bucks managers.

307.    Defendants additionally violated O.C.G.A. § 16-14-4(b) through their association with, and participation in, the criminal enterprise described above, for which the common purpose was to systematically steal from Lucky Bucks for Defendants' benefit.

308.    Defendants also violated O.C.G.A. § 16-14-4(c) by conspiring together to violate the RICO Act in order to steal from Lucky Bucks.

309.    As alleged herein, Linares, Smith, Ali, Howard, Damani, Kassam, and Sayani began this scheme to steal Lucky Bucks' location contracts, money, equipment, property, and employees.

310.    As evidenced by the Signal chats for Angel, Unique, AKS, Klass Amusement, Dynamic, Lee Caudell, Prestige, and Pinball involving individual Linares, Smith, Ali, Howard, Kassam, and Sayani, the coordinated effort to buy and sell Lucky Bucks' location contracts and licenses, it is clear that these Defendants formed an enterprise in fact pursuant to O.C.G.A. § 16-14-3(3) and engaged in theft of trade secrets, theft by taking, theft of services, theft by deception, and theft by receiving stolen property via the methods described above.

311.    Based on the lengths taken by Linares, Smith, Ali, Howard, Kassam, and Sayani via means, including Signal chats, WhatsApp messages, and private conversations, to conceal their theft of

location contracts, licenses, equipment, and services of Lucky Bucks' technicians, the Linares, Smith, Ali, Howard, Kassam, and Sayani worked to steal from Lucky Bucks.

312.    Lucky Bucks is entitled to remedial orders that prevent the individual and entity Defendants from continuing to engage in racketeering activity pursuant to O.C.G.A. §§ 16-14-6(a) and (b).

313.    Between 2020 and 2023, Defendants each participated in the aforementioned acts in furtherance of their enterprise as described herein.

314.    Lucky Bucks is entitled to an award of actual damages, treble damages, punitive damages, and attorneys' fees against Defendants pursuant to O.C.G.A. § 16-14-6(c).

## COUNT II—BREACH OF FIDUCIARY DUTY
### (Against ~~Kassam and~~ Ali)

**A.    ~~Imran Ali~~**

315.    In his role as Lucky Bucks' Director of Operations, Ali was authorized to act on Lucky Bucks' behalf as its agent, in which role he undeniably owed Lucky Bucks fiduciary duties to his employer, Lucky Bucks, under the common law of Georgia, including the duty of loyalty and care.

316.    Ali also owed fiduciary duties to Lucky Bucks as a result of his employment agreement, which required him to maintain the confidentiality of Lucky Bucks' confidential information, and to refrain from competing with Lucky Bucks by working for Lucky Bucks' competitors, such as the B-Side businesses.

317.    Ali violated his fiduciary duties to Lucky Bucks through his participation in Defendants' conspiracy, including:

      a.    arranging for stolen Lucky Bucks equipment to be delivered to B-Side businesses;

      b.    coordinating the sale of location contracts from Georgia Winners to Lucky Bucks at a large markup after those same locations had been stolen from Lucky Bucks;

c.  usurping Lucky Bucks' corporate opportunities for the B-Side businesses;

d.  providing services directly for Lucky Bucks' competitors, in direct contravention to the best interest of Lucky Bucks, including by managing customer relationships for the B-Side businesses; and

e.  accessing Lucky Bucks' computer systems after his employment ended to steal Lucky Bucks' trade secrets for Defendants' use and benefit.

318.  By causing Lucky Bucks to engage in self-dealing transactions that were unfair and detrimental to Lucky Bucks, Ali breached his fiduciary duty of loyalty to Lucky Bucks.

319.  The self-dealing transactions were not entirely fair to Lucky Bucks.

320.  Lucky Bucks has suffered damage as a result of All's breaches of fiduciary duty described above. Accordingly, Lucky Bucks has a right to recover damages from Ali.

**B.      Tony Kassam**

321.    Kassam was employed by Lucky Bucks as its COO—in which role he was ultimately responsible for and controlled every aspect of Lucky Bucks' COAM operations in Georgia—and a member of Lucky Bucks' board of managers until October 11, 2023.

322.    In his role as Lucky Bucks' COO, he was authorized to act on Lucky Bucks' behalf as its agent, in which role he owed Lucky Bucks fiduciary duties, including the duty of loyalty and care.

323.    Kassam breached his duties to Lucky Bucks in multiple ways, including:

    a.    self-dealing distributions funded by saddling Lucky Bucks with massive amounts of debt, which debt ultimately drove the company into bankruptcy;

    b.    while running Lucky Bucks, Kassam facilitated the theft of Lucky Bucks' COAM machines, parts, and labor for the benefit of the competing B-Side businesses;

    c.    facilitating the sale of one of Lucky Bucks' dormant master licenses to Georgia Winners in exchange for a promissory note that was never paid in full;

    d.    coordinating the sale of location contracts from Georgia Winners to Lucky Bucks at a large markup after those same locations had been stolen from Lucky Bucks;

    e.    facilitating the transfer of expiring location contracts to the B-Side businesses by directing Lucky Bucks to file "no dispute" notices with the GLC, which expedited those transfers for the benefit of Lucky Bucks' competitors;

    f.    usurping Lucky Bucks corporate opportunities for the B-Side businesses;

    g.    causing Lucky Bucks to engage in transactions with entities (the B-Side

~~businesses) with which he had an undisclosed economic interest; and~~

~~h.    authorizing the unjustified transfer of dividends to Lucky Bucks' detriment.~~

~~324.    Kassam's role as Lucky Bucks' COO undeniably placed him in the position of acting as Lucky Bucks' agent, in which role he was obligated to operate in a manner that supported Lucky Bucks' interests.~~

~~325.    By causing Lucky Bucks to engage in self-dealing transactions that were unfair and detrimental to Lucky Bucks, Kassam breached his fiduciary duty of loyalty to Lucky Bucks.~~

~~326.    The self-dealing transactions were not entirely fair to Lucky Bucks.~~

~~327.    Kassam breached his fiduciary duty of care by taking actions that he affirmatively knew would be harmful to the interests of Lucky Bucks.~~

~~328.    Lucky Bucks has suffered damage as a result of Kassam's breaches of fiduciary duty described above. Accordingly, Lucky Bucks has a right to recover damages from Kassam.~~

### COUNT III—FRAUD
### (Against Damani, Kassam, Ali, Sayani, Smith, Howard, Linares, Haque, Klass Entertainment, Chisti, and Georgia Winners)

**A.**    ~~A.~~ **Anil Damani**

321.    ~~329.~~Damani made material misrepresentations and omissions in his dealings with Lucky Bucks.

322.    ~~330.~~In 2019, Damani, while he was still running Lucky Bucks, recruited Chisti to "purchase" a dormant master license and establish Georgia Winners as a B-Side business.

323.    ~~331.~~Communications kept by Chisti that were produced in an arbitration show the involvement of Damani, Kassam, Ali, Haque, and Vaswani in the scam.

324.    ~~332.~~Chisti was a straw man, and Georgia Winners was controlled by Damani, Kassam, Ali, Haque, and Vaswani.

325.    ~~333.~~Negotiations for the fraudulent transaction began in spring of 2019 and continued

during the time Damani was being investigated, and later ousted from Lucky Bucks, by the GLC.

326.    334.Chisti was promised 12.5% of revenue for lending his name and good credit to the venture, while the other 87.5% was directed to the criminal conspiracy through Blue Georgia, a shell company set up by Motin (whose alias is Sam Lamosine).

327.    335.Damani caused Lucky Bucks to enter into an agreement to "sell" Georgia Winners a master license.

328.    336.Georgia Winners, under the direction of Damani, never paid for the master license; instead, it provided a $400,000 promissory note at closing. Although Damani assured Chisti he would make payments on that promissory note, payments eventually ceased.

329.    337.Damani fraudulently directed the proceeds paid by Chisti for the purchase of the license to himself or another entity under his control through the promissory note deception.

330.    338.By 2021, Georgia Winners had 6 six location licenses. However, Chisti never sought location licenses, because Damani, Kassam, Ali, Haque, and Vaswani handled the day-to-day operations and payments for Georgia Winners and the solicitation of location licenses.

331.    339.In an APA dated August 6, 2021, Lucky Bucks entered into an asset purchase agreement, orchestrated by Damani, Kassam, Ali, Haque, and Vaswani, whereby Lucky Bucks would pay over $5,000,000 to Georgia Winners.

332.    340.Damani did not disclose that he had a secret economic ownership interest in Georgia Winners.

333.    341.Damani conspired with and aided and abetted the frauds committed by Kassam and Ali against Lucky Bucks.

334.    342.Damani's misrepresentations, omissions, and fraudulent concealment were knowing and intentional.

335. 343.Lucky Bucks relied on Damani's misrepresentations and omissions, which were made through others, to conceal his improper involvement with Georgia Winners' transactions with Lucky Bucks.

336. 344.As a result, Lucky Bucks entered into sham agreements through which it either overpaid, or through which it was underpaid, to Defendants' benefit.

337. 345.Lucky Bucks is entitled to recover damages caused by Damani's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.B.

**B.** **Tony Kassam**

338. 346.Kassam made material misrepresentations and omissions in his role as a manager and officer of Lucky Bucks.

339. 347.Kassam took part in the fraudulent Georgia Winners APA transactions with Damani, Ali, Haque, Vaswani, and Chisti, described above, while running Lucky Bucks.

340. 348.The sales data for these locations were fraudulently inflated by Blue Georgia, the shell company that conspired with Kassam.

341. 349.Kassam, acting in a management capacity for Lucky Bucks at this time, was in possession of the login information and password for Georgia Winners's COAM portal with the GLC.

342. 350.Through this portal, Kassam was able to watch the day-to-day sales and revenue of Georgia Winners.

343. 351.Before the sale to Lucky Bucks, the daily sales of the locations held by Georgia Winners jumped three-fold.

344. 352.In his role running Lucky Bucks, Kassam chose not to examine a glaring red flag, but instead allowed the misrepresentation of the value of the locations. As a result, Lucky Bucks bought those locations at fraudulently inflated prices. He did so knowingly and intentionally, because he had a secret

undisclosed economic interest in Georgia Winners and the other B-Side businesses.

345.    353. Kassam also omitted his involvement in Defendants' conspiracy, including his involvement with the B-Side Defendants, in connection with the submission of "No Dispute" notices.

346.    354. By omitting his involvement and ordering the submission of "No Dispute" notices for locations that wished to end their relationship with Lucky Bucks in favor of the B-Side businesses, Kassam induced Lucky Bucks to allow those locations to switch master license holders early, to Lucky Bucks' detriment.

347.    355. Kassam's material misrepresentations and omissions were knowing and intentional.

348.    356. Lucky Bucks relied on Kassam's material misrepresentations and omissions.

349.    357. Between 2020 and 2022, Kassam, in conjunction with Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement, Advance, and AKS, orchestrated purchase and sales of Lucky Bucks' master licenses and location contracts at unfair prices, including the following examples:

    a.  On November 24, 2020, Lucky Bucks entered into an APA to purchase locations from Lee Caudell for $1,133,508.60.

    b.  Later, on June 17, 2021, Lucky Bucks bought location contracts from Lee Caudell for $8,433,953.57.

    c.  The very next day, Lucky Bucks bought more location contracts from Lee Caudell for $8,166,046.43.

    d.  On January 25, 2021, Lucky Bucks purchased location licenses from Lee Caudell for $3,043,606.46.

    e.  On January 28, 2021, Lucky Bucks purchased a location license from Lee Caudell for $518,000.

    f.  On February 1, 2021, Lucky Bucks sold location contracts to Peak for

$300,000. Approximately one year later, on March 22, 2022, Peak sold those same location contracts back to Lucky Bucks for $2,667,125.97, nearly nine times for what Lucky Bucks sold them for.

g.  On March 17, 2021, Lucky Bucks purchased location contracts from ~~AKSfor~~ AKS for $390,750.85.

h.  On May 25, 2021, Lucky Bucks sold location contracts to Unique for $979,419.60.

i.  On November 1, 2021, Lucky Bucks purchased location contracts from Klass Amusement for $14,573,620.55.

~~j.~~ j.  On February 11, 2022, Lucky Bucks purchased location licenses from Klass Amusement for $2,122,342.73.

350.  ~~358.~~ Lucky Bucks entered into transactions with other entity Defendants and permitted Kassam to remain employed, due to the material misrepresentations and omissions he made, thereby allowing Kassam and the other Defendants to continue stealing from Lucky Bucks.

351.  ~~359.~~ Lucky Bucks also refrained from earlier investigation of Kassam's illegal competition and theft as a result of Kassam's fraudulent concealment of the existence of the B-Side businesses and his relationship to them.

352.  ~~360.~~ Lucky Bucks is entitled to recover damages caused by Kassam's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**C.    Imran Ali**

353.  ~~361.~~ Ali made material misrepresentations and omissions in his dealings with Lucky Bucks.

354.  ~~362.~~ Specifically, Ali, who was an employee of Lucky Bucks, affirmatively represented

that he was an honest employee, when, in fact, he was doing work for the B-Side businesses, including Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, Pinball, and Georgia Winners.

355.    363.As an example, Ali was actively working for Georgia Winners, in coordination with Damani, Kassam, Haque, Vaswani, and Chisti, while he was employed by Lucky Bucks. In connection with his Georgia Winners work, Ali helped to facilitate the sale of location contracts to Lucky Bucks based on fraudulently inflated player numbers.

356.    364.Lucky Bucks relied upon the valuation of these location contracts given All's representations that he was an honest employee and efforts to conceal his involvement with Georgia Winners.

357.    365.Ali also concealed that he and the other Defendants were actively stealing COAM machines from Lucky Bucks for the benefit of the B-Side businesses and other unknown entities.

358.    366.In addition, Ali concealed his involvement in the theft of services racket described above, in which he coordinated the use of Lucky Bucks' technicians, who were on the clock and being paid by Lucky Bucks, to provide services to the B-Side Defendants and other entities using the Signal app.

359.    367.Further, on information and belief, Ali controlled Meyersgold, which was used to pay the technicians for their B-Side work.

360.    368.Ali took other affirmative steps to avoid discovery of his misconduct, such as: communicating via the Signal app; telling technicians who performed work for the B-Side not to disclose his activities to honest Lucky Bucks' employees; and, on information and belief, removing or destroying, or causing the removal or destruction of, his employment agreement.

361.    369.All's material misrepresentations and omissions were knowing and intentional.

362.    370.Lucky Bucks relied on All's material representations that he was an honest employee

of Lucky Bucks, as well as his material omissions concerning his involvement in Defendants' schemes.

363.    ~~371.~~Ultimately, Lucky Bucks entered into transactions with the entity Defendants and permitted Ali to remain employed in reliance on the material misrepresentations and omissions made by him.

364.    ~~372.~~Lucky Bucks also refrained from earlier investigation of Ali's illegal competition and theft as a result of Ali's fraudulent concealment of the existence of the B-Side businesses and his relationship to Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, Pinball, and Georgia Winners.

365.    ~~373.~~Lucky Bucks is entitled to recover damages caused by Ali's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**D.    A1 Amin Sayani**

366.    ~~374.~~Sayani made material misrepresentations and omissions in his dealings with Lucky Bucks.

367.    ~~375.~~Specifically, Sayani, who was an employee of Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for the B-Side businesses and stealing from Lucky Bucks in coordination with other Defendants.

368.    ~~376.~~As an example, Sayani was involved in the ongoing theft of COAM machines and services from Lucky Bucks, which thefts benefited the other Defendants, including Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

369.    ~~377.~~Sayani also took affirmative steps to conceal his affiliation with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball, such as communicating via the Signal app and telling technicians who performed work for the B-Side not to disclose his activities to honest Lucky Bucks' employees.

370. ~~378.~~Sayani's material misrepresentations and omissions were knowing and intentional.

371. ~~379.~~Lucky Bucks relied on All's material misrepresentations and omissions given his repeated representations that he was an honest employee of Lucky Bucks.

372. ~~380.~~Lucky Bucks permitted Sayani to remain employed in reliance on the material misrepresentations and omissions he made, thereby allowing Sayani and the other Defendants to continue stealing from Lucky Bucks.

373. ~~381.~~Lucky Bucks also refrained from earlier investigation of Defendants' illegal competition and theft as a result of Sayani's fraudulent concealment of the existence his relationships with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

374. ~~382.~~Lucky Bucks is entitled to recover damages caused by Sayani's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**E.    Derrick Smith**

375. ~~383.~~Smith made material misrepresentations and omissions in his dealings with Lucky Bucks.

376. ~~384.~~Specifically, Smith, who was an employee of Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for the B-Side businesses and stealing from Lucky Bucks.

377. ~~385.~~As an example, Smith asked Adam Essig to work as a technician for the B-Side businesses, including Angel, Dynamic, and Klass Amusement, to Lucky Bucks' detriment.

378. ~~386.~~Smith also concealed his affiliation with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball by taking affirmative steps to avoid discovery of his misconduct, such as communicating via the Signal app and telling technicians who performed work for the B-Side not to disclose his activities to honest Lucky Bucks' employees.

379. 387.Smith's material misrepresentations and omissions were knowing and intentional.

380. 388.Lucky Bucks relied on Smith's material misrepresentations and omissions given his repeated representations that he was an honest employee of Lucky Bucks.

381. 389.Lucky Bucks permitted Smith to remain employed in reliance on the material misrepresentations and omissions he made, thereby allowing Smith and the other Defendants to continue stealing from Lucky Bucks.

382. 390.Lucky Bucks also refrained from earlier investigation of Smith's illegal competition and theft as a result of Smith's fraudulent concealment of his relationships with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

383. 391.Lucky Bucks is entitled to recover damages caused by Smith's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**F.    Jonathan Howard**

384. 392.Howard made material misrepresentations and concealed material facts in his dealings with Lucky Bucks.

385. 393.Specifically, Howard, affirmatively represented that he was an honest employee, when, in fact, he was doing work for the B-Side businesses and stealing from Lucky Bucks.

386. 394.Additionally, Howard concealed his affiliation with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball. Howard also took affirmative steps to avoid discovery of his misconduct, such as communicating via the Signal app and telling technicians who performed work for the B-Side not to disclose his activities to honest Lucky Bucks ' employees.

387. 395.Howard's material misrepresentations and omissions were knowing and intentional.

388. 396.Lucky Bucks relied on Howard's material misrepresentations and omissions given his repeated representations that he was an honest employee of Lucky Bucks.

389. ~~397.~~Lucky Bucks permitted Howard to remain employed in reliance on the material misrepresentations and omissions he made, thereby allowing Howard and the other Defendants to continue stealing from Lucky Bucks.

390. ~~398.~~Lucky Bucks also refrained from earlier investigation of Defendants' illegal competition and theft as a result of Howard's fraudulent concealment of the existence of his work for the B-Side business, specifically, Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

391. ~~399.~~Lucky Bucks is entitled to recover damages caused by Howard's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

## G.    Arnaldo "Johnathan Linares" Perez

392. ~~400.~~Linares made material misrepresentations and concealed material facts in his dealings with Lucky Bucks.

393. ~~401.~~Specifically, Linares, who was a contractor for Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for the B-Side businesses and stealing from Lucky Bucks.

394. ~~402.~~Linares also concealed his affiliation with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball, and took other affirmative steps to avoid discovery of his misconduct, such as communicating via the Signal app.

395. ~~403.~~Linares' material misrepresentations and omissions were knowing and intentional.

396. ~~404.~~Lucky Bucks relied on Linares' material misrepresentations and omissions given his repeated representations that he was an honest contractor for Lucky Bucks.

397. ~~405.~~Lucky Bucks permitted Linares to remain employed in reliance on the material misrepresentations and omissions he made, thereby allowing Linares and the other Defendants to continue

stealing from Lucky Bucks.

398. ~~406.~~Lucky Bucks also refrained from earlier investigation of Defendants' illegal competition and theft as a result of Linares' fraudulent concealment of the existence of his relationship to Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

399. ~~407.~~Lucky Bucks is entitled to recover damages caused by Linares' fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

## H.    Shakeel Haque

400. ~~408.~~Haque made material misrepresentations and concealed material facts in his dealings with Lucky Bucks.

401. ~~409.~~Specifically, Haque, who was an employee of Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for Defendants and stealing from Lucky Bucks.

402. ~~410.~~Haque also concealed his affiliation with Angel, Dynamic, Unique, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, Pinball, and Georgia Winners, and took other affirmative steps to avoid discovery of his misconduct, such as communicating via the Signal app and telling technicians who performed work for the B-Side to not disclose his activities to honest Lucky Bucks' employees.

403. ~~411.~~Kassam, Ali, Haque and Vaswani also took part in a scheme where they collectively helped cause Georgia Winners and Lucky Bucks to enter into an APA whereby Georgia Winners sold three of the locations back to Lucky Bucks in exchange for $5,654,007.18, which amount was vastly inflated. Indeed, after Lucky Bucks purchased the location contracts, they dramatically underperformed what had been represented as their monthly revenue despite no significant changes to the locations.

404. ~~412.~~Haque's material misrepresentations and omissions were knowing and intentional.

405. ~~413.~~Lucky Bucks relied on ~~Haque's~~ Hague's material misrepresentations and omissions

given his repeated representations that he was an honest contractor for Lucky Bucks.

406. 414.Lucky Bucks permitted Haque Hague to remain employed in reliance on the material misrepresentations and omissions he made, thereby allowing Haque Hague and the other Defendants to continue stealing from Lucky Bucks.

407. 415.Lucky Bucks also refrained from earlier investigation of Defendants' illegal competition and theft as a result of Linares' fraudulent concealment of the existence of his relationship to Angel, Dynamic, UniqueUnigue, AKS, Advance, Klass Amusement, Prestige, Lee Caudell, and Pinball.

408. 416.Lucky Bucks is entitled to recover damages caused by Haque's Hague's fraud pursuant to

**0.**  C.G.A. § 51-6-1 and the common law of Georgia.

**1.    Anand Vaswani**

409. 417.Vaswani made material misrepresentations and concealed material facts in his dealings with Lucky Bucks.

410. 418.Specifically, Vaswani, who was an employee of Lucky Bucks, affirmatively represented that he was an honest employee, when, in fact, he was doing work for Defendants and stealing from Lucky Bucks.

411. 419.Vaswani also concealed his affiliation with Georgia Winners and took other affirmative steps to avoid discovery of his misconduct, such as communicating via the Signal app with Chisti, who believed Haque Hague was acting as a representative of Lucky Bucks based on Haque's Hague's representations.

412. 420.Vaswani took part in the Georgia Winners scheme detailed above and was in charge of directing Chisti on exactly what he needed to do.

413. 421.Vaswani ran the back-office operations for Georgia Winners while operating as a

sales representative for Lucky Bucks.

414. 422. Further, Vaswani maneuvered Chisti and directed him on how to fill out official forms required by the GLC, and even the company's W-9.

415. 423. Vaswani also started Blue Georgia, along with Motin, and managed its accounting and payments. Blue Georgia received 87.5% of the profits from Georgia Winners, which Vaswani was silently running. Vaswani also controlled the bank account for Blue Georgia.

416. 424. While working for Lucky Bucks, and under a non-compete and non-solicitation agreement, Vaswani used Blue Georgia to bring locations to Georgia Winners.

417. 425. While employed by Lucky Bucks, Vaswani signed the original location contracts for Georgia Winners in 2019, which were eventually sold to Lucky Bucks in 2021 at a falsely inflated rate.

418. 426. Vaswani's material misrepresentations and omissions were knowing and intentional.

419. 427. Lucky Bucks relied upon the valuation of these location contracts given Vaswani's affirmative representations that he was an honest employee, as well as his efforts to conceal his involvement in the APAs with Georgia Winners.

420. 428. As a result, Lucky Bucks was harmed because Lucky Bucks paid more for the locations based on the fraudulently inflated numbers.

421. 429. Lucky Bucks is entitled to recover damages caused by Vaswani's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**J. Klass Entertainment**

422. 430. Klass Entertainment made material misrepresentations and omissions in its dealings with Lucky Bucks.

423. 431. As an example, on July 14, 2021, in a series of four separate, smaller transactions, Lucky Bucks paid $200,000 to "Klass Entertainment," purportedly for "advertising and marketing." These

payments were allegedly for "sponsorships" of various charitable events.

424. ~~432.~~As an example, one of the alleged sponsorships was for the "Rahul Deshpande Recital" in August 2019 that was coordinated by Para Share LLC, which coordinates in person shows and tours. On August 1, 2019, Klass Entertainment issued a $45,000 invoice to Lucky Bucks for a "Gold package" sponsorship for that event.

425. ~~433.~~However, Harshad Parashare, Para Share's founder and CEO, did not recall ever receiving a sponsorship of $10,000 or more in connection with a Para Share event, let alone the $45,000 for which Klass Entertainment invoiced Lucky Bucks on August 1, 2019.

426. ~~434.~~Further, Parashare reviewed Para Share ~~EEC's~~ LLC's accounting records back through its inception, which did not reflect that any money was paid by, or received from, Lucky Bucks, Klass Entertainment, or any of the named Defendants.

427. ~~435.~~On information and belief, all of the other "sponsorship" invoices submitted by Klass Entertainment to Lucky Bucks were false and fraudulent.

428. ~~436.~~In issuing sham invoices to Lucky Bucks for such purported sponsorships, Klass Entertainment made material misrepresentations to Lucky Bucks.

429. ~~437.~~Lucky Bucks relied on those misrepresentations because it had no reason to suspect that Klass Entertainment would not provide the funds to the respective events for which Lucky Bucks had purchased sponsorships.

430. ~~438.Asa~~ As a result, Lucky Bucks was harmed because Lucky Bucks received nothing as a result of the sham sponsorships.

431. ~~439.~~Lucky Bucks is entitled to recover damages caused by Klass Entertainment's fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

**K.      Mohammad Chisti and Georgia Winners**

432.    ~~440.~~Chisti and Georgia Winners, made material misrepresentations and omissions in their dealings with Lucky Bucks.

433.    ~~441.~~In 2019, Damani, while he was still running Lucky Bucks, recruited Chisti to "purchase" a dormant master license and establish Georgia Winners as a B-Side business.

434.    ~~442.~~Communications kept by Chisti that were produced in an arbitration show the involvement of Damani, Kassam, Ali, Haque, and Vaswani in the scam.

435.    ~~443.~~In reality, Chisti was a straw man, and Georgia Winners was controlled by Damani, Kassam, Ali, Haque, and Vaswani.

436.    ~~444.~~Negotiations for the fraudulent transaction began in spring of 2019 and continued during the time Damani was being investigated, and later ousted from Lucky Bucks, by the GLC.

437.    ~~445.~~Chisti was promised 12.5% of revenue for lending his name and good credit to the venture, while the other 87.5% was directed to the criminal conspiracy through Blue Georgia, a shell company set up by Motin.

438.    ~~446.~~Chisti affirmatively represented that he was in charge of Georgia Winners by holding himself out as Georgia Winners' owner, in which role he signed blank checks that would then be used by Damani, Kassam, Ali, Haque, and Vaswani. Chisti also executed agreements on behalf of Georgia Winners, including APAs with Lucky Bucks.

439.    ~~447.~~Damani caused Lucky Bucks to enter into an agreement to "sell" Georgia Winners a master license, which sale required Chisti's participation as Georgia Winners' signatory.

440.    ~~448.~~Georgia Winners, under the direction of Damani, never paid for the master license; instead, it provided a $400,000 promissory note at closing. Although Damani assured Chisti he would make payments on that promissory note, payments eventually ceased.

441.    449.By 2021, Georgia Winners had 6 six location licenses. However, Chisti never sought location licenses, because Damani, Kassam, Ali, Haque, and Vaswani handled the day-to-day operations and payments for Georgia Winners and the solicitation of location licenses.

442.    450.On August 6, 2021, Lucky Bucks entered into an APA with Georgia Winners, orchestrated by Damani, Kassam, Ali, Haque, and Vaswani, whereby Lucky Bucks would pay over $5,000,000 to Georgia Winners. Chisti executed that APA on behalf of Georgia Winners.

443.    451.Chisti's and Georgia Winners' misrepresentations, omissions, and fraudulent concealment were knowing and intentional.

444.    452.Lucky Bucks relied on Chisti's and Georgia Winners' misrepresentations and omissions, which were made through others to conceal the improper involvement of Damani, Kassam, Ali, Haque, and Vaswani.

445.    453.As a result, Lucky Bucks entered into sham agreements with Georgia Winners through which it either overpaid, or through which it was underpaid, to Defendants' benefit.

446.    454.Lucky Bucks is entitled to recover damages caused by Chisti's and Georgia Winners' fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

## COUNT IV—COMPUTER THEFT (O.C.G.A. § 16-9-93(a))
## (Against Savani and Ali)

447.    455.In November 2023, Sayani and Ali each committed the offense of computer theft by accessing Lucky Bucks' computer network with knowledge that such use was without authority and with the intention of taking Lucky Bucks' property and using that property for Defendants' benefit.

448.    456.Specifically, on November 17, 2023, Sayani accessed Microsoft Excel files on the Lucky Bucks network drive titled "LB Logins & Passwords.xlsx," "LB Ops Active Contract Sheet - TK_07052023," "Ops Workbook," "LB Master 03_16_2022_TK," and "Clusters Current."

449.    457.Sayani attempted to login log in on a subsequent occasion, but Lucky Bucks' new

management had blocked his access by that point.

450. 458.As for Ali, on November 6, 2023, he accessed Microsoft Excel files on the Lucky Bucks network drive titled "LB Ops Active Contracts Sheet," "Ops Workbook," "Continuity- Feb_Final," and "Weekly Stats."

451. 459.That same day, Ali also accessed a filed file titled "LB Logins & Passwords" that contained various passwords and login credentials for Lucky Bucks IT systems that Ali had created.

452. 460.Sayani's and All's employment with Lucky Bucks had ended—and with it their authorization to access Lucky Bucks' computer system—prior to November 2023.

453. 461.During Sayani's and All's unauthorized access of Lucky Bucks' computer system, they accessed files that disclose the identity and terms of Lucky Bucks' contracts with individual location license holders, in addition to other files that would be useful for the competing B-Side businesses, such as route clusters.

454. 462.Sayani's and All's unauthorized access has caused damage to Lucky Bucks by forcing it to spend money on, *inter alia,* security audits and other protective measures.

455. 463.Further, on information and belief, Defendants have continued to use the confidential information contained in the files accessed by Sayani and Ali to unfairly compete with Lucky Bucks, including with respect to Lucky Bucks' location contracts, for Defendants' benefit.

456. 464.Lucky Bucks is entitled to recover the damages caused by Sayani's and All's unauthorized access pursuant to O.C.G.A. § 16-9-93(g).

## COUNT V—BREACH OF CONTRACT
**(Against ~~Daniani~~Damani, ~~ ~~Kassam, ~~Ali~~All, ~~Sayani~~ Savani, Smith, Howard, Linares, Hague, and Vaswani)**

457. 465.Sayani and Haque executed non-compete, non-solicitation, and confidentiality agreements with Lucky Bucks.

458. 466. Sayani's agreement provided that:

a.  Sayani would maintain the confidentiality of Lucky Bucks confidential and propriety business information; and

b.  Sayani would not accept other employment, occupation, or consulting activity, nor would he engage in activities that conflicted with his obligations to Lucky Bucks.

459. 467. Similarly, Hague's Haque's agreement stated as follows:

a.  Hague Haque would not, during his employment or for two years thereafter, solicit Lucky Bucks ' employees or customers;

b.  Hague Haque would maintain the confidentiality of Lucky Bucks confidential and propriety business information;

c.  Hague Haque would refrain from interfering with Lucky Bucks' contracts and business relationships, including, but not limited to, Lucky Bucks' customer or client contracts or relationships; and

d.  Hague Haque would not, either during his employment or for 18 months thereafter, work for, obtain or plan to obtain an interest in, or affiliate with any other COAM business within a defined geographical territory.

460. 468. Kassam, Ali, Howard, Vaswani also executed substantially similar non-compete, non-solicitation, and confidentiality agreements with Lucky Bucks, in accordance with Lucky Bucks' standard practice. However, on information and belief, Defendants either removed all copies of those documents before Kassam, Howard, Vaswani, and Ali resigned, or they instructed other members of the conspiracy to do so.

461. 469. Linares executed an independent contractor agreement with Lucky Bucks, which

provided, in relevant part, that he would maintain the confidentiality of Lucky Bucks' confidential and proprietary information, and that misuse of such information would irreparably harm Lucky Bucks.

462. 470. By participating in Defendants' conspiracy, including with respect to the theft of Lucky Bucks' trade secrets, the solicitation of Lucky Bucks's customers using Lucky Bucks' confidential information, the solicitation of Lucky Bucks' employees to perform work for the B-Side businesses, the work performed for the competing B-Side businesses, and the theft of Lucky Bucks' location contracts, COAM machines, parts, and equipment, Kassam, Ali, Sayani, Smith, Howard, Linares, Haque, Vaswani, and Damani each breached their agreements with Lucky Bucks.

463. 471. Asa As a result of those breaches, Lucky Bucks has been substantially harmed.

464. 472. The breaches of contract described by each of the Lucky Bucks above have damaged, and, unless enjoined, will continue to damage the Lucky Bucks. Lucky Bucks is also entitled to recover damages caused by the foregoing breaches.

**COUNT VI—FRAUDULENT TRANSFERS**
**(Against Damani and Kassam)**

473.    Under the Georgia Uniform Voidable Transactions Act, O.C.G.A. §§ 18-2-74 *et seq.* (the "UVTA"), Lucky Bucks and its creditors (who now own Lucky Bucks) may avoid any transfer of an interest in property or the incurrence of an obligation that was made with the intent to hinder, delay, or defraud creditors.

474.    In 2021, Lucky Bucks entered into a senior secured credit facility in the aggregate amount of approximately $535,000,000, which was increased to $610,000,000 in October 2021.

475.    Prior to incurring obligations under these credit facilities, Lucky Bucks disclosed that a substantial portion of the proceeds of the debt would be used to fund distributions to shareholders, including Damani and Kassam.

476.    On information and belief, Damani coordinated with Kassam, who was then running Lucky Bucks as COO and a member of the holding company's board, and others to use the proceeds therefrom to fund dividend distributions.

477.    In July 2021, Lucky Bucks issued a cash dividend of approximately $200,000,000 to Lucky Bucks' shareholders with the proceeds of the financings, rather than net earnings.

478.    Of that amount, more than $50,000,000 was distributed to Damani, and more than $500,000 was distributed to Kassam, an insider for the purposes of the UVTA.

479.    By 2022, Lucky Bucks and its affiliates had taken on hundreds of millions of dollars' worth of debt, substantial portions of which were used improperly to fund the massive distributions, which should only have been issued from Lucky Bucks' net earnings, not debt.

480.    By the end of 2022, Lucky Bucks owed its creditors over $500,000,000, which debts were impossible to repay.

481.    In conjunction with other members of the HoldCo board of managers and recipients of the 2021 Dividend, Damani and Kassam acted with actual intent to hinder, delay, or defraud creditors by saddling Lucky Bucks with debts that it could not hope to repay, thereby rendering Lucky Bucks insolvent and forcing it into bankruptcy.

482.    Lucky Bucks is entitled to a judgment against Damani and Kassam in the amount of the value that they each received, directly or indirectly, and any other payments, profits, fees, benefits, incentives, and other compensation that they received, directly or indirectly, in connection with the 2021 Dividend.

**COUNT VII—IMPROPER DIVIDENDS**
**(Against Kassam)**

483.    On July 30, 2021, Lucky Bucks entered into a senior secured credit agreement in the aggregate amount of approximately $535,000,000.

484.    That senior secured credit agreement included both a $35,000,000 revolving credit facility due 2026, and a $500,000,000 firstdien term loan due 2027. The term loan was used to refinance certain existing obligations, as well as to fund a $200,000,000 distribution to aligned shareholders, including Kassam.

485.    In July 2021, Lucky Bucks issued a cash dividend of approximately $200,000,000 to Lucky Bucks's shareholders with the debt proceeds. Of that amount, more than $50,000,000 was distributed to Damani, and more than $500,000 to Kassam, who was running Lucky Bucks' COAM operations at this time as COO.

486.    The 2021 Dividend was issued in violation of O.C.G.A. § 14-4-65 because it was not declared or distributed from Lucky Bucks' actual legitimate net earnings but was instead funded by new debt.

487.    Kassam is liable to Lucky Bucks for the double the amount of the illegal dividend because he was an officer and manager responsible for the declaration of the 2021 Dividend.

**COUNT IX—ATTORNEY'S COUNT VI—ATTORNEY'S FEES PURSUANT TO O.C.G.A. § 13-6-11**
**(Against All Defendants)**

465.    488.As their conduct described above shows, Defendants have acted in bad faith and have caused Lucky Bucks to incur unnecessary trouble and expense within the meaning of O.C.G.A. § 13-6-11.

466.    489.Accordingly, Defendants are liable to Lucky Bucks for its attorneys' fees and costs of litigation.

**COUNT X—PUNITIVE VII—PUNITIVE DAMAGES**
**(Against All Defendants)**

467.    490.Defendants acted with a specific intent to cause harm to Lucky Bucks when undertaking the tortious conduct described above.

468.    491.Defendant's Defendants' actions constitute willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

469.    492.Lucky Bucks is entitled to an award of punitive damages against Defendants in an amount to be determined at trial.

**DEMAND FOR RELIEF**

Lucky Bucks demands that the Court:

i.      Grant a trial by jury on all claims so triable;

ii.     Order Defendants to return all property in their possession that was stolen from Lucky Bucks, including but not limited to, COAM machines, parts, location contracts, and equipment, pursuant to O.C.G.A. § 16-4-6(a)(l);

iii.    Order that the individual Defendants be permanently forbidden from participating in the COAM business in Georgia, either directly or indirectly through agents, entities, or strawmen, pursuant to O.C.G.A. § 16-4-6(a)(2);

iv.     Revoke all Class B COAM master licenses issued by the GLC to any entity

controlled by Defendants pursuant to O.C.G.A. § 16-4-6(a)(4);

    v.    Revoke the corporate charters of all entities that Defendants organized under the laws of this state, pursuant to O.C.G.A. § 16-4-6(a)(5);

    vi.    Order Defendants to pay Lucky Bucks compensatory, exemplary, treble and punitive damages in an amount to be determined at trial;

    vii.    Order Defendants to pay Lucky Bucks' attorneys' fees, costs, and expenses of litigation, pursuant to O.C.G.A. § 13-6-11 and O.C.G.A. § 16-4-6(c); and

~~viii.    Order Defendants Damani and Kassam to return their improper dividends; and~~

viii.    ~~ix.~~Order any and all other relief as the Court deems just and proper.

Respectfully submitted, this ~~23rd~~ 5th day of ~~October 2024~~June, 2025.

*/s/ Joshua Mayes* Ryan Teague Georgia Bar No. 701321 rteague@robbinsfirm.com Joshua Mayes Georgia Bar No. 143107 j may ~~es@robbinsfinn~~es@robbinsfirm. com Carey A. Miller Georgia Bar No. 976240 cmiller@robbinsfirm. com Chuck Boring Georgia Bar No. 065131 cboring@robbinsfirm. com Michael D. Forrest Georgia Bar No. 974300 mforrest@robbinsfirm.com Macy McFall Georgia Bar No. 411457 mmcfall@robbinsfirm. com Fanny Chac
Georgia Bar No. 175192
fchac@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318 Telephone: (678) 701-9381 Facsimile: (404) 856-3255

*Counsel for Arc Gaming and Technologies, LLC f/k/a Lucky Bucks, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed Plaintiffs ~~**FIRST**~~ **SECOND AMENDED COMPLAINT**

with the Clerk of Court using the Court's e-file system, which will automatically provide electronic

notification of the same to all counsel of record.

Respectfully submitted, this ~~23rd~~ 5th day of ~~October 2024~~ June, 2025.

_/s/ Joshua Mayes_ Joshua

Mayes Georgia Bar No.

143107

*Counsel for Arc Gaming and Technologies, LLC*
*f/k/a Lucky Bucks, LLC*

| Summary Report | |
|---|---|
| Title | **compareDocs Comparison Results** |
| Date & Time | 6/5/2025 9:59:31 AM |
| Comparison Time | 7.84 seconds |
| compareDocs version | v5.1.900.2 |

| Sources | |
|---|---|
| Original Document | 2024.10.23 - Amended Complaint - 24CV000131 4873-0773-9891 v.1.pdf |
| Modified Document | Arc Gaming - Second Amended Complaint.pdf |

| Comparison Statistics | |
|---|---|
| Insertions | 16 |
| Deletions | 18 |
| Changes | 249 |
| Moves | 0 |
| Font Changes | 0 |
| Paragraph Style Changes | 0 |
| Character Style Changes | 0 |
| TOTAL CHANGES | 283 |
| | |
| | |
| | |

| Word Rendering Set Markup Options | |
|---|---|
| Name | Standard |
| Insertions | |
| Deletions | |
| Moves / Moves | |
| Font Changes | |
| Paragraph Style Changes | |
| Character Style Changes | |
| Inserted cells | |
| Deleted cells | |
| Merged cells | |
| Changed lines | Mark left border. |

| compareDocs Settings Used | Category | Option Selected |
|---|---|---|
| Open Comparison Report after saving | General | Always |
| Report Type | Word | Redline |
| Character Level | Word | False |
| Include Comments | Word | False |
| Include Field Codes | Word | True |
| Flatten Field Codes | Word | False |
| Include Footnotes / Endnotes | Word | True |
| Include Headers / Footers | Word | True |
| Image compare mode | Word | Insert/Delete |
| Include List Numbers | Word | True |
| Include Quotation Marks | Word | False |
| Show Moves | Word | True |
| Include Tables | Word | True |
| Include Text Boxes | Word | True |
| Show Reviewing Pane | Word | True |
| Summary Report | Word | End |
| Detail Report | Word | Separate (View Only) |
| Document View | Word | Print |

**C:\Users\randerson\OneDrive - Robbins Firm\Documents\2024.10.23 - Amended Complaint - 24CV000131 4873-0773-9891 v.1.pdf (compared to C:\Users\randerson\OneDrive - Robbins Firm\Documents\Arc Gaming - Second Amended Complaint.pdf)**
Done by compareDocs - 6/5/2025 9:59:31 AM

**Main document changes**

**Change #1 - Deleted**

Fulton County Superior Court ***EFILED***PM Date: 10/23/2024 6:12 PM Che Alexander, Clerk

**Change #2 - Changed**

"EEC " changed to "LLC "

**Change #3 - Changed**

"EEC" changed to "LLC"

**Change #4 - Deleted**

CIVIL ACTION FILEv- NO. 24cv000131

**Change #5 - Inserted**

v.

**Change #6 - Inserted**

CIVIL ACTION FILE NO. 24CV000131

**Change #7 - Changed**

"EEC" changed to "LLC"

**Change #8 - Changed**

"EEC" changed to "LLC"

**Change #9 - Changed**

"EEC" changed to "LLC"

**Change #10 - Changed**

"EEC" changed to "LLC"

**Change #11 - Changed**

"EEC" changed to "LLC"

**Change #12 - Changed**

"EEC" changed to "LLC"

**Change #13 - Changed**

"EEC" changed to "LLC"

**Change #14 - Changed**

"EEC " changed to "LLC "

**Change #15 - Changed**

"EEC" changed to "LLC"

**Change #16 - Changed**

"EEC" changed to "LLC"

**Change #17 - Changed**

"EEC" changed to "LLC"

**Change #18 - Changed**

"FIRST " changed to "SECOND "

**Change #19 - Deleted**

emergency

**Change #20 - Changed**

" " changed to "' "

**Change #21 - Deleted**

the return of fraudulent and illegal dividends distributed by Lucky Bucks;

**Change #22 - Changed**

", " changed to " "

**Change #23 - Deleted**

Kassam was the direct recipient of over $500,000 of distributions from Lucky Bucks while he managed the Company.

**Change #24 - Changed**

" " changed to "' "

**Change #25 - Changed**

" " changed to "' "

**Change #26 - Changed**

"Dekalb " changed to "DeKalb "

**Change #27 - Changed**

" " changed to "' "

**Change #28 - Changed**

" " changed to "' "

**Change #29 - Changed**

"Ali " changed to "All "

**Change #30 - Deleted**

20.

**Change #31 - Inserted**

20.

**Change #32 - Changed**

"30300" changed to "30309"

**Change #33 - Changed**

"30300" changed to "30309"

**Change #34 - Changed**

"Magua " changed to "Magna "

**Change #35 - Inserted**

of

**Change #36 - Inserted**

of

**Change #37 - Changed**

"James " changed to "Janies "

**Change #38 - Inserted**

a

**Change #39 - Changed**

"Mosher " changed to "Hall "

**Change #40 - Changed**

" " changed to "' "

**Change #41 - Changed**

"CQAM " changed to "COAM "

## Change #42 - Deleted
that

## Change #43 - Changed
"6 " changed to "six "

## Change #44 - Changed
", " changed to " "

## Change #45 - Inserted
had

## Change #46 - Changed
"purported " changed to "purportedly "

## Change #47 - Changed
" " changed to "' "

## Change #48 - Changed
" " changed to "' "

## Change #49 - Changed
"2 " changed to "two "

## Change #50 - Changed
" " changed to "' "

## Change #51 - Changed
"AKSfor " changed to "AKS for "

## Change #52 - Changed
" " changed to "' "

## Change #53 - Changed
" " changed to "' "

## Change #54 - Deleted
DetailsI*pick up 3 SEis(green, red and orange)Need to add 944 locks on them for out door. 331 dongle n of initeverything else to get full install done return all of the left decals to me. should be 20 decals backOct 19, 2022 14:46:58but first come see meOd 19, 2022 14:47:071 Alex StumpShouldn't 1 drop off this machine atAA first?straight to meOct19, 2022 14:47:28Can doOct 19,202214:4713 {Q

## Change #55 - Deleted

Check machines out through LB's supply group, right?Oct 19,2022 15:18:14 COAlso, should I stop by omegato pick up more modem cablesOct 19,202215:18:50 <0

## Change #56 - Inserted

Also, should I stop by omegato pick up more modem cablesOct 19,202215:18:50 <0

## Change #57 - Inserted

Check machines out through LB's supply group, right?Oct 19,2022 15:18:14 CO

## Change #58 - Inserted

Can doOct 19,202214:4713 {Q

## Change #59 - Inserted

Oct 19, 2022 14:46:58but first come see meOd 19, 2022 14:47:071 Alex StumpShouldn't 1 drop off this machine atAA first?straight to meOct19, 2022 14:47:28

## Change #60 - Inserted

pick up 3 SEis(green, red and orange)Need to add 944 locks on them for out door. 331 dongle n of initeverything else to get full install done return all of the left decals to me. should be 20 decals back

## Change #61 - Inserted

I*

## Change #62 - Inserted

Details

## Change #63 - Changed

" " changed to "` "

## Change #64 - Changed

" " changed to "` "

## Change #65 - Changed

" " changed to "` "

## Change #66 - Changed

" " changed to "` "

## Change #67 - Changed

" " changed to "` "

**Change #68 - Changed**

" " changed to "' "

**Change #69 - Changed**

" " changed to "' "

**Change #70 - Changed**

"breaks " changed to "brakes "

**Change #71 - Changed**

" " changed to "' "

**Change #72 - Changed**

" " changed to "' "

**Change #73 - Changed**

"that " changed to "the "

**Change #74 - Deleted**

vi.

**Change #75 - Changed**

"filed " changed to "file "

**Change #76 - Changed**

" " changed to "' "

**Change #77 - Changed**

" " changed to "' "

**Change #78 - Changed**

" " changed to "' "

**Change #79 - Changed**

" " changed to "' "

**Change #80 - Changed**

" " changed to "' "

**Change #81 - Changed**

"Buck's " changed to "Bucks' "

**Change #82 - Deleted**

Kassam and

**Change #83 - Deleted**

A. Imran Ali

**Change #84 - Changed**

" " changed to "' "

**Change #85 - Deleted**

B. Tony Kassam321. Kassam was employed by Lucky Bucks as its COO—in which role he was ultimately responsible for and controlled every aspect of Lucky Bucks' COAM operations in Georgia—and a member of Lucky Bucks' board of managers until October 11, 2023.322. In his role as Lucky Bucks' COO, he was authorized to act on Lucky Bucks' behalf as its agent, in which role he owed Lucky Bucks fiduciary duties, including the duty of loyalty and care.323. Kassam breached his duties to Lucky Bucks in multiple ways, including:a. self-dealing distributions funded by saddling Lucky Bucks with massive amounts of debt, which debt ultimately drove the company into bankruptcy;b. while running Lucky Bucks, Kassam facilitated the theft of Lucky Bucks' COAM machines, parts, and labor for the benefit of the competing B-Side businesses;c. facilitating the sale of one of Lucky Bucks' dormant master licenses to Georgia Winners in exchange for a promissory note that was never paid in full;d. coordinating the sale of location contracts from Georgia Winners to Lucky Bucks at a large markup after those same locations had been stolen from Lucky Bucks;e. facilitating the transfer of expiring location contracts to the B-Side businesses by directing Lucky Bucks to file "no dispute" notices with the GLC, which expedited those transfers for the benefit of Lucky Bucks' competitors;f. usurping Lucky Bucks corporate opportunities for the B-Side businesses;g. causing Lucky Bucks to engage in transactions with entities (the B-Side businesses) with which he had an undisclosed economic interest; andh. authorizing the unjustified transfer of dividends to Lucky Bucks' detriment.324. Kassam's role as Lucky Bucks' COO undeniably placed him in the position of acting as Lucky Bucks' agent, in which role he was obligated to operate in a manner that supported Lucky Bucks' interests.325. By causing Lucky Bucks to engage in self-dealing transactions that were unfair and detrimental to Lucky Bucks, Kassam breached his fiduciary duty of loyalty to Lucky Bucks.326. The self-dealing transactions were not entirely fair to Lucky Bucks.327. Kassam breached his fiduciary duty of care by taking actions that he affirmatively knew would be harmful to the interests of Lucky Bucks.328. Lucky Bucks has suffered damage as a result of Kassam's breaches of fiduciary duty described above. Accordingly, Lucky Bucks has a right to recover damages from Kassam.

**Change #86 - Deleted**

A.

**Change #87 - Changed**

"329." changed to "321."

**Change #88 - Changed**

"330." changed to "322."

**Change #89 - Changed**

"331." changed to "323."

**Change #90 - Changed**

"332." changed to "324."

**Change #91 - Changed**

"333." changed to "325."

**Change #92 - Changed**

"334." changed to "326."

**Change #93 - Changed**

"335." changed to "327."

**Change #94 - Changed**

"336." changed to "328."

**Change #95 - Changed**

"337." changed to "329."

**Change #96 - Changed**

"6 " changed to "six "

**Change #97 - Changed**

"338." changed to "330."

**Change #98 - Changed**

"339." changed to "331."

**Change #99 - Changed**

"340." changed to "332."

**Change #100 - Changed**

"341." changed to "333."

**Change #101 - Changed**

"342." changed to "334."

**Change #102 - Changed**

"343." changed to "335."

**Change #103 - Changed**

"344." changed to "336."

**Change #104 - Changed**

"345." changed to "337."

**Change #105 - Deleted**

B.

**Change #106 - Changed**

"346." changed to "338."

**Change #107 - Changed**

"347." changed to "339."

**Change #108 - Changed**

"348." changed to "340."

**Change #109 - Changed**

"349." changed to "341."

**Change #110 - Changed**

"350." changed to "342."

**Change #111 - Changed**

"351." changed to "343."

**Change #112 - Changed**

"352." changed to "344."

**Change #113 - Changed**

"353." changed to "345."

**Change #114 - Changed**

"354." changed to "346."

**Change #115 - Changed**

"355." changed to "347."

**Change #116 - Changed**

"356." changed to "348."

**Change #117 - Changed**

"357." changed to "349."

**Change #118 - Changed**

"AKSfor " changed to "AKS for "

**Change #119 - Inserted**

j.

**Change #120 - Deleted**

j.

**Change #121 - Changed**

"358." changed to "350."

**Change #122 - Changed**

"359." changed to "351."

**Change #123 - Changed**

"360." changed to "352."

**Change #124 - Changed**

"361." changed to "353."

**Change #125 - Changed**

"362." changed to "354."

**Change #126 - Changed**

"363." changed to "355."

**Change #127 - Changed**

"364." changed to "356."

**Change #128 - Changed**

"365." changed to "357."

**Change #129 - Changed**

" " changed to "` "

**Change #130 - Changed**

"366." changed to "358."

**Change #131 - Changed**

"367." changed to "359."

**Change #132 - Changed**

" " changed to "' "

## Change #133 - Changed
"368." changed to "360."

## Change #134 - Changed
"369." changed to "361."

## Change #135 - Changed
"370." changed to "362."

## Change #136 - Changed
"371." changed to "363."

## Change #137 - Changed
"372." changed to "364."

## Change #138 - Changed
"373." changed to "365."

## Change #139 - Changed
"374." changed to "366."

## Change #140 - Changed
"375." changed to "367."

## Change #141 - Changed
"376." changed to "368."

## Change #142 - Changed
" " changed to "' "

## Change #143 - Changed
"377." changed to "369."

## Change #144 - Changed
"378." changed to "370."

## Change #145 - Changed
"379." changed to "371."

## Change #146 - Changed
"380." changed to "372."

**Change #147 - Changed**

"381." changed to "373."

**Change #148 - Changed**

"382." changed to "374."

**Change #149 - Changed**

"383." changed to "375."

**Change #150 - Changed**

"384." changed to "376."

**Change #151 - Changed**

"385." changed to "377."

**Change #152 - Changed**

" " changed to "' "

**Change #153 - Changed**

"386." changed to "378."

**Change #154 - Changed**

"387." changed to "379."

**Change #155 - Changed**

"388." changed to "380."

**Change #156 - Changed**

"389." changed to "381."

**Change #157 - Changed**

"390." changed to "382."

**Change #158 - Changed**

"391." changed to "383."

**Change #159 - Changed**

"392." changed to "384."

**Change #160 - Changed**

"393." changed to "385."

**Change #161 - Changed**

" " changed to "` "

## Change #162 - Changed
"394." changed to "386."

## Change #163 - Changed
"395." changed to "387."

## Change #164 - Changed
"396." changed to "388."

## Change #165 - Changed
"397." changed to "389."

## Change #166 - Changed
"398." changed to "390."

## Change #167 - Changed
"399." changed to "391."

## Change #168 - Changed
"400." changed to "392."

## Change #169 - Changed
"401." changed to "393."

## Change #170 - Changed
"402." changed to "394."

## Change #171 - Changed
"403." changed to "395."

## Change #172 - Changed
"404." changed to "396."

## Change #173 - Changed
"405." changed to "397."

## Change #174 - Changed
"406." changed to "398."

## Change #175 - Changed
"407." changed to "399."

**Change #176 - Changed**

"408." changed to "400."

**Change #177 - Changed**

"409." changed to "401."

**Change #178 - Changed**

" " changed to "' "

**Change #179 - Changed**

"410." changed to "402."

**Change #180 - Changed**

"411." changed to "403."

**Change #181 - Changed**

"412." changed to "404."

**Change #182 - Changed**

"Haque's " changed to "Hague's "

**Change #183 - Changed**

"413." changed to "405."

**Change #184 - Changed**

"Haque " changed to "Hague "

**Change #185 - Changed**

"Haque " changed to "Hague "

**Change #186 - Changed**

"414." changed to "406."

**Change #187 - Changed**

"Unique" changed to "Unigue"

**Change #188 - Changed**

"415." changed to "407."

**Change #189 - Changed**

"Haque's " changed to "Hague's "

**Change #190 - Changed**

"416." changed to "408."

## Change #191 - Changed
"417." changed to "409."

## Change #192 - Changed
"418." changed to "410."

## Change #193 - Changed
"Haque " changed to "Hague "

## Change #194 - Changed
"Haque's " changed to "Hague's "

## Change #195 - Changed
"419." changed to "411."

## Change #196 - Changed
"420." changed to "412."

## Change #197 - Changed
"421." changed to "413."

## Change #198 - Changed
"422." changed to "414."

## Change #199 - Changed
"423." changed to "415."

## Change #200 - Changed
"424." changed to "416."

## Change #201 - Changed
"425." changed to "417."

## Change #202 - Changed
"426." changed to "418."

## Change #203 - Changed
"427." changed to "419."

## Change #204 - Changed
"428." changed to "420."

**Change #205 - Changed**

"429." changed to "421."

**Change #206 - Changed**

"430." changed to "422."

**Change #207 - Changed**

"431." changed to "423."

**Change #208 - Changed**

"432." changed to "424."

**Change #209 - Changed**

"433." changed to "425."

**Change #210 - Changed**

"EEC's " changed to "LLC's "

**Change #211 - Changed**

"434." changed to "426."

**Change #212 - Changed**

"435." changed to "427."

**Change #213 - Changed**

"436." changed to "428."

**Change #214 - Changed**

"437." changed to "429."

**Change #215 - Changed**

"438." changed to "As a "

**Change #216 - Changed**

"438." changed to "430."

**Change #217 - Changed**

"439." changed to "431."

**Change #218 - Changed**

"440." changed to "432."

**Change #219 - Changed**

"441." changed to "433."

## Change #220 - Changed
"442." changed to "434."

## Change #221 - Changed
"443." changed to "435."

## Change #222 - Changed
"444." changed to "436."

## Change #223 - Changed
"445." changed to "437."

## Change #224 - Changed
"446." changed to "438."

## Change #225 - Changed
"447." changed to "439."

## Change #226 - Changed
"448." changed to "440."

## Change #227 - Changed
"6 " changed to "six "

## Change #228 - Changed
"449." changed to "441."

## Change #229 - Changed
"450." changed to "442."

## Change #230 - Changed
"451." changed to "443."

## Change #231 - Changed
"452." changed to "444."

## Change #232 - Changed
"453." changed to "445."

## Change #233 - Changed
"454." changed to "446."

**Change #234 - Changed**

"455." changed to "447."

**Change #235 - Changed**

"456." changed to "448."

**Change #236 - Changed**

"login " changed to "log in "

**Change #237 - Changed**

"457." changed to "449."

**Change #238 - Changed**

"458." changed to "450."

**Change #239 - Changed**

"filed " changed to "file "

**Change #240 - Changed**

"459." changed to "451."

**Change #241 - Changed**

"460." changed to "452."

**Change #242 - Changed**

" " changed to "' "

**Change #243 - Changed**

"461." changed to "453."

**Change #244 - Changed**

"462." changed to "454."

**Change #245 - Changed**

"463." changed to "455."

**Change #246 - Changed**

"464." changed to "456."

**Change #247 - Changed**

"Daniani" changed to "Damani"

**Change #248 - Changed**

" " changed to " "

## Change #249 - Changed
"Ali" changed to "All"

## Change #250 - Changed
" Sayani" changed to " Savani"

## Change #251 - Changed
"465." changed to "457."

## Change #252 - Changed
"466." changed to "458."

## Change #253 - Changed
"Hague's " changed to "Haque's "

## Change #254 - Changed
"467." changed to "459."

## Change #255 - Changed
"Hague " changed to "Haque "

## Change #256 - Changed
" " changed to "' "

## Change #257 - Changed
"Hague " changed to "Haque "

## Change #258 - Changed
"Hague " changed to "Haque "

## Change #259 - Changed
"Hague " changed to "Haque "

## Change #260 - Changed
"468." changed to "460."

## Change #261 - Changed
"469." changed to "461."

## Change #262 - Changed
"470." changed to "462."

**Change #263 - Changed**

"471." changed to "As a "

**Change #264 - Changed**

"471." changed to "463."

**Change #265 - Changed**

"472." changed to "464."

**Change #266 - Deleted**

COUNT VI—FRAUDULENT TRANSFERS(Against Damani and Kassam)473. Under the Georgia Uniform Voidable Transactions Act, O.C.G.A. §§ 18-2-74 et seq. (the "UVTA"), Lucky Bucks and its creditors (who now own Lucky Bucks) may avoid any transfer of an interest in property or the incurrence of an obligation that was made with the intent to hinder, delay, or defraud creditors.474. In 2021, Lucky Bucks entered into a senior secured credit facility in the aggregate amount of approximately $535,000,000, which was increased to $610,000,000 in October 2021.475. Prior to incurring obligations under these credit facilities, Lucky Bucks disclosed that a substantial portion of the proceeds of the debt would be used to fund distributions to shareholders, including Damani and Kassam.476. On information and belief, Damani coordinated with Kassam, who was then running Lucky Bucks as COO and a member of the holding company's board, and others to use the proceeds therefrom to fund dividend distributions.477. In July 2021, Lucky Bucks issued a cash dividend of approximately $200,000,000 to Lucky Bucks' shareholders with the proceeds of the financings, rather than net earnings.478. Of that amount, more than $50,000,000 was distributed to Damani, and more than $500,000 was distributed to Kassam, an insider for the purposes of the UVTA.479. By 2022, Lucky Bucks and its affiliates had taken on hundreds of millions of dollars' worth of debt, substantial portions of which were used improperly to fund the massive distributions, which should only have been issued from Lucky Bucks' net earnings, not debt.480. By the end of 2022, Lucky Bucks owed its creditors over $500,000,000, which debts were impossible to repay.481. In conjunction with other members of the HoldCo board of managers and recipients of the 2021 Dividend, Damani and Kassam acted with actual intent to hinder, delay, or defraud creditors by saddling Lucky Bucks with debts that it could not hope to repay, thereby rendering Lucky Bucks insolvent and forcing it into bankruptcy.482. Lucky Bucks is entitled to a judgment against Damani and Kassam in the amount of the value that they each received, directly or indirectly, and any other payments, profits, fees, benefits, incentives, and other compensation that they received, directly or indirectly, in connection with the 2021 Dividend.COUNT VII— IMPROPER DIVIDENDS(Against Kassam)483. On July 30, 2021, Lucky Bucks entered into a senior secured credit agreement in the aggregate amount of approximately $535,000,000.484. That senior secured credit agreement included both a $35,000,000 revolving credit facility due 2026, and a $500,000,000 firstdien term loan due 2027. The term loan was used to refinance certain existing obligations, as well as to fund a $200,000,000 distribution to aligned shareholders, including Kassam.485. In July 2021, Lucky Bucks issued a cash dividend of approximately $200,000,000 to Lucky Bucks's shareholders with the debt proceeds. Of that amount, more than $50,000,000 was distributed to Damani, and more than $500,000 to Kassam, who was running Lucky Bucks' COAM operations at this time as COO.486. The 2021 Dividend was issued in violation of O.C.G.A. § 14-4-65 because it was not declared or distributed from

Lucky Bucks' actual legitimate net earnings but was instead funded by new debt.487. Kassam is liable to Lucky Bucks for the double the amount of the illegal dividend because he was an officer and manager responsible for the declaration of the 2021 Dividend.

**Change #267 - Changed**

"COUNT IX—ATTORNEY'S " changed to "COUNT VI—ATTORNEY'S "

**Change #268 - Changed**

"488." changed to "465."

**Change #269 - Changed**

"489." changed to "466."

**Change #270 - Changed**

"X—PUNITIVE " changed to "VII—PUNITIVE "

**Change #271 - Changed**

"490." changed to "467."

**Change #272 - Changed**

"491." changed to "Defendants' "

**Change #273 - Changed**

"491." changed to "468."

**Change #274 - Changed**

"492." changed to "469."

**Change #275 - Inserted**

and

**Change #276 - Deleted**

viii. Order Defendants Damani and Kassam to return their improper dividends; and

**Change #277 - Changed**

"ix." changed to "viii."

**Change #278 - Changed**

"23rd " changed to "5th "

**Change #279 - Changed**

"October 2024" changed to "June, 2025"

**Change #280 - Changed**

"es@robbinsfinn" changed to "es@robbinsfirm"

## Change #281 - Changed
"FIRST " changed to "SECOND "

## Change #282 - Changed
"23rd " changed to "5th "

## Change #283 - Changed
"October 2024" changed to "June, 2025"

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed Plaintiff's **SECOND AMENDED COMPLAINT**

with the Clerk of Court using the Court's e-file system, which will automatically provide electronic

notification of the same to all counsel of record.

Respectfully submitted, this 5th day of June, 2025.

<u>/s/ Joshua Mayes</u>
Joshua Mayes
Georgia Bar No. 143107

*Counsel for Arc Gaming and Technologies, LLC*
*f/k/a Lucky Bucks, LLC*