## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LUCKY BUCKS, LLC, *et al.*<br><br>     Debtors. | Chapter 11<br><br>No. 23-10758 (KBO) |
| LB NEWHOLDCO, LLC and<br>LUCKY BUCKS, LLC,<br><br>     Plaintiffs,<br><br>v.<br><br>TRIVE CAPITAL MANAGEMENT LLC,<br>*et al.*,<br><br>     Defendants. | Adversary Proceeding<br><br>No. 25-50965 (KBO) |

## MEMORANDUM OF LAW IN SUPPORT OF
## TRIVE DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

PACHULSKI STANG ZIEHL
   & JONES LLP

Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
(t) (302) 652-4100
(f) (302) 652-4400

WILMER CUTLER PICKERING
   HALE AND DORR LLP

Philip D. Anker (admitted *pro hac vice*)
Ross E. Firsenbaum (admitted *pro hac vice*)
Charles C. Bridge (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888

Joel Millar (admitted *pro hac vice*)
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363

Dated: September 5, 2025

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 3

    A.    Factual Background ...........................................................................................3

    B.    Procedural Background.......................................................................................8

SUMMARY OF ARGUMENT ......................................................................................... 9

ARGUMENT.................................................................................................................... 10

I.      THE FRAUDULENT-TRANSFER CLAIMS SHOULD BE DISMISSED...........................................13

    A.    The Lenders' Authorization Of The OpCo Distribution Bars The
           Fraudulent-Transfer Claims...................................................................................13

    B.    The Complaint Fails To State A Plausible Claim Of Intentional Fraudulent
           Transfer ...............................................................................................................17

II.     THE AIDING-AND-ABETTING CLAIM SHOULD BE DISMISSED ...........................................23

    A.    The HoldCo LLC Agreement Disclaimed Any Fiduciary Duties ........................24

    B.    The Complaint Fails To Allege A Breach Of Any Fiduciary Duty......................26

    C.    The Complaint Fails To Allege That The Trive Defendants "Knowingly
           Participated" In Any Breach ..................................................................................28

III.   THE CLAIMS FOR ATTORNEY'S FEES, PUNITIVE DAMAGES, AND A DECLARATORY
      JUDGMENT SHOULD BE DISMISSED......................................................................................29

IV.   THE CLAIMS SHOULD BE DISMISSED WITH PREJUDICE ......................................................30

CONCLUSION................................................................................................................. 30

## CASES

*Abrams v. Trive Cap. Mgmt. LLC*,
    No. 24-50130 (Bankr. D. Del.) ............................................................................7

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
    390 B.R. 80 (Bankr. S.D.N.Y. 2008), *aff'd*, 379 F. App'x 10 (2d Cir. 2010) ............. 13-14

*Arc Gaming & Techs., LLC v. Angel Amusements, LLC*,
    No. 24-cv-00131 (Ga. Super. Ct.).................................................................... 7-8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................26

*Bash v. Textron Fin. Corp.*,
    2013 WL 12526002 (N.D. Ohio July 22, 2013) ...............................................30

*Bos. Trading Grp., Inc. v. Burnazos*,
    835 F.2d 1504 (1st Cir. 1987) (Breyer, J.)........................................................21

*Cal. Pub. Emps.' Ret. Sys. v. Coulter*,
    2002 WL 31888343 (Del. Ch. Dec. 18, 2002)..................................................27

*Covey v. Com. Nat'l Bank of Peoria*,
    960 F.2d 657 (7th Cir. 1992) .............................................................................19

*Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*,
    500 B.R. 464 (W.D. Tex. 2013)...................................................................15, 17

*Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*,
    302 A.3d 430 (Del. Ch. 2023)...........................................................................24

*Fisk Ventures, LLC v. Segal*,
    2008 WL 1961156 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) ............ 24-25

*Footlick v. Topstep LLC*,
    2024 WL 1283702 (N.D. Ill Mar. 26, 2024)......................................................24

*Gabelli & Co. v. Liggett Grp., Inc.*,
    479 A.2d 276 (Del. 1984) ..................................................................................26

*Gardner v. Kinney*,
    498 S.E.2d 312 (Ga. Ct. App. 1998)..................................................................29

*Husky Int'l Elecs., Inc. v. Ritz*,
    578 U.S. 355 (2016)...........................................................................................21

*In re 3P Hightstown, LLC*,
   631 B.R. 205 (Bankr. D.N.J. 2021) ...................................................................24

*In re Able Body Temp. Servs., Inc.*,
   626 B.R. 643 (Bankr. M.D. Fla. 2020) ...............................................................23

*In re Adelphia Recovery Tr.*,
   634 F.3d 678 (2d Cir. 2011).................................................................................15

*In re ALH Holdings, LLC*,
   675 F. Supp. 2d 462 (D. Del. 2009).....................................................................27

*In re Allonhill, LLC*,
   2019 WL 1868610 (Bankr. D. Del. Apr. 25, 2019), *aff'd in part, remanded
   in part*, 2020 WL 1542376 (D. Del. Mar. 31, 2020)...........................................14

*In re Amcad Holdings, LLC*,
   579 B.R. 33 (Bankr. D. Del. 2017) ......................................................................30

*In re Bos. Generating LLC*,
   617 B.R. 442 (Bankr. S.D.N.Y. 2020), *aff'd on other grounds*, 2021
   WL 4150523 (S.D.N.Y. Sept. 13, 2021), *aff'd on other grounds*, 2024
   WL 4234886 (2d Cir. Sept. 19, 2024) .................................................................15

*In re Columbia Pipeline Grp., Inc. Merger Litig.*,
   --- A.3d ----, 2025 WL 1693491 (Del. June 17, 2025) .......................................28

*In re Cred Inc.*,
   650 B.R. 803 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024)...................10, 29

*In re Direct Access Partners, LLC*,
   602 B.R. 495 (Bankr. S.D.N.Y. 2019)..................................................................21

*In re DSI Renal Holdings, LLC*,
   2020 WL 550987 (Bankr. D. Del. Feb. 4, 2020) .................................................14

*In re Dunn*,
   2006 WL 6810930 (B.A.P. 9th Cir. Oct. 31, 2006).............................................15

*In re Elrod Holdings Corp.*,
   421 B.R. 700 (Bankr. D. Del. 2010) ....................................................................22

*In re Fairfield Sentry Ltd.*,
   147 F.4th 136 (2d Cir. 2025) .........................................................17, 18, 20, 21

*In re Fedders N. Am., Inc.*,
   405 B.R. 527 (Bankr. D. Del. 2009) .........................................................22, 23, 28

iii

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
  2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ....................................................................26

*In re Lyondell Chem. Co.*,
  503 B.R. 348 (Bankr. S.D.N.Y. 2014), *abrogated on other grounds by In
  re Trib. Fraudulent Conv. Litig.*, 818 F.3d 98 (2d Cir. 2016), *vacated and
  superseded on other grounds*, 946 F.3d 66 (2d Cir. 2019) ..........................................14, 15

*In re Mindbody, Inc., S'holder Litig.*,
  332 A.3d 349 (Del. 2024) ................................................................................................28

*In re Murphy*,
  331 B.R. 107 (Bankr. S.D.N.Y. 2005)..............................................................................14

*In re New Life Adult Med. Day Care Ctr., Inc.*,
  2014 WL 6851258 (Bankr. D.N.J. Dec. 3, 2014) .............................................................14

*In re NorthEast Gas Generation, LLC*,
  639 B.R. 914 (Bankr. D. Del. 2022) .................................................................................12

*In re Old CarCo LLC*,
  435 B.R. 169 (Bankr. S.D.N.Y. 2010).........................................................................5, 20

*In re ONH AFC CS Invs., LLC*,
  2025 WL 1353850 (Bankr. D. Del. May 8, 2025)............................................................14

*In re Opus E. LLC*,
  698 F. App'x 711 (3d Cir. 2017) ................................................................................. 18-19

*In re Our Alchemy, LLC*,
  2019 WL 4447519 (Bankr. D. Del. Sept. 16, 2019)...................................................24, 25

*In re Physiotherapy Holdings, Inc.*,
  2016 WL 3611831 (Bankr. D. Del. June 20, 2016)..........................................................15

*In re R.M.L., Inc.*,
  92 F.3d 139 (3d Cir. 1996)...............................................................................................18

*In re Refco, Inc. Sec. Litig.*,
  2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009)............................................................ 16-17

*In re Shenango Grp. Inc.*,
  501 F.3d 338 (3d Cir. 2007).............................................................................................12

*In re SRC Liquidation LLC*,
  581 B.R. 78 (D. Del. 2017), *aff'd*, 765 F. App'x 726 (3d Cir. 2019) ...............................30

iv

*In re Syntax-Brillian Corp.*,
    2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) .............................................................22

*In re Trib. Co. Fraudulent Conv. Litig.*,
    10 F.4th 147 (2d Cir. 2021) .......................................................................................22, 23

*In re Trib. Co. Fraudulent Conv. Litig.*,
    2017 WL 82391 (S.D.N.Y. Jan. 6, 2017), *aff'd*, 10 F.4th 147 (2d Cir. 2021)...................23

*In re Tronox Inc.*,
    429 B.R. 73 (Bankr. S.D.N.Y. 2010)..................................................................................29

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ....................................................................................................26

*In re Zohar III, Corp.*,
    631 B.R. 133 (Bankr. D. Del. 2021) ..................................................................................11

*Litt v. Wycoff*,
    2003 WL 1794724 (Del. Ch. Mar. 28, 2003)....................................................................28

*Malhan v. Sec'y U.S. Dep't of State*,
    938 F.3d 453 (3d Cir. 2019)...............................................................................................30

*McElrath v. Kalanick*,
    224 A.3d 982 (Del. 2020) ..................................................................................................27

*McRitchie v. Zuckerberg*,
    315 A.3d 518 (Del. Ch. 2024)............................................................................................26

*Merchs.' Nat'l Props., Inc. v. Meyerson*,
    2000 WL 1041229 (Del. Ch. July 24, 2000)......................................................................28

*N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*,
    930 A.2d 92 (Del. 2007) ....................................................................................................27

*Odyssey Partners, L.P. v. Fleming Cos.*,
    735 A.2d 386 (Del. Ch. 1999)............................................................................................27

*Off. Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*,
    2004 WL 1949290 (Del. Ch. Aug. 24, 2004) ............................................................. 27-28

*Osios LLC v. Tiptree, Inc.*,
    2024 WL 2947854 (Del. Ch. June 12, 2024)....................................................................24

*Schilling v. Rogers*,
    363 U.S. 666 (1960)...........................................................................................................30

*Schmidt v. Skolas,*
  770 F.3d 241 (3d Cir. 2014) ................................................................................5

*Shuker v. Smith & Nephew, PLC,*
  885 F.3d 760 (3d Cir. 2018) ...............................................................................11

*Stone ex rel. AmSouth Bancorporation v. Ritter,*
  911 A.2d 362 (Del. 2006) ...................................................................................26

*Thysis, Inc. v. Chemron Corp.,*
  2011 WL 13162410 (N.D. Ga. Aug. 25, 2011) ..................................................29

*Tredennick v. Bone,*
  323 F. App'x 103 (3d Cir. 2008) ........................................................................11

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.,*
  479 B.R. 405 (N.D. Tex. 2012).............................................................................15

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.,*
  761 F.3d 409 (5th Cir. 2014) ...............................................................................22

*United States v. Miller,*
  145 S. Ct. 839 (2025)....................................................................................14, 17

*Victory Med. Ctr. Beaumont, L.P. v. Conn. Gen. Life Ins. Co.,*
  2018 WL 3467915 (E.D. Tex. July 17, 2018) ....................................................15

*Wellman v. Wellman,*
  933 F.2d 215 (4th Cir. 1991) ..............................................................................14

*Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC,*
  2014 WL 5509787 (Del. Ch. Oct. 31, 2014) ......................................................12

## STATUTES

11 U.S.C.
  § 101.................................................................................................................12, 18
  § 544.................................................................................................13, 14, 15, 17, 29
  § 548.................................................................................................13, 14, 16, 17, 18
  § 550.................................................................................................13, 14, 17, 29

28 U.S.C. §§ 2201-2202 .....................................................................................30

Del. Code Ann. tit. 6
  § 18-1101 ...........................................................................................................24
  § 1302..................................................................................................................18
  § 1304..........................................................................................................17, 18, 22

Ga. Code Ann.

§ 13-6-11 ...........................................................................................................................29
§ 18-2-72 ...........................................................................................................................18
§ 18-2-74 .............................................................................................................17, 18, 22
§ 51-12-5.1 .........................................................................................................................29

## RULES

Fed. R. Bankr. P. 2004 ...........................................................................................5, 9, 30

Fed. R. Civ. P. 9 ...............................................................................................10, 11, 18

Defendants Trive Capital Management LLC ("TCM"), Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, TCFIII Luck Holdings LLC, Quantum Gaming Corp., Southern Star Gaming, LLC, and Shravan Thadani (collectively, the "Trive Defendants") respectfully submit this memorandum in support of their motion to dismiss the Complaint [D.I. 2][1] ("Compl.") filed by LB NewHoldCo, LLC ("NewHoldCo") and Lucky Bucks, LLC ("Lucky Bucks" and, with NewHoldCo, "Plaintiffs").

## PRELIMINARY STATEMENT

1.     Plaintiffs are the successors to two companies recently reorganized under Chapter 11: Lucky Bucks and its parent Lucky Bucks HoldCo, LLC ("HoldCo" and, with Lucky Bucks, the "OpCo Debtors").  They posit that the bankruptcy was inevitable after the OpCo Debtors made a $203.6 million distribution in July 2021 to the Trive Defendants and Lucky Bucks's other equity holders (the "OpCo Distribution"), funded by a credit facility provided by leading lenders who, after Lucky Bucks's reorganization, now own most of the company.  The Court should see that theory for what it is:  a cynical attempt to recast, with 20/20 hindsight, an unexceptional corporate dividend readily approved by sophisticated financial institutions—armed with the same balance-sheet information that the Trive Defendants had—as somehow fraudulent.  Indeed, the Holdings Trustee has asserted that Plaintiffs named the Trive Defendants in this action solely to further Plaintiffs' "scheme to justify breaching [their] Settlement Agreement" with the Holdings Trustee to pay the Holdings Trustee 40% of Plaintiffs' recoveries in their Georgia action, which sought to recover the same OpCo Distribution but did not name any of the Trive Defendants.  *See Holdings Trustee's Response to the Reorganized Debtors' Status Update*, Bankr. D.I. 404, ¶¶ 20, 28.

---

[1] References to filings (i) in this adversary proceeding are cited as "D.I."; (ii) in the bankruptcy case, Case No. 23-10758 (KBO), as "Bankr. D.I."; and (iii) in unrelated dockets as "Dkt. No."

2.      Plaintiffs' efforts to pin liability on the Trive Defendants are extraordinarily weak. The Trive Defendants acquired a majority interest in Lucky Bucks in August 2020. Plaintiffs do not allege that the Trive Defendants did so, putting at risk hundreds of millions of dollars in capital, while knowing of some sort of ongoing fraud at Lucky Bucks. Indeed, Plaintiffs cannot allege that the Trive Defendants were participants in—or at any time prior to the OpCo Distribution became aware of—the supposed "B-Side Businesses" fraudulent scheme that Plaintiffs say was orchestrated in secret by Lucky Bucks's co-founder. Instead, their theory is that the Trive Defendants' receipt of Lucky Bucks's financial data must have caused the Trive Defendants to discover by the spring and summer of 2021 (less than one year after they had invested in Lucky Bucks) that, for whatever reason, the business had become insolvent—and that therefore the ensuing OpCo Distribution was a fraudulent transfer. But when the Complaint is stripped of its rhetoric, Plaintiffs are left with just one concrete factual allegation of insolvency: Lucky Bucks's June 30, 2021 balance sheet, which showed that the business's liabilities exceeded its assets on a *book*-value basis. That allegation gets the Plaintiffs nowhere. As court after court has held, a company's solvency is measured by its *market*, not book, value. The Complaint alleges no facts establishing that Lucky Bucks was insolvent in July 2021 on a *market*-value basis, nor that anyone (including the Trive Defendants) believed it was. On the contrary, the Complaint alleges that highly sophisticated lenders, *after reviewing a* ▮▮▮▮▮ *that* ▮▮▮ *showed that* ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, decided nevertheless to extend hundreds of millions of dollars in credit to Lucky Bucks, with full knowledge and express agreement that Lucky Bucks would immediately use the new credit facility to issue the OpCo Distribution to its equity holders.

3.    This basic flaw is fatal to all of Plaintiffs' claims against the Trive Defendants.  The claims for intentional fraudulent transfer (Counts I-III) certainly cannot survive with such meager allegations of insolvency and the Trive Defendants' supposed fraudulent intent.  And for the same reason, Plaintiffs have not alleged the "knowing participation" necessary for aiding-and-abetting liability (Count V).

4.    Plaintiffs' claims have other fatal flaws, too.  All the claims are barred by the expansive release under the OpCo Debtors' confirmed Chapter 11 plan.  The fraudulent-transfer claims also fail because the lenders knew of the impending OpCo Distribution and consented to it by entering into the credit agreement.  And the aiding-and-abetting claim fails at multiple levels— including because the HoldCo LLC Agreement (defined below) expressly ███████████████ ███████████████████████████████████████, whose supposed breach of those nonexistent duties is the primary violation that the Trive Defendants allegedly aided and abetted.

5.    Plaintiffs filed their Complaint after they had received tens of thousands of documents from the Trive Defendants, and after what the Complaint itself describes as a lengthy and extensive investigation into the causes of Lucky Bucks's bankruptcy.  Even so, all Plaintiffs can allege is that the Trive Defendants knew what the lenders themselves knew full well before they funded the OpCo Distribution and plainly viewed as irrelevant—that the *book* value of Lucky Bucks's assets did not exceed its liabilities.  The Court should dismiss with prejudice.

## BACKGROUND

### A.    Factual Background

6.    Lucky Bucks was a Georgia company founded in 2011 by defendant Anil Damani as a coin-operated amusement machine ("COAM") business.  Compl. ¶¶ 2, 18, 40.  COAMs offer skill-based games and are typically placed in gas stations and convenience stores.  *Id.* ¶ 40.  The

Georgia Lottery Commission (the "GLC") regulates the COAM industry in Georgia. *Id.* ¶¶ 2, 41-42. By 2020, Lucky Bucks was "one of the largest COAM businesses in Georgia." *Id.* ¶ 40.

7. Defendant TCM is a private-equity firm, incorporated in Delaware and headquartered in Texas. Compl. ¶ 19. In August 2020, certain Trive Defendants, each an affiliate of TCM, acquired an indirect, majority equity interest in Lucky Bucks by purchasing a majority stake in HoldCo, Lucky Bucks's parent company. *Id.* ¶¶ 4, 19-29, 60-61. This majority interest gave the Trive Defendants the right to appoint two members of HoldCo's board of managers (the "Board"). *Id.* ¶¶ 4, 63. Damani, as a HoldCo equity holder, appointed Kassam as the Board's third member. *Id.* ¶ 63. The Complaint does not allege that any of the Trive Defendants, when investing substantial capital into Lucky Bucks in August 2020, knew or had any reason to believe that the business was insolvent or fraudulent (but invested anyway).

8. Beginning in February 2021, Lucky Bucks pursued financing that culminated in a new credit facility to refinance an existing credit facility and fund a distribution to its equity holders. Compl. ¶¶ 69, 76-77. Negotiations with prospective lenders began in February 2021 and continued for several months thereafter. *See id.* ¶¶ 70-76.

9. Macquarie Capital Funding LLC ("Macquarie") led those negotiations for the lenders (collectively, the "Lenders"). It "agreed to act as administrative agent and collateral agent" for itself and the other Lenders. *Id.* ¶ 71. On its website, Macquarie states that it has Australian $941 billion in assets under management, https://www.macquarie.com/us/en.html (last visited Sept. 5, 2025), and that it is a "global adviser [sic] and investor" with "deep-sector expertise" in industries including "[c]onsumer, gaming & leisure," https://www.macquarie.com/us/en/about/company/macquarie-capital.html (last visited Sept. 5, 2025). Macquarie supposedly conducted extensive diligence on Lucky Bucks, raising "various diligence questions," to which

Lucky Bucks and Mr. Thadani responded. Compl. ¶ 74. Among many other things, Macquarie's

diligence included receiving (on )

—including a                          showing that,

                                         . *See* Ex. C.[2]

    10.    Ultimately, Macquarie's receipt and review of Lucky Bucks's financials did not

dissuade it and its fellow sophisticated Lenders from extending hundreds of millions of dollars in

credit. On July 30, 2021, Lucky Bucks entered into a senior secured credit facility with the Lenders

"in the aggregate amount of approximately $535 million." Compl. ¶ 76.

    11.    The fully underwritten credit agreement between the Lenders and Lucky Bucks (the

"Credit Agreement") made clear that

                                                                                                 . Specifically, the

Credit Agreement's "                          " covenant specified that Lucky Bucks "        " use the loan

proceeds "                                    "                                    , "

                          " Ex. A § 6.11; *id.* at Preliminary Statements, § 1.01 ("                          ").[3]

    12.    The Lenders were well compensated for the risks they took in lending to Lucky

Bucks. The loans paid interest rates of                          (or                          ), subject

---

[2] Citations to "Ex. __" refer to exhibits to the Declaration of Ross E. Firsenbaum, filed herewith. Plaintiffs received copies of these documents in November 2024, when the Trive Defendants re-produced to Plaintiffs the Rule 2004 document productions that the Trive Defendants had made to the Holdings Trustee. *See infra* ¶ 21; Ex. E. The documents are "a part of the record," even at the pleading stage, "as a result of the Rule 2004 discovery." *In re Old CarCo LLC*, 435 B.R. 169, 183-186 (Bankr. S.D.N.Y. 2010); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("[T]he primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff— is dissipated where the plaintiff has actual notice and has relied upon these documents in framing the complaint." (brackets and ellipsis omitted)).

[3] Because the Complaint discusses and relies on the Credit Agreement, the Court may consider it at this stage. *See Schmidt*, 770 F.3d at 249 (courts may consider documents "integral to or explicitly relied upon in the complaint" (emphasis omitted)).

to ██████████████, plus ████████████████████████████████[4]

The Lenders ████████████████████████████████████████████
████████████████████████████████████████████████.[5]

13.     Upon the execution of the Credit Agreement on July 30, 2021, the OpCo Distribution proceeded as agreed.  That same day, HoldCo's Board executed a written consent approving a distribution of $203,599,943.53 from Lucky Bucks to its sole member and parent, HoldCo.  Compl. ¶ 78.  That consent stated that, "based on [Lucky Bucks's] balance sheet … as of June 30, 2021, and other information, reports and statements provided to [HoldCo], after giving effect to the [OpCo] Distribution, the *fair* value of all of [Lucky Bucks's] assets exceeds all [of Lucky Bucks's] liabilities … as of the date hereof."  *Id.* ¶ 84 (emphasis added).  Also on July 30, 2021, HoldCo's Board executed a second written consent, approving a distribution of $203,599,943.53 "to the holders of HoldCo's equity."  *Id.* ¶¶ 78, 80-83.

14.     The Complaint claims that, at the time of the OpCo Distribution, the Trive Defendants knew that Lucky Bucks was insolvent.  But the only factual support for that claim is the allegation that the Trive Defendants were aware of Lucky Bucks's June 30, 2021 balance sheet (Ex. D), which showed that Lucky Bucks was insolvent—not based on its "fair" value—but rather on a *book*-value basis.  Compl. ¶¶ 68, 84-85, 108-109, 121-122, 132-133, 143-144.  The June 30, 2021 balance sheet, like the ██████████████████ that the Lenders evidently viewed as irrelevant, did not purport to state the market or fair value of Lucky Bucks's business.  *See* Ex. D.

15.     After the OpCo Distribution, a new parent holding company was created—Lucky Bucks Holdings LLC ("Holdings")—which "became the sole and managing member of HoldCo."

<hr />

[4] Ex. A (Credit Agreement) §§ 2.01, 2.08, 2.09; *id.* § 1.01 (definitions of "Eurocurrency Rate," "Base Rate," and "Applicable Rate"); *id.* ("Preliminary Statements").
[5] Ex. A (Credit Agreement) §§ 4.01(a), 6.10, 8.01, 8.02, & Exs. F, G.

Compl. ¶¶ 90-91. In November 2021 and January 2022, Holdings issued unsecured payment-in-kind notes to sophisticated investment firms and used most of the proceeds to fund distributions to its equity holders, as required by the credit agreement governing the transaction. *Id.* ¶ 92. Those Holdings distributions are the subject of a separate adversary proceeding in this Court, *see Abrams v. Trive Cap. Mgmt. LLC*, No. 24-50130 (Bankr. D. Del.), and are not at issue here.

16.     Plaintiffs allege that Lucky Bucks's performance later declined due in large part to an alleged fraudulent scheme "masterminded" by defendants Damani and Kassam, and "other" Lucky Bucks employees. Compl. ¶ 53. The alleged scheme involved "siphoning off dozens of valuable Location License contracts from Lucky Bucks to businesses" secretly controlled by Damani and Kassam (the "B-Side Businesses"). *Id.* ¶¶ 53, 56. Damani and Kassam "went to extensive lengths to conceal their misconduct." *Id.* ¶¶ 53-54. They used "covert communications applications," "delet[ed] files and records" from Lucky Bucks's computer systems, and "us[ed] a network of B-Side Businesses and individuals to disguise their systematic pillaging" of Lucky Bucks. *Id.* They were able to "conceal their fraudulent conduct through their extensive and intricate campaign" until after Lucky Bucks emerged from bankruptcy in October 2023, when the scheme was "uncover[ed]" through a "comprehensive investigation." *Id.* ¶¶ 98, 101-102.

17.     In January 2024, the OpCo Debtors filed a complaint, which Reorganized Lucky Bucks amended some nine months later, against the scheme's participants in Georgia state court, including Damani and Kassam. Neither the original nor the amended complaint asserted any claims against the Trive Defendants or the HoldCo Board members they appointed, Messrs. Boyden and Sekhri. *See id.* ¶¶ 53, 102; *Arc Gaming & Techs., LLC v. Angel Amusements, LLC*, No. 24-cv-00131 (Ga. Super. Ct.), Dkt. Nos. 1 (original complaint filed Jan. 2, 2024), 231

(amended complaint filed Oct. 23, 2024).[6] Indeed, the complaints in that action (like the Complaint here) do not allege that any of the Trive Defendants were in any way involved in, or ever became aware of, the alleged fraudulent scheme relating to the B-Side Businesses.

## B. Procedural Background

18.     In June 2023, Lucky Bucks, HoldCo, and Holdings filed for Chapter 11 protection. Compl. ¶¶ 95-96. The Court later converted the Holdings case to a Chapter 7 liquidation. *Id.* ¶¶ 97, 100. Thereafter, the Court confirmed the OpCo Debtors' reorganization plan ("Plan"). *See* Bankr. D. I. 187 (Plan); Bankr. D.I. 214 (Confirmation Order). The Plan "embodied an extensively negotiated equitization transaction," in which the Lenders "swapp[ed]" their debt "for equity in NewHoldCo"—one of the Plaintiffs here—"and certain takeback second lien debt." Compl. ¶ 98.[7]

19.     The Plan included releases in favor of the "Released Parties," including the Trive Defendants. Compl. ¶ 99.[8] Those releases were "subject to extensive negotiation among the parties." *Id.* They provided that "each of the OpCo Debtors, [and] their respective Estates," gave broad releases to "each Released Party" "from any and all Claims and Causes of Action … in law, equity, contract, tort or otherwise, … based on, relating to, or in any manner arising from … any of the OpCo Debtors," "including the capital structure, management, ownership, or operations thereof," "the Prepetition OpCo First Lien Credit Agreement," and "any Avoidance Actions," as well as "any other act or omission, transaction, agreement, event or other occurrence related or

---

[6] Because the Complaint discusses the Georgia complaint and it is subject to judicial notice, the Court may consider it on this motion. *See supra* ¶ 9 n.2.

[7] Because the Complaint discusses the Plan and the Plan is subject to judicial notice, the Court may consider it on this motion. *See supra* ¶ 9 n.2.

[8] *See* Bankr. D.I. 187 (Plan), art. I.A (defining "Released Party" to include "Sponsors" and their "Related Parties"); *id.* (defining "Sponsors" to include the "Trive Sponsors," defined in turn to mean "Southern Star Gaming LLC, TCFIII Luck Acquisition LLC, and TCFIII Luck SPV LP"); *id.* (defining "Related Party" to include an extensive list of related persons and entities, including "current and former directors, managers, [and] officers," "equity holders … whether such equity interests are held directly or indirectly," "affiliated investment funds or investment vehicles," and "subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, [and] agents").

relating to any of the foregoing taking place on or before the OpCo Plan Effective Date." Bankr. D.I. 187 (Plan), art. VIII.A.2.

20.    Plaintiffs emerged from bankruptcy on October 2, 2023.  Compl. ¶ 98.  Lucky Bucks now bears the trade name of Arc Gaming and Technology ("<u>Arc Gaming</u>").  *Id.* ¶ 18.

21.    On November 26, 2024, the Trive Defendants finished re-producing to Plaintiffs copies of document productions that the Trive Defendants had made to the Holdings Trustee in response to his Rule 2004 subpoena.  *See* Ex. E.  Undersigned counsel made further re-productions of documents to Plaintiffs on February 27, 2025, *see* Ex. F, and on April 24, 2025, *see* Ex. G.  In total, Plaintiffs received approximately 21,000 documents from these re-productions, totaling over 197,000 pages.  On June 2, 2025—more than six months after receiving those re-productions— Plaintiffs filed their Complaint in this adversary proceeding, for the first time (and through different counsel) asserting that the Trive Defendants have any liability.  D.I. 2.

## SUMMARY OF ARGUMENT

22.    Plaintiffs' fraudulent-transfer claims fail for at least two independent reasons. *First*, the Lenders expressly authorized the OpCo Debtors to use $203 million of their loan proceeds to fund the OpCo Distribution.  As a matter of law, that consent estops Plaintiffs, standing in the Lenders' shoes and suing for their exclusive benefit, from seeking to recover, as supposed fraudulent transfers, the very distributions the Lenders agreed would be made.  *Second*, the Complaint does not allege facts remotely supporting a claim that the OpCo Debtors made the OpCo Distribution with "actual intent" to hinder, delay, or defraud creditors.  All Plaintiffs offer in this regard is a conclusory theory that the HoldCo Board and Trive Defendants knew Lucky Bucks was insolvent because a June 2021 balance sheet—like ███████████████████████████ ████████████████████████████████████████████████████████—allegedly showed insolvency on a *book*-value basis.  But the relevant question for Plaintiffs' fraudulent-

transfer claims is whether Lucky Bucks was insolvent on a *market*-value basis. Plaintiffs plead no facts coming anywhere close to showing that the OpCo Debtors or Trive Defendants knew that Lucky Bucks was insolvent (or that, in fact, it was), much less that the Trive Defendants "actually intended" to hinder the Lenders by issuing a distribution that the Lenders agreed to finance even after ████████████████████████████████████████████████████████████ .

23.     Plaintiffs' remaining claims against the Trive Defendants should also be dismissed. *First*, the purported claim for aiding and abetting a breach of fiduciary duty fails in multiple ways. There was no primary violation that the Trive Defendants could have aided and abetted because the Managers (defined below) of HoldCo owed no fiduciary duty to HoldCo as managers. Further, even if the Managers had owed any fiduciary duty to HoldCo, the Complaint does not allege that any such duty was breached. And even if it did, the Complaint does not allege any facts suggesting that the Trive Defendants knowingly participated in any breach. *Second*, the purported Georgia-law claims for attorney's fees and punitive damages are requests for relief, not standalone causes of action—and Plaintiffs have no viable substantive Georgia-law claim on which to premise such relief. The federal Declaratory Judgment Act, too, is a source of remedies, not rights, and fails for lack of a viable underlying claim. And all the claims were in any event released under the Plan. The Complaint should be dismissed in full, with prejudice.

## ARGUMENT

24.     "To survive a motion to dismiss," a complaint "must contain sufficient *factual* matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Cred Inc.*, 650 B.R. 803, 812 (Bankr. D. Del. 2023) (quotation marks omitted; emphasis added), *aff'd*, 658 B.R. 783 (D. Del. 2024). As to Plaintiffs' intentional-fraudulent-transfer claims, Plaintiffs must plead "with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including "the date, time and place of the alleged fraud" or other facts that "inject precision" sufficient to give each

defendant "notice of the precise misconduct with which it is charged." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018); *see also In re Zohar III, Corp.*, 631 B.R. 133, 169-170 (Bankr. D. Del. 2021) (Rule 9(b) applies to actual-fraudulent-transfer claims). Furthermore, Plaintiffs may not engage in group pleading—as the Complaint does, *e.g.* Compl. ¶¶ 6, 8, 11, 73, 90, 101, 106—but must instead "inform each defendant of the nature of his alleged participation in the fraud," *Tredennick v. Bone*, 323 F. App'x 103, 105 (3d Cir. 2008).

25.     As discussed below, Plaintiffs' claims fail for numerous reasons. But before addressing each, the Trive Defendants wish to be clear on one point. There is an additional, threshold reason why those claims fail: They were released under the Plan.

26.     Plaintiffs implicitly concede that all of their claims against the Trive Defendants were so released by the OpCo Debtors' release of the "Released Parties" (which included the Trive Defendants) unless those claims were preserved under a carve-out to that release. *See* Compl. ¶¶ 99, 113-115; Bankr. D.I. 187 (Plan), art. VIII.A.2; *supra* ¶¶ 18-19. Plaintiffs thus devote a significant part of their Complaint to making the case that their claims were purportedly preserved under the carve-out. *See* Compl. ¶¶ 104-116. But Plaintiffs do not engage with the carve-out's actual terms. The Plan included a broad release of the Released Parties from all of the OpCo Debtors' "Claims and Causes of Action" relating to the OpCo Debtors. Bankr. D.I. 187 (Plan), art. VIII.A.2. The Plan defined the term "Causes of Action" expansively to include "any and all" "claims … and causes of action of any kind, nature or character whatsoever." *Id.* art. I.A (definition of "Causes of Action"). The carve-out, by contrast, preserved, not "Causes of Action," but only "*Claims* and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes *actual fraud, willful misconduct, or gross negligence*, in each case, solely to the extent determined by a Final Order of a court of competent jurisdiction." *Id.*

11

art. VIII.A.2 (emphases added). In contrast to its broad definition of "Causes of Action," the Plan defined "Claim" only to "mean[] any claim, as defined in section 101(5) of the Bankruptcy Code, *against an OpCo Debtor*." *Id.* art. I.A (emphasis added). Obviously, the claims asserted in the Complaint *by* the Opco Debtors against the Trive Defendants are not "Claims" "*against* an OpCo Debtor." And there has been no prior judicial determination, much less a Final Order, of actual fraud or willful misconduct by any Trive Defendant. *See Yucaipa Am. All. Fund I, LP v. SBDRE LLC*, 2014 WL 5509787, at \*10-12 (Del. Ch. Oct. 31, 2014) (giving issue-preclusive effect to Delaware bankruptcy decision interpreting similar release carve-out language to require prior judicial determination of willful misconduct "*before* [plaintiff] can bring suit").

27.     It is hornbook law that a Chapter 11 plan should be enforced in accordance with its plain terms. *In re Shenango Grp. Inc.*, 501 F.3d 338, 344 (3d Cir. 2007) ("contract principles" govern interpretation of "confirmed plan of reorganization"); *In re NorthEast Gas Generation, LLC*, 639 B.R. 914, 923 (Bankr. D. Del. 2022) ("Where a plan (like a contract) is unambiguous, its terms must be enforced as written."). That principle carries particular force here because the Plan's release was "subject to extensive negotiation among the parties," Compl. ¶ 99, and because the Trive Defendants obtained the benefit of the release as part of TCM's agreement to enter into the Restructuring Support Agreement and support the OpCo Debtors' reorganization.[9]

28.     Plaintiffs will no doubt urge the Court to disregard the release's plain terms and permit parol evidence and discovery into the parties' intent behind the release. As noted, that would be contrary to settled law. But, in any event, Plaintiffs themselves concede that they must allege that the Trive Defendants' conduct constituted actual fraud, willful misconduct, or gross

---

[9] Bankr. D.I. 187 (Plan), art. I.A (definitions of "Released Party," "Sponsors") (providing that TCM's treatment as a "Released Party" and "entitle[ment] to receive … the benefit of any release … in the OpCo Plan" was conditioned on signing the Restructuring Support Agreement).

negligence—and as set forth below, they have failed to do so. Accordingly, while the release bars Plaintiffs' claims, the Complaint also suffers from numerous other, fatal defects that require dismissal of all of Plaintiffs' claims against the Trive Defendants.

## I. THE FRAUDULENT-TRANSFER CLAIMS SHOULD BE DISMISSED

### A. The Lenders' Authorization Of The OpCo Distribution Bars The Fraudulent-Transfer Claims

29. Plaintiffs' fraudulent-transfer claims fail because the Lenders expressly authorized the OpCo Debtors to use the loan proceeds to fund the OpCo Distribution. As a matter of law, that consent estops Plaintiffs, standing in the Lenders' shoes and suing for their exclusive benefit, from seeking to recover, as supposed fraudulent transfers, the very transfers the Lenders approved.

30. That the Lenders consented to the OpCo Distribution is clear. The Credit Agreement provided that Lucky Bucks " " use the loan proceeds "

" *Supra* ¶ 11.

31. That consent estops Plaintiffs from avoiding the OpCo Distribution because Plaintiffs stand in the Lenders' shoes under § 544(b) in Counts II and III and are subject to the same defenses that would apply to the Lenders. Under § 544(b), Plaintiffs can avoid a transfer only if a "triggering creditor" could have done so outside bankruptcy. The OpCo Debtors' *only* outstanding creditors are the Lenders. All other creditors, owed less than $1 million, were paid in full under the Plan.[10] Plaintiffs accordingly cannot sue in those paid creditors' shoes, since none would benefit. *See Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80, 92-97 (Bankr. S.D.N.Y. 2008) (transfers could not be avoided under 11 U.S.C. §§ 544, 548, 550 because all

---

[10] Allowed general unsecured claims totaling $957,314 were paid in full under the Plan, as were all allowed administrative claims and professional fees. *Post-Confirmation Report Quarter Ending March 31, 2024*, Bankr. D.I. 361, at 2, 4, 7; *Post-Confirmation Report Quarter Ending December 31, 2023*, Bankr. D.I. 360, at 7; Plan art. III.B.4(b).

creditors who could have avoided the transfers were paid in full under Chapter 11 plan and would not benefit from any recoveries), *aff'd*, 379 F. App'x 10 (2d Cir. 2010); *accord Wellman v. Wellman*, 933 F.2d 215, 218-219 (4th Cir. 1991); *In re New Life Adult Med. Day Care Ctr., Inc.*, 2014 WL 6851258, at \*6 (Bankr. D.N.J. Dec. 3, 2014).[11] Thus, because Plaintiffs stand exclusively in the Lenders' shoes, Plaintiffs have "no greater rights of avoidance" than the Lenders would have had under state law. *United States v. Miller*, 145 S. Ct. 839, 847-848, 852 (2025).

32. The Lenders could not have avoided the OpCo Distribution under state law. "[C]reditors who are participants in an alleged fraudulent transfer, or who have ratified it, cannot then seek to have that transfer avoided." *In re Lyondell Chem. Co.*, 503 B.R. 348, 383 (Bankr. S.D.N.Y. 2014), *abrogated on other grounds by In re Trib. Fraudulent Conv. Litig.*, 818 F.3d 98 (2d Cir. 2016), *vacated and superseded on other grounds*, 946 F.3d 66 (2d Cir. 2019). Whether labeled "'ratification,' 'consent,' 'estoppel,' or 'material participation in the transaction,'" "the underlying point is the same. Creditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it." *Id.* at 383-384 (brackets omitted). Thus, the *Lyondell* court dismissed fraudulent-transfer claims because the lenders' "loan documents required [the] loan proceeds to be used" "for the purpose of financing an LBO" and paying the "proceeds … to stockholders." *Id.* at 384-385.

---

[11] *Cf. In re DSI Renal Holdings, LLC*, 2020 WL 550987, at \*6-9 (Bankr. D. Del. Feb. 4, 2020) (Owens, J.) (capping §§ 544, 548, and 550 recoveries to amount necessary to satisfy allowed creditor claims, since recovery of excess amounts "would provide no accompanying benefit to creditors as they would have already received payment in full" and instead "would serve to give rights and value to the Debtors to which they were not entitled outside, nor were given inside, bankruptcy"); *In re ONH AFC CS Invs., LLC*, 2025 WL 1353850, at \*5-9 (Bankr. D. Del. May 8, 2025) (endorsing *DSI Renal*'s analysis capping recoveries under §§ 544, 548, and 550 once claims are paid in full; "Fraudulent conveyance is a creditor's remedy. Where the beneficiary of a bankruptcy trustee's fraudulent conveyance action is a party that would not have been able to assert a fraudulent conveyance claim against the defendant immediately before the bankruptcy [there, equity holders], it would make no sense (for the reasons *DSI Renal* explains) to permit a bankruptcy trustee to assert a fraudulent conveyance claim for the benefit of that party."); *accord In re Allonhill, LLC*, 2019 WL 1868610, at \*52 (Bankr. D. Del. Apr. 25, 2019), *aff'd in part, remanded in part*, 2020 WL 1542376 (D. Del. Mar. 31, 2020); *In re Murphy*, 331 B.R. 107, 122-125 (Bankr. S.D.N.Y. 2005).

Similarly, the *Verizon* court held that a trustee could not sue under § 544(b) in the lenders' shoes to avoid payments to the debtor's parent company because the lenders "knew" and "required that their loans be used to pay [the parent]." *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 479 B.R. 405, 410-411 (N.D. Tex. 2012).[12] Numerous cases are in accord.[13]

33. To be sure, a few decisions have held that a trustee may sue on behalf of lenders to avoid transfers that those lenders authorized where the lenders supposedly acted without "full knowledge of all material facts." *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *12-13 (Bankr. D. Del. June 20, 2016); *In re Bos. Generating LLC*, 617 B.R. 442, 450-451, 493-495 (Bankr. S.D.N.Y. 2020), *aff'd on other grounds sub nom. Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021), *aff'd on other grounds*, 2024 WL 4234886 (2d Cir. Sept. 19, 2024). But that reasoning conflates the law of fraudulent *inducement* with the law of fraudulent *transfer*. If the lender was misled about the borrower's creditworthiness, it may have a claim that it was fraudulently *induced* to make the *loan*, but it cannot maintain a claim of fraudulent *transfer* if it knew that the borrower was going to *transfer*, not retain, the proceeds. *See Verizon*, 479 B.R. at 410-411 (argument that lenders were "duped" about debtor's creditworthiness was "irrelevant" because "plaintiff's claims are for fraudulent transfers, not for fraud"; "[b]ecause [the] lenders … had full knowledge of the transfers … , they could not have brought fraudulent transfer claims"); *Lyondell*, 503 B.R. at 385, 389 & n.201, 390-392 ("[w]hile more nuanced

[12] In a separate ruling, *Verizon* permitted the trustee to sue in the shoes of a different, non-lender, creditor, reading Fifth Circuit precedent to require that result even though the creditor's claim had been satisfied. *Id.* at 414. That ruling departs from the principle recognized by numerous authorities noted above that a transfer cannot be avoided if all creditors who could have avoided the transfer have been paid and would not benefit. *See supra* ¶ 31 & n.11.

[13] *See, e.g.*, *Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 478-480 (W.D. Tex. 2013) (plaintiff could not sue in lenders' shoes to avoid payment of loan proceeds to shareholder, where loan documents required payment); *In re Dunn*, 2006 WL 6810930, at *8 (B.A.P. 9th Cir. Oct. 31, 2006) (creditor who agreed that note proceeds would be paid to defendant could not avoid transfer); *Victory Med. Ctr. Beaumont, L.P. v. Conn. Gen. Life Ins. Co.*, 2018 WL 3467915, at *5-7 (E.D. Tex. July 17, 2018) (creditor's agreed settlement of claim estopped it from avoiding settlement); *In re Adelphia Recovery Tr.*, 634 F.3d 678, 691 (2d Cir. 2011) ("A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance.").

knowledge might be necessary to establish ratification in other contexts, it is more than sufficient here for the LBO lenders to have known … that the proceeds of their loans were going to stockholders," though complaint alleged LBO earnings projections were "inflated").

34.     In any event, there is no plausible allegation that the Lenders were misled here. Plaintiffs' theory of "fraud" is that the Trive Defendants knew Lucky Bucks was insolvent because its liabilities on a June 30, 2021 balance sheet exceeded the accounting *book value* of its assets. *See supra* ¶ 9; *infra* ¶ 41.  But that supposed "insolvency" was not hidden from the Lenders. Macquarie received a █████████████████████████████, showing ████████████████ ████████████████████████████████████.  *See supra* ¶ 9; *infra* ¶ 42.  The Lenders thus knew that ████████████████████████████████████████████ when they extended their loan and authorized the OpCo Debtors to pay the loan proceeds to the shareholders.

35.     The Lenders' authorization of the OpCo Distribution also precludes the same fraudulent transfer-claims asserted under § 548 in Count I.  Although a claim under § 548 is brought on behalf of the estate, rather than in the shoes of a particular creditor, courts have held that the Bankruptcy Code's avoidance and recovery powers may not be used where, as here, none of the estate's creditors who would benefit can legitimately claim to be harmed by the transfer.

36.     Thus, in *Refco*, the court held that a trustee could not bring a § 548 fraudulent transfer claim if the only beneficiary was the lender who had authorized in its credit agreement the very payment that the trustee sought to recover.  *In re Refco, Inc. Sec. Litig.*, 2009 WL 7242548, at *8-11 (S.D.N.Y. Nov. 13, 2009), *R&R adopted*, 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010). "The avoidance power of a trustee depends on whether there is a legitimate creditor to take advantage of the recovery," but the lender's "involvement in the transaction … disqualif[ied]" the

lender as such a creditor. *Id.* at \*9, \*11. Similarly, in *Crescent Resources*, the court held that a trustee could not recover fraudulent transfers under § 550—which permits recovery of transfers avoided under § 544 and § 548 only if recovery is "for the benefit of the estate"—to the extent that a recovery would benefit the lenders that had authorized the transfers. *See* 500 B.R. at 478-483.[14]

37. That principle controls here. The § 548 claim, like the § 544 claims, would benefit only the Lenders, who made their loans knowing the proceeds would be paid to shareholders and unavailable to repay the Lenders. No fraudulent-transfer claim can lie in such circumstances.

## B. The Complaint Fails To State A Plausible Claim Of Intentional Fraudulent Transfer

38. The fraudulent-transfer claims also fail because the Complaint fails to allege facts sufficient to show that the OpCo Debtors made the OpCo Distribution with "actual intent" to "hinder, delay, or defraud" their creditors. 11 U.S.C. § 548(a)(1)(A); Del. Code Ann. tit. 6, § 1304(a)(1); Ga. Code Ann. § 18-2-74(a)(1).[15]

39. Plaintiffs tacitly acknowledge that, whatever dispute there might be regarding the scope of the Plan's release, it certainly released any constructive fraudulent-transfer claim. They therefore assert only claims of intentional fraudulent transfer. To state such a claim, Plaintiffs must plausibly allege that the OpCo Debtors made the OpCo Distribution with "*actual* intent" to impede their creditors, i.e., that they willfully "*intended* to hinder, delay, or defraud creditors." *In re Fairfield Sentry Ltd.*, 147 F.4th 136, 162 (2d Cir. 2025). This "demanding standard" requires

---

[14] Unlike this case, *Crescent Resources* involved other, non-lender creditors who could have avoided the transfers (and benefited from such avoidance). But while the court permitted recoveries to pay those creditors, it denied recovery of any excess amount to pay the lenders, because it saw "no equitable basis for allowing such a recovery" under § 550. *See* 500 B.R. at 482-483. Here, by contrast, there are *no* creditors who could avoid the transfers outside bankruptcy who would benefit from recovery of the OpCo Distribution. The bar to recovery in this case is thus even more clear than in *Crescent Resources*—and comports fully with § 544(b)'s prohibition on using avoiding powers to "unwind transactions that would never actually be at risk of invalidation outside of bankruptcy proceedings." *Miller*, 145 S. Ct. at 847.

[15] Though a choice-of-law inquiry is unnecessary on this motion, if the claims survive, the Trive Defendants reserve all rights to dispute that Delaware or Georgia law govern any state-law claims asserted under § 544(b).

more than "recklessness or negligence"; rather, Plaintiffs must show that the Debtors made the transfer with a conscious "desire[]" to hinder, delay, or defraud creditors or "know[ledge]" that the transfer was "substantially certain" to result in such harm. *Id.* at 162-163. Moreover, as noted *supra* (¶ 24), such claims must be pleaded with the particularity required by Rule 9(b).

40. The Complaint does not remotely allege facts showing that the OpCo Debtors, acting through the only actors who could have authorized the OpCo Distribution (the HoldCo Board, *see infra* ¶ 44 & n.20), "actually intended" the OpCo Distribution to hinder their creditors. And while it is the intent of the "debtor" that matters, 11 U.S.C. § 548(a)(1)(A), the Complaint does not come close to alleging any such intent on the part of the Trive Defendants either, even assuming *arguendo* that the Complaint had pleaded a basis to impute the Trive Defendants' intent to those Opco Debtors.

41. The *only* basis on which the Complaint alleges that the OpCo Debtors or the Trive Defendants supposedly knew that the Opco Debtors were insolvent and had "actual intent" to hinder, delay and defraud creditors is that the HoldCo Board and Trive Defendants knew that Lucky Bucks' June 30, 2021, balance sheet showed that its liabilities exceeded its assets. Compl. ¶¶ 68, 84-85, 108-109, 121-122, 132-133, 143-144. But that balance sheet merely showed the assets' accounting *book value*, not their actual *market value*. That *book value* was irrelevant as a measure of the assets' actual market value and the OpCo Debtor's solvency. Section 548 and its state-law counterparts define a debtor as "insolvent" only if its debts exceed it assets "at a *fair valuation*."[16] And it is well settled that the "fair value" of a going-concern business like Lucky Bucks is measured by the company's *market value*, not its *book value*. *See, e.g.*, *In re Opus E.*

---

[16] 11 U.S.C. §§ 101(32)(A), 548 (emphasis added); *accord* Del. Code Ann. tit. 6, §§ 1302, 1304(b)(9); Ga. Code Ann. §§ 18-2-72, 18-2-74(b)(9); *In re R.M.L., Inc.*, 92 F.3d 139, 154-155 (3d Cir. 1996) ("[S]olvency is measured" under the "'balance sheet' test: assets and liabilities are tallied *at fair valuation* to determine whether the corporation's debts exceed its assets." (further quotation marks omitted)).

*LLC*, 698 F. App'x 711, 715 (3d Cir. 2017) ("'Fair valuation' is determined by valuing the debtor's assets" on a "going concern" basis, *i.e.*, "by looking at an asset's market value" (quotation marks omitted)); *Covey v. Com. Nat'l Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992) ("Accountants may value assets at cost ('book value'), but if the market value of a firm's assets exceeds its liabilities, it is solvent notwithstanding red ink in the balance sheet.").

42.     If there were any doubt as to this point, the Lenders' own actions would put that doubt to rest. The Lenders—highly sophisticated investors, led by Macquarie—invested half a billion dollars in loans to the OpCo Debtors and authorized them to make the OpCo Distribution, after conducting substantial due diligence, Compl. ¶¶ 74-75, and pursuant to a Credit Agreement that included                                                                    .[17]   Indeed, well before the closing, Macquarie received

                                                                    *showing that*

                                                                    . *See supra* ¶¶ 9, 34.  Yet, Macquarie and the other Lenders decided to enter into the Credit Agreement anyway, making plain that they concluded that those                    were irrelevant—and that the actual market value of Lucky Bucks' assets exceeded its liabilities, including the debt Lucky Bucks would owe to the Lenders for the new $535 million loan they were extending to it.  The Lenders' own decision to lend hundreds of millions of dollars knowing

                                                                    renders utterly implausible any suggestion that the OpCo Debtors or the Trive Defendants knew to a "substantial certainty" that the OpCo Debtors were insolvent and "actually intended" to hinder, delay, or defraud the Debtors'

---

[17]  *See* Ex. A (Credit Agreement) § 4.01(n) (requiring that

                                                                    ).

creditors.[18] *See Fairfield Sentry*, 147 F.4th at 162; *In re Old Carco LLC*, 435 B.R. 169, 193-194 (Bankr. S.D.N.Y. 2010) (dismissing intentional-fraudulent-transfer claims where alleged insolvency was "implausible" given "contemporaneous market information" that "sophisticated banking establishments" extended loans to the debtor).

43. The Complaint's few other allegations are even flimsier. The conclusory allegation that the Lenders were misled about compliance with "the GLC order banning Damani's involvement," Compl. ¶¶ 74, 120, 131, 142, is not based on any alleged misrepresentation: the GLC's order prohibited Mr. Damani from serving as an "officer" of Lucky Bucks or "member of the HoldCo Board" or exercising "operational control" over the business, *id.* ¶¶ 50-51, and the Complaint does not allege that Mr. Damani did any of those things. Rather, the Complaint alleges only that Mr. Damani was kept in the loop regarding the Macquarie loan and certain M&A opportunities and exercised his right as a shareholder to nominate a HoldCo director. *Id.* ¶¶ 63, 66-67, 72-73. Nor does the Complaint plausibly allege that Macquarie was misled when it decided to go forward with the transaction, though one of its diligence requests for a "revenue build" had allegedly not been fulfilled. *Id.* ¶ 75. And the Complaint's allegations regarding the Holdings Distributions, *id.* ¶¶ 90-94, have nothing to do with the claims asserted in this case; those transfers were made by a different company (Holdings), long after the OpCo Distribution, and did not involve a single transfer, or the incurrence of a single obligation, by the OpCo Debtors. None of these supposed schemes to mislead the Lenders plausibly suggests that the OpCo Debtors were insolvent at the time of the OpCo Distribution, much less that the Debtors or the Trive Defendants

---

[18] While this Court must accept for purposes of this Motion any well-pleaded allegations in the Complaint, Plaintiffs also have an obligation to make only those allegations for which they have a reasonable basis. Plaintiffs' own files include detailed decks and other analyses prepared in early 2022 by leading investment bankers and potential buyers, ███████████████, suggesting that, even after taking account of the OpCo Dividend and Holdings Distributions, Lucky Bucks was worth more than $1 billion, and that ██████████████████████████████████ ████████████████████████████. If any aspect of this case survives this motion, the Trive Defendants look forward to presenting that and other evidence to the Court.

"actually intended" the OpCo Distribution—which the Lenders themselves required—to hinder, delay, or defraud those Lenders. *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 361-362 (2016) (noting that "fraudulent conveyances are not an inducement-based fraud"); *Fairfield Sentry*, 147 F.4th at 161-164 (explaining that "actual intent" requires "desire" or knowledge to "substantial certainty" that transfer will hinder creditors).[19]

44.     Nor does the Complaint plead "actual intent" to hinder creditors by alleging that Messrs. Damani and Kassam schemed to divert and re-sell location contracts. Compl. ¶¶ 3-4, 53-59, 85, 89, 108, 121, 132, 143. The Complaint all but admits that a majority of the HoldCo Board's members, Messrs. Sekhri and Boyden, were *not* involved in that scheme. *Id.* ¶¶ 89, 108, 121, 132, 143 (alleging only that "Kassam" "knew when signing the Lucky Bucks Consent that the value of the Company's assets were inflated"); *id.* ¶ 54 (alleging that Damani and Kassam "went to extensive lengths to conceal their misconduct"). Nor does the Complaint allege that the Trive Defendants were involved in the alleged fraud. To the contrary, it alleges that Damani and Kassam had been looting the company since at least 2019, yet TCM invested in the company in August 2020 to acquire a majority of its equity; plainly, Trive was unaware of that scheme when it invested its own money, and there are no allegations that Trive somehow uncovered the scheme in the next six to 11 months when the Credit Agreement to fund the OpCo Distribution was being negotiated and executed. *Id.* ¶¶ 53, 60-61. Indeed, the Complaint alleges that Reorganized Lucky Bucks did not uncover the scheme until 2023, and it then sued its alleged participants in Georgia state court—not including Sekhri, Boyden, or the Trive Defendants. *Id.* ¶¶ 53, 102; *see supra* ¶ 17.

---

[19] *See also Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1510 (1st Cir. 1987) (Breyer, J.) ("Fraudulent conveyance law is basically concerned with *transfers* that 'hinder, delay or defraud' creditors … [and not] with how such debts were created."); *In re Direct Access Partners, LLC*, 602 B.R. 495, 543 (Bankr. S.D.N.Y. 2019) ("[E]ven if the Trustee had proved that [investors] were defrauded into making additional investments [in the debtor], that would be a 'fraud' different from the one that the Trustee is required to prove here. … [T]he Trustee's claims need to focus on the intent with which transfers were made, not the manner in which money was raised.").

Accordingly, any alleged fraudulent intent of Mr. Kassam cannot be imputed to the OpCo Debtors or the Trive Defendants because no facts are alleged plausibly suggesting that the other HoldCo board members (Sekhri and Boyden) who held majority control of the board—the corporate actor having the authority to approve the OpCo Distribution—had any such intent when they approved the OpCo Distribution.[20]

45.     Finally, the Complaint purports to allege five "badges of fraud": transfer (i) to insiders, (ii) for no consideration, (iii) after incurring a substantial debt (the $535 million loan), (iv) while Lucky Bucks was insolvent, (v) involving a substantial portion of Lucky Bucks' assets.[21] But "[t]he badges-of-fraud analysis is not a check-the-box inquiry," and the court must "examine the totality of the circumstances to determine whether fraudulent intent exists." *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at \*5 (Bankr. D. Del. Feb. 8, 2016). The supposed badges of fraud alleged here fail to create a plausible inference of fraudulent intent.

46.     The first two badges—transfer to insiders, for no supposed consideration—are present in every dividend to shareholders and thus carry little weight. *See, e.g.*, *Trib.*, 10 F.4th at 162 (badges insufficient where they alleged facts "generally" present in "most" cases); *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 435 (5th Cir. 2014) (badges that "are a feature of every spin-off transaction" did not show fraudulent intent (brackets omitted)).

---

[20] *See In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 159-160 (2d Cir. 2021) (dismissing intentional-fraudulent-transfer claim, despite allegations that CEO had fraudulent intent, because debtor company's intent under "control test" could be established only through "actual intent" of corporate actor having the authority to control the transfer— the board—which lacked such intent); *In re Elrod Holdings Corp.*, 421 B.R. 700, 709-712 (Bankr. D. Del. 2010) (intentional-fraudulent-transfer claim failed because fraudulent intent of two directors could not be imputed to debtor where majority of its independent directors approved the challenged transfers); *see also* Ex. B (Fifth Amended and Restated Limited Liability Company Agreement of Lucky Bucks HoldCo, LLC (the "HoldCo LLC Agreement")) at Trive_00074767 (§ 5.01(h)(iv)) (requiring                                                    ); *id.* at Trive_00074764 (§ 5.01(c)(iii), (c)(v)) (providing that
                          ). Because the Complaint discusses the HoldCo LLC Agreement (Compl. ¶ 63), the Court may consider it on this motion. *See supra* ¶ 11 n.3.
[21] *See* Compl. ¶¶ 119, 121-122, 130, 132-133, 141, 143-144; *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (listing badges of fraud); Del. Code Ann. tit. 6, § 1304(b) (same); Ga. Code Ann. § 18-2-74(b) (same).

22

47.     The third badge—transfer after incurring a substantial debt to the Lenders—is also present in every leveraged dividend or recapitalization transaction and likewise carries little weight. *See In re Trib. Co. Fraudulent Conv. Litig.*, 2017 WL 82391, at \*15 (S.D.N.Y. Jan. 6, 2017) (badges that "simply describe[d] the basic features of any [leveraged buyout], which … invariably requires a company to incur debt" did not show fraudulent intent), *aff'd*, 10 F.4th 147 (2d Cir. 2021). And that is particularly true here, where the Lenders authorized the OpCo Debtors to make the transfer. The reason that transferring assets after incurring a substantial debt can be suspicious is because it may evidence an intent by the debtor to elude payment to a creditor by attempting to put its assets out of reach in response to incurring a debt to the creditor. *In re Able Body Temp. Servs., Inc.*, 626 B.R. 643, 663 (Bankr. M.D. Fla. 2020) (explaining that "'incurrence of substantial debt' badge" addresses debtor who "transfers assets to place them beyond the new creditor's reach"). But no such inference of fraudulent intent can arise here, where the OpCo Debtors made the transfer with the approval of Lenders who made the loan for that very purpose.

48.     The last two badges—transfer while insolvent, involving a substantial portion of the debtor's assets—are premised on nothing more than the *book value* of Lucky Bucks' assets. *See* Compl. ¶¶ 84-85; 121-122(c), (e); 132-133(c), (e); 143-144(c), (e). This theory fails, as already discussed. *See supra* ¶¶ 41-42. Even if Plaintiffs had plausibly alleged insolvency (they have not), that would not state a claim of *intentional* fraudulent transfer. *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).

## II.     THE AIDING-AND-ABETTING CLAIM SHOULD BE DISMISSED

49.     Count Five (Compl. ¶¶ 160-170) claims that the Trive Defendants and others aided and abetted the breach alleged in Count Four (*id.* ¶¶ 149-159), *i.e.*, the alleged breach by the Managers of "fiduciary duties to HoldCo" that they supposedly owed as managers, *id.* ¶ 153. Under Delaware law, such an aiding-and-abetting claim requires "(1) the existence of a fiduciary

relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *In re Our Alchemy, LLC*, 2019 WL 4447519, at *9 (Bankr. D. Del. Sept. 16, 2019) (ellipsis omitted).

50.     Here, the aiding-and-abetting claim fails for several independent reasons.  *First*, the Managers did not owe a fiduciary duty to HoldCo.  *Second*, even if they did, the Complaint alleges no facts suggesting that the Managers breached any such duty.  *Third*, the Complaint does not allege facts establishing the Trive Defendants' "knowing participation" in any supposed breach.

## A.     The HoldCo LLC Agreement Disclaimed Any Fiduciary Duties

51.     The aiding-and-abetting claim is dead on arrival because there is no primary violation (*i.e.*, breach of fiduciary duty) that the Trive Defendants could have aided and abetted. The alleged underlying violation is a breach of fiduciary duties that the Managers owed to HoldCo *as its managers*.  *See* Compl. ¶ 153.  No such duties existed.  The HoldCo LLC Agreement expressly ▬▬▬▬▬▬, providing that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬" HoldCo.  Ex. B at Trive_00074765 (§ 5.01(e)) ("▬▬▬▬▬▬").  Delaware law permits such provisions in LLC agreements:  "To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company," those duties "may be … eliminated by provisions in the limited liability company agreement." Del. Code Ann. tit. 6, § 18-1101(c).  And the courts have enforced such provisions.[22]

---

[22] *See e.g.*, *Osios LLC v. Tiptree, Inc.*, 2024 WL 2947854, at *7-8 (Del. Ch. June 12, 2024) (dismissing fiduciary-duty claim where LLC agreement stated "each Indemnified Person shall not owe any fiduciary duties to the Company"); *Footlick v. Topstep LLC*, 2024 WL 1283702, at *6-7 (N.D. Ill Mar. 26, 2024) (dismissing fiduciary-duty claim against officers where LLC agreement specified that they had "no duties (including fiduciary duties)"); *Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*, 302 A.3d 430, 445 (Del. Ch. 2023) (finding fiduciary duties unambiguously eliminated by LLC agreement, which stated that no such duties were owed, "notwithstanding anything to the contrary existing at law, in equity or otherwise"); *In re 3P Hightstown, LLC*, 631 B.R. 205, 213 (Bankr. D.N.J. 2021) (finding that Delaware LLC agreement expressly waived managers' fiduciary duties under § 18-1101(c)); *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *11 (Del. Ch. May 7, 2008) (finding fiduciary duties unambiguously

52.     To state the obvious, a fiduciary duty cannot be breached if it does not exist.  The Court should not entertain an aiding-and-abetting claim if Plaintiffs cannot even "establish[] that an underlying breach of fiduciary duty occurred."  *Our Alchemy*, 2019 WL 4447519, at *9.

53.     To be sure, Section 5.01(e) of the HoldCo LLC Agreement does allow for the possibility that ███████████████████████ "████████████" ███████████ ████████.  Ex. B at Trive_00074765 (§ 5.01(e)).  But no such express provisions exist.  The Complaint leans upon Section 9.02 of the LLC Agreement, *see* Compl. ¶¶ 105-106, but that section serves a different purpose:  It ████████████████████████████████████ ██████████████████████████████████████████████████, and then includes ████████████████ "█████████████████████████████████████████ █████████████████████████████████" Ex. B at Trive_00074787 (§ 9.02(b)); *see* Compl. ¶¶ 105-106.  That ██████████████████████████████████ ███████████████████████████████████████████████████████.  *See* Ex. B at Trive_00074765 (§ 5.01(e)).  Indeed, the Complaint ignores Section 9.03, which immediately follows Section 9.02 and expressly states that ██ "███████████," ████████████████████, "███████████████████████████████████████████████ █████████████████████████████████████████████████ ██████████████████████" *Id.* at Trive_00074787 (§ 9.03).

---

eliminated by LLC agreement, which "flatly stat[ed] that members have no duties other than those expressly articulated in the Agreement" and which "[did] not expressly articulate fiduciary obligations"), *aff'd*, 984 A.2d 124 (Del. 2009).

**B.** **The Complaint Fails To Allege A Breach Of Any Fiduciary Duty**

54. The Court need go no further than Section 5.01(e). But even if the Managers did owe fiduciary duties to HoldCo as managers (they did not), Plaintiffs' claim still fails because the Complaint does not allege that the Managers breached any such duties.

55. It is "settled law" that "the declaration and payment of a dividend rests in the discretion of the corporation's board of directors in the exercise of its business judgment," absent "fraud or gross abuse of discretion." *Gabelli & Co. v. Liggett Grp., Inc.*, 479 A.2d 276, 280 (Del. 1984). The Managers cannot be liable for making the OpCo Distribution simply because it, "in hindsight, turned out poorly for the company." *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *22 (Del. Ch. Oct. 12, 2011).[23] Rather, Plaintiffs must establish that the Managers "breached their fiduciary duty of care or of loyalty or acted in bad faith." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del. 2006). Although the Complaint offers threadbare legal conclusions that the Managers breached the "fiduciary duties of loyalty, good faith and fair dealing," Compl. ¶ 150, it alleges no facts to support those legal conclusions.[24]

56. That the Managers allegedly authorized the Distribution "for the purpose of enriching" HoldCo's equity holders, Compl. ¶ 157(a)-(b); *see id.* ¶¶ 70, 114, does not establish fiduciary disloyalty. "[C]orporate directors have a fiduciary duty to act in the best interests of the corporation's *stockholders*," *McRitchie v. Zuckerberg*, 315 A.3d 518, 540 (Del. Ch. 2024) (emphasis added), so there was nothing disloyal about seeking to "enrich[]" HoldCo's equity holders through the Distribution (rather than using that cash for other permissible purposes, such

---

[23] The allegation that the Managers were "aware of no legitimate business interest" for the Distribution, Compl. ¶ 154(c), is wholly conclusory and need not be credited, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[24] The duty of loyalty includes a requirement that officers and directors act in "good faith"; it is not a separate fiduciary duty but rather is "a subsidiary element, i.e., a condition, of the fundamental duty of loyalty." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (brackets and quotation marks omitted).

as capital investment). And if Plaintiffs mean to argue that the Managers were disloyal to HoldCo's *creditors*—because the Managers supposedly knew that the Distribution would render HoldCo insolvent, *e.g.*, Compl. ¶ 154(d)—that argument fares no better. The Complaint does not plausibly plead insolvency. *See supra* ¶¶ 41-42. And even if it did, any fiduciary duties owed by the Managers were owed *to HoldCo*, not its creditors. *See N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (explaining that directors of a corporation "in the zone of insolvency" continue to owe fiduciary duties *to the corporation*, not to its creditors).

57. Plaintiffs get no further through allegations that Mr. Boyden and Mr. Sekhri lacked independence as Managers. *See* Compl. ¶¶ 165, 175, 178. That the Trive Defendants appointed Mr. Boyden and Mr. Sekhri to the Board is "not, alone, a sufficient basis for a finding that [they were] controlled." *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 408 (Del. Ch. 1999); *see also McElrath v. Kalanick*, 224 A.3d 982, 995-996 (Del. 2020) (allegations that founder appointed director "as a means of retaining control," hoping that director "might be loyal to him," did not show lack of independence).[25] And the side letters allegedly executed by Mr. Boyden and Mr. Sekhri, *see* Compl. ¶ 178, merely acknowledged that TCM had certain consent rights over company decisions and in no way suggest that either Manager had a "personal or other relationship" that rendered him "beholden to" the Trive Defendants, *Cal. Pub. Emps.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002).

58. Even if Mr. Boyden or Mr. Sekhri were not independent, that would matter only if he "was conflicted in his loyalties *with respect to the challenged board actions*." *Off. Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, 2004 WL 1949290, at *10 (Del.

---

[25] The question of director independence typically arises in the context of demand futility, *see, e.g.*, *Kalanick*, 224 A.3d at 995-996, but Delaware courts apply the same standards when assessing director independence for purposes of fiduciary-duty claims, *see, e.g.*, *Odyssey Partners*, 735 A.2d at 408; *In re ALH Holdings, LLC*, 675 F. Supp. 2d 462, 483-84 (D. Del. 2009).

Ch. Aug. 24, 2004) (emphasis added) (quoting *Litt v. Wycoff*, 2003 WL 1794724, at *4 (Del. Ch. Mar. 28, 2003)).  There are no allegations that the Managers placed the Trive Defendants' interests over those of any other HoldCo equity holder, nor that the Trive Defendants benefitted from the Distribution at the expense of any other HoldCo equity holders.  *See Fedders*, 405 B.R. at 540.[26]

### C.  The Complaint Fails To Allege That The Trive Defendants "Knowingly Participated" In Any Breach

59.     To state an aiding-and-abetting claim, Plaintiffs must plead scienter—*i.e.*, facts showing that the Trive Defendants "kn[e]w that the [Managers'] conduct constitute[d] a breach" and that the Trive Defendants "had actual knowledge that their conduct was legally improper."  *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 390-391 (Del. 2024) (quotation marks omitted), *accord In re Columbia Pipeline Grp., Inc. Merger Litig.*, --- A.3d ----, 2025 WL 1693491, at *22-23 (Del. June 17, 2025).  "Th[e] requirement that the aider and abettor must know that *its own* conduct regarding the breach was legally improper is distinct from knowledge that the primary party's conduct was a breach."  *Mindbody*, 332 A.3d at 391.

60.     The Complaint falls well short of meeting this burden.  The Trive Defendants invested in Lucky Bucks in August 2020, approximately 11 months before the OpCo Distribution and only six months prior to the start of negotiations over the credit agreement preceding that dividend.  *See* Compl. ¶¶ 4, 19-29, 60-61, 70-76.  It would be nonsensical to suggest (and is not, in fact, alleged) that the Trive Defendants invested hundreds of millions of dollars in Lucky Bucks knowing that it was insolvent, or that it was engaged in a fraud.  Moreover, there are no allegations that the Trive Defendants learned of any information over the next six to eleven months that would

---

[26] The Complaint implies that the Managers breached their fiduciary duties by not considering whether to "retain an independent financial advisor."  Compl. ¶ 79.  But there is no fiduciary duty to retain outside advisors.  *See Merchs.' Nat'l Props., Inc. v. Meyerson*, 2000 WL 1041229, at *6 (Del. Ch. July 24, 2000) (rejecting claim that board "wrongfully failed to hire an outside financial advisor" because "duty of care" did not "require[] them to retain" one).

have alerted them to Lucky Bucks' supposed insolvency or the alleged B-Side Business Fraud. As discussed, Plaintiffs' allegations of insolvency rest on a balance sheet that reflected only the OpCo Debtors' book, not market, value, and that the Lenders themselves viewed as irrelevant. *See supra* ¶¶ 41-42. But even if Plaintiffs had sufficiently alleged that Lucky Bucks was insolvent (they have not), there are no allegations showing the Trive Defendants *knew* Lucky Bucks was insolvent. *See Cred*, 650 B.R. at 823-824 (plaintiffs failed to allege scienter despite allegations defendant was informed of dire financial situation and corporate looting). The Complaint concedes that the Trive Defendants were unaware of the B-Side Business Fraud. Compl. ¶¶ 85, 115, 121, 132, 143, 167.

## III. THE CLAIMS FOR ATTORNEY'S FEES, PUNITIVE DAMAGES, AND A DECLARATORY JUDGMENT SHOULD BE DISMISSED

61. Plaintiffs' purported claims for attorney's fees and punitive damages should be dismissed. *See* Compl. ¶¶ 184-186 (Count Seven) (citing Ga. Code Ann. § 13-6-11); *id.* ¶¶ 187-189 (Count Eight) (citing Ga. Code Ann. § 51-12-5.1). Neither cited Georgia statute creates an independent cause of action; each merely provides additional relief for an underlying substantive claim. *See Thysis, Inc. v. Chemron Corp.*, 2011 WL 13162410, at *5 (N.D. Ga. Aug. 25, 2011); *Gardner v. Kinney*, 498 S.E.2d 312, 313 (Ga. Ct. App. 1998). Plaintiffs have no viable substantive claim against the Trive Defendants, let alone any arising under Georgia law that would permit the recovery of attorney's fees or punitive damages. Indeed, only Count Three of the Complaint even purports to assert a substantive claim invoking Georgia law against the Trive Defendants. But that claim is asserted via § 544 and § 550 of the Bankruptcy Code, which specify that Plaintiffs' only remedies are to "avoid" the transfer and "recover … the property transferred, or, … [its] value"; there is no provision to recover punitive damages or attorney's fees. 11 U.S.C. §§ 544(b), 550(a); *see also In re Tronox Inc.*, 429 B.R. 73, 111 (Bankr. S.D.N.Y. 2010) ("§ 550 bars punitive damages

notwithstanding their possible availability under state law"); *Bash v. Textron Fin. Corp.*, 2013 WL 12526002, at \*2-3 (N.D. Ohio July 22, 2013) (same).

62.     Similarly, Plaintiffs are not entitled to relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (the "DJA"), *see* Compl. ¶¶ 190-195 (Count Nine), because they lack a viable underlying cause of action.  The DJA "is procedural only" and "presupposes the existence of a judicially remediable right."  *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 457 n.3 (3d Cir. 2019).  Because the DJA "creates a remedy, not rights," *id.*, it is "not an independent source of federal jurisdiction," *Schilling v. Rogers*, 363 U.S. 666, 677 (1960).

## IV.     THE CLAIMS SHOULD BE DISMISSED WITH PREJUDICE

63.     The Court should dismiss with prejudice.  As discussed, Plaintiffs' claims against the Trive Defendants all suffer from fundamental and incurable legal flaws.  *See In re Amcad Holdings, LLC*, 579 B.R. 33, 42 (Bankr. D. Del. 2017) (dismissing with prejudice because "any amendment would be futile").  Plaintiffs conducted a lengthy and "comprehensive investigation into prepetition conduct" before bringing suit, Compl. ¶ 102, and they long ago received copies of the Trive Defendants' Rule 2004 productions, *see supra* ¶ 21.  Further opportunities to amend are thus unwarranted.  *See In re SRC Liquidation LLC*, 581 B.R. 78, 94-95 (D. Del. 2017) (affirming dismissal with prejudice because "Plaintiff had access to documents and discovery" when crafting his complaint), *aff'd*, 765 F. App'x 726 (3d Cir. 2019).

## CONCLUSION

64.     The Court should dismiss the claims against the Trive Defendants, with prejudice.

Dated: September 5, 2025
     Wilmington, Delaware

Respectfully submitted,

**WILMER CUTLER PICKERING
  HALE AND DORR LLP**

Philip D. Anker (admitted *pro hac vice*)
Ross E. Firsenbaum (admitted *pro hac vice*)
Charles C. Bridge (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888
philip.anker@wilmerhale.com
ross.firsenbaum@wilmerhale.com
charles.bridge@wilmerhale.com

Joel Millar (admitted *pro hac vice*)
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363
joel.millar@wilmerhale.com

*Attorneys for Defendants Trive Capital
Management LLC, Trive Capital Fund III LP,
Trive Capital Fund III-A LP, TCFIII Luck LP,
TCFIII Luck SPV LP, TCFIII Luck
Acquisition LLC, TCFIII Luck Holdings LLC,
Quantum Gaming Corp., Southern Star
Gaming, LLC, and Shravan Thadani*

**PACHULSKI STANG ZIEHL
  & JONES LLP**

By: */s/ Laura Davis Jones*

Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
(t) (302) 652-4100
(f) (302) 652-4400
ljones@pszjlaw.com
pkeane@pszjlaw.com

*Attorneys for Defendants Trive Capital
Management LLC, Trive Capital Fund III LP,
Trive Capital Fund III-A LP, TCFIII Luck LP,
TCFIII Luck SPV LP, TCFIII Luck
Acquisition LLC, TCFIII Luck Holdings LLC,
Quantum Gaming Corp., Southern Star
Gaming, LLC, and Shravan Thadani*