## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LUCKY BUCKS, LLC, *et al.* | Case No. 23-10758 (KBO) |
| Debtors. | |
| LB NEWHOLDCO, LLC and LUCKY BUCKS, LLC, | |
| Plaintiffs, | Adversary Proceeding Adv. Pro No. 25-50965 (KBO) |
| v. | |
| TRIVE CAPITAL MANAGEMENT LLC, *et al.*, | |
| Defendants. | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

**COLE SCHOTZ P.C.**
Justin R. Alberto (No. 5126)
Patrick J. Reilley (No. 4451)
Stacy L. Newman (No. 5044)
500 Delaware Avenue, Ste. 600
Wilmington, DE 19801
Telephone: (302) 652-3131

*Counsel to Plaintiffs LB NewHoldCo, LLC and Lucky Bucks, LLC*

**REID COLLINS & TSAI LLP**
William T. Reid, IV (*pro hac vice* forthcoming)
Gregory S. Schwegmann (*pro hac vice* forthcoming)
Jeremy H. Wells (*pro hac vice* forthcoming)
1301 S. Capital of Texas Highway, Ste. C300
Austin, Texas 78746
Telephone: (512) 647-6100

Alexander J. Rigby (No. 7257)
300 Delaware Avenue, Ste. 770
Wilmington, DE 19801
Telephone: (302) 467-1765

Angela Somers (*pro hac vice* forthcoming)
420 Lexington Avenue, Suite 2515
New York, NY 10170
Telephone: (212) 344-5200

Dated: November 4, 2025
      Wilmington, Delaware

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 2

FACTUAL BACKGROUND ............................................................................................... 3

    A.    After growing Lucky Bucks to one of the largest COAM operators in Georgia, Damani sells a controlling interest in the Company to Trive. ................................ 3

    B.    After the GLC bars his involvement in the operations of Lucky Bucks, Damani and his associates ramp up a scheme to loot the Company. ................................. 5

    C.    While taking near total control of Lucky Bucks, Trive still involves Damani in the Company's operations in violation of the GLC Executive Order.................... 6

    D.    Trive defrauds lenders in order to cash out on its investment in Lucky Bucks. ..... 7

    E.    Lucky Bucks collapses into bankruptcy, and investigations discover the B-Side Scheme. .................................................................................................................. 9

PROCEDURAL BACKGROUND...................................................................................... 11

PLEADING STANDARDS................................................................................................ 12

SUMMARY OF THE ARGUMENT ................................................................................. 13

ARGUMENT ..................................................................................................................... 14

    A.    Plaintiffs' claims were not released because the OpCo Plan's release expressly carves out claims based on actual fraud and willful misconduct......................... 14

        1.    The Release carves out "liabilities" for fraud and willful misconduct, not just "Claims" against the OpCo Debtors. ...................................................... 14

        2.    No condition precedent exists that would bar Plaintiffs from pursuing the carved-out claims. ...................................................................................... 17

    B.    Defendants cannot escape liability through a ratification defense based on lender consent obtained through omissions and misrepresentations. ................... 19

        1.    Lenders who were deceived about material facts cannot ratify the fraudulent transfers as a matter of law......................................................... 20

        2.    Defendants' reliance on *Lyondell* fails because that case involved no allegations of fraud or misrepresentation. ..................................................... 25

    C.    The Complaint adequately pleads actual fraudulent intent through both direct evidence and badges of fraud............................................................................... 29

1. The Complaint alleges direct evidence that Defendants made misrepresentations with the intention of defrauding the OpCo lenders   into funding the OpCo Distribution.................................................................... 30

2. Plaintiffs also allege numerous badges of fraud that sufficiently plead intent to hinder, delay, and defraud. ............................................................ 33

D. The Complaint sufficiently alleges managers of HoldCo and officers of Lucky Bucks owed fiduciary duties to the entities they served and breached those duties. ............................................................................................................... 38

1. As Managers of HoldCo, Sekhri, Boyden, and Kassam had a fiduciary duty not to engage in conduct that lacked good faith..................................... 38

2. As officers of Lucky Bucks, Sekhri, Boyden, Bouskill, Ijaz, and Kassam had express fiduciary duties not to engage in conduct that lacked good faith. .................................................................................................................... 41

3. The Complaint states claims for breaches of managing members and officers in Counts Four and Six.................................................................... 43

a. Count Four adequately alleges the Managers breached their fiduciary duties by coordinating with Trive and Damani to effectuate the OpCo Distribution knowing it would leave HoldCo insolvent. ........................................................................ 43

b. Count Six adequately alleges the Management Defendants and Kassam breached their fiduciary duties by entering into sham transactions and signing false documents that permitted the OpCo Distribution........................................................................ 46

4. The Complaint sufficiently pleads in Count Five that the Trive Defendants, Bouskill, Ijaz and Damani knowingly participated in the breach of     duties owed by managers to HoldCo and aided and abetted the breach. ................. 47

E. The Court should not dismiss Plaintiffs' claims for attorneys' fees, punitive damages, and declaratory relief. .......................................................................... 49

F. This Court should hear the core bankruptcy claims at the heart of this case........ 50

CONCLUSION................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. H.S.B.C.*,
  634 F.3d 678 (2d Cir. 2011)................................................................................21

*Advanced Reimbursement Solutions LLC v. Spring Excellence Surgical Hospital LLC*,
  No. CV-17-01688-PHX-DWL, 2018 WL 3023296 (D. Ariz. June 27, 2018) .......................20

*In re Appleseed's Intermediate Hldgs., LLC*,
  470 B.R. 289 (D. Del. 2012)................................................................................37

*ASARCO LLC v. Americas Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008) ............................................................................21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................12

*Ashkenazi v. Kent S. Assocs., LLC*,
  51 A.D.3d 611 (N.Y. App. Div. 2008) ..................................................................18

*In re Bayou Steel BD Holdings, L.L.C.*,
  642 B.R. 371 (Bankr. D. Del. 2022) ................................................................40, 41

*Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*,
  500 B.R. 464 (W.D. Tex. 2013)............................................................................28

*In re Boston Generating LLC*,
  617 B.R. 442 (Bankr. S.D.N.Y. 2020) .............................................................22, 25

*In re Cadira Group Holdings, LLC Litig.*,
  2021 WL 2912479 (Del. Ch. July 12, 2021)...............................................38, 39, 40

*In re CAH Acquisition Company #1*,
  LLC, 2022 WL 4389301 (Bankr. E.D. N.C. Sept. 22, 2022) ..................................19

*Charys Liquidating Trust v. Growth Management, LLC (In re Charys Holding Co.)*,
  No. 08-10289 (BLS), 2010 WL 2774852 (Bankr. D. Del. July 14, 2010) ..............29

*In re Cred Inc.*,
  No. 20-12836-JTD, 2024 WL 1345194 (D. Del. Mar. 29, 2024)...........................14

*CSH Theatres, LLC v. Nederlander of San Francisco Associates*,
  2015 WL 1839684 (Del. Ch. April 21, 2015)........................................................39

*In re Davis*,
    2011 WL 5429095 (Bankr. W.D. Tenn. Nov. 8, 2011) ........................................................32

*In re Direct Access Partners, LLC*,
    602 B.R. 495 (Bankr. S.D.N.Y. 2019) ....................................................................................28

*DirectTV Latin Am., LLC v RCTV Intern. Corp.*,
    115 A.D.3d 539 (N.Y. App. Div. 2014) .................................................................................18

*DoubleLine Capital v. Odebrecht Fin.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018)....................................................................................21

*In re Dowd*,
    616 B.R. 212 (Bankr. N.D. Ga., 2020) ..................................................................................29

*Drivetrain, LLC v. X. Commerce, Inc.*,
    2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023) .................................................................30

*In re Elec. Last Mile Sols., Inc.*,
    2024 WL 223195 (Del. Ch. Jan. 22, 2024) ......................................................................47, 48

*In re Extended Stay, Inc.*,
    2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) ...........................................................21

*Farrell v. Bd. of Educ. of N.Y.C.*,
    113 A.D. 405 (N.Y. App. Div. 1906) ....................................................................................18

*In re Fedders North America, Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) ................................................................................12, 30

*Feeley v. NHAOCG, LLC*,
    62 A.3d 649 (Del. Ch. 2012)..................................................................................................38

*Foxchase, LLLP v. Cliatt*,
    562 S.E.2d 221 (Ga. App. 2002)............................................................................................49

*In re GBG USA Inc.*,
    666 B.R. 115 (Bankr. S.D.N.Y. 2024)...................................................................................32

*Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*,
    2014 WL 6703980 (Del. Ch. Nov. 26, 2014) ........................................................................48

*Greenfield v. Philles Records, Inc.*,
    780 N.E.2d 166 (N.Y. 2002)..................................................................................................14

*In re Grogan*,
    476 B.R. 270 (D. Or. 2012) ...................................................................................................16

*In re HH Liquidation, LLC*,
  590 B.R. 211 (Bankr. D. Del. 2018) .......................................................40

*Johnson & Johnson Health Care Sys., Inc. v. SaveOnSP, LLC*,
  No. 3:23-cv-04181-ZNQ-LHG, 2025 WL 2161673 (D.N.J. May 5, 2025) ..........................43

*LaSala v. Bordier et Cie*,
  519 F.3d 121 (3d Cir. 2008)..................................................................47

*In re Lucky Bucks, LLC*,
  No. 23-10758 (KBO), D.I. 393 (Bankr. D. Del. Oct. 28, 2024) ...................................1, 13, 17

*Lui v. Park Ridge at Terryville Ass'n*,
  196 A.D.2d 579 (N.Y. App. Div. 1993) .......................................................18

*Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*,
  127 A.D.3d 48 (N.Y. App. Div. 2015) .......................................................15

*In re Mallinckrodt PLC*,
  No. 20-12522 (JTD), 2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) ..........................29, 37

*Maric Healthcare, LLC v. Guerrero*,
  2024 WL 2993336 (Del. Ch. 2024) .........................................................41

*In re Maxus Energy Corp.*,
  641 B.R. 467 (Bankr. D. Del. 2022) .........................................................37

*Mehra v. Teller*,
  2021 WL 300352 (Del. Ch. Jan. 29, 2021).....................................................39

*In re Millennium Lab Holdings II, LLC*,
  2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) .............................................32

*In re Millennium Lab Holdings II, LLC*,
  2019 WL1005657 (Bankr. D. Del. Feb. 28, 2019) .............................................36

*In re Millennium Lab Holdings II, LLC*,
  2025 WL 794311 (Bankr. D. Del. Mar. 12, 2025)..............................................21

*MSKP Oak Grove, LLC v. Venuto*,
  839 Fed. Appx. 708 (3d Cir. 2020)..........................................................30

*In re MultiOpCo Plan Corp. S'holders Litig.*,
  268 A.3d 784 (Del. Ch. 2022).............................................................41

*Munich Reinsurance Am., Inc. v. Am. Nat'l Ins. Co.*,
  936 F. Supp. 2d 475 (D.N.J. 2013) .........................................................18

*In re Nat'l Serv. Indus., Inc.*,
  No. AP 14-50377 (MFW), 2015 WL 3827003 (Bankr. D. Del. June 19, 2015) ...................33

*In re New Century TRS Holdings, Inc.*,
  No. 09-52251 (KJC), 2013 WL 1196605 (Bankr. D. Del. Mar. 25, 2013)...........................19

*New Enterprise Assocs. 14, L.P. v. Rich*,
  295 A.3d 520 (Del. Ch. 2023)................................................................................................39

*Olin Corp. v. Am. Home Assurance Co.*,
  704 F.3d 89 (2d Cir. 2012)....................................................................................................16

*In re Our Alchemy, LLC*,
  642 B.R. 155 (Bankr. D. Del. 2022) ......................................................................................29

*In re PA Co-Man, Inc.*,
  644 B.R. 553 (Bankr. W.D. Pa. 2022) ..................................................................................35

*PAH Litig. Tr. v. Water St. Healthcare P'rs, L.P. (In re Physiotherapy Hldgs., Inc.)*,
  2016 WL 3611831 (Bankr. D. Del. June 20, 2016).......................................................*passim*

*Pardo v. Gonzaba (In re APF Co.)*,
  308 B.R. 183 (Bankr. D. Del. 2004) ......................................................................................12

*Parlux Fragrances, LLC v. S. Carter Enterprises, LLC*,
  204 A.D.3d 72 (N.Y. App. Div. 2022) ..................................................................................18

*In re Premier Int'l Holdings, Inc.*,
  443 B.R. 320 (Bankr. D. Del. 2010) ..................................................................................9, 16

*In re Refco, Inc. Sec. Litig.*,
  2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009)........................................................................28

*Riverside Risk Advisors LLC v. Chao*,
  2022 WL 14672745 (Del. Ch. Oct. 26, 2022) .......................................................................38

*Robinson v. Family Dollar Inc.*
  679 Fed. Appx. 126,131 (3d Cir. 2017).................................................................................12

*Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*,
  742 F.2d 786 (3d Cir. 1984)..................................................................................................12

*Song v. eGPS Sols. I, Inc.*,
  899 S.E.2d 530 (Ga. App. 2024)............................................................................................42

*In re Syntax-Brillian Corp.*,
  No. 08-11407 (BLS), 2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016)................................30

*In re Tronox Inc.*,
  503 B.R. 239 (Bankr. S.D.N.Y. 2013) ................................................................22, 28

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*,
  479 B.R. 405 (N.D. Tex. 2012) ................................................................................28

*VXI Lux HoldCo S.à.r.l. v. SIC Holdings, LLC*,
  171 A.D.3d 189 (N.Y. App. Div. 2019) ...................................................................1

*Wagner v. BRP Grp., Inc.*,
  316 A.3d 826 (Del. Ch. 2024) .................................................................................39

*Washington State Investment Board v. Odebrecht S.A.*,
  461 F.Supp.3d 46 (S.D.N.Y. 2020) ........................................................................20

*In re White*,
  559 B.R. 787 (Bankr. N.D. Ga., 2016) ...................................................................30

*In re Winstar Communications, Inc.*,
  348 B.R. 234 (Bankr. D. Del. 2005) .......................................................................34

*Yucaipa Am. All Fund I, LP v. SBDRE LLC*,
  2014 WL 5509787 (Del. Ch. Oct. 31, 2014) ....................................................18, 19

*In re Zohar III, Corp.*,
  631 B.R. 133 (Bankr. D. Del. 2021) ..................................................................12, 29

**Statutes**

6 *Del. C.* § 18-1101(e) ...............................................................................................39

6 *Del. C.* § 1304(a)(1) ................................................................................................29

11 U.S.C. § 548(a)(1)(A) ............................................................................................29

O.C.G.A. § 13-6-11 ....................................................................................................49

O.C.G.A. § 14-11-101(18) ..........................................................................................42

O.C.G.A. § 14-11-305............................................................................................42, 43

O.C.G.A. § 16-14-1...............................................................................................10, 50

O.C.G.A. § 18-2-74(a)(1) ...........................................................................................29

O.C.G.A. § 51-12-5.1 .................................................................................................49

**Other Authorities**

Fed. R. Civ. P. 9(b) ................................................................................................................12, 33

Fed. R. Civ. P. 12(b)(6)................................................................................................................12

Plaintiffs LB NewHoldCo, LLC ("**NewHoldCo**") and its subsidiary, Lucky Bucks, LLC (together, "**Plaintiffs**" or "**Reorganized Lucky Bucks**"), as successors in interest to Lucky Bucks HoldCo, LLC ("**HoldCo**") and Lucky Bucks, LLC (together, "**Lucky Bucks**," the "**Company**" or the "**OpCo Debtors**"), filed an adversary proceeding complaint (the "**Complaint**") (D.I. No. 1)[1] against Trive Capital Management LLC, Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Quantum Gaming Corp., Southern Star Gaming LLC, Shravan Thadani, (collectively, the "**Trive Defendants**"), Anil Damani, LBV27, LLC, Lucky Bucks Ventures, Inc. (collectively, the "**Damani Defendants"**), Shafik Kassam ("**Kassam**"), James Boyden, Ryan Bouskill, Manu Sekhri, Seven Aces Holdings ULC and Hassan Ijaz (collectively, the "**Management Defendants**", and all defendants collectively, the "**Defendants**").

The Trive Defendants moved to dismiss Plaintiffs' claims (D.I. Nos. 11, 12, 13, and 26), supported by a *Trive Memorandum of Law in Support of Defendants' Motion to Dismiss* ("**Trive Defs.' Brief**") (D.I. No. 25). The Damani Defendants moved to dismiss Plaintiffs' claims (D.I. No. 19), supported by a *Brief in Support of Defendants Anil Damani, Lucky Bucks Ventures, Inc., and LBV27, LLC's Motion to Dismiss Complaint* ("**Damani Defs.' Brief"**) (D.I. No. 20). The Management Defendants moved to dismiss Plaintiffs' claims (D.I. Nos. 16 and 18), supported by a *Brief in Support of Management Defendants' Motion to Dismiss the Complaint* ("**Management Defs.' Brief**") (D.I. No. 17). Kassam moved to dismiss Plaintiffs' claims (D.I. Nos. 14, and 23), supported by a *Brief in Support of Defendant Shafik Kassam's Motion to Dismiss Complaint and Joinder in Co-Defendants Motion to Dismiss* ("**Kassam Brief**") (D.I. No. 15).

The Defendants' motions should be denied for the reasons below.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Complaint.

**INTRODUCTION**

Through this action, Plaintiffs seek to redress the harm caused to Lucky Bucks through Defendants' fraudulent scheme to siphon $203.6 million out of the Company through an improper leveraged LLC distribution (the "**OpCo Distribution**"). The OpCo Distribution directly led to the Company's inevitable bankruptcy at the expense of the Company's creditors.

Each of the Defendants participated in the scheme. In the years leading up to the OpCo Distribution, Defendants Damani and Kassam systematically looted the company and diverted cash to entities under their control. The Trive Defendants—which owned a controlling interest in the Company—and the Management Defendants concealed the Company's flagging performance in large part caused by Damani and Kassam's misconduct. And each of the Defendants misrepresented or otherwise concealed Damani's ongoing involvement in the Company despite having been banned from operational involvement by the Georgia Lottery Commission ("**GLC**"). By concealing this conduct and issuing the OpCo Distribution, Defendants plunged the now-insolvent Company into inevitable bankruptcy. In their Motions, Defendants raise four primary arguments to escape liability for this conduct. Each is meritless.

First, Defendants claim that the Company's bankruptcy estates released Plaintiffs' claims in the *First Amended Joint Chapter 11 Plan for Lucky Bucks, LLC and Lucky Bucks HoldCo LLC* (the "**OpCo Plan**"). In fact, the release Defendants point to has an explicit carveout for causes of action "arising out of or relating to any act or omission of a Release Party that constitutes actual fraud, willful misconduct, or gross negligence." Each of Plaintiffs' claims easily satisfy this carveout.

Second, Defendants argue that the Company's lenders ratified the OpCo Distribution despite having been fraudulently induced into funding the transaction. Yet the Trive Defendants' brief acknowledges case law holding that a party cannot ratify a fraudulently induced transaction.

Third, Defendants argue that Plaintiffs have not adequately alleged Defendants' intent to defraud. In so arguing, Defendants largely ignore the extensive allegations detailing direct evidence of Defendants' fraud. Defendants also brush aside the Complaint's allegations supporting numerous "badges of fraud" from which fraudulent intent can be inferred at the pleadings stage.

Finally, Defendants claim that the Management Defendants owed no fiduciary duties to the Company, even though the Management Defendants and Kassam owed a fiduciary duty to act in good faith, and they fell far short of that mark.

The Court should take the Defendants' arguments for what they are: a desperate attempt to avoid any responsibility for their fraudulent conduct. The Court should deny the Motions in full.

## FACTUAL BACKGROUND

A.    **After growing Lucky Bucks to one of the largest COAM operators in Georgia, Damani sells a controlling interest in the Company to Trive.**

In 2011, Anil Damani founded Lucky Bucks, a Georgia-based enterprise built to own and operate skill-based coin-operated amusement machines ("**COAMs**"). Lucky Bucks placed these machines in gas stations, convenience stores, and other retail establishments that derived their principal revenue from the sale of goods and services. Winners were rewarded primarily through gift cards or store merchandise in order to comply with Georgia's laws governing amusement gaming.[2]

The COAM industry is heavily regulated by the GLC, which issues and supervises two primary forms of licenses—Master Licenses and Location Licenses. Holders of Master Licenses, such as Lucky Bucks, are permitted to own and service COAMs throughout Georgia, while Location License holders may only host machines at a single site. Each location must operate under

---

[2] Compl. ¶¶ 41–42.

a written, exclusive contract with a single Master License holder. Master License holders are not permitted to either hold Location Licenses or have any interest in locations under contract with that Master License holder.[3]

Because the number of licenses is limited and each location contract can generate substantial monthly revenue, these assets are highly valuable and frequently traded within the industry. Lucky Bucks's growth strategy depended on acquiring such licenses and location contracts from other operators.[4] Through these efforts, Lucky Bucks grew into one of the largest COAM operators in Georgia, managing more than 3,500 machines at its peak and holding hundreds of exclusive location contracts that produced consistent, high-margin revenue.[5]

In 2016, seeking liquidity and capital for further expansion, Damani sold a 51% interest in HoldCo to Southern Star Gaming LLC ("**Southern Star**") for approximately $13.5 million. The transaction was financed primarily through Trive Capital Management (together with its affiliates, "**Trive**"), a private equity firm that supplied both equity and debt to Southern Star and subsequently committed additional financing. Between 2018 and 2019, Trive and Southern Star increased their stake to roughly 70% of HoldCo, collaborating with Damani to execute an aggressive acquisition campaign that absorbed at least nineteen smaller COAM operators.[6]

By 2020, Lucky Bucks dominated the Georgia market, with a business model dependent on continued acquisitions and leverage-based financing.[7]

---

[3] Compl. ¶¶ 42–43.

[4] Compl. ¶¶ 43–44.

[5] Compl. ¶¶ 40, 44.

[6] Compl. ¶¶ 45–47.

[7] Compl. ¶¶ 44.

**B.    After the GLC bars his involvement in the operations of Lucky Bucks, Damani and his associates ramp up a scheme to loot the Company.**

In May 2020, the GLC issued a notice of intent to revoke Lucky Bucks's Master Licenses, alleging that Damani had offered an unlawful inducement—a residence—to a Location License owner. The resulting administrative proceeding culminated in a June 2020 executive order (the "**GLC Executive Order**") that found Damani in violation of Georgia's COAM laws. The order allowed Lucky Bucks to retain its Master Licenses but required Damani to resign as CEO and as a director, to relinquish all operational authority, to cease having any managerial functions or operational control of the Company, and to convert his ownership to a non-voting interest. Damani also entered a five-year non-compete agreement prohibiting his involvement in any competing COAM operation.[8]

Despite these explicit restrictions, Damani, Kassam, and others at the Company immediately began violating the GLC Executive Order. Using Kassam as his proxy on the HoldCo Board, Damani continued to direct operations behind the scenes. Beginning in or around 2019, they engineered a complex fraudulent scheme to siphon some of Lucky Bucks's most lucrative location contracts to entities they secretly controlled known as the "B-Side Businesses" (the "**B-Side Scheme**"). Through this scheme, they deprived Lucky Bucks of high-performing location contracts, while simultaneously arranging for the Company to repurchase those same contracts at grossly inflated prices.[9]

To inflate the repurchase prices, Damani and Kassam used false play data and coordinated with complicit employees to overstate monthly machine revenues. Because COAM contracts were typically priced as a multiple of average monthly revenue, this manipulation enabled them to sell

---

[8] Compl. ¶¶ 48–52.

[9] Compl. ¶¶ 53–55, 57.

the same contracts back to Lucky Bucks for inflated sums. Between October 2020 and June 2021, Lucky Bucks completed a spree of acquisitions totaling over $30 million, including two transactions in June 2021—with one B-Side entity alone accounting for $16.6 million. Kassam, serving as both an officer and board member, approved the transactions despite his direct involvement in the underlying fraud.[10]

The scheme distorted the Company's financial reporting and created the illusion of revenue growth. Internally, however, senior finance officers raised red flags. In February 2021, EVP Ijaz warned that certain newly acquired location contracts were severely underperforming and cautioned that the Company had "overpaid by 63%."[11] Damani and Kassam nevertheless continued to funnel assets and cash through covert channels, employing encrypted communications and deleting company records to hide their misconduct. By mid-2021, Lucky Bucks's true financial condition had deteriorated significantly, even as its books reflected inflated revenue from artificially enhanced acquisitions.[12]

## C.    While taking near total control of Lucky Bucks, Trive still involves Damani in the Company's operations in violation of the GLC Executive Order.

While Damani and Kassam manipulated operations internally, Trive solidified its external control over Lucky Bucks. In August 2020, Trive acquired nearly all remaining shares of Seven Aces Limited—the parent company of Southern Star—and purchased an additional 5% of equity interest in HoldCo from Damani, which gave Trive a controlling interest in Lucky Bucks's corporate chain. Through amendments to partnership and LLC agreements, Trive obtained veto rights over virtually all significant corporate actions, including acquisitions, budgets, distributions,

---

[10] Compl. ¶¶ 56–57.

[11] Compl. ¶¶ 59.

[12] Compl. ¶¶ 58–59.

and new debt issuances.[13] Moreover, through Southern Star, Trive controlled two of HoldCo's three board seats, which it gave to Sekhri and Boyden. Trive exercised its control in all aspects of the Company. Trive inserted Thadani directly into the Company's day-to-day affairs, including working closely with Kassam on operational matters.[14]

Crucially, however, through Lucky Bucks Ventures, Inc.'s ownership interest in HoldCo, Damani retained the power to appoint his proxy, Kassam, as the third member of the HoldCo board. This allowed Damani to maintain extensive involvement at Lucky Bucks, despite the GLC's formal ban. Trive knew Damani maintained his involvement with the Company and "walked around egg shells" with Kassam so as not to disturb Damani's influence. Primarily through Thadani, Trive worked with Damani in assessing new acquisitions, again knowing full well that the GLC had banned Damani from doing so.[15]

In addition to working with Damani on acquisitions, Trive also kept a close eye on Lucky Bucks's management team. This included weekly calls with Defendants Bouskill and Ijaz to receive updates on the Company's financial performance and detailed financial reporting prepared by Bouskill and Ijaz. These reports included the Company's balance sheet for June 2021, which clearly showed that the Company's liabilities exceeded its assets, even without accounting for Damani and Kassam's B-Side Scheme, which Trive was also aware of.[16]

## D.    Trive defrauds lenders in order to cash out on its investment in Lucky Bucks.

By June 2021, despite Lucky Bucks's growing liabilities, Trive sought to generate an immediate return on its investment through a highly leveraged distribution. Indeed, Trive and the

---

[13] Compl. ¶¶ 60–63.

[14] Compl. ¶¶ 64–65.

[15] Compl. ¶¶ 63, 66–67.

[16] Compl. ¶ 68.

Management Defendants' entire goal for the transaction was to "maximize the dividend" paid to insiders.[17] In early 2021, Trive began courting lenders. When traditional lenders resisted, Trive turned to Macquarie Capital Funding LLC ("**Macquarie**"), crafting a narrative of stability while concealing the Company's deteriorating finances and Damani's continued involvement. Indeed, Macquarie specifically asked about Damani's involvement—likely knowing that a violation of the GLC Executive Order could mean that the Company could be shuttered—yet Trive explicitly (and falsely) represented that Damani had no operational involvement whatsoever.[18] Emails show that Thadani and others instructed officers to withhold full revenue data from Macquarie, fearing it would expose underperformance.[19]

On July 30, 2021, Trive consummated a new $535 million senior secured credit facility (the "**OpCo First Lien Credit Facility**"), with Macquarie as administrative agent. The proceeds were used primarily to fund the $203.6 million OpCo Distribution to insiders, as well as to retire Lucky Bucks's prior debt. Board members Sekhri, Boyden, and Kassam approved the transaction through written consent, falsely asserting that the Company's assets exceeded its liabilities. In reality, Lucky Bucks's June 30, 2021 balance sheet showed a $45 million deficit, which ballooned to over $250 million immediately after the OpCo Distribution. The funds were routed through multiple affiliated entities, ultimately resulting in Trive receiving approximately $119 million, Damani more than $50 million, and Sekhri over $30 million.[20]

There was no legitimate process or business rationale for the distribution, nor could the Company afford it. No board materials, solvency opinions, or financial analyses were prepared or

---

[17] Compl. ¶ 70.

[18] Compl. ¶¶ 70–74.

[19] Compl. ¶¶ 75.

[20] Compl. ¶¶ 76–80, 84–85.

considered. Instead, again, internal communications reveal that Trive's entire goal was to "maximize the dividend" and recover its investment within months. Immediately following the transaction, Trive and Lucky Bucks executives awarded themselves "one time bonuses" funded by the same proceeds—further evidence that the purpose was enrichment, not corporate necessity.[21]

**E.   Lucky Bucks collapses into bankruptcy, and investigations discover the B-Side Scheme.**

The OpCo Distribution left Lucky Bucks grossly overleveraged and incapable of sustaining operations. Far from concerned, Trive and the other Defendants had already started planning yet another distribution before the OpCo Distribution was completed. Given restrictions on the Company's new debt, Trive's partners pursued an additional round of financing through the creation of a new parent entity, Lucky Bucks Holdings ("**Holdings**"). This entity issued approximately $250 million in payment-in-kind notes ("**PIK Notes**") in late 2021 and early 2022, the proceeds of which were again distributed to insiders as so-called "Holdings Distributions." By layering new debt on top of the already unsustainable OpCo debt facility, Defendants effectively stripped the Company of everything that was not bolted to the floor and plunged the Company even deeper into insolvency.[22]

By mid-2023, Lucky Bucks's liabilities exceeded $800 million, and the Company could no longer meet its debt obligations. On June 8 and 9, 2023, the OpCo Debtors and Holdings filed voluntary petitions for chapter 11 protection in the U.S. Bankruptcy Court for the District of Delaware. The filings were authorized by the Holdings board—comprising the same individuals who had approved the OpCo Distribution—and supported by a declaration from Boyden. That

---

[21] Compl. ¶¶ 77, 79, 86–88.

[22] Compl. ¶¶ 90–94.

declaration acknowledged the refinancing but obscured the nature and scale of the insider distributions. In truth, the same parties responsible for the Company's financial ruin continued to direct the proceedings under Trive's control.[23]

Following months of negotiations, the Bankruptcy Court confirmed the OpCo Plan in July 2023.[24] The OpCo Plan converted the OpCo lenders' claims into equity in NewHoldCo. Once control shifted and new management was installed, Reorganized Lucky Bucks initiated a comprehensive investigation into the prepetition conduct of the prior owners and management. The investigation, along with a parallel inquiry by the chapter 7 Trustee for the converted Holdings estate, uncovered extensive evidence of fraud, self-dealing, and concealment by Damani, Kassam, Trive, and their associates.[25]

These investigations revealed that Defendants had acted with actual intent to defraud Lucky Bucks, Holdings, and their creditors. The orchestrated distributions, false financial representations, and concealment of Damani's ongoing involvement were not isolated lapses of judgment—they were part of a calculated effort to extract value from a failing enterprise and to leave its creditors unpaid. A separate Georgia state court complaint (the "**Georgia Complaint**" and such action, the "**Georgia Action**") alleges, among other things, breach of fiduciary duty and violations of Georgia's Racketeer Influenced and Corrupt Organizations Act. Stemming from the same integrated scheme, the Complaint here alleges claims for actual fraudulent transfer (Counts One, Two, and Three); breach of fiduciary duty against the HoldCo Board members and Lucky Bucks officers under Delaware and Georgia law, respectively (Counts Four and Six); aiding and

---

[23] Compl. ¶¶ 95–97.

[24] Compl. ¶ 98.

[25] Compl. ¶¶ 98–101.

abetting breach of fiduciary duty against Trive and Damani (Count Five); and requests for attorneys' fees, punitive damages, and declaratory relief (Counts Seven, Eight, and Nine).[26] Each of these claims arises from willful misconduct that falls squarely within the category of "Preserved Claims" under the confirmed OpCo Plan.[27]

## **PROCEDURAL BACKGROUND**

On June 8 and 9, 2023, the OpCo Debtors and Holdings filed for chapter 11 protection in the U.S. Bankruptcy Court for the District of Delaware.[28] On July 28, 2023, the Court entered an order confirming the OpCo Plan.[29] As part of the OpCo Plan, the OpCo Debtors released certain third parties, subject to extensively negotiated carveouts covering claims and liabilities against the Defendants (among others) "arising out of or relating to any act or omission of a Released Party that constituted actual fraud, willful misconduct, or gross negligence." [30]

Shortly after the effective date of the OpCo Plan, based on a motion filed by certain of Holdings' creditors, the Court converted the Holdings chapter 11 case to a chapter 7 liquidation on the ground that Holdings had no prospect of reorganizing.

Plaintiffs, as successors in interest to the OpCo Debtors, filed the Complaint in this action, which brings many of the claims preserved in the OpCo Plan. The Holdings Trustee has filed his own adversary proceeding against many of the same defendants, before this Court, which in large part seeks to claw back the Holdings Distribution.[31]

---

[26] Compl. ¶¶ 117–195.

[27] Compl. ¶¶ 102–103.

[28] Compl. ¶ 96.

[29] Compl. ¶ 98.

[30] Compl. ¶ 99.

[31] Compl. ¶¶ 8 n.3, 100.

## PLEADING STANDARDS

"To avoid dismissal under Rule 12(b)(6), the plaintiff need only provide sufficient factual matter to state a claim for relief that is plausible on its face when accepting that factual matter as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This only requires that well-pleaded allegations "raise a right to relief above the speculative level." *Robinson v. Family Dollar Inc.* 679 Fed. Appx. 126,131 (3d Cir. 2017). A plaintiff must allege sufficient facts to nudge the claims "across the line from conceivable to plausible[.]" *In re Zohar III, Corp.*, 631 B.R. 133, 155 (Bankr. D. Del. 2021).

Rule 8(a) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." While Rule 9(b) requires plaintiff's allegations based on fraud be pleaded "with particularity," "focusing exclusively on its 'particularity' language '[in Rule 9(b)] is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Zohar,* 631 B.R. at 170.

Moreover, "[t]he requirements of Rule 9(b) are relaxed and interpreted liberally where a trust formed for the benefit of creditors is asserting the fraudulent transfer claims[.]" *In re Fedders North America, Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009) "This is because of the trustee's inevitable lack of knowledge concerning acts of fraud previously committed against the debtor, a third party." *Id.*; *see also Pardo v. Gonzaba (In re APF Co.)*, 308 B.R. 183, 188 (Bankr. D. Del. 2004) ("[I]n the bankruptcy context, Rule 9(b) should be interpreted liberally, particularly when

the trustee is bringing the action"). Here, as this Court commented, Reorganized Lucky Bucks is "functionally equivalent" to a post-confirmation trust in these circumstances.[32]

## SUMMARY OF THE ARGUMENT

Defendants make four broad arguments for dismissal of the Complaint, each of which fails.

*First*, Defendants argue that Plaintiffs' claims were released under the OpCo Plan. This is incorrect. In fact, Plaintiffs' claims were explicitly carved out of the OpCo Plan's releases and are the precise claims that all of the relevant parties considered when negotiating the releases.

*Second*, Defendants argue that certain pre-petition lenders ratified the OpCo Distribution. As pleaded in the Complaint, the lenders entered into the transaction based on material misrepresentations regarding the Company's finances and operations. Given these misrepresentations, the lenders could not have ratified the Defendants' misconduct.

*Third*, Defendants contend the Complaint insufficiently pleads intent for intentional fraudulent transfer. But the Complaint details both direct evidence of the requisite intent and numerous "badges of fraud" that, taken together, satisfy the intent element at the pleadings stage.

*Fourth*, Management Defendants argue that they owed no fiduciary duties to the Company and, accordingly, did not breach such duties. The relevant operating agreements, however, clearly indicate that the Management Defendants owed a fiduciary duty not to act in bad faith. And the bad faith of the Management Defendants is evident from the allegations set out in the Complaint.

*Fifth*, Defendants argue that attorneys' fees and punitive damages are not separate causes of action as pleaded in the Complaint. Georgia law requires such relief to be specially pleaded, and Plaintiffs are entitled to such relief.

---

[32] *See In re Lucky Bucks, LLC,* No. 23-10758 (KBO), D.I. 393 (Bankr. D. Del. Oct. 28, 2024) (Hr'g Tr. 45:2–6) (This Court concluded: "I find that the reorganized debtor is *functionally equivalent to a post-confirmation trust* and that these claims were vested in the reorganized debtor for the future pursuit for the entity and its new shareholders, which were former creditors of the debtors" (emphasis added)).

*Sixth*, Defendants argue that Plaintiffs are not entitled to declaratory relief finding that their conduct constituted fraud or willful misconduct. Defendants illogically argue that Plaintiffs must obtain a final order finding fraud or willful misconduct before bringing suit, and that Plaintiffs are not entitled to seek such an order. The Court should instead find that the Defendants' misconduct falls squarely within the claims expressly preserved by the OpCo Plan.

*Seventh*, the Damani Defendants argue that Plaintiffs engaged in forum shopping by bringing core bankruptcy claims in this Court rather than Georgia state court—an absurd proposition warranting no further discussion.

## ARGUMENT

**A.     Plaintiffs' claims were not released because the OpCo Plan's release expressly carves out claims based on actual fraud and willful misconduct.**

Defendants argue that the Complaint should be dismissed based on the OpCo Debtors' release (the "**Release**")[33] of certain third parties contained in the OpCo Plan. But the Release clearly and unambiguously carves out the claims asserted in this action. By contrast, the Defendants' nonsensical reading of the Release would turn its plain meaning on its head and call into question similar releases in countless other confirmed plans of reorganization.

### 1.     *The Release carves out "liabilities" for fraud and willful misconduct, not just "Claims" against the OpCo Debtors.*

"In construing a confirmed plan of reorganization, courts in the Third Circuit apply principles of contractual interpretation." *In re Cred Inc.*, No. 20-12836-JTD, 2024 WL 1345194, at *6 (D. Del. Mar. 29, 2024) (citation omitted). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield*

---

[33] OpCo Plan, Art. VIII.A.2

*v. Philles Records, Inc.*, 780 N.E.2d 166, 171 (N.Y. 2002).[34] In pertinent part, the OpCo Plan provides that certain parties are released "from any and all Claims and *Causes of Action . . .* arising at any time and *related in any way to the OpCo Debtors* or the Chapter 11 Cases . . . *other than Claims and liabilities resulting therefrom* arising out of or relating to any act or omission of a Released Party that constitutes *actual fraud, willful misconduct, or gross negligence*."[35] The liabilities resulting from the causes of action set out in the Complaint indisputably relate to the OpCo Debtors and sound in actual fraud, willful misconduct, and gross negligence.[36] Plaintiffs' causes of action in the Complaint against the Defendants are thus clearly carved out from the Release, and this should be the end of the analysis.

In their Motions, Defendants offer a contorted interpretation of the Release that flies in the face of numerous canons of contractual interpretation. Specifically, Defendants argue that the carveout—which was clearly intended to preserve the very causes of action brought by the Plaintiffs here—is instead limited to "Claims" as defined in the OpCo Plan.[37] The OpCo Plan's definition of "Claims," however, is limited to Claims brought "*against the OpCo Debtors*."[38] Defendants do not even try to explain why the Release *by the OpCo Debtors* would carve out only claims against themselves because that would defy any reasonable explanation. It is hornbook law that courts should not interpret a written agreement in a manner that would produce such an absurd result. *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48, 54 (N.Y. App. Div. 2015) ("It is well settled 'that a contract should not be interpreted to produce an absurd result, one

---

[34] The OpCo Plan is governed by New York law. OpCo Plan, art. I.D.

[35] OpCo Plan, art. VIII.A.2 (emphasis added).

[36] Compl. ¶¶ 106–116.

[37] Trive Defs.' Br. at 17.

[38] OpCo Plan art. I.A (emphasis added).

that is commercially unreasonable, or one that is contrary to the intent of the parties.") (quoting *Cole v. Macklowe*, 99 A.D.3d 595, 596 (N.Y. App. Div. 2012)).

Defendants' insistence that the carveout is limited to "Claims" as defined in the OpCo Plan also completely ignores that the carveout applies to "Claims *and liabilities*." "Liability" is a broad legal term that encompasses not only causes of action such as those set out in the Complaint, but all "legal responsibility[ies] to another or to society, enforceable by civil remedy or criminal punishment." LIABILITY, Black's Law Dictionary (12th ed. 2024). Defendants implicitly argue that the Court should render the inclusion of "liabilities" in the carveout to be meaningless, which once again would violate a basic tenet of contractual construction. *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) ("Any interpretation of a contract that 'has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'") (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)). And to the extent Defendants are arguing that "liabilities" is limited to liabilities arising only from Claims as defined in the OpCo Plan, such a reading is similarly flawed. If a "Claim"—which is defined as a right to payment—is already released, a release of liabilities arising from the Claim would be entirely superfluous.[39]

At bottom, Defendants argue for a reading of the Release that flies in the face of the parties' clear intent. *See In re Premier Int'l Holdings, Inc.*, 443 B.R. 320, 334 (Bankr. D. Del. 2010) (agreements must be interpreted "in accord with the parties' intent.") (citing *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166 (2002)). Here, the intent of the OpCo Plan is not only clear on the face of the OpCo Plan itself, but also from numerous statements made before this Court both before

---

[39] Although not stated in their confusing argument regarding the Release, Defendants appear to be invoking the last antecedent rule, which courts sometimes apply to find that a qualifying phrase modifies the immediately preceding words or phrases. But this rule is "only a textual aid, and its application yields to more persuasive contextual evidence of the . . . [parties'] intent." *In re Grogan*, 476 B.R. 270, 280 (D. Or. 2012).

and after confirmation of the OpCo Plan, as well as a recognition by the Court of the same.[40] To

the extent the Court finds that the language of the Release and the intent of the parties is somehow

unclear, which it is not, Plaintiffs respectfully request the opportunity to amend the Complaint to

add ample evidence of such intent, including by reference to other provisions of the OpCo Plan,

as well as statements and draft OpCo Plan revisions from the Trive Defendants that clearly indicate

their understanding that the carveout to the Release was designed specifically to bring the causes

of action set out in the Complaint.

**2.       *No condition precedent exists that would bar Plaintiffs from pursuing the carved-out claims.***

Next, Defendants contend that, pursuant to the Release, Plaintiffs may not prosecute their

claims absent a "Final Order" (as defined in the OpCo Plan) finding that the Defendants engaged

in actual fraud, willful misconduct, or gross negligence. Once again, Defendants urge the Court to

adopt a reading of the Release that would create an utterly absurd result. Indeed, their argument

would render the carveout effectively meaningless, as there would be no way for Plaintiffs to

obtain such a Final Order other than by bringing the claims alleged in the Complaint. Nor has such

a requirement been imposed in countless other chapter 11 plans with similar release language.

Although their argument is not particularly clear, Defendants seem to read the inclusion of

"other than" at the start of the carveout to suggest that the Release established a condition precedent

to bringing a claim. But that language indicates nothing more than an exclusion, not a condition

---

[40] *See, e.g.*, Transcript of Status Conference at 5:19–6:8, *In re Lucky Bucks, LLC*, et al., Case No. 23-10758 (KBO) (Bankr. D. Del. Jul. 27, 2023) (Counsel for the OpCo lenders: "They are receiving the releases under the plan—"they" being the released parties, *including Trive—except for the carve-out for the—the bad boys, the gross negligence, the willful misconduct, and the like*."); Transcript of Status Conference at 44:24–45:6, *In re Lucky Bucks, LLC*, et al., Case No. 23-10758 (KBO) (Bankr. D. Del. Oct. 28, 2024) (The Court: "I also find, and I think this is the more interesting issue, that the requests fall within the scope of Rule 2004. While unusual, in this circumstance, with respect to these claims, I find that the reorganized debtor is functionally equivalent to a post-confirmation trust and that these claims were vested in the reorganized debtor for the future pursuit for the entity and its new shareholders, which were former creditors of the debtors. So, for those reasons, I will grant the relief that has been requested[.]"

precedent. *Farrell v. Bd. of Educ. of N.Y.C.*, 113 A.D. 405 (N.Y. App. Div. 1906). (reading "other than" as an exclusion, not a condition precedent). "Courts are reluctant to interpret a contractual clause as a condition precedent in the absence of . . . unmistakable conditional language" *Parlux Fragrances, LLC v. S. Carter Enterprises, LLC,* 204 A.D.3d 72, 85 (N.Y. App. Div. 2022) (quoting *VXI Lux HoldCo S.à.r.l. v. SIC Holdings, LLC*, 171 A.D.3d 189, 195 (N.Y. App. Div. 2019)). "New York courts recognize certain terms as indicating the presence of a condition precedent: 'if', 'unless,' and 'until' are some of the terms that courts interpret as creating a condition." *Munich Reinsurance Am., Inc. v. Am. Nat'l Ins. Co.*, 936 F. Supp. 2d 475, 494 (D.N.J. 2013) (citation omitted); *see also DirectTV Latin Am., LLC v RCTV Intern. Corp.*, 115 A.D.3d 539, 540 (N.Y. App. Div. 2014) (The "tell-tale signs of a condition precedent, are the words 'if,' 'until,' and 'unless.'"). Here, the Release contains no such "tell-tale signs" of a condition precedent.

Notably, "the law does not favor a construction which creates a condition precedent." *Lui v. Park Ridge at Terryville Ass'n*, 196 A.D.2d 579, 582 (N.Y. App. Div. 1993). "A contractual duty will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition" to other events occurring. *Ashkenazi v. Kent S. Assocs., LLC*, 51 A.D.3d 611, 612 (N.Y. App. Div. 2008). The Release does not have clear language indicating an intent to create a condition precedent because there was no such intent.

Defendants tellingly point to only one case that they claim adopts their interpretation of "similar release carve-out language to require prior judicial determination of willful misconduct '*before* [plaintiff] can bring suit.'"[41] *See Yucaipa Am. All Fund I, LP v. SBDRE LLC*, 2014 WL 5509787, at *10–12 (Del. Ch. Oct. 31, 2014). But while the release considered by the *Yucaipa* court contains a similar carveout, Defendants fail to mention that the releasors in *Yucaipa* also

---

[41] Trive Defs.' Br. at 12.

expressly agreed "*not to sue upon* [a claim absent a final order of gross negligence or willful misconduct], whether or not accrued and *whether or not known or suspected to exist in its favor.*" *Id.* at *10 (emphasis added). In other words, the *Yucaipa* court was interpreting a release with an explicit condition precedent. The court was not reading a condition precedent into the release as the Defendants counsel this Court to do.[42]

At bottom, Defendants use contorted logic to prop up release arguments that simply contradict the plain language of the OpCo Plan, as well as the understanding of the Court and every stakeholder in the case. To the extent the Defendants have established an ambiguity in the OpCo Plan—and Plaintiffs contend that they have not—this Court, which confirmed the OpCo Plan, is in the best position to resolve that ambiguity in a manner that is consistent with the parties' clear intent, which here is to allow Plaintiffs to bring their expressly preserved claims. *See In re New Century TRS Holdings, Inc.*, No. 09-52251 (KJC), 2013 WL 1196605 at *6 (Bankr. D. Del. Mar. 25, 2013) ("[T]he issuing court is in the best position to provide guidance and clarify orders should the parties require it."); *In re CAH Acquisition Company #1*, LLC, 2022 WL 4389301, at *11 (Bankr. E.D. N.C. Sept. 22, 2022) (A court is "required to interpret its prior orders (not just the plan confirmation orders, but also the preconfirmation Settlement Agreement) in order to determine whether the claims are barred or were preserved post [] confirmation").

**B.      Defendants cannot escape liability through a ratification defense based on lender consent obtained through omissions and misrepresentations.**

Plaintiffs have pleaded facts that clearly bar dismissal based on the Defendants' ratification defense. The affirmative defense of ratification rarely warrants dismissal on a motion to dismiss.

---

[42] The *Yucaipa* decision is also distinguishable on a number of other grounds. Not only did it involve a private credit agreement, not a bankruptcy OpCo Plan, but it also dealt with potential contribution and indemnification claims where a condition precedent for a final non-appealable order makes sense. As argued above, a condition precedent for a Final Order in this case would simply render the carveout entirely meaningless.

The Defendants would have to show that "the facts supporting the defense appear on the face of the complaint," and that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *Washington State Investment Board v. Odebrecht S.A.*, 461 F.Supp.3d 46, 79 (S.D.N.Y. 2020) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)); *see also Advanced Reimbursement Solutions LLC v. Spring Excellence Surgical Hospital LLC*, No. CV-17-01688-PHX-DWL, 2018 WL 3023296, at *2 (D. Ariz. June 27, 2018) (affirmative defenses may not be raised by motion to dismiss" unless "the defense raises no disputed issues of fact.") (quoting *Scott v. Kulhmann*, 746 F.2d 1377, 1378). That is clearly not the case here.

### 1.     *Lenders who were deceived about material facts cannot ratify the fraudulent transfers as a matter of law.*

The Defendants' argument that the OpCo lenders' "authorization" of the OpCo Distribution bars Plaintiffs' fraudulent transfer claims misconstrues both the applicable legal standard and misrepresents the allegations in the Complaint.[43] Although some creditors who authorize transfers *with full knowledge* generally cannot seek to avoid them later, this principle applies *only* where those creditors possessed complete and accurate information about all material facts when providing consent. Here, Plaintiffs' Complaint details Defendants' systematic misrepresentation of Lucky Bucks's true financial condition and concealment of "bet-the-firm" regulatory violations stemming from Damani's ongoing involvement with the Company's operations. These substantial allegations preclude any finding of informed consent or valid ratification at this stage.

---

[43] *See* Trive Defs.' Br. at 13–17; *see also* Management Defs.' Br. at 20.

Ratification of a fraudulent transfer requires "full knowledge of all material facts" concerning a transaction. *PAH Litig. Tr. v. Water St. Healthcare P'rs, L.P. (In re Physiotherapy Hldgs., Inc.)*, 2016 WL 3611831, at *12 (Bankr. D. Del. June 20, 2016); *accord In re Extended Stay, Inc.*, 2020 WL 10762310, at *74 (Bankr. S.D.N.Y. Aug. 8, 2020); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 427 (S.D. Tex. 2008). It stands to reason that a party cannot ratify a transaction when it lacks "both knowledge of a defect in the act to be confirmed[.]" *DoubleLine Capital v. Odebrecht Fin.*, 323 F. Supp. 3d 393, 468 (S.D.N.Y. 2018) (internal citation omitted). Without full knowledge of material facts, no ratification can occur because the party has not "*knowingly* giv[en] sanction or affirmance to an act which would otherwise be unauthorized and not binding." *Adelphia Recovery Tr. v. H.S.B.C.*, 634 F.3d 678, 691 (2d Cir. 2011) (emphasis added).

Intent is a "central element" of ratification, and consent must be informed to be valid. *In re Physiotherapy Hldgs.*, 2016 WL 3611831, at *12; *In re Millennium Lab Holdings II, LLC*, 2025 WL 794311, at *6–7 (Bankr. D. Del. Mar. 12, 2025) (denying summary judgment on intentional fraudulent transfer claim notwithstanding that "the dividend to shareholders was disclosed" because the debtor did not disclose material facts); *In re Extended Stay*, 2020 WL 10762310, at *74 ("Courts reject claims that a party has ratified a transaction where that party lacks all the material facts necessary to do so.").

When assessing ratification of a fraudulent transfer, the debtor's actual financial condition is a quintessentially material fact. *In re Physiotherapy Hldgs.,* 2016 WL 3611831, at *12. In fact, the *Physiotherapy* court explained that a debtor's financial health may be "the most material fact." *Id.* When a firm lacks adequate cash flows, it "may find itself unable to pay its debts as they come due," making "this information highly pertinent to a reasonable investor's decision to lend money

to a company." *Id.* Because the lenders in *Physiotherapy* "may have been misled into lending money into a company whose financial health was poorer than represented," there could be no ratification. *Id.*

This approach properly recognizes the distinction between agreeing to the mechanics of a transaction and giving informed consent to the risks involved. A lender may understand that loan proceeds will be distributed to equity holders while being fundamentally deceived about whether the borrower can service the remaining debt, particularly in a case like this one that involves a dividend recapitalization funded by new debt. Misrepresentations about solvency or asset values directly undermine lenders' ability to assess this critical risk. When lenders participate in a transaction "based on the information provided to them," they cannot be deemed to have ratified it if the financial statements they relied upon "were false and misleading." *In re Tronox Inc.*, 503 B.R. 239, 276 (Bankr. S.D.N.Y. 2013); *see also In re Boston Generating LLC*, 617 B.R. 442, 495 (Bankr. S.D.N.Y. 2020) (adopting the reasoning of *Physiotherapy* and finding that lenders who "simply bought into [the transaction] based on the information available to them" could not be deemed to have ratified transfers when that information included "material misstatements and omissions."). This approach properly recognizes the distinction between agreeing to the mechanics of a transaction and giving informed consent to the risks involved. A lender may understand that loan proceeds will be distributed to equity holders while being fundamentally deceived about whether the borrower can service the remaining debt.

The Complaint alleges numerous facts demonstrating that the OpCo lenders were misled regarding Lucky Bucks's financial condition. The most fundamental misrepresentation concerns Lucky Bucks's solvency itself. The Lucky Bucks Consent, executed by all three HoldCo Board members, explicitly represented that "based on the balance sheet of the Company as of June 30,

2021, and other information, reports and statements provided to HoldCo, after giving effect to the Aggregate Distribution, the fair value of all of the Company's assets exceeds all the liabilities of the Company."[44] This representation was demonstrably false. The Company's June 30, 2021 balance sheet showed that Lucky Bucks had approximately $248.2 million in assets against approximately $293.2 million in liabilities—a $45 million deficit even before the OpCo Distribution.

While Defendants argue that Macquarie had the information underpinning this balance sheet, Macquarie did not know that the entire valuation premise that would justify lending to a balance-sheet-insolvent company was corrupted by an undisclosed fraudulent scheme. Specifically, the Complaint alleges that at the time of the OpCo Distribution, Damani, Kassam and others at the Company had been perpetrating a years-long systematic fraud whereby valuable location contracts were diverted from Lucky Bucks to secretly controlled B-Side Businesses, then sold back to Lucky Bucks at artificially inflated prices.[45] The B-Side Scheme involved using "sham players to falsely increase the monthly revenue rate" before resale, thus inflating both the purchase price and the apparent value of Lucky Bucks's contract portfolio—its primary asset.[46] The scheme fundamentally corrupted any financial statements on which the lenders relied, artificially inflating asset values while simultaneously draining actual value from the Company.[47]

While the Trive Defendants may or may not have known about the details of the B-Side Scheme,[48] all of the Defendants knew that the lenders were not being provided a full picture of the

---

[44] Compl. ¶ 84.

[45] Compl. ¶¶ 53–58.

[46] Compl. ¶ 56.

[47] Compl. ¶¶ 54, 108, 121.

[48] Plaintiffs certainly expect that the extent to which the Trive Defendants knew or should have known about the B-Side Scheme will be the subject of discovery in this case.

Company's financial health. After giving effect to the OpCo Distribution and the new debt, the deficit ballooned to approximately $258.2 million, with only $244.5 million in assets against $502.7 million in liabilities.[49] These were not minor discrepancies or differences in valuation methodology; they were fundamental misrepresentations about whether the Company's assets exceeded its liabilities at all.

Beyond the false solvency representation, the Complaint alleges a pattern of deliberate concealment designed to prevent the OpCo lenders from discovering the Company's true condition. When Macquarie's diligence specifically inquired about Damani's involvement in the business following the GLC Executive Order, Defendants provided false assurances. Despite knowing that Damani remained in "frequent contact" with Kassam regarding Company operations—both of whom were actively involved in diverting Company assets through the B-Side Scheme—Defendants told Macquarie that Damani had "no operational involvement in the business."[50]This misrepresentation was unquestionably material because it concealed not just a regulatory compliance issue but an ongoing fraudulent scheme by Damani and Kassam that was actively depleting Company value.

When Macquarie requested a "revenue build on a full twelve month basis" in June 2021, Defendants' internal communications reveal a deliberate decision to withhold this information. Ijaz immediately flagged that they "cannot go down this path," and Sekhri instructed the team to "hide behind the availability of the portal data."[51] Defendants likewise concealed data showing that acquired locations were "significantly underperforming" their projections. The Complaint

---

[49] Compl. ¶ 84.

[50] Compl. ¶ 74.

[51] Compl. ¶ 75.

alleges that by February 2021, the Defendants already knew that the Company had "over paid by 63%" for certain locations, yet they concealed this fact from the OpCo lenders who were being asked to fund hundreds of millions in distributions to equity holders.[52]

Finally, the OpCo lenders were not aware that, before even finalizing the OpCo Distribution, the Trive Defendants were already exploring how to take even more value out of the company through yet another dividend. These efforts resulted in the creation of a new parent company, Holdings, that took on $250 million more debt, to tap out all the value that Trive could possibly squeeze from the already deteriorating Company.[53] Shortly after the Holdings Distribution, the Company collapsed.[54]

Taken together, these allegations are precisely the type of undisclosed material facts regarding financial health that precludes ratification under *Physiotherapy* and *Boston Generating*. The OpCo lenders did not simply make a bad business decision with full information; they were induced to fund a massive distribution based on false representations about solvency, concealment of operational involvement by a banned individual, deliberate withholding of performance data, and financial statements corrupted by an undisclosed fraudulent scheme. Under these circumstances, the lenders cannot be deemed on a motion to dismiss to have provided informed consent that would bar fraudulent transfer claims.

> **2.    *Defendants' reliance on* Lyondell *fails because that case involved no allegations of fraud or misrepresentation.***

Realizing the weakness of their ratification defense, Defendants brush away the clear import of *Physiotherapy* and *Boston Generating*, arguing that those decisions "conflate the law of

---

[52] Compl. ¶ 59.

[53] Compl. ¶ 90–92.

[54] Compl. ¶ 95–96.

fraudulent inducement with the law of fraudulent transfer."[55]  But these decisions do not conflate two separate legal theories. Rather, they correctly recognize that separating fraud in connection with a loan or transaction from fraud in connection with the transfer or conveyance is impossible where the loan facilitated the challenged transfers as part of a single integrated transaction. Misrepresentations made in connection with the loan were also made in connection with obtaining lenders' consent to the transfers. As such, faulty ratification of the loan is also faulty ratification of transfer.

The distinction Defendants attempt to draw would, yet again, lead to an absurd result: insiders could obtain consent to transfers through fraud, then claim immunity because the fraud related to the loan funding the transfer rather than the transfer itself. But when a loan's primary purpose is to fund a distribution, misrepresentations about the borrower's ability to repay directly relate to the transfer's fraudulent nature. Lenders' consent to the use of proceeds cannot be separated from their reliance on false information about whether the company could service the debt after making that distribution.

Indeed, the ratification defense exists to protect transferees who received distributions that creditors genuinely approved with full knowledge. It should not shield those who obtained consent through misrepresentation and concealment. When insiders make false representations about solvency and conceal material negative information, they cannot later claim the protection of a consent that was never truly informed. To hold otherwise would not only protect but actively promote inequitable, fraudulent action.

Defendants' heavy reliance on *In re Lyondell Chemical Co.* is misplaced. Most fundamentally, *Lyondell* involved no allegations whatsoever that the lenders relied on false or

---

[55] Trive Defs.' Br. at 15.

misleading financial information. 503 B.R. 348, 385 (Bankr. S.D.N.Y. 2014). The *Lyondell* court's entire analysis is built on the premise that lenders had accurate information about the transaction and company when they agreed to fund a leveraged buy-out. Indeed, the court found ratification appropriate precisely because "the LBO lenders . . . have known—as the documents themselves establish—that they were lending for the purposes of an LBO, and that the proceeds of their loans were going to stockholders." *Id*. There was no suggestion that the lenders were deceived about the company's financial condition, the value of its assets, or any other material fact.

In *Physiotherapy*, this Court distinguished *Lyondell* on this precise ground, finding that *Lyondell* was "highly distinguishable because, as noted at oral argument, there were no allegations that the Lyondell lenders relied on false financial statements." *Physiotherapy*, 2016 WL 3611831, at \*13. This distinction is not merely technical—it goes to the heart of what constitutes valid consent. A lender who knows the true financial condition of a borrower and nonetheless agrees to fund a distribution has made an informed business decision. A lender who is deceived about that financial condition has not truly consented at all.

Moreover, the nature of the *Lyondell* transactions differs substantially from the facts at issue in this case. *Lyondell* involved a leveraged buy-out where sophisticated lenders understood they were participating in an inherently risky transaction structure. *Physiotherapy*, 2016 WL 3611831, at \*13 (noting that "[t]he creditors knew they were participating in a leveraged buyout that carried potential risk"). Here, the OpCo Distribution was not structured as a leveraged buy-out, but rather as a dividend recapitalization purportedly supported by strong business fundamentals and accurate financial statements. As discussed, the Complaint alleges that certain

27

Defendants specifically misrepresented the Company's solvency and concealed material negative information to induce lender consent.[56]

Even the *Lyondell* court itself acknowledged the limited scope of its holding, explicitly noting that "more nuanced knowledge might be necessary to establish ratification in other contexts." *Lyondell*, 503 B.R. at 385. This caveat recognizes that the ratification analysis cannot be mechanically applied but must account for the specific circumstances of each case, particularly where allegations of fraud, concealment, and misrepresentation are present, as is the case here.[57]

Simply put, on a motion to dismiss, the Court must accept Plaintiffs' well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. The Complaint alleges false representations about solvency, concealment of prohibited involvement by Damani, deliberate withholding of performance data, and an undisclosed scheme that corrupted asset valuations. Under these facts, the OpCo lenders' alleged "authorization" or "ratification" of the OpCo Distribution, obtained through deception about material facts, cannot bar Plaintiffs' fraudulent transfer claims at the pleadings stage.

---

[56] Compl. ¶¶ 74–75, 84–85.

[57] The remaining cases cited by Defendants only underscore why ratification is inappropriate here, as each involved circumstances fundamentally different from the systematic deception alleged in the Complaint. *Crescent Resources* was decided on summary judgment after extensive discovery established that lenders had received comprehensive and accurate information. *Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 478–80 (W.D. Tex. 2013). *Direct Access Partners* likewise provides no support for Defendants' position, as it was decided after a full trial where the court made factual findings that no fraud occurred. *In re Direct Access Partners, LLC*, 602 B.R. 495, 542–43 (Bankr. S.D.N.Y. 2019). The *Verizon* case demonstrates why knowledge of use of proceeds alone cannot establish ratification when financial condition is misrepresented. The court there distinguished between arguments about how funds would be used (which the lenders knew) and arguments about the debtor's creditworthiness, finding the latter "irrelevant" only because there were no allegations of deception about financial condition. *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 479 B.R. 405, 410–11 (N.D. Tex. 2012). And, finally, *Refco* involved unique circumstances where the lender itself was "heavily involved in structuring the transaction" and was engaged in its own fraudulent conduct. *In re Refco, Inc. Sec. Litig.*, 2009 WL 7242548, at *11 (S.D.N.Y. Nov. 13, 2009). The court found that a lender who was essentially a co-conspirator in fraud could not claim to be a victim of that same fraud. *Id.*

**C.      The Complaint adequately pleads actual fraudulent intent through both direct evidence and badges of fraud.**

Despite extensive allegations (as set out above), Defendants claim that Plaintiffs have failed to meet their burden that the OpCo Debtors made the OpCo Distribution with actual intent to hinder, delay, and defraud creditors. "Determining whether a transfer was made with actual fraudulent intent is a fact intensive inquiry rarely susceptible to resolution at the pleading stage." *In re Our Alchemy, LLC*, 642 B.R. 155, 164 (Bankr. D. Del. 2022). As such, "[i]n general, a fraudulent transfer claim will withstand dismissal if it alleges, inter alia, the transferor, the transferee, the amount of the transfer, and relevant date." *In re Zohar III, Corp.*, 631 B.R. 133, 170 (Bankr. D. Del. 2021). Here, Plaintiffs easily meet this low burden. In fact, the Complaint sets out detailed direct and circumstantial evidence that the OpCo Debtors[58] made the OpCo Distribution with actual intent to hinder, delay and defraud creditors.

At the pleadings stage, a plaintiff may establish intent one of two ways: (1) through direct evidence; or (2) through circumstantial evidence, often referred to as "badges of fraud." *In re Mallinckrodt PLC*, No. 20-12522 (JTD), 2024 WL 206682, at *24 (Bankr. D. Del. Jan. 18, 2024); *Charys Liquidating Trust v. Growth Management, LLC (In re Charys Holding Co.),* No. 08-10289 (BLS), 2010 WL 2774852, at *8 (Bankr. D. Del. July 14, 2010). "The law does not require direct evidence alone because people do not frequently declare their intent to do something unlawful." *In re Mallinckrodt PLC*, 2024 WL 206682, at *24 (citing *MSKP Oak Grove, LLC v. Venuto*, 839 Fed. Appx. 708, 712 (3d Cir. 2020)); *see also In re Dowd*, 616 B.R. 212, 227 (Bankr. N.D. Ga., 2020). Plaintiffs have provided sufficient factual allegations under both formulations.

---

[58] The debtor's intent is the relevant inquiry. 11 U.S.C. §548(a)(1)(A) (if debtor. . . made such transfer . . . with actual intent to hinder, delay, or defraud"); 6 *Del. C. §*1304(a)(1) (focus is on debtor's intent -- whether "the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor."); O.C.G.A. §18-2-74(a)(1) (issue is whether "the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor").

Courts should not look at what badges of fraud are absent, but at which ones are present, as a movant need not demonstrate the presence of every badge. In fact, "[e]ven one badge of fraud can suffice to 'cast suspicion on the transferor's intent.'" *MSKP Oak Grove, LLC v. Venuto*, 839 Fed. Appx. 708, 712 (3d Cir. 2020) (citation omitted); *In re Fedders North America, Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009). Few badges can suffice where the transfer is part of a scheme or "elaborate ruse." *Drivetrain, LLC v. X. Commerce, Inc.*, 2023 WL 1804627, at *4 (Bankr. D. Del. Feb. 7, 2023). "[T]he confluence of several [badges] in one transaction generally provides conclusive evidence of an actual intent to defraud." *Id.* Badges of fraud include, among other things, "the relationship between the debtor and the transferee," "consideration for the conveyance," "insolvency or indebtedness of the debtors," and "how much of the debtor's estate was transferred." *Id.*

Notably, courts look to the totality of the circumstances and "may consider factors other than badges of fraud" to determine whether fraudulent intent has been adequately pleaded. *In re Live Well Financial*, Inc., 652 B.R. 699, 705 (Bankr. D. Del., 2023); *In re Syntax-Brillian Corp.*, No. 08-11407 (BLS), 2016 WL 1165634, at *5, (Bankr. D. Del. Feb. 8, 2016) ("While the badges of fraud provide a basic rubric, courts examine the totality of the circumstances to determine whether fraudulent intent exists."). See *In re White*, 559 B.R. 787, 804 (Bankr. N.D. Ga., 2016). Between the well pleaded and specific direct allegations of fraud and the numerous badges of fraud, Plaintiffs have easily met their burden on a motion to dismiss.

**1.    The Complaint alleges direct evidence that Defendants made misrepresentations with the intention of defrauding the OpCo lenders into funding the OpCo Distribution.**

Defendants claim that the "only basis" on which the Complaint alleges evidence of actual intent to hinder, delay or defraud creditors is the June 30, 2021 balance sheet showing that the

Company was balance-sheet insolvent.[59] Not so. As set out above, Plaintiffs have alleged direct evidence of each of the Defendants' intent to fraudulently induce the OpCo lenders into funding the OpCo Distribution.

*First*, the Complaint alleges that Macquarie was justifiably concerned about whether Damani was still involved in the Company's operations in contravention of the GLC Executive Order, which potentially posed an existential risk to the Company.[60] Trive (through Thadani) and the Management Defendants explicitly assured the Lenders that "Anil [Damani] has . . . no operational involvement in the business."[61] This statement and similar statements by the Defendants set out in the Complaint were patently false. Trive and the Management Defendants worked closely with Damani in assessing Lucky Bucks acquisitions.[62] Moreover, all Defendants knew that Kassam acted as Damani's puppet at the company, and Kassam was in charge of the Company's operations.[63] The Complaint goes on to allege that Trive's appointees on the board knew how Damani was skirting the GLC Executive Order and "walked around egg shells" with Kassam so as not to disturb Damani's influence in the Company's operations.[64] Damani was plainly more involved than being "kept in the loop," as Defendants suggest.[65]

*Second*, upon the request of Macquarie for information about the Company's revenue, Defendants Sekhri, Bouskill, Ijaz and Trive (through Thadani) knowingly decided to mislead the

---

[59] *See* Trive Defs.' Br. at 18.

[60] Compl. ¶¶ 74.

[61] Compl. ¶¶ 74.

[62] Compl. ¶¶ 66–67.

[63] Compl. ¶¶ 54, 63.

[64] Compl. ¶¶ 63.

[65] Trive Defs.' Br. at 20.

lenders regarding the Company's flagging performance.[66] Specifically, Macquarie requested "a revenue build on a full twelve month basis" of the Company. Knowing that many of its Location Licenses were underperforming, Defendants opted to mislead the lenders into thinking the requested data was unavailable.[67]

*Third*, Kassam, working as Damani's representative on the board, executed the Lucky Bucks Consent approving the OpCo Distribution knowing that it misrepresented the Company's solvency.[68] Trive's board appointees, Boyden and Sekhri, similarly signed the Lucky Bucks Consent knowing that the Company's true financial condition had been concealed from the OpCo lenders.[69] Each of these misleading actions was taken with the intent to "maximize the dividend" at the expense of the OpCo lenders and in the face of the Company's clear insolvency.[70]

It is no surprise that Defendants' motions largely miscast these facts or ignore them all together. Similar facts have regularly been found sufficient to plead intent for the purposes of an actual fraud fraudulent transfer. *See, e.g.*, *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3–4 (Bankr. D. Del. Feb. 28, 2019) (denying dismissal of fraudulent transfer claim where concealment of risks and untruthful lender materials, coupled with other facts, supported inference of actual intent); *In re GBG USA Inc.*, 666 B.R. 115, 142–43 (Bankr. S.D.N.Y. 2024) (allegations that insider-directed distributions were concealed from lenders and made while insolvent or undercapitalized sufficiently pleaded actual intent); *In re Davis*, 2011 WL 5429095, at *22 (Bankr. W.D. Tenn. Nov. 8, 2011 (report & recommendation on cross-motions for summary

---

[66] Compl. ¶¶ 75.

[67] Compl. ¶¶ 75.

[68] Compl. ¶¶ 78, 84–85, 89.

[69] Compl. ¶¶ 78, 84–85.

[70] Compl. ¶¶ 70.

judgment) (recommending summary judgment for trustee on a fraudulent transfer claim where transfers used later-obtained funds to pay earlier obligations and masked the enterprise's true condition, harming later creditors—establishing actual intent). These allegations alone are enough to state a plausible claim of intentional fraudulent transfer.

### 2. *Plaintiffs also allege numerous badges of fraud that sufficiently plead intent to hinder, delay, and defraud.*

In addition to the extensive direct evidence of intent to hinder, delay and defraud creditors, the Complaint also alleges numerous badges of fraud that, when considered in totality, are themselves sufficient to defeat the Motions. These badges of fraud include:

- The ultimate recipients of the OpCo Distribution were Company insiders, including the Trive Defendants that appointed 2/3 of the HoldCo Board; Defendant Sekhri who sat on the HoldCo Board and held HoldCo equity; and Damani who also owned HoldCo equity and appointed the other member of the HoldCo Board.[71]

- No consideration was paid for the OpCo Distribution.[72]

- The Company was insolvent at the time of the OpCo Distribution.[73]

- The OpCo Distribution was a substantial portion of Lucky Bucks's assets (approximately 84%) at the time of the transfer—at which point Trive was already planning additional distributions to take even more cash out of the business.[74]

Each of these are classic badges of fraud from which actual fraudulent intent can be inferred for purposes of Rule 9(b). *See, e.g.*, *In re Nat'l Serv. Indus., Inc.*, No. AP 14-50377 (MFW), 2015 WL 3827003, at *4 (Bankr. D. Del. June 19, 2015).

Knowing that the totality of circumstances provides overwhelming support for Plaintiffs' actual fraudulent transfer claims, Defendants try to pick off certain allegations, one by one, to

---

[71] Compl. ¶¶ 122(a).

[72] Compl. ¶¶ 122(b).

[73] Compl. ¶¶ 85, 122(c).

[74] Compl. ¶¶ 85, 90.

contend Plaintiffs have failed to state a claim. In particular, Trive contends that the Company's actual intent to defraud is not alleged because the June 30, 2021 balance sheet showed only book values.[75] Trive claims Plaintiffs were required to allege that the Company was insolvent on a "going concern value" because that is the test of fair market value.

Putting aside that insolvency is just one badge of fraud, nowhere in the Complaint is it alleged that the June 30, 2021 balance sheet, which showed an approximately $45 million deficit, utilized book values or that the value of assets and liabilities in the June 30, 2021 balance sheet differed from fair market values. If anything, the Complaint states that the OpCo Debtors repurchased Location License contracts in the fall of 2020 through June of 2021 at artificially high prices, which would be reflected on the June 30, 2021 balance sheet, since there are no historic values for those contracts.[76] Yet, the June 30, 2021 balance sheet still showed that both Lucky Bucks and HoldCo were severely insolvent. Plaintiffs have met their pleading stage burden of adequately alleging insolvency, and Defendants' improper attempt to impose a merits stage burden of fair valuation determination should be rejected.

The case law Defendants cite does not alter this result. Instead, it directs courts to consider the holistic status of the debtor-company. In *In re Opus East LLC*, the court found that it should use a realistic framework to determine whether liquidation value or going concern value is used. 698 Fed. Appx. 711, 715 (3d Cir. 2017). And while Defendants cite *Covey v. Commercial Nat. Bank of Peoria* to support the proposition that market value can be higher than book value, Trive neglects to mention that the court also stated "the reverse is true as well: a firm whose assets are

---

[75] Trive Defs.' Br. at 41–42.

[76] Compl. ¶¶ 57–59. Whether a going concern value or liquidation value or something in between is the right standard to apply to the OpCo Debtors' asset for solvency purposes to determine their fair market value will be determined at trial. *In re Winstar Communications, Inc.*, 348 B.R. 234, 275 (Bankr. D. Del. 2005) (liquidation value should be used if, at the time in question, the business as a going concern is unrealistic.

worth less than book value may be insolvent despite a financial statement showing positive net worth." 960 F.2d 657, 660 (7th Cir. 1992). The allegations regarding the June 30, 2021 balance sheet together with other allegations in the Complaint, support the plausibility of the Company's insolvency before the OpCo Distribution.

Moreover, regardless of the Company's status before the OpCo Distribution was made, *after* the OpCo Distribution, the Company was clearly insolvent. After the OpCo Distribution, the Company's deficit ballooned to approximately $258.2 million, with only $244.5 million in assets against $502.7 million in liabilities (including the new debt).[77] Putting aside numerous other allegations, based on the allegations of the false financial information, the lack of reasonable prospects that the Company could repay the OpCo lenders, its eventual bankruptcy filing, Boyden's omission of the OpCo Distribution from the Boyden First Day Declaration, and the Company's inability to pay creditors, it is clearly plausible that the OpCo Distribution hindered, delayed, and defrauded creditors.[78] *See In re PA Co-Man, Inc.*, 644 B.R. 553, 583 (Bankr. W.D. Pa. 2022) ([d]etermining whether a claim for relief is plausible is a "context-specific task" requiring the court to "draw on its judicial experience and common sense") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Defendants also place great weight on their contention that OpCo lenders chose to lend to the Company despite being given the information contained in the June 30, 2021 balance sheet. Notwithstanding that this argument ignores the misrepresentations in the July 30, 2021 solvency certificate (the "**Solvency Certificate**"), it also relies on information outside the pleadings—and thus is inappropriate for consideration on a motion to dismiss—and ignores the fact that the balance

---

[77] Compl. ¶ 85.

[78] Compl. ¶¶ 96, 98, 122. 133, 144.

sheet in question was already misleading and did not accurately reflect the Company's financial state.[79] In particular, the balance sheet did not reflect that: (i) the Location License contracts had been repurchased at inflated prices;[80] (ii) financial information that would have revealed this and other problems, such as low revenue build on a full twelve month basis;[81] (iii) Damani's managerial and operational involvement in the Company's businesses in violation of the GLC Executive Order, which posed substantial risk to the ongoing operations of the Company;[82] and (iv) Trive's desire to extract even more cash from the Company after the OpCo Distribution was complete.[83] Taken together, these allegations more than plausibly support insolvency as a badge of fraud. *See, e.g.*, *In re Millennium Lab Holdings II, LLC*, 2019 WL1005657, at *4 (Bankr. D. Del. Feb. 28, 2019) (fraudulent transfer claims stated through allegations of a failure to "disclose … challenges to [debtor's] business model" and allegations that "information disseminated in connection with the loan … was untruthful").

The Trive Defendants also argue that Kassam is the only Company Defendant that knew about the B-Side Scheme and that Kassam's knowledge cannot be imputed to Trive. But Trive exercised de facto control over the Company, and through Thadani, was fully aware of all the details of its operations.[84] In fact, Thadani (a Trive Partner) spoke with Sekhri about the Company's operations nearly every day.[85] Thadani was thus well aware of the fair value of the Location License contracts, and the Company's financial condition, which included the value of

---

[79] Compl. ¶¶ 54–59, 73–75, 84–85, 108, 121.

[80] Compl. ¶¶ 59, 75.

[81] Compl. ¶ 75.

[82] Compl. ¶ 74.

[83] Compl. ¶¶ 90–94.

[84] Compl. ¶¶ 62–68.

[85] Compl. ¶ 64.

its contracts as its central assets.[86] Indeed, Thadani (along with Defendants Bouskill and Ijaz) were involved in hiding the Company's flagging revenue from the Lenders in order to complete the OpCo Distribution.[87]

Next, the Defendants also dismiss the allegation that the "ultimate recipients of the OpCo Distribution were insiders of the Company" because the transfer was a dividend. To the contrary, distributions made to entities that control the debtor are particularly suspect, even (or especially) if they purport to be a dividend. *In re Maxus Energy Corp.*, 641 B.R. 467, 513 (Bankr. D. Del. 2022) ("when a transferee is in a position to dominate or control the debtor's disposition of the property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor"); *In re Mallinckrodt PLC,* 2024 WL 206682, at *23 (Bankr. D. Del. 2024) (where the transferee dominates or controls the debtor, the transferee's intent will be imputed to the debtor). Courts have found a fraudulent transfer to occur when a dividend is paid with intent to hinder, delay or defraud creditors. *See e.g.*, *In re Appleseed's Intermediate Hldgs., LLC*, 470 B.R. 289, 300 (D. Del. 2012) (court denied motion to dismiss based on four badges of fraud, including dividends paid to an insider).

Finally, the Damani Defendants argue in passing that Plaintiffs have not alleged the "who, what, when, where" as to him and his related entities (including LBV27, LLC and Lucky Bucks Ventures, Inc.). The Complaint contains many allegations regarding Damani's involvement.[88] In any event, it is intent of the transferor, here, the OpCo Debtors, that is relevant to stating a claim for intentional fraudulent transfer.

---

[86] Compl. ¶ 67.

[87] Compl. ¶75.

[88] Compl. ¶¶ 3, 5–7, 9, 35, 53–58, 61, 63, 66–67, 70–74, 81, 83, 85, 88–89, 95, 107–108, 110, 115–116, 120–124, 126, 131–135, 137, 142–144, 148.

**D.      The Complaint sufficiently alleges managers of HoldCo and officers of Lucky Bucks owed fiduciary duties to the entities they served and breached those duties.**

> **1.      *As Managers of HoldCo, Sekhri, Boyden, and Kassam had a fiduciary duty not to engage in conduct that lacked good faith.***

Defendants contend that Sekhri, Boyden, and Kassam (managers of HoldCo) had no fiduciary duties to HoldCo under the Fifth Amended and Restated Limited Liability Company Agreement of Lucky Bucks HoldCo, LLC ("**HoldCo LLC Agreement**")[89] because the agreement modified some fiduciary duties. Defendants also claim that they are insulated from liability for their misconduct because they are "Covered Persons" pursuant to Section 9.02 of the HoldCo LLC Agreement. Defendants are simply wrong.

Under Delaware law (which governs the HoldCo LLC Agreement), the manager of an LLC owes fiduciary duties to the LLC unless the LLC agreement explicitly provides otherwise. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660–61 (Del. Ch. 2012) ("Numerous Court of Chancery decisions hold that the managers of an LLC owe fiduciary duties."); *Riverside Risk Advisors LLC v. Chao*, 2022 WL 14672745, at *30 (Del. Ch. Oct. 26, 2022) (citing *Ross Hldg. and Mgmt. Co. v. Advance Realty Grp.*, LLC, 2014 WL 4374261, at *12 (Del. Ch. Sept. 4, 2014) ("By default, the traditional fiduciary duties applicable to corporations apply to limited liability companies"). An intent to eliminate fiduciary duties in an LLC agreement must be plain and unambiguous. *In re Cadira Group Holdings, LLC Litig.*, 2021 WL 2912479, at *11 (Del. Ch. July 12, 2021).

Although the HoldCo LLC Agreement modified some fiduciary duties owed by HoldCo Managers, it explicitly preserves the duty not to engage in fraud, willful misconduct, or bad faith

---

[89] *See* Management Defs.' Br. at 21–25; Damani Defs.' Br. at 20; A copy of the HoldCo LLC Agreement is attached as Ex. A to the *Declaration of Jacob Fields in Support of Management Defendants' Motion to Dismiss the Complaint.* D.I. No. 18-1.

conduct.[90] A contractual duty to refrain from "willful misconduct" or "bad faith" corresponds with the traditional duty of loyalty. *Id.* at *12. Defendants' claim that they owe no duties whatsoever is wrong. The HoldCo LLC Agreement contains three separate provisions preserving these core duties.

*First,* the HoldCo LLC Agreement preserves the implied contractual covenant of good faith and fair dealing and requires that "Covered Persons," including managers like the Management Defendants, to make decisions in "good faith." HoldCo LLC Agreement §§ 5.01(e); 9.03. At a minimum, this means that the Management Defendants had to use good faith in making decisions and not act in bad faith—a duty which includes not violating applicable law. *See Wagner v. BRP Grp., Inc.*, 316 A.3d 826, 871 (Del. Ch. 2024) ("At a minimum, the implied covenant requires that the party empowered with the discretion to make a determination to "use good faith in making that determination."). *Mehra v. Teller*, 2021 WL 300352, at *28 (Del. Ch. Jan. 29, 2021) (describing that bad faith can be established where a manager "acts with the intent to violate applicable positive law.").

*Second*, the HoldCo LLC Agreement states that managers remain liable for any loss "incurred by reason of such Covered Person's fraud, willful misconduct or willful breach of this Agreement." This carve-out from exculpation means managers cannot escape liability for the very conduct alleged here. Sekhri, Boyden and Kassam are not liable for liabilities incurred by HoldCo as long as their acts are "in good faith on behalf of the Company."[91] These provisions immunize

---

[90] 6 *Del. C.* § 18-1101(e) (the Delaware Limited Liability Company Act) provides that a manager's duties may be restricted, but an "LLC agreement cannot eliminate bad faith breaches of the implied covenant of good faith and fair dealing." *Wagner v. BRP Grp., Inc.*, 316 A.3d 826, 848–49 (Del. Ch. 2024); New *Enterprise Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 580–81 (Del. Ch. 2023) (footnotes omitted); *CSH Theatres, LLC v. Nederlander of San Francisco Associates*, 2015 WL 1839684, at *11 (Del. Ch. April 21, 2015).

[91] HoldCo LLC Agreement § 9.02(b).

managers from claims for breach of the duty of care but not claims for an act of bad faith or breach of loyalty. *In re HH Liquidation, LLC*, 590 B.R. 211, 272 (Bankr. D. Del. 2018) (citing *Stone v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006)).

*Third,* the HoldCo LLC Agreement denies indemnification for acts constituting fraud, gross negligence, or willful misconduct. This provision confirms that the duty of loyalty and duty of good faith (alongside the duties listed) cannot be eliminated because if they did not exist there would be no need for the indemnification provision to discuss such acts.[92] S*ee In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 404–05 (Bankr. D. Del. 2022).

Delaware courts have consistently held that such carve-outs in LLC agreements preserve the fiduciary duties of good faith and loyalty. For example, in *Cadira Group*, the defendants argued—like here—that their operating agreement eliminated all fiduciary duties because it purported to "restrict the liability and fiduciary duties . . . to the maximum extent permitted by applicable law." 2021 WL 2912479, at *12. The Court of Chancery rejected this argument and found that duty of loyalty claims were available because the LLC agreement expressly left open claims for any "Manager's bad faith, gross negligence, willful misconduct or actual fraud." *Id*.

Indeed, this Court reached a similar conclusion in *Bayou Steel*, refusing to dismiss claims where the agreement's indemnification provision carved out "fraud or willful misconduct." 642 B.R. at 403. Although the directors in *Bayou* were exculpated for "debts, liabilities commitments or any other obligation of the Company," as well as breaches of fiduciary duty of a director for pursuing an opportunity of the company, the directors were not exculpated from losses relating to conduct that lacked good faith or constituted fraud or willful misconduct. *Id.* 403–4. This Court

---

[92] HoldCo LLC Agreement § 9.04. Section 9.04 further provides that: "The termination of any proceeding by settlement shall not be deemed evidence that a Covered Person [managers] acted in a manner which did not constitute good faith or that constituted fraud, gross negligence or willful misconduct. These two provisions further show that Sekhri and Boyden had a remaining duty of loyalty to HoldCo."

held that the exculpation provisions were ambiguous, and because exculpation for breaches of fiduciary duty must be unambiguous  and evince clear intent, the duties were not exculpated. *Id.*

Here, like in *Bayou Steel*, the HoldCo LLC Agreement not only has conflicting provisions concerning the duty of loyalty, but also carves out willful misconduct from its indemnification provisions. Consequently, the HoldCo LLC Agreement does not evince clear intent to exculpate the duty of loyalty and good faith. If anything, the three provisions discussed demonstrate the opposite. *See Maric Healthcare, LLC v. Guerrero*, 2024 WL 2993336, at *6 (Del. Ch. 2024) (describing that a breach of fiduciary duty occurs when a fiduciary commits a fraudulent, or wrongful act).

Sekhri, Boyden, and Kassam breached the preserved duties in the HoldCo LLC Agreement by knowingly signing the Solvency Certificate and authorizing a $203.6 million distribution that rendered HoldCo insolvent.[93] Such conduct constitutes fraud and willful misconduct that no exculpation can shield.[94]

### 2. *As officers of Lucky Bucks, Sekhri, Boyden, Bouskill, Ijaz, and Kassam had express fiduciary duties not to engage in conduct that lacked good faith.*

Defendants Sekhri, Boyden, Bouskill, Ijaz, and Kassam argue for dismissal based on the Lucky Bucks, LLC Second Amended and Restated Operating Agreement ("**LB LLC Agreement**"),[95] which is governed by Georgia law. In doing so, the Defendants reinterpret the claims against Sekhri, Boyden, Bouskill and Ijaz as claims *against HoldCo* as the managing

---

[93] *See* Compl. ¶¶ 78, 84, 85, 108–110, 154, 177.

[94] To the extent Defendants Sekhri and Boyden respond that the wrongdoing of Defendants is only a contract claim, caselaw is clear that the fraud and willful misconduct taken in bad faith constitutes a breach of fiduciary duties. See e.g., *In re MultiOpCo Plan Corp. S'holders Litig.*, 268 A.3d 784, 805 (Del. Ch. 2022). However, if this Court finds that the Plaintiffs' claims against Sekhri and Boyden are more properly pleaded as a contract claim, Plaintiffs request leave to replead them as such claims based on substantial similar allegations since they violated provisions in the HoldCo LLC Agreement to not act in an unlawful manner or to make distributions that were not fraudulent.

[95] A copy of the LB LLC Agreement is attached as Ex. D to the *Declaration of Jacob Fields in Support of Management Defendants' Motion to Dismiss the Complaint.* D.I. No. 18-4.

member of Lucky Bucks.[96] But no such allegations against HoldCo for breach of fiduciary duty exist, and this Court need not consider the dismissal of a fictional claim.

The LB LLC Agreement explicitly imposes fiduciary duties on officers. Section 4.1 states unequivocally that "[e]ach Officer of the Company shall possess any and all fiduciary duties that are owed by officers and other persons pursuant to the Act." The "Act" here refers to Georgia's LLC statute, under which managers must act "in good faith" and "in the best interests of the limited liability company." O.C.G.A. § 14-11-305; *Song v. eGPS Sols. I, Inc.*, 899 S.E.2d 530, 540 (Ga. App. 2024) (managing members owe duties of utmost good faith and loyalty). "Other persons" includes managers. O.C.G.A. § 14-11-101(18).

This is further supported by the management structure established in the LB LLC Agreement. Section 3.1 vests management in HoldCo as "Sole Member," but explicitly allows delegation: "the Sole Member may, at any time and from time to time, *delegate such power* to Officers as provided by Article 4 hereof." Section 4.1 confirms this delegation, providing that "the Sole Member shall be deemed to have *delegated to each Officer the duties* and authority as the Sole Member may prescribe[.]" As managing member, HoldCo originally owed fiduciary duties to Lucky Bucks but delegated that management responsibility—and the related fiduciary duties— to the Officers. Thus, the Officers: (i) had duties established by Section 4.1 as duties of "officers and other persons"; (ii) were delegated duties from the managing member pursuant to Sections 3.1 and 4.1; and (iii) served as agents of HoldCo pursuant to Section 4.1.[97]

The exculpation provisions in the LB LLC Agreement confirm this distribution of duties. While Section 6.3 eliminates duties for most "Covered Persons," it explicitly carves out "Officers,

---

[96] Management Defs.' Brief ¶ 60.

[97] LB LLC Agreement § 4.1 provides that Officers "shall act for and on behalf of the Company as authorized agents subject to the authorization of the Sole Member.

employees and expressly authorized agents."[98] This makes clear the difference in duties between Officers and managers. Section 6.2(b) further confirms Officers' liability for "breach of any of such Covered Person's fiduciary duties owed to the Company"—there would be no need for this provision if officers had no duties. Thus, there is no limitation on liability for Officers. And the Complaint properly alleges these duties were breached.[99]

### 3.    The Complaint states claims for breaches of managing members and officers in Counts Four and Six.

#### a.    Count Four adequately alleges the Managers breached their fiduciary duties by coordinating with Trive and Damani to effectuate the OpCo Distribution knowing it would leave HoldCo insolvent.

Read as a whole, the Complaint clearly alleges a coordinated fraudulent scheme that breaches any conceivable fiduciary duty. *See Johnson & Johnson Health Care Sys., Inc. v. SaveOnSP, LLC*, No. 3:23-cv-04181-ZNQ-LHG, 2025 WL 2161673, at *3 (D.N.J. May 5, 2025) (noting that on a motion to dismiss the complaint is read holistically).

The OpCo Distribution scheme had three components. *First*, there was asset manipulation. Kassam and Damani (while acting as Managers and in an undisclosed violation of the GLC Executive Order) sold and then repurchased COAM contracts at inflated prices in order to artificially inflate Lucky Bucks's value, and therefore HoldCo's value.[100] Sekhri and the other

---

[98] LB LLC Agreement §6.1(a) (emphasis added).  *See* Ga. Code Ann. § 14-11-305 (2024) (providing that articles of organization or a written operating agreement may not eliminate liability for intentional misconduct, knowing violation of law, or receiving personal benefit in violation of a written operating agreement).

[99] Compl. ¶¶ 105, 174–78, and 180–83. Defendants' other arguments do not stand muster. To start, Defendants' citation to *In re Beaulieu Grp.*, LLC actually provides support for Plaintiffs' claims. No. 17-41677-PWB, 2021 WL 4469928 (Bankr. N.D. Ga. Sept. 29, 2021); *see* Management Defs.' Br. at 25. There, the LLC agreement vested management in a Board of Managers who retained fiduciary duties, while officers had none. *Beaulieu*, 2021 WL 44699928, at *14. Here, in contrast, the LB LLC Agreement made clear that the Officers had fiduciary duties, just like the Beaulieu Board of Managers. And, although Defendants contend that Plaintiffs seek to "circumvent a clear waiver," Plaintiffs' claims target the parties who actually retained fiduciary duties under the express terms of the LB LLC Agreement. *See* Management Defs.' Br. at 24.

[100] Compl. ¶¶ 3, 54-58, 4, 67.

Managers coordinated with the Trive Defendants and Damani and his companies (again in violation of the GLC Executive Order) to control HoldCo and strip value from Lucky Bucks and thus from HoldCo through a series of transactions.[101]

*Second*, there was deception. When the Managers could not find willing lenders, they obtained financing through misrepresentation.[102] Kassam and Sekhri, while coordinating with Damani, misrepresented Damani's involvement in the business to assure the OpCo lenders funded the OpCo Distribution.[103] The Managers also hid information and submitted false financial information to the OpCo lenders and knew the Solvency Certificate was false.

*Finally*, there was self-dealing. The OpCo Distribution was made when HoldCo was insolvent and the transfers further rendered it insolvent after the transaction.[104] From this deal, Sekhri received a $33.3 million distribution plus an "incentive loan" (a special benefit to Sekhri contrary to the Management Defendants' contention[105]), and Kassam and Boyden received bonuses for their participation in the OpCo Distribution.[106]

Through their manipulation, deception, and self-dealing, the Managers acted not in HoldCo's interests, but to enrich themselves and their sponsors. Dismissal of the claims is thus clearly unwarranted.

Each Defendant pulls a line or two out of the Complaint to support dismissal in a piecemeal fashion. Management Defendants contend that, to prove the claims in Count Four, Plaintiffs merely fault the Managers for not obtaining outside financial advice, and that the Complaint does

---

[101] Compl. ¶¶ 60-68, 70-89, 155, 165, 178.

[102] Compl. ¶¶ 75, 78-79.

[103] Compl. ¶ 4.

[104] Compl. ¶ 84, 85, 107-108, 112.

[105] Management Defs.' Brief ¶66

[106] Compl. ¶¶ 4, 34, 35, 37, 88-89, 149 – 159.

not show the Managers knew the Solvency Certificate was false.[107] Kassam contends that he is lumped together with the other Managers and that the Complaint is conclusory.[108] The Trive Defendants argue that Plaintiffs' claims against the Managers are based on valid distributions, and that Sekhri and Boyden do not need to be independent managers.[109]

These arguments fail. The Complaint contains extensive allegations demonstrating Management Defendants' involvement in misconduct through their interactions with Damani (Kassam), their management of HoldCo's sole asset, Lucky Bucks (Sekhri, Boyden and Kassam), and their management of HoldCo at the direction of Trive (Sekhri). Further, Kassam cannot possibly be "lumped together" with the other Managers when his name is mentioned 105 times in the Complaint in connection with the above activity, specific allegations apply to him alone, and he is a central player in the wrongdoing, especially as related to the B-Side Scheme.[110] Finally, as to the Trive Defendants, Plaintiffs allege the Managers had a coordinated and pre-planned scheme to strip value from Lucky Bucks, render it insolvent and benefit themselves, the Damani Defendants, and the Trive Defendants. Thus, their arguments that the Managers could independently act in a fraudulent manner and without good faith holds no weight, not least given Trive's control of the Company and position as the primary beneficiary of the misconduct.

In sum, Defendants' arguments cannot overcome the Complaint's detailed allegations of a pre-planned scheme to strip value from HoldCo through fraud and self-dealing—clear breaches of fiduciary duty.

---

[107] *See* Defendants Brief ¶¶ 66-67.

[108] *See* Kassam Brief ¶23-24.

[109] *See* Trive Defs.' Br. ¶ 55–56.

[110] *See* Compl. ¶¶ 53–59, 84–85, 108, 110, 121, 132, 143, 156.

>    **b.    Count Six adequately alleges the Management Defendants and Kassam breached their fiduciary duties by entering into sham transactions and signing false documents that permitted the OpCo Distribution.**

As Officers of Lucky Bucks, the best argument the Management Defendants can muster is that the allegations involve only administrative acts. But issuing critical certificates and wiring hundreds of millions of dollars are hardly menial and caused significant harm to Lucky Bucks. Moreover, viewed in the context of the Complaint as a whole, the Management Defendants' acts become more significant: they participated in or were aware of the B-Side Scheme and Location License underperformance;[111] they knew of and permitted Damani to take an active and improper role in the Company's operations;[112] they knew of Lucky Bucks's poor financial condition and Bouskill execution of the Solvency Certificate;[113] they worked with the Trive Defendants to "maximize the dividend" despite the Company being insolvent;[114] they withheld information from the Lenders;[115] and they granted bonuses for the OpCo Distribution.[116]

Kassam, once again, argues that Plaintiffs did not provide enough details about his looting of Lucky Bucks and HoldCo, and that he is simply lumped together with other Defendants.[117] But the allegations above show that Kassam, in particular, was aware that the acts at issue constituted breaches of fiduciary duty based on actual fraud, willful misconduct or gross negligence.[118]

---

[111] Compl. ¶ 64.

[112] Compl. ¶ 68.

[113] Compl. ¶ 70,77.

[114] Compl. ¶ 79.

[115] Compl. ¶ 80, 105, 110, 111.

[116] Compl. ¶¶ 33, 34, 35, 36, 88, 112, 157, 166, 168, 180, 181.

[117] Kassam Br. ¶ 23.

[118] *See* Compl. ¶¶ 3, 50–57, 63, 78, 84–85, 108–110, 121, 132, 143, 156.

Again, issuing false certificates and wiring $203.6 million to insiders while concealing insolvency are not "administrative acts"—they are willful breaches of the duty to act in Lucky Bucks's best interests. The officers who executed this scheme violated their express fiduciary duties under the LB LLC Agreement.

### 4.    The Complaint sufficiently pleads in Count Five that the Trive Defendants, Bouskill, Ijaz and Damani knowingly participated in the breach of duties owed by managers to HoldCo and aided and abetted the breach.

Under Delaware law, aiding and abetting a breach of fiduciary duty has three elements: (1) a breach of fiduciary duty; (2) knowing participation in that breach by the defendant; and (3) damages. *LaSala v. Bordier et Cie,* 519 F.3d 121, 130 (3d Cir. 2008). The element of knowing participation involves two concepts: knowledge and participation. *In re Elec. Last Mile Sols., Inc.*, 2024 WL 223195, at *3 (Del. Ch. Jan. 22, 2024). Knowledge may be alleged generally, requiring only facts supporting a reasonable inference of knowledge." *Id.* at *4. The Complaint clearly alleges each of these elements.

To start, as stated above, the Complaint adequately alleges that the Management Defendants breached their fiduciary duties to HoldCo by authorizing the OpCo Distribution while insolvent and through fraud. Each of the Trive Defendants, Bouskill, Ijaz, and Damani knowingly participated in these breaches.

Knowledge is easy to infer here. Bouskill and Ijaz prepared Lucky Bucks's financial statements and knew certain locations were severely underperforming. As CFO and EVP of Finance, they had "sufficient handle on [the Company's] operations" to also know the Solvency Certificate was false. *See In re P3 Health Gp. Hldgs*., LLC, 2022 WL 15035833, at *5 (Del. Ch. Oct. 26, 2022).[119]

---

[119] Compl. ¶¶ 59, 85.

The Trive Defendants aided and abetted breach of fiduciary duty through Thadani (a Trive Partner). Thadani spoke with Sekhri nearly every day about Lucky Bucks, held weekly calls with Bouskill and Ijaz, and was involved in all high-level strategic decisions.[120] This deep involvement raises "an inference that [he was] aware of the catastrophic problems" and the Company's "deeply misleading disclosures" to the lenders. *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *21 (Del. Ch. Nov. 26, 2014). Damani orchestrated the B-Side Scheme and knew his continued involvement violated the GLC Executive Order—allegations sufficient to show knowledge at the pleadings stage.[121]

The participation requirement is also satisfied, as each of the defendants affirmatively participated in the breaches. Bouskill and Ijaz coordinated with Thadani to obtain the OpCo First Lien Credit Facility, executed the false Solvency Certificate despite knowing of underperforming locations, and facilitated the wire transfers.[122] Thadani affirmatively misrepresented Damani's involvement to Macquarie and instructed officers to withhold revenue data from the OpCo lenders.[123] And Damani appointed Kassam to the Board to authorize the distribution and maintained prohibited involvement in operations.[124] These Defendants were "involved from start to finish" in obtaining financing through misrepresentation and executing the fraudulent OpCo Distribution. *Elec. Last Mile Sols., Inc. S'holder Litig.*, 2024 WL 223195, at *5. This constitutes "knowing participation" at the pleadings stage.

---

[120] Compl. ¶¶ 64–65.

[121] Compl. ¶¶ 54–59, 167

[122] Compl. ¶¶ 75, 80, 111–12, 168.

[123] Compl. ¶ 74–75, 88.

[124] Compl. ¶¶ 63, 83, 167.

**E.**    **The Court should not dismiss Plaintiffs' claims for attorneys' fees, punitive damages, and declaratory relief.**

In Count Six, Plaintiffs assert a claim for breach of fiduciary duty under Georgia law. For the reasons set out in section VI.D.3.b., *supra*, those claims are sufficiently pleaded. Moreover, Plaintiffs have asserted numerous allegations indicating that Defendants acted with bad faith.[125] Such bad faith "aris[ing] out of the transaction on which the cause of action is predicated" allows for the factfinder to consider an award of attorneys' fees. *Foxchase, LLLP v. Cliatt*, 562 S.E.2d 221, 224 (Ga. App. 2002) (affirming a jury award of attorneys' fees on a claim for breach of fiduciary duty); O.C.G.A. § 13-6-11. Section 13-6-11 requires that a request for attorneys' fees be "specially pleaded" and included in the prayer. Plaintiffs have done so, and Count Seven for attorneys' fees should not be dismissed.

Similarly, Georgia law allows for Plaintiffs to seek punitive damages on its tort claims, and such an award "must be specifically prayed for in a complaint." O.C.G.A. § 51-12-5.1. Plaintiffs have included this in both Count Eight of the Complaint and their demand for relief, which is more than sufficient to satisfy the requirements of section 51-12-5.1.

Finally, Defendants have moved to dismiss Plaintiffs' Count Nine for declaratory judgment. Defendants cynically argue both that Plaintiffs need a final order of fraud or willful misconduct before filing affirmative claims, and that Plaintiff cannot seek such an order through declaratory relief.  The Court should not countenance this attempt to convert the Release carveout into a Catch-22 but rather should find that the claims alleged in the Complaint have not been released.

---

[125] *See* section V.I.D.3.b., *supra*.

**F.      This Court should hear the core bankruptcy claims at the heart of this case.**

Finally, the Damani Defendants accuse Plaintiffs of engaging in forum shopping because of a separate case that Reorganized Lucky Bucks has brought in Georgia state court.[126] But the Damani Defendants completely miscast the Georgia Action, in which the Company has brought claims—including violations of Georgia's Racketeer Influenced and Corrupt Organizations Act—against various Company insiders related to their connection to the B-Side Scheme.[127] Indeed, the primary purpose of the Georgia Action was to retrieve the COAM machines that were stolen through a fraudulent scheme allegedly orchestrated and implemented by, among others, Damani and Kassam, and to recover diverted location contracts, which were—and remain—Lucky Bucks's most valuable assets.  It obviously made sense for Reorganized Lucky Bucks to pursue those purely Georgia state-law claims in Georgia state court. By contrast, the claims at the heart of this case are core bankruptcy claims stemming from the OpCo Distribution, which was the transaction that led the Company to file for bankruptcy protection in this very Court, and are brought predominantly against Defendants that were not named as defendants in the Georgia Action. It is not only equitable for Plaintiffs to bring these claims in this Court, it would be nonsensical for Plaintiffs to bring them in any other forum.

<u>**CONCLUSION**</u>

For all of the reasons stated above, the Motions to Dismiss should be denied. In the alternative and to the extent that Defendants' Motions are not denied in their entirety, Plaintiffs respectfully request leave to amend the Complaint.

[*Remainder of Page Intentionally Left Blank*]

---

[126] Compl. ¶ 102.

[127] *Id.*

Dated: November 4, 2025

**COLE SCHOTZ P.C.**

By: */s/ Justin R. Alberto*

Justin R. Alberto (No. 5126)
Patrick J. Reilley (No. 4451)
Stacy L. Newman (No. 5044)
500 Delaware Avenue, Ste. 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: jalberto@coleshotz.com
Email: preilley@coleschotz.com
Email: snewman@coleschotz.com

**REID COLLINS & TSAI LLP**

William T. Reid, IV (*pro hac vice* forthcoming)
Jeremy H. Wells (*pro hac vice* forthcoming)
1301 S. Capital of Texas Highway, Ste. C300
Austin, Texas 78746
Telephone: (512) 647-6100
Facsimile: (512) 647-6129
Email: wreid@reidcollins.com
Email: jwells@reidcollins.com

Alexander J. Rigby (No. 7257)
300 Delaware Avenue, Ste. 770
Wilmington, DE 19801
Telephone: (302) 467-1765
Facsimile: (302) 467-1772
Email: arigby@reidcollins.com

Angela Somers (*pro hac vice* forthcoming)
420 Lexington Avenue, Suite 2515
New York, NY 10170
Telephone: (212) 344-5200
Facsimile: (212) 344-5299
Email: asomers@reidcollins.com

*Counsel for Plaintiffs LB NewHoldCo, LLC and
Lucky Bucks, LLC*