**<u>EXHIBIT K</u>**

Fulton County Superior Court
***EFILED***TV
Date: 10/20/2025 1:48 PM
Che Alexander, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| ARC Gaming, LLC f/k/a<br>Lucky Bucks, LLC | \| | |
| | \| | |
| Plaintiff, | \| | CIVIL ACTION FILE |
| | \| | |
| v. | \| | NO. 24cv000131 |
| | \| | |
| Anil Damani, | \| | |
| Tony Kassam, | \| | |
| Imran Ali, | \| | |
| Al Amin Sayani, | \| | |
| Derek Smith, | \| | |
| Jonathan Howard, | \| | |
| Arnaldo "Jonathan Linares" Perez, | \| | |
| Shakeel Haque, | \| | |
| Anand Vaswani, | \| | |
| Mohibul Motin, | \| | |
| Muhammed Chisti, | \| | |
| Angel Amusements, LLC, | \| | |
| Dynamic Gaming, LLC, | \| | |
| Unique Amusement, LLC, | \| | |
| AKS Amusements, Inc., | \| | |
| Advance Amusement, LLC, | \| | |
| Klass Amusement, LLC, | \| | |
| Prestige Amusement, LLC, | \| | |
| Lee Caudell, Inc., | \| | |
| Pinball Amusement, LLC, | \| | |
| Peak Amusement, LLC, | \| | |
| Meyersgold, LLC, | \| | |
| Blue Georgia 1000, Inc., | \| | |
| Georgia Winners, LLC, and | \| | |
| Klass Entertainment Group, LLC, | \| | |
| | \| | |
| | \| | |
| Defendants | \| | |

## REPORT and RECOMMENDATION

This matter is before the Court on Motions To Dismiss[1] filed by Defendants Anil Damani, Tony Kassam, Imran Ali, Meyersgold, LLC, Jonathan Howard, Angel Amusements, LLC, Dynamic Gaming, LLC, Advance Amusement, LLC, Klass Amusement, LLC, Prestige Amusement, LLC, Lee Caudell, Inc., and Pinball Amusement, LLC.

Also pending are Plaintiff's Motion to Add Parties, Defendant Unique Amusements, LLC's Motion For Summary Judgment, and Motions for Protective Order seeking to delay discovery until a ruling on the motions to dismiss, filed by Lee Caudell and Pinball, Damani, and Prestige Amusements.

On June 11, 2025, the presiding Judge entered an Order appointing the undersigned as a Special Master. (Order Appointing Special Master, June 11, 2025). That Order directed that "The Special Master shall have the authority to …make proposed findings of fact and conclusions of law regarding pending motions, dispositive or otherwise, which the Court may or may not adopt." (*See id.* at 2).

## PROCEDURAL HISTORY

The undersigned presumes that the parties are familiar with the procedural history of this matter prior to the appointment order. Therefore, it is only necessary to engage in a more limited discussion of the relevant submissions related to the

---

[1] Various other defendants have adopted some, or all, these motions to dismiss and are discussed below where relevant.

pending motions. Defendant Anil Damani filed a Motion To Dismiss[2] on November 7, 2024, and Plaintiff filed its Response In Opposition to that motion on December 9, 2024. Damani filed a Reply on July 8, 2025. Defendant Tony Kassam filed a Motion To Dismiss on November 18, 2024, and Plaintiff filed its Response In Opposition to that motion on December 16, 2024. Defendants Imran Ali and Meyersgold, LLC filed a Motion To Dismiss on December 6, 2024. Plaintiff filed its Response In Opposition to that motion on December 20, 2024. Defendant Howard filed a Motion To Dismiss on November 22, 2024. Plaintiff filed its Response In Opposition to that motion on December 20, 2024. Defendant Angel Amusements, LLC filed a Motion To Dismiss on November 18, 2024. Plaintiff filed its Response In Opposition to that motion on December 18, 2024. Angel Amusements, LLC filed a Reply in support of its motion on July 10, 2025. Defendant Dynamic Gaming, LLC filed a Motion To Dismiss on November 21, 2024. Plaintiff filed its Response In Opposition to that motion on December 20, 2024. Defendant AKS Amusements, Inc. filed a Notice of Joinder adopting the Motion To Dismiss filed by Lee Caudell, Inc. and Pinball Amusement, LLC on December 3, 2024. Defendant Advance Amusement, LLC filed a Motion To Dismiss on Jan. 2, 2025. Plaintiff filed its response to that motion on January 29, 2025. Advance Amusement, LLC filed a

---

[2] Defendants Arnaldo "Jonathan Linares" Perez, Haque, Motin, and Blue Georgia 1000 adopted Damani's motions, and those of the other defendants, on May 28, 2025.

Reply in support of its motion on February 24, 2025. Klass Amusement, LLC filed a Motion To Dismiss on November 7, 2024. Plaintiff filed its Response In Opposition to that motion on December 9, 2024. Defendant Prestige Amusement, LLC filed its Motion To Dismiss on November 7, 2024. Plaintiff filed its Response In Opposition on December 9, 2024. Defendants Lee Caudell, Inc. and Pinball Amusement, LLC filed their Motion To Dismiss on November 12, 2024.[3] Plaintiff filed its Response in Opposition to that motion on December 12, 2024. Defendants Lee Caudell, Inc. and Pinball Amusement, LLC filed a reply in support of that motion on July 1, 2025. Defendant Peak Amusement, LLC filed a Notice of Joinder in Lee Caudell, Inc.'s motion on November 22, 2024. Plaintiff filed a Response to the notice on December 20, 2024.

Lucky Bucks filed its Motion To Add Parties on November 6, 2024. Defendant Damani filed a Response in opposition to that motion on December 12, 2024. Lucky Bucks filed its Reply in support of that motion on December 20, 2024.

Defendant Unique Amusement, LLC filed a Motion For Summary Judgment on May 21, 2025. Lucky Bucks filed its Response In Opposition to that motion on June 23, 2025.

---

[3] Defendant AKS Amusements, Inc. filed a Notice of Joinder adopting the Motion To Dismiss filed by Lee Caudell, Inc. and Pinball Amusement, LLC on December 3, 2025. Plaintiff filed a Response to that motion on December 20, 2024.

Also pending are several motions for protective order seeking to delay discovery until a ruling on the motions to dismiss. (*See* Lee Caudell and Pinball Amusement's Motion for Protective Order, filed June 3, 2024; Damani's Motion For Protective Order, filed November 12, 2024, and Prestige Amusement's Motion for Protective Order, filed November 22, 2024).

On June 26, 2025, the undersigned entered an Order setting a status conference for July 11, 2025, and asked the parties whether the voluminous briefing already submitted to the Court was sufficient for the undersigned to consider the pending motions to dismiss in connection with Plaintiffs' Second Amended Complaint, which had been only recently filed on June 5, 2025. (Order, June 26, 2025.) In response to the Order setting the status conference, no parties objected to the motions to dismiss being considered based on the Second Amended Complaint. Accordingly, this Report and Recommendation will assess the Defendants' respective Motions To Dismiss as applied to Plaintiff's Second Amended Complaint. The above-referenced motions are ripe for disposition based on the submissions discussed above.

## DISCUSSION

### I.    Allegations In The Second Amended Complaint

Set out below is a summary of the allegations in Plaintiff's Second Amended

Complaint. (Second Amended Compl., June 6, 2025 ("SAC")). Additional specific allegations will be addressed in more detail as necessary in evaluating particular claims.

### A. Coin-Operated Amusement Machines

Plaintiff Arc Gaming and Technologies, LLC, f/k/a Lucky Bucks, LLC ("Lucky Bucks") alleges it has been harmed by a wide-ranging conspiracy spearheaded by its former owner, Anil Damani and carried out by Damani, other individuals, and related companies. Understanding these allegations requires diving into the business world of coin-operated amusement machines ("COAMs"), which is part of a heavily regulated industry overseen by the Georgia Lottery Corporation ("GLC"). (SAC, ¶¶ 43-59).

COAMs resemble digital slot machines prevalent in casinos. (SAC, ¶ 43). One important distinction is that the COAMs which drive the businesses involved in this lawsuit depend on the skill of the player to win. (SAC, ¶ 43). Another meaningful difference between COAMs and digital slot machines is reflected in the form of payout – COAMs in Georgia do not pay out winnings in cash. (*Id.*). Instead, COAMs only provide winners with credit for in-store purchases or gift cards. (*Id.*).

COAMs are not cheap – a modern machine can easily run $10,000-$15,000. (SAC, ¶ 44). GLC issues two different types of licenses – Class A which governs traditional arcade games, and Class B which relate to COAMs. (SAC, ¶ 45). For

purposes of this action, the relevant Class B licenses are referred to as "master" licenses and "location" licenses. (SAC, ¶ 46).

A master license provides its holder with permission to buy, own, and service COAMs around the state. On the other hand, a location license only authorizes the holder to place machines owned by a master license holder at a specific location. (SAC, ¶ 47). A location license holder must have a written, exclusive contract with a master license holder, and the term of that contract must be greater than one year. (SAC, ¶ 48). Master license holders must not hold location licenses, and these master license holders are responsible for the ongoing service and maintenance of their machines. (SAC, ¶¶ 48-49).

Revenue from COAMs is split evenly between master license holders and location license holders after paying GLC its share of the proceeds. (SAC, ¶ 51). Master license holders may not provide inducements to location license holders to try to secure a contract. (SAC, ¶ 52).  All COAMs in Georgia are connected to a computer system which tracks COAM play and the resulting revenue for GLC. (SAC, ¶ 53). Location license holders collect revenue weekly and transmit it to GLC, which subsequently distributes net revenue to master license holders and location license holders, respectively. (SAC, ¶ 54).

Master licenses are transferrable, so frequently master license holders will work to assemble "routes" of location licenses. (SAC, ¶ 55). Because of the tightly restrained market, master licenses can become quite valuable. (SAC, ¶ 56). The most

valuable asset of master license holders are their contracts with location license holders. (SAC, ¶ 57). Location contracts, when sold, are usually valued at a multiple of their monthly revenue derived from the COAMs at the particular location. (SAC, ¶ 59).

### B. History of Lucky Bucks

Lucky Bucks, the predecessor of Arc Gaming, was formed around 2011 by Defendant Anil Damani, and over the following decade Lucky Bucks became one of the largest master license holders in Georgia. (SAC, ¶ 60). Acquisitions fueled Lucky Bucks' growth, and by 2020 Lucky Bucks held six master licenses. (SAC, ¶ 61). In 2020, GLC alleged wrongdoing on the part of Damani and it sought to revoke Lucky Bucks' master license. (SAC, ¶ 63). At the end of the administrative proceeding that followed, a GLC hearing officer approved a settlement of the dispute whereby Lucky Bucks could keep its master license, but only if Damani would "resign as an officer" and "relinquish all operational control over the business and operations of [Lucky Bucks]." (SAC, ¶ 65). Under the agreement, Damani could retain his shares in a related holding company only so long as those shares were converted to non-voting shares. (*Id.*).

Upon being forbidden from being involved in Lucky Bucks' operations, Damani signed a five-year non-competition agreement with Lucky Bucks. (SAC, ¶ 66). Once Damani relinquished control, Kassam, the Chief Operating Officer, became responsible for operations. (SAC, ¶ 67).

Despite being barred from involvement in Lucky Bucks' day-to-day activities, Damani stayed involved behind the scenes. (SAC, ¶¶ 67-70). Between the time of the agreement for Damani to step aside and June 2023, Lucky Bucks' financial condition deteriorated substantially. (SAC, ¶¶ 72-78). In June 2023, Lucky Bucks filed bankruptcy in the United States Bankruptcy Court for the District of Delaware. (SAC, ¶ 79). In October 2023, Lucky Bucks came out of bankruptcy as a separate entity owned by former lenders, and it is now run by new managers. (SAC, ¶¶ 80-81).

Defendants used numerous B-side businesses to keep Damani's involvement a secret from the GLC and Lucky Bucks' lenders. (SAC, ¶ 88). The B-side businesses which acquired Lucky Bucks' location contracts included Dynamic, Angel, Prestige, Klass Amusement, Peak, Lee Caudell and Pinball. (SAC, ¶ 87).

Eventually, Lucky Bucks repurchased some of these location contracts. (SAC, ¶ 114). Part of the purchase prices of some these were fraudulently inflated through the use of sham players. (SAC, ¶ 115). Using sham players to inflate revenue numbers artificially could result in Lucky Bucks overpaying for reacquiring location contracts. (SAC, ¶ 116). Many location contracts reacquired from the B-side businesses did not continue to post revenues consistent with the revenues reported prior to the acquisition. (SAC, ¶ 117). Lucky Bucks entered into Asset Purchase agreements with Klass Amusement, Peak, Lee Caudell, and Prestige and alleges that

at least some of the sales figures which were relied upon in making these deals were fraudulently inflated. (SAC, ¶ 119).

### C. *Theft of Machines*[4]

Kassam, Ali, Howard and others devised a scheme to steal COAMs belonging to Lucky Bucks. (SAC, ¶ 125). Damani was also aware of and profited from the scheme. (SAC, ¶ 125). When sending these machines out for delivery, rather than following standard protocols, these machines would simply be marked with an "X." (SAC, ¶ 126). Each of these stolen cabinets, referred to as X-cabinets, had a market value of more than $10,000. (SAC, ¶ 126).

Once Kassam, Ali, Howard and others decided to steal one of these COAMs belonging to Lucky Bucks, warehouse workers were instructed to remove anything that could identify the machine as belonging to Lucky Bucks, including the machine's serial numbers. (SAC, ¶ 127). Frequently these stolen machines would be delivered to B-side businesses. (SAC, ¶ 129). When new management took over Lucky Bucks, a truck full of X-cabinets was in its parking lot. (SAC, ¶ 130). Many machines were taken out of state, while others were given to the B-side businesses. (SAC, ¶ 131-132). Lucky Bucks was not paid for any of the stolen machines. (SAC, ¶ 133). Kassam was aware that Lucky Bucks' employees were transporting stolen

---

[4] These allegations are also relevant for the alleged predicate acts of Theft By Receiving and Use Of An Article With An Altered Identification Mark.

machines and that Lucky Bucks was not being paid for those machines. (SAC, ¶ 139).

### D. Theft Of Services

While working for Lucky Bucks, numerous employees were asked to work on the side for B-side businesses. (SAC, ¶¶ 154-158). These employees did work for the B-side businesses including Klass Amusement, Prestige, Dynamic, Unique and Angel while on the clock for Lucky Bucks and being paid by Lucky Bucks. (SAC, ¶ 158).

Signal chats shared between Lucky Bucks employees and management indicated that Dynamic, Angel, Prestige, Klass Amusement, Peak, Unique, AKS, Lee Caudell and Pinball received technicians, parts and equipment belonging to Lucky Bucks. (SAC, ¶ 159). For example, Lucky Bucks employee Stump delivered Lucky Bucks' equipment to Prestige 24 times between October 3, 2022 and January 20, 2023 while on the clock for Lucky Bucks and being paid by Lucky Bucks. (SAC, ¶ 161). He delivered equipment to Unique six times between October 7, 2022 and January 20, 2023. (SAC, ¶ 162). In addition, he delivered equipment to Klass Amusement three times in the relevant time frame of late 2022 through early 2023. (SAC, ¶ 163).

When doing work for the B-side businesses, the Lucky Bucks employees were told to hide their Lucky Bucks hats or clothing. (SAC, ¶ 173). These Lucky Bucks

employees who did this extra work were paid additional money on the side, through Meyersgold. (SAC, ¶ 175).

During the time frame in question Stumps made a total of 70 stops for the purpose of doing work for Prestige, Klass Amusement, Unique, Dynamic, AKS, and Angel. (SAC, ¶ 188). Around the same time, Kassam, Ali, and Defendant Al Amin Sayani engaged in weekly virtual meetings with Damani and employees of Damani's other businesses. (SAC, ¶ 192). These recurring weekly meetings took place during the workday. (SAC, ¶ 193). Kassam, Ali, and Sayani received invitations to these meetings through their Lucky Bucks email addresses. (SAC, ¶ 194.) For example, those people participated in a virtual meeting with Damani on December 8, 2022. (*Id.*). Lucky Bucks alleges on information and belief that the purpose of these weekly meetings was to plan, coordinate, and manage the activities set out in the Second Amended Complaint. (SAC, ¶ 196).

E.  *Theft of Money*[5]

The B-side businesses also allegedly stole money from Lucky Bucks. (SAC, ¶ 198). In particular, on July 14, 2022, Lucky Bucks transferred $850,000 to Prestige as an exclusivity deposit related to a proposed asset purchase agreement. (SAC, ¶

---

[5] In this section of its complaint, Lucky Bucks also makes allegations related to parties it seeks to add to the lawsuit regarding what it alleges were "sham" sponsorship payments. (SAC, ¶¶ 202-206).

199). Rather than completing the deal, the individual defendants allowed Prestige[6] to keep this money and wrote this expense off as a loss for Lucky Bucks. (SAC, ¶ 201).

### F. Unauthorized Access To Lucky Bucks' IT Systems

Lucky Bucks operates a shared network drive where it stores documents for its business operations. (SAC, ¶ 215). Access to the network is password protected. (SAC, ¶ 217). Sayani and Ali set up the system as administrators. (SAC, ¶ 218). After the end of their employment with Lucky Bucks, Sayani and Ali each used their usernames and passwords to access files on the Lucky Bucks shared network which contained trade secret and confidential information. (SAC, ¶ 219).

### G. Breach of Contract

Sayani and Haque executed non-compete, non-solicitation, and confidentiality agreements with Lucky Bucks. (SAC, ¶ 231). Kassam, Howard, Vaswani, and Ali executed substantially similar non-compete, non-solicitation, and confidentiality agreements with Lucky Bucks. (SAC, ¶ 234.) Lucky Bucks does not currently possess copies of the executed version of these agreements and alleges that as part of the conspiracy all these documents were removed from its files. (SAC, ¶ 235). "Linares" Perez executed an independent contractor agreement which

---

[6] Notably, at no point in setting out its claims does Lucky Bucks reference this allegedly unlawful retention of the exclusivity deposit.

provided he would keep Lucky Bucks' confidential and proprietary information secret. (SAC, ¶ 236).

In 2016, Damani executed an employment agreement with Lucky Bucks featuring non-compete, non-solicitation, and confidentiality provisions.[7] (SAC, ¶ 237). As part of his May 26, 2020 settlement with the GLC, Damani entered into a Separation Agreement and General Release ("Separation Agreement") which provided that the terms of his 2016 agreement were ratified and reincorporated into the Separation Agreement. (SAC, ¶ 238). In addition, Exhibit A to the Separation Agreement was a Non-Competition, Non-Solicitation, and Non-Disclosure Agreement providing that "a) Damani would not, directly or indirectly, compete with Lucky Bucks; and b) Damani would not, directly or indirectly, hire or solicit Lucky Bucks' employees or customers." (SAC, ¶ 239). Damani, Kassam, Ali, Sayani, Vaswani, Haque and Howard breached their contractual obligations by soliciting Lucky Bucks' employees and customers through their involvement in the B-side businesses. (SAC, ¶ 240).

## II.    Legal Standard For Motions To Dismiss

Georgia law permits a defendant to file a motion seeking dismissal "for failure to state a claim upon which relief may be granted." O.C.G.A. § 9-11-12(b)(6). "A

---

[7] Plaintiff further alleges on information and belief that the provisions of that agreement are substantially similar to those contained in Haque's employment agreement. (SAC, ¶ 237).

motion to dismiss should only be granted if the allegations of the complaint, construed most favorably to the plaintiff, disclose with certainty that the plaintiff would not be entitled to relief under any state of provable facts." *McGowan v. Progressive Preferred Ins. Co.*, 281 Ga. 169, 170 (2006). Indeed, at all times, "the trial court must accept as true all well-pled material allegations in the complaint and must resolve any doubts in favor of the plaintiff." *Roberson v. Northrup*, 302 Ga. App. 405, 405 (2010); *see also Trop, Inc. v. City of Brookhaven*, 296 Ga. 85, 86 (2014) (in considering motion for judgment on the pleadings "all well-pleaded allegations of the opposing party's pleading are taken to be true.").

Dismissal is appropriate, however, when a complaint is "clearly without any merit; and this want of merit may consist in an absence of law to support a claim of the sort made, or of facts sufficient to make a good claim, or in the disclosure of some fact which will necessarily defeat the claim." *Mabra v. SF, Inc.*, 316 Ga. App. 62, 66 (2012). The rule requiring that all facts be viewed in the light most favorable to the plaintiff as the non-movant does not extend to unfounded legal conclusions. *Trop,* 296 Ga. at 87. "A complaint lacks any legal basis for recovery where '(1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief

sought. If, within the framework of the complaint, evidence may be introduced which will sustain a grant of the relief sought by the claimant, the complaint is sufficient and a motion to dismiss should be denied.'" *Hill v. Bd. of Regents of the Univ. Sys. of Georgia*, 351 Ga. App. 455, 458 (2019) (quoting *Villa Sonoma at Perimeter Summit Condo. Assn, Inc., v. Commercial Indus. Bldg. Owners Alliance, Inc.,* 349 Ga. App. 666, 666 (2019)).  Authority relevant to consideration of motions to dismiss RICO claims will be discussed in the section addressing that claim.

### III.    Count I: Violations of Georgia's RICO Act (all Defendants)

In Count I, Lucky Bucks asserts that all Defendants are liable for violations of the Georgia RICO Act. Defendants Damani, Kassam, Ali, Howard, Haque, "Linares" Perez, Motin, Angel Amusements, LLC, Dynamic Gaming, LLC, AKS Amusements, Inc., Klass Amusement, LLC, Prestige Amusement, LLC, Lee Caudell, Inc., Pinball Amusement, LLC, Peak Amusement, LLC, Advance Amusement,, LLC, Meyersgold, LLC, and Blue Georgia 1000, Inc. have moved to dismiss this claim or otherwise adopted a motion to dismiss filed by other defendants.

The Court of Appeals of Georgia recently set out the purpose behind Georgia's RICO Act:

> The Georgia RICO Act was enacted by the Georgia General Assembly to impose criminal penalties against those engaged in an interrelated pattern of criminal activity motivated by or the effect of which is pecuniary gain or economic or physical threat or injury, and civil remedies to compensate those injured by reason of such acts. Indeed,

under OCGA § 16-14-4 (a), [i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money. In this regard, racketeering activity, also known as a predicate act, is the commission of, the attempt to commit, or the solicitation or coercing of another to commit, a crime which is chargeable by indictment under one of forty categories of offenses.

*Kearney v. Oppenheimer & Co., Inc*., 915 S.E.2d 709, 715 (Ga. Ct. App. 2025) (internal quotations omitted).

It is also "unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." O.C.G.A. § 16-14-4(b). A "pattern of racketeering activity" is defined as "[e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents. . . ." O.C.G.A § 16-14-3(4)(A).

Lucky Bucks identifies six potential predicate acts to support its RICO claim. Each is addressed below.

### A.  Theft By Deception (O.C.G.A. § 16-8-3)

In its Order of September 23, 2024, the Court assessed Lucky Bucks' complaint and concluded that it "does not meet the liberal notice pleading standard and provide the particularity required for fraud and fraud-based RICO claims," while

providing Lucky Bucks an opportunity to replead those claims. The parties disagree about whether the theft by deception predicate act falls within the Court's definition of a "fraud-based RICO claim[]" requiring a heightened pleading standard.  As explained below, each side identifies recent Georgia authority in advancing its arguments.

Defendants point to *Bazemore v. U.S. Bank Nat'l Assoc.,* 363 Ga. App. 723 (2022) to support their position that theft by deception must be pled with particularity when it is a predicate act. The Bazemores sued their mortgage lender and a law firm in connection with a foreclosure on their home. Included in the complaint was a RICO claim alleging theft by deception. *Id.* at 729. The trial court had granted a motion to dismiss without providing the plaintiffs an opportunity to replead. *Id.* at 725. On appeal, the Court of Appeals of Georgia held that the claims for "theft by deception, mail fraud, and wire fraud are not pled with the requisite degree of particularity, but this is not fatal at the motion to dismiss stage, as the trial court should treat the motion as a motion for more definite statement as to these claims." *Id.* at 730. If this were all the relevant authority on this issue it would appear that Georgia law requires fraud-based predicate acts in the RICO context to be pled with particularity, but Lucky Bucks points to other caselaw that supports its position that theft by deception need not be pled with particularity as a RICO predicate act.

Shortly after issuing its decision in *Bazemore,* the Court of Appeals of Georgia once again had an opportunity to consider a RICO claim relying on theft by

deception as one of its predicate acts. In *Hansford v. Veal,* 369 Ga. App. 641 (2023) the court addressed an interlocutory appeal where a lower court had struck the pleadings of defendant borrowers in a RICO case alleging improprieties in a lending transaction. The complaint alleged that individuals borrowed money from the plaintiff under false pretenses. *Id.* at 641. Following discovery misconduct and resulting contempt proceedings against the defendants, the trial court granted a default judgment against the defendants, but in doing so, over a series of orders, left open the possibility that the defendants could dispute liability on the RICO claim "because the complaint fails to make specific allegations against each defendant." *Id.* at 643.

On appeal, the court agreed with the appellant that the default admissions of one of the defendants prevented that party from disputing liability. *Id.* at 647. That conclusion prompted the reviewing court to examine the complaint to see if the allegations entitled the plaintiff to relief. *Id.* at 647-48. In assessing the trial court's rulings regarding this issue, the Court of Appeals disagreed with the lower court's reliance on a federal case, *Pombert v. Glock, Inc.,* 171 F.Supp.3d 1321 (N.D. Ga. 2016). In doing, so the Court of Appeals highlighted that "the Georgia RICO statute is considerably broader than the federal RICO statute and … federal circuit court opinions regarding the federal statute, while instructive, do not control our construction or application of the Georgia RICO statute." *Id.* at 650 (*quoting Blalock v. Anneewakee, Inc.,* 206 Ga. App. 676, 677-78 (1992)). The trial court's reliance on

*Pombert*, in the appellate court's view, impermissibly required a heightened pleading standard when theft by deception is a predicate act. *Hansford,* 369 Ga. App. at 651.

In reaching its conclusion, the *Hansford* court looked to the decision in *Bazemore* as it stated that "this Court has specifically held that the federal pleading requirements are only necessary when a plaintiff alleges mail and wire fraud." *Hansford,* 369 Ga. App. 651. That section of *Hansford* cites a footnote from *Bazemore*, but it failed to consider language from the body of the opinion and the result of the case which flatly contradict that statement. In assessing the allegations of the complaint, the *Bazemore* court treated the theft by deception predicate act just like the mail and wire fraud predicates, as it held

> The Bazemores' claims for **theft by deception**, mail fraud, and wire fraud are not pled with the **requisite degree of particularity**, but this is not fatal at the motion to dismiss stage, as the trial court should treat the motion to dismiss as a motion for more definite statement as to these claims.

*Bazemore,* 363 Ga. App. at 730 (emphasis added). From the foregoing, it is clear that in *Bazemore* treated the theft by deception predicate act just like mail and wire fraud in requiring a heightened degree of "particularity." *Bazemore,* 363 Ga. App. at 730.

Untangling the tension between these two Court of Appeals of Georgia opinions is simply a matter of identifying which one was issued first and following that decision. The panel in the subsequently-decided *Hansford* opinion lacked the authority to change the result in *Bazemore.  See White v. State,* 305 Ga. 111, 121 (2019) ("[T]he older decisions of [the Court of Appeals] are binding on [panels of

that] court until reversed or overruled by the Supreme Court of overruled by [the Court of Appeals, and the Court of Appeals] must adhere to the authority of those cases which [it] think[s] state the correct principle of law. Anything to the contrary which may have been ruled by [panels of the Court of Appeals] in [more recent decisions] must yield to the older authorities [from that court].”); *see also Love v. McKnight*, 321 Ga. 196, 201, n. 9 (2025) (older decisions of the Court of Appeals are binding on later panels until reversed or overruled by this Court or overruled by the Court of Appeals).

In light of this authority, the *Hansford* court’s statement that “we decline to adopt the heightened pleadings standard relied on in *Pombert* when a predicate offense such as theft by deception is alleged,” *Hansford,* 369 Ga. App. at 651, had no legal effect in light of the prior panel’s decision in *Bazemore*.  The *Bazemore* court applied a heightened pleading standard to a theft by deception predicate act by requiring “the requisite degree of particularity,” *Bazemore,*  363 Ga. App. at 730, and treated theft by deception just like mail fraud and wire fraud. So, in accordance with this Court’s prior Order of September 23, 2024 -- and *Bazemore* -- the predicate act based on theft by deception is one of the “fraud-based RICO claims” which must be pled with particularity. As this Court stated in its prior Order, “For each count that includes a claim for fraud or a fraud-based predicate act, Plaintiff shall plead with particularity … to include, at a minimum, the alleged specific fraudulent statement

at issue, the occasion on which the statement was made, the speaker, and in what ways Lucky Bucks acted upon the statement." (Order of September 23, 2024 at 7).

Lucky Bucks alleges all Defendants committed the offense of theft by deception "by obtaining property from Lucky Bucks, including master licenses, location license contracts[8], COAM machines, parts, and equipment by deceitful or artful means. (SAC, ¶ 293). In connection with what it describes elsewhere as "theft of locations contracts," (SAC, ¶¶ 85-124), Lucky Bucks further alleges that Defendants Kassam, Prestige, Lee Caudell, Pinball, Dynamic, Klass Amusement and AKS "orchestrated purchase and sales of Lucky Bucks' master licenses and location licenses at unfair prices," (SAC, ¶ 294). Additionally, Lucky Bucks alleges the Defendants were concealing that they were "manipulating Lucky Bucks to enter into commercially disadvantageous agreements via the individual Defendants who were then corrupt managers of Lucky Bucks." (SAC, ¶ 295).

Theft by deception is obtaining "property by any deceitful means or artful practice with the intention of depriving the owner of the property." O.C.G.A. § 16-8-3. A conclusion that theft by deception has occurred is "authorized only when there is a deceitful misrepresentation regarding an existing fact or past event." *Robinson v. State,* 198 Ga. App. 431, 433 (1991).

---

[8] While Georgia law criminalizes theft of property, and property may include "contract rights," O.C.G.A. §16-1-3(13), this protection does not extend to an expired contract. Thus, the allegations regarding the alleged "theft" of locations contracts do not state a predicate act.

In its prior Order, the Court directed Lucky Bucks to identify "the alleged specific fraudulent statement at issue, the occasion on which the statement was made, the speaker and in what ways Lucky Bucks acted upon the statement." (Order of September 23, 2024 at 7.)  Lucky Bucks' complaint does not include any of these components of what the Court required, much less all of them. Lucky Bucks has failed to allege the predicate act of theft by deception for any of the defendants, therefore to the extent Defendants move to dismiss for the failure to plead theft by deception as a predicate act with particularity, it is **RECOMMENDED** that those motions be **GRANTED.**

### B.  Theft By Taking (O.C.G.A. § 16-8-2)

Lucky Bucks alleges that Smith, Howard, Ali, Kassam and Sayani committed the predicate act of theft by taking. Of these defendants, only Kassam filed a motion to dismiss, which was adopted by Howard and Ali. While it is alleged that stolen cabinets were delivered to B-side businesses including Unique, Prestige, Klass Amusements, AKS and Dynamic, (SAC ¶ 255), it appears that this predicate act is only alleged to have been committed by the individual defendants set forth above.

While technically Kassam argued for the dismissal of the RICO claim based on a lack of conspiracy, his motion did not address the theft by taking predicate act. For this reason, his motion, and the derivative motions of Howard and Ali are due to

be **DENIED** with respect to the allegations relating to the predicate act of theft by taking.

    *C. Theft By Receiving Stolen Property (O.C.G.A. § 16-8-7)*

    "A person commits the offense of theft by receiving stolen property when he receives, disposes of, or retains stolen property which he knows or should know was stolen unless the property is received, disposed of, or retained with intent to restore it to the owner." O.C.G.A. § 16-8-7(a). "Receiving" means, among other things, "acquiring possession or control . . . of the property." O.C.G.A. § 16-8-7(a).

    Lucky Bucks alleges that at the direction of "Linares" Perez, Smith or the B-side entity receiving the property, that Stump was directed to deliver equipment to B-side entities numerous times despite those entities having no right to possess that property. (SAC ¶¶ 281-283, 285). Defendants Prestige, Klass Amusement, Angel, and Pinball seek dismissal of the RICO claim asserted based on receiving stolen property as a predicate act.

    In particular, Prestige contends that the allegation that "Defendants knew or should have known that the Lucky Bucks property at issue was stolen" must be disregarded because it conflicts with the Stump affidavit which was attached to the complaint. Defendant Prestige is correct that when there is a "discrepancy between the allegations in the complaint and the exhibits attached to it, the exhibits control." *See Love v. Fulton Cty. Bd. Of Tax Assessors,* 348 Ga. App. 309, 310 (2018).

In seeking dismissal, Prestige attempts to highlight supposed inconsistencies and omissions from the Stump affidavit as a way to attack the complaint. In doing so, it asks this straightforward principle typically employed to iron out minor inconsistencies between allegations and accompanying documents to bear far too much weight. In particular, Prestige points out that Stump testified that he made 22 visits to Prestige's warehouse between October 2022 and January 2023. On 17 of those trips, he picked up equipment from Prestige and delivered it to other locations. He also made two trips to Augusta, Georgia doing Prestige work. From this starting point, Prestige emphasizes that nowhere in the Stump affidavit did he state that Prestige was aware that the equipment he delivered to Prestige was stolen.

To state a claim that could survive a motion to dismiss, Lucky Bucks was not required to make sure every attachment mechanistically tracked the complaint and recited all the elements of a cause of action. Under Georgia's liberal pleading standard which applies to this predicate act, it need not even required to allege every element of the cause of action in all circumstances so long as the allegations fairly put the defendant on notice of the claim. Here, Lucky Bucks alleged that Prestige possessed property that was stolen from Lucky Bucks, (SAC ¶ 281), and that Prestige knew or should have known that the equipment was stolen (SAC ¶ 284). At this stage of the litigation, Lucky Bucks has adequately alleged that Prestige committed the predicate act of receiving stolen property.

Defendant Angel Amusements' motion to dismiss tracks a similar path to the one laid out by Prestige.  Angel contends that the complaint's failure to specify what precise "equipment" it allegedly improperly received is fatal to Lucky Bucks' claim. However, at this stage of the litigation, Lucky Bucks has satisfied Georgia's pleading standards by alleging Stump "delivered stolen X-Cabinets to warehouses belonging to . . . Klass Amusement . . . during his initial employment with Lucky Bucks. He was falsely told that the B-Side business had purchased the stolen X-Cabinets from Lucky Bucks." (SAC, ¶ 255). The Second Amended Complaint also alleges the Klass "knew or should have known that the Lucky Bucks property at issue was stolen." (SAC, ¶ 284; *see also* SAC, ¶ 256 (photo of Lucky Bucks equipment at a Klass Amusement location)).

Defendant Angel Amusements contends that Lucky Bucks has not alleged it committed the predicate act of theft by receiving because the requisite state of mind has not been properly alleged. In doing so, Angel relies on the idea that "Proof of possession, alone, of recently stolen property is not sufficient to establish the essential element of the offense of theft by receiving stolen property that the possessor knew or should have known that the property was stolen." *Wells v. State*, 268 Ga. App. 62, 62 (2004). Again, Angel's position overlooks the fact that at this stage of the litigation Lucky Bucks is allowed to make an allegation like the one in paragraph 284 where it generally alleged, with respect to the state of mind of the defendants, that the B-side businesses which possessed stolen Lucky Bucks

equipment "knew or should have known that the Lucky Bucks property at issue was stolen." (SAC, ¶ 284) *see also* (SAC ¶¶ 144–46) ("Linares directed Mr. Stump to pick up three expensive COAM machines from Plaintiff's warehouse and install them at a location under contract with Angel.")).

Finally, Pinball makes arguments which are similar to the ones advanced by the other defendants. It also points out that Lucky Bucks' allegation that photos in paragraphs 139, 248 and 243 show machines belonging to Lucky Bucks in locations operated by other defendants. Pinball correctly points out that in paragraph 291 Lucky Bucks alleges that a photograph shows a machine which was its property at a Pinball location. At this stage in the litigation, Lucky Bucks has properly alleged the predicate act of theft by receiving stolen property against Pinball based on the allegations noted above.

Based on the foregoing, the motions to dismiss any claim based on the predicate act of theft by receiving stolen property filed by Prestige, Angel, Klass Amusement, and Pinball are due to be **DENIED**.

### D. Use Of An Article With An Altered Identification Mark (O.C.G.A. § 16-9-70(b))

Lucky Bucks alleges that Smith, Ali, Kassam, Sayani, and Howard committed the offense of use of an article with an altered identification mark by removing identity markers such as serial numbers from machines prior to distributing those machines to B-Side businesses and others. (SAC, ¶ 288). In particular, Lucky Bucks

alleges that the defendants specified above instructed warehouse workers and technicians to remove anything on the machines that could identify the machines as belonging to Lucky Bucks. (SAC, ¶ 289). These altered machines, referred to as X-cabinets, were then delivered to B-Side businesses including Unique, Prestige, Klass Amusement and Pinball. (SAC, ¶ 290-291).

"A person commits the offense of criminal use of an article with an altered identification mark when he or she buys, sells, receives, disposes of, conceals, or has in his or her possession . . . any other mechanical or electrical device . . . from which he or she knows the manufacturer's name plate, serial number, or any other distinguishing number or identification mark has been removed for the purpose of concealing or destroying the identity of such article." O.C.G.A. § 16-9-70.

Kassam takes aim at this predicate act by contending that the allegations that he ordered the removal of the serial numbers of the X-cabinets to conceal the fact that the machines rightfully belonged to Lucky Bucks were "conclusory." (Kassam's Motion To Dismiss, at 2). Going further, he suggests that the allegation that the removal of the serial numbers was done to hide the fact the X-cabinets belonged to Lucky Bucks was merely speculation. (*Id.*). To the contrary, the Second Amended Complaint alleges that Kassam and others "would instruct warehouse [] strip COAM machines of anything that could be used to identify it as belonging to Lucky Bucks, including often removing the manufacturers' serial number plates," (SAC, ¶ 289), and that "the serial numbers [were] removed to hide the fact that those machines

28

properly belonged to Lucky Bucks." (SAC, ¶ 292). The allegations of the Second Amended Complaint fairly put Kassam[9] on notice that the RICO claim alleges that he committed the predicate act of Use of an Article with an Altered Identification Mark.

Lucky Bucks alleges that X-cabinets were delivered to Unique[10], Prestige[11], Klass Amusement and Pinball.  Klass Amusement contends that the allegations against it are insufficient to state a claim for this predicate act because the Klass Amusement location where an X-cabinet was found had formerly been a Lucky Bucks location. This argument does nothing to derail the clear implications of the allegations that COAMs lawfully belonging to Lucky Bucks were stolen and taken to certain B-side businesses and that the identifying information was removed for the purpose of concealing that the X-cabinets actually belonged to Lucky Bucks.

Pinball offers two arguments in seeking to avoid any claim based on this predicate act. First, it contends that possession of an article lacking proper identification mark is not enough to show a predicate act unless "the defendant was aware the serial number had been removed" and that the defendant " 'knew the serial number had been removed for the purpose of concealing the identity of' the article."

---

[9] Defendants Ali and Howard adopted Kassam's arguments on this issue and accordingly their motions to dismiss with respect to the predicate act of Use of an Article with an Altered Identification Mark are also due to be denied.

[10] Unique's motion for summary judgment is discussed separately in Section X.

[11] Prestige filed a motion to dismiss which did not address this predicate act.

(Lee Caudell & Pinball Amusement's Motion To Dismiss, 11/12/2024, at 11-12 (*quoting Power v. State*, 260 Ga. 101, 103 (1990))). Here, where the Second Amended Complaint plainly alleges that an X-cabinet was found at a Pinball location, (SAC, ¶ 291), and that "the serial number had been removed "to hide the fact those machines properly belonged to Lucky Bucks," (SAC, ¶ 292), it is fair to draw the inference, at this stage of the litigation, that the recipient of this machine was aware that the identification mark had been removed for this purpose.

In addition, Pinball asserts that Lucky Bucks cannot base its RICO claim on two predicate acts based on the same conduct. This argument suggests that the actions which would support a conclusion that Pinball committed a Theft By Receiving stolen property predicate act and a determination that it committed the predicate act of Use of an Article with an Altered Identification Mark cannot both rest on the fact that a single machine was alleged to be located at a Pinball location. In making this argument, Pinball relies on *Security Life Insurance Co. v. Clark,* 273 Ga. 44, 48 n. 22 (2000). In that case, the Supreme Court of Georgia rejected the plaintiff's argument that forging an insurance document could support a RICO claim based on the predicate acts of forgery and mail fraud and concluded that a "single transaction" does not amount to two predicate acts.

Lucky Bucks counters this argument by pointing out that in this multi-defendant case it does not need to show that Pinball committed multiple predicate acts, so long as at least one other defendant committed at least one predicate act, too.

Lucky Bucks is correct on this point, as it need not show a pattern of racketeering on the part of Pinball alone to state a RICO claim. For this reason, its argument based on *Clark* is insufficient to justify dismissal of the RICO claim against it. If, as is true here, Lucky Bucks has alleged at least one predicate act on the part of Pinball, that conduct, if proved alongside related predicate acts by at least one other defendant could support a finding of liability on the RICO claim.

As they relate to the predicate act of Use Of An Article With An Altered Identification Mark, the Motions To Dismiss filed by Kassam, Klass Amusements, and Pinball (as adopted by Howard and Ali), are due to be **DENIED**.

### E.  *Theft of Trade Secrets (O.C.G.A. § 16-8-3)*

Lucky Bucks alleges that "Kassam, Ali, Sayani, Haque and Vaswani stole Lucky Bucks' trade secrets, including customer lists and the expiration dates and renewal terms of location contracts." (SAC, ¶ 242, *see also id.,* ¶¶ 243-248). In this Court's Order of September 23, 2024, it ruled that Lucky Bucks' claim for misappropriation of trade secrets was due to be dismissed because the identity of its customers and the terms of those contracts were not trade secrets. Given that Lucky Bucks' claim for misappropriation of trade secrets has been dismissed, its allegations that taking the same information would amount to theft of a trade secret sufficient to serve as a predicate act as part of a RICO claim must fail, as well. To the extent that Lucky Bucks' RICO claim depends on Theft of Trade Secrets as a predicate act, it is

hereby **RECOMMENDED** that Defendants' motions be **GRANTED** and that claim

be **DISMISSED**.

   *F.  Theft of Services (O.C.G.A. § 16-8-13)*

   In connection with the predicate act of Theft of Services, Lucky Bucks alleges

the following:

> Linares, Smith, Kassam, Howard and Ali had multiple technicians, []
> do work for, at a minimum Klass Amusement, Prestige, Dynamic,
> Unique, Lee Caudell, Peak, AKS, Pinball and Angel while working on
> the clock and getting paid by Lucky Bucks.

(SAC, ¶ 264). In taking aim at this allegation, several defendants, including Angel,

Klass, Prestige, Caudell, and Pinball rely upon *Five Star Athlete Mgmt., Inc. v. Davis,*

355 Ga. App. 774 (2020). In *Five Star Athlete,* the Court of Appeals of Georgia held

that "services" are not considered "personal property" which can support a claim

under the RICO Act. *Five Star Athlete Mgmt.,* 355 Ga. App. at 778. In that case, the

plaintiff contended that he had provided services to the agency representing a future

NFL player, and that he was not paid for providing those recruiting services. *Id.* at

775. In connection with the RICO claim, the defendant asserted that because

O.C.G.A. §16-14-4(a) only expressly prohibited a person from obtaining "real

property" and "personal property" through racketeering activity, that plaintiff could

not maintain a civil action for being deprived of his recruiting "services." The Court

of Appeals accepted this argument, as it concluded that "services" do not fall within

the definition of "personal property under the RICO Act." *Id.* at 781.

In attempting distinguish *Five Star Athlete Mgmt.,* Lucky Bucks asserts that the court's holding would only apply if the "'pattern of racketeering activity' merely resulted in someone 'acquir[ing] or obtain[ing]' services but no real or personal property, there would be no violation of the RICO statute." (Pl's Resp. To Angel Amusements' Motion To Dismiss, at 14 (quoting *Five Star Athlete Mgmt.,* at 778)). Contrary to the contentions made by Lucky Bucks, the Court of Appeals' opinion in *Five Star Athlete Mgmt.* makes no such distinction. Instead, it flatly concluded that deprivation of services could not support a claim under the RICO Act because " 'services' are not included within the definition of the term 'personal property' under the RICO Act." *Five Star Athlete Mgmt.,* 355 Ga. App. at 778. Naturally, this holding forecloses any suggestion that "Theft of Services" could serve as a predicate act. To the extent that Lucky Bucks' RICO claim depends on Theft of Services as a predicate act, it is hereby **RECOMMENDED** that Defendants' motions be **GRANTED** and that claim be **DISMISSED**.

### G. Enterprise (O.C.G.A. §16-14-4(b))

Lucky Bucks alleges that all defendants violated §16-14-4(b) "through their association with, and participation in the criminal enterprise described above, for which the common purpose was to systematically steal from Lucky Bucks for Defendants' benefit." (SAC, ¶ 307). Defendants Damani, Klass Amusement, Prestige, Pinball and Angel Amusements have moved to dismiss any RICO claim to the extent it rests on an allegation of an enterprise under § 16-14-4(b).

An enterprise is defined as "any person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity; or any uncharted union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises." O.C.G.A. § 16-14-3(3). To sustain a claim under §16-14-4(b), the plaintiff must demonstrate the existence of an enterprise as an independent element of the claim. Establishing a RICO enterprise requires "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Martin v. State*, 189 Ga. App. 483, 486, (1988) (*quoting U.S. v. Turkette,* 452 U.S. 576, 583 (1981)).

Defendants assert that Lucky Bucks has failed to allege the three elements of a RICO enterprise – purpose, relationships, and longevity. (*See* Damani's Motion To Dismiss, 11/7/2024, at 15-16; Klass Amusement's Motion To Dismiss, 11/7/2024, at 22-23; Prestige's Motion To Dismiss, 11/7/2024, at 11-12; Pinball's Motion To Dismiss, 11/12/2024, at 20-22; Angel Amusements' Motion To Dismiss, 11/18/2024, at 10). Lucky Bucks counters this argument by asserting that "Georgia RICO enterprise claims do not have as elements the three structural elements required for federal RICO claims." (Lucky Bucks' Response To Damani's Motion To Dismiss, 12/9/2024, at 17).

While important structural differences between Georgia's RICO act and its federal counterpart exist, the definition of an enterprise is not one of them.  The

Supreme Court of Georgia has observed that "[the enterprise] provision of the Georgia RICO statute is substantially the same as the comparable provision of the federal RICO statute." *Chancey v. State*, 256 Ga. 415, 428, 349 S.E.2d 717, 729 (1986). On this point, Lucky Bucks asserts that *Benevolent Lodge No. 3 v. Davis,* 365 Ga. App. 564, 568 n.11 (2022) supports its position.  (*See* Lucky Bucks' Response to Damani's Motion To Dismiss, 12/9/2024, at 17). To the contrary, the referenced footnote from *Benevolent Lodge No. 3* merely recites the statutory definition of enterprise – a provision which the Supreme Court of Georgia has noted tracks the federal provision. Lucky Bucks has drawn no meaningful distinction between Georgia's treatment of an enterprise and that derived from federal authority. Under these circumstances, it is appropriate to look to federal decisions for guidance and to rely on the well-established requirements that an enterprise be evaluated concerning whether its alleged members share a common purpose, relationship, and longevity.  *See Almanza v. United Airlines, Inc.* 851 F.3d 1060, 1067 (11th Cir. 2017).

When the second amended complaint's allegations are viewed against this backdrop, its shortcomings on this issue come into focus. With respect to a shared purpose, "An abstract common purpose, such as a generally shared interest in making money, will not suffice." *Cisneros v. Petland, Inc.,* 972 F.3d 1204, 1211 (11th Cir. 2020). To show a shared purpose, relationships between the various alleged members of the enterprise along with longevity of such relationships must be alleged. *See id.* at 1211 ("a RICO plaintiff must plausibly allege that the participants

shared the purpose of enriching themselves through a particular criminal course of conduct.").

Lucky Bucks' allegations on these points fall short. First, as to purpose, Lucky Bucks alleges "the common purpose of the enterprise was to systematically steal from Lucky Bucks for Defendants' benefit." (SAC, ¶ 307). This allegation, when viewed in connection with the handful of adequately alleged predicate acts, is insufficient to link all potential defendants together. In addition, the allegations of the Second Amended Complaint are lacking as to providing any sense of how the various defendants, especially the B-side businesses, could be shown to have any relationship with the individual defendants or each other. Aside from an allegation concerning a recurring video meeting between Kassam, Damani, and others, there are simply no allegations tying the defendants, especially the corporate defendants, to each other. In an attempt to allege the existence of a RICO enterprise, Lucky Bucks alleges that, "As evidenced by the signal chats for Angel, Unique, AKS, Klass Amusement, Dynamic, Lee Caudell, Prestige and Pinball involving individual [defendants] Linares, Smith, Ali, Howard, Kassam, and Sayani the coordinated effort to buy and sell Lucky Bucks' location contracts and licenses, it is clear that these Defendants formed an enterprise in fact pursuant to O.C.G.A. §16-14-3(3) and engaged in theft of trade secrets, theft of services, theft by deception, and theft by receiving stolen property via the methods described above." (SAC, ¶ 310). When this allegation is considered in tandem with the only properly pled predicate acts, it

does not adequately allege an enterprise. While the referenced signal chats do allege that Lucky Bucks employees delivered equipment to some B-side businesses, nothing in the allegations concerning the B-side businesses suggests any knowledge of any coordinated efforts to benefit other B-side entities that could even arguably bind them together in a sustained relationship sufficient to allege an enterprise.

Where, as here, the relationship prong is not met, it follows that any attempt to show the requisite longevity fails, as well. Accordingly, Lucky Bucks has failed to allege the existence of a RICO enterprise sufficient to allow its §16-14-4(b) claim to move forward. For the reasons stated above, it is hereby **RECOMMENDED** that Defendants' Motions To Dismiss be **GRANTED** to the extent that the motions seek dismissal of Lucky Bucks' RICO claim based on the existence of an enterprise for purposes of §16-14-4(b).

*H. Conspiracy (O.C.G.A. §16-14-4(c))*

Lucky Bucks also alleges that "Defendants violated §16-14-4(c) by conspiring together to violate the RICO Act to steal from Lucky Bucks." (SAC, ¶ 308). Going further, Lucky Bucks alleges[12] "Linares, Smith, Ali, Howard, Damani, Kassam, and

---

[12] Lucky Bucks also alleges "Based on the lengths taken by Linares, Smith, Ali, Howard, Kassam, and Sayani via means, including Signal chats, WhatsApp messages and private conversations, to conceal their theft of location contracts, licenses, equipment, and services of Lucky Bucks' technicians, the [sic] Linares, Smith, Ali, Howard, Kassam, and Sayani worked to steal from Lucky Bucks." (SAC, ¶ 311). This allegation states nothing more than some of the individual defendants were secretive in their communications, and it does nothing to help establish a RICO conspiracy among all Defendants.

Sayani began this scheme to steal Lucky Bucks' location contracts, money, equipment, property, and employees." (SAC, ¶ 309).

The allegations under §16-14-4(c) suffer from the same problems as the enterprise allegations. While Lucky Bucks conclusorily alleges that all Defendants entered into a conspiracy to commit numerous predicate acts, it has not alleged any concerted activity or connectivity between the various competing B-side entities to allow its surviving RICO claims to go forward on this basis.

### I. Summary of RICO Claims

The recommended dismissal of the claims based on the existence of an enterprise or a conspiracy claim is not fatal to Lucky Bucks' RICO claim. As Lucky Bucks correctly points out, its § 16-14-4(a) claim is not subject to dismissal. *See Cisneros,* 972 F.3d at 1221 ("One part of the Georgia RICO statute, O.C.G.A. § 16-14-4(a), does not require proof of an enterprise.") Lucky Bucks has alleged that "Through their coordinated efforts to steal from Lucky Bucks through a pattern of racketeering activity – the commission of the predicate acts described above, Defendants violated O.C.G.A. § 16-14-4(a). (SAC, ¶ 305).

Based on the foregoing, if the presiding Judge adopts this Report and Recommendation, the RICO claim pursuant to §16-14-4(a) would be allowed to go forward based on the allegations of Theft By Taking, Theft By Receiving Stolen Property and Use of An Item With An Altered Identification Mark, as discussed above, against individual defendants Smith, Howard, Ali, Kassam, "Linares" Perez,

and Sayani along with corporate defendants Prestige, Klass Amusement, Angel, Pinball and Unique.[13]

## IV.   Count II: Breach Of Fiduciary Duty (Ali)

Count II is a claim for Breach of Fiduciary Duty against Defendant Imran Ali. (SAC, ¶¶ 4, 315-320). Lucky Bucks alleges that by virtue of Ali's role as Lucky Bucks' Director of Operations, he was authorized to act as the company's agent, and he therefore owed Lucky Bucks the duty of loyalty and care. (SAC, 315). Plaintiff also asserts that Ali's employment agreement was the source of fiduciary duties requiring him to maintain the confidentiality of Lucky Bucks' confidential information and to avoid competing with Lucky Bucks by engaging in work for competitors like the B-Side businesses. (SAC, ¶ 316).

Lucky Bucks alleges Ali breached his fiduciary duties by "arranging for stolen equipment to be delivered to B-Side businesses," "coordinating sale of location contracts from Georgia Winners to Lucky Bucks at a large markup after those same locations had been stolen from Lucky Bucks," "usurping Lucky Bucks' corporate opportunities for the B-Side businesses," "providing services directly to Lucky Bucks' competitors …," and "assessing Lucky Bucks' computer systems after his employment ended to steal Lucky Bucks' trade secrets for Defendants' [] benefit." (SAC, ¶ 317(a)-(e)).

---

[13] Unique's motion for summary judgment will be discussed below in Section X.

Ali's Motion To Dismiss in its entirety only adopted arguments made by Defendant Kassam[14] in his Motion To Dismiss. Specifically, these arguments take issue with the complaint's failure to incorporate prior paragraphs with respect to this Count. Going further, it is asserted, without citation to authority, that when a Breach of Fiduciary Duty is based on fraud, the plaintiff's allegations must satisfy a heightened pleading standard. It also is contended that the specific allegations are too broad by failing to identify the "'self-dealing' transactions that 'drove the company into bankruptcy'" with requisite specificity.

"A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Perry Golf Course Dev., LLC v. Hous. Auth. of City of Atlanta*, 294 Ga. App. 387, 393 (2008). Under Georgia law it is well-established that "[an employee] is not entitled to solicit customers for a rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." *Burson v. Milton Hall Surgical Assocs., LLC*, 343 Ga. App. 159, 168 (2017).

Ali has brought to the Court's attention no authority suggesting that a breach of fiduciary duty must be pled with particularity. The allegations of existence of a

---

[14] Lucky Bucks did not assert a breach of fiduciary duty claim against Kassam in the Second Amended Complaint. Therefore, it is recommended that Kassam's Motion To Dismiss be **DENIED as moot** as it relates to that claim.

duty by virtue of his employment and its breach by his alleged involvement in the B-Side businesses are amply developed in the complaint when viewed in the light most favorable to Lucky Bucks as the non-moving party. (SAC, ¶ 317 (a)-(e)). For that reason, it is **RECOMMENDED** that Defendant Ali's Motion To Dismiss the breach of fiduciary duty claim be **DENIED.**

## V.    Count III: Fraud (Damani, Kassam, Ali, Howard, "Linares" Perez, Haque)

Lucky Bucks asserts fraud claims against Damani, Kassam, Ali, Sayani, Smith, Howard, "Linares" Perez, and Haque. Damani has filed a motion to dismiss addressing this claim and Kassam, Ali, Howard, "Linares" Perez, and Haque have adopted it.

The Court entered an Order on September 23, 2024 assessing a prior version of Lucky Bucks' complaint. After concluding that the complaint "does not meet the liberal notice pleading standard and provide the particularity required for fraud and fraud-based RICO claims," the Court gave Lucky Bucks an opportunity to replead those claims. (Order of September 23, 2024, at 7). Going further, the Court explicitly directed that, "For each count that includes a claim for fraud or a fraud-based predicate act, Plaintiff shall plead with particularity … to include, at a minimum, the alleged specific fraudulent statement at issue, the occasion on which the statement was made, the speaker, and in what ways Lucky Bucks acted upon the statement." (Order of September 23, 2024, at 7).

*A. Damani's Motion To Dismiss*

In connection with its fraud claim against Damani, Lucky Bucks alleges that in 2019, Damani recruited Chisti to buy a dormant master license and to set up Georgia Winners as a B-side business. (SAC, ¶ 322). Lucky Bucks alleges that the transaction began prior to Damani being banned from involvement with Lucky Bucks, and that it continued until after he was no longer allowed to participate in managing the affairs of Lucky Bucks. (SAC, ¶ 325). Lucky Bucks sold Georgia Winners a master license, but rather than being paid cash for it, Lucky Bucks accepted a $400,000 promissory note at closing. (SAC, ¶ 328). Damani assured Chisti he would make payments on the note, but later payments stopped. (SAC, ¶ 328). Later, in 2021, Lucky Bucks entered into an asset purchase agreement with Georgia Winners. (SAC, ¶ 331). "Damani did not disclose he had a secret economic ownership interest in Georgia Winners." (SAC, ¶ 332). "Lucky Bucks relied on Damani's misrepresentations and omissions, which were made through others, to conceal his improper involvement with Georgia Winners' transactions with Lucky Bucks." (SAC, ¶ 335).

To state a claim for fraud under Georgia law, a plaintiff must allege "a willful misrepresentation of a material fact, made to induce another to act, upon which such person acts [or avoids acting] to his injury." *Weathers v. Dieniahmar Music, LLC,* 337 Ga. App. 816, 824 (2016). A fraud claim must be pled with particularity in accordance with O.C.G.A. § 9-11-9(b). *See Z-Space, Inc. v. Dantanna's CNN Ctr.,*

*LLC,* 349 Ga. App. 248, 254 (2019). Indeed, the Court has already cautioned Lucky Bucks that to plead its fraud claim properly it must "include, at a minimum, the alleged specific fraudulent statement at issue, the occasion on which the statement was made, the speaker, and in what ways Lucky Bucks acted upon the statement." (Order of September 23, 2024, at 7).

With respect to its claim against Damani, these allegations do not identify a specific fraudulent statement made by him to Lucky Bucks. It alleges that "Georgia Winners, under the direction of Damani, never paid for the master license, it provided a $400,000 promissory note at closing," and that while "Damani assured Chisti he would make payments on that promissory note, payments eventually ceased." (SAC, ¶ 328). This allegation, when viewed in the light most favorable to Lucky Bucks, does not set out a specific fraudulent statement made to Lucky Bucks. At best, it alleges that Damani told Chisti he would cover the payments on the note and later he stopped making them. Not only does this allegation fail to set out a specific statement made to Lucky Bucks, nothing about this allegation suggests Lucky Bucks acted to its detriment based on an alleged misrepresentation from Damani to Chisti. Lucky Bucks further alleges "it relied on Damani's misrepresentations and omissions, which were made through others, to conceal his improper involvement with Georgia Winners' transactions with Lucky Bucks." (SAC, ¶ 335). While the alleged "improper involvement" of Damani with Georgia

Winners may be relevant with respect to Lucky Bucks' contract claim against him, such an allegation does not satisfy the Court's requirements for stating a fraud claim.

In response to Damani's motion to dismiss, Lucky Bucks grasps at allegations set out elsewhere in its Second Amended Complaint to try to meet its burden of identifying specific statements by Damani sufficient to support its fraud claim. Notably, none of the conduct identified by Lucky Bucks actually is referenced in its fraud claim. First, Lucky Bucks points to the following allegation:

> On information and belief, at least a portion of the purchase prices specified in the APAs were based on fraudulently inflated revenues for some of the locations being purchased. For example, in April 2022, Chisti informed Ijaz that Georgia Winners, at Damani's direction, "setup ghetto locations hardly doing $20000 a month and then they work with operators of locations to pump money to show higher sales and sell these locations back to lucky bucks on much higher margins."

(SAC, ¶¶ 119-120). This allegation refers to APAs, asset purchase agreements, involving at least five defendants. (*See* SAC, ¶ 115 (alleging transactions involving "Lee Caudell, Peak, AKS, Georgia Winners, and Klass Amusements" involved "fraudulently inflated" purchase prices "likely through the use of sham players")). From this launching point Lucky Bucks argues that "Damani made material misrepresentations through Georgia Winners … regarding location values." (Lucky Bucks' Resp. to Damani's Motion To Dismiss, 12/9/2024, p. 20). Putting aside for a moment the critical fact that Lucky Bucks did not clearly make such an allegation and instead invites the Court to weave together scraps of other allegations to make a viable fraud claim against Damani, its allegations still fall far short of "particularity."

Allegations that "**at least a portion,**" (SAC, ¶ 119 (emphasis added)), of purchase prices reflected in multiple asset purchase agreements involving at least five other companies, (*see* SAC ¶ 115 (emphasis added)), "were based on fraudulently inflated revenues for **some** of the locations being purchased," (SAC, ¶ 119 (emphasis added)), and that the potential unidentified misrepresentations regarding the same were caused by Damani, yet, "made **through others**," (SAC ¶ 335 (emphasis added)), are too vague and indefinite to meet the standard of particularity required by O.C.G.A. §9-11-9(b).

In response to the motion to dismiss, Lucky Bucks also asserts that its allegations regarding sham sponsorship payments state a claim for fraud against Damani. Once again, no allegations concerning the alleged sham sponsorship payments actually appear in the section setting out the fraud claim. (*See* SAC, ¶¶ 321-337). With respect to the "sham sponsorship payments," Lucky Bucks alleges that on or about July 14, 2021, through four smaller transactions, Lucky Bucks paid $200,000 to "Klass Entertainment" for "advertising and marketing." (SAC, ¶ 202). The payments were ostensibly for "sponsorships" of charitable events. (SAC, ¶ 202). One of the sponsorships was for a "Rahul Deshpande recital in August 2019, which was promoted by Para Share, LLC. (SAC, ¶ 203). Para Share invoiced Lucky Bucks for a $45,000 "Gold package" sponsorship on August 1, 2019.[15]  (SAC, ¶ 203).

---

[15] In its brief, Lucky Bucks references invoices purportedly from 2021. (Lucky Bucks' Response To Damani's Motion To Dismiss, 12/09/2024, p. 21). The Second

Harshad Parashare, CEO of Para Share, did not recall ever receiving a sponsorship of more than $10,000 for a Para Share event. (SAC, ¶ 204). Lucky Bucks further alleges that Klass Entertainment never provided any marketing or advertising services to Lucky Bucks, and instead it simply took $200,000 from Lucky Bucks. ((SAC, ¶ 206). Lucky Bucks also alleges, on information and belief, that Klass Entertainment is "beneficially owned or controlled by Damani and Kassam." (SAC, ¶ 302).

Lucky Bucks' assertion, made on information and belief, that Klass Entertainment is "owned and controlled by Damani and Kassam" is not enough to salvage its fraud claim against Damani based on the sponsorship payments. Again, it fails to identify[16] a "specific fraudulent statement at issue." (See Order of 9/23/2024, at 7). With no fraudulent statement identified, it follows that the "occasion on which the statement was made" is lacking, too. At best, the "sham sponsorship" allegations appear to suggest the Klass Entertainment may have failed

---

Amended Complaint identifies one alleged payment for the Rahul Deshpande recital was made in 2019 and the corresponding invoice were from 2019. (SAC, ¶¶ 203, 204). For purposes of the present motion the undersigned will assume the concert, invoices, and payment all occurred within a short period of time and ignore the tension created from the allegations suggesting the payment may have happened some two years after the concert and the corresponding invoice.

[16] The failure to identify a specific fraudulent statement necessarily means that Lucky Bucks has also failed to meet the other demands of the Court's order which also required it to indicate "the occasion on which the statement was made, the speaker, and in what ways Lucky Bucks acted upon the statement." (*See* Order of 9/23/2024, at 7).

to keep up its end of a bargain with respect to marketing and promotional services with respect to the Rahul Deshpande performance, these allegations do not save Lucky Bucks' fraud claim against Damani from dismissal. Accordingly, it is **RECOMMENDED** that the fraud claim against Damani be **DISMISSED**.

### B. Kassam's Motion To Dismiss

Kassam filed a motion to dismiss adopting the arguments made by Damani. (Kassam's Motion To Dismiss, 11/18/2024, p. 3). Lucky Bucks filed a response to Kassam's motion, but it did not expressly address the fraud claim in that response. (*See* Lucky Bucks' Response to Kassam's Motion To Dismiss, p. 14 (alluding to "eight specific ways" Kassam committed fraud without describing same in connection with a breach of fiduciary duty claim which has since been withdrawn)). In light of authority mandating that "the failure of a nonmoving party to respond does not automatically entitle the moving party to judgment in its favor," *Russell v. Muscogee Cnty. Sch. Dist.,* 341 Ga. App. 229, 234, (2017), the undersigned will address the fraud claim against Kassam based on what is alleged in the Second Amended Complaint.

Lucky Bucks alleges that Kassam "made material misrepresentations and omissions in his role as a manager and officer of Lucky Bucks." (SAC, ¶ 338). It further alleges that he "took part in the fraudulent Georgia Winners APA transactions" (SAC, ¶ 339), as he chose not to examine a "glaring red flag." (SAC,

¶ 344), by not monitoring sales data to uncover the alleged scheme involving sham players," (SAC, ¶ 340).

Again, as was true for the claim against Damani, these allegations do not comply with the Court's directions regarding pleading a fraud claim with particularity. Lucky Bucks does not identify a specific misrepresentation[17] made by Kassam, instead suggesting he had a duty to stop others from tricking the company. (SAC, ¶ 344 ("chose not to examine a glaring red flag, but instead allowed the misrepresentation of the value of the locations")). Given the absence of a specific fraudulent statement, it is **RECOMMENDED** that the fraud claim against Kassam be **DISMISSED**.

### C.  Ali, Howard, "Linares" Perez, and Haque's Motions To Dismiss

Defendants Ali, Howard, "Linares" Perez, and Haque adopted Damani's motion to dismiss the fraud claim asserted against them. In connection with these two defendants, Lucky Bucks alleges that each "affirmatively represented that he was an honest employee." (SAC, ¶ 354 (Ali); ¶ 385 (Howard); ¶ 393("Linares" Perez); ¶ 401 (Haque)).  Missing from the complaint, however, is any suggestion of when, where, how, or to whom any of these defendants made such a representation.

---

[17] The failure to identify a specific fraudulent statement necessarily means that Lucky Bucks has also failed to meet the other demands of the Court's order which also required it to indicate "the occasion on which the statement was made, the speaker, and in what ways Lucky Bucks acted upon the statement." (*See* Order of 9/23/2024, at 7).

The mere existence of an employment relationship does not create a freewheeling, ongoing, implied statement of being an "honest employee" transforming every potential impropriety into actionable fraud. As Lucky Bucks has not sufficiently pled fraud with particularity in its claims against Ali, Howard, "Linares" Perez, and Haque, it is **RECOMMENDED** those claims be **DISMISSED.**

## VI.   <u>Count IV: Computer Theft (Ali)</u>

In Count IV, Lucky Bucks asserts a claim under O.C.G.A. § 16-9-93(a) against Defendants Ali and Sayani. Ali seeks dismissal of this claim.

The Second Amended Complaint alleges that on November 6, 2023, Ali accessed Microsoft Excel files on Lucky Bucks' computer system. (SAC, ¶ 450). As of this date, Ali was no longer employed by Lucky Bucks, and therefore he had no authority to access these documents. (SAC, ¶ 452). In taking this action, accessed files entitled "LB Ops Active Contacts Sheet," "Ops Workbook," "Continuity Feb_Final" and "Weekly Stats." (SAC, ¶ 450). These files contained information that would have been helpful to competing B-Side businesses such as contacts with location license holders and related route clusters. (SAC, ¶ 453).

Stating a claim for computer theft requires a plaintiff to allege that the defendant:

> use[d] a computer or computer network with knowledge that such use [was] without authority and with the intention of: (1) [t]aking or appropriating any property of another, whether or not with the intention of depriving the owner of possession; (2) [o]btaining property by any deceitful means or artful practice; or (3) [c]onverting property to such

person's use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property.

O.C.G.A. § 16-9-93(a). Under this statute, "Property" includes "data." O.C.G.A. §16-9-92(13).

In seeking dismissal Ali advances a single argument – that Lucky Bucks failed to allege that he accessed the network with knowledge that such use was without authority. To the contrary, Lucky Bucks expressly alleges that the access was "with knowledge that such use was without authority." (SAC, ¶ 447). Further, the logical inference drawn from the allegation that Ali accessed the network while no longer an employee is that he did so with knowledge that his use was without authority. This allegation is sufficient to carry the day for Lucky Bucks at this juncture.

For this reason, it is **RECOMMENDED** that Ali's Motion To Dismiss be **DENIED** with respect to Count IV, Computer Theft.

## VII.  <u>Count V: Breach of Contract (Damani, Kassam, Ali, Howard, "Linares" Perez, and Haque)</u>

Lucky Bucks asserts claims for breach of contract against several defendants in Count V. (SAC, ¶¶ 457-464) (claims against Damani, Kassam, Ali, Sayani, Smith, Howard, "Linares" Perez, Haque, and Vaswani). Defendants Damani, Kassam, Ali, Howard, "Linares" Perez, and Haque seek dismissal of the breach of contract claim.

To prevail on a claim for breach of contract, a plaintiff must show "the (1) breach and the (2) resultant damages (3) to the party who has the right to complain

about the contract being broken." *UWork.com, Inc. v. Paragon Techs.*, Inc., 321 Ga. App. 584, 590 (2013).

### A. Damani's Motion To Dismiss

In support of his motion, Damani contends that the complaint fails to allege in conduct on his part which could be considered a breach of the agreement. This position is unavailing, as Lucky Bucks has alleged that Damani executed an employment agreement and a Separation Agreement containing non-compete, non-solicitation, and confidentiality provisions. (SAC, ¶¶ 66, 237-239 (alleging non-competition, non-solicitation, and non-disclosure provisions in 2016 employment agreement, Separation Agreement, and Exhibit A to Separation Agreement, respectively)). The Second Amended Complaint also contains allegations that Damani orchestrated and was otherwise involved in assisting the B-Side businesses which competed with Lucky Bucks which would amount to a breach of his obligations causing economic harm to Lucky Bucks. (*See, e.g.,* SAC, introductory ¶ 2 identifying "Parties" ("Damani continued to direct the actions of his co-conspirators from behind the scenes"); ¶ 68 ("Damani remained involved in the effort to steal Lucky Bucks locations and location contracts via the APAs between Lucky Bucks and B-side entities whereby Damani was updated on developments and timing"); ¶ 69 ("Damani was looped into [a] sale [of locations]"); ¶ 88 (describing use of B-Side businesses as part of "systematic effort .. to conceal Damani's involvement"); ¶ 169 (alleging Damani used "me" alias to participate in

Signal chats related to theft of COAMs); ¶ 192-94 (alleging Damani's participation in weekly recurring virtual meetings Kassam, Ali, and Sayani and employees of Damani's other businesses)).   At this stage of the litigation, Lucky Bucks has fairly put Damani on notice of the nature of the alleged breaches, and this claim should be allowed to go forward against Mr. Damani. Accordingly, it is **RECOMMENDED** that Damani's motion to dismiss the breach of contract claim be **DENIED.**

### B. Kassam's Motion To Dismiss

In seeking dismissal of the breach of contract claim Defendant Kassam turns to a familiar refrain that there is no RICO conspiracy. This argument does not take into account that Kassam could have breached non-compete, non-solicitation and confidentiality provisions without that conduct amounting to a RICO predicate act. The allegations that he worked with B-Side businesses to take opportunities and business away from Lucky Bucks, (*see, e.g.,* ¶ 88 (describing use of B-Side businesses as part of "systematic effort to loot Lucky Bucks of location contracts")), alone is sufficient to state a claim for breach of contract at this stage of the litigation. For that reason, it is **RECOMMENDED** that Kassam's motion to dismiss the breach of contract claim be **DENIED.**

### C. Ali, Howard, "Linares" Perez, and Haque Adopted The Motions

Defendants Ali, Howard, "Linares" Perez, and Haque have adopted the arguments made by Damani and Kassam. As Damani and Kassam's motions are due to be denied for the reasons stated above, the same is true for the other defendants.

Therefore, it is hereby **RECOMMENDED** that with respect to the claims for Count V, Breach of Contract, that the motions of Damani, Kassam, Ali, Howard, "Linares" Perez, and Haque be **DENIED.**

### VIII.   Count VI: Attorney's Fees  and Count VII: Punitive Damages

Any claims for attorney's fees and punitive damages depend on the viability of an underlying claim. As for attorney's fees, if the presiding Judge adopts this Report and Recommendation, any defendant still facing a claim for RICO, breach of fiduciary duty, computer theft or breach of contract could still be subject to an award of attorney's fees. With respect to a claim for punitive damages, such a claim would remain viable for any defendant subject to a claim under RICO or a claim for breach of fiduciary duty.

### IX.   Lucky Bucks' Motion To Add Parties

Shortly after filing its First Amended Complaint, Lucky Bucks filed a Motion To Add Parties. (Plaintiff's Motion To Add Parties, November 6, 2024). In the motion, Lucky Bucks explains that its amended complaint, filed on October 23, 2024, named Mohammed Chisti, Georgia Winners, LLC and Klass Entertainment Group as parties. In the motion, Lucky Bucks asserts that it did not bring claims against Chisti and Georgia Winners in the original complaint because at the time of filing the lawsuit it was involved an arbitration proceeding against Chisti and Georgia Winners. Going further, it explains that the arbitration was dismissed without prejudice shortly before filing the amended complaint in this matter. Lucky

Bucks also asserts that it sought to add Klass Entertainment only after securing an affidavit supporting its potential claims against that entity.

Defendant Damani filed a Response in Opposition to Plaintiff's Motion To Add Parties. In it he argues that Lucky Bucks' actions in seeking to add more defendants reflects its tendency to overreach in this matter to improperly expand the proceedings, and that it unreasonably delayed seeking to amend, especially when it was aware of its potential claims against the putative new defendants long before filing its motion to add them.

O.C.G.A. § 9-11-15 states that "[a] party may amend [its] pleadings as a matter of course and without leave of court at any time before the entry of a pretrial order." O.C.G.A. § 9-11-15. In deciding a motion to add parties, that provision must be read in harmony with O.C.G.A. § 9-11-21, which provides that leave of court must be secured to add a new party. "In determining whether to allow an amendment to add a party, the trial court may consider whether the new parties will be prejudice thereby and whether the movant has some excuse or justification for having failed to name and serve the new parties previously." *Benedek v. Bd. of Regents of Univ. Sys. of Ga.,* 332 Ga. App. 573, 575 (2015).

Georgia courts have recognized that "[t]he right to amend is properly broad." *Id.* at 574. In keeping with this view, it is not appropriate to delve into the merits when considering a motion to add parties. *See id.* at 575 ("the trial court denied [plaintiff's] motion to add new parties based on a consideration of the merits of the

claims against these parties. But this is not the proper analysis to be used by a trial court when considering a motion to add additional parties."). Instead, the trial court's focus should remain on delay and prejudice.

In the current instance, the delay is justifiable, and the prejudice to the newly added parties is limited. Lucky Bucks points out that it was involved in an arbitration against Chisti and Georgia Winners. As for Klass Entertainment, Lucky Bucks explains that it only received an affidavit from Harshad Paramore supporting its claims against Klass Entertainment until well after the original complaint was filed. Adding these defendants at this stage of the litigation will not unnecessarily delay the case. Under these circumstances, it is **RECOMMENDED** that Lucky Bucks' Motion To Add Parties be **GRANTED.** If the presiding Judge adopts this recommendation, it is further recommended that a deadline for serving the Second Amended Complaint on the new parties be set within the Order adopting this Report and Recommendation.

## X.    <u>Unique's Motion For Summary Judgment</u>

Defendant Unique Amusement, LLC has filed a motion for summary judgment. It is the product, in part, of Unique electing to pursue a different procedural course than the other defendants. In particular, many other defendants filed motions to dismiss and then asked the Court to stay their discovery[18]

---

[18] Given that during the pendency of several defendants' motions for protective order that apparently no discovery occurred with respect to those parties, it is

obligations. Unique, on the other hand, engaged in discovery with Lucky Bucks. Unique's summary judgment motion is directed at several predicate acts identified by Lucky Bucks, many of which will be rendered irrelevant if the presiding Judge adopts this Report and Recommendation. Either way, the ultimate disposition of the other defendants' motions to dismiss is certain to provide substantial clarity in resolving Unique's Motion for Summary Judgment. It is hereby **RECOMMEDED** that Unique's Motion for Summary Judgment be **DENIED WITHOUT PREJUDICE** with a right to file an amended motion for summary judgment following the presiding Judge's review of this Report and Recommendation.

## CONCLUSION

For the reasons set out above, it is hereby **REPORTED** and **RECOMMENDED** as follows:

That Damani's Motion To Dismiss be **GRANTED in PART** and **DENIED in PART**; that it be **GRANTED** with respect to the RICO claim and the fraud claim and **DENIED** with respect to the claim for breach of contract;

That Kassam's Motion To Dismiss be **GRANTED in PART** and **DENIED in PART**; that it be **GRANTED** with respect to the fraud claim and **DENIED** with

---

**RECOMMENDED** that those motions be **GRANTED**. (*See* Lee Caudell and Pinball Amusement's Motion for Protective Order, filed June 3, 2024; Damani's Moton For Protective Order, filed November 12, 2024 and Prestige Amusement's Motion for Protective Order, filed November 22, 2024). If the presiding Judge adopts this Report and Recommendation, it is further **RECOMMENDED** that no discovery take place until the entry of a scheduling order.

respect to the claim for breach of contract and for the RICO claim to the extent the same relies on the predicate acts of Theft by Taking and Use of an Article With an Altered Identification Mark. It is further **RECOMMENDED** that it be **DENIED as MOOT** with respect to the claim for breach of fiduciary duty;

That Ali's Motion to Dismiss be **GRANTED in PART and DENIED in PART**; that it be **GRANTED** as to the fraud claim and **DENIED** with respect to the Computer Theft, Breach of Fiduciary Duty, Breach of Contract and RICO claims to the extent that claim relies on the alleged predicate acts of Theft By Taking, Use of An Article With An Altered Identification Mark;

That the Motions To Dismiss adopted by Arnaldo "Jonathan Linares" Perez and Shakeel Haque be **GRANTED in PART** and **DENIED in PART**; that the motions be **GRANTED** as to the fraud and RICO claims and **DENIED** as to claims for breach of contract;

That the Motions To Dismiss adopted by Motin and Blue Georgia 1000, Inc. be **GRANTED;**

That Meyersgold's Motion To Dismiss be **GRANTED**;

That Howard's Motion To Dismiss be **GRANTED in PART** and **DENIED in PART**; that it be granted as to the fraud claim and **DENIED** on the claim for breach of contract and the RICO claim to the extent that claim relies on the alleged predicate acts of Theft By Taking and Use of An Article With An Altered Identification Mark, but otherwise **GRANTED** with respect to the RICO claim;

That Angel Amusements' Motion To Dismiss be **GRANTED in PART** and **DENIED in PART**; that the motion be **DENIED** as to the RICO claim to the extent that claim relies on the predicate act of Theft By Receiving Stolen Property and otherwise **GRANTED** with respect to the RICO claim;

That Dynamic Gaming's Motion To Dismiss be **GRANTED**;

That Advance Amusement's Motion To Dismiss be **GRANTED;**

That Klass Amusement's Motion To Dismiss be **GRANTED in PART** and **DENIED in PART**; that the motion be **DENIED** as to the RICO claim to the extent that claim relies on the predicate acts of Theft By Receiving Stolen Property and Use of An Article with an Altered Identification Mark and otherwise **GRANTED** with respect to the RICO claim;

That Prestige Amusement's Motion To Dismiss be **GRANTED in PART** and **DENIED in PART**; that the motion be **DENIED** as to the RICO claim to the extent that claim relies on the predicate acts of Theft By Receiving Stolen Property and Use of An Article with an Altered Identification Mark and otherwise **GRANTED** with respect to the RICO claim;

That Lee Caudell's Motion to Dismiss be **GRANTED**;

That Pinball's Motion To Dismiss be **GRANTED in PART** and **DENIED in PART**; that the motion be **DENIED** as to the RICO claim to the extent that claim relies on the predicate acts of Theft By Receiving Stolen Property and Use of An

Article with an Altered Identification Mark and otherwise **GRANTED** with respect to the RICO claim;

That Peak Amusement's Motion To Dismiss be **GRANTED**;

That AKS Amusements' Motion To Dismiss be **GRANTED**;

That Lucky Bucks' Motion To Add Parties be **GRANTED**;

That the Motions for Protective Order filed by Lee Caudell and Pinball Amusement, Damani, and Prestige be **GRANTED**; and

That Unique Amusement's Motion For Summary Judgment be **DENIED without prejudice** and with the right to refile following the presiding Judge's consideration of this Report and Recommendation. It is further **RECOMMENDED** that no discovery take place until following entry of a scheduling order after the presiding Judge's consideration of this Report and Recommendation.

**IT IS SO REPORTED and RECOMMENDED,**

This 16th day of October, 2025,

_s/J. CLAY FULLER_
Special Master

_Filed and served via e-FileGA._