# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LUCKY BUCKS, LLC, *et al.*<br><br>*Debtors*. | Chapter 11<br>Case No. 23-10758 (KBO) |
| LB NEWHOLDCO, LLC and LUCKY BUCKS, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>TRIVE CAPITAL MANAGEMENT LLC, *et al.*,<br><br>*Defendants*. | Adversary Proceeding<br>Adv. Proc. No. 25-50965 (KBO) |

## REPLY BRIEF IN SUPPORT OF MANAGEMENT DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

POTTER ANDERSON & CORROON LLP
M. Blake Cleary (No. 3614)
Jesse L. Noa (No. 5973)
James R. Risener (No. 7334)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Phone: (302) 984-6026

ALLEN OVERY SHEARMAN STERLING US LLP
C. Luckey McDowell (admitted *pro hac vice*)
Ian E. Roberts (admitted *pro hac vice*)
Jacob Fields (admitted *pro hac vice*)
2601 Olive St 17th Floor
Dallas, TX 75201
Phone: (214) 271-5777

-and-

Samuel Cooper (admitted *pro hac vice*)
800 Capitol Street, Suite 2200
Houston, Texas, 77002
Phone: (713) 354-4838

Dated: December 4, 2025

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT....................................................................................................................................2

    I.     Plaintiffs' Causes of Action Are Not Preserved by the Carveout............................2

    II.    Plaintiffs' Constructive-Fraud Theory Cannot State "Actual Fraud" (Counts 1-3).................................................................................................................................7

    III.   The Fiduciary Duty Claims Fail under the LLC Agreements and Applicable Law .......................................................................................................................10

        A.    The HoldCo LLC Agreement Eliminates Fiduciary Duties (Counts 4 & 5).............................................................................................................10

        B.    The Lucky Bucks Operating Agreement Does Not Impose Fiduciary Duties on Officers (Count 6).......................................................................14

    IV.   Ancillary & Declaratory Judgment Claims (Counts 7-9) ......................................15

CONCLUSION................................................................................................................................15

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                                       **Page(s)**

*In re Arctic Glacier International, Inc.*,
255 F.Supp.3d 534 (D. Del. 2017), *aff'd*, 901 F.3d 162 (3d Cir. 2018) ................................... 7

*In re Bayou Steel BD Holdings, LLC*,
642 B.R. 371 (Bankr. D. Del. 2022) ................................................................................. 12, 13

*In re Beaulieu Group, LLC*,
No. 17-41677-BEM, 2021 WL 4469928 (Bankr. N.D. Ga. Sep. 29, 2021) ............................ 15

*In re Cadira Group Holdings, LLC Litigation*,
No. 2018-0616-JRS, 2021 WL 2912479, at *3 (Del. Ch. July 12, 2021) ......................... 12, 13

*Greenfield v. Philles Records, Inc.*,
780 N.E.2d 166 (N.Y. 2002) .................................................................................................... 3

*Halliburton Co. v. Highlands Ins. Grp., Inc.*,
811 A.2d 277 (Del. 2002) ........................................................................................................ 3

*In re HH Liquidation, LLC*,
590 B.R. 211 (Bankr. D. Del. 2018) ...................................................................................... 12

*Karol v. Polsinello*,
8 N.Y.S.3d 447 (2015) ............................................................................................................ 3

*Mehra v. Teller*,
No. 2019-0812-KSJP, 2021 WL 30035, at *28 (Del. Ch. Jan. 29, 2021) ............................... 11

*Muzak Corp. v. Hotel Taft Corp.*,
133 N.E.2d 688 (N.Y. 1956) ................................................................................................... 4

*In re NorthEast Gas Generation LLC*,
639 B.R. 914 (Bankr. D. Del. 2022) ....................................................................................... 7

*Olin Corp. v. Am. Home Assurance Co.*,
704 F.3d 89 (2d Cir. 2012) ...................................................................................................... 5

*In re Premier Int'l Holdings, Inc.*,
443 B.R. 320 (Bankr. D. Del. 2010) ....................................................................................... 3

*In re Shenango Group Inc.*,
501 F.3d 338 (3d Cir. 2007) .................................................................................................... 7

*Wagner v. BRP Grp., Inc.*,
    316 A.3d 826, 871 (Del. Ch. 2024)..................................................................................10, 11

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ...............................................................................................................11

*Yucaipa Am. All. Fund I, LP v. SBDRE LLC*,
    No. 9151 (VCP), 2014 WL 5509787 (Del. Ch. Oct. 31, 2014) ........................................5, 6, 7

**Statutes**

11 U.S.C. § 544(b) ...........................................................................................................................8

11 U.S.C. § 548(a)(1)(A) ................................................................................................................7

Defendants Manu Sekhri, James Boyden, Ryan Bouskill, Hassan Ijaz and Seven Aces Holdings ULC ("Seven Aces" and collectively, the "Management Defendants") respectfully submit this reply to the Brief in Opposition (the "Opposition" or "Opp.") [D.I. 29] filed by Plaintiffs LB NewHoldCo, LLC ("NewHoldCo") and its subsidiary, Lucky Bucks, LLC ("Lucky Bucks" and, together with NewHoldCo, "Reorganized Debtors").

## PRELIMINARY STATEMENT

1.  If the Opposition makes anything clear, it is that this Court need not look further than the plain terms of the OpCo Plan Release to resolve this action. Plaintiffs do not dispute that the Release is valid and enforceable, nor that it encompasses Plaintiffs' claims against Defendants. They do not even contend the Release is ambiguous. Instead, they stake their entire case on the notion that the Carveout[1] provision exempts their claims from being released merely because they have *alleged* fraud. But this effort to sidestep the Release is fundamentally flawed: first, it ignores the Carveout's limited scope—namely, that it only preserves the ability to seek recovery based on third-party "Claims" against the OpCo Debtors. Second, it skirts the corollary, and equally clear, requirement of a prior judicial "Final Order" finding misconduct by a Released Party.

2.  Ignoring virtually every canon of construction, Plaintiffs would have the Court work backward from their version of the parties' intent into an interpretation that cannot be squared with the Release's plain language. The Release was fundamental to the OpCo Plan—a negotiated, Court-sanctioned resolution at the core of the Debtors' reorganization, which should be enforced by its terms.

---

[1] The OpCo Plan Release broadly releases all causes of action against the Management Defendants (and other Released Parties) "other than *Claims* and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, *each solely to the extent as determined by a Final Order of a court of competent jurisdiction*." OpCo Plan § VIII(A)(2) (emphases added).

1

3. Even if their claims had not been released, the Complaint's conclusory insolvency assertions and asserted "badges" of fraud—all based on facts undisputedly disclosed to lenders—do not meet Rule 9(b) pleading standards for actual fraud claims. Nor do Plaintiffs plausibly allege fiduciary breaches under the governing LLC agreements, which expressly *eliminate* such duties under Delaware and Georgia law. Ancillary claims for fees, punitive damages, and declaratory relief necessarily fall with the core claims. The Motion to Dismiss should be granted.

## ARGUMENT

### I. Plaintiffs' Causes of Action Are Not Preserved by the Carveout

4. As Management Defendants explained in their brief, there are two reasons why Plaintiffs are precluded from invoking the Carveout; Plaintiffs rebut neither reason.

5. First, while the Release refers to both Causes of Action and Claims, the Carveout's plain text applies only to "Claims," not to the separately defined category of "Causes of Action." The Plan defines "Claims" to mean claims "against an OpCo Debtor," whereas suits against non-debtors like the Management Defendants are "Causes of Action." That distinction is dispositive. *See* Mot. at ¶ 26. In response, Plaintiffs agree that the plain language governs but then immediately jettison the text to argue that the parties "clearly intended" a different result. Opp. 14-16. To do so, Plaintiffs resort to parol evidence—which here amounts to brief and selective statements in hearing transcripts which supposedly bear on the parties' real intent (Opp. at 17 n.40).[2] Of course, none of those statements is remotely relevant to the current dispute over the scope of the Release.

---

[2] Plaintiffs first cite a statement by counsel for the OpCo lenders in a July 27, 2023 status conference. Tr. at 5:19–6:8, *In re Lucky Bucks, LLC*, et al., Case No. 23-10758 (KBO) (Bankr. D. Del. Jul. 27, 2023). But that statement merely reflects that the Release has a carve-out. The definition of "Claims" is not addressed, and the issue of the scope of the Release was not discussed or disputed in the hearing. Second, Plaintiffs cite to this Court's statement more than a year later during the October 2024 hearing on the Rule 2004 dispute. Tr. at 44:24–45:6, *In re Lucky Bucks, LLC, et al.*, Case No. 23-10758 (KBO) (Bankr. D. Del. Oct. 28, 2024). But, again, the scope of the Release was not before the Court in that hearing, nor did Court expressly address the issue.

6.      More importantly, Plaintiffs get the analysis backward because "the best evidence of what parties to a written agreement intend is what they say in their writing," *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002); *Halliburton Co. v. Highlands Ins. Grp., Inc.*, 811 A.2d 277, 280 (Del. 2002) (where the "contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity"). That rule is "particularly important" where, as here, "the instrument was negotiated between sophisticated, counseled business people." *In re Premier Int'l Holdings, Inc.*, 443 B.R. 320, 334 (Bankr. D. Del. 2010). As part of these negotiations, the Management Defendants obtained the benefit of the Release in exchange for entering the Restructuring Support Agreement and supporting the OpCo Debtors' reorganization. Moreover, all sides here *agree* the Release is unambiguous. *See* Opp. at 14-15. This precludes any use of parol evidence to support "intent"-based arguments. *See, e.g.*, *Karol v. Polsinello*, 8 N.Y.S.3d 447, 451 (2015) (parol evidence regarding customary practice deemed inadmissible where there is no ambiguity); *Premier Int'l*, 443 B.R. at 334 ("Extrinsic evidence of intent may only be considered if an agreement is ambiguous," and language "does not become ambiguous merely because the parties urge different interpretations in the litigation.") (applying New York law) (internal quotes omitted).

7.      Plaintiffs next argue that limiting the Carveout to Claims asserted against the Debtors—which is how the Carveout is drafted—would lead to absurd results. Opp. at 15. To the contrary, when the two contested parts of the Carveout are considered together, the language as drafted makes imminent sense. The Carveout only applies in a situation where (i) a third party *successfully* asserts claims against the Debtor and (ii) those Claims arise out of or relate to fraud, willful misconduct or gross negligence by a Released Party. But for the Carveout, the Plan Release would prevent the Debtors from pursuing those Released Parties under recovery theories such as

3

reimbursement, contribution, indemnification, or equitable subrogation. The Carveout, however, narrowly preserves the Debtors' ability to pivot in that limited situation, by providing that it only applies (i) with respect to Claims (as defined in the Plan) and (ii) "to the extent determined by a Final Order of a court of competent jurisdiction." This is far from absurd. In contrast, Plaintiffs' interpretation would allow parties to bypass the Plan Release by merely asserting fraud, rendering both the "Claims" definition and the "Final Order" provision meaningless.

8. Faced with the fact that the Release provision as defined is entirely sensible, Plaintiffs veer back to the text to argue—unconvincingly—that, because the Carveout applies to "Claims *and liabilities*," and because "liability is a broad legal term," then the Carveout should allow their causes of action to proceed. Opp. at 16. Of course, this argument conveniently ignores the rest of that clause—*i.e.*, that the Carveout applies to "Claims and *liabilities resulting therefrom*…" When read in full, this clause can only refer to liabilities resulting from Claims against OpCo. Plaintiffs' interpretation simply ignores that crucial limiting language of "resulting therefrom," a reading which flies in the face of principles of construction. *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688 (N.Y. 1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract") (citations omitted).[3]

9. Second, Plaintiffs do no better in their effort to avoid the Release's "Final Order" prerequisite. Once again, Plaintiffs cannot grapple with this plain text and argue that because the Carveout does not expressly use the term "condition precedent," the words "Final Order" cannot

---

[3] Plaintiffs also ignore that their interpretation would render meaningless the OpCo Plan's anti-suit injunction for released claims by allowing parties to evade the Release with accusations of "willful misconduct," regardless of merit. *See* OpCo Plan Section VIII.A.5.

4

be interpreted as a requirement for invoking the Carveout. Opp. at 17-18.[4] But the Release language is complete as it is and by its own terms limits the carveout to claims "solely to the extent" determined by a "Final Order." No additional language is required, and Plaintiffs make no attempt to offer an alternative construction. Indeed, Plaintiffs' reading would entirely moot the "Final Order" wording and render meaningless the "Final Order" requirement—an approach that "violate[s] a basic a basic tenet of contractual construction." Opp. at 16 (citing *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).

10.     Management Defendants' interpretation of the Release is consistent with its plain meaning, and with the *Allied Systems* case, where Judge Sontchi construed a near-identical provision as requiring a prior judicial finding before suit by the releasor could proceed.[5] *See The Official Comm. of Unsecured Creditors of Allied Sys. Hldgs., Inc*. (*In re Allied Sys. Hldgs., Inc*.), Ch. 11 Case No. 12–11564(CSS), Adv. No. 12-50947–CSS (Bankr. D. Del.). The *Allied Systems* carve-out language is indistinguishable from the Carveout at issue here, as it released all claims "*except to the extent caused by such Lender's or Agent's gross negligence or willful misconduct . . . as determined by a court of competent jurisdiction by a final and non-appealable judgment.*"[6] Judge Sontchi held that this language—especially the final clause—required a prior judicial determination of misconduct before the carve-out could be triggered, explaining in his oral ruling:

> I agree that the carve out as written deals with the narrow situation of a finding at some time post signing of the covenant by a court that there's been willful misconduct or gross negligence. And ... I don't think that is done in the auspices of a lawsuit directly related

---

[4] In support of their "condition precedent" arguments, Plaintiffs cite numerous New York cases involving releases or exculpation provisions that do not contain a carve-out for fraud or willful misconduct, or that do not address the issue of a prior judicial determination and are thus inapposite here. Opp. at 17-19.

[5] *See also Yucaipa Am. All. Fund I, LP v. SBDRE LLC*, No. 9151 (VCP), 2014 WL 5509787, at *10 (Del. Ch. Oct. 31, 2014) (adopting same construction of the release carveout on collateral estoppel grounds in light of *Allied Systems*).

[6] *Id*. at *10 (quoting the relevant carveout provision construed by Judge Sontchi in *Allied Systems*).

5

between the parties, it has to come from somewhere else. It's a little vague, but I think it's fair to say it has to be a narrow exception . . .[7]

11. The absence of the words "condition precedent" did not alter the analysis in that matter. The requirement of a prior judicial determination was express in the language and structure of the release, which was designed to provide finality and certainty to released parties, except in the "narrow situation" where a court has found misconduct and that finding is beyond appeal. So too here.

12. Plaintiffs admit that the *Allied Systems* and *Yucaipa* courts construed a "similar carveout" but attempt to distinguish it because the release in those cases contained an express "covenant not to sue," which Plaintiffs argue transformed the prior judicial determination requirement into an "explicit condition precedent." Opp. at 18-19. This is meritless. Putting aside that neither the *Allied Systems* nor *Yucaipa* courts adopted this reasoning, Plaintiffs conveniently ignore the OpCo Plan injunction that expressly enjoins a Releasing Party from bringing any released claims. *Id*. § VIII.5. There is no basis to distinguish Judge Sontchi's construction from the Carveout in this case.

13. In sum, the Release says what it says. The Carveout preserves the ability to bring "Claims" for misconduct, but only *after* a court has made the requisite, non-appealable finding in connection with an unreleased third party's claim *against the OpCo Debtors*. Not only is this interpretation compelled by the plain language, but it allows for finality for the release parties appropriately balanced against a limited exception where actual misconduct has been

---

[7] Transcript from hearing on Feb. 27, 2013 at 109:14-110:5 (Adv. Pro. No. 12-50947, D.I. 162). A copy of the transcript is attached as Exhibit C to the *Declaration of Jacob Fields in Support of Management Defendants' Motion to Dismiss the Complaint*. D.I. No. 18-3.

determined—by a court—to have occurred.[89]  Plaintiff's claims are not saved by the Carveout, and dismissal with prejudice is required.  *See, e.g., In re Arctic Glacier International, Inc.*, 255 F.Supp.3d 534, 554-59 (D. Del. 2017) (affirming the bankruptcy court's interpretation of the plan releases and discharges and decision to dismiss the claims), *aff'd*, 901 F.3d 162 (3d Cir. 2018).

## II. Plaintiffs' Constructive-Fraud Theory Cannot State "Actual Fraud" (Counts 1-3)

14.  Plaintiffs' fraudulent transfer claims require particularized facts showing that the OpCo Debtors made the transfers "with actual intent to hinder, delay, or defraud" creditors.  11 U.S.C. §§ 548(a)(1)(A); 544(b).  But, at bottom, Plaintiffs plead at most a constructive-fraud theory based on the contention that Lucky Bucks was insolvent when the Credit Agreement was signed. To bootstrap this pleading into actual fraud, Plaintiffs rely heavily on a June 30, 2021 balance sheet and various "badges" of fraud, but those allegations do not amount to plausibly showing any fraudulent intent.  *See* Mot. at ¶¶ 34-37, 44-48.

15.  To begin, Plaintiffs cannot overcome that the OpCo First Lien Credit Agreement explicitly contemplated the distribution as an agreed use of proceeds, a feature known to and consented to by the sophisticated lenders who funded the facility. Courts consistently conclude that such publicly disclosed recapitalizations negotiated by sophisticated parties do not support an inference of fraudulent intent to hinder or delay creditors.  *See* Mot. at ¶¶ 49-51.

---

[8] Plaintiffs also try to distinguish *Yucaipa* on grounds that it involved a private credit agreement, not a bankruptcy Plan, but that makes no difference—the same contract-interpretation principles govern in both contexts. *E.g.*, *In re Shenango Group Inc.*, 501 F.3d 338, 344 (3d Cir. 2007) ("In construing a confirmed plan of reorganization, we apply contract principles."); *In re NorthEast Gas Generation LLC*, 639 B.R. 914, 923 (Bankr. D. Del. 2022) ("Where a plan (like a contract) is unambiguous, its terms must be enforced as written.").

[9] Plaintiffs' Opposition notes that, in the Rule 2004 context, this Court previously recognized the reorganized debtor as akin to a post-confirmation trust with vested claims for pursuit on behalf of new equity (former creditors). Opp. at 17 n.40.  Even assuming that finding could be transposed in this context, it has no bearing on the plain meaning of the Release. Vesting merely identifies a claim holder; it does not create claims where the Plan released them.

16. Further, three of the four alleged "badges of fraud" are facts that were undisputedly disclosed to lenders—that "the ultimate recipients of the OpCo Distribution were Company insiders…," that, as recapitalization dividends, "[n]o consideration was paid for the OpCo Distribution," and that the Distribution "was a substantial portion of Lucky Bucks's assets." *See* Opp. at 33. It beggars belief that Plaintiffs could rely on these pre-disclosed facts as evidence of actual fraud, and Plaintiffs cite no authorities approving such "badges" as suggestive of fraud in a context where they were pre-disclosed.[10]

17. The Opposition argues that the lenders were duped by misleading financial statements, yet—aside from the solvency statement in the Lucky Bucks Consent—fails to cite a single example of an alleged false statement attributed to a particular Management Defendant. Nor does the Complaint identify a single creditor who relied to its detriment on any statement by any Management Defendant, much less with facts showing any individualized fraudulent intent. Plaintiffs do not tie any Management Defendants to any other specific alleged misstated financial metrics disclosed during the diligence process. Beyond that, the Complaint merely states that the Management Defendants engaged in normal course of business activities. *See* Mot. at ¶¶ 35-36.

18. Instead, Plaintiffs fall back on the "fundamental misrepresentation" of the Lucky Bucks Consent, which allegedly affirmed the company's solvency as of June 30, 2021. Opp. at 22. Plaintiffs contend this document was "demonstrably false" because an internal balance sheet dated June 30, 2021 allegedly reflected a $45 million deficit before the OpCo Distribution. *Id.* As explained in briefing by the Management Defendants, this allegation is insufficient to plausibly

---

[10] Plaintiffs respond by citing numerous authorities that are inapplicable because they involve the adjudication of ratification as an affirmative defense. While Defendants may indeed assert such a defense, at this time the relevant point is that the lenders' foreknowledge of the use of proceeds—as alleged—renders any fraud claims implausible under Rule 12(b)(6) and Rule 9(b).

8

show insolvency.  Mot. at ¶¶ 37-38.

19.     As the Trive Defendants pointed out, this theory also fails because Macquarie had the information underpinning this balance sheet.  *See* Mem. of Law in support of Trive Defendants' Motion to Dismiss [D.I. 25] at ¶ 34.  Plaintiffs do not contest this fact but argue that "Macquarie did not know that the entire valuation premise . . . was corrupted by an undisclosed fraudulent scheme" by Damani, Kassam, and others to divert location contracts to controlled entities then resell them to Lucky Bucks.  Opp. at 23.  As Plaintiffs put it, the alleged B-Side scheme "fundamentally corrupted any financial statements on which the lenders relied."  *Id*.

20.     In other words, Plaintiffs concede that the balance-sheet information provided to them supported the Lucky Bucks Consent but was undermined by the alleged B-Side scheme—a separate alleged set of supposedly fraudulent acts not even alleged to have been known to any Management Defendant.  This argument necessarily undermines any fraudulent intent by the Management Defendants and is fatal to Plaintiffs' fraud claims against them.

21.     Separately, the Opposition asserts that "Defendants" allegedly told Macquarie that Damani had "no operational involvement in the business" despite knowing that Damani remained in contact with Kassam about Company operations.  Opp. at 24.  Aside from the fact that this says nothing about any defendant's actual knowledge of the alleged B-Side fraud, this argument contradicts the Complaint itself, which *denies* that any Management Defendants made any representations about Damani's operational involvement—the single cited instance of this representation is attributed to Thadani alone.  Compl. ¶ 74.

22.     Ultimately, Plaintiffs fall back on the asserted "badges" of fraud: insolvency, insider status, and lack of consideration.  But courts have routinely found these factors—standing alone or in combination—do not suffice to plead actual intent.  *See* Mot. at ¶ 48.  Plaintiffs must

9

allege specific statements, including facts supporting a strong inference of intent to defraud creditors at the time of the transfer. They fail to do so for any Management Defendant.

### III. The Fiduciary Duty Claims Fail under the LLC Agreements and Applicable Law

23. Counts Four, Five, and Six fail for multiple reasons that Plaintiffs fail to rebut.

**A. The HoldCo LLC Agreement Eliminates Fiduciary Duties (Counts 4 & 5)**

24. Count 4 asserts breach of fiduciary duty claims against Defendants Sekhri and Boyden in their capacities as managers of HoldCo. Count 5 asserts claims against Defendants Bouskill and Ijaz for aiding and abetting those alleged breaches.

25. Plaintiffs do not dispute that, under Delaware LLC law, fiduciary duties may be modified or eliminated by agreement. The HoldCo Agreement does just that, expressly providing that managers "shall, to the fullest extent permitted by applicable law, have no duties (fiduciary or otherwise)" other than as "expressly set forth in this Agreement," and no implied duties are allowed beyond the implied *contractual* covenant of good faith and fair dealing. § 5.01(e). Indeed, the title of that subsection is "No Fiduciary Duties." Despite this, Plaintiffs would have the Court revive full-fledged fiduciary duties based on scattered references to "good faith" and "willful misconduct" contained in other parts of the contract. None of their arguments is availing.

26. First, Plaintiffs point out that the HoldCo LLC Agreement preserves the implied contractual covenant of good faith and fair dealing, then argue that this implied contractual covenant imposed a general duty to "not act in bad faith." Opp. at 39. But preserving the *contractual* covenant of good faith and fair dealing is not the same as preserving fiduciary duties, as Plaintiffs suggest. The implied covenant cannot be used to impose fiduciary-like duties disclaimed by the Holdco LLC Agreement, and Plaintiffs cite no authorities holding otherwise.[11]

---

[11] Plaintiffs' cases on this point are not supportive. First, *Wagner v. BRP Grp., Inc.* involved a claim for breach of the implied covenant of good faith and fair dealing—a contract claim—and the Court of Chancery made clear that such a

27.     Next, Plaintiffs try wringing fiduciary duties from the exculpation provisions in sections 9.02 and 9.03.  That also fails because section 9.02 does not mention fiduciary duties, and section 9.03 explicitly *disclaims* any duties, including fiduciary duties, that the managers may have.  This disclaimer does not extend to "Officers, employees and expressly authorized agents" of HoldCo, but Plaintiffs do not assert any claims against any such persons:  Count 4 asserts claims against Defendants Sekhri and Boyden specifically in their capacities as HoldCo "managers" (not officers), and Count 5 asserts claims against Defendants Bouskill and Ijaz for aiding and abetting those purported breaches without alleging they were officers (or had any other role) at HoldCo.[12]

28.     Still, Plaintiffs claim that the exculpation provision (section 9.03) "requires that 'Covered Persons' . . . make decisions in good faith." (Opp. at 39), but this mischaracterizes the actual text.  That section does not abstractly require making "decisions in good faith" as Plaintiffs posit but merely states that a Covered Person "shall not be liable . . . for its good faith reliance *on the provisions of this Agreement.*"  Again, the waiver provision (section 5.01(e)) expressly eliminates the very fiduciary duties that Plaintiffs seek to find.[13]

29.     Similarly, Plaintiffs point out that managers are not exculpated from liability for losses "incurred by reason of such Covered Person's fraud, willful misconduct or willful breach of this Agreement."  Opp. at 39-40 (citing section 9.02(b)).  But they ignore language in the very same paragraph that unambiguously **precludes Plaintiffs' very claims** by providing that "any

---

claim requires showing breach of "a specific implied contractual obligation" in the LLC agreement, which Plaintiffs here do not plead. 316 A.3d 826, 871 (Del. Ch. 2024).  *Mehra v. Teller* did not even address the scope of the implied covenant of good faith and fair dealing.  No. 2019-0812-KSJP, 2021 WL 300352, at *28 (Del. Ch. Jan. 29, 2021).

[12] This is not an oversight.  The HoldCo LLC Agreement explicitly identifies Sekhri and Boyden as managers (§ 5.01(b)(ii)) and states that "there are no Officers of the Company" as of the date of signing (§ 5.02(a)).

[13] As explained in the Management Defendants' briefing (Mot. at ¶¶ 64-69), even if fiduciary duties were not waived, Plaintiffs do not meet the high standard required to plead fiduciary claims premised on bad faith or breach of loyalty. *See, e.g.*, *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66 (Del. 2006) (fiduciary bad-faith claims require showing "subjective bad intent," "intentional dereliction of duty, [or] a conscious disregard for one's responsibilities").

11

action taken by a Covered Person as required pursuant to the Lucky Bucks Financing shall be deemed to have been taken in good faith and shall not constitute a willful breach of this Agreement." *Id*. § 9.02(b). "Lucky Bucks Financing" is defined to mean, individually and collectively, "indebtedness under the Existing [January 29, 2020] Credit Agreement *or any refinancing thereof*." *Id*. § 6.02(a)(iv). On its face, the OpCo First Lien Credit Facility (which funded the OpCo Distributions) is precisely such a refinancing.[14] In other words, the HoldCo LLC Agreement precludes any finding of bad faith related to any steps taken under to the OpCo First Lien Credit Facility—this alone is sufficient to defeat Counts 4 and 5.

30.     But even if that dispositive language did not exist, Plaintiffs simply cite no legal authority holding that an LLC agreement revives fiduciary duties, *ipso facto*, merely by exempting willful misconduct from exculpation or indemnification—especially when those duties are unambiguously waived elsewhere in the document. And Plaintiffs misstate Delaware law to the extent they suggest that exculpation provisions can only protect "managers from claims for breach of the duty of care but not claims for an act of bad faith or breach of loyalty." Opp. at 40.[15] As this Court has observed, Delaware's LLC Act "allow[s] exculpation of all liabilities for breach of fiduciary duty, including the duty of loyalty." *In re Bayou Steel BD Holdings, LLC*, 642 B.R. 371, 401 (Bankr. D. Del. 2022) (citing § 18-1101(e)).

31.     Plaintiffs' cited authorities do not move the needle. In *In re Cadira Group Holdings, LLC Litigation*, the Delaware Court of Chancery construed the meaning of an LLC

---

[14] The OpCo First Lien Credit Facility is attached as Ex. B to the *Declaration of Jacob Fields in Support of Management Defendants' Motion to Dismiss the Complaint*. D.I. No. 18-2. The recitals to that agreement make clear that the proceeds were to, among other things, "pay for the Closing Date Refinancing," which is in turn defined as the repayment of the January 29, 2020 "Existing Credit Agreement." *Id*. § 1.01

[15] Plaintiffs cite one case in support of this principle. Opp. at 40 (citing *In re HH Liquidation, LLC*, 590 B.R. 211 (Bankr. D. Del. 2018)). But the *HH Liquidation* court, in the section Plaintiffs cite, was itself relying solely on two cases applying Delaware law applicable to corporations—not LLCs.

agreement's waiver-of-duties provision. The court found that the LLC agreement in that case "at first glance" waived fiduciary duties but immediately revived traditional fiduciary duties by—in the very same paragraph—"green-lighting claims" of any type that were based on members' "bad faith, gross negligence, willful misconduct or actual fraud." No. 2018-0616-JRS, 2021 WL 2912479, at *3 (Del. Ch. July 12, 2021). *Cadira* did not involve the construction of an exculpation or indemnification provision, much less hold that such clauses could independently revive fiduciary duties, as Plaintiffs attempt to argue. Moreover, in contrast to *Cadira*, the waiver-of-duties provision here (section 5.02(e)) is not ambiguous about the scope of fiduciary duties—they are fully waived to the extent allowed by law, except as stated in the LLC agreement itself.

32.   In *Bayou Steel*, 642 B.R. at 403, this Court analyzed LLC agreements of three related entities to determine if their respective members were exculpated from liability for fiduciary breaches: for two entities, the LLC agreements explicitly exculpated members for fiduciary claims. But, for the third entity, the LLC agreement only provided that members were not liable for the LLC's debts, obligations, and liabilities solely by reason of their being a member or acting as a manager. The Court found this language insufficient to exculpate breaches of fiduciary duties, especially since the LLC Agreement did not elsewhere clearly waive fiduciary duties. *Id*. 404 (noting that, because the third LLC agreement "did not eliminate the Director Defendants' fiduciary duties . . .[,] the Court is careful when interpreting and applying related exculpation for breaches of such duties.").[16] Here, the opposite is true: the HoldCo Agreement unambiguously *waived* fiduciary duties for purposes of § 18-1101(c); under *Bayou*, this weighs

---

[16] In *Bayou*, the Court also cited the fact that the LLC agreement carved out "willful misconduct, bad faith or fraud" from indemnification, which suggested "certain breaches of the duty of loyalty will not be indemnified." *Id*. at 404-05. The Court reasoned that, if the LLC agreement "eliminated such liabilities, there would be no reason to address their indemnification…" *Id*. Plaintiffs try to coopt this logic but skip the most important factor—unlike the LLC entity in *Bayou*, the HoldCo LLC Agreement unequivocally *waived* fiduciary duties pursuant to § 18-1101(c) of the Delaware LLC Act.

13

heavily against Plaintiffs' attempt to revivify those same duties through the exculpation clause.

### B. The Lucky Bucks Operating Agreement Does Not Impose Fiduciary Duties on Officers (Count 6)

33. In Count 6, Plaintiffs assert fiduciary claims under Georgia law against the Management Defendants in their capacities as officers of Lucky Bucks, LLC. This claim also fails. The Lucky Bucks Operating Agreement (the "<u>Georgia Operating Agreement</u>"): (1) vests management in HoldCo as the "Sole Member," (2) broadly eliminates fiduciary duties for "Covered Persons" (defined to include HoldCo), and (3) provides exculpation except for enumerated misconduct (fraud, intentional or willful misconduct, willful breach, knowing violation of law). *See* Mot. at ¶ 59. In their Opposition, Plaintiffs argue that, "[a]s managing member, HoldCo originally owed fiduciary duties to Lucky Bucks but delegated that management responsibility—and the related fiduciary duties—to the Officers," and Plaintiffs contend that Georgia's LLC statute imposes duties of loyalty and good faith. Opp. at 42. Both premises are wrong.

34. For starters, Plaintiffs' premise is erroneous because, as the sole managing member, HoldCo owed no fiduciary duties to Lucky Bucks LLC—they were expressly waived in Section 6.3. As a Covered Person, HoldCo had no fiduciary duties to delegate to the Management Defendants. Furthermore, while the Georgia Operating Agreement provides that HoldCo can delegate to officers "the duties and authority as [HoldCo] may prescribe from time to time" (*id*. § 4.1), Count 6 does not actually *plead* any duties were so delegated. In fact, the only acts attributed to any Management Defendants were those that allegedly "facilitated" the OpCo Distribution (*e.g.*, approving wire transfers), which Plaintiffs acknowledge was made under HoldCo board directives. *See* Compl. ¶¶ 175, 181.

35. Under the Georgia Operating Agreement, the only fiduciary duties that HoldCo

14

prescribed to officers were those "that are owed by officers and other persons pursuant to the [Georgia LLC] Act." *Id*. § 4.1. But, under Georgia law, "officers of an LLC do not owe fiduciary duties to the LLC," only managers do. *In re Beaulieu Group, LLC*, No. 17-41677-BEM, 2021 WL 4469928, at *14 (Bankr. N.D. Ga. Sep. 29, 2021). Plaintiffs relegate this dispositive holding to a footnote and fail in their attempt to distinguish it.[17] Opp. at 43 n.99.

## IV. Ancillary & Declaratory Judgment Claims (Counts 7-9)

36. Plaintiffs do not dispute that their claims for attorney's fees and punitive damages under Georgia law depend on the viability of their primary claims. Opp. at 29-30.

37. Plaintiffs argue that if the Carveout requires a prior judicial finding of fraud or misconduct before they can bring affirmative claims (it does), then Plaintiffs should be allowed to seek such a finding through declaratory relief. Opp. at 49. This argument does not rebut that the declaratory judgment claim is duplicative of the merits claims nor dispute that the law prohibits overlapping claims. *See* Mot. at ¶¶ 78-80. Moreover, Plaintiffs' "Catch-22" argument is a red herring. As described above, the Carveout preserves the ability to bring claims for misconduct, but only after a court has made the requisite finding in connection with an unreleased third party's claim against the OpCo Debtors.

## CONCLUSION

For the reasons above, the Management Defendants and Seven Aces respectfully request that the Court dismiss the claims against them with prejudice.

---

[17] Plaintiffs confusingly assert that the LLC agreement in *Beaulieu* "vested management in a Board of Managers who retained fiduciary duties, while officers had none," whereas here "the LB LLC Agreement made clear that the Officers had fiduciary duties, just like the *Beaulieu* Board of Managers." Opp. at 43 n.99. This is meritless. *Beaulieu* said nothing about the LLC agreement disclaiming fiduciary duties of officers—the Court's entire analysis focused on discerning the default fiduciary duties prescribed for managers and officers under the Georgia LLC Act, ultimately finding that Georgia law imposed (waivable) fiduciary duties on LLC managers but *not* officers. *Beaulieu*, 2021 WL 4469928, at *14.

Dated: December 4, 2025
       Wilmington, DE

**POTTER ANDERSON & CORROON LLP**

*/s/ M. Blake Cleary*
M. Blake Cleary (No. 3614)
Jesse L. Noa (No. 5973)
James R. Risener (No. 7334)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Phone: (302) 984-6026
Email: bcleary@potteranderson.com
        jnoa@potteranderson.com
        jrisener@potteranderson.com

-and-

**ALLEN OVERY SHEARMAN STERLING US LLP**

C. Luckey McDowell (admitted *pro hac vice*)
Ian E. Roberts (admitted *pro hac vice*)
Jacob Fields (admitted *pro hac vice*)
2601 Olive St 17th Floor
Dallas, TX 75201
Phone: (214) 271-5777
Email: luckey.mcdowell@aoshearman.com
        ian.roberts@aoshearman.com
        jacob.fields@aoshearman.com

-and-

Samuel Cooper (admitted *pro hac vice*)
800 Capitol Street, Suite 2200
Houston, Texas, 77002
Phone: (713) 354-4838
Email: samuel.cooper@aoshearman.com

*Counsel for Manu Sekhri, James Boyden, Ryan Bouskill, Hassan Ijaz, and Seven Aces Holdings ULC*