# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Ronald J. Friedman, *as Trustee for The SportCo Creditors' Liquidation Trust*, | ) ) ) | Case No. 3:24-00576-JDA |
| Appellant, | ) ) | |
| v. | ) ) | **OPINION AND ORDER** |
| F. Hewitt Grant; Todd Boehly; Charles E. Walker, Jr.; Andrew Kupchik, | ) ) ) | |
| Appellees. | ) ) | |
| | ) | |

This matter is before the Court on appeal filed by Ronald J. Friedman, as Trustee for The SportCo Creditors' Liquidation Trust ("the Trustee") [Doc. 1], from a bankruptcy court order (the "Order") and judgment entered in favor of F. Hewitt Grant ("Grant"), Charles E. Walker, Jr. ("Walker"), Todd Boehly ("Boehly"), and Andrew Kupchik ("Kupchik") (collectively, "Defendants") [Doc. 26-3 at 285–316, 318]. The Court has jurisdiction over the appeal in accordance with 28 U.S.C. 158(a). Having carefully considered the parties' briefs, the record, and the applicable law, the Court will affirm the judgment and modify the Order.

## BACKGROUND[1]

**The Parties and Debtors**

SportCo Holdings, Inc. ("SportCo"); its wholly owned subsidiary United Sporting Co. ("USC"); USC's wholly owned subsidiary Ellett Brothers, LLC ("Ellett"); and various subsidiaries of Ellett-Bonitz Brothers, Inc.; Evans Sports, Inc.; Jerry's Sports, Inc.;

---

[1] This case was tried on stipulated facts. [Doc. 26-3 at 285.] This section summarizes the bankruptcy court's factual findings and the proceedings in the bankruptcy court.

Outdoor Sports Headquarters, Inc.; Quality Boxes, Inc.; and Simmons Guns Specialties, Inc. (collectively "Debtors") had their principal place of business in South Carolina. [Doc. 26-3 at 287 ¶¶ 1, 4.] Ellett, a South Carolina limited liability company, was founded on November 2, 2006. [*Id.* at 287 ¶ 4.]

In 2008, Wellspring Capital Partners IV, L.P. ("Wellspring IV"), an investment fund managed by Wellspring Capital Partners, LLC ("Wellspring"), acquired Ellett. [*Id.* at 288 ¶ 5.] Wellspring IV formed SportCo, a Delaware corporation, as a holding company to own USC, another Delaware corporation, which in turn owned 100% of Ellett. [*Id.*]

Throughout their history, Ellett and other Debtors were marketers and distributors of a broad line of products and accessories for hunting and shooting sports, and for marine, camping, archery, and other outdoor activities. [*Id.* at 288 ¶ 6.] The products included firearms, reloading and ammunition, leather goods, camping equipment, sportsman gifts, and a variety of other outdoor sporting goods. [*Id.*] By the later years of their operations, Debtors' customer base consisted of 20,000 independent retailers covering all 50 states. [*Id.*]

Debtors achieved high sales and revenues and had significant operations until sometime in 2016, when their profits began to decrease. [*Id.* at 288 ¶ 7.] In 2012, for instance, Debtors' revenues were approximately $1.2 billion. [*Id.*]

**Previous and Challenged Transactions**

Wellspring IV became by far the largest shareholder of Debtors in 2008 when it acquired Ellett. [*Id.* at 288 ¶ 8.] As part of that transaction, in addition to making an equity investment, Wellspring IV extended an $18 million secured loan at a 20% interest rate to SportCo, subordinated to the existing asset-based lending group of Bank of America,

Regions Bank, and Wells Fargo Bank. [*Id.* at 288–89 ¶ 8.] Ellett and its subsidiaries were also liable for this loan. [*Id.* at 289 ¶ 8.] Defendants were not involved in this financing in any capacity.[2] [*Id.*]

In 2009, Wellspring IV invested an additional $27.4 million in SportCo and loaned another $17 million in subordinated, secured debt at a 20% interest rate to SportCo, to finance Debtors' acquisition of Jerry's Sports, Inc. [*Id.* at 289 ¶ 9.] Ellett and its subsidiaries were also liable for this loan. [*Id.*] Defendants were not involved in this financing in any capacity. [*Id.*]

The challenged transactions at issue in this matter were financed by secured loans from Prospect Capital Corporation ("Prospect"), a publicly traded business development corporation that makes debt and equity investments in middle market business across a range of industries, and from Summit Partners Credit Fund, LP; Summit Partners Credit Fund A-1, L.P.; Summit Investors I, LLC; and Summit Investors I (UK), L.P. (collectively, "Summit"). [*Id.* at 289 ¶ 11.] Summit are subsidiaries of Summit Partners, which is an investment firm that, through its credit division, invests in growth capital, recapitalizations, acquisitions and leveraged buyouts, distressed situations/debtor-in-possession financings and rescue financings for middle-market companies. [*Id.*]

**2012 Financing and Dividend**

---

[2] As to Defendants, Boehly was a passive minority investor in SportCo. [Doc. 26-3 at 294 ¶ 33.] Grant, Kupchik, and Walker had been employees of Debtors who became minority shareholders through stock compensation and stock purchases during their employment. [*Id.*] On October 1, 2012, Boehly owned 1.47% of SportCo's equity; Grant owned 0.5%; Kupchik owned 0.88%; and Walker owned 0.05%. [*Id.* at 32–33.]

3

On September 28, 2012, Prospect and Summit (together, the "Second Lien Lenders") entered into a Second Lien Loan and Security Agreement (the "Second Lien Loan Agreement") with Ellett; Evans Sports, Inc.; Jerry's Sports, Inc.; Simmons Gun Specialties, Inc.; Bonitz Brothers, Inc.; and Outdoor Sports Headquarters, Inc. (the "Borrower Debtors") for a $170 million loan. [*Id.* at 289 ¶ 12.] The Second Lien Loan Agreement provided that the loan would be used to fund a one-time dividend to SportCo's shareholders (the "2012 Dividend"), to pay down certain pre-existing debt of the Borrower Debtors, and to pay associated costs and fees to the Second Lien Lenders. [*Id.* at 289–90 ¶ 12.]

The Second Lien Loan Agreement provided for the Second Lien Lenders to loan the Borrower Debtors a total of $170 million, with Prospect providing $100 million and Summit providing $70 million. [*Id.* at 291–92 ¶ 23.] The Second Lien Loan Agreement specified that the loan proceeds would be available to Debtors "solely" to pay a dividend to Debtors' shareholders in an amount up to $134,500,000 and to repay a portion of the outstanding second lien debt owed by SportCo (for which Ellett and its subsidiaries were also liable) to Wellspring in the amount of $34,791,000. [*Id.* at 292 ¶ 23.] The Second Lien Loan Agreement further provided for the loans to accrue interest at the rate per annum equal to the greater of the LIBOR rate plus 11% and 12.75%, and for Prospect and Summit to be paid an upfront fee of $2,250,000 and $1,575,000, respectively. [*Id.* at 292 ¶ 24.]

Under the terms of the Second Lien Loan Agreement, the Second Lien Lenders' obligation to provide the $170 million in financing was conditioned on their receipt of "evidence satisfactory to them . . . that, after giving effect to [the financing and its use to

4

pay a dividend that] each Borrower [would remain] Solvent." [*Id.* at 293 ¶ 27 (alterations in original) (internal quotation marks omitted).]

On Friday, September 28, 2012, USC, as Ellett's sole member, signed a written consent approving a resolution authorizing Ellett to enter into, inter alia, the Second Lien Loan Agreement and to perform its obligations thereunder. [*Id.* at 293 ¶ 30.]    On September 26, 2012, via a Unanimous Written Consent, the board of directors of USC approved payment of a cash dividend to SportCo of $169,500,000 payable on or before November 27, 2012. [*Id.*]  On September 28, 2012, via a Unanimous Written Consent, the board of directors of SportCo declared a cash dividend of up to $134,500,000 to its shareholders payable on or before November 27, 2012. [*Id.*]

On the following business day, Monday, October 1, 2012, pursuant to the Second Lien Loan Agreement, the Second Lien Lenders collectively loaned $170 million to Ellett. [*Id.* at 294 ¶ 31.]  On the same day, Defendants and Wellspring IV received the following dividends, totaling $133,905,517.14, from the proceeds of the Second Lien Loan Agreement: $130,024,072.35 to Wellspring IV; $1,967,081.28 to Boehly; $1,180,248.77 to Kupchik; $667,430.68 to Grant; and $66,684.06 to Walker. [*Id.* at 294 ¶ 32.]  These amounts were remitted from a bank account held in Ellett's name.[3]  [*Id.*]

In accordance with the terms of the Second Lien Loan Agreement, Ellett used the remainder of the loan proceeds—approximately $34,791,100—to repay a portion of the

---

[3] This type of transaction is known as a "dividend recapitalization."  Under a dividend recapitalization, the borrowing company "assume[s] new debt and use[s] that money to pay a dividend to the shareholders of its holding company." *Reynolds v. Behrman Cap. IV LP*, No. 2:18-cv-00514-ACA, 2022 WL 163693, at *2 (N.D. Ala. Jan. 18, 2022); *Reynolds v. Behrman Bros. Mgmt. Corp.*, No. 19 Civ. 5842 (LGS), 2020 WL 1957372, at *3 (S.D.N.Y. Apr. 23, 2020) ("In a dividend recapitalization, a company incurs debt to pay dividends to shareholders, with the effect of increasing a company's debt to equity ratio.").

outstanding secured debt owing to Wellspring IV and to pay the Second Lien Lenders various fees and reimburse their transactional costs incurred in connection with the loan. [*Id.* at 294 ¶ 34.]

In their resolutions declaring and authorizing the payment of the 2012 Dividend executed on or before September 28, 2012, USC's board of directors and SportCo's board of directors each found that the "fair saleable value of the Corporation's assets exceeds the value of its liabilities, including all contingent and other liabilities, by an amount that is greater than the capital of the Corporation" and "after giving effect to the payment of the Dividend, the aggregate value of the Corporation's assets will exceed the sum of its liabilities and capital." [*Id.* at 294 ¶ 35 (internal quotation marks omitted).]

Defendants played no role in the negotiations that led to the Second Lien Loan Agreement or the payment of the 2012 Dividend. [*Id.* at 294 ¶ 33.]

**2013 Financing and Dividend**

In January 2013, Prospect reached out to Wellspring to offer additional financing for the purpose of another dividend. [*Id.* at 295 ¶ 36.] On March 7, 2013, the Second Lien Lenders, along with the Borrower Debtors, executed the First Amendment and Limited Consent to the Second Lien Loan Agreement (the "2013 Loan Amendment"), whereby Prospect loaned the Borrower Debtors an additional $60 million to fund an additional dividend (the "2013 Dividend"). [*Id.* at 295 ¶ 38.]

Because the 2013 financing was structured as an amendment to the Second Lien Loan Agreement, Prospect and Summit, as the Second Lien Lenders, maintained the same liens, rights, and protections, and the 2013 financing earned the same interest rate, as Prospect and Summit had for the 2012 financing. [*Id.* at 296 ¶ 40.] Under the 2013

Loan Amendment, Prospect and Summit also were paid an upfront fee of $1,350,000 and $700,000, respectively. [Id.]

Under the terms of the 2013 Loan Amendment, Prospect's obligation to provide the additional $60 million in financing was conditioned on its receipt of "evidence satisfactory to them . . . that, after giving effect to [the additional financing and its use to pay a dividend that] each Borrower [would remain] Solvent." [Id. at 296 ¶ 42 (internal quotation marks omitted).]

The additional $60 million in financing closed on March 7, 2013. [Id. at 297 ¶ 44.] On that date, satisfied that the Borrower Debtors remained solvent, Prospect funded the additional $60 million in loan proceeds. [Id. at 297 ¶ 44 & n.6.]

On the same day, the boards of directors of each of Ellett, USC, and SportCo declared and authorized the dividends to be paid using most of the proceeds of the 2013 additional financing. [Id. at 297 ¶ 45.] Specifically, Ellett's sole member approved the 2013 Loan Amendment and thereby authorized a distribution to USC of up to $60 million; the board of directors of USC approved payment of a cash dividend to SportCo of $60 million; and the board of directors of SportCo declared a cash dividend of up to $60 million to its shareholders. [Id.]

Debtors' boards approved the loan distribution (a) after finding that the "fair saleable value of the Corporation's assets exceeds the value of its liabilities, including all contingent and other liabilities, by an amount that is greater than the capital of the Corporation" and after giving effect to the payment of the Dividend, the aggregate value of the Corporation's assets will exceed the sum of its liabilities and capital, and (b) after receiving an opinion from the valuation firm of Houlihan Lokey Financial Advisors, Inc.,

dated March 6, 2013, which confirmed that the incurrence of the debt for the money borrowed to pay the 2013 Dividend, and the payment of that dividend, would leave USC solvent. [*Id.* at 297 ¶ 46 (internal quotation marks omitted).]

On March 7, 2013, Defendants received the following dividends out of the proceeds of the 2013 Loan Amendment: $847,743.75 to Boehly; $287,639.45 to Grant; $508,646.25 to Kupchik; and $28,738.51 to Walker. [*Id.* at 298 ¶ 48.] In addition, Wellspring IV received $53,145,394.59, and Summit and some of its affiliates, as shareholders of SportCo, received $2,890,467.07. [*Id.*] These transfers were remitted from a bank account held in the name of Ellett. [*Id.*]

Defendants played no role in the negotiations that led to the 2013 Loan Amendment or the payment of the 2013 Dividend. [*Id.* at 298 ¶ 49.]

**Subsequent Events and this Litigation**

Debtors remained solvent, and paid their bills as they came due, for years after they paid the 2012 and 2013 Dividends. [*Id.* at 298 ¶ 50.] In 2015, Ellett was the fifth largest private company in South Carolina and the largest distributor of firearms in the United States, with annual revenues of $750 million, over 350 employees nationwide, and 175 employees in South Carolina. [*Id.*] However, sometime after 2015, Debtors began to experience financial difficulties. [*Id.* at 298 ¶ 51.] And on December 31, 2018, Debtors defaulted on the Second Lien Loan Agreement. [*Id.* at 299 ¶ 52.]

Prospect initiated this litigation by filing a complaint in the Court of Common Pleas for Lexington County, South Carolina ("state court") on May 23, 2019, naming as defendants Wellspring and certain of its affiliates, Defendants, and certain other individuals associated with Debtors and Wellspring. [*Id.* at 299 ¶ 53.] Shortly after the

state court suit was initiated, on June 10, 2019 (the "Petition Date"), Debtors filed Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court"). [*Id.* at 299 ¶ 54.] The operative pleading in this underlying adversary proceeding, the Amended Complaint, asserts fraudulent transfer claims under Section 544(b) of the Bankruptcy Code against Defendants seeking to avoid and recover the payment of those portions of the 2012 and 2013 Dividends that Defendants received.[4] [*Id.* at 300 ¶ 58.] In asserting those claims, the Trustee identified three sets of what he claims were creditors that he argues could have brought suit on the Petition Date and, under the law of South Carolina, voided the payment of those dividends to Defendants: (1) Prospect and Summit, (2) Garmin USA, Inc.; Vista Outdoor Sales, LLC, on behalf of its corporate affiliates Federal Cartridge Company and Bushnell Holdings, Inc.; Navico Inc.; Remington Arms Company, LLC; and Leupold & Stevens, Inc. (collectively, "Trade Creditors"), and (3) the Town of Chapin, South Carolina (the "Town" or the "Town of Chapin"). [*Id.* at 300 ¶ 58, 302 ¶ 64.]

On September 6, 2019, Wellspring and its affiliates, which were defendants at the time, removed the litigation from state court to the United States Bankruptcy Court for the District of South Carolina (the "South Carolina Bankruptcy Court" or the "Bankruptcy Court"). [*Id.* at 299 ¶ 55.] On November 6, 2019, the Delaware Bankruptcy Court confirmed the Plan for Debtors. [*Id.* at 299 ¶ 56.]

---

[4] Prospect did not name Summit as a defendant even though it was a shareholder of SportCo at the time of the 2013 Dividend and, as noted, received more than $2.8 million as part of the payment of that dividend. [Doc. 26-3 at 299 ¶ 53.] Before filing the state court action, Prospect asked Summit whether Summit wanted to join as another plaintiff but, as Adam Britt, a Managing Director of Summit, testified, Summit declined to do so. [*Id.*]

In the present adversary action, the Bankruptcy Court found for Defendants following a trial on stipulated facts, disagreeing with the Trustee that the 2012 and 2013 Dividend payments were "voluntary" or gratuitous transfers, subject to S.C. Code Ann. § 27-23-10, commonly known as the Statute of Elizabeth, and therefore finding that repayment to the bankruptcy estate of the 2012 and 2013 Dividend payments was not mandated. [*Id.* at 305–15.]

**Ellett's Trade Creditors and the Town**

The Trade Creditors provided goods to Ellett on credit and had outstanding claims for ordinary course accounts payable against Ellett at the time Debtors paid the 2012 and/or 2013 Dividends. [*Id.* at 302 ¶¶ 64, 65.] Those claims did not arise out of the funding provided by Prospect and Summit to enable Debtors to pay those dividends. [*Id.* at 302 ¶ 65.] However, after they issued the 2012 and 2013 Dividends, Debtors paid those claims in full in the ordinary course and well before the Petition Date. [*Id.* at 302–03 ¶¶ 65, 67–71.]

Thereafter, for several years, the Trade Creditors continued to extend trade credit in the ordinary course, and Debtors continued to pay any outstanding accounts payable in the ordinary course. [*Id.* at 302 ¶ 66.]

A yearly Town of Chapin business license is required to conduct business in Chapin, South Carolina. [*Id.* at 303 ¶ 72.] Between March 7, 2013, and the Petition Date, such business licenses were effective for each respective calendar year, January 1 to December 31. [*Id.*] As of March 7, 2013, Ellett owed at least $320,000 to the Town for a business license for the year 2013. [*Id.* at 303–04 ¶ 72.] The amount owed as of March 7, 2013, to the Town for that license was paid in full by Ellett well before the Petition Date.

[*Id.* at 304 ¶ 72.] Ellett did not owe the Town any amount at the time of the 2012 Dividend, as Ellett had already paid the license fee for that year. [*Id.*] Between March 7, 2013, and the Petition Date, Ellett operated on Town of Chapin business licenses for all or portions of each year. [*Id.*] Ellett operated its business in Chapin for the entirety of the calendar years 2013, 2014, 2015, 2016, 2017, and 2018, and part of the 2019 calendar year. [*Id.*] Ellett paid in full, as and when due, for the business licenses for all years until 2019. [*Id.*]

For several years the Trade Creditors also extended credit to Ellett in the ordinary course, and Ellett continued to pay any outstanding accounts payable in full in the ordinary course. [*Id.* at 302 ¶ 66.] As of the Petition Date, Ellett owed the Trade Creditors varying amounts, all based on invoices from 2017 or later. [*Id.* at 304–05 ¶¶ 74–80.]

## STANDARD OF REVIEW

District courts have jurisdiction over appeals from final judgments and orders of the bankruptcy courts. 28 U.S.C. § 158(a); *see, e.g., Educ. Credit Mgmt. Corp. v. Kirkland (In re Kirkland)*, 600 F.3d 310, 314 (4th Cir. 2010). Upon review, a district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *Anderson v. Cordell (In re Infinity Bus. Grp., Inc.)*, 628 B.R. 213, 226 (D.S.C. 2021) (internal quotation marks omitted), *aff'd*, 31 F.4th 294 (4th Cir. 2022). "The standard of review of a bankruptcy appeal by a district court is the same as when a court of appeals reviews a district court proceeding." *Id.* Consequently, a district court reviews the bankruptcy court's findings of fact for clear error and its legal conclusions de novo. *Internal Revenue Serv. v. White (In re White)*, 487 F.3d 199, 204 (4th Cir. 2007). A finding of fact is clearly erroneous when "the entire record demonstrates convincingly to the reviewing court that a mistake has been committed." *Infinity Bus. Grp.,*

11

628 B.R. at 226 (internal quotation marks omitted).   Further, the court reviews mixed findings of law and fact "under a hybrid standard, applying to the factual portion of each inquiry the same standard applied to questions of pure fact and examining *de novo* the legal conclusions derived from those facts." *Id.* (internal quotation marks omitted).

## APPLICABLE LAW

Section 544(b)(1) of the Bankruptcy Code provides, as is relevant here, that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title." 11 U.S.C. § 544(b)(1). In this adversary proceeding, the Trustee seeks to avoid those portions of the 2012 and 2013 Dividends that Defendants received.

"Section 544 does not establish substantive provisions for the avoidance of transfers; rather, it merely gives the Trustee the status of a creditor under state law and allows nonbankruptcy law to determine the rights that accrue as a result of that created status." *Campbell v. Deans (In re J.R. Deans Co.)*, 249 B.R. 121, 129 (Bankr. D.S.C. 2000); *see Memory v. Jefferson Fed. Sav. & Loan (In re Fair)*, 28 B.R. 160, 163 (Bankr. M.D. Ala. 1983) ("[F]irst, the trustee or the debtors must exercise the rights under Section 544(b) of an unsecured creditor with an allowable claim.   Second, such an unsecured creditor must have the right under the state law to avoid a transfer."); *In re Lang*, 5 B.R. 371, 374 (Bankr. S.D.N.Y. 1980) ("Section 544(b) . . . chains the trustee to the rights a creditor would have to void fraudulent transfers under applicable local law, absent bankruptcy.").   The existence of the Trustee's rights generated by Section 544(b) are dependent on the rights of actual creditors possessing claims that are allowable in

bankruptcy. *See, e.g.*, *Campbell v. Haddock (In re Haddock)*, 246 B.R. 810, 814 (Bankr. D.S.C. 2000).  In this case, the Trustee claimed the challenged transfers were voidable under the Statute of Elizabeth.[5]  [Doc. 26-3 at 58, 71–72.]  Thus, the initial determination to be made by the Court is at the time of the filing of the bankruptcy petition, "whether there is a creditor with an allowed claim in this case who provides the Trustee standing to assert the Statute of Elizabeth action."  *In re Haddock*, 246 B.R. at 814; 5 Collier on Bankruptcy ¶ 544.06[1] (Richard Levin & Henry J. Sommer eds., 16th ed. 2025) ("Under [S]ection 544(b)(1), the trustee succeeds to the rights of an unsecured creditor *in existence at the commencement of the case* who may avoid the transfer under applicable [federal, state, or local] law. . . . If there is no creditor against whom the transfer is voidable under the applicable law, the trustee is powerless to act under [S]ection 544(b)(1)." (emphasis added)).

The Statute of Elizabeth provides:

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them, or of any lease, rent, commons, or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment, and execution which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every one of them

---

[5] The Bankruptcy Court ruled that South Carolina law governs the Trustee's Section 544(b) claims.  [Doc. 26-3 at 306 & n.8.]  As an additional ground for affirmance of the Order, Defendants contend that the law of New York governs those claims and that the Trustee's claims would fail under New York law because under New York law the Trustee would have to show that Ellett was already insolvent when it made the Dividend payments or that the payments left Ellett insolvent.  [Doc. 33 at 33–39.]  The Trustee does not argue that his claims could succeed under New York law, but he contends that the Bankruptcy Court correctly ruled that South Carolina law governs.  [Doc. 36 at 20–24.]

> whose actions, suits, debts, accounts, damages, penalties, and forfeitures by guileful, covinous, or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

S.C. Code Ann. § 27-23-10(A).

Because the Statute of Elizabeth is a South Carolina statute, its interpretation "is ultimately the prerogative" of the Supreme Court of South Carolina. *Chrysler Fin. Co. v. Schlant*, 243 B.R. 613, 616 (W.D.N.Y. 2000); *see* 28 U.S.C. § 1652 ("The laws of the several states . . . shall be regarded as rules of decision in civil actions in the courts of the United Sates, in cases where they apply."). That court explained the principles guiding application of the statute in *Beaufort Veneer & Package Co. v. Hiers*, 140 S.E. 238 (S.C. 1927):

> A voluntary deed may be set aside at the instance of an existing creditor upon the ground of constructive or legal fraud, even where there is not the slightest taint of actual or moral fraud in the transaction, under the principle that the law requires that one must be just before he is generous. The law will not permit one who is indebted at the time to give his property away, provided such gift proves prejudicial to the interest of existing creditors. The motive which prompts the donor to make the gift is wholly immaterial. *If the donor is indebted at the time, and the event proves that it is necessary to resort to the property attempted to be conveyed away by a voluntary deed for the purpose of paying such indebtedness, the voluntary conveyance will be set aside*, and the property subjected to the payment of such indebtedness, upon the ground that it would otherwise operate as a legal fraud upon the rights of creditors, even though it might be perfectly clear that the transaction was free from any trace of moral fraud.

*Id.* at 240 (emphasis added) (internal quotation marks omitted).

Accordingly, using a constructive fraud theory, a creditor may challenge the transfer under some circumstances when the transfer is not made in exchange for valuable consideration and setting the transfer aside is necessary to allow repayment of debt that existed before the challenged transfer ("pre-transfer debt"). *In re J.R. Deans Co.*, 249 B.R. at 130. To do so, a creditor must prove the following elements:

> (1) the grantor *was indebted to him at the time of the transfer*; (2) the conveyance was voluntary; and (3) the grantor failed to retain sufficient property *to pay the indebtedness* to the plaintiff in full—not merely at the time of the transfer, but in the final analysis when the creditor seeks to collect his debt.

*Mathis v. Burton*, 460 S.E.2d 406, 408 (S.C. Ct. App. 1995) (internal quotation marks omitted) (emphasis added). In this context, a voluntary conveyance is "a conveyance made upon a mere nominal consideration or without consideration." *Bakst v. Probst* (*In re Amelung*), 436 B.R. 806, 810 (Bankr. D.S.C. 2010) (internal quotation marks omitted).[6]

In contrast to creditors for pre-transfer debts, creditors for debts incurred after a challenged transfer ("post-transfer debts") cannot avoid transfers under a constructive fraud theory. Rather, they must show the debtor made the transfer with actual intent to defraud his creditors. *See Mathis*, 460 S.E.2d at 409 ("Subsequent creditors must show 'actual moral fraud,' rather than legal fraud."). This is so because subsequent creditors are charged with notice of the prior transfer. *See, e.g., Hovis v. Ducate* (*In re Ducate*), 369 B.R. 251, 260–61 (Bankr. D.S.C. 2007) ("If a creditor is a subsequent one with notice, as such he can have no ground upon which he can say that a gift is a fraud upon him. In other words, it would be unjust to allow a subsequent creditor to avoid a transfer, even

---

[6] "A clear and convincing evidentiary standard governs fraudulent conveyance claims under the Statute of Elizabeth." *Oskin v. Johnson*, 735 S.E.2d 459, 463 (S.C. 2012).

one that is voluntary, as fraudulent if the creditor knew or should have known of the transfer before the debt was incurred." (cleaned up)); *Eigleberger v. Kibler*, 10 S.C. Eq. 113, 121 (S.C. Eq. 1833) (holding, regarding a creditor whose debt was incurred after the gratuitous transfer the creditor sought to void, "[i]f he is a creditor at all, he is a subsequent one with notice, and as such can have no ground upon which he can say . . . that the gift is a fraud as to him"). In the present case, the Trustee's claims are for constructive fraud only. [Doc. 26-3 at 58, 71–72.]

### THE BANKRUPTCY COURT'S RULING

Following a trial on the merits on November 15, 2023 [Doc. 26-3 at 146–284], the Bankruptcy Court issued the Order on January 18, 2024 [*id.* at 285–316]. The Bankruptcy Court found that the Second Lien Lenders—which had provided the loans that funded the 2012 and 2013 Dividends (the "Dividends" or the "Transfers")—were "triggering creditors," into whose shoes the Trustee could step to seek to avoid the Transfers. [*Id.* at 307–09.] Considering the constructive fraud elements, the Bankruptcy Court noted that the final element of the claim was satisfied because "it is uncontested that the Borrower Debtors were unable to pay their debts to the Second Lien Lenders." [*Id.* at 307.] However, the Bankruptcy Court held that the Transfers were not voluntary transfers, but were instead supported by valuable consideration. [*Id.* at 309–15.] In reaching that conclusion, the Bankruptcy Court, applying the "collapsing doctrine," determined that it was important to view the Transfers not in isolation, but in the context of all of the transactions as a whole. [*Id.* at 314–15.] Viewing the transactions in that manner, the Bankruptcy Court concluded:

> [A]ll parties involved received value: the Second Lien Lenders received fees and costs associated with the transactions and, for several years, received principal and interest payments on the resulting debt; *Ellett*, along with the other Borrower

16

> Debtors, *received funds to satisfy pre-existing debt and
> provide for payment of the dividends to shareholders*; and the
> Defendants—shareholders by virtue of employment with
> and/or investment in the Borrower Debtors—received the
> dividends at issue.  Therefore, the Court finds that Ellett
> received more than nominal consideration in the overall
> transaction and Plaintiff has failed to meet his burden of
> proving that the 2012 Dividend and 2013 Dividend payments
> were voluntary for purposes of the Statute of Elizabeth.

[*Id.* (emphasis added).]  The Bankruptcy Court therefore ordered that judgment be

entered in favor of Defendants.[7]  [*Id.* at 316.]

## DISCUSSION

The Trustee challenges the Order, claiming that the Bankruptcy Court erred in

concluding that the Transfers were supported by consideration.  [Doc. 31 at 16–34.]

Defendants disagree, arguing the Bankruptcy Court was correct in this finding and, even

if it was not, offering multiple reasons why the Order can be affirmed otherwise.  [Doc. 33

at 25–59.]  As will be explained, the Court will affirm the judgment and modify the Order

to rest on the basis that, at the Petition Date, there were no creditors that could void the

Transfers under a constructive fraud theory.

Although Defendants have not filed a cross-appeal, it is well settled that, when

reviewing judicial proceedings, "if the decision below is correct, it must be affirmed," even

if the lower court did not identify the reason that justifies affirmance.  *Helvering v. Gowran*,

302 U.S. 238, 245–46 (1937) (collecting cases)).  The Fourth Circuit has applied this

---

[7] The Bankruptcy Court also considered an argument by Defendants that if the Section
544(b) elements were satisfied, the Trustee's avoidance should still be barred because
the balancing of the equities favors Defendants.  [*Id.* at 315.]  Assuming that the argument
was not mooted by the Bankruptcy Court's conclusion that the elements were not
satisfied, the Bankruptcy Court concluded that the equities did not strongly favor either
side and did not warrant precluding the Trustee's claims.  [*Id.*]

principle in reviewing bankruptcy cases before it on appeal from a district court's decision. *See Anderson & Assocs., PA v. S. Textile Knitters De Hond. Sewing Inc. (In re S. Textile Knitters)*, 65 F. App'x 426, 436–37 (4th Cir. 2003); *Cnty. Fuel Co. v. Equitable Bank Corp.*, 832 F.2d 290, 294 (4th Cir. 1987); *see also Liebmann v. Goden*, 629 F. Supp. 3d 314, 322 (D. Md. 2022) (holding the district court may "affirm the bankruptcy court on any ground supported by the record" (internal quotation marks omitted)), *aff'd sub nom.*, *Rullan v. Goden*, No. 22-2099, 2023 WL 4787463 (4th Cir. July 27, 2023); *LeCann v. Cobham (In re Cobham)*, 551 B.R. 181, 189 (E.D.N.C.) (same), *aff'd*, 669 F. App'x 171 (4th Cir. 2016). Otherwise, "[i]t would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate." *SEC v. Chenery*, 318 U.S. 80, 88 (1993).

        In this case Defendants argue that the Court should affirm the judgment in their favor because the Trustee has not shown that there is any creditor that, on the Petition Date, could have voided the Transfers under a constructive fraud theory, such that the Trustee could step into that creditor's shoes. [Doc. 33 at 45–55]; *see, e.g., Vieira v. Think Tank Logistics, LLC (In re Levesque)*, 661 B.R. 731, 768 (Bankr. D.S.C. 2024) (holding that under the Statute of Elizabeth, "the Trustee must demonstrate that there is a creditor with a valid unsecured claim in the bankruptcy case who could assert a claim to avoid the transfer in whose shoes the Trustee now stands"). Defendants contend that the Second Lien Lenders, which were the only triggering creditors the Bankruptcy Court identified, could not have voided the transfers under the Statute of Elizabeth under a constructive fraud theory on the Petition Date. [Doc. 33 at 51–55.] Defendants argue that this is so

18

because South Carolina courts would not treat Ellett's debt to them as pre-transfer debt when the debt and the challenged transfers were substantially contemporaneous and, indeed, the debt arose when the creditors transferred the property to Ellett for the very purpose of funding the Dividends. [*Id.*] Defendants also argue that several equitable principles would preclude the Second Lien Lenders from seeking to void as a fraudulent conveyance a conveyance that it proposed, loaned money to fund, and profited from. [*Id.* at 55–58.]

In contrast, the Trustee contends that the Bankruptcy Court correctly identified the Second Lien Lenders as creditors whose shoes the Trustee could step into to avoid the Transfers under a theory of constructive fraud. [Doc. 36 at 28–30.] The Trustee argues that the applicable authorities interpreting the Statute of Elizabeth provide that creditors with pre-transfer debts may void the debts under a constructive fraud theory. [*Id.*] The Trustee contends that "[n]one of these authorities mention, much less require, the absence of knowledge of the impending fraudulent transfers." [*Id.* at 29.] The Trustee also argues that so long as the elements of constructive fraud are satisfied, equitable principles cannot prevent the Trustee from avoiding the Transfers. [*Id.* at 30–33.]

The Trustee alternatively contends that the Trade Creditors and the Town are triggering creditors. [*Id.* at 30.] In support of that position, the Trustee argues that "because multiple courts have found that so long as a triggering creditor was a creditor on both the date of the fraudulent transfers and the bankruptcy petition date, the Trustee has established standing under [Section] 544 of the Bankruptcy Code to avoid the transfers." [*Id.*] Defendants, on the other hand, argue that these creditors could not void the Transfers under a constructive fraud theory because Ellett's only *pre-transfer* debts

19

to them were paid off years before the Petition Date. [Doc. 33 at 45–50.]

The Court agrees with Defendants as to all of these creditors and therefore affirms the Bankruptcy Court's judgment in favor of Defendants on this basis.[8]  Because the Bankruptcy Court identified only the Second Lien Lenders as triggering creditors, the Court will begin by discussing them before moving on to the Trade Creditors and the Town.

**The Second Lien Lenders**

As noted, Section 544(b)(1) of the Bankruptcy Code provides that a bankruptcy trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor *that is voidable under applicable law by a creditor holding an unsecured claim* that is allowable under section 502 of this title."  11 U.S.C. § 544(b)(1).

Although Defendants discuss a number of different equitable principles, the Court focuses on the argument that the Second Lien Lenders would be estopped from voiding the Transfers because of their ratification of them and participation in them.[9]  On this

---

[8] Given this holding, the Court does not address Defendants' additional alternative arguments for affirmance.

[9] The Bankruptcy Court did not directly address this issue.  Having found that the Trustee could not prove the elements of constructive fraud, the Bankruptcy Court did address what it described as the Trustee's assertion that there was a "general equitable defense to the Statute of Elizabeth," and the Bankruptcy Court concluded,

> [T]he equities [do not] weigh strongly in favor of either side. The Second Lien Lenders, the Debtors, and the remaining Defendants were involved in for-profit business activities or investments.  In the end, some won and some lost in the transaction.  As in many bankruptcy cases, the supposed winners were sued to recover for the benefit of the supposed losers.  [The Trustee] steps into the shoes of triggering creditors pursuant to [Section] 544 for the benefit of all creditors.  Any inequities of such a situation are not clear to

issue, the Court finds instructive the case of *U.S. Bank National Association v. Verizon Communications, Inc. ("USBNA")*, 479 B.R. 405 (N.D. Tex. 2012), which reached this same result on nearly identical facts.  In that case, lenders (the "Lenders") made loans to the debtor for the express purpose of financing the debtor's acquisition of particular business from other companies (the "Sellers").  *Id.* at 410.  Under the terms of their agreement, the Lenders required that their loans to the debtor be used to purchase that business.  *Id.*  In the debtor's subsequent bankruptcy, the Trustee sought to avoid these transfers.  *Id.*  On the question of whether the Lenders could be triggering creditors, the Sellers argued that the Lenders were estopped from seeking to void the debtor's use of the funds for that purchase.  *Id.*

> The district court agreed, reasoning:

> > "A creditor who ratifies or participates in a fraudulent transfer may be estopped from attacking the transfer." *In re Dunn*, Nos. CC-05-1406-MoSnK, CC06-1046-MoSnK, 2006 WL 6810930, at *8 (9th Cir. BAP Oct. 31, 2006); see also *Lane v. Eggleston*, 284 F. 743, 745 (5th Cir. 1922) (stating that a creditor cannot "avoid [a transfer], after he has voluntarily assented to it").  In one case, the lender was "intimately involved" and had "voluntarily participated" in the alleged fraudulent transfer. *In re Refco, Inc. Securities Litigation*, No. 09-Civ-2885-GEL, 2009 WL 7242548, at *11 (S.D.N.Y. Nov. 13, 2009).  The court held that the lender "cannot be the triggering creditor, because it was a material participant in the alleged fraudulent transaction … [F]raudulent transfers [are] not voidable where the benefit would run to a creditor that ratified the transfer." *Id.* (internal citations and punctuation omitted).

> > Because of their participation in the alleged fraudulent transfers, [the Lenders] would have been barred from bringing

> > the Court from these facts and do not support preclusion of claims under [Section] 544 and the Statute of Elizabeth.

[Doc. 26-3 at 315.]  The Court therefore considers the estoppel issue de novo.

fraudulent transfer claims on the date [the debtor] filed its bankruptcy petition. As the defendants note, the [Lenders] "not only *knew* that their loans would be used to [purchase the business]; they not only *consented* that their loans be used to [purchase the business]; they *required* that their loans be used to [purchase the business]."

. . .

As a result, because [the Lenders] could not have brought fraudulent transfer claims at the time of [the debtor's] bankruptcy filing, [the Lenders] cannot be the plaintiff's Section 544(b) triggering creditor.

*Id.* at 411–12 (some alterations in original) (internal record citation omitted); *see also Whittaker v. Groves Venture, LLC (In re Bolon)*, 538 B.R. 391, 408 (Bankr. S.D. Ohio 2015) (similar); *Miller v. CSFB (In re Refco, Inc. Sec. Litig.)*, No. 07 MDL 1902 GEL, 2009 WL 7242548, at *11 (S.D.N.Y. Nov. 13, 2009) (similar), *Report and Recommendation adopted by* 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010); *see also Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 384–85 (S.D.N.Y. 2014), corrected (Jan. 16, 2014) (explaining that regardless of whether the defense is called "'ratification,' 'consent,' 'estoppel,' or 'material participa[tion] in the transaction' . . . the underlying point is the same," namely, "[c]reditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it" (first alteration in original)); *cf. Tuller v. Nantahala Park Co.*, 281 S.E.2d 474, 478 (S.C. 1981) ("Hilton Head Co., of course, cannot be heard in this or in any other action to say that the mortgage which it gave was a fraudulent conveyance.").

The Court concludes that the Second Lien Lenders are precluded from being triggering creditors under Section 544(b) in this case under exactly the same reasoning. Just as the lenders did in *USBNA*, the Second Lien Lenders knew that their loans would

be used in part to fund the Dividends; they consented to that use of the proceeds; and

their agreement required that the funds be used for that purpose.[10]  *See USBNA*, 479

B.R. at 411–12; *In re Bolon*, 538 B.R. at 408; *In re Refco, Inc. Sec. Litig.*, 2009 WL

7242548 at *11.  That the Second Lien Lenders benefited financially from the loans [Doc.

26-3 at 292 ¶ 24, 296 ¶ 40] provides a further basis for estopping them from attempting

to void the Transfers.[11]  *Cf. Edwards v. Edwards*, 176 S.E.2d 123, 125 (S.C. 1970) (when

a provision of a divorce decree directing a husband to transfer certain property to his wife

was issued at the husband's insistence in return for other consideration in his favor,

holding that the husband was estopped to assert that the court directing the transfer was

without jurisdiction to order him to convey realty, stating, "While such a void judgment as

a general rule neither binds nor bars any one, yet a party who procures such a judgment

to be entered in his favor may not in good conscience be heard to impeach it. * * * Even

where one who did not procure it accepts the benefits of a void judgment, he is estopped

to assert its invalidity." (internal quotation marks omitted)).  The Court therefore concludes

that the Second Lien Lenders cannot be triggering creditors under Section 544(b).

---

[10] As noted, the Second Lien Loan Agreement specified that the loan proceeds would be available to Debtors "solely" to pay a dividend to Debtors' shareholders in an amount up to $134,500,000 and to repay a portion of the outstanding second lien debt owed by SportCo (for which Ellett and its subsidiaries were also liable) to Wellspring in the amount of $34,791,000.  [Doc. 26-3 at 292 ¶ 23.]

[11] The Trustee discounts the significance of the Second Lien Lenders' notice of—and role in causing—the Transfers, arguing that South Carolina courts have repeatedly found "the purpose, reasoning or knowledge behind a fraudulent transfer does not matter" concerning creditors with pre-transfer debt.  [Doc. 36 at 29 (citing *In re Ducate*, 369 B.R. at 258).]  But in the cases the Trustee refers to, it is *the debtor's* mental state that the South Carolina courts have stated does not matter.  *See, e.g.*, *In re Ducate*, 369 B.R. at 258.  The Trustee has not cited, and the Court is not aware of, any South Carolina case holding that a creditor whose debt arose from the creditor's facilitation of the challenged transfer would be allowed to void the transfer as a fraudulent conveyance.

**The Trade Creditors and the Town**

The Trustee maintains that, even if the Second Lien Lenders cannot void the Transfers under a constructive fraud theory, the Trade Creditors and the Town can. [Doc. 36 at 30.] It is stipulated, however, that the only debts Debtors had incurred to the Trade Creditors and the Town before the Transfers were fully repaid well before the Petition Date. [Doc. 26-3 at 302–04 ¶¶ 67–72, 74.] Although Ellett, after the Transfers, incurred new debts to these same creditors [Doc. 26-3 at 304–05 ¶¶ 74–81], as noted, proof of actual intent to defraud is required to void transfers based on post-transfer debts, *see In re Ducate*, 369 B.R. at 260–61; *Eigleberger*, 10 S.C. Eq. at 121, and the Trustee's claims in this case are only for constructive fraud [Doc. 26-3 at 58, 71–72].

The Trustee argues that "multiple courts have found that so long as a triggering creditor was a creditor on both the date of the fraudulent transfers and the bankruptcy petition date, the Trustee has established standing under [Section] 544 of the Bankruptcy Code to avoid the transfers." [Doc. 36 at 30.] The holdings the Trustee refers to concern satisfying the requirements of Section 544(b)(1), which provides that a bankruptcy trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor *that is voidable under applicable law by a creditor holding an unsecured claim* that is allowable under section 502 of this title." 11 U.S.C. § 544(b)(1) (emphasis added). These cases hold that the debt that allows a creditor to avoid the challenged transfer "under applicable law" need not be the same debt as the debt that is the basis for the "unsecured claim" for the Trustee to have standing; rather, the language of Section 544(b)(1) merely requires that the creditor be the same. *See, e.g., Katchadurian v. NGP Energy Cap. Mgmt., LLC (In re Northstar Offshore Grp., LLC)*, 616 B.R. 695, 723 (Bankr.

S.D. Tex. 2020); *Silverman v. Sound Around, Inc. (In re Allou Distribs., Inc.)*, 392 B.R. 24, 32–34 (Bankr. E.D.N.Y. 2008).  For purposes of this decision, the Court assumes that these cases are correct and thus, *so long as the Statute of Elizabeth allowed particular creditors to void the Transfers under a constructive fraud theory on the Petition Date*, the fact that the debts allowing them to void the Transfers are different from the debts comprising their current unsecured claim will not prevent the Trustee from possessing standing under Section 544(b)(1).

The Court therefore turns to the critical question of whether the Trade Creditors and the Town lost their ability to void the Transfers under the Statute of Elizabeth under a constructive fraud theory years prior to the Petition Dates when their only pre-transfer debts were repaid.  The Court concludes that they did.

The Trustee argued before the Bankruptcy Court that even though voiding transfers based on *post*-transfer debt requires proof of actual fraud generally, the Statute of Elizabeth makes an exception if the creditor is one to whom the debtor also owed a *pre*-transfer debt and that is especially true when the credit relationship is an ongoing one. [Doc. 26-3 at 76–77.]  The Court sees no reason why South Carolina law would provide for such an exception, however.  As explained, South Carolina law treats pre-transfer debt and post-transfer debt differently because when a debt is incurred after a transfer, the creditor is charged with notice of the prior transfer, whereas a creditor concerning a pre-transfer debt is generally not charged with notice.  *See, e.g., In re Ducate*, 369 B.R. at 260–61; *Eigleberger*, 10 S.C. Eq. at 121.  Because the Trade Creditors' and the Town's only pre-transfer debts were repaid prior to the Petition Date, they no longer had the ability to void the Transfers on the basis of those debts on the

Petition Date. *Cf. Brock v. Bowman*, 9 S.C. Eq. 185, 188 (S.C. Eq. 1832) ("[A] gift cannot prevail against *existing* debts." (emphasis added)); *McElwee v. Sutton*, 18 S.C.L. 128, 130–31 (S.C. App. L. & Eq. 1831) ("[I]f the donor at the time of the gift is indebted, but subsequently pays his debts, and is entirely free from debt, then such antecedent indebtedness cannot vitiate the gift."). As for the new debts that Ellett *incurred years after* the Transfers, the Trade Creditors and the Town are charged with notice of the Transfers and thus must show actual fraud in order to void them. *See In re Ducate*, 369 B.R. at 260–61; *Eigleberger*, 10 S.C. Eq. at 121. That Ellett owed a different debt to the same creditors at the time of the Transfers does not somehow negate the reason for charging post-transfer creditors with notice of transfer as concerns the post-transfer debt, whether or not the parties' credit relationship has continued from the time of the original indebtedness. Accordingly, even a creditor to whom Ellett also once owed a pre-transfer debt must prove actual fraud in order to void the transfer based on new, post-transfer debt. *Cf. Mathis*, 460 S.E.2d at 408 (holding that even if the debtor patient incurred some of her debt to the creditor hospital before the challenged transfer, because the debtor "incurred the overwhelming portion of her debt subsequent to the challenged transfer, the trial judge erred by" treating the creditor as an existing creditor rather than a subsequent creditor). For this reason, the Trustee could not avoid the Transfers under a constructive fraud theory by stepping into the shoes of either the Trade Creditors or the Town.

Because none of the creditors the Trustee has identified could have voided the Transfers under the Statute of Elizabeth based on a constructive fraud theory on the Petition Date, the Court concludes that the Trustee lacks standing under Section 544(b) to challenge the Transfers and the Court therefore affirms the judgment in favor of

Defendants for this alternative reason.[12]

---

[12] Assuming arguendo that the Trustee had shown the existence of a triggering creditor, the Court would conclude that the Bankruptcy Court erred in ruling that the collapsing doctrine demonstrates the Transfers were supported by valuable consideration. The Bankruptcy Court concluded that viewing the Transfers as one component of the larger transaction reveals that the net effect to Ellett was that it "received funds to satisfy pre-existing debt and provide for payment of the dividends to shareholders" and these funds served as the consideration supporting the Transfers. [Doc. 26-3 at 315.] Although there are some examples of the collapsing doctrine being used successfully by defendants, *see* Michael J. Heyman, *The Step-Transaction Defense: Collapsing Multi-Step Transactions to Defend Against Fraudulent Conveyance* Allegations, 30 Cal. Bankr. J. 1, at 8–13 (2009) (collecting cases), the Court does not agree that the doctrine assists Defendants in this case.

First, the extinguishing of nearly $35 million of Ellett's pre-existing debt was not valuable consideration Ellett received *in exchange for paying the Dividends*. The extinguishment of this pre-existing debt was in exchange for a transfer separate from the payment of the 2012 Dividend, and the Trustee has not sought to avoid that separate transfer. There is no basis by which the Bankruptcy Court could simply lump this transfer that actually was supported by consideration with the other transfers that were not supported by consideration and conclude that the economic reality is that all of the transfers together were supported by consideration. Rather, the economic reality is that Ellett paid approximately $190 million in dividends and received nothing in return. The fact that it was a single loan that funded both the 2012 Dividend and repayment of the $35 million in pre-existing debt did not change the net effect to Ellett or, more importantly, to its creditors. Instead, when all of the transactions are taken into consideration, it is apparent that the net effect was that Ellett massively increased its indebtedness and netted nothing in exchange. *See United States v. Tabor Ct. Realty Corp.*, 803 F.2d 1288, 1300–01 (3d Cir. 1986) (affirming the district court's ruling "that the *aggregate* transaction was fraudulent, notwithstanding the fact that a portion of the loan proceeds was allegedly used to pay existing creditors").

Second, Ellett's momentary possession of the loan proceeds that Ellett used to pay the Dividends was also of no benefit to Ellett—or its creditors—because Ellett merely gave those proceeds away in the form of the Dividends and received nothing in return. Indeed, that the economic reality that the debtor and its creditors *do not* receive any real benefit for serving as a pass-through for assets in these types of scenarios is the whole reason for applying the collapsing doctrine in the paradigmatic case. *See, e.g. HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) ("The paradigmatic scheme" of a collapsed transaction occurs where "one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then *gratuitously* transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing."); *Tabor Ct. Realty Corp.*, 803 F.2d at 1302. In the

## CONCLUSION

In sum, for the reasons discussed, the judgment of the Bankruptcy Court is AFFIRMED and the Order of the Bankruptcy Court dated January 18, 2024, is MODIFIED to reflect that the basis for judgment in Defendants' favor is that the Trustee failed to show that there is any creditor that could have voided the challenged transfers under a constructive fraud theory, such that the Trustee could step into that creditor's shoes.

IT IS SO ORDERED.

s/ Jacquelyn D. Austin
United States District Judge

September 23, 2025
Columbia, South Carolina

---

present case, unlike in the paradigmatic case, the issue of whether Ellett received consideration for the Transfers looks very much the same whether the Transfers are viewed in isolation or in the context of the amalgamated transactions. From either view, Ellett received nothing in exchange for paying the Dividends and Ellet's creditors were much worse off.