**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| LUCKY BUCKS, LLC *et al.*, | ) | |
| | ) | Case No. 23-10758 (KBO) |
| Debtors. | ) | |
| | ) | |
| | ) | |
| LB NEWHOLDCO, LLC and | ) | |
| LUCKY BUCKS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. Proc. No. 25-50965 (KBO) |
| | ) | |
| v. | ) | **Related to Adv. D.I. 11, 14, 16, 19** |
| | ) | |
| TRIVE CAPITAL MANAGEMENT LLC, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER REGARDING**
**DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**

Upon consideration of *Trive Defendants' Motion to Dismiss Plaintiffs' Complaint*,[1] *Defendant Shafik Kassam's Motion to Dismiss the Complaint and Joinder in Co-Defendants' Motion to Dismiss*,[2] *Management Defendants' Motion to Dismiss Complaint*,[3] and *Defendant Anil Damani, Lucky Bucks Ventures, Inc., and LBV27 LLC's Motion to Dismiss Plaintiff's Complaint*[4] (collectively, the "Motions"), the Court hereby finds and concludes the following:

## I.   FACTS ALLEGED IN THE COMPLAINT

Plaintiffs LB NewHoldCo, LLC ("NewHoldCo") and its subsidiary, Lucky Bucks LLC ("Lucky Bucks") (together, the "Plaintiffs") are the successors in interest to debtors Lucky Bucks and its parent Lucky Bucks HoldCo, LLC ("HoldCo") (together with Lucky Bucks, the "Company" or the "OpCo Debtors"). Plaintiffs allege that Lucky Bucks' founder Anil Damani ("Damani") launched a scheme to loot the Company with the help of its Chief Operating Officer Shafik Kassam ("Kassam") after Damani was banned by the Georgia Lottery Commission

---

[1] Adv. D.I. 11.

[2] Adv. D.I. 14.

[3] Adv. D.I. 16.

[4] Adv. D.I. 19.

("GLC") from managing or operating the Company.  The scheme got underway in 2019, when the duo allegedly began stealing assets and diverting contracts to entities secretly controlled by Damani and then arranging for Lucky Bucks to repurchase them at grossly inflated prices.[5]  The value of each repurchased contract was based on artificially inflated monthly revenue generated at the location to which each contract was tied.  This scheme caused the Company to overpay for the contracts and overstate the contracts' value on its financials.[6]

In 2020, defendant Trive[7] took control of the Company when it acquired a majority stake in HoldCo and secured the right to appoint two of the three HoldCo board members.[8]  Rather than curtailing Damani's looting, however, Trive worked with Damani and his allies to siphon money from the Company on an even greater scale.[9]  In the first phase of this scheme, Defendants[10] used the Company's artificially inflated financials to convince prospective lenders to provide new debt, even though the Company was already insolvent due to the ongoing looting, and then used that new debt to fund a $203.6 million distribution to themselves (the "OpCo Distribution").[11]  In the second phase of the scheme, Defendants created a new parent entity ("Holdings") to take on even more debt for the purpose of funding an additional $240 million in distributions (the "Holdings Distributions") just months after the OpCo Distribution.[12]  The burdens of the new debt, combined with the ongoing fraud, drove the company into bankruptcy.

## II.    RELEVANT PROCEDURAL HISTORY

In June 2023, Lucky Bucks, HoldCo, and Holdings filed for chapter 11 protection.  Following confirmation of the OpCo Debtors' plan of reorganization (the "Opco Plan"),[13] Plaintiffs commenced this adversary proceeding to challenge the OpCo Distribution, asserting claims for, among other things, fraudulent transfer, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.  Defendants seek dismissal of the Complaint.  The parties completed briefing, and the Court held oral argument.  This matter is ripe for adjudication.

---

[5] Adv. D.I. 2 ¶ 3 (the "Compl.").

[6] *Id.*

[7] Defendants Trive Capital Management LLC, Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, TCFIII Luck Holdings LLC, Southern Star Gaming LLC, Quantum Gaming Corp, and Shravan Thadani are referred to herein as "Trive".

[8] Compl. ¶¶ 64-68.  Trive appointed Manu Sekhri ("Sekhri") (then CEO of Lucky Bucks and equity owner) and James Boyden ("Boyden") (then EVP of Business Development of Lucky Bucks) to the board.  The third board member, appointed by Damani, was Kassam.

[9] *Id.* ¶ 4.

[10] The term "Defendants" refers to all defendants named in the Complaint.

[11] *Id.* ¶¶ 5-6.

[12] *Id.* ¶ 8.  The Holdings Distribution is the subject of a separate proceeding maintained in Holdings' later converted chapter 7 bankruptcy proceeding.  *See* Case No. 23-10756 & Adv. Proc. No. 24-50130.

[13] Bankr. D.I. 187 (Opco Plan); Bankr. D.I. 214 (Confirmation Order).

## III.   JURISDICTION AND VENUE

The Court has subject-matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157, and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware.  Venue is proper pursuant to 28 U.S.C. § 1409(a).

## IV.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6), made applicable here by Federal Rule of Bankruptcy Procedure 7012(b), provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted."[14]  When reviewing a motion to dismiss, the "Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[15]  The Court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"[16]

## V.   DISCUSSION

### A.   Plan Release (All Counts)

Defendants first argue that Plaintiffs' claims are barred by the plain language of the release given to them, each as a "Released Party",[17] by the OpCo Debtors in the OpCo Plan.  Plaintiffs do not dispute that each Defendant is a Related Party that received a release from the OpCo Debtors in the OpCo Plan.  They argue, however, that the claims they now assert are preserved by a specific carveout contained in the release.

---

[14] FED. R. CIV. PROC. 12(b)(6).

[15] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[16] *Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 556 U.S. at 679).

[17] "Released Party" is defined, in pertinent part, by the OpCo Plan as "each of: (a) the OpCo Debtors and their Estates; (b) the officers of each of the OpCo Debtors, the members of any board of managers of each OpCo Debtor, the managing members (or comparable governing bodies or Persons) of each OpCo Debtor, and employees of each OpCo Debtor; (c) the OpCo DIP Lenders and the OpCo DIP Agent; (d) the Consenting Prepetition Lenders; (e) the Prepetition OpCo First Lien Lenders; (f) the Prepetition OpCo First Lien Agent; (g) the Sponsors; (h) the Consultants; (i) all holders of Claims or Interests that (A) vote to accept the OpCo Plan; (B) vote to reject the OpCo Plan and do not elect to opt out of the releases contained in Article VIII of the OpCo Plan; or (C) are Unimpaired and do not timely File an objection to the releases contained in Article VIII of the OpCo Plan that is not resolved before Confirmation; . . . ; (k) the Committee and its members, if any, each in its capacity as such; and (l) each Related Party of each Person in clauses (a) through clause (k), in each case, solely in its capacity as such . . . ."  OpCo Plan, Art. 1 § A at 15-16.

3

A confirmed plan of reorganization must be interpreted in accordance with applicable contract law.[18]  New York law applies to the OpCo Plan.[19]  "It is axiomatic under New York law . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties."[20]  "[S]pecific clauses of a contract are to be read consistently with the overall manifest purpose of the parties' agreement.  Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms."[21]  "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."[22]  "Nevertheless, a contract should not be construed 'disregarding common sense in favor of formalistic literalism' that defies logic."[23]  "The Court should construe the contract 'in a manner that accords the words their fair and reasonable meaning and achieves a practical interpretation of the expressions of the parties.  Put otherwise, a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.'"[24]

Article VIII.A.2 of the OpCo Plan memorializes the release at issue (the "Release").  It states in pertinent part that:

> [E]ach Released Party is . . . released by each of the Opco Debtors . . . from any and all Claims and Causes of Action . . . *other than Claims and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, in each case, solely to the extent determined by a Final Order of a court of competent jurisdiction*.[25]

The emphasized language is the carveout (the "Carveout") upon which the Plaintiffs rely.

---

[18] *In re Shenango Grp. Inc.*, 501 F.3d 338, 344 (3d Cir. 2007) ("In construing a confirmed plan of reorganization, we apply contract principles.").

[19] OpCo Plan, Art. I § D at 21.

[20] *Attestor Cap. LLP v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*, 2019 WL 3852445, at *26 (S.D.N.Y. Aug. 16, 2019) (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (internal quotation marks omitted).

[21] *In re AMR Corp.*, 562 B.R. 20, 29 (Bankr. S.D.N.Y. 2016) (quoting *Consedine v. Portville Cent. Sch. Dist.*, 12 N.Y.3d 286, 293 (N.Y. 2009)).

[22] *In re Allegiance Telecom, Inc.*, 356 B.R. 93, 99 (Bankr. S.D.N.Y. 2006) (*quoting Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876 (N.Y. 2004)).

[23] *Solus Alt. Asset Mgmt., LP v. Delphi Auto. PLC (In re DPH Holdings Corp.)*, 553 B.R. 20, 27 (Bankr. S.D.N.Y. 2016) (quoting *Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137, 143-44 (N.Y. App. Div. 1st Dep't 2008) (internal quotations and citations omitted)).

[24] *Id.* (quoting *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (N.Y. App. Div. 1st Dep't 2010) (internal quotations and citations omitted)).

[25] OpCo Plan, Art. VIII § A.2 at 56-57 (emphasis added).

The Release broadly releases the Defendants from "Claims" and "Causes of Action". The term "Claim" does not capture Plaintiffs' claims in this proceeding because that term is narrowly defined as "any claim . . . against an OpCo Debtor, to the extent not paid during the course of the Chapter 11 Cases."[26] However, the term "Causes of Action" is more expansive and does includes Plaintiffs' claims:

> any and all Claims, interests, damages, remedies, demands, rights, actions, suits, claims, cross-claims, counterclaims, third-party claims, obligations, liabilities, defenses, offsets, powers, privileges, licenses, indemnities, guaranties, franchises, debts, liens, losses, costs (including attorneys' fees and costs of defense and investigation), expenses, controversies, assessments, penalties, fines, charges, promises, commitments, appeals, omissions, contingencies, sums of money, judgments, executions and causes of action of any kind, nature or character whatsoever (whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly, indirectly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise). Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and Claims under contracts or for breaches of duties imposed by applicable law; (b) the right to object to or otherwise contest Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Claim under any state, federal or foreign law, including any fraudulent transfer or similar Claim or claim.[27]

The Carveout preserves only "Claims and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence[.]"[28] It does not preserve any "Causes of Action". Therefore, Defendants argue that the Plaintiffs claims are barred by the plain language of the Release. They also argue that the Carveout requires a non-debtor party to obtain a final order against the Released Parties on account of claims premised on actual fraud, willful misconduct, or gross negligence before Plaintiffs may pursue their claims against the Released Parties.

The Court will first address the Defendants' second argument. The Court does not interpret the Carveout to require as a condition precedent to this action a prior judicial determination obtained by a non-debtor third party. The plain language does not provide for it, and the Court is not clear how Defendants' suggested approach could be implemented by a third party. The Release

---

[26] *Id.*, Art. I § A at 4.

[27] *Id.*

[28] *Id.*, Art. VIII § A.2 at 57.

applies to Claims and Causes of Action belonging to the OpCo Debtors and their estates. To the extent that any were preserved following the effective date of the OpCo Plan, they were vested with the reorganized OpCo Debtors, which were given the right to commence and prosecute them.[29]

The Court now turns to the Defendants' first argument, which is not as simple. The Court agrees that the Carveout, as written, does not include Plaintiffs' claims. In an attempt to expand the scope of the Carveout, Plaintiffs argue that Defendants' reading of the Carveout fails to assign any meaning to the phrase "and liabilities" that follows the term "Claims", effectively arguing that "and liabilities" means "Causes of Action". This is not a reasonable interpretation. The Carveout's use of the phrase "liabilities resulting therefrom" plainly refers to obligations that arise from preserved Claims. Furthermore, the OpCo Debtors knew how to use the term "Causes of Action" (having used it in the beginning of the Release to grant the Released Parties a broad release) and did not use it for the Carveout.

Plaintiffs also argue that, under the Defendants' interpretation of the Carveout, only claims for actual fraud, willful misconduct, or gross negligence asserted by an OpCo Debtor against the other would be preserved, which would produce an absurd result and fly in the face of the parties' intent. This is persuasive for several reasons.

First, Article III of the Plan specifically sets forth the treatment of "Claims" asserted by one OpCo Debtor against another in Section B.6 titled "Class 6B – OpCo Intercompany Claims".[30] Section B.6 provides that these claims, if allowed "shall be adjusted, continued, settled, Reinstated, discharged, or eliminated in a tax-efficient manner (to the extent reasonably practicable) as determined by the OpCo Debtors, with the consent of the Required Consenting Lenders (in consultation with the Consenting RC Ad Hoc Group Lenders)[.]"[31] This treatment is contradictory to, and would be rendered superfluous by, the Defendants' argument that all Claims held by one OpCo Debtor against another were Released except for those subjected to the Carveout.

Second, during a status conference following the confirmation hearing to discuss disputed language of the proposed confirmation order related to claims of Holdco, counsel for the ad hoc group of holders of prepetition first lien credit facility claims indicated that the Carveout applied to claims against the Defendants and no party in attendance, including counsel for Trive and the OpCo Debtors corrected the record:

> The language in question, with respect to 'notwithstanding herein and to the contrary' has caused some concern for Trive, which is one of the sponsors, if you recall, of the company, the primary equity holder. And their concern is that somehow the inclusion of that language creates an ambiguity as to the scope of the releases that are

---

[29] *Id.*, Art. IV § A.7 at 35.

[30] "OpCo Intercompany Claim" is defined by the OpCo Plan as "any Claim against an OpCo Debtor held by another Debtor." *Id.*, Art. I § A at 11. The term "Debtors" "means Lucky Bucks, Holdco, and Holdings." *Id.* at 6.

[31] *Id.*, Art. III § B.6 at 30.

being provided by the OpCo debtors' estates and the other releasing parties under the OpCo debtors' plan, against the released parties, i.e., Trive.  We have no issue removing that language because we do for the [sic] believe there is an ambiguity as to the scope of the releases.  ***They are receiving the releases under the plan – "they" being the released parties, including Trive – except for the carve-out for the – the bad boys, the gross negligence, the willful misconduct, and the like.***  So, we believe this whole sentence is for our benefit and we're okay removing that language in question.[32]

In sum, neither side has offered an interpretation of the Carveout that can be applied without either rewriting it and potentially upsetting the reasonable expectations of the parties or interpreting it in manner so narrow that it is potentially absurd and also violative of the reasonable expectations of the parties.  The record should be developed on the intended and understood scope of the Carveout so that future arguments may be made regarding its effect on Plaintiffs' claims.[33]  The Court will therefore deny the Motions on the basis that the Plaintiffs' claims have been released.

## B.    Fraudulent Transfer Claims (Counts I – III)

The first three counts of the Complaint assert claims to avoid and recover the OpCo Distribution as an actual fraudulent transfer pursuant to sections 544, 548, and 550 of the Bankruptcy Code (the "Code") and Delaware and Georgia law.[34]  Defendants move to dismiss these claims on two independent grounds:  ratification and failure to state a claim.

### 1.    Ratification

Defendants argue that Plaintiffs' fraudulent transfer claims fail because the OpCo Distribution was ratified by the OpCo Debtors' lenders, who expressly authorized the OpCo

---

[32] Bankr. D.I. 216 (Jul. 27, 2023 Hr'g Tr. at 5:19-6:10 (emphasis added)).

[33] A more plausible explanation of the problem presented is that the Carveout meant to carveout little-"c" claims and not big-"C" Claims from the Release.  A review of the Plan and Confirmation Order indicate additional possible errors were made in the usage of the defined term "Claims" when "claims" may have been intended.  For instance, the Plan's exculpation provision provides that "no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claims and Causes of Action related to any act or omission occurring between the Petition Date and the OpCo Plan Effective Date in connection with, relating to, or arising out of, the OpCo Debtors Chapter 11 Cases . . . ***except for <u>Claims</u> and liabilities resulting therefrom related to any act or omission that is determined . . . to have constituted actual fraud, willful misconduct, or gross negligence by an Exculpated Party.***"  *See* OpCo Plan, Art. VII § A.4 at 58 (emphasis added).  Applying Defendants' Carveout arguments to this provision would nullify the customary exculpation carve-out for actual fraud, willful misconduct, or gross negligence of all exculpated parties, which is required for the Court to approve exculpation for estate fiduciaries.

[34] 11 U.S.C. §§ 548(a)(1)(A), 544 & 550; 6 DEL. C. § 1304(a)(1); O.C.G.A. § 18-2-74(a)(1).

Debtors to use the loan proceeds to fund the OpCo Distributions.[35]  This authorization, in Defendants' view, estops Plaintiffs – who are standing in the lenders' shoes and suing for their exclusive benefit – from seeking to recover the OpCo Distribution as fraudulent.  In support of their argument, Defendants cite several cases for the proposition that creditors who authorize or sanction a transaction cannot later claim to have been defrauded by it.[36]

Plaintiffs respond that the lenders could not have ratified the OpCo Distribution because they did not know of all material facts when they agreed to the loan.  Specifically, Plaintiffs argue that the Complaint details how Defendants systematically misrepresented Lucky Bucks' true financial condition when negotiating with the lenders and how they concealed ongoing regulatory violations stemming from Damani's continued involvement with the Company's operations.  In support of their position, Plaintiffs rely on cases establishing that ratification cannot be applied to estop creditors from avoiding a transfer if the creditors did not have complete and accurate information about material facts when consenting to the transfer.[37]

Having considered all allegations set forth in the Complaint, the Court concludes that ruling on this issue requires further factual development.  "Ratification 'is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding.'"[38]  While Defendants attempt to limit the ratification analysis to the question of whether the lenders affirmed the use of the proceeds, the Court is persuaded by the cases cited by the Plaintiffs that require an examination of the totality of the facts and circumstances known by the creditors alleged to have ratified a transaction.  Plaintiffs have alleged facts that put into question the lenders'

---

[35] Adv. D.I. 13 (Firsenbaum Declaration), Ex. A (Credit Agreement) ¶ 11 (providing that Lucky Bucks "will" use the loan proceeds to "finance the Closing Distribution").

[36] *See, e.g.*, *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 383-84 (Bankr. S.D.N.Y. 2014) ("Creditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it."); *United States Bank Nat'l Ass'n v. Verizon Communs., Inc.*, 479 B.R. 405, 411-12 (N.D. Tex. 2012) ("[B]ecause Idearc's banks and bondholders could not have brought fraudulent transfer claims at the time of the Idearc bankruptcy filing, they cannot be the plaintiff's Section 544(b) triggering creditor."); *In re Refco, Inc. Sec. Litig.,* No. 07 MDL 1902 GEL, 2009 WL 7242548, at *10 (S.D.N.Y. Nov. 13, 2009), *report and recommendation adopted sub nom. In re Refco Sec. Litig.*, No. 07 MDL 1902 JSR, 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010) ("The Credit Agreement provides that the funds from Refco could be used only for the purchase of PlusFunds shares, and could only be disbursed with the permission of Refco. Refco was thus intimately involved with and voluntarily participated in what the Plaintiff readily asserts was a fraudulent transaction.").

[37] *See, e.g.*, *PAH Litigation Trust v. Water St. Healthcare Partners, L.P. (In re Physiotherapy Holdings, Inc.)*, No. 13-12965 (KG), 2016 WL 3611831, at *12 (Bankr. D. Del. June 20, 2016) (denying motion to dismiss on ratification defense as requiring resolution of factual issues); *Holliday v. K Road Power Mgmt, LLC (In re Boston Generating LLC)*, 617 B.R. 442, 495 (Bankr. S.D.N.Y. 2020) (adopting reasoning of *Physiotherapy* and finding that lenders could not be deemed to have ratified transfers when the information they were given included material misstatements and omissions); *Kirschner v. J.P. Morgan Chase Bank, N.A. (In re Millennium Lab Holdings II, LLC)*, No. 17-51840 (LSS), 2025 WL 794311, at *6-7 (Bankr. D. Del. Mar. 12, 2025) (denying summary judgment on fraudulent transfer claim notwithstanding dividend to shareholders was disclosed because debtor did not disclose material facts).

[38] *Physiotherapy*, No. 13-12965 (KG), 2016 WL 3611831, at *12 (quoting 57 N.Y.JUR.2D ESTOPPEL, *Ratification and Waiver* § 87 (2007)).

8

knowledge of material facts regarding the entire transaction.  For that reason, the Motions on the ratification defense are denied.

### 2.     Failure To State A Claim

Defendants next argue that the fraudulent transfer claims fail because Plaintiffs have not sufficiently alleged that the OpCo Distribution was made with "actual intent to hinder, delay, or defraud."[39]   Plaintiffs may establish the necessary intent through direct evidence or through circumstantial evidence.[40]  "Because debtors rarely admit fraudulent intent, courts must usually infer it" through circumstantial evidence.  To demonstrate fraudulent intent in the absence of direct evidence, claimants typically rely on "'badges of fraud,' *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."[41]  Generally, pleading a single badge of fraud is insufficient to state a viable claim for relief; rather, a "confluence of several in one transaction" is required.[42]

Plaintiffs have alleged five badges of fraud with respect to the OpCo Distribution:  that it involved transfers to insiders, for no consideration, after incurring substantial debt, while Lucky Bucks was insolvent, and involved a substantial portion of Lucky Bucks' assets.  For the first three badges, Defendants do not dispute that they have been sufficiently alleged but instead argue that the Court should ignore them because they are present in every case involving transactions of this type.  The Court does believe that it is appropriate to ignore these elements at this stage even if they are commonplace.  It will decide how much weight to give them once the record is developed.

As for the last two badges – transfers while insolvent, involving a substantial portion of the debtor's assets – Defendants argue that these badges have not been sufficiently pled.  Plaintiffs describe in the Complaint how the alleged looting and resale scheme occurring at the time of the OpCo Distribution led to significant revenue losses for the OpCo Debtors, and that the OpCo Debtors' balance sheet during this time reflected a negative $45 million deficit.[43]  Because of the

---

[39] 11 U.S.C. § 548(a)(1)(A); 6 DEL. C. § 1304(a)(1); O.C.G.A. § 18-2-74(a)(1).

[40] *See, e.g.*, *Friedman v. Wellspring Cap. Mgmt., LLC (In re SportCo Holdings, Inc.)*, Nos. 19-11299, 20-50554 (JKS), 2021 WL 4823513, at *14 (Bankr. D. Del. Oct. 14, 2021) ("For an actual fraudulent transfer claim to survive a motion to dismiss, the plaintiff must allege facts that, taken as true, establish direct or circumstantial evidence of intent to defraud."); *MSKP Oak Grove, LLC v. Venuto*, 839 Fed. Appx. 708, 712 (3d Cir. 2020) ("Because debtors rarely admit fraudulent intent, courts must usually infer it.").

[41] *Kirschner v. Large S'holders (In re Tribune Co. Fraudulent Conveyance Litig.)*, 10 F.4th 147, 160 (2d Cir. 2021).

[42] *In re Zohar III Corp.*, 631 B.R. 133, 174 (Bankr. D. Del. 2021).

[43] *See, e.g.,* Compl. ¶¶ 53-58 (describing Company's purchase of contracts at inflated prices and Company's artificially inflated projected revenues); ¶ 59 (discussing significant underperformance of purchased contracts and quoting Ijaz as stating, in connection with quarterly financial reporting, that "it will be a big disaster when they realize that we over paid by 63%); ¶ 75 (discussing reactions to lenders' request for revenue build including statement by Ijaz that "they cannot go down this path," and instruction from Sekhri to "hide behind the availability of the portal data."); ¶ 85 (stating that "[e]ven without giving effect to the OpCo Distribution, Lucky Bucks' June 30, 2021 balance sheet showed approximately $248.2 million of assets and approximately $293.2 million of liabilities, for an approximately $45 million deficit.").

ongoing fraud, it is reasonable to infer that this deficit was more significant.  The Court finds these allegations sufficient to support the last two badges of fraud.  Defendants take issue with Plaintiffs' reliance on the OpCo Debtors' book value as an appropriate valuation method.  However, this question is best left for future expert testimony.[44]

Having found that Plaintiffs have adequately alleged five badges of fraud, the Court will deny the Motions for failure to state Counts I through III.

## C. Fiduciary Duty Claims (Counts IV – VI)

### 1. Claims Asserted Under Delaware Law

In Count IV, Plaintiffs assert a claim for breach of fiduciary duty under Delaware law against defendants Sekhri, Boyden, and Kassam, each in their capacity as a HoldCo manager.[45] Plaintiffs allege that these defendants breached their fiduciary duties in authorizing the OpCo Distribution by not acting in the interests of HoldCo and instead acting in the interests of themselves and those who appointed them.  In Count V, Plaintiffs assert a claim against the remaining defendants for aiding and abetting the breach of fiduciary duty alleged in Count IV. Defendants argue multiple grounds for dismissal of both claims, but the Court need only consider one.  Specifically, Defendants argue, and the Court agrees, that Sekhri, Boyden, and Kassam owed no fiduciary duty to HoldCo because, as permitted by Delaware law, the HoldCo LLC Agreement (the "HoldCo Agreement") eliminated their fiduciary duties.

The Delaware Limited Liability Company Act (the "Delaware LLC Act") provides that "the fiduciary duties of a member, manager, or other person that is a party to or bound by a limited liability company agreement may be expanded or restricted or eliminated by provisions in the limited liability company agreement."[46]  Accordingly, "if the operating agreement is silent with respect to standards of conduct, then, by default, the traditional fiduciary duties applicable to corporations will apply[.]  If, on the other hand, an LLC's operating agreement plainly disclaims, restricts or limits the duties of its managers and members, the parties must look to the agreement's provisions to understand their rights and remedies."[47]  "Drafters of a limited liability company agreement 'must make their intent to eliminate fiduciary duties plain and unambiguous.'"[48]

---

[44] *See, e.g.*, *Beskrone v. OpenGate Cap. Grp. (In re PennySaver USA Publ'g, LLC)*, 587 B.R. 445, 459 (Bankr. D. Del. 2018) ("[I]nsolvency is highly fact-specific and 'should be based on seasonable appraisals or expert testimony.'  A motion to dismiss is not the proper place to bring in experts to determine insolvency." (quoting *In re Robin Indus., Inc.*, 78 F.3d 30, 38 (2d Cir. 1996)).

[45] At the time of the OpCo Distribution, HoldCo was a Delaware limited liability company.  *Id.* ¶ 151.

[46] *In re Cadira Grp. Holdings, LLC Litig.*, No. CV 2018-0616-JRS, 2021 WL 2912479, at *11 (Del. Ch. July 12, 2021) (citing 6 *Del. C.* § 18-1101(c)).

[47] *Smith v. Scott*, No. CV 2020-0263-JRS, 2021 WL 1592463, at *9 (Del. Ch. Apr. 23, 2021) (internal citations and quotations omitted).

[48] *Orbis Opportunity Fund, LP v. Boyer*, No. 20-cv-40-RGA, 2020 WL 3060368, at *8 (D. Del. June 9, 2020) (quoting *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 659-63 (Del. Ch. 2012)).

Defendants argue that consistent with the Delaware LLC Act, HoldCo fully eliminated the fiduciary duties of its managers in section 5.01(e) in the HoldCo Agreement, which provides in pertinent part, that:

> No Fiduciary Duties.  None of the Managers, in their capacity as a Manager, shall, to the fullest extent permitted by applicable law, have any duties (fiduciary or otherwise) or liabilities to the Company . . . (other than [ ] as expressly set forth in this Agreement . . . ), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or exist against any of them (other than the implied contractual covenant of good faith and fair dealing).[49]

Plaintiffs disagree, arguing that the above-quoted provision cannot be read in isolation due to its inclusion of the phrase "other than as expressly set forth in this Agreement," which they suggest conveys an intent to modify traditional fiduciary duties rather than eliminate them entirely. Plaintiffs contend that the HoldCo Agreement contains three other provisions expressly preserving the duty not to engage in fraud, willful misconduct, or bad faith conduct, which they argue corresponds with the traditional duty of loyalty.  These provisions, found in Article IX of the Holdco Agreement, titled "Liability, Exculpation, Indemnification, and Insurance," provide that (1) "Covered Persons" are required to make decisions in "good faith,"[50] (2) managers will not be exculpated for losses incurred by acts or omissions in bad faith or by reason of "fraud, willful misconduct or willful breach of this Agreement,"[51] and (3) similarly, managers will not be indemnified for losses incurred by acts or omissions in bad faith or by reason of "by reason of fraud, willful misconduct, or willful breach of this Agreement."[52]

The Court agrees with Defendants' interpretation of the HoldCo Agreement.  Section 5.01(e) of the HoldCo Agreement contains a plain and unambiguous disclaimer of fiduciary duties for managers.  Although it leaves open the possibility that other parts of the Agreement might "set forth" or otherwise create fiduciary duties, the provisions on which Plaintiffs rely do not accomplish the task.  The latter two provisions relied upon by Plaintiffs do not impose duties but make clear when exculpation or indemnification are unavailable.[53]  Plaintiffs argue that these provisions have no purpose if they are not read as preserving fiduciary duties.  However, duty modification, exculpation, and indemnification provisions perform different functions.  For instance, "[d]uty modification affects whether an obligation exists.  Exculpation affects the remedies that a party can seek."[54]  And even though the HoldCo Agreement eliminated fiduciary

---

[49] Adv. D.I. 13, Ex. B ("HoldCo  Agreement") § 5.01(e)).

[50] *Id.* § 9.03.

[51] *Id.* § 9.02(b).

[52] *Id.* § 9.04.

[53] *Id.* § 9.02 and § 9.04.

[54] *Calumet Cap. Partners LLC v. Victory Park Cap. Advisors, LLC*, No. No. 2025-0036-JTL, 2026 WL 246995, at *8 (Del. Ch. Jan. 29, 2026).

duties, it contractually imposed others, such as the duty to make decisions in good faith, which support the existence of the exculpation and indemnification provisions of the HoldCo Agreement.

The third provision relied upon by Plaintiffs entitled "Duties and Liabilities of Covered Persons," also lends no support for their theory. It repeats the disclaimer that managers have "no duties (including fiduciary duties) that would otherwise exist at law" "except as expressly provided by this Agreement" and then sets forth a decision-making standard for "Covered Persons", stating:

> Whenever in this Agreement a Covered Person . . . is permitted or required to make a decision . . ., the Covered Person shall (i) unless expressly provided to the contrary, be entitled to make such decision in its sole and absolute discretion, (ii) be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and (iii) have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person . . . is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other applicable law.[55]

Far from imposing traditional fiduciary duties on managers, this provision sets forth a contractually agreed upon, subjective "good faith" standard that is contrary to the objective one applied under the common law applicable to fiduciary duties.[56]

Plaintiffs' final reliance on the implied contractual covenant of good faith and fair dealing applicable to all Delaware limited liability company agreements fares no better.[57] Delaware courts are clear that this implied covenant cannot serve as the basis for a fiduciary duty claim when such duties have been eliminated:

---

[55] HoldCo Agreement § 9.03.

[56] The HoldCo Agreement's "good faith" standard, which expressly allows managers to base decisions on their own interests, is not only inconsistent with the duty of good faith that is a subset of the traditional duty of loyalty, but is anathema to the concept of a fiduciary, which is by definition "someone who is required to act for the benefit of another person[.]" FIDUCIARY, Black's Law Dictionary (12th ed. 2024). *See also In re Atlas Energy Res., LLC*, 2010 Del. Ch. LEXIS 216, at *41, 43 (Del. Ch. Oct. 28, 2010) (considering LLC agreement with similar provision and observing that "while under Delaware's common law, 'the objective elements of good faith dominate the subjective element,' under § 7.9(b), only the subjective intent of Energy's officers and directors matters when determining whether they acted in good faith. . . . Thus, an Energy director or officer satisfies the duty to act in good faith under § 7.9(b) of the LLC Agreement if she subjectively believes her conduct is in the best interest of Energy and its unitholders.").

[57] 6 Del. C. § 18-1101(c) ("[T]he limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.").

Fiduciary duty claims are not a replacement for implied covenant claims, particularly where fiduciary duties are disclaimed in an LLC agreement.  Delaware law upholds the elimination of fiduciary duties in LLC agreements.  Our courts are all the more hesitant to resort to the implied covenant where, as here, an alternative entity agreement eliminates fiduciary duties as part of a detailed contractual governance scheme.  Respecting the elimination of fiduciary duties requires that courts not bend an alternative and less powerful tool - the implied covenant - into a fiduciary substitute.[58]

For these reasons, the Court will grant the Motions with respect to Count IV.  Because Count V depends upon the success of Count IV, the Court will also grant the Motions with respect this claim.

### 2.      Georgia Claim (Count VI)

In Count VI, Plaintiffs assert a claim for breach of fiduciary duty under Georgia law against defendants Sekhri, Boyden, Kassam, Bouskill, and Ijaz, each in their capacity as an officers of Lucky Bucks.[59]  Plaintiffs allege that these defendants breached their fiduciary duties to Lucky Bucks by approving and/or facilitating the OpCo Distribution for the purpose of enriching certain individuals at the expense of the Company.  Defendants argue that this claim fails because Plaintiffs cannot establish that defendants owed fiduciary duties to Lucky Bucks under its operating agreement

Like Delaware law, Georgia's Limited Liability Company Act (the "Georgia LLC Act") confers fiduciary duties on managers or members of an LLC, but they may be restricted or eliminated (with limited exception) in a written operating agreement.[60]  Similar to the HoldCo Agreement, the Lucky Bucks Operating Agreement (the "LB Agreement") includes a provision disclaiming fiduciary duties, but the drafters plainly made the disclaimer inapplicable to officers:

> Duties and Liabilities of Covered Persons.  To the fullest extent permitted by applicable law, **a Covered Person (*other than Officers*, employees and expressly authorized agents of the Company or any of its Subsidiaries) has no duties (including fiduciary duties)**, that would otherwise exist at law, in equity or otherwise, to the Company, its Affiliates or to any other Covered

---

[58] *Khan v. Warburg Pincus, LLC*, No. 2024-0523-LWW, 2025 WL 1251237, at *8 (Del. Ch. Apr. 30, 2025) (internal quotations and citations omitted), *aff'd*, No. 236, 2025, 2025 WL 3525599 (Del. Dec. 9, 2025); *see also Atlas Energy*, 2010 Del. Ch. LEXIS 216, at *42 ("[W]here the parties have contractually agreed to eliminate fiduciary duties, they may not invoke the implied covenant as a back door through which such duties may be reimposed after the fact.").

[59] Lucky Bucks was a Georgia limited liability company at the time of the OpCo Distribution.  Compl. ¶ 173.

[60] *See* O.C.G.A. § 14-11-305 (fiduciary duties of members or managers of an LLC).

> Person except as expressly provided by this Agreement or any other written agreement with the Company.[61]

In fact, the LB Agreement imposes the fiduciary duties of the Georgia LLC Act on officers. Specifically, section 4.1 of the LB Agreement states:

> <u>General Provisions</u>.  The Sole Member shall have the right, but not the obligation, to appoint one or more persons to serve as officers of the Company (individually, an "Officer" and collectively, the "Officers"), and who, in such capacity, shall act for and on behalf of the Company as authorized agents subject to the authorization of the Sole Member. Each person appointed as an Officer shall serve at the pleasure of the Sole Member and the Sole Member shall be deemed to have delegated to each Officer the duties and authority as the Sole Member may prescribe from time to time. Such appointment shall be evidenced by a written instrument naming each person appointed as an Officer.  The delegation of authority by the Sole Member as herein contemplated shall be revocable, at any time and for any reason, by the Sole Member who shall have sole and absolute discretion. ***Each Officer of the Company shall possess any and all fiduciary duties that are owed by officers <u>and other persons</u> pursuant to the Act.***  As of December 28, 2020, the Officers are as follows: (a) James Boyden, Executive Vice President of Business Development, (b) Shafik (Tony) Kassam, Chief Operating Officer and (c) Hassan Ijaz, Executive Vice President of Finance.[62]

Defendants contend that this section is invalid under Georgia law, but the cases they cite in support of that proposition only establish that officers have no statutory duties.[63]  They do not prohibit their imposition onto officers in an operating agreement.  As acknowledged by the Georgia Court of Appeals in *Stoker v. Bellemeade*, the Georgia LLC Act expressly provides for the ability of Georgia limited liability companies to modify the duties and liabilities set forth in the Act and makes clear that "[i]t is the policy of this state with respect to limited liability companies to give maximum effect to the principle of freedom of contract and to the enforceability of operating agreements."[64]  In addition, section 14-11-304 of the Georgia LLC Act makes clear that "[t]he articles of organization or a written operating agreement may contain any provision relating to any

---

[61] Adv. D.I. 18, Ex. 4 (LB Agreement) at § 6.3 (emphasis added).

[62] *Id.* § 4.1 (emphasis added)

[63] *In re Beaulieu Grp., LLC*, No. 17-41677-BEM, 2021 WL 4469928, at *15 (Bankr. N.D. Ga. Sept. 29, 2021) (concluding no fiduciary duties are owed by officers under the Georgia LLC Act or applicable operating agreement); *Stoker v. Bellemeade, LLC*, 615 S.E.2d 1, 9 (Ga. Ct. App. 2005), *rev'd on other grounds in Bellemeade, LLC v. Stoker*, 631 S.E.2d 693 (Ga. 2006) (LLC members "exercised the freedom granted by the LLC Act to restrict or eliminate [fiduciary] duties by contract").

[64] *Stoker*, 615 S.E.2d at 9 (citing O.C.G.A. § 14-11-1107(b) and § 14-11-305).

14

phase of managing the business or regulating the affairs of the limited liability company."[65] Based on the foregoing, the Court is unable to hold that section 4.1 of the LB Agreement is invalid.

Defendants also argue that even if they did have fiduciary duties under Georgia law, Plaintiffs have not alleged that Defendants engaged in conduct amounting to a breach of those duties. The Court finds that Plaintiffs have sufficiently alleged the claims. Plaintiffs have set forth facts suggesting that each of the defendants played a role in the alleged scheme to defraud the Company and was financially rewarded for doing so. The Court will therefore deny the Motions with respect to Count VI.

### D. Attorneys' Fees and Punitive Damages (Counts VII and VIII)

In Counts VII and VIII, Plaintiffs assert claims for statutory attorneys' fees and punitive damages under sections 13-6-11 and 51-12-5.1 of the Official Georgia Code.[66] Defendants move to dismiss these claims, correctly pointing out that these Georgia statutes do not create an independent cause of action. They provide additional relief for an underlying substantive state law claim.[67] Having moved to dismiss all underlying substantive state law claims, Defendants argue that the Court should also dismiss these too.

For defendants Sekhri, Boyden, Kassam, Bouskill, and Ijaz, this argument is moot because the Georgia claim for breach of fiduciary duty will remain. For all other defendants (Trive and Damani), only the fraudulent transfer claims asserted under the Bankruptcy Code will remain following the issuance of this decision and dismissal of Counts IV and V. Defendants contend that such claims cannot support a claim for attorneys' fees or punitive damages because section 550 of the Bankruptcy Code provides the only remedy for avoided transfers.[68] Plaintiffs appear to

---

[65] O.C.G.A. § 14-11-304.

[66] Count VII asserts claims pursuant to O.C.G.A. § 13-6-11 ("The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them."). Count VIII seeks punitive damages under O.C.G.A. § 51-12-5.1 (allowing punitive damages in tort actions where it is proven that "defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.").

[67] *Thysis, Inc. v. Chemron Corp.*, No. 1:08-CV-03879-SCJ, 2011 WL 13162410, at *5 (N.D. Ga. Aug. 25, 2011) ("A claim for punitive damages cannot stand alone."); *Gardner v. Kinney*, 230 Ga. App. 771, 772, 498 S.E.2d 312, 313 (1998) ("When a defendant asserts a claim for relief independent of a claim for litigation expenses incurred in defending against a plaintiff's case-in-chief, defendant may recover litigation expenses incurred in prosecuting such an independent claim in accordance with O.C.G.A. § 13-6-11.").

[68] 11 U.S.C. § 550 (providing that to the extent a transfer is avoided, the trustee may recover the property transferred or its value); *see also Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 111 (Bankr. S.D.N.Y. 2010) ("Persuasive authority holds that § 550 bars punitive damages notwithstanding their possible availability under state law.").

concede this point, as they offer no response in their briefing.[69]   Accordingly, the Motions with respect to Counts VII and VIII are granted with respect Trive and Damani.

### E.   Declaratory Judgment (Count IX)

In Count IX, Plaintiffs seek a declaratory judgment that Defendants' alleged acts or omissions constitute actual fraud or willful misconduct.[70]   Defendants move to dismiss on the grounds that Plaintiffs lack a viable underlying cause of action.[71]   As with the claims for statutory damages discussed above, the arguments with respect to this claim have been mooted by the Court's rulings allowing the fraudulent transfer and the Georgia fiduciary duty claims to remain.

### F.   Forum Shopping

Finally, Defendant Damani argues that Plaintiffs have engaged in forum shopping because some of the claims filed against him (fraudulent transfer, attorneys fees, and punitive damages) were filed first in a related action pending in Georgia state court before they were voluntarily removed by plaintiff there and refiled by Plaintiffs here.[72]   Damani argues that the claims were withdrawn from Georgia after Plaintiffs faced multiple adverse rulings, and refiled here to foster a strategic advantage.

Plaintiffs respond that the removal of claims from the Georgia action was nothing more than an attempt to limit the focus of the Georgia case to state law claims regarding the operating business and bring all claims relating to the OpCo Distribution in this Court.  Plaintiffs further argue that Damani has not identified any strategic advantage that Plaintiffs obtained by pursuing their claims here rather than in Georgia.

The Third Circuit has explained that "[w]hile reasonable minds may differ about what constitutes forum shopping in any particular case, the term generally denotes some attempt to gain an unfair or unmerited advantage in the litigation process."[73]   Although Damani argues that Plaintiffs re-filed some of their claims in this Court for the purpose of obtaining an advantage, he never identifies the advantage, and none is apparent.  For this reason, Damani's Motion to dismiss for forum shopping is denied.

---

[69] *See* Adv. D.I. 29 at 49 (discussing only the sufficiency of the breach of fiduciary duty claims as underlying substantive claims).  *See also HQ Specialty Pharma Corp. v. Fresenius Kabi USA, L.L.C.*, No. 21-1714 (MN), 2025 LX 218233, at *15 (D. Del. July 2, 2025) (citing *CardSoft, LLC v. VeriFone, Inc.*, 807 F.3d 1346, 1353 (Fed. Cir. 2015) ("By failing to respond to [defendant's] argument in the briefing, [plaintiff] has effectively conceded that [point].")).

[70] 28 U.S.C. §§ 2201-2202.

[71] *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 457 n.3 (3d Cir. 2019) ("[T]he Declaratory Judgment Act is procedural only," and "presupposes the existence of a judicially remediable right[.]") (internal citations omitted).

[72] *See Arc Gaming and Technologies, LLC f/k/a Lucky Bucks LLC v. Damani, et al.*, Civil Action No. 24CV000131 (Superior Court of Fulton County, Georgia).

[73] *Chavez v. Dole Food Co.*, 836 F.3d 205, 222 (3d Cir. 2016).

## VI.   CONCLUSION

For the foregoing reasons, the Court hereby concludes and orders that:

1.      Counts IV and V are dismissed.

2.      Counts VII and VIII are dismissed with respect to defendants Trive and Damani.

3.      All remaining relief requested in the Motions is denied.


Dated: March 30, 2026
Wilmington, Delaware

Karen B. Owens
Chief Judge